UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN PARROTT AND LAURIE PARROTT, Derivatively on Behalf of BIOPURE CORPORATION, | ) ) ) | Civil Action No. |
| | ) | |
| Plaintiff, | ) | **04 ᶜᵛ 10177 NG** |
| | ) | |
| vs. | ) | DERIVATIVE ACTION |
| | ) | |
| THOMAS A. MOORE, CARL W. RAUSCH, DAVID N. JUDELSON, CHARLES A. SANDERS, M.D., C. EVERETT KOOP, M.D., DANIEL P. HARRINGTON and J. RICHARD CROUT, M.D., | ) ) ) ) ) ) | MAGISTRATE JUDGE Alexander DEMAND FOR JURY TRIAL |
| | ) | |
| Defendants, | ) ) | |
| | ) | RECEIPT #_____ |
| -and- | ) ) | AMOUNT $ _150 -_ SUMMONS ISSUED__8_ |
| | ) | LOCAL RULE 4.1_____ |
| BIOPURE CORPORATION, a Delaware Corporation, | ) ) | WAIVER FORM_____ MCF ISSUED_____ |
| | ) | BY DPTY. CLK. _____ |
| Nominal Defendant. | ) ) | DATE __1-26-04__ |
| | ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, BREACH OF FIDUCIARY DUTIES AND FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

**I.**

## NATURE OF THE ACTION

1.          This is a shareholders derivative action brought in the right of, and for the benefit

of, nominal defendant Biopure Corporation ("Biopure" or the "Company") against its Board of

Directors (the"Board") and certain top officers to remedy defendants' breaches of fiduciary duties

and other violations of law which have inflicted millions of dollars in damages upon Biopure's

reputation, goodwill and standing in the business community and have exposed it to millions of

dollars in potential liability for violations of state and federal law.  This action arises out of

defendants' causing Biopure to file false financial statements and to issue misleading statements

and conceal material facts from investors and the public concerning Hemopure®, one of the

Company's primary products, between March 17, 2003  and December 24, 2003 (the "Relevant

Period").  Defendants' misconduct has caused severe, irreparable, injury and damages to the

Company, particularly to its reputation and goodwill in the investment and business community,

and has virtually destroyed this once valuable franchise.

**II.**

## SUMMARY OF THE ACTION

2.          Biopure is a biotechnology company that develops, manufacturers and markets

oxygen therapeutics, a new class of pharmaceuticals that are intravenously administered to

deliver oxygen to the body's tissues.  The Company had developed two products, one of which is

Hemopure® [hemoglobion glutamer - 250 (biovinc)|, which is an investigational product for the

treatment of acutely anemic surgical patients and for the elimination, delay or reduction of red

blood cell transfusions in these patients.  Hemopure® is a human blood substitute made from

1

refined cow hemoglobin which acts like red blood cells to deliver oxygen to the body. However,

unlike donated blood, Hemopure® does not have to be matched to a patient's blood type.

3.        On July 31, 2002, Biopure submitted a Biologic License Application ("BLA") to

the U.S. Food and Drug Administration ("FDA") seeking regulatory approval to market

Hemopure® in the U.S. for use in orthopedic surgery. On that date, the *Boston Globe* ran an

indepth article questioning the Company's suspicious concealment of information concerning

Hemopure's® status:

> Though Biopure completed its two Phase III trials in November 2000, the
> company has been extraordinarily secretive about the results. In a departure from
> common practice, it has declined to release the comprehensive results of the
> potentially pivotal experiments. Instead, it has disclosed bits and pieces of the
> results, none of which are definitive.
>
> "It's out of the ordinary," said Dr. Mark Monane, biotechnology and life sciences
> analyst for Needham & Co. in New York. "We generally expect to get the results
> of phase 2 trials, then phase 3 trials, then a filing to the FDA. I don't think there's
> a regulatory rule requiring it, but most investors would like to hear about the
> phase 3 data before the filing. In general, phase 3 trials are material events and
> there's a need to disclose the results to investors."

