The lower the share price, the more stock Biopure will have to sell in order to reach that goal, and thus the greater the dilution to its current shareholders. The company now has 44 million shares outstanding, giving it a market capitalization of $106.5 million.

* * *

*According to SEC filings, Rausch has sold 246,074 shares this year for net proceeds of nearly $1.6 million. He first sold 30,000 shares in April at $3.13. Then, in June, when shares had jumped to around $6, he sold about 67,000 shares over six trading days.*

*In August, he sold 149,500 shares for about $1.1 million. Those sales, starting Aug. 5, came after Biopure said it had received a letter from the FDA requesting additional information on its application to sell Hemopure®. At the time, Biopure said that the letter indicated Hemopure® was a step closer to approval, as the FDA was not requesting additional clinical trials, and that it would respond to the request within two months.*

Biopure's shares shot up on the news and traded above $8 for part of August and September. But Oct. 30, the company said it would need until June 30, 2004, to respond to the FDA's questions, which were detailed in a letter of about 30 pages.

* * *

According to the company's proxy statement, Rausch in January was the company's fourth-largest shareholder, with control of just over 2 million shares.

48.     Also commenting on how Biopure's management had misled the public concerning their communications with the FDA concerning Biopure and on Rausch's insider trading was a December 26, 2003 article appearing in *TheStreet.com* by Adam Feuerstein entitled "Biopure Gets SEC Wells Notice." The article stated in relevant part:

Biopure has received a Wells notice from the Securities and Exchange Commission, informing the company that regulators may file civil endorsement proceedings relating to material disclosures made – and not made – about its experimental blood substitute, Hemopure.

26

Tom Moore, Biopure's CEO, also received a Wells notice, as did Howard Richman, former vice president of regulatory affairs, who was fired by the company in October.

*Biopure issued a news release at 5:52 pm EST Dec. 24 disclosing the SEC action, although the company acknowledged receiving the actual Wells notices Monday. The company's curiously timed statement included its first public acknowledgment that the Food and Drug Administration had "safety concerns" about Hemopure® back in March, contrasting with Biopure's upbeat public pronouncements.*

\* \* \*

The SEC sends a Wells notice to a company or an individual after its staff has completed an investigation and determined that sufficient wrongdoing has occurred to warrant charges to be filed. As permitted under the Wells notice process, Biopure said it will respond to the SEC in writing before the agency's staff formally decides what action, if any, to take.

*At the center of the SEC's investigation is whether Biopure executives misled the public about its communications with the FDA. Biopure is seeking Hemopure's approval as an oxygen-carrying blood substitute for use in patients undergoing elective orthopedic surgery. Despite many delays and regulatory setbacks, Biopure's management insisted publicly that Hemopure was close to approval, until begrudgingly admitting otherwise in October. In the interim, Biopure and its executives sold millions of dollars in company stock.*

\* \* \*

Biopure's Christmas Eve news release revealed new and troubling information about the company's dealings with the FDA. *Some of this information paints a much more negative picture about Hemopure and seems to contradict management's bullish pronouncements about the product's chances for approval.*

*For the first time, Biopure disclosed Wednesday that in March it sought FDA permission to start a new clinical trial testing Hemopure in hospitalized trauma patients. But the FDA refused to allow the study because of "safety concerns" stemming from the company's Phase III orthopedic surgery trial.*

*This marks the first time Biopure has admitted safety problems with Hemopure.* However, *TheStreet.com* previously reported on serious safety problems

27

associated with Hemopure for more than 2.5 years, citing data presented at medical meetings but not made widely available to investors, as well as information obtained from people involved in the Hemopure clinical study. These concerns included incidences of Hemopure-treated patients suffering from acute kidney failure, as well as relatively large numbers of deaths in Hemopure patients aged 75 or older.

Also Wednesday, Biopure said it submitted more information to the FDA in May, in an attempt to get the agency to lift the "clinical hold" on the trauma trial. The FDA refused twice, and even asked Biopure to conduct three additional animal studies of Hemopure. The last FDA rejection came July 30, the company said. Biopure has now given up seeking permission for the trauma study, although the company said it is still pursuing a trauma program.

