# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE BIOPURE CORPORATION | ) | **Master Docket No. 1:04-cv-10177 (NG)** |
| DERIVATIVE LITIGATION | ) |  |
|  | ) | **Assigned to Judge Nancy Gertner** |
|  | ) |  |
| _____ | ) | **Magistrate Judge Alexander** |

## COMPENDIUM OF UNREPORTED AUTHORITIES
### CITED IN DEFENDANTS' MEMORANDUM OF LAW
### IN SUPPORT OF THEIR MOTION TO DISMISS THE VERIFIED
### CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Robert A. Buhlman, BBO #554393
Eunice E. Lee, BBO #639856
Michael D. Blanchard, BBO #636860
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

**CASES**

*A.R. DeMarco Enterprises, Inc. v. Ocean Spray Cranberries, Inc.,* No.Civ.A. 19133-NC, 2002 WL. 31820970 (Del. Ch. Dec. 4, 2002) ..............................................1

*Apple Computer, Inc. v. Exponential Tech., Inc.*, No.16315, 1999 WL. 39547 (Del. Ch. Jan. 21, 1999) ............................................................................................2

*Dollens v. Zionts, No. 01 C02826,* 2002 WL. 1632261 (N.D. Ill. July 22, 2002) ................................................................................................................................3

*Haseotes v. Bentas*, No.Civ.A. 19155 NC, 2002 WL. 31058540 (Del. Ch. Sept. 3, 2002) ......................................................................................................................4

*Lewis v. Fites*, Civ.A.No. 12566, 1993 WL. 47842 (Del. Ch. Feb 19, 1993) ....................5

*McMichael v. United States Filter Corp.*, No. EDCV 99-182VAP (MCX), 2001 WL. 418981 (C.D. Cal. Feb. 23, 2001) ................................................................6

*In re Paxson Communication Corp. Shareholders Litig.,* No.Civ.A. 17568, 2001 WL. 812028 (Del. Ch. July 12, 2001) ............................................................7

*Rattner v. Bidzos*, No.Civ.A. 19700, 2003 WL 22284323 (Del. Ch. Sep 30, 2003) ...............................................................................................................................8

*In re Stratus Computer, Inc. Sec. Litig.*, Civ.A. 89-2075-Z, 1992 WL 73555 (D. Mass. March 27, 1992) ..............................................................................................9

*In re United Telecommunications, Inc., Sec. Litig.*, No.90-2251-EEO, 1993 WL 100202 (D. Kan. March 4, 1993) ........................................................................10

*In re Wheelabrator Technologies Inc. Shareholders Litig.*, C.A.No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) ....................................................................11

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by regular mail, on September 27, 2004.

/s/ Michael D. Blanchard
Michael D. Blanchard

# EXHIBIT 1

Not Reported in A.2d
2002 WL 31820970 (Del.Ch.), 28 Del. J. Corp. L. 698
**(Cite as: 2002 WL 31820970 (Del.Ch.))**

**H**

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

A.R. DEMARCO ENTERPRISES, INC.,
Individually and Derivatively on behalf of
Ocean Spray Cranberries, Inc., Plaintiff,
v.
OCEAN SPRAY CRANBERRIES, INC., Sherwood
J. Johnson, H. Robert Hawthorne,
Douglas R. Beaton, Benjamin A. Gilmore, II, Ray E.
Habelman, Jerome J. Jenko,
Stephen V. Lee, III, Ralph A. May, William G.
Pietersen, Francis J. Podvin,
Martin B. Potter, and Ray E. Smith, Jr., Defendants.

No. Civ.A. 19133-NC.

Submitted Oct. 3, 2002.
Decided Nov. 26, 2002.
Revised Dec. 4, 2002.

Daniel V. Folt and Gary W. Lipkin, of Cozen O'Connor, Wilmington, Delaware; H. Robert Fiebach , David M. Doret, and Kristine Maciolek, of Cozen O'Connor, Philadelphia, Pennsylvania, for Plaintiff, of counsel.

Jesse A. Finkelstein, Catherine G. Dearlove, and J. Travis Laster, of Richards, Layton & Finger, P.A., Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*

CHANDLER, J.

**\*1** The crux of this action is a dispute over the strategic vision of Ocean Spray, Inc. Plaintiff believes that selling or merging all or part of the company would best serve the interests of the shareholders. Defendants believe they can continue to operate Ocean Spray as an independent entity and conduct a viable turnaround of the company.

Plaintiff filed a complaint alleging various breaches of disclosure, fiduciary duties, and implied contractual duties, as well as common law fraud. Defendants moved to dismiss the complaint and to strike one of the plaintiff's requested forms of relief, characterized as an order directing the sale of the company. For reasons set forth in this opinion, I deny in part defendants' motion to dismiss Count I. The motion is granted, however, with respect to all other counts, as well as Count I in part, except that Counts III, V, and VI are dismissed without prejudice. Since plaintiff's request for an order instructing the directors to pursue a sale or merger, and to fully cooperate with a bona fide purchaser, is not an available remedy in these circumstances, the motion to strike is moot and is also denied.

I. BACKGROUND FACTS [FN1]

FN1. As required under Court of Chancery Rule 12(b)(6), the facts alleged in plaintiff's complaint are assumed to be true for the purposes of defendants' motions. Therefore, all facts are drawn from that complaint and the materials incorporated by reference in the complaint.

Ocean Spray is a Delaware Corporation that operates as an agricultural cooperative. Ocean Spray processes, markets, and distributes the products of its growers. There are approximately 750 cranberry growers and 150 citrus growers who own shares in Ocean Spray. Plaintiff A.R. DeMarco Enterprises, Inc. ("DeMarco") is one of the larger cranberry growers and a (roughly) three percent shareholder of Ocean Spray.

The shares of Ocean Spray are not traded publicly. The growers are the shareholders. Growers obtain shares at par value in proportion to the average amount of crop produced over a three-year period. The number of shares is adjusted every three years to account for changes in production. Shares are purchased or redeemed at par value. Ocean Spray's certificate of incorporation requires each grower to be party to a cooperative marketing agreement with Ocean Spray. The cooperative marketing agreement provides for the issuance and redemption of shares at par value.

Growers are required to deliver to Ocean Spray all agricultural products ("product") grown on designated lands in return for their proportion of shares. Ocean Spray then processes, markets, and distributes the product. Ocean Spray also lobbies for legislation in support of its growers, seeks to develop new markets for its products, and works to expand its current markets and increase the consumption of Ocean Spray products.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

During the mid-1990's, the cranberry business was booming and reached a high of $60 per barrel in 1996. As in most agricultural markets, however, the boom did not last forever. At the time of the complaint, there was an oversupply of cranberries, a stagnant market, and increased competition by producers of other fruits. In addition, cranberry growers who are not Ocean Spray stockholders have been competing aggressively with Ocean Spray. The result was that the return from the 1999 crop was $10.75 per barrel, with no real change in sight. The cost of production is around $35 per barrel, so plaintiff was operating at a loss at the time the complaint was filed.

*2 In response to the problems in the cranberry market, the United States Department of Agriculture ("USDA") reduced the amount of cranberries allowed to be produced by thirty-five percent. [FN2] Ocean Spray lobbied the USDA for this reduction in an effort to counter the over-supply of cranberries because Ocean Spray's business has suffered during the product glut. Furthermore, an important distribution contract with PepsiCo was lost when PepsiCo purchased Tropicana, and the increasing competition in the beverage and food industry has stifled growth. Ocean Spray has countered by introducing a new product line, the Craisin, but that has not been enough to reverse the downward trend.

> FN2. The USDA is responsible for setting allowable levels of production for several crops, including cranberries and citrus products. The complaint only addresses the USDA production order as it relates to cranberries. Citrus products are covered by other USDA production orders not addressed in the complaint.

Ocean Spray's board of directors retained several consultants in 1999 to help determine a course of action for the company. Plaintiff's president and chief executive officer, J. Garfield DeMarco ("Mr.DeMarco"), was on the board of Ocean Spray at that time. All of the consultants allegedly encouraged a sale or merger transaction for Ocean Spray, including Bain & Company, a financial consulting firm, and Merrill Lynch, an investment banking firm.

The board at that time consisted of twenty-five directors. By a vote of thirteen to eleven, the board voted against pursuing a sale or merger and for keeping the consultants' reports confidential. As a board member, Mr. DeMarco voted for a sale or merger and against keeping the reports confidential.

The board also later decided not to follow a recommendation for a straw poll of the shareholders as to the consideration of a sale or merger because the poll would be purely hypothetical and not based on a concrete transaction.

In 2000, the board proposed resolutions reducing the number of directors from twenty-five to fifteen and allowing the removal of directors without cause. Mr. DeMarco voted against changing the composition of the board and allowing removal of directors without cause. The shareholders, however, voted to approve the change and Mr. DeMarco was removed from the board. [FN3] The board now consists of eleven growers, the Ocean Spray CEO, and three persons not affiliated with Ocean Spray. [FN4] According to the complaint, the board consists primarily of persons "known to be unsympathetic to sale or merger." [FN5]

> FN3. After the 2000 annual meeting where the shareholders approved the change in board composition, Mr. DeMarco refused to resign. He was removed from the board without cause. Compl. ¶ 96.

> FN4. Three different slates of directors were nominated-a company slate, a pro-merger slate, and an anti-merger slate. It is unclear from the pleadings which slate of nominees was elected. Also, defendants state that the actual resolution reduced the board to nine to twelve directors with the authority to increase the board to fifteen, which they later did by appointing the three directors not affiliated with Ocean Spray. The facts in the complaint, however, are all that the Court is allowed to consider upon a motion to dismiss. Recognizing that the end result was the fifteen directors mentioned in the complaint, the difference between plaintiff's assertions and defendants' is inconsequential.

> FN5. Compl. ¶ 96.

DeMarco, along with other shareholders equaling approximately fifteen percent of Ocean Spray, offered proposed resolutions to be placed on the ballot for the 2001 annual meeting. Ocean Spray resisted the resolutions and sought to rewrite them. The shareholders brought suit against the board in Massachusetts (the "Massachusetts action") to place their resolutions on the agenda. The suit was later withdrawn without prejudice in light of a settlement with Ocean Spray to include the resolutions on the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

agenda for the 2001 annual meeting. The agreement allegedly provided that representatives of both Merrill Lynch and Bain would be present, as well as an independent teller to participate in counting the votes. Nevertheless, none of these representatives were present at the 2001 annual meeting.

**\*3** The resolutions to be presented to the shareholders involved directing the board to pursue a sale or merger of Ocean Spray. At the 2001 meeting, management made presentations in opposition to the resolution. Management also presented the information Merrill Lynch and Bain had provided to the board. As will be discussed later, the information the board presented was allegedly misleading, incomplete, and inaccurate with respect to Merrill Lynch's and Bain's recommendations. Management's prospects for a turnaround were also allegedly misleading in that they failed to highlight Ocean Spray's reserve supply of cranberries. [FN6]

> FN6. Plaintiff argues that even if Ocean Spray's actions decreased the cranberry glut, the reserve supply would still prevent the growers from increasing their yield and obtaining the benefit of Ocean Spray's actions to decrease the glut. Compl. ¶ 117(b).

After the presentations were made, a vote was taken and the shareholders rejected the resolution to pursue a sale or merger by a vote of sixty-two percent to thirty-eight percent. The vote tally for the directors, however, appeared flawed in that one director was said to have received all but just under 55,000 votes in his favor, even though DeMarco alleges that it voted, but did not vote its 120,000 votes for that candidate.

In September of 2001, plaintiff filed this action. Defendants moved to strike plaintiff's request for a court order directing the board to pursue a sale or merger of the company, and moved to dismiss all seven counts of the complaint.

## II. STANDARD OF REVIEW

The standard governing a motion to dismiss is well established. A party is entitled to dismissal of the complaint only where it is clear from its allegations that the plaintiff would not be entitled to relief under any set of facts that could be proven to support the claim. Moreover, the Court is required to accept all of plaintiff's factual allegations as true and give plaintiff the benefit of all inferences that may be drawn from

the facts.

## III. ANALYSIS

Plaintiff's complaint lists seven counts against defendants. All of the counts allege direct claims except for Count II, which alleges a derivative claim.

### A. Defendants' Motion to Strike

Defendants move to strike plaintiff's request for an order compelling the sale of Ocean Spray. Rule 12(f) requires that the matter to be stricken be "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." [FN7]

> FN7. Court of Chancery Rule 12(f).

Section 141 of the Delaware General Corporation Law ("DGCL") provides that the board of directors shall manage the business and affairs of the corporation. A request for an order to compel the sale of Ocean Spray cannot be granted. Plaintiff cites no authority for the proposition that this Court might properly order a sale of a company in these circumstances, and this Court is aware of none.

Plaintiff's request, however, does not fall under the criteria listed in Rule 12(f). Instead, I believe the motion to strike is unnecessary, as the underlying claim for relief itself must be dismissed under Rule 12(b)(6). I therefore deny the motion to strike.

### B. Count I-Breach of the Duty of Disclosure

Plaintiff alleges that the management of Ocean Spray presented false and misleading information to the shareholders with respect to the vote on a shareholder proposal for a resolution directing the board to research the viability of a sale or merger. Specifically, the complaint alleges:

**\*4** (1) Shareholders were misled by a statement that Merrill Lynch concluded Ocean Spray had not lost value over the past year. Plaintiff adequately alleges that that statement is misleading because a Merrill Lynch report clearly states that cranberry prices dramatically affect the corporation's value. Since cranberry prices had changed over the past year, it is reasonable to infer that the value of Ocean Spray changed as well.

(2) Shareholders were misled by a statement that the Bain report did not state that a sale was the best

financial move, when plaintiff alleges that the report in fact said otherwise.

(3) Shareholders were misled by a management statement that Bain presented a dismal view of a post-sale Ocean Spray, when, allegedly, Bain never addressed that issue in its report.

(4) Shareholders were misled by management as to the viability of its predictions regarding the turnaround plan, including the existence of the two-year cranberry reserve.

These four allegations state a claim that survives a motion to dismiss under Rule 12(b)(6). The complaint also alleges misleading disclosures with respect to board nominees, legal requirements for merger or sale, and issues related to those topics. These broad and conclusory characterizations that almost all of the board's communications with the shareholders were materially false do not state a claim upon which relief can be granted. Therefore, the motion to dismiss Count I is granted except for the four allegations listed above. These four allegations survive for the following reasons.

Defendants request dismissal on the grounds that the resolution was precatory, and did not constitute shareholder action. Thus, defendants state that no duty to disclose existed, so no duty of disclosure violation occurred. Defendants also state that if a duty to disclose existed, the information was stale because it was two years old. The age of the information, defendants argue, made it no longer material.

Directors owe a duty not to mislead or deceive shareholders. [FN8] "The directors' fiduciary duties include the duty to deal with their stockholders honestly. Shareholders are entitled to rely upon the truthfulness of all information disseminated to them by the directors they elect to manage the corporate enterprise." [FN9] "Delaware law also protects shareholders who receive false communications from directors even in the absence of a request for shareholder action. When the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty." [FN10]

FN8. *See Malone v. Brincat,* 722 A.2d 5, 10-11 (Del.1998).

FN9. *Id.* (citing *Marhart, Inc. v. CalMat*

*Co.,* 1992 Del. Ch. LEXIS 85 at \*9 (Del. Ch.)).

FN10. *Id.* at 14. *Malone* states that the only difference resulting from the presence or absence of shareholder action involves what elements the plaintiff must prove. If shareholder action is present, then plaintiff need not prove reliance, causation, or damages. When shareholder action is absent, plaintiff must show reliance, causation, and damages. Therefore, the board's duty to be honest has not changed, only what the plaintiff must show at trial to prove a breach of the duty of disclosure. *Id.* at 11.

Thus, the presence or absence of shareholder action in this context is irrelevant. Even if no duty of disclosure existed, once the board decided to provide information to the shareholders, it had to do so honestly and in good faith. In addition, the fact that some of the information may have been dated does not mean the board may pick and choose from information (based on its age) and thereby arguably present a less than complete picture regarding an issue of great interest to stockholders. Qualifying the information because of its age, or adding appropriate disclaimers may have been appropriate.

**\*5** In any event, accepting the truth of these allegations, as I must at this stage, plaintiff has adequately stated a claim upon which relief can be granted for the above four disclosure allegations. It is important to note, however, that of the relief requested, the only relief available under these allegations is a new vote on the shareholder proposal, should plaintiff prevail in its disclosure claim. Accordingly, the motion to dismiss is denied with respect to those four allegations in Count I. The motion to dismiss is granted as to the remaining alleged disclosure violations in Count I.

*C. Count II-Breach of Fiduciary Duties (Derivative Claim)*

Plaintiff alleges a derivative claim, but did not make demand upon the board. Since it is a derivative claim, demand must be made on the board, or be excused based upon futility. [FN11]

FN11. *See* Court of Chancery Rule 23.1.

To determine "demand futility the Court of Chancery in the proper exercise of its discretion must decide

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." [FN12]

> FN12. *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984).

Plaintiff alleges that the directors fail to meet the first prong of *Aronson v. Lewis* because they voted against the shareholder resolution to pursue a sale or merger of Ocean Spray. According to plaintiff, the directors must be acting in their own self-interest because they are not pursuing a sale or merger. A mere allegation that the board decided not to pursue a sale or merger is not enough to show that the individual directors were not independent or were interested. There must be allegations of interest or lack of independence that lead an individual board member to reject pursuing a sale or merger. A presumption that the directors must be self-dealing simply because they have not done what a plaintiff wants them to do is not a proper basis for demonstrating demand futility. These allegations fail to show demand futility as required under *Aronson.*

Plaintiff also alleges lack of independence because the directors receive compensation for serving on the board. It is well established in Delaware law that ordinary director compensation alone is not enough to show demand futility. [FN13] Accordingly, demand is not excused under the first prong of *Aronson.*

> FN13. *See Grobow v. Perot,* 539 A.2d 180,188 (Del.1988). This is true as long as the compensation does not exceed customary bounds, but "the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee." *Orman v.. Cullman,* 794 A.2d 5, 29 n. 62 (Del. Ch.2002).

As for the second prong of *Aronson,* plaintiff alleges that the board's failure to pursue a sale or merger is beyond the scope of what a reasonable person would decide. Plaintiff alleges that failure to pursue a sale or merger will result in less affluent shareholders going out of business and having to redeem their Ocean Spray stock. The fact that not all shareholders may survive in the current economic climate does not meet *Aronson*'s standard, since the board is to act for the benefit of Ocean Spray as a whole and may not

advance the interests of a few shareholders exclusively. No facts are alleged which even suggest that the Ocean Spray directors' actions were not in the best interest of the corporation except that plaintiff thinks they are not. Finally, the naked allegation that management is entrenched is not enough to meet *Aronson's* second prong. [FN14] That, again, is too conclusory to warrant excusal of demand.

> FN14. *Grobow,* 539 A.2d at 188.

**\*6** Plaintiff has failed to show demand futility. Accordingly, Count II is dismissed under Rule 23.1 for failure to make demand upon the board.

*D. Count III-Breach of Fiduciary Duties (Direct Claim)*

Plaintiff alleges a direct claim based on special injuries:

(1) Plaintiff is adversely affected by defendants' actions in not pursuing a sale or merger, which will result in a forced redemption of its shares. Plaintiff's specific geographical, distributive, and product situations, as compared to other shareholders, causes it to have specific and individual money damages not borne by other shareholders.

(2) Defendants' actions in lobbying to reduce the amount of product plaintiff could grow without reducing the amount of production needed for it to maintain its shares results in a forced divesture of its stock to the benefit of the unaffected shareholders.

(3) The forced divestiture causes plaintiff to suffer voting power dilution.

The basis of plaintiff's allegations is that Ocean Spray will redeem its shares and cause plaintiff to lose economic and voting rights. But, nothing in the complaint alleges that Ocean Spray actually has sought to redeem plaintiff or any other shareholder. Section 8(f) of the Cooperative Marketing Agreement ("CMA") between Ocean Spray and DeMarco provides that "[a]t the written request of the Cooperative, the Grower agrees to present for redemption at par value any Common Shares of the Cooperative in excess of one hundred percent (100%) of the shareholdings required under Subsection (a) of this Section 8." [FN15]

> FN15. Section 8(a): "The Common Stock Equity Quota currently is Twenty-Six

Not Reported in A.2d                                                                    Page 6
**(Cite as: 2002 WL 31820970, \*6 (Del.Ch.))**

Dollars ($26.00) per barrel delivered. During the term of this Agreement, Grower agrees to work toward, achieve, or maintain (as the case may be) holdings of Common Shares of the Cooperative having a par value equal to the amount resulting from multiplying the Common Stock Equity Quota by the average of the number of barrels of the three (3) most recent crops produced by the Grower on the land described in Exhibit A. The Common Stock Equity Quota may be increased or decreased in reasonable amounts by the Board of Directors of the Cooperative and any changes shall become effective upon written notice to the Grower."

Until redemption is actually sought, these allegations are not ripe. As mentioned above, nothing in the complaint alleges that Ocean Spray has attempted (or even threatened) redemption. This asserted harm is, therefore, entirely hypothetical. "Courts in this country generally, and in Delaware in particular, decline to exercise jurisdiction over cases in which a controversy has not yet matured to a point where judicial action is appropriate." [FN16] Because this Court cannot issue advisory opinions that purport to decide an issue before it is ripe, Count III is dismissed without prejudice.

> FN16. *Stroud v. Milliken Enterprises, Inc.,* 552 A.2d 476, 480 (Del.1989) ("Unless a controversy is 'ripe for judicial determination,' a court may simply be asked to render an advisory opinion. The law is well settled that courts will not lend themselves 'to decide cases which have become moot, or to render advisory opinions.')(*citing State v. Mancari,* 223 A.2d 81, 82-83 (Del.1966)).

*E. Count IV-Election Relief under § 225*

Count IV fails to state a claim upon which relief can be granted. Plaintiff alleges that the 2001 elections were improper because
  (1) the slate of nominees was improperly chosen;
  (2) the proxy statement was false and misleading;
  (3) misrepresentations/omissions occurred in connection with the votes at the meeting;
  (4) the shareholders were not given enough information to make an informed vote;
  (5) management denied supporters of the proposed sale or merger access to corporate records;
  (6) Ocean Spray failed to honor the agreement in the Massachusetts action by

  (a) failing to fairly disseminate the consultants' information regarding sale and merger;
  (b) failing to disclose the directors favoring each approach; and
  **\*7** (c) failing to allow an independent observer to serve as teller of the votes;
  (7) the vote tabulation was flawed.

The first allegation-that the slate of nominees was improperly chosen-does not state a claim because the board has the authority to submit its own slate of nominees and is not required to disclose why other nominees were not selected. Also, opposing slates were available to the shareholders; the board did not give the shareholders an all or nothing choice. Thus, this allegation in Count IV fails to state a claim and is dismissed.

The allegations relating to the Massachusetts action also fail to state a claim. The Massachusetts agreement was not part of the complaint, and the complaint fails to allege any nonconclusory details as to how that agreement was binding upon Ocean Spray. Plaintiff fails to allege that a failure to honor the alleged agreement constitutes a proper § 225 claim. This portion of Count IV is also dismissed.

The remaining allegations in Count IV fare no better. I note, initially, that rather than bring an action challenging the results immediately and seeking expedited review as § 225 contemplates, plaintiff waited eight months after the election process to file its complaint. Thus, the allegations regarding the allegedly flawed vote tabulation and the misrepresentations/omissions in connection therewith are insufficient as a matter of law. Specifically, plaintiff states that it voted over 120,000 shares, and none of them were for Director Pietersen. The voting results from the 2001 election, however, indicate that Pietersen received all but just less than 55,000 of the votes cast, or 3,486,084 votes, which constituted 98% of the vote. Even assuming for the sake of argument that plaintiff is correct regarding its 120,000 votes, Pietersen still received 95% of the vote, far in excess of the majority needed to prevail in the election.

Ultimately, the complaint fails to assert any flaws that would call the 2001 election into question. No improprieties in the election process are alleged. Nor is it alleged that the opposition slate in fact won the election. The only allegation is that an immaterial number of votes were miscounted. That is not sufficient, in my opinion, to state a claim under § 225.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
(Cite as: 2002 WL 31820970, *7 (Del.Ch.))

The remaining parts of Count IV-alleging that the shareholders were misinformed when voting-are just reiterations of the four allegations that survive under Count I. Count IV does not properly allege a § 225 claim with respect to these allegations since the appropriate relief-a new vote on the shareholder proposal-is properly requested under Count I and not Count IV. Thus, Count IV is dismissed.

*F. Count V-Declaratory Judgment*

Count V fails to state a claim upon which relief can be granted because the allegations are not yet ripe. Plaintiff seeks a declaratory judgment that:

(1) only a simple majority is needed to sell the assets of the company; and

(2) the provisions requiring involuntary redemption by plaintiff due to changes by the USDA and short term market conditions are invalid because they conflict with the certificate of incorporation.

**\*8** The first request is not ripe because no transaction has been proposed against which to assess this statement. Any decision by this Court on this question would be advisory. The Court can only determine the vote required when a transaction is proposed and the board takes a position regarding the required vote. [FN17]

> FN17. *See Stroud,* 552 A.2d at 480 (discussed *supra* at n. 16).

The second request is also not ripe. Ocean Spray has yet to ask for an involuntary redemption of Plaintiff's shares. As noted earlier, until that occurs the issue is not ripe. Accordingly, Count V is dismissed without prejudice.

*G. Count VI-Contractual Remedies*

Count VI fails to state a claim upon which relief can be granted because it is not yet ripe. Plaintiff alleges Ocean Spray violated its implied contractual duties of good faith and fair dealing by lobbying for a reduction in the amount of crop that plaintiff can produce and then implementing a provision that will cause forced divestiture of plaintiff's shares due to decreased production. Plaintiff also alleges that Ocean Spray failed to exclude the 2001-2002 growing year in the calculations to determine share ownership, as requested, even though it had done so in the past. The harm of these actions, however, does not occur until Ocean Spray seeks redemption. Plaintiff concedes in its complaint that no redemption has occurred. [FN18]

> FN18. *See* Compl. ¶ 197-198.

Until Ocean Spray seeks redemption, the allegations in the complaint are not ripe. The Court will not determine if a contract violation occurred before the alleged violation is even attempted. [FN19]

> FN19. *See Stroud,* 552 A.2d at 480 (discussed *supra* at n. 16).

Additionally, plaintiff states in its complaint that "Ocean Spray functions as an industry trade association, promoting the legislative agenda of growers." [FN20] If Ocean Spray is required to lobby on behalf of the cooperative, it seems incongruous to suggest that such lobbying violates an implied duty. Plaintiff admits that there is a glut of cranberries, [FN21] so it is reasonable to expect Ocean Spray to lobby to reduce that glut. Plaintiff agreed to comply with any federal regulations concerning the production of cranberries in paragraph six of the Cooperative Marketing Agreement. In fact, paragraph six states that "the Grower specifically agrees that it will not be entitled to any compensation or proceeds for cranberries not complying with the above requirements ..." Where an express provision that has not been violated discusses the area of the alleged implied breach, it is unlikely that such a breach occurred. [FN22]

> FN20. Compl. ¶ 29.

> FN21. Compl. ¶ 47.

> FN22. *See, e.g., Shenandoah Life Ins. Co. v. Valero Energy Corp,* 1988 Del. CH. LEXIS 84 (Del. Ch.).

The complaint fails to allege any implied contractual breach. The harm alleged has also not occurred. Accordingly, Count VI is dismissed without prejudice.

*H. Count VII-Common Law Fraud and Misrepresentation*

Count VII fails to state a claim upon which relief can be granted. Plaintiff alleges fraud by the defendants through material misrepresentations and omissions designed to cause plaintiff to vote against the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

shareholder resolution to direct the board to pursue a sale or merger of Ocean Spray. Plaintiff also alleges that the fraud caused it to rely on that information to its economic detriment. Plaintiff admits that it voted *for* the shareholder resolution to direct the board to pursue a sale or merger. Plaintiff also admits that it knew the correct information in light of the material misrepresentations because Mr. DeMarco, plaintiff's CEO, was on the Ocean Spray board when the board learned the allegedly correct information.

**\*9** A claim for fraud must meet the following five elements:

> 1) a false representation, usually one of fact, made by the defendant;
>
> 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
>
> 3) an intent to induce the plaintiff to act or refrain from acting;
>
> 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and
>
> 5) damage to the plaintiff as a result of such reliance. [FN23]

> FN23. *Gaffin v. Teledyne, Inc.,* 611 A.2d 467, 472 (Del.1992).

Plaintiff did not act in accordance with the defendants' recommendation, but instead voted *for* the shareholder resolution. Thus, no justifiable reliance can be shown.

Plaintiff argues alternatively that justifiable reliance is shown by the fraud to those shareholders who in fact voted *against* the resolution. But the reason fraud and misrepresentation claims are not suitable for class treatment is because reliance must be established on

an individual basis. [FN24] DeMarco cannot establish reliance here.

> FN24. *Id.* at 472-73.

### IV. CONCLUSION

The motion to dismiss with respect to Count I is denied in part. The four allegations listed earlier in the opinion state a claim for breach of the duty of disclosure. Should the four disclosure allegations prove to be material and false, plaintiff's requested remedy of a new vote on the shareholder proposal is the only relief that survives the motion to dismiss. Count I is dismissed as to all other disclosure allegations.

Plaintiff's allegations with respect to Counts III, V, and VI are not yet ripe. The divestiture alleged by DeMarco has not occurred, so a judicial determination cannot be made on these counts. Count VI also fails to properly plead a breach of any implied contractual duty. Counts III, V, and VI are dismissed without prejudice.

Count II is dismissed for failure to make demand upon the board and failure to adequately plead demand futility. Counts IV and VII are dismissed for failure to state a claim upon which relief can be granted. The motion to strike is denied because it is moot.

IT IS SO ORDERED.

2002 WL 31820970 (Del.Ch.), 28 Del. J. Corp. L. 698

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Not Reported in A.2d

1999 WL 39547 (Del.Ch.)

**(Cite as: 1999 WL 39547 (Del.Ch.))**

**C**

Page 9

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

APPLE COMPUTER, INC., Plaintiff,

v.

EXPONENTIAL TECHNOLOGY, INC., Gordon Campbell, Donald R. Shriner, George S. Taylor, Paul Dali and Eddie Kawamura, Defendants.

No. 16315.

Jan. 21, 1999.

Jesse A. Finkelstein, and Raymond J. DiCamillo, of Richards, Layton & Finger, Wilmington, Delaware, for Plaintiff.

William D. Johnston, and Matthew G. Zaleski, III, of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware; Michael H. Kalkstein, and David S. Elkins, of Graham & James LLP, Palo Alto, California, for Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, Chancellor.

*1 This is an action by Plaintiff Apple Computer, Inc. ("Apple") against Exponential Technology, Inc. ("Exponential") and its top director/officers (the "Directors"). [FN1] In its capacity as Exponential shareholder, Apple seeks (1) to set aside the sale of Exponential's patent portfolio (allegedly substantially all of Exponential's assets), (2) to have a custodian appointed to wind up Exponential's affairs, and (3) to nullify litigation support agreements with two defendant director/officers and Exponential's Chief Operating Officer. Exponential and its Directors argue that Apple's real motivation is to distract Exponential from its ongoing lawsuit against Apple for breach of contract brought in California state court (the "California Action"). Exponential has moved to dismiss or for partial summary judgment, and seeks to stay these proceedings.

FN1. At the relevant times. Gordon Campbell was Chairman of the Exponential Board of Directors. Donald R. Shriner was Exponential President and CEO and a director; George S. Taylor was Chief Technical Officer and a director; and Paul Dali and Eddie Kawamura were members of the board. Exponential and the Directors filed this motion together. To simplify the discussion. I refer to Exponential to describe their collective position.

I conclude that Apple has adequately pled a *prima facie* breach of 8 *Del. C.* § 271 by alleging that Exponential sold substantially all of its assets, its patent portfolio, without seeking shareholder approval. Even so, subsequent shareholder ratification would moot Apple's patent claim. Because it is unclear how the alleged failure of some Exponential shareholders to date their proxies would affect the ratification, however, I cannot consider partial summary judgment on that basis until the parties develop the record on this discrete question. At the same time, I conclude that a stay of counts I and II would not jeopardize Delaware adjudication of those claims, would permit the parties to use the California Action's evidentiary record on Apple's purported wrongdoing to assist valuation of Exponential's allegedly valuable chose in action against Apple, and would prevent this litigation from disrupting the California Action. Therefore, I will stay counts I and II pending the California judge's final judgment.

As for Apple's request for appointment of a custodian, I conclude that the facts as pled by Apple cannot sustain the remedy requested. Apple pleads facts showing that Exponential's management started closing operations in response to a drastically altered business environment and that management is currently pursuing a $500 million claim against Apple. I dismiss the request for appointment of a custodian for failure to plead facts showing that the Directors abandoned Exponential.

Apple claims that the litigation support agreements constitute gift or waste. Similarly, I find that the facts as alleged by Apple show that the agreements fall well within the range of reasonable compensation for services. Furthermore, Apple fails to plead particularized facts excusing it from making demand against the board. This claim too must be dismissed.

I. BACKGROUND

Apple is in the business of manufacturing and selling

personal computers, bundled with Apple's proprietary operating system, MacOS. Apple also markets name-brand computer peripherals and software. The company is incorporated and headquartered in California. Chiefly known for its Macintosh, PowerPC and-most recently-iMac computers, Apple runs a distant second to Microsoft Windows, Intel Pentium chip-based machines (the Wintel platform) in the global PC market.

**\*2** Exponential is a privately-held Delaware corporation based in San Jose, California. Until May 15, 1997, Exponential designed and marketed CPUs, specifically PowerPC CPUs, for the PC market. [FN2] Apple was one of Exponential's original investors, its largest shareholder, and biggest customer. In April 1994, Apple purchased 1.5 million shares of Exponential's freely convertible Series A Preferred Stock at $1 per share [FN3] and a warrant granting Apple the right to buy an additional 1.5 million shares of Series A at the same price. At the same time, Apple and Exponential executed an agreement to have Exponential "design, develop, prototype and test, and procure fabrication and assembly of" PowerPC CPUs according to an agreed upon schedule (the "Product Agreement"). [FN4]

> FN2. A central processing unit ("CPU") is the microprocessing chip that serves as the "brains" of a PC. "PC" stands for "personal computer." The PowerPC CPU is a reduced instruction set chip ("RISC") designed to serve as the brains of the PowerPC "open standard" hardware architecture jointly developed by IBM, Motorola, and Apple. Apple designed a version of the PowerPC running MacOS. More information on this technology can be found at IBM. *PowerPC Microprocessor product information.* http://www    .    chips.ibm.com/products/ppc/ overview/ (as of Dec. 17, 1998)

> FN3. This purchase constituted 25% of Exponential's outstanding preferred shares.

> FN4. Compl. ¶ 12.

In October 1996, Exponential and Apple entered into a second agreement setting forth the terms by which Exponential would sell its CPUs to Apple (the "Purchase Agreement"). The parties also modified the delivery schedule appended to the Product Agreement. They agreed that Exponential would deliver a 500 megahertz CPU to Apple by April 1, 1997.

In December 1996, Apple bought 519,480 shares of Exponential Series C Preferred Stock at $3.85 per share and a warrant to buy another 750,000 at the same price. This purchase confirmed Apple's status as Exponential's largest shareholder, giving Apple just under 10% of the voting preferred shares. [FN5] Apple placed one of its employees on the Exponential board.

> FN5. Apple believes that its Exponential preferred holdings constituted 9.53% of all outstanding shares if calculated on a fully converted basis. Compl. ¶ 13.

In late March 1997, defendant Donald R. Shriner ("Shriner"), Exponential's President and CEO, wrote Apple's management to inform them that Exponential could not meet its April deadline for developing a 500Mhz CPU and anticipated that the CPU would not be ready until at least September. Both parties are silent as to what transpired immediately afterward, but they agree that on May 22, 1997, Exponential sent its shareholders a letter [FN6] informing them that management had closed Exponential's San Jose facility and would soon decide whether to close the Austin facility as well. Exponential's management blamed Apple for its woes, stating in the letter that Apple refused to work out the parties' problems and forced Exponential out of business by effectively preventing Exponential from selling its CPUs to makers of Apple clones. The letter also stated that Exponential would seek a buyer for its patent portfolio, and Exponential did so. It sold its forty-five odd patents by auction to S3, a graphics chip maker and Delaware corporation, for over $10 million.

> FN6. Apple argues that the contents of Exponential's letter to its shareholders is not properly before the Court because it is attached to Exponential's Dorris Affidavit and not the complaint. Although I include the facts contained in the letter as background, the details contained in the writings do not alter the core facts pled in Apple's complaint and, furthermore, Apple references the letter in its complaint: (1) "Campbell informed Exponential's shareholders in writing that Exponential had been shut down permanently;" and (2) "Exponential announced that it had auctioned off the Patent Portfolio." Comp. ¶ ¶ 15, 16. Therefore, under *In re Santa Fe Pacific Corp. Shareholders Litig.,* it is proper for me to examine the contents of the letter, so long as I do not rely on its

truthfulness. Del.Supr., 669 A.2d 59, 68-70 (1995) ("Without the ability to consider the document at issue. 'complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure." ') (*citing Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991)). Even without the embellished facts, the core facts relevant to the disposition of this motion are contained in Apple's complaint.

Exponential is using those funds to pay off creditors and to underwrite a lawsuit it filed against Apple on September 15, 1997, in California Superior Court. [FN7] In the California Action, Exponential alleges Apple forced it out of business, claiming breach of contract, breach of fiduciary duty, and intentional and negligent interference with contractual relations and with prospective economic advantage. Exponential seeks damages in the amount of $500 million.

FN7. *Exponential Tech. Inc. v. Apple Computer, Inc.,* Cal. Sup.Ct. County of Santa Clara, Case No. CV768801.

*3 Concurrently, Exponential is winding up its CPU design-related operations. Exponential has laid off its employees and closed its doors. Effective September 24, 1997, its board approved litigation support agreements with defendants Donald Shriner and Gordon Campbell, Exponential Chairman ("Campbell"), as well as nondefendant Stephanie Dorris, Chief Financial Officer ("Dorris"). [FN8] The support packages cost Exponential a minimum of $23,200 and maximum of $66,000 per month. The agreement entitles Exponential to a minimum of 342 and maximum of 502 hours of work per month. Exponential prepaid Campbell, Shriner, and Dorris for a year's worth of their minimum salary under the litigation support agreements. (*See* Table 1 below.)

FN8. Shriner and Campbell receive $5,600 per month for thirty-two hours of work. Ms. Dorris is charged with not only litigation support, but continuing the winding up process. She is paid $12,000 per month for ninety-six hours work. If any one of them exceeds his or her hourly quota, each has the right to earn overtime pay at $125 per hour, but each individual's monthly salary is capped at $22,000 per month.

Table 1
Breakdown of Monthly Payments under Litigation Support Agreements

|  | initial hours | initial salary * | max hours overtime | max salary overtime ** | total hours | total salary |
|---|---|---|---|---|---|---|
| Shriner | 32 | $ 5,600 | 131 | $ 16,400 | 163 | $ 22,000 |
| Cambell | 32 | 5,600 | 131 | 16,400 | 163 | 22,000 |
| Dorris | 96 | 12,000 | 80 | 10,000 | 176 | 22,000 |
| Grand Total | 160 | $ 23,200 | 342 | $ 19,600 | 502 | $ 66,000 |

FN* Shriner & Campbell's initial salary is $175 per hour. Dorris' initial hourly wage is $125.
FN* * All three earn overtime at $175 per hour.

Apple filed a § 220 action in this Court seeking to inspect Exponential's books and records. Exponential reached agreement with Apple and turned over certain books and records. On April 13, 1998, Apple filed this action. Responding to Apple's claim that shareholder approval was required of the patent portfolio sale under 8 *Del. C.* § 271, Exponential asked its shareholders to ratify the sale. A majority of the common stock shareholders of record, and of the aggregated preferred stock (Series A, B, and C) shareholders of record, delivered written consents to Exponential ratifying sale of the patent portfolio.

Some of the shareholders failed to date the consents.

II. PARTIES' CONTENTIONS

Apple asserts three basic claims: (1) Exponential failed to allow its shareholders to vote on its sale of the patent portfolio; (2) Exponential's management abandoned the company and a custodian should be appointed; and (3) the litigation support agreements constitute waste of Exponential's assets. The following details the nature of Apple's claims, the parties' positions as to the motion to dismiss each

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

claim, and my decision as to each claim.

*A. Sale of the Patent Portfolio*

1. *Apple's Claims*

  Apple pleads three versions of the unlawful sale of assets claim. Count I alleges that Exponential's sale of the patents violated 8 *Del. C.* § 271 because the patents constituted "substantially all of its assets" and the sale was not put to the shareholders for a vote, much less approved by "a majority of stockholders entitled to vote thereon."   [FN9] Exponential's certificate of incorporation tracks the language of § 271 and Apple's count II claims that the sale breached that provision in Exponent's certificate. Count III alleges that Exponential's management breached its fiduciary duties and violated the shareholder franchise under *Blasius*   [FN10] by denying the shareholders the opportunity to vote on the sale.

      FN9. 8 *Del. C.* § 271.

      FN10. *Blasius Indus., Inc. v. Atlas Corp.,* Del. Ch., 564 A.2d 651 (1988).

2. *Exponential's Grounds for Dismissal/Partial Summary Judgment*

  *4 In its motion to dismiss, Exponential attacks the patent sale claims in four ways. First, it alleges that the sale did not constitute a sale of all or substantially all of Exponential's assets as a matter of law, so no shareholder right to approve the transaction arose. Second, it argues that Apple's failure to join S3 as a party to this action constitutes grounds for dismissal. Third, Exponential asserts that the shareholders' ratification of its patent portfolio sale after the fact moots counts I, II, and III and constitutes grounds for rendering summary judgment in its favor on those claims. Finally, Exponential alleges that as to the Directors, Apple has pled no facts showing breach of the duty of loyalty; therefore, Exponential's § 102(b)(7) certificate of incorporation provision moots all damages claims asserted against the Directors.

3. *Analysis*

  In evaluating a complaint subject to a motion to dismiss, I must deny the motion unless I am reasonably certain that the plaintiff cannot recover under any set of facts that could be proven to support the action. [FN11] Furthermore, I must accept all well-pled facts as true and grant all reasonable

inferences drawn from the pleadings in favor of the plaintiff. [FN12] Bearing in mind that plaintiff must give defendant only fair notice of the claim and that I am to liberally construe the complaint, my task is to dismiss only those claims that are deficient as a matter of law.

      FN11. *See Rabkin v. Philip A. Hunt Chem Corp.,* Del.Supr., 498 A . 2d 1099, 1104 (1985).

      FN12. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 n.6 (1988).

  As a preliminary matter, I note that counts I and II are identical for the purposes of this motion to dismiss. The certificate's language tracking § 271 creates a claim differing in no material way from the statutory claim described in count I. Both are directed against Exponential, not the Directors. On the other hand, count III's apparent invocation of *Blasius* review attempts to elevate the same factual allegations into more than a claim for breach of the duty of care and names the Directors, not Exponential, as the wrongdoers. That implication deserves scrutiny.

  Apple correctly states that a board's failure to comply with § 271 (if proven at trial) is a breach of fiduciary duty. Not all breaches of a shareholder vote-related statutory duty, however, invoke *Blasius.* [FN13] *Blasius* recognized that the shareholder franchise is a cornerstone of corporate democracy and cannot be subjugated to the board's desire to entrench itself. [FN14] *Blasius* and similar cases involve tactical maneuvers by incumbent boards seeking to ward off hostile acquirers and defeat dissident slates. In *Blasius* itself, the incumbent board appointed new members at the eleventh hour to preclude shareholders from filling those seats by electing a hostile acquirer's candidates . [FN15] Similarly, in *Aprahamian v. HBO & Co.,* the directors delayed a shareholder meeting to prevent the incumbent directors' electoral defeat. [FN16] In these cases, the board's duty of loyalty was not necessarily implicated in the traditional sense of self-dealing, but the potential for entrenchment in the face of a hostile acquisition-the type of situation also implicating the *Unocal* standard of intermediate review-did arise. [FN17] Therefore, the Court has carefully scrutinized board action implicating shareholder franchise rights in these situations because of the inherent possibility that the board will frustrate a shareholder vote in order to protect itself. [FN18]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FN13. *See, e.g., Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1377 (1996) (not applying *Blasius* because board took action affecting shareholder franchise in conjunction with shareholder approval of transaction).

FN14. *Blasius,* 564 A.2d at 659 (explaining "[w]hy the deferential business judgment rule does not apply to board acts taken for the primary purpose of interfering with a stockholder's vote, even if taken advisedly and in good faith.").

FN15. *See id.* at 663 (enjoining board's appointment of new directors because it impermissibly interfered with shareholder franchise by preventing shareholders from electing a majority of dissident directors at upcoming election).

FN16. Del. Ch., 531 A.2d 1204, 1206-07 (1987) (enjoining board from delaying director election where board's motivation was to prevent incumbents' defeat by dissident slate).

FN17. *See Stroud v. Grace,* Del.Supr., 606 A.2d 75, 92 n.3 (1992) (" Board action interfering with the exercise of the franchise often arose during a hostile contest for control where an acquiror launched both a proxy fight and a tender offer. Such action necessarily invoked both *Unocal* and *Blasius.* The two 'tests' are not mutually exclusive because both recognize the inherent conflicts of interest that arise when shareholders are not permitted free exercise of their franchise.").

FN18. *See Aprahamian,* 531 A.2d at 1206-07 ("In the interests of corporate democracy, those in charge of the election machinery of a corporation must be held to the highest standards in providing for and conducting corporate elections. The business judgment rule therefore does not confer any presumption of propriety on the acts of the directors in postponing the annual meeting.").

**\*5** Here, the patent sale for which a shareholder vote was allegedly required could not serve as an opportunity for entrenchment. It did not invoke either a traditional duty of loyalty conflict or an inherently suspect defense against a hostile bid or election of an insurgent slate. [FN19] A sale of assets is a business decision that might trigger § 271 obligations. In the

absence of a hostile acquirer or some other motivation for disenfranchising the shareholders, however, a board's unintentional failure to fulfill its supposed § 271 obligations, while perhaps constituting a breach of fiduciary duty, does not ordinarily trigger *Blasius* review. [FN20] Therefore, Apple has failed to meaningfully distinguish count III's alleged fiduciary duty breach from the statutory duty-of-care breach alleged in counts I and II. [FN21] Consequently, I treat count III as if it repleads count I (and count II), adding the Directors as defendants.

FN19. *See Stroud,* 606 A.2d at 91 ("The stringent standards of review imposed by *Stahl* and *Blasius* arise from questions of divided loyalty, and are well-settled.").

FN20. *See Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1376 (1996) (holding that application of the 'compelling justification' standard set forth in *Blasius* is appropriate only where the 'primary purpose' of the board's action is to interfere with or impede exercise of the shareholder franchise).

FN21. *Cf. Unitrin, Inc. v. American Gen. Corp.,* Del.Supr., 651 A.2d 1361, 1378-79 (1995) (holding that where a board deliberately employed legal strategies designed to frustrate or completely disenfranchise shareholders, this conduct violated Delaware law, but where the board's primary purpose was not to interfere with or impede exercise of the shareholder franchise, *Blasius* review was inappropriate). Based on *Unitrin* and *Stroud,* I distinguish Exponential's alleged breach of § 271 from a good faith breach of the duty of loyalty in *Blasius.* First of all, in *Blasius,* the offensive conduct, packing the board, was arguably taken in good faith only because the board misapprehended the law. Secondly, it was designed to disenfranchise the shareholders. Here, there was no such wrongful purpose involved in the sale of the patents.

My first task in evaluating Apple's allegation that Exponential and the Directors breached § 271 is to determine whether Apple pleads facts *prima facie* establishing that the patent sale required prior shareholder approval. To establish the framework of what type of asset sales fall under § 271, Exponential quotes *Signal Companies:*

The [*Signal* ] Court stated that 'all or substantially all' of the assets are involved if:
    the sale is of assets quantitatively vital to the

operation of the corporation *and* is out of the ordinary and substantially affects the existence and purpose of the corporation. [FN22]

> FN22. Defs.' Op. Br. at 16 (quoting *Gimbel v. Signal Cos.*, Del. Ch., 316 A.2d 599, 606 (1974)).

Exponential argues that under this standard, Apple's pleadings are conclusory. Exponential maintains that Apple fails to credit Exponential with the value of its California Action and that Apple's claim that the sale of the patents struck at the heart of Exponential's business purpose ignores the fact that Apple's breach of contract already irreversibly altered Exponential's purpose. Although Exponential may prevail on these factual arguments at trial, they constitute just that-factual arguments. Arguing that Apple's pleadings are conclusory because the claims fail under the fact scenario portrayed by Exponential misinterprets Apple's pleading burden.

Apple has stated that the $10 million sale of the patents precluded Exponential from continuing in the CPU design business and constituted the sale of Exponential's most valuable asset. Apple's pleadings give notice of this claim and if I adopt its version of the facts at trial, it is within the realm of realm of reasonable outcomes that I would agree that the patent sale should have been approved by the shareholders. For instance, Apple may be able to prove that the future, contingent value of the California Action was negligible and, furthermore, show that despite the drastically changed operating environment within which Exponential decided to sell its portfolio, the patent sale itself constituted a watershed event that fundamentally altered Exponential's business mission from designing CPUs to litigating the California Action. Under that set of facts, Apple might reasonably prevail.

*6 Exponential also seeks dismissal of the patent sale claims because Apple failed to join S3 as a party to this action. First, I find that S3's participation in this litigation is necessary only to the extent that Apple seeks rescission of the sale. If Apple seeks that relief, it must take the appropriate steps to add S3 to this action. I cannot, however, justify dismissing the entire claim at this juncture because of this potential shortcoming. [FN23]

> FN23. *See Russell v. Morris*, Del. Ch., C.A. No. 10009, Chandler, V.C. (Feb. 14, 1990), mem. op. at 15 (holding case "is not dismissed under Rule 19(b) [where joinder

is not feasible] upon failure of a plaintiff to join an indispensable party.").

Next, turning for a moment to the summary judgment standard, [FN24] Exponential argues that its post-transaction ratification of the patent portfolio sale moots Apple's claims. This argument requires me to interpret our decisions on the issue of ratification. [FN25] Our law divides improper acts by the board into two categories: void and voidable. Void acts, acts that are *ultra vires,* fraudulent, gifts, or waste, are legal nullities incapable of cure. Voidable acts, acts performed in the interest of the company, but beyond the authority of management, are also (if challenged by a shareholder or other person with standing) cause for legal relief. The difference is that if the shareholders ratify the voidable act after the fact, the ratification cures the defect and relates back to moot all claims. [FN26] Apple argues that failure to allow a shareholder vote on the sale of the patent portfolio violated the shareholders' statutory § 271 rights and, thus, was a void act that cannot be later cured. Exponential points out that Apple fails to plead any facts showing that Exponential acted in bad faith by not fulfilling its purported § 271 obligations. This leads Exponential to conclude that the patent sale claims, if viable, were mooted by the shareholders' ratification. Exponential cites *Michelson v. Duncan* as support for this position:

> FN24. Summary judgment is granted where the movant shows that no material facts are in dispute and the movant is entitled to judgment as a matter of law. Ch. Ct. R. 56. The movant's burden in this instance shall be to establish that ratification moots the claim as a matter of law (the legal standard) and show that the facts uncontrovertibly indicate that the patent sale was ratified by a majority of common and a majority of preferred shareholders (compliance with the standard). *See Hurtt v. Goleburn,* Del. Supr ., 330 A.2d 134, 135 (1974) (interpreting movant's burden under Superior Court's virtually identical Rule 56 and holding that moving defendant in medical malpractice case had to establish standard of care for medical profession (a mixed question of fact and law) and to establish that the facts undisputedly showed defendant's compliance with that standard).

> FN25. For a discussion of ratification issues, see *In re Wheelabrator Tech., Inc. Shareholder Litig.,* Del. Ch., 663 A.2d 1194 (1995).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 15
**(Cite as: 1999 WL 39547, \*6 (Del.Ch.))**

FN26. *See Michelson v. Duncan,* Del.Supr., 407 A.2d 211, 218-19 (1979).

It is the law of Delaware, and general corporate law, that a validly accomplished shareholder ratification relates back to cure otherwise unauthorized acts of officers and directors.

\* \* \*

It is only where a claim of gift or waste of assets, fraud, or *ultra vires* is asserted that a less than unanimous shareholder ratification is not a full defense.

\* \* \*

If shareholders have approved an otherwise voidable act, their approval extinguishes any claim for losses based on prior lack of authority of the directors to undertake such action. [FN27]

FN27. *Id.* at 219-20.

Despite the seemingly dispositive language in *Michelson,* our Supreme Court has not uniformly held that post-transaction ratification moots a shareholder claim based on a *voidable* act. Those instances where the Court allowed a ratified transaction to be disputed in court involved, however, the selfish acts of a majority shareholder, acts that implicated the duty of loyalty. [FN28] Here, that is not the case. Apple does not allege facts showing that Exponential's management intentionally sold off the patent portfolio to entrench itself or sold the patent to an entity controlled by management. In the light most favorable to Apple, the facts show that Exponential unintentionally, and in good faith, sold the patent portfolio without seeking shareholder approval.

FN28. *See, e.g., Kahn v. Lynch Comm. Sys.,* Del.Supr., 638 A.2d 1110 (1994); *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985) (shifting burden of persuasion under entire fairness to plaintiff to show transaction was unfair where defendants' obtained shareholder ratification of deal).

**\*7** Our Supreme Court has also held that where a board executes its functions in a grossly negligent manner, that behavior rebuts the business judgment rule and subjects the underlying transaction to entire fairness review. [FN29] I conclude that Apple has pled facts that sufficiently allege Exponential completely failed to even attempt to comply with its statutory obligation to seek shareholder approval under § 271. If true, this allegation constitutes gross negligence. [FN30] Therefore, without shareholder ratification, the board's breach of its duty of care would subject this sale to entire fairness review and the possibility of rescission or rescissory damages (putting aside the Directors' § 102(b)(7) defense). Nonetheless, Exponential's conduct, because it was not in bad faith, constitutes a voidable, not a void act.

FN29. *See Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 371 (1993) ("A breach of either the duty of loyalty or the duty of care rebuts the presumption that the directors have acted in the best interests of the shareholders, and requires the directors to prove that the transaction was entirely fair.").

FN30. If a board's uninformed, hasty approval of a merger constitutes gross negligence in breach of its duty of care under 8 *Del. C.* §§ 141 & 251(b), it follows that a failure to hold a shareholder vote under § 271 (and § 141) would constitute gross negligence in violation of the board's duty of care under that statute. *See Smith v. Van Gorkom:* In the specific context of a proposed merger of domestic corporations, a director has a duty under 8 *Del. C.* § 251(b), along with his fellow directors, to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders. Certainly in the merger context, a director may not abdicate that duty by leaving to the shareholders alone the decision to approve or disapprove the agreement.
Del.Supr. 488 A.2d 858, 873 (1985) (citations omitted).

Accordingly, since Apple has alleged facts that, at the motion to dismiss stage, appear sufficient to rebut the business judgment rule, the question is what effect will shareholder ratification have on the transaction? I understand the language in *Michelson* to support the proposition that ratification moots a good faith error such as alleged here. Even if the Directors (and Exponential) acted in a grossly negligent fashion by ignoring § 271, subsequent ratification of the patent sale by a majority of both common and preferred shareholders would invoke judicial review under the business judgment rule.

That conclusion seems particularly apt here because the harm alleged by Apple was precisely the *opportunity* to vote on the patent sale. [FN31]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Assuming § 271 was triggered, but overlooked, the ratification vote itself goes a long way in remedying the harm incurred by the erstwhile disenfranchised shareholders. Thus, I conclude that Exponential's board has already taken the step most appropriate to cure the injury alleged by Apple.

> FN31. To adopt Apple's argument that the patent sale was void would in effect create a *per se* rule that a board's violation of § 271 could never be cured. This Court eschews inflexible rules that cannot discriminate good faith acts from disloyal conduct. *See Blasius Indus., Inc. v. Atlas Corp.*, Del. Ch., 564 A.2d 651, 661 (1988) ("In two recent cases dealing with shareholder votes, this court struck down board acts done for the primary purpose of impeding the exercise of stockholder voting power. In doing so, a *per se* rule was not applied.").

Accordingly, Apple must resort to claims of gift or waste to overcome the presumption of validity that would cloak the ratified patent sale. As to a potential waste or gift claim, Apple admitted in its complaint that the patents were sold at auction for more than $10 million and has not alleged that the transaction constituted gift or waste. Therefore, shareholder ratification would moot counts I, II, and III.

That conclusion is hypothetical, however, because Apple raises a challenge to Exponential's ratification vote. Apple charges that the signers of 3,385,723 of the preferred stock consents voting in favor of ratifying the patent sale neglected to date their consents. 8 *Del. C.* § 228(c) requires that "[e]very written consent shall bear the date of signature of each stockholder." That condition is imposed in order to facilitate enforcement of § 228(c)'s sixty-day time limit for returning consents (measured from return of the first signed consent to the last). [FN32] Exponential does not dispute Apple's factual challenge, but argues that there is no possibility that the sixty-day limit was not fulfilled; therefore, Exponential urges that I should not accord Apple's technical dispute any weight. I cannot agree. I make no decision either way as to whether the undated consents are valid, but defer resolution of this issue to a later date. The parties need time to develop a record on this issue and to provide briefs on the legal implications of § 228(c)'s date requirement within the context of *ex post* shareholder ratification. For the moment, I cannot render summary judgment against counts I, II, and III when the factual basis for the shareholders' ratifying vote is controverted.

> FN32. That section commands:
> Every written consent shall bear the date of signature of each stockholder or member who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this section to the corporation, written consents signed by a sufficient number of holders or members to take action are delivered to the corporation by delivery to its registered office in this State, its principal place of business or an officer of agent of the corporation having custody of the book in which proceedings of meetings of stockholders or members are recorded. Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.
> 8 *Del. C.* § 228(c).

**\*8** Finally, Exponential argues that counts I, II, and III should be dismissed as moot under 8 *Del. C.* § 102(b)(7). Apple has not alleged any facts that indicate that the Exponential board's failure to seek shareholder approval was anything more than a good faith error. [FN33] To the extent that counts I, II and III seek monetary damages against the individual Directors, the claims are dismissed. [FN34]

> FN33. *See Arnold v. Society for Savings Bancorp*, Del.Supr., 650 A.2d 1270, 1286-88 (1994) (applying § 102(b)(7) to disclosure claims where plaintiff failed to plead facts implicating duty of loyalty); *Green v. Phillips*, Del. Ch.. C.A. No. 14436, Jacobs, V.C. (June 19, 1996), mem. op. at 14 (dismissing waste claim under § 102(b)(7) because plaintiff failed to plead facts showing board was interested in transaction or otherwise acting in bad faith).

> FN34. Count III is brought solely against the Directors and is accordingly dismissed.

* * *

Count III fails to state a *Blasius* claim. Counts I, II, and III are dismissed under § 102(b)(7) as against the individual Directors.

*B. Business Abandonment & Appointment of a Custodian*

*1. Apple's Claims*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Counts IV and V of Apple's complaint ask the Court to appoint a custodian to manage Exponential. Count IV asserts a claim under 8 *Del. C.* § 226(a)(3) and Count V asserts an identical claim arising from Exponential's bylaws, which track § 226(a)(3). Apple alleges that Exponential's board of directors has abandoned its design and marketing of CPUs and taken steps to wind up those operations. Apple also urges me to find that Exponential's pursuit of the California Action does not constitute a legitimate business activity for the purposes of § 226(a)(3). As to the latter argument, Apple draws an analogy to situations where courts have refused to assert personal jurisdiction over juridical persons whose only business in the state was to appear in litigation. [FN35] Apple believes that this Court should adopt the same reasoning that pursuing the California Action is not a business, in determining whether or not Exponential's Directors have abandoned its businesses.

> FN35. *See. e.g., Harman v. Stillwell,* Colo.App., 944 P.2d 665, 669 (1997) ("The few decisions from other jurisdictions upon the point support the conclusion that the commencement and maintenance of a lawsuit do not constitute transacting business for the purpose of a long-arm or similar jurisdictional statute.").

### 2. *Exponential's Grounds for Dismissal*

Exponential seeks to dismiss Apple's claim for failure to plead any facts supporting a crucial element of the claim. Exponential asserts that it may affirmatively defeat a § 226(a)(3) claim by showing either that it is in the process of winding up certain of its operations and paying off debts or in the process of pursuing the California Action. Either way, it argues, Exponential is conducting legitimate business activities that preclude a finding that the Directors have abandoned Exponential.

### 3. *Analysis*

As explained below, I dismiss counts IV and V because Apple alleges facts that, under every set of provable circumstances and reasonable inferences therefrom, fundamentally contradict the essential elements of an abandonment claim. The elements of Apple's claim are contained in the language of 8 *Del. C.* § 226(a)(3) itself, which requires the plaintiff to show "the corporation has abandoned its business and has failed within a reasonable time to take steps to dissolve, liquidate or distribute its assets." Former

Chancellor Allen noted that the operative words of § 226 are "abandoned its business." [FN36] He analyzed the phrase in two parts:

> FN36. *Giancarlo v. OG Corp.,* Del. Ch., C.A. No. 10669, Allen, C. (June 23, 1989), mem. op. at 4-6.

The first part asks, to what do the words "its business" refer?

* * *

Our law, expressly since 1967 (*see* Section 102(a)(3)) and implicitly from a much earlier date, has recognized that a corporation may validly be formed in order "to engage in any lawful activity." It would be a mistake and unwarranted to conclude that the legislature intended to insert the concept of a binding, limiting, original intention through the device of Section 226(a)(3) at the very time that it amended Section 102(a)(3).

*9 Accordingly, I conclude that "its business" does not refer to any original intention more narrow than the purposes clause of a corporation's charter. Rather, in my opinion, "its" business refers to any business within the purposes clause of the corporation's charter in which the corporation purports to be engaged.

Thus, it seems to me the dispositive question is not whether the present situation with respect to OG was or was not within the plan of its originators, but whether the corporation is engaging in any business whatsoever presently or has it "abandoned" all business. [FN37]

> FN37. *Id.*

Thus, as construed in *OG Corp.,* business is to be widely construed to include all legitimate activities-investing, manufacturing, providing services, etc.-in which a corporation may engage.

Former Chancellor Allen went on to investigate the second aspect of business abandonment: What constitutes abandonment? He concluded that it meant the directors had ceased to manage the assets of the company and were not engaging in any activities designed to either continue in business or liquidate. [FN38] What is implied in *OG Corp.,* but frequently overlooked, is that the act of liquidating does not demonstrate that management has abandoned its corporation. It shows that management is engaging in the process of terminating its businesses. A defendant

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

who shows at trial that the corporation is winding up can affirmatively defend against a request for appointment of a custodian. Of course, if the liquidation is taking place in an illegal or wrongful manner, that wrongdoing may disqualify the liquidation as legitimate "business" under the statute, but any wrongful business activity-such as illegal gambling-would run afoul of the corporation's charter as well as 8 *Del. C.* § 102(a)(3), and presumably would be disqualified as "business" under § 226(a)(3) . [FN39]

> FN38. *Id.* at 7-8 ("If the directors cease to manage the assets committed to them, if they abandon the business, they may be said to forfeit their claim to control those assets.").

> FN39. *See Rosan v. Chicago Milwaukee Corp.,* Del. Ch., C.A. No. 10526, Chandler, V.C. (Feb. 6, 1990), mem. op. at 13 (noting that defendant corporation's charter "authorized it to engage in any "lawful act or activity for which corporations may be organized").

In short, *OG Corp.* requires a plaintiff making a § 226(a)(3) claim to show that the corporation is engaging in no legitimate business activity. The claim must fail if the defendant directors can demonstrate to the contrary, *i.e.,* show that the business is still active (or passively investing) in one legitimate line of business or is in the process of liquidating. [FN40] In the context of evaluating a motion to dismiss, I may dismiss a claim if the plaintiff includes in its pleadings facts that incontrovertibly constitute an affirmative defense to a claim. [FN41]

> FN40. Even if the plaintiff meets this burden, the corporation has a "reasonable time" to begin liquidating. 8 *Del. C.* § 226(a)(3).

> FN41. *Wolf v. Assaf,* Del. Ch., C.A. No. 15339, Steele, V.C. (June 16, 1998), mem. op. at 8-9 (citing *Kansas Reinsur. Co. v. Congressional Mort. Corp. of Texas,* 20 F.3d 1362, 1366 (5th Cir.1987) for the proposition that "when a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate").

Apple's complaint is flawed in two distinct ways. First, Apple attempts to discredit Exponential's pursuit of the California Action as a legitimate

business activity. It makes the novel, but fundamentally inappropriate, analogy to cases involving a court's assertion of personal jurisdiction over somebody whose only "business" in the state has been to pursue a law suit. State courts outside Delaware have held that a juridical person who faithfully appears in court to resolve a dispute has not availed itself of the protections of that jurisdiction and, therefore, is not amenable to personal jurisdiction. [FN42] I do not quibble with the proposition that due process considerations preclude a court from bootstrapping personal jurisdiction for a second lawsuit onto a litigant's appearance in earlier or ongoing litigation. That rationale, however, is completely inapposite to the issue before me.

> FN42. *See Harman v. Stillwell,* Colo.App., 944 P.2d 665, 669 (1997): *Ohio Cas. Ins. Co. v. First Nat'l Bank.* Okla.Supr., 425 P.2d 934, 938 (1967) (holding that a foreign corporation was not "doing business" when it engaged in litigation in the state in determining the issue of jurisdiction and process in a suit filed against the foreign corporation.).

*10 Indeed, there is no need to draw an answer to this issue from analogy to jurisdictional disputes in sister states. The meaning of business under § 226 has been construed to include any activity permissible under a corporation's charter and 8 *Del. C.* § 102(a)(3). Pursuit of a legal claim in court is well within the range of acceptable-one may even say, common-activities in which corporations engage. Therefore, by admitting to Exponential's pursuit of the California Action and its execution of litigation support agreements with the two director defendants and its COO, Apple's own pleading contains an affirmative defense to its § 226(a)(3) claim: Exponential is engaging in a legitimate business activity.

Secondly, Apple takes the mistaken tack of showing Exponential's winding up process as proof that Exponential is in need of a custodian. As I stated before, the act of winding up or liquidating is grounds for *not* appointing a custodian. Apple pleads that Exponential laid off its employees, ceased operations, informed shareholders of the shutdown, and sold its patent portfolio, without pleading any (nonconclusory) facts alleging wrongdoing. Once again, Apple has alleged facts constituting an affirmative defense to § 226(a)(3). Those winding up functions show that Exponential has *not* failed within a reasonable period to take steps to dissolve,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

liquidate, or distribute its assets. The fact that Apple objects to Exponential's approach to winding up-in particular, Exponential's decision to pursue the California Action before finally liquidating-is of no import. [FN43] It takes more than allegations that a business is closing down in a reasonable fashion to state a claim under § 226(a)(3).

> FN43. As discussed later (§ III.C.3), Apple's references to Exponential's balance sheet and insinuations of wrongful asset transfers are conclusory.

\* \* \*

By admitting that Exponential is winding up certain operations and continues to pursue the California Action, Apple has pled facts that fatally undercut its § 226(a)(3) claim. Accordingly, I dismiss counts IV and V.

### C. Litigation Support Agreements

#### 1. *Apple's Claims*

Apple asserts two claims in count VI. First, it insinuates that the Directors are frivolously expending Exponential's dwindling resources. Second, it alleges that Exponential wasted corporate assets by agreeing to the litigation support agreements.

#### 2. *Exponential's Grounds for Dismissal*

Exponential points to the balance sheet used by Apple to document Exponential's supposedly dwindling asset base. It argues that the same sheet shows Exponential paid down its outstanding liabilities and increased shareholder equity in the period during which Apple alleges that Exponential's assets dwindled. As to the litigation support agreements, Exponential contends that Apple has failed to demonstrate that the board was incapable of fairly and independently examining Apple's derivative waste claim. Exponential adds that the agreements are so reasonable that no Court could ever find them to constitute waste.

Apple responds to the demand futility argument by insisting that a majority of the board members, namely, Campbell, Shriner, and Taylor, who approved the agreements, were not disinterested. Exponential admits that two directors, Campbell and Shriner, were interested. But Exponential disputes Apple's argument that defendant George S. Taylor,

director and former Chief Technical Officer ("Taylor"), was beholden to Campbell as an Exponential cofounder and, therefore, incapable of rendering an independent decision. Apple also offers the allegedly wasteful nature of the litigation support agreements as evidence that the Exponential board was incapable of exercising proper business judgment.

#### 3. *Analysis*

\*11 The rigorous standard for pleading elements of a waste claim contrasts with the liberal approach for evaluating dismissal of a waste claim. A count can be dismissed for failure to state a claim if no set of facts as alleged in the complaint support the relief sought. What this effectively means is that the Court must consider the various factual permutations possible within the framework of the plaintiff's allegations and conclude whether any one conceivable set of facts could possibly merit granting plaintiff relief. If so, the claim cannot be dismissed.

A claim of waste requires a diametrically opposite analysis. It requires the Court to determine whether the corporation has bestowed an asset upon another in exchange for something so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid. [FN44] This strict standard requires the Court to apply a reasonable person standard and deny a claim of waste wherever a reasonable person might deem the consideration received adequate. When this difficult standard is applied in the liberal context of a motion to dismiss, in order for the complaint to survive the motion, the Court must find that in any of the possible sets of circumstances inferable from the facts alleged under the complaint, no reasonable person could deem the received consideration adequate. Conversely, if in each possible set of factual circumstances inferable from Apple's allegations, I can conclude that a reasonable person would deem the litigation support (and winding up) services received by Exponential as adequate value in exchange for the fees paid to Shriner, Campbell and Dorris, I must dismiss the claim. [FN45]

> FN44. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 189 (1988).

> FN45. *See Steiner v. Meyerson,* Del. Ch., C.A. No. 13139, Allen, C. (July 18, 1995) ("If under the circumstances any, reasonable person might conclude that the deal made

sense, then the judicial inquiry ends.").

The facts as alleged by Apple are straightforward and not susceptible to a wide range of possible permutations. I evaluate Count VI assuming that Shriner, Campbell, and Dorris will receive the maximum amount possible under the litigation support agreements, $66,000 per month total. In return, Exponential can expect 502 hours of winding up and litigation support work. [FN46] Apple makes no credible allegations that this compensation will bankrupt Exponential or that Shriver, Campbell, and Dorris lack the ability or intent to provide their support services. Instead, Apple chooses to pillory Exponential's pursuit of the California Action and to insinuate that the litigation support agreements are extravagant extras donated to Shriver, Campbell, and Dorris in return for nothing. Apple's conclusory rhetoric cannot overcome the factual import of Apple's own allegations. Shriver, Campbell, and Dorris agreed to perform litigation support services and, in Dorris' case, to assist Exponential's operational shutdown. The exact pecuniary value of these services is hard to measure, but 502 hours of service per month falls well within the range of reasonable value to receive in exchange for consulting fees of $66,000. I need not evaluate the merits of the California Action itself to conclude that the lawsuit's existence constitutes a reasonable business purpose for entering into the litigation support agreements, and Exponential's undisputed shutdown merits employ of Dorris' efforts to wind up Exponential's operations. Under the allegations contained in Apple's complaint-ignoring its antagonistic aspersions-there is no factual scenario that would defeat my determination that the litigation support agreements are reasonable in scope and amount. Therefore, Apple's claim fails as a matter of law.

> FN46. By assuming the largest possible transfer of Exponential funds to Shriner, Campbell, and Dorris, I examine Apple's claim under the set of facts most favorable to the conclusion that the services received in return for that expenditure constitutes waste. If I were to assume either the minimum prepaid salary or any amount in between, I discern no material impact on my analysis here.

*12 As for Apple's generalized assertion that Exponential's assets are dwindling, conclusory remarks about dwindling assets and citations from a balance sheet do not constitute proper pleading of a waste claim. Except for the litigation support agreements, Apple does not document what assets were traded away or what inadequate consideration might have been received. The issue is not the size of the Exponential assets conveyed in contrast to the amount of assets remaining in Exponential, but the size of Exponential assets conveyed in comparison to the value received in exchange. Therefore, this "general waste" claim cannot survive Exponential's motion to dismiss. [FN47]

> FN47. Insofar as Apple's evidence of "general waste" is background information to its specific litigation support agreement claim, that background information does not alter my earlier conclusion that the specific claim is deficient as a matter of law.

Finally, I conclude as an additional basis for dismissing count VI that Apple fails to plead facts demonstrating demand futility. To assert a derivative claim, Apple must comply with Chancery Court Rule 23.1 and rebut the presumption of proper business judgment by pleading particularized facts raising "a reasonable doubt that (a) the directors were disinterested and independent, [or] that (b) the challenged action was otherwise the result of a valid exercise of business judgment." [FN48] Apple pled neither with particularity.

> FN48. Benerofe v. Cha. Del. Ch., C.A. No. 14614. Chandler, V.C. (Sept. 12, 1996), mem. op. at 13.

Exponential's board was comprised of five members. Exponential concedes that Campbell and Shriner were interested in the litigation support agreements. Apple claimed that a majority of the board was incapable of rendering proper business judgment and tries to substantiate this assertion by alleging that Taylor was not independent. Apple alleges that Taylor was not independent because "Campbell and Taylor founded Exponential together." [FN49] Apple would have me conclude that this one sentence pleads particularized facts establishing that Taylor did not maintain his independent discretion in approving the litigation support agreements because he was beholden to Campbell as an Exponential cofounder. Apple's allegation is conclusory. The factual predicate, that Taylor and Campbell are cofounders, falls far short of raising a reasonable doubt as to Taylor's disinterestedness. [FN50] Apple fails to plead facts that even suggest that a third Exponential director was incapable of exercising proper business judgment in approving the agreements.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 21
**(Cite as: 1999 WL 39547, \*12 (Del.Ch.))**

FN49. Compl. ¶ 46(b).

FN50. *See Benerofe, supra* note 48, mem. op. at 17 (finding "the fact that the corporation has one controlling shareholder does not, as a matter of law, establish that its directors are dominated or controlled by that shareholder").

Apple's second attempt at proving demand futility is to argue that the board's approval of the allegedly wasteful agreements itself constituted gross negligence. If so, the board's failure to inform itself adequately of the nature of the agreements and exercise due care in approving them would serve as grounds for excusing Apple's failure to make demand. [FN51] I have already concluded that the agreements did not constitute waste, but fell well within the parameters of the board's business judgment. Apple makes no particularized allegations of why the agreements were wasteful or how the board grossly neglected its duties in approving them. Therefore, Apple's conclusory attacks on the litigation support agreements cannot rebut the presumption of validity that attaches to those agreements. Apple has failed to allege gross negligence on the part of the Directors sufficient to excuse Apple from making demand.

FN51. *Id.* at 20 (weighing presumption of business judgment rule against particularized facts alleging gross negligence).

**\*13** Consequently, by failing to allege particularized facts raising a reasonable doubt as to the board's due care or disinterestedness in approving the litigation support agreements, Apple has failed to comply with Rule 23.1 and for this reason, too, I must dismiss count VI.

\* \* \*

Count VI is dismissed for failure to plead facts demonstrating waste and, additionally, for failure to meet the pleading requirements of Chancery Court Rule 23.1

*D. Motion to Stay*

1. *Exponential's Grounds for Stay*

Exponential bases its request for a stay as to counts I and II on the need to consider the outcome of the California Action in determining whether the value of that litigation as a chose in action precluded

application of § 271 to the patent sale. Exponential believes that a stay is merited under *McWane* [FN52] or *forum non conveniens.*

FN52. *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* Del.Supr., 263 A.2d 281 (1970).

2. *Apple's Counter-Argument*

Apple disputes the applicability of *McWane* because the California Action and this suit raise substantially different claims. Apple adds that the heavy burden placed on a movant under *forum non conveniens* precludes issuance of a stay. Apple advances the following reasons for denying the stay: (1) this action raises questions of Delaware law; (2) Exponential's failure to show prejudice in collecting evidence and bringing witnesses to Delaware mitigates against staying this action; (3) the dissimilarities between the California Action and this suit preclude deferring to that court's adjudication; and (4) this Court's expertise and expeditious treatment of § 226 matters compels rapid resolution here. Furthermore, Apple argues that even under *McWane,* the California Action cannot provide a basis for a stay because the California court is incapable of acting promptly and because the California court cannot grant all the relief requested in this action. Apple adds that a stay would enable the Directors to continue squandering Exponential's assets. [FN53]

FN53. Because I concluded above that Apple has not pled facts showing waste or abandonment of Exponential and its assets, Apple's argument that the Directors are squandering assets is unpersuasive and I do not address it further.

3. *Analysis*

This Court applies identical elements in evaluating a motion to stay under *McWane* and under *forum non conveniens:*

(1) The applicability of Delaware law;
(2) The relative ease of access to proof;
(3) The availability of compulsory process for witnesses;
(4) The pendency or non-pendency of a similar action or actions in another jurisdiction;
(5) The possibility of a view of the premises, if appropriate; and
(6) All other practical considerations which would make the trial easy, expeditious and inexpensive.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
(Cite as: 1999 WL 39547, *13 (Del.Ch.))

What distinguishes these standards is the background presumption against which the elements are applied. Under *McWane,* this Court evaluates the motion in light of our policy of discouraging forum shopping and preserving the plaintiff's original choice of a non-Delaware forum; if the elements support the movant's request, "discretion should be freely exercised in favor of the stay." [FN54] Under *forum non conveniens,* however, the presumption is that the Delaware action will proceed, and "[t]he burden rests with the defendant to prove 'the combination and the weight of the factors to be considered balance overwhelmingly in favor of the defendant." ' [FN55]

FN54. *McWane,* 263 A.2d at 283.

FN55. *Macklowe v. Planet Hollywood, Inc.,* Del. Ch., C.A. No. 13689. Steele. V.C. (Oct. 4, 1994). mem. op. at 8-9 (citations omitted).

*14 Despite the different emphasis, *McWane* and *forum non conveniens* serve the same purpose: to entertain "considerations of comity and the necessities of an orderly and efficient administration of justice" and to avoid "the wasteful duplication of time, effort, and expense that occurs when judges, lawyers, parties, and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts." [FN56] Moreover, both standards invoke the trial court's discretion. Where granted, a motion to stay is not a final decision on the merits, but an interlocutory order. Thus, appellate review of the trial court's decision is limited. The Supreme Court defines its task in this situation as restricted to a determination of whether the trial judge abused his or her discretion. *General Foods Corp. v. Cryo-Maid, Inc.* stands for the proposition that the trial judge's decision to grant or deny the motion, if supported by a reasonable interpretation of the facts, shall not be disturbed. [FN57]

FN56. *McWane.* 263 A.2d at 283.

FN57. Del.Supr., 198 A.2d 681, 684 (1964) ("Our function is not to substitute our judgment.... We can only examine the record to determine if possible whether or not there could be a reasonable difference of view upon the propriety of his act.").

Indeed, *Cryo-Maid* epitomizes the lenient appellate review of a non-final stay granted under *forum non conveniens.* The Court noted that the trial judge found that the parties' incorporation in Delaware had

been used to assert Delaware jurisdiction over a contract dispute that took place in Illinois and that invoked New York state law. [FN58] The *Cryo-Maid* Court found that the Chancellor seemed persuaded that plaintiff's motivation in choosing Delaware as the forum was to harass defendant as part of its strategic jockeying in the matter. [FN59] The Court noted, on the other hand, that the Delaware action was first filed, a factor traditionally mitigating against a stay, and that the Delaware plaintiff would need to add counterclaims in Illinois to get the relief sought in Chancery. [FN60] Balancing these factors, the Court held that the decision to stay or not stay resided with the trial judge and even if the Supreme Court disagreed with the result, it would not reverse the trial judge's grant of a stay. [FN61]

FN58. *Id.* at 682, 684.

FN59. *Id.*

FN60. *Id.* at 684.

FN61. *Id.* at 685 ("The matter is one to be determined as a discretionary act in the light of all facts and circumstances and in the interest of expeditious and economic administration of justice. The Vice Chancellor has decided upon this basis and there is in this record nothing which shows him clearly to have been wrong."). *But cf. McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* Del.Supr., 263 A.2d 281, 283 (1970) (reversing trial court's refusal to stay later-filed Delaware action as abuse of discretion). *McWane* expressly affirms the *Cryo-Maid* Court's holdings, so I will rely on the wide authority vested in me by that decision. *Id.* at 284.

Exponential now calls upon me to exercise that discretion. I must first decide whether to evaluate Exponential's motion under *McWane* or *forum non conveniens.* This threshold question turns on whether or not the out-of-state action is first filed and involves the same or similar parties disputing the same or similar issues. If the out-of-state action is not first filed or it involves significantly different parties or issues, *forum non conveniens* applies.

In this matter, the only remaining claims are the § 271 patent sale claims in counts I and II. The California Action, although filed before this action and involving substantially the same litigants, is a breach of contract and breach of fiduciary duty action arising from Exponential and Apple's business

relationship. Therefore, the nature of the actions is sufficiently disparate to preclude application of the *McWane* analysis. Exponential must meet the significant burden established by *Cryo-Maid*.

a. The Applicability of Delaware Law

**\*15** Apple's remaining claims arise from § 271 and the language in its certificate tracking the statute. Therefore, this dispute centers around questions of Delaware law best decided by this Court. It does not, however, require a summary proceeding, a factor that would emphasize the need to proceed with this matter immediately. For this element to factor in favor of Apple, I must conclude that by granting the stay, I relinquish the opportunity to decide these questions of Delaware law. In this instance, however, the California Action would not resolve those issues. I am reassured that when the stay lifts at the conclusion of that trial, it will be this Court to which the litigants turn for resolution of the § 271 claims and, consequently, accord this factor no weight. [FN62]

> FN62. The *Cryo-Maid* Court added the Delaware law element to motion-to-stay analysis to recognize this state's policy of deciding questions of Delaware law rather than having another jurisdiction handle them. *Cryo-Maid*, 198 A.2d at 683 (adding "whether or not the controversy is dependent upon the application of Delaware law which the courts of this State more properly should decide than those of another jurisdiction"). That policy is not implicated here, because, as with a motion to stay pending a motion to dismiss, the ultimate resolution of the Delaware legal issues remains with this Court.

b. The Relative Ease of Access to Proof

Exponential argues in favor of a stay because the California judge's award in that action will help this Court determine whether Exponential's chose in action had significant value at the time of the patent sale. I am not persuaded that the ultimate outcome of that trial will change this Court's analysis of the Directors' § 271 duties. To the extent that the value or non-value of Exponential's claim against Apple will affect this Court's evaluation of whether the patents constituted substantially all of the assets of Exponential, that value must be calculated based on what the Board knew at the time of the patent sale. To factor the eventual outcome of the litigation into the propriety of their valuation of the chose in action would effectively require the Directors to look into a

crystal ball and predict the future. What triggers § 271 is a sale of substantially all the company's assets. If the chose in action constituted enough value at the time of the sale to preclude application of § 271, that value must be determined as it was perceived at that time.

In this sense, however, evidence gathered in the California Action should be useful in resolving this § 271 dispute. (The opposite would not be true.) Exponential and Apple are in the process of establishing an evidentiary record in the California Action documenting and rebutting each other's alleged wrongdoing. This record of alleged wrongdoing will reflect what the parties knew at the time of the patent sale about Apple's alleged breach of contract and fiduciary duty. Relying on not only that evidence, but the California Court's assessment of that evidence's credibility and import will help the parties document what the Board knew about the California Action when the patents were sold. That knowledge in turn will enable me to me assess whether the chose in action's value precluded application of § 271 to the patent sale. Therefore, granting the stay would assist creation of a full record upon which to resolve Apple's § 271 claims. It would also save the litigants the time and effort wasted when simultaneously engaging in discovery for two related matters. A stay will prevent duplicative waste of effort by allowing the litigants here to review the California Action's record before embarking upon further discovery in this matter.

c. The Availability of Compulsory Process for Witnesses

**\*16** Neither party addressed serious concerns as to this issue in their briefs. I conclude that this element is irrelevant.

d. The Pendency or Non-Pendency of a Similar Action or Actions in Another Jurisdiction

This inquiry is broader ranging than the threshold issue of whether to apply *McWane* or *forum non conveniens*. It embraces tactical issues as well as the question whether the two actions will be duplicative. I have already determined that the substantive dispute of the California Action is not the same as the § 271 claims.

I did not conclude, however, that there is no strategic nexus between the two actions. Exponential accuses Apple of pursuing this action to disrupt Exponential's

California Action. In particular, it criticizes Apple's request to appoint a custodian as a strategic attempt to topple its litigation opponent's leadership. I did not factor this argument into my evaluation of Exponential's motion to dismiss because ulterior motives are irrelevant to my disposition of the parties' legal rights.

In the course of evaluating the most efficient scheduling of these parties' Delaware dispute, however, I do not think that it is an abuse of discretion to factor in the fortuitously coincidental, if not strategically advantageous, timing of Apple's suit. In doing so, I am not sanctioning Apple for pursuing the Delaware action. I will, however, note that Exponential's efforts vis-a-vis the California Action will be diverted to defending this action, if both proceed at the same time. Therefore, the presence of the earlier-filed California Action, while not deserving of the *McWane* analysis, does weigh in favor of a stay.

e. The Possibility of a View of the Premises if Appropriate

This element is irrelevant.

f. All Other Practical Considerations Which Would Make the Trial Easy, Expeditious, and Inexpensive

No other considerations have been addressed by the parties.

* * *

Having evaluated each factor, I will balance them to determine whether Exponential has shown that the circumstances overwhelmingly favor granting a stay.
. Although Apple's § 271 claims should be tried in Delaware, this element is of no consequence because the California court will not decide the substantive issues involved in this action and Apple will have its day in a Delaware court.
. Gathering of proof will be facilitated by a stay because conclusion of the California Action will provide a record to assist valuation of that action as it existed at the time of the patent sale;
. Pendency of a similar action in California favors a stay in order to allow the parties to focus on one matter at a time and avoid any fortuitous distractions that might arise from pursuing both

actions simultaneously; and
. Elements c, e and f are immaterial.

All of these factors favor granting the stay. The only countervailing prejudice to Apple would be the delay implicit in the stay. I conclude that the facts overwhelmingly support Exponential's motion [FN63] and I stay counts I and II in accord with "considerations of comity and the necessities of an orderly and efficient administration of justice." [FN64]

> FN63. *See Dimeling, Schreiber & Park v. Packaging Indus. Group, Inc.,* Del. Ch., C.A. No. 1157-K. Chandler, V.C. (Nov. 15, 1991), mem. op. at 4 ("The doctrine [of *forum non conveniens* ] empowers a Court to decline jurisdiction whenever considerations of convenience, expense and the interests of justice dictate that litigation in the forum selected by the plaintiff would be unduly inconvenient, expensive or otherwise inappropriate.") (citing *Monsanto Co. v. Aetna Casualty and Surety Co.,* Del.Super., 559 A.2d 1301, 1304 (1988)).

> FN64. *McWane,* 263 A.2d at 283.

4. *Summary*

*17 Counts I and II against Exponential are hereby stayed pending judgment in the California Action. I add the proviso that either party may submit a request for reconsideration of this order, if at any time it appears that the California Action is not proceeding towards a timely resolution because of the opposing party's delay, the California court's administrative backlog, or any other legitimate reason (except the requesting party's own intransigence.)

III. CONCLUSION

For the reasons set forth above, I dismiss counts I and II against the individual directors and counts III, IV, V, and VI, in their entirety, and I conditionally stay counts I and II against Exponential.

IT IS SO ORDERED.

1999 WL 39547 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Not Reported in F.Supp.2d
2002 WL 1632261 (N.D.Ill.)
(Cite as: 2002 WL 1632261 (N.D.Ill.))

**Page 25**

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Jeffrey DOLLENS and Jeff Vukovich, derivatively on behalf of Westell Technologies, Inc., Plaintiffs,
v.
Marc ZIONTS, J. William Nelson, Howard L. Kirby, Jr., Thomas A. Reynolds, III, Robert C. Penny, III and Melvin J. Simon, Defendants.

No. 01 C02826.

July 22, 2002.

Officers and directors moved to dismiss shareholders' derivative action. The District Court, Lefkow, J., held that: (1) shareholders sufficiently alleged that a demand on the board of directors before filing derivative action based on insider trading would have been futile, and (2) except for one corporate insider, claims for breach of fiduciary duty were not sufficiently alleged since there was no basis to infer from the complaint that any of defendants was a declarant or otherwise involved in making false or misleading statements.

Motion granted in part and denied in part.

[1] Corporations ☞320(5)

101k320(5)

Shareholders sufficiently alleged that a demand on the board of directors before filing derivative action based on insider trading would have been futile; shareholders adequately pled that five of the eight directors would face a substantial likelihood of personal liability that would prevent them from exercising impartiality in considering a shareholder demand. Fed.R.Civ.P. 23.1.

[2] Federal Civil Procedure ☞636
170Ak636

Except for one corporate insider, claims against officers and directors for breach of fiduciary duty based on alleged misrepresentations they made to the public in order to artificially inflate company's stock

price were not sufficiently alleged since there was no basis to infer from the complaint that any of them was a declarant or otherwise involved in making false or misleading statements. Fed.R.Civ.P. 9(b).

[3] Corporations ☞307
101k307

Delaware law permitted a separate claim of breach of fiduciary duty against officers and directors based on insider trading.

[4] Corporations ☞320(2)
101k320(2)

Shareholders could not bring a derivative action to recover expenses from a pending securities action involving company until the case has proceeded to final judgment or settlement.

[5] Corporations ☞320(7)
101k320(7)

Shareholders' derivative claim against officers and directors for damages based on company's "integrity in the market" and "loss of goodwill" was conclusional and insufficient because shareholders did not apprise defendants of the basis and extent of the alleged damages.

*MEMORANDUM OPINION AND ORDER*

LEFKOW, J.

**\*1** This case is before the court on the motion of defendants Marc Zionts ("Zionts"), J. William Nelson ("Nelson"), Howard L. Kirby, Jr. ("Kirby"), Thomas A. Reynolds, III ("Reynolds"), Robert C. Penny, III ("Penny") and Melvin J. Simon ("Simon"), [FN1] who are or were officers or directors of Westell Technologies, Inc. ("Westell"), to dismiss the consolidated complaint brought by two individual shareholders, Jeffrey Dollens ("Dollens") and Jeff Vukovich ("Vukovich"), derivatively on behalf of Westell. In their motion to dismiss, defendants contend (1) that the complaint fails to adequately plead a prerequisite to suit, namely, that a demand by plaintiffs on Westell's board of directors to take action against defendants on behalf of the corporation would be futile, (2) that allegations of fraud underlying the claims in Counts I and II are not pled with particularity as required by Federal Rule of Civil

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Procedure 9(b), and (3) that Count II fails to plead a legally cognizable theory of damages. For the reasons articulated below, the court grants in part and denies in part defendants' motion to dismiss.

> FN1. Defendants currently hold or held the following positions at Westell: Zionts was Chief Executive Officer ("CEO") from December 1997 until March 1, 2001 and a director from January 2000 until March 1, 2001; Nelson was President and Chief Operating Officer from December 1997 until March 1, 2001 when he became CEO succeeding Zionts and a director since January 2000; Kirby has been a director since March 2000; Reynolds has been a director since January 2000; Penny has been a director since 1998; and Simon has been the Assistant Secretary and Assistant Treasurer and a director since 1992.

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir.1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kennedy v. Nat'l Juvenile Det. Ass'n,* 187 F.3d 690, 695 (7th Cir.1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 977 (7th Cir.1999); *Zemke v. City of Chicago,* 100 F.3d 511, 513 (7th Cir.1996).

In addition to the mandates of Rule 12(b)(6), Federal Rule of Civil Procedure 9(b) requires "all averments of fraud" to be "stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994); *see also DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) ("Although states of mind may be pleaded generally [under Rule 9(b) ], the 'circumstances' must be pleaded in detail. This means

the who, what, when, where, and how: the first paragraph of any newspaper story.").

## FACTS

Plaintiffs' consolidated derivative complaint alleges the following facts, which are taken as true for purposes of this motion: Nominal defendant Westell, a Delaware corporation headquartered in Aurora, Illinois, is a provider of Digital Subscriber Line ("DSL") technology, which allows high-speed data to be transported through local telephone lines. (Compl. ¶ 13.) On May 9, 2000, financial analyst Charles Pluckhahn ("Pluckhahn") of Stephens, Inc., issued a report, stating "[o]n a conference call with analysts, Westell's management indicated that its largest customer of CPE [customer premises equipment] is still unannounced and this new customer would continue to be its largest during the coming fiscal year." Although this customer was "unannounced," Westell "leaked" to analysts that SBC Communications ("SBC"), was driving demand for Westell's DSL equipment. (*Id.* ¶ 14.) Specifically, another analyst, Joseph Bellace ("Bellace") of Jefferies & Co., reported on May 16, 2000 that:

> *2 Demand for DSL related equipment (about 44% of company revenues) continues to be very strong, with good visibility extending for the next three months. Accelerated deployment of DSL service by British Telecom and SBC Communications (an unannounced customer) are driving this performance.

(*Id.*) The net effect of these positive reports was that the price of Westell stock received a temporary bounce to close at $28 a share on May 17, 2000; on June 26, 2000, however, the price of stock closed at $14.6875 a share. (*Id.* ¶¶ 15-16.)

Despite the positive reports, defendants knew by late June 2000 that SBC would be cutting back its purchases of DSL modems from Westell. Defendants acquired this non-public information through their positions as directors and/or senior officers of Westell and their receipts of reports, attendance at meetings, and access to all of Westell's books, records and other proprietary information. (*Id .* ¶ 12.) Defendants realized that when this information became public, it would seriously affect Westell's revenues, earnings and price of common stock. (*Id.* ¶ 16.) Defendants thus embarked on a massive hype campaign to inflate the price of Westell's stock so that they could unload as much stock as possible before the news concerning SBC's cutbacks in purchases of Westell's DSL modems became public. (*Id.*)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

For example, Westell announced on June 28, 2000 that it entered into a new partnership (although it did not specify with whom or what company) to meet the "expanding demand" for its products because it was "running at full capacity in its existing Aurora facility." (*Id.* ¶ 17.) On June 29, 2000, Barry Sine ("Sine"), an analyst at Kaufman Brothers, reported that he spoke with Westell and that "[b]ased on the massive demand for DSL services by Westell's customers," he expected Westell to report strong results for the June quarter. (*Id.* ¶ 18.) He further reported "we believe SBC Communications will again be the company's largest account, despite the fact that it is still an unannounced customer." Sine then issued a "Strong Buy" rating on Westell with a price target of $65 a share. (*Id.* ¶¶ 17-18.)

On July 7, 2000, Bellace issued a "Buy" rating on Westell with a $50 price target. (*Id.* ¶ 19.) As a result of his consultations with officers at Westell, he projected that Westell's 2001 revenues (for the period April 1, 2000 to March 31, 2001) would be $400 to $425 million. As with Sine, Bellace did not know about SBC's cutbacks. On the same day Bellace issued his Buy report, Westell stock increased by 25%, ending at $19 a share.

On July 18, 2000, Westell issued what one analyst called a "blockbuster announcement." (*Id.* ¶ 20.) Westell announced that it had established a supplier relationship with SBC. Analysts following Westell responded with uniformly positive reports. On July 20, 2000, an analyst at Kaufman Brothers issued a report reiterating its "Strong Buy" on Westell and $65 price target. The report stated:

**\*3** Westell Technologies followed yesterday's blockbuster announcement that it had won SBC Communications (SBC $43 5/8) as a customer with second quarter results that were well above our estimate, consensus, whisper and even telepathic expectations.... The key driver of revenue was the company's DSL customer premises equipment (CPE) business, which posted $61.9 million in revenue, 40% higher than our estimate and up 282% sequentially.

\* \* \*

We are today more bullish on shares of Westell Technologies than ever.

(*Id.* ¶¶ 20-22.)

Similarly, on July 21, 2000 another analyst at Chase Hambrecht & Quist Inc. issued a report rating Westell a "Buy" with a $70 target. The report stated

that:

Growth was once again driven by rapid acceleration in the Company's DSL businesses; [w]e believe that the Company maintains numerous opportunities for additional upside as it continues to capitalize upon its strong relationships with its strategic partners....

\* \* \*

It appears that Westell's DSL businesses continue to fire on all cylinders.

(*Id.* ¶ 23.) As a result of Westell's announcement, the market's reaction was swift and dramatic. (*Id.* ¶ 21.) The price of Westell's common stock rose up to $28.50 a share by July 21, 2000 and closed at $30 a share on July 25, 2000.

From July 21 to August 1, 2000, defendants sold about 450,000 shares of Westell stock total, reaping proceeds of almost $11.5 million. (*Id.* ¶ 24.) Specifically, between July 21 and August 1, 2000, Zions, who had never sold any Westell stock before this time, sold 231,440 shares at between $28 and $29 a share or approximately 65% of his holdings, reaping proceeds of $5,557,730; on July 21, 2000, Nelson sold 100,000 shares at $27.38 a share or approximately 40% of his holdings, reaping proceeds of $2,738,000; between July 24 and August 1, 2000, Kirby, who had never sold any Westell stock before this time, sold 80,000 shares at between $22.79 and $29.09 a share or approximately 20% of his holdings, reaping proceeds of $2,057,700; on July 24, 2000, Reynolds sold 27,200 shares at $28.46 a share or approximately 30% of his holdings, reaping proceeds of $774,122; on July 25, 2000, Penny sold 4,098 shares at $30 a share, reaping proceeds of $122,940; and on July 25, 2000, Simon sold 5,000 shares at $30 a share, reaping proceeds of $150,000. (*Id.* ¶ 10(a)-(f).)

Only days after defendants unloaded their Westell stock, the real story about SBC's cutbacks emerged. In early August, Bellace reported that SBC had, beginning in June 2000, changed its purchasing requirements for DSL modems, and thus would be ordering fewer modems in the future from Westell. (*Id.* ¶ 25.) The stock price tumbled right back to the mid-to-high teens immediately upon release of the news (which was admittedly known by Westell management six to eight weeks earlier). (*Id.*) As was later reported by Pluckhahn, it was not merely a decline in usage by SBC that had caused Westell's problems but also that SBC had begun purchasing more from Westell's main competitor, Efficient

Networks. (*Id.*)

**\*4** On October 18, 2000, Westell admitted that the decline in orders from SBC would have a material negative effect on its revenues and earnings. Westell reported second quarter DSL revenues of $49.5 million, many millions lower than what it had assured analysts two months earlier. As a result of this announcement, Westell's stock price dropped to $5.94 a share on October 19, 2000.

Since the release of the various negative reports and with Westell's poor growth prospects, several Westell shareholders commenced a class action on or about October 27, 2000 against Westell (and others), alleging that Westell's public disseminations were materially false and misleading in violation of federal securities laws. [FN2] Further, on or about August 2, 2001, plaintiffs filed the instant derivative action against nominal defendant Westell and the six named defendants, alleging various breaches of fiduciary duties for insider trading and misappropriation of information under Count I and for exposing Westell to significant liability and damages under Count II.

> FN2. There is also the federal securities class action *In re Westell Technologies, Inc. Sec. Litig.,* No. 00 C 6735, which is related to the instant derivative action. (*See* Order, Sept. 4, 2001).

### DISCUSSION
### A. Dismissal for failure to plead demand futility

[1] In a derivative action, a shareholder plaintiff seeks to enforce a right that belongs to the corporation. *See Kamen v. Kemper Fin. Servs. Inc.,* 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). "[G]iven 'the basic principle of corporate governance that the decisions of a corporation-including the decision to initiate litigation-should be made by the board of directors or the majority of shareholders,' most jurisdictions require a pre-suit demand be made of the corporation's board of directors." *In re Abbott Laboratories Derivative Shareholders Litig.,* 293 F.3d 378, 386 (7th Cir.2002), quoting *Kamen,* 500 U.S. at 95. A pre-suit demand "allows the directors to exercise their business judgment and determine whether litigation is in the best interest of the corporation." *In re Abbott,* 293 F.3d at 386.

Federal Rule of Civil Procedure 23.1 requires the derivative complaint to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Because the requirement of a shareholder plaintiff to make a demand on the board of directors "is more than a pleading requirement, it is a substantive right of the shareholder and the directors[.] ... [T]he law of the state of incorporation ... controls these substantive rights and governs what excuses are adequate for failure to make a demand." *In re Abbott,* 293 F.3d at 387. Delaware is Westell's state of incorporation and the parties agree that Delaware law applies here.

Plaintiffs concede that they made no demand on Westell's board of directors prior to filing their complaint. However, they aver that a demand would have been futile because five of the eight directors on Westell's board personally benefitted from conduct alleged in their complaint and, therefore, were interested and could not have impartially responded to a demand. (Compl.¶¶ 11, 44.) In determining whether a demand would be futile, the court must consider whether

> **\*5** ... the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Rales v. Blasband,* 634 A.2d 927, 933-34 (Del.1993). [FN3] "To establish a reasonable doubt, plaintiffs are not required to plead facts that would be sufficient to support a judicial finding of demand futility ... [n]or must plaintiffs demonstrate a reasonable probability of success on the merits." *McCall v. Scott,* 239 F.3d 808, 816 (6th Cir.2001), citing *Grobow v. Perot,* 539 A.2d 180, 186 (Del.1988) and *Rales,* 634 A.2d at 934.

> FN3. Because plaintiffs assert that they are not challenging a business decision by Westell's board, the demand futility test in *Rales,* 622 A.2d at 934, and not *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984), applies here. *See In re Abbott,* 293 F.3d at 387, 388 n. 3.

"[W]hether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness and independence of a majority of the Board must be determined from the accumulation of all the facts taken together." *McCall,* 239 at

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

816-17. A director is interested when "he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a 'materially detrimental impact' on a director but not the corporation or its stockholders." *Id.* at 825, quoting *Rales,* 634 A.2d at 936. However, "the 'mere threat' of personal liability in the derivative action does not render a director interested[.]" *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995). Rather, "reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present 'a substantial likelihood' of liability on the part of a director." *McCall,* 239 F.3d at 825, citing *Rales,* 634 A.2d at 936. Moreover, "[e]ven if a director has no personal interest in a decision, his discretion must also be free from the influence of other interested persons." *Seminaris,* 662 A.2d at 1354. A director is independent if he can make a decision "based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Rales,* 662 A.2d at 936, quoting *Aronson v. Lewis,* 473 A.2d 805, 816 (Del.1984).

Defendants assert that the complaint fails to plead a substantial likelihood of liability on the part of the director defendants (Nelson, Kirby, Reynolds, Penny and Simon) because it does not attribute any of the alleged misrepresentations or knowledge of the SBC problems to these defendants. Defendants further contend the complaint alleges only that defendants are directors (with the exception of Nelson who also is CEO and Simon who also is the Assistant Secretary and Assistant Treasurer) and sold Westell stock, and rely primarily on *McCall,* 239 F.3d at 825. [FN4] Plaintiffs assert the director defendants were clearly interested because they knew public disclosure of the decline in orders by SBC would have a material effect on Westell's stock price and sold their stock from July 21 to August 1, 2000. Plaintiffs rely on *In re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 115-16 (S.D.N.Y. Mar.9, 2000) and *In re Cooper Companies, Inc. Shareholders Derivative Litig.,* No. 12584, 2000 WL 1664167, at \*6-7 (Oct. 31, 2000).

> FN4. Moreover, defendants argue the complaint fails to plead that there is a substantial likelihood of liability on the part of the director defendants because it does not allege they engaged in conduct more egregious than mere or gross negligence and also point to Westell's Charter, which precludes directors' liability for actions based on negligence or gross negligence under Section 102(b)(7) of the Delaware

Code, 8 Del. Laws 102(b)(7) (2000). Plaintiffs, however, apparently do not intend to pursue a claim for breach of duty of care (Resp. at p. 8) although they aver in their derivative complaint that "[t]he Director Defendants' sales of Westell stock, while in possession and control of this material, non-public information, was a breach of their fiduciary duties of loyalty, good faith, and *due care."* (Compl.¶ 37) (emphasis added). Thus, the court does not consider whether plaintiffs adequately plead demand futility based on defendants' alleged breach of duty of care or other negligent conduct. See *McCall v. Scott,* 239 F.3d 808, *reh'g granted,* 250 F.3d 997 (6th Cir.2001), addressing the demand futility exception with respect to directors' liability based on a breach of duty of care claim.

**\*6** In *McCall,* the court held that the plaintiffs' derivative complaint did not adequately plead demand futility under Delaware law based on insider trading allegations because it did not link the directors' alleged acquisition of non-public material information with their stock sales. 239 F.3d at 825-26. The court recognized that "when directors and officers own stock or receive compensation in stock, they should be expected to trade those securities in the normal course of events." *Id.* at 825. As such, it concluded "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.... Further, fraudulent intent may be inferred from the timing and quantities of the trades." *Id.* (internal citations and quotations omitted).

In applying these standards, the *McCall* court looked at the plaintiffs' factual allegations of insider trading over a two year period or from January 1995 to April 1997 and found that the plaintiffs only generally averred that some of the company's stock "at prices artificially inflated by the undisclosed fraudulent practices authorized or permitted by the Board." *Id.* Moreover, the court determined that some of these director defendants maintained their substantial holdings of company stock during this time period and that the plaintiffs also failed to plead, regarding certain directors, the "relative holdings or the timing of the transfers." *Id.* The court then concluded "[a]lthough relying upon the 'red flags' to allege that the directors knew or recklessly disregarded [the company's] improper policies and practices, plaintiffs failed to connect the timing of any of the stock transactions to

those warnings." *Id.* at 825-26.

In *In re Oxford Health Plans, Inc.,* 192 F.R.D. at 115-16, the court held that the plaintiffs properly pled demand futility where the director defendants knew of management's misrepresentations to the financial markets concerning the company's financial crisis but feared that taking action would harm the company's market price, result in increased regulatory oversight, slow the growth of the company, and jeopardize their personal and financial interests and their personal ties to the company's CEO. It further determined that any independence or disinterested status of the directors was lost because two of the director defendants sold company stock when they were in possession of material non-public adverse information and another director received substantial annual contract payments through the board.

In *In re Cooper Companies, Inc. Shareholders Derivative Litig.,* 2000 WL 1664167, at *6-7, the court held that the plaintiffs properly pled demand futility because three directors including the co-chairman profited from and/or participated in a fraud scheme to profit from the purchase and sale of bonds based on inside information. Further, it concluded that two directors lacked independence because they were corporate inferiors to the co-chairman and absented themselves from an emergency board meeting.

*7 After a review of these cases, the court concludes that plaintiffs' allegations do create a reasonable doubt that a majority of Westell's board of eight directors could have exercised disinterested and independent business judgment in responding to a shareholder demand. Defendants attempt to distinguish *In re Oxford Health Plans, Inc.* and *In re Cooper Companies, Inc. Shareholders Derivative Litig.* by arguing that the plaintiffs in those cases pled more particularized facts. Plaintiffs' allegations here, however, are similar to the facts pled in those cases because, although plaintiffs do not specify the exact manner in which defendants knew SBC would order fewer modems from Westell (Compl ¶¶ 10, 12), plaintiffs allege the director defendants learned about this non-public information by late June 2000 and sold their Westell stock when the price was artificially inflated by Westell's "blockbuster announcement" that it won SBC as a customer. Further, right after the director defendants sold their stock, the negative news of SBC's cutbacks became public and Westell stock declined from a high of $30 a share to the mid-to-high teens.

Moreover, unlike the facts in *McCall* where the court examined insider trading allegations within a time period of over two years or from January 1995 to April 1997, here plaintiffs' allegations focus on a ten day time period during which the director defendants sold their Westell stock. Specifically, plaintiffs allege Nelson unloaded 40% of his holdings between July 24 and August 1, 2000; Kirby, who never sold Westell stock before, unloaded 20% of his holdings on July 24; and Reynolds unloaded 30% of his holdings on July 25. Although in smaller amounts, still coincident in timing, Simon sold 5,000 shares, and Penny sold 4,098 shares on July 25, realizing profits of $150,000 and $122,940, respectively. [FN5] As to Simon, a director and the Assistant Secretary and Assistant Treasurer, and Penny, an outside director, plaintiffs do not allege that Simon or Penny unloaded large amounts of their personal holdings of Westell stock or that prior to that time period, they never traded their Westell stock. However, Delaware law provides that "where all the defendant directors allegedly engaged in insider trading within a matter of weeks based upon the same inside information, ... the insider trading claims should be viewed collectively." *Strougo v. Carroll,* No. 8040, 1991 WL 9978, at *4, 17 Del. J. Corp. L. 352, 362 (Del. Ch. Jan. 29, 1991) (unpublished); *see also In re Gen. Instrument Corp. Sec. Litig.,* 23 F.Supp.2d 867, 874 (N.D.Ill.1998), quoting *Strougo.* As such, plaintiffs have adequately pled that five of Westell's eight directors would face a substantial likelihood of personal liability that would prevent them from exercising impartiality in considering a shareholder demand. *See Strougo,* 1991 WL 9978, at *4, 17 Del. J. Corp. L. at 362 ("Common sense suggests that, at a board meeting at which plaintiff's demand might be considered, the defendant directors' interest in their own alleged wrongdoing would affect their decisions as to whether to sue their co-directors for the same alleged wrongs."). Accordingly, defendants' motion to dismiss for failure to plead demand futility is denied.

FN5. Plaintiffs include Zionts' sales of stock during that ten day period when arguing that the director defendants were interested. However, when plaintiffs filed their derivative complaint in August 2001, Zionts had not been a director for approximately five months or since March 2001. *Rales,* 634 A.2d at 934 (stating demand futility pled "as of the time the complaint is filed"); (*see also* Compl. ¶ 11.)

B. Dismissal for failure to plead fraud with particularity

**\*8** Alternatively, defendants argue that even if plaintiffs' demand is excused as futile, plaintiffs' complaint should be dismissed for failure to plead fraud with specificity in Counts I and II under Federal Rule of Civil Procedure 9(b). Plaintiffs respond (in a footnote) that they do not need to plead their claims for breach of fiduciary duty under Rule 9(b) (Resp. p. 10 n. 5) but plaintiffs also rely on *In re Cendant Corp. Derivative Action Litig.,* in which the court applied the Rule 9(b) standard. 189 F.R.D. 117, 131 (D.N.J.1999) (holding the plaintiffs pled fraud with particularity in their insider trading claim under Delaware law because the plaintiffs alleged the defendants knew at the time of their stock sales that the company's earning reports were inflated by accounting improprieties, which would cause the inflated price of the company's stock to fall down).

Although plaintiffs claim they are only alleging that defendants engaged in insider trading, they also allege that defendants made misrepresentations to the public in order to artificially inflate Westell's stock price. [FN6] Indeed, plaintiffs' derivative complaint arises from the same operative facts as those identified in the class action complaint in *In re Westell Technologies, Inc. Sec. Litig.,* No. 00 C 6735 (see Mem. Op. and Order, Oct. 26, 2001 at p. 20). [FN7] Therefore, the court will apply Rule 9(b). *See In re Gen. Instrument Corp. Sec. Litig.,* No. 96 C 1129, 1997 WL 610452, at \* 10 (N.D.Ill. Sept.24, 1997).

> FN6. Plaintiffs make the following allegations: Westell disseminated false and misleading information (Compl.¶ 4) and kept the public "in the dark about the nature and extent of the SBC problem" (*Id .* ¶ 19), and defendants engaged in "a massive hype campaign ... to inflate the price of the Company's stock[.]" (*Id.* ¶ 16.)

> FN7. Whether plaintiffs meet the Rule 9(b) standard involves another argument raised by defendants in their motion to dismiss, which is that Nelson, Kirby, Reynolds, Penny and Simon be dismissed for the same reasons the court dismissed Nelson, Kirby and Reynolds as defendants in the *In re Westell Technologies, Inc. Sec. Litigation,* No. 00 C 6735. Therefore, the court addresses that argument here as well.

[2] In the class action, the plaintiff alleged that defendants Zionts, Nelson, Kirby, Reynolds and other defendants not named in the instant derivative action violated the Securities Act of 1934 by knowingly and/ or recklessly making false and misleading statements to the class plaintiffs through press releases and conversations with analysts. Further, the plaintiff alleged that some of these defendants personally profited from these misrepresentations by selling their personal holdings to the class plaintiffs after artificially inflating the price of Westell stock. On defendants' motion to dismiss, the court found it could be reasonably inferred from the plaintiff's class complaint that Westell's spokesperson made the allegedly false and misleading statements as authorized by Zionts and other Westell top management. However, the court dismissed Nelson, Kirby and Reynolds as defendants because there was no basis to infer from the class complaint that any of them was a declarant or otherwise involved in making false or misleading statements even though it found the plaintiff alleged a strong inference of scienter based on insider trading as to Nelson, Kirby and Reynolds as well as Zionts.

[3] For these same reasons, all of the defendants except for Zionts must be dismissed with respect to any claims of breach of fiduciary duty based on alleged misrepresentations they made to the public since there is no basis to infer from plaintiffs' derivative complaint that any of them was a declarant or otherwise involved in making false or misleading statements. Nevertheless, Delaware law provides a separate claim of breach of fiduciary duty based on insider trading. *See In re Cendant Corp. Derivative Action Litig.,* 189 F.R.D. at 131 (D.N.J.1999); *accord Oberly v. Kirby,* 592 A.2d 445, 463 (Del.1991) ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such a profit or advantage is not gained at the expense of the fiduciary [,]" citing *Brophy v. Cities Serv. Co.,* 70 A.2d 5, 7 (Del.Ch.1949)). Thus, for the same reasons plaintiffs adequately pled demand futility, the claim for insider trading will remain against each defendant. Accordingly, defendants' motion to dismiss for failure to plead fraud with particularity is granted in part and denied in part with respect to Counts I and II.

C. Dismissal for failure to plead a legally cognizable theory of damages under Count II

**\*9** Defendants next move to dismiss Count II, asserting plaintiffs fail to plead a legally cognizable theory of damages. Specifically, defendants argue that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

plaintiffs' claims for damages based on Westell's potential exposure in defending class actions including significant legal liability and costs is premature and damages based on harm to Westell's integrity in the market and goodwill is conclusional.

[4] With respect to plaintiffs' claim for damages based on Westell's exposure to defending class actions, plaintiffs cannot bring a derivative action to recover expenses from a pending securities action involving Westell until the case has proceeded to final judgment or settlement. *In re United Telecomm., Inc. Sec. Litig.,* No. 90-2251-EEO, 1993 WL 100202, at \*3 (D.Kan. Mar.4, 1993); *cf. In re Symbol Tech. Sec. Litig.,* 762 F.Supp. 510, 516-17 (E.D.N.Y.1991) (holding that the derivative plaintiff could not seek litigation expenses associated with a securities class action that had not yet proceeded to final judgment or settlement under a claim for corporate waste). Thus, this claim for damages is premature and must be dismissed. *See In re Symbol,* 762 F.Supp. at 516-17.

[5] Moreover, with respect to plaintiffs' claim for damages based on Westell's "integrity in the market" and "loss of goodwill" (Compl.¶¶ 4, 27, 28, 41), this claim is conclusional and insufficient because plaintiffs do not apprise defendants of the basis and extent of the alleged damages. *In re United Telecomm.,* 1993 WL 100202, at \*2; *accord In re Symbol,* 762 F.Supp. at 517 (rejecting an injury in the marketplace theory and stating "damages must be shown to directly flow from the wrongful acts of

defendants, and not the mere commencement of legal proceedings against the corporation."). Therefore, this claim is dismissed. [FN8]

> FN8. However, where plaintiffs allege that defendants are liable to Westell under Count II (Compl.¶ 42), a claim for damages based on that allegation is legally cognizable since Delaware law "has long recognized the availability of a stockholder derivative action to recover profits obtained by corporate insiders through breach of their fiduciary duties." *In re Symbol,* 762 F.Supp. at 517. Therefore, that claim for damages under Count II must remain.

Accordingly, defendants' motion to dismiss Count II for failure to plead a legally cognizable theory of damages is granted in so far as plaintiffs plead damages based on Westell's defending the pending federal securities action (Compl.¶¶ 4, 27, 41) and Westell's loss of integrity in the market (*id.* ¶¶ 28, 41) and goodwill (*id.* ¶ 41).

### ORDER

Wherefore, and for the reasons stated above, defendants' motion to dismiss plaintiffs' verified derivative complaint [# 26-1] is granted in part and denied in part.

2002 WL 1632261 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Not Reported in A.2d                                        **Page 33**
2002 WL 31058540 (Del.Ch.)
**(Cite as: 2002 WL 31058540 (Del.Ch.))**
**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

Demetrios B. HASEOTES and George Haseotes,
individually and derivatively on
behalf of Cumberland Farms, Inc., Plaintiffs,
v.
Lily H. BENTAS and Cumberland Farms, Inc., a
Delaware corporation, Defendants.

No. Civ.A. 19155 NC.

Submitted April 9, 2002.
Decided Sept. 3, 2002.

William D. Johnston, Danielle Gibbs and John J.
Paschetto, of Young Conaway Stargatt & Taylor,
LLP, Wilmington Delaware; Robert J. Valihura, Jr.,
of Robert J. Valihura, Jr., PA, Wilmington, Delaware;
Rosanna Sattler, of Posternak Blankstein & Lund,
LLP, Boston, Massachusetts; and William F. Griffin,
Jr. and Thomas S. Fitzpatrick, of Davis Malm &
D'Agostine, PC of Boston, Massachusetts; for
Plaintiffs.

Jesse A. Finkelstein and Catherine G. Dearlove, of
Richards Layton & Finger, P.A., Wilmington,
Delaware; Jeffrey B. Rudman, John F. Batter, III and
Peter J. Kolovos, of Hale and Dorr, LLP, Boston,
Massachussetts; for Defendants.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.

*1 Pending is a motion to dismiss claims brought
both individually and derivatively on behalf of
Cumberland Farms, Inc. ("Cumberland Farms" or
"the Company") in this action by two director-
shareholders against the other two director-
shareholders. The feuding directors and shareholders
are all siblings. The defendants have moved to
dismiss (i) for failure to satisfy the demand
requirements of Court of Chancery Rule 23.1 and (ii)
for failure to state cognizable claims under Rule
12(b)(6). For the reasons next discussed, the Court
denies the Rule 23.1 motion in its entirety and the
Rule 12(b)(6) motion to dismiss as to the first cause

of action (Counts I-IV). The Court grants, however,
the Rule 12(b)(6) motion to dismiss the second cause
of action (Counts V and VI) for failure to state a
legally cognizable claim.

**I. FACTS**

A. The Parties

The facts recited below are derived from the well-
pled allegations of the complaint. The plaintiffs,
Demetrios B. Haseotes ("Demetrios"), a former Chief
Executive Officer of the Company, and his brother,
George Haseotes ("George") are directors and
shareholders of Cumberland Farms. Each of the
plaintiffs owns 2 shares of Cumberland Farms Class
A voting common stock and 30,253.5 shares of its
Class B non-voting common stock. Together, the
plaintiffs together hold 50% of the issued and
outstanding shares of each class of stock.

The defendants are Cumberland Farms and Lily
Bentas ("Bentas"), the Company's current CEO and a
director. Cumberland Farms is a closely-held, family-
owned Delaware corporation in the business of
operating and leasing gasoline stations and
convenience stores throughout New England, the
Mid-Atlantic states, and Florida. The Company's
principal place of business is located in Canton,
Massachusetts.

The Company has four directors: Demetrios, George,
Bentas, and their brother, Byron Haseotes ("Byron"),
who is not named as a defendant. Bentas is a
shareholder, Chairman of the Board, CEO, and
President of Cumberland Farms. She owns 2 shares of
Class A voting common stock, and 7,566 shares of
Class B non-voting stock, representing 25%
and 6.25%, respectively, of the issued and
outstanding shares of each class. Together, Bentas
and Byron own 50% of the Company's Class A voting
stock.

The plaintiffs, Demetrios and George, have sued
Bentas derivatively and individually. They claim that
Byron is part of a "director faction" with Bentas, and
that Bentas is attempting illegally to seize control of
the board of directors and the Company.

B. Background of the Dispute

In December 1993, the Company underwent a
federal bankruptcy reorganization. Before that time,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the Board consisted only of the four above mentioned "family directors." Under the approved terms of the Bankruptcy Court, the Company's certificate of incorporation was amended to add five "independent directors," who were selected by Bentas and the Creditors Committee. The non-family directors' terms expired when the Company's debt obligations were satisfied in December 1998. After the Company emerged from bankruptcy, the four family directors were, once again, the only members of the Board.

**\*2** Since at least 1998, there has been dissension among the four siblings about who should control the Company. Bentas proposed to create a Board structure that would include non-family directors and thereby eliminate the plaintiffs' ability to deadlock the Board. The plaintiffs rejected that proposal. After the bankruptcy was concluded and the Board returned entirely to the control of the four "family directors," the two opposing camps--with Demetrios and George on one side and Bentas and Byron on the other--could neither agree upon nor cooperate to resolve many critical issues. The result was a deadlock that prevented the Board from having a productive meeting at which meaningful decisions were made, from December 1998 until April 2000.

To end the Board deadlock, in June 1999, Bentas and Byron sought the appointment of a Court-appointed custodian in a previous action filed in this Court. [FN1] In November 1999, the Court in that action denied Bentas' and Byron's motion for summary judgment on the custodianship claim, and ordered the parties to conduct a stockholders' meeting for the purpose of electing a board of directors.

> FN1. *Bentas v. Haseotes,* Civ. Action No.
> 17223.

Unfortunately, the Court-ordered shareholder meeting did not eliminate the deadlock. Bentas and Byron were reelected, because Demetrios and George voted for them. The plaintiffs, however, continued in office as holdover directors, because Bentas and Byron did not vote for them. Because it appeared likely that the Board impasse would persist unchanged, this Court issued a Memorandum Opinion in March 2000 determining that a custodian should be appointed. Thereafter, in April 2000, R. Timothy Columbus, Esq. was appointed as Custodian.

In April 2000, the plaintiffs filed a lawsuit in the Superior Court of Massachusetts alleging claims similar to those pled here. [FN2] The defendants

moved to dismiss that suit, and the Massachusetts Court dismissed the case on the grounds of *forum non conveniens,* to enable this Court to determine the claims.

> FN2. *Haseotes v. Cumberland Farms,* Civ.
> Action No. 00-1435-H.

C. Facts Relevant to the Claims

1. *The Allegations of Wrongful Conduct*

The plaintiffs' claims center upon an alleged scheme by Bentas to entrench herself in her position as a director and officer, and to marginalize the voices and roles of Demetrios and George. The plaintiffs claim that Bentas attempted to carry out this plan in two ways: first, by wrongfully conditioning a refinancing of existing corporate debt upon the plaintiffs' agreeing to enlarge the Board, and second, by attempting to obstruct the plaintiffs from obtaining corporate information to which they were entitled.

Specifically, the complaint alleges that in September 1998 the Company owed approximately $150 million in long-term debt to various creditors. That debt, which would mature in 2003, carried with it a weighted-average interest rate of approximately 10% per year. In early 1999, upon the recommendation of the plaintiffs, the corporation's officers were encouraged to explore refinancing alternatives to reduce the Company's interest expense. Proposals from several financial institutions were solicited and studied. In April 1999, Donald E. Holt, the Company's Chief Financial Officer, selected Freidman, Turbidy & Company ("Freidman, Turbidy") to carry out a private placement of $150 million of debt to refinance the older, higher interest debt. It is alleged that this private placement would have resulted in interest savings of approximately 3%, or $4.5 million per year, until maturity.

**\*3** According to the plaintiffs, after Mr. Holt initiated the refinancing plan, Bentas instructed him and other Company employees to abandon the refinancing effort and to suspend payments to Freidman, Turbidy. The plaintiffs claim that Bentas did that to further her scheme to expand the Board. Specifically, they claim that Bentas refused to allow the refinancing to proceed unless and until Demetrios and George agreed to add new members to the Board, which would dilute the plaintiffs' power as directors and the effectiveness of their dissenting voices.

After Bentas terminated the effort to refinance Cumberland Farms' debt, the plaintiffs sought to revive the process. They contacted corporate officers in an effort to obtain the information required for them to proceed. In response, Bentas, without Board approval and in her capacity as a corporate officer, promulgated a memorandum entitled "Procedures for Directors' Requests for Information and Operational Advice" (the "Memorandum"). The effect of those procedures was to require non-management directors to channel all requests for information through the corporate secretary, who would then determine whether it was in the "best interests" of the Company to divulge the information to the director who requested it.

A similar memorandum, distributed to all corporate vice presidents, prohibited all Company employees from providing information to non-management directors or from taking directions, suggestions, or advice from those directors, upon their request. These director requests were to be sent to the corporate secretary, who in turn would send them to Bentas. The Memorandum provided that the procedures would be "strictly enforced." This information policy directive, the plaintiffs claim, was essentially an effort by Bentas to coerce the plaintiffs into acquiescing in her plan to elect other like-minded directors who would be allied with her. The complaint does not allege that the plaintiffs were deprived of any essential information as a result of this new policy.

2. *The Causes of Action*

The Complaint alleges two claims. The first is derivative, and the second is an individual.

The First Cause of Action (Claims I-IV) charges the defendant, Bentas, with breaching her fiduciary duty to Cumberland Farms by preventing the refinancing of the Company's debt, in order to further her personal goal of entrenching herself at the Company's expense. The plaintiffs seek judgment in Cumberland Farms' favor against Bentas, in an amount equal to the lost interest savings, plus pre-judgment and post-judgment interest.

The Second Cause of Action (Claims V and VI), is an individual claim that seeks to nullify the 1999 Bentas information policy directive designed to prevent non-managerial directors (i.e., the plaintiffs) from seeking corporate information directly from officers and employees.

## II. THE APPLICABLE LAW AND THE PARTIES' CONTENTIONS

The defendants advance two separate grounds in support of their motion to dismiss. The first is that the complaint fails to comply with the demand requirements of the Court of Chancery Rule 23.1. The second is that the plaintiffs have not stated a claim upon which relief can be granted under Rule 12(b)(6).

*4 Under Rule 23.1, for the plaintiffs to demonstrate that they have standing to maintain a derivative action, they must first make a demand on the Board to provide the directors an opportunity to address the claim. [FN3] Failing that, the plaintiffs must show that they were excused from making a demand, on the basis that a demand would have been futile. [FN4] Because the plaintiffs here did not make a demand upon the Board, they must establish that a demand would have been futile. [FN5]

> FN3. *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 730 (Del.1988).

> FN4. *Id.*

> FN5. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984).

Where the lawsuit attacks a decision made by the board, the appropriate futility standard is that articulated in *Aronson v. Lewis.* [FN6] Here, however, no Board decision is being challenged. Rather, the decisions attacked were made by Bentas in her capacity as an officer. Therefore, the rule articulated in *Rales v. Blasband* is the appropriate standard for determining whether demand is excused. [FN7] That standard has been articulated by the Delaware Supreme Court thusly:

> FN6. *Id.* at 814.

> FN7. *Rales v. Blasband,* 634 A.2d 927 (Del.1993).

[I]t is appropriate in these situations to examine whether the board that would be addressing the demand can impartially consider the merits without being influenced by improper considerations. Thus, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time of the complaint is filed, the board of directors

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

could have properly exercised its independent and disinterested business judgment in responding to the demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile. [FN8]

FN8. *Id.* at 934.

Thus, the plaintiff must plead with particularity facts creating a reasonable doubt that at the time the complaint was filed, the Board could have exercised a disinterested and independent business judgment in responding to a demand. [FN9] Whether or not a demand would have been futile is gauged solely from the non-conclusory factual allegations of the complaint. [FN10] A lack of independence may be shown where the particularized facts pled in the complaint establish a reasonable doubt whether the director is able to consider impartially a demand when "financial, familial, or other relationships" with the conflicted director are implicated. [FN11]

FN9. *In re Cooper Companies, Inc. Shareholders Derivative Litigation,* 2000 Del. Ch. LEXIS 158 (Del. Ch. Oct. 31, 2000).

FN10. *White v. Panic,* 783 A.2d 543, 548 (Del.2001).

FN11. *Grimes v. Donald,* 673 A.2d 1207, 1216 (Del.1996).

In short, the Rule 23.1 issue is whether the Complaint contains particularized factual allegations that establish that it would have been futile to make a demand. That issue is addressed in Part III A of this Opinion.

The defendants also seek dismissal under Rule 12(b)(6) for a failure to state a claim upon which relief can be granted. In considering that motion, the Court will assume that all well-pled allegations of the complaint are true and will give the plaintiff the benefit of all reasonable inferences that can be drawn from the pleading. [FN12] To obtain a dismissal, the movant must demonstrate that the non-moving party would not be entitled to relief under any of the facts (or reasonable inferences therefrom) alleged in the complaint. [FN13] Where the factual allegations are conclusory in nature, those allegations will not be accepted as true for purposes of the motion. [FN14]

FN12. *Grimes* at 1213-14.

FN13. *Siegman v. Tri-Star Pictures, Inc.,* 1989 Del. Ch. LEXIS 56 (Del. Ch. May 5, 1989, revised May 30, 1989), slip op. at 32 (*citing Harman v. Masoneilan Int'l, Inc.,* 442 A.2d 487, 502 (Del.1982).

FN14. *Id.*

*5 The Rule 12(b)(6) motion is addressed in Parts III B 1 and B 2 of this Opinion.

### III. ANALYSIS
#### A. The Rule 23.1 Motion

I first consider whether the complaint must be dismissed for failure to make demand upon the family directors, in particular, Byron Haseotes. Thereafter, I address the demand issue as it relates to the Custodian.

##### 1. *Demand upon the Family Directors*

The focus of the demand futility analysis is whether the complaint creates a reasonable doubt that, as of the time the complaint was filed, the Board could have properly exercised its independent and disinterested business judgment in responding to a demand. The Cumberland Farms Board consists of four members, two of whom are the plaintiffs. The third director, Bentas, must be assumed to be incapable of exercising independent and disinterested judgment on the issue of whether to cause Cumberland Farms to sue her. That leaves only the fourth director--Byron. If Byron would not have been capable of exercising a disinterested and independent judgment regarding whether to sue his sister, then the entire Board would be conflicted, indeed, deadlocked 2-2. Demand would therefore be futile and, thus, excused. Accordingly, the focus of the demand analysis is upon whether Byron was disinterested and independent.

I conclude that the facts alleged in the complaint create a reasonable doubt whether Byron could impartially consider a demand. The complaint alleges that Bentas and Byron have voted as a bloc on all issues that have come before the Board. Indeed, the complaint characterizes Bentas and Byron as a "faction." The complaint also describes Byron as a "lock-step ally" who in the past has refused to initiate litigation against his sister, while having no similar inhibition against suing his brothers, the plaintiffs. Specifically, in *Byron Haseotes v. V.S. Haseotes &*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*Sons Limited Partnership et al.,* [FN15] Byron sued the family Partnership claiming that he was owed over $2 million. Byron sued Demetrios and George as general partners who were liable for the debts of the partnership. Byron did not, however, join Bentas as a defendant, even though she was also a general partner. Byron's lawsuit was initiated in January 2001, after the deadlock had occurred, and after the two opposing camps had formed within the Cumberland Farms Board.

FN15. Civ. Action No. 01-0086-A.

The defendants insist, that the plaintiffs have alleged no particularized facts that would establish that Byron had a conflicting interest or lacked independence. Because of Byron's substantial ownership interest in the Company, the defendants urge, Byron's interests are perfectly aligned with those of the firm. Accordingly, if the refinancing would be profitable to the Company, Byron would be capable of objectively considering a lawsuit against Bentas for having blocked that refinancing. Furthermore, the defendants argue, there is no claim that Byron played any role in terminating the refinancing efforts or in implementing the new information procedures, or that Byron otherwise sought to entrench himself.

*6 I cannot agree with the defendants' arguments. The plaintiffs have pled facts from which it is reasonably inferable that Byron had countervailing interests which could disable him from disinterestedly and objectively considering a demand. If, as the plaintiffs allege, Bentas and Byron constituted a "faction" that voted together on all disputed issues, it is reasonable to conclude that Byron would be more strongly motivated to support his sister rather than oppose her to promote the short-term increase in the value of the Company. At least at the pleading stage, there is reason to doubt that Byron could have responded disinterestedly to a demand.

Regarding independence, the defendants contend that the facts do not show that Byron was dominated or controlled by Bentas. They brush aside any adverse inference that the plaintiffs draw from Byron's failure to sue Bentas in *Byron Haseotes v. V.S. Haseotes General Partnership,* arguing that that suit was against the partnership, of which Bentas was a general partner. Therefore, defendants urge that in substance, the litigation was as much a suit against Bentas as it was against Demetrios and George.

Again, I cannot agree. The complaint alleges that the

Board was equally divided on virtually all issues that came before it, that Byron and Bentas consistently voted together, and that they share a common vision for the Company's future. Those factual allegations create a reason to doubt whether Byron could consider a proposal to sue an ally (Bentas) whose decisions would be directed towards accomplishing and implementing that common vision. Buttressing that doubt is Byron's suit against the family partnership, in which he named as a defendants all of the general partners except Bentas. If Bentas and Byron were so closely aligned as alleged here, there is reason to question whether Byron has ceded to Bentas his ability to vote independently. Therefore, a reasonable doubt has also been shown as to whether Byron could independently consider a demand. [FN16]

> FN16. The defendants also make a third argument regarding this issue of demand based on the "second prong" of the test articulated in *Aronson.* However, this argument lacks merit because, as already mentioned, *Aronson* is not the applicable futility standard.

### 2. *Demand upon the Custodian*

The defendants next argue that the Custodian was capable of considering a demand impartially and that the plaintiffs have failed to plead facts that would excuse a demand upon the Custodian. In my view, that argument lacks merit as well.

The flaw in this argument is that it rests upon an invalid premise. The Custodian was appointed by the Court and was vested with the power to vote on certain matters of corporate governance when the Board was deadlocked. The Amended Order Appointing the Custodian does not, however, require the Custodian to cast a tie-breaking vote on every issue. Rule 23.1 presupposes that the persons to whom a demand is addressed will actually vote to accept or reject a demand. Here, it is alleged that the Custodian has expressly disclaimed any authority to vote, and has taken the position that even if he did have the authority, he would not exercise it. That being the case, the issue of the Custodian's disinterestedness and independence is never reached. By definition, a demand upon the Custodian would be futile, because it is futile to demand that a person take action where that person has clearly and in advance declined to do so.

*7 Having concluded that a demand is excused, I

next turn to the motion to dismiss the claims under Rule 12(b)(6).

B. The Rule 12(b)(6) Motion

1. *Counts I-IV*

In support of their Rule 12(b)(6) motion, the defendants contend that none of Counts I-IV states a cognizable claim that Bentas' actions breached a fiduciary duty to the Company, or inflicted any harm derivatively upon the Company or individually upon the plaintiffs. I disagree with the defendants' analysis, and conclude those Counts do state a cognizable claim for relief.

The complaint alleges that (i) Bentas' decided to terminate prematurely the proposed refinancing project and (ii) Bentas issued an ultimatum to Demetrios that he agree to expand the Board in exchange for her reconsidering the refinancing proposal. The defendants urge that those allegations do not state valid cognizable claims. Rather, the defendants say, those actions represented the exercise by Bentas of her business judgment as CEO. That the plaintiffs disagree with that business decision does not constitute a basis for holding the decision-maker liable.

While that view of the matter might be adopted after a trial based on a full factual record, that view cannot be reached as a matter of law at this stage, where the only portion of the record being considered is the complaint. That complaint alleges that as of the end of September 1998, the Company had approximately $150 million in long-term debt at a weighted-average interest rate of 10% per year. The directors then studied and decided upon a plan to refinance the debt--a plan that, if adopted, would have saved the Company about $4.5 million in interest costs. Nonetheless, Bentas halted the transaction, specifically to further her personal goal of extracting a concession from the plaintiffs relating to her plan to restructure the Board.

These allegations state a cognizable claim because, if they are true, they would establish that Bentas breached her fiduciary duty of loyalty by placing her own personal interests and objectives ahead of the best interests of the corporation. [FN17] It is claimed that Bentas was holding up a refinancing plan that would benefit the Company, to obtain a concession that would benefit her personally. Specifically, it is alleged that Bentas told Demetrios that she would not

allow any further exploration of a refinancing unless and until he agreed to increase the size of the Board. While Bentas may ultimately be able to show after a trial that she had a legitimate, unselfish motive for her actions, at this stage it must be concluded that the facts alleged in this complaint state a cognizable derivative claim for relief. Accordingly, the motion to dismiss Counts I-IV will be denied.

> FN17. To the extent that Bentas argues that she is exculpated by the Cumberland Farms charter provision modeled after 8 *Del.C.* § 102(b)(7), that argument need not be addressed because by its terms, § 102(b)(7) exculpates only a judgment for money damages based on a violation of the duty of care.

2. *Counts v. and VI*

The final two Counts are direct claims which the defendants urge must also be dismissed, because (i) the Bentas-promulgated Information Procedures did not violate 8 *Del.C.* § 141 or § 220(d) and (ii) it is not alleged that the plaintiffs were actually deprived of information that they needed in their capacity as directors. Therefore, because no harm has been suffered, there is no basis to award judicial relief.

**\*8** 8 *Del.C.* 220(d) gives directors the right to inspect corporate books and records for a proper purpose relating to their director roles. The complaint here does not allege any denial or unreasonable abridgement of the directors' statutory right of inspection. All that the complaint alleges is that Bentas adopted a policy that established procedures for non-management directors to obtain corporate information. Delaware law does not proscribe the imposition of reasonable conditions or limitations for obtaining access to corporate books and records, so long as those conditions do not deprive the directors of, or impermissibly infringe upon, their information rights.

The Court acknowledges that the plaintiffs are claiming that Bentas adopted the information policy to hinder the plaintiffs in their efforts to pursue a refinancing. But even if that is true, without a cognizable injury, there can be no remedy. In this case, there is no claim that the directors were actually deprived of information to which they are entitled, or that the plaintiff directors were hindered in the performance of their directorial duties. For these reasons, Counts V and VI fail to state a cognizable claim for relief.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
**(Cite as: 2002 WL 31058540, \*8 (Del.Ch.))**

IV. CONCLUSION

 For all of the reasons discussed, the defendants'
Motion to Dismiss on Rule 23.1 grounds and their
Rule 12(b)(6) motion as it relates to Counts I-IV, are
denied. The Rule 12(b)(6) motion to dismiss is
granted insofar as that motion relates to Counts V and
VI, without prejudice to the plaintiffs' right to move
for leave to amend. IT IS SO ORDERED.

 2002 WL 31058540 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Not Reported in A.2d
1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046
(Cite as: 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046)

**Page 40**

Ȼ

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

Harry LEWIS, Plaintiff,
v.
Donald V. FITES, George A. Schaefer, James W.
Wogsland, Charles E. Rager, Frank
N. Grimsley, R.R. Thornton, Lilyan H. Affinito, John
W. Fondahl, Louis V.
Gerstner, Jr., Robert E. Gilmore, James P. Gorter,
Walter H. Helmerich, III,
Jerry R. Junkins, Charles F. Knight, Lee L. Morgan,
and Rawleigh Warner, Jr.,
Defendants,
and
Caterpillar, Inc., Nominal Defendant.

Civ. A. No. 12566.

Submitted: Nov. 10, 1992.
Decided: Feb. 19, 1993.

**1048** Kevin Gross, of Rosenthal, Monhait, Gross
& Goddess, P.A., Wilmington, of counsel: Stanley
M. Grossman, Marc I. Gross, and Judith R. Schneider
, of Pomerantz Levy Haudek Block & Grossman,
New York City, and Norman Berman, of Berman
DeValerio & Pease, Boston, MA, for Plaintiff.

Lawrence A. Hamermesh, of Morris, Nichols, Arsht
& Tunnell, Wilmington, of counsel: Douglas A. Poe,
Franklin P. Auwarter, and Mitchell D. Raup, of
Mayer, Brown & Platt, Chicago, Ill, for defendants.

MEMORANDUM OPINION

BERGER, Vice Chancellor.

*1 In this derivative action, a stockholder of
defendant, Caterpillar Inc. ("Caterpillar"), alleges
that the company's officers and directors breached
their fiduciary duties in connection with the
dissemination of periodic financial reports. In
addition to Caterpillar, the complaint names as
defendants thirteen directors, including three present
or former officers, and three other Caterpillar officers
who are not directors of the company. This is the
decision on defendants' motion to dismiss for failure
to make demand pursuant to Chancery Court Rule
23.1.

The facts, summarized below, are drawn from the
complaint and a consent order, referred to in the
complaint, entered by the Securities and Exchange
Commission ("SEC") on March 31, 1992 (the
"Consent Order"). Caterpillar, a Delaware
corporation with operations throughout the world,
manufactures heavy industrial machinery. The
claims in this case relate to Caterpillar's Brazilian
subsidiary, Caterpillar Brazil, S.A. ("CBSA"). In
1989, CBSA accounted for approximately 23% of
Caterpillar's net profits, although CBSA's revenues
represented only 5% of Caterpillar's total revenues.
CBSA's exceptional 1989 results were based largely
on non-operating factors such as Brazil's high
inflation and a favorable currency exchange rate. In
December, 1989, Brazil **1049** elected a new
President who was expected to institute economic
reforms to curb inflation.

Caterpillar's management recognized that changes
implemented by the new administration in Brazil
could have a significant impact on CBSA's 1990
performance. Caterpillar reports its financial results
on a consolidated basis and historically management
had not viewed each subsidiary's profits as reliable
indicators of its contribution to the parent company.
In January of 1990, however, Caterpillar's accounting
department began to analyze CBSA's performance
separately. Management's analysis was reported to
Caterpillar's board at the February 1990 board
meeting. Caterpillar's directors were told that the
situation in Brazil was "volatile" and that operations
in Brazil would have a significant negative impact on
Caterpillar's overall results for 1990.

Approximately two weeks after the February board
meeting, Caterpillar filed its 1989 Form 10-K. As in
prior years, the 1989 financial results were reported
on a consolidated basis. As a result, CBSA's
disproportionate impact on Caterpillar's overall
profits was not disclosed. The Management
Discussion and Analysis ("MD & A") section of the
Form 10-K did not provide very much information
about Brazil. It stated:

Sales rose 14% in 1989 [in Latin America], the
sixth consecutive year of improvement. The
biggest gain was in Brazil, where very high
inflation rates increased demand for hard goods,
including earth moving equipment. (Given the
extraordinarily high rate of inflation in Brazil,
many contractors preferred to own hard assets,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10177-NG    Document 22    Filed 09/27/2004    Page 49 of 119

Not Reported in A.2d                                                    Page 41
(Cite as: 1993 WL 47842, *1 (Del.Ch.), 18 Del. J. Corp. L. 1046, **1049)

such as equipment, rather than depreciating cruzados.) Toward yearend, however, sales growth in Brazil moderated as interest rates rose.
*2 OUTLOOK
... Sales in Brazil, however, could be hurt by post-election policies which will likely aim at curbing inflation.
Consent Order, p. 6.

On March 15, 1990, Fernando Collor de Mello, Brazil's newly elected President, took office. President Collor immediately instituted sweeping economic changes, including an 80% reduction in the amount of currency in circulation and a plan to devalue the Brazilian currency. The Consent Order describes these reforms as creating an "economic crisis [where] even large companies were unable to meet their payrolls or pay normal trade payables." Consent Order, p. 4. However, the impact of these changes on CBSA did **1050 not become manifest until after the close of its first quarter on March 31, 1990.

At Caterpillar's April 1990 board meeting, management advised the directors that profits in Brazil would be substantially lower in 1990 than they had been in 1989. Management discussed the likely negative effects of President Collor's new programs, but the 1990 forecast was not revised because management considered the situation in Brazil too volatile and difficult to predict. On May 9, 1990, Caterpillar filed its Form 10-Q for the first quarter of 1990. The MD & A section of that report did not disclose anything about CBSA's anticipated performance. It stated only that demand in Brazil had increased but that Caterpillar continued to be concerned about Brazil's uncertain economic situation.

Caterpillar continued to monitor the impact of Brazil's new policies on CBSA throughout April and May of 1990. By June, Caterpillar had concluded that CBSA would suffer significant losses in 1990 as a result of the Brazilian economic reforms. Accordingly, on June 25, 1990, Caterpillar issued a press release announcing that results for 1990 would be substantially lower than previously projected. Later that day, Caterpillar also disclosed CBSA's importance to the company's 1989 earnings and advised stock analysts that Caterpillar's disappointing results for the second quarter of 1990 were caused largely by circumstances in Brazil. The next day, Caterpillar stock opened at 51 3/4 , down 9 5/8 points from the previous day's opening price.

Following these disclosures, the SEC began an investigation and two class action law suits were filed. The class action suits charged Caterpillar and its management with violations of federal securities laws based upon alleged false statements and omissions in the company's 1989 Form 10-K and first quarter 1990 Form 10-Q. On March 31, 1992, the SEC investigation was concluded by the issuance of the Consent Order in which the SEC found that Caterpillar violated Section 13(a) and Rules 13a-1 and 13a-13 of the Exchange Act. As part of the Consent Order, Caterpillar voluntarily implemented procedures to ensure future compliance with MD & A requirements. The federal court actions are still pending.

Plaintiff claims that the alleged misstatements and omissions in Caterpillar's SEC filings have exposed the company to significant potential liability and that the company is already being injured by the cost of defending the pending class actions. Plaintiff alleges that the individual defendants breached their fiduciary duties by failing to fully disclose material information concerning CBSA and by failing **1051 to maintain adequate controls to assure proper disclosure of the same information. Plaintiff made no demand on Caterpillar's board before instituting this action. Rather, plaintiff alleges that demand would have been futile and, therefore, demand is excused pursuant to Chancery Court Rule 23.1. Defendants moved to dismiss on several grounds. However, in light of my conclusion that plaintiff has not adequately pled demand futility, I will not reach the alternative grounds for dismissal urged by all defendants or the jurisdictional argument raised by those individual defendants who are not also directors of Caterpillar.

*3 The test for determining whether a derivative plaintiff has adequately alleged demand futility is well settled:
(1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.
Levine v. Smith, Del.Supr., 591 A.2d 194, 205 (1991). The complaint alleges that Caterpillar's directors have been aware of the alleged wrongs for more than two years but have taken no action because they participated in and approved the alleged wrongs and would have to sue themselves. Allegations of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

this sort offered as an excuse for failure to make demand have been rejected repeatedly. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 815, 818 (1984); *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 625 (1984); *Haber v. Bell,* Del.Ch., 465 A.2d 353, 359, 360 (1983). Plaintiff offers two additional factors to buttress his claim that defendant directors are interested for purposes of the demand requirement. In the complaint, he notes that defendants agreed to the entry of the Consent Order. Since the Consent Order establishes a violation of federal securities law, plaintiff argues that defendant directors are much more likely to be held liable in this case than in a case where there has been no finding of wrongdoing. This heightened threat of personal liability, according to plaintiff, creates a reasonable doubt that Caterpillar's directors are disinterested. Plaintiff also suggested, at oral argument, that several of Caterpillar's directors were interested in withholding information about CBSA because they were then standing for re-election and the undisclosed information would reflect poorly on them.

Neither of these additional facts excuse demand. The Consent Order does not contain any admission of wrongdoing and it does **1052 not include any findings concerning Caterpillar's directors. Thus, the Consent Order does not create a substantial likelihood of director liability. *See Aronson v. Lewis,* 473 A.2d at 815. The fact that three directors were being considered for re-election at the time of the alleged wrongdoing, likewise, fails to excuse demand. First, a majority of the Caterpillar directors were not slated for election at that time and, therefore, were not interested in avoiding disclosures in order to continue on the board. Second, the complaint contains no allegations suggesting that the positions of those directors who were seeking re-election were actually threatened. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988).

Alternatively, plaintiff argues that demand should be excused because there is a reasonable doubt that the directors' conduct was the product of a valid exercise of business judgment. He argues that Caterpillar's directors engaged in a knowing violation of federal securities laws. Before the two financial statements at issue were filed, the Caterpillar board knew that CBSA's profits in 1990 would be substantially lower than in 1989. Plaintiff describes this as being "obviously" material information that should have been fully disclosed. Plaintiff's Memorandum of Law, p. 15. Plaintiff acknowledges that Caterpillar's general counsel opined on the adequacy of the

disclosures before the board approved filing the 1989 Form 10-K. However, plaintiff contends that reliance on outside opinions and reports is not sufficient to insulate the directors as a matter of law. *See Avacus Partners, L.P. v. Brian,* Del. Ch., Civil Action No. 11,001, Allen, C. (October 24, 1990), Mem.Op. at 16. Here, plaintiff suggests that the board's reliance was misplaced in light of the information known to the directors. Accordingly, plaintiff argues that there is a reasonable doubt that the directors' conduct will be protected by the business judgment rule.

*4 The problem with this argument is that it is premised on an assumption that I am not prepared to make. Plaintiff seems to be arguing that because the directors knew of the economic problems affecting CBSA, they also must have known that Caterpillar's MD & A disclosures were inadequate and misleading. The facts set forth in the Consent Order suggest the opposite:

> The MD & A sections of the 1989 10-K and 10-Q for the first quarter of 1990 were drafted by employees in Caterpillar's accounting department. Prior to the issuance of those reports, the language of the MD & A was reviewed by the Controller, Financial Vice President, Treasurer, and **1053 the company's legal, economic, and public affairs departments. After that, the language of the MD & A was reviewed by the top officers of the Company.
> The board of directors reviewed the final draft of the 1989 Form 10-K, including the MD & A, at the February 1990 board meeting. At that time, the board, including top management who were members of the board, received a written opinion of the company's independent auditor that the financial statements complied with the rules and regulations of the Commission, and also an opinion of the company's General Counsel that the Form 10-K complied with all the rules and regulations of the Commission.

Consent Order, p. 5 (footnotes omitted). While it is true, as plaintiff suggests, that the directors' reliance on these reports does not totally insulate them from potential liability, that reliance certainly is a factor to be considered in deciding whether there is a reasonable doubt as to the applicability of the business judgment rule. Here, there is nothing in the complaint to suggest that the directors' reliance was unreasonable. Accordingly, I conclude that the complaint fails to satisfy the second prong of the demand futility test and that the complaint, therefore, must be dismissed for failure to make demand.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
**(Cite as: 1993 WL 47842, \*4 (Del.Ch.),  18 Del. J. Corp. L. 1046, \*\*1053)**

 IT IS SO ORDERED.

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

2001 WL 418981
2001 WL 418981 (C.D.Cal.), Fed. Sec. L. Rep. P 91,406
(Cite as: 2001 WL 418981 (C.D.Cal.))

**Page 44**

H

United States District Court, C.D. California.

Sheila MCMICHAEL; Donald G. Kennedy; Sharell J. Kennedy; James E. Gemmill; 1111426 Ontario, Inc.; Tom Hoh, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
UNITED STATES FILTER CORPORATION; Richard Heckmann; Nicholas C. Memmo; Andrew D. Seidel; James E. Clark; Robert S. Hillas; John L. Diederich; Ardon E. Moore; C. Howard Wilkens, Jr.; J. Danforth Quayle; Arthur B. Laffer; Albert E. Osborne, Jr.; Does, 1 through 25, inclusive, Defendants.

Nos. EDCV 99-182VAP (MCX), DECV 00-340VAP (MCX), EDCV 00-341VAP (MCX), EDCV 00-528VAP (MCX), EDCV 00-196VAP (MCX), EDCV00-223VAP (MCX).

Feb. 23, 2001.

ORDER GRANTING 1) THE MOTION TO DISMISS OF DEFENDANTS UNITED STATES FILTER CORPORATION, RICHARD HECKMANN, NICHOLAS C. MEMMO, ANDREW D. SEIDEL, JAMES E. CLARK, ROBERT S. HILLAS, JOHN L. DIEDERICH, ARDON E. MOORE, C. HOWARD WILKENS, JR., J. DANFORTH QUAYLE, ARTHUR B. LAFFER, AND ALBERT E. OSBORNE, JR.; AND 2) THE MOTION TO DISMISS OF DEFENDANTS VIVENDI S.A., EAU ACQUISITION CORP., AND JEAN-MARIE MESSIER

PHILLIPS, J.

*1 The Motions to Dismiss filed by Defendants United States Filter Corporation, Richard Heckmann, Nicholas C. Memmo, Andrew D. Seidel, James E. Clark, Robert S. Hillas, John L. Diederich, Ardon E. Moore, C. Howard Wilkens, Jr., J. Danforth Quayle, Arthur B. Laffer, Albert E. Osborne, Vivendi S.A., Eau Acquisition Corp. and Jean-Marie Messier came before the Court for hearing on January 22, 2001. After reviewing and considering all papers in support of, and in opposition to, the Motions, and hearing the arguments advanced by counsel, the Court orders that the Motions to Dismiss are GRANTED.

I. Background

Vivendi S.A. and its wholly owned subsidiary, Eau Acquisition Corp. ("Vivendi") acquired United States Filter ("US Filter") in 1999. [Plaintiffs' Second Amended Consolidated Class Action Complaint ("Second Am. Compl.") at 1; Plaintiffs' Complaint ("Compl.") at 3.]

Plaintiffs are stockholders in U.S. Filter. They filed a class action suit [FN1] on March 23, 1999 against Richard Heckmann, Chairman of the Board of Directors, President, and Chief Executive Officer of U.S. Filter, as well as Nicholas C. Memmo, Andrew Seidel, James Clark, Robert Hillas, John Diederich, Ardon Moore, C. Howard Wilkens, J. Danforth Quayle, Arthur B. Laffer, and Alfred Osborne, Directors of U.S. Filter ("US Filter Defendants"). [FN2]

FN1. Lead Plaintiffsinclude: Donald and Sharell Kennedy, James Gemmill, 1111426 Ontaio Inc., Tom Hoh, Cam Co., Sheila McMichael, all shareholders of US. Filter whose shares were purchased for $31.50. [Second Am. Cmpl. at 4-5.] The proposed class consists of: all common stockhlders in U.S. Filter who are being and will be harmed by Defendants'alleged harmful actions in connection with Vivendi's acquisitionof U.S. Filter ("the Class"), including those who tendered their shres to Vivendi pursuant to the tender offer ("tendering subclass'). [Second Am. Compl. at 1.] This Court gave Plaintiffs 45 days frm the date of the Court's disposition on these motions to dismss to file for class certification. [See October 31, 2000 Orde Continuing Deadline for Filing Motion Opposition to Motion o Dismiss.]

FN2. Nicholas Memmo s not a Director of U.S. Filter, although he is named in Plaintiff' Complaint. [Carl Alan Roth Declaration, ¶ 10, Ex. H (solicittion/recommendation statement in which Mr. Memmo is not mentione as Director receiving payment) at I-4.] Mr. Memmo is an Officer o U.S. Filter and did not participate in the decision to recommendthe Vivendi transaction.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2001 WL 418981
(Cite as: 2001 WL 418981, *1 (C.D.Cal.))

Page 45

US Filter was a global provider of industrial, municipal, commercial, and consumer water and wastewater systems, products, and services. It announced on March 22, 1999 that its Board of Directors ("Board") had approved a tender offer by Vivendi, a French environmental services provider, to acquire all outstanding stock (180 million shares) of U.S. Filter for $31.50 a share, or approximately 5.73 billion dollars ("Vivendi transaction"). [Compl. at 4, 6; Second Am. Compl. at 1.] As part of the agreement, U.S. Filter would merge with Eau Acquisition Corp. ("merger"). [Second. Compl. at 11-12.]

Plaintiffs allege the Board, in agreeing to the merger and tender offer, breached their fiduciary duties of care and loyalty. [Second Am. Compl. at 2.] The Board, Plaintiffs claim, did not use reasonable care to maximize shareholder value by failing to ascertain U.S. Filter's true market value before agreeing to the share price. [Second Am. Compl. at 2.] Plaintiffs further allege three members of the Board--Messrs. Seidel, Heckmann, and Spence ("Inside Directors")-- accepted additional consideration of up to 11.55 million dollars from Vivendi ("additional payments"), or more than six dollars a share beyond the price paid to shareholders, for their agreement. [FN3] [Second Am. Compl. at 2.] As further inducement, Vivendi agreed to "gross up" the payments to the Inside Directors by paying the taxes the Board was required to pay on the payments received in excess of $31.50 a share. [Second Am. Compl. at 2-3.]

FN3. Although Plaintiffs allege Mr. Spence, the Chief Financial Officer of U.S. Filter,was a Director at the time of the offer, Defendants claim Mr. pence was an Officer, not a Director, and was not involved in the dcision to accept the offer. [US Filter's Notice of Motion and otion to Dismiss at 2, n. 1.] Mr. Spence, however, did receive payment from Vivendi. [Roth Decl., Ex. H.]

Plaintiffs allege: (1) Violation of Section 14(d)(7) of the Securities Exchange Act of 1934 ("the Act") and Rule 14(d)(10) promulgated thereunder by U.S. Filter Defendants; (2) Violation of Section 20(a) of the Exchange Act by Vivendi and Jean-Marie Messier, Chairman and CEO of Vivendi S.A. and the President of Eau Acquisition Corp.; and (3) breach of fiduciary duty by U.S. Filter Defendants. [FN4]

FN4. US Filter attacs Plaintiffs' third claim, and Vivendi attacks Plaintiffs' frst and second claims.

II. Proceedings

*2 Defendants removed this case on May 21, 1999. On June 20, 2000, several cases arising from the Vivendi transaction were consolidated . [FN5]

FN5. The consolidate cases include: *Fagin v. Vivendi S.A. et al.,* 00- 341(VAP); *CAM C. v. Eau Acquisition Corp., et al.,* 00-340(VAP); *Hack v. Vivedi S.A. et al.,* 00-528_(VAP); *Worry v. Vivendi S.A. et al.,* 00- 196(VAP); and *Gothelf v. Eau Acquisition Corp., et al.,* 00-223(VAP).

Plaintiffs filed a Second Amended Consolidated Complaint on July 12, 2000. On December 4, the Court ordered Defendants Vivendi S.A., Eau Acquisition Corp., and Jean Marie Messier to be added to the Second Amended Complaint. [See December 4, 2000 Order.]

On September 25, 2000 U.S. Filter, Richard Heckmann, Nicholas Memmo, Andrew Seidel, James Clark, Robert Hillas, John Diedrich, Ardon Moore, C. Howard Wilkens, Jr., J. Danforth Quayle, Arthur B. Laffer and Alfred E. Osborne filed a Motion to Dismiss accompanied by the Declaration of Carl Alan Roth.

On September 25, 2000 Vivendi S.A., Eau Acquisition Corp. and Jean Marie Messier filed a Motion to Dismiss along with the Declaration of Andrew Houston.

Plaintiffs filed Opposition to the U.S. Filter Motion on November 8, 2000. Plaintiffs filed Opposition to the Vivendi Motion on November 8, 2000. Vivendi filed its Reply on December 8, 2000, and U.S. Filter filed its Reply on December 8, 2000.

III. Legal Standard
A. Applicable Law

This case is before the Court pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act. The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

Breach of fiduciary duty is a state law claim, and as U.S. Filter is incorporated in Delaware, Delaware law applies to U.S. Filter's Motion to Dismiss. *CTS Corp. v. Dynamics Corp.,* 481 U.S. 69, 90 107 S.Ct. 1637, 1650, 95 L.Ed.2d 67 (1987) ("This beneficial free market system depends at its core upon the fact that a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

corporation--except in the rarest situations--is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of incorporation."); *Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982) (finding law of state of incorporation should govern corporation's internal affairs); Cal. Corp.Code § 2116 (applying law of state of incorporation to liability for actions of directors or officers of foreign corporation); *Batchelder v. Kawamoto,* 147 F.3d 915, 920 (9th Cir.1998).

B. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits dismissal where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't.,* 901 F.2d 696, 699 (9th Cir.1990). Nevertheless, "nothing in rule 12(b)(6) confines its sweep to claims which are obviously insupportable;" rather, if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations at hand, "a claim must be dismissed without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989).

*3 Although the same facts gave rise to both Motions to Dismiss, each Motion raises different issues. While one discussion of the facts suffices, the Motions are addressed separately below.

IV. The Vivendi Motion to Dismiss

Plaintiffs' first and second claims are directed at the Vivendi Defendants. [FN6] The Vivendi Defendants argue that Plaintiffs have failed to state a claim because: (1) The additional payments were not consideration or an integral part of the offer; (2) Rule 14(d)(10) does not regulate payments to executives for preexisting obligations; (3) without violation of Rule 14(d) of the Exchange Act, Plaintiffs have no Rule 20 violation; and (4) Plaintiffs' suit is barred by the statute of limitations. As Plaintiffs have not pled that the payments were additional consideration, they fail to make successful Rule 14(d)(10) and Rule 20 claims and their two claims against Vivendi are dismissed.

FN6. Vivendi, S.A. i a French company. Eau Acquisition Corp. is incorporated in Delawre.

A. The Statute of Limitations

Vivendi claims complaints filed more than one year after the tender offer are barred by the statute of limitations. In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) the Supreme Court established a uniform statute of limitations for Section 10(b) claims that "[l]itigation instituted pursuant to ... 10(b) and Rule 10b-5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf,* 111 S.Ct. at 2782; *Maki v. Grenda,* 92-CV-0819E(M), 1993 WL 427456 at *2 (W.D.N.Y. Oct. 15, 1993) (applying *Lampf* to Rule 14(d)). [FN7]

FN7. On December 20,1991, the President signed Senate Bill 543 into law, essentiallyoverruling *Lampf.* The new law states that: "The limitation perid for any private civil action implied under section 10(b) of thisAct that was commenced on or before June 19, 1991, shall be the liitation period provided by the laws applicable in the jursdiction, including principles of retroactivity, as suc laws existed on June 19, 1991." 15 U.S.C. § 78aa-1. *See riggs v. Pace American Group, Inc.,* 170 F.3d 877 (9th Cir.1999) (annoncing rule replacing *Lampf* ). Senate Bill 543 has not yet been appled to Rule 14(d). Accordingly, the Court applies the one year tatute of limitations.

Plaintiffs were put on inquiry notice by the publication of the tender offer materials on March 26, 1999. [Vivendi Mot. to Dismiss at 22.] Vivendi argues that only the first two of the six actions filed were timely--as they were filed before March 26, 2000. [Vivendi Mot. to Dismiss at 22.]

Plaintiffs claim the commencement of a class action suspends the applicable statute of limitations as to all members of the class who would have been parties had the suit continued as a class action. [Opp'n to Vivendi Mot. at 20; *American Pipe and Constr. Co. V. Utah,* 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed. Ed 714 (1974) ("To hold to the contrary would frustrate the principal function of a class suit."); *Crown, Cork & Seal. Co. v. Parker,* 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) (holding that the filing of class action tolled the applicable statute of limitations for all asserted members of the class, not just for intervenors); *Griggs v. Pace Am. Group,*

2001 WL 418981                                                                    **Page 47**
**(Cite as: 2001 WL 418981, *3 (C.D.Cal.))**

*Inc.,* 170 F.3d 877, 880 (9th Cir.1999); *but see Robbin v. Fluor Corp.,* 835 F.2d 213, 214 (9th Cir.1987) (interpreting *American Pipe* not to allow tolling when the district court in the previous action had denied class certification, and when second action sought to relitigate the issue of class certification and thereby to circumvent the earlier denial).

**\*4** This Court gave Plaintiffs forty-five days from the disposition of this action to certify as a class. Moreover, Plaintiffs do not seek to relitigate the issue of class certification. The claims against Vivendi are not time barred.

B.  Plaintiffs have not stated a claim that the payments to the Inside Directors were consideration for acceptance of the tender offer.

Under Rule 14d-10, 17 C.F.R. § 240.14d-10, also known as the "all-holder-- best-price" rule:

> (a) No bidder shall make a tender offer unless:
> (1) The tender offer is open to all security holders of the class of securities subject to the tender offer; and
> (2) The consideration paid to any security holder pursuant to the tender offer is the highest consideration paid to any other security holder during such tender offer.

"Rule 14d-10 prohibits a bidder from making a tender offer that is not open to all shareholders or that is made to shareholders at varying prices." *Epstein v. MCA, Inc.,* 50 F.3d 644, 652-53 (9th Cir.1995), *rev'd on other grounds,* 516 U.S. 367 (1996), *cert. denied* 528 U.S. 1004, 120 S.Ct. 497, 145 L.Ed.2d 384 (1999). The SEC, in promulgating Rule 14d-10, "emphasized the need for 'equality of treatment among all shareholders who tender their shares." ' *Epstein,* 50 F.3d at 655 (quoting S.Rep. No. 550, 90th Cong., 1st sess. 10 (1967)). Rule 14d-10 ensures that all "holders of the same security are offered precisely the same consideration." *Epstein,* 50 F.3d at 657.

Plaintiffs allege the payments to the three Directors were an "integral part" of Vivendi's tender offer, made to induce the Directors to tender their shares and endorse the transaction. [First. Am. Compl. ¶¶ 34-36.]

Vivendi Defendants claim the payments to the three Directors had no relation to the purchase of stock, were not new consideration, and were merely "golden parachute" employment contracts. [Vivendi Motion to Dismiss Second Amended Consolidated Class Action Complaint ("Vivendi Mot. to Dismiss") at 9-10.]

Much of the dispute between the parties over the payments centers on the precedential value of *Epstein v. MCA, Inc.,* 50 F.3d 644 (9th Cir.1995) ( *"Epstein I"* ). Even if *Epstein I* [FN8] retains precedential value and applies to this case, Plaintiffs still cannot state a claim on the subject of the payments. In *Epstein I,* the Ninth Circuit held:

> FN8.  In 1990, Matsusita Electric Industrial Co. made a tender offer for the common tock of MCA, Inc., a Delaware corporation. In a class action fild in Delaware court against MCA and its directors for breach f fiduciary duty, the Complaint alleged Matsushita's tender ofer violated Rules 10b-3 and 14d-10. *See Epstein I.* Plaintffs alleged Matsushita violated Rule 14d-10 by offering preferentialtreatment in the tender offer to MCA principals Lew Wasseran and Sidney Sheinberg. *Id.* Plaintiffs alleged Matsushita ofered a tax-driven stock swap arrangement to Wasserman, then MCA'schairman and chief executive officer, and a $21 million bonus to heinberg, then MCA's chief operating officer and owner of 1,170,00 shares of MCA common stock. *Id.*
> In *Epstein I,* the Ninth Circuit addressed two issues: Rule 14d-10 and the appliction of the full faith and credit clause to a Delaware court's settlement procedure. The court held that Matsushita violated Rle 14d-10 by paying Wasserman consideration not offered to other hareholders, and found that plaintiffs were entitled to summary jdgment on liability. *Epstein I,* 50 F.3d at 657.
> The Supreme Cour, in *Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 37, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996), reversed and remanded *Epstein I,* ruling that the Ninth Circuit had to give full faith and credit to the Delaware court's settlement. On remand in *Epstei v. MCA, Inc.,* 126 F.3d 1235, *cert. denied* 528 U.S. 1004, 120 S.Ct.497, 145 L.Ed.2d 384 (1999) ( *"Epstein II"* ), the Ninth Circuit intrpreted the Supreme Court's ruling to govern only the issue of ful faith and credit, noting: "None of these rulings on the meritsof the Rule 14d-10 claims were disturbed by the Supreme Court in *Matsushita* ... The Court reversed our judgment and remanded for furter proceedings solely on the basis of the first question ... 'Wether a federal court can withhold full faith and credit from a stae court final judgment approving a class

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

action settlement simly because the settlement released exclusively federal caims." '

To be sure, the fact that a private purchase of stock and a public tender offer are both part of a single plan of acquisition does not ... render the purchase a part of a tender offer for purposes of Rule 14d-10. Rule 14d-10 does not prohibit transactions entered into or effected before, or after, a tender offer--provided that all material terms of the transaction stand independent of the tender offer.

*Epstein 1* did not address the issue of payment of preexisting obligations to executives of the target company. As discussed below, because the payments in question were no more than golden parachute payments, which were disclosed to shareholders [Vivendi Mot. to Dismiss at 7; Houston Decl., Ex. 11 at 28], they were not additional consideration, and Defendants have not violated Rule 14d-10.

*5 First, despite Plaintiffs' argument that this is a matter for summary judgment, and should not be addressed on a motion to dismiss, Defendants' Motion is based on undisputed facts regarding the payments, not on the intent behind them. [*See* Plaintiffs' Opposition to Vivendi's Motion to Dismiss ("Opp'n to Vivendi Mot.") at 5; Vivendi's Reply ("Vivendi Reply") at 2.]

Second, upon examination, the substance of the 1998 employment agreements and 1999 agreements is identical. Both sets of agreements employ the same formula to determine the amount of payment. The 1998 employment agreements contained change of control provisions, entitling the executive to a payment of "base salary for the balance of the Employment Term, plus the target annual incentive bonus scheduled for each year following the Date of Termination for the balance of the Employment Term." [*See* Houston Decl., Exs. 8 (¶ 4(e)), 9(¶ 3.6), 10 (¶ 3.6).] The employment term of Messrs. Spence and Seidel was thirty-six months, and of Mr. Heckmann, sixty-three months. [Houston Decl., Ex. 9 (¶ 2), 10 (¶ 2), 8(¶ 1b).]

The 1999 employment agreements entitled the three executives to payments they were to receive under the change of control provision in the 1998 agreements. [Houston Decl., Exs. 5 (¶ 3(l)), 6 (¶ 3(h)), 7(¶ 3(h)).] The agreements of Messrs. Spence and Seidel provided for a payment of three times their base

salary (corresponding to their thirty-six month employment terms) plus maximum bonuses of $1,950,000 to Mr. Spence and $2,100,000 to Mr. Seidel. [Exs. 6, 7 (¶ 3(h)).] Mr. Heckmann's agreement provided for a payment of five times his base salary (corresponding to his sixty-three month employment term) and a maximum bonus of $7,500,000. [Ex. 5 (¶ 3(i)).] The maximum payments were based on executive salaries and bonuses that would have been used in calculating the 1998 payments. [Vivendi Mot. to Dismiss at 7.] While the agreements themselves may have changed slightly in form, their substance did not alter. Unlike Mr. Wasserman's payment in *Epstein I*, these payments were premised on a company's preexisting duty. 50 F.3d at 656 (noting two facts indicated the payments were integral: the redemption value of Wasserman's preferred stock incorporated the tender offer price by reference and the Capital Contribution and Loan Agreement was conditioned on the tender offer's success).

Third, the 1999 agreements were disclosed as part of Vivendi's Offer to Purchase [Ex. 11 at 28.] Although in oral argument, Plaintiffs' counsel argued that under Rule 14d-10, Defendants were obligated to disclose the "nature" of the payments in addition to disclosing their existence, Plaintiffs offer no support for this argument. The Supreme Court has indicated, to the contrary, that the Act was not intended to govern the fairness of the terms of a merger, but rather their disclosure. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L .Ed.2d 480 (1977) ("The 'fundamental purpose' of the Act ... [is] implementing a 'philosophy of full disclosure'; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern.").

*6 Fourth, the payments came not from Vivendi, but from U.S. Filter--the target corporation. Vivendi, in acknowledging the payments in the 1999 employment agreements, was doing no more than recognizing U.S. Filter's preexisting duty to pay its executives. Plaintiffs have not alleged facts sufficient to challenge Vivendi's assertion that the obligation to pay preexisted the tender offer. Plaintiffs argue that because talks between U.S. Filter and Vivendi began in 1996, predating the 1998 agreements, Vivendi cannot argue that it had not role in the agreements. [Opp'n to Vivendi Mot. at 9.] Vivendi counters that the earlier talks between the two companies were unrelated to the tender offer and instead dealt with a possible sale of certain Vivendi assets to U.S. Filter;

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

therefore, when the tender offer was discussed, the 1998 payments were not an issue. [Vivendi Reply at 4.]

Defendants add that the payments, as part of the New Employment Agreements, were conditioned on the completion of the subsequent *Merger* of Eau Acquisition Corp. and U.S. Filter--not the tender offer itself. [Vivendi Mot. to Dismiss at 10; Houston Decl., Exs. 5-7 (defining the effective date of the agreement as the merger date and providing the new agreement terminates should the Merger fail); Vivendi Reply at 3.] Plaintiffs' argument that the merger was contingent on the tender offer, and therefore the payments were integral [Opp'n to Vivendi Mot. to Dismiss at 13], begs the question. The payments were not integral to the tender offer because, as Defendants show, they merely recognized a preexisting duty.

Accordingly, the payments are not regulated by Rule 14(d)(10) and Plaintiffs' Rule 14(d)(10) claim against Vivendi is dismissed without leave to amend.

C. Without finding that Defendants violated Rule (14)(d) of the Exchange Act, the Court cannot find a violation of Section 20 of the Act.

As the Court has found that Vivendi did not violate Rule 14(d) of the Act, it cannot find liability under Section 20--a secondary liability provision. *Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971 (9th Cir.1999) (finding no secondary liability without primary violations).

V. The U.S. Filter Motion to Dismiss

US Filter Defendants bring their Motion on the following grounds: (1) U.S. Filter's Certificate of Incorporation bars the duty of care claim; (2) Plaintiffs' breach of fiduciary duty claim is barred by the Business Judgment Rule; and (3) Plaintiffs' fiduciary duty claim fails because the Vivendi transaction was ratified by U.S. Filter shareholders. [US Filter's Notice of Motion and Motion to Dismiss ("US Filter Mot.").] All of these attacks are directed only at Plaintiffs' third claim, the state law claim for breach of fiduciary duty. For the reasons set forth below, the Motion is granted.

A. Plaintiffs' breach of fiduciary duty claim is a direct claim.

Plaintiffs' third claim for breach of fiduciary duty targets both the alleged additional consideration and

the transaction itself. Plaintiffs attack the payments to the Inside Directors as unlawful and in violation of Rule 14(d), alleging the payments were "made pursuant to the merger, contingent on the merger and as an integral part of the merger." [Second Am. Compl. at 19; Plaintiffs' Opposition to U.S. Filter's Motion to Dismiss ("Opp'n to U.S. Filter Mot.") at 13; Second Am. Compl. at 10-12.] As both parties stipulated at the hearing on the Motion, Plaintiffs' third claim is a direct one.

B. US Filter Shareholders tendered their shares but did not ratify the Vivendi transaction.

*7 Defendants argue Plaintiffs' fiduciary duty claims fail because fully informed U.S. Filter shareholders ratified the Vivendi transaction. [US Filter Mot. at 20.]

With ratification, shareholder duty of care claims are extinguished. *Solomon v. Armstrong,* 747 A.2d 1098, 1115 (Del.1999); *Harbor Fin. Partners v. Huinzenga,* 751 A.2d 879, 890 (Del. Ch.1999) ("[T]he effect of untainted stockholder approval of the merger is to invoke the protection of the business judgment rule and to insulate the Merger from all attacks other than on the ground of waste."); *Van Gorkom,* 488 A.2d at 889.] Moreover, in the face of a claim of self-dealing, a fully-informed shareholder vote in favor of the challenged transaction maintains the Business Judgment Rule's presumptions. *Solomon,* 747 A.2d at 1116. The burden then shifts from Defendants to Plaintiffs to rebut the Rule and allege facts showing "no person of ordinary sound business judgment could view the benefits received as a fair exchange for the consideration paid by the corporation." *Solomon,* 742 A.2d at 1116.

Plaintiffs argue that there was never a shareholder vote, only a tendering of shares. Without such a vote, there can be no ratification. [Opp'n to U.S. Filter Mot. at 22.]

Defendants reply that the tender of shares by ninety-six percent of the shareholders *does* constitute ratification. [US Filter's Reply ("US Filter Reply") at 2 (citing *Cinerama,* 663 A.2d at 1176 (Del.1995) ("tender by an overwhelming majority of ... stockholders [is] ... approval and ... constitute [s] substantial evidence of fairness."))]. Moreover, U.S. Filter disclosed the efforts of the Board to obtain the best price for U.S. Filter stock, the terms of the Agreement with Vivendi, and the details of the employment and voting agreements. [US Filter Mot.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2001 WL 418981                                                                    Page 50
(Cite as: 2001 WL 418981, *7 (C.D.Cal.))

at 6-9; US Filter Reply at 3; Roth Decl. at ¶ 9; Ex. G at 243-384; Second Am. Compl. at ¶¶ 2-4.]

The term "ratification" is applied to several different situations, including shareholder approval of a stock option plan and a loan to or from a director or officer. *In re Wheelabrator Technologies, Inc. Shareholders Litigation,* 663 A.2d 1194, 1201, n .4 (Del. Ch.1995) (*"Wheelabrator II"* ); *Solomon,* 747 A.2d at 1115, n. 40. Moreover, ratification has a variety of effects on a board's decision, depending on the circumstances. *See id.* In any event, a shareholder vote is a required component of ratification. In *Wheelabrator II,* the court explained that in light of all the different methods of ratification, the term "has now acquired an expanded meaning intended to describe any approval of challenged board action by a *fully informed vote* of shareholders, irrespective of whether that shareholder vote is legally required for the transaction to attain legal existence." (emphasis added). 663 A.2d at 1201, n. 4. Accordingly, Defendants' ratification defense is not a bar to Plaintiffs' breach of fiduciary duty claim.

C. US Filter's certificate of incorporation bars Plaintiffs' duty of care claim.

1. Judicial Notice

**\*8** Defendants argue U.S. Filter's certificate of incorporation bars Plaintiffs' duty of care claims and ask the Court to take judicial notice of the certificate of incorporation. [US Filter Mot. at 23, n. 20; US Filter Request for Judicial Notice.] A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. [FN9] Fed.R.Evid. 201(b).

> FN9. US Filter Defenants also ask the Court to take judicial notice of U.S. Filter'sQuarterly Report, the Solicitation Recommendation Statemnt, the Offer to Purchase, and U.S. Filter's Current Report. (exhiits G, H, I and J). The Court may take judicial notice of th contents of documents filed with an administrative agency *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018, fn. (5th Cir.1996). Fed. Rule Evid. 201(b)(2); *Bryant v. Avado Brads, Inc.,* 187 F.3d 1271, 1283 (11th Cir.1999) (taking judicial notie of relevant public documents required to be filed with the SEC fo the purpose of determining what

statements the documents containand not to prove the truth of the documents' contents); *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (holding publicy filed SEC documents could be judicially noticed under at motin to dismiss stage); *Cortec Indus., Inc. v. Sum Holding L.P.,* 99 F.2d 42, 47 (2d Cir.1991) (citing *Kramer* ). Furthermore, Plaintifs quote the documents in their Complaint. *Branch v. Tunnell,* 14 F.3d 449 (9th Cir.1994), *cert. denied,* 512 U.S. 1219, 114 S.Ct.2704, 129 L.Ed.2d 832. US Filter Defendants also ask te Court to take judicial notice of all five consolidated complains and four dismissals. These requests are granted. The Court alo takes judicial notice of the stock price in Exhibit K. *Plevyv. Haggerty,* 38 F.Supp.2d 816, 835 (C.D.Cal.1998) (finding sock price appropriate for judicial notice); *In re 3Com Securitis Litigation,* 1999 WL 1039715,*4 (N.D.Cal.1999) (taking judicia notice of closing stock price because cited by plaintiff in Complint and capable of verification). Finally, U.S. Filter asks the Cort to take judicial notice of Exhibit L, a collection of article concerning the company. As these contain facts in controversy nd are not publicly filed and easily verified, the Court dnies the Request as to Exhibit L.

The certificate of incorporation of a Delaware corporation is a publicly filed document, and as such, can be judicially noticed. *See In re Wheelabrator Technologies Inc. Shareholders Litigation,* No. Civ. A. 11495, 1992 WL 212595 at *11, 18 Del. J. Corp. L. 778, 800 (Del. Ch. Sept. 1, 1992) (taking judicial notice of exculpatory clause in certificate of incorporation Rule as the certificate is filed with the office of the Secretary of State of Delaware, a source "whose accuracy cannot reasonably be questioned") (citing *Diceon Electronics, Inc. v. Calvary Partners, L.P.,* 772 F.Supp. 859 (D.Del.1991) ("On a motion to dismiss the Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered.").

2. Certificate of Incorporation

Article VIII of U.S. Filter's certificate of incorporation provides:

> To the fullest extent permitted by the General Corporation law of Delaware ... a director of this corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

[Declaration of Carl Roth, Ex. F (U.S. Filter certification of incorporation).] Such exculpation clauses are valid under Delaware law. 8 Del. C. § 102(b)(7) (corporations are empowered to shield directors from breaches of the duty of care); *See Wheelabrator,* 1992 WL 212595 at \*11.

Plaintiffs, however, argue Defendants' use of the certificate of incorporation is an affirmative defense and, as such, may not be used as a grounds for a motion to dismiss. [Opp'n to U.S. Filter Mot. at 23.] Plaintiffs cite *In re Fredericks of Hollywood, Inc. Shareholder Litig.,* 2000 Del. Ch. LEXIS 19 (January 21, 2000) in support of their argument. The court in *Fredericks,* however, held that Defendants could use the exculpatory clause in the certificate of incorporation to shield them from duty of care claims, provided that "a dismissal on that ground does not prevent a plaintiff from pursuing well-pleaded claims that the directors breached their fiduciary duty of loyalty." 2000 Del. Ch. LEXIS 19 at \*19 (citing *Emerald Partners v. Berlin,* 726 A.2d 1215 (Del.1999)). Here, dismissal of Plaintiffs' breach of fiduciary duty of care claims by the exculpatory clause does not preclude Plaintiffs' duty of loyalty claim.

Accordingly, U.S. Filter's certificate of incorporation bars Plaintiffs' third claim insofar as it is based on the duty of care.

**D. Plaintiffs fail to assert facts to overcome the presumption of the Business Judgment Rule.**

**1. The Business Judgment Rule**

**\*9** Plaintiffs' third claim [FN10] for breach of the duties of care and loyalty fails to overcome the strong presumption of the Business Judgment Rule.

> FN10. As the certifiate of incorporation bars Plaintiffs' duty of care claim, the Cort now need only address Plaintiffs' duty of loyalty claim. The Cort, however, will address the merits of *both* the care and loyalty laims.

The Business Judgment Rule "sets up a presumption that directors' decisions are made in good faith and are based upon sound and informed business judgment." *Unocal Corp. v. Mesa Petroleum, Co.,* 493 A.2d 946, 958 (Del.1985) ("The business judgment rule is a 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action taken was in the best interests of the company." ') (*citing Aronson v. Lewis,* 473 A.2d 805 (Del.1984), *overruled by Brehm v. Eisner,* 746 A.2d 244 (Del.1998)); *Kahn on Behalf of DeKalb Genetics Corp. v. Roberts,* 679 A.2d 460, 461 (Del.1996); *F D.I.C. v. Castetter,* 184 F.3d 1040 (9th Cir.1999); *Lee v. Interinsurance Exch.,* 50 Cal.App. 4th 694, 715 (1996).

The Rule reflects the principle that the business and affairs of a corporation are managed by or under the corporation's board of directors. *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345 (Del.1993). In exercising their managerial powers, "directors are charged with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders." *Cede,* 634 A.2d at 360; *Smith v. Van Gorkom,* 488 A.2d 858, 872.

The Business Judgment Rule "posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be "attributed to any rational business purpose." *Cede,* 634 A.2d at 360 (Del.1993) (citing *Sinclair Oil Corp. v.. Levien,* 280 A.2d 717, 720 (Del.1971)); *In re J.P. Stevens & Co ., Inc.,* 542 A.2d 770, 780-81 (Del. Ch.1988) (finding decision in question must be "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith"); *A.C. Acquisitions Corp. v. Anderson, Clayton & Co.,* 519 A.2d 103, 111 (Del.1986).

Thus, a shareholder plaintiff challenging a board decision has the burden at the outset to rebut the rule's presumption. *Van Gorkom,* 488 A.2d at 872 (Del.1985); *Cede,* 634 A.2d at 360. To rebut the Rule, plaintiff must "provide evidence that directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty--good faith, loyalty or due care." *Cede* 634 A.2d at 360. If the plaintiff cannot overcome the presumption, the business judgment rule attaches to protect corporate officers and directors and the decisions they make, and courts hesitate to second-guess such decisions. *Van Gorkom,* 488 A.2d at 872; *Cede,* 634 A.2d at 360; *Aronson,* 473 A.2d at 812 (finding, on motion to dismiss, burden is on party challenging decision to establish facts rebutting presumption). Should a plaintiff rebut the Rule, the burden shifts to the defendant directors to prove the "entire fairness" of the transaction. *Cede,* 634 A.2d at 360.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2. Plaintiffs' Duty of Care Claim

*10 In the context of a merger or a sale, directors are charged with the duty of informing themselves of all material information reasonably available to them before voting on a proposed plan. *Cede,* 634 A.2d at 368 (citing *Aronson,* 473 A.2d at 812). The duty of care, therefore, is a duty to act on an informed basis. *Id* . Under the Rule's presumption, a court will not find the directors to have breached their duty of care unless they individually "and the board collectively have failed to inform themselves fully and in a deliberate manner before voting." *Cede* 634 A.2d at 368 (citing *Van Gorkom,* 488 A.2d at 873; *Aronson,* 473 A.2d at 812).

Plaintiffs claim Defendants, in accepting the Vivendi offer, breached their fiduciary duty of care and failed to "take all reasonable steps to assure the maximization of stockholder value." [Second Am. Compl. at 23.] Defendants failed both to implement a bidding mechanism to foster a fair auction of the company to the highest bidder, and to explore other purchasers or strategic alternatives which would return greater value to Plaintiffs. [Second Am. Compl. at 23.] In addition to agreeing to an inadequate stock price, Defendants consummated agreements containing lock-up provisions (granting Vivendi, for no consideration, an option to purchase 19.9% of U.S. Filter in the event U.S. Filter terminated the agreement); termination fees (requiring U.S. Filter to pay 245 million dollars to Vivendi should it accept another offer); and no-shop clauses (prohibiting U.S. Filter from soliciting, initiating, or encouraging any other offer). [Second Am. Compl. at 24; Roth Decl. ¶ 11, Ex. I at 445.]

*Provisions of the Agreement*

Regarding the lock-up provisions, termination fee and no-shop clauses, the Court's inquiry focuses on whether or not these measures would act to foreclose other offers or "merely to afford some protection to prevent disruption of the Agreement by proposals from third parties that are neither bona fide nor likely to result in a higher transaction." *Matador Capital Management Corp. v. BRC Holdings, Inc.,* 729 A.2d 280, 293 (Del. Ch.1998).

In *Matador,* the court was asked to enjoin a proposed merger on the basis of, among other issues, provisions similar to those challenged by Plaintiffs. In analyzing the no-shop provision, the court reasoned that it was not, in fact, a defensive measure because it

did not prevent the board from responding to unsolicited inquiries. 729 A.2d at 291. Instead, the measure required the board to respond to situations only where the board has made a good faith determination that the unsolicited offer was bona fide and may result in a transaction more favorable to stockholders. 729 A.2d at 291.

Here, Plaintiffs allege U.S. Filter's acceptance of the no-shop provision was a breach of its duty of care. This argument overlooks a key clause in the no-shop provision, however, requiring the Board to consider any bona fide written proposal, if rejection of such would be a breach of the Directors' fiduciary duty. [Roth Decl., Ex. I at 444.]

*11 Similarly, the lock-up provision and the termination fee do not foreclose other offers. Rather, they provide some guarantee and stability to the offer on the table. *See Matador,* 729 A.2d at 291, & n. 15 (explaining termination fees are not unusual in merger context) (citing *Kysor Indus. Corp. v. Margaux, Inc.,* 674 A.2d 889, 897 (Del.1996). Moreover, Plaintiffs do not claim that any of the challenged provisions chilled other bidders. *See Yanow v. Scientific Leasing, Inc.,* 1988 WL 8772 at *5, 13 Del. J. Corp. L. 1273, 1281 (Del. Ch. Feb. 8, 1988) (noting that the restrictive provision was not a lock-up option that would operate to preclude higher bids). Finally, the existence of the provisions was disclosed to all U.S. Filter shareholders. [US Filter Mot. to Dismiss at 8.] In sum, the challenged provisions do not support Plaintiffs' attempt to claim breach of the duty of care.

*Failure to Accept Adequate Price*

Second, Plaintiffs charge Defendants failed to investigate and accepted an inadequate price for the stock. [First Am. Compl. at 23.] Courts are hesitant to challenge a board's decision to recommend an offer where there is no evidence of a competing offer. *Matador,* 729 A.2d at 293 (finding the failure of competitors to make a bid within a month after the transaction was evidence that directors obtained best offer and therefore refusing to enjoin proposed merger); *Barkan v. Amsted Industrial, Inc.,* 567 A.2d 1279, 1287 (Del.1979) ( "[W]hen it is widely known that some change of control is in the offing and no rival bids are forthcoming over an extended period of time, that fact is supportive of the board's decision to proceed."); *Cf. Paramount Communication Inc. v. OVC Network, Inc.,* 637 A.2d 34, 46 (Del.1994) (upholding claim because directors favored one bidder over another). Plaintiffs fail to allege U.S.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Filter ever received a competing offer.

The Court is not persuaded that the Directors breached their duty of care by recommending the transaction at a time the stock was at a low point. *See Eisenberg v. Chicago Milwaukee Corp.,* 537 A.2d 1051, 1061 (Del. Ch.1987) ( "In what sense do corporate officers behave inequitably if they cause the corporation to offer to purchase its own publicly-sold shares at a premium above market, even if the market price is at an historic low?") Although the *Eisenberg* court enjoined the self tender offer on other grounds, it explained that if a disclosure of all material facts had been made, the fact that directors timed the offer to coincide with low preferred stock price levels still did not render the transaction involuntary and coercive. 537 A.2d at 1061.

*Revlon Duties*

Finally, Plaintiffs cite *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 180 (Del.1986), in which the court found that when a transaction results in a change in control of the company, the transaction is subject to enhanced scrutiny and defendants have the burden to show they were informed adequately and acted reasonably. [Opp'n to U.S. Filter Mot. at 14; *Paramount,* 637 A.2d at 45; *Barkan,* 567 A.2d at 1286.] Assuming that *Revlon* duties attach here, [FN11] Plaintiffs have not alleged facts adequate to support their claim.

>        FN11. There is some ispute among
>        Delaware courts as to whether or not a
>        break-up of he company is required to
>        trigger *Revlon* duties. *See Whelabrator,*
>        1992 WL 212595 at * 11.

*12 In *Barkan,* the Delaware Supreme Court explained *Revlon* duties in the context of a merger with a single bidder. 567 A.2d at 1286. *Revlon* held that in the case of multiple bidders, directors cannot use defensive tactics that destroy the auction process. *Id.* (citing *Revlon,* 506 A.2d at 182-85). The *Barkan* court noted:

>        *Revlon* does not demand that every change in the
>        control of a Delaware corporation be preceded by
>        a heated bidding contest.... When the board is
>        considering a single offer and has no reliable
>        grounds upon which to judge its adequacy, this
>        concern for fairness demands a canvas of the
>        market to determine if higher bids may be
>        elicited.... When, however, the directors possess a
>        body of reliable evidence with which to evaluate

the fairness of a transaction, they may approve that transaction without conducting an active survey of the market.

*Barkan,* 568 A.2d at 1286. Although the court explained that a canvas of the market is preferable to analysis of investment banks (as was done here), the court clarified that no one method of information gathering is required by a board. *Id.* Accordingly, the court found that the advice of investment bankers, "coupled with the special circumstances surrounding the negotiation and consummation of the ... [transaction] supported a finding that Amsted's directors had acted in good faith to arrange the best possible transaction for shareholders." *Id.*

Furthermore, as the court explained in *In re Wheelabrator,* Plaintiffs need to allege more than a change in control to avoid dismissal of their *Revlon* claims; they must allege specific facts of breach of duty such as a lack of information. *In re Wheelabrator,* 1992 WL 212595 at **8-9 ("[E]ven if there occurred a 'fundamental change of corporate control' that triggered *Revlon* duties ... plaintiffs have not alleged ... directors were so uninformed ... that they violated their *Revlon* duties ... What the plaintiffs do allege is ... directors failed to conduct a market check to assure themselves that there were no superior alternative transactions. That, without more, is insufficient.") Alleging the board wrongly delegated the decision to its financial advisors was insufficient, according to the *Wheelabrator* court. *Id.* Plaintiffs were required to make allegations regarding how much the board knew:

>        The focus of that allegation is upon the scope of
>        the financial advisors' investigation, not upon the
>        directors' knowledge of the company's value.
>        While overseeing a faulty investigation might
>        constitute a breach of other fiduciary duties owed
>        by directors under more general principles, that
>        conduct does not constitute a breach of Revlon
>        duties as described in *Barkan.* Because the
>        complaint fails to allege a breach of *Revlon* duties
>        under the standards of either *Barkan* or
>        *Paramount,* the plaintiffs' Revlon claims must be
>        dismissed.

*13 *Id.*

In this case, Plaintiffs fail to allege specific facts of unreasonable behavior by the Directors. In fact, Plaintiffs admit that beginning in January, 1996, Defendants spent almost two years negotiating the transaction, conducting "due diligence", approving possible merger partners, and retaining investment

banks (Salomon Smith Barney and J.P. Morgan) to conduct market checks and issue fairness opinions. [Opp'n to U.S. Filter Mot. at 5; Declaration of Leigh Parker, Ex. B. (Solicitation/Recommendation Statement) at 000054.] Plaintiffs allege nothing to suggest that under the circumstances of the transaction, the market checks and fairness opinions were inadequate. As in *Barkan,* the circumstances surrounding the Vivendi tender offer support a finding that the directors exercised the requisite due care. 567 A.2d at 1287.

Discussions between U.S. Filter and Vivendi regarding a potential merger and tender offer began in January, 1999. [US Filter Mot. to Dismiss at 6.] On March 26, 1999 Vivendi issued its tender offer statement to U.S. Filter shareholders. [First Am. Compl. at 1.] From this time, shareholders had twenty-seven days to tender their shares. [US Filter Mot. to Dismiss at 9.] During this time, U.S. Filter was "in play." *Barkan,* 567 A.2d at 1287. From March 26 to April 22, 1999, however, not one bidder emerged to make a competing offer, nor did any emerge during the time Vivendi and U.S. Filter were discussing the transaction. [US Filter Mot. to Dismiss at 9.] Moreover, the price offered to U.S. Filter shareholders was a twenty-five percent premium about the share price. [US Filter Mot. to Dismiss at 1.]

Plaintiffs emphasize analysts' reports that U.S. Filter looked promising, was on target to meet its restructuring goals, and was moving forward to capitalize on its 1998 acquisition of Culligan. [Second Am. Compl. at 8.] A director of Credit Suisse First Boston announced that despite the poor performance of the U.S. Filter stock, U.S. Filter would improve its profit margin and shareholders would, in turn, see value created and be "richly rewarded." [Second Am. Compl. at 9.] Moreover, analysts termed U.S. Filter's management team "the best senior management team out of all the environmental companies on Wall Street." [Second Am. Compl. at 9.] With such a team, U.S. Filter had "open-ended growth potential." [Second Am. Compl. at 10.] None of this, however, alleges a breach of the duty of care. US Filter may have been promising and well run, and may have begun both to capitalize on its acquisition and restructure, but Vivendi still paid a twenty-five percent premium above U.S. Filter's twenty-five dollar share price. [US Filter Mot. at 1.] Plaintiffs' call for a required bidding contest fails. *See Freedman v. Restaurant Assocs.,* Civ. A. No. 9212, 1990 LEXIS 142, at \*\*16-17 (Del. Ch.1990)

(dismissing claim that directors had breached duty under *Revlon* by failing to hold auction); *Barkan,* 567 A.2d at 1286 (finding no one action the Board must take to analyze single offer).

**\*14** In light of these circumstances, Plaintiffs fail to rebut the presumption that Defendants exercised the requisite due care in approving the transaction and adequately informed themselves of the value of the company.

3. Plaintiffs' Duty of Loyalty Claim

The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director." *Cede* 634 A.2d at 361.

Plaintiffs allege Messrs. Heckmann, Seidel and Spence, "US Filter Insiders," breached their duty of loyalty by accepting additional consideration. Plaintiffs claim: "Knowing that the U.S. Filter Insiders as a group controlled less than 2% of U.S. Filter's outstanding shares, the Vivendi Defendants realized the U.S. Filter Insiders' agreement to support, and endorse the tender offer was crucial." [Second Am. Compl. at 16.] In return for their endorsement, the Insiders received payment of more than 11.55 million dollars plus the gross-up payment. [Second Am. Compl. at 2.] Although the payments were made "under the guise of new employment agreements" [Second Am. Compl. at 3], they became effective only if the offer was successful.

To prevail on their breach of loyalty claim, Plaintiffs must overcome the Business Judgment Rule presumption and show a majority of the U.S. Filter Directors had personal interests potentially adverse to the interests of U.S. Filter and its shareholders. *Cinerama, Inc. v. Technicolor. Inc.,* 663 A.2d 1156, 1168 (Del.1995) (holding to maintain duty of loyalty claim, plaintiff must show materially self-interested board members 1) either constituted majority of or controlled and dominated the board or failed to disclose their interests in the transaction to the board and 2) a reasonable board member would have regarded the existence of their material interests as a significant fact in the evaluation of the proposed transaction) (citing *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1153 (Del. Ch.1994)), *rev'd on other grounds* 758 A.2d 485 (Del.2000)).

Absent such a showing by Plaintiffs, the presence of several potentially interested or conflicted directors

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

does not deprive the board as a whole of the Business Judgment Rule's presumption of loyalty. *Cede,* 634 A.2d at 363 (rejecting argument that one director's receipt of tangible benefit not shared by stockholders is sufficient to overcome the business judgment presumption); *McMillan v. Intercargo Corp.,* No. Civ. A. 16963, 2000 WL 516265 (Del. Ch., Apr. 20, 2000) (citing *Cinerama* and finding plaintiffs had not pled facts sufficient to rebut business judgment presumption and state a claim for breach of duty of loyalty).

Plaintiffs have not alleged facts, which, if true, show that a majority of the Board had any personal interest in the alleged injurious transactions. Indeed, they allege only three of the eleven Directors stood to gain from the Vivendi transaction. *Thompson v. Enstar Corp.,* 509 A.2d 578, 581 (Del. Ch.1984) (dismissing action for failure to overcome business judgment rule presumption when ten of twelve directors were acting independently); *McMillan,* 2000 WL 516265 at *8 ("The independence and disinterestedness of five of the eight directors is unchallenged. The presence of an unconflicted board majority undercuts any inference that the decisions of the ... board can be attributed to disloyalty.").]

*15 Moreover, Plaintiffs do not assert the three Insiders coerced or influenced the rest of the Board's decision to approve the Merger. Plaintiffs cite *Parnes* for support of their argument that one director can taint the entire merger process. [Opp'n to U.S. Filter Mot. At 19.] The facts of *Parnes,* however, are distinguishable. In that case, the court found that one director, by demanding a bribe in exchange for his approval of a merger, tainted the entire process, and the board members breached their duty when they *acquiesced* to the director's demand for a bribe. *Parnes,* 722 A.2d at 1246. Moreover, the corrupt director in *Parnes* was the central decision-maker in the merger process. *Id.* at 1245. Plaintiffs here do not allege the Inside Directors tainted the entire process, do not allege that the other Directors acquiesced to the demands of the Insiders, and do not allege that the Inside Directors were the key-decision makers in the merger process.

Plaintiffs do allege that the endorsement of the Insiders "was critical to the success of the Tender Offer." [First Am. Compl. at 11.] The *Parnes* court found that it was "inexplicable that independent directors, acting in good faith, could approve" a deal in which one director "tainted the entire process of finding an interested merger partner and negotiating

the transaction by demanding a bribe." 722 A.2d at 1247. Applying that standard here, the Court must determine whether or not it was "inexplicable" for the other directors on the U.S. Filter Board, knowing of the payments totaling 11.55 million to the inside directors, to approve the deal.

If the other directors, in good faith, thought the payments were the recognition of preexisting obligations to the Insiders, their approval of the deal cannot be characterized as inexplicable. In other words, the Court must analyze whether or not the payments were additional consideration (as Plaintiffs argue) or previously owed compensation (as Defendants argue). As the Court concluded in the context of the Vivendi Motion to Dismiss, the payments are the recognition of U.S. Filter's preexisting duty to pay the directors in a change of control context. [*See* Section IV-B, *supra.*] The Board's decision, therefore, was not inexplicable.

Additionally, Plaintiffs' argument that the Insiders "endorsement" of the tender offer tainted the transaction is deflated by the reasoning in *Golaine v. Edwards,* No. Civ. A. 15404, 1999 WL 1271882 at *8 (Del. Ch. Dec. 2, 1999). There, the court dismissed a claim that payment by the acquiring corporation of an additional twenty million dollars in fees improperly tainted the transaction. *Id.* The court found that in the context of an 8.3 billion dollar deal, twenty million dollars was "immaterial." *Id* . Similarly, the 11.55 million dollars paid to the Inside Directors was immaterial in the scheme of this transaction, in which over five billion was at stake. [US Filter Mot. at 14.] Furthermore, the Insider Directors' stock represented only two percent of U.S. Filter's common stock, and by endorsing the tender offer to shareholders, the Board was recommending the directors "vote them out of a [director] job." [US Filter Mot. at 2, 15.] These additional factors highlight Plaintiffs' failure to state a duty of loyalty claim.

*16 Thus, Plaintiffs neither pled that a majority of the Board had a conflict of interest nor that the three Insiders tainted the Board's decision-making process. Moreover, in the context of the larger transaction, Plaintiffs fail to allege that the additional payments were material enough to represent a conflict of interest. Accordingly, Plaintiffs' claim for breach of the duty of loyalty is dismissed.

Defendants have shown Plaintiffs cannot state a claim for breach of fiduciary duty as the exculpatory

clause in the certificate of incorporation bars the duty of care claim and as Plaintiffs are unable to overcome the presumption of the Business Judgment Rule on the duties of care and loyalty claims, and have not sought leave to amend their Complaint. Accordingly, U.S. Filter's Motion is granted and the claim is dismissed without leave to amend. *Schreiber Dist. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986) ("If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.").

VI. Conclusion

Accordingly, as Plaintiffs have failed to state a claim for breach of fiduciary duty and violation of Rule 14d-10 or Rule 20 of the Act, Plaintiffs' third claim against U.S. Filter and first and second claims against Vivendi are dismissed without leave to amend.

IT IS SO ORDERED.

ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION

The Court has received and considered all papers filed in support of, and in opposition to, Plaintiffs' Motion for Reconsideration originally noticed for hearing on April 9, 2001. The Motion is appropriate for resolution without oral argument. *See* Fed.R.Civ.P. 78; Local Rule 7.11 The Motion is DENIED.

I. BACKGROUND

Plaintiffs are stockholders in U.S. Filter Corporation. They filed a class action suit [FN1] on March 23, 1999 against Richard Heckmann, Chairman of the Board of Directors, President, and Chief Executive Officer of U.S. Filter, Nicholas C. Memmo, Andrew Seidel, James Clark, Robert Hillas, John Diedrich, Ardon Moore, C. Howard Wilkins, J. Danforth Quayle, Arthur B. Laffer, and Alfred Osborne, Directors of U.S. Filter ("US Filter Defendants").

> FN1. Lead Plaintiffs: Donald and Sharell Kennedy, James Gemmill, 1111426 Ontario Inc., Tom Hoh, Cam Co., Sheila McMichael, all shareholders of U.S. Filter whose shares were purchased for $31.50. [Second Am. Compl. at 4-5.] The class: all common stockholders in U.S. Filter who are being and will be harmed by Defendants' alleged harmful actions in connection with

Vivendi's acquisition of U.S. Filter ("the Class"), including those who tendered their shares to Vivendi pursuant to the tender offer ("tendering subclass"). [Second Am. Compl. at 1.]

US Filter is a global provider of industrial, municipal, commercial, and consumer water and wastewater systems, products, and services. On March 22, 1999 it announced that its Board of Directors ("Board") had approved a tender offer by Vivendi, S.A. a French environmental services provider, to acquire all outstanding stock (180 million shares) of U.S. Filter for $31.50 a share, or approximately 5.73 billion dollars ("Vivendi Transaction"). [Plaintiffs' Second Amended Consolidated Class Action Complaint ("Second Am. Compl.") at 1] As part of the agreement, U.S. Filter would merge with Eau Acquisition Corp. ("merger"). [Second Am. Compl. at 11-12.]

*17 Plaintiffs alleged the Board's agreement to this merger and tender offer breached its fiduciary duties of care and loyalty. [Second Am. Compl. at 2.] Plaintiffs further alleged three members of the Board--Messrs. Seidel, Heckmann, and Spence ("Inside Directors")--accepted additional consideration of up to 11.55 million dollars from Vivendi, or more than six dollars a share beyond the price paid to all shareholders, for their agreement. [Second Am. Compl. at 2.] As further inducement, Vivendi agreed to "gross up" the payments to the Inside Directors by paying the taxes the Board was required to pay on the payments received in excess of $31.50 a share. [Second Am. Compl. at 2-3.]

Among their claims, Plaintiffs alleged that Vivendi violated Rule 14(d)(10) of the Securities Exchange Act of 1934 by agreeing to pay three U.S. Filter executives additional consideration for their shares in the guise of new employment agreements. [*Id.*] This claim is the subject of Plaintiffs' Motion for Reconsideration.

On September 25, 2000 U.S. Filter, Richard Heckmann, Nicholas Memmo, Andrew Seidel, James Clark, Robert Hillas, John Diedrich, Ardon Moore, C. Howard Wilkens, Jr., J. Danforth Quayle, Arthur B. Laffer and Alfred E. Osborne filed a Motion to Dismiss with the Declaration of Carl Alan Roth. On September 25, 2000 Vivendi SA, Eau Acquisition Corp. and Jean Marie Messier filed a Motion to Dismiss with the Declaration of Andrew Houston. On February 22, 2001 the Court granted both Motions to Dismiss. [*See* Feb. 22, 2001 Order.]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

On March 12, 2001 Plaintiffs filed a Motion for Reconsideration of the Court's Grant of the Motion to Dismiss filed by Vivendi, S.A., Eau Acquisition Corp. And Jean-Marie Messier ("Vivendi") ("Mot. for Recons."). Vivendi filed Opposition on March 26, 2001 ("Opp'n"). Plaintiffs filed a Reply on April 2, 2001.

## II. LEGAL STANDARD

Under Rule 7.16 of the Local Rules of the Central District of California,

> A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

Plaintiffs do not satisfy any of the requirements of Rule 7.16. They admit to offering no material difference in fact or law, or the emergence of any new material facts. [*See* Mot. for Recons.] While they contend that the Court erred in its earlier ruling, they have not made a manifest showing of the failure of the Court to consider material facts presented before it rendered its decision. Accordingly, the Motion for Reconsideration is denied.

## III. ANALYSIS

**\*18** In its February 22, 2001 Order the Court dismissed Plaintiffs' Rule 14(d)(10) claim as Plaintiffs could not allege that the payments to the Inside Directors were additional consideration for acceptance of the tender offer. [Feb. 22, 2001 Order at 9.] As set forth in the Court's Order, the Inside Directors were paid pursuant to 1999 employment agreements. [*Id.* at 12.] The terms of the 1999 employment agreements were identical in substance to preexisting 1998 employment agreements entitling the directors to severance payments. [*Id.*] Plaintiffs failed to allege any facts demonstrating that the payments were any more than U.S. Filter's fulfilment of a pre-existing obligation.

In their Motion, Plaintiffs contend that the Court erred in its reasoning. [Mot. for Recons. at 2.] Such an argument cannot be countenanced on a Motion for Reconsideration. First, despite the Court's finding that the 1998 and 1999 agreements contained substantively identical formulas to calculate severance payments, Plaintiffs now claim that the Court miscalculated the payments and argue that the 1999 agreement did more than honor the obligations of the 1998 agreement. [Mot. for Recons. at 5.] According to their own calculations, Plaintiffs contend (as they did in the Opposition to Vivendi's Motion to Dismiss) that Mr. Heckmann was entitled to *more* under the 1999 agreement that under the 1998 agreement. [Mot. for Recons. at 5.]

Plaintiffs belabor other issues, contesting the purpose of the tender offer itself, claiming that although Mr. Heckmann's termination was required in the 1998 agreement, it was taken out of the 1999 agreement, and challenging the Court's finding that dismissal of the claim was supported by the disclosure of the agreements to the shareholders. [*See* Plaintiffs' Reply to Defendant's Opposition ("Reply") at 1,2; Mot. for Recons. at 6.]

None of this, however, demonstrates a failure to consider material evidence. The Court considered the evidence and arguments presented to it before ruling, including the formulas for severance payment in both agreements, Mr. Heckmann's termination, the actual purpose of the tender offer, and the disclosure of the payments to shareholders. Plaintiffs have failed to show otherwise; rather, they merely disagree with the Court's conclusions. Accordingly, Plaintiffs' Motions fails to satisfy the requirements of Local Rule 7.16(c). [FN2]

FN2. Plaintiffs argue that Local Rule 7.16 cannot "trump" Federal Rule of Civil Procedure 59(e). [Reply at 3.] This argument is misplaced as the standard for reconsideration under the Federal Rules and local rule 7.16 is the same. *School Dist. No. 1J. Multnomah County, Or. v. ACandS, Inc.,* 5 F.3d 1255 (1993) ("Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."), *cert. denied* 512 U.S 1236, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1994).

Finally, Plaintiffs claim that their Second Amended Complaint was tested for the first time by the Motions

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2001 WL 418981
**(Cite as: 2001 WL 418981, \*18 (C.D.Cal.))**

to Dismiss and ask leave to amend their pleading further. [Mot. for Recons. at 8.] As Defendants point out, however, at the hearing on the Motion to Dismiss, the Court noted, and the Plaintiffs conceded, that Plaintiffs' Second Amended Complaint was extremely detailed. [Opp'n at 11 (citing 1/22/01 hearing transcript at 32-33).] The Court, accordingly, "found it hard to fathom" how much more Plaintiffs could allege. [*Id.*] Moreover, neither at the hearing, nor in this Motion, do Plaintiffs indicate what else they seek to allege. Plaintiffs' request for leave to amend, therefore, is denied.

### IV. CONCLUSION

**\*19** Accordingly, Plaintiffs' Motion is DENIED.

IT IS SO ORDERED.

2001 WL 418981 (C.D.Cal.), Fed. Sec. L. Rep. P 91,406

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Not Reported in A.2d
2001 WL 812028 (Del.Ch.)
**(Cite as: 2001 WL 812028 (Del.Ch.))**

**Page 59**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

In re PAXSON COMMUNICATION CORPORATION SHAREHOLDERS LITIGATION

No. CIV.A. 17568.

Submitted: April 25, 2001.
Decided: July 10, 2001.
July 12, 2001.

Joseph A. Rosenthal, Jr., of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; of Counsel: Kenneth J. Vianale and Robert R. Adler, of Milberg Weiss Bershad Hynes & Lerach LLP, Boca Raton, Florida; Milberg Weiss Bershad Hynes & Lerach LLP, New York, New York; Stull, Stull & Brody, New York, New York; Law Offices of Curtis V. Trinko, LLP, New York, New York; Weiss & Yourman, New York, New York; Attorneys for Plaintiffs.

Kenneth J. Nachbar and James G. McMillan, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of Counsel: Tracy Nichols, of Holland & Knight LLP, Miami, Florida; Attorneys for Defendants.

MEMORANDUM OPINION

CHANDLER, Chancellor.

*1 This action arises out of the alleged rejection of a cash offer for Paxson Communications Corporation ("Pax" or the "Company") from Fox Network ("Fox") and the later acceptance by Pax of a series of agreements (the "NBC Transactions") with the National Broadcasting Company, Inc. ("NBC"). The plaintiffs allege that Fox made an all cash offer of $20 per share for Pax common stock (the "Fox Offer") that was summarily rejected by the directors and/or senior officers of Pax. [FN1] Shortly after the alleged Fox Offer, NBC invested $415 million in Pax in exchange for convertible preferred stock, certain warrants, and the right to purchase certain shares owned by Pax's controlling stockholder, Lowell W. Paxson.

FN1. These directors and/or officers of Pax are Lowell W. Paxson, the Chief Executive Officer ("CEO") and Chairman of the Pax Board of Directors (the "Pax Board"), William E. Simon Jr., Jeffrey Sagansky, James Bocock, Bruce Burnham, and James Greenwald (collectively, the "Individual Defendants").

Based on these events, the plaintiffs make two claims, each premised on the Individual Defendants' alleged violations of their fiduciary duties of loyalty and care. Plaintiffs first assert a direct claim, arguing that the defendants abdicated their duty to evaluate and fairly respond to the Fox Offer with a view towards maximizing shareholder value and thereby depriving the Company's shareholders of a substantial premium that Fox (or perhaps another potential bidder) might have been willing to provide ("Claim I"). They also present a derivative claim on behalf of Pax to redress injuries suffered (and to be suffered) by the Company as a result of the Individual Defendants' purported violations of their fiduciary duties ("Claim II"). This is the Court's decision on the defendants' motion to dismiss these two claims.

I. FACTUAL BACKGROUND

Defendant Pax is a Delaware corporation with its headquarters in West Palm Beach, Florida. Pax is a network television broadcasting company that owns and operates the largest group of broadcast television stations in the United States. Pax is a publicly traded company whose Class A common stock trades on the American Stock Exchange. Pax's capital structure also includes Class B common stock. The Class B stock, beneficially owned entirely by Pax Chairman Lowell Paxson, is identical to the Class A stock except that each Class B share possesses ten votes per share. Class A shares possess one vote per share.

The Individual Defendants were the six members of the Pax Board at the time of the challenged NBC Transactions. Lowell Paxson, Jeffrey Sagansky, and James Bocock were also officers of the Company during the period in question. Through his ownership of 39.2% of the Pax Class A stock and 100% of the Pax Class B stock, Mr. Paxson controls approximately 75% of Pax's voting power.

On or about August 9, 1999, Pax issued a press release announcing that it had formally retained

Not Reported in A.2d
(Cite as: 2001 WL 812028, *1 (Del.Ch.))

Salomon Smith Barney ("Salomon") to explore potential strategic alternatives for the Company. In this press release, Pax stated that the Pax Board had decided to pursue this course of action in anticipation that the Federal Communications Commission would loosen ownership restrictions affecting the broadcasting industry.

**\*2** The plaintiffs contend that shortly after issuing this press release, Pax received an unsolicited offer from Fox to acquire Pax for approximately $20.00 per share. They further allege that Pax responded to the Fox Offer with a counter-offer of $26.00 per share, but failed to enter into a genuine negotiating process with Fox aimed at selling the Company. As Pax common stock had traded between $6.00 and $17.4375 over the preceding twelve months, the plaintiffs conclude that this aborted attempt to sell Pax deprived them as Pax shareholders of a substantial premium.

On September 15, 1999, Pax entered into the NBC Transactions. These three agreements included an investment agreement (the "Investment Agreement"), a call option agreement (the "Call Agreement"), and a stockholder agreement (the "Stockholder Agreement"). In the aggregate, NBC and its affiliates paid approximately $415 million for the rights they received in the NBC transactions.

In the first of these transactions, the Investment Agreement, Pax agreed to: (i) sell 41,500 shares of newly created preferred stock in Pax to a wholly owned subsidiary of NBC ("NBC Sub I"), convertible at any time into 31,896,032 shares of Pax Class A common stock for an initial conversion price of $13.01 per share; (ii) issue a warrant ("Warrant A") to another wholly owned subsidiary of NBC ("NBC Sub II") to purchase up to 13,065,507 shares of Pax common stock at an exercise price of $12.60 per share; and, (iii) issue a warrant ("Warrant B") to NBC Sub II to purchase another 18,966,620 shares of Pax common stock at an exercise price equal to the average closing prices of the Class A common stock for the 45 consecutive trading days before the warrant exercise date, subject to a minimum exercise price of $22.50 per share during the three years after September 15, 1999. Subject to certain conditions and limitations, Warrants A and B are exercisable for ten years from September 15, 1999.

Concurrently with the Investment Agreement, a wholly owned subsidiary of NBC entered into the Call Agreement with Lowell Paxson, personally, and

certain entities controlled by him. By the terms of the Call Agreement, the NBC subsidiary was granted the right (the "Call Right") to purchase all, but not less than all, of Mr. Paxson's 8,311,639 shares of Pax's Class B common stock (the "Call Shares"). Under the Call Agreement, the NBC subsidiary may purchase the Call Shares at a price equal to the greater of (i) the average of the closing sale prices of the Class A common stock for the 45 consecutive trading days ending on the trading date immediately preceding the date of exercise of the Call Right; and (ii) $22.50 per share for any exercise of the Call Right within three years of September 15, 1999, or $20.00 per share if the Call Right is exercised thereafter.

The third of the NBC transactions, the Stockholder Agreement, provided, among other things, for NBC to have representation on the Pax Board if permitted by applicable law. The Stockholder Agreement also requires NBC's consent for Pax to take certain actions, including the adoption of a shareholder's rights plan, amendments to Pax's organizational documents, and issuances of stock or other securities.

**\*3** If NBC converts the newly created preferred shares, exercises both warrants, and purchases Lowell Paxson's Class B shares, NBC would own approximately 49% of the equity in Pax and control almost 70% of its voting power.

## II. ANALYSIS
### A. Standard on a Motion to Dismiss

A motion to dismiss under Court of Chancery Rule 12(b)(6) will be granted where it appears with "reasonable certainty" that the plaintiff could not prevail on any set of facts that can be inferred from the pleadings. [FN2] The plaintiff, however, is entitled to all reasonable inferences that can be drawn from the complaint. [FN3] With this standard in mind, I turn to my analysis of the two claims pending before me.

> FN2. *Solomon v. Path Communications Corp.*, Del.Supr., 672 A.2d 35, 38 (1996) (citing *In re USACafes, L.P. Litig.*, Del. Ch., 600 A.2d 43, 47 (1991).

> FN3. *Id.* (citing *In re USACafes*, 600 A.2d at 47).

### B. Claim I

Claim I purports to be a class action claim for breach

of fiduciary duty. The defendants insist that Claim I is in fact a derivative claim that can be brought only on the Company's behalf and, therefore, must be dismissed for failure to state a direct claim.

The Delaware courts are often faced with the complex task of distinguishing derivative claims from individual claims. [FN4] The distinction between the rights of the corporation as opposed to the individual rights of shareholders is often "a narrow one" that can have extremely important consequences for litigation. [FN5] Among these consequences are:

> FN4. *See generally* Donald J. Wolfe. Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 9- 2(a), 516-26 (1998).

> FN5. *Kramer v. Western Pacific Indus., Inc.,* Del.Supr., 546 A.2d 348, 351-52 (1988).

> the possible dismissal for an unjustified failure to demand that the board institute litigation; the general inability of a derivative plaintiff to engage in discovery relevant to the demand issue when dismissal on such grounds is sought; [and,] the ability of a special litigation committee of the board to terminate even a properly instituted derivative action as to which demand has been shown to be futile. [FN6]

> FN6. Wolfe and Pittenger, § 9-2(a) at 516.

In determining whether a given claim is derivative or direct in nature, this Court must look to " 'the nature of the wrong alleged' and the relief, if any, which could result if plaintiff were to prevail." [FN7] In determining the nature of the wrong alleged, the Court will not be bound by the plaintiff's characterization of the claim in the complaint, but rather must look to "the body of the complaint." [FN8]

> FN7. *Kramer,* 546 A.2d at 352 (quoting *Elster v. American Airlines, Inc.,* Del. Ch., 100 A.2d 219, 221-23 (1953)).

> FN8. *Kramer,* 546 A.2d at 352 (quoting *Lipton v. News Int'l PLC,* Del.Supr., 514 A.2d 1075, 1078 (1986).

To have standing to sue directly rather than derivatively on behalf of the corporation, the plaintiff

must have been injured "*directly* or *independently* of the corporation." [FN9] In other words, the plaintiff needs to have sustained a "special injury," defined as "a wrong inflicted upon [a shareholder] alone or a wrong affecting any particular right which [that shareholder] is asserting,--such as his preemptive rights as a stockholder, rights involving the control of the corporation, or a wrong affecting the stockholders and not the corporation." [FN10]

> FN9. *Kramer,* 546 A.2d at 352.

> FN10. *Lipton,* 514 A.2d at 1079 (citing *Elster v. American Airlines, Inc.,* Del. Ch., 100 A.2d 219, 222 (1953)).

Although there is no standard test that shall be mechanistically applied in all cases to determine whether a given claim is derivative or direct, probably the most-cited formulation is that of former Chancellor Brown in *Moran v. Household International Inc.:*

> *4 To set out an individual action, the plaintiff must allege either 'an injury which is separate and distinct from that suffered by other shareholders,' ... or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation. [FN11]

> FN11. 490 A.2d 1059, 1070 (1985), *aff'd,* Del.Supr., 500 A.2d 1346 (1986) (quoting 12b Fletcher Cyclopedia of Corps, § 5921, at 452 (perm.ed., rev.vol.1984)).

The Supreme Court has made clear that although Chancellor Brown's *Moran* formulation may serve as "a quite useful guide," that test is not conclusive. [FN12] Rather, Delaware courts must ultimately look "to whether the plaintiff has alleged 'special' injury, in whatever form." [FN13]

> FN12. *Lipton,* 514 A.2d at 1078.

> FN13. *Id.*

In this case, the plaintiffs assert that they have suffered two distinct, direct injuries that each bestow standing on the plaintiffs to bring direct claims against the defendants. Plaintiffs point to the dilution of their ownership interest, earnings per share and voting power due to the effect of the NBC Transactions. Additionally, plaintiffs argue that the Pax Board's failure to pursue the Fox Offer in favor of the NBC Transactions resulted in the loss of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

opportunity for the shareholders to receive optimum value for their investment in Pax. I address each of these contentions in turn.

First, the plaintiffs argue that "it is well-settled that equity dilution and diminution of one's voting power constitutes a direct injury to the shareholders and not the corporation." [FN14] They contend that the NBC Transactions will dilute the equity and voting power of the plaintiff shareholders should NBC Sub I convert its 41,500 shares of preferred stock into 31,896,032 shares of common stock and NBC Sub II exercise its warrants to purchase a total of 32,032,127 shares of Pax common stock.

FN14. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 9.

Plaintiffs point to two cases, *In re Tri-Star Pictures, Inc. Litigation* [FN15] and *Oliver, et al. v. Boston University, et al.* [FN16] to support the proposition that their dilution claim is direct rather than derivative. Their reliance on these two cases, however, is misplaced. In *Tri-Star,* the plaintiffs, former stockholders of Tri-Star Pictures, Inc. ("Tri-Star"), challenged an assets for stock transaction between Tri-Star and Coca-Cola Company ("Coca-Cola"), a 36.8% stockholder of Tri-Star before the transaction. [FN17] The complaint alleged that Coca-Cola had wrongfully manipulated the transaction to receive an excessive amount of Tri-Star shares in exchange for assets having a lower value. As a result of the transaction, Coca-Cola obtained an 80% stock interest in Tri-Star and the public shareholders, who had formerly owned 43.4% of the common equity, now owned only 20% of Tri-Star's equity. [FN18] Because Coca-Cola, a significant stockholder of Tri-Star before the transaction, did not suffer a similar dilution of their percentage ownership or their voting power as compared to the plaintiffs, the Supreme Court held that the plaintiffs had suffered a special injury not shared equally by all shareholders. [FN19] This rendered the plaintiffs' claims direct and not derivative in nature. [FN20]

FN15. Del.Supr., 634 A.2d 319 (1993).

FN16. Del. Ch., C.A. No. 16570, mem. op., Steele, V.C. (July 18, 2000).

FN17. *Tri-Star,* 634 A.2d at 321.

FN18. *Id.* at 330-31.

FN19. *Id.* at 330.

FN20. *Id.*

**\*5** Similarly, in *Boston University,* plaintiffs, investors in Seragen, Inc. ("Seragen"), argued that the defendants, controlling shareholders, directors, and officers of Seragen, unfairly took advantage of their controlling position to dilute the minority's interests, engage in self-dealing, and effect a merger that resulted in a disproportionate amount of consideration to be paid to the controlling shareholders. [FN21] The Court held that for the purposes of a motion to dismiss, the plaintiffs had adequately alleged a direct claim, noting that "the defendants engaged in self-dealing that resulted in reduced voting power and stock dilution." [FN22]

FN21. *Boston University,* mem. op. at 1-2.

FN22. *Id.* at 6.

Together, *Tri-Star* and *Boston University* stand for the proposition that dilution claims are individual in nature where a significant stockholder's interest is increased "at the sole expense of the minority." [FN23] *Tri-Star* and *Boston University* have no application, in my opinion, where the entity benefiting from the allegedly diluting transaction, NBC, is a third party rather than an existing significant or controlling stockholder. This identical distinction was also made by Vice Chancellor Jacobs in *Turner v. Bernstein.* [FN24] In that case, Vice Chancellor Jacobs noted that a claim of stock dilution and a corresponding reduction in a stockholder's voting power states a direct claim

FN23. *Tri-Star,* 624 A.2d at 330.

FN24. Del. Ch., C.A. No. 16190, slip op. at 44-45, Jacobs, V.C. (Feb. 9, 1999). *See also In re Ply Gem Indus., Inc. Shareholders Litig.,* Del. Ch., Consol. C.A. No. 15779-NC, Noble, V.C. (June 26, 2001).

only in transactions where a significant stockholder sells its assets to the corporation in exchange for the corporation's stock, and influences the transaction terms so that the result is (i) a decrease (or 'dilution') of the asset value and voting power of the stock held by the public stockholders and (ii) a corresponding increase (or benefit) to the shares held by the significant stockholder. [FN25]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FN25. *Id.*

Under this principle, to the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares of Pax results from the issuance of new equity to a third party (NBC), plaintiff's dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed.

Plaintiffs also argue that the Call Agreement between NBC and Lowell Paxson confers a benefit on him, namely, "the potential sale of his Class B stock for prices unavailable to the public shareholders at the time (or, indeed, thereafter up to the present)." [FN26] Thus, plaintiffs assert that the overall injury to Pax's shareholders is not shared equally by all shareholders, Lowell Paxson is engaging in self-dealing, and Claim I is therefore direct. This argument also fails, as it fundamentally misunderstands the nature of a call option.

FN26. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 10.

As explained above, the Call Agreement entered into by a wholly owned subsidiary of NBC with Lowell Paxson, personally, and certain entities controlled by him, grants the NBC subsidiary the right to purchase all, but not less than all, of Mr. Paxson's Class B Shares of Pax at a price specified by the agreement for a period of ten years. The Call Agreement does not necessarily confer on Mr. Paxson "the opportunity to sell [his] shares to NBC for between $20.00 and $22.00 per share." [FN27] Rather, the Call Agreement grants NBC the right, for a specified period, to purchase Mr. Paxson's shares *only if NBC should so desire.* Thus, Mr. Paxson has obligated himself to sell his Pax shares to NBC at a fixed price or if higher, the market price, but only if NBC chooses to exercise its Call Right. As stockholders are assumed to act in their own economic self-interest, NBC will exercise its Call Right only if it believes it is in its own best interests to do so. [FN28] That is, NBC will exercise should it believe that the value of Mr. Paxson's stock exceeds the call price.

FN27. *Id.* at 3.

FN28. *See Unitrin, Inc. v. American Gen. Corp.,* Del.Supr., 651 A.2d 1361, 1380-81 (1995).

**\*6** As the defendants point out, the Call Agreement actually places several very important burdens on Mr.

Paxson's ownership of the Class B stock. First, Mr. Paxson has precluded himself from selling his shares to any other person or entity besides NBC for the duration of the Call Right. No other Pax stockholder has similarly had his liquidity taken away in this manner. Second, Mr. Paxson has agreed to relinquish a portion of any possible appreciation in his Pax stock above $20.00 or $22.50 per share. No other Pax shareholder has similarly relinquished his right to equity appreciation by having to sell at a defined or average price. Third, Mr. Paxson has agreed to sell his Class B stock, which alone provides control of the Company, to NBC at NBC's sole discretion, without necessarily receiving the control premium his shares would ordinarily command. As the Call Agreement imposes substantial burdens on Mr. Paxson, in contrast to the substantial benefits alleged by plaintiffs, this argument in favor of plaintiffs' standing to bring a direct claim also fails.

In the plaintiffs' second attempt to support a direct claim, they allege that the defendants' failure to properly explore the Fox Offer, and later engage in serious negotiations with Fox, deprived the plaintiffs of the opportunity to realize the optimum value for their Pax stock. This, according to the plaintiffs, caused them to suffer individual injury. In substance, the plaintiffs argue that as soon as the Pax Board announced that Pax had retained Salomon to "explore strategic alternatives," the plaintiffs were entitled to a reasonable inference that the individual defendants had engaged in an active bidding process seeking to sell Pax and were under a fiduciary obligation to maximize value for the Pax shareholders in accordance with *Revlon, Inc. v. McAndrews & Forbes Holdings, Inc.* [FN29] This argument fails for at least two reasons.

FN29. Del.Supr., 506 A.2d 173 (1986); *see also Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 47 (1994) ("Under Delaware law there are, generally speaking and without excluding other possibilities, two circumstances which may implicate *Revlon* duties. The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company.") (quoting *Paramount Communications, Inc. v. Time Inc.,* Del.Supr., 571 A.2d 1140, 1150 (1990).

First, the plaintiffs have failed to distinguish these facts from the numerous cases that have previously

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
**(Cite as: 2001 WL 812028, \*6 (Del.Ch.))**

held that allegations that directors wrongfully failed to pursue business combinations are derivative in nature. Vice Chancellor Hartnett's opinion in *Sumers v. Beneficial Corporation* is representative of this line of authority. [FN30] In *Sumers,* the plaintiff alleged that directors of Beneficial Corporation announced that the corporation was for sale and then "summarily and arbitrarily rejected, without timely disclosure to the public shareholders," acquisition offers made at substantial premiums over the market price. [FN31] The Court held that

>        FN30. Del. Ch., C.A. No. 8788, mem. op., Hartnett, V.C. (Mar. 9, 1988). *See also Bodkin v. Mercantile Stores Co.,* Del. Ch., C.A. No. 13770, mem. op., Chandler, V.C. (Nov. 1, 1996); *Lewis v. Spencer,* Del. Ch., C.A. No. 8651, mem. op., Berger, V.C. (Oct. 31, 1989), *aff'd,* Del.Supr., 577 A.2d 753 (1990).

>        FN31. *Sumers,* mem. op. at 2.

> [t]he complaint in the present suit ... does not state any claim of breach of contractual rights, nor any facts which, if true, would constitute a special or individual cause of action. Plaintiffs' injury, if any, is the same as the injury to all other stockholders of [the corporation]. [FN32]

>        FN32. *Id.* at 4.

In the present case, the plaintiffs have represented to the Court that "[t]he Class B stock is identical to the Class A stock except for voting power. The economic attributes are identical." [FN33] They have failed to identify any significant difference between the facts in this matter and those found in the *Sumers* line of cases.

>        FN33. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 10 n. 5.

\*7 Second, *Revlon* does not apply where the plaintiffs cannot allege that a sale or change of control has taken place or necessarily will take place such that the public shareholders of a corporation have been or will be deprived of a control premium. To the contrary, it is clear from the complaint that Mr. Paxson controls Pax through his ownership of 39.2% of the Company's Class A stock and 100% of the Company's class B stock. These holdings collectively represent 75% of Pax's voting power. If NBC exercises its Call Right, a possibility that is by no means assured, it will control Pax. If NBC does

not exercise, Mr. Paxson will retain control. In either circumstance therefore, the minority public shareholders of Pax will be subject to a controlling shareholder. The only difference would be the identity of that controlling shareholder. In other words, the public shareholders of Pax will never be in the position to collectively control the corporation and therefore receive a control premium for their shares.

This Court's recent decision in *In re Digex Shareholders Litigation* [FN34] is directly on point as to *Revlon's* applicability to the facts of this case. There, WorldCom, Inc. ("WorldCom") sought to acquire Digex, Inc. ("Digex"). However, another company, Intermedia Communications, Inc. ("Intermedia"), was the majority shareholder of Digex. Ultimately, Worldcom entered into a merger with Intermedia instead of Digex, a transaction by which it would effectively acquire Intermedia's controlling stake in Digex. During the litigation that ensued, Digex's minority public stockholders sought to assert a *Revlon* claim that they had been deprived of a substantial premium for their shares. The Court rejected this claim, noting that "[t]he Digex minority existed before the proposed merger and it will not change under the proposed transaction. What will change is the ownership of Digex's majority shareholder, Intermedia." [FN35] Similarly here, even if NBC exercises its Call Right, from the perspective of a Pax minority shareholder, all that will change is the identity of the majority shareholder. [FN36]

>        FN34. Del. Ch., C.A. No. 18336, mem. op., Chandler, C. (Dec. 13, 2000).

>        FN35. *Id.* at 40.

>        FN36. *See also In re Santa Fe Pac. Corp. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 70-71 (1995) ("Plaintiffs appear to rest their claim of a duty to seek the best value reasonably available on allegations that the Board initiated an active bidding process. Plaintiffs do not consider, however, that this method of invoking the duty requires that the Board also seek to sell control of the company or take other actions which would result in a break-up of the company.")

The plaintiffs try to avoid *Digex's* reasoning by asserting that the entire Company was for sale, thus triggering the directors' *Revlon* duties, as soon as Pax announced that it "had formally retained Salomon to

explore strategic alternatives." [FN37] Plaintiffs' contend that they are entitled to the reasonable inference that the announcement of the engagement of an investment bank to "explore strategic alternatives" is well-known industry lexicon for a company that has initiated an active sales process. [FN38]

> FN37. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 3, 10-11.

> FN38. *Id.* at 10-11.

This assertion is simply not in accord with Delaware law. The phrase "strategic alternatives" contemplates the possibility of many types of transactions. A sale of the company may be one. It goes without saying, however, that many other types of transactions including special dividend payments, stock repurchases, stock issuances, or recapitalizations are all within the purview of "strategic alternatives." Moreover, numerous cases have held that *Revlon* duties have not applied even where companies have hired investment bankers. [FN39] This case is no different.

> FN39. *See, e.g., In re Santa Fe Pac. Corp.,* 669 A.2d at 70-71; *In re Delta & Pineland Co. Shareholders Litig.,* Del. Ch., C.A. No. 17707, mem. op., Chandler, C. (June 21, 2000).

**\*8** Finally, plaintiffs insist most urgently that this case is controlled by Vice Chancellor Strine's opinion in *In re Gaylord Container Corp. Shareholders Litigation.* [FN40] They invoke *Gaylord* to support their argument that they have suffered a direct injury as a result of being "prevented from receiving an adequate offer for their shares." [FN41] Plaintiffs' reliance on *Gaylord* is misplaced. *Gaylord* involved *Unocal* claims where a board of directors allegedly enacted defensive measures intended to restrict shareholder action and to make an acquisition virtually impossible without the board's consent. Here, the plaintiffs have alleged no *Unocal* claims, nor are there facts present here which could support such a claim. The arguments made in *Gaylord* simply do not apply to the facts present in this case.

> FN40. Del. Ch., 747 A.2d 71 (1999).

> FN41. Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 11.

For all of the reasons discussed above, the plaintiffs'

claims are solely derivative in nature. As such, Claim I must be dismissed for failing to state a direct claim.

## C. Claim II

The plaintiffs have asserted a derivative claim on behalf of Pax to redress injuries allegedly suffered and to be suffered by the Company as a direct result of the Individual Defendants' purported fiduciary duty violations. The defendants argue that Claim II must be dismissed because it fails to meet the pleading requirements of Chancery Rule 23.1 to excuse plaintiffs' failure to make pre-suit demand on the Pax Board. [FN42] Not surprisingly, plaintiffs respond that they are properly excused from making demand because the Pax Board acted for entrenchment purposes, Mr. Paxson dominated and controlled the Pax board, and Mr. Paxson enjoyed a personal financial interest not shared with the other stockholders.

> FN42. Ct. Ch. R. 23.1. The rule states in pertinent part, "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

To allege with particularity that a demand upon the board would have been futile, the plaintiffs must establish a reasonable doubt that: (1) a majority of the board of directors is disinterested and independent; and (2) the challenged transaction was a valid exercise of business judgment. [FN43]

> FN43. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984).

The plaintiffs have attempted to establish reasonable doubt under the first prong of the *Aronson* test by arguing that the directors of Pax were motivated by their desire to remain entrenched. They base this allegation on the argument that had the defendants negotiated a takeover by Fox, the positions of the Individual Defendants may have been in jeopardy. Conversely, the transaction ultimately entered into with NBC did not oust the Individual Defendants from their positions at Pax. [FN44] Therefore, the plaintiffs contend that it is reasonable to infer that the defendants' alleged rejection of the Fox Offer was motivated by their desire to entrench themselves in office rather than from a desire to engage in an "investment-oriented" transaction as opposed to an

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    **Page 66**
**(Cite as: 2001 WL 812028, *8 (Del.Ch.))**

outright sale of the Company.

> FN44. The plaintiffs seem to disregard the fact that if NBC gains control of Pax pursuant to the NBC Transactions, the Individual Defendants stand a distinct possibility of being ousted from their positions.

The plaintiffs also contend that because Mr. Paxson has granted NBC the Call Right, he enjoys a unique financial benefit not shared by the other Pax shareholders. As discussed above, the plaintiffs appear to have misunderstood the nature of a call option. There is no assurance that the Call Right will ever be exercised. In fact, as noted above, Mr. Paxson has encumbered ownership of his class B Pax shares in several ways that are unique to him. Additionally, even if NBC exercises the Call Right, the resulting stock will merely be because NBC, a third party, has concluded that that decision is in its, not Mr. Paxson's, best interests.

**\*9** Under the standard to be applied in cases where plaintiffs plead pre-suit demand futility, "the decision to reject a takeover proposal, hostile or friendly, will not excuse demand absent particularized allegations of a breach of fiduciary duty, such as self-dealing, fraud, overreaching, or lack of good faith." [FN45] Nothing even close to such an allegation has been made here. Further, the plaintiffs essentially argue that demand must be excused in any case where directors refrain from selling a company. As *Pogostin* makes clear, this is not the law of Delaware. [FN46]

> FN45. *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 627 (1984).

> FN46. *Id.*

Moreover, it is well-established that a successful claim of demand futility requires the existence of an *actual threat* to the directors' positions on the board. [FN47] No such allegation exists here either, as director removal could not occur without the consent of the controlling shareholder, Mr. Paxson. There has been no allegation that Mr. Paxson sought to remove himself or any other Pax director from office. [FN48]

> FN47. *See, e.g., Bodkin,* mem. op. at 8; *Greenwald v. Batterson,* Del. Ch., C.A. No. 16475, mem. op. at 11, Lamb, V.C. (July 26, 1999) ("the mere allegation that directors have taken action to entrench themselves without an allegation that the

directors believed themselves vulnerable to removal from office, will not excuse demand."); *Grobow v. Perot,* Del. Ch., 526 A.2d 914, 922-23 (1987), *aff'd,* Del.Supr., 539 A.2d 180 (1988).

> FN48. *See Bodkin,* at 8.

The plaintiffs also attempt to satisfy *Aronson* by arguing that a majority of Pax's directors were dominated and controlled by Mr. Paxson. Specifically, they contend that directors Sagansky and Bocock are beholden to Lowell Paxson merely because they are officers of Pax. That is, the plaintiffs point out that Mr. Paxson is Mr. Sagansky's and Mr. Bocock's superior in the Company, he has voting control of Pax, and he has the power to elect all of the Company's directors and appoint its officers. [FN49]

> FN49. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 15.

Nevertheless, under *Aronson,*

> in the demand context even proof of majority ownership does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person. [FN50]

> FN50. *Aronson,* 473 A.2d at 815.

In reviewing whether demand has been satisfied, after "giving little or no weight to vague conclusory statements, ... [the Court] must evaluate, under the reasonable doubt standard, whether the facts pleaded with particularity are consistent with domination of the independence of the judgment of the remaining board members." [FN51] Even where the *potential* for domination or control by a controlling shareholder exists, the complaint must allege particularized allegations that would support an inference of domination or control. [FN52]

> FN51. *Friedman v. Beningson,* C.A. No. 12231, mem. op. at 10, Allen, C. (Dec. 4, 1995).

> FN52. *See, e.g., Friedman* (noting where the plaintiffs alleged domination of board decision making by a corporation's Chairman, CEO, President, and 36%

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

stockholder, "[f]rom a practical perspective, this confluence of voting control with directorial and official decision making authority, while not itself sufficient under the cases to support a conclusion of reasonable doubt is nevertheless quite consistent with control of the board."); *Heineman v. Datapoint Corp.,* Del.Supr., 611 A.2d 950, 955 (1992) (holding in a case where a controlling stockholder allegedly dominated and controlled the board through his control of the positions of other directors as well as his control of business organizations in which the other directors were investors that "an allegation of controlling stock ownership does not raise, *per se,* a reasonable doubt as to the board's independence.... To raise such a doubt a party attacking a corporate transaction must advance particularized factual allegations from which the Court of Chancery can reasonably infer that the board members who approved the transaction are acting at the direction of the allegedly dominating individual or entity." (citations omitted).)

Here, paragraph 43 of the Complaint alleges that defendants Sagansky and Bocock enjoy certain "emoluments of office" that they seek to retain. [FN53] At no point do the plaintiffs describe or list any of these alleged emoluments. The complaint also alleges that defendants Sagansky and Bocock receive "substantial salaries, bonuses, payments, benefits, and/or other emoluments." [FN54] Again, these generalized allegations do not contain any details that would suggest impropriety specifically on behalf of these two directors/officers of Pax. The complaint contains no information concerning what amounts of stock or cash have been paid either to Sagansky or to Bocock as compensation or as a bonus. There is no information plead regarding the stock ownership positions of either of these directors/officers in the Company that might help to illustrate what the Fox Offer might have meant to them financially. There are no allegations concerning any payments that may have flowed to these two director/officers should they have been terminated, constructively or otherwise, had the alleged Fox Offer been pursued. [FN55]

FN53. Compl., ¶ 43(1).

FN54. Compl., ¶ 43(2).

FN55. This short list of information the plaintiffs may have pled to support their claims is merely illustrative and is in no way to be construed as exhaustive or as

sufficient.

**\*10** Moreover, the Complaint alleges that "[t]he Board members also have close personal and business ties with each other." [FN56] This allegation is also hopelessly vague. The plaintiffs have not pled the existence of any particular personal relationship between either Bocock or Sagansky and Paxson. The plaintiffs have pled no facts beyond this very generalized statement that supports this allegation in any way.

> FN56. Compl., ¶ 43(2). For an example where allegations of interestedness were found sufficient to withstand a 12(b)(6) motion, *see In re Ply Gem Indus., Inc. Shareholders Litig.,* Del. Ch., Consol. C.A. No. 15779-NC, Noble, V.C. (June 26, 2001).

In sum, the plaintiffs have not pled, with any particularity, facts that could support an excusal of demand under the reasonable doubt standard. This lack of specificity is simply insufficient to satisfy even the barest requirements set forth by *Aronson* and its progeny.

Finally, I note in passing plaintiffs' allegation that, in rejecting the Fox Offer in favor of the NBC Transactions, Mr. Paxson acted out of a personal desire to remain entrenched and to continue to enjoy the emoluments of office. Quite frankly, I am unable to grasp the distinction (accepting the premise that Mr. Paxson desires to remain in office) between a cash sale to Fox as opposed to the series of transactions that would lead to NBC being in control of Fox. In either circumstance, Mr. Paxson would seem to have about the same chance of remaining in office. Furthermore, it appears from plaintiffs' allegations that Mr. Paxson must be willing to forego a substantial cash premium on his significant holdings of Pax stock offered by way of the Fox Offer, in order to continue to enjoy certain unspecified "emoluments of his offices" in Pax. [FN57] This would not have been in Mr. Paxson's economic best interests and thus seems to defy logic. [FN58]

> FN57. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 15. Plaintiffs essentially posit that Mr. Paxson declined a premium that totaled over $200 million in order to continue to enjoy the emoluments of his offices. I note that NBC has the right to exercise the Call Option whenever it wishes, removing Mr. Paxson from control of the Company. This fact seems to have

been overlooked in the plaintiffs' analysis.

FN58. *See Parnes v. Bally Entertainment Corp.,* Del. Ch., C.A. No. 15192, mem. op. at 31-32, Chandler, C. (Feb. 23, 2001).

### III. CONCLUSION

Based on all the foregoing reasons, I conclude that the complaint in the present suit alleges claims that are solely derivative in nature. Due to the plaintiffs' failure to comply with the demand requirements of Court of Chancery Rule 23.1, the complaint is therefore dismissed.

An Order has been entered consistent with the determination reached in this memorandum opinion.

### ORDER

For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

ORDERED that the complaint is dismissed for failure to comply with Court of Chancery Rule 23.1.

2001 WL 812028 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

Not Reported in A.2d
2003 WL 22284323 (Del.Ch.)
(Cite as: 2003 WL 22284323 (Del.Ch.))

**Page 69**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Barbie RATTNER, Plaintiff,

v.

D. James BIDZOS, Stratton D. Sclavos, Timothy Tomlison, Roger H. Moore, David J. Cowan, Anil H.P. Pereira, Douglas L. Wolford, Robert J. Korzeniewski, James M. Ulam, Quentin P. Gallivan, Dana L. Evan, Kevin R. Compton, William L. Chenevich, Gregory L. Reyes and Scott G. Kriens, Defendants, and VERISIGN, INC., a Delaware corporation, Nominal Defendant.

No. Civ.A. 19700.

Submitted April 7, 2003.
Decided Sept. 30, 2003.
As Revised Oct. 7, 2003.

James S. Green, and Kevin A. Guerke, of Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware; Peter D. Bull, and Joshua M. Lifshitz, of Bull & Lifshitz, LLP, New York, New York, for Plaintiff, of counsel.

David C. McBride, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; David M. Furbush, and Noah D. Boyens, of O'Melveny & Myers LLP, Menlo Park, California, for Defendants, of counsel.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

*1 Plaintiff Barbie Rattner ("Rattner") brings this derivative action on behalf of Nominal Defendant VeriSign, Inc. ("VeriSign" or the "Company") alleging that Defendants James D. Bidzos ("Bidzos"), Stratton D. Sclavos ("Sclavos"), Timothy Tomlinson ("Tomlinson"), Roger H. Moore ("Moore"), David J. Cowan ("Cowan"), Anil H.P. Pereira ("Pereira"), Douglas L. Wolford ("Wolford"), Robert J. Korzeniewski ("Korzeniewski"), James M. Ulam ("Ulam"), Quentin P. Gallivan ("Gallivan"), Dana L.

Evan ("Evan"), Kevin R. Compton ("Compton"), William L. Chenevich ("Chenevich"), Gregory L. Reyes ("Reyes") and Scott G. Kriens ("Kriens") (collectively, the "Individual Defendants") breached their fiduciary duties owed to the Company and its shareholders. Specifically, Rattner asserts that the Individual Defendants breached their fiduciary duty of care by inadequately maintaining accounting controls and utilizing improper accounting and audit practices. Rattner also contends that certain Individual Defendants sold securities while in possession of material inside information, thereby breaching their fiduciary duties, and that the remaining Individual Defendants have committed waste. In addition, Rattner seeks contribution and indemnification from the Individual Defendants for claims that have been or may be pursued against the Company based upon the Individual Defendants' alleged misconduct.

Defendants have moved to dismiss each of Rattner's claims under Court of Chancery Rule 23.1 for failure to make a demand upon the VeriSign board of directors (the "Board"). They argue that the conclusory allegations of the Stockholder's Amended Derivative Complaint (the "Amended Complaint") fail to create a reasonable doubt as to whether a majority of the Board is capable of rendering an impartial decision regarding the pursuit of this derivative litigation. Defendants have also moved to dismiss, under Court of Chancery Rule 12(b)(6), Rattner's claims for breach of fiduciary duty and waste.

For the reasons that follow, I conclude that, because demand is not excused under Court of Chancery Rule 23.1, this action must be dismissed.

I. BACKGROUND [FN1]

FN1. This background is taken from the allegations of the Amended Complaint. *White v. Panic,* 783 A.2d 543, 547 n. 5 (Del.2001).

A. *The Parties*

Rattner is, and has been at all relevant times, a common stock shareholder of VeriSign. VeriSign, a Delaware corporation, was founded in April 1995. It is a leading provider of digital trust services, enabling various Internet users to engage in secure digital

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

commercial transactions and communications.

The Individual Defendants are the current directors and the senior officers of the Company. Sclavos is the Chairman of the Board and Bidzos is the Vice Chairman of the Board. The remaining directors on the eight member Board are Moore, Cowan, Compton, Chenevich, Reyes and Kriens (collectively, along with Sclavos and Bidzos, the "Director Defendants"). Of the current Board members, the only director who held a senior management position at the time this action was filed [FN2] is Sclavos, who is also VeriSign's President and Chief Executive Officer. [FN3] Bidzos served as Chairman of the Board (April 1995 through March 12, 2002) and Chief Executive Officer (April 1995 through July 1995). Prior to becoming a VeriSign director in February 2002, Moore had been President and Chief Executive Officer of Illuminet Holdings, Inc. ("Illuminet") from December 1995 until December 2001, when VeriSign acquired Illuminet.

> FN2. This action was filed on June 12, 2002; Rattner lodge her Amended Complaint on October 4, 2002.

> FN3. Sclavos has served as the Company's President and Chief Executive Officer since April 1995.

*2 The remaining Individual Defendants, with the exception of Tomlinson, [FN4] are senior officers of the Company. Pereira is VeriSign's Executive Vice President and General Manager, Enterprise and Service Provider Division, who formerly, from October 2000 to January 2001, served as VeriSign's Senior Vice President and Group General Manager of the Enterprise and Service Provider Division. Wolford serves as VeriSign's Senior Vice President and Group General Manager of Web Presence Services. Korzeniewski is the Executive Vice President of Corporate and Business Development, and has held that position since June 2000. Ulam, since October 2001, has been Senior Vice President, General Counsel of the Company; previously he served as Vice President, General Counsel of VeriSign from the time of his joining the Company in June 2000. Gallivan is VeriSign's Executive Vice President, Worldwide Sales and Services, a position he has held since April 1, 1999. Finally, Evan has served, since January 1, 2001, as the Company's Executive Vice President of Finance and Administration and Chief Financial Officer.

> FN4. Tomlinson served as a director (April 1995 until May 2002) and as the Company's Secretary (April 1995 through October 2000). Tomlinson is also a partner in the law firm of Tomlinson, Zisko & Master LLP (the "Tomlinson Firm"). In 2000, VeriSign paid approximately $900,000 to the Tomlinson Firm.

B. *The Misstatements*

Rattner principally complains of alleged insider trading and a failure to oversee properly the accounting practices at VeriSign. Common to both allegations is a series of allegedly misleading statements made over a twelve-month period from January 2001 through January 2002 (the "Relevant Period"). On January 24, 2001, VeriSign released its fourth quarter and fiscal 2000 financial results (the "January 24 Release"). The release noted that during the fourth quarter, the Company earned revenues of $197.4 million, representing a 613% increase over the previous year's fourth quarter results. For fiscal 2000, VeriSign reported revenues of $474.8 million, amounting to a 460% increase over revenues in the previous fiscal year. These revenues resulted in pro forma net income for the quarter, excluding the amortization of goodwill and intangible assets and acquisition-related charges of $45.5 million, equivalent to $0.21 diluted earnings per share; pro forma net income for fiscal 2000 was $129.1 million. However, after including the charges for amortization of goodwill and intangible assets and other acquisition related charges, the fiscal 2000 net loss was $3.1 billion. [FN5] The release also highlighted the international expansion undertaken by the Company in fiscal year 2001. However, Rattner alleges that the picture was not as rosy as was portrayed.

> FN5. Amended Compl. ¶ 48.

In the Amended Complaint, Rattner asserts that, because of a failure to maintain and oversee properly the accounting practices at VeriSign, the statements contained in the January 24 Release conveyed inaccurate information. Specifically, VeriSign improperly recorded "round trip revenue" and barter transactions, thus artificially inflating the Company's reported revenues for fiscal 2000. VeriSign also failed to record impairments in the value of certain investments it made in other companies during a round of private equity financing that commenced in the third quarter of 2000 . [FN6] Thus, Rattner concludes that because the Company failed to record

revenues accurately and write down impaired asset values on a timely basis, in violation of Generally Accepted Accounting Principles ("GAAP"), the earnings projections and financial statements contained in the January 24 Release were overly optimistic and materially misleading.

> FN6. Charges related to these investments were $74 million in fiscal 2001 and $94.8 million in the first half of fiscal 2002. *Id.* ¶ 49.

**\*3** Other undisclosed accounting practices of the Company also are claimed to have contributed to an inflated market price for VeriSign common stock. Rattner alleges that the Individual Defendants either "were manipulating" [FN7] or "should have been aware of the manipulation" [FN8] of the reported days sales outstanding (DSO) by including the deferred revenue, and excluding the accounts receivable, of companies acquired by VeriSign. Furthermore, Rattner also contends that there were other material misstatements made during the Relevant Period. Rattner notes that:

> FN7. *Id.* ¶ 47; *cf. id.* ¶ 62 (noting that "VeriSign" engaged in manipulation).

> FN8. *Id.* ¶ 70.

[t]he Company also failed to disclose that (i) the integration of Illuminet and H.O. Systems failed as the number of enterprise clients declined after the acquisitions; (ii) the Company would incur almost $80 million in charges, engage a[sic] massive restructuring and layoff a substantial portion of its workforce as a result of the acquisitions of Illuminet and H.O. Systems; [and] (iii) the Company would need to massively increase its allowance for doubtful accounts. [FN9]

> FN9. *Id.* ¶ 47. The Amended Complaint only informs that the acquisition of H.O. Systems, Inc. ("H.O.Systems") closed on February 8, 2002. *Id.* ¶ 76.

These allegedly improper accounting practices and material misstatements reappeared in numerous financial statements, releases and public statements during the Relevant Period, rendering each materially misleading for the reasons previously noted. To this end, the Amended Complaint quotes extensively from myriad sources publicly disseminated by the Company during the Relevant Period, each allegedly

materially misleading, including: statements made by Sclavos at a February 1, 2001, analysts' meeting, the Company's 10K report for fiscal year 2000 issued on March 28, 2001; an April 26, 2001, press release; a July 26, 2001, press release; a September 24, 2001, article in *Bloomberg;* an October 25, 2001, press release; and a January 24, 2002, press release. [FN10] The alleged effect of these numerous material misstatements was to inflate artificially the stock price of VeriSign over the course of the Relevant Period.

> FN10. *See id.* ¶¶ 50-55, 57, 58, 60, 64-69.

## C. *Alleged Wrongdoing by the Individual Defendants*

With the knowledge that the market price of VeriSign stock was artificially inflated, and while in possession of other material non-public information, during the Relevant Period "certain defendants" sold over 875,000 shares of VeriSign stock for proceeds in excess of $47 million, and Moore sold approximately 995,000 shares of Illuminet stock for over $37 million. [FN11] Specifically:

> FN11. A central problem with the Amended Complaint is that one is never certain who is selling how much and which sales are being challenged. As with questions surrounding which Director Defendants have been implicated in certain federal securities class action lawsuits, *see infra* text accompanying note 79, this defect stems from the inconsistent use of defined terms and a failure to use defined terms. Often in the Amended Complaint, Rattner notes that "certain defendants" engaged in allegedly illicit transactions, but nowhere are these ambiguous assertions clarified. Particularly unhelpful is the definition provided in the Third Cause of Action, well after the discussion of the underlying facts of this dispute:
>
> 108. Certain defendants (the "Insider Trading Defendants"), at all relevant times, occupied fiduciary positions with VeriSign and were privy to confidential material inside information concerning VeriSign and its operations.
> Amended Compl. ¶ 108.
> I draw the inference that the challenged sales include all of the sales by Individual Defendants during the Relevant Period. Therefore, at issue are the sales of VeriSign common stock and Illuminet options by Bidzos, Cowan, Evan, Gallivan, Korzeniewski, Pereira, Sclavos, Tomlinson,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Ulam, Wolford, and Moore (collectively, the "Selling Defendants") so noted. *See id.* ¶ 37.

a) Bidzos sold 15,000 shares of VeriSign common stock on May 22, 2001, for net proceeds of $991,890;

b) Cowan sold 20,800 shares on February 1, 2001; 53,125 shares during the period of May 1-2, 2001; and 22,000 shares on November 13, 2001 (a total of 95,925 shares), of VeriSign common stock for total net proceeds of $5,132,773;

c) Evan sold 500 shares on January 31, 2001; 6,500 shares during the period of February 1-28, 2001; 3,000 shares on March 1, 2001; 60,100 shares during the period of May 1-31, 2001; 4,000 shares during the period of May 17-21, 2001; 12,500 shares during the period of August 1-29, 2001; and 10,000 shares during the period of November 13-14, 2001 (a total of 96,600 shares), of VeriSign common stock for total net proceeds of $5,025,988;

*4 d) Gallivan sold 37,000 shares during the period of February 6-28, 2001; 3,000 shares on March 1, 2001; and 82,994 shares during the period of May 2-8, 2001 (a total of 122,994 shares), of VeriSign common stock for total net proceeds of $7,164,007;

e) Korzeniewski sold 15,000 shares on February 2, 2001; 25,000 shares on May 3, 2001; 74,626 shares during the period of May 3-31, 2001; 15,000 shares on August 27, 2001; and 33,700 shares during the period of November 2-13, 2001 (a total of 163,326 shares), of VeriSign common stock for total net proceeds of $8,442,775;

f) Pereira sold 800 shares on January 31, 2001; 9,700 shares during the period of February 6-28, 2001; 2,500 shares on March 1, 2001; 47,600 shares during the period of May 2-31, 2001; 11,000 shares during the period of August 3-31, 2001; and 15,000 shares during the period of November 7-30, 2001 (a total of 86,600 shares), of VeriSign common stock for total net proceeds of $4,676,900;

g) Sclavos sold 50,000 shares on February 28, 2001; 135,000 shares during the period of May 7-31, 2001; and 60,375 shares during the period of August 3-29, 2001 (a total of 245,375 shares), of VeriSign common stock for total net proceeds of $13,229,650;

h) Tomlinson sold 875 shares on January 30, 2001; 1,875 shares on February 26, 2001; 1,875 shares during the period of May 1-21, 2001;

1,775 shares on August 1, 2001; and 2,400 shares during the period of November 7-13, 2001 (a total of 8,800 shares), of VeriSign common stock for total net proceeds of $476,827;

i) Ulam sold 8,000 shares on March 1, 2001; 2,711 shares during the period of May 22-31, 2001; and 2,500 shares on August 3, 2001 (a total of 13,211 shares), of VeriSign common stock for total net proceeds of $697,925; and

j) Wolford sold 5,000 shares on January 31, 2001, and 12,900 shares on May 8, 2001 (a total of 17,900 shares), of VeriSign common stock for total net proceeds of $1,174,000. [FN12]

FN12. Amended Compl. ¶ 37.

Thus, during the Relevant Period, the Selling Defendants (except Moore) sold a total of 875,731 shares of VeriSign common stock for aggregate net proceeds of $47,512,615. Moore disposed of 995,000 in-the-money, unexercised Illuminet stock options at some point between March 26, 2001 and April 3, 2002, earning net proceeds of $37,113,500. [FN13]

FN13. *Id.* The per option value received by Moore was estimated by Rattner based upon the market value of Illuminet common stock as of December 12, 2001, the closing date of the merger between Illuminet and VeriSign, less the per share exercise price.

Moreover, the material misstatements which opened the door for the Selling Defendants to engage in improper insider trading were allegedly the products of the Individual Defendants' breaches of fiduciary duty in failing to oversee adequately the Company's accounting procedures. The Amended Complaint maintains that the Individual Defendants "knew, or were reckless in not knowing, the facts which indicated that the fiscal 2000 and 2001 Form 10-Ks and all of the Company's interim financial statements, press releases, public statements, and filings with the SEC" were misleading. [FN14] Moreover, it is alleged, the Individual Defendants systematically failed to assure VeriSign's compliance with applicable federal and state laws, SEC rules and regulations, FASB Statements of Concepts and GAAP.

FN14. *Id.* ¶ 94.

D. *Subsequent Events*

*5 In February 2002, rumors began circulating as to

**(Cite as: 2003 WL 22284323, \*5 (Del.Ch.))**

the accounting practices employed by VeriSign. [FN15] On March 19, 2002, the Company, in its 10-K for 2002, disclosed that 10% of its 2001 revenues were derived from reciprocal deals with either its customers or other companies in which it had invested. That day, the price of VeriSign shares fell by more than 9%, closing down $2.61 to $26.42. [FN16] On April 25, 2002, a VeriSign press release noted, in addition to its financial and operating results for the first quarter of 2002, that DSO had increased to 81 days, and that the Company was restructuring its operations in order to best accommodate the recently acquired companies of Illuminet and H.O. Systems. Upon this news, the price of VeriSign shares tumbled from $18.24 to $9.89. [FN17] A July 25, 2002 press release noted that the Company had recorded a $4.6 billion charge in connection with a non-cash charge relating to a portion of the Company's goodwill and intangible assets, as directed by FASB Statement No. 142. [FN18] On August 7, 2002, VeriSign announced that its marketing practices were under investigation by the Federal Trade Commission, regarding allegedly misleading direct-mail advertising campaigns. The Company is also the target of several securities fraud class action lawsuits filed in the Northern District of California.

FN15. *Id.* ¶ 71.

FN16. *Id.* ¶¶ 72-73.

FN17. When the Amended Complaint was filed, VeriSign traded at $4 per share.

FN18. Amended Compl. ¶ 79.

## II. CONTENTIONS

In the Amended Complaint, Rattner primarily advances two theories of wrongdoing by the Individual Defendants. First, Rattner alleges that the Selling Defendants, in violation of their fiduciary duties, engaged in insider trading; that is, the Selling Defendants profited from selling VeriSign common stock (or, in the case of Moore, selling Illuminet options) while knowing that improper accounting practices at VeriSign, the products of which were publicly disseminated through material misstatements, created an inflated market price. [FN19] In support of this claim, Rattner notes several aspects of the challenged stock sales executed during the Relevant Period. First, the Individual Defendants, by virtue of their positions, were privy to material, undisclosed information concerning the alleged

accounting improprieties. Second, the timing of the sales, in that many of the Individual Defendants sold their holdings simultaneously and on days immediately following the release of allegedly misleading information or, in the case of Moore, after the announcement of the acquisition of Illuminet yet before that acquisition's closing, raises suspicions that the sales were part of an overall scheme of insider trading. Third, Rattner alleges that the sales of VeriSign stock (or Illuminet options) by the Selling Defendants during the Relevant Period were not consistent with the Individual Defendants' previous trading activity. Finally, Rattner notes that many of the Individual Defendants sold substantial portions of their VeriSign (or Illuminet) holdings for millions of dollars. Rattner further contends that all of the Director Defendants committed waste by allowing the Selling Defendants to misappropriate a valuable asset, in the form of proprietary information, of the Company. [FN20]

FN19. Rattner also alleges that some of the Individual Defendants participated in or encouraged the improper accounting practices. *Id.* ¶ 47.

FN20. These claims will be referred to collectively as the "Insider Trading Claims."

\*6 Rattner also presses a second set of claims concerning the alleged dissemination of misleading statements to the market and the improper oversight exercised in failing to assure the accuracy of VeriSign's accounting systems. Rattner charges the Individual Defendants with inadvertent, if not knowing, misdeeds in maintaining accurate financial reporting and recording systems, conduct which ultimately permitted the Selling Defendants to engage in insider trading and resulted in damages to the Company. [FN21] More pertinently, in the demand excusal context, and in essence, Rattner alleges that the Director Defendants "have engaged in a sustained and systematic failure to exercise their oversight responsibilities to ensure that VeriSign complied with Federal and State Laws, rules and regulations and to ensure the integrity of its financial reporting." [FN22] Thus, by failing to oversee adequately the Company's financial reporting and recording systems, the Director Defendants breached their fiduciary duties. [FN23]

FN21. Amended Compl. ¶¶ 98, 101.

FN22. *Id.* ¶ 100.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FN23. Collectively, these claims will be referred to as the "Accounting Oversight Claims."

Because of the Individual Defendants' misdeeds, Rattner claims that the Company has suffered harm in that VeriSign's goodwill and integrity in the market have been impugned. Furthermore, the Company has been injured by bearing the cost of defense and being subjected to potential liability stemming from the pending class actions in federal court. Rattner thus requests that the following relief be granted: (1) that the Individual Defendants account to VeriSign for all damages and costs sustained now or in the future; (2) that the Individual Defendants return to VeriSign all salaries and remuneration of any kind received while the Individual Defendants were in breach of their fiduciary duties; (3) that a constructive trust be imposed on all profits derived from insider trading by the Selling Defendants; and (4) a declaration that VeriSign is entitled to contribution and indemnification for any claims that have been, or may be, asserted against it in connection with the Individual Defendants' alleged misconduct.

In response to the Amended Complaint, Defendants have moved to dismiss this action for failure to comply with Court of Chancery Rule 23.1. [FN24] Defendants argue that Rattner has not pled with particularity in the Amended Complaint facts which demonstrate that demand is futile. They contend that Rattner, in the Amended Complaint, does not allege with particularity facts that would constitute insider trading, and thus a disabling interest, by a majority of the Board. Similarly, Rattner fails to allege with particularity that the Board failed to exercise proper oversight regarding the Company's financial recording and reporting systems. Moreover, Defendants note that merely because the Director Defendants would be asked to authorize suit against themselves does not necessarily prevent a majority of the Board from exercising disinterested and independent business judgment in deciding the merits of, and whether to pursue, Rattner's claims. Therefore, Defendants request that this action be dismissed.

FN24. The Defendants have also moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6). However, given my disposition of the Defendants' motions to dismiss under Court of Chancery Rule 23.1, the Defendants' motion to dismiss under Court of Chancery Rule 12(b)(6) will not be addressed. Similarly, I do not address

Defendants' contention that this action should be dismissed because "prosecution of this amended action is not in the best interests of the Company." Op. Br. in Supp. of Defs.' Mot. to Dismiss at 13.

### III. ANALYSIS

*7 Court of Chancery Rule 23.1 requires that, in derivative actions, "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." The demand requirement embodied in Court of Chancery Rule 23.1 is an acknowledgement that a shareholder's prosecution of a derivative action necessarily impinges upon the power and autonomy of a board of directors to manage the affairs of the corporation, including whether or not to pursue a cause of action belonging to the corporation. [FN25] The hurdle of proving demand futility also serves an important policy function of promoting internal resolution, as opposed to litigation, of corporate disputes and grants the corporation a degree of control over any litigation brought for its benefit. [FN26]

FN25. *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990); *Aronson v. Lewis,* 473 A.2d 805, 811-12 (Del.1984).

FN26. *Spiegel,* 571 A.2d at 773; *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at *5 (Del.Ch. June 21, 2000).

A critical requirement of Court of Chancery Rule 23.1 is that the complaint must allege *with particularity* the reasons for demand excusal.

Those pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.... What the pleader must set forth are particularized factual statements that are essential to the claim.... A prolix complaint larded with conclusory language ... does not comply with these fundamental pleading mandates. [FN27]

FN27. *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000) (footnotes omitted).

In considering whether a derivative plaintiff has

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

satisfied Court of Chancery Rule 23.1, I am confined to reviewing the well-pled allegations of the complaint. [FN28] While I am unable to accept cursory contentions of wrongdoing in light of the obligation to plead facts with particularity, I must accept as true all well-pled allegations of fact in the complaint, and all reasonable inferences from non-conclusory allegations contained in the complaint must be drawn in favor of the plaintiff. [FN29] With these principles in mind, I turn to the question of whether Rattner has pleaded with particularity that demand upon the Board would be futile and, thus, is excused.

> FN28. *White,* 783 A.2d at 547 n. 5; *Zimmerman v. Braddock,* 2002 WL 31926608, at *7 (Del.Ch. Dec.20, 2002); *Ash v. McCall,* 2000 WL 1370341, at *6 (Del.Ch. Sept.15, 2000).

> FN29. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988).

The business judgment rule and demand excusal are "inextricably bound." [FN30] When a derivative suit challenges decisions made by directors in accordance with their managerial authority, "stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim." [FN31] However, it is also recognized that the business judgment rule only operates in instances of action by the board of directors or a conscious decision to refrain from acting. [FN32] The business judgment rule has no role in the case of inaction by the board of directors. [FN33] From this dichotomy, two overlapping yet different tests have been developed to determine whether demand is excused.

> FN30. *Aronson,* 473 A.2d at 812.

> FN31. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993).

> FN32. *Aroson,* 473 A.2d at 813.

> FN33. *Id.; Guttman v. Huang,* 823 A.2d 492, 499-500 (Del.Ch.2003); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *14 n. 39 (Del.Ch. Dec.18, 2002).

**\*8** If a derivative suit challenges a decision made by a board of directors, then demand futility is properly evaluated under that test announced in *Aronson v.*

*Lewis.* [FN34] Under the *Aronson* test, "[t]o determine whether demand would be futile, the Court must determine whether the particular facts, as alleged, create a reason to doubt that: '(1) the directors are disinterested and independent' or '(2) the challenged transaction was otherwise the product of a valid exercise of business judgment." ' [FN35] Thus, *Aronson* adopted a two-pronged analysis for determining whether demand is futile: the first prong inquires into the independence and disinterestedness of the directors, and the second prong focuses on the substantive nature of the challenged transaction and the directors' approval thereof. [FN36]

> FN34. *Rales,* 634 A.2d at 933 ("The essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors is being challenged in the derivative suit."); *Haseotes v. Bentas,* 2002 WL 31058540, at *4 (Del.Ch. Sept.3, 2002).

> FN35. *In re Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 285 (Del.Ch.2003) (quoting *Aronson,* 473 A.2d at 814).

> FN36. *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984); *Aronson,* 473 A.2d at 814.

The parties, however, agree that, here, because Rattner does not challenge any particular action undertaken by the Board as a whole, the standard established in *Rales v. Blasband* governs the determination of demand futility. Thus, under the *Rales* test,

> a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile. [FN37]

> FN37. *Rales,* 634 A.2d at 934.

Because there has been no action or decision by a board of directors, a premise of the *Aronson* test, that of the application of the business judgment rule, is lacking, and accordingly it is under the *Rales* test that the fundamental right of boards of directors to manage the affairs of corporations is recognized. [FN38] Thus, in examining "whether the board that would be addressing the demand can impartially

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
(Cite as: 2003 WL 22284323, *8 (Del.Ch.))

consider its merits without being influenced by improper considerations," [FN39] the focus is upon the disinterestedness and the independence of a majority of the board of directors in responding to a demand.

> FN38. *In re Fuqua Indus., Inc. S'holders Litig.,* 1997 WL 257460, at *13 (Del.Ch. May 13, 1997); *Kohls v. Duthie,* 791 A.2d 772, 780 (Del.Ch.2000); *see also Rales,* 634 A.2d at 933 ("[t]he absence of board action ... makes it impossible to perform the essential inquiry contemplated by *Aronson*-- whether the directors have acted in conformity with the business judgment rule [in consciously deciding to act or refrain from acting]").

> FN39. *Rales,* 634 A.2d at 934.

Under the *Rales* test, demand is excused if the particularized facts of the Amended Complaint create a reasonable doubt that, at the time the original complaint was filed, a majority of the Board could have exercised disinterested and independent business judgment in responding to Rattner's demand. Rattner does not challenge the independence of any Director Defendant; thus, the inquiry turns to the disinterestedness of the Director Defendants at the time this action was filed. Directors are considered disinterested for purposes of determining demand futility when they "appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." [FN40] Directorial interest may also be said to exist when " 'a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." ' [FN41]

> FN40. *Aronson,* 473 A.2d at 812; *see also Orman v. Cullman,* 794 A.2d 5, 23 (Del.Ch.2002).

> FN41. *Orman,* 794 A.2d at 23 (quoting *Rales,* 634 A.2d at 936).

*9 Often, as is the case here, a derivative suit essentially asks the directors to authorize a suit against themselves and, thus, to act against their own personal interests.

The conundrum for the law in this area is well understood. If the legal rule was that demand was excused whenever, by mere notice pleading, the plaintiffs could state a breach of fiduciary duty claim against a majority of the board, the demand requirement of the law would be weakened and the settlement value of so-called "strike suits" would greatly increase, to the perceived detriment of the best interests of stockholders as investors. But, if the demand excusal test is too stringent, then stockholders may suffer as a class because the deterrence effects of meritorious derivative suits on faithless conduct may be too weak. [FN42]

> FN42. *Guttman,* 823 A.2d at 500.

Except in "egregious circumstances," the "mere threat" of personal liability does not constitute a disabling interest for a director considering a derivative plaintiff's demand. [FN43] "[H]owever, a 'substantial likelihood' of personal liability prevents a director from impartially considering a demand." [FN44] It is this difference, between a "mere threat" of personal liability and (i) "a substantial likelihood" of personal liability or (ii) a "mere threat" in "egregious circumstances," as addressed in the context of the first prong of *Aronson* [FN45] and the test established in *Rales,* [FN46] that accommodates and balances the competing policy concerns of adequately policing boards of directors while guarding against strike suits. With this framework in mind, I turn to determining whether, at the time this action was originally filed, a majority of the Board could have impartially considered a demand made upon the Board and, thus, whether demand is excused. [FN47]

> FN43. *H-M Wexford LLC v. Encorp, Inc.,* 2003 WL 21254843, at *14 (Del.Ch. May 27, 2003) (citing *Aronson,* 473 A.2d at 815; *Malpiede v. Towson,* 780 A.2d 1075, 1085 (Del.2001)).

> FN44. *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995) (quoting *Rales,* 634 A.2d at 936); *see also Benerofe v. Cha,* 1996 WL 535405, at *6 (Del.Ch. Sept.12, 1996).

> FN45. *See, e.g., Malpiede,* 780 A.2d at 1085; *Kohls,* 791 A.2d at 782 n. 36 (noting that "[i]n a way, this inquiry [into whether a defendant director was interested in the decision to bring litigation because of a substantial threat of personal liability] is *related* to the second prong of the *Aronson test*." ) (emphasis added); *Katz v. Halperin,* 1996 WL 66006, at *8-*9 (Del.Ch. Feb.5,

1996).

FN46. *See, e.g., Rales,* 634 A.2d at 936; *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1269 (Del.Ch.1995).

FN47. Accordingly, for purposes of determining demand futility, the Individual Defendants who are not Director Defendants are largely irrelevant.

For demand to be excused, the particularized facts of the Amended Complaint must create a reasonable doubt that, at the time this action was filed, four of the eight directors on the Board could have exercised their disinterested business judgment in considering a demand. [FN48] Rattner argues that demand is excused for both the Insider Trading Claims and the Accounting Oversight Claims for several reasons. Rattner asserts that demand would have been futile because "[c]ertain defendants personally profited from the wrongful activities alleged by selling VeriSign stock at artificially inflated prices." [FN49] While this allegation carries some uncertainty, [FN50] I understand Rattner to contend that because four of the eight directors are alleged to have traded VeriSign (or Illuminet) securities on the basis of non-public and material knowledge, a majority of the Board is not disinterested and, thus, is incapable of impartially considering a demand. Next, Rattner claims that demand would have been futile because all of the Director Defendants are accused of breaching their fiduciary duties by having failed to exercise adequate oversight over the Company's financial recording and reporting systems, thereby leading to the wrongful conduct complained of in this action. Finally, Rattner notes that "[c]ertain of the Individual Defendants are defendants in the federal securities class action suits described [in the Complaint], and face a substantial likelihood of liability given the misstatements" made during the Relevant Period. [FN51]

FN48. *See In re The Limited, Inc. S'holders Litig.,* 2002 WL 537692, at *7 (Del.Ch. Mar.27, 2002); *Beneville v. York,* 769 A.2d 80, 85-87 (Del.Ch.2000). Again, because Rattner never seriously argues that any member of the Board lacks independence, the sole focus of my inquiry is into the disinterestedness of a majority of the Board.

FN49. Amended Compl. ¶ 102(a). The Defendants argue that the allegation that "certain defendants" are incapable of

considering a demand is itself plead with insufficient particularity. However, I will presume that, in the context of an effort to justify a failure to make demand upon the Board, Rattner is referring to those Defendants who are directors and who sold shares of VeriSign.

FN50. *See supra* note 11.

FN51. Amended Compl. ¶ 102(d)

A. *The Insider Trading Claims*

**\*10** In order for demand to be excused with respect to the Insider Trading Claims, a reasonable doubt must exist that four of the eight VeriSign directors are incapable of exercising their disinterested business judgment in considering a demand. Rattner contends that this requirement for demand futility is satisfied as "[f]our of the directors who sold their shares on the basis of inside information are interested because each of them received a personal financial benefit from those transactions." [FN52] With respect to the Insider Trading Claims, Rattner does not challenge the disinterestedness of four (Compton, Chenevich, Reyes, and Kriens) of the directors. Therefore, were Rattner's attack upon any of the remaining four directors (Bidzos, Sclavos, Moore and Cowan) unsuccessful, a "majority" of the Board would not be implicated and demand would not be excused.

FN52. Pl.'s Answering Br. at 10.

Before I begin my analysis of demand excusal with respect to the Insider Trading Claims, it is important to note what facts, in connection with the Insider Trading Claims, are *not* alleged, at all or with particularity, in the Amended Complaint. Rattner merely posits, without any particularized facts, that the Director Defendants knew of inside information, and that they knew of (or directly participated in) the allegedly material misstatements. [FN53] Thus, absent from the particularized allegations of the Amended Complaint are the "precise roles that [the Director Defendants] played at the [C]ompany [and] the information that would have come to their attention in those roles." [FN54] The Amended Complaint is also devoid of any particularized facts that could lead to the inference that the timing of the trades reflected the Selling Defendants' impermissible insider trading. The Amended Complaint contains no particularized facts regarding the timing of the Director Defendants' trades in relation to permitted trading periods; while the pattern observed does

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

reflect trading activity on behalf of the Director Defendants after the release of allegedly misleading statements, no particularized allegation of the Amended Complaint answers whether this temporal proximity was in fact part of the Company's practice to prevent Company insiders from improperly benefiting from informational asymmetries. [FN55] Moreover, although Rattner cursorily alleges that there were differences between prior years and the Relevant Period, [FN56] the Amended Complaint does not shed light upon the trading practices of the Director Defendants prior to the Relevant Period. [FN57] Finally, the Amended Complaint often refers to allegedly improper sales by the Director Defendants as occurring over nearly a one-month time span. While not determinative, certainly the failure of Rattner to pinpoint the timing of the challenged sales detracts from her alleged theory of selling soon after the release of misleadingly bullish statements.

> FN53. Rattner's best effort toward alleging with particularity the Director Defendants' knowledge, and how they acquired such knowledge, is set forth in Paragraph 33 of the Amended Complaint:
> 33. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors['] meetings and committees thereof and via reports and other information provided to them in connection therewith.
> Although Rattner may have sought to satisfy the requirement to plead facts with particularity, Paragraph 33 of the Amended Complaint charges directors, solely upon the basis of their status as directors, with knowledge of alleged corporate activity. The conclusory assertions contained in Paragraph 33 fail to allege with particularity what information the directors knew and how they acquired such knowledge. The conclusory nature of Rattner's allegations is perhaps most obvious in Paragraph 34 of the Amended Complaint which provides in part: 34. It is appropriate to treat the Individual Defendants as a group for

pleading purposes and *to presume* that the false, misleading and incomplete information they conveyed in the Company's public filings and press releases as alleged herein are the collective actions of the narrowly defined group of defendants identified above .... (emphasis added).

> FN54. *Guttman,* 823 A.2d at 503.

> FN55. *See id.* at 503-04.

> FN56. Amended Compl. ¶ 85(c).

> FN57. *See Guttman,* 823 A.2d at 498.

Rattner argues that, with respect to the Insider Trading Claims, demand is excused because four of the eight directors have been implicated in alleged insider trading. Delaware has recognized a cause of action against directors who abuse their knowledge of a corporation's private information at the expense of unwitting purchasers of their stock. [FN58] Recently, however, this Court noted the differences between archetypical claims of self-dealing and insider trading claims, concluding:

> FN58. *Brophy v. Cities Serv. Co.,* 70 A.2d 5, 8 (Del.Ch.1949).

**\*11** As a matter of course, corporate insiders sell company stock and such sales, in themselves, are not quite as suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting at both sides of the negotiating table. Although insider sales are (rightly) policed by powerful forces--including the criminal laws--to prevent insiders from unfairly defrauding outsiders by trading on non-public information, it is unwise to formulate a common law rule that makes a director "interested" whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information. [FN59]

> FN59. *Guttman,* 823 A.2d at 502. The Court further explained:
> This would create the same hair-trigger demand excusal that *Aronson* and *Rales* eschewed. The balanced approach that is more in keeping with the spirit of those important cases is to focus the impartiality analysis on whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of

personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition.
*Id.*

Thus, critically, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." [FN60]

> FN60. *Stepak v. Ross,* 1985 WL 21137, at *5 (Del.Ch. Sept.5, 1985); *see also Guttman,* 823 A.2d at 505 ("Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter."); *Rosenberg v. Oolie,* 1989 WL 122084, at *3 (Del.Ch. Oct.16, 1989) ("[I]f 'a person "in a confidential or fiduciary position, in breach of his duty, *uses his knowledge* to make a profit for himself, he is accountable for such profit" " ') (quoting *Brophy,* 70 A.2d at 8).

After reviewing the Amended Complaint, I conclude that Rattner has not pleaded facts with particularity that create a reasonable doubt that a majority of the Board is disinterested with respect to the Insider Trading Claims. It is important to note that only one Director Defendant is a senior manager of the Company; that is, only Sclavos held a senior management position with VeriSign at the time this action was filed. The Amended Complaint alleges general knowledge in a conclusory fashion on behalf of the Director Defendants, explained solely by virtue of their service in their various capacities. Thus, even somehow assuming Sclavos suffers from a disabling interest, nothing has been pleaded with particularity as to the scienter of seven of the eight members of the Board. [FN61]

> FN61. As noted above, Rattner has not questioned the independence from Sclavos of the seven other directors.

The Amended Complaint's allegations implicating Moore's sale of unexercised Illuminet options also fail to taint the disinterestedness of Moore in considering a demand made upon the Board. On September 23, 2001, VeriSign and Illuminet entered into a merger agreement. As consideration, VeriSign would exchange 0.93 shares of VeriSign common

stock for each outstanding share of Illuminet and, thus, would issue 30.4 million shares for the outstanding shares of Illuminet, as well as assume Illuminet's outstanding employee stock options. [FN62] Rattner complains that "[a]t some point after announcement of the Illuminet acquisition, but prior to being elected to the [Board], Moore exercised Illuminet options (or VeriSign options exchanged in the Merger) and sold the underlying stock." [FN63] The Complaint fails to allege with any specificity when the sales were made or whether the shares were all sold at one time. [FN64] Moreover, if trading resulting from the Illuminet options is assumed to be relevant to the purpose of determining demand futility with respect to the Insider Trading Claims, the Amended Complaint still fails to allege particularized facts that compromise Moore's impartiality. Not one particularized allegation in the Amended Complaint explains what inside knowledge Moore traded upon or how he gleaned such information. [FN65] Therefore, I conclude that the Amended Complaint fails to allege the particularized facts necessary to raise a reasonable doubt as to Moore's ability to exercise his disinterested business judgment.

> FN62. Amended Compl. ¶ 63.

> FN63. *Id.* ¶ 20. The Illuminet acquisition was announced in September 2001; Moore became a director of VeriSign in February 2002. Rattner also alleges that "rather than convert his Illuminet options into VeriSign options, defendant Moore exercised and sold off his Illuminet options." *Id.* ¶ 63. Rattner also contends that Moore's disposition of his Illuminet interest was "unusual in nature and timing," *id.* ¶ 85, because the "sales occurred after announcement of the acquisition of Illuminet by VeriSign and prior to closing of that transaction." *Id.* ¶ 85(e).

> FN64. Rattner alleges that, in March 2001, Moore held 995,000 "in the money" options and by April 2002 had disposed of them. *Id.* ¶ 37 n. 1.

> FN65. Rattner asserts that "Moore, while in possession of other material adverse non-public information, sold approximately 995,000 of his privately-held Illuminet stock." *Id.* ¶ 82. Rattner does not identify that "material adverse non-public information" to which she refers.

*12 Additionally, I note that the Amended Complaint

fails to allege any facts with particularity that would permit me to draw a reasonable inference that the challenged sales were executed upon the basis and because of non-public information. Much is made about the timing and size of the sales. However, as has been noted, [FN66] the Amended Complaint does not assist in determining whether the pattern of executed trades was the product of an orchestrated scheme to defraud the market and the Company's shareholders or good faith adherence to Company policy or consistent with prior individual practices. Additionally, while several Individual Defendants disposed of large percentages of their stock holdings, of the four Director Defendants, only two (Cowan and Moore) can be characterized as having disposed of a "large" percentage of their holdings. [FN67] Essentially, Rattner seeks to impose liability and excuse demand on the basis that the Director Defendants sold VeriSign stock (or Illuminet options) during the Relevant Period. If accepted, Rattner's theory would make a step toward the implementation of the very common law rule warned of in *Guttman*. It is a step which I decline to take. Thus, I conclude that, with respect to the Insider Trading Claims, Rattner has failed to plead with particularity factual allegations which, at the time this action was filed, create a reasonable doubt that a majority of the Board was disinterested and therefore incapable of impartially considering a demand.

> FN66. *See supra* notes 53-55 and accompanying text.

> FN67. In determining whether demand is excused, I am confined to the controlling complaint and may consider documents referred to in the complaint when such documents are integral to a plaintiff's claim or are incorporated into the complaint by reference. *In re New Valley Corp. Deriv. Litig.,* 2001 WL 50212, at *4-*6 (Del.Ch. Jan.11, 2001). Rattner, in her brief, argues that the large percentages disposed of by the Individual Defendants support her alleged theory of insider trading. *See* Pl.'s Answering Br. at 12 n. 7 (citing "2002 Proxy"). However, nowhere in the Amended Complaint did Rattner allege the total personal holdings of the individual Director Defendants. Here, the "2002 Proxy," a citation subject to uncertainty, was not referred to in the Amended Complaint. Also, the document is not integral to Rattner's claim.

B. *The Accounting Oversight Claims*

Rattner also claims that demand is excused with respect to the Accounting Oversight Claims because all of the members of the Board are potentially liable for failure to exercise proper supervision over VeriSign's financial recording and reporting systems. In this situation, the *Rales* test, in examining the "interest" of the challenged directors, asks whether "the directors face a 'substantial likelihood' of personal liability, [and thus whether] their ability to consider a demand impartially is compromised ..., excusing demand." [FN68]

> FN68. *Guttman,* 823 A.2d at 501.

Rattner's Accounting Oversight Claims are best described as a type of *Caremark* [FN69] claim. As was noted in *In re Caremark International Derivative Litigation,* a claim for failure to exercise proper oversight is one of, if not the, most difficult theories upon which to prevail. [FN70] In the typical *Caremark* case, "[i]n order to hold the directors liable, [a] plaintiff will have to demonstrate that they were grossly negligent in failing to supervise these subordinates." [FN71] Here, once again, it is instructive to review not what facts the Amended Complaint alleges, but what facts the Amended Complaint fails to allege, with particularity.

> FN69. *In re Caremark Int'l Deriv. Litig.,* 698 A.2d 959 (Del.Ch.1996).

> FN70. *Id.* at 967; *see also Guttman,* 823 A.2d at 505-06.

> FN71. *Seminaris,* 662 A.2d at 1355.

The Amended Complaint sets forth vast tracts of quoted materials from public sources, detailing wrongdoings in the form of alleged misstatements. The Amended Complaint also summarizes numerous SEC rules and regulations, and FASB and GAAP standards. However, conspicuously absent from any of the Amended Complaint's allegations are particularized facts regarding the Company's internal financial controls during the Relevant Period, notably the actions and practices of VeriSign's audit committee. [FN72] The Amended Complaint also is similarly wanting of any facts regarding the Board's involvement in the preparation of the financial statements and the release of financial information to the market.

> FN72. As has been noted, relevant facts

include "whether the company had an audit committee during that period, how often and how long it met, who advised the committee, and whether the committee discussed and approved any of the allegedly improper accounting practices." *Guttman*, 823 A.2d at 498.

*13 Rattner calls attention to what she suggests should have been a "red flag" to the Director Defendants, placing them on notice of the systematic failure of the Company's internal controls. The Amended Complaint, relatively briefly, attempts to explain that the Defendant Directors should have been on notice of certain alleged misstatements, noting that "VeriSign" purchased companies with large amounts of deferred revenues, allegedly in order to manipulate its DSO by increasing its deferred revenue and excluding its accounts receivables, thereby creating the false impression of growth. [FN73] Specifically, the Amended Complaint alleges that DSO were steadily rising from the second quarter of 2000 (DSO of 32) through the first quarter of 2002 (when DSO peaked at 81), which should have signaled to the VeriSign directors that something was amiss, given that VeriSign's revenue stream is "mainly derived from subscription based products and services (over 85% of revenue) which are recognized ratably and ordinarily should carry a low DSO of 45--50 days or less." [FN74] However, it is again important to recall the structure of the Board, in that only one Director Defendant is alleged to have been a senior manager of the Company at the time this action was filed. There is nothing alleged with particularity in the Amended Complaint that would either demonstrate or permit me to draw the reasonable inference that the Director Defendants were aware of a possibly onerous elevation in a single financial statistic. [FN75] As has been noted, claimed red flags "are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer." [FN76] Thus, the Amended Complaint, in the one instance it alleges a reason why the Director Defendants could somehow have been aware of alleged misdoings at the Company, still falls short of pleading with particularity facts that would excuse demand.

FN73. Amended Compl. ¶ 62.

FN74. *Id.* ¶ 70.

FN75. *See In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *2 (Del.Ch. June 5, 2003).

FN76. *Id.*

None of these allegations contained in the Amended Complaint (individually or collectively) pleads with particularity sufficient to sustain an inference that the Defendant Directors were guilty of gross negligence. While the Amended Complaint is quick to prattle off numerous alleged infractions of laws, rules and principles, Rattner never notes the accounting procedures employed by the Company or the Board's involvement in VeriSign's financial recording and reporting systems. The only information one can snare from the Amended Complaint is that there exists a body of rules regarding the accuracy of recording and reporting financial information which may have been violated. Equally as important, I am unable, from the face of the Amended Complaint, to determine what role, if any, the Board or its members played in the internal processes of collecting and disseminating financial information. The most I can safely admit knowledge of is that Compton, Chenevich and Kriens were members of the Audit Committee during the Relevant Period and, thus, that the Company had an Audit Committee. [FN77] Therefore, I am unable to conclude that a majority of the Board faces a substantial likelihood of liability for failing to oversee VeriSign's compliance with required accounting and disclosure standards. [FN78]

FN77. Ironically, these Director Defendants are three of the four directors who were not alleged to have engaged in insider trading.

FN78. To the extent that Rattner alleges intentional wrongdoing by the Director Defendants, I note that, for the same reasons set forth above, the Amended Complaint does not allege with particularity facts that at all show knowing participation by any of the Director Defendants (with the possible exception of Sclavos as the only management director). I also observe that, in contrast to Rattner's alternative theories of wrongdoing, the issue of demand futility with respect to claims of intentional wrongdoing would be judged under the two-pronged *Aronson* standard. *See supra* text accompanying note 35. However, given the highly conclusory nature of the Amended Complaint, the Amended Complaint fails to plead with particularity demand futility under either prong

*14 Finally, Rattner asserts another theory as to why demand is excused: because "[c]ertain of the

Individual Defendants are defendants in ... federal securities class action suits ... and face a substantial likelihood of liability given the misstatements of VeriSign' [sic] earnings and the trading in VeriSign stock during the stated class period in those actions." [FN79] Here, too, the Amended Complaint leaves far too much to the imagination. The only particularized facts contained in the Amended Complaint regarding the federal securities class action lawsuits are that such suits were filed and are pending in the Northern District of California. One is left to guess at which of the Individual Defendants, indeed if any of the Director Defendants, are defendants in the federal securities class action lawsuits. These conclusory and cryptic allegations are insufficient to satisfy the demand excusal requirements of Court of Chancery Rule 23.1.

> FN79. Amended Compl. ¶ 102(d).

Thus, a symptomatic and ultimately fatal defect to all of Rattner's claims is a failure to plead facts with particularity. Here, the cause of this systematic failure is left to supposition, although one suspects that the "first to file custom" and the resulting "unseemly race to the court house" may be at fault. [FN80] In her brief, Rattner noted:

> FN80. *Rales,* 634 A.2d at 934-35 n. 10; *see also In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1.

[I]t is unclear from a review of public filings how exactly Moore's Illuminet options were disposed. Indeed, prior to filing the Amended Complaint, plaintiff's counsel requested an explanation from defendants' counsel regarding Moore's disposition since it is critical to the demand futility analysis. After taking the matter under advisement, defendants' counsel refused to provide any information. [FN81]

> FN81. Pl.'s Answering Br. at 12 (citation omitted).

Our cases have consistently advised would-be derivative plaintiffs to utilize the "tools at hand" before filing complaints. [FN82] In particular, the books and records provisions of 8 *Del. C.* § 220 may be quite helpful for derivative plaintiffs confronted with the need to satisfy the pleading requirements of Court of Chancery Rule 23.1 [FN83] They might have been helpful here; Rattner has never stated whether she availed herself of the tools at hand before embarking upon what is now discovered to have been an ultimately--at least in this venue--unsuccessful journey. Thus, both the causes of the Amended Complaint's deficiencies and whether an often overlooked tool for plaintiffs could have been useful remain a mystery. What is clear is that the Amended Complaint fails to set forth particularized facts that create a reasonable doubt as to the disinterest or independence of a majority of the Board at the time this action was filed so as to excuse demand.

> FN82. *See Brehm,* 746 A.2d at 266-67; *In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1; *Guttman,* 823 A.2d at 504.

> FN83. *See e.g., In re The Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 279 (Del.Ch.2003).

### IV. CONCLUSION

For the foregoing reasons, the Amended Complaint will be dismissed. [FN84] An order will be entered in accordance with this Memorandum Opinion.

> FN84. The dismissal as to Rattner will be with prejudice. *See* Court of Chancery Rule 15(aaa).

### ORDER

AND NOW, this *30th* day of September, 2003, for the reasons set forth in the Court's Memorandum Opinion of even date,

**\*15** IT IS HEREBY ORDERED that the above-entitled action be, and the same hereby is, dismissed. This dismissal is with prejudice as to Plaintiff Bobbie Rattner.

2003 WL 22284323 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

Not Reported in F.Supp.

**Page 83**

1992 WL 73555 (D.Mass.)

**(Cite as: 1992 WL 73555 (D.Mass.))**

▷

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.

In Re STRATUS COMPUTER, INC. SECURITIES
LITIGATION, Defendant.

CIV. A. 89-2075-Z.

March 27, 1992.
Recommendations on Motions to Dismiss Dec. 10,
1991.

Thomas G. Shapiro, Shapiro, Grace & Haber,
Boston, Mass., for plaintiffs.

Maynard Mohan Kirpalani, Parker, Coulter, Daley &
White, Boston, Mass., for defendant Stratus
Computer, Inc.

Peter M. Saparoff, Palmer & Dodge, Helen A.
Robichaud, Gaston & Snow, Boston, Mass., for
defendants Status Computer, Inc., William E. Foster
and Gary Haroian.

Thomas J. Dougherty, Skadden, Arps, Slate,
Meagher & Flom, Boston, for defendants William H.
Thompson, Robert E. Donahue and Robert A.
Freiburghouse.

Peter J. MacDonald, Hale & Dorr, Boston, Mass., for
defendants Alexander V. D'Arbeloff, Robert M.
Morrill, Paul J. Ferri, Gardner C. Hendrie and J.
Burgess Jamieson.

ZOBEL, District Judge.

*1 The Objection to the recommendation pertaining
to Counts I, II and IV are overruled. Plaintiff does
not object to the recommendation pertaining to Count
III. The Court accepts the Magistrate Judge's
findings and recommendations and allows the motion
to dismiss. The complaint shall be dismissed as to
all defendants. Donald Oldham having never been
served, the complaints against him is dismissed for
failure to make service.

*FINDINGS AND RECOMMENDATIONS ON
DEFENDANTS MOTIONS TO DISMISS*

ALEXANDER, United States Magistrate Judge.

These motions have been referred to this Court by
Order of Reference. The defendants move to dismiss
each count of the plaintiffs' Consolidated Amended
Complaint on a various grounds. The factual
background is culled from the allegations of the
complaint, which the Court takes as true for the
purposes of the motions to dismiss under
Fed.R.Civ.P. 12(b)(6). *See Lessler v. Little,* 857 F.2d
866, 867 (1st Cir.1988), *cert. denied,* 489 U.S. 1016,
109 S.Ct. 1130, 103 L.Ed.2d 192 (1989) (citations
omitted). This Court will not dismiss a count for
failure to state a claim unless "it appears beyond
doubt that [plaintiffs] can prove no set of facts [that]
would entitle [them] to relief." *Id.* (citations omitted).

FACTUAL BACKGROUND

*Plaintiffs*

Plaintiff Laurel Catania purchased 500 shares of
stock in the defendant Stratus Computer, Inc.
(Stratus) on August 23, 1989. Plaintiff Stephen
DelGrasso purchased 200 shares of Stratus stock on
August 18, 1989. Plaintiff John Garabidian
purchased 200 shares of Stratus stock on August 28,
1989. Plaintiff Bruce Wilhelmy purchased 1,000
shares of Stratus stock on September 15, 1989.
Plaintiff Elliot Shwartz purchased 100 shares of
Stratus stock on August 9, 1989. These plaintiffs
bring suit on behalf of themselves and a class of all
who purchased shares of Stratus stock between July
25, 1989, and September 19, 1989. Plaintiff Steven
D. Bergman brings his action as a derivative suit on
behalf of Stratus.

*Defendants*

Stratus is a Massachusetts corporation. It
manufactures and sells fault tolerant computer
systems, used in automatic teller machine networks
and securities trading systems, among other
applications. Defendant William E. Foster is
President, Chief Executive Officer and Chairman of
the Board of Stratus. Defendant Gary E. Haroian is
Senior Vice President of Finance and Administration,
Chief Financial Officer and Treasurer. Defendant
Robert Freiburghouse is Senior Vice President of
Engineering. Defendant Robert Donahue is Vice
President and Controller. Defendant William H.
Thompson is Senior Vice President of Marketing.
Defendant J. Donald Oldham is Vice President.
Defendants Alexander V. D'Arbeloff, Robert M.
Morrill, Paul J. Ferri, Gardner C. Hendrie and J.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      **Page 84**
**(Cite as: 1992 WL 73555, *1 (D.Mass.))**

Burgess Jamieson are directors of Stratus.

*Facts*

Stratus has been a highly successful company in the computer industry. Stratus sells its products both internationally and domestically. The domestic channels for its sales are under distribution agreements with IBM Corporation (IBM) and Olivetti & Co., S.P.A. (Olivetti). In 1988, the sales to IBM accrued to 32% of Stratus's revenues, while the sales to Olivetti made up 8% of revenues.

**\*2** Since 1982, Stratus has grown annually from 40% to 50%. In the April 3, 1989, edition of *Business Week*, defendant Foster predicted 30% growth for the third quarter of 1989. In a Letter to Shareholders in the Annual Report for the fiscal year ended January 1, 1989, which was disseminated in late March of 1989, defendant Foster expressed confidence and optimism in Stratus's performance and growth. The statement mentioned historical increases in growth and emphasized the unique aspects of Stratus, as well as its relationship with IBM, as attributes. The statement discussed efforts to build sales through product development. The statement highlighted the telecommunications industry, declaring that Stratus expected to exceed the projected industry growth rate of 25%, due to its unique attributes. The statement recounted past international growth, and expressed the expectation that the same international growth rate would continue in 1989. The statement represented that Stratus's "products are in greater demand than ever before," and asserted as "fact" that Stratus was "positioned to achieve even greater long term success." *Consolidated Amended Complaint* ¶ 36. On March 27, 1989, Prudential-Bache Securities, Inc. issued a report quoting defendant Haroian as stating that "the company feels that a 40%-60% [annual growth] is sustainable for the long term." *Id.* ¶ 37.

As growth had continued in the first quarter, defendant Foster made statements to the *Origin Universal News Service* on April 25, 1989, and to *The Boston Globe* on April 26, 1989, discussing that growth. He emphasized Stratus's international performance, noting that it offset softness in the domestic market. He stated that "we remain confident in our continued growth both domestically and internationally." *Id.* ¶ 38.

Stratus's Form 10-Q for the quarter ended April 2, 1989, depicted an increase in net revenues of 41%.

The defendants attributed the increase to "the growth in the marketplace" and "the rapidly growing customer base." Financial analysts stated that the first quarter results concurred with their projections.

On May 2, 1989, defendant Foster represented to *The Boston Globe* that domestic sales had slowed, but that the strength of Stratus's other markets was such that there would be no overall slowing down. On May 15, 1989, *Computer World* reported Stratus's growth in the Pacific Rim, noting that Stratus expected the same growth in 1989.

In a July 29, 1989, press release announcing earnings for the second quarter of 1989, Foster emphasized those aspects that had contributed to the growth, noting an increase in customer accounts, both domestically and internationally. The plaintiffs contend that this statement, coupled with projections of a 30% increase in earnings, was materially misleading, because Stratus knew or recklessly disregarded indications that a decrease in the domestic market would make the overall business outlook inaccurate.

**\*3** Revenues and income for the second quarter and for the six months of the first two quarters of 1989 increased by greater than 30%. On August 4, *Value Line* estimated that Stratus's 1989 sales would reflect a 34% increase over 1988 sales. It noted a 25% rate of growth in the United States, stating that sales through IBM were expanding at a rate of approximately 45%.

The complaint alleges that, during the class period, Stratus was in contact with professional participants in the stock market and that the individual defendants periodically provided information to analysts at meetings. Stratus confirmed the reasonableness of the analysts' estimates for 1989, at these meetings, including at a meeting on September 12, 1989, at Cowen & Co., in New York City. On September 17, 1989, *The New York Times* estimated revenues at $360 million for the year. By late July of 1989, the complaint alleges, the defendants knew or recklessly disregarded that projected levels of sales were not attainable.

On September 18, 1989, the defendants announced that revenues and earnings for the third quarter would not meet expectations, due to weakness in the domestic market. They indicated a 20% to 25% rate of growth in the short term. Dow Jones, *Business Week* and *McGraw Hill News* reported this

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10177-NG     Document 22     Filed 09/27/2004     Page 97 of 119

Not Reported in F.Supp.                                                                 Page 85
(Cite as: 1992 WL 73555, *3 (D.Mass.))

information. *Value Line* reduced its earnings estimates for 1989. The price of Stratus's stock fell from $33- 1/2 on September 15, 1989 to $26. Third quarter earnings ultimately released on October 20, 1989, indicated an increase in earnings of only 12%, due to a weak domestic market.

Plaintiffs allege that the directors made several sales of Stratus stock with material knowledge of the decline in growth. Defendant Oldham sold 2,825 shares on September 5 and 14. Defendant Thompson sold 3,000 shares on August 25. Defendant Donahue sold 1,807 shares on August 24. Defendant Freiburghouse sold 28,938 shares on August 1 and 30,000 shares on May 12.

## ANALYSIS

*Count I*

Count I alleges that the defendants made materially misleading statements that would create the impression that Stratus was growing at a 30% rate, when the defendants knew or recklessly disregarded indications that such a growth rate was not attainable. Count I claims that these misleading statements, made with knowledge of their falsity or reckless disregard for the truth, violated sections 10(b) and 20 of the Securities and Exchange Act, as well as Rule 10b-5, promulgated by the Securities and Exchange Commission. Stratus and each of the individual defendants, except defendant Oldham move to dismiss this count. Their primary contention is that the count fails to satisfy the pleading requirements of Rule 9(b).

According to Rule 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The First Circuit has identified three purposes behind this rule:

*4 (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations.

*New England Data Services., Inc. v. Becher,* 829 F.2d 286, 289 (1st Cir.1987). Because the danger of strike suits is great in cases alleging securities fraud, this circuit will construe Rule 9(b) strictly in that

context. *Id.* at 288; *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991).

Under Rule 9(b), while the pleadings need not prove the case, they "must 'specif[y] ... the time, place and content of .. [each] alleged false representation.' " *Konstantinakos v. Federal Deposit Ins. Corp.,* 719 F.Supp. 35, 38 (D.Mass.1989) (quoting *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 229 (1st Cir.1980)). The First Circuit has stated that Rule 9(b) "requires specification of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *McGinty,* 633 F.2d at 228, *quoted in New England Data Services,* 829 F.2d at 288. The pleadings, however, must provide a minimal foundation of indicia as to the misleading qualities of the statements. *See id.* (pleadings failed to satisfy Rule 9(b), because "the complaint does not explain what was misleading about any of the challenged statements"); *Wittenberg v. Continental Real Estate Partners, LTD-74A,* 478 F.Supp. 504, 508 (D.Mass.1979) (complaint must "state how each statement amounted to a misrepresentation.") (citation omitted), *aff'd per curiam,* 625 F.2d 5 (1st Cir.1980). The First Circuit has recently stated that the complaint must include "factual allegations that would support a reasonable inference that adverse circumstances existed ... and were known and deliberately disregarded by defendants." *Romani,* 929 F.2d at 878. "The requirement that supporting facts be pleaded applies even when the fraud relates to matters peculiarly within the knowledge of the opposing party." *Id.* (citing *Wayne Investment v. Gulf Oil Corp.,* 739 F.2d 11, 13-14 (1st Cir.1984); *New England Data Services,* 829 F.2d at 288); *see also In re Healthco International, Inc.,* Civil Action No. 91-10710-MA, Memorandum and Order at 14 n. 9 (D.Mass. Nov. 7, 1991). Thus, the complaint may not rest on mere allegations and conclusions, *Hayduk v. Lanna,* 775 F.2d 441, 444 (1st Cir.1985); nor may it be so groundless in fact that it proceeds only on mere "information and belief." *See Driscoll v. Landmark Bank for Sav.,* 758 F.Supp. 48, 51 (D.Mass.1991) (citing *Wayne,* 739 F.2d at 14).

The complaint alleges statements attributable to the nominal defendant Stratus and defendants Foster and Haroian that are sufficiently specific to satisfy the time, place and content requirements. As to defendants Donahue, Freiburghouse and Thompson, however, the complaint does not allege anything except vague connections by virtue of their positions. Merely being a director or officer is not ground for

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

imposition of liability under § 10(b).  *Loan v. Federal Deposit Ins. Corp.,*  717 F.Supp. 964, 968 (D.Mass.1989).  Rule 9(b) requires specification of which defendants are accused of performing what acts.  *Hayduk,*  775 F.2d at 443;  *Loan,*  717 F.Supp. at 968 ("[w]here multiple defendants are involved, each person's role in the alleged fraud must be particularized in order to satisfy Rule 9(b)");  *see also Konstantinakos,*  719 F.Supp. at 39 (complaint dismissed,  *inter alia,*  because there were no allegations as to the roles of each individual defendant).  On this basis, alone, this Court should dismiss Count I as to defendants Donahue, Freiburghouse and Thompson.

**\*5**  As to the other defendants, while the statements alleged to be fraudulent are set out in the complaint according to the time, place and content requirements, they do not meet the standard recently set by the First Circuit in  *Romani.*  Beyond the time, place and content requirement, the complaint must allege adverse circumstances that were known and disregarded.  *Romani,*  929 F.2d at 878.  The plaintiffs, here, do not state any facts that would serve as a starting point on which to build a case of knowing or reckless disregard of adverse circumstances. [FN1]  Rather, the complaint is alleged on mere "information and belief."  The First Circuit has circumscribed the use of this manner of pleading fraud in the most explicit terms. [FN2]

As Magistrate Judge Ponsor recently noted in a similar case:

The allegations of fraud here are so generic that [they] could have been drafted by any competent practitioner generally familiar with securities fraud case law, without any independent knowledge of defendants' conduct, simply by collating language from leading cases with excerpts from defendants' ... 10-Q forms, annual reports and press releases.

*Wilkes v. Heritage Bancorp, Inc.,*  1990 WL 263612 (D.Mass.1990).  Courts in this district have repeatedly dismissed complaints that merely quote company statements or predictions as supporting facts for fraud.  *See, e.g., Driscoll,*  758 F.Supp. 48;  *Akerman v. Bankworcester Corp.,*  751 F.Supp. 11 (D.Mass.1990);  *Loan,*  717 F.Supp. at 967.  Such an exiguous body of factual support will not pass muster.  Count I fails to meet the requirements of Rule 9(b).

*Count II*

Count II alleges that the defendants Donahue, Freiburghouse, Oldham and Thompson traded Stratus stock on inside information, in contravention of sections 10(b) and 20(A)(a) of the Securities and Exchange Act and Rule 10b-5.  Defendants Donahue, Freiburghouse and Thompson move this Court to dismiss Count II.

The defendants first contend that the Court should dismiss Count II for failure to comply with Rule 9(b).  This Court finds persuasive the defendants' argument that Rule 9(b) is applicable.  In  *Hayduk,*  the First Circuit indicated that Rule 9(b) applies in any case where "  *fraud lies at the core of the action.*' "  *Hayduk,*  775 F.2d at 443 (quoting  *Lopez v. Bulova Watch Co., Inc.,*  582 F.Supp. 755, 766 (D.R.I.1984)) (emphasis in original).  The plaintiff is essentially arguing that the defendants engaged in a conspiracy to defraud.  As Rule 10b-5 states, it is unlawful:

(c) To engage in any act, practice, or course of business which operates or would operate as a  *fraud or deceit*  upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (emphasis added).  As one court noted, "Congress ... amended the Exchange Act to expressly provide a private right of action for contemporaneous buyers and sellers asserting  *claims of fraud committed through insider trading.*"  *Elysian Federal Savings Bank v. First Interregional Equity Corp.,*  713 F.Supp. 737 (D.N.J.1989).  Thus, it would appear that insider trading claims demand application of Rule 9(b).

**\*6**  Having determined that Rule 9(b) applies, Count II should be dismissed against defendants Donahue, Freiburghouse and Thompson for the same reasons as Count I. [FN3]  The factual allegations simply do not make reference to them, except to identify their status.  There is no allegation as to what information they knew but did not disclose.

Defendants Donahue, Freiburghouse and Thompson also argue for dismissal on the grounds that none of the plaintiffs traded securities "contemporaneously" with them, as required under the Securities and Exchange Act.  *See*  15 U.S.C. § 78t-1(a).  Judge McNaught has ruled out an interpretation of "contemporaneous" that would include purchases by the plaintiffs  *before*  the defendants.  *Backman v. Polaroid Corp.,*  540 F.Supp. 667, 670 (D.Mass.1982) ;  *see also Abelson v. Strong,*  644 F.Supp. 524, 527 (D.Mass.1986) (allegations that plaintiffs purchased

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 87
**(Cite as: 1992 WL 73555, *6 (D.Mass.))**

"during the period of market manipulation" were not sufficient to confer standing on plaintiffs to bring insider trading suit). He also refused to include within that term purchases that occurred four days (two trading days) after a defendant's sale. *Backman,* 540 F.Supp. at 671. The facts of that case would bar all claims except plaintiff Garibidian's claim against defendant Thompson, as Garibidian purchased within three days (one trading day) of Thompson's sale. The defendants argue persuasively, however, that the logic of Judge McNaught's decision requires an interpretation of "contemporaneous" to mean "same day." [FN4] Under such an interpretation, none of the plaintiffs would have standing to bring the class suit under Count II.

*Count III*

Count III is a more cursory version of Count I, alleging that the defendants other than the derivative director defendants engaged in negligent misrepresentation by refusing to exercise reasonable care in the statements they made. This assertion appears to relate back to the allegations that the defendants acted in reckless disregard of indications that earnings would decrease. What these indications were is not clear. Count III is even less particular than Count I. The defendants move to dismiss it.

This district has clearly held that Rule 9(b) applies to claims of negligent misrepresentation. *Howard v. Cycare Systems, Inc.,* 128 F.R.D. 159 (D.Mass.1989); *Morgan v. Financial Planning Advisors,* 701 F.Supp. 923 (D.Mass.1988); *Flier v. Billingsley,* 1988 WL 92465 (D.Mass.1988). The same rule against pleadings on "information and belief" and the same policy against allowing "strike suits" apply to negligent misrepresentation claims as apply to outright claims of fraud. *Howard,* 128 F.R.D. at 162 (quoting *Wayne,* 739 F.2d at 13-14); *Simcox v. San Juan Shipyard, Inc.,* 754 F.2d 430, 439 (1st Cir.1985). Furthermore, without the duties imposed by the securities laws, it is unclear upon what this claim is based. The factual statements appear to have been true when made, and the other statements are "statements of opinion [or] of conditions to exist in the future," which are not actionable under Massachusetts law. *Morgan,* 701 F.Supp. at 927 (quoting *Pepsi Cola Metropolitan Bottling Co. v. Pleasure Island, Inc.,* 345 F.2d 617, 622 (1st Cir.1965)). Massachusetts law, moreover, generally imposes a requirement of privity in order to bring a claim of negligent misrepresentation. *Capitol Indemnity Corp. v. Freedom House Development*

*Corp.,* 487 F.Supp. 839, 842 (D.Mass.1980). It is unclear how the plaintiffs in this case could meet that requirement, given that they are merely purchasers on a public stock exchange. *See, e.g., In re Consumers Power Company Securities Litigation,* 105 F.R.D. 583, 596-98 (E.D.Mich.1985) (stock purchasers lacked privity and, thus, could not sue for negligent misrepresentation). Thus, Count III should be dismissed.

*Count IV*

**\*7** Count IV is a derivative suit brought by plaintiff Bergman on behalf of Stratus for breach of fiduciary duty to Stratus by the individual defendants. The defendants invoke four grounds for dismissal of this count: (1) failure to meet Rule 9(b)'s particularity requirement; (2) failure to meet Rule 8(a)'s pleading requirement; (3) failure of the plaintiff to plead with particularity the circumstances excusing demand on the corporation, as required by Rule 23.1; and (4) failure to verify the complaint, as required by Rule 23.1. Each of these grounds supports dismissal.

The defendants' first argument is that Rule 9(b) applies and that plaintiff Bergman has not complied with it. Oddly, plaintiff Bergman does not respond to this argument, but merely incorporates by reference the arguments of the other plaintiffs with regard to Rule 9(b) under the other counts of the complaint. This Court sees nothing to rebut the defendants' arguments.

Judge Keeton has stated that Rule 9(b)'s particularity requirement "extends to averments of fraud or mistake, whatever may be the theory of legal duty-- statutory, tort, contractual, or *fiduciary.* " *Shapiro v. Miami Oil Producers, Inc.,* 84 F.R.D. 234, 236 (D.Mass.1979) (emphasis added); *see also Hayduk,* 775 F.2d at 443 ("where fraud lies at the core of the action, Rule 9(b) applies"). If the breach of fiduciary duty derives from conduct that is negligent, rather than fraudulent, however, Rule 9(b) would not apply. *Shapiro,* 84 F.R.D. at 236. That the breach of fiduciary duty alleged here derives from conduct that is fraudulent, and not merely negligent, is plain from the complaint. Plaintiff Bergman claims: that each of the directors "participated in, knew of, and was on notice of the wrongful and illegal conduct" ( *Consolidated Amended Complaint* ¶ 82(e)); that the directors "knowingly engaged in self-dealing from which they profited personally" (*Id.* ¶ 82(f)); and that the defendants' conduct violated their fiduciary duties of candor and loyalty "requir[ing] them to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

disseminate truthful information" (*Id.* ¶ 83).    The derivative count plainly asserts the sort of claim for which Rule 9(b) contemplates the application of its particularity requirement.

Having determined that Rule 9(b) applies, it is immediately apparent that Count IV does not comply with the rule.    The allegations are vague and amorphous.    It is not at all clear which defendants are alleged to have performed what specific acts that would constitute a violation of fiduciary duty.    *See Hurley v. Federal Deposit Ins. Corp.,* 719 F.Supp. 27, 31 (D.Mass.1989) ("Where multiple defendants are involved, each defendant's role in the fraud must be particularized....    This requirement serves to place each defendant on notice of what role he is alleged to have played in the fraud.") (citations omitted); *Margaret Hall Foundation, Inc. v. Atlantic Financial Management, Inc.,* 572 F.Supp. 1475, 1481 (D.Mass.1983) ("In a securities fraud case ..., it is clear that the complaint should 'particularize as to each ... of the defendants the activities for which the plaintiff seeks to hold them accountable.' ") (quoting *Lerman v. ITB Management Corp.,* 58 F.R.D. 153, 156 (D.Mass.1973)).    Count IV only discusses the defendants in collective terminology, making no reference to any particular act of any individual defendant.

**\*8** Beyond the vague allegations of participation, implication, knowledge and dissemination there is no reference to adverse circumstances that would provide a foundation upon which to build these charges.    While the charges seem to stem from Counts I through III, five of the six directors sued under Count IV are in no way implicated in Counts I through III.    It is, thus, by no means clear whom plaintiff Bergman alleges to have done what.    Not only does Count IV fail to provide the defendants with the notice requisite to the preparation of meaningful responses, but the danger of holding the individual defendants *in terrorem* and subjecting them to a frivolous suit that might likely injure their reputations is high.    *See New England Data Services,* 829 F.2d at 289; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539, 552 (1975), *reh'g denied,* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975).    Thus, Count IV warrants dismissal under Rule 9(b).

The defendants also argue that Count IV fails to comply even with the basic pleading requirements of Rule 8(a) and, thus, should be dismissed under Rule 12(b)(6) for failure to state a claim.    Their argument

on this ground is also persuasive.    Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief.    Fed.R.Civ.P. 8(a).    As the First Circuit has stated:

While a complaint need only set out 'a generalized statement of facts,' there must be enough information 'to outline the elements of the pleaders' claim.'    ...    More detail is required than a plaintiff's bald statement 'that he has a valid claim of some type,' and courts do 'not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened....' "

*Kadar Corp. v. Milbury,* 549 F.2d 230, 233 (1st Cir.1977) (quoting Wright & Miller, Federal Practice and Procedure: Civil § 1357).    The complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."    *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80, 85 (1957).

Nowhere does Count IV charge the outside directors with any specific wrongdoing.    Rather, Count IV seems to implicate them only because of their status as directors.    That tenuous connection, however, is an insufficient basis for alleging a cause of action. *Cf. Konstantinakos,* 719 F.Supp. at 39 (mere status as directors is insufficient basis to support cause of action for securities fraud in which directors did not participate); *Schmid v. National Bank of Greece, S.A.,* 622 F.Supp. 704, 712 (D.Mass.1985), *aff'd,* 802 F.2d 439 (1st Cir.1986) ("An officer of a corporation does not incur personal liability for a tort committed by the corporation or by another corporate officer merely by virtue of the office which he holds in the corporation.") (citations omitted).    As Judge Tauro has noted, where a complaint alleges "violation of ... fiduciary duties" without "attempt[ing] to delineate among the defendants their participation or responsibilities in the activities which are the subject of th[e] suit," it does not give the defendants the notice required of either Rule 8(a) or Rule 9(b). *Lerman,* 58 F.R.D. at 155 & n. 2 (D.Mass.1973).

**\*9** Yet another reason for dismissing Count IV is the failure of plaintiff Bergman to make a demand on the board of directors that the corporation bring the lawsuit.    Rule 23.1 requires that, in a derivative action, the complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ..., and the reasons for the plaintiff's failure to obtain the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

**(Cite as: 1992 WL 73555, *9 (D.Mass.))**

Page 89

action or for not making the effort." Fed.R.Civ.P. 23.1. The First Circuit has explained:

The purpose of the demand requirement is, of course, to require resort to the body legally charged with conduct of the company's affairs before licensing suit in the company's name by persons not so charged. Given the expense of litigation and the normal presumptions running in favor of those acting for the company, this seems only reasonable.

*Heit v. Baird,* 567 F.2d 1157, 1162 n. 6 (1st Cir.1977). Thus, the particularity requirement under Rule 23.1 "is not a technical rule of pleading, but one of substantive right." *In re Kauffman Mutual Fund Actions,* 479 F.2d 257, 263 (1st Cir.1973), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973) (quoting *Bartlett v. New York, N.H. & H.R.R.,* 221 Mass. 530, 538, 109 N.E. 452, 456 (1915)).

There are two phases of the demand requirement. Not only must any reasons excusing demand satisfy the substantive state law, but Rule 23.1 imposes an independent federal requirement that such reasons be pled with particularity. *Tural v. Rogatol Distributors, Inc.,* No. 91-1472 (1st Cir. Nov. 27, 1991). In pleading the reasons excusing demand, the particularity rule requires more specificity of the complaint than mere allegations of "participation" or "acquiescence" in the challenged conduct. *Grossman v. Johnson,* 674 F.2d 115, 124 (1st Cir.1982), *cert. denied, Grossman v. Fidelity Municipal Bond Fund, Inc.,* 459 U.S. 838, 103 S.Ct. 85, 74 L.Ed.2d 80 (1982), *reh'g denied,* 459 U.S. 1138, 103 S.Ct. 774, 74 L.Ed.2d 986 (1983). The factual allegations of the complaint must describe misconduct with specificity. *Heit,* 567 F.2d at 1161 (citing 3B Moore's Federal Practice ¶ 23.1.19, at 23.1-83 (Rev. ed. 1977)).

Much of the rationale behind this Court's finding that Count IV does not satisfy the Rule 9(b) particularity requirement applies *a fortiori* to the Rule 23.1 particularity requirement. In vague and conclusory fashion, Count IV asserts six reasons justifying demand futility, none of which have specific factual support in the complaint and one of which contradicts an earlier count in the complaint. According to the complaint, demand would be futile because:

(a) The acts complained of herein constitute violations of the federal securities and other federal laws and fiduciary duties owed by directors and officers and these acts are incapable of ratification;

(b) Each of the directors is implicated in the dissemination of the false and misleading statements and omissions alleged herein;

*10 (c) Each member of the Board of Directors had access to confidential financial information indicating Stratus' true and [sic] financial condition and prospects.

(d) Social, business and other relationships tie the officers and directors of Stratus to one another, and any legitimate 'independent' action by Stratus against any of the individual defendants would be impossible;

(e) Each of the current directors participated in, knew of, and was on notice of the wrongful and illegal conduct alleged herein; and

(f) Five of the six directors who comprise Stratus' board have been involved in trading in Stratus' common stock on the basis of material non-public information and will be personally liable for any wrongdoing, in that they knowingly engaged in self-dealing from which they profitted [sic] personally.

*Consolidated Amended Complaint* ¶ 82.

Starting with the most egregious deviation from Rule 23.1, item (f) stands in peculiar contrast to the conspicuous absence of five of the six directors from any of the other counts of the complaint, including Count II--the count alleging insider trading. Such a mysterious and vague assertion cannot satisfy the particularity requirement. Count II, moreover, fails to state a claim or meet the particularity requirement of Rule 9(b). *See supra.* Item (a) is also suspect, as this complaint fails to allege particular conduct that would violate the federal securities laws. What other federal laws may be implicated is unclear. [FN5]

Finally, allowing a complaint to circumvent the demand requirement through allegations as vague and conclusory as items (b) through (e) would render the demand requirement nugatory. These items, in light of the factual allegations of the complaint, cannot be understood to allege particular misconduct by the individual directors nor particular circumstances specific to each director. "[S]tripped of these conclusory allegations, the facts set forth in the complaint" fail to "make out with sufficient particularity misconduct that would excuse a demand on directors." *Heit,* 567 F.2d at 1161 (citing 3B Moore's Federal Practice ¶ 23.1.19, at 23.1-83 (Rev.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

ed. 1977).

These allegations are similar to the one Judge Tauro found insufficient to satisfy Rule 23.1's particularity requirement in *Lerman*. In that case, the plaintiff alleged:

Demand upon the Fund to bring this action would be futile because those in control of the Fund are alleged wrongdoers. Statutes place such decisions in the directors and control of such an action would be subject to control of the wrongdoers, preventing diligent prosecution.

*Lerman*, 58 F.Supp. at 156 (quoting *Complaint* ¶ 24). The allegations in the case at bar have the same degree of particularity as the allegation in *Lerman*. *Kauffman* and *Heit* require more than such vague and conclusory allegations. [FN6]

Yet another ground for dismissing Count IV is Rule 23.1's verification requirement. Rule 23.1 states, in part: "In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ... the complaint shall be verified...." Fed.R.Civ.P. 23.1. Verification is another safeguard to ensure that complaints in derivative suits are well-grounded in fact and to prevent frivolous litigation. *Smachlo v. Birkelo*, 576 F.Supp. 1439, 1442 (D.Del.1983) (citations omitted). Plaintiff Bergman contends that his verification of the first complaint should excuse verification of the Consolidated Amended Complaint. The case law, however, stands against him. *See, e.g., Federal Deposit Ins. Corp. v. Kerr*, 637 F.Supp. 828, 843 (W.D.N.C.1986) (requiring verification of Second Amended Complaint); *Stein v. Aldrich* [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,473, at 92,781 (S.D.N.Y.1980) (amended complaint "must be verified by plaintiff"). In this case, verification of the Consolidated Amended Complaint might have eliminated some of the discrepancies. Thus, on any of these grounds, Count IV should be dismissed.

### Conclusion

*11 In light of these findings, this Court recommends that Counts I, II, III and IV be dismissed as to all defendants except defendant Oldham, who has not filed a motion to dismiss.

FN1. The complaint offers several statements of accurate historical facts regarding past growth, products and performance. These statements place Stratus in a positive light. There are also many statements of opinion and predictions offering an optimistic prognosis on the expected rate of growth. Some of the opinions and predictions are specifically quantifiable. *See Priest v. Zayre*, Civil Action No. 86-2411-Z, Memorandum of Decision at 5 (D.Mass. May 1, 1987). Nonparty statements by the media and financial analysts bolstered this optimistic impression. While the complaint gives the times, places and contents of statements made expressing confidence in the projected rate of Stratus's growth, it does not allege quantifiable information that the defendants could have known and disregarded. *Cf. Healthco*, Civil Action No. 91-10710-MA, Memorandum and Order at 14, n. 9 ("Plaintiffs aver no facts as to how Defendants' accounting system would or should have made them aware of any concrete financial figures for the fourth quarter before ... [defendant] announced its expected losses for the fourth quarter.") Without allegations of lack of reasonable basis, knowing falsehood or recklessness that satisfy Rule 9(b), the predictions are not actionable. *See Kirby v. Cullinet Software, Inc.*, 721 F.Supp. 1444, 1453-54 (D.Mass.1989).

The complaint merely leaves this Court to infer adverse circumstances from the rather vague charges of insider trading (which, as will be discussed *infra* under Count II, are inadequate). Notably, however, there are no allegations of sales of stock by defendants Foster and Haroian, the only defendants to whom the plaintiffs have attributed representations that would satisfy the time, place and content requirements. Charges that some defendants sold stock, while other defendants made optimistic projections about the company, clearly will not, without a particularly pled conspiracy, satisfy Rule 9(b). *Fingar v. Prudential-Bache Securities, Inc.*, 662 F.Supp. 1119, 1124 (E.D.N.Y.1987). Here, the plaintiffs seem to plead a conspiracy by knowledge, which is inadequate. *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.1990), *cert. denied*, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) (quoting *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir.1986) ("the case 'against an aider, abettor, or conspirator may not rest on a bare inference that the defendant must have had knowledge of the facts....' ").

FN2. *Romani*, 929 F.2d at 828 ("Where

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
**(Cite as: 1992 WL 73555, \*11 (D.Mass.))**

allegations of fraud are ... based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief."); *Hayduk,* 775 F.2d at 444 ("Without supporting facts regarding the circumstances surrounding the formation of the conspiracy to defraud plaintiffs or plaintiffs' basis for believing that a conspiracy existed for the purpose of defrauding them, the allegation becomes a conclusional accusation of the sort that is proscribed by Rule 9(b)."); *Wayne,* 739 F.2d at 14 (complaint may not proceed on mere "information and belief" without some independent factual basis for alleging fraud--"even when the fraud relates to matters peculiarly within the knowledge of the opposing party"); *see also Driscoll,* 758 F.Supp. at 51 ("Allegations in the form of mere conclusions, accusations, or speculation are not sufficient to meet Rule 9(b)'s particularity requirement without supporting facts surrounding the scheme to defraud or a basis for believing such a scheme existed.") (citing *Hayduk,* 775 F.2d at 444; *Wayne,* 739 F.2d at 14). As Judge Caffrey has stated: "Rule 9(b) does not require the plaintiff to present specific evidence; however, the plaintiff must identify some facts or circumstances to support the allegations of fraud...." *Id.* at 52.

FN3. This Court has not received a motion from defendant Oldham.

FN4. As Judge McNaught noted, the rationale for limiting recovery to those who traded during the same period of insider trading is that " '[n]on-contemporaneous traders do not require the special protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information.' " *Id.* at 670 (quoting *Fridrich v. Bradford,* 542 F.2d 307, 326-27 (6th Cir.1976) (Celebrezze, concurring)); *see also Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 94-95 (2d Cir.1981) (same). Judge Skinner cited *Backman* and *Wilson* with approval in *Abelson,* 644 F.2d at 527. In a more open-ended violation, such as large scale "tipping," this rationale would not apply, and the rule might be less restrictive. *See Backman,* 540 F.Supp. at 670 n. 1.

FN5. Item (a) would also encounter difficulties in the substantive prong of the demand analysis. The assertion that the defendants violated federal statutes is an insufficient basis for excusing demand, at least under federal law. *Lewis v. Sporck,* 612 F.Supp. 1316, 1322-23 (N.D.Cal.1985). Nor does it matter that the directors would essentially have to sue themselves. *Id.*

FN6. Insofar as five of the six defendants are not named in the count alleging insider trading and insofar as that count does not pass muster, the substantive prong of the demand requirement also poses a major difficulty. The complaint fails to implicate a majority of the directors in wrongdoing. *See Datz v. Keller,* 347 Mass. 766, 196 N.E.2d 922, 923 (1964) (dismissing complaint for insufficiently making "allegations of fact that both a majority of the directors and the holders of a majority stock interest are in the group of wrongdoers, or under their control"), *cited in Houle v. Low,* 407 Mass. 810, 813 n. 3, 556 N.E.2d 51, 53 n. 3 (1990); *accord Jackson v. Stuhlfire,* 28 Mass.App.Ct. 924, 926, 547 N.E.2d 1146, 1148 (1990); *see also Hayden v. Perfection Cooler Co.,* 227 Mass. 589, 593, 116 N.E. 871, 873 (1917) (derivative plaintiff must make "specific allegations that the majority of the directors were wilfully disregardful of the interests of the corporation"). The language of these cases indicates that Massachusetts law would only excuse demand for harm caused to the corporation by a majority of the directors. Here, the complaint fails to allege conduct beyond "mere approval of corporate action, absent self-interest or other indication of bias." *Kauffman,* 479 F.2d at 264; *see also Heit,* 567 F.2d at 1162 ("As the complaint fails to set forth facts showing that a majority of the directors ... engaged in a facially improper transaction, we hold that the failure of the plaintiff to make a demand on the directors before commencing this suit was unexcused, and dismissal of the case for noncompliance with Rule 23.1 was proper."); *Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983) ("absent specific allegations of self-dealing or bias on the part of a majority of the board, mere approval and acquiescence are insufficient to render demand futile").

1992 WL 73555 (D.Mass.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

Not Reported in F.Supp.
1993 WL 100202 (D.Kan.)
(Cite as: 1993 WL 100202 (D.Kan.))
**Page 92**

**H**

Only the Westlaw citation is currently available.

United States District Court, D. Kansas.

In re UNITED TELECOMMUNICATIONS, INC.,
SECURITIES LITIGATION.
Relates to All Actions.

No. 90-2251-EEO.

March 4, 1993.

Eric C. Sexton, Don R. Lolli, Beckett, Lolli, Bartunek & Beckett, Kansas City, MO, Stephen D. Ramos, Berger & Montague, Philadelphia, PA, Lee S. Shalov, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, Steven M. Steingard, Dianne M. Nast, Kohn, Savett, Klein & Graf, Philadephia, PA, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, David Jaroslawicz, Law Offices of David Jaroslawicz, New York City, Richard Dannenberg, Lowey, Dannenberg, Bemporad, Brachtl & Selinger, P.C., New York City, for plaintiffs.

Arthur L. Liman, Allan Blumstein, Paul, Weiss, Rifkind, Wharton & Garison, New York City, Stephen D. Oestreich, Patricia I. Avery, Wolf, Popper, Ross, Wolf & Jones, New York City, for William T. Esrey and Arthur B. Krause.

Lawrence Kill, Anderson, Kill, Olick & Oshinsky, P.C., New York City, for Paul H. Henson.

Heather Suzanne Woodson, Stinson, Mag & Fizzell, Overland Park, KS, Brant M. Laue, George E. Feldmiller, Mark S. Foster, Stinson, Mag & Fizzell, Kansas City, MO, Laura L. Ozenberger, Arthur A. Chaykin, Kansas City, MO, for United Telecommunications, Inc.

MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

**\*1** This matter is before the court on defendants' motion to dismiss Plaintiff's Second Amended Consolidated Derivative Complaint (the "complaint"). For the reasons stated below, defendants' motion is granted, and the complaint is dismissed without prejudice.

This derivative action is brought on behalf of United Telecommunications, Inc. ("United"), asserting claims against United's directors for breach of fiduciary duty. Specifically, the complaint alleges that the United directorate is responsible for gross mismanagement of the company, and for participating in and allowing dissemination by the company of public statements that were fraudulent and misleading. United is being sued in a related class action for securities fraud arising out of the same conduct that in this suit the directors are charged with having committed or recklessly disregarded. It is the position of the derivative plaintiffs that the directors should answer for any damage the corporation sustains as a result of the class action. The class action, having withstood defendants' motion to dismiss for failure to state a claim, has been consolidated with the instant derivative action and is pending before this court.

The allegations of the derivative complaint are similar in many respects to those of the class action complaint. The derivative complaint alleges that United management, including the directors, made optimistic predictions about the company's prospects, which were fraudulent and misleading in light of material, undisclosed information about United's substantial financial difficulties. Derivative plaintiffs allege that the directors participated in or recklessly disregarded (and therefore failed to prevent) issuance of the fraudulent public statements, even though they were in possession of information that revealed these statements were untrue or misleading.

Plaintiffs allege that the directors' mismanagement and breach of duty has damaged the corporation. The complaint states that, as a result of the directors' wrongful actions, "the company has been named as a defendant in actions brought by purchasers of its securities, who suffered as a direct consequence of the individual defendants' conduct," and "[t]o the extent that United Telecommunications is found liable for the damages alleged by the purchasers of its securities, such liability will be the direct consequence of the acts and/or omissions of the individual defendants." Complaint ¶ 173. In the section of the complaint entitled "Futility of Demand," the plaintiffs also assert that they are excused from making demand on the board of directors to bring the suit. One of the plaintiffs' purported grounds for excusing demand on the board

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 93
**(Cite as: 1993 WL 100202, *1 (D.Kan.))**

of directors is the allegation that "as a result of the acts of unfair competition against other, honest telecommunications companies, and because of the severe damage to United Telecommunication's credibility and ability to conduct business, United Telecommunications has suffered and will continue to suffer millions of dollars of lost revenue, increased expenses, and increased costs in gaining access to capital markets."

**\*2** Defendants argue that the complaint should be dismissed for failure to state a claim, in that the complaint fails to adequately plead damages. Defendants argue that because the class action is still pending, the derivative claim seeking recovery from the directors of a judgment the company has not yet been ordered to pay is premature. Defendants suggest that at this point, damage to the company is only speculative. Plaintiffs respond that where a defendant has caused the difficulty in assessing damages, it cannot defend on the grounds that damages are somewhat speculative.

In analyzing the issue presented, *i.e.,* whether or not the complaint must be dismissed for failure to adequately plead a claim for damages, the court will begin with the plaintiffs' allegations that United has suffered and will continue to suffer injury as a result of its own acts of unfair competition and from damage to its credibility and ability to conduct business. First, it is not at all clear from the complaint whether plaintiffs intend these statements to be a claim for damages. The allegations, which appear in a section of the complaint headed "Futility of Demand," occupy the fifth spot in a list of seven reasons offered to show why demand on the board to bring this suit would have been futile. Notwithstanding this ambiguity, and giving plaintiffs every benefit of the doubt, the court must still find that the allegations are deficient. With respect to the charge of unfair competition, the complaint pleads no facts which, if true, would support a finding that the company has been harmed by the supposed acts of unfair competition. *See Swanson v. Bixler,* 750 F.2d 810, 813 (all well-pleaded facts, as distinguished from conclusory allegations, must be taken as true). The plaintiffs' assertion that the company's acts of unfair competition have caused it to suffer lost revenue and increased costs is conclusory and, in the absence of factual allegations to back it up, insufficient to state a claim. Equally deficient is the allegation that United has been harmed by damage to its credibility and ability to conduct business. By way of comparison, we note that the court in *In re*

*Symbol Technologies Securities Litigation,* 762 F.Supp. 510 (E.D.N.Y.1991), was asked to dismiss allegations very similar to those before the court today. The derivative plaintiffs in *Symbol* alleged that "the director defendants' acts have undermined Symbol Technologies' credibility in the securities market and have jeopardized the continued public acceptance and marketability of its stock to the injury of the Company." *Id.* at 517. Dismissing the complaint, the court held that "this type of boilerplate language is not sufficient to withstand a motion to dismiss. Defendants are entitled to know more specifically what damages are being claimed, as well as the extent of those damages." *Id.* In the instant case, plaintiffs' allegations that the company has suffered injury to its credibility and ability to conduct business are conclusory and not supported by pleaded facts that, if true, would demonstrate that United has indeed sustained injury, financial or otherwise, due to a loss of credibility or ability to conduct business. This sort of conclusory allegation, as the *Symbol* court observed, does not adequately apprise the defendants of the basis for the damages claimed or the extent of those damages. *See Conley v. Gibson,* 355 U.S. 41, 47 (1957) (complaint must give the defendant "fair notice" of the plaintiff's claim). As such, the allegations are insufficient to withstand defendants' motion to dismiss.

**\*3** The remaining claim for damages arises out of the plaintiffs' contention that the directors are responsible for any judgment the company might be ordered to pay in the class action. The amount of these damages is, obviously, contingent upon the outcome of the pending class action.

In order to invoke the jurisdiction of the federal courts, a party must meet the threshold requirement imposed by Article III of the Constitution that there be a case or controversy. "While more than an abstract injury must be shown, it is enough if the plaintiff ' "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged ... conduct and the injury must be both "real and immediate," not "conjectural" or "hypothetical." ' " *Professional Service Indus. v. Kimbrell,* 766 F.Supp. 1557, 1559 (D.Kan.1991) (alteration in original) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-02) (other citations omitted). Courts do not decide cases based upon " 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Id.* (quoting *Thomas v. Union Carbide Agr. Products Co.,* 473 U.S. 568, 580 (1985) (quoting 13A Wright & Miller, *Federal*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              **Page 94**
**(Cite as: 1993 WL 100202, \*3 (D.Kan.))**

*Practice and Procedure* § 3532 (1984))).

Courts routinely dismiss claims as premature if the alleged injury is contingent upon the outcome of a separate, pending lawsuit; one example is the case of *Lincoln House, Inc. v. Dupree,* 903 F.2d 845 (1st Cir.1990). In *Lincoln,* plaintiff's federal RICO claim was premised on allegations that the defendant diverted assets in an effort to avoid paying plaintiff on a judgment plaintiff was then seeking in a pending state court suit against the defendant. Thus, the only injury alleged was the defendant's inability to satisfy a prospective state court judgment against the defendant, *if* the plaintiff happened to succeed in its pending action. The court held that the damages were wholly contingent upon the plaintiff's success in a separate case, making the plaintiff's claim of damages, at that point, purely speculative and not ripe for resolution. *Id.* at 847. The court noted that since the only damages alleged could not yet be proved, having never been incurred, the plaintiff could hardly claim hardship if consideration of the case was presently withheld. The court affirmed dismissal of the complaint without prejudice.

In the instant case, plaintiffs assert on behalf of the corporation damages that are speculative and contingent upon the outcome of the class action. This conclusion is suggested even by the language of the complaint, which states that the director defendants should be held liable "*to the extent that* United Telecommunications is held liable for the damages alleged by the purchasers of its securities." Complaint ¶ 173. Additionally, the complaint asserts that the defendants, by their acts of mismanagement and misconduct, have exposed the company to "*potential* damages" in connection with the class action. Complaint ¶ 178(e). Where, as here, the claim of damages is contingent on the outcome of a separate, pending lawsuit, the claim is not ripe and the complaint must be dismissed. *Lincoln,* 903 F.2d at 847, *accord Banker's Trust Co v. Rhoades,* 859 F.2d 1096, 1106, (2d Cir.1988) (since alleged damages depend on the outcome of pending bankruptcy proceeding, claim for damages must be dismissed as premature); *In re: Symbol,* 762 F.Supp. at 516 (derivative plaintiffs claimed directors were liable for damages company might have to pay as a result of pending securities fraud class action; court held no injury had been sustained for which plaintiff

could recover, cause of action had not yet accrued, and complaint must be dismissed); *Prosoco, Inc. v. Stonewall Surplus Linesinuane Co., Inc.,* 1989 WL 58989, at \*1 (D.Kan 1989) (where all of plaintiff's claims arose out of pending state court action, damages were purely speculative and claim was not ripe). Accordingly, the court finds that the derivative action is not ripe and the complaint must be dismissed, without prejudice. With respect to the allegations of damage premised on unfair competition and loss of credibility and ability to conduct business, the court has found that the allegations are conclusory and insufficient to state a claim for these damages. Because plaintiffs have already taken two opportunities to amend their complaint, and because plaintiffs (with the benefit of discovery) have spared the court no detail in their pleadings to date, the court is of the view that further amendment to the unfair competition and business credibility allegations would be futile and the same will not be allowed. Plaintiffs should have been aware of the court's concerns about these allegations, which the court pointed out in its opinion dismissing the class action complaint for failure to plead fraud with particularity. *See In re United Telecommunications,* 781 F.Supp. 696, 703, n. 3 (D.Kan.1991).

**\*4** Finally, while this motion has been pending, the court has received correspondence from counsel in the form of letter-briefs, in which counsel present additional argument and authority pertaining to issues before the court. The parties are advised that the proper procedure for submitting additional argument and authority to the court is to file a pleading with the Clerk of the Court. See D.Kan.R. 206. While the court does not wish to deter counsel from submitting additional authority or argument when appropriate, counsel should be aware that from this point forward, the court will not consider any argument or authority presented by way of letter to the court.

IT IS THEREFORE ORDERED BY THE COURT that Defendants' Motion to Dismiss the Second Amended Consolidated Derivative Complaint is granted, and the derivative complaint is dismissed without prejudice.

1993 WL 100202 (D.Kan.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 11

Not Reported in A.2d                                   **Page 95**
1992 WL 212595 (Del.Ch.), 18 Del. J. Corp. L. 778
**(Cite as: 1992 WL 212595 (Del.Ch.), 18 Del. J. Corp. L. 778)**

▷

UNPHISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

In re WHEELABRATOR TECHNOLOGIES INC.
SHAREHOLDERS LITIGATION.

C.A. No. 11495.

Submitted: June 1, 1992.
Decided: Sept. 1, 1992.

**783** Joseph A. Rosenthal and Kevin Gross, of
Rosenthal, Monthait, & Gross, P.A., Carolyn D.
Mack, of Greenfield & Chimicles, Wilmington,
Steven G. Schulman and Lee S. Shalov, of Milberg,
Weiss, Bershad, Specthrie & Lerach; Abbey & Ellis;
Goodkind, Labaton & Rudoff; Law Offices of Joseph
H. Weiss; and Law Offices of Curtis V. Trinko, all of
New York City; and Schiffrin & Craig, Ltd.,
Chicago, Ill., for plaintiffs.

**784** David C. McBride and Bruce L. Silverstein,
of Young, Conaway, Stargatt & Taylor, Wilmington,
for defendants Wheelabrator Technologies, Inc. and
the Individual defendants.

Henry E. Gallagher, Jr., and John C. Kairis, of
Connolly, Bove, Lodge & Hutz, Wilmington, and
Ernest Summers, III, of Waste Management, Inc.,
Oak Brook, Ill., for defendant Waste Management,
Inc.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.

*1 Beginning on April 5, 1990, the plaintiffs, who
are shareholders of Wheelabrator Technologies, Inc.
("WTI"), filed several shareholder class actions
challenging a proposed merger between WTI and
Waste Management, Inc. ("Waste"). Named as
defendants were WTI, its board of directors, and
Waste. The actions were later consolidated, and the
plaintiffs filed a Consolidated Amended Class Action
Complaint on August 10, 1990. Following expedited
discovery, the plaintiffs moved to preliminarily enjoin
the merger. By Opinion dated September 6, 1990,
the Court denied that motion. *In re Wheelabrator
Technologies, Inc. Shareholders Lit.*, Del.Ch.,
Cons.C.A. No. 11495, Jacobs, V.C. (Sept. 6, 1990) ("

*Wheelabrator 1* "). WTI's stockholders approved the
merger the following day.

The plaintiffs then filed a Second Amended
Consolidated Class Action Complaint (the
"complaint"), seeking declaratory relief and money
damages, or, alternatively, rescission of the merger.
On August 12, 1991, the defendants moved to dismiss
the complaint pursuant to Chancery Court Rule
12(b)(6). The parties briefed that motion, and orally
argued it on March 13, 1992. Thereafter, the parties
submitted supplemental briefs at the Court's request.
This is the Opinion of the Court adjudicating the
defendants' motion to dismiss the complaint.

I. *PERTINENT FACTS* [FN1]

WTI is a publicly held Delaware corporation in the
business of developing and providing refuse-to-
energy services. Waste provides **785** international
waste management services to commercial, industrial,
and municipal customers. In August, 1988, Waste
acquired a 22% equity interest in WTI, and as a
result, Waste became entitled to (and did) designate
four of WTI's eleven directors.

Between December, 1989 and March, 1990, Waste
decided that its best interests would be served by
increasing its investment in WTI to a majority equity
position. On March 23, 1990, principals of Waste
and WTI met to discuss what ultimately became the
merger agreement. On March 30, 1990, WTI's board
of directors (excluding Waste's director-designees)
unanimously approved the merger agreement, under
which Waste would acquire an additional 33% of
WTI's common stock and become a 55% stockholder
of WTI. The acquisition would take the form of a
stock-for-stock merger of a Waste subsidiary into
WTI. Each share of WTI common stock would be
converted into .574 shares of newly issued WTI stock
and .469 shares of Waste common stock. That
exchange ratio would allow WTI's stockholders to
receive a 10% premium over the market value of the
WTI shares being given up in the merger. [FN2] As
part of the merger agreement, Waste and WTI also
executed five other separate agreements, denominated
"Ancillary Agreements." [FN3]

On July 30, 1990, WTI and Waste disseminated to
WTI's shareholders a joint proxy statement stating
that the boards of both corporations advocated
shareholder approval of the merger agreement as

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

outlined above.    As earlier stated, a majority of WTI's stockholders (excluding Waste) approved the merger on September 7, 1990.

**786 After the merger two events transpired that are subjects of the complaint.    First, on November 17, 1990, WTI announced that it would write-off approximately $40 million of merger-related restructuring charges against its third quarter earnings.    As a result, WTI would report a $7.2 million third-quarter loss instead of enjoying a $32.7 million gain.    Second, in late December, 1990, Waste announced that its subsidiary, Waste Management International, expected its 1990 revenues to be more than double the previous year's level of $388 million. [FN4]

## II. THE CONTENTIONS

In their complaint the plaintiffs seek declaratory relief and compensatory and/or rescissory damages, or, alternatively, rescission of the merger.    Count I of the complaint alleges that WTI and its directors breached their duty to make adequate disclosure to WTI's shareholders by distributing a proxy statement that was materially false and misleading in various respects.    Count II claims that WTI and its directors, aided and abetted by Waste, breached their duties under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986) (" *Revlon* "), to maximize shareholder value in the merger transaction.    Count III charges that WTI and its directors breached their duty of care to WTI's shareholders by entering into the merger agreement and recommending its approval by shareholders.    Count IV avers that WTI and its directors, aided and abetted by Waste, breached their duty of loyalty to WTI's shareholders.

*2 The defendants argue that the complaint (or portions thereof) must be dismissed for the following reasons:    (a) the complaint fails to allege any actionable disclosure violations;    (b) therefore, the shareholder vote approving the merger operated as a fully informed ratification barring the plaintiffs' other claims;    (c) an exculpatory provision in WTI's certificate of incorporation bars the plaintiffs' money damage claims against WTI's directors for breach of their *Revlon* duties and their duties of care and disclosure;    (d) as a corporate entity, WTI owed no fiduciary duties to its shareholders, and cannot be held vicariously liable for its directors' breaches of fiduciary duty;    (e) Waste owed no fiduciary duties to WTI's shareholders, since it **787 was not a majority

stockholder before the merger;    (f) Waste's designees on the WTI board violated no fiduciary duty because those directors did not participate in the merger negotiations or deliberations on WTI's behalf;    and (g) WTI's directors did not breach any duties prescribed by *Revlon.* [FN5]

To succeed on this motion to dismiss, the defendants must demonstrate that the plaintiffs are not entitled to the relief they seek under any set of facts that could be proven to support their claims.    *Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985).    In applying this standard, the Court will draw all reasonable inferences from the well-pleaded allegations of the complaint, which, for purposes of the motion, are taken as true.    However, inferences and conclusions of fact that are unsupported by specific factual allegations will not be accepted as true.    *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988).

For the reasons explained below, I conclude that the motion to dismiss must be granted with respect to (i) all but one of the plaintiffs' disclosure claims, (ii) the *Revlon* claims, (iii) the claims against WTI other than for equitable fraud, (iv) the claims against Waste and its designees to the WTI board, and (v) the plaintiffs' money damage claims against WTI's directors for breach of the duty of care.    In all other respects the motion will be denied.    The Court addresses the plaintiffs' disclosure claims in Part III of this Opinion. In Part IV the Court treats the plaintiffs' *Revlon* claims, and in Part V it considers the arguments advanced separately on behalf of specific defendants. Finally, in Part VI the Court considers the defense based upon WTI's exculpatory certificate provision.

## III. THE DISCLOSURE CLAIMS

Since the legal sufficiency of the plaintiffs' disclosure claims determines whether the Court reaches the issue of shareholder ratification, those claims are addressed first.    Had no disclosure claim survived, the Court would conclude (for present purposes) that the directors' actions were ratified by a fully informed shareholder vote.    *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 890 (1985).    Since **788 one disclosure claim does survive, the Court will not reach the ratification issue.

*3 With one new addition (and a few new twists), the plaintiffs' disclosure claims are identical to those earlier presented on the preliminary injunction motion.    Thus, the plaintiffs repeat their claim that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 97
(Cite as: 1992 WL 212595, *3 (Del.Ch.), 18 Del. J. Corp. L. 778, **788)

the proxy statement was false, misleading, and incomplete in its disclosures relating to comparable transactions and companies and the adequacy of the premium received by shareholders ("the comparables"); the Ancillary Agreements and their value to WTI; the financial condition of Waste, including potential material criminal and/or civil liabilities; and the merger negotiations and board deliberations. (*See* Sec.Am.Comp., ¶¶ 34(A)-(D).) The only new disclosure claim is that the proxy statement failed to disclose the $40 million merger-related charge against earnings that WTI announced approximately three months after the merger. (*See id.*, ¶ 34(E).)

To state a cognizable claim for breach of the duty of disclosure, the alleged disclosure violations must be material. *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929 (1985). [FN6]  In *Wheelabrator 1*, the Court ruled that the plaintiffs would probably not succeed in establishing their disclosure claims, because the plaintiffs had not established the materiality of certain of the alleged improper disclosures, and the proxy statement itself negated certain of their other claims that material facts had been misrepresented or omitted.  That preliminary ruling, to be sure, does not preclude the plaintiffs from realleging in their complaint their previously rejected claims.  But, by the same token, neither does it preclude the Court from applying its previous analysis on this motion to dismiss (subject, of course, to the constraints governing Rule 12(b)(6) motions). Applying that selfsame approach, I conclude that the plaintiffs' disclosure claims, with one exception, fare no better now than they did before. [FN7]

**789  For the reasons now discussed, only one of the disclosure claims survives the dismissal motion.

A. *Disclosures Concerning the "Comparables"*

In *Wheelabrator 1*, I concluded that the purpose of the proxy disclosures relating to the "comparables" was simply to recite the information and analysis that WTI's financial advisors had provided to the WTI board in connection with the merger.   As thus viewed, those disclosures were not materially false or misleading.  *See Wheelabrator 1, supra*, at 13-14. Despite that ruling, the plaintiffs argue that on this motion the Court must now credit their allegation that these disclosures were intended to persuade WTI's shareholders that the merger was a "good deal." (*See* Or.Arg.Tr. at 49-62.)   I cannot agree.   The Court based its earlier (preliminary) conclusion upon the

express language of the proxy statement, which was-- and still is--incorporated into the complaint by reference.   *See supra* note 6.   That proxy language plainly discloses that the purpose of these disclosures was to recount the investment bankers' presentations to the board.   In my view, no reasonable shareholder could read the disclosure language as an advocacy statement. [FN8]   What the plaintiffs have done is mischaracterize in their complaint a particular fact disclosed in the proxy statement.   Based on that mischaracterization the plaintiffs then claim that the fact was misleadingly disclosed.       In such circumstances the Court is hardly bound to accept as true a demonstrable mischaracterization and the erroneous allegation that flows from it.      Nothing plaintiffs have presented alters my previous evaluation of this disclosure claim.

B. *Disclosures Relating to the Ancillary Agreements*

*4  To support their disclosure claim relating to the Ancillary Agreements, the plaintiffs argue:

> **790  Defendants have represented that the Ancillary Agreements were a "meaningful benefit" to WTI's shareholders.   (Proxy at 29) The statement is misleading since defendants failed to clearly and candidly disclose the directors' failure to obtain any quantification of the benefits which would flow from said agreements, as well as several salient factors detracting from or refuting any such purported benefits.   (Complaint ¶ 25)    Again, once defendants chose to speak, they had a fiduciary duty to tell the whole truth.  Certainly some shareholders would find defendants' lack of valuation concerning the Ancillary Agreements as affecting the "total mix" of information in deciding whether to approve the proposed merger transaction.

(Pl.Ans.Br. at 38-39.)

The flaw in this claim lies in its premise that the proxy statement did not  "clearly and candidly disclose the directors' failure to obtain any quantification of the benefits which would flow from [the Ancillary Agreements.]"   That premise is fatally undercut by the proxy disclosure that WTI's financial advisors "made no attempt to quantify the benefits which might be achieved pursuant to these agreement[s]." (Proxy St. at 39.)   In addition, the second (and unstated) premise of the plaintiffs' disclosure claim--that a qualitative prediction must be quantified if it relates to value--is not supported by any authority cited to or located by this Court.   *See*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

*In re Dataproducts Corp. Shareholders Lit.,* Del.Ch., C.A. No. 11164, Jacobs, V.C., Mem.Op. at 17-18 (Aug. 22, 1991). Accordingly, no further disclosure was required. *Wheelabrator 1, supra,* at 18 (citing *In re Genentech, Inc. Shareholders Lit.,* Del.Ch., Cons. C.A. No. 11377, Chandler, V.C., Mem.Op. at 21 (June 6, 1990)).

The plaintiffs also claim that the proxy statement misleadingly failed to disclose the value of certain "costs" to WTI associated with the Ancillary Agreements. One such claimed cost was WTI's having abandoned its international waste disposal business in exchange for an option to purchase shares of Waste Management International at a discount (which, plaintiffs contend, was less valuable). That cost, plaintiffs urge, was substantial and material, as evidenced by Waste's post-merger announcement (in December, 1990) that Waste Management International's revenues in 1990 would be twice the 1989 level. (Sec.Am.Comp., ¶¶ 25(A), 30.) Thus, plaintiffs conclude, WTI would have profited more by competing with Waste **791 Management International than by gaining the right to purchase its shares at a discount.

But the complaint does not allege that the directors knew of or attributed any specific dollar value to that Ancillary Agreement. Nor do plaintiffs cite authority for their unstated premise that the directors had a fiduciary or other affirmative duty to place a dollar value on that agreement when disclosing its terms. The proxy statement clearly disclosed that WTI would be giving up its international waste disposal business in exchange for the option. (*See* Proxy St. at 52.) So far as the complaint reveals, that disclosure provided the stockholders with essentially the same information that the directors had when they evaluated this particular agreement.

**\*5** The other alleged cost of the Ancillary Agreements was WTI's having taken over Waste's medical waste business, which (the plaintiffs allege) was unprofitable and politically unpopular. (Sec.Am.Comp., ¶ 25(B).) That claim labors under a similar infirmity, namely the implicit (and unsupported) assumption that the defendants had an underlying affirmative duty to place a dollar value on that "cost" and then disclose that value. Since no such duty exists here, this claim also fails.

For these reasons the disclosure claims relating to the Ancillary Agreements are legally insufficient.

## C. *Disclosures Relating to Waste*

The plaintiffs next allege that the proxy statement failed to disclose certain information essential to determining Waste's value. They first allege that there were undisclosed "potentially material criminal and civil liabilities of Waste arising from its waste-handling activities." These included potential liabilities arising out of a contract between the United States Army and Chemical Waste Management (Waste's 78% subsidiary) that was being investigated by the Army and the Federal Bureau of Investigation. (Sec.Am.Comp., ¶ 26(B).) The complaint, however, alleges no facts from which one could infer that that information was material; it alleges only (and in conclusory terms) that the information was "potentially" material. (*Id.*)

The plaintiffs also claim that there were other inadequate disclosures relating to Waste, namely that the proxy statement (i) contained no projections of or other information about Waste's value, other than financial statements and valuations by Lazard and Salomon, which were based on public information ( *see id.,* ¶ 26(A)); and (ii) falsely implied that Waste was financially robust and growing (*see* **\*792** *id.,* ¶ 26(C)). Once again, however, the plaintiffs have not coherently articulated a basis for imposing a duty to disclose information in addition to what was actually disclosed. Moreover, the proxy statement factually negates both disclosure claims. As noted in *Wheelabrator 1, supra,* at 16:

> [T]he record does not support the plaintiffs' claim that the Proxy disclosures concerning Waste are insufficient. The Proxy Statement contains detailed disclosures of Waste's business and management (Proxy St. at 79-80, 83-94), and of its historical financial data and pro forma financial statements. (*Id.* at 19-21, 62-63).

Since the plaintiffs have no new support for their resurrected claims, those claims will be dismissed.

## D. *Disclosure Relating to the Post-Merger Restructuring Charge*

The plaintiffs do advance one new disclosure claim: On November 17, 1990, WTI announced its third quarter and nine-month financial results. WTI took a $40 million pretax restructuring charge related to the merger with Waste. According to WTI's Form 10-Q for the quarter ended September 30, 1990, the charge "reflects the anticipated costs of realigning the Company's

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

operations to fully realize the potential benefits of the integration with [Waste], and includes employee severance, relocation and other related charges." This $40 million charge was sufficient to turn a $32.7 million quarterly gain from operations into a $7.2 miillion [sic] loss. The Proxy Statement, though it includes projections for WTI through December 31, 1990, makes no mention of a $40 million charge as a result of the merger.

*6 (Sec.Am.Comp., ¶ 29.)

This claim is deficient because the complaint does not allege that at the time of the merger WTI's directors knew or should have known that WTI would write off $40 million as a restructuring charge against earnings. The merger was approved on September 7, 1990, two months before WTI publicly filed its Form 10-Q disclosing that write-off. Even if that information were material, WTI's directors cannot be faulted for failing to disclose what (so far as the complaint reveals) was, at that point, unknown and unknowable. *In re Anderson, Clayton Shareholders Lit.,* Del.Ch., 519 A.2d 669, 693 (1986).

The plaintiffs insist that one can infer from the pleaded facts that the defendants knew or should have known about the restructuring **793 charge at the time of the vote on the merger. [FN9] I cannot agree. The plaintiffs have pointedly *not* alleged that WTI's directors knew or could have known about the restructuring charge at that time, and the proxy statement itself specifically disclaimed any predictions of post-merger results. (*See id.* at 15-18; Proxy St. at 18-19.) The plaintiffs cannot fill by inference a factual void they created in their own pleading. Therefore, this new disclosure claim will also be dismissed.

E. *Disclosures Concerning the Merger Negotiations and Board Deliberations*

The one disclosure claim that the Court finds to be legally sufficient concerns the merger negotiations and WTI's board deliberations. The plaintiffs allege that Waste dictated the terms of the transaction to WTI's board, and that WTI and Waste engaged in only one day of negotiations. If true, that alleged fact contradicts the proxy statement disclosure that there was substantial merger negotiations that took place over the course of one week. (*See* Proxy St. at 30.) That disputed fact would also be material: it would create a doubt in the shareholders' minds whether the directors adequately represented the

shareholders' interests during the negotiations. A substantial likelihood exists that a reasonable shareholder would find that fact important in deciding whether to vote for the merger. *Rosenblatt v. Getty Oil Co., supra.*

The defendants respond that the plaintiffs are simply pejoratively characterizing the events leading up to the merger, and that WTI's directors had no duty to adopt that sinister characterization and confess to the plaintiffs' charges of wrongdoing. That argument cannot succeed, because what the plaintiffs complain of is an omission to disclose a material *fact.* Although the apparent lack of factual support for this allegation gives me reason for concern, [FN10] that concern **794 is not a valid basis to dismiss the claim at this procedural stage.

Since this disclosure claim is legally sufficient, the Court does not reach the issue of the effect of shareholder ratification. For present purposes the shareholder vote approving of the merger will not be presumed to have been fully informed. *See Smith v. Van Gorkom,* 488 A.2d at 890. Because shareholder ratification is the only defense that the defendants have interposed against the plaintiffs' duty of loyalty and duty of care claims against WTI's directors, *see supra* note 5, those claims will survive this motion. [FN11]

IV. THE REVLON CLAIMS

*7 The most problematic claims concern the alleged breach of the directors' so-called *Revlon* duty to maximize shareholder value in a sale of corporate control. The defendants urge dismissal of these claims, arguing that *Paramount Communications, Inc. v. Time Inc.,* Del.Supr., 571 A.2d 1140 (1989) (" *Paramount* "), is the controlling authority for when *Revlon* duties attach, and that under *Paramount* no *Revlon* duties were triggered here.

The plaintiffs counter by arguing that *Barkan v. Amsted Industries, Inc.,* Del.Supr., 567 A.2d 1279 (1989) ("*Barkan* ") is the controlling authority, and that under *Barkan* the directors' *Revlon* duties were triggered and violated. The plaintiffs further contend that *Paramount* and *Barkan* are consistent, but that even if the Court finds to the contrary, the triggering requirements of *Paramount* were satisfied as well.

As for when *Revlon* duties are triggered, the Supreme Court's pronouncements in *Barkan* and *Paramount* are not easily reconciled, for they appear

Case 1:04-cv-10177-NG    Document 22    Filed 09/27/2004    Page 114 of 119

Not Reported in A.2d                                                    Page 100
(Cite as: 1992 WL 212595, *7 (Del.Ch.), 18 Del. J. Corp. L. 778, **794)

to flow from different premises. The premise of *Barkan* is that "the general principles announced in *Revlon* [and in other cited decisions] govern this case and every case where a fundamental change of corporate control occurs or is contemplated." 567 A.2d at 1286 (footnote omitted). Reasoning from that premise, the *Barkan* Court continued:

> This Court has found that certain fact patterns demand certain responses from the directors.... *Revlon* is merely **795 one of an unbroken line of cases that seek to prevent the conflicts of interest that arise in the field of mergers and acquisitions by demanding that directors act with scrupulous concern for fairness to shareholders.... When the board is considering a single offer and has no reliable grounds upon which to judge its adequacy, this concern for fairnss demands a canvas of the market to determine if higher bids may be elicited. When, however, the directors possess a body of reliable evidence with which to evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market.

*Id.* at 1286-87 (citations omitted).

Under *Barkan* it appears that a board becomes subject to *Revlon* duties whenever "a fundamental change of corporate control occurs or is contemplated," *id.* at 1286, and that the nature of those duties depends upon particular factual circumstances. *Barkan* holds that when only one bidder is present, the directors have a duty to be adequately informed of the value of their own company before committing it to a change-of-control transaction. If the directors act without that knowledge they breach that duty, unless they first conduct an auction or canvass the market.

The premise of *Paramount* appears more narrow. There the Supreme Court stated that *Revlon* duties arise when "the dissolution or break-up of the corporate entity [is] inevitable." 571 A.2d at 1150. The Supreme Court then described two circumstances where that event will generally occur:

*8 Under Delaware law there are, generally speaking and without excluding other possibilities, two circumstances which may implicate *Revlon* duties. The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear breakup of the company. However, *Revlon* duties may also be triggered where, in response to a bidder's offer, a target abandons its long-term strategy and

seeks an alternative transaction involving the break-up of the company.

*Id.* (citation and footnote omitted). Thus, *Paramount* suggests that *Revlon* duties arise only (i) in the two enumerated scenarios and (ii) in circumstances involving undefined "other possibilities."

The plaintiffs contend that *Paramount* and *Barkan* are reconcilable if *Paramount*'s "other possibilities" category is understood to include **796 *Barkan*'s formulation that *Revlon* duties arise whenever "a fundamental change of corporate control occurs or is contemplated." The plaintiffs' attempted reconciliation is problematic. A "fundamental change of corporate control" need not involve the "dissolution" or "breakup" of a company. Moreover, *Paramount* expressly rejects the proposition that *Revlon* duties automatically arise whenever a corporate transaction "might be construed as putting a corporation either 'in play' or 'up for sale' " [FN12]-- two situations arguably satisfying the *Barkan* "fundamental change of corporate control" standard. Because *Barkan* appears not to fit within *Paramount*'s categories, it would be difficult to conclude with confidence that the *Barkan* formulation was intended as one of *Paramount*' s "other possibilities."

It is, of course, possible that *Paramount* rejects the more generic *Barkan* formulation of when *Revlon* duties arise, and, thus, overrules *Barkan* sub silentio on that point. Absent a clear indication to that effect by our Supreme Court, however, I am not prepared to so conclude. *Paramount* gives no such clear indication; indeed, it does not even cite *Barkan,* a case the Supreme Court decided only three months earlier.

Fortunately, this case does not require the Court to reconcile the standard of *Paramount* with that of *Barkan,* for under either standard the plaintiffs have failed to plead a cognizable *Revlon* claim. The plaintiffs clearly have not satisfied the requirements of *Paramount.* [FN13] And, even assuming (but without deciding) that *Revlon* duties were triggered under the *Barkan* standard, no facts are alleged that support a cognizable claim that those duties were breached here. That is, even if there occurred a "fundamental change of corporate control" [FN14] that triggered *Revlon* duties under *Barkan,* the plaintiffs **797 have not alleged that WTI's directors were so uninformed about WTI's value that they violated their *Revlon* duties by not conducting an active survey of the market, or "market check."

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10177-NG    Document 22    Filed 09/27/2004    Page 115 of 119

Not Reported in A.2d                                                    Page 101
(Cite as: 1992 WL 212595, *8 (Del.Ch.), 18 Del. J. Corp. L. 778, **797)

*9 What the plaintiffs do allege is that WTI's directors failed to conduct a market check to assure themselves that there were no superior alternative transactions. (Sec.Am.Comp., ¶ 46.) That, without more, is insufficient. Under *Barkan* the plaintiffs must allege that WTI's directors did not have adequate information about the value of WTI. Here, the complaint says nothing about what the directors' did (or did not) know about WTI's value.

The plaintiffs stress that the complaint also alleges:

> The board of directors was not advised that it must, and did not, evaluate the adequacy of the merger. The board did not direct Lazard and Salomon to investigate and obtain the best available alternative transaction, limiting the advisors' role simply to determining whether the offer was "fair."

(*Id.*, ¶ 21(D); *see also id.*, ¶¶ 43, 46(A).) That allegation also does not address the directors' knowledge of WTI's value. Fairly read, it charges that WTI's board abdicated to its financial advisors the responsibility of evaluating the merger consideration, yet did not direct those advisors to investigate and obtain the best available alternative transaction. (*See* Pl. Ans. Br. at 68-69.) The focus of that allegation is upon the scope of the financial advisors' investigation, not upon the directors' knowledge of the company's value. While overseeing a faulty investigation might constitute a breach of other fiduciary duties owed by directors under more general principles, that conduct does not constitute a breach of *Revlon* duties as described in *Barkan*. [FN15] Because the complaint fails to allege a breach of *Revlon* duties under the standards of either *Barkan* or *Paramount*, the plaintiffs' *Revlon* claims must be dismissed.

**798 V. CLAIMS AGAINST PARTICULAR DEFENDANTS

The defendants next urge the dismissal of all claims against particular defendants. They contend that no claim is stated against (i) WTI, because a corporate entity owes no fiduciary duties to its shareholders and cannot be held vicariously liable for its directors' breaches of fiduciary duty; (ii) Waste, because it was not a fiduciary, and therefore owed no fiduciary duties to WTI's shareholders before the merger; and (iii) Waste's designees on the WTI board, because those directors did not participate in the merger negotiations or deliberations. I address each argument in turn.

First, while it is correct that the corporate entity as such is not a fiduciary to its stockholders and cannot be held liable to them on that basis, the corporation can be held liable in cases involving fraud or affirmative misconduct. *Gaffin v. Teledyne, Inc.,* Del. Ch., C.A. No. 5786, Hartnett, V.C., Mem.Op. at 6-7 (Oct. 9, 1987) (*citing Radol v. Thomas,* 6th Cir., 772 F.2d 244, 258 (1985), *cert. denied,* 477 U.S. 903 (1986); *Jordan v. Global Natural Resources, Inc.,* S.D.Ohio, 564 F.Supp. 59 (1983); *Bankers Securities Corp. v. Kresge Department Stores, Inc.,* D.Del., 54 F.Supp. 378 (1944)); *see also In re Dataproducts Corp. Shareholders Lit.,* Del.Ch., C.A. No. 11164, Jacobs, V.C., Mem.Op. at 13 (Aug. 22, 1991). A claim for equitable fraud is stated where a plaintiff alleges (a) a false representation (which may be negligent) by the defendant, (b) justifiable reliance by the plaintiff upon that representation, and (c) resulting damage. *Gaffin, supra,* at 7-8. Those allegations must be pleaded with particularity. Ch. Ct. Rule 9(b).

*10 The complaint here states a claim for equitable fraud against WTI. The disclosure claims found to be legally sufficient herein are levelled at (among others) WTI. (*See* Sec.Am.Comp., ¶¶ 27(D), 34(D)). The plaintiffs allege that WTI falsely represented that substantial negotiations took place, when in fact they did not. It also avers that the proxy statement was "false, misleading, and incomplete in its descriptions of the merger negotiations and board deliberations, which were material factors for shareholders in evaluating the recommendations of the board of directors and its financial advisors." (*Id.,* ¶ 27.) These allegations, fairly read, claim that the plaintiffs justifiably relied upon the misrepresentation when deciding to approve the merger. And in challenging the adequacy of the merger consideration, the complaint adequately alleges resulting damage. (*Id.,* ¶ 33.)

Second, it is correct that Waste owed no fiduciary duties to WTI's shareholders before the merger, and that Waste's designees **799 on WTI's board violated no fiduciary duties since they did not participate in the merger negotiations on WTI's behalf. Yet, those facts do not necessarily dispose of the plaintiffs' independent claim that Waste and its designees to WTI's board aided and abetted WTI's other directors in breaching their fiduciary duty to WTI's stockholders. To evaluate that latter claim a different analysis must be employed.

To state an aiding and abetting claim against a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10177-NG    Document 22    Filed 09/27/2004    Page 116 of 119

Not Reported in A.2d                                                                   **Page 102**
(Cite as: 1992 WL 212595, *10 (Del.Ch.), 18 Del. J. Corp. L. 778, **799)

nonfiduciary, the complaint must allege (i) the existence of a fiduciary relationship, (ii) a breach of that relationship, and (iii) knowing participation by the defendant in the fiduciary's breach. *See Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1344 (1987). Of particular pertinence here is that the complaint must contain factual allegations from which "knowing participation" can be reasonably inferred. *Weinberger v. Rio Grande Indus.,* Del.Ch., 519 A.2d 116, 131 (1986). The allegations in the complaint are wholly conclusory. (Sec. Am. Comp., ¶¶ 10, 11, 49, 61.) Where, as here, it is undisputed that Waste's designees played no role in negotiating or approving the merger, such minimalist pleading will almost certainly be fatal. *See Citron v. E.I. DuPont de Nemours & Co.,* Del. Ch., 584 A.2d 490, 499 & n. 12 (1990); *Greenfield v. Tele-Communications, Inc.,* Del.Ch., C.A. No. 9814, Allen, C., Ltr. Op. at 6-9 (May 10, 1989).

The facts asserted in the complaint do not state a case for knowing participation. Not only were the Waste designees uninvolved, but also Waste was not a majority stockholder when the merger was negotiated and, significantly, plaintiffs do not allege that WTI's board was in some fashion controlled by Waste. *See Deutsch v. Cogan,* Del. Ch., C.A. No. 8808, Hartnett, V.C., Ltr. Op. at 6 (Apr. 11, 1989). Instead, plaintiffs rely on conclusory charges that Waste "dictated" terms to a self-dealing WTI board, after having threatened to dispose of its 22% minority position in WTI if its terms were not met. (Sec. Am. Comp., ¶¶ 17, 19A, 19C.) These allegations, if true, lead to an inference of hard bargaining on the part of Waste--conduct in which Waste had every right to engage--not of complicity in whatever breaches of duty WTI's board may have committed. "Knowing participation" requires more. *See In re Shoe-Town, Inc. Stockholders Lit.,* Del. Ch., C.A. No. 9483, Chandler, V.C., Mem. Op. at 20 (Feb. 12, 1990) (knowing participation sufficiently alleged where the defendant charged with aiding and abetting took an active role in advising the board, the buyer, and the special committee).

*11 **800 For these reasons, all claims against WTI will be dismissed with the exception of the claim for equitable fraud. The claims against Waste and its designees on WTI's board will also be dismissed.

## VI. EFFECT OF EXCULPATORY CERTIFICATE PROVISION

On November 21, 1986, long before the events at issue, WTI amended its certificate of incorporation pursuant to 8 *Del.C.* § 102(b)(7), to add a provision eliminating its directors' personal liability for money damages for specified breaches of fiduciary duty. That provision ("Article FOURTEENTH") tracks the language of § 102(b)(7) and pertinently states:

> A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the director derived an improper personal benefit.

(App. to Def. Op. Br., Exh. 3 at 3.) The defendants take the position that by virtue of Article FOURTEENTH, the plaintiffs' duty of care and duty of disclosure claims must be dismissed, as must their *Revlon* claims against WTI's directors, at least insofar as those claims seek monetary damages. [FN16]

The plaintiffs argue that the Court may not consider Article FOURTEENTH on this Rule 12(b)(6) motion, because the complaint does not plead or otherwise refer to that provision. There is authority to support this view. *Boeing Co. v. Shrontz,* Del. Ch., C.A. No. 11273, Berger, V.C., Mem. Op. at 7 (Apr. 20, 1992); *see Rothenberg v. Santa Fe Pacific Corp.,* Del. Ch., C.A. No. 11749, Jacobs, V.C. (May 18, 1992). The defendants did not raise Article FOURTEENTH as an affirmative defense in their Rule 12(b)(6) dismissal motion. They contend, instead, that this Court may and should take judicial notice of WTI's certificate provision. Thus, the Court must **801 resolve a threshold issue: can it judicially notice the contents of a certificate of incorporation of a Delaware corporation on a Rule 12(b)(6) dismissal motion? Having reviewed the pertinent legal authorities and the parties' supplemental briefs, I conclude that it can.

Rule 201(b) of the Delaware Uniform Rules of Evidence states:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Del. Unif.R.Ev. 201(b). The certificate of incorporation of a Delaware corporation falls within

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the ambit of that Rule. By law it is filed with, and is obtainable by resort to, the office of the Secretary of State of Delaware. *See* 8 *Del. C.* § 101. That office is located within the territorial jurisdiction of Delaware and is a source "whose accuracy cannot reasonably be questioned."

**\*12** The Court is not barred from taking judicial notice of a Delaware corporation's certificate of incorporation simply because the procedural setting is a motion to dismiss under Rule 12(b)(6). Judicial notice may be taken at any stage of the proceeding. Del.Unif.R.Ev. 201(f). The United States District Court for Delaware has specifically held that publicly filed documents (of which a certificate of incorporation is an example) are judicially noticeable on a motion to dismiss. *Diceon Electronics, Inc. v. Calvary Partners, L.P.,* D.Del., 772 F.Supp. 859, 861 (1991) ("On a motion to dismiss the Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered."); *see also Southmark Prime Plus, L.P. v. Falzone,* D.Del., 776 F.Supp. 888, 891-92 (1991) ("[O]n a motion for judgment on the pleadings, as with motions to dismiss pursuant to Rule 12(b), the Court is not strictly limited to the facts addressed in the pleadings; the Court may take judicial notice of additional facts where appropriate."). [FN17]

Having judicial noticed, and then considered, the contents of Article FOURTEENTH, I conclude as a matter of law that that Article bars the plaintiffs' duty of care claim insofar as it seeks **\*\*802** monetary damages against WTI's directors. *Rothenberg, supra,* at 9-10. However, because of Article FOURTEENTH's exceptions (which track those of § 102(b)(7)), that provision does not bar (a) the plaintiffs' duty of loyalty claims, (b) any claim that the directors derived an improper personal benefit from the merger, or (c) any claim that the directors' actions were not in good faith or involved intentional misconduct or knowing violations of law. [FN18] *Id.* at 10 n. 6.

\* \* \*

For the foregoing reasons, the pending motion to dismiss will be granted with respect to (i) the plaintiffs' disclosure claims, except for the claim relating to the merger negotiations, (ii) the *Revlon* claims, (iii) all claims against WTI except for the claims of equitable fraud, (iv) all claims against Waste and its designees to the WTI board, and (v) the

plaintiffs' money damage claims against WTI's directors for breach of the duty of care. In all other respects the motion will be denied. Counsel shall submit a form of implementing order on notice.

FN1. The facts are derived from both the complaint and the documents incorporated therein by reference.

FN2. To support their claim that the merger price was unfair, the plaintiffs argue that the premium received by WTI's shareholders was only 4%. (*See* Sec.Am.Comp., ¶¶ 19(B), 43, 45(A), 55, 60.) The Court disagrees with the plaintiffs' analysis for the reasons stated in its earlier Opinion. *See Wheelabrator 1, supra,* at 5 n. 2. That issue has no impact on the resolution of the pending motion, however.

FN3. The Ancillary Agreements are described in the preliminary injunction Opinion. *Wheelabrator 1, supra,* at 6 n. 3. The terms of only two of those agreements are relevant on this motion. In one, Waste granted WTI an option to purchase 15% of the stock of Waste Management International, Inc. ("Waste Management International") at a discount from the fair market value of such stock at the time the option is exercised. (Waste Management International is a Waste subsidiary that owns most of Waste's interest in waste management service operations outside of North America.) In exchange for that option, WTI agreed to forego its own waste management service operations outside North America for ten years, and not to compete with Waste International in that particular market. In the other agreement, Waste gave WTI an option to purchase Waste's medical-waste disposal business at a 15% discount from fair market value.

FN4. Plaintiffs allege that this announcement evidences the harm caused to WTI by the Ancillary Agreement in which WTI agreed not to operate outside of North America for ten years. *See supra* note 3.

FN5. Notably, the defendants do not challenge the legal sufficiency of the plaintiffs' claims against WTI's directors for breach of their duties of care and loyalty. (*See* Def. Rep. Br. at 26 n. 12.) Rather, the defendants urge the dismissal of those claims solely on the basis of the affirmative defenses of shareholder ratification and WTI's exculpatory certificate provision.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10177-NG    Document 22    Filed 09/27/2004    Page 118 of 119

Not Reported in A.2d                                                      Page 104
(Cite as: 1992 WL 212595, *12 (Del.Ch.),  18 Del. J. Corp. L. 778, **802)

FN6. The disclosure claims must also be validated by the contents of the disclosure document.    In evaluating the legal sufficiency of the plaintiffs' disclosure claims, the Court may consider the proxy statement, since it was specifically referred to and relied upon in (and is therefore deemed to be incorporated by reference into) the complaint.    *Wiener v. The Southern Co.,* Del. Ch., C.A. No. 10525, Jacobs, V.C., Mem.Op. at 11 & n. 7 (Jan. 24, 1992) (and cases cited therein).

FN7.  *See In re KDI Corp. Shareholders Lit.,* Del. Ch., Cons. C.A. No. 10278, Berger, V.C., Mem.Op. at 10-11 (Dec. 13, 1990) (The "disclosure claims ... were considered and rejected in connection with plaintiffs' motion for a preliminary injunction.    Little more needs to be added in the context of this motion to dismiss.... Disclosure claims do not survive a motion to dismiss simply because they are inserted in the Complaint. There must be some basis from which this Court can infer that the non-disclosures were material....") (citations omitted).

FN8.  The challenged proxy disclosures concerning the comparables are preceded by the following statement:
As described above ... Lazard Freres and Salomon Brothers delivered their written fairness opinions to the Board of Directors of WTI.    In that connection, Lazard Freres and Salomon Brothers each conducted a review of certain financial information and discussed    certain    financial    analyses prepared by them relating to WTI, [Waste] and the proposed transaction, and made a joint presentation concerning their review to WTI's Board of Directors, as further described below.
(Proxy St. at 37.)

FN9.  Those facts are that the charge related directly to the merger, only a short period of time elapsed between the shareholders' approval of the merger and the disclosure of the restructuring charge, and that the magnitude of the charge itself was such that WTI's directors knew or should have known about it at the time of the merger. (*See* Or. Arg. Tr. at 64- 67.)

FN10. The Court rejected this claim at the preliminary injunction stage because it lacked    sufficient    record    support. *Wheelabrator I, supra,* at 16-17.    At oral

argument on the motion to dismiss, the Court asked plaintiffs' counsel whether, given that ruling, there was any evidentiary basis for this claim.    (*See* Or. Arg. Tr. at 75.)    Counsel responded that there was, citing the deposition of Mr. James Edward Koenig.    The Court has reviewed that deposition, and continues to be of the view that on the present record the evidentiary support is scanty at best.

FN11. The defendants have raised WTI's exculpatory certificate of incorporation provision as a defense to the duty of care claims against WTI's directors, but only insofar as those claims seek money damages. These money damage claims are dismissed for the reasons discussed in Part VI of this Opinion.

FN12. *Paramount,* 571 A.2d at 1151.

FN13. Neither of the two *Paramount* scenarios for triggering *Revlon* duties are implicated here.    The plaintiffs argue that this case falls under the first, *i.e.,* "when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company." *Paramount,* 571 A.2d at 1150.    However, Waste, not WTI, "initiated" the merger discussions and negotiations. (Am. Comp., ¶ 17).    There was no "active bidding process" since there was only one bidder, and it is not altogether clear that the merger constituted a "sale" or "business    reorganization,"    since    WTI continues as a corporate entity and its public shareholders remained shareholders (albeit minority owners) of WTI after the merger. Finally, there will be no "break-up of the company."

FN14. The defendants argue that no "change of corporate control" of WTI resulted from the merger, because Waste is a public company and the public shareholders of WTI became shareholders of Waste, another public company.    As noted, I need not decide that issue here.

FN15. The plaintiffs' other fiduciary duty claims (Sec. Am. Comp., ¶¶ 54, 59.) survive this motion, even though they rest upon the same set of facts as the *Revlon* claims. *See supra* note 5.    Thus, the practical result of dismissing the *Revlon* claim is that the plaintiffs will now be required to establish their fiduciary duty causes of action under a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
(Cite as: 1992 WL 212595, *12 (Del.Ch.), 18 Del. J. Corp. L. 778, **802)

traditional analysis where they will bear the burden of establishing that the directors are not entitled to the presumptions of the business judgment rule.

FN16. Since the Court has determined that the *Revlon* claims must be dismissed on other grounds, *see supra* Part IV, it does not consider the effect of the exculpatory certificate provision on those claims.

FN17. Although Federal Court decisions interpreting Federal Rules of Civil Procedure are not binding, this Court accords them considerable weight when interpreting counterpart Chancery Court Rules. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 542 A.2d 1182, 1191 n. 11 (1988); *Moran v. Household Int'l., Inc.,* Del. Ch., 490 A.2d 1059, 1073, *aff'd,* Del.Supr., 500 A.2d 1346 (1985). Federal decisions interpreting counterpart Rules of Evidence are entitled to similar deference.

FN18. Nor does Article FOURTEENTH bar the plaintiffs' disclosure claims for monetary damages against WTI's directors, as the defendants urge. The defendants rely upon *In re Dataproducts Corp. Shareholders Lit.,* Del. Ch., C.A. No. 11164, Jacobs, V.C., Mem.Op. at 12-13 (Aug. 22, 1991), where this Court found that an exculpatory certificate provision similar to Article FOURTEENTH barred the plaintiffs' duty of disclosure claims for monetary damages. The defendants' reliance upon *Dataproducts* is misplaced, because in that case:

the complaint [did] not allege that the complained-of disclosure violations were of the kind for which damages are allowed under that certificate provision. Even under liberal "notice pleading" standards the complaint [could not] be fairly read to charge the directors with having acted intentionally or in bad faith, or with having violated a fiduciary duty of loyalty (as distinguished from the duty to exercise appropriate due care). *Id.* at 12. By contrast, the complaint here specifically alleges that by virtue of the nondisclosures WTI's directors "intended to carry out ... a preconceived plan." (Sec. Am. Comp., ¶ 33.) That is, the complaint here (unlike that in *Dataproducts* ) alleges that the breach of the duty of disclosure was an intentional violation of the duty of loyalty. Thus, Article FOURTEENTH does not bar the plaintiffs' monetary damage claims against WTI's directors for breach of their duty of disclosure.

1992 WL 212595 (Del.Ch.), 18 Del. J. Corp. L. 778

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.