UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE BIOPURE CORPORATION DERIVATIVE LITIGATION | ) | Master Docket No.1:04-cv-10177 NG |
| | ) | |
| | ) | Assigned to Judge J. Nancy Gertner |
| | ) | |
| _____ | ) | Magistrate Judge Alexander |

**APPENDIX OF UNREPORTED AUTHORITIES CITED IN PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE VERIFIED CONSOLIDATED AMENDED
SHAREHOLDER DERIVATIVE COMPLAINT**

| CASE | TAB |
|---|---|

*Dollens v. Zionts,*
No. 01C2826, 2002 WL 1632261 (N.D. Ill. July 22, 2002) . . . . . . . . . . . . . . . . . . . . . . . 1

*Fitzgerald v. Cantor,*
No. 16297, 1998 WL 326686 (Del. Ch. June 16, 1998) . . . . . . . . . . . . . . . . . . . . . . . . 2

*Heineman v. Datapoint Corp.,*
No. 7956, 1990 WL 154149 (Del. Ch. Oct. 9, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Cooper Co., Inc.,*
No. 12584, 2000 WL 1664167 (Del. Ch. Oct. 31, 2000) . . . . . . . . . . . . . . . . . . . . . . . 4

*In re First Woburn Bancorp., Inc.,*
No. 13725, 1999 WL 33318823 (Del. Ch. Oct. 5, 1999) . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Nat'l Auto Credit, Inc. S'holders Litig.,*
No. 19028, 2003 WL 139768 (Del. Ch. Jan. 10, 2003) . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re New Valley Corp.,*
No. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Paxson Communication Corp. S'holders Litig.,*
No. 17568, 2001 WL 812028 (Del. Ch. July 21, 2001) . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Stratus Computer, Inc. Sec. Litig.,*
No. 89-2075-Z, 1992 WL 73555 (D. Mass. Mar. 27, 1992) . . . . . . . . . . . . . . . . . . . . 9

*Int'l Equity Capital Growth Fund, L.P. v. Clegg,*
No. 14995, 1997 WL 208955 (Del. Ch. Apr. 21, 1997) . . . . . . . . . . . . . . . . . . . . . . 10

*JPMorgan Chase Bank v. Winnick,*
No. 03 Civ. 8535(GEL), 2004 WL 1418197 (S.D.N.Y. June 23, 2004) . . . . . . . . . . . 11

*Kahn v. Roberts,*
No. 12,324, 1994 WL 70118 (Del. Ch. Feb. 28. 1994) . . . . . . . . . . . . . . . . . . . . . . . 12

*Khoury Factory Outlets, Inc. v. Snyder,*
No. 11,568, 1996 WL 74725 (Del. Ch. Jan. 8, 1996) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mizel v. Connelly,*

No. 16638, 1999 WL 550369 (Del. Ch. July 22, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rattner v. Bidzos,*
No. 19700, 2003 WL 22284323 (Del. Ch. Sep. 30, 2003) . . . . . . . . . . . . . . . . . . . . . . 15

*Sanders v. Wang,*
No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) . . . . . . . . . . . . . . . . . . . . . . . . 16

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by regular mail on November 12, 2004.

/s/ Timothy L. Miles
Timothy L. Miles

3

# TAB 1

Not Reported in F.Supp.2d

**Page 83**

2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Jeffrey DOLLENS and Jeff Vukovich, derivatively on behalf of Westell Technologies, Inc., Plaintiffs,
v.
Marc ZIONTS, J. William Nelson, Howard L. Kirby, Jr., Thomas A. Reynolds, III, Robert C. Penny, III and Melvin J. Simon, Defendants.

No. 01 C02826.

July 22, 2002.

Officers and directors moved to dismiss shareholders' derivative action. The District Court, Lefkow, J., held that: (1) shareholders sufficiently alleged that a demand on the board of directors before filing derivative action based on insider trading would have been futile, and (2) except for one corporate insider, claims for breach of fiduciary duty were not sufficiently alleged since there was no basis to infer from the complaint that any of defendants was a declarant or otherwise involved in making false or misleading statements.

Motion granted in part and denied in part.

[1] Corporations ☞320(5)
101k320(5)
Shareholders sufficiently alleged that a demand on the board of directors before filing derivative action based on insider trading would have been futile; shareholders adequately pled that five of the eight directors would face a substantial likelihood of personal liability that would prevent them from exercising impartiality in considering a shareholder demand. Fed.R.Civ.P. 23.1.

[2] Federal Civil Procedure ☞636
170Ak636
Except for one corporate insider, claims against officers and directors for breach of fiduciary duty based on alleged misrepresentations they made to the public in order to artificially inflate company's stock price were not sufficiently alleged since there was no basis to infer from the complaint that any of them was a declarant or otherwise involved in making false or misleading statements. Fed.R.Civ.P. 9(b).

[3] Corporations ☞307
101k307
Delaware law permitted a separate claim of breach of

fiduciary duty against officers and directors based on insider trading.

[4] Corporations ☞320(2)
101k320(2)
Shareholders could not bring a derivative action to recover expenses from a pending securities action involving company until the case has proceeded to final judgment or settlement.

[5] Corporations ☞320(7)
101k320(7)
Shareholders' derivative claim against officers and directors for damages based on company's "integrity in the market" and "loss of goodwill" was conclusional and insufficient because shareholders did not apprise defendants of the basis and extent of the alleged damages.

*MEMORANDUM OPINION AND ORDER*

LEFKOW, J.

**\*1** This case is before the court on the motion of defendants Marc Zionts ("Zionts"), J. William Nelson ("Nelson"), Howard L. Kirby, Jr. ("Kirby"), Thomas A. Reynolds, III ("Reynolds"), Robert C. Penny, III ("Penny") and Melvin J. Simon ("Simon"), [FN1] who are or were officers or directors of Westell Technologies, Inc. ("Westell"), to dismiss the consolidated complaint brought by two individual shareholders, Jeffrey Dollens ("Dollens") and Jeff Vukovich ("Vukovich"), derivatively on behalf of Westell. In their motion to dismiss, defendants contend (1) that the complaint fails to adequately plead a prerequisite to suit, namely, that a demand by plaintiffs on Westell's board of directors to take action against defendants on behalf of the corporation would be futile, (2) that allegations of fraud underlying the claims in Counts I and II are not pled with particularity as required by Federal Rule of Civil Procedure 9(b), and (3) that Count II fails to plead a legally cognizable theory of damages. For the reasons articulated below, the court grants in part and denies in part defendants' motion to dismiss.

> FN1. Defendants currently hold or held the following positions at Westell: Zionts was Chief Executive Officer ("CEO") from December 1997 until March 1, 2001 and a director from January 2000 until March 1, 2001; Nelson was President and Chief Operating Officer from December 1997 until March 1, 2001 when he became CEO succeeding Zionts and a director since January 2000; Kirby has been a director since March 2000; Reynolds has been a director

since January 2000; Penny has been a director since 1998; and Simon has been the Assistant Secretary and Assistant Treasurer and a director since 1992.

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir.1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kennedy v. Nat'l Juvenile Det. Ass'n,* 187 F.3d 690, 695 (7th Cir.1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 977 (7th Cir.1999); *Zemke v. City of Chicago,* 100 F.3d 511, 513 (7th Cir.1996).

In addition to the mandates of Rule 12(b)(6), Federal Rule of Civil Procedure 9(b) requires "all averments of fraud" to be "stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994); *see also DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) ("Although states of mind may be pleaded generally [under Rule 9(b) ], the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story.").

## FACTS

Plaintiffs' consolidated derivative complaint alleges the following facts, which are taken as true for purposes of this motion: Nominal defendant Westell, a Delaware corporation headquartered in Aurora, Illinois, is a provider of Digital Subscriber Line ("DSL") technology, which allows high-speed data to be transported through local telephone lines. (Compl.¶ 13.) On May 9, 2000, financial analyst Charles Pluckhahn ("Pluckhahn") of Stephens, Inc., issued a report, stating "[o]n a conference call with analysts,

Westell's management indicated that its largest customer of CPE [customer premises equipment] is still unannounced and this new customer would continue to be its largest during the coming fiscal year." Although this customer was "unannounced," Westell "leaked" to analysts that SBC Communications ("SBC"), was driving demand for Westell's DSL equipment. (*Id.* ¶ 14.) Specifically, another analyst, Joseph Bellace ("Bellace") of Jefferies & Co., reported on May 16, 2000 that:

> *2 Demand for DSL related equipment (about 44% of company revenues) continues to be very strong, with good visibility extending for the next three months. Accelerated deployment of DSL service by British Telecom and SBC Communications (an unannounced customer) are driving this performance.

