# APPENDIX
# PART 2

# TAB 4

Not Reported in A.
2000 WL 1664167 (Del.Ch.), 27 Del. J. Corp. L. 659
**(Cite as: 2000 WL 1664167 (Del.Ch.))**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

In re COOPER COMPANIES, INC.
SHAREHOLDERS DERIVATIVE LITIGATION.

No. 12584.

Submitted: July 27, 2000.
Decided: Oct. 31, 2000.

Joseph A. Rosenthal, Esquire, of Rosenthal, Monhait,
Gross & Goddess, P.A., Wilmington, Delaware;
Attorneys for Plaintiffs Other Than Bruce D. Sturman;
and Stephen E. Jenkins, Esquire, of Ashby & Geddes,
Wilmington, Delaware; Attorneys for Plaintiff Bruce
D. Sturman; and Bruce E. Gerstein, Scott W. Fisher
and Jerald M. Stein, Esquires, of Garwin, Bronzaft,
Gerstein & Fisher, L.L.P., New York, New York;
Attorneys for Plaintiffs.

R. Franklin Balotti and Robert J. Stearn, Jr., Esquires,
of Richards, Layton & Finger, Wilmington, Delaware;
Attorneys for Individual Defendants Gary A. Singer,
Steven G. Singer, Brad C. Singer, Dorothy Singer,
Karen Sue Singer, Norma Singer Brandes, Normel
Construction Corp., Brandes and Singer, and Romulus
Holdings, Inc.

A. Gilchrist Sparks, III and William M. Lafferty,
Esquires, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware; Attorneys for Defendant
Cooper Companies.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.

**\*1** These shareholder derivative actions, now
consolidated, were brought on behalf of the Cooper
Companies, Inc. ("Cooper" or "the company")
beginning in 1992. Despite the eight year pendency of
this litigation, the case has not advanced beyond the
pleading stage. The three successive complaints were
the subject of three separate motions to dismiss. The
plaintiffs' response to each motion was to amend their
complaint. The defendants have moved to dismiss the
current complaint; *i.e.,* the Consolidated and Amended
Complaint, and the plaintiffs have responded by
moving for leave to amend to file a proposed Second
Consolidated and Amended Complaint (the

"Complaint") to which was later added a proposed
Supplement (the "Supplement"). The defendants
oppose the motion to amend on the ground that even if
allowed, the amended pleading would be dismissible
for (i) failure to comply with the demand and pleading
requirements of Court of Chancery Rule 23.1 and (ii)
failure to state a cognizable claim under Rule 12(b)(6).
Thus, the defendants have moved to dismiss both the
current complaint as well as the proposed amended
complaint if the amendment is allowed.

Given the nature of the defendants' opposition to the
amendment, I conclude that considerations of judicial
efficiency favor granting the motion for leave to
amend, leaving for decision on the pending Motion to
Dismiss the amended pleading. Accordingly, this
Opinion addresses that dismissal motion which, for the
reasons next set forth, will be denied.

I. PROCEDURAL HISTORY AND RELEVANT
PLEADED FACTS

A. Procedural History

This case, whose procedural history has been erratic,
is one of the older matters on this Court's docket. In
May 1992, three shareholders of Cooper filed separate
derivative actions against certain members of Cooper's
board of directors. Those actions were later
consolidated, and a motion to dismiss the complaint,
accompanied by a brief, was filed but never responded
to.

For the next three years nothing was done to prosecute
the case, until the spring of 1995, when the parties
reached an agreement in principle to settle the matter.
That agreement was later broadened to include a
derivative action that had been filed separately in New
York in June 1995 by plaintiff Bruce D. Sturman
("Sturman"). Thereafter, the case lay dormant until
April 30, 1996, when the parties filed formal settlement
papers. A settlement hearing was held on July 1, 1996,
and thereafter, the parties made additional submissions
in support of the settlement. After the Court informally
advised counsel that it was not inclined to approve the
settlement as then structured, counsel informed the
Court, on January 10, 1997, that they had decided not
to proceed with the settlement.

Thereafter, the plaintiffs filed a motion for partial
summary judgment against defendant Gary A. Singer
("Gary Singer"), but they never prosecuted that motion.
For another ten months the case lay dormant until
December 1997, when the Court entered an order

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

consolidating the Sturman action with the previously consolidated action, and the plaintiffs filed a Consolidated and Amended Complaint.

*2 The defendants moved to dismiss that complaint in January 1998. Rather than respond to that motion, the plaintiffs moved for leave to file a Second Consolidated Amended Complaint on February 15, 1999. Thereafter, the plaintiffs once again put the case on the back shelf, not filing an opening brief in support of their Motion to Amend until January 24, 2000. At that time the plaintiffs also sought leave to file a "Supplement" to the Second Consolidated Amended Complaint.

Thereafter, all parties filed a Stipulation and Order providing for the dismissing all defendants other than Gary Singer, Steven G. Singer ("Steven Singer"), Brad C. Singer ("Brad Singer"), Romulus Holdings, Inc. ("Romulus"), and the nominal defendant Cooper. The individual defendants are the moving parties on the pending dismissal motion.

B. Pertinent Pleaded Facts

What follows are the nonconclusory facts asserted in the Complaint, including the Supplement.

Cooper is a Delaware corporation based in Pleasanton, California. At the time the initial complaints in these consolidated derivative actions were filed, Cooper's Board of Directors consisted of 10 members, three of whom were brothers, namely: (1) Gary Singer, who was a co-chairman of the Board, (2) Steven Singer, who was also an officer, and (3) Brad Singer. The other directors were (4) Joseph C. Feghali ("Feghali"), who was Steven Singer's father-in-law; (5) Arthur Bass ("Bass"); (6) Robert S. Weiss ("Weiss"), who was Cooper's Chief Financial Officer and Treasurer; (7) Robert S. Holcombe ("Holcombe"), who was Cooper's Vice President and General Counsel; (8) Warren J. Keegan ("Keegan"); (9) Michael H. Kalkstein ("Kalkstein") and (10) plaintiff Bruce Sturman ("Sturman"), who was a co-chairman of the Board in May 1992. Defendant Romulus is a Delaware corporation whose shareholders were the Singer brothers and other Singer family members.

1. The Allegations of Wrongful Conduct

The alleged wrongdoing involves a scheme by the Singers and others to profit from the purchase and sale of bonds based on inside information. According to the Complaint, beginning in February 1991, Gary Singer

and G. Albert Griggs ("Griggs"), a bond analyst with Keystone Custodian Funds, Inc. ("Keystone") agreed that Gary Singer would cause Cooper to pay Griggs substantial funds in return for (a) informing Gary Singer in advance of the names, proposed prices, face amount, and intended purchase dates of the high-yield bonds Griggs was recommending that Keystone purchase; and then (b) causing Keystone to purchase those bonds from Cooper and the Singer family. This scheme (the "trading scheme") was perpetrated fifteen times between March 1991 and January 1992. As a result, Cooper and other Singer-controlled entities (including Romulus) purchased $78 million of high-yield bonds during that nine month period, from which Griggs and the Singers realized profits of $3,053,692. Of that amount the Singer interests received $1,757,286.

*3 During this period, efforts were made to conceal the trading scheme. In June 1991, Griggs recruited John D. Collins ("Collins") to act as an intermediary for the money and information passing between himself, and Gary Singer and Cooper. In late September 1991, at a meeting at Gary Singer's home, Gary Singer, Steven Singer, Griggs, and Collins discussed the need to craft a written consulting agreement, and to receive written research reports from Collins relating to the high yield bonds that were subject to the trading scheme. The purpose was to create a pretext for Cooper making the payments to Collins. After the meeting, Griggs asked Gary and Steven Singer to conduct all of their future discussions concerning monies to be paid in the trading scheme, with Collins.

In October 1991, Collins incorporated Back Bay Capital, Inc. ("Back Bay"), a corporation of which Collins was identified as the President and sole shareholder. Gary Singer then caused Cooper to enter into a consulting agreement with Back Bay. That agreement provided for "incentive compensation" (to be determined by Cooper in its sole discretion) for bond investment recommendations that resulted in gains to Cooper. The consulting agreement also provided for a $420,000 "one time all inclusive fee" as purported compensation for all past services rendered by Collins and Back Bay, plus an annual $100,000 "base fee."

Between February 1991 and February 1992, Gary Singer caused Cooper to pay approximately $730,000 to Griggs, Collins and Back Bay as "consulting fees." The Complaint alleges that the Singer-controlled directors caused Cooper to fail to disclose these

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
**(Cite as: 2000 WL 1664167, \*3 (Del.Ch.))**

affiliated transactions, which involved the Singer family, in its annual report. Moreover, in press releases sent to Cooper's shareholders, those directors misrepresented information relating to the trading scheme.

The Complaint alleges that the Singer family and affiliates realized profits of not less than $1,757,286 from the fraud. Cooper itself realized net profits of about $500,000, but the cost of the trading scheme to Cooper far outweighed the benefits. The reason is that in January 1992, the United States Securities and Exchange Commission (the "SEC") began an investigation that embroiled the Company in civil and criminal lawsuits that ultimately cost Cooper millions of dollars in fines and restitution. In response to subpoenas issued to them to testify during the SEC investigation, Gary and Steven Singer refused to answer questions about the trading scheme, and asserted their Fifth Amendment privilege against self-incrimination. They also refused to be interviewed by Cooper's independent counsel in Cooper's own internal investigation.

The Complaint alleges that all of Cooper's directors were aware of the SEC's investigation by the end of January 1992, yet they continued to entrust Gary Singer with the authority to manage personally Cooper's multimillion dollar securities portfolio. Moreover, on February 11, 1992, only four days after Steven Singer had invoked his Fifth Amendment privilege, the Board formally elected Steven to the position of Chief Operating Officer.

**\*4** In May 1992, the SEC and the United States Attorney for the Southern District of New York filed civil and criminal charges. On May 21, 1992, Collins and Griggs entered guilty pleas in the United States District Court for the Southern District of New York to criminal charges arising out of the SEC and criminal investigations of the trading scheme. As part of the plea arrangement, Griggs identified Gary Singer as the person who had caused Cooper and the Singer family to enter into the trading scheme and to make the above-described payments. Also, the SEC began--and later settled--a civil action against Griggs and Collins arising out of the trading scheme. The plaintiffs allege that despite those developments, Steven Singer caused Cooper's public relations officer to disseminate a press release that falsely and misleadingly denied "any knowledge of wrongdoing on the part of [Cooper's] officers or employees."

At the end of May 1992, Gary Singer agreed to take a

"temporary leave of absence," but the Board continued to cause the Company to pay his compensation and all other benefits under his employment contract. Gary Singer was also allowed to serve out his term as a director and to participate in board meetings through the end of July 1992, when his salary was terminated. After (and despite) Gary Singer's termination, the Board determined that Cooper would continue to underwrite his medical and life insurance, and to provide him with office space, secretarial and support services and an automobile--benefits worth approximately $80,000 per year. Gary Singer continued to receive those benefits until shortly after he was convicted, on January 13, 1994, of twenty-one counts of money laundering, mail and wire fraud, and violating the Racketeer Influenced and Corrupt Organizations Act. Cooper was also convicted on six counts of mail fraud and one count of wire fraud, and was required to pay $1,319,166 in restitution to Keystone, plus a $1,831,568 fine.

