# APPENDIX
# PART 3

# TAB 7

Not Reported in A.                                           **Page 38**
2001 WL 50212 (Del.Ch.)
**(Cite as: 2001 WL 50212 (Del.Ch.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

**In re NEW VALLEY** CORPORATION Derivative
Litigation

No. Civ.A. 17649.

Date Submitted Dec. 19, 2000.
Date Decided Jan. 11, 2001.

Jay W. Eisenhofer, Megan D. McIntyre, John C.
Kairis, Grant & Eisenhofer, P.A., Wilmington,
Delaware, and Norman M. Monhait, Rosenthal,
Monhait, Gross & Goddess, P.A., Wilmington,
Delaware, Judith L. Spanier, Abbey, Gardy &
Squitieri, LLP, New York, New York, for Plaintiffs, of
counsel.

Michael D. Goldman, Peter J. Walsh, Jr., Brian C.
Ralston, Potter Anderson & Corroon LLP,
Wilmington, Delaware, Michael L. Hirschfeld, Jennifer
M. Anglim, Allana F. Stark, Teresa A. Gonsalves,
Milbank, Tweed, Hadley & McCloy LLP, New York,
New York, for Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.

*\*1* Pending before me in this derivative action is
defendants' motion to dismiss the plaintiffs' amended
complaint. This Memorandum Opinion constitutes my
decision on defendants' motion.

## I. BACKGROUND FACTS [FN1]

> FN1. As this is a decision on defendants'
> motion to dismiss, I will recite the facts as
> presented in the amended complaint.

### A. The Parties

The plaintiff shareholders in this consolidated
derivative action are Richard Fuss ("Fuss") and
Richard C. Goodwin ("Goodwin"). The plaintiffs are,
and have at all relevant times been, shareholders of
nominal defendant New Valley Corporation ("New
Valley"). New Valley is a Delaware corporation with

its principal offices in Miami, Florida. Among New
Valley's endeavors is its investment banking and
brokerage business and the ownership and management
of commercial real estate.

BGLS, Inc. ("BGLS"), a Delaware corporation, owns
all the stock of New Valley Holdings, Inc. ("NV
Holdings") and is the controlling stockholder of New
Valley. BGLS is wholly owned by Brooke Group, Ltd
("Brooke"). Thus, as of September 30, 1996, Brooke
owned, either directly or indirectly, 100% of NV
Holdings, approximately 42% of the outstanding New
Valley common stock, approximately 60% of the New
Valley Class A Preferred shares, and approximately
9% of the outstanding New Valley Class B Preferred
shares. As a result of a July 1999 recapitalization by
New Valley, Brooke's voting power and ownership
increased from approximately 42% to just over 55%.
Brooke is a named defendant.

The individual defendants in this action are various
current and former members of New Valley's Board of
Directors. Those individual defendants are: Bennett S.
Lebow ("LeBow"), Howard M. Lorber ("Lorber"),
Arnold I. Burns ("Burns"), Ronald J. Kramer
("Kramer"), Richard J. Lampen ("Lampen"), Henry C.
Beinstein ("Beinstein"), Barry W. Ridings ("Ridings"),
Richard S. Ressler ("Ressler"), and Victor M. Rivas
("Rivas"). [FN2] Moreover, each of these individuals
has intertwining relationships with various entities
connected to, or doing business with, New Valley.
[FN3]

> FN2. Ressler is no longer a member of New
> Valley's Board of Directors and was replaced
> by Rivas. Thus, at the time of the transaction
> at issue, the New Valley board was comprised
> of: LeBow, Lorber, Burns, Kramer, Ressler,
> Lampen, Beinstein, and Ridings (the
> "Individual Defendants"). The current Board
> is: LeBow, Lorber, Burns, Kramer, Lampen,
> Beinstein, Ridings, and Rivas (the "Current
> Board").

> FN3. The precise nature of each of these
> subsidiary relationships will be examined
> below.

### B. Brooke's Need for Cash

In 1995, New Valley emerged from bankruptcy with
over $300 million in unrestricted cash with which it
began to make various investments. As of December
31, 1995, New Valley had current assets of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

$234,165,000 (consisting of, *inter alia*, $38,559,000 in cash and cash equivalents and $164,592,000 of investment securities) and current liabilities of $183,292,000. Despite this apparent wealth, as of September 30, 1996, New Valley had allowed the dividends on its preferred stock to accrue to a total of $40/share for Class A and $39.59/share for Class B.

Brooke, however, was not nearly so financially vigorous. By September 1996, Brooke's balance sheet showed total current assets of $81,433,000 ($54 million of which was inventory), but included current liabilities of $166,223,000. During the first nine months of 1996, Brooke suffered severe cash flow deficits and financed the bulk of its operations and investment activities with borrowing and the few dividends it did receive from its New Valley shares. Brooke also had two looming needs for large amounts of money or additional financing. [FN4] First, in March 1997, the more than $10 million balance on its revolving credit facility would mature and, second, it would be forced to redeem certain notes in 1998 for $37.5 million.

> FN4. In addition to these future expenses, the plaintiffs note that Brooke was saddled with the ongoing contractual liability to pay LeBow (Brooke's Chairman, President, and CEO) a yearly salary of nearly $1.5 million with a minimum bonus of $742,188 plus a payment of 10% of his base salary in lieu of executive benefits.

**\*2** Brooke found the cash reserves held by its subsidiary, New Valley, extremely attractive. Relying on the "trickling-in" of dividends, however, was not an efficient way for Brooke to gain access to those reserves because Brooke did not own all of the outstanding preferred shares of New Valley. Thus, a significant portion of that cash would "leave the family" and go to New Valley's outside shareholders.

*C. The Solution Presents Itself*

In January 1997, in a move that would apparently ease the financial woes of Brooke, New Valley began to discuss and evaluate the possibility of purchasing certain assets from Brooke. The contemplated transaction involved New Valley purchasing from Brooke 99.1% of the common stock of Brook's subsidiary, BML. BML was involved in Russian real estate development and its principal assets were three properties in Moscow-Ducat Place I, II, and III. Ducat Place I was a completed office building. Ducat Place II was a nearly complete office building. Ducat Place III

was a planned, but not yet constructed, mixed-use building. The anticipated purchase price for the BML stock was $55 million subject to a final appraisal of Ducat Places II and III and receipt of a favorable fairness opinion. Finally, the transaction was set to close on or before January 31, 1997. This proposed transaction was presented at a special meeting of New Valley's Board of Directors on January 8, 1997.

At this same Board meeting, the directors were informed of the somewhat incestuous relationships among the parties. More specifically, they were advised that Brooke ultimately controlled both BML and New Valley and that Directors LeBow, Lorber, and Lampen had direct financial or employment relationships with one or more of the parties to the transaction. Because of these relationships, the Board established a Special Committee to review the transaction with the aid of legal and financial counsel and to make recommendations to the full Board concerning the transaction. The Special Committee consisted of Beinstein, Burns, and Ridings.

The Special Committee met twice. The first meeting, on January 15, 1997, was attended by Committee members Beinstein and Burns (but not Ridings), Lampen, and representatives of Fischbein Badillo Wagner & Harding ("Fischbein") as legal counsel and Oppenheimer & Co., Inc. as financial advisers. Lampen distributed a draft appraisal by Healey & Baker of Ducat Places II and III. Oppenheimer explained to the Committee that the $55 million purchase price included a "goodwill" premium that accounted for the difference between the purchase price and the appraised values of Ducat Places II and III plus the net proceeds from a planned sale of Ducat Place I.

The Committee met again on January 28, 1997. The same parties were in attendance except Ridings also was present. At or shortly before this meeting, the Special Committee received the proposed purchase agreement, the final Healey & Baker appraisal dated January 23, 1997, and an Oppenheimer fairness opinion dated January 27, 1997.

**\*3** Oppenheimer based its fairness opinion on the Healey & Baker appraisal and on the expected cash flows of the Ducat properties. Using these as a jumping-off point, Oppenheimer found that the value of BML's assets, in their entirety, was approximately $71 million. After subtracting $23 million in liabilities and assuming $8 million in goodwill, Oppenhiemer ultimately opined that the $55 million transaction price

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

was fair.

Based on the appraisal, the fairness opinion, and the advice of legal counsel, the Special Committee adopted a resolution recommending to the full New Valley Board that New Valley proceed with the transaction. The next day, the full New Valley Board voted to follow the recommendation of the Special Committee and approved the purchase of the BML stock under the purchase agreement's terms. On January 31, 1997, Brooke publicly announced the deal.

### D. The Aftermath

In March 1997, Fuss filed a derivative action alleging that the defendants breached their fiduciary duties by approving the BML transaction at an unfair price and based upon an unfair process. On or about November 17, 1998, in accordance with to 8 *Del. C.* § 220, Goodwin served a demand letter on New Valley seeking to inspect the corporation's books and records relating to the disputed transaction. On December 11, 1998, Goodwin filed a complaint seeking to enforce these inspection rights. Shortly before trial, the parties settled this dispute and certain documents were presented to Goodwin. Thereafter, on December 9, 1999, Goodwin filed a derivative complaint alleging substantially the same claims as those in the Fuss complaint, but containing additional factual allegations based, in part, on the information gleaned from the documents produced in the § 220 action.

On February 7, 1999, this Court consolidated the two separate actions and directed that Goodwin's complaint would serve as the complaint for the consolidated action. On February 28, 2000, plaintiffs filed an amended derivative complaint for the purpose of correcting certain factual errors identified by the defendants relating to the composition of the Board at the time Goodwin filed his original complaint. The amended complaint contains three separate counts. Count I alleges that the individual directors breached their fiduciary duties in approving the transaction. Count II avers that Brooke, through its agents and as controlling shareholder of New Valley, breached its fiduciary duties owed to New Valley. Count III, against Brooke, asserts that Brooke aided and abetted the individual defendants in breaching their fiduciary duties. Finally, the amended complaint alleges that prior demand on the Board, pursuant to Court of Chancery Rule 23.1, was futile in this derivative action.

The defendants filed a motion to dismiss the amended complaint. The Court heard oral argument on the motion on December 19, 2000. This is the Court's decision on the motion.

### E. Summary of the Arguments

**\*4** The defendants' move to dismiss this action on several grounds. First, they seek the dismissal of this action because the amended complaint fails to state a claim upon which relief can be granted. Specifically, the defendants argue that the complaint should be dismissed because the factual allegations in the complaint are belied by the documents produced in the § 220 action and which the plaintiffs used in identifying and pleading their cause of action. The defendants also insist that the complaint fails to state a claim because the plaintiffs have failed properly to allege that the transaction was not "entirely fair" to New Valley.

Next, the defendants contend that the amended complaint should be dismissed because the plaintiffs failed to plead adequately that demand on the Board was excused under Court of Chancery Rule 23.1. Finally, the defendants seek the dismissal of the breach of fiduciary duty claims against the disinterested directors because the claim is affirmatively barred by § 102(b)(7) of the Delaware General Corporation Law ("DGCL").

The plaintiffs defend against this motion by arguing that the defendants improperly rely on documents outside of the complaint to support their motion to dismiss for failure to state a claim. Moreover, they assert that the burden is on the defendants to prove "entire fairness" because there is a reasonable doubt (1) that a majority of the board could have disinterestedly and independently considered a demand, and (2) that the transaction was otherwise the product of a valid business judgment.

The plaintiffs also urge that they have properly pled demand futility because a majority of the Board is interested in the transaction or lacked independence. Finally, they argue that § 102(b)(7) does not bar their claims because exceptions in that provision apply to this transaction.

### II. ANALYSIS

#### A. Standard of Review

The standard this Court applies when evaluating a motion to dismiss under Rule 12(b)(6) is rigorous. A complaint will be dismissed only if "it appears to a reasonable degree of certainty that the plaintiff will not

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

be entitled to relief under any set of facts that could be proved in support of his claim." [FN5] Moreover, in this procedural setting, I consider, as I must, all well-pled facts as true and draw all inferences in a light most favorable to the non-moving party. [FN6] "What this effectively means is that the Court must consider the various factual permutations possible within the framework of the plaintiff's allegations and conclude whether any one conceivable set of facts could possibly merit granting plaintiff relief. If so, the claim cannot be dismissed." [FN7] Finally, while the complaint is designed to give only general notice of the claim asserted, merely conclusory allegations will not be accepted as true absent specific allegations of fact to support them . [FN8]

> FN5. *Wood v. Frank E. Best, Inc.,* Del. Ch., C.A. No. 16281, Chandler, C. (July 9, 1999), mem. op. at 2 (citing *Grobow v. Perot,* Del.Supr., 539 A.2d 180 (1988)).

> FN6. *Id.*

> FN7. *Apple Computer, Inc. v. Exponential Technology, Inc.,* Del. Ch., C.A. No. 16315, Chandler, C. (Jan. 21, 1999), mem. op. at 29.

> FN8. *See Solomon v. Pathe Communications Corp.,* Del.Supr., 672 A.2d 35, 38 (1996).

As a general rule, the Court, in ruling on a motion to dismiss, will consider only those matters raised in the operative pleading, the complaint. [FN9] The Court may, however, "consider, for certain purposes, the content of documents that are integral to or are incorporated by reference into the complaint." [FN10]

> FN9. *In re Santa Fe Pac. Corp. Shareholder Litig.,* Del.Supr., 669 A.2d 59, 68 (1995).

> FN10. *In re Lukens Inc. Shareholders Litig.,* Del. Ch., 757 A.2d 720, 727 (1999) (citing *In re Santa Fe Pac. Corp. Shareholder Litig.,* 669 A.2d at 69-70).

*B. Application of the Standard to This Case*

**\*5** In the present case, I must analyze the defendants' motion in light of the standard set forth above. To that end, I must decide: (1) whether the complaint fails to state a claim for which relief can be granted because the documents upon which the plaintiffs base their allegations contradict the factual allegations in the complaint; (2) whether the complaint must be dismissed because the plaintiffs have failed to properly

allege a lack of "entire fairness;" (3) whether the complaint must be dismissed for a failure to adequately plead that demand on the Board was excused; and (4) whether the claim for breach of fiduciary duty against the disinterested directors is barred by § 102(b)(7) of the DGCL.

*1. The Documents Outside the Complaint*

The plaintiffs, in their complaint, openly acknowledge that some of the allegations in the complaint are a direct result of information gleaned from documents provided to Goodwin after the settlement of the § 220 action.    [FN11] The plaintiffs did not, however, actively    incorporate    these    documents    into    the complaint either by reference or by appending them to the complaint. The defendants argue that certain documents are either integral to, or effectively incorporated by reference into, the plaintiffs' complaint and must be considered in evaluating this motion to dismiss. Those documents are: the minutes of the New Valley Board and Special Committee meetings, the Healey & Baker appraisal, and the Oppenheimer fairness opinion.

> FN11. *See* Pls.' Am. Compl. at 1 and 2 ("This amended Complaint is based, in part, on the information contained in those documents.").

In this case, I am not persuaded that the documents highlighted by the defendants are either integral to, or effectively incorporated into, the plaintiffs' amended complaint. In comparing these documents in this case to documents in other cases, it is clear that these documents do not directly portray a complete picture of the reasons behind the actions and decisions of each New Valley director.

The Delaware Supreme Court's decision in *In re Santa Fe Pac. Corp. Shareholder Litig.* [FN12] is one of the seminal cases on this issue and provides this Court with significant    guidance. There, the Supreme Court affirmed the Court of Chancery's consideration of a proxy statement in ruling on a motion to dismiss, stating:

> FN12. 669 A.2d 59 (1995).

> It was certainly proper to consult the Joint Proxy to analyze the disclosure claim because the operative facts relating to such a claim *perforce* depend upon the language of the Joint Proxy. Thus, the document is used not to establish the truth of the statements therein, but to examine only what is

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

disclosed. [FN13]

FN13. *Id.* at 69.

The Court also quotes from an earlier Court of Chancery decision for the proposition that "the court may judiciously rely on [documents outside the complaint] not to resolve disputed facts but at least to establish what was disclosed to the shareholders." [FN14] It also recognized that in addition to disclosure statements in disclosure disputes, the relevant publication in libel cases and the contract in breach of contract cases are also types of documents outside the complaint that courts have considered on motions to dismiss. Other Delaware decisions on this issue seem to follow this limitation on going outside the complaint and reflect that our Courts most often do so only to consider the actual disclosures in a disclosure dispute and the contracts in a breach of contract dispute. [FN15] Thus, this exception to the general rule is narrowly tailored to specific types of documents and specific uses of those documents.

> FN14. *Id.* (quoting from *Abbey v. E.W. Scripps Co.*, Del. Ch., C.A. No. 13397, Allen, C. (Aug. 9, 1995), mem. op. at 4, n. 1).

> FN15. For disclosure disputes, *see In re Lukens Inc. Shareholders Litig.*, Del. Ch., 757 A.2d 720 (1999); *Sanders v. Devine*, Del. Ch., C.A. No. 14679, Lamb, V.C. (Sept. 24, 1997), mem. op.; *Wiener v. The Southern Co.*, Del. Ch., C.A. No. 10525, Jacobs, V.C. (Jan. 24, 1992), mem. op.; *Glaser v. Norris*, Del. Ch., C.A. No. 9538, Chandler, V.C. (Jan. 6, 1992), op. For breach of contract disputes, *see Midland Food Services, LLC v. Castle Hill Holdings, LLC*, Del. Ch., C.A. No. 16779, Strine, V.C. (July 16, 1999), mem. op.; *Ash/ Ramunno Assoc., Inc. v. Branner*, Del. Ch., C.A. No. 12389, Hartnett, V.C. (May 21, 1993), mem. op.

**\*6** The documents in this case, the minutes of the meetings, the appraisal, and the fairness opinion, are not in the same nature as a disclosure statement, a contract, or an allegedly libelous publication. The latter are operative documents that are central to the cause of action. The former are more evidentiary in nature. Thus, the "truth" of the matters contained in those documents may tend to prove or disprove the plaintiffs' allegations. In this case, the plaintiffs contend that the defendants breached their fiduciary duties by approving and entering into the disputed transaction. While the minutes of the meetings describe the actions of the Board and the Special Committee and, to a

certain extent, explain the rationale behind the Board's actions, the minutes of the meetings do not reflect exactly what each director thought of, or understood about, the proposed transaction at the time he voted to approve it. Thus, the documents, on their face, do not reflect the complete picture that can only really be drawn after discovery. Similarly, while the fairness opinion and appraisal may on their face be clear on what they say and do not say, it is not clear from these two documents how the import of that information registered with each director.

Additionally, I note that the defendants argue that New Valley "must have the opportunity to bring to the Court's attention errors in plaintiffs' *interpretation* and *mischaracterizations* in plaintiffs' recitation of the contents of such documents." [FN16] Matters of interpretation and characterization are matters where reasonable minds can differ. Disputed matters of interpretation and characterization of documents do not fall within this exception to the general rule and, in my opinion, should not be injected into a motion to dismiss.

> FN16. Defs.' Reply Br. at 4 (emphasis added).

Based on the authority cited above, I conclude that the documents highlighted by the defendants are neither integral to, nor effectively incorporated into, the plaintiffs' complaint. Thus, I will not consider those documents in evaluating the pending motion to dismiss. [FN17] The defendants' argument that the extraneous documents contradict the factual allegations in the complaint and, thus, the complaint fails to state a claim, is not persuasive and fails.

> FN17. Goodwin availed himself of the "tools at hand" by filing the § 220 action. He should not now be penalized for taking this step that our courts have encouraged. Plaintiffs are urged to use these "tools" to gather information and evaluate whether a legitimate claim exists. The defendants stress that courts have looked to outside documents, as a policy matter, to prevent parties from quoting only portions of documents such that it hides the inevitable conclusion that the claim is doomed to fail. While I have found here that the documents will not be considered on this motion to dismiss, I do believe that the same policy considerations are fostered by Court of Chancery Rule 11. *See Mizel v. Connelly*, Del. Ch., C.A. No. 16638, Strine, V.C. (Aug. 2, 1999), mem. op. at 12-13. In *Mizel*, Vice Chancellor Strine refused to consider an

Not Reported in A.
**(Cite as: 2001 WL 50212, \*6 (Del.Ch.))**

affidavit on a motion to dismiss, but was troubled by what the affidavit apparently showed about the allegations in the complaint. He went on to note that Rule 11 may be implicated if the documents ultimately "raised a serious question regarding whether the plaintiff's attorney had drafted the factual allegations in the complaint in good faith and after 'an inquiry reasonable under the circumstances.' After the repeated admonitions of the Supreme Court to use the 'tools at hand,' lawyers who fail to use those tools to craft their pleadings do so at some peril." *Id.*

### 2. *Pleading of "Entire Fairness"*

In considering this issue, the Court "must first review the complaint to ascertain whether [the plaintiffs'] entire fairness claim is subsumed within it. All that is required is that the complaint give 'fair notice' of these claims. A court undertaking that analysis must afford a liberal construction to the language of the pleading." [FN18] Once the entire fairness standard has been pled, the defendants bear the initial burden of demonstrating the two aspects: fair dealing and fair price. [FN19] That burden, however, may be shifted to the plaintiffs to show that the transaction was *not* entirely fair in two situations. The first is where the transaction has been approved "by an independent committee of directors who have real bargaining power that can be exerted in dealings with a majority shareholder who does not dictate the terms" of the transaction. [FN20] The second is the approval of the transaction by a fully informed vote of the majority of the minority shareholders.

> FN18. *Emerald Partners v. Berlin*, Del.Supr., 726 A.2d 1215, 1220 (1999).

> FN19. *Id.* at 1222.

> FN20. *Id.* at 1222-23.

\*7 Both sides appear to agree that the transaction at issue will be evaluated under the "entire fairness" standard. Moreover, the amended complaint, read as a whole, gives "fair notice" of these claims. In this case, the real dispute on this issue centers around which party bears the ultimate burden of showing the existence or absence of entire fairness.

At this stage of the proceedings, I do not have to decide which party bears the ultimate burden on this issue. First, because the Court is evaluating the legal sufficiency of the complaint, it has no evidence from

the defendants that would allow it to determine whether they have adequate proof that a truly independent committee with real bargaining power evaluated the transaction. Thus, the Court is not adequately poised to determine if the defendants have successfully shifted the burden to the plaintiffs.

Second, even if the ultimate burden is on the plaintiffs to show the transaction is not entirely fair, these plaintiffs have sufficiently alleged facts which, if true, are reasonably calculated to show that the approval of this transaction was fatally flawed in that it was not the result of a fair process and did not result in a fair price. [FN21] For these reasons, I conclude that the plaintiffs have alleged facts sufficient to initially plead an entire fairness claim. Thus, defendants' argument-that plaintiffs' complaint is legally deficient as to this claim-fails.

> FN21. *See* Pls.' Am. Compl. ¶¶ 47-55 for allegations of unfair process and ¶¶ 37-46 for allegations of unfair price.

### 3. *Pleading of Demand Excused*

The defendants argue that this derivative suit should be dismissed because the plaintiffs have not sufficiently pled that demand on the board, as required by Court of Chancery Rule 23.1, has been excused. As Vice Chancellor Jacobs has noted:

> Under our well developed caselaw in this area, a derivative complaint must be dismissed unless it alleges with particularity facts demonstrating that demand would have been futile. Demand is considered futile, and will be excused, only if the particularized facts alleged in the complaint create a reasonable doubt (*i.e.,* reason to doubt) that (1) the directors upon whom the demand would be made were disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. [FN22]

> FN22. *Zupnick v. Goizueta,* Del. Ch., 698 A.2d 384, 386 (1997).

The New Valley Board changed composition from the time of the transaction to the time Goodwin filed his complaint. The parties have expended considerable time and energy debating whether demand was excused as to the Board that approved the transaction or as to the Board as it was composed when the amended complaint was filed. The defendants urge the Court to examine demand futility in the context of the makeup of the current board. Logically, however, at this stage I

Not Reported in A.
(Cite as: 2001 WL 50212, *7 (Del.Ch.))

do not have to decide this issue, for the plaintiffs have alleged particularized facts that, if true, give me reason to believe that demand on even the current Board would have been futile.

The amended complaint pleads with particularity facts that give this Court some reason to believe that a majority of New Valley's current Board is not disinterested or independent. [FN23] The facts alleged in the complaint show that all the members of the current Board have current or past business, personal, and employment relationships with each other and the entities involved. For instance, some conflicts are quite clear as in the case of LeBow who is New Valley's Chairman and CEO but also the controlling shareholder of Brooke. The nature and extent that others may be interested is less clear. Burns and Ridings both received $30,000 from Brooke for agreeing to be a director nominee in Brooke's proxy bid for RJR Nabisco Holdings Corp. in 1996. Burns also is a former non-lawyer employee of a law firm that has rendered substantial legal services to New Valley. Lampen is employed by, and receives substantial compensation from, both New Valley and Brooke. Ressler is a Director for New Valley and owns approximately 10.8% of Brooke's stock. Finally, Rivas is both a director of New Valley and CEO of Landenburg, a subsidiary of New Valley. While this list is not exhaustive, it does provide some indication of the nature of some of the conflicts.

>    FN23. *See* Pls.' Am. Compl. at ¶¶ 2-19, 70.

**\*8** Although the actual extent of these relationships is not altogether clear at this point in the litigation, [FN24] the existence of these interests and relationships is enough to defeat a motion to dismiss. The Court will reserve judgment on the ultimate nature of these relationships until an adequate record exists, after further discovery and factual development. Thus, I conclude that plaintiffs have sufficiently pled demand futility to survive the defendants' motion to dismiss. [FN25]

>    FN24. Although some of the allegations of interestedness appear innocuous on the surface, the plaintiffs assert that some of the directors (like Rivas) are beholden to LeBow for their allegedly lucrative employment positions outside of New Valley and, thus, are not disinterested.

>    FN25. Because the plaintiffs have satisfied their pleading burden on this prong of the demand futility test, I do not have to reach the

question whether the decision was the product of the exercise of valid business judgment.

### 4. *Are Plaintiffs' Claims Barred by § 102(b)(7)?*

Defendants argue that New Valley's certificate of incorporation contains a provision, in accordance with 8 *Del. C.* § 102(b)(7), limiting the liability of directors and, thus, that this action should be dismissed as to the directors they identify as disinterested. [FN26] Section 102(b)(7), however, contains several exceptions to its limited liability rule. For instance, liability will not be limited (1) where a director has breached the duty of loyalty, (2) for acts not in good faith or for intentional misconduct, and (3) where the director has derived an improper personal benefit. [FN27]

>    FN26. The defendants contend that Burns, Beinstein, Ridings, and Rivas are disinterested directors. They seem to concede that the remaining defendants are "interested."

>    FN27. *See* 8 *Del. C.* §§ 102(b)(7)(i),(ii), and (iv).

Counts I and II of the amended complaint allege that the defendants breached their duty of loyalty and acted in bad faith. Both, if proven, fall within the exceptions to the exculpatory provision. Moreover, for substantially the same reasons as above, I find that the plaintiffs have alleged sufficient facts in support of Counts I and II to initially plead that the defendants breached their duty of loyalty and have acted in bad faith. For these reasons, I find that the defendants' arguments for dismissal fall short.

### III. CONCLUSION

When evaluating a motion to dismiss this Court ordinarily may not consider documents outside the complaint. That being so, I consider only the well pleaded allegations of the amended complaint to determine whether the plaintiffs' case survives a motion to dismiss.

Accepting the allegations in the amended complaint as true and construing all inferences in favor of the plaintiffs, I conclude that they have supported all three counts of their amended complaint with well-pled allegations of fact. Because I am reasonably certain that the plaintiffs will be entitled to relief if their allegations ultimately prove true, I deny the defendants' motion to dismiss.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
**(Cite as: 2001 WL 50212, \*8 (Del.Ch.))**

An Order has been entered in accordance with this Memorandum Opinion.

### ORDER

For the reasons assigned in this Court's Memorandum Opinion entered in this case on this date, it is,

ORDERED that defendants' motion to dismiss the amended complaint in this action is denied.

2001 WL 50212 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# TAB 8

Not Reported in A.
2001 WL 812028 (Del.Ch.)
**(Cite as: 2001 WL 812028 (Del.Ch.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

In re PAXSON COMMUNICATION
CORPORATION SHAREHOLDERS LITIGATION

No. CIV.A. 17568.

Submitted: April 25, 2001.
Decided: July 10, 2001.
July 12, 2001.

Joseph A. Rosenthal, Jr., of Rosenthal, Monhait, Gross
& Goddess, P.A., Wilmington, Delaware; of Counsel:
Kenneth J. Vianale and Robert R. Adler, of Milberg
Weiss Bershad Hynes & Lerach LLP, Boca Raton,
Florida; Milberg Weiss Bershad Hynes & Lerach LLP,
New York, New York; Stull, Stull & Brody, New
York, New York; Law Offices of Curtis V. Trinko,
LLP, New York, New York; Weiss & Yourman, New
York, New York; Attorneys for Plaintiffs.

Kenneth J. Nachbar and James G. McMillan, III, of
Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware; of Counsel: Tracy Nichols, of Holland &
Knight LLP, Miami, Florida; Attorneys for Defendants.

MEMORANDUM OPINION

CHANDLER, Chancellor.

*1 This action arises out of the alleged rejection of a
cash offer for Paxson Communications Corporation
("Pax" or the "Company") from Fox Network ("Fox")
and the later acceptance by Pax of a series of
agreements (the "NBC Transactions") with the
National Broadcasting Company, Inc. ("NBC"). The
plaintiffs allege that Fox made an all cash offer of $20
per share for Pax common stock (the "Fox Offer") that
was summarily rejected by the directors and/or senior
officers of Pax. [FN1] Shortly after the alleged Fox
Offer, NBC invested $415 million in Pax in exchange
for convertible preferred stock, certain warrants, and
the right to purchase certain shares owned by Pax's
controlling stockholder, Lowell W. Paxson.

FN1. These directors and/or officers of Pax
are Lowell W. Paxson, the Chief Executive
Officer ("CEO") and Chairman of the Pax

Board of Directors (the "Pax Board"),
William E. Simon Jr., Jeffrey Sagansky,
James Bocock, Bruce Burnham, and James
Greenwald (collectively, the "Individual
Defendants").

Based on these events, the plaintiffs make two claims,
each premised on the Individual Defendants' alleged
violations of their fiduciary duties of loyalty and care.
Plaintiffs first assert a direct claim, arguing that the
defendants abdicated their duty to evaluate and fairly
respond to the Fox Offer with a view towards
maximizing shareholder value and thereby depriving
the Company's shareholders of a substantial premium
that Fox (or perhaps another potential bidder) might
have been willing to provide ("Claim I"). They also
present a derivative claim on behalf of Pax to redress
injuries suffered (and to be suffered) by the Company
as a result of the Individual Defendants' purported
violations of their fiduciary duties ("Claim II"). This is
the Court's decision on the defendants' motion to
dismiss these two claims.

I. FACTUAL BACKGROUND

Defendant Pax is a Delaware corporation with its
headquarters in West Palm Beach, Florida. Pax is a
network television broadcasting company that owns
and operates the largest group of broadcast television
stations in the United States. Pax is a publicly traded
company whose Class A common stock trades on the
American Stock Exchange. Pax's capital structure also
includes Class B common stock. The Class B stock,
beneficially owned entirely by Pax Chairman Lowell
Paxson, is identical to the Class A stock except that
each Class B share possesses ten votes per share. Class
A shares possess one vote per share.

The Individual Defendants were the six members of
the Pax Board at the time of the challenged NBC
Transactions. Lowell Paxson, Jeffrey Sagansky, and
James Bocock were also officers of the Company
during the period in question. Through his ownership
of 39.2% of the Pax Class A stock and 100% of the
Pax Class B stock, Mr. Paxson controls approximately
75% of Pax's voting power.

On or about August 9, 1999, Pax issued a press release
announcing that it had formally retained Salomon
Smith Barney ("Salomon") to explore potential
strategic alternatives for the Company. In this press
release, Pax stated that the Pax Board had decided to
pursue this course of action in anticipation that the
Federal Communications Commission would loosen

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

ownership restrictions affecting the broadcasting industry.

**\*2** The plaintiffs contend that shortly after issuing this press release, Pax received an unsolicited offer from Fox to acquire Pax for approximately $20.00 per share. They further allege that Pax responded to the Fox Offer with a counter-offer of $26.00 per share, but failed to enter into a genuine negotiating process with Fox aimed at selling the Company. As Pax common stock had traded between $6.00 and $17.4375 over the preceding twelve months, the plaintiffs conclude that this aborted attempt to sell Pax deprived them as Pax shareholders of a substantial premium.

On September 15, 1999, Pax entered into the NBC Transactions. These three agreements included an investment agreement (the "Investment Agreement"), a call option agreement (the "Call Agreement"), and a stockholder agreement (the "Stockholder Agreement"). In the aggregate, NBC and its affiliates paid approximately $415 million for the rights they received in the NBC transactions.

In the first of these transactions, the Investment Agreement, Pax agreed to: (i) sell 41,500 shares of newly created preferred stock in Pax to a wholly owned subsidiary of NBC ("NBC Sub I"), convertible at any time into 31,896,032 shares of Pax Class A common stock for an initial conversion price of $13.01 per share; (ii) issue a warrant ("Warrant A") to another wholly owned subsidiary of NBC ("NBC Sub II") to purchase up to 13,065,507 shares of Pax common stock at an exercise price of $12.60 per share; and, (iii) issue a warrant ("Warrant B") to NBC Sub II to purchase another 18,966,620 shares of Pax common stock at an exercise price equal to the average closing prices of the Class A common stock for the 45 consecutive trading days before the warrant exercise date, subject to a minimum exercise price of $22.50 per share during the three years after September 15, 1999. Subject to certain conditions and limitations, Warrants A and B are exercisable for ten years from September 15, 1999.

Concurrently with the Investment Agreement, a wholly owned subsidiary of NBC entered into the Call Agreement with Lowell Paxson, personally, and certain entities controlled by him. By the terms of the Call Agreement, the NBC subsidiary was granted the right (the "Call Right") to purchase all, but not less than all, of Mr. Paxson's 8,311,639 shares of Pax's Class B common stock (the "Call Shares"). Under the Call Agreement, the NBC subsidiary may purchase the Call

Shares at a price equal to the greater of (i) the average of the closing sale prices of the Class A common stock for the 45 consecutive trading days ending on the trading date immediately preceding the date of exercise of the Call Right; and (ii) $22.50 per share for any exercise of the Call Right within three years of September 15, 1999, or $20.00 per share if the Call Right is exercised thereafter.

The third of the NBC transactions, the Stockholder Agreement, provided, among other things, for NBC to have representation on the Pax Board if permitted by applicable law. The Stockholder Agreement also requires NBC's consent for Pax to take certain actions, including the adoption of a shareholder's rights plan, amendments to Pax's organizational documents, and issuances of stock or other securities.

**\*3** If NBC converts the newly created preferred shares, exercises both warrants, and purchases Lowell Paxson's Class B shares, NBC would own approximately 49% of the equity in Pax and control almost 70% of its voting power.

## II. ANALYSIS

### A. Standard on a Motion to Dismiss

A motion to dismiss under Court of Chancery Rule 12(b)(6) will be granted where it appears with "reasonable certainty" that the plaintiff could not prevail on any set of facts that can be inferred from the pleadings. [FN2] The plaintiff, however, is entitled to all reasonable inferences that can be drawn from the complaint. [FN3] With this standard in mind, I turn to my analysis of the two claims pending before me.

> FN2. *Solomon v. Path Communications Corp.,* Del.Supr., 672 A.2d 35, 38 (1996) (citing *In re USACafes, L.P. Litig.,* Del. Ch., 600 A.2d 43, 47 (1991).

> FN3. *Id.* (citing *In re USACafes,* 600 A.2d at 47).

### B. Claim I

Claim I purports to be a class action claim for breach of fiduciary duty. The defendants insist that Claim I is in fact a derivative claim that can be brought only on the Company's behalf and, therefore, must be dismissed for failure to state a direct claim.

The Delaware courts are often faced with the complex task of distinguishing derivative claims from individual

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
(Cite as: 2001 WL 812028, *3 (Del.Ch.))

claims. [FN4] The distinction between the rights of the corporation as opposed to the individual rights of shareholders is often "a narrow one" that can have extremely important consequences for litigation. [FN5] Among these consequences are:

> FN4. *See generally* Donald J. Wolfe. Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 9- 2(a), 516-26 (1998).

> FN5. *Kramer v. Western Pacific Indus., Inc.,* Del.Supr., 546 A.2d 348, 351-52 (1988).

the possible dismissal for an unjustified failure to demand that the board institute litigation; the general inability of a derivative plaintiff to engage in discovery relevant to the demand issue when dismissal on such grounds is sought; [and,] the ability of a special litigation committee of the board to terminate even a properly instituted derivative action as to which demand has been shown to be futile. [FN6]

> FN6. Wolfe and Pittenger, § 9-2(a) at 516.

In determining whether a given claim is derivative or direct in nature, this Court must look to " 'the nature of the wrong alleged' and the relief, if any, which could result if plaintiff were to prevail." [FN7] In determining the nature of the wrong alleged, the Court will not be bound by the plaintiff's characterization of the claim in the complaint, but rather must look to "the body of the complaint." [FN8]

> FN7. *Kramer,* 546 A.2d at 352 (quoting *Elster v. American Airlines, Inc.,* Del. Ch., 100 A.2d 219, 221-23 (1953)).

> FN8. *Kramer,* 546 A.2d at 352 (quoting *Lipton v. News Int'l PLC,* Del.Supr., 514 A.2d 1075, 1078 (1986).

To have standing to sue directly rather than derivatively on behalf of the corporation, the plaintiff must have been injured "*directly* or *independently* of the corporation.￼" [FN9] In other words, the plaintiff needs to have sustained a "special injury," defined as "a wrong inflicted upon [a shareholder] alone or a wrong affecting any particular right which [that shareholder] is asserting,--such as his preemptive rights as a stockholder, rights involving the control of the corporation, or a wrong affecting the stockholders and not the corporation." [FN10]

> FN9. *Kramer,* 546 A.2d at 352.

> FN10. *Lipton,* 514 A.2d at 1079 (citing *Elster v. American Airlines, Inc.,* Del. Ch., 100 A.2d 219, 222 (1953)).

Although there is no standard test that shall be mechanically applied in all cases to determine whether a given claim is derivative or direct, probably the most-cited formulation is that of former Chancellor Brown in *Moran v. Household International Inc.*:

*4 To set out an individual action, the plaintiff must allege either 'an injury which is separate and distinct from that suffered by other shareholders,' ... or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation. [FN11]

> FN11. 490 A.2d 1059, 1070 (1985), *aff'd,* Del.Supr., 500 A.2d 1346 (1986) (quoting 12b Fletcher Cyclopedia of Corps, § 5921, at 452 (perm.ed., rev.vol.1984)).

The Supreme Court has made clear that although Chancellor Brown's *Moran* formulation may serve as "a quite useful guide," that test is not conclusive. [FN12] Rather, Delaware courts must ultimately look "to whether the plaintiff has alleged 'special' injury, in whatever form." [FN13]

> FN12. *Lipton,* 514 A.2d at 1078.

> FN13. *Id.*

In this case, the plaintiffs assert that they have suffered two distinct, direct injuries that each bestow standing on the plaintiffs to bring direct claims against the defendants. Plaintiffs point to the dilution of their ownership interest, earnings per share and voting power due to the effect of the NBC Transactions. Additionally, plaintiffs argue that the Pax Board's failure to pursue the Fox Offer in favor of the NBC Transactions resulted in the loss of the opportunity for the shareholders to receive optimum value for their investment in Pax. I address each of these contentions in turn.

First, the plaintiffs argue that "it is well-settled that equity dilution and diminution of one's voting power constitutes a direct injury to the shareholders and not the corporation." [FN14] They contend that the NBC Transactions will dilute the equity and voting power of the plaintiff shareholders should NBC Sub I convert its 41,500 shares of preferred stock into 31,896,032

shares of common stock and NBC Sub II exercise its warrants to purchase a total of 32,032,127 shares of Pax common stock.

> FN14. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 9.

Plaintiffs point to two cases, *In re Tri-Star Pictures, Inc. Litigation* [FN15] and *Oliver, et al. v. Boston University, et al.* [FN16] to support the proposition that their dilution claim is direct rather than derivative. Their reliance on these two cases, however, is misplaced. In *Tri-Star,* the plaintiffs, former stockholders of Tri-Star Pictures, Inc. ("Tri-Star"), challenged an assets for stock transaction between Tri-Star and Coca-Cola Company ("Coca-Cola"), a 36.8% stockholder of Tri-Star before the transaction. [FN17] The complaint alleged that Coca-Cola had wrongfully manipulated the transaction to receive an excessive amount of Tri-Star shares in exchange for assets having a lower value. As a result of the transaction, Coca-Cola obtained an 80% stock interest in Tri-Star and the public shareholders, who had formerly owned 43.4% of the common equity, now owned only 20% of Tri-Star's equity. [FN18] Because Coca-Cola, a significant stockholder of Tri-Star before the transaction, did not suffer a similar dilution of their percentage ownership or their voting power as compared to the plaintiffs, the Supreme Court held that the plaintiffs had suffered a special injury not shared equally by all shareholders. [FN19] This rendered the plaintiffs' claims direct and not derivative in nature. [FN20]

> FN15. Del.Supr., 634 A.2d 319 (1993).

> FN16. Del. Ch., C.A. No. 16570, mem. op., Steele, V.C. (July 18, 2000).

> FN17. *Tri-Star,* 634 A.2d at 321.

> FN18. *Id.* at 330-31.

> FN19. *Id.* at 330.

> FN20. *Id.*

**\*5** Similarly, in *Boston University,* plaintiffs, investors in Seragen, Inc. ("Seragen"), argued that the defendants, controlling shareholders, directors, and officers of Seragen, unfairly took advantage of their controlling position to dilute the minority's interests, engage in self-dealing, and effect a merger that resulted in a disproportionate amount of consideration to be paid to the controlling shareholders. [FN21] The Court

held that for the purposes of a motion to dismiss, the plaintiffs had adequately alleged a direct claim, noting that "the defendants engaged in self-dealing that resulted in reduced voting power and stock dilution." [FN22]

> FN21. *Boston University,* mem. op. at 1-2.

> FN22. *Id.* at 6.

Together, *Tri-Star* and *Boston University* stand for the proposition that dilution claims are individual in nature where a significant stockholder's interest is increased "at the sole expense of the minority." [FN23] *Tri-Star* and *Boston University* have no application, in my opinion, where the entity benefiting from the allegedly diluting transaction, NBC, is a third party rather than an existing significant or controlling stockholder. This identical distinction was also made by Vice Chancellor Jacobs in *Turner v. Bernstein.* [FN24] In that case, Vice Chancellor Jacobs noted that a claim of stock dilution and a corresponding reduction in a stockholder's voting power states a direct claim

> FN23. *Tri-Star,* 624 A.2d at 330.

> FN24. Del. Ch., C.A. No. 16190, slip op. at 44-45, Jacobs, V.C. (Feb. 9, 1999). *See also In re Ply Gem Indus., Inc. Shareholders Litig.,* Del. Ch., Consol. C.A. No. 15779-NC, Noble, V.C. (June 26, 2001).

only in transactions where a significant stockholder sells its assets to the corporation in exchange for the corporation's stock, and influences the transaction terms so that the result is (i) a decrease (or 'dilution') of the asset value and voting power of the stock held by the public stockholders and (ii) a corresponding increase (or benefit) to the shares held by the significant stockholder. [FN25]

> FN25. *Id.*

Under this principle, to the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares of Pax results from the issuance of new equity to a third party (NBC), plaintiff's dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed.

Plaintiffs also argue that the Call Agreement between NBC and Lowell Paxson confers a benefit on him, namely, "the potential sale of his Class B stock for prices unavailable to the public shareholders at the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
(Cite as: 2001 WL 812028, *5 (Del.Ch.))

Page 58

time (or, indeed, thereafter up to the present)." [FN26] Thus, plaintiffs assert that the overall injury to Pax's shareholders is not shared equally by all shareholders, Lowell Paxson is engaging in self-dealing, and Claim I is therefore direct. This argument also fails, as it fundamentally misunderstands the nature of a call option.

> FN26. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 10.

As explained above, the Call Agreement entered into by a wholly owned subsidiary of NBC with Lowell Paxson, personally, and certain entities controlled by him, grants the NBC subsidiary the right to purchase all, but not less than all, of Mr. Paxson's Class B Shares of Pax at a price specified by the agreement for a period of ten years. The Call Agreement does not necessarily confer on Mr. Paxson "the opportunity to sell [his] shares to NBC for between $20.00 and $22.00 per share." [FN27] Rather, the Call Agreement grants NBC the right, for a specified period, to purchase Mr. Paxson's shares *only if NBC should so desire.* Thus, Mr. Paxson has obligated himself to sell his Pax shares to NBC at a fixed price or if higher, the market price, but only if NBC chooses to exercise its Call Right. As stockholders are assumed to act in their own economic self-interest, NBC will exercise its Call Right only if it believes it is in its own best interests to do so. [FN28] That is, NBC will exercise should it believe that the value of Mr. Paxson's stock exceeds the call price.

> FN27. *Id.* at 3.

> FN28. *See Unitrin, Inc. v. American Gen. Corp.,* Del.Supr., 651 A.2d 1361, 1380-81 (1995).

**\*6** As the defendants point out, the Call Agreement actually places several very important burdens on Mr. Paxson's ownership of the Class B stock. First, Mr. Paxson has precluded himself from selling his shares to any other person or entity besides NBC for the duration of the Call Right. No other Pax stockholder has similarly had his liquidity taken away in this manner. Second, Mr. Paxson has agreed to relinquish a portion of any possible appreciation in his Pax stock above $20.00 or $22.50 per share. No other Pax shareholder has similarly relinquished his right to equity appreciation by having to sell at a defined or average price. Third, Mr. Paxson has agreed to sell his Class B stock, which alone provides control of the Company, to NBC at NBC's sole discretion, without necessarily

receiving the control premium his shares would ordinarily command. As the Call Agreement imposes substantial burdens on Mr. Paxson, in contrast to the substantial benefits alleged by plaintiffs, this argument in favor of plaintiffs' standing to bring a direct claim also fails.

In the plaintiffs' second attempt to support a direct claim, they allege that the defendants' failure to properly explore the Fox Offer, and later engage in serious negotiations with Fox, deprived the plaintiffs of the opportunity to realize the optimum value for their Pax stock. This, according to the plaintiffs, caused them to suffer individual injury. In substance, the plaintiffs argue that as soon as the Pax Board announced that Pax had retained Salomon to "explore strategic alternatives," the plaintiffs were entitled to a reasonable inference that the individual defendants had engaged in an active bidding process seeking to sell Pax and were under a fiduciary obligation to maximize value for the Pax shareholders in accordance with *Revlon, Inc. v. McAndrews & Forbes Holdings, Inc.* [FN29] This argument fails for at least two reasons.

> FN29. Del.Supr., 506 A.2d 173 (1986); *see also Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 47 (1994) ("Under Delaware law there are, generally speaking and without excluding other possibilities, two circumstances which may implicate *Revlon* duties. The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company.") (quoting *Paramount Communications, Inc. v. Time Inc.,* Del.Supr., 571 A.2d 1140, 1150 (1990).

First, the plaintiffs have failed to distinguish these facts from the numerous cases that have previously held that allegations that directors wrongfully failed to pursue business combinations are derivative in nature. Vice Chancellor Hartnett's opinion in *Sumers v. Beneficial Corporation* is representative of this line of authority. [FN30] In *Sumers,* the plaintiff alleged that directors of Beneficial Corporation announced that the corporation was for sale and then "summarily and arbitrarily rejected, without timely disclosure to the public shareholders," acquisition offers made at substantial premiums over the market price. [FN31] The Court held that

> FN30. Del. Ch., C.A. No. 8788, mem. op., Hartnett, V.C. (Mar. 9, 1988). *See also Bodkin v. Mercantile Stores Co.,* Del. Ch., C.A. No. 13770, mem. op., Chandler, V.C.

Not Reported in A.                                                                 Page 59
(Cite as: 2001 WL 812028, *6 (Del.Ch.))

(Nov. 1, 1996); *Lewis v. Spencer*, Del. Ch., C.A. No. 8651, mem. op., Berger, V.C. (Oct. 31, 1989), *aff'd*, Del.Supr., 577 A.2d 753 (1990).

> FN31. *Sumers*, mem. op. at 2.

[t]he complaint in the present suit ... does not state any claim of breach of contractual rights, nor any facts which, if true, would constitute a special or individual cause of action. Plaintiffs' injury, if any, is the same as the injury to all other stockholders of [the corporation]. [FN32]

> FN32. *Id.* at 4.

In the present case, the plaintiffs have represented to the Court that "[t]he Class B stock is identical to the Class A stock except for voting power. The economic attributes are identical." [FN33] They have failed to identify any significant difference between the facts in this matter and those found in the *Sumers* line of cases.

> FN33. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 10 n. 5.

*7 Second, *Revlon* does not apply where the plaintiffs cannot allege that a sale or change of control has taken place or necessarily will take place such that the public shareholders of a corporation have been or will be deprived of a control premium. To the contrary, it is clear from the complaint that Mr. Paxson controls Pax through his ownership of 39.2% of the Company's Class A stock and 100% of the Company's class B stock. These holdings collectively represent 75% of Pax's voting power. If NBC exercises its Call Right, a possibility that is by no means assured, it will control Pax. If NBC does not exercise, Mr. Paxson will retain control. In either circumstance therefore, the minority public shareholders of Pax will be subject to a controlling shareholder. The only difference would be the identity of that controlling shareholder. In other words, the public shareholders of Pax will never be in the position to collectively control the corporation and therefore receive a control premium for their shares.

This Court's recent decision in *In re Digex Shareholders Litigation* [FN34] is directly on point as to *Revlon's* applicability to the facts of this case. There, WorldCom, Inc. ("WorldCom") sought to acquire Digex, Inc. ("Digex"). However, another company, Intermedia Communications, Inc. ("Intermedia"), was the majority shareholder of Digex. Ultimately, Worldcom entered into a merger with Intermedia

instead of Digex, a transaction by which it would effectively acquire Intermedia's controlling stake in Digex. During the litigation that ensued, Digex's minority public stockholders sought to assert a *Revlon* claim that they had been deprived of a substantial premium for their shares. The Court rejected this claim, noting that "[t]he Digex minority existed before the proposed merger and it will not change under the proposed transaction. What will change is the ownership of Digex's majority shareholder, Intermedia." [FN35] Similarly here, even if NBC exercises its Call Right, from the perspective of a Pax minority shareholder, all that will change is the identity of the majority shareholder. [FN36]

> FN34. Del. Ch., C.A. No. 18336, mem. op., Chandler, C. (Dec. 13, 2000).

> FN35. *Id.* at 40.

> FN36. *See also In re Santa Fe Pac. Corp. Shareholders Litig.*, Del.Supr., 669 A.2d 59, 70-71 (1995) ("Plaintiffs appear to rest their claim of a duty to seek the best value reasonably available on allegations that the Board initiated an active bidding process. Plaintiffs do not consider, however, that this method of invoking the duty requires that the Board also seek to sell control of the company or take other actions which would result in a break-up of the company.")

The plaintiffs try to avoid *Digex's* reasoning by asserting that the entire Company was for sale, thus triggering the directors' *Revlon* duties, as soon as Pax announced that it "had formally retained Salomon to explore strategic alternatives." [FN37] Plaintiffs' contend that they are entitled to the reasonable inference that the announcement of the engagement of an investment bank to "explore strategic alternatives" is well-known industry lexicon for a company that has initiated an active sales process. [FN38]

> FN37. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 3, 10-11.

> FN38. *Id.* at 10-11.

This assertion is simply not in accord with Delaware law. The phrase "strategic alternatives" contemplates the possibility of many types of transactions. A sale of the company may be one. It goes without saying, however, that many other types of transactions including special dividend payments, stock repurchases, stock issuances, or recapitalizations are all

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                                                    Page 60
(Cite as: 2001 WL 812028, *7 (Del.Ch.))

within the purview of "strategic alternatives."
Moreover, numerous cases have held that *Revlon*
duties have not applied even where companies have
hired investment bankers. [FN39] This case is no
different.

> FN39. *See, e.g., In re Santa Fe Pac. Corp.,*
> 669 A.2d at 70-71; *In re Delta & Pineland
> Co. Shareholders Litig.,* Del. Ch., C.A. No.
> 17707, mem. op., Chandler, C. (June 21,
> 2000).

   *8 Finally, plaintiffs insist most urgently that this case
is controlled by Vice Chancellor Strine's opinion in *In
re Gaylord Container Corp. Shareholders Litigation.*
[FN40] They invoke *Gaylord* to support their argument
that they have suffered a direct injury as a result of
being "prevented from receiving an adequate offer for
their shares." [FN41] Plaintiffs' reliance on *Gaylord* is
misplaced. *Gaylord* involved *Unocal* claims where a
board of directors allegedly enacted defensive
measures intended to restrict shareholder action and to
make an acquisition virtually impossible without the
board's consent. Here, the plaintiffs have alleged no
*Unocal* claims, nor are there facts present here which
could support such a claim. The arguments made in
*Gaylord* simply do not apply to the facts present in this
case.

> FN40. Del. Ch., 747 A.2d 71 (1999).

> FN41. Pl.'s Answering Br. in Opp'n to Defs.'
> Mot. to Dismiss, at 11.

   For all of the reasons discussed above, the plaintiffs'
claims are solely derivative in nature. As such, Claim I
must be dismissed for failing to state a direct claim.

*C. Claim II*

   The plaintiffs have asserted a derivative claim on
behalf of Pax to redress injuries allegedly suffered and
to be suffered by the Company as a direct result of the
Individual Defendants' purported fiduciary duty
violations. The defendants argue that Claim II must be
dismissed because it fails to meet the pleading
requirements of Chancery Rule 23.1 to excuse
plaintiffs' failure to make pre-suit demand on the Pax
Board. [FN42] Not surprisingly, plaintiffs respond that
they are properly excused from making demand
because the Pax Board acted for entrenchment
purposes, Mr. Paxson dominated and controlled the
Pax board, and Mr. Paxson enjoyed a personal
financial interest not shared with the other

stockholders.

> FN42. Ct. Ch. R. 23.1. The rule states in
> pertinent part, "[t]he complaint shall ... allege
> with particularity the efforts, if any, made by
> the plaintiff to obtain the action the plaintiff
> desires from the directors or comparable
> authority and the reasons for the plaintiff's
> failure to obtain the action or for not making
> the effort."

   To allege with particularity that a demand upon the
board would have been futile, the plaintiffs must
establish a reasonable doubt that: (1) a majority of the
board of directors is disinterested and independent; and
(2) the challenged transaction was a valid exercise of
business judgment. [FN43]

> FN43. *Aronson v. Lewis,* Del.Supr., 473
> A.2d 805, 814 (1984).

   The plaintiffs have attempted to establish reasonable
doubt under the first prong of the *Aronson* test by
arguing that the directors of Pax were motivated by
their desire to remain entrenched. They base this
allegation on the argument that had the defendants
negotiated a takeover by Fox, the positions of the
Individual Defendants may have been in jeopardy.
Conversely, the transaction ultimately entered into with
NBC did not oust the Individual Defendants from their
positions at Pax. [FN44] Therefore, the plaintiffs
contend that it is reasonable to infer that the
defendants' alleged rejection of the Fox Offer was
motivated by their desire to entrench themselves in
office rather than from a desire to engage in an
"investment-oriented" transaction as opposed to an
outright sale of the Company.

> FN44. The plaintiffs seem to disregard the
> fact that if NBC gains control of Pax pursuant
> to the NBC Transactions, the Individual
> Defendants stand a distinct possibility of
> being ousted from their positions.

   The plaintiffs also contend that because Mr. Paxson
has granted NBC the Call Right, he enjoys a unique
financial benefit not shared by the other Pax
shareholders. As discussed above, the plaintiffs appear
to have misunderstood the nature of a call option.
There is no assurance that the Call Right will ever be
exercised. In fact, as noted above, Mr. Paxson has
encumbered ownership of his class B Pax shares in
several ways that are unique to him. Additionally, even
if NBC exercises the Call Right, the resulting stock
sale will merely be because NBC, a third party, has

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

concluded that that decision is in its, not Mr. Paxson's, best interests.

**\*9** Under the standard to be applied in cases where plaintiffs plead pre-suit demand futility, "the decision to reject a takeover proposal, hostile or friendly, will not excuse demand absent particularized allegations of a breach of fiduciary duty, such as self-dealing, fraud, overreaching, or lack of good faith." [FN45] Nothing even close to such an allegation has been made here. Further, the plaintiffs essentially argue that demand must be excused in any case where directors refrain from selling a company. As *Pogostin* makes clear, this is not the law of Delaware. [FN46]

> FN45. *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 627 (1984).

> FN46. *Id.*

Moreover, it is well-established that a successful claim of demand futility requires the existence of an *actual threat* to the directors' positions on the board. [FN47] No such allegation exists here either, as director removal could not occur without the consent of the controlling shareholder, Mr. Paxson. There has been no allegation that Mr. Paxson sought to remove himself or any other Pax director from office. [FN48]

> FN47. *See, e.g., Bodkin,* mem. op. at 8; *Greenwald v. Batterson,* Del. Ch., C.A. No. 16475, mem. op. at 11, Lamb, V.C. (July 26, 1999) ("the mere allegation that directors have taken action to entrench themselves without an allegation that the directors believed themselves vulnerable to removal from office, will not excuse demand."); *Grobow v. Perot,* Del. Ch., 526 A.2d 914, 922-23 (1987), *aff'd,* Del.Supr., 539 A.2d 180 (1988).

> FN48. *See Bodkin,* at 8.

The plaintiffs also attempt to satisfy *Aronson* by arguing that a majority of Pax's directors were dominated and controlled by Mr. Paxson. Specifically, they contend that directors Sagansky and Bocock are beholden to Lowell Paxson merely because they are officers of Pax. That is, the plaintiffs point out that Mr. Paxson is Mr. Sagansky's and Mr. Bocock's superior in the Company, he has voting control of Pax, and he has the power to elect all of the Company's directors and appoint its officers. [FN49]

> FN49. Pls.' Answering Br. in Opp'n to Defs.'

> Mot. to Dismiss, at 15.

Nevertheless, under *Aronson,*

> in the demand context even proof of majority ownership does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person. [FN50]

> FN50. *Aronson,* 473 A.2d at 815.

In reviewing whether demand has been satisfied, after "giving little or no weight to vague conclusory statements, ... [the Court] must evaluate, under the reasonable doubt standard, whether the facts pleaded with particularity are consistent with domination of the independence of the judgment of the remaining board members." [FN51] Even where the *potential* for domination or control by a controlling shareholder exists, the complaint must allege particularized allegations that would support an inference of domination or control. [FN52]

> FN51. *Friedman v. Beningson,* C.A. No. 12231, mem. op. at 10, Allen, C. (Dec. 4, 1995).

> FN52. *See, e.g., Friedman* (noting where the plaintiffs alleged domination of board decision making by a corporation's Chairman, CEO, President, and 36% stockholder, "[f]rom a practical perspective, this confluence of voting control with directorial and official decision making authority, while not itself sufficient under the cases to support a conclusion of reasonable doubt is nevertheless quite consistent with control of the board."); *Heineman v. Datapoint Corp.,* Del.Supr., 611 A.2d 950, 955 (1992) (holding in a case where a controlling stockholder allegedly dominated and controlled the board through his control of the positions of other directors as well as his control of business organizations in which the other directors were investors that "an allegation of controlling stock ownership does not raise, *per se,* a reasonable doubt as to the board's independence.... To raise such a doubt a party attacking a corporate transaction must advance particularized factual allegations from which the Court of Chancery can reasonably infer that the board members who approved the transaction are acting at the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

direction of the allegedly dominating individual or entity." (citations omitted).)

Here, paragraph 43 of the Complaint alleges that defendants Sagansky and Bocock enjoy certain "emoluments of office" that they seek to retain. [FN53] At no point do the plaintiffs describe or list any of these alleged emoluments. The complaint also alleges that defendants Sagansky and Bocock receive "substantial salaries, bonuses, payments, benefits, and/or other emoluments." [FN54] Again, these generalized allegations do not contain any details that would suggest impropriety specifically on behalf of these two directors/officers of Pax. The complaint contains no information concerning what amounts of stock or cash have been paid either to Sagansky or to Bocock as compensation or as a bonus. There is no information plead regarding the stock ownership positions of either of these directors/officers in the Company that might help to illustrate what the Fox Offer might have meant to them financially. There are no allegations concerning any payments that may have flowed to these two director/officers should they have been terminated, constructively or otherwise, had the alleged Fox Offer been pursued. [FN55]

FN53. Compl., ¶ 43(1).

FN54. Compl., ¶ 43(2).

FN55. This short list of information the plaintiffs may have pled to support their claims is merely illustrative and is in no way to be construed as exhaustive or as sufficient.

*10 Moreover, the Complaint alleges that "[t]he Board members also have close personal and business ties with each other." [FN56] This allegation is also hopelessly vague. The plaintiffs have not pled the existence of any particular personal relationship between either Bocock or Sagansky and Paxson. The plaintiffs have pled no facts beyond this very generalized statement that supports this allegation in any way.

FN56. Compl., ¶ 43(2). For an example where allegations of interestedness were found sufficient to withstand a 12(b)(6) motion, see In re Ply Gem Indus., Inc. Shareholders Litig., Del. Ch., Consol. C.A. No. 15779-NC, Noble, V.C. (June 26, 2001).

In sum, the plaintiffs have not pled, with any particularity, facts that could support an excusal of demand under the reasonable doubt standard. This lack of specificity is simply insufficient to satisfy even the barest requirements set forth by Aronson and its progeny.

Finally, I note in passing plaintiffs' allegation that, in rejecting the Fox Offer in favor of the NBC Transactions, Mr. Paxson acted out of a personal desire to remain entrenched and to continue to enjoy the emoluments of office. Quite frankly, I am unable to grasp the distinction (accepting the premise that Mr. Paxson desires to remain in office) between a cash sale to Fox as opposed to the series of transactions that would lead to NBC being in control of Fox. In either circumstance, Mr. Paxson would seem to have about the same chance of remaining in office. Furthermore, it appears from plaintiffs' allegations that Mr. Paxson must be willing to forego a substantial cash premium on his significant holdings of Pax stock offered by way of the Fox Offer, in order to continue to enjoy certain unspecified "emoluments of his offices" in Pax. [FN57] This would not have been in Mr. Paxson's economic best interests and thus seems to defy logic. [FN58]

FN57. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 15. Plaintiffs essentially posit that Mr. Paxson declined a premium that totaled over $200 million in order to continue to enjoy the emoluments of his offices. I note that NBC has the right to exercise the Call Option whenever it wishes, removing Mr. Paxson from control of the Company. This fact seems to have been overlooked in the plaintiffs' analysis.

FN58. See Parnes v. Bally Entertainment Corp., Del. Ch., C.A. No. 15192, mem. op. at 31-32, Chandler, C. (Feb. 23, 2001).

III. CONCLUSION

Based on all the foregoing reasons, I conclude that the complaint in the present suit alleges claims that are solely derivative in nature. Due to the plaintiffs' failure to comply with the demand requirements of Court of Chancery Rule 23.1, the complaint is therefore dismissed.

An Order has been entered consistent with the determination reached in this memorandum opinion.

ORDER

For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
**(Cite as: 2001 WL 812028, \*10 (Del.Ch.))**

 ORDERED that the complaint is dismissed for failure
to comply with Court of Chancery Rule 23.1.

 2001 WL 812028 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.