# APPENDIX
# PART 4

# TAB 9

Not Reported in F.Supp.  
1992 WL 73555 (D.Mass.)  
**(Cite as: 1992 WL 73555 (D.Mass.))**

Page 1

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.

In Re STRATUS COMPUTER, INC. SECURITIES LITIGATION, Defendant.

CIV. A. 89-2075-Z.

March 27, 1992.  
Recommendations on Motions to Dismiss Dec. 10, 1991.

Thomas G. Shapiro, Shapiro, Grace & Haber, Boston, Mass., for plaintiffs.

Maynard Mohan Kirpalani, Parker, Coulter, Daley & White, Boston, Mass., for defendant Stratus Computer, Inc.

Peter M. Saparoff, Palmer & Dodge, Helen A. Robichaud, Gaston & Snow, Boston, Mass., for defendants Status Computer, Inc., William E. Foster and Gary Haroian.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, for defendants William H. Thompson, Robert E. Donahue and Robert A. Freiburghouse.

Peter J. MacDonald, Hale & Dorr, Boston, Mass., for defendants Alexander V. D'Arbeloff, Robert M. Morrill, Paul J. Ferri, Gardner C. Hendrie and J. Burgess Jamieson.

ZOBEL, District Judge.

*1 The Objection to the recommendation pertaining to Counts I, II and IV are overruled. Plaintiff does not object to the recommendation pertaining to Count III. The Court accepts the Magistrate Judge's findings and recommendations and allows the motion to dismiss. The complaint shall be dismissed as to all defendants. Donald Oldham having never been served, the complaints against him is dismissed for failure to make service.

*FINDINGS AND RECOMMENDATIONS ON DEFENDANTS MOTIONS TO DISMISS*

ALEXANDER, United States Magistrate Judge.

These motions have been referred to this Court by Order of Reference. The defendants move to dismiss each count of the plaintiffs' Consolidated Amended Complaint on a various grounds. The factual background is culled from the allegations of the complaint, which the Court takes as true for the purposes of the motions to dismiss under Fed.R.Civ.P. 12(b)(6). *See Lessler v. Little,* 857 F.2d 866, 867 (1st Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989) (citations omitted). This Court will not dismiss a count for failure to state a claim unless "it appears beyond doubt that [plaintiffs] can prove no set of facts [that] would entitle [them] to relief." *Id.* (citations omitted).

FACTUAL BACKGROUND  
*Plaintiffs*

Plaintiff Laurel Catania purchased 500 shares of stock in the defendant Stratus Computer, Inc. (Stratus) on August 23, 1989. Plaintiff Stephen DelGrasso purchased 200 shares of Stratus stock on August 18, 1989. Plaintiff John Garabidian purchased 200 shares of Stratus stock on August 28, 1989. Plaintiff Bruce Wilhelmy purchased 1,000 shares of Stratus stock on September 15, 1989. Plaintiff Elliot Shwartz purchased 100 shares of Stratus stock on August 9, 1989. These plaintiffs bring suit on behalf of themselves and a class of all who purchased shares of Stratus stock between July 25, 1989, and September 19, 1989. Plaintiff Steven D. Bergman brings his action as a derivative suit on behalf of Stratus.

*Defendants*

Stratus is a Massachusetts corporation. It manufactures and sells fault tolerant computer systems, used in automatic teller machine networks and securities trading systems, among other applications. Defendant William E. Foster is President, Chief Executive Officer and Chairman of the Board of Stratus. Defendant Gary E. Haroian is Senior Vice President of Finance and Administration, Chief Financial Officer and Treasurer. Defendant Robert Freiburghouse is Senior Vice President of Engineering. Defendant Robert Donahue is Vice President and Controller. Defendant William H. Thompson is Senior Vice President of Marketing. Defendant J. Donald Oldham is Vice President. Defendants Alexander V. D'Arbeloff, Robert M. Morrill, Paul J. Ferri, Gardner C. Hendrie and J. Burgess Jamieson are directors of Stratus.

*Facts*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                       Page 2
(Cite as: 1992 WL 73555, *1 (D.Mass.))

Stratus has been a highly successful company in the computer industry. Stratus sells its products both internationally and domestically. The domestic channels for its sales are under distribution agreements with IBM Corporation (IBM) and Olivetti & Co., S.P.A. (Olivetti). In 1988, the sales to IBM accrued to 32% of Stratus's revenues, while the sales to Olivetti made up 8% of revenues.

*2 Since 1982, Stratus has grown annually from 40% to 50%. In the April 3, 1989, edition of *Business Week,* defendant Foster predicted 30% growth for the third quarter of 1989. In a Letter to Shareholders in the Annual Report for the fiscal year ended January 1, 1989, which was disseminated in late March of 1989, defendant Foster expressed confidence and optimism in Stratus's performance and growth. The statement mentioned historical increases in growth and emphasized the unique aspects of Stratus, as well as its relationship with IBM, as attributes. The statement discussed efforts to build sales through product development. The statement highlighted the telecommunications industry, declaring that Stratus expected to exceed the projected industry growth rate of 25%, due to its unique attributes. The statement recounted past international growth, and expressed the expectation that the same international growth rate would continue in 1989. The statement represented that Stratus's "products are in greater demand than ever before," and asserted as "fact" that Stratus was "positioned to achieve even greater long term success." *Consolidated Amended Complaint* ¶ 36. On March 27, 1989, Prudential-Bache Securities, Inc. issued a report quoting defendant Haroian as stating that "the company feels that a 40%-60% [annual growth] is sustainable for the long term." *Id.* ¶ 37.

As growth had continued in the first quarter, defendant Foster made statements to the *Origin Universal News Service* on April 25, 1989, and to *The Boston Globe* on April 26, 1989, discussing that growth. He emphasized Stratus's international performance, noting that it offset softness in the domestic market. He stated that "we remain confident in our continued growth both domestically and internationally." *Id.* ¶ 38.

Stratus's Form 10-Q for the quarter ended April 2, 1989, depicted an increase in net revenues of 41%. The defendants attributed the increase to "the growth in the marketplace" and "the rapidly growing customer base." Financial analysts stated that the first quarter results concurred with their projections.

On May 2, 1989, defendant Foster represented to *The Boston Globe* that domestic sales had slowed, but that the strength of Stratus's other markets was such that there would be no overall slowing down. On May 15, 1989, *Computer World* reported Stratus's growth in the Pacific Rim, noting that Stratus expected the same growth in 1989.

In a July 29, 1989, press release announcing earnings for the second quarter of 1989, Foster emphasized those aspects that had contributed to the growth, noting an increase in customer accounts, both domestically and internationally. The plaintiffs contend that this statement, coupled with projections of a 30% increase in earnings, was materially misleading, because Stratus knew or recklessly disregarded indications that a decrease in the domestic market would make the overall business outlook inaccurate.

*3 Revenues and income for the second quarter and for the six months of the first two quarters of 1989 increased by greater than 30%. On August 4, *Value Line* estimated that Stratus's 1989 sales would reflect a 34% increase over 1988 sales. It noted a 25% rate of growth in the United States, stating that sales through IBM were expanding at a rate of approximately 45%.

The complaint alleges that, during the class period, Stratus was in contact with professional participants in the stock market and that the individual defendants periodically provided information to analysts at meetings. Stratus confirmed the reasonableness of the analysts' estimates for 1989, at these meetings, including at a meeting on September 12, 1989, at Cowen & Co., in New York City. On September 17, 1989, *The New York Times* estimated revenues at $360 million for the year. By late July of 1989, the complaint alleges, the defendants knew or recklessly disregarded that projected levels of sales were not attainable.

On September 18, 1989, the defendants announced that revenues and earnings for the third quarter would not meet expectations, due to weakness in the domestic market. They indicated a 20% to 25% rate of growth in the short term. Dow Jones, *Business Week* and *McGraw Hill News* reported this information. *Value Line* reduced its earnings estimates for 1989. The price of Stratus's stock fell from $33-1/2 on September 15, 1989 to $26. Third quarter earnings ultimately released on October 20, 1989, indicated an increase in earnings of only 12%, due to a weak domestic market.

Plaintiffs allege that the directors made several sales

Case 1:04-cv-10177-NG   Document 23-4   Filed 11/12/2004   Page 5 of 20

Not Reported in F.Supp.  
(Cite as: 1992 WL 73555, *3 (D.Mass.))

Page 3

of Stratus stock with material knowledge of the decline in growth. Defendant Oldham sold 2,825 shares on September 5 and 14. Defendant Thompson sold 3,000 shares on August 25. Defendant Donahue sold 1,807 shares on August 24. Defendant Freiburghouse sold 28,938 shares on August 1 and 30,000 shares on May 12.

ANALYSIS

*Count I*

Count I alleges that the defendants made materially misleading statements that would create the impression that Stratus was growing at a 30% rate, when the defendants knew or recklessly disregarded indications that such a growth rate was not attainable. Count I claims that these misleading statements, made with knowledge of their falsity or reckless disregard for the truth, violated sections 10(b) and 20 of the Securities and Exchange Act, as well as Rule 10b-5, promulgated by the Securities and Exchange Commission. Stratus and each of the individual defendants, except defendant Oldham move to dismiss this count. Their primary contention is that the count fails to satisfy the pleading requirements of Rule 9(b).

According to Rule 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The First Circuit has identified three purposes behind this rule:

*4 (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations.

*New England Data Services., Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir.1987). Because the danger of strike suits is great in cases alleging securities fraud, this circuit will construe Rule 9(b) strictly in that context. *Id.* at 288; *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991).

Under Rule 9(b), while the pleadings need not prove the case, they "must 'specif[y] ... the time, place and content of .. [each] alleged false representation.' " *Konstantinakos v. Federal Deposit Ins. Corp.*, 719 F.Supp. 35, 38 (D.Mass.1989) (quoting *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 229 (1st Cir.1980)). The First Circuit has stated that Rule 9(b) "requires specification of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *McGinty*, 633 F.2d at 228, *quoted in New England Data Services*, 829 F.2d at 288. The pleadings, however, must provide a minimal foundation of indicia as to the misleading qualities of the statements. *See id.* (pleadings failed to satisfy Rule 9(b), because "the complaint does not explain what was misleading about any of the challenged statements"); *Wittenberg v. Continental Real Estate Partners, LTD-74A*, 478 F.Supp. 504, 508 (D.Mass.1979) (complaint must "state how each statement amounted to a misrepresentation.") (citation omitted), *aff'd per curiam*, 625 F.2d 5 (1st Cir.1980). The First Circuit has recently stated that the complaint must include "factual allegations that would support a reasonable inference that adverse circumstances existed ... and were known and deliberately disregarded by defendants." *Romani*, 929 F.2d at 878. "The requirement that supporting facts be pleaded applies even when the fraud relates to matters peculiarly within the knowledge of the opposing party." *Id.* (citing *Wayne Investment v. Gulf Oil Corp.*, 739 F.2d 11, 13-14 (1st Cir.1984); *New England Data Services*, 829 F.2d at 288); *see also In re Healthco International, Inc.*, Civil Action No. 91-10710-MA, Memorandum and Order at 14 n. 9 (D.Mass. Nov. 7, 1991). Thus, the complaint may not rest on mere allegations and conclusions, *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir.1985); nor may it be so groundless in fact that it proceeds only on mere "information and belief." *See Driscoll v. Landmark Bank for Sav.*, 758 F.Supp. 48, 51 (D.Mass.1991) (citing *Wayne*, 739 F.2d at 14).

The complaint alleges statements attributable to the nominal defendant Stratus and defendants Foster and Haroian that are sufficiently specific to satisfy the time, place and content requirements. As to defendants Donahue, Freiburghouse and Thompson, however, the complaint does not allege anything except vague connections by virtue of their positions. Merely being a director or officer is not ground for imposition of liability under § 10(b). *Loan v. Federal Deposit Ins. Corp.*, 717 F.Supp. 964, 968 (D.Mass.1989). Rule 9(b) requires specification of which defendants are accused of performing what acts. *Hayduk*, 775 F.2d at 443; *Loan*, 717 F.Supp. at 968 ("[w]here multiple defendants are involved, each person's role in the alleged fraud must be particularized in order to satisfy Rule 9(b)"); *see also Konstantinakos*, 719 F.Supp. at 39 (complaint dismissed, *inter alia*, because there were

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1992 WL 73555, *4 (D.Mass.))

Page 4

no allegations as to the roles of each individual defendant). On this basis, alone, this Court should dismiss Count I as to defendants Donahue, Freiburghouse and Thompson.

*5 As to the other defendants, while the statements alleged to be fraudulent are set out in the complaint according to the time, place and content requirements, they do not meet the standard recently set by the First Circuit in *Romani*. Beyond the time, place and content requirement, the complaint must allege adverse circumstances that were known and disregarded. *Romani*, 929 F.2d at 878. The plaintiffs, here, do not state any facts that would serve as a starting point on which to build a case of knowing or reckless disregard of adverse circumstances. [FN1] Rather, the complaint is alleged on mere "information and belief." The First Circuit has circumscribed the use of this manner of pleading fraud in the most explicit terms. [FN2]

As Magistrate Judge Ponsor recently noted in a similar case:

The allegations of fraud here are so generic that [they] could have been drafted by any competent practitioner generally familiar with securities fraud case law, without any independent knowledge of defendants' conduct, simply by collating language from leading cases with excerpts from defendants' ... 10-Q forms, annual reports and press releases.

*Wilkes v. Heritage Bancorp, Inc.*, 1990 WL 263612 (D.Mass.1990). Courts in this district have repeatedly dismissed complaints that merely quote company statements or predictions as supporting facts for fraud. *See, e.g., Driscoll*, 758 F.Supp. 48; *Akerman v. Bankworcester Corp.*, 751 F.Supp. 11 (D.Mass.1990); *Loan*, 717 F.Supp. at 967. Such an exiguous body of factual support will not pass muster. Count I fails to meet the requirements of Rule 9(b).

*Count II*

Count II alleges that the defendants Donahue, Freiburghouse, Oldham and Thompson traded Stratus stock on inside information, in contravention of sections 10(b) and 20(A)(a) of the Securities and Exchange Act and Rule 10b-5. Defendants Donahue, Freiburghouse and Thompson move this Court to dismiss Count II.

The defendants first contend that the Court should dismiss Count II for failure to comply with Rule 9(b). This Court finds persuasive the defendants' argument that Rule 9(b) is applicable. In *Hayduk*, the First Circuit indicated that Rule 9(b) applies in any case where "*fraud lies at the core of the action.*'" *Hayduk*, 775 F.2d at 443 (quoting *Lopez v. Bulova Watch Co., Inc.*, 582 F.Supp. 755, 766 (D.R.I.1984)) (emphasis in original). The plaintiff is essentially arguing that the defendants engaged in a conspiracy to defraud. As Rule 10b-5 states, it is unlawful:

(c) To engage in any act, practice, or course of business which operates or would operate as a *fraud or deceit* upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (emphasis added). As one court noted, "Congress ... amended the Exchange Act to expressly provide a private right of action for contemporaneous buyers and sellers asserting *claims of fraud committed through insider trading.*" *Elysian Federal Savings Bank v. First Interregional Equity Corp.*, 713 F.Supp. 737 (D.N.J.1989). Thus, it would appear that insider trading claims demand application of Rule 9(b).

*6 Having determined that Rule 9(b) applies, Count II should be dismissed against defendants Donahue, Freiburghouse and Thompson for the same reasons as Count I. [FN3] The factual allegations simply do not make reference to them, except to identify their status. There is no allegation as to what information they knew but did not disclose.

Defendants Donahue, Freiburghouse and Thompson also argue for dismissal on the grounds that none of the plaintiffs traded securities "contemporaneously" with them, as required under the Securities and Exchange Act. *See* 15 U.S.C. § 78t-1(a). Judge McNaught has ruled out an interpretation of "contemporaneous" that would include purchases by the plaintiffs *before* the defendants. *Backman v. Polaroid Corp.*, 540 F.Supp. 667, 670 (D.Mass.1982); *see also Abelson v. Strong*, 644 F.Supp. 524, 527 (D.Mass.1986) (allegations that plaintiffs purchased "during the period of market manipulation" were not sufficient to confer standing on plaintiffs to bring insider trading suit). He also refused to include within that term purchases that occurred four days (two trading days) after a defendant's sale. *Backman*, 540 F.Supp. at 671. The facts of that case would bar all claims except plaintiff Garibidian's claim against defendant Thompson, as Garibidian purchased within three days (one trading day) of Thompson's sale. The defendants argue persuasively, however, that the logic of Judge McNaught's decision requires an interpretation of "contemporaneous" to mean "same

Not Reported in F.Supp.  
(Cite as: 1992 WL 73555, \*6 (D.Mass.))

Page 5

day." [FN4] Under such an interpretation, none of the plaintiffs would have standing to bring the class suit under Count II.

*Count III*

Count III is a more cursory version of Count I, alleging that the defendants other than the derivative director defendants engaged in negligent misrepresentation by refusing to exercise reasonable care in the statements they made. This assertion appears to relate back to the allegations that the defendants acted in reckless disregard of indications that earnings would decrease. What these indications were is not clear. Count III is even less particular than Count I. The defendants move to dismiss it.

This district has clearly held that Rule 9(b) applies to claims of negligent misrepresentation. *Howard v. Cycare Systems, Inc.,* 128 F.R.D. 159 (D.Mass.1989); *Morgan v. Financial Planning Advisors,* 701 F.Supp. 923 (D.Mass.1988); *Flier v. Billingsley,* 1988 WL 92465 (D.Mass.1988). The same rule against pleadings on "information and belief" and the same policy against allowing "strike suits" apply to negligent misrepresentation claims as apply to outright claims of fraud. *Howard,* 128 F.R.D. at 162 (quoting *Wayne,* 739 F.2d at 13-14); *Simcox v. San Juan Shipyard, Inc.,* 754 F.2d 430, 439 (1st Cir.1985). Furthermore, without the duties imposed by the securities laws, it is unclear upon what this claim is based. The factual statements appear to have been true when made, and the other statements are "statements of opinion [or] of conditions to exist in the future," which are not actionable under Massachusetts law. *Morgan,* 701 F.Supp. at 927 (quoting *Pepsi Cola Metropolitan Bottling Co. v. Pleasure Island, Inc.,* 345 F.2d 617, 622 (1st Cir.1965)). Massachusetts law, moreover, generally imposes a requirement of privity in order to bring a claim of negligent misrepresentation. *Capitol Indemnity Corp. v. Freedom House Development Corp.,* 487 F.Supp. 839, 842 (D.Mass.1980). It is unclear how the plaintiffs in this case could meet that requirement, given that they are merely purchasers on a public stock exchange. *See, e.g., In re Consumers Power Company Securities Litigation,* 105 F.R.D. 583, 596-98 (E.D.Mich.1985) (stock purchasers lacked privity and, thus, could not sue for negligent misrepresentation). Thus, Count III should be dismissed.

*Count IV*

\*7 Count IV is a derivative suit brought by plaintiff Bergman on behalf of Stratus for breach of fiduciary duty to Stratus by the individual defendants. The defendants invoke four grounds for dismissal of this count: (1) failure to meet Rule 9(b)'s particularity requirement; (2) failure to meet Rule 8(a)'s pleading requirement; (3) failure of the plaintiff to plead with particularity the circumstances excusing demand on the corporation, as required by Rule 23.1; and (4) failure to verify the complaint, as required by Rule 23.1. Each of these grounds supports dismissal.

The defendants' first argument is that Rule 9(b) applies and that plaintiff Bergman has not complied with it. Oddly, plaintiff Bergman does not respond to this argument, but merely incorporates by reference the arguments of the other plaintiffs with regard to Rule 9(b) under the other counts of the complaint. This Court sees nothing to rebut the defendants' arguments.

Judge Keeton has stated that Rule 9(b)'s particularity requirement "extends to averments of fraud or mistake, whatever may be the theory of legal duty-- statutory, tort, contractual, or *fiduciary.*" *Shapiro v. Miami Oil Producers, Inc.,* 84 F.R.D. 234, 236 (D.Mass.1979) (emphasis added); *see also Hayduk,* 775 F.2d at 443 ("where fraud lies at the core of the action, Rule 9(b) applies"). If the breach of fiduciary duty derives from conduct that is negligent, rather than fraudulent, however, Rule 9(b) would not apply. *Shapiro,* 84 F.R.D. at 236. That the breach of fiduciary duty alleged here derives from conduct that is fraudulent, and not merely negligent, is plain from the complaint. Plaintiff Bergman claims: that each of the directors "participated in, knew of, and was on notice of the wrongful and illegal conduct" (*Consolidated Amended Complaint* ¶ 82(e)); that the directors "knowingly engaged in self-dealing from which they profited personally" (*Id.* ¶ 82(f)); and that the defendants' conduct violated their fiduciary duties of candor and loyalty "requir[ing] them to disseminate truthful information" (*Id.* ¶ 83). The derivative count plainly asserts the sort of claim for which Rule 9(b) contemplates the application of its particularity requirement.

Having determined that Rule 9(b) applies, it is immediately apparent that Count IV does not comply with the rule. The allegations are vague and amorphous. It is not at all clear which defendants are alleged to have performed what specific acts that would constitute a violation of fiduciary duty. *See Hurley v. Federal Deposit Ins. Corp.,* 719 F.Supp. 27, 31 (D.Mass.1989) ("Where multiple defendants are involved, each defendant's role in the fraud must be

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
(Cite as: 1992 WL 73555, *7 (D.Mass.))

Page 6

particularized.... This requirement serves to place each defendant on notice of what role he is alleged to have played in the fraud.") (citations omitted); *Margaret Hall Foundation, Inc. v. Atlantic Financial Management, Inc.,* 572 F.Supp. 1475, 1481 (D.Mass.1983) ("In a securities fraud case ..., it is clear that the complaint should 'particularize as to each ... of the defendants the activities for which the plaintiff seeks to hold them accountable.' ") (quoting *Lerman v. ITB Management Corp.,* 58 F.R.D. 153, 156 (D.Mass.1973)). Count IV only discusses the defendants in collective terminology, making no reference to any particular act of any individual defendant.

*8 Beyond the vague allegations of participation, implication, knowledge and dissemination there is no reference to adverse circumstances that would provide a foundation upon which to build these charges. While the charges seem to stem from Counts I through III, five of the six directors sued under Count IV are in no way implicated in Counts I through III. It is, thus, by no means clear whom plaintiff Bergman alleges to have done what. Not only does Count IV fail to provide the defendants with the notice requisite to the preparation of meaningful responses, but the danger of holding the individual defendants *in terrorem* and subjecting them to a frivolous suit that might likely injure their reputations is high. *See New England Data Services,* 829 F.2d at 289; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539, 552 (1975), *reh'g denied,* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975). Thus, Count IV warrants dismissal under Rule 9(b).

The defendants also argue that Count IV fails to comply even with the basic pleading requirements of Rule 8(a) and, thus, should be dismissed under Rule 12(b)(6) for failure to state a claim. Their argument on this ground is also persuasive. Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief. Fed.R.Civ.P. 8(a). As the First Circuit has stated:

While a complaint need only set out 'a generalized statement of facts,' there must be enough information 'to outline the elements of the pleaders' claim.' ... More detail is required than a plaintiff's bald statement 'that he has a valid claim of some type,' and courts do 'not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened....' "

*Kadar Corp. v. Milbury,* 549 F.2d 230, 233 (1st Cir.1977) (quoting Wright & Miller, Federal Practice and Procedure: Civil § 1357). The complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80, 85 (1957).

Nowhere does Count IV charge the outside directors with any specific wrongdoing. Rather, Count IV seems to implicate them only because of their status as directors. That tenuous connection, however, is an insufficient basis for alleging a cause of action. *Cf. Konstantinakos,* 719 F.Supp. at 39 (mere status as directors is insufficient basis to support cause of action for securities fraud in which directors did not participate); *Schmid v. National Bank of Greece, S.A.,* 622 F.Supp. 704, 712 (D.Mass.1985), *aff'd,* 802 F.2d 439 (1st Cir.1986) ("An officer of a corporation does not incur personal liability for a tort committed by the corporation or by another corporate officer merely by virtue of the office which he holds in the corporation.") (citations omitted). As Judge Tauro has noted, where a complaint alleges "violation of ... fiduciary duties" without "attempt[ing] to delineate among the defendants their participation or responsibilities in the activities which are the subject of th[e] suit," it does not give the defendants the notice required of either Rule 8(a) or Rule 9(b). *Lerman,* 58 F.R.D. at 155 & n. 2 (D.Mass.1973).

*9 Yet another reason for dismissing Count IV is the failure of plaintiff Bergman to make a demand on the board of directors that the corporation bring the lawsuit. Rule 23.1 requires that, in a derivative action, the complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ..., and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. The First Circuit has explained:

The purpose of the demand requirement is, of course, to require resort to the body legally charged with conduct of the company's affairs before licensing suit in the company's name by persons not so charged. Given the expense of litigation and the normal presumptions running in favor of those acting for the company, this seems only reasonable.

*Heit v. Baird,* 567 F.2d 1157, 1162 n. 6 (1st Cir.1977). Thus, the particularity requirement under Rule 23.1 "is not a technical rule of pleading, but one of substantive right." *In re Kauffman Mutual Fund*

Not Reported in F.Supp.  
(Cite as: 1992 WL 73555, *9 (D.Mass.))

Page 7

*Actions,* 479 F.2d 257, 263 (1st Cir.1973), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973) (quoting *Bartlett v. New York, N.H. & H.R.R.,* 221 Mass. 530, 538, 109 N.E. 452, 456 (1915)).

There are two phases of the demand requirement. Not only must any reasons excusing demand satisfy the substantive state law, but Rule 23.1 imposes an independent federal requirement that such reasons be pled with particularity. *Tural v. Rogatol Distributors, Inc.,* No. 91-1472 (1st Cir. Nov. 27, 1991). In pleading the reasons excusing demand, the particularity rule requires more specificity of the complaint than mere allegations of "participation" or "acquiescence" in the challenged conduct. *Grossman v. Johnson,* 674 F.2d 115, 124 (1st Cir.1982), *cert. denied, Grossman v. Fidelity Municipal Bond Fund, Inc.,* 459 U.S. 838, 103 S.Ct. 85, 74 L.Ed.2d 80 (1982), *reh'g denied,* 459 U.S. 1138, 103 S.Ct. 774, 74 L.Ed.2d 986 (1983). The factual allegations of the complaint must describe misconduct with specificity. *Heit,* 567 F.2d at 1161 (citing 3B Moore's Federal Practice ¶ 23.1.19, at 23.1-83 (Rev. ed. 1977)).

Much of the rationale behind this Court's finding that Count IV does not satisfy the Rule 9(b) particularity requirement applies *a fortiori* to the Rule 23.1 particularity requirement. In vague and conclusory fashion, Count IV asserts six reasons justifying demand futility, none of which have specific factual support in the complaint and one of which contradicts an earlier count in the complaint. According to the complaint, demand would be futile because:

(a) The acts complained of herein constitute violations of the federal securities and other federal laws and fiduciary duties owed by directors and officers and these acts are incapable of ratification;

(b) Each of the directors is implicated in the dissemination of the false and misleading statements and omissions alleged herein;

*10 (c) Each member of the Board of Directors had access to confidential financial information indicating Stratus' true and [sic] financial condition and prospects.

(d) Social, business and other relationships tie the officers and directors of Stratus to one another, and any legitimate 'independent' action by Stratus against any of the individual defendants would be impossible;

(e) Each of the current directors participated in, knew of, and was on notice of the wrongful and illegal conduct alleged herein; and

(f) Five of the six directors who comprise Stratus' board have been involved in trading in Stratus' common stock on the basis of material non-public information and will be personally liable for any wrongdoing, in that they knowingly engaged in self-dealing from which they profitted [sic] personally.

*Consolidated Amended Complaint* ¶ 82.

Starting with the most egregious deviation from Rule 23.1, item (f) stands in peculiar contrast to the conspicuous absence of five of the six directors from any of the other counts of the complaint, including Count II--the count alleging insider trading. Such a mysterious and vague assertion cannot satisfy the particularity requirement. Count II, moreover, fails to state a claim or meet the particularity requirement of Rule 9(b). *See supra.* Item (a) is also suspect, as this complaint fails to allege particular conduct that would violate the federal securities laws. What other federal laws may be implicated is unclear. [FN5]

Finally, allowing a complaint to circumvent the demand requirement through allegations as vague and conclusory as items (b) through (e) would render the demand requirement nugatory. These items, in light of the factual allegations of the complaint, cannot be understood to allege particular misconduct by the individual directors nor particular circumstances specific to each director. "[S]tripped of these conclusory allegations, the facts set forth in the complaint" fail to "make out with sufficient particularity misconduct that would excuse a demand on directors." *Heit,* 567 F.2d at 1161 (citing 3B Moore's Federal Practice ¶ 23.1.19, at 23.1-83 (Rev. ed. 1977).

These allegations are similar to the one Judge Tauro found insufficient to satisfy Rule 23.1's particularity requirement in *Lerman.* In that case, the plaintiff alleged:

Demand upon the Fund to bring this action would be futile because those in control of the Fund are alleged wrongdoers. Statutes place such decisions in the directors and control of such an action would be subject to control of the wrongdoers, preventing diligent prosecution.

*Lerman,* 58 F.Supp. at 156 (quoting *Complaint* ¶ 24). The allegations in the case at bar have the same degree of particularity as the allegation in *Lerman.*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
(Cite as: 1992 WL 73555, *10 (D.Mass.))

Page 8

*Kauffman* and *Heit* require more than such vague and conclusory allegations. [FN6]

Yet another ground for dismissing Count IV is Rule 23.1's verification requirement. Rule 23.1 states, in part: "In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ... the complaint shall be verified...." Fed.R.Civ.P. 23.1. Verification is another safeguard to ensure that complaints in derivative suits are well-grounded in fact and to prevent frivolous litigation. *Smachlo v. Birkelo*, 576 F.Supp. 1439, 1442 (D.Del.1983) (citations omitted). Plaintiff Bergman contends that his verification of the first complaint should excuse verification of the Consolidated Amended Complaint. The case law, however, stands against him. *See, e.g., Federal Deposit Ins. Corp. v. Kerr*, 637 F.Supp. 828, 843 (W.D.N.C.1986) (requiring verification of Second Amended Complaint); *Stein v. Aldrich* [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,473, at 92,781 (S.D.N.Y.1980) (amended complaint "must be verified by plaintiff"). In this case, verification of the Consolidated Amended Complaint might have eliminated some of the discrepancies. Thus, on any of these grounds, Count IV should be dismissed.

*Conclusion*

*11 In light of these findings, this Court recommends that Counts I, II, III and IV be dismissed as to all defendants except defendant Oldham, who has not filed a motion to dismiss.

FN1. The complaint offers several statements of accurate historical facts regarding past growth, products and performance. These statements place Stratus in a positive light. There are also many statements of opinion and predictions offering an optimistic prognosis on the expected rate of growth. Some of the opinions and predictions are specifically quantifiable. *See Priest v. Zayre*, Civil Action No. 86-2411-Z, Memorandum of Decision at 5 (D.Mass. May 1, 1987). Nonparty statements by the media and financial analysts bolstered this optimistic impression. While the complaint gives the times, places and contents of statements made expressing confidence in the projected rate of Stratus's growth, it does not allege quantifiable information that the defendants could have known and disregarded. *Cf. Healthco*, Civil Action No. 91-10710-MA, Memorandum and Order at 14, n. 9 ("Plaintiffs aver no facts as to how Defendants' accounting system would or should have made them aware of any concrete financial figures for the fourth quarter before ... [defendant] announced its expected losses for the fourth quarter."). Without allegations of lack of reasonable basis, knowing falsehood or recklessness that satisfy Rule 9(b), the predictions are not actionable. *See Kirby v. Cullinet Software, Inc.*, 721 F.Supp. 1444, 1453-54 (D.Mass.1989).

The complaint merely leaves this Court to infer adverse circumstances from the rather vague charges of insider trading (which, as will be discussed *infra* under Count II, are inadequate). Notably, however, there are no allegations of sales of stock by defendants Foster and Haroian, the only defendants to whom the plaintiffs have attributed representations that would satisfy the time, place and content requirements. Charges that some defendants sold stock, while other defendants made optimistic projections about the company, clearly will not, without a particularly pled conspiracy, satisfy Rule 9(b). *Fingar v. Prudential-Bache Securities, Inc.*, 662 F.Supp. 1119, 1124 (E.D.N.Y.1987). Here, the plaintiffs seem to plead a conspiracy by knowledge, which is inadequate. *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.1990), *cert. denied*, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) (quoting *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir.1986) ("the case 'against an aider, abettor, or conspirator may not rest on a bare inference that the defendant must have had knowledge of the facts....' ").

FN2. *Romani*, 929 F.2d at 828 ("Where allegations of fraud are ... based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief."); *Hayduk*, 775 F.2d at 444 ("Without supporting facts regarding the circumstances surrounding the formation of the conspiracy to defraud plaintiffs or plaintiffs' basis for believing that a conspiracy existed for the purpose of defrauding them, the allegation becomes a conclusional accusation of the sort that is proscribed by Rule 9(b)."); *Wayne*, 739 F.2d at 14 (complaint may not proceed on mere "information and belief" without some independent factual basis for alleging fraud--"even when the fraud relates to matters peculiarly within the knowledge of the opposing party"); *see also Driscoll*, 758 F.Supp. at 51 ("Allegations in the form of mere conclusions, accusations, or speculation are not sufficient to meet Rule 9(b)'s particularity requirement without supporting

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10177-NG    Document 23-4    Filed 11/12/2004    Page 11 of 20

Not Reported in F.Supp.
(Cite as: 1992 WL 73555, *11 (D.Mass.))
Page 9

facts surrounding the scheme to defraud or a basis for believing such a scheme existed.") (citing *Hayduk*, 775 F.2d at 444; *Wayne*, 739 F.2d at 14). As Judge Caffrey has stated: "Rule 9(b) does not require the plaintiff to present specific evidence; however, the plaintiff must identify some facts or circumstances to support the allegations of fraud...." *Id.* at 52.

FN3. This Court has not received a motion from defendant Oldham.

FN4. As Judge McNaught noted, the rationale for limiting recovery to those who traded during the same period of insider trading is that " '[n]on-contemporaneous traders do not require the special protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information.' " *Id.* at 670 (quoting *Fridrich v. Bradford*, 542 F.2d 307, 326-27 (6th Cir.1976) (Celebrezze, concurring)); *see also Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94-95 (2d Cir.1981) (same). Judge Skinner cited *Backman* and *Wilson* with approval in *Abelson*, 644 F.2d at 527. In a more open-ended violation, such as large scale "tipping," this rationale would not apply, and the rule might be less restrictive. *See Backman*, 540 F.Supp. at 670 n. 1.

FN5. Item (a) would also encounter difficulties in the substantive prong of the demand analysis. The assertion that the defendants violated federal statutes is an insufficient basis for excusing demand, at least under federal law. *Lewis v. Sporck*, 612 F.Supp. 1316, 1322-23 (N.D.Cal.1985). Nor does it matter that the directors would essentially have to sue themselves. *Id.*

FN6. Insofar as five of the six defendants are not named in the count alleging insider trading and insofar as that count does not pass muster, the substantive prong of the demand requirement also poses a major difficulty. The complaint fails to implicate a majority of the directors in wrongdoing. *See Datz v. Keller*, 347 Mass. 766, 196 N.E.2d 922, 923 (1964) (dismissing complaint for insufficiently making "allegations of fact that both a majority of the directors and the holders of a majority stock interest are in the group of wrongdoers, or under their control"), *cited in Houle v. Low*, 407 Mass. 810, 813 n. 3, 556 N.E.2d 51, 53 n. 3 (1990); *accord Jackson v. Stuhlfire*, 28 Mass.App.Ct. 924, 926, 547 N.E.2d 1146, 1148 (1990); *see also Hayden v. Perfection Cooler Co.*, 227 Mass. 589, 593, 116 N.E. 871, 873 (1917) (derivative plaintiff must make "specific allegations that the majority of the directors were wilfully disregardful of the interests of the corporation"). The language of these cases indicates that Massachusetts law would only excuse demand for harm caused to the corporation by a majority of the directors. Here, the complaint fails to allege conduct beyond "mere approval of corporate action, absent self-interest or other indication of bias." *Kauffman*, 479 F.2d at 264; *see also Heit*, 567 F.2d at 1162 ("As the complaint fails to set forth facts showing that a majority of the directors ... engaged in a facially improper transaction, we hold that the failure of the plaintiff to make a demand on the directors before commencing this suit was unexcused, and dismissal of the case for noncompliance with Rule 23.1 was proper."); *Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir.1983) ("absent specific allegations of self-dealing or bias on the part of a majority of the board, mere approval and acquiescence are insufficient to render demand futile").

1992 WL 73555 (D.Mass.)

END OF DOCUMENT

# TAB 10

Not Reported in A.  
1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259  
**(Cite as: 1997 WL 208955 (Del.Ch.))**

Page 46

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

INTERNATIONAL **EQUITY CAPITAL GROWTH** FUND, L.P., Plaintiff,  
v.  
C. Stephen CLEGG and Jacob Pollock, Defendants,  
and  
Globe Building Materials, Inc. and Diamond Home Services, Inc., Nominal Defendants.

No. Civ.A. 14995.

Submitted Aug. 16, 1996.  
Decided April 22, 1997.

Martin P. Thily, S. Mark Hurd, Morris, Nichols, Arsht & Tunnell, Wilmington, for Plaintiff.

Charles S. Crompton, Jr., Arthur L. Dent, Potter, Anderson & Corroon, Wilmington, for Defendants C. Stephen Clegg, Jacob Pollock.

Lawrence S. Drexler, Oberly, Jennings & Drexler, P.A., Wilmington, for Nominal Defendants, Globe Building Materials, Inc., Diamond Home Services, Inc.

ALLEN, Chancellor

*1 In this action a 26% shareholder in a close corporation challenges a series of transactions between the corporation, its 80%-owned subsidiary Diamond Home Services, ("Diamond"), and two directors of both corporations. The action is before this court on a motion to dismiss the complaint pursuant to Court of Chancery Rule 23.1, and with regard to certain claims, for dismissal for lack of standing and failure to state a claim on which relief can be granted. The motion has been brought by the individual defendants. This motion requires determining the independence of a board of directors for the purposes of excusing demand under Rule 23.1; the time of an alleged wrong in a continuing contractual relationship, for the purposes of determining a shareholder's standing to challenge that alleged wrong; and the ripeness for adjudication of an alleged usurpation of a corporate opportunity and an uncompleted merger transaction.

This action is brought as a derivative claim by International **Equity Capital Growth** Fund, L.P. ("Fund"), purportedly on behalf of Globe Building Materials, Inc. ("Globe"). The complaint alleges that C. Stephen Clegg ("Clegg") and Jacob Pollock ("Pollack"), the chairman and CEO and a director, respectively of both Globe and its subsidiary, have engaged in transactions with Globe and Diamond to the detriment of those companies in violation of their fiduciary duties. Plaintiff seeks (1) a declaration the defendants violated their fiduciary duties (2) recissory and compensatory damages and (3) a declaration that the announced terms of Diamond's proposed acquisition of The Handy Craftsman, Inc. ("Handy Craftsman") are unfair to Diamond.

For the reasons set forth below, I conclude that (1) plaintiffs have met their burden under Court of Chancery Rule 23.1 of casting reasonable doubt upon the independence of the Globe and Diamond boards with respect to the majority of the transactions that are the basis for this action; (2) the plaintiffs have alleged specific facts relating to the performance of the financial services contract that state a claim which the plaintiffs have standing to assert; and (3) while the alleged usurpation of a corporate opportunity has been completed, the agreement between Diamond and Handy Craftsman as described in the plaintiff's pleadings does not constitute a claim ripe for judicial review. Consequently, the defendant's motion for dismissal pursuant to Rule 23.1 for failure to make demand and for lack of standing must in large part be denied, while the defendant's motion to dismiss claims relating to Diamond's prospective purchase of Handy Craftsman is granted and those claims will be dismissed without prejudice.

I. THEORIES OF THE COMPLAINT

Count 1 of the Complaint accuses Mr. Clegg of arranging for Globe to enter into transactions in which he had a personal financial interest and which were unfair to Globe. Count II accuses Mr. Clegg of arranging for Diamond to enter into unfair self-dealing transactions in violation of his fiduciary duty of loyalty. Count II accuses Mr. Pollock of arranging the sale of the Chester Facility to Globe in violation of his fiduciary duties of loyalty to Globe. Count IV accuses Mr. Clegg of usurping a corporate opportunity of Diamond's when he purchased Handy Craftsman in 1995.

*2 With regard to Fund's standing to litigate issues relating to the 1989 Financial Services Agreement between Globe and Clegg Industries, Fund claims that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Globe's payments under the Agreement became wasteful in 1993 when Clegg Industries became incapable of rendering any services in consideration for the payments. Consequently, Fund argues the wasteful conduct occurred in 1993, after it had made its investment in Globe. As to the ripeness of Fund's claim regarding Diamond's purchase of Handy Craftsman, Fund asserts that Diamond and Clegg have entered into an agreement in principle, a contractual obligation under Delaware law subject to judicial review.

II. THE PARTIES

Plaintiff is a Bermuda partnership, that on December 31, 1992, purchased 505 shares of Globe common stock, warrants to purchase 1,350 shares of Globe common stock, and $2,000,000 in Globe subordinated debt. Currently, Fund owns 630 shares of Globe common stock, comprising 26.2% of Globe's total common stock.

Nominal defendant Globe is a Delaware corporation manufacturing shingles and other roofing products. Globe was formed in 1989 by Clegg Industries. Nominal defendant Diamond is a Delaware corporation formed in 1993 by Globe. Diamond markets and sells residential roofing systems and home improvement products. It is 80 % owned by Globe.

C. Stephen Clegg is the Chairman of the Board, Chief Executive Officer, Treasurer, and Assistant Secretary of Globe. He also controls the voting rights for 1,472 shares of Globe stock (56.5% of the voting stock). Directly or indirectly, Mr. Clegg owns or controls 888 shares; 240 of these shares are held by Globe Investors, Inc, 47% of whose voting shares are owned by Clegg, and 225 shares are held by 29 W Partners, 100% of whose voting shares are held by Clegg. Clegg is Chairman of the Board, Chief Executive Officer, and President of Diamond. In addition, Clegg is Chairman of the Board and Chief Executive Officer of Clegg Industries, Mid-West Spring Manufacturing Company, Catalog Holdings, Inc. ("CHI"), and a director and member of the Compensation Committee of the Board of Directors of Ravens Metal Products, Inc. ("Ravens").

Defendant Jacob Pollock has been a director of Globe since 1989, and a director of Diamond since September, 1993. He is also a director of Spring, and the controlling shareholder, Chairman of the Board and Chief Executive Officer of Ravens. Additionally, he allegedly owns and controls J. Pollock & Company.

The directors of Globe currently are Clegg, Pollock, Globe Vice-President John Klikus ("Klikus") and George A. Stinson ("Stinson"). The directors of Diamond are Clegg, Pollock, Diamond Vice-President James M. Gillespie ("Gillespie"), Stinson, and James F. Bere Jr.

III. THE GOVERNANCE OF GLOBE AND DIAMOND GENERALLY

Defendants' motion seeks to dismiss all claims for failure to make demand upon the boards of Globe and Diamond pursuant to Court of Chancery Rule 23.1. Plaintiff's argument that demand is excused rests in every case on the alleged lack of independence of the majority of those boards. The evaluation of the independence of a board for the purposes of a Rule 23.1 motion is necessarily factually specific. There are few bright lines. Evaluation of director independence for this purpose is performed under the cross-pressures of two applicable principles. First, at such an early stage, plaintiff should be accorded the benefit of a pleading doubt. Second, plaintiff must however not rely on "conclusions" but must plead specific "facts" showing a reasonable doubt as to the applicability of the business judgment presumption.

*3 In evaluating whether the plaintiff has cast reasonable doubt on these Boards' ability independently to evaluate these transactions at the time this suit was filed, I place weight on several allegations that bear upon the extent of the independence of a majority of the boards of directors of Globe and Diamond from Clegg. First, Clegg held 56% of the voting stock of Globe at the time of the filing of the complaint. Globe held 80% of the voting stock of Diamond. Consequently, it was within Clegg's power to designate and to remove members of either Board if he felt so moved. Allegations of voting control coupled with self interested transactions themselves go very far to excusing demand. Second, Clegg is alleged to have used this power in his management of each Board between January and May of 1996 for the purposes of removing directors who had exercised independent judgement.

In January 1996, Mr. Clegg allegedly refused to reappoint the independent director Abplanalp to the Globe board, replacing him with Globe Vice President John Klikus. Also in January, Mr. Clegg allegedly fired Mr. Griffin as Chief Executive Officer of Diamond and had him removed from Diamond's board, following a disagreement over a transaction in which

Not Reported in A. Page 48
(Cite as: 1997 WL 208955, *3 (Del.Ch.))

Mr. Clegg had a personal interest. Finally, Mr. Clegg is alleged to have threatened Mr. Lefkowitz, the plaintiff's nominee to the Globe Board of Director, with being removed from the Globe board at some unspecified time, and to have then actually purported to remove him after plaintiff filed this action.

As to the role of plaintiffs, I note that Fund made a substantial investment in Globe more than three years before the complaint was filed. It sought to participate in the Globe's governance by designating Lefkowitz to Globe's board under a Shareholders Agreement. Lefkowitz is alleged to have objected to some of the transactions which are the subjects of this action. I conclude that these allegations are sufficient to raise a reasonable doubt concerning the independence of the Globe and Diamond boards.

IV. THE CLEGG-GLOBE TRANSACTIONS

A. The Financial Services Transactions

Upon Clegg Industries' incorporation of Globe in 1989 and Mr. Clegg's appointment of Globe's directors, Globe entered into a contract with Clegg Industries for unspecified financial services pursuant to which Globe would pay Clegg Industries $350,000 per year (the "Financial Services Agreement"). In addition, under the contract, Globe was required to compensate any Clegg Industries employee while working for Globe without any reduction in the $350,000 payment due Clegg Industries under the Agreement. This contract was in force at the time of Fund's initial investment in Globe on December 31, 1992.

It is alleged that during 1993, all Clegg Industries employees other than Mr. Clegg were transferred from the Clegg Industries payroll to the Globe payroll. Among the employees purportedly so transferred was a particular Clegg Industries employee who had been performing financial services for Globe. Payments to Clegg Industries under the Financial Services Agreement continued.

*4 Secondly, in July 1993, Globe issued Clegg Industries 1,534 shares of its preferred stock and warrants to purchase 13 shares of common stock having a total assigned value of $152,000. These securities were purportedly issued to compensate Clegg Industries for investment banking services related to Globe's 1993 investment in Diamond. In December 1993, Globe paid Clegg Industries a further $150,000, purportedly as compensation for work related to Globe's senior note offering earlier in 1993. Both payments were approved by Globe's Board of Directors and, plaintiff claims, governed services of the type Clegg Industries had an obligation to provide Globe under the 1989 Financial Services Agreement. Thus the payments are alleged to be wasteful and unfair self-dealing.

Thirdly, in January 1995, Mr. Clegg dismissed the Chief Executive Officer of Diamond and assumed the position himself at a salary of $100,000 per year. Pursuant to Globe's Bank Loan and Security Agreement, payments under the Financial Services Agreement had to be reduced to $250,000 per year as a result. The $100,000 payment to Clegg is challenged as a breach of loyalty.

1. Plaintiffs Standing to Challenge the Financial Services Transactions

For a plaintiff to have standing to bring a derivative action, that plaintiff must have been a shareholder of the corporation at the time the alleged wrong was committed, and must remain a shareholder through the course of the derivative action. 8 Del. C. § 327. Plaintiff claims that Clegg Industries' failure after 1993 to provide services under the Financial Services Agreement created a right to terminate its payments which Globe failed to assert. A failure by a corporation to assert a legal right at the time that right comes into being may be a breach of duty, and thus a possible basis for a shareholder's derivative action. [FN1] Plaintiff was a shareholder throughout 1993 and has remained a shareholder since that time. Consequently plaintiff has standing to bring claims for breach of fiduciary duty arising out of Globe's failure to enforce its contract with Clegg Industries. [FN2]

> FN1. *Mills Acquisition Co. v. MacMillan, Inc.*, Del.Supr., 559 A.2d 1261, 1280 (1989).

> FN2. The standing rule is to be construed to facilitate the discovery of wrongdoing and discourage "strike suits." There is precedent suggesting that even were the transaction under consideration found to have commenced with the execution of the Financial Services Agreement in 1989, in the particulars of this case, where the plaintiff has a substantial and continuing equity investment, a limited equitable exception to the standing requirement to facilitate the correction of corporate wrongdoing may apply. *Schreiber v. Bryan*, Del. Ch., 396 A.2d 512 (1978); *MacIray v. Pleasant Hills, Inc.*, Del. Ch., 109 A.2d 830 (1954).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2. Demand Excused

Rule 23.1 requires plaintiffs in a derivative action to "allege with particularity" their reasons for not making a pre-suit demand upon the board of directors to bring the action. Its purpose is to "ensure that a stockholder exhausts his intra corporate remedies, and then to provide a safeguard against strike suits." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 811 (1984). Plaintiff has the burden of alleging particularized facts raising a reasonable doubt that the board of directors is disinterested and independent or that the challenged transactions were the product of a valid exercise of business judgment. *Aronson v. Lewis, supra.*

The complaint involves a number of separate transactions occurring over several years and involving different persons in different capacities. In these circumstances, the appropriate approach to board independence is to review each board's independence with respect to each transaction alleged to give rise to a claim against the defendant directors of that corporation.

*5 For the reasons discussed below, I find plaintiff has met its burden of alleging specific facts raising reasonable doubts as to the majority of the board's independence when approving the Financial Services Transactions.

The Financial Services Transactions allegedly each involved Mr. Clegg or corporations he controlled as counter parties. Because Mr. Clegg is alleged to have voting control of Globe, this conflict of interest is sufficient to cast reasonable doubt on Mr. Clegg's independence. But there is more alleged than this alone. Mr. Klikus is an employee of Globe answering to Mr. Clegg. Mr. Clegg allegedly named him to the board in January 1996, replacing the long-standing independent board member, Abplanalp. Additionally, plaintiff alleges that in early 1996, Mr. Clegg removed John Griffin as President of Diamond for refusing to enter into an interested transaction with Mr. Clegg at the price Mr. Clegg desired. This allegation supports an inference that Mr. Klikus was aware of the alleged circumstances surrounding Mr. Griffin's dismissal. In light of Mr. Clegg's control of 56% of Globe's voting stock, these additional alleged facts are sufficient to support the inference that Klikus is beholden to Clegg and therefore to cast doubt on his ability to independently review the Financial Services Transactions.

With respect to the independence of Mr. Pollock, defendant rightly argues that Mr. Pollock does not have a direct interest in the Financial Services Transactions or the other Clegg-Globe Transactions. Pollock did approve each of the transactions named in this complaint in which either he or Clegg was the counter party. Pollock benefitted from certain of these transactions; Clegg benefitted from others, at the alleged expense of Globe. These allegations reflecting a clear pattern of mutual advantage is sufficient in my opinion to raise a reasonable doubt concerning Mr. Pollock's independence of Mr. Clegg. Finally, Mr. Clegg is on the Compensation Committee of Ravens, with direct involvement in setting Mr. Pollock's compensation as Chief Executive Officer of that company.

Perhaps neither Mr. Clegg's control of the majority of shares of Globe, Mr. Pollock's approval of any single one of the Clegg-Globe Transactions, Mr. Clegg's serving on Ravens' board of director, nor Mr. Pollock's appointment by Mr. Clegg, each taken in isolation, would be sufficient to cast reasonable doubt on Mr. Pollock's independence with respect to the transaction at issue. In combination, however, I find the plaintiff has alleged particular facts that support a reasonable doubt as to Pollock's independence with respect to Globe's Financial Services Transactions. Since Clegg, Klikus, and Pollock made up a majority of the Globe board of directors at the time the complaint was filed, demand is excused with respect to claims arising from the Financial Services Transactions.

B. The Clegg-Globe Marketing Services Transactions

In 1994, Globe allegedly paid $150,000 Catalog Holdings, Inc. ("CHI"), a corporation alleged to be controlled by Mr. Clegg, purportedly in consideration for the future placing of advertisements for Globe's products in the catalog of H.I., Inc., a wholly-owned subsidiary of CHI. In addition, Globe allegedly received an option expiring August 1, 1997 to purchase 3,275 shares of CHI common stock for $100 per share. Fund asserts that H.I., Inc. was a new company with a limited customer base and limited retail catalog distribution. Additionally, Fund claims that shingles for residential roofing, Globe's principle product, are not generally advertised directly to consumers. Finally, Fund asserts that CIR's current market value is far below $100 per share, implying that the value of the options Globe received is relatively low.

*6 The same analysis that led me to conclude that the plaintiff had cast doubt on the Globe board's independence in approving the Financial Services

Transactions for the purposes of excusing demand under Rule 23.1 applies to the Marketing Transactions. Consequently, demand is excused.

### V. E CLEGG-DIAMOND MARKETING SERVICES TRANSACTION

Simultaneously with the Globe-CHI transaction, Diamond allegedly paid $150,000 to CI-H, purportedly for access to 3,0004,000 sales leads and certain call center services from H.I., Inc., as well as options to purchase 3,275 shares of CHI common stock for $100 per share. However, plaintiff alleges that H.I., Inc. *had no such sales leads to sell* and that Diamond already owned a call service center. Thus plaintiff alleges that the transaction was self-interested, wasteful, and disloyal.

I find that plaintiffs have met their burden of casting doubt on the independence of the Diamond board with respect to this transaction, and that consequently, demand is excused. Plaintiff alleges, that as an owner of CHI, Mr. Clegg had a direct personal interest in Diamond's issuing securities to CHI in exchange for unnecessary marketing services. This allegation is sufficient to support a reasonable doubt as to Mr. Clegg's independence with respect to these transactions.

Mr. Gillespie is a director of Diamond and an employee of the company. Mr. Clegg, by virtue of his majority control of Globe and Globe's 80% ownership of Diamond, controls Diamond. Mr. Clegg, it is alleged, used this control in February, 1996, to remove an employee director for challenging his judgment on an allegedly self-interested transaction with respect to Mr. Clegg. As was the case with Mr. Klikus, plaintiff pleaded sufficient particular facts to support a reasonable doubt as to Gillespie's independence based on his being beholden to Mr. Clegg.

Finally, as to Mr. Pollock's independence, the same factual circumstances discussed above in relation to Mr. Pollock's involvement in the Clegg-Globe transactions apply to the Clegg-Diamond Marketing Services Transaction. The alleged firing and removal of Mr. Griffin speaks generally to how Mr. Pollock might view Mr. Clegg's approach to board management. Consequently, I conclude plaintiff has pleaded sufficient factually specific allegations to support a reasonable doubt that a majority of the Diamond Board at the time the complaint was filed were capable of independent judgement with respect to both the Clegg-Diamond Marketing Services Transactions and Mr. Clegg's alleged purchase of Handy Craftsman.

### VI. THE PURCHASE OF B CHESTER FACILITY

This claim relates to Globe's purchase of a shingle manufacturing plant from a company allegedly controlled by Mr. Pollock. Fund alleges this purchase was the product of Mr. Pollock's fraudulent self-dealing with the assistance of Mr. Clegg. Fund further alleges that Mr. Pollock and Mr. Clegg failed to disclose material information about the state of the shingle plant to the board in violation of their fiduciary duties. For the reasons that follow I conclude that these allegations do support a reasonable doubt as to the independence of the Globe board with respect to both the Chester Facility acquisition itself and the disclosure issue arising out of the acquisition. Thus plaintiff is excused from making presuit demand regarding these claims.

*7 Fund alleges that during 1992 and January 1993, Globe leased a shingle manufacturing plant in Chester, West Virginia, from J. Pollock & Co. for $205,000 and that in February 1993, Mr. Clegg proposed to the Board of Globe that Globe purchase the Chester facility for $940,000. The Board approved the purchase. Fund alleges that at the time of the purchase Globe's shingle operations' sales and gross profits were declining, and its shingle plants were operating at less than full capacity. Fund also alleged that Mr. Clegg and Mr. Pollock knew at the time of the proposal to the board that the Chester facility was "deficient in design and structure," and failed to share their knowledge with Globe's other board members.

In early 1995, Mr. Clegg told the Board of Globe that Diamond was refusing to buy shingles from the Chester Facility. Mr. Lefkowitz later informed the Globe Board that he had learned the Chester Facility manufactured poor quality shingles due to the defects present at the time of Globe's purchase of the Chester Facility from J. Pollock & Co. In the fall of 1995, the Chester Facility was closed due to the product quality problems.

Since Mr. Pollock was a board member of Globe, Globe's purchase of the Chester Facility was an interested transaction insofar as he was concerned. However, plaintiffs have not alleged facts that directly would establish a conflict of interest with respect to other members of the Globe board with respect to the Chester Facility Acquisition. In fact, Mr. Clegg's 47% direct ownership of Globe gives him a substantial

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.  
(Cite as: 1997 WL 208955, *7 (Del.Ch.))

Page 51

direct financial interest in Globe obtaining fair terms in the transaction. The complaint alleges Mr. Clegg and Mr. Pollock acted together to mislead the other members of the board into entering purchasing the facility. The complaint does not allege Mr. Clegg's motive for acting against his economic interest, but the clear implication of the complaint as a whole is that Mr. Clegg relied on Mr. Pollock's support in effectuating numerous other transactions that benefited Mr. Clegg carrying out his own allegedly disloyal actions. It is one possible and not unreasonable inference that all the alleged actions complained of together constituted a common scheme by Mr. Clegg and Mr. Pollock. While a finding that such a plan or scheme actually existed would require proof, as a matter of pleading I am satisfied that plaintiff has raised a reasonable doubt as to Mr. Clegg's independence, and thus the independence of a majority of the Globe board, with respect to Globe's acquisition of the Chester Facility.

In addition, plaintiff has alleged that both Mr. Clegg and Mr. Pollock knew at the time of the Globe board's consideration of the Chester Facility Acquisition that the Facility had design and structural flaws rendering it incapable of producing salable shingles. Plaintiff further alleges Clegg and Pollock concealed this information from the board. Such concealment would violate both directors' duty to disclose to other directors. *Hoover Industries v. Chase,* Del. Ch., C.A. No. 9276, slip. op. at 4 (July 13, 1988). With respect to this alleged breach of fiduciary duty, Mr. Pollock has an alleged direct financial interest casting doubt on the applicability of the business judgement rule. Mr. Clegg stands accused of a breach of duty of a more serious nature than the mere approval of the challenged transaction, and Mr. Klikus is, for the purpose of this transaction as well as the Clegg-Globe transactions, subject to reasonable doubts to his independence due to his being beholden to Clegg for his position as an employee of Globe. Consequently, as to allegations of breach of fiduciary duty due to Mr. Clegg and Mr. Pollock's alleged failure to disclose to the Globe board, plaintiff is excused from the demand requirement of Rule 23.1.

VII. THE HANDY CRAFTSMAN TRANSACTIONS AND THE DIAMOND IPO

*8 On May 12, 1994, the Diamond board allegedly specifically agreed to prohibit any officer from investing in a competitor of Diamond. The complaint is silent as to what form this agreement took. The exact nature of this agreement is of minor relevance in light of the existence of the corporate opportunity doctrine. In 1995, Mr. Clegg acquired Handy Craftsman, allegedly a competitor of Diamond's in the home improvement and repair business. This acquisition is the subject of plaintiff's claim for usurpation of a corporate opportunity.

In early 1996, Clegg approached the Donald Griffin, then the Chief Executive Officer of Diamond, and asked Mr. Griffin to arrange for Diamond to buy Handy Craftsman from him. Mr. Griffin allegedly refused to do so at the price Mr. Clegg wanted. Shortly thereafter, Mr. Clegg allegedly removed Mr. Griffin from the Diamond board, and had him dismissed from his position as Chief Executive Officer.

On April 19, 1996, Diamond filed a Form S-1 with the United States Securities and Exchange Commission, registering a public offering of 3,420,000 shares of Diamond, including a secondary offering of 833,000 Diamond shares owned by Globe. Mr. Clegg allegedly did not seek or obtain the consent of the Globe board for the sale of Globe's 833,000 Diamond shares. These shares constitute one-third of Globe's holding in Diamond. Mr. Lefkowitz has allegedly objected to Globe's sale of Diamond stock.

In its S-1 dated April 19, 1996, Diamond states it is going to acquire all or substantially all of the assets of Handy for $2,000,000. As of this date, the purchase of Handy Craftmen's assets has not been completed.

On the basis of these allegations, plaintiff brings claims derivatively against Mr. Clegg for usurping a corporate opportunity in violation of a board decision when he purchased Handy Craftsman; acting without authority to sell Globe's Diamond holdings in the 1996 IPO, and violating his duty of loyalty by arranging for Diamond's purchase of Handy Craftsman's assets for a price plaintiff alleges is "grossly in excess of their true worth."

A. Ripeness

Defendant's motion to dismiss seeks to have claims related to Diamond's pending acquisition of Handy Craftsman dismissed as unripe. Defendant argues that no contract for sale of Handy Craftsman exists, and that consequently there is no transaction for this court to review. Plaintiffs response is that an agreement in principle has been reached, which imposes certain obligations on both parties to complete the negotiations, and that consequently the terms on which agreement have been reached thus far are reviewable

Not Reported in A.      Page 52
(Cite as: 1997 WL 208955, *8 (Del.Ch.))

by this court.

This aspect of the defendant's motion applies solely to the plaintiff's claims of breach of the fiduciary duty of loyalty asserted in relation to the sale of Handy Craftsman to Diamond. It is not a defense to plaintiff's claim of usurpation of corporate opportunity directed at Mr. Clegg's 1995 completed acquisition of Handy Craftsman.

*9 As to the proposed Diamond acquisition, the law of contracts has long reflected the interdependent nature of the specific terms of a contract under negotiation. Consequently, mere agreements to agree are unenforceable at common law. However, plaintiff asserts that agreements to negotiate in good faith may be enforced if all the material terms of the contract have been agreed to by the parties. [FN3] Plaintiff has alleged Diamond "is paying" $2,000,000 for Handy. Plaintiff does not allege that Diamond has executed a contract purchasing Handy or its assets, or that all material terms of such a contract have been agreed to by the relevant parties. Plaintiff only alleges Diamond has announced its intention to make such an acquisition at a particular price. Price is not the only material term in such a contract, and consequently no contractual obligation has been created. Diamond has taken no action this court can review in connection with its announced intention to acquire Handy. Consequently, all claims for breach of fiduciary duty in relation to Diamond's announced intention to acquire Handy are dismissed without prejudice.

> FN3. Neither party seeks to show what the governing state law is for the alleged agreement in principle between Diamond and Handy. Fortunately, Delaware law, Indiana law (Diamond's principle place of business), Illinois law (Clegg's place of residence), and New York law (a common jurisdiction specified in merger and acquisition contracts) all require the parties to have reached agreement on all material terms before an "agreement to agree" will be enforced. *VS & A Communications Partners, LP. v. Palmer Broadcasting L.P.,* Del. Ch., C.A. No. 12521, Allen, C. (July 14, 1992), Mem. Op. at 6; *Kinko's Graphics Corp. v. Townsend,* Ind. D., 803 F.Supp. 1450 (1992); *Wagner Excello Foods, Inc. v. Fearn Intl., Inc.,* Ill.App., 235 Ill.App.3d 224, 176 Ill.Dec. 258, 601 N.E.2d 956 (1992); *Teachers Ins. & Annuity Ass'n of America v. Butler,* S.D.N.Y., 626 F.Supp. 1229 (1986).

B. Demand Futility with Respect to the Claim Arising from Clegg's Acquisition of Handy Craftsman

The reasoning that has led me to excuse the demand requirement in relation to plaintiff's other claims on behalf of Diamond against Mr. Clegg applies with particular force to plaintiffs claim of usurpation of corporate opportunity. Here plaintiff alleges that Mr. Clegg has removed a director specifically over issues relating to Mr. Clegg's investment in Handy Craftsman. This easily casts a reasonable doubt on the ability of Mr. Klikus, a Diamond employee, and Mr. Pollock, who was engaged in a web of dealings with Mr. Clegg, to act independently in reviewing plaintiffs allegations regarding Mr. Clegg's alleged purchase of a competing business.

C. Demand Futility With Respect to the Claim Arising from Prospective Sale of Globe's Stock in Diamond

Plaintiff alleges that Clegg arranged for Globe to include a portion of its investment in Diamond in a forthcoming sale of Diamond stock to the public without Globe's board approving the transaction. However, plaintiffs do not specify how these alleged facts constitute a wrong. Plaintiffs generally allege self-dealing by Mr. Clegg and Mr. Pollock, but this sale to the public is not a self-dealing transaction. A reasonable inference would be that the claim here is that Mr. Clegg as an officer exceeded his authority by selling a substantial portion of Globe's assets without board approval. As a general matter, corporate officers have the "inherent" authority to engage in acts "arising in the usual and regular course of business" without obtaining board approval. *Lee v. Jenkins Brothers,* 268 F.2d 357 (2d Cir.1959), cert. denied 361 U.S. 913, 80 S.Ct. 257, 4 L.Ed.2d 183, as cited in William L. Cary and Melvin Aron Eisenberg, CORPORATIONS: CASES AND MATERALS, 300 (7th Ed.1995). As is often the case in corporation law, there is no bright line distinguishing the ordinary business decision from the extraordinary one. Plaintiffs here allege that all of Globe's 1995 pre-tax earnings came from its stake in Diamond. Consequently, I find these allegations support a reasonable inference that the decision to sell a third of that stake in a public offering was an extraordinary one requiring board approval.

*10 However, plaintiffs have not alleged any facts suggesting this transaction was an interested one or that the board was in any way unable to review this particular action independently. Consequently, plaintiffs claim relating to the sale of Diamond stock is dismissed pursuant to Rule 23.1.

Not Reported in A.  
(Cite as: 1997 WL 208955, *10 (Del.Ch.))

Page 53

VIII. CONCLUSION

For the reasons set forth, the plaintiff's claims arising out of Diamond's efforts to purchase Handy Craftsman and Globe's efforts to sell a portion of its interest in Diamond are dismissed without prejudice. As to the remainder of the plaintiffs claims, the individual defendants' motion to dismiss is DENIED.

1997 WL 208955 (Del.Ch.), 23 Del. J. Corp. L. 259

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.