4.        In September 2002, the Company received a grant from the U.S. Department of

the Army to conduct clinical trials of Hemopure® for the treatment of trauma patients. In March

2003, the Company submitted a "trauma study protocol" to the FDA in connection with its plans

to conduct a phase II clinical trial of Hemopure® for the treatment of trauma patients. At the

time, this information was not revealed by Biopure to the public.

5.        During the Relevant Period, the defendants continually represented they were

optimistic of achieving FDA approval to market Hemopure® to orthopedic patients. However,

unbeknownst to the public, as early as March 2003, the FDA had informed the defendants that

2

the proposed clinical trials could not go forward, citing "safety concerns" arising from adverse

event data submitted as part of the Company's BLA which sought FDA approval to market

Hemopure® to orthopedic surgery patients. Thus, the defendants were on notice that FDA

approval of the BLA, which would allow the first commercial distribution, if any, of

Hemopure® in the United States, was in serious jeopardy and would be delayed beyond the mid-

2003 target date defendants had previously stated.

6.          Finally, under the threat of civil litigation by the Securities and Exchange

Commission ("SEC"), on December 24, 2003, after the close of the market on Christmas Eve,

the defendants announced a potential SEC inquiry for securities fraud, and for the first time,

disclosed material problems with is Hemopure® product and the FDA approval process. The

defendants announced that:

> (1)    On Monday, December 22, 2003, the Company had received a Wells
> Notice from the SEC. The SEC sends a Wells notice to a company or an
> individual after its staff has completed an investigation and its staff has completed
> an investigation and determined that sufficient wrongdoing has occurred to
> warrant civil charges being filed. The SEC sent a Wells notice to Biopure,
> defendant Moore and Howard Richman, the Company's former vice president of
> regulatory affairs, *for failing to adequately disclose material information about*
> *Biopure's communications with the FDA concerning the Company's*
> *application;*

> (2)    For the first time, that in March 2003, the Company had sought FDA
> permission to begin new clinical trial testing of Hemopure® in hospitalized
> trauma patients and that the FDA has repeatedly denied the request;

> (3)    The FDA had refused to allow the study because of material "safety
> concerns" from the Company's Phase III orthopedic surgery trial;

> (4)    The FDA had placed a "clinical hold" on any trauma trials, and requested
> more information, including additional animal studies, before Hemopure® could
> be tested in humans under trauma conditions; and

3

(5)    Despite Biopure's supplemental filings on July 30, 2003, the FDA again had denied Biopure's request that if lift its "clinical hold," barring any Hemopure® trauma trials.

7.    In response to this news, the Company's common stock has fallen as low as under $2 per share in January 2004, from a Relevant Period high of over $8 per share in August and September of 2003, erasing over $266 million in market capitalization, or 75% of the Company's market value during the Relevant Period, and severely reducing the Company's financing options. As a result of the defendants misrepresentations and nondisclosures concerning its communications with the FDA, Biopure's stock traded at artificially inflated prices during the Relevant Period. Certain insiders, including defendant Carl W. Rausch ("Rausch"), took advantage selling hundreds of thousands of shares of his personally held stock for proceeds of nearly $1.6 million at prices as high as $7.53 per share.

8.    As a direct result of this illegal course of conduct, the Company has been exposed to tens of millions of dollars in potential liability for violations the nation's securities laws and regulations and has been named in numerous federal securities class action lawsuits filed in the United States District Court for the District of Massachusetts, on behalf of investors who purchased Biopure's shares. These lawsuits allege that investors purchased shares of the Company based on false and materially misleading statements regarding the financial condition of the Company and that they have been significantly damaged thereby. Specifically, those actions allege that defendants caused Biopure to: (i) deceive the investing public regarding Biopure's business, operations, management and intrinsic value of Biopure common stock; (ii) be exposed to tens of millions of dollars in potential securities fraud liability for issuing a false and misleading registration statements and prospectuses during the Relevant Period in order to issue

4

over 5.5 million common shares for over $35 million in proceeds; (iii) enable certain defendants and insiders to sell significant amounts of their personally-held shares of Biopure common stock at artificially inflated prices; and (iv) cause Biopure shareholders to purchase Biopure securities at artificially inflated prices during the Relevant Period. Defendants also increased the Company's general and administrative costs by almost $2.3 million during the first nine-months of 2003, due in large part to defendants causing Biopure to take a substantial non-cash charge to fund certain directors' stock purchases and to pay of "recruiting" costs.

### III.

### JURISDICTION AND VENUE

9.       This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 (a)(2) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

10.       This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

11.       Venue is proper in the Court because nominal defendant Biopure is headquartered in this District and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more of the defendants either resides in or maintains executive offices in this District, and defendants have substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

5

## IV.

## PARTIES

12.         Plaintiffs John Parrott and Laurie Parrott, are residents of the Sate of Washington, are and were at all relevant times complained of herein, shareholders of nominal defendant Biopure.

13.         Nominal defendant Biopure is a Delaware corporation with its principal executive offices located at 11 Hurley Street, Cambridge, MA 02141.

14.         Defendant Thomas A. Moore ("Moore") was, at all relevant times, a director of Biopure, its President and Chief Executive Officer ("CEO"). Moore is a citizen of New Jersey. As an officer and director of Biopure, Moore owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. But as late as July, 2002, when Biopure filed the Hemopure® FDA application, Moore had not begun working at Biopure full-time, despite being the Company's President and CEO. Moreover, as its President and CEO, Moore had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Moore owed to Biopure and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a result of his wrongdoing, Moore received a Wells Notice from the SEC and has been named as a defendant in numerous securities fraud lawsuits brought against the Company by its shareholders. In addition, Moore certified the Company's financial

6

statements filed with the SEC during the Relevant Period including its Form 10-Q's without disclosing the adverse material information concerning the Company's communications with the FDA regarding Biopure and therefore Moore is a direct participant in the wrongdoing. Pursuant to his employment agreement with the Company, Moore receives an annual base salary of not less than $350,000. By virtue of his executive positions with Biopure, his longer term personal, professional and financial relationships with Sanders, Rausch, Judelson and the other members of the Biopure Board, his stock sales and personal participation in the underlying misconduct, Moore is not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein.

15.        Defendant Rausch was, at all relevant times, Vice Chairman of Biopure and its Chief Technical Officer ("CTO"). Rausch is a citizen of Massachusetts. As Vice Chairman of Biopure, Rausch owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as CTO, Rausch had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Rausch owed to Biopure and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a result of his wrongdoing, Rausch has been named as a defendant in numerous securities fraud lawsuits brought against the Company by its shareholders. During the Relevant Period, Rausch engaged in massive insider trading disposing of 246,574 shares of his personally

7

held Biopure stock for proceeds of $1,596,900. In 1984, Rausch co-founded Biopure with defendant David N. Judelson ("Judelson"). Rausch and Judelson are close friends and confidants. For example, Rausch sold some of his personally held Biopure stock to Judelson. Rausch and Judelson appointed Charles A. Sanders, M.D. ("Sanders") as Chairman and Moore CEO, President and as a director in 2002. Moreover, Judelson serves on Biopure's Compensation Committee which determines Rausch's salary, bonuses and stock options. By virtue of his executive positions with the Company, his stock sales, his personal participation in the underlying misconduct, and his long term personal, professional and financial relationships with Sanders, Moore, Judelson and the other members of the Biopure Board, Rausch is not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein.

16.        Defendant Judelson was, at all relevant times, Vice Chairman of Biopure and a member of its Compensation Committee. Judelson is a citizen of New York. As Vice Chairman of Biopure, Judelson owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Compensation Committee, Judelson had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Judelson owed to Biopure and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. In 1984, Judelson co-founded Biopure with Rausch. Judelson

8

and Rausch are close friends and confidants. For example, Rausch sold some of his personally

held Biopure stock to Judelson. Rausch and Judelson appointed Sanders as Chairman and Moore

as CEO, President and as a director in 2002. Moreover, Judelson serves on Biopure's

Compensation Committee which determines Moore and Rausch's salary, bonuses and stock

options. By virtue of his executive positions with the Company, his personal participation in the

underlying misconduct and his extensive and long-term personal, professional, and financial

relationships with Rausch, Moore and Sanders, and the other members of the Biopure board,

Judelson is not independent, is not disinterested and could not have adequately considered a pre-

suit demand to bring the allegations contained herein.

17.        Defendant Sanders was, at all relevant times, a director of Biopure, Chairman of

its Compensation Committee and a member of the Nominating and Audit Committees. Sanders

is a citizen of North Carolina. As Chairman of Biopure, Sanders owed a duty to the Company

and its shareholders to be reasonably informed about the business and operations of the

Company. Moreover, as Chairman of its Compensation Committee and as a member of its

Nominating and Audit Committees, Sanders had also assumed important managerial

responsibilities at Biopure which required him to be well informed about the day-to-day

operations of the Company, particularly, as a member of its Audit Committee, with ensuring that

the Company's financial statements and corresponding press releases included all material

information including the Company's communication with the FDA concerning Hemopure®.

Rather than fulfill these important fiduciary duties Sanders owed to Biopure and its shareholders

he, upon information and belief, actively participated in or knowingly encouraged, sponsored or

approved many of the wrongful acts or omissions complained of herein, and/or breached his

9

fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Sanders previously served as General Director of Massachusetts General Hospital and Professor of Medicine at Harvard Medical School, along with Douglas M. Hansell, M.D. who currently serves as Biopure's Vice President of Medical Affairs and served with Sanders at Massachutes General Hospital and at Harvard. As a member of the Audit Committee, Sanders approved the Company's financial statements without including the adverse material information concerning the Company's communications with the FDA regarding Hempoure and therefore Sanders is a direct participant in the wrongdoing. By virtue of his executive positions with Biopure, his personal participation in the underlying misconduct, and his extensive and long-term personal, professional and financial relationships with Moore, Rausch and Judelson, Sanders is not disinterested, is not independent and would not have adequately considered a pre-suit demand to bring the allegations contained herein.

18.        Defendant C. Everett Koop, M.D. ("Koop") was, at all relevant times, a director of Biopure. Koop is a citizen of New Hampshire. As a director of Biopure, Koop owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Rather than fulfill these important fiduciary duties Koop owed to Biopure and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Koop is a consultant for other companies in the pharmaceutical industry such as Biopure, regularly speaking on their behalf in front on regulatory bodies. For instance, in April 1999, Koop spoke

10

at a Congressional Advisory Hearing on the national blood supply on behalf of Biopure, along with another former Biopure executive. In fact, on December 4, 1990, weeks before Koop joined the Board, Koop was hired by Biopure and was give the title of "Chairman of Scientific Advisory Committee" charged with advising the company on domestic, worldwide and military applications of its products and developing medical and scientific relationships with health organizations and medical centers around the world. By virtue current and past executive and/or consulting positions with the Company, his personal participation in the underlying misconduct and his long-term personal, professional and financial relationships with Moore, Rausch, Sanders and Judelson, Koop would never authorize a suit for the claims asserted herein because it would threaten these relationships and jeopardize his livelihood.

19.        Defendant Daniel P. Harrington ("Harrington") was, at all relevant times, a director of Biopure, Chairman of its Audit Committee and a member of the Nominating Committee. Harrington is a citizen of Ohio. As a director of Biopure, Harrington owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as Chairman of its Audit Committee and as member of its Nominating Committee, Harrington had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company, particularly, as a member of its Audit Committee, with ensuring that the Company's financial statements and corresponding press releases included all material information including the Company's communication with the FDA concerning Hemopure®. Rather than fulfill these important fiduciary duties Harrington owed to Biopure and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the

11

wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As Chairman and as a member of the Audit Committee, Harrington approved the Company's financial statements without including the adverse material information concerning the Company's communications with the FDA regarding Hemopure® and therefore Harrington is a direct participant in the wrongdoing. Harrington has served as President of HTV Industries, Inc. ("HTV"), one of Biopure's venture capitalist, since 1991. HTV, along with Judelson and Moore, took part in the Company's April 2003 public offering in which it raised over $13 million. In the offering, HTV purchased 516,529 shares of the Company's common stock and warrants to purchase an addition 103,306 shares while Moore and Judelson each purchased 206,612 shares and warrants to purchase to an additional 41,322 shares. According to the Company's most recent Proxy Statement, Harrington owns 1,560,089 shares of Biopure or 4.7% of the Company's outstanding common stock which includes 1,498,219 shares and warrants to purchase 11,111 shares owned by HTV. By virtue of his close personal, professional and financial relationships with Rausch, Judelson, Sanders and Moore and the other members of the Biopure Board, his personal participation in the underlying misconduct, and his and HTV's purchases and ownership of substantial shares of Biopure's stock, Harrington could not adequately investigate and would never authorize a suit for the claims asserted herein.

20.        Defendant J. Richard Crout, M.D. ("Crout") was, at all relevant times, a director of Biopure and a member of its Audit Committee. Court is a citizen of Maryland. As a director of Biopure, Crout owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Audit

12

Committee, Crout had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company, particularly, as a member of its Audit Committee, with ensuring that the Company's financial statements and corresponding press releases included all material information including the Company's communication with the FDA concerning Hemopure®. Rather than fulfill these important fiduciary duties Crout owed to Biopure and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a member of the Audit Committee, Crout approved the Company's financial statements without including the adverse material information concerning the Company's communications with the FDA regarding Hemopure® and therefore Crout is a direct participant in the wrongdoing. Crout owns Crout Consulting and is a pharmaceutical industry consultant, and his vocation is providing regulatory and drug development advice to pharmaceutical and biotechnology companies. Similarly, Crout and Sanders have long served together on the Trimeris board of directors. In 1994, Paul A. Miller was named to the newly-created position of Marketing Manager-Nutritional Products at MBf USA where it was announced he would work closely with Koop who had also recently joined MBf USA as "Chairman of its Advisory Board," to guide the development and global launch of the Company's vitamin supplement and nutritional products line. Prior to joining MBf USA, Miller had most recently served under Crout at as the Consumer Segment Product Manager for Boehringer Mannheim Corp., prior to Crout founding Crout Consulting. By virtue of his extensive and long-term personal,

13

professional and financial relationships with Rausch, Moore, Sanders and Judelson and the fact

that Crout's primary vocation is serving as a consultant pharmaceutical companies such as

Biopure, he would never authorize a suit for the claims asserted herein because it would damage

his personal, professional and financial relationships and could potentially jeopardize his

livelihood.

21.         The defendants identified above in ¶¶15-21 are collectively referred to hereinafter

as the "Individual Defendants."

## V.

## FACTS

22.         On July 31, 2002, Biopure submitted a BLA to the FDA seeking regulatory

approval to market Hemopure® in the U.S. for use in orthopedic surgery.  On that date, the

Company issued a press release entitled "Biopure Submits Hemopure® Marketing Application to

the U.S. FDA" that stated in part:

> Biopure Corporation today announced that it has submitted an electronic Biologic
> License Application (BLA) to the U.S. Food and Drug Administration (FDA) for
> its oxygen therapeutic Hemopure® [hemoglobin gultamer - 250 (bovine), or
> HBOC-201].  The company is seeking regulatory approval to market this
> pharmaceutical product in the United States for the treatment of the signs and
> symptoms of acute anemia in adult patients undergoing orthopedic surgery, and
> for the purpose of eliminating, delaying or reducing the need for red blood cells in
> these patients.

23.         In September 2002, the Company received a $980,000 grant from the U.S.

Department of the Army to fund a randomized, standard therapy-controlled, single center Phase

II clinical trial in consenting trauma patients as a precursor to broader trials.

24.         In March 2003, the Company submitted a "trauma study protocol" to the FDA in

14

connection with its plans to conduct a Phase II clinical trial of Hemopure® for the treatment of trauma patients. However, at the time, this information was not revealed by Biopure to the public.

25.        During the Relevant Period, the defendants continually represented they were optimistic of achieving FDA approval to market Hemopure® to orthopedic patients. However, unbeknownst to the public, as early as March 2003, the FDA had informed the defendants that the proposed clinical trials could not go forward, citing "safety concerns" arising from adverse event data submitted as part of the Company's BLA which sought FDA approval to market Hemopure® to orthopedic surgery patients. Thus, the defendants were on notice that FDA approval of the BLA, which would allow the first commercial distribution, if any, of Hemopure® in the United States, was in serious jeopardy and would be delayed beyond the mid-2003 target date defendants had previously stated.

## IMPROPER STATEMENTS MADE
## DURING THE RELEVANT PERIOD

26.        On March 17, 2003, Biopure filed its quarterly report on Form 10-Q for the period ending January 31, 2003. The Form 10-Q, signed and certified by defendant Moore reported that the Company had a net loss of $0.36 per share during the first quarter fiscal 2003 compared to a net loss of $0.38 for the same period last year. In addition the Form 10-Q included the following representations concerning the Company's Hemopure® research and development efforts, stating in pertinent part as follows:

> Research and development expenses continue to include amounts for support of the BLA review process including responding to FDA inquiries, preparing for and participating in FDA inspections of facilities and documentation and preparing for a possible FDA Advisory Panel presentation. These BLA support costs were

15

$2,232,000 for the first fiscal quarter of 2003 and are expected to continue at approximately the same level *until the middle of this calendar year, when the Company is hopeful that it will receive action by the FDA on the BLA....*

*If the FDA were to grant marketing approval for Hemopure this calendar year, we anticipate that we would have material revenues from this project in fiscal 2004.* We do not anticipate that we will attain profitability, however, until we are able to increase our manufacturing capacity. There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure, the timing of the construction of additional capacity and other factors that may affect our ability to generate a profit from our research and development of Hemopure.

27.     On or about March 25, 2003, Biopure issued a press release announcing that it has

raised $13.4 million in gross proceeds through the sale of 5,548,480 shares of its common stock

at $2.42 per share. The press release stated in pertinent part as follows:

Hemopure® [hemoglobin glutamer - 250 (bovine)] is approved in South Africa for the treatment of adult surgical patients who are acutely anemic and for the purpose of eliminating or reducing the need for allogenic red blood cell transfusion in these patients. Biopure's application to market Hemopure® in the United States for a similar indication in adult patients undergoing elective orthopedic surgery is currently being reviewed by the U.S. Food and Drug Administration....

The previously announced $4.9 million in FY02/03 Congressional appropriations administered through the U.S. Army and anticipated $4 million in U.S. Navy funding from a Cooperative Research and Development Agreement (CRADA) *for clinical trials of Hemopure® in trauma* are project-specific funds independent from Biopure's reported cash on hand. Completion of the pivotal RESUS clinical trial of Hemopure® in trauma is contingent upon further funding. $908,900 of the Army funding is from Grant DAMD17-02-1-0697, for which the U.S. Army Medical Research Acquisition Activity, 820 Chandler Street, Fort Detrick MD 21702-5014 is the awarding and administering acquisition office.

28.     On or about May 22, 2003, Biopure issued a press release announcing its financial

results for the second fiscal quarter ended April 30, 2003. For the quarter, the Company reported

a net loss of $0.35 per common share, compared with a net loss of $0.49 per common share, for

the corresponding period in 2002.   Regarding the FDA's pending approval of Biopure's

16

Hemopure® BLA, the press release stated in pertinent part:

> Biopure is hopeful that in mid 2003 the FDA will complete its review and act on Biopure's biologic license application (BLA) to market Hemopure® in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery.    As part of this review, the agency has inspected the company's manufacturing and data-handling facilities and has audited its contract research partners and several clinical sites in the United States and South Africa.  Biopure has responded to all questions raised by the FDA to date.

29.         On or about May 30, 2003, the Company issued a press release announcing that

the FDA had notified Biopure that it will complete its review and act on the Company's BLA for

Hemopure® by August 29, 2003.  Defendant Moore, on behalf of the Company, commented on

the FDA's review process:

> "We're very pleased with the FDA's progress in reviewing our application[.]  We continue to work closely with the agency toward a final decision that will allow us to make Hemopure available as an alternative to red blood cell transfusion.  We're also continuing our preparations to roll out the product to leading orthopedic surgery centers following approval."

30.         On our about July 23, 2003, Biopure issued a press releasing announcing that it

has raised $17.2 million in gross proceeds through the sale of 3,083,000 shares of its common

stock at $5.58 per share.

31.         On or about August 21, 2003, Biopure issued a press release announcing its

financial results for the third fiscal quarter ended July 31, 2003.  For the quarter, the Company

reported a net loss of $0.28 per common share, compared with a net loss of $0.43 per common

share, for the corresponding period in 2002.    The press release included the following

representations concerning the FDA's review of the Company's Hemopure® BLA, stating in

pertinent part as follows:

> On July 30th, the FDA sent Biopure a letter stating that the agency has completed

17

its review of the company's BLA to market Hemopure® in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. The letter requests additional information and suspends the BLA review clock with 30 days remaining in the original review cycle. It does not request additional clinical trials.

32.     On or about October 30, 2003, Biopure announced its plan to respond by June 30, 2004, to the FDA's questions regarding its BLA for Hemopure®. The press release stated that the Company has adjusted its operating plan to reduce expenses and conserve cash while it completes its written response to the FDA. The press release stated in pertinent part as follows:

> During the past two months the company has had several substantive interactions with the FDA to clarify the Agency's questions. Many of Biopure's responses have been completed. However, some require the retrieval of source medical documents and/or historical blood transfusion data from clinical trial sites in various countries, which will take several months to complete.

Defendant Moore, on behalf of the Company, commented, in pertinent part, as follows:

> "In the best interests of our shareholders, today we've taken the steps necessary to more efficiently run our business while we complete our comprehensive response to all of the FDA's questions[.] We view the Agency's questions as a 'roadmap' to approval and have set a conservative, achievable target date for our response. We remain enthusiastically committed to commercializing Hemopure® in the United States as expeditiously as possible."

## THE TRUTH IS REVEALED AND THE COMPANY IS SEVERELY DAMAGED

33.     After the close of trading on December 24, 2003, at 5:52 p.m., the Individual Defendants caused the Company to issue a press release announcing that: (1) the Company, defendant Moore and a former Vice President had each received Wells Notices from the SEC related to the Company's inadequate disclosures concerning communications with the FDA about Hemopure®'s applications; and (2) in March 2003 - undisclosed to the public - the Company had filed an application with the FDA for the use of Hemopure® in clinical trauma studies, but that

18

the FDA had repeatedly blocked the trial due to material safety concerns. Specifically, the

Individual Defendants caused the Company to issue a press release entitled "Biopure Receives

'Wells Notice' From Securities and Exchange Commission" which stated in relevant part.

> Biopure Corporation reported that on December 22, 2003, it received a"Wells
> Notice" from the staff of the Securities and Exchange Commission (SEC)
> indicating the staff's preliminary decision to recommend that the SEC bring a
> civil injunctive proceeding against the company. As permitted under the Wells
> process, Biopure intends to respond promptly and thoroughly in writing before the
> SEC staff formally decides what action, if any, to recommend. The company's
> chief executive officer and its former senior vice president of Regulatory and
> Operations also received Wells Notices.

> Biopure believes the notices relate to the company's disclosures
> concerning its communications with the Food and Drug Administration (FDA)
> about a trauma study protocol the company submitted to the Agency in March
> 2003 and about the company's biologics license application (BLA) for
> Hemopure® [hemoglobin gluatamer-250 (bovine)]. The company did not
> publicly disclose its communications with the FDA about the proposed trauma
> protocol and investigational new drug application (IND) because it does not
> believe communications about proposed clinical trials are material prior to the
> initiation of a trial.

34.     In the same press release, and several months after the fact, the Company

provided its first details about the failed trauma study applications and the defendants'

communications with the FDA.

> [In March 2003] Biopure submitted the trauma protocol for a Phase II
> clinical trial of Hemopure® for the treatment of hemorrhagic shock casualties in
> the hospital setting, where red blood cell transfusions are available. The FDA
> placed this trauma protocol under a new IND that is separate from the company's
> previous IND and its BLA to market Hemopure® for the treatment of acutely
> anemic adult patients undergoing orthopedic surgery and for the elimination or
> reduction of red blood cell transfusions in these patients. The protocol sought to
> administer up to 15 units of Hemopure®, a proposed dosage that was 50 percent
> higher than administered in previous clinical trials.

> After the in-hospital trauma protocol was submitted to the FDA and the
> new IND was assigned, the Agency placed a clinical hold on the proposed trauma

trial due to safety concerns. The FDA referred to a review of adverse event data
from the company's Phase III orthopedic surgery trial, which was submitted in the
BLA. The data from that Phase III trial has been previously presented at medical
meetings.

In May 2003, Biopure responded to the FDA's clinical hold and also filed
the response as a BLA amendment because it discussed data previously submitted
with the BLA. That amendment resulted in the FDA extending its BLA review
period up to 90 days, as previously announced on May 30, 2003. The Agency
also requested three additional pre-clinical animal studies of Hemopure® in
conscious swine to address its concerns regarding high-volume administration.
After the company's responses, the FDA has twice declined to lift the clinical
hold, most recently in a letter dated July 30, 2003. This letter is separate from the
FDA complete response letter Biopure received on that date in response to its
BLA for orthopedic surgery. The questions in the FDA's trauma letter were the
same as some of the questions in the BLA complete response letter and had two
additional questions, one about the company's analysis of age-specific effects in
individuals over age 75 in the Phase III orthopedic surgery trial and a second
question about dosing.

35.        Thus, during the Relevant Period, the Individual Defendants failed to disclose:

(1)     All material facts and information about Biopure's Hemopure®
applications with the FDA, including all material, adverse communications
received from the FDA concerning Hemopure®'s safety;

(2)     That in March 2003 Biopure submitted a trauma protocol for Phase II
clinical trial of Hemopure® for the treatment of "hemorrhagic shock casualties in
the hospital setting" and that the FDA placed this trauma protocol under a new
investigational drug application;

(3)     That by May 2000, the FDA placed a "clinical hold" on Biopure's
proposed trauma trial "due to safety concerns";

(4)     That in June/July 2003, the FDA requested that the Company perform
three additional pre-clinical animal studies of Hemopure® in conscious swine to
address safety and dosage concerns before any trials would be allowed on humans
and that despite Bioupure's submission of additional finding, the FDA still refused
to allow the Hemopure® trauma study; and

(5)     That based on adverse event data submitted with the Company's Phase III
orthopedic surgery trial, the FDA had voiced "safety concerns" about Hemopure®
that would prevent clinical studies for trauma and, at best, severely delay approval
for use in orthopedic surgery.

36.        In response to this news, the Company's common stock fell 14% from a closing

price of $2.82 per share on December 24, 2003 to a closing price per share of $2.43, erasing over

$17.3 million in market capitalization, and a far cry from the Relevant Period high of $8.25 per

share. Indeed, during the Relevant Period, the Company's market capitalization has been slashed

by over $266 million.

37.        In addition, as a result of the Individual Defendants misrepresentations and

nondisclosures concerning its communications with the FDA, Biopure's stock traded at

artificially inflated prices during the Relevant Period. Certain insiders, including defendant

Rausch, took advantage by selling hundreds of thousands of his personally held stock for

proceeds of nearly $1.6 million as prices as high of $7.53 per share.

38.        A December 27, 2003 article in the *Boston Globe* entitled "Biopure Stock Slips

After SEC News" commented on the Company's shocking December 24th announcement and on

defendant Rausch's suspicious trading prior to the announcement. The article stated in relevant

part:

> Shares of Biopure Corp. fell 14 percent yesterday, the first day of trading after the
> Cambridge company's surprise Christmas Eve announcement that federal
> regulators may bring civil legal action over whether it disclosed enough about its
> blood-substitute research. The decline comes at a bad time for Biopure, which is
> preparing to sell more stock to stay in business.
>
> ***In addition, filings show that Carl W. Rausch, the company's co-
> founder and chief technical officer, sold thousands of shares in August, after
> the company's announcement of what seemed like favorable federal regulatory
> actions sent its shares sharply up. They hit an intraday high of $9.03 on Aug. 1.
> Rausch sold shares on seven days from Aug. 5 to Aug. 28.***
>
> Biopure's shares closed at $2.43 yesterday, down 39 cents from their close
> Wednesday at 1 p.m, a drop of almost 14 percent. At 5:52 p.m. Wednesday,
> Biopure said the Securities and Exchange Commission had given notice it may
> pursue legal actions against Biopure, its chief executive Thomas A. Moore and a
> former executive, Howard Richman, who oversaw the company's dealings with

21