Biopure said Wednesday that it hadn't previously disclosed anything about its trauma study publicly because the company didn't consider the information material, since the study was never started. *However, Biopure executives weren't shy about discussing Hemopure when they could put a positive spin on events.*

As the FDA was blocking the Hemopure trauma program, Biopure was still trying to get the blood substitute approved for use in orthopedic surgery. On Aug. 1, the FDA told Biopure that the Hemopure review was completed but that the product could not be approved until additional data and information were submitted. At that time, Biopure executives expressed confidence in press releases and a conference call that the FDA was eager to approve Hemopure and that it would happen soon.

*Throughout the spring and summer, Biopure management talked repeatedly about how well its communications with the FDA were progressing over Hemopure's eventual approval. This bullish talk helped boost Biopure's stock price. On Aug. 1, the day Biopure disclosed the FDA letter, Biopure's stock jumped 22% to $7.30 on heavy volume. By the end of August, Biopure was trading above $8 per share.*

*Biopure insiders then sold company stock. The biggest seller, by far, has been Carl Rausch, Biopure's co-founder and former chief executive. During the months of June and August, Rausch, whose current title is chief technology officer, sold company stock worth about $1.5 million.*

* * *

In late July, Biopure also raised $17.2 million through the private placement sale of its own common stock to unnamed investors.

28

> *Eventually, Biopure management couldn't hide the fact that the FDA was nowhere close to approving Hemopure. In October, the company acknowledged that it would take almost a year for the company to compile and resubmit the information requested by the agency. Biopure's stock sunk below $3 per share.*

49.     Moreover, on February 5, 2004, just over a month after the SEC had recommended civil action against the Company and Moore for misleading investors concerning Hemopure®, the SEC and the FDA announced plans to work together in an attempt to crack down on companies that make false and misleading statements concerning their products under review by the FDA. On that date, the SEC issued a press release entitled "SEC and FDA Take Steps to Enhance Inter-Agency Cooperation." The press release stated in relevant part:

> The Securities and Exchange Commission announced today that members of its senior staff and senior personnel of the Food and Drug Administration (FDA) are continuing and enhancing their cooperative efforts in support of the Commission's activities An exchange of letters memorializes the initiatives to be taken by the FDA to support the Commission in carrying out its mission to protect investors and maintain the integrity of the nation's securities markets.
>
> The FDA generally assists the Commission by: (1) providing technical assistance, when appropriate, to the Division of Corporation Finance in its review of Commission filings, and (2) providing documents and information to the Division of Enforcement. These forms of assistance to the staff will continue, but with certain enhancements.
>
> Among the initiatives described in the letters exchanged by the SEC and FDA staff are:
>
> •     A centralized procedure adopted by the FDA for referring to the SEC staff possible instances of securities laws violations by public companies regulated by the FDA.
>
> •     Identification of contacts in each of the FDA's main organizational components (known as Centers) to serve as points of contact for the SEC and its staff to use in requesting information from FDA. These individuals would be responsible for assuring that such requests are handled promptly and thoroughly.

29

- The continued sharing of non-public information by the FDA with the SEC, consistent with FDA's current practice, and a commitment to endeavor to take steps to further expedite this process.

Stephen M. Cutler, Director of the Commission's Division of Enforcement, and a signatory of the SEC's letter, said, "The Commission staff appreciates FDA's strong interest in coordinating our agencies' activities in a cooperative manner. *When companies misrepresent the status of the FDA's review of their products, investors can be harmed. We are eager to continue working with the FDA to aggressively address such situations and to enhance our already-productive relationship.*"

50.     Commenting on SEC's announcement, an article by Adam Feuerstein appearing in

*TheStreet.com* entitled "Cyberonics' Disturbing Pattern of Chatter," relative to Biopure, stated in relevant

part:

The Food and Drug Administration and the Securities and Exchange Commission recently announced plans to work together to crack down on companies that make false or misleading statements about products under FDA review.

* * *

*Companies often take it upon themselves to offer one-sided, typically very positive, accounts of their all-important interactions with the FDA, often to the point of misleading investors, ImClone and Biopure being classic examples.*

Executives who like to tout their dealings with the FDA know full well that regulators are barred by law from offering their own version of events. (Case in point, the FDA declined to comment for this story about its interactions with Cyberonics.)

Last week, the FDA and the SEC announced a joint effort to catch companies that try to take advantage of this situation. "If companies know we have these mechanisms in place, they will know it does not pay to make misleading statements to the investing public, that the law will catch up with them," FDA chief Mark McClellan told BioCentury, an industry newsletter. "The best advice for companies is to be straightforward in your dealings with investors. Don't misrepresent the information that you receive from the FDA," he added.

51.     Then, on February 24, 2004, the Individual Defendants caused the Company to suddenly

30

announce that defendant Moore, the Company's President and CEO", had resigned, effective immediately. In response to this shocking news, the Company's stock plunged another 16% in afternoon trading closing at $1.36 on the day on a volume of 3.5 million shares.

52.    Commenting on the sudden resignation of Moore, a February 24, 2004 article in *Reuters* entitled "Biopure chief resigns in midst of SEC probe," stated in relevant part:

> Biopure, whose stock has plunged in recent months as it struggles to get an experimental blood substitute to market, said on Tuesday that Chief Executive Thomas Moore resigned.

> The stock fell 13 percent at $1.41 in afternoon trading

> Two months ago the stock dropped 14 percent when Biopure disclosed that securities investigators might level civil charges against Moore and the company for possibly misleading investors and about prospects for the blood substitute Hemopure.

53.    An article on February 25, 2004 by Jeffrey Krasner appearing in *The Boston Globe* entitled "Biopure CEO Resigns Moore's Departure Amid Company's Woes Sparks 16% Stock Drop," commented on the Company's troubles over the last 18 months.  The article stated in relevant part:

> Moore's resignation caps a disastrous 18-month run in which Biopure delayed plans to build a manufacturing plant, misleadingly told investors that a Food and Drug Administration letter indicated Hemopure would likely be approved, withheld information from shareholders that the FDA had stopped a clinical trial due to safety concerns, and

> unveiled layoffs totaling nearly 50 percent of its workforce.

54.    Then, on April 30, 2004, after the close of the market, the Individual Defendants caused the Company to announce that additional Wells Notices had been issued by the SEC to defendants Sanders, Crout, Rausch and Kober.  On that date at 4:42 p.m. ET, the Individual Defendants caused the Company to issue a press release entitled "Biopure Updates Previously Disclosed Securities and Exchange

31

Commission Inquiry."  The press release stated in relevant part:

> Biopure Corporation reported today that on April 29, 2004, the U.S. Securities and
> Exchange Commission (SEC) issued additional "Wells Notices" to four individuals
> concerning matters disclosed in Biopure's press release dated December 24, 2003.  ***The
> notices indicate that the SEC staff may recommend that the Commission bring a
> civil action against Biopure's non-executive Chairman Dr. Charles A. Sanders,
> former Board Member Dr. J. Richard Crout, Chief Technology Officer and Board
> Member Carl W. Rausch, and General Counsel Jane Kober for possible violations
> of federal securities laws.***

55.       A press release by *Reuters* also on April 30, 2004 stated in relevant part:

> Biopure Corp. said on Friday U.S. securities regulators issued "Wells Notices" to four
> company officials, indicating they might bring civil action against the executives for possible
> securities laws violations.

> Biopure said in December that the U.S. Securities and Exchange Commission sent Wells
> Notices to the company and its chief executive at the time and that the SEC might
> recommend civil injunction procedures against both.  The company's stock has plunged
> to about $1, far below last summer's high of about $9, when prospects for the product
> seemed brighter.

> ***The SEC is concerned that Biopure may have misled investors about the blood
> substitute, Hemopure, and that it failed to tell investors that the U.S. Food and
> Drug Administration had refused to allow it io initiate a clinical trial of the
> product because of potential side effects.***

56.       On this news, the Company's stock collapsed another 35% on heavy trading from a close

on April 30, 2004 of $1.25 to a close on May 3, 2004 of $.90, and thus becoming a penny stock.  The

Company's stock has continued to plummet to below $.70 per share. Thus, from a Relevant Period high

of over $8 per share in August and September of 2003, the defendants have erased over $350 million in

market capitalization or over 90% of the Company.

57.       Another article appearing in *TheStreet.com* on May 3, 2004, entitled "More Legal Woes

for Biopure" commented on the additional Wells Notices and stated in relevant part:

Struggling biotech company Biopure shares could be under pressure Monday after the company's disclosure that the Securities and Exchange Commission had issued additional Wells Notices to four company officials.

"The notices indicate that the SEC staff may recommend that the commission bring a civil action against Biopure's non-executive Chairman Dr. Charles A. Sanders, former Board Member Dr. J. Richard Crout, Chief Technology Officer and Board Member Carl W. Rausch, and General Counsel Jane Kober for possible violations of federal securities laws," the company said in a statement released late Friday.

\* \* \*

In question is the company's characterization of communications with the Food and Drug Administration about its application for the artificial blood substitute Hemopure, designed to aid acutely anemic patients undergoing orthopedic surgery.

Biopure had submitted an application to the FDA in July 2002 seeking approval. Twelve months later, the company said the FDA had relatively few questions about -- and required no new tests for -- Hemopure. Biopure said it could answer the FDA's questions in 30 to 60 days. *As it turns out, the agency had more questions and concerns than the company had originally indicated.*

In early April, Biopure said it may have to conduct more human trials in addition to four more animal tests requested by the agency. Biopure now says it expects to answer the FDA's questions and to complete the animal testing in the early fall.

*Late last year, Biopure said for the first time that it had received Wells Notices from the SEC. Since then, the company has suffered a number of setbacks. Its stock has plummeted from a 52-week high of $9.03 touched in August 2003 and CEO Thomas A. Moore resigned in February.*

58.    An article appearing in *The Boston Globe* on May 24, 2004 entitled "On Life Support,"

stated in relevant part:

**Biopure Corp.**

12-31-99 market capitalization

$370.5 million

Current market capitalization

33

*$35.2 million*

There's blood in the water at the Cambridge blood-substitute maker, as the SEC probes whether executives properly disclosed a clinical-trial shutdown that tanked the stock. In February, CEO Thomas Moore declared "in my heart, I'm quite sure we will succeed." The next week, he resigned.

59.     Even worse, on June 23, 2004, the the Individual Defendants caused Biopure to announce that because the daily minimum bid for its stock had remained below $1.00 for 30 consecutive days, it had been notified by Nasdaq it was in serious jeopardy of having its common stock delisted – a result which would be devastating for the Company. A press release issued on that date by the Company entitled, "Biopure Appoints New President and Chief Executive Officer and Restructures the Company; Company Focuses on Clinical Development of Hemopure® Oxygen Therapeutic Product for Cardiovascular and Trauma Applications and Appoints Distinguished Medical Advisory Board" stated in relevant part:

> Biopure has received notice from the Nasdaq Stock Market that its daily minimum bid price fell, and remained below, $1.00 for 30 consecutive business days. As a result, Biopure is out of compliance with Nasdaq's $1.00 minimum bid price for continued inclusion. The company has 180 calendar days, or until December 14, 2004 to regain compliance, and will have an additional 180 calendar days, if at December 14, 2004 the company meets Nasdaq's initial listing criteria other than the bid price requirement.

60.     Further commenting on this latest bad news for the Company and summarizing the other damages inflicted upon the Company as a result of Individual Defendants' misconduct was a June 24, 2004 article appearing in the *Boston Globe* entitled "Troubled Biopure launches revamp; Two executives quit as new CEO is hired; drug plan shifted." The press release stated in relevant part:

> Foundering Biopure Corp., sought to improve its fortunes yesterday with a broad restructuring plan.
>
> The Cambridge biotechnology company hired Zafiris, a former Biopure executive, as its chief executive, disclosed the departures of two high-ranking executives, laid off 25

34

employees, and changed course in its quest for regulatory approval for its experimental blood substitute, Hemopure.

*Despite the flurry of activity, however, the bad news for Biopure continued to pour in. The company disclosed that the Nasdaq Stock Market may delist its stock because the bid has been mired below $1 for more than 30 days. The company has until Dec. 14 to pull its stock above the $1 mark.*

On news of yesterday's layoffs and organizational changes, the stock dipped 6.5 percent to 72 cents. Biopure asked a series of questions about its application. *The stock fell even farther in December when the Securities and Exchange Commission launched an investigation, apparently into whether investors were misled about the nature of the FDA's communications.*

\* \* \*

Biopure's vision for a blood substitute that could be used when no real blood is available for a transfusion caught the eye of the investors who saw the potential for huge markets. Hemopure is made from cow's blood and can be stored at room temperature for three years. It can be used by people of all blood types, and doesn't transmit disease.

*But the company ran into trouble starting in August 2003 when the FDA asked a series of questions about Biopure's application to market Hemopure, and required new animal trials, a costly time consuming setback that is a strong indication that government reviewers had concerns about the blood substitute's safety for further human testing.*

So instead of opening a manufacturing facility this year in South Carolina, which had been planned as far back as 2002, *the company is coping with SEC investigation and fending off at least half-dozen shareholder lawsuits filed in the US District Court in Boston.*

*In April, the company disclosed that the SEC indicated it may initiate civil actions against some Biopure executives. At the time of the FDA's questions in August 2003 about the Hemopure applications, executives issued public statements saying the FDA reaction was positive.* The company has said it believed it acted properly.

61.    Finally, a July 5, 2004 article by Adam Feuerstein in *TheStreet.com* entitled "Biotech 101:

The Road to FDA Approval," described in detail the complete FDA process for BLA's such that for

35

Biopure's Hemopure®.  Discussing the final approval process, and how certain companies such as Biopure take it upon themselves to mislead investors concerning the approval process, the article stated in relevant part:

### Stamps of Approval

After the BLA or NDA is filed and an advisory committee, if required, convenes to vote, the final approval decision is left up to the FDA.  You'd think this final step would be straight forward, but it's actually pretty labyrinthine.

The FDA can rule in a variety of ways.  The simplest FDA action is the approval letter, issued by the FDA when the agency deems a drug safe, effective and ready to be marketed.

Conversely, the FDA an issue a non-approvable letter when the agency concludes that a drug's clinical data or safety data do not warrant approval.  This rejection letter of sorts is, of course, bad news an usually precipitates the drug company's plunging stock price.

Investor confusion can be highest, however, when the FDA issues a complete response letter, or likewise, an approvable letter, Simply put, the actions are akin to conditional approvals, meaning that the FDA requires additional information before it can issue a final ruling.  The trick for drug companies-and investors–is figuring out how much additional information is required and how long it will take to compile and resubmit.

Unfortunately, the FDA doesn't make complete response or approvable letters public, so investors have to rely on company's explanation and interpretation of these letters to determine whether a final drug approval is imminent or significantly delayed.

*Lest you think drug companies always play straight-up and honest with investors, look at what Biopure (BPUR:Nasdaq) did in July 2003.  The company received a complete response letter from the FDA regarding its human blood substitute Hemopure.  But instead of telling investors that the FDA was asking for new animal and human clinical studies, Biopure management suggested to investors that the FDA had no substantial issues with Hemopure and that approval was right around the corner.*

*The truth eventually came out, leading to a decimation of Biopure's stock price, the resignation of most of the company's management, including the CEO,*

*and an ongoing Securities and Exchange Commission investigation. Hemopure is nowhere close to being approved.*

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

62. Plaintiffs bring this action derivatively in the right and for the benefit of Biopure to redress injuries suffered, and to be suffered, by Biopure as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Biopure is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

63. Plaintiffs will adequately and fairly represent the interests of Biopure in enforcing and prosecuting its rights.

64. Plaintiffs are and were owners of the stock of Biopure during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

65. The Board of Biopure at the time this action was instituted consisted of the following individuals: Director Defendants Moore, Rausch, Judelson, Sanders, Koop, Harrington and Crout. In addition to the particularized reasons set forth in ¶¶22-28, plaintiffs did not make any demand on the Board of Biopure to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the following additional reasons:

a. As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at

37

management and Board meetings, each of the Director Defendants knew the adverse non-public information regarding Hemopure® and the Company's discussions with the FDA. While in possession of this material adverse non-public information regarding the Company, the following current members of the Biopure Board participated in the illegal insider selling:

> i.     During the Relevant Period, Rausch sold 246,574 shares of Biopure stock for proceeds of $1,596,900. Because this defendant received a personal financial benefit from the challenged insider trading transactions, this defendant is interested and any demand upon him is futile;

> b.     The Compensation Committee of the Board determines, after consulting with the CEO, establishes, authorizes and administers Biopure's compensation policies, practices and plans for Biopure's directors, executive officers and other key personnel. The Compensation Committee is comprised of defendants Sanders and Judelson. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Sanders and Judelson. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Moore, Rausch, Koop, Harrington and Crout is futile;

> c.     The principal professional occupation of defendants Moore and Rausch are their employment with Biopure, pursuant to which they received and continue to receive substantial monetary compensations and other benefits. Specifically, for FY:03 Moore received an annual base salary of not less than $350,000. Rausch also received a salary for FY:03 of nearly $350,000. In addition, both Moore and Rausch were granted options to purchase Biopure stock and are entitled to bonuses. Accordingly, defendants Moore and Rausch lack independence from defendants Sanders and Judelson, who exert

influence over defendant Moore and Rausch's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendants Moore and Rausch incapable of impartially considering a demand to commence and vigorously prosecute this action;

        d.    According to Biopure's Proxy Statements filed with the SEC, Director Defendants Harrington, Sanders and Crout served on the Audit Committee during the Relevant Period. The Audit Committee is responsible for reviewing the activities of Biopure's internal auditors and independent accountants. The Audit Committee evaluates Biopure's organization and its internal controls, policies, procedures and practices to determine whether they are reasonably designed to: provide for the safekeeping of Biopure's assets; assure the accuracy and adequacy of Biopure's records and financial statements; reviews Biopure's financial statements and reports; monitors compliance with Biopure's internal controls, policies, procedures and practices; and receives direct compliance reports from Biopure's internal auditors and General Counsel and from the independent accountants. Nonetheless, the Audit Committee, with full knowledge of the Company's communication with the FDA concerning Hemopure®, recommended that the Board of Directors include the improper audited financial statements in Biopure's filings with the SEC during the Relevant Period without disclosing this material information. By such actions, these defendants breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

        e.    The entire Biopure Board and senior management participated in the wrongs complained of herein. Biopure's directors are not disinterested or independent due to the following: Director Defendants Moore, Rausch, Judelson, Sanders, Koop, Harrington and Crout served on the Biopure Board during the Relevant Period. Pursuant to their specific duties as Board members, each was

charged with the management of the Company and to conduct its business affairs.  Each of the

above-referenced defendants breached the fiduciary duties that they owed to Biopure and its shareholders

in that they failed to reveal to the public the Company's communications with the FDA concerning

Hemopure® despite admittedly having such knowledge.  Thus, the Biopure Board cannot exercise

independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute

this action because its members are interested personally in the outcome as it is their actions that have

subjected Biopure to millions of dollars in liability for possible violations of applicable securities laws;

       f.     The Director Defendants of Biopure, as more fully detailed herein, participated in,

approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to

conceal or disguise those wrongs from Biopure's stockholders or recklessly and/or negligently disregarded

the wrongs complained of herein, and are therefore not disinterested parties;

       g.     As detailed herein at ¶¶22-28, in order to bring this suit, all of the directors of

Biopure would be forced to sue themselves and persons with whom they have extensive business and

personal entanglements, which they will not do, thereby excusing demand. As set forth in particularity in

¶¶22-28 because a majority of the Director Defendants have long-term personal, professional and financial

relationships with each other and other board members, a majority of the Director Defendants could not

have adequately considered a demand to bring the allegations made herein rendering any such demand

futile;

       h.     The acts complained of constitute knowing violations of the fiduciary duties owed

by Biopure's officers and directors and these acts are incapable of ratification;

       i.     Each of the Director Defendants authorized and/or permitted the improper

statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

j.      Any suit by the Director Defendants to remedy these wrongs would likely expose the Director Defendants and Biopure to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

k.      Biopure has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Biopure any part of the damages Biopure suffered and will suffer thereby;

l.      If the Director Defendants were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

m.      If Biopure's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this

41

Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Biopure. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, plaintiffs assert, upon information and belief, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Biopure against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Biopure, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Biopure to sue them, since they will face a large uninsured liability.

66.    Moreover, despite the Director Defendants having knowledge of the claims and causes of action raised by plaintiffs, the current Board has failed and refused to seek to recover for Biopure for any of the wrongdoing alleged by plaintiffs herein.

67.    Plaintiffs have not made any demand on shareholders of Biopure to institute this action since such demand would be a futile and useless act for the following reasons:

a.    Biopure is a publicly held company with approximately 48.17 million shares outstanding, and tens of thousands of shareholders;

b.    Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

      c.      Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## DAMAGES TO BIOPURE

68.      As a direct result of the Individual Defendants' breaches of their fiduciary duties and other violations of law, the Company has been severely damaged. The Individual Defendants' nondisclosures concerning the Company's communications with the FDA concerning Hemopure® have caused severe, irreparable, injury and damage to the company's reputation and goodwill in the investment and business communities and threaten to virtually destroy this once valuable franchise. For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled securities analysts and the investing public, such that Biopure's ability to raise capital – on favorable terms – will be impaired in the future. Indeed, the Company's market capitalization has already been severely damaged with over $350 million erased, or over 90% of the Company's market value during the Relevant Period, and severely reducing the Company's financing options. Moreover, the Individual Defendants' actions have placed the Company is serious peril of having it's common stock delisted by Nasdaq.

69.      In addition, significant Company money will have to be spent defending the Company in the numerous securities fraud lawsuits brought against the Company as a direct result of the conduct of the Individual Defendants. These lawsuits will costs hundreds of thousands to defend and possibly millions if not tens of millions to resolve. In addition, significant Company funds will have to be expended defending the Company against the SEC pursuant to charges outlined in the Wells notices. Moreover, management will have to expend significant time answering these charges instead of being able to focus on the

Company's core business. Moreover, the Company will have to spend addition Company funds employing independent outside counsel.

## VI.

## CAUSES OF ACTION

### COUNT I
### Against All Individual Defendants for Breach of Fiduciary Duty

70.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

71.    The Individual Defendants owed and owe Biopure fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Biopure the highest obligation of good faith, fair dealing, loyalty and due care.

72.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

73.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

74.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Biopure has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

75.    Plaintiffs on behalf of Biopure have no adequate remedy at law.

## COUNT II
### Against All Individual Defendants for Abuse of Control

76.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

77.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Biopure, for which they are legally responsible.

78.     As a direct and proximate result of the Individual Defendants' abuse of control, Biopure has sustained significant damages.

79.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

80.     Plaintiffs on behalf of Biopure have no adequate remedy at law.

## COUNT III
### Against All Individual Defendants for Gross Mismanagement

81.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

82.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Biopure in a manner consistent with the operations of a publicly held corporation.

83.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Biopure has sustained significant damages in excess of tens of millions of dollars.

45

84.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

85.     Plaintiffs on behalf of Biopure have no adequate remedy at law.

## COUNT IV
**Against All Individual Defendants for Waste of Corporate Assets**

86.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

87.     As a result of the improper statements and nondisclosures, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused Biopure to waste valuable corporate assets by paying incentive based bonuses and stock options to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions including responding the SEC's allegations and securities fraud actions.

88.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

89.     Plaintiffs on behalf of Biopure have no adequate remedy at law.

## COUNT V
**Against All Individual Defendants for Unjust Enrichment**

90.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

91.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Biopure.

46

92.     Plaintiffs, as  shareholders and representatives of Biopure, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VI
### Against Defendant Rausch for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

93.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

94.     At the time of the stock sales set forth herein, the defendant Rausch knew the information described above, and sold Biopure common stock on the basis of such information.

95.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which defendant Rausch used for his own benefit when he sold Biopure common stock.

96.     At the time of his stock sales, defendant Rausch knew of the undisclosed adverse information concerning the Company's communications with the FDA concerning Hemopure®. Defendant Rausch's sales of Biopure common stock while in possession and control of this material adverse non-public information was a breach of his fiduciary duties of loyalty and good faith.

97.     Since the use of the Company's proprietary information for their own gain constitutes a breach of defendant Rausch's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Rausch obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Biopure have an effective remedy;

C.    Awarding to Biopure restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants including all illegal proceeds from insider selling;

D.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: July 14, 2004.                    Respectfully submitted,

                                         /s/ Timothy L. Miles
                                         By:    Timothy L. Miles

48

DOUGLAS S. JOHNSTON, JR. (*pro hac vice*)
GEORGE E. BARRETT (*pro hac vice*)
TIMOTHY L. MILES (*pro hac vice*)
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue, North
Nashville, TN 37201
Telephone: 615/244-2202
Facsimile: 615/252-3798
djohnston@barrettjohnston.com
gbarrett@barrettjohnston.com
tmiles@barrettjohnston.com

BRIAN J. ROBBINS
JEFFREY P. FINK
ROBBINS UMEDA & FINK, LLP
1010 Second Avenue, Suite 2360
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Plaintiffs' Co-Lead Counsel

MARY T. SULLIVAN, BBO #487130
SEGAL ROITMAN & COLEMAN
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: 617/742-0208
Facsimile: 617/742-2187

Plaintiffs' Liaison Counsel

JAMES G. STRANCH
BRANSTETTER, KILGORE, STRANCH &
JENNINGS
227 Second Avenue North
Nashville, TN 37201
Telephone: 615/254-8801
Facsimile: 615/255-5419

Plaintiffs' Counsel

49

## **VERIFICATION**

I, Laurie Parrott, hereby declare as follows:

I am a shareholder of Biopure Corporation and have been during the relevant times pertinent hereto. I certify under penalty of perjury that I have reviewed the foregoing Verified Consolidated Amended Shareholder Derivative Complaint for Breach of Fiduciary Duties, Abuse of Control, Gross Mismanagement, Waste of Corporate Assets, Unjust Enrichment, and for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information ("Consolidated Amended Complaint"), and authorized its filing and that the contents in the Consolidated Amended Complaint are true to the best of my knowledge, information and belief.


Dated: July 6, 2004                        _____/s/ Laurie Parrott_____
                                                              LAURIE PARROTT

## **VERIFICATION**

I, John Parrott, hereby declare as follows:

I am a shareholder of Biopure Corporation and have been during the relevant times pertinent hereto. I certify under penalty of perjury that I have reviewed the foregoing Verified Consolidated Amended Shareholder Derivative Complaint for Breach of Fiduciary Duties, Abuse of Control, Gross Mismanagement, Waste of Corporate Assets, Unjust Enrichment, and for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information ("Consolidated Amended Complaint"), and authorized its filing and that the contents in the Consolidated Amended Complaint are true to the best of my knowledge, information and belief.

Dated: July 6, 2004                           /s/John Parrott
                                                    JOHN PARROTT