(*Id.*) The net effect of these positive reports was that the price of Westell stock received a temporary bounce to close at $28 a share on May 17, 2000; on June 26, 2000, however, the price of stock closed at $14.6875 a share. (*Id.* ¶¶ 15-16.)

Despite the positive reports, defendants knew by late June 2000 that SBC would be cutting back its purchases of DSL modems from Westell. Defendants acquired this non-public information through their positions as directors and/or senior officers of Westell and their receipts of reports, attendance at meetings, and access to all of Westell's books, records and other proprietary information. (*Id .* ¶ 12.) Defendants realized that when this information became public, it would seriously affect Westell's revenues, earnings and price of common stock. (*Id.* ¶ 16.) Defendants thus embarked on a massive hype campaign to inflate the price of Westell's stock so that they could unload as much stock as possible before the news concerning SBC's cutbacks in purchases of Westell's DSL modems became public. (*Id.*)

For example, Westell announced on June 28, 2000 that it entered into a new partnership (although it did not specify with whom or what company) to meet the "expanding demand" for its products because it was "running at full capacity in its existing Aurora facility." (*Id.* ¶ 17.) On June 29, 2000, Barry Sine ("Sine"), an analyst at Kaufman Brothers, reported that he spoke with Westell and that "[b]ased on the massive demand for DSL services by Westell's customers," he expected Westell to report strong results for the June quarter. (*Id.* ¶ 18.) He further reported "we believe SBC Communications will again be the company's largest account, despite the fact that it is still an unannounced customer." Sine then issued a "Strong Buy" rating on

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1632261, *2 (N.D.Ill.))

Westell with a price target of $65 a share. (*Id.* ¶¶ 17-18.)

On July 7, 2000, Bellace issued a "Buy" rating on Westell with a $50 price target. (*Id.* ¶ 19.) As a result of his consultations with officers at Westell, he projected that Westell's 2001 revenues (for the period April 1, 2000 to March 31, 2001) would be $400 to $425 million. As with Sine, Bellace did not know about SBC's cutbacks. On the same day Bellace issued his Buy report, Westell stock increased by 25%, ending at $19 a share.

On July 18, 2000, Westell issued what one analyst called a "blockbuster announcement." (*Id.* ¶ 20.) Westell announced that it had established a supplier relationship with SBC. Analysts following Westell responded with uniformly positive reports. On July 20, 2000, an analyst at Kaufman Brothers issued a report reiterating its "Strong Buy" on Westell and $65 price target. The report stated:

> *3 Westell Technologies followed yesterday's blockbuster announcement that it had won SBC Communications (SBC $43 5/8) as a customer with second quarter results that were well above our estimate, consensus, whisper and even telepathic expectations.... The key driver of revenue was the company's DSL customer premises equipment (CPE) business, which posted $61.9 million in revenue, 40% higher than our estimate and up 282% sequentially.

> \* \* \*

> We are today more bullish on shares of Westell Technologies than ever.

(*Id.* ¶¶ 20-22.)

Similarly, on July 21, 2000 another analyst at Chase Hambrecht & Quist Inc. issued a report rating Westell a "Buy" with a $70 price target. The report stated that:

> Growth was once again driven by rapid acceleration in the Company's DSL businesses; [w]e believe that the Company maintains numerous opportunities for additional upside as it continues to capitalize upon its strong relationships with its strategic partners....

> \* \* \*

> It appears that Westell's DSL businesses continue to fire on all cylinders.

(*Id.* ¶ 23.) As a result of Westell's announcement, the market's reaction was swift and dramatic. (*Id.* ¶ 21.) The price of Westell's common stock rose up to $28.50 a share by July 21, 2000 and closed at $30 a share on

July 25, 2000.

From July 21 to August 1, 2000, defendants sold about 450,000 shares of Westell stock total, reaping proceeds of almost $11.5 million. (*Id.* ¶ 24.) Specifically, between July 21 and August 1, 2000, Zionts, who had never sold any Westell stock before this time, sold 231,440 shares at between $28 and $29 a share or approximately 65% of his holdings, reaping proceeds of $5,557,730; on July 21, 2000, Nelson sold 100,000 shares at $27.38 a share or approximately 40% of his holdings, reaping proceeds of $2,738,000; between July 24 and August 1, 2000, Kirby, who had never sold any Westell stock before this time, sold 80,000 shares at between $22.79 and $29.09 a share or approximately 20% of his holdings, reaping proceeds of $2,057,700; on July 24, 2000, Reynolds sold 27,200 shares at $28.46 a share or approximately 30% of his holdings, reaping proceeds of $774,122; on July 25, 2000, Penny sold 4,098 shares at $30 a share, reaping proceeds of $122,940; and on July 25, 2000, Simon sold 5,000 shares at $30 a share, reaping proceeds of $150,000. ( *Id.* ¶ 10(a)-(f).)

Only days after defendants unloaded their Westell stock, the real story about SBC's cutbacks emerged. In early August, Bellace reported that SBC had, beginning in June 2000, changed its purchasing requirements for DSL modems, and thus would be ordering fewer modems in the future from Westell. (*Id.* ¶ 25.) The stock price tumbled right back to the mid-to-high teens immediately upon release of the news (which was admittedly known by Westell management six to eight weeks earlier). (*Id.*) As was later reported by Pluckhahn, it was not merely a decline in usage by SBC that had caused Westell's problems but also that SBC had begun purchasing more from Westell's main competitor, Efficient Networks. (*Id.*)

*4 On October 18, 2000, Westell admitted that the decline in orders from SBC would have a material negative effect on its revenues and earnings. Westell reported second quarter DSL revenues of $49.5 million, many millions lower than what it had assured analysts two months earlier. As a result of this announcement, Westell's stock price dropped to $5.94 a share on October 19, 2000.

Since the release of the various negative reports and with Westell's poor growth prospects, several Westell shareholders commenced a class action on or about October 27, 2000 against Westell (and others), alleging that Westell's public disseminations were materially false and misleading in violation of federal securities

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

laws. [FN2] Further, on or about August 2, 2001, plaintiffs filed the instant derivative action against nominal defendant Westell and the six named defendants, alleging various breaches of fiduciary duties for insider trading and misappropriation of information under Count I and for exposing Westell to significant liability and damages under Count II.

> FN2. There is also the federal securities class action *In re Westell Technologies, Inc. Sec. Litig.,* No. 00 C 6735, which is related to the instant derivative action. (*See* Order, Sept. 4, 2001).

### DISCUSSION
#### A. Dismissal for failure to plead demand futility

[1] In a derivative action, a shareholder plaintiff seeks to enforce a right that belongs to the corporation. *See Kamen v. Kemper Fin. Servs. Inc.,* 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). "[G]iven 'the basic principle of corporate governance that the decisions of a corporation-including the decision to initiate litigation-should be made by the board of directors or the majority of shareholders,' most jurisdictions require a pre-suit demand be made of the corporation's board of directors." *In re Abbott Laboratories Derivative Shareholders Litig.,* 293 F.3d 378, 386 (7th Cir.2002), quoting *Kamen,* 500 U.S. at 95. A pre-suit demand "allows the directors to exercise their business judgment and determine whether litigation is in the best interest of the corporation." *In re Abbott,* 293 F.3d at 386.

Federal Rule of Civil Procedure 23.1 requires the derivative complaint to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Because the requirement of a shareholder plaintiff to make a demand on the board of directors "is more than a pleading requirement, it is a substantive right of the shareholder and the directors[.] ... [T]he law of the state of incorporation ... controls these substantive rights and governs what excuses are adequate for failure to make a demand." *In re Abbott,* 293 F.3d at 387. Delaware is Westell's state of incorporation and the parties agree that Delaware law applies here.

Plaintiffs concede that they made no demand on Westell's board of directors prior to filing their complaint. However, they aver that a demand would have been futile because five of the eight directors on Westell's board personally benefitted from conduct alleged in their complaint and, therefore, were interested and could not have impartially responded to a demand. (Compl.¶¶ 11, 44.) In determining whether a demand would be futile, the court must consider whether

> *5 ... the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Rales v. Blasband,* 634 A.2d 927, 933-34 (Del.1993). [FN3] "To establish a reasonable doubt, plaintiffs are not required to plead facts that would be sufficient to support a judicial finding of demand futility ... [n]or must plaintiffs demonstrate a reasonable probability of success on the merits." *McCall v. Scott,* 239 F.3d 808, 816 (6th Cir.2001), citing *Grobow v. Perot,* 539 A.2d 180, 186 (Del.1988) and *Rales,* 634 A.2d at 934.

> FN3. Because plaintiffs assert that they are not challenging a business decision by Westell's board of directors, the demand futility test in *Rales,* 622 A.2d at 934, and not *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984), applies here. *See In re Abbott,* 293 F.3d at 387, 388 n. 3.

"[W]hether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness and independence of a majority of the Board must be determined from the accumulation of all the facts taken together." *McCall,* 239 at 816-17. A director is interested when "he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a 'materially detrimental impact' on a director but not the corporation or its stockholders." *Id.* at 825, quoting *Rales,* 634 A.2d at 936. However, "the 'mere threat' of personal liability in the derivative action does not render a director interested[.]" *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995). Rather, "reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present 'a substantial likelihood' of liability on the part of a director." *McCall,* 239 F.3d at 825, citing *Rales,* 634 A.2d at 936. Moreover, "[e]ven if a director has no personal interest in a decision, his discretion must also be free from the influence of other interested persons." *Seminaris,* 662 A.2d at 1354. A director is independent if he can make a decision "based on the corporate

merits of the subject before the board rather than extraneous considerations or influences." *Rales,* 662 A.2d at 936, quoting *Aronson v. Lewis,* 473 A.2d 805, 816 (Del.1984).

Defendants assert that the complaint fails to plead a substantial likelihood of liability on the part of the director defendants (Nelson, Kirby, Reynolds, Penny and Simon) because it does not attribute any of the alleged misrepresentations or knowledge of the SBC problems to these defendants. Defendants further contend the complaint alleges only that defendants are directors (with the exception of Nelson who also is CEO and Simon who also is the Assistant Secretary and Assistant Treasurer) and sold Westell stock, and rely primarily on *McCall,* 239 F.3d at 825. [FN4] Plaintiffs assert the director defendants were clearly interested because they knew public disclosure of the decline in orders by SBC would have a material effect on Westell's stock price and sold their stock from July 21 to August 1, 2000. Plaintiffs rely on *In re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 115-16 (S.D.N.Y. Mar.9, 2000) and *In re Cooper Companies, Inc. Shareholders Derivative Litig.,* No. 12584, 2000 WL 1664167, at *6-7 (Oct. 31, 2000).

> FN4. Moreover, defendants argue the complaint fails to plead that there is a substantial likelihood of liability on the part of the director defendants because it does not allege they engaged in conduct more egregious than mere or gross negligence and also point to Westell's Charter, which precludes directors' liability for actions based on negligence or gross negligence under Section 102(b)(7) of the Delaware Code, 8 Del. Laws 102(b)(7) (2000). Plaintiffs, however, apparently do not intend to pursue a claim for breach of duty of care (Resp. at p. 8) although they aver in their derivative complaint that "[t]he Director Defendants' sales of Westell stock, while in possession and control of this material, non-public information, was a breach of their fiduciary duties of loyalty, good faith, and *due care."* (Compl.¶ 37) (emphasis added). Thus, the court does not consider whether plaintiffs adequately plead demand futility based on defendants' alleged breach of duty of care or other negligent conduct. See *McCall v. Scott,* 239 F.3d 808, *reh'g granted,* 250 F.3d 997 (6th Cir.2001), addressing the demand futility exception with respect to directors' liability based on a breach of duty of care claim.

**\*6** In *McCall,* the court held that the plaintiffs' derivative complaint did not adequately plead demand

futility under Delaware law based on insider trading allegations because it did not link the directors' alleged acquisition of non-public material information with their stock sales. 239 F.3d at 825- 26. The court recognized that "when directors and officers own stock or receive compensation in stock, they should be expected to trade those securities in the normal course of events." *Id.* at 825. As such, it concluded "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.... Further, fraudulent intent may be inferred from the timing and quantities of the trades." *Id.* (internal citations and quotations omitted).

In applying these standards, the *McCall* court looked at the plaintiffs' factual allegations of insider trading over a two year period or from January 1995 to April 1997 and found that the plaintiffs only generally averred that some of the directors sold millions of dollars of the company's stock "at prices artificially inflated by the undisclosed fraudulent practices authorized or permitted by the Board." *Id.* Moreover, the court determined that some of these director defendants maintained their substantial holdings of company stock during this time period and that the plaintiffs also failed to plead, regarding certain directors, the "relative holdings or the timing of the transfers." *Id.* The court then concluded "[a]lthough relying upon the 'red flags' to allege that the directors knew or recklessly disregarded [the company's] improper policies and practices, plaintiffs failed to connect the timing of any of the stock transactions to those warnings." *Id.* at 825-26.

In *In re Oxford Health Plans, Inc.,* 192 F.R.D. at 115-16, the court held that the plaintiffs properly pled demand futility where the director defendants knew of management's misrepresentations to the financial markets concerning the company's financial crisis but feared that taking action would harm the company's market price, result in increased regulatory oversight, slow the growth of the company, and jeopardize their personal and financial interests and their personal ties to the company's CEO. It further determined that any independence or disinterested status of the directors was lost because two of the director defendants sold company stock when they were in possession of material non-public adverse information and another director received substantial annual contract payments through the board.

In *In re Cooper Companies, Inc. Shareholders Derivative Litig.,* 2000 WL 1664167, at *6-7, the court

held that the plaintiffs properly pled demand futility because three directors including the co-chairman profited from and/or participated in a fraud scheme to profit from the purchase and sale of bonds based on inside information. Further, it concluded that two directors lacked independence because they were corporate inferiors to the co-chairman and absented themselves from an emergency board meeting.

*7 After a review of these cases, the court concludes that plaintiffs' allegations do create a reasonable doubt that a majority of Westell's board of eight directors could have exercised disinterested and independent business judgment in responding to a shareholder demand. Defendants attempt to distinguish *In re Oxford Health Plans, Inc.* and *In re Cooper Companies, Inc. Shareholders Derivative Litig.* by arguing that the plaintiffs in those cases pled more particularized facts. Plaintiffs' allegations here, however, are similar to the facts pled in those cases because, although plaintiffs do not specify the exact manner in which defendants knew SBC would order fewer modems from Westell (Compl ¶¶ 10, 12), plaintiffs allege the director defendants learned about this non-public information by late June 2000 and sold their Westell stock when the price was artificially inflated by Westell's "blockbuster announcement" that it won SBC as a customer. Further, right after the director defendants sold their stock, the negative news of SBC's cutbacks became public and Westell stock declined from a high of $30 a share to the mid-to-high teens.

Moreover, unlike the facts in *McCall* where the court examined insider trading allegations within a time period of over two years or from January 1995 to April 1997, here plaintiffs' allegations focus on a ten day time period during which the director defendants sold their Westell stock. Specifically, plaintiffs allege Nelson unloaded 40% of his holdings between July 24 and August 1, 2000; Kirby, who never sold Westell stock before, unloaded 20% of his holdings on July 24; and Reynolds unloaded 30% of his holdings on July 25. Although in smaller amounts, still coincident in timing, Simon sold 5,000 shares, and Penny sold 4,098 shares on July 25, realizing profits of $150,000 and $122,940, respectively. [FN5] As to Simon, a director and the Assistant Secretary and Assistant Treasurer, and Penny, an outside director, plaintiffs do not allege that Simon or Penny unloaded large amounts of their personal holdings of Westell stock or that prior to that time period, they never traded their Westell stock. However, Delaware law provides that "where all the defendant directors allegedly engaged in insider

trading within a matter of weeks based upon the same inside information, ... the insider trading claims should be viewed collectively." *Strougo v. Carroll,* No. 8040, 1991 WL 9978, at *4, 17 Del. J. Corp. L. 352, 362 (Del. Ch. Jan. 29, 1991) (unpublished); *see also In re Gen. Instrument Corp. Sec. Litig.,* 23 F.Supp.2d 867, 874 (N.D.Ill.1998), quoting *Strougo.* As such, plaintiffs have adequately pled that five of Westell's eight directors would face a substantial likelihood of personal liability that would prevent them from exercising impartiality in considering a shareholder demand. *See Strougo,* 1991 WL 9978, at *4, 17 Del. J. Corp. L. at 362 ("Common sense suggests that, at a board meeting at which plaintiff's demand might be considered, the defendant directors' interest in their own alleged wrongdoing would affect their decisions as to whether to sue their co-directors for the same alleged wrongs."). Accordingly, defendants' motion to dismiss for failure to plead demand futility is denied.

> FN5. Plaintiffs include Zionts' sales of stock during that ten day period when arguing that the director defendants were interested. However, when plaintiffs filed their derivative complaint in August 2001, Zionts had not been a director for approximately five months or since March 2001. *Rales,* 634 A.2d at 934 (stating demand futility pled "as of the time the complaint is filed"); (*see also* Compl. ¶ 11.)

B. Dismissal for failure to plead fraud with particularity

*8 Alternatively, defendants argue that even if plaintiffs' demand is excused as futile, plaintiffs' complaint should be dismissed for failure to plead fraud with specificity in Counts I and II under Federal Rule of Civil Procedure 9(b). Plaintiffs respond (in a footnote) that they do not need to plead their claims for breach of fiduciary duty under Rule 9(b) (Resp. p. 10 n. 5) but plaintiffs also rely on *In re Cendant Corp. Derivative Action Litig.,* in which the court applied the Rule 9(b) standard. 189 F.R.D. 117, 131 (D.N.J.1999) (holding the plaintiffs pled fraud with particularity in their insider trading claim under Delaware law because the plaintiffs alleged the defendants knew at the time of their stock sales that the company's earning reports were inflated by accounting improprieties, which would cause the inflated price of the company's stock to fall down).

Although plaintiffs claim they are only alleging that defendants engaged in insider trading, they also allege that defendants made misrepresentations to the public

in order to artificially inflate Westell's stock price. [FN6] Indeed, plaintiffs' derivative complaint arises from the same operative facts as those identified in the class action complaint in *In re Westell Technologies, Inc. Sec. Litig.,* No. 00 C 6735 (see Mem. Op. and Order, Oct. 26, 2001 at p. 20). [FN7] Therefore, the court will apply Rule 9(b). *See In re Gen. Instrument Corp. Sec. Litig.,* No. 96 C 1129, 1997 WL 610452, at * 10 (N.D.Ill. Sept.24, 1997).

> FN6. Plaintiffs make the following allegations: Westell disseminated false and misleading information (Compl.¶ 4) and kept the public "in the dark about the nature and extent of the SBC problem" (*Id* . ¶ 19), and defendants engaged in "a massive hype campaign ... to inflate the price of the Company's stock[.]" (*Id.* ¶ 16.)

> FN7. Whether plaintiffs meet the Rule 9(b) standard involves another argument raised by defendants in their motion to dismiss, which is that Nelson, Kirby, Reynolds, Penny and Simon be dismissed for the same reasons the court dismissed Nelson, Kirby and Reynolds as defendants in the *In re Westell Technologies, Inc. Sec. Litigation,* No. 00 C 6735. Therefore, the court addresses that argument here as well.

 [2] In the class action, the plaintiff alleged that defendants Zionts, Nelson, Kirby, Reynolds and other defendants not named in the instant derivative action violated the Securities Act of 1934 by knowingly and/ or recklessly making false and misleading statements to the class plaintiffs through press releases and conversations with analysts. Further, the plaintiff alleged that some of these defendants personally profited from these misrepresentations by selling their personal holdings to the class plaintiffs after artificially inflating the price of Westell stock. On defendants' motion to dismiss, the court found it could be reasonably inferred from the plaintiff's class complaint that Westell's spokesperson made the allegedly false and misleading statements as authorized by Zionts and other Westell top management. However, the court dismissed Nelson, Kirby and Reynolds as defendants because there was no basis to infer from the class complaint that any of them was a declarant or otherwise involved in making false or misleading statements even though it found the plaintiff alleged a strong inference of scienter based on insider trading as to Nelson, Kirby and Reynolds as well as Zionts.

 [3] For these same reasons, all of the defendants except for Zionts must be dismissed with respect to any

claims of breach of fiduciary duty based on alleged misrepresentations they made to the public since there is no basis to infer from plaintiffs' derivative complaint that any of them was a declarant or otherwise involved in making false or misleading statements. Nevertheless, Delaware law provides a separate claim of breach of fiduciary duty based on insider trading. *See In re Cendant Corp. Derivative Action Litig.,* 189 F.R.D. at 131 (D.N.J.1999); *accord Oberly v. Kirby,* 592 A.2d 445, 463 (Del.1991) ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such a profit or advantage is not gained at the expense of the fiduciary [,]" citing *Brophy v. Cities Serv. Co.,* 70 A.2d 5, 7 (Del.Ch.1949)). Thus, for the same reasons plaintiffs adequately pled demand futility, the claim for insider trading will remain against each defendant. Accordingly, defendants' motion to dismiss for failure to plead fraud with particularity is granted in part and denied in part with respect to Counts I and II.

 C. Dismissal for failure to plead a legally cognizable theory of damages under Count II

 *9 Defendants next move to dismiss Count II, asserting plaintiffs fail to plead a legally cognizable theory of damages. Specifically, defendants argue that plaintiffs' claims for damages based on Westell's potential exposure in defending class actions including significant legal liability and costs is premature and damages based on harm to Westell's integrity in the market and goodwill is conclusional.

 [4] With respect to plaintiffs' claim for damages based on Westell's exposure to defending class actions, plaintiffs cannot bring a derivative action to recover expenses from a pending securities action involving Westell until the case has proceeded to final judgment or settlement. *In re United Telecomm., Inc. Sec. Litig.,* No. 90-2251-EEO, 1993 WL 100202, at *3 (D.Kan. Mar.4, 1993); *cf. In re Symbol Tech. Sec. Litig.,* 762 F.Supp. 510, 516-17 (E.D.N.Y.1991) (holding that the derivative plaintiff could not seek litigation expenses associated with a securities class action that had not yet proceeded to final judgment or settlement under a claim for corporate waste). Thus, this claim for damages is premature and must be dismissed. *See In re Symbol,* 762 F.Supp. at 516-17.

 [5] Moreover, with respect to plaintiffs' claim for damages based on Westell's "integrity in the market" and "loss of goodwill" (Compl.¶¶ 4, 27, 28, 41), this claim is conclusional and insufficient because plaintiffs

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 1632261, \*9 (N.D.Ill.))**

do not apprise defendants of the basis and extent of the alleged damages. *In re United Telecomm.,* 1993 WL 100202, at \*2; *accord In re Symbol,* 762 F.Supp. at 517 (rejecting an injury in the marketplace theory and stating "damages must be shown to directly flow from the wrongful acts of defendants, and not the mere commencement of legal proceedings against the corporation."). Therefore, this claim is dismissed. [FN8]

> FN8. However, where plaintiffs allege that defendants are liable to Westell under Count II (Compl.¶ 42), a claim for damages based on that allegation is legally cognizable since Delaware law "has long recognized the availability of a stockholder derivative action to recover profits obtained by corporate insiders through breach of their fiduciary duties." *In re Symbol,* 762 F.Supp. at 517. Therefore, that claim for damages under Count II must remain.

Accordingly, defendants' motion to dismiss Count II for failure to plead a legally cognizable theory of damages is granted in so far as plaintiffs plead damages based on Westell's defending the pending federal securities action (Compl.¶¶ 4, 27, 41) and Westell's loss of integrity in the market (*id.* ¶¶ 28, 41) and goodwill (*id.* ¶ 41).

### ORDER

Wherefore, and for the reasons stated above, defendants' motion to dismiss plaintiffs' verified derivative complaint [# 26-1] is granted in part and denied in part.

2002 WL 1632261 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Not Reported in A.
1998 WL 326686 (Del.Ch.), 24 Del. J. Corp. L. 189
**(Cite as: 1998 WL 326686 (Del.Ch.))**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

Cantor FITZGERALD, L.P., Plaintiff,
v.
Iris CANTOR, Individually, and as De Facto Trustee
of the Cantor Family Trust,
and Iris Cantor as Trustee of the Michelle Labozzetta
Trust, Iris Cantor as
Trustee of the Suzanne Fisher Trust, Iris Cantor as
Trustee of the Howard
Lutnick Trust, Iris Cantor as Trustee of the Stuart
Fraser Trust, Iris Cantor
as Trustee of the Monica Muhart Trust, and Iris Cantor
as Trustee of the Randi
Ross Trust, Cantor Fitzgerald Incorporated, Rodney
Fisher, Market Data
Corporation and Chicago Board Brokerage, L.L.C.,
Defendants.

No. C.A. 16297.

Submitted June 3, 1998.
Decided June 16, 1998.

Rodman Ward, Karen L. Valihura, Joseph M. Asher
and George F. Fraley, III of Skadden, Arps, Slate,
Meagher & Flom, Wilmington, Delaware, of counsel
Thomas J. Schwarz and Jeremy A. Berman of
Skadden, Arps, Slate, Meagher & Flom, New York
City, for plaintiff.

Lawrence C. Ashby, Stephen E. Jenkins, Richard D.
Heins and  Richard I.G. Jones, Jr. of Ashby & Geddes,
Wilmington, Delaware, of counsel, Jack C. Auspitz
and Howard E. Heiss of Morrison & Foerster, New
York City, Steven M. Weinberg of Weinberg Sullivan,
Phoenix, Arizona; Barry I. Slotnick, J. Lawrence
Crocker and Joshua T. Rabinowitz of Slotnick Shapiro
& Crocker, New York City, David F. Dobbins and
Saul B. Shapiro of Patterson, Belknap, Webb & Tyler,
New York City, for defendants Iris Cantor, Cantor
Fitzgerald Incorporated, Rodney Fisher and Market
Data Corporation.

Martin P. Tully and William Lafferty of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware, of
counel Josef J. Riemer, Ellen M. Moskowitz and Mark
A. Racanelli of Kirkland & Ellis, New York City, for
defendant Chicago Board Brokerage, L.L.C.

MEMORANDUM OPINION

STEELE, Vice Chancellor.

*1 Cantor Fitzgerald, L.P. ("CFLP" or "Plaintiff"), a
Delaware limited partnership, alleges that three of its
limited partners, working through a Delaware
corporation under their control and in conjunction with
an unassociated Delaware limited liability corporation,
have developed a product that will compete directly
with CFLP's core business. Plaintiff CFLP seeks a
preliminary injunction against all five defendants to
prevent the new product's launch on July 13, 1998.
Plaintiff may obtain a preliminary injunction if it
establishes the following three elements: (1) a
reasonable likelihood of success on the merits, (2)
imminent, irreparable harm will result if an injunction
is not granted and (3) the damage to Plaintiff if the
injunction does not issue will exceed the damage to the
defendants if the injunction does issue. [FN1] Decision
on the application for a Preliminary Injunction is
reserved until the record may be supplemented on the
issues of the existence of imminent, irreparable harm
and whether the balance of the equities favors the
issuance of the injunction.

> FN1. *Mills Acquisition Co. v. Macmillan,
> Inc.,* Del.Supr., 559 A.2d 1261, 1279 (1988).

In the underlying Complaint, Plaintiff alleges breach
of fiduciary duty, breach of contract and unjust
enrichment claims against the three limited partners. It
alleges aiding and abetting, tortious interference and
unjust enrichment claims against the Delaware
corporation and limited liability company. [FN2]
Defendants have moved to dismiss all claims pursuant
to Rule 12(b)(6) or for Judgment on the Pleadings
pursuant to Rule 12(c). As to the fiduciary duty and
contract claims, defendants' Motions to Dismiss and
joint Motion for Judgment on the Pleadings are denied.
As to the unjust enrichment claims, the Motions to
Dismiss/joint Motion for Judgment on the Pleadings
are granted with respect to the three limited partners
and denied with respect to the Delaware corporation
and limited liability company.

> FN2. At the parties' request, this Opinion
> does not address four additional counts of the
> Complaint.

BACKGROUND

Plaintiff CFLP is a leading inter-dealer and

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                                                      **Page 106**
(Cite as: 1998 WL 326686, *1 (Del.Ch.))

institutional broker of United States Treasury securities and other government securities. Three of the defendants in this action, Iris Cantor ("Cantor"), Rodney Fisher ("Fisher"), and Cantor Fitzgerald Incorporated ("CFI") (collectively "Limited Partner Defendants"), are Limited Partners in CFLP. Cantor, in addition to being a Limited Partner of CFLP, is also the Vice Chairman of CFLP and the owner [FN3] and CEO of CFI.

> FN3. Cantor owns CFI through the Iris Cantor Trust, of which Cantor is grantor, trustee and sole beneficiary.

Market Data Corporation ("MDC"), a fourth defendant in this action, is a Delaware corporation in the business of distributing financial data and of licensing software and technology for electronic trading systems. CFLP spun off MDC in 1987 in order to enhance the focus of MDC's business as a separate profit center. Cantor is majority shareholder of MDC [FN4], and Fisher is MDC's Chairman and CEO.

> FN4. Cantor is the majority shareholder of MDC through the Iris Cantor Trust.

The fifth defendant is Chicago Board Brokerage, L.L.C. ("CBB"), a Delaware limited liability company. CBB is a joint venture of Ceres Trading Limited Partnership, a limited partnership controlled by the Chicago Board of Trade, and Prebon Yamane, a broker/competitor of CFI. "CBB was formed to develop a new and more efficient way of brokering and trading Treasuries--through an interactive electronic trading system...." [FN5]

> FN5. CBB's Memorandum of Law is Support of Its Motion to Dismiss the Complaint at 2-3 (hereafter "CBB's Open. Dismiss Br.").

*2 CFLP filed this action after CBB announced that, on July 13, 1998, it will launch a new electronic trading system called "MarketPower." CFLP contends the new system is intended to compete directly against CFLP in its "historic core business"--the brokerage of U.S. Treasuries. CBB concedes that, through MarketPower, it "intends to bring full and fair competition to the Treasuries market," which is currently "dominated by plaintiff CFLP." [FN6] CBB developed the specifications for MarketPower and searched for approximately four years for a vendor to build the system. Ultimately, CBB chose MDC as its vendor because "it committed to develop the software on a timetable acceptable to CBB and because [it]

could produce the software on acceptable financial terms." [FN7]

> FN6. CBB's Open. Dismiss Br. at 3.

> FN7. CBB's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction at 4 (hereafter "CBB's Opposing P.I. Br.").

Although CBB did not sign a formal contract with MDC until February 9, 1998, and did not announce the impending launch of MarketPower until March 19, 1998, CFLP learned from one of its employees that MDC was close to signing a contract with CBB to develop an electronic trading system at least as early as September of 1997. On October 6, 1997, CFLP sent a letter to Cantor, Fisher and MDC objecting to MDC's role as CBB's software vendor. CFLP claimed that the activity constituted a breach of the 1996 Agreement of Limited Partnership of Cantor Fitzgerald, L.P. ("1996 Limited Partnership Agreement" or "1996 Agreement"). CFLP knew that its warnings were going unheeded, however, in November of 1997, when a CFLP employee attended a high-profile, industry-wide, public demonstration of the MarketPower software that MDC built for CBB. Plaintiff did not initiate this action until April 6, 1998.

Plaintiff never expressed any concern directly to CBB about the propriety of using MDC as CBB's software vendor. Nevertheless, CBB learned of the allegations in CFLP's October 6, 1997, letter through MDC. Fisher assured CBB, however, as he had from the start of the companies' negotiations in June of 1997, that CFLP and MDC were separate companies and that CFLP's allegations were baseless. In fact, the Agreement Between Chicago Board Brokerage, L.L.C., and Market Data Corporation (the "CBB/MDC Software Licensing Agreement") provides that if CFLP ever materially interferes with MDC's participation in the CBB/MDC deal, MDC will be in material breach of the CBB/MDC Software Licensing Agreement, and CBB may terminate the agreement and look to its rights as stated in paragraphs 8.3 and 11.3. Thus, between October of 1997, and April of 1998, in reliance on MDC's assurances, CBB "made substantial commitments ... to prepare for the launch of MarketPower, including hiring more staff and undertaking the significant task of building a network to support the system." [FN8] Despite seeing caution flags waved, CBB intends to launch as scheduled, on July 13, 1998.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FN8. CBB's Opposing P.I. Br. at 8.

## CONTENTIONS OF THE PARTIES

Count I of the Complaint alleges that the Limited Partner Defendants, by allowing or causing MDC to collaborate with CBB to develop and sell a product intended to compete directly against CFLP in its "historic core business," breached a fiduciary duty of loyalty owed to CFLP and breached section 3.03(b) of the 1996 Limited Partnership Agreement. Count III of the Complaint alleges that Cantor and CFI breached section 3.03(a) of the 1996 Agreement. Counts II and IV of the Complaint, respectively, allege that MDC and CBB, by collaborating on the development and sale of MarketPower, aided and abetted the Limited Partner Defendants' breach of their duty of loyalty and tortiously interfered with the 1996 Limited Partnership Agreement. Count V alleges a claim of unjust enrichment against all five defendants.

*3 Shortly after filing the Complaint, CFLP filed a Motion for Preliminary Injunction to prevent the July 13, 1998, launch of MarketPower. CFLP contends that it has at least a reasonable likelihood of success on the merits, based on its interpretation of the 1996 Limited Partnership Agreement and based on Delaware's case law concerning the fiduciary duty of loyalty and accomplice liability. CFLP also contends that, if MarketPower is allowed to be released in July, CFLP will suffer irreparable harm in the form of, *inter alia,* loss of customers and of market share. Finally, CFLP argues that the harm it will suffer if the Court refuses to issue an injunction substantially outweighs the harm that defendants will suffer if the Court grants the injunction. All five defendants contest Plaintiff's arguments and oppose the Motion for Preliminary Injunction.

Fisher, MDC and CBB have filed Motions to Dismiss the Complaint for failure to state a claim. Because Cantor and CFI had already filed their Answer, they were prohibited from filing a Motion to Dismiss and instead filed a joint Motion for Judgment on the Pleadings ("J.O.P."). Rather than respond to the defendants' Motions to Dismiss/Motion for J.O.P. directly, CFLP filed a Motion for Leave to File Amended Complaint. CFLP contends that the proposed Amended Complaint has fixed any problems that may have existed in the original Complaint. As to the defendants who have not yet filed a responsive pleading, CFLP may amend the Complaint as of right. [FN9] However, with respect to Cantor and CFI, CFLP must obtain this Court's permission to file an Amended

Complaint. [FN10]

FN9. Ct.Ch.R. 15(a).

FN10. Ct.Ch.R. 15(a). A party may also amend its complaint by written consent of the adverse party, but there has been no written consent in this case.

This Court liberally grants motions to amend "unless there is a showing of substantial prejudice or legal insufficiency." [FN11] Cantor and CFI oppose CFLP's Motion to Amend on the basis of legal insufficiency. The standard for assessing the legal sufficiency of a proposed Amended Complaint is the same standard applicable to a Motion to Dismiss. [FN12] Therefore the Court's decision on defendants' Motions to Dismiss, which follows, implicitly decides Plaintiff's motion to amend the Complaint as well.

FN11. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* Del.Ch., C.A. No. 13950, 1996 WL 189435 at *3, Allen, C. (Apr. 16, 1996).

FN12. *Moore Business Forms, Inc. v. Cordant Holdings Corp.,* Del.Ch., C.A. No. 13911, 1995 WL 707877 at *2, Jacobs, V.C. (Nov. 30, 1995).

## THE 1996 LIMITED PARTNERSHIP AGREEMENT

Section 3.03(b) of the 1996 Limited Partnership Agreement states:

"Each Partner acknowledges its duty of loyalty to the Partnership and agrees to take no action to harm (or that would reasonably be expected to harm) the Partnership or any Affiliated Entity."

The Limited Partner Defendants are "Partners," [FN13] and Plaintiff contends they are, as a result, bound by the terms of section 3.03(b). CFLP contends that the Limited Partner Defendants, by allowing MDC to contract with CBB to develop a product that will compete with CFLP in its core business, breached their fiduciary duty of loyalty to CFLP and took an action that would reasonably be expected to harm CFLP.

FN13. The 1996 Agreement of Limited Partnership of Cantor Fitzgerald, L.P., § 1.01 (hereafter "1996 Limited Partnership Agreement"), defines "Partner," in part, as "the General Partners and the Limited Partners."

Section 3.03(a) states, in pertinent part:

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

"Nothing contained in this Agreement shall be deemed to preclude the Managing General Partner, CFI or any of their respective Affiliates from engaging or investing in or pursuing, directly or indirectly, any interest in other business ventures of every kind, nature or description independently or with others; *provided,* that such activities do not constitute Competitive Activities." [FN14]

> FN14. 1996 Limited Partnership Agreement § 3.03(a) (italics in original). Cantor and MDC appear to be Affiliates of CFI.1996 Limited Partnership Agreement § 1.01. (defining "Affiliate" as any person or entity "that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified [person or entity]").

*4 The 1996 Agreement states that " 'Competitive Activity' shall have the meaning given in Section 11.04(c)." Section 11.04(c) states, in pertinent part:
"[A] Partner shall be considered to have engaged in a Competitive Activity if such Partner while a Partner ...
(ii) solicits any of the customers of the Partnership or any Affiliated Entity (or any of their employees), induces such customers or their employees to reduce their volume of business with, terminate their relationship with or otherwise adversely affect their relationship with, the Partnership or any Affiliated Entity ...
(iv) directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of the Partnership or of any Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business or
(v) assists others in engaging in any Competing Business in the manner described in the foregoing clause (iv)." [FN15]

> FN15. A Competing Business: "(i) involves the conduct of the wholesale or institutional brokerage business, (ii) consists of marketing, manipulating or distributing financial price information of a type supplied by the Partnership or any Affiliated Entity to information distribution services or (iii) competes with any other business conducted by the Partnership or any Affiliated Entity if such business was first engaged [in] by the

Partnership or an Affiliated Entity...." 1996 Limited Partnership Agreement § 11.04(c).

CFLP contends that the Limited Partner Defendants, by allowing or causing MDC to help CBB develop and sell MarketPower, have: (1) "solicit[ed] the customers of CFLP to reduce their volume of business with CFLP" in violation of section 11.04(c)(ii), (2) "directly engag[ed] in a Competing Business" in violation of section 11.04(c)(iv) and (3) "assist[ed] others in engaging in [a] Competing Business" in violation of section 11.04(c)(v). [FN16]

> FN16. Plaintiff's Opening Brief in Support of Its Motion for Preliminary Injunction at 15. The quotation includes Rodney Fisher, but CFLP has apparently since conceded that § 3.03(a) of the 1996 Agreement does not apply to Fisher.

* * *

This is the Court's decision on defendants' Motions to Dismiss and joint Motion for J.O.P.

DISCUSSION

A cause of action may be dismissed pursuant to Rule 12(b)(6) for failure to state a claim when, assuming the truth of all well-pleaded facts in the Complaint and construing all inferences to be drawn from those facts in the light most favorable to the non-moving party, the Court is convinced that there is no set of facts under which the plaintiff would be entitled to relief. [FN17] The Court may consider facts contained in documents incorporated into the complaint by reference when deciding a motion to dismiss. [FN18] The 1996 Limited Partnership Agreement and the CBB/MDC Software Licensing Agreement are incorporated by reference into CFLP's Amended Complaint.

> FN17. *Union Texas Petroleum Holdings, Inc. v. Travelers Indem. Co.,* Del.Ch., C.A. No. 15548, 1998 WL 83068 at *3, Chandler, C. (Feb. 19, 1998).

> FN18. *See e.g., In re Santa Fe Pacific Corp. Shareholder Litigation,* Del.Supr., 669 A.2d 59, 69-70 (1995) (considering joint and supplemental proxy statements on motion to dismiss disclosure action and suggesting appropriateness of considering underlying contract in action for its breach).

The legal standard applicable to a Motion for J.O.P. differs from the standard applicable to a Motion to

Dismiss. Although the Court is still required to assume the truth of all well-pleaded facts in the Complaint and to construe all inferences to be drawn from those facts in the light most favorable to the non-moving party, just as on a motion to dismiss, "[a] motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law." [FN19]

> FN19. *Desert Equities v. Morgan Stanley,* Del.Supr., 624 A.2d 1199, 1205 (1993).

Counts I and III of the Amended Complaint allege that the Limited Partner Defendants breached their duty of loyalty to CFLP and the 1996 Limited Partnership Agreement. The 1996 Agreement clearly states that all Limited Partners owe CFLP a duty of loyalty and agree to take no action that would reasonably be expected to harm CFLP. The Agreement also states that CFI and its Affiliates may not engage in Competitive Activities or Competing Businesses. The Amended Complaint alleges that the Limited Partner Defendants, while Limited Partners of CFLP, allowed MDC to contract with CBB to develop and sell a product that will compete directly against CFLP in its core business of brokering U.S. Treasuries. The underlying facts, stated in the Amended Complaint, if true, would seem to support an inference of (a) a breach of the Limited Partners' duty of loyalty, (b) harm to CFLP, (c) a Competitive Activity and (d) a Competing Business.

**\*5** The Limited Partner Defendants contend, among other arguments, that regardless of the 1996 Limited Partnership Agreement's terms [FN20], they have earned the right to allow or cause MDC to compete with CFLP through a prior course of dealing. They contend that since 1993, the year CFLP first inserted the language currently found in sections 3.03(a), 3.03(b) and 11.04(c) of the 1996 Agreement, MDC has completed, or has proposed and negotiated, many transactions with CFLP's competitors that would arguably constitute Competitive Activities or Competing Businesses, or that might arguably be considered a violation of the Limited Partner Defendants' duty of loyalty and harmful to CFLP. Defendants contend that Plaintiff never objected to, or sought to enjoin, these dealings, notwithstanding that some allegedly involved the development of electronic trading systems for companies that compete directly with CFLP in the fields of mortgage-backed securities and emerging markets, as well as in CFLP's core business of U.S. Treasuries.

> FN20. The Limited Partner Defendants also contend that the 1996 Agreement, when considered in the context of its drafting history, permits them to take precisely the actions CFLP complains of in this action. This argument is more appropriately considered next month, when the record concerning all three elements of the Preliminary Injunction standard is complete.

The Limited Partner Defendants may prevail on their theory after a full trial on the merits. On the very limited record before me, however, and construing all reasonable inferences in the light most favorable to CFLP, I cannot say with certainty that there is no set of facts under which CFLP would be entitled to relief. Thus, Fisher's Motion to Dismiss Counts I and III is denied. Similarly, whether Cantor and CFI may allow or cause MDC to compete with CFLP, despite the terms of the 1996 Agreement, because of the parties' prior course of dealing is a disputed material fact that precludes this Court from entering judgment on the pleadings. Cantor's and CFI's joint Motion for J.O.P. on counts I and III is denied.

Counts II and IV raise accomplice liability theories against MDC and CBB. Count II is a claim for aiding and abetting the Limited Partner Defendants' breach of fiduciary duty, and Count IV is a claim for tortiously interfering with the 1996 Limited Partnership Agreement. The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant. [FN21] The elements of tortious interference are: (1) a contract, (2) defendant's knowledge of the contract, (3) an intentional act that is a significant factor in causing the breach of the contract, (4) lack of justification and (5) injury. [FN22]

> FN21. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del.Ch., C.A. No. 13950, 1995 WL 694397 at \*15, Allen, C. (1995).

> FN22. *See CPM Indus. v. Fayda Chems. & Minerals, Inc.,* Del.Ch., C.A. No. 15996, 1997 WL 770683 at \*7, Jacobs, V.C. (Nov. 26, 1997).

A common basis for dismissing accomplice liability theories under Rule 12(b)(6) is that Plaintiff has stated no underlying claim for principal liability. As I have explained, however, the Amended Complaint does state a claim for breach of the duty of loyalty expressly inserted in the 1996 Limited Partnership Agreement.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Defendants contend, nevertheless, that Counts II and IV must be dismissed because Plaintiff has stated no facts to support the elements of knowing participation or of intentional action without justification. I disagree. Plaintiff has pleaded sufficient facts to support these elements of its respective claims.

**\*6** Plaintiff alleges that MDC and CBB agreed to work together to develop and sell a product that would compete directly with Plaintiff's core business. It alleges that the product is operable and is set to launch on July 13, 1998. Certain Defendants admit in their pleadings that customers are currently being solicited to use the product. MDC received a letter explaining that such a relationship/product would constitute a breach of the Limited Partner Defendants' duty of loyalty found in the 1996 Limited Partnership Agreement. Plaintiff has alleged that MDC shared this information with CBB and that, in response, CBB required MDC to agree to indemnify CBB in the event that Plaintiff should obtain "against MDC any final and unappealable permanent injunction, court order or settlement of any litigation...." [FN23]

> FN23. Agreement Between Chicago Board Brokerage, L.L.C., and Market Data Corporation §§ 2.9, 8.3, 11.3.

Under these circumstances, the Court may infer that MDC and CBB had reason to believe that developing and marketing MarketPower may constitute a breach of the Limited Partner Defendants' duty of loyalty found in the 1996 Limited Partnership Agreement. The Court may further infer that MDC's and CBB's continued development and marketing of MarketPower in the face of their knowledge lacked justification. Accordingly, defendants' Motions to Dismiss Counts II and IV are denied.

Finally, all five defendants have moved to dismiss Count V, which alleges a cause of action for unjust enrichment. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." [FN24] The elements of unjust enrichment have also been stated in this way: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law. [FN25]

> FN24. *Fleer Corp. v. Topps Chewing Gum, Inc.,* Del.Supr., 539 A.2d 1060, 1062 (1988).

> FN25. *Khoury Factory Outlets, Inc. v. Snyder,* Del.Ch., C.A. No. 11,568, 1996 WL 74725 at \*11, Kiger, M. (Jan. 8, 1996).

The Limited Partner Defendants argue that a cause of action for unjust enrichment does not lie when a contract determines the obligations between the parties. [FN26] However, the Amended Complaint specifically states: "In the alternative, and/or with respect to conduct *not governed by the existence of an express contract,* CFLP seeks the equitable remedy of unjust enrichment." [FN27] Thus, unless and until this Court determines that the defendants' obligations are governed exclusively by contract, Plaintiff has properly stated a claim for unjust enrichment.

> FN26. See *ID Biomedical Corp. v. TM Techs., Inc.,* Del.Ch., C .A. No. 13269, 1995 WL 130743 at \*15, Steele, V.C. (Mar. 16, 1995), for a discussion of this principle.

> FN27. Proposed Amended Complaint ¶ 113 (emphasis added).

I do, however, find that the claims against the Limited Partner Defendants are governed exclusively by contract and that, as to them, the Motions to Dismiss/ joint Motion for J.O.P. must be granted with respect to Count V. Whether or not there is an implied duty of loyalty which applies to limited partners generally and prohibits the conduct complained of here is not an issue. Here, by contract, within the 1996 Limited Partnership Agreement, the parties accepted the invitation of 6 *Del.C.* § 17-1101(d) to address fiduciary duties. The 1996 Agreement is certainly not silent on the subject. Therefore, it may be fairly assumed that the parties intended the nature and scope of the fiduciary duties owed, by whom to whom, to be addressed within the language adopted by them in their own freely-fashioned agreement. This Court repeatedly has emphasized that Delaware law favors allowing parties to an agreement to pursue their own aims so long as no underlying fraud or innocent misrepresentation taints the crafting of the language actually adopted. [FN28] This is consistent with the policy of the General Assembly expressed in 6 *Del.C.* § 17-1101(c).

> FN28. *See, e.g., In re Cencom Cable Income Partners, L.P. Litig.,* Del.Ch., C.A. No. 14634, 1997 WL 666970 at \*4, Steele, V .C. (Oct. 15, 1997); *In re Cencom Cable Income Partners, L.P. Litig.,* Del.Ch., C.A. No. 14634, 1996 WL 74726 at \*4-5, Steele, V.C.

Not Reported in A.
**(Cite as: 1998 WL 326686, \*6 (Del.Ch.))**

(Feb. 15, 1996).

\*7 Cantor's and CFI's joint Motion for J.O.P. with respect to Count V is granted. Fisher's Motion to Dismiss Count V is granted.

The claims against CBB and MDC are not governed by any contract with CFLP. The Amended Complaint states a claim that survives CBB's and MDC's Motions to Dismiss. Plaintiff repeatedly alleges that, if MarketPower is a success, defendants will be enriched, and Plaintiff will be impoverished. Plaintiff also alleges that neither defendant can retain any benefit resulting from the success of MarketPower "justifiably" or in accordance with "the fundamental principles of justice or equity and good conscience," because they knew that Cantor, Fisher, and CFI were prohibited from producing a product that would compete with Plaintiff's core business. Assuming the truth of these facts, as I must at this stage, I find that Plaintiff has stated a claim that survives CBB's and MDC's Motions to Dismiss. CBB's and MDC's Motion to Dismiss Count V is denied.

CONCLUSION

Plaintiff's Motion for Leave to File Amended Complaint is *granted.* Defendants' Motions to Dismiss the Amended Complaint/joint Motion for J.O.P. are *granted, in part, and denied, in part.* Decision on Plaintiff's Motion for a Preliminary Injunction is *reserved* until the record is supplemented, on July 6 - 8, 1998, on the issues of the existence of imminent, irreparable harm and whether the balance of the equities favors the issuance of the injunction.

IT IS SO ORDERED.

1998 WL 326686 (Del.Ch.), 24 Del. J. Corp. L. 189

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Not Reported in A.                                                          **Page 80**
1990 WL 154149 (Del.Ch.), Fed. Sec. L. Rep. P 95,664, 16 Del. J. Corp. L. 1508
**(Cite as: 1990 WL 154149 (Del.Ch.), 16 Del. J. Corp. L. 1508)**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

Stanley HEINEMAN, Plaintiff,
v.
DATAPOINT CORPORATION, Harold E. O'Kelley,
Edward P. Gistaro, Gene K. Beare,
Evelyn Berezin, Harry G. Bowles, William K. Karnes,
George Kozmetsky, and
William C. Leone, Defendants.

CIV. A. No. 7956.

Submitted: Sept. 7, 1990.
Decided: Oct. 9, 1990.

**\*\*1510** Joseph A. Rosenthal, of Morris, Rosenthal,
Monhait & Gross, P.A., Wilmington, Ernest T.
Kaufman, Los Angeles, Cal., for plaintiff.

Robert J. Katzenstein, Clark W. Furlow, and Vicki A.
Hagel, of Lassen, Smith, Katzenstein & Furlow,
Wilmington, for Datapoint Corporation.

R. Franklin Balotti, Gregory P. Williams, Joseph J.
Bodnar, and Matthew J. Ferretti, of Richards, Layton
& Finger, Wilmington, for Individual defendants.

*MEMORANDUM OPINION*

**\*\*1511** ALLEN, Chancellor.

**\*1** The complaint in this derivative action is against
the eight individuals who at the relevant time
comprised the board of directors of Datapoint
Corporation. It challenges the board's approval of
payments totalling $15 million to themselves and to
officers of the company. It is alleged that these
payments were authorized in the shadow of an
impending hostile effort to win control of the
corporation and are invalid both because they
constituted waste of assets and because they were
motivated for their enhancement effect.

Pending is a motion to dismiss the complaint on the
ground that it fails to allege facts that if true state a
claim upon which relief may be granted (Rule
12(b)(6)) and on the ground that it fails to state with
particularity facts excusing a pre-suit demand upon the
directors themselves (Rule 23.1).

For the reasons that follow the motion will be denied
on both grounds except as to the purported claim based
upon an entrenchment theory. The complaint, while
skeletal, does in my opinion allege facts that state a
litigable claim for waste and does allege facts that
sufficiently implicate all directors in the wrong alleged
as to excuse pre-suit demand upon them.

I.

The pleadings of the complaint can be summarized
briefly:

6. "In recent months one or more attempts have been
made to remove "the directors and management" of
Datapoint from office. Defendants have been advised
that a further effort of this kind is in process."

7. "In response to their threatened removal as directors
and/or officers ... the individual defendants announced
on or about February 27, 1985, that they had
implemented a plan whereby more than $15 million of
the company's cash had been utilized for the purchase
of special benefits for themselves...."

8. "... [A]pproximately $13.1 million in cash was
transferred from the accounts of the company to a so-
called trust account.... The monies placed in the so-
called trust account are to be paid over to certain
officers and directors ... pursuant to employment and/
or severance arrangements they have established for
themselves."

**\*\*1512** 9. "To further accomplish the objections set
forth in paragraph seven ... the individual defendants
caused the company to expend $2.1 million cash ... for
the purchase of annuities, payable to themselves upon
their termination as members of the board of
directors."

10. "The actions of the individual defendants ... served
no valid business or corporate purpose and were
undertaken solely to entrench ... without any
consideration or benefit flowing to Datapoint
whatsoever...."

11. "The acts and transactions set forth above
constitute conversion, waste and spoilation...."

II.

I turn, first to defendants motion under 12(b)(6).
Such a motion may be granted, generally, only when
under no state of facts reasonably foreseeable under the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10177-NG    Document 23    Filed 11/12/2004    Page 24 of 25

Not Reported in A.                                                            **Page 81**
(Cite as: 1990 WL 154149, *1 (Del.Ch.), 16 Del. J. Corp. L. 1508, **1512)

allegation of the complaint would plaintiff be entitled to relief. *Morgan v. Wells,* Del.Ch., 80 A.2d 504 (1951). The test is liberally construed in order to give effect to the philosophy of notice pleading that underlies modern rules of procedure. Thus, all inferences that would favor the sufficiency of the complaint are accepted on such a motion. *Delaware State Troopers Lodge v. O'Rourke,* Del.Ch., 403 A.2d 1109 (1979); *Vale v. Atlantic Coast and Inland Corp.,* 99 A.2d 396 (1953). There is an outer limit to this solicitude to plaintiffs at this primary stage however. That limit commands that on such a motion the court need not accept mere conclusions of fact not supported by specific allegations. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988). The distinction between conclusions of fact and specific facts, which can appear clear in some instances (*e.g.,* "defendant was negligent") may quite often appear hazy (*e.g.,* "the price was below market for goods of that type"). Thus, judicial evaluation of the substance of the pleadings seems inevitable to some extent in ruling on a 12(b)(6) motion. In that effort we ought not lose sight of the generally lenient standards that are appropriate.

*2 Applying this test I conclude that the complaint very plainly does allege briefly but sufficiently a claim for corporate waste, but fails in its attempt to allege an entrenchment claim.

### A.

In passing upon a claim of waste of corporate assets a court must decide whether "what the corporation has received is so inadequate **1513 in value that no ordinary sound business judgment would deem it worth that which the corporation has paid." *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 189. This inquiry, of course, compels the court to examine the facts of the particular situation. *Saxe v. Brady,* 184 A.2d at 610. Even assuming that payments complained about here did serve a valid business purpose, it is virtually impossible to determine on the pleadings that the value received by the corporation for the particular payment is such as to preclude a finding of waste as a matter of law. Nor do I consider that the allegations constitute "mere conclusion" of fact. The amount of the payments, the circumstances and the size of the company suffice to meet a higher test. Accordingly, defendant's motion to dismiss for failure to state a claim must be denied.

### B.

I cannot conclude that the complaint alleges a claim of entrenchment that could conceivably justify the entry of a judgment in plaintiff's favor. Such a claim has two elements; the first is proof of a corporate action that has the effect of protecting the tenure of corporate directors by one means or another; the second is proof that that action was motivated primarily or solely for the purpose of achieving that effect. The second element of such a claim presently precisely the type of conclusion that is hard to know, easy to make and difficult to prove or disprove. Thus it presents the very sort of situation in which the judicial gloss concerning pleading of conclusions is most apt. Here, however, I need not engage in that type of analysis. Rather I conclude the complaint fails sufficiently to allege the first element of a claim of entrenchment.

The complaint alleges that Datapoint has 20,000,000 shares outstanding and had a market price per share of $20 or $400,000,000 market capitalization. It alleges payments of $15 million or less then 3% of the market capitalization. Proof of these facts could not support a final judgment that the acts complained would act as a material deterrent to either a proxy or consent contest (the form of contest the complaint alleges was to occur) or even to a cash tender offer, given their modest proportions, when viewed in context.

### III.

I turn then to the Rule 23.1 motion. The legal test is whether plaintiff has alleged with particularity facts that, if true, create a reasonable doubt that 1) the directors are disinterested and **1514 independent or 2) the challenged transaction was otherwise the product of a valid business judgement. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984). Under Rule 23.1 the court cannot excuse demand unless the well-pleaded facts create a reasonable doubt that the business judgment rule applies to the board's actions. *Grobow,* 539 A.2d at 187.

*3 The complaint alleges that demand was excused because "[a]ll the individual defendants have a personal financial interest in the acts and transactions alleged herein." Defendants seek to divide the transactions into two and to challenge the allegation of futility with regards to the severance agreements only. They say that *those* agreements benefitted only the two officer-directors of the corporation, so the agreements could have been approved by a disinterested majority of the board. [FN1]

Plaintiff's complaint, however, is most easily read as

asserting that the board's approval of the severance agreements and the annuities was part of a single transaction in which the board voted some benefits to itself and some benefits to the officers of the corporation. On this view the board may be interested with respect to the plan which is comprised of two elements.

The question is whether this argument is consistent with the facts alleged in the complaint. In analyzing this question, I am mindful that the plaintiff has not had the benefit of discovery. *See Grobow,* 539 A.2d at 186-87.

These paragraphs clearly do charge that the board approved the different payments as part of a single transaction. This would unquestionably be a self-dealing transaction. It goes without saying that board approval of a self-dealing transaction raises a reasonable doubt about whether the business judgment rule protects the board's actions. Therefore, demand is excused under the second prong of the *Aronson* test.

If a review of the actual facts would show that these two aspects of the complaint are in fact and should in

law be treated as completely **1515 independent, then that may be shown in an application for summary judgment. At this stage it seems apparent to me that defendants motion to dismiss should be denied. IT IS SO ORDERED.

> FN1. The complaint itself does not indicate whether the benefits are limited to these two directors; it states simply that the money was to be paid to "certain officers and directors." (Complaint ¶ 8) In this respect the complaint is perhaps intentionally vague. I will accept defendants' characterization of the facts because this statement does not clearly indicate that the agreements benefitted a majority of the directors, and it is plaintiffs burden to so allege. Moreover, the terms "employment and/or severance arrangements," normally refer to agreements with employees, not directors, implying that the severance agreements applied only to the officer-directors.

 1990 WL 154149 (Del.Ch.), Fed. Sec. L. Rep. P 95,664, 16 Del. J. Corp. L. 1508

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.