On May 21, 1992, the day that Collins and Griggs pled guilty to the criminal charges, directors Sturman and Warren Keegan called an emergency special meeting of the Cooper board of directors for 12 noon on May 26, 1992. The purpose of the meeting was to consider the responses required by the Griggs and Collins guilty pleas, by the SEC action against Collins and Griggs, by Griggs' identification of Gary Singer as his co-conspirator, and the effect of these matters on Cooper. Also to be considered were potential remedial measures such as the discharge of those responsible and the filing of appropriate litigation.

On May 22, 1992, Brad Singer and director Holcombe responded to Sturman and Keegan, that a "majority of the Board will not be available," purportedly because of the need to attend previously scheduled management meetings on the West Coast. On May 26, 1992, only plaintiff Sturman and Mr. Keegan attended the telephonic board meeting, which failed for want of a quorum. [FN1]

> FN1. The complaint alleges that Brad Singer and Mr. Holcombe called a special meeting for two days later--Thursday, May 28, 1992. The complaint does not disclose whether the May 28th meeting took place or, if so, what happened at that meeting.

2. The Causes of Action

**\*5** The Complaint alleges three derivative causes of action. The First Cause of Action charges defendants Gary, Steven, and Brad Singer with breaching their

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

fiduciary duties to Cooper, by causing it to enter into illegal and imprudent transactions at Cooper's expense for the financial profit of the Singer family, including themselves. The Complaint also claims that Romulus was a "participant [ ] in, principal[ ] of, and beneficiar[y] of those fiduciary breaches, and [was] wrongfully enriched therefrom and thereby."

In their Second Cause of Action, plaintiffs claim that as a result of those fiduciary breaches, Gary, Steven, and Brad Singer, as well as Romulus, are jointly and severally liable to Cooper to account for, and disgorge to Cooper, all profits made by members of the Singer family and their affiliates.

In their Third Cause of Action, the plaintiffs claim that Gary Singer breached his fiduciary duty to Cooper by having the Singer family purchase high yield bonds based on investment advice that Cooper paid for, thereby enabling the Singer family to realize profits of not less than $1,757,286 on the purchase and resale of the bonds "recommended" to Cooper. The plaintiffs further claim that Steven and Brad Singer and Romulus were participants in, and beneficiaries of, Gary Singer's fiduciary breach and were wrongfully enriched thereby.

Lastly, the plaintiffs claim that a demand upon the Board would have been futile, because a majority of Cooper's board of directors were either interested in the wrongs complained of or lacked the requisite independence to consider a demand impartially. Plaintiffs allege that the futility of making a demand is further evidenced by the unwillingness of the Singer-dominated directors to attend the special board meeting that Sturman and Keegan attempted to convene, and by their refusal to acknowledge or address the serious problems caused by the Singer directors' self-dealing.

## II. THE PARTIES' CONTENTIONS, THE APPLICABLE STANDARD, AND THE PERTINENT ISSUES

The defendants raise two separate grounds for dismissal. The first is that the Complaint should be dismissed in its entirety for failure to comply with the demand requirements of Court of Chancery Rule 23.1. The second is that the plaintiffs' claims, contained in both the Complaint and the Supplement, should be dismissed for failure to state a claim upon which relief can be granted. [FN2]

> FN2. The defendants also advance the separate argument that the Supplement should be dismissed because it is barred by the

plaintiffs' undue delay.

To have standing to maintain a derivative action under Rule 23.1, a plaintiff must first make a demand on the board to redress the wrong being complained of, or demonstrate that a demand should be excused as futile. [FN3] Because the plaintiffs did not make a demand upon the Cooper board, they must establish that a demand would have been futile. [FN4] To establish futility, the plaintiff must plead with particularity facts that create a reasonable doubt (*i.e.,* a reason to doubt) that (i) a majority of the directors were disinterested and independent, or that (ii) the challenged action was otherwise the product of a valid business judgment. Demand futility is to be determined solely from the well-pled allegations of the Complaint. [FN5]

> FN3. *Kaplan v. Peat, Marwick, Mitchell & Co.,* Del.Supr., 540 A.2d 726, 730 (1988).

> FN4. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

> FN5. *Aronson,* 473 A.2d at 814-17. In this context, the term "reasonable doubt" means, "reason to doubt." *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1217 (1996).

*6 In this case, the plaintiffs claim that demand would have been futile because a majority of the directors were not disinterested or independent, and therefore could not have impartially considered a demand. Thus, the issue posed by the Rule 23.1 motion is whether the particularized factual allegations of the Complaint create a reason to doubt that a majority of Cooper's board of directors were disinterested and independent. That issue is addressed in Part III A of this Opinion.

The defendants also move to dismiss the plaintiffs' claims against most of the defendants under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In considering a Rule 12(b)(6) motion to dismiss, the Court assumes the truth of the well-pled allegations of the complaint, giving the plaintiff the benefit of all reasonable inferences that can be drawn from the pleading. Conclusory statements without supporting factual averments will not be accepted as true for purposes of a motion to dismiss. [FN6]

> FN6. *Grimes v. Donald,* 673 A.2d at 1213-14

Specifically, the defendants contend that (i) the First

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                                                    **Page 5**
**(Cite as: 2000 WL 1664167, \*6 (Del.Ch.))**

and Third Causes of Action should be dismissed as against Brad Singer and Romulus, (ii) the Second Cause of Action should be dismissed as against all of the individual defendants, and (iii) the proposed Supplement should be dismissed because the plaintiffs unduly delayed in filing it, and because the Supplement fails to state a claim against Romulus. These arguments are addressed in Part III B of this Opinion.

### III. ANALYSIS
A. The Rule 23.1 Motion

I turn first to the Rule 23.1-related question of whether the Complaint must be dismissed for failure to plead demand futility. That question reduces to the issue of whether the Complaint's particularized allegations create a reason to doubt that a majority of Cooper's directors, at the time these suits were filed, were disinterested and independent. Of the ten directors on Cooper's Board, the plaintiffs concede that three-- Messrs. Keegan, Kalkstein, and Sturman--were disinterested and independent. Thus, to establish demand futility, the plaintiffs must show a reason to doubt the disinterestedness and independence of at least five of the remaining seven directors.

In the case of Gary, Steven, and Brad Singer, that showing is made because the Complaint alleges with sufficient particularity that each of them profited, directly or indirectly, from the wrongful scheme, and that Gary and Steven Singer directly participated in the wrongdoing. Similarly, the Complaint alleges that director Feghali was interested and/or lacked independence because he was Steven Singer's father in law. That family relationship is sufficient to create a reason to doubt Mr. Feghali's ability to impartially consider a demand. [FN7] That leaves in issue the status of the three remaining directors, Messrs. Weiss, Holcombe, and Bass.

> FN7. *See Mizel v. Connelly,* Del. Ch., C.A. 16638, Strine, V.C., Mem. Op. at 9-11 (July 22, 1999); *Harbor Finance Partners v. Huizenga,* Del. Ch., C.A. No. 14933, Strine, V.C., Mem. Op. at 21-22 (Nov. 17, 1999). In their brief the defendants assume *arguendo,* and thus do not contest, that the Singers and Mr. Feghali cannot be deemed disinterested and/or independent. (Individual Def. Ans. Br. at 15).

To resolve this motion I need consider only Messrs. Weiss and Holcombe, both of whom were members of senior management. Mr. Weiss was Cooper's Chief Financial Officer and Treasurer; Mr. Holcombe was

Vice President and General Counsel. The Complaint alleges that they "owed their positions and their livelihood to maintaining the good will of the Singer directors."

\*7 The defendants argue that these facts are insufficient to create a reasonable doubt as to these two directors' disinterest and independence, because there is no allegation that the Singers, either individually or collectively, had the corporate authority unilaterally to terminate the their employment or otherwise cause Cooper to do so. I cannot agree. To be sure, an allegation that the Singers had the authority to discharge Holcombe and Weiss would have been amply sufficient to create the requisite reasonable doubt. But, that level of specificity is not, at least in these circumstances, indispensable, because it is reasonable to infer from the fact that Gary Singer was Messrs. Weiss's and Holcombe's corporate superior, that he (Gary) was in a position to exercise "considerable influence" over them. [FN8] That inference, coupled with the allegation that Messrs. Weiss and Holcombe were among the directors who (along with the Singers) absented themselves from the emergency meeting called by Sturman and Keegan, creates reason to doubt that Weiss and Holcombe could have responded impartially to a demand.

> FN8. *Mizel v. Connelly, supra; Rales v. Blasband,* Del.Supr., 634 A.2d 927, 937 (1993); see also *Steiner v. Meyerson,* Del. Ch., C.A. No. 13139, Allen, C., Mem. Op. at 4, 22-23 (July 18, 1995) (Chairman and CEO who, although not a controlling stockholder, "was in a position to exert 'considerable influence' ' over a director who was the company's President, Chief Operating Officer and Chief Financial Officer, thereby disabling the subordinate from impartially considering a demand adverse to the CEO's interests).

Because the Complaint creates a reason to doubt the disinterest and/or independence of a majority of Cooper's board, the plaintiffs have demonstrated demand futility. Accordingly, the motion to dismiss under Rule 23.1 will be denied.

Having determined that this lawsuit may proceed as a derivative action, I next turn to the issue of whether the plaintiffs have stated cognizable claims for relief.

B. The Rule 12(b)(6) Motion

In support of their Rule 12(b)(6) motion, the defendants first contend that the First and Third Causes

Not Reported in A.
(Cite as: 2000 WL 1664167, *7 (Del.Ch.))

of Action should be dismissed as against Brad Singer and Romulus. In their First Cause of Action the plaintiffs claim that the individual defendants caused Cooper to enter into the trading scheme at Cooper's expense for the financial profit of the Singer family, including themselves. In their Third Cause of Action the plaintiffs claim that (i) Gary Singer breached his fiduciary duty to Cooper by having the Singer family purchase high yield bonds based on investment advice that Cooper had paid for, and that (ii) Steven Singer, Brad Singer, and Romulus participated in and benefited from Gary Singer's breach and were wrongfully enriched thereby. The defendants argue that those Causes of Action state no claims against Brad Singer, because the Complaint fails to allege that Brad Singer played any role in, or even knew of, the illegal securities transactions. They also contend that those Causes of Action must be dismissed as against Romulus, because (in defendants' words) "they do not plead any comprehensible claim."

The defendants also seek the dismissal of the Second Cause of Action, as against all of the individual defendants. That Cause of Action alleges that the Singers and Romulus are jointly and severally liable to Cooper to account for, and disgorge to Cooper, all profits made by the Singer family and their affiliates as a result of their fiduciary breaches. The defendants argue that the Second Cause of Action does not state a claim because "joint and several liability is a theory of damages recovery, not a cause of action." [FN9]

FN9. Individual Def. Ans. Br. at 36.

*8 Lastly, the defendants argue that the Supplement must be dismissed because (i) the defendants unduly delayed in filing it, and because in any event, (ii) the Supplement fails to state a claim against Romulus.

These arguments are addressed in reverse order.

1. The Supplement

The defendants object to the Supplement on the ground that it fails to state a claim against Romulus and that its inclusion in the Complaint is untimely and would unfairly prejudice them. The short answer is that the Supplement does not purport to state a new claim against Romulus, and the inclusion of its contents would not be prejudicial.

The Supplement adds to the Complaint one paragraph (¶ 14(a)) that fleshes out the factual allegations specific to Romulus. The plaintiffs concede that the

Supplement does not state a new cause of action against Romulus or otherwise change the essential thrust of the (first) Consolidated and Amended Complaint, which alleges that Romulus was used as a vehicle to conduct the trading scheme and receive the illicit profits therefrom.

Given that concession, the motion to dismiss the Supplement is without merit.

2. The First and Third Causes of Action

(a) Claims Against Romulus

The Complaint alleges that at the time of the discussions among Gary Singer, Griggs, and Collins concerning the fictitious "consulting agreement," Steven Singer reconstituted his wholly-owned corporation, Romulus. Steven did that to facilitate the trading scheme and funnel the illicit profits to family members. Initially, Steven was Romulus's sole stockholder and director, but after he reconstituted Romulus, Steven distributed blocks of its stock to various Singer family members. Thereafter, from September 1991 to February 1992, Romulus became the principal vehicle for trades made in the trading scheme and realized illicit profits of over $1 million.

Based on these allegations, the plaintiffs argue that the Complaint states a claim against Romulus because it alleges that Steven Singer reconstituted Romulus, and then used that entity to engage in the trading scheme, rather than have Steven himself directly participate, receive the profits, and then write checks to his family members under his own name.

I agree. To the extent Steven's alleged participation in the trading scheme would constitute a breach of his fiduciary duty as a Cooper director, [FN10] Steven could not escape liability for that conduct by interposing a newly-created corporate vehicle to engage in the same conduct and, as a consequence, conceal Steven's personal involvement. Moreover, to the extent the profits from the wrongful scheme were diverted to that corporate vehicle, that entity would be liable to the same extent as the individual fiduciary who controlled and hid behind it. To achieve that result, in such circumstances the fiduciary obligations of the person who forms and controls the entity are deemed to be attributed to the entity itself. [FN11]

FN10. The defendants do not contend that the Complaint fails to state a claim against Steven Singer.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                                    Page 7
(Cite as: 2000 WL 1664167, *8 (Del.Ch.))

FN11. *See Barbieri v. Swing-N-Slide Corp.,* Del. Ch., C.A. No. 14239, Steele, V.C., Mem. Op. at 7-8 (Jan. 29, 1997). Although Steven Singer is alleged to have parceled out interests in Romulus to his family members instead of owning 100% of Romulus himself, that does not preclude the existence of a claim against Romulus, because the inference from the alleged facts is that Steven controlled Romulus and determined how its business would be conducted and who would reap the rewards from the trading scheme.

*9 I conclude, therefore, that the Complaint states cognizable claims against Romulus.

(b) Claims Against Brad Singer

Lastly, the defendants contend that the First and Third Causes of Action should be dismissed against Brad Singer, because the Complaint fails to allege any facts from which it can reasonably be inferred that Brad Singer participated in, or even knew about, the transactions complained of. I cannot agree.

The Complaint alleges that in September 1991, Steven Singer (i) transferred to Brad Singer ten shares (of seventy shares outstanding) of Romulus, which until February 1992 was the principal vehicle for trades made in the scheme and (ii) realized over $1 million in illicit profits. Thus, the Complaint may fairly be read to allege that Brad Singer was an indirect recipient of the illegal diversions to Romulus, and that he wrongfully participated in the trading scheme (First Cause of Action), for which he, as a Cooper fiduciary, must account to Cooper for his profits (Second Cause of Action) and for his unjust enrichment (Third Cause of Action).

The defendants' argument that the Complaint does not allege that Brad Singer knew of the scheme or that he was benefiting from it, ignores the fact that Brad's knowledge may be inferred from the facts that are alleged. Brad Singer was a brother of Gary and Steven Singer, who are charged with having engineered the scheme. Brad, like his brothers, was also a director of Cooper. To accept the defendants' position, the Court would have to conclude from the Complaint as a matter of law that either (i) Brad Singer never spoke with his brothers at family gatherings about Romulus and its (alleged) role in the scheme to enrich the Singer family, or (ii) that information was concealed from Brad by his brothers, who in so doing made Brad an unwitting accomplice. On a fully developed record, either scenario may turn out to be the fact, but at this procedural stage the Court is not required to assume such improbable conclusions. On the contrary, because all reasonable inferences must be resolved in plaintiffs' favor, it may be inferred that Brad Singer discussed Romulus's activities and finances with his brothers and informed himself of Romulus's (and his) newly-found sources of cash.

Accordingly, I conclude that the plaintiffs have stated cognizable claims against Brad Singer for having knowingly participated in the trading scheme, and/or for having knowingly received illicit profits from a wrongful scheme that harmed Cooper, of which Brad Singer was a fiduciary.

3. Second Cause of Action

Lastly, the defendants contend that the Second Cause of Action should be dismissed as against all of the individual defendants, because the claim it asserts--that the Singers and Romulus are jointly and severally liable to account for and disgorge to Cooper all profits made by the Singers and their affiliates from the trading scheme--is a theory of damages recovery, not a cause of action.

*10 The difficulty in assessing this argument is that the plaintiffs do not frontally respond to it. The only reference in their brief to their Second Cause of Action is found on page 6 of their Reply Brief, where they contend that Brad Singer, while a fiduciary, "benefitted, directly or indirectly, from the [trading] scheme and should account to Cooper for its profits (Second Cause of Action)."

From this I infer that the primary thrust of the claim being advanced in the Second Cause of Action is restitution; *i.e.,* that the defendants have a duty to account to Cooper for their unjustly received profits. As thus viewed, the Second Cause of Action states a cognizable claim. Insofar as the Second Cause of Action also alleges that the individual defendants are jointly and severally liable, that does (as the defendants argue) plead a theory of damages recovery, but even so, it does not make the primary claim dismissible.

The Second Cause of Action states a cognizable claim and will not be dismissed.

IV. CONCLUSION

For the reasons discussed, the defendants' Motions to Dismiss are denied. IT IS SO ORDERED. Given the procedural history of this case, plaintiffs' counsel are

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                                                    **Page 8**
**(Cite as: 2000 WL 1664167, \*10 (Del.Ch.))**

directed to prosecute it with prompt diligence.

 2000 WL 1664167 (Del.Ch.), 27 Del. J. Corp. L. 659

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Not Reported in A.
1999 WL 33318823 (Del.Ch.)
**(Cite as: 1999 WL 33318823 (Del.Ch.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

In the Matter of FIRST WOBURN BANCORP., INC.

No. Civ.A. 13725.

Oct. 5, 1999.

ORDER DENYING MOTION TO INTERVENE AND MOTION IN OPPOSITION TO PETITION TO EXTEND EXISTENCE

STEELE, Vice Chancellor.

**\*1** IT IS ORDERED this 5 th day of October, 1999 that:

1. On August 13, 1999, this Court issued an Order extending the existence of First Woburn Bancorp, Inc. ("First Woburn") for two years for the purpose of winding up the affairs of the corporation.

2. On August 13, 1999, Mr. Walter Carucci, a shareholder of First Woburn, filed a Motion to Intervene and a motion in Opposition to Petition to Extend the Existence of First Woburn.

3. In the latter motion, Mr. Carucci asks this Court to modify its August 13, 1999 Order by ordering that First Woburn shall only have an additional three months, instead of the two years provided in the Order, in which to wind up the affairs of the corporation.

4. Mr. Carucci argues First Woburn and its Court-appointed receiver ("Receiver") are needlessly delaying final liquidation; and that a more expeditious conclusion would reduce fees paid, leaving more assets available for distribution to the shareholders.

5. The Receiver maintains that it is in the best interest of First Woburn and its shareholders for First Woburn to reach a "closing agreement" with the Internal Revenue Service ("I.R.S.") before final dissolution. Apparently, this task can take some time, and it was with this constraint in mind that the August 13, 1999 Order issued allowing two years for dissolution.

6. While this Court sympathizes with Mr. Carucci and the other shareholders who have now waited many years for disbursement of First Woburn's remaining assets, the Receiver's decision to seek a closing agreement from the I.R.S., while perhaps debatable, has the *prima facie* protection of the business judgment rule.

7. The Receiver's decision is entitled to the protective presumption of the business judgment rule in the absence of any persuasive evidence of bad faith, self-dealing, gross negligence, or any other reason justifying removal of that protection.

8. Accordingly, there is no basis for this Court to substitute its own judgment for that of the Receiver.

9. The motion to intervene is *denied*.

10. The motion opposing the extension is *denied*.

IT IS SO ORDERED

1999 WL 33318823 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Not Reported in A.
2003 WL 139768 (Del.Ch.)
**(Cite as: 2003 WL 139768 (Del.Ch.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

In re NATIONAL AUTO CREDIT, INC.
SHAREHOLDERS LITIGATION

No. Civ.A. 19028.

Submitted March 8, 2002.
Decided Jan. 10, 2003.

Norman M. Monhait, of Rosenthal, Monhait, Gross &
Goddess, P.A., Wilmington, Delaware; Brian P.
Glancy, of Hughes Sisk & Glancy, P.A., Wilmington,
Delaware; Goodkind Labaton Rudoff & Sucharow
LLP, New York, New York; Harnes Keller LLP, New
York, New York, for Plaintiffs.

Edward P. Welch, and Julie A. Tostrup, of Skadden,
Arps, Slate, Meagher & Flom, LLP, Wilmington,
Delaware; Jonathan J. Lerner, of Skadden, Arps, Slate,
Meagher & Flom LLP, New York, New York; Herbert
F. Kozlov, of Parker Duryee Rosoff & Haft, New
York, New York, for Defendants James J. McNamara,
John A. Gleason, William S. Marshall, Henry Y.L.
Toh, Donald Jasensky, Peter T. Zackaroff, Mallory
Factor and Thomas F. Carney, Jr.

Barry M. Klayman, of Wolf, Block, Schorr and Solis-
Cohen, LLP, Wilmington, Delaware, for Nominal
Defendant National Auto Credit, Inc.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

**\*1** At issue are motions to dismiss the operative
complaint (the "Complaint") in this consolidated
derivative action brought on behalf of Nominal
Defendant National Auto Credit, Inc. ("NAC"), a
Delaware corporation. [FN1] The Plaintiffs contend
that members of NAC's board of directors (the
"Board") committed corporate waste and breached
their fiduciary duties of care and loyalty by entering
into a series of interlocking transactions, approved at a
December 15, 2000, Board meeting (the "Meeting").
Furthermore, the Plaintiffs seek to rescind the
agreement to acquire ZoomLot Corporation
("ZoomLot"), approved by the Board at the Meeting

(the "ZoomLot Agreement").

> FN1. This litigation originated with three
> derivative actions: *Academy Capital
> Management, Inc. v. McNamara,* C.A. No.
> 19028 (filed July 31, 2001); *Markovich v.
> McNamara,* C.A. No. 19061; and *Harbor
> Finance Partners v. McNamara,* C.A. No.
> 19087. Pursuant to the Order of
> Consolidation, the complaint in *Academy
> Capital Management v. McNamara,* C.A. No
> 19028, was "deemed the operative complaint
> in the consolidated action." Defendants were
> not required to respond to the complaints filed
> in the other actions.

The Defendants have moved to dismiss the Complaint
on several grounds. First, they contend that the
Complaint must be dismissed because the Plaintiffs
have failed to satisfy the pre-suit demand requirements
imposed by Court of Chancery Rule 23.1. The
Defendants also urge a dismissal of the Complaint
pursuant to Court of Chancery Rule 12(b)(6) for failure
to state a claim for corporate waste or breach of
fiduciary duty upon which this Court can grant relief.
Finally, the Defendants assert that the Plaintiffs'
application to rescind the ZoomLot Agreement must be
dismissed pursuant to Court of Chancery Rule 19 for
failure to join indispensable parties.

For the reasons that follow, I deny the Defendants'
motions to dismiss, under Court of Chancery Rule
23.1, because demand was futile and thus excused. In
addition, I also deny the Defendants' motions to
dismiss, under Court of Chancery Rule 12(b)(6), the
Plaintiffs' claims for breach of the duty of loyalty and
for corporate waste. However, I grant the Defendants'
motions to dismiss, under Court of Chancery Rule
12(b)(6), the Plaintiffs' claim for breach of the duty of
care and the Defendants' motions to dismiss, pursuant
to Court of Chancery Rule 19, the Plaintiffs'
application for rescission of the ZoomLot Agreement.

I. FACTUAL BACKGROUND [FN2]

> FN2. The factual background is taken from
> the well-pleaded allegations of the Complaint.
> *White v. Panic,* 783 A.2d 543, 548 n. 5
> (Del.2001).

A. *The Parties*

Plaintiffs Academy Capital Management, Inc., Harbor
Finance Partners, and Levy Markovich (collectively,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
(Cite as: 2003 WL 139768, *1 (Del.Ch.))

the "Plaintiffs") are common stockholders of NAC and have continuously held shares of NAC common stock at all relevant times. The Complaint challenges the adoption at the Meeting of three resolutions (approving an employment agreement for NAC's Chairman and Chief Executive Officer, authorizing the ZoomLot Agreement, and awarding to the directors compensation for past services in addition to increasing their directors' fees) (collectively, the "Resolutions"), each allegedly approved as a *quid pro quo.*

NAC's executive offices are in Solon, Ohio. NAC stock trades on the OTC Bulletin Board. [FN3] Until March 2000, NAC primarily "invested in sub-prime used automobile consumer loans it purchased from used car dealerships." [FN4] However, as explained subsequently, NAC, under the leadership of Defendant James J. McNamara ("McNamara") and the Board, would radically alter its core business activity and the composition of the Board.

> FN3. As of July 31, 2001, NAC's market capitalization had dropped to $2.9 million. The Plaintiffs note that the market price for common shares of NAC was significantly and consistently undervalued in comparison to NAC's book value or liquidation value. Compl. ¶ 3.

> FN4. *Id.*

*2 McNamara has been Chairman and CEO of NAC since the Meeting in December 2000. [FN5] Between November 3, 2000, and the Meeting, McNamara served as interim Chairman and CEO. McNamara also heads the Board's Special Committee, which manages the business and affairs of NAC, and serves on the Board's Compensation Committee, which reviews compensation of NAC officers. He has been a director of NAC since February 1998.

> FN5. McNamara also served as Chairman of NAC from April 1998 to November 1999.

The other defendants are those directors present at the Meeting who approved the Resolutions. They, and their dates of service as NAC directors, are: John A. Gleason ("Gleason"), February 1998 to September 1999, and November 3, 2000, to present; William S. Marshall ("Marshall"), 1983 to 1993, March 1998 to September 28, 1999, and November 3, 2000, to present; Henry Y.L. Toh ("Toh"), December 1998 to present; Mallory Factor ("Factor"), December 15, 2000, to present; [FN6] Thomas F. Carney ("Carney"), December 15, 2000, to present; Donald Jasensky

("Jasensky"), November 1999 to present; [FN7] and Peter T. Zackaroff ("Zackaroff"), November 1999 to present (collectively, including McNamara, the "Defendant Directors"). None of the Defendant Directors, except for McNamara, Zackaroff, and Jasensky, was elected by shareholders of NAC; instead, they were appointed by the other Defendant Directors. [FN8] The terms of McNamara, Factor, and Gleason, as Class III directors, had expired prior to the Meeting. [FN9] At the time of the filing of the Complaint, NAC had last held an annual stockholders' meeting in September 1999. [FN10]

> FN6. Factor also is the owner of Mallory Factor, Inc., a stock-promoting firm that has conducted business, in the form of investor relations services, with NAC since April 2000. Additionally, Mallory Factor, Inc., has subleased property to NAC which will serve as NAC's new executive offices.

> FN7. Jasensky is also the President of Automotive Personnel LLC, a company that provided placement services to NAC in 1998 and 2000.

> FN8. Compl. ¶ 5(b). McNamara, Zackaroff, and Jasensky were elected by written consent.

> FN9. *Id.* ¶ 5(c).

> FN10. *Id.* ¶ 5(d).

Though not named as a defendant in this consolidated action, Ernest C. Garcia, Jr. ("Garcia") is a central figure in the events surrounding NAC and any alleged wrongdoing by the Defendant Directors, in particular any by McNamara. Garcia, with his affiliates, formed ZoomLot Corp. in March 2000. In a transaction that allegedly occurred in mid-1999, McNamara directed NAC to pay Garcia $1,000,000 for an option to purchase all of his holdings in NAC stock (the "Garcia Option"). Garcia then granted Defendant Director Toh a proxy to vote all of Garcia's NAC shares. The Garcia Option was extended for another 120 days on June 24, 1999, for additional consideration of $500,000, and later re-extended for another 120 days on August 8, 1999, for an additional $1,000,000. NAC exercised its rights under the Garcia Option on November 22, 1999, and paid to Garcia $2,274,445 for his 2,849,630 shares subject to the Garcia Option. [FN11] As will be discussed, Garcia, as the holder of the Garcia Option, allegedly played a key role in McNamara's 1999-2000 struggle for control of NAC. Even after McNamara acquired control of NAC, Garcia's dealings with NAC

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
(Cite as: 2003 WL 139768, *2 (Del.Ch.))

were not yet over.

FN11. *Id.* ¶ 29.

B. *The History of NAC, Before December 15, 2000.*

The issues before the Court principally concern the adoption of the Resolutions at the Meeting. However, to understand fully their adoption and my ultimate disposition of the Defendants' motions, it is necessary to review a broader slice of NAC's troubled history. Therefore, I begin my discussion of NAC several years before the Meeting.

**\*3** NAC is no stranger to litigation. In the past four years, NAC has resolved significant suits concerning possible violations of securities laws and an internal contest for control. In January 1998, NAC found itself involved in class action securities fraud litigation after its auditor, Deloitte and Touche LLP, resigned due to its perceived inability to rely upon management's representations. This litigation ultimately concluded in April 2000 with a $6.5 million settlement. [FN12]

> FN12. The Plaintiffs also note that there were simultaneous investigations by the Securities and Exchange Commission, the United States Attorney for the Northern District of Ohio, and the Federal Bureau of Investigation.

In addition to the securities litigation, NAC was beset by internal strife. The Board, led by McNamara, challenged the supremacy of Sam J. Frankino ("Frankino"), NAC's former chairman and its then-largest shareholder. The Plaintiffs allege that during that conflict, McNamara's entrenchment motive was evidenced by the Garcia Option granted in exchange for the proxy for Garcia's shares given to Toh, who could be trusted to vote those shares in favor of McNamara. [FN13] The factions in this contest for control, which was heavily litigated before this Court, reached a settlement on November 3, 2000. The settlement provided for, *inter alia,* the repurchase by NAC of the shares then held by Frankino and his affiliates for an aggregate price in excess of $35 million, [FN14] the reimbursement of Frankino's significant litigation costs, [FN15] the execution of a standstill agreement between Frankino and NAC, and the release by Frankino of NAC's directors from any and all liability. Most importantly for the McNamara faction, Frankino and his affiliates resigned from the Board.

FN13. Compl. ¶ 29.

> FN14. This equates to an approximate per share repurchase price of $2.25.

FN15. These costs surpassed $2 million.

In the course of dealing with the adverse consequences from the battle for control, the Board also supervised the exit of NAC from its old line of business (investment in consumer automobile loans) and its subsequent entry into unrelated ventures. In March 2000, NAC sold nearly all of its portfolio of automobile loans; thus, at that point, NAC's assets consisted primarily of cash and short-term, highly-liquid investments. [FN16] Then in early April 2000, NAC purchased from Reading Entertainment, Inc., ("Reading") a fifty-percent passive interest in Angelika Film Center, LLC, which operated a multiplex cinema in Manhattan's SoHo district. NAC provided, as consideration, 8.9 million shares of NAC common stock and 100 shares of NAC Series A preferred stock. [FN17] Yet, NAC and Reading were not finished, and their relationship, like that between the feuding blocks of NAC directors, would be altered on November 3, 2000.

FN16. Compl. ¶ 8.

FN17. *Id.* ¶ 9.

Contemporaneously with the settlement reached between the warring factions of the Board, NAC, at McNamara's direction, executed a stock purchase and standstill agreement with Reading. Pursuant to this agreement, "NAC repurchased from Reading 5.2 million (of Reading's 8.9 million) shares of NAC common stock and all of its Series A [preferred stock]." [FN18] Additionally, and perhaps more significantly, Reading accepted a standstill agreement prohibiting Reading and its affiliates from purchasing any more shares of NAC and from altering the composition of the Board until August 31, 2003. Finally, Reading was permitted to designate two members of the Board. [FN19]

> FN18. *Id.* ¶ 11.

> FN19. *Id.* Reading appointed James Cotter ("Cotter") and Scott A. Braly ("Braly").

**\*4** One would think that, given the agreements reached between NAC and Frankino, and those between NAC and Reading, some equilibrium had been achieved. But the composition of the Board

Not Reported in A.                                                              Page 68
(Cite as: 2003 WL 139768, *4 (Del.Ch.))

would again be changed prior to December 15, 2000. On November 3, 2000, NAC's then-Chairman and CEO, David Huber, resigned from those positions, allegedly under pressure from McNamara. McNamara was then chosen to serve as interim Chairman and CEO. [FN20] On November 22, 2000, director Philip Sauder resigned from the Board, again allegedly at the behest of McNamara. [FN21] Thus, much had transpired before the Meeting. However, the events that occurred at the Meeting are the focus of the litigation now before me.

FN20. *Id.* ¶ 12.

FN21. *Id.* ¶ 13.

C. *The Meeting*

On December 11, 2000, the then-members of the Board received an agenda for the Meeting. Slated items included: McNamara's transition to permanent Chairman and CEO of NAC and the attendant change in his compensation, discussion and possible adoption of a business plan, and consideration of several transactions with various third-parties. The draft of the business plan and the materials regarding third-party transactions were first circulated on December 12 and December 12-13, respectively. McNamara's elevation to a position of permanency did not go unchallenged; Cotter, one of the directors designated by Reading, circulated a memo critical of McNamara's background, concluding that McNamara was unqualified to serve in the capacities proposed.

At the beginning of the Meeting, the Board appointed Factor and Carney to fill the vacancies caused by the resignations of Phillip Sauder and David Huber. The Board then deliberated on the merits of the third-party transactions and the terms of a contract for the retention and compensation of McNamara as permanent Chairman and CEO of NAC (the "McNamara Employment Agreement" or the "Employment Agreement"). Also at this time, McNamara proposed awarding the other Defendant Directors supplemental payments in consideration for services previously rendered, granting them stock options and increasing their directors' fees for future services.

During a break, a representative of NAC approached the two directors appointed by Reading, Cotter and Braly, with a proposed buy-out of the remaining NAC common stock held by Reading. This repurchase was conditioned upon the immediate resignations of Cotter

and Braly from the Board and the execution of another standstill preventing future purchases by Reading or its affiliates of any NAC shares. That same day, Reading agreed to surrender "all 4.7 million of [its] remaining NAC shares for $8 million." [FN22] Furthermore, Cotter and Braly tendered their immediate resignations. [FN23]

FN22. *Id.* ¶ 20. Thus, NAC ultimately repurchased 9.9 million shares from Reading for $16 million, an approximate per share price of $1.60. I acknowledge that the aggregate number of shares claimed to have been repurchased from Reading (9.9 million) does not equal the number of shares allegedly transferred to Reading in consideration for the 50% passive interest in Angelika Film Center, LLC (8.9 million).

FN23. *Id.*

While these actions cast a shadow over the discernible motives of the Board and its "leader" McNamara in the controversy now before me, the Plaintiffs principally complain of the Resolutions adopted at the Meeting.

D. *The Resolutions*

The Resolutions adopted by the Board at the Meeting concerned various subjects: the McNamara Employment Agreement, the ZoomLot Agreement, and a compensation package and increase in future directors' fees.

**\*5** The McNamara Employment Agreement secured McNamara's position as CEO until December 31, 2003. For his services, McNamara would be paid an annual base salary of $500,000 and an annual bonus of a minimum of $250,000. Pursuant to the Employment Agreement, McNamara also received: a $750,000 signing bonus; $134,856 for past services rendered; 350,000 shares of NAC common stock; [FN24] an additional 750,000 options; [FN25] and finally, a $1 million bonus, contingent upon the listing of NAC on a "major exchange." In the event of termination of the employment relationship for specified reasons, either by NAC or McNamara, NAC would pay McNamara three times his annual base salary, plus the minimum annual bonus ($250,000) for each year remaining on the Employment Agreement, plus any excise taxes thereon. [FN26]

FN24. This represented approximately 4% of NAC's common stock prior to the approval of

Not Reported in A.
(Cite as: 2003 WL 139768, *5 (Del.Ch.))

the ZoomLot Agreement.

FN25. The options have a 10-year duration, and a strike price equal to NAC's share price at the time of the grant, or $0.664. These options represented approximately 8.5% of the common stock of NAC prior to the approval of the ZoomLot Agreement.

FN26. Compl. ¶ 24.

At the Meeting, the Defendant Directors also approved the ZoomLot Agreement. In consideration for the acquisition of ZoomLot, NAC agreed to issue 270,953 shares of NAC Series B preferred stock [FN27] and 729,047 shares of NAC Series C preferred stock. [FN28] Furthermore, NAC agreed to supply $6.5 million in working capital to ZoomLot, of which NAC funded $2 million within ten days of the closing. [FN29] Finally, other amounts may be expended if ZoomLot exercises an option to repurchase dealer management software, an application critical to ZoomLot's operations, from Cygnet Capital (the "Cygnet Option"). This software was transferred from ZoomLot to Cygnet Capital by Garcia immediately before December 15, 2000. The Cygnet Option was exercisable until December 15, 2002, at a price equal to Cygnet Capital's cost of acquiring the software plus imputed annual interest of 30%. [FN30] Thus the Plaintiffs note that, "[a]s a result of the ZoomLot Agreement, the equivalent of 2.7 million [c]ommon [s]hares ..., or 23.5% of [NAC's] outstanding common shares [,]" was issued to Garcia and his affiliates. [FN31] Therefore, as Garcia and his affiliates then held approximately 3 million common shares (or 26.7% of NAC's outstanding common shares), Garcia could "block any attempt to alter, amend, or repeal [NAC's] by-laws, which include [NAC's] staggered board provision." [FN32] Depending on whether one utilizes book value for the NAC shares or the approximate repurchase values of the shares from Frankino and Reading ($2.245 or $1.60), NAC paid for ZoomLot between $36.5 million and $27.5 million.

FN27. Id. ¶ 31(a). The NAC Series B preferred stock became convertible into shares of NAC common stock, at a preferred stock to common stock ratio of 1:10, shortly after the ZoomLot Agreement was approved.

FN28. At the option of its holders, the NAC Series C preferred stock may be redeemed, after September 30, 2003, or on or after January 1, 2004, if a defined "valuation event" occurs, for a per share price of the

greater of $15 or ten times the market price at the time of redemption. Id. ¶ 31(b)-(c).

FN29. Also at the time of the closing, NAC advanced funds to ZoomLot, so ZoomLot could repay the approximately $5 million it owed to Cygnet Capital Corporation ("Cygnet Capital"), a corporation wholly-owned by Garcia. Id. ¶ 33.

FN30. Id. ¶ 34.

FN31. Id. ¶ 35.

FN32. Pls.' Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 10. Altering, amending, or repealing NAC's bylaws requires an affirmative 80% vote of NAC's outstanding shares.

What the Plaintiffs allege to be so striking about the ZoomLot Agreement is the condition of ZoomLot. ZoomLot, a "dot-com" company, provides business-to-business e-commerce services to non-franchise used car dealerships and other used car industry entities. Such services are aimed at enabling the delivery of financing and insurance to the used car dealers' customers. ZoomLot had been formed by Garcia and his affiliates in March 2000 to acquire the internet operations of Cygnet Dealer Finance, Inc., a company wholly-owned by Garcia. [FN33] As of November 30, 2000, ZoomLot reported a negative shareholders equity of $3,900,761, and revenues for the previous year of $115,244, [FN34] resulting in an operating loss of $3,721,875. ZoomLot's assets were valued at $1,280,451. [FN35] Thus, the Plaintiffs conclude, NAC paid "an excessive amount" for ZoomLot. [FN36]

FN33. ZoomLot completed the acquisition of these operations on July 1, 2000.

FN34. Eighty-six percent of these revenues were derived from one customer.

FN35. Compl. ¶ 30(b).

FN36. Id. ¶ 36.

*6 Moreover, the Defendant Directors approved at the Meeting monetary compensation for the Defendant Directors' (excluding McNamara) past services, options, and increases in directors' fees to be paid in the future (collectively, the "Directors' Fees"). Previously, NAC's directors had been paid $1,000 per

board meeting they attended. For their past services rendered, the individual Defendant Directors were to receive the following sums: $208,000 (Zackaroff, Jasensky); $203,500 (Toh); and $66,916 (Marshall, Gleason). [FN37] The Defendant Directors also were each awarded stock options [FN38] for the underlying common stock amounts of: 70,000 shares (Zackaroff, Jasensky, Toh, Gleason, Marshall), and 50,000 shares (Factor, Carney). Finally, the directors' fees to be paid to each of the Defendant Directors (excluding McNamara) in the future were increased to an annual rate of $55,000, plus $5,000 annually for serving on one or more committees of the Board. [FN39]

> FN37. Jasensky and Factor can also be regarded as indirectly receiving payments from NAC through payments to third-party companies. During its 2001 fiscal year, NAC agreed to pay Automotive Personnel LLC, of which Jasensky is President, $43,000 for "placement services" rendered three years prior. NAC additionally agreed to pay Automotive Personnel LLC $59,800 for "outplacement services" shortly after December 15, 2000. Also, since April 2000, NAC paid to Mallory Factor, Inc., a stock promoting firm owned by Factor, $20,000 per month plus reimbursement for expenses, totaling $251,000. Additionally, on May 29, 2001, NAC paid $80,000 to Mallory Factor, Inc., for "investor relations services." *Id.* ¶ 4.

> FN38. These options were exercisable for 10 years, at a strike price of the then current NAC market price of $0.664.

> FN39. Compl. ¶ 4.

The Defendant Directors' business plans were not received well by the market. On December 19, 2000, NAC's closing price was $0.62 per share. Upon announcing the ZoomLot Agreement the following day, NAC's stock plummeted 32%. By June 29, 2001, NAC's stock had declined to a closing price of $0.25 per share. [FN40]

> FN40. *Id.* ¶ 38.

## II. CONTENTIONS

In the Complaint, the Plaintiffs claim that the Defendant Directors, in adopting the Resolutions, breached their fiduciary duty of loyalty, their fiduciary duty of care, and committed corporate waste. Specifically, the Plaintiffs allege that the adoption of the McNamara Employment Agreement and the ZoomLot Agreement was the culmination of a long-

brewing entrenchment scheme, designed to secure McNamara's control over NAC and also to confer upon him excessive compensation. The Plaintiffs characterize the Directors' Fees as authorized as a *quid pro quo* for the remaining Defendant Directors' support. Thus, the Plaintiffs conclude, the Defendant Directors engaged in a series of interrelated transactions that furthered their interests at the expense of all other NAC shareholders. By doing so, it is charged, the Defendant Directors violated their duty of loyalty. Moreover, the Plaintiffs assert, the Defendant Directors (excluding McNamara) arrived at these decisions uninformed and, therefore, violated the duty of care owed to NAC and its stockholders. Finally, the Plaintiffs claim that the McNamara Employment Agreement, the ZoomLot Agreement, and the Directors' Fees are so egregious as to constitute corporate waste.

In response, the Defendants have moved to dismiss the Complaint on the grounds that the Plaintiffs failed to make a pre-suit demand upon the Board as required by Court of Chancery Rule 23.1 ("Rule 23 .1"). The Defendants contend that pre-suit demand was not excused with respect to the adoption of the McNamara Employment Agreement, the ZoomLot Agreement, or the Directors' Fees because a majority of the Board were independent and disinterested when their individual conduct is evaluated on a separate, resolution-by-resolution basis. Thus, the Defendants approach the issue of determining demand futility from the perspective that each Resolution must be analyzed distinctly from the others; in other words, the Defendants argue that the Resolutions do not constitute one interrelated group of transactions, but instead are three separate transactions, each to be analyzed in isolation regarding any alleged breach of fiduciary duty. Furthermore, the Defendants posit that each Resolution, individually, is the product of an informed business judgment, and thus no breach of the duty of care has occurred. Lastly, the Defendants deny that the McNamara Employment Agreement, the ZoomLot Agreement, or the Directors' Fees amount to corporate waste.

*7 The Defendants have also moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) ("Rule 12(b)(6)"), arguing that the Plaintiffs have failed to state a claim for any of the alleged breaches of the fiduciary duties of loyalty and care or for corporate waste. Additionally, the Defendants maintain that the Plaintiffs' demand for rescission of the ZoomLot Agreement must be dismissed, pursuant to Court of Chancery Rule 19 ("Rule 19"), for failure to join the

Not Reported in A.
(Cite as: 2003 WL 139768, *7 (Del.Ch.))

indispensable parties of Garcia or any of the other ZoomLot shareholders who relinquished their ZoomLot shares pursuant to the ZoomLot Agreement (the "Relinquishing Shareholders").

The Plaintiffs respond that any pre-suit demand was futile, and thus excused "because the challenged transactions are each a *quid pro quo* for the others and the [Defendant Directors] are personally interested in the challenged transactions collectively." [FN41] They contend the Complaint sets forth particularized facts that establish a reasonable doubt that a majority of the Board was disinterested and independent at the time the Complaint was filed. Considering the Resolutions together, each Defendant Director had an interest, personally benefiting from excessive compensation and securing and maintaining control of NAC (McNamara) or from increased directors' fees and payments (the seven remaining Defendant Directors), in approving the interrelated transactions. Thus, when the Resolutions are analyzed together, the particularized facts, and reasonable inferences drawn from them, establish that a reasonable doubt exists as to the disinterestedness and independence of eight of the ten directors of NAC. Moreover, the Plaintiffs insist that the sheer amount of money received by the Defendant Directors in connection with the adoption of the Resolutions creates a reasonable doubt as to their disinterestedness. Finally, the Plaintiffs contend that demand is also excused because the particularized facts of the Complaint establish a reasonable doubt that the adoption of the Resolutions was the result of a valid exercise of business judgment.

FN41. *Id.* ¶ 49.

### III. ANALYSIS

The Defendants have moved to dismiss the Complaint pursuant to Rules 23.1 and 12(b)(6). I begin with Rule 23.1.

#### A. *Demand Futility*

Under Delaware law, the board of directors of a corporation manages the business and affairs of the corporation. [FN42] This authority encompasses the decision to initiate litigation. [FN43] "Because a derivative action fetters managerial prerogative, it is regulated by ... Rule 23.1 which requires a shareholder first to demand that the directors pursue the alleged cause of action." [FN44] Rule 23.1 requires a plaintiff in a derivative action to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action

the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort" in his complaint.

FN42. 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.").

FN43. *Zapata Corp. v. Maldonado,* 430 A.2d 779, 782 (Del.1981).

FN44. *In Re NVF Co. Litig.,* 1989 WL 146237, at *4 (Del. Ch. Nov. 22, 1989) (citation omitted). The demand requirement established by Rule 23.1 prevents "a stockholder [from causing] the corporation to expend money and resources in discovery and trial in the stockholder's quixotic pursuit of a purported corporate claim based solely on conclusions, opinions or speculation." *Brehm v. Eisner,* 746 A.2d 244, 255 (Del.2000).

*8 There are, however, circumstances in which a plaintiff in a derivative action can plead that demand was futile and, therefore, excused. [FN45] "Under *Aronson v. Lewis,* demand is considered futile and, therefore, excused only if the particularized facts alleged in the complaint create a reasonable doubt that: 1) the directors are disinterested and independent; or 2) the challenged transaction was otherwise the product of a valid exercise of business judgment." [FN46] In the controversy before me, the Plaintiffs assert that demand was futile under both prongs of *Aronson*.

FN45. *Aronson v. Lewis,* 473 A.2d 805, 812-13 (Del.1984).

FN46. *In re Walt Disney Co. Deriv. Litig.,* 731 A.2d 342, 353-54 (Del. Ch.1998), *aff'd in part and rev'd in part sub nom. Brehm v. Eisner,* 746 A.2d 244 (Del.2000). The rule is one of substantive right, and, as such, the failure to satisfy the demand requirement, in this case to meet either of the two prescribed showings of *Aronson*, precludes a court from considering the merits of an otherwise valid claim. *Haber v. Bell,* 465 A.2d 353, 357 (Del. Ch.1983).

In determining whether demand was futile, I must limit the scope of my inquiry to the allegations of the Complaint. [FN47] These allegations are accepted as true in deciding the motions to dismiss. [FN48]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.

(Cite as: 2003 WL 139768, *8 (Del.Ch.))

Furthermore, I must afford the Plaintiffs all reasonable inferences that logically flow from the alleged facts. [FN49] However, I need not accept as true "conclusionary allegations of fact or law not supported by allegations of specific fact," nor need I "draw all inferences from [the allegations] in plaintiffs' favor unless they are reasonable inferences." [FN50]

> FN47. *White,* 783 A.2d at 548 n. 5; *In re The Limited Inc. S'holders Litig.,* 2002 WL 537692, at *1 n. 1 (Del. Ch.2002).
>
> FN48. *Haber,* 465 A.2d at 357.
>
> FN49. *White,* 783 A.2d at 549.
>
> FN50. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988).

After reviewing the Complaint with these principles in mind, I find that the Plaintiffs have alleged particularized facts that create a reasonable doubt regarding the disinterestedness of the Defendant Directors (excluding McNamara), who constituted a majority (seven of ten) of the Board when the Complaint was filed. Thus, demand is futile and, hence, excused under the first prong of *Aronson.* [FN51]

> FN51. The Plaintiffs also allege that the two directors appointed after the Meeting, Stephen Johnson, who is Garcia's brother-in-law and General Counsel to Cygnet Capital, and Gary Trujillo, who is affiliated with other Garcia investments, are beholden to Garcia. Compl. ¶ 47. Because I conclude that the Plaintiffs have established a reasonable doubt as to the disinterestedness of a majority of the Board, I need not speculate on the possible independence of these two directors or any claims of a lack of independence of a majority of the Board.

Under *Aronson's* first prong, demand is deemed futile if the particularized facts alleged in the complaint create a reasonable doubt that a majority of the board of directors was disinterested and independent at the time the action was filed. [FN52] It is the Plaintiffs' burden to allege particularized facts that create a reasonable doubt that a majority of the Board was "interested." [FN53] Directors are deemed disinterested when they "neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." [FN54] Subsequently, "[t]his definition was further refined ... when our Supreme Court recognized that 'directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." ' [FN55]

> FN52. *Pogostin v. Rice,* 480 A.2d 619, 627 (Del.1984).
>
> FN53. *Katz v. Halperin,* 1996 WL 66006, at *7 (Del. Ch. Feb. 5, 1996).
>
> FN54. *Aronson,* 473 A.2d at 812; *see also Orman v. Cullman,* 794 A.2d 5, 23 (Del. Ch.2002).
>
> FN55. *Orman,* 794 A.2d at 23 (quoting *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993)).

The Plaintiffs' claim that all eight Defendant Directors were materially interested in the adoption of the Resolutions is premised upon the existence of a single scheme designed to entrench McNamara while advancing the personal financial interests of the Defendant Directors. The Complaint alleges that McNamara financially benefited from obtaining approval of the Employment Agreement. The Complaint further alleges that McNamara consolidated his control of NAC through the ZoomLot Agreement. [FN56] In return for their approvals of the McNamara Employment Agreement and the ZoomLot Agreement, the Defendant Directors obtained the Directors' Fees. The timing of the Resolutions, it is urged, is simply too coincidental and compels the drawing of an inference of a single, self-interested scheme. Thus, demand is excused because the Resolutions, enacted as a *quid pro quo,* establish a reasonable doubt that the Defendant Directors were disinterested.

> FN56. It is the Plaintiffs' theory that by transferring to Garcia NAC preferred stock convertible unto a sizable block of common stock, enough to block any changes to NAC's bylaws, McNamara all but guaranteed his position in NAC. Garcia, in light of his previous involvement in the contest for control with Frankino, could be trusted to act accordingly.

**\*9** The Defendants maintain that the Plaintiffs have failed to allege particularized facts so as to excuse demand under the first prong of *Aronson.* They characterize the Plaintiffs' *quid pro quo* theory as conclusory and unsupported by the particularized facts

of the Complaint. As a consequence, the disinterestedness of the Defendant Directors must be analyzed distinctly and individually for each of the three Resolutions. The Defendants, proceeding under such an approach, assert that a majority of the Board was disinterested with respect to the ZoomLot Agreement because none (and certainly far less than a majority) had any personal interest (other than as a shareholder in a general sense) in the transaction. Next, the Defendants contend that the Plaintiffs have failed to allege with particularity that any Defendant Director (other than McNamara) received a personal benefit from the adoption of the McNamara Employment Agreement. The Defendants also assert that the payment of directors' fees alone is insufficient to disqualify a director from considering demand. Furthermore, the Defendants claim that the Plaintiffs have failed to plead (with particularity) facts proving the materiality to the individual Defendant Directors of any benefits received from receiving the Directors' Fees. Therefore, after analyzing each Resolution in isolation, the Defendants conclude that pre-suit demand was not excused.

Thus, the contentions of the Plaintiffs and the Defendants regarding whether or not pre-suit demand was futile, because a reasonable doubt exists as to the disinterestedness of a majority of the Board, ultimately devolve into two competing views of the nature of the Resolutions. The Plaintiffs urge that the adoption of the Resolutions was a single, self-interested transaction and, thus, I should consider the Resolutions collectively. Conversely, the Defendants characterize the Resolutions as three separate and distinct business decisions; therefore, I am to analyze each Resolution independently. In the procedural context of this litigation, I accept as a reasonable inference from the particularized facts of the Complaint that the Resolutions are to be viewed as a single, interrelated set of transactions, authorized as a *quid pro quo,* in determining whether reasonable doubt exists as to the disinterestedness of each of the Defendant Directors.

In deciding whether to consider a sequence of transactions separately or collectively, the Court reviews the circumstances surrounding the challenged transactions, as alleged by the particularized facts of the complaint, to decide whether it can be reasonably inferred that those transactions constitute a single, self-interested scheme. [FN57] The timing of the transactions factors significantly into the Court's decision. [FN58] Here the Resolutions were adopted at the same meeting, within minutes of each other. They also immediately followed the proposed buy-back from

Reading conditioned upon the resignation of its two designees on the Board and were adopted less than a month and a half after the conclusion of a bitter contest for control. I find that it is a reasonable inference from the particularized facts of the Complaint that the Resolutions were adopted as a *quid pro quo,* and, as they amount to a single plan furthering the individual interests of the Defendant Directors, they are to be considered together for purposes of deciding demand futility.

FN57. This is not to say that the decision based on the allegations of the Complaint to consider the challenged transactions collectively for purposes of determining demand futility also determines the outcome of this proceeding. *See Heineman v. Datapoint Corp.,* 1990 WL 154149, at *3 (Del. Ch. Oct. 9, 1990) (noting, after deciding to consider the board of directors' approvals of two payment plans collectively for purposes of excusing demand, that "[i]f a review of the actual facts would show that these two aspects of the complaint are in fact and should in law be treated as completely independent, then that may be shown in an application for summary judgment").

FN58. *See Noerr v. Greenwood,* 1997 WL 419633, at *9 (Del. Ch. July 16, 1997) (noting that two plans comprised a unified scheme when, among other things, the two plans were "presented to the board at the same meeting, and to the stockholders in the same proxy solicitation"); *see also Strougo v. Carroll,* 1991 WL 9978, at *4 (Del. Ch. Jan. 29, 1991) (viewing a series of insider trading claims collectively "where all the defendant directors allegedly engaged in insider trading within a matter of weeks based upon the same inside information"); *Heineman,* 1990 WL 154149, at *3 (noting that the recent and ongoing attempts to remove directors, when coinciding with the directors' transfer of $13.1 million into a trust account established to pay directors' salaries and purchase of $2.1 million in annuities payable to the directors upon their termination, "clearly do charge that the board approved the different payments as part of a single transaction").

*10 The Defendants' attempt to distinguish previous instances when this Court treated multiple transactions collectively, though factually correct, misses the point of my inquiry. The Defendants stress that in each case the Court bundled together transactions that were substantively similar; they argue that acquiring ZoomLot and increasing directors' fees are

substantively quite different. However, I am deciding whether it is a reasonable inference, from the particularized facts of the Complaint, whether the Resolutions constitute a single plan furthering the interests of the Defendant Directors. By the Defendants' logic, if directors wish to engage in such a transaction, which "goes without saying ... raises a reasonable doubt about whether the business judgment rule protects the board's actions," [FN59] all they would need to do is approve inducements in different forms. The issue is whether it is a *reasonable inference* that the Resolutions constituted and implemented a single plan. Restricting my analysis to those transactions that "appear" similar to one another would be clearly unreasonable in these circumstances. Thus, I reject the Defendants' argument to consider the Resolutions individually for purposes of deciding demand futility.

        FN59. *Heineman,* 1990 WL 154149, at *3.

  If a majority of the Board appeared on both sides of this unitary undertaking or expected to derive personal financial benefit from it, as opposed to a benefit which devolves upon the corporation or all stockholders, then demand is deemed futile as a majority of the Board is considered to have been interested in the adoption of the Resolutions. [FN60] The Defendant Directors, excluding McNamara (the "Seven Defendant Directors"), constituted seven of ten directors when the demand was made, and with a determination that the Seven Defendant Directors were interested in the single, unified transaction, the Plaintiffs have successfully alleged that a majority of the Board was interested in the adoption of the Resolutions. The Plaintiffs have asserted that McNamara sought to assure his continued status at NAC through the ZoomLot Agreement, because the consideration given Garcia and his affiliates, ultimately in the form of NAC common stock, guaranteed that no bylaw could be changed without Garcia's approval. However, I need not consider the Plaintiffs' allegations as to the possible interest of McNamara in this single *quid pro quo* transaction. Demand is excused under the first prong of *Aronson* because I find particularized facts establish a reasonable doubt as to the disinterestedness of the Seven Defendant Directors, who as a bloc constituted a majority of the Board at the time the Complaint was filed.

        FN60. *See Bergstein v. Texas Int'l Co.,* 453
        A.2d 467, 471 (Del. Ch.1982).

  The Defendants argue, citing numerous authorities,

that the receipt of directors' fees alone is "insufficient to disqualify any director from considering demand." [FN61] This oversimplifies Delaware law. This Court has stated that under Delaware law, the receipt of customary directors' fees does not suggest a conflict of interest, the rationale being that, if it did, every director who receives a director's fee would be deemed biased. [FN62]

        FN61. Opening Br. in Supp. of Individual
        Defs.' Mot. to Dismiss at 20. The Defendants
        principally rely upon *Grobow,* 539 A.2d at
        188, and its progeny, including *In re Walt
        Disney,* 731 A.2d at 354 n. 18, 360 (noting
        that to hold otherwise "expressly would
        overrule the Delaware Supreme Court");
        *Silverzweig v. Unocal Corp,* 1989 WL 3231,
        at *2 (Del. Ch. Jan. 19, 1989), *aff'd,* 561 A.2d
        993 (Del.1989) (Table).

        FN62. *Grobow,* 526 A.2d at 923 n. 12 (citing
        *In re E.F. Hutton Banking Practices Litig.,*
        634 F.Supp. 265, 271 (S.D.N.Y.1986);
        *Pogostin,* 480 A.2d at 624).

  **\*11** It should be noted, however, that the rule that receipt of customary directors' fees does not create a disqualifying interest is one involving the application of a presumption (*i.e.,* the presumption of director disinterest). It is not an unvarying principle that mechanically applies irrespective of the circumstances. Conceivably a situation might arise where directors' compensation, in the form of "directors' fees," becomes so lavish that a mechanical application of the presumption would be totally at variance with reality. [FN63]

        FN63. *Grobow,* 526 A.2d at 923 n. 12.

  Recently this Court has noted, regarding the holdings of *Grobow v. Perot* [FN64] and *Moran v. Household Int'l, Inc.,* [FN65] "that these cases were based on circumstances in which the fees paid to directors were customary and usual in amount. *This Court's view of the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee."* [FN66] That "conceivable situation" is what now exists before me. Ignoring the possible fees for serving on a Board committee (an additional $5,000 annually), the Seven Defendant Directors received an increase in directors' compensation from $1,000 per meeting to $55,000 annually. And this "reward" was combined with significant compensation for past services and the

bestowing of a substantial number of stock options. Moreover, the Seven Defendant Directors were fully aware of the upcoming increase in directors' compensation; this is the essence of the *quid pro quo.* Thus, the Seven Defendant Directors voted on the Resolutions authorizing both the McNamara Employment Agreement and the ZoomLot Agreement with a known causal link to their remuneration. It is not that the Directors' Fees are large amounts paid on a regular basis; rather, the Directors' Fees were the product of massive increases which reasonably can be inferred to have been granted in return for the Defendant Directors' support of the McNamara Employment Agreement and the ZoomLot Agreement. Therefore, there is nothing "usual and customary" about the Directors' Fees, and as such, they are distinguishable from the fees paid in *Grobow* and its progeny.

> FN64. 539 A.2d at 188 ("The only averment permitting such an inference [of financial interest on the part of the defendant directors] is the allegation that all [the defendant] directors are paid for their services as directors. However, such allegations, without more, do not establish any financial interest.").

> FN65. 490 A.2d 1059, 1074-75 (Del. Ch.1985) ("Where a majority of the directors are independent or outside directors receiving no income other than usual directors' fees the presumption of good faith is heightened.").

> FN66. *Orman,* 794 A.2d at 29 n. 62 (emphasis added); *see also A.R. Demarco Enters., Inc. v. Ocean Spray Cranberries, Inc.,* 2002 WL 31820970, at *5 n. 13 (Del. Ch. Nov. 26, 2002).

The Defendants also correctly point out that any disqualifying interest arising from the Directors' Fees, which include the increased future fees, must be material. [FN67] While no detailed showing has been made as to the Seven Defendant Directors' financial status, it is a reasonable inference, drawn from the Complaint's particularized facts, that such amounts are material, and, thus, I conclude that the Complaint does state a reasonable basis to question their disinterestedness. [FN68] Thus, a reasonable doubt exists as to whether the Seven Defendant Directors were disinterested in the adoption of the Resolutions.

> FN67. "Materiality means that the alleged benefit was significant enough 'in the context of the director's economic circumstances, as

to have made it improbable that the director could perform her fiduciary duties to the ... shareholders without being influenced by her overriding personal interest." ' *Orman,* 794 A.2d at 23 (alteration in original) (emphasis removed) (quoting *In re General Motors Class H S'holders Litig.,* 734 A.2d 611, 617 (Del. Ch.1999)).

> FN68. *See In re Ply Gem Indus., Inc. S'holders Litig.,* 2001 WL 755133, at *9 (Del. Ch. June 26, 2001) (reasonable basis exists to question a director's independence when that director receives $91,000 in consulting fees); *see also Friedman v. Beningson,* 1995 WL 716762, at *5 (Del. Ch. Dec. 4, 1995) (director's receipt of $48,000 in consulting fees, "when considered in the context of the other facts alleged, represents a substantial interest").

Therefore, the particularized facts of the Complaint, and the reasonable inferences drawn therefrom, create a reasonable doubt as to the disinterestedness of a majority of the Board in its adoption of the Resolutions. Thus I conclude any pre-suit demand was futile with respect to claims regarding the Resolutions, and is therefore excused under the first prong of *Aronson.*

*B. Defendants' Motions Under Rule 12(b)(6)*

**\*12** The Defendants have also moved to dismiss the Complaint pursuant to Rule 12(b)(6). Rule 12(b)(6), while involving many of the same issues addressed under Rule 23.1, presents a more lenient standard under which I review the Plaintiffs' claims than that posed by the demand requirement of Rule 23.1. [FN69]

> FN69. Rule 23.1, as noted previously, requires the plaintiff to plead facts with particularity. In contrast, the evaluation of a Rule 12(b)(6) motion is consistent with the more lenient notice pleading concepts embodied in Court of Chancery Rule 8(a). *Levine v. Smith,* 591 A.2d 194, 207 (Del.1991).

"The standard on a motion to dismiss under ... Rule 12(b)(6) is well known. The motion will be granted if it appears with 'reasonable certainty' that the plaintiff could not prevail on any set of facts that can be inferred from the pleading." [FN70] In evaluating whether the Plaintiffs could not prevail on any set of facts that can be inferred from the Complaint, I am again to assume the truthfulness of the well-pleaded

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                    Page 76
(Cite as: 2003 WL 139768, *12 (Del.Ch.))

allegations in the Complaint, and furthermore, I am to favor the Plaintiffs with all reasonable inferences drawn from those allegations. [FN71] However, "neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true." [FN72] With this in mind, I turn to the Defendants' contentions.

> FN70. *Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del. Ch.2000), *aff'd,* 794 A.2d 1160 (Del.2002) (Table) (quoting *Solomon v. Pathe Communications Corp.,* 672 A.2d 35, 38 (Del.1996)).

> FN71. *Solomon,* 672 A.2d at 38; *see also Grobow,* 539 A.2d at 188 n. 6.

> FN72. *Grobow,* 539 A.2d at 188 n. 6.

### 1. *Claims for Breach of the Fiduciary Duty of Loyalty*

For the reasons set forth above, I find that the Plaintiffs have sufficiently stated a claim for the Defendant Directors' breach of the fiduciary duty of loyalty. The Resolutions, constituting a single, self-interested transaction were approved by the Board; however, it has been noted that the particularized facts of the Complaint, and reasonable inferences drawn therefrom, establish a reasonable doubt that a majority (the Seven Defendant Directors) of the Board was disinterested in the Resolutions' approval. Thus, the Plaintiffs' claims for breach of the fiduciary duty of loyalty survive the Defendants' challenge under the more lenient notice standard of Rule 12(b)(6).

### 2. *Claim for Breach of the Fiduciary Duty of Care*

The Plaintiffs have also asserted a claim for the Defendant Directors' breach of the fiduciary duty of care in adopting the Resolutions. Because pre-suit demand was excused under the first prong of *Aronson,* I did not consider, under the more exacting standards of Rule 23.1, whether the actions of the Defendant Directors were otherwise a valid exercise of business judgment. This issue must now be confronted under the more lenient standard of Rule 12(b)(6). However, even under this relatively plaintiff-friendly standard, I find that the Plaintiffs have failed to state a claim for a breach of the duty of care.

The duty of care requires that "[i]n making business decisions, directors must consider all material information reasonably available, and the directors'

process is actionable only if grossly negligent." [FN73] The Plaintiffs have set forth nothing but conclusory descriptions of any deficiency in the Board's decision-making process. Thus, the dearth of allegations of fact in the Complaint leads me to conclude with reasonable certainty that the Plaintiffs cannot prevail on any claim for breach of the duty of care.

> FN73. *Brehm,* 746 A.2d at 259.

### 3. *Claims of Corporate Waste*

**\*13** The Plaintiffs' claims of corporate waste also present issues distinct from those of the fiduciary duty of loyalty. [FN74] The Plaintiffs contend that the outrageous facts of this case differentiate the Board's actions from those previously afforded the benefit of the business judgment rule. The Defendants counter that the Plaintiffs' allegations are indistinguishable from past situations in which Delaware courts have rejected a plaintiff's claim of corporate waste. They say the Plaintiffs are merely challenging, with the benefits of hindsight, three business judgments of the Board and, as such, their claims should be dismissed.

> FN74. *In re The Limited, Inc. S'holders Litig.,* 2002 WL 537692, at \*7 ("Although the challenged transactions may be questioned because of doubts about the loyalty of the directors approving them, it does not necessarily follow that they constitute corporate waste.").

Waste has been defined as " 'an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." ' [FN75] This is a very high burden, not easily met by would-be plaintiffs; any other rule would allow plaintiff shareholders to second guess the decisions of boards of directors, thereby creating disincentives for the optimal assumption of economic risk. [FN76] Thus, "[u]nder this standard, a corporate waste claim must fail if 'there is *any substantial* consideration received by the corporation, and ... there is a *good faith judgment* that in the circumstances the transaction is worthwhile." ' [FN77]

> FN75. *White,* 783 A.2d at 554 (quoting *Brehm,* 746 A.2d at 263); *see also Lewis v. Vogelstein,* 699 A.2d 327, 336 (Del.1997)
>
> .

> FN76. *Steiner v. Meyerson,* 1995 WL 441999, at \*1 (Del. Ch. July 19, 1995).

FN77. *White,* 783 A.2d at 554 (alteration in original) (quoting *Brehm,* 746 A.2d at 263).

a. The ZoomLot Agreement

The Plaintiffs contend that the acquisition of ZoomLot at an outrageous price, amidst circumstances that suggest self-interested behavior, amounts to corporate waste by the Defendant Directors. The Defendants respond that the Plaintiffs' assertion is exactly the kind of second-guessing protected by the business judgment rule; the fact that, in retrospect, NAC overpaid for a speculative dot-com venture does not mean that the Defendant Directors committed corporate waste. I agree with the Plaintiffs.

I cannot say with reasonable certainty that the ZoomLot Agreement did not constitute corporate waste. It is not merely the sheer magnitude of the purchase price. Instead, it is doubtful whether NAC was purchasing anything, other than shelter for McNamara by placing a preclusive amount of stock into the hands of Garcia, when it acquired ZoomLot. NAC had already divested itself of its portfolio of car loans and thus cannot reasonably argue for any gained synergies. Moreover, I cannot say with reasonable certainty that the ZoomLot Agreement was approved as a "good faith judgment that in the circumstances the transaction [was] worthwhile." Garcia transferred critical application software out of ZoomLot immediately before December 15, 2000, leaving to ZoomLot only an option to repurchase the software at a price equal to the cost to acquire plus 30% interest per annum. [FN78] Thus, these factors, combined with the history between Garcia and McNamara, preclude me from dismissing the Plaintiffs' claim of corporate waste with respect to the ZoomLot Agreement.

FN78. I realize that the Cygnet Option may be ultimately viewed as a secured loan at a 30% annual interest rate, made by Cygnet Capital (and, thus, Garcia). However, this does not detract from my inability to conclude with reasonable certainty that the approval of the ZoomLot Agreement was "a good faith judgment that in the circumstances the transaction was worthwhile."

b. Director and Officer Compensation

**\*14** The Plaintiffs have also pressed claims of corporate waste regarding the Board's approval of the McNamara Employment Agreement and the Directors' Fees. The Plaintiffs argue that, while the Defendants are correct in stating that Delaware courts are loathe to

find that executive compensation packages constitute corporate waste, the situation presented here is beyond the pale. They point to two factors that distinguish the McNamara Employment Agreement: first, the relative size of the compensation in relation to the value of NAC and, second, as "NAC no longer ha[d] an active business to manage," [FN79] the Company was paying McNamara essentially to sit idle. The Defendants answer by stressing that the size of an executive compensation package does not open the door for courts to second guess the business judgments of boards of directors . [FN80] They characterize the Complaint as deficient and devoid of any discussion of what McNamara was worth to NAC and also question the weight I should give to the Plaintiffs' "pre-*Brehm* authority." [FN81] Similarly, the Plaintiffs assert that the approval of the Directors' Fees constitutes corporate waste. The Defendants once again characterize the Plaintiffs' argument as merely complaining that NAC has overpaid, this time in the market for directors' services, a decision that is protected by the business judgment rule. I find the Plaintiffs' arguments persuasive and refuse to dismiss under Rule 12(b)(6) their claims for corporate waste with respect to the McNamara Employment Agreement and the Directors' Fees.

FN79. Pls.' Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 30.

FN80. *See In re Walt Disney Co. Deriv. Litig.,* 731 A.2d at 350 ("Nature does not sink a ship merely because of its size, and neither do courts overrule a board's decision to approve and later honor a severance package, merely because of *its* size." (emphasis in original)).

FN81. The Plaintiffs cited in support of their argument *Rosan v. Chicago-Milwaukee Corp.,* 1990 WL 13482 (Del. Ch. Feb. 6, 1990) (noting that the Court allowed to proceed a claim for waste when the defendant railroad company that became an investment company holding primarily liquid assets that were managed by an outside firm continued to pay its president an annual salary of $450,000). Pls. Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 30.

While acknowledging that the test for waste poses an extremely high burden to disappointed shareholder plaintiffs, I cannot say with reasonable certainty that, given the exceptional facts of this case, the Plaintiffs could not prevail on their claim for corporate waste regarding the McNamara Employment Agreement. It is

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

not the mere allegation that McNamara is being compensated some threshold amount that permits the Plaintiffs' waste claim to proceed; instead, it is that McNamara is being paid a large sum of money to be the head of what essentially is a passive corporation. Accepting the Plaintiffs' allegations as true, NAC's assets consist of a 50% passive interest in Angelika, ZoomLot, and cash and highly liquid marketable securities. [FN82] This Court has ruled that maintaining the same level of executive compensation, after a divestment of a corporation's assets to create essentially a passive company, "barely" excused demand under Rule 23.1. [FN83] Here, the Board actually increased McNamara's compensation. Thus, I conclude that, under the more lenient standard of Rule 12(b)(6), the Plaintiffs have sufficiently stated a claim for corporate waste in relation to the McNamara Employment Agreement.

> FN82. For present purposes, I accept the Plaintiffs' allegations that NAC is now a "passive" company. The Complaint notes that "Garcia and his affiliates retained the complete right to manage" ZoomLot. Compl. ¶ 25. Thus, I cannot tell with any confidence that the presence of ZoomLot as part of the NAC corporate family requires a different conclusion.

> FN83. *Rosan,* 1990 WL 13482, at *8.

Furthermore, I find that the Plaintiffs' waste claims concerning the Directors' Fees survive the Defendants' motions to dismiss. The basis for dismissal of the typical waste claim regarding directors' fees is that the corporation received services of some value in consideration for the payments made. Here, the reasonable inference is that the increase in future fees to be paid, in addition to the granting of stock options and rewarding of significant sums for past efforts, were to induce the Seven Defendant Directors to engage in a self-interested transaction. As such, I cannot say with reasonable certainty that the approval of the unusual and not customary Directors' Fees does not constitute corporate waste.

**\*15** Finally, I believe at this stage it would be imprudent to dismiss the corporate waste claims for the McNamara Employment Agreement and the Directors' Fees. "Like any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the

corporation." [FN84] Thus in *Telxon,* the Delaware Supreme Court noted that because a trial would clarify the directors' contribution to the corporation (to establish the reasonableness of their compensation), and as this Court "did not consider the interplay between the [d]irectors' compensation and the possible breach of their fiduciary duties[,] ... [the claim] was decided prematurely" by this Court in granting summary judgment. [FN85] In this case, I have found it a reasonable inference that the Defendant Directors, in adopting the Resolutions, engaged in a *quid pro quo* effort that, if true, raises serious questions regarding a breach of their fiduciary duties. Therefore, I reject the Defendants' motions to dismiss pursuant to Rule 12(b)(6) the Plaintiffs' claims for corporate waste concerning the approval of the McNamara Employment Agreement and the grant of Directors' Fees.

> FN84. *Telxon Corp. v. Meyerson,* 802 A.2d 257, 265 (Del.2002).

> FN85. *Id.* at 266.

### C. *Defendants' Motions to Dismiss for Failure to Join Indispensable Parties*

Lastly, the Defendants contend that the Plaintiffs' application to rescind the ZoomLot Agreement should be dismissed pursuant to Rule 19 for failure to join indispensable parties. Specifically, the Defendants argue that because the Plaintiffs have not joined as parties Garcia or the other Relinquishing Shareholders, and because rescission of that agreement would necessarily affect the rights of those parties, the Plaintiffs have failed to join indispensable parties; thus, dismissal is warranted. In response, the Plaintiffs do not contest the merits of dismissal pursuant to Rule 19; instead, they posit that the Court is not required to decide this issue presently. [FN86]

> FN86. Pls.' Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 32 (citing *Crescent/Mach I Partners, L.P. v. Turner,* 2000 WL 1481002 (Del. Ch. Sept. 29, 2000); *Meeker v. Bryant,* 1981 WL 7616 (Del. Ch. May 12, 1981)). The Defendants have also asserted, uncontested by the Plaintiffs, that this Court has no personal jurisdiction over the Relinquishing Shareholders.

I am satisfied that now is a proper time to resolve the Defendants' motions. The Plaintiffs' reliance upon *Crescent/Mach I Partners, L.P.* is misplaced. In that case, the Court refused to decide the defendants'

Not Reported in A.
**(Cite as: 2003 WL 139768, \*15 (Del.Ch.))**

argument that a pending appraisal proceeding was the sole remedy for plaintiffs seeking rescission of a challenged merger, or alternatively, rescissory damages. In so abstaining from deciding whether rescission was an appropriate remedy, the Court noted that in response to a motion to dismiss, it "simply determine[s] whether [a] plaintiff has stated a claim for which relief might be granted." [FN87] The Court further noted that if "plaintiffs have stated cognizable claims, then 'the nature of that relief is not relevant and need not be addressed." ' [FN88] However, though I need not determine the nature of relief to be granted while considering the Defendants' motions to dismiss, it does not follow that I must currently refrain from deciding whether the Plaintiffs have failed to join indispensable parties. That is because the factual needs of such a determination are different from those required to decide whether rescission is an appropriate remedy.

> FN87. *Crescent/Mach I Partners, L.P.,* 2000 WL 1481002, at \*20.

> FN88. *Id.* (quoting *Chaffin v. GNI Group, Inc.,* 1999 WL 721569, at \*7 (Del. Ch. Sept. 3, 1999)).

**\*16** The determination of whether a plaintiff has failed to join an indispensable party entails a set of factual concerns different from those involved in a decision regarding the nature of relief to be granted. As this Court noted, when considering a motion to dismiss, "to decide whether rescission relief is (or is not) feasible would not only go beyond the scope of a motion to dismiss, but also would be imprudent, because the issue is fact driven and cannot be decided in the absence of an evidentiary record." [FN89] In this case, the facts as pleaded are sufficiently well developed to permit me to render a decision regarding the Plaintiffs' alleged failure to join indispensable parties. Therefore, because such a determination is proper at this time and because the Plaintiffs do not contest the merits of the Defendants' arguments in favor of dismissal, I find that the Plaintiffs' failure to join as parties Garcia and the other Relinquishing Shareholders amounts to a failure to join indispensable parties. Thus, the Plaintiffs' application to rescind the ZoomLot Agreement is dismissed pursuant to Rule 19.

> FN89. *Chaffin,* 1999 WL 721569, at \*7.

### IV. CONCLUSION

For the foregoing reasons, the Plaintiffs' claim for breach of the fiduciary duty of care and their application for rescission of the ZoomLot Agreement are dismissed. [FN90] Otherwise, Defendants' motions to dismiss are denied.

> FN90. Dismissal of the duty of care claim is with prejudice. Dismissal of the application for rescission of the ZoomLot Agreement is without prejudice.

IT IS SO ORDERED.

2003 WL 139768 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.