# APPENDIX
# PART 5

# TAB 11

Slip Copy
2004 WL 1418197 (S.D.N.Y.)
**(Cite as: 2004 WL 1418197 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

JPMORGAN CHASE BANK, in its capacity as
Administrative Agent under the Credit
Agreement, Plaintiff,
v.
Gary WINNICK, Dan J. Cohrs, Lodwrick M. Cook,
Hank Millner James C. Gorton,
Joseph Clayton, Thomas J. Casey, S. Wallace Dawson
Jr., Susan Dullabh, Thomas
Robershaw, David A Walsh Joseph P. Perrone, Robin
Wright, Patrick Joggerst,
Brian Fitzpatrick, David Carrey, Jackie Armstrong,
Mark Attanasio, David L.
Lee, Geoffrey J.W. Kent, Eric Hippeau, Norman
Brownstein, William E. Conway,
Jr., Defendants.

No. 03 Civ. 8535(GEL).

June 23, 2004.

Ralph C. Ferrara, Colby A. Smith, Jonathan E.
Richman, Jeffrey S. Jacobson, Debevoise & Plimpton,
New York, N.Y. for defendants.

Michael L. Hirshfeld, Andrew E. Tomback, Allan S.
Brilliant, Millbank, Tweed, Hadley & McCloy, for
plaintiff.

OPINION AND ORDER

LYNCH, J.

**\*1** This action presents another strand in the web of
litigation surrounding the alleged accounting fraud and
eventual bankruptcy of the telecommunications
company Global Crossing, Ltd. ("GC"). Plaintiff JP
Morgan Chase Bank brings this action on behalf of a
syndicate of commercial banks ("the Banks") against
various officers, directors, and employees of GC in
connection with a series of loans extended to GC
between August 17, 2001, and September 28, 2001,
pursuant to a credit agreement entered into in August
2000 (the "Credit Agreement"). The Banks claim that
GC made intentional and negligent misrepresentations
to the Banks regarding the company's compliance with
certain financial covenants in the Credit Agreement in
order to mislead the Banks into continuing to extend
the company credit. Plaintiffs seek $1.7 billion in

damages. Defendants now move for dismissal of, or in
the alternative, for summary judgment against, the
plaintiffs' claims. For the reasons set forth below, the
motion to dismiss will be granted in part; as to the
remaining claims, the motion for summary judgment
will be denied.

BACKGROUND

The relevant facts, which are drawn from the
complaint except where otherwise noted, are as
follows. On August 10, 2000, the Banks entered into a
Credit Agreement with GC to extend a total of $2.25
billion of credit to GC, $1.7 billion of which was in the
form of a credit facility (or line of credit) (the "Credit
Facility") and the remainder of which was in the form
of a term loan. Under the terms of the Credit
Agreement, the Banks agreed to extend credit to GC up
to the $1.7 billion limit provided in the Credit Facility,
provided a GC officer certified that the company was
in compliance with the covenants and the other terms
of the Credit Agreement at the time of each borrowing.
Failure to comply with the covenants in the agreement
would result in a default, terminating GC's line of
credit and causing all of its debt under the Credit
Agreement (including the term loan and any amount
extended under the Credit Facility) to come
immediately due. Under the agreement, each loan
request was "deemed" a "representation and warranty"
by GC that no "event of default" had occurred. (*See*
Jacobson Decl. Ex. A, Credit Agreement § 4.02.) The
Banks also secured the right under the Credit
Agreement to inspect GC's books and records "upon
reasonable prior notice ... and as often as reasonably
requested." (*Id.* § 5.07.)

Whether or not the company was in compliance with
its covenants was to be determined in part by
calculating its "Total Leverage Ratio," or the ratio of
its debt to a specific measure of its earnings styled as
"four-quarter trailing consolidated earnings before
interest, taxes, depreciation and amortization"
("Consolidated EBITDA"). GC was required to
maintain a Total Leverage Ratio below 4.75 during the
relevant time period, meaning that GC's debt could not
exceed 4.75 times its Consolidated EBITDA.
Consolidated EBITDA, as defined in the Credit
Agreement, included regular recurring income booked
under Generally Accepted Accounting Principles
("GAAP"), as well as "deferred revenue," which
consisted of income received that could not, in
accordance with GAAP, be booked in the current
accounting period. The use of Consolidated EBITDA

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

as a measure was significant in that a main source of GC's revenue was sales of "indefeasible rights of use" ("IRU"), the right to use capacity on its fiber-optic network for a specified time period. Under GAAP, revenue from IRU sales could not be booked up front, but rather, had to be amortized over the life of the IRU. By including deferred revenue in Consolidated EBITDA, the company was able to report revenue from the IRU sales up front, thus increasing its total reported income and decreasing its Total Leverage Ratio.

*2 The complaint alleges that following a slowdown in the telecommunications industry in late 2000 due to a glut of capacity on the market, GC began engaging in "improper reciprocal trades of IRUs with other distressed participants in the industry." (Compl.¶ 14.) These reciprocal transactions, or "swaps" of capacity, would typically involve a sale of capacity to another telecom provider in exchange for that provider's agreement to purchase capacity from GC of an equivalent stated value; each company would then be able to book the revenue from the sale. In fact, the complaint alleges, these transactions were "of little to no value to [GC]," as the capacity purchased was unnecessary and the income created by the sales was artificial; they were entered solely in order to create the appearance of revenue, to inflate the Consolidated EBITDA, and thus to meet the company's debt covenants and the financial expectations of the securities markets.

Reporting revenue from the improper swaps up front and including it in its Consolidated EBITDA successfully deceived the Banks into believing that GC was financially solvent, when in fact it was on the brink of financial collapse. "The artificial revenue became a significant enough portion of [GC's] Consolidated EBITDA to make the Defendants' certifications false" beginning with financial statements submitted at the end of the fourth quarter of 2000 (Compl.¶ 15), and allowed the company to continue to draw on its Credit Facility until it had reached the $1.7 billion maximum under the agreement at the end of September 2001. On the basis of GC's inclusion of revenue from swaps in its 2000 annual report on Form 10-K and in its quarterly reports for the first three quarters of 2001, the Banks now bring claims against defendants for intentional and negligent misrepresentation, as well as related claims of conspiracy and aiding and abetting. Defendants move for dismissal of all claims for failure to allege any actionable misrepresentations, and in the alternative, for summary judgment on grounds that the plaintiffs could not reasonably have relied on the

defendants' misrepresentations.

DISCUSSION
I. MOTION TO DISMISS

A. *Legal Standard on a Motion to Dismiss*

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in its favor. *Leeds v.. Meltz*, 85 F.3d 51, 53 (2d Cir.1996). The Court will not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Beyond the facts in the complaint, the Court may consider "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir.1991).

B. *Actionable Misrepresentations*

*3 The defendants' principal argument on their motion to dismiss plaintiffs' claims, and their sole argument on plaintiffs' fraud claims in particular, is that the plaintiffs have failed to allege any actionable misrepresentation on the part of the defendants. In order to state a claim for fraud under New York law, the plaintiff must allege that the defendant made a "material misrepresentation or omission of fact." *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir.1997). [FN1] Defendants claim that their forms 10-Q for the first and second quarters of 2001, which were provided to the Banks at the time the loans were sought, specifically and truthfully disclosed the existence of reciprocal swap transactions. (*See* D. Br. 7-8; Jacobson Decl. Ex. MM at 11, 16; OO at 21.) [FN2] This should have put the Banks on notice "of the very information they claim not to have had when they made the loans," and should have "superseded whatever was said or was not said about such transactions" in the 2000 10-K. (D.Br.8.)

> FN1. Defendants do not challenge the plaintiffs' pleading on the other elements of a claim for fraud under New York law on their motion to dismiss. Those elements are knowledge of falsity, intent to defraud, reasonable reliance, and causation. *Schlaifer Nance*, 119 F.3d at 98. Defendants do, however, challenge the reasonableness of plaintiffs' reliance in their motion for

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

summary judgment, discussed below. *See infra* Part II.

> FN2. Defendants also reference disclosures made in press releases issued prior to the time-period of the loans. These documents are outside of the evidentiary record, and are not attached to or incorporated by reference in the complaint. As such, they cannot properly be considered on a motion to dismiss.

The defendants' arguments on this front are unconvincing, because disclosure of these transactions did not put the plaintiffs on notice of the underlying fraud. Plaintiffs do not claim that the defendants failed to disclose the existence of reciprocal capacity trades; indeed, as plaintiffs concede, the existence of such transactions was known to the Banks when they entered into the Credit Agreement in August 2000. (P. Opp.5.) Nor do they claim that reciprocal transactions are intrinsically improper: the Banks do not contest that, as the defendants have argued, such arrangements could serve the legitimate business purpose of allowing telecommunications companies to avoid unnecessary capital construction costs by engaging in mutual trades of capacity. Rather, the gravamen of plaintiffs' claim is that beginning in the fourth quarter of 2000, GC's transactions had no purpose other than to create the appearance of revenue. As such, they had no legitimate business justification, and GC's reporting of the revenue derived from them was inherently false and misleading. It is therefore immaterial that defendants' first and second quarter 10-Qs disclosed the existence of reciprocal transactions, as that is not what plaintiffs allege them to have misrepresented. [FN3]

> FN3. The defendants' argument that the revelations in the first and second quarter 10-Qs "superseded" any falsehoods in the 2000 10-K by revealing the existence of swaps is therefore irrelevant. Even if the quarterly statements corrected any past non-disclosure of existing swaps, this would not have made a difference because, as stated above, the issue was the nature of the swaps and not their existence.

As a matter of pleading, plaintiffs have adequately alleged that the defendants' financial statements in their 2000 10-K and their first and second quarter 10-Qs included revenue figures that were materially false and misleading (or, stated differently, that they omitted the material fact that the transactions in question were shams), and that these falsehoods were perpetrated in order to preserve the company's ability to draw on a line of credit that was increasingly necessary for its

day-to-day survival. The motion to dismiss plaintiffs' claims on these grounds is therefore denied. [FN4]

> FN4. Defendants have not raised any defenses specific to plaintiffs' claims for aiding and abetting fraud (third cause of action) or conspiracy to commit fraud (fourth cause of action), but have merely argued that these claims "cannot survive if the underlying claims are deficient." (D.Br.9.) Because plaintiffs' underlying claims for fraud withstand the motion to dismiss, these ancillary claims survive as well.

### C. *Claims against "Reporting Defendants"*

**\*4** Defendants next challenge the plaintiffs' claims (second and sixth causes of action) against two of the so-called "Reporting Defendants," Susan Dullabh and Thomas Robershaw, for fraudulent and negligent misrepresentations based on their signing of GCs borrowing requests submitted over the two-month period in question. The plaintiffs allege that because each borrowing requests was "deemed" a representation by GC that it remained in compliance with its covenants, when in fact it was not, the individual officers signing such requests should be liable for those false representations. Defendants argue that because the borrowing requests "do not make any representations at all [but] simply asked for money," and because they do not contain any "facial inaccuracies," the requests cannot constitute actionable misrepresentations. (D. Br. 12; Reply 10.) They further argue that because Dullabh and Robershaw were not parties to the Credit Agreement that created the provision "deeming" the requests to be a representation about GC's financial condition, this provision cannot create an actionable tort claim against them.

If defendants were correct, the provision of the Credit Agreement deeming the borrowing requests to be representations about the company's financial condition would be meaningless. This provision represented a bargained-for agreement between two sophisticated business entities. By allowing the Banks to rely on each borrowing request as a renewed representation that GC's covenants remained satisfied, these requests served as a proxy for a more thorough, and undoubtedly more onerous, reporting requirement. This clearly operated to GC's benefit in terms of ease of drawing on its credit. In turn, it provided important protection for the Banks in the event that such representations should prove false. Having so clearly benefitted from this provision, GC cannot now escape from its burdens by resort to the lame argument that the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

borrowing requests did not amount to a "facial misrepresentations." Nothing in the law of misrepresentation requires courts to ignore the context in which a representation was made, or the fact that it was only considered a "representation" pursuant to a separate contract between the parties. The Banks had every right to rely on these requests at the time they were made as "representations," as they were understood under the Credit Agreement's terms, and to have them legally construed as such in a subsequent tort claim for fraud. [FN5]

> FN5. The fact that the reports did not contain "facial misrepresentations" is, however, relevant to the question of whether the Banks were on inquiry notice of the fraud. *See infra* Part II.C.2.

Defendants' further argument that Dullabh and Robershaw cannot be held liable because they were not parties to the Credit Agreement, and therefore did not agree to "deem" the requests representations of compliance, is equally devoid of support. The one case defendants cite, *Lerner v. Amalgamated Clothing & Textile Workers Union,* 938 F.2d 2, 5 (2d Cir.1991), does not, as defendants claim, stand for the broad proposition that "a contract with [a] corporation does not bind [its] officer" (D.Br.12); rather, *Lerner* simply held that an officer does not become personally bound to perform a contract (there, to pay employee wages and benefits) merely by signing it. As plaintiffs correctly point out, a corporation may only act through its agents, *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 101 (2d Cir.2001), and under New York law, "[o]fficers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it." *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994) (citations omitted). [FN6] Dullabh and Robershaw were not low-ranking employees; they were the Vice President Treasury and the Director of Capital Markets, respectively. At the pleading stage, it is appropriate to allow the plaintiffs' claims to proceed against these defendants on the assumption that persons occupying such positions in the company would have knowledge of both the fraud and the substantive terms of the Credit Agreement when they signed the borrowing requests. *Cf. In re Symbol Techs. Secs. Litig.,* 762 F.Supp. 510, 515 (E.D.N.Y.1991) (holding that inference of outside directors' knowledge of fraud should be allowed at the pleading stage for purposes of establishing "demand futility" because such knowledge, "along with information about when and how [the director] received it, is peculiarly within the

possession of the defendants and cannot be known to plaintiff prior to discovery"). [FN7] Defendants' motion to dismiss plaintiffs' second and sixth claims against them on these grounds will therefore be denied.

> FN6. Defendants' attempt to distinguish *Cohen* is unavailing. Defendants argue that the Banks have not alleged that Dullabh and Robershaw had knowledge of the fraud, as plaintiffs have "acknowledge[d] was required in *Cohen v. Koenig.*" (D. Reply 10 .) But *Cohen* states that "[o]fficers and directors of a corporation may be held liable for fraud if they *participate in it or have actual knowledge* of it." 25 F.3d at 1173 (emphasis added). Plaintiffs have sufficiently alleged these defendants' participation in the fraud. ( *See* Compl. ¶¶ 25-26.)

> FN7. Defendants also attempt to distinguish *In re Symbol Technologies Securities Litigation,* 762 F.Supp. 510 (E.D.N.Y.1991) and *Marine Midland Bank v. John E. Russo Produce Co.,* 50 N .Y.2d 31 (1980), also cited by plaintiffs, on grounds that the defendants in this case were not "outside directors" as they were in those cases. (D. Reply 10.) The fact that Dullabh and Robershaw were in fact *inside* officers cuts against, rather than for, defendants' argument, since as insiders they would likely have been more directly involved in the day-to-day activities of the corporation than the defendants in *Marine Midland* and *Symbol Technologies.*

### D. Negligent Misrepresentation and Related Claims

**\*5** In addition to arguing that plaintiffs fail to assert an actionable misrepresentation for purposes of any of its claims, defendants further assert a specific challenge to plaintiffs' negligent misrepresentation claims. Defendants argue that these claims are deficient for two related reasons; first, that no "special relationship" existed between the Banks and the defendants such that the defendants were under a legal duty to speak with care, and second, that a purely contractual relationship cannot support a negligent misrepresentation claim. Defendants are correct.

Under New York law, in order to state a claim for negligent misrepresentation, a plaintiff is required to allege that the speaker is bound to the other party "by some relation or duty of care." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 788 (2d Cir.2003). [FN8] In ordinary commercial contexts, liability does not attach as a matter of course for merely negligent statements; rather, it is imposed "only on those persons

who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmel v. Schaefer,* 89 N.Y.2d 257, 263 (1996). As courts have noted, such specialized knowledge usually arises due to the speaker's status as a professional, such as an accountant or an engineer, with a particular background in the subject of the alleged misrepresentation. *Kimmell,* 89 N.Y.2d at 263; *Doehla v. Wathne Limited, Inc.,* No. 98 Civ. 6087(CSH), 1999 WL 566311, at *19 (S.D .N.Y. Aug. 3, 1999). A special relationship may be brought about by "either privity of contract between the parties or a relationship so close as to approach that of privity." *I.L.G.W.U. Nat'l Retirement Fund v. Cuddlecoat,* No. 01 Civ. 4019(BSJ), 2004 WL 444071, at *3 (S.D.N.Y. Mar. 11, 2004), quoting *Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377, 382 (1992). However, where the duty arises in commercial contexts in which a contract exists, the duty attendant to that special relationship "must spring from circumstances extraneous to, and not constituting elements of the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island RR Co.,* 70 N.Y.2d 382, 389 (1987). In other words, "[i]f the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort." *Hargrave v. Oki Nursery, Inc.,* 636 F.2d 897, 899 (2d Cir.1980).

> FN8. Defendants do not challenge plaintiffs' pleadings with respect to the other elements of the tort of negligent misrepresentation, which are "(1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage." *Dallas Aerospace,* 352 F.3d 775, 788 (2d Cir.2003).

Plaintiffs argue that the Credit Agreement itself established the elements of a "special relationship" required by New York law:

> (1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance.

**\*6** *Doehla,* 1999 WL 566311, at \*20, citing *Prudential,* 80 N.Y.2d at 384. They assert that defendants were aware that their statements would be used to satisfy the Banks of GC's financial condition and induce them to extend loans, that the Banks relied

on such representations, and that the defendants knew that the Credit Agreement required these assurances and themselves provided them "in order to cause the Banks to rely on them and advance funds." (P. Opp.10.) However, the plaintiffs fail to show how these factors were in any way distinct from the defendants' obligations under the terms of the Credit Agreement itself. "[T]he contract itself is the sole basis for the imposition of a special duty, but that duty only extends as far as the contract's scope-- the reasonable disclosure of information by [defendants] to [plaintiffs]." *PPI Enters. (U.S .), Inc. v. Del Monte Foods Co.,* No. 99 Civ. 3794(BSJ), 2003 WL 22118977, at \*25-\*26 (S.D.N.Y. Sept. 11, 2003). Without the obligation imposed under the terms of the Credit Agreement, the defendants would be under no obligation to use special care to provide accurate financial information to the Banks; indeed, if not for the existence of the contract, they would have had no relationship to the Banks whatsoever. Plaintiffs may not "transmogrify the contract claim into one for tort." *Hargrave,* 636 F.2d at 899; *see also LaSalle Bank v. Citicorp Real Estate,* No. 02 Civ. 7868(HB), 2003 WL 1461483, at \*3-\*6 (S.D.N.Y. Mar. 21, 2003) (holding that no special relationship existed between a mortgage loan seller and purchaser where duty to provide accurate information about financial status of companies subject to mortgage arose solely from the operative purchase agreement).

*Kimmel,* relied on by plaintiffs, is not to the contrary. *Kimmell* explains that "[i]n a commercial context, a duty to speak with care exists when 'the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for the information." ' *Kimmell,* 89 N.Y.2d at 263, quoting *International Prods. Co. v. Erie R.R. Co.,* 244 N.Y. 331, 338 (1927) (alteration in original). But, as other courts have noted, *Kimmell* did not represent a departure from the traditional understanding that a special relationship is required in order to state a claim for negligent misrepresentation. *See Dallas Aerospace,* 352 F.3d at 788-89; *I.L.G.W.U.,* 2004 WL 444071, at \*2. In *Kimmell,* the New York Court of Appeals upheld an award against the C.E.O. of an energy company for negligent misrepresentations to investors regarding the company's financial prospects based on out-of-date utility rates. There, the duty did not arise simply from the existence of the contract or from its terms, but rather, from the particular factual circumstances underlying the plaintiffs' decision to invest. In upholding the award, the court emphasized that the defendant had personally sought out the individual

investors, had earned a commission for inducing them to invest, and had "personally requested 'updated' projections [to give to plaintiffs], which he represented were reasonable and generated after a 'thorough discussion with our West Coast administrator,' even though they were not based on the utility rate structure in effect at the time." 89 N.Y.2d at 264-65. "[U]nder these circumstances," the court concluded that there was sufficient evidence in the record to support a finding that "the defendant owed a duty of care to plaintiffs here." *Id.* at 265. Thus, *Kimmell* neither abolished the requirement of a special relationship nor loosened the requirement that such relationship must arise due to some factor extraneous to the contract's terms.

*7 Plaintiffs also argue, however, that they have met the requirement of pleading a special relationship by alleging that the defendants "possessed specialized expertise, knowledge, and experience concerning [GC's] accounting and actual financial condition." (P. Opp.10.) According to plaintiffs, because the defendants were "far more knowledgeable about the fiber optic cable business, and particularly the structure and specific capacity needs of [GC's] fiber optic network" than the Banks, the Banks were "absolutely entitled to rely upon Defendants' representations in this regard." (*Id.* at 11.) But this amounts to nothing more than knowledge of the particulars of the company's business--and of the true situation underlying the misrepresentations pertaining to that business. This does not constitute the type of "specialized knowledge" that is required in order to impose a duty of care in the commercial context; if it were, every bank would have a claim against every borrower who failed to exercise due care in the context of commercial bank loans. *See LaSalle,* 2003 WL 1461483, at *3-*4 (no duty arose from seller's "unique knowledge or access to information" about mortgage status). Borrowers will almost always have "specialized" knowledge of the particulars of their businesses, and indeed, of the facts underlying any misrepresentations made in support of desired loans. That is why banks, which are in the business of assessing lending risks posed by potential borrowers, have sophisticated means of assessing those risks that cut across industries and areas of technical expertise. The relationship between a bank and a borrower is the very epitome of an arm's length commercial transaction: the borrower must comply with the negotiated terms of its contract, and may not defraud the lender by deliberate falsehood, but it is not liable in tort for mere carelessness about its representations.

Finally, plaintiffs argue that at the very least, the question of whether a special relationship exists is a question of fact. It is true that several cases have so characterized it. *See, e.g., Suez Equity Investors,* 250 F.3d at 103-04; *Wells Fargo Bank Northwest, N.A. v. Taca Int'l Airlines, S.A.,* 247 F.Supp.2d 352, 366-67 (S.D.N.Y.2002); *Kimmell,* 89 N.Y.2d at 264; *Knight Securities L.P. v. Fiduciary Trust Co.,* 774 N.Y.S.2d 488, 489 (1st Dept.2004). But these cases were decided on different facts. For example, in *Suez Equity Investors,* a case involving alleged misrepresentation between investors and a healthcare financing venture, the court specifically found that "plaintiff's complaint implies a relationship between the parties that extended beyond the typical arm's length business transaction: defendants initiated contact with plaintiffs, induced them to forebear from performing their own due diligence, and repeatedly vouched for the veracity of the allegedly deceptive information." 250 F.3d at 103. Similarly, in *Wells Fargo,* which involved a dispute between the lessee and lessor of an aircraft, the complaint alleged that several of the defendant's agents "made expert representations about maintenance costs," "had unique expertise in the intended conversion of Airbus 300 aircraft from passenger to cargo use," and "misrepresented the historical maintenance costs and the good mechanical condition of the planes." *Wells Fargo,* 247 F.Supp.2d at 366-67. On these facts, the court assumed that "these somewhat sparse allegations suffice, at least at the pleading stage" to withstand a motion to dismiss, "[s]ince the determination of whether a special relationship exists is essentially a factual inquiry." *Id.* at 367.

*8 In each of these cases, the facts alleged in the complaint could fairly be read to justify a finding of a special relationship of trust and confidence, above that created by the contracts involved. [FN9] By contrast, where no such allegations have existed, courts have not hesitated to dismiss negligent representation claims on motions to dismiss. For instance, In *LaSalle Bank,* a mortgage loan purchaser charged that the seller had misrepresented the status of various mortgages purchased. The court rejected the argument that the defendant had a duty, "separate and distinct from its contractual one, to impart correct information based on [its] unique knowledge or access to information" about the mortgage loans in question. 2003 WL 1461483, at *3. The contract, which represented "a complex transaction between two sophisticated entities," could not form the basis of for the plaintiff's reliance. *Id.* at *5. The court dismissed the case on the ground that "the factual predicates of [defendant's] negligent misrepresentation claim are elements of and not

extraneous to [the contract], and thus ... do not create an independent duty on [defendant]." *Id.* at *3. *See also I.L.G.W.U.,* 2004 WL 444071, at *2-*3 (dismissing negligent misrepresentation claim where the third-party plaintiff failed to allege existence of special relationship between union and clothing manufacturer); *Doehla,* 1999 WL 566311, at *20 (dismissing negligent misrepresentation claim against lawyer by non-client where lawyer did not "hold himself out to be an expert" and "reliance on [his] opinion by the third-party [was not the] 'end and aim' of the engagement of the lawyer"); *Clark-Fitzpatrick,* 70 N.Y.2d at 390 (dismissing gross negligence claim by contractor against railroad where duty to use due care in designing the project was "clearly within the contemplation of the written agreement").

> FN9. The other case cited by plaintiff, *Goodman Mfg. Co. L.P. v. Raytheon Co.,* No. 98 Civ. 2774(LAP), 1999 WL 681382, at *15 (S.D.N.Y. Aug. 31, 1999), did not reach the question of whether a special relationship existed, because the court found that the plaintiffs had failed to allege reasonable reliance.

Such is the case here. Plaintiffs have failed to allege either a relationship that is in any way distinct from that between a plain vanilla borrower and lender, or a duty of care arising from any source external to the Credit Agreement. The law does not impose liability for negligent misrepresentations in such a context. Plaintiffs' claims for negligent misrepresentation, along with their ancillary claims of "aiding and abetting" such misrepresentations (plaintiffs' fifth through seventh causes of action), must therefore be dismissed.

Because plaintiffs' fraud claims survive, the Court will now turn to defendants' motion for summary judgment on these remaining claims.

## II. MOTION FOR SUMMARY JUDGMENT

### A. *Standard for Summary Judgment*

For their summary judgment motion, which was filed prior to discovery, defendants rely solely on financial reports and other documents available in the public record. [FN10] Summary judgment is appropriate when no genuine issues of material fact are in dispute and when, viewing the evidence in a light most favorable to the nonmoving party, no reasonable trier of fact could disagree as to the outcome of the case. *See Nabisco, Inc. v. Warner-Lambert Co.,* 220 F.3d 43, 45 (2d Cir.2000). While all ambiguities in the

evidentiary record must be resolved in favor of the nonmoving party, "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). To establish a genuine issue of material fact, the party opposing summary judgment " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F .3d at 114, quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

> FN10. The evidence relied upon is limited to the text of the Credit Agreement; certain GC disclosures during 2001; certain press reports during the same period; securities analysts' reports about GC; the market prices of GC's stock and the stocks of other telecom companies; and the GC Plan of Reorganization filed with the Bankruptcy Court. (*See* D. Br. 13; D. Rule 56.1 Statement of Undisputed Facts).

### B. *Fraud Claims*

*9 With respect to plaintiffs' fraud claims, defendants assert that the plaintiffs cannot demonstrate reliance on the alleged misrepresentations. The crux of their argument is that, even accepting arguendo that the financial reports provided to the Banks were in themselves sufficiently false and misleading to survive the motion to dismiss, the plaintiffs' claims would fail because the Banks had access to information sufficient to put them on notice of the alleged falsehoods. Such access would have triggered a "duty to inquire" negating the reasonableness of the Banks' reliance on those representations. The Banks' information, according to defendants, derived from two sources: (1) GC's financial statements themselves, which disclosed the existence of swaps, and (2) reports publicly issued by various financial analysts assessing the financial status of GC for the purpose of educating potential investors. [FN11] Plaintiffs dispute both the legal question of when a duty to inquire is triggered under

New York law and the factual assertion that the information available was sufficient to put them on notice of the fraud.

> FN11. Defendants argue that the service of a JP Morgan officer, Maria Elena Lagomasino, on GC's audit committee during the relevant time period should have put the Banks on notice of the alleged fraud. This argument is without merit. First, the complaint does not charge Lagomasino with any particular knowledge. Second, there is no allegation that Lagomasino served on the GC board in her capacity as a JP Morgan officer. On the contrary, plaintiffs have provided evidence in the form of an email from an official at JP Morgan specifying the parameters of her roles with respect to the two companies: namely, that she would "not be serving at the request of [JP Morgan], but rather independently," that her "fiduciary obligations as a director of Global and a [JP Morgan] executive are distinct from one another," and that she "may not share with [JP Morgan] nonpublic information relating to Global ... acquired in [her] capacity as a Global director." (Tomback Decl. Ex. A.) Any information that she might have known was therefore not chargeable to the Banks. *See New York Marine & General Ins. Co. v. Tradeline (L.L.C.),* 266 F.3d 112, 122 (2d Cir.2001) ( "[K]nowledge acquired by an agent *acting within the scope of its agency* is imputed to the principal." (emphasis added)); *Martinson v. Massachusetts Bay Ins. Co.,* 947 F.Supp. 124, 129 (S.D.N.Y.1996) (holding that under New York agency law, notice given to individual could not be imputed to defendant corporation where it was undisputed that individual was not acting as defendant's agent).

### 1. *Test for Reliance and the Duty to Inquire*

In order to prevail on a claim for fraudulent misrepresentation under New York law, plaintiffs must show that the defendants made a false representation of a material fact to the plaintiffs, and that the plaintiffs were injured as a result of justifiable reliance upon that representation. *Dallas Aerospace,* 352 F.3d at 784. Reliance is necessary in order to demonstrate causation; where a plaintiff actually knew at the time a representation was made that it was false, she cannot claim to have relied on the truth of that representation, and any injury she suffers is therefore not attributable to the defendant. *See Christophedes,* 106 F.3d 22, 26-27; *Stolow v. Greg Manning Auctions Inc.,* 258 F.Supp.2d 236, 249 (S.D.N.Y.2003); *Greenberg v.*

*Chrust,* 282 F.Supp.2d 112, 119 (S.D.N.Y.2003).

As a threshold matter, plaintiffs assert that the proper test for reliance is not "reasonable" reliance, but "justifiable" reliance, which they argue is a less demanding burden. Although it is true that some cases use the language of "justifiable" reliance," *see e.g., Christophedes,* the distinction is hardly clear. Rather, it appears that the cases use these terms somewhat interchangeably. *See, e.g., Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 156 (2d Cir.1995) ("[The plaintiff is] required to establish that it actually relied on the disclosure or lack thereof, and that such reliance was reasonable or justifiable."); *also compare Schlaifer Nance,* 119 F.3d at 98, and *DIMON,* 48 F.Supp.2d 359, 367 (S.D.N.Y.1999) (reasonable), *with Christophedes,* 106 F.3d at 26-27, and *Lazard Freres,* 108 F.3d at 1531 (justifiable), *but see id.* at 1543 (reasonable). However, the Court need not decide which standard applies because factual questions remain that preclude summary judgment even under the purportedly more stringent "reasonableness" standard.

*10 In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable, New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision. "Ordinarily there is no duty to exercise due diligence, and [courts] have described the necessary showing of care as 'minimal diligence' or 'negating its own recklessness." ' *Banque Franco-Hellenique de Commerce Int'l et Maritime, S.A. v. Christophides,* 106 F.3d 22, 26-27 (2d Cir.1997) (citations omitted). However, sophisticated business entities are held to a higher standard. As Judge Friendly explained, where the plaintiff "has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80-81 (2d Cir.1980) (quoting *Schumaker v. Mather,* 133 N.Y. 590, 596 (1892). Therefore, "where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Schlaifer Nance,* 119 F.3d at 98, quoting *Grumman Allied Indus. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984).

In addition, "[a] heightened degree of diligence is required where the victim of fraud had hints of its falsity." *Christophides,* 106 F.3d at 26-27. This rule applies where the "[c]ircumstances [are] so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false"; in such cases, a plaintiff "cannot reasonably rely on those representations, but rather must 'make additional inquiry to determine their accuracy.' " *Sclaiffer Nance,* 119 F.3d at 98, quoting *Keywell Corp. v. Weinstein,* 33 F.3d 159, 164 (2d Cir.1994). Once the duty to inquire is triggered, as defendants claim it was here, a plaintiff is foreclosed from bringing a claim for false representations if no inquiry is made. *Giannacopoulos v. Credit Suisse,* 37 F.Supp.2d 626, 632-33 (S.D.N.Y.1999).

The parties' legal dispute concerns the precise circumstances that trigger this duty to inquire. At oral argument and in a subsequent round of supplemental briefing on this subject (and to a lesser degree in their motion papers), defendants have argued that the duty to inquire is triggered as soon as a plaintiff has nay "hints of falsity," or any information indicating that the statements *"may be false."* (See D. Reply 6, citing *Christophides,* 106 F.3d 22, 26-27; supplemental letter-brief from Ralph C. Ferrara, dated April 19, 2004 [hereinafter "Ferrara Letter."] ) Under this standard, the argument goes, the Banks, as sophisticated lenders, had sufficient "hints" that the information GC had presented was false, and should therefore be foreclosed from complaining; the duty to inquire was triggered here by both GC's financial reports themselves, which disclosed the existence of swaps, and analysts' reports questioning the quality of the revenue such swaps produced. The Banks counter that the duty to inquire is not triggered by a mere "hint" of falsity, but rather, requires more direct and definitive notice, and further, that no such duty exists where the plaintiffs would not have been able to ascertain the truth even had they made an inquiry.

*11 With respect to the appropriate legal standard, it is true that the language in some of the cases cited is quite strong. *See, e.g., Grumman,* 748 F.2d at 737 ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance."); *Abrahami v. UPC Constr. Co., Inc.,* 638 N.Y.S.2d 11, 14 (1st Dept.1996) ("[W]here a party has means available to him for discovering, by the exercise of ordinary intelligence, the true nature of a transaction he is about to enter into, he must make use of those

means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentation." (internal citations and quotations omitted)); *Gianappolis,* 37 F.Supp.2d at 632-33 ("Parties cannot demand judicial protection when they could have protected themselves with a reasonable inquiry into any misrepresented facts."). However, this does not mean that any bright line rule exists. To the contrary, the Second Circuit has characterized the inquiry into what constitutes reasonable reliance as "always nettlesome because it is so fact-intensive." *Schlaifer Nance,* 119 F.3d at 98. A closer analysis of the facts of the cases hinging on reliance indicates that the standard is not as unforgiving as defendants make it out to be.

These cases fall into two rough categories. The first are those in which a sophisticated party performs no independent investigation whatsoever, even when the context or background information available should arouse suspicion. As Judge Friendly noted, "[d]ecisions holding that reliance on misrepresentations is not justified are generally cases in which plaintiff was placed on guard or practically faced with the facts." *Mallis,* 615 F.2d at 81. For example, in *Abrahami,* 638 N.Y.S.2d 11, the plaintiffs, who were private investors, sued a construction company in which they had invested after the defendant had made false representations about the company's "excellent business prospects." *Id.* at 12. The court held that plaintiffs' reliance on the representations was not justified because they had been "put on notice of UPC's possible precarious financial condition, and the need to conduct an investigation, by the initial reporting of only $54 of cash on hand," and yet had conducted no independent investigation. *Id.* at 14. Had they exercised their right to perform an audit, the court found, the truth would have been available to them. *Id.* Similarly, in *Waksman v. Cohen,* No. 00 Civ. 9005(WK), 2002 WL 31466417 (S.D.N.Y. Nov. 4, 2002), a partner in a real estate brokerage sued his partners for fraudulently concealing the status of a real-estate property that was the subject of litigation and thus inducing him to settle his claims. The court held that reliance was not justifiable when, in the context of settlement negotiations conducted "in the wake of contentious litigation," the plaintiff failed to make any independent inquiry into the status of the property, despite being empowered to do so under New York partnership law. *Id.* at *6-*9. *See also PPI Enterprises,* 2003 WL 22118977, at *21 (no justifiable reliance where stock seller "failed to pursue or failed to reasonably incorporate into its own analysis of its Del Monte stock's value a series of disclosures made by

Del Monte").

**\*12** The second group of cases are those in which a term of a contract central to the plaintiff's claim explicitly disavows or contradicts any representation on the subject of the supposed misrepresentation. For example, in *Dallas Aerospace,* 352 F.3d 775, the plaintiff, a buyer of used aircraft engines, sued the seller of an engine for falsely concealing that the engine had been involved in a "hard landing." The Second Circuit held that the existence of a "conspicuous 'AS IS WHERE IS' ' clause in the contract of sale explicitly "negate[d] all implied warranties concerning the condition of the goods." *Id.* at 785. Under these circumstances, the plaintiff was obligated to conduct an independent inquiry into the history of the engine, which would have been available from various other sources. *Id.* at 786. In *Schlaifer Nance v. Estate of Andy Warhol,* 927 F.Supp. 650 (S.D.N.Y.1996), the licensee of various works in the estate of the artist Andy Warhol sued the estate for misrepresentations about whether certain of the works subject to the licensing agreement had entered the public domain or were held by third parties. The district court found that the licensing agreement itself incorporated documents that indicated third-party ownership or otherwise "contemplated the possibility that the warranties were inaccurate" as to particular artworks. *Id.* at 663. Because the licensee had "conducted no due diligence to speak of," under these circumstances, it could not claim reasonable reliance. *Id.* at 662. In affirming the district court's finding, the Second Circuit noted that numerous "red flags" had led to the "clear message [that] exclusive ownership of copyrights to all of Warhol's known artwork was an impossibility." 119 F.3d 91, 99. *See also Siemens Westinghouse Power Corp. v. Dick Corp.,* 299 F.Supp.2d 242, 247-48 (S.D.N.Y.2004) (reliance not justified in claim for misrepresentation over delays in installation of turbine where liquidated damage clause in contract anticipated delays, and where claimant could have discovered potential problems with turbine from public documents); *Valassis Communications, Inc. v. Weimer,* 758 N.Y.S.2d 311, 312 (1st Dept.2003) (no reasonable reliance where plaintiff failed to verify accuracy of information in extra-contractual representation, despite specific contract provision disclaiming reliance on such representations); *Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Int'l Ltd.,* 702 N.Y.S.2d 258, 259 (1st Dept.2000) ("[The] claim of justifiable reliance is ... conclusively refuted by the disclaimer of representations of value contained in the ... provision

setting forth the general terms governing the parties' transactional relationship.").

Viewed together, the facts of these cases do not support the interpretation that a duty to inquire is necessarily triggered as soon as a plaintiff has the slightest "hints" of any "possibility" of falsehood. In each of these cases, the notice to the plaintiff was clear and direct: it was either provided by plaintiff's own direct knowledge of the fraud, by the terms of an operative contract, or by circumstances surrounding the parties' relationship (*e.g.* litigation) that would normally arouse suspicion. In each of these circumstances, the plaintiff may be said to have been "placed on guard or practically faced with the facts" of the complained of fraud, *Mallis,* 615 F.2d at 81, and fulfilling the duty to inquire was a necessary precondition to proceeding with a misrepresentation claim. Thus, whether a duty to inquire is triggered is a context-specific and fact-based inquiry, rather than a bright-line rule, as defendants argue. *See Schlaifer Nance,* 119 F.3d at 98; *Doehla,* 1999 WL 566311, at \*10. The outcome on this summary judgment motion therefore turns on the factual question of whether, when faced with the available information, the plaintiffs should necessarily have inquired further.

### 2. *Information Available in GC's Books and Records*

**\*13** Defendants' first argument is that the Banks, as sophisticated lenders with the "means" to discover the alleged falsehood, are foreclosed from claiming reasonable reliance because GC's financial records should themselves have put the plaintiffs on notice of the fraud. Their argument is not that the Banks failed to perform a sufficient initial investigation into the company's finances at the time they entered the Credit Agreement in August 2000--their due diligence on this front is not in dispute. Nor do defendants appear to claim that the Banks actually knew at the time the financial reports were made that they were false. Rather, their argument is that the financial reports on which the contract was based and the reports submitted subsequently should have aroused suspicion about GC's financial health at the time the loans were extended in August and September 2001.

This case is therefore distinguishable from those cases in which the plaintiff utterly failed to examine the defendants' representations or to perform due diligence in entering the challenged transaction in the first place. *See, e.g., Lazard Freres & Co. v. Protective Life Insurance Co.,* 108 F.3d 1531, 1543 (2d Cir.1997) (no reasonable reliance where broker-dealer failed to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

examine relevant report before entering contract); *Miller v. Doniger,* 707 N.Y.S.2d 170, 170-71 (1st Dept.2000) (no reasonable reliance where buyers failed to verify financial reports that were expressly based on sellers' own unverified representations); *Abrahami,* 638 N.Y.S.2d at 14; *Waksman,* 2002 WL 31466417, at *6-*9. It is undisputed that the Banks expressly bargained not only for the right to examine GC's books and records, but also for the provision of the Agreement deeming each borrowing request to be a representation that GC remained in compliance with its debt covenants at the time the request was made. Under these circumstances, it cannot be argued that the Banks failed to bargain for adequate safeguards to establish, at least initially, the basis for their reliance on the defendants' representations. Rather, this case deals with post-contract misrepresentations that the defendants claimed should have triggered the Banks' duty to inquire further before extending any loans under the Credit Facility.

Defendants effectively argue that GC's own financial statements, which claimed to show that the company was in compliance with its covenants, were so transparently false--or at least, that the assumptions on which they were based were so apparently questionable--that no reasonable banker would have lent GC a penny without conducting further inquiry into their accuracy. That argument cannot, on this record, support summary judgment. A reasonable fact-finder could conclude that the financial documents provided would not, on their face, have alerted the Banks to potential fraud. Just as disclosing the existence of reciprocal transactions does not amount to disclosure of the underlying fraud, neither would it necessarily have put the plaintiffs on notice that they should have investigated whether the reciprocal transactions were shams. Financial reports disclosing revenue from reciprocal transactions are quite different from those reports or documents held in other cases to have put plaintiffs on notice, such as the financial report in *Abrahami* showing "$54 cash on hand." 638 NY.S.2d at 14. There, the report itself demonstrated blatantly and directly the precariousness of the company's cash flow. Here, in stark contrast, GC's reports showed healthy revenues; discovering the falsity of those claims would have required an inquiry into the quality of the revenue reported. While it is true that the company's public financials had prompted some analysts to raise these very questions, *see infra,* the Court cannot say that the reports themselves should necessarily have generated sufficient doubt on the part of the Banks to trigger a duty to inquire as a matter of law.

*14 Moreover, even had the Banks exercised their right to inspect GC's books, there is no evidence on the present record that they necessarily had the means to discover the fraud. Under New York law, a plaintiff is not precluded from claiming reliance if the facts allegedly misrepresented are "peculiarly within the [defendant's] knowledge." *Mallis,* 615 F.2d at 80. Under such circumstances, "it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." *Id.; accord Lazard Freres,* 108 F.3d at 1542; *DIMON Inc. v. Folium, Inc.,* 48 F.Supp.2d at 368-71; *Doehla,* 1999 WL 566311, at *13. The entire complaint is based on the theory that GC "cooked the books" to make it appear that the reciprocal transactions had a justifiable business purpose, and that they had carefully concealed the truth from the Banks as well as the public at large. It is not at all apparent on this sparse, pre-discovery record, that the true nature of the swaps would have been revealed upon inspection. Perhaps further evidence will emerge in discovery or at trial indicating that, had the Banks performed even a cursory inquiry, they would have been able to ascertain that these transactions were shams. No such evidence exists at present. Moreover, even if the truth could have been discovered, there is no way of knowing what effort this would have taken. "New York cases recognize that the peculiar knowledge exception applies not only where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty." *DIMON,* 48 F.Supp.2d at 368; *see also Lazard Freres,* 108 F.3d at 1542 & n.9 (noting that New York law does not require that the information be "available only to the defendant and absolutely unknowable by the plaintiff before reliance can be deemed justified"); *Mallis,* 615 F.2d at 80 ("[I]ndeed some cases have imposed liability in situations in which plaintiff could have determined the truth with relatively modest investigation."). Factual questions therefore remain as to whether or not the Banks had access to the truth, and even if they did, as to what it would have taken to discover it. *See Doehla,* 1999 WL 566311, at *14.

Finally, defendants argue that reasonable reliance is impossible, because the Banks had bargained for the right to examine GC's books and records but failed to exercise that right. There is no such bright-line rule, even where sophisticated entities are concerned. Under defendants' reasoning, whenever a party bargains for a right which, if exercised, might provide the means to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

discover a concealed falsehood, it must exercise that right in every instance or risk extinguishing its remedies. Such a rule would not be realistic. Rather, the obligation to exercise the right of inspection must be understood as contingent on either "*indisputable access* to truth-revealing information," *Doehla*, 1999 WL 566311, at *11 (emphasis in original), or some suspicious event or information triggering the duty to inquire. The mere existence of the right to inquire, without more, is not dispositive. [FN12]

> FN12. Plaintiffs argue that the Banks actually could not have exercised their right to inspect GC's books, despite their contractual guarantee of that right, for fear of being sued, because they were "contractually obligated to lend--period--upon the presentation by [GC] of facially compliant documentation." (P. Opp.23.) This cannot be the case; if it were, the bargained for right to inspect the company's books would be meaningless. "Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... will be avoided if possible." *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992) (internal quotation and citation omitted); *see also* Restatement (Second) Contracts § 203 (1979) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable ... or of no effect.").

3. *Information in Analysts' Reports*

**\*15** The defendants argue that information external to the financial reports themselves, namely the company's plummeting stock price and negative public reports on GC issued during the relevant time period by financial analysts, should have raised sufficient questions about the swaps to trigger the Banks' duty to inquire. This argument is more persuasive, and if defendants' bright-line "hints of falsehood" test were the correct legal standard, the duty to inquire might well have been triggered. Information was readily available from a variety of credible and knowledgeable public sources casting doubt on both the value of the reported swap revenue and the company's financial prospects overall. But, as established above, that is not the standard. Rather, the reasonableness of the plaintiffs' reliance hinges on whether, on these facts, a reasonable lender of equivalent experience should have inquired further. To prevail on summary judgment, defendants must establish that only one answer to this question is possible.

The most obvious indicator of impending troubles was GC's stock price, which had plummeted from $29.19 a share at the time the Agreement was finalized to $4.98 a share, an 83% decline, when the Banks began lending money to GC under the Credit Facility on August 17, 2001; by the date of the last loan, it had declined to $1.80, a 94% decline. In addition, during the six weeks in which the Banks made their loans, GC's bonds lost between 35 and 55% of their value. (*Id.* Ex. DD, EE.) This decline was mirrored by a similar decline in stock prices in the telecommunications industry in general, which had declined by a median of 86% between the date of the Agreement and September 30, 2001. (*Id.* Ex. HH.)

Analysts' reports, too, raised significant red flags. For example, on August 3, 2001, a Lehman Brothers report explained, "[t]he optimistic view of [swaps] is that [GC] needed the capacity ... in parts of the world where its network wasn't built out, and the $358M supplants capex that would have been spent to build out the network. The pessimistic view is that [GC] needs to spend this cash to solicit the business of other carriers, without which it would not be able to hit its numbers." (Jacobson Decl. Ex. F.) Under the heading "2Q Results Weak: Lowering Rating to Hold From a Buy," Credit Suisse First Boston described "disappointing recurring [revenues], and increased dependence on [revenues] derived from capacity swaps," and noted, "given that swap revenues are difficult to equate to market price levels and, this quarter, were so large (21% of rev[enues] ), we are concerned that the quality of revenues was weaker than we had anticipated." (*Id.* Ex. B.) Merrill Lynch commented, "[w]hile we see capacity sales as staying stronger than many analysts have predicted, the fact that capacity/IRU sales make up a larger proportion of total revenues will nonetheless raise concerns over future growth rates and also cash flows.... Note also that capacity sales seemed to include a substantial contribution for capacity exchanged with other carriers." (*Id.* Ex. I.) During the same period, Moody's, Merrill Lynch, Credit Suisse First Boston, and Standard and Poors all either downgraded GC stock or reviewed it for possible downgrade. (*Id.* Ex. E, I, J.)

**\*16** However, as plaintiffs are quick to point out, the news on the street was not entirely negative, and many analysts' reports were either steadfastly positive or distinctly mixed. First Union Securities, for example, commented that GC "views its commitments to purchase services as capex spending for reasonably priced network elements it would otherwise build. We

believe that this is a reasonable explanation, however, we approach intercarrier revenue or swaps with what we believe is an appropriate amount of skepticism, as it is difficult to determine how much [of GC's] spending is in direct exchange for other carriers' decision to purchase services on [GC's] network." (*Id.* Ex. C.) In response to GC's disclosure of a particular capacity trade, Piper Jaffray Equity Research Notes remarked that "[t]he market has viewed this transaction as a capacity swap rather than a true sale of capacity. While we disagree, the market does not seem to care, as it is looking for the bad in every telecom services earnings report and ignoring any good news." (*Id.* Ex. G.) On August 13, Goldman Sachs wrote:

> In response to the quarter, some concerns were also raised about revenues that [GC] collects from operators from which [GC] also purchases various types of network capacity (representing capital expenditures.) Critics term these transactions "swaps" and discount the quality of these revenues. Their concern is that the transaction only occurs as a way to fabricate revenues.... Our view is that these transactions for [GC] make sense, they are a normal part of operations (all carriers buy and sell to one another)[,] they will continue for [GC] and the industry, and that the accounting is correct.... [GC] is rare in actually disclosing what portion of its revenues is negotiated in connection with capex purchases that it makes. So its disclosure goes beyond standard accounting practices, and sheds a bright light on its operations.... Yes, Global Crossing is using, like most carriers, capacity purchases as an incentive to drive revenues. We've spoken to other carriers that explicitly put capacity purchase requirements in RFPs, in order to sell their own capacity as they fulfill their network requirements with other service providers. While transactions between carriers raises [*sic* ] the potential for abuse in the reporting of revenue, we see none of that in [GC's] operations.

(*Id.* Ex. H.) In conclusion, Goldman Sachs gave GC an "[o]verall positive rating." (*Id.*) On August 24, under the heading "Unreasonable Low Valuation Despite Superb Industry Positioning," Deutsche Banc noted that "unfortunately, every carrier uses swaps or pseudo swaps to create their network over time. In [GC's] case, the 'swaps' number was high, which the company acknowledged and disclosed. We note no other companies have done this.... We believe the lesser of two evils is swapping to create a network versus increasing CapEx to build from scratch." (*Id.* Ex. K.) It reiterated its "[v]ery positive rating." (*Id.*) Thus, even while some analysts had raised serious questions, their conclusions were ultimately mixed.

*17 A reasonable jury could conceivably find that the prevailing view among analysts was negative, and that the totality of the circumstances should have put the plaintiffs on inquiry notice. But the appropriate reaction of a lending institution under these circumstances, when confronted with GC's official declaration of substantial revenue and continued representations that it was in compliance with its covenants, is for a jury to determine. Although the company's stock and bond prices had foundered, this was part of an industry-wide decline, and was not necessarily indicative of fraud. Companies presumably apply for credit in part in order to prepare for precisely such down-turns. While the market was clearly skeptical of reciprocal transactions, several analysts had concluded that such doubts were unfounded and had persevered in their positive ratings. Markets are fickle by nature, and analysts prone to disagree. It would hardly be to the benefit of either Banks or those in need of credit to hold that Banks must conduct an investigation into the accuracy of the financial statements of any company that seeks a loan while its stock price is declining. Finally, the analysts' reports are completely extraneous to the contractual relationship between GC and the Banks. Certainly, their conclusions are relevant to whether the Banks were on inquiry notice of the alleged fraud, but defendants have failed to cite a single misrepresentation case, and the Court has found none, in which "background noise" of this variety has been held as a matter of law to have put a plaintiff on inquiry notice of fraud.

On balance, the question of what a sophisticated lender should have done when faced with the available information is one about which reasonable people could easily differ. Even if the Banks had launched an inquiry, it is not clear on the present facts that they could have discovered the alleged fraud. Defendants continue to dispute that there was any fraud to discover, and would surely have taken the same position had inquiry been made in 2001; no doubt, the truth will still be in dispute after extensive investigation through the discovery phase of this action. Under these circumstances, the Court cannot say as a matter of law that the Banks' reliance was unreasonable (or unjustified) because a sophisticated lender could have protected itself by making reasonable inquiries. Where "the reasonableness of reliance depends upon factual determinations that are not plain from a review of the complaint and its attachments or that remain in dispute after discovery, the fraud claim should not be summarily dismissed on

Slip Copy                                                                 **Page 104**
**(Cite as: 2004 WL 1418197, \*17 (S.D.N.Y.))**

that ground." *Doehla,* 1999 WL 566311, at \*12; *see also id.* (listing cases refusing to summarily dismiss such claims). The issue of whether the Banks' reliance was reasonable or justifiable is a factual question inappropriate for summary adjudication. The motion for summary judgment must therefore be denied.

CONCLUSION

**\*18** Defendants' motion to dismiss the complaint is granted as to plaintiffs' negligent misrepresentation claims (fifth, sixth, and seventh causes of action), and denied as to plaintiffs' fraud claims (first through fourth causes of action). Defendants' motion for summary judgment on these remaining claims is denied.

SO ORDERED:

2004 WL 1418197 (S.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# TAB 12

Not Reported in A.
1994 WL 70118 (Del.Ch.), Fed. Sec. L. Rep. P 98,201
(Cite as: 1994 WL 70118 (Del.Ch.))

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

Alan **KAHN,** derivatively on behalf of **Dekalb**
Genetics Corporation, Plaintiff,
v.
Charles C. ROBERTS, Richard O. Ryan, Paul R. Judy,
Bruce P. Bickner, Thomas H.
Roberts, III, Thomas H. Roberts, Jr., John R. Nelson,
and Douglas C. Roberts,
Defendants,
and
**Dekalb** Genetics Corporation, Nominal Defendant.

Civ.A.No. 12,324.

Submitted Nov. 5, 1993.
Decided Feb. 28, 1994.

On Plaintiff's motion to amend the amended
complaint: Granted.

Gary W. Aber, Heiman, Aber & Goldlust,
Wilmington, (Curtis V. Trinko, Peggy J. Wedgworth,
Law Offices of Curtis v. Trinko, of counsel), New
York City, for plaintiff.

Edward P. Welch and Karen L. Valihura, Skaden,
Arps, Slate, Meagher & Flom, Wilmington, for
defendants Thomas H. Roberts, Jr. and Thomas H.
Roberts, III.

Martin P. Tully, Morris, Nichols, Arsht & Tunnell,
Wilmington, (Jeremy G. Epstein, and Helen
Macfarlane, Shearman & Sterling, of counsel), New
York City, for defendants Charles C. Roberts, Richard
O. Ryan, Paul R. Judy, Bruce P. Bickner, John R.
Nelson, and Douglas C. Roberts.

Stephen E. Jenkins, Ashby & Geddes, Wilmington, for
nominal defendant Dekalb Genetics Corp.

**\*1** On Defendants' motions for Judgment on the
Pleadings: Granted in part and denied in part.

MEMORANDUM OPINION

HARTNETT, Vice Chancellor.

SUMMARY OF HOLDINGS
I

Plaintiff filed this suit in 1991, challenging the 1991
repurchase by Dekalb Genetics Corporation ("Dekalb")
of shares of its Class A Common Stock from two of its
directors. There are three issues now pending
resolution. First, plaintiff seeks leave to amend the
Complaint for a second time to add four additional
directors as defendants and to add a Count II to the
Complaint alleging a breach of the duty of candor.
Because defendants have not shown that the
amendments will cause them any real prejudice or that
undue delay exists, plaintiff's motion for leave to
amend the Complaint must be granted, subject to a
review of the legal sufficiency of its allegations.

Secondly, defendants Thomas Roberts, Jr. and
Thomas Roberts, III (collectively the Thomas Roberts
defendants), seek a judgment on the pleadings
dismissing this action as to them on the grounds that
the Complaint (as now amended) fails to state a
cognizable claim against them. Because Count I, as
amended, does not state a cause of action against them,
it must be dismissed as to them. The Thomas Roberts
defendants' motion for judgment on the pleadings as to
Count II, however, must be denied because it states a
claim against them.

Lastly, the remaining defendants also seek judgment
on the pleadings. Their motion must be denied
because Count I of the Complaint (as now amended)
alleges particularized facts sufficient to excuse a pre-
suit demand as to the stockholder derivative claim and
because Count II adequately states a putative class
action claim of breach of the duty of candor.

THE MOTION TO AMEND
II

Chancery Rule 15(a) provides that after an answer has
been filed, a plaintiff may only amend the Complaint
by leave of Court or by written consent of the adverse
party. A ruling on a Motion to Amend the Complaint
is within the discretion of the Court and leave to amend
"shall be freely given when justice so requires." *Bokat
v. Getty Oil Co.,* Del.Supr., 262 A.2d 246 (1970).
Motions to amend are liberally granted in order to
further the salutary policy of having cases determined
on their merits. Wright & Miller, *Federal Practice
and Procedure: Civil 2d,* § 1474 (1990). Such
motions are not granted automatically, however, and
motions to amend may be denied upon a showing of
prejudice, undue delay, or legal insufficiency. *Seibert
v. Harper & Row, Publishers, Inc.,* Del.Ch., No.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                    **Page 124**
**(Cite as: 1994 WL 70118, \*1 (Del.Ch.))**

6639-NC, Berger, V.C. (Dec. 5, 1984), *citing, Stotland v. GAF Corp.,* Del.Ch., No. 6876-NC, Longobardi, V.C. (Mar. 24, 1983).

 Defendants have not shown that any real prejudice or undue delay will occur if leave to amend is granted. The legal sufficiency of the amendments is better addressed in connection with defendants' motion for judgment on the pleadings. The motion of plaintiff for leave to amend the Complaint for a second time must, therefore, be granted.

### THE STANDARD FOR MOTIONS FOR JUDGMENT ON THE PLEADINGS
### III

 A motion for judgment on the pleadings pursuant to Chancery Rule 12(c) is similar to a motion to dismiss brought pursuant to Chancery Rule 12(b)(6) for the failure to state a claim upon which relief can be granted. It can only be granted where the material facts are not in dispute and the Court will apply the same standard for granting relief as it would have employed had the motion been brought under Chancery Rule 12(b)(6). Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1367 (1992). The Court, in its discretion, may defer ruling on the motion until trial. *Id.*

 **\*2** On a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, all well-pleaded allegations of the Complaint must be taken as being true and a court should not dismiss a claim unless it appears to a reasonable certainty that the plaintiff would not be entitled to relief under any facts which could be proven to support the claim. *Del. State Troopers Lodge v. O'Rourke,* Del. Ch., 403 A.2d 1109 (1979). In ruling on such a motion, a court must construe the complaint and all inferences contained therein in the light most favorable to the plaintiff. *Weinberger v. UOP, Inc.,* Del.Ch., 409 A.2d 1262 (1979); *Morgan v. Wells,* Del.Ch., 80 A.2d 504 (1951). A motion to dismiss is not favored. Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1357 (1992).

 The complaint, nevertheless, must fairly apprise the defendants as to the facts which are relied upon by plaintiff, *Jefferson Chemical Co., Inc. v. Mobay Chemical Co.,* Del.Ch., 253 A.2d 512 (1969), and inferences or conclusions of law or fact will not be assumed to be true without specific allegations of facts which support the inferences or conclusions. *Bergstein v. Texas Int'l Co.,* Del.Ch., 453 A.2d 467 (1982), *app.*

den., *Texas Int'l Co. v. Bergstein,* Del.Supr., 461 A.2d 695 (1983). In the absence of an allegation of fraud, vagueness alone generally does not warrant dismissal of a complaint. See *Mayer v. Adams,* Del.Supr., 174 A.2d 313 (1961).

 In considering a Chancery Rule 12(b)(6) motion to dismiss or a Rule 12(c) motion for judgment on the pleadings, only those matters referred to in the pleadings are to be considered by the Court, unless the motion is converted into a Rule 56 summary judgment motion. Chancery Rule 12(c); *Haber v. Bell,* Del.Ch., 465 A.2d 353 (1983); *Grobow v. Perot,* Del.Supr., 539 A.2d 180 (1988); Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1367 (1992).

### THE DISCLOSURE CLAIMS
### IV

 All the defendants' have moved for judgment on the pleadings as to the putative class action claim in Count II of the Complaint that there was a breach of the duty of candor.

 Count II asserts a class action claim based upon the defendants' alleged breach of the duty of candor arising out of the voluntary disclosures by the directors to the stockholders of Dekalb after the completion of the repurchase of the Thomas Roberts' stock by Dekalb. On July 15, 1991, the directors of DeKalb wrote to the stockholders that the repurchase

> was a good transaction for the company, and one that allows certain Roberts family members to diversify their holdings and gain the liquidity they sought. Tom Roberts, Jr. and Tom Roberts, III will continue to fulfill their current terms as directors.

 In Count II it is alleged that this is misleading in that the defendants failed to disclose the real reasons for the repurchase.

### V

 It is well-settled that a board of directors seeking shareholder approval of a specific corporate action must disclose all material facts relating to the requested action so that shareholders can make an informed decision. *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773 (1993); *Stroud v. Milliken Enterprises, Inc.,* Del.Supr., 552 A.2d 476 (1989). Even, as here, where stockholder approval was not sought or needed, directors who decide voluntarily to disclose information relating to a corporate transaction to stockholders are subject to the duty of full and frank

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
**(Cite as: 1994 WL 70118, \*2 (Del.Ch.))**

disclosure of all material facts. *See Kelly v. Bell,* Del.Ch., 254 A.2d 62, 71 (1969), *aff'd,* Del.Supr., 266 A.2d 878 (1970); *Marhart, Inc. v. Calmart Co.,* Del.Ch., No. 11,820-NC, Berger, V.C. (April 22, 1992). A fact is material if there is

> \*3 ... a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Zirn,* 621 A.2d at 779, *quoting TSC Industries v. Northway,* 426 U.S. 438, 449 (1976).

### VI

Because Count II, the disclosure claim, is brought as a class action and not as a stockholder derivative claim, the more stringent pleading requirements mandated by Chancery Rule 23.1 are not triggered as to that Count.

The well-pleaded allegations of Count II of the Complaint are sufficient, (if only barely so), to state a claim upon which relief can be granted. In effect, it is alleged that the repurchase was really made because of Thomas Roberts, Jr.'s attempt to convince the Dekalb board to sell the company, his alleged "threats" to have the Thomas Roberts family stock sold to a potentially hostile third party and other acts involving the Thomas Roberts' relationship with the directors.

The Delaware Supreme Court has held that whether corporate disclosures are adequate is a mixed question of law and fact. *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 777 (1993), citing *Shell Petroleum, Inc. v. Smith,* Del.Supr., 606 A.2d 112, 113 (1992). It is, therefore, often difficult in a disclosure violation claim to determine merely from the allegations in the complaint that there is a reasonable certainty that the plaintiff would not be entitled to relief under any set of facts which could be proven to support his claim. Nor have the briefs shed much light on the issue. From the present record it is unclear whether the allegedly withheld information might assume actual significance in the deliberations of a reasonable stockholder as to his investment objectives. And even if so, it is unclear from the pleadings whether any omitted facts would have been viewed by a reasonable Dekalb stockholder as having significantly altered the total mix of information available considering all the facts and circumstances, including that the stockholders were not

asked to act on the information gratuitously disclosed. Because those issues necessarily involve disputed questions of fact, they should not be determined here merely from an examination of the allegations in the pleadings. See Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1357 (1992).

The motion for judgment on the pleadings as to Count II, because of the failure to state a claim upon which relief may be granted, must, therefore, in this Court's discretion, be denied. Wright & Miller, *Federal Practice and Procedure: Civil 2d.* § 1357; *Zirn, supra; Heineman v. Datapoint Corp.,* Del.Supr., 611 A.2d 950, 955 (1992).

THE THOMAS ROBERTS DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS
AS TO COUNT
I
### VII

\*4 Next to be addressed is the Thomas Roberts defendants' motion for judgment on the pleadings as to Count I. The Complaint indicates that neither Thomas Roberts, Jr., nor Thomas Roberts, III, participated in the vote to approve the repurchase of their stock. (Complaint, ¶ 1). The only wrong alleged against them is that they wanted to and ultimately did sell their stock at a premium. Although plaintiff alleges that Thomas Roberts, Jr., "threatened" to sell his family's stock to an unnamed third party who could attempt to acquire Dekalb, it is settled that a director may ordinarily legally sell his own stock in the company to anyone. *Harris v. Carter,* Del.Ch., 582 A.2d 222 (1990).

Count I, if construed liberally, alleges a breach of fiduciary duties stemming from the alleged desire of the Dekalb directors to protect their positions within the company. Obviously the Thomas Roberts defendants could not have been driven by an entrenchment motive when they sold their Class A voting stock. Nor is it alleged that they voted for the purchase. The fact, standing alone, that the Thomas Roberts defendants sold their stock to Dekalb at a premium does not state a claim of a breach of fiduciary duty on their part. *See Grobow,* 539 A.2d at 189. Without additional allegations of wrongdoing on the part of the Thomas Roberts defendants, Count I fails to state any claim against them. Count I must, therefore, be dismissed as to Thomas Roberts, Sr. and Thomas Roberts, Jr.

THE FAILURE TO HAVE MADE A PRE-SUIT
DEMAND

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                      **Page 126**
**(Cite as: 1994 WL 70118, \*4 (Del.Ch.))**

VIII

The remaining defendants also assert that Count I must be dismissed because plaintiff did not make a pre-suit demand on the directors.

As will be seen, all the claims of Count I, except for the claim of a failure to use due care, must be dismissed because of the failure of plaintiff to have made a pre-suit demand.

Because Count I of the Complaint (as amended) is brought as a stockholder derivative claim, it triggers the pleading requirements of Chancery Rule 23.1 that impose a more stringent pleading burden on the plaintiff than in other cases.    Chancery Court Rule 23.1 reads in pertinent part:

> In a derivative action, ... the complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort.

This Court, in determining whether a pre-suit demand would have been futile, must decide:

> [W]hether, under the particularized facts alleged, a reasonable doubt is created that:  (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

*Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984). To successfully maintain a stockholder derivative claim where pre-suit demand was not made, a plaintiff must plead particularized facts sufficient to create a reasonable doubt that the business judgment rule protects the challenged corporate transaction.    *Id.* at 812.    A plaintiff may adequately plead demand futility by satisfying either prong of the two-part test of *Aronson.   Id.* at 815; *Levine v. Smith,* Del.Supr., 591 A.2d 194 (1991).

**\*5** To meet the first prong of the *Aronson* test and adequately show the futility of a pre-suit demand, a plaintiff must plead particularized facts sufficiently demonstrating that the defendant directors had a financial interest in the challenged transaction, that they were motivated by a desire to retain their positions on the board or within the company (an entrenchment motive), or that they were dominated or controlled by a person interested in the transaction. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188-89 (1988), *citing Aronson,* 473 A.2d at 812-16.

The second prong of the *Aronson* test focuses on whether the transaction could have been a "valid exercise of business judgment."    A Complaint alleging demand futility that does not satisfy the first prong of *Aronson* must allege particularized facts sufficient to create a reasonable doubt that the business judgment rule protects the challenged acts from further judicial scrutiny.   *Grobow,* 539 A.2d at 189.

A claim of corporate waste is generally addressed under the second prong of *Aronson.*    In order to successfully plead a claim of corporate waste where there has not been a pre-suit demand, a plaintiff must plead particularized facts demonstrating that "what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid."  *Grobow,* 539 A.2d at 189, *citing Saxe v. Brady,* Del.Ch., 184 A.2d 602, 610 (1962).

IX

Plaintiff alleges in Count I that the defendants breached their duties of loyalty and care by approving the repurchase of stock from the Thomas Roberts defendants.

Plaintiff further alleges that a pre-suit demand on the Dekalb directors would have been futile because:  (1) Dekalb's board is controlled and dominated by members of the Roberts family;  (2) prosecution of the plaintiff's claims would jeopardize the continued tenure of the defendants with Dekalb, threatening the financial benefits and personal prestige which accrue to the defendants by virtue of their positions as directors and employees of Dekalb;  (3) the defendants were driven by an entrenchment motive in approving the repurchase;  (4) the repurchase constitutes corporate waste;  and (5) the repurchase is not protected by the business judgment rule because the defendants were not adequately informed concerning the repurchase and did not sufficiently discuss the proposed transaction before approving the repurchase.

The first two allegations of demand futility are insufficient as a matter of law.    Conclusory allegations of domination and control, without particularized facts showing that an individual person or entity interested in the transaction controlled the board's vote on the transaction, are insufficient to excuse pre-suit demand. *Aronson,* 473 A.2d at 816.   *Cf. Rales v. Blanchard,* Del.Supr., 634 A.2d 927 (1993).

Plaintiff has failed to plead any particularized facts

Not Reported in A.                                                          **Page 127**
**(Cite as: 1994 WL 70118, \*5 (Del.Ch.))**

demonstrating domination and control of the board by the two Thomas Roberts defendants or by the entire Roberts' Family. Nor does the Complaint contain any particularized facts demonstrating that prosecution of the plaintiff's claims would jeopardize the directors' positions as directors or employees. Plaintiff's argument is merely a different formulation of the often-rejected argument that pre-suit demand is excused because "directors otherwise would have to sue themselves, thereby placing the conduct of the litigation in hostile hands and preventing its effective prosecution." This argument has been considered and rejected by the Delaware Supreme Court in *Aronson* and other cases. Pre-suit demand, therefore, cannot be excused on this basis.

                                    X

*6 A plaintiff, however, may successfully plead pre-suit demand futility by alleging particularized facts demonstrating that the sole or primary purpose of the board's action was to perpetuate its own control. *Frantz Mfg. Co. v. EAC Industries,* Del.Supr., 501 A.2d 401 (1985). However, an entrenchment theory based on supposition rather than alleged fact does not excuse a pre-suit demand. *Grobow,* 539 A.2d at 188.

Here, plaintiff has failed to allege particularized facts sufficient to demonstrate that the stock repurchase was driven solely or primarily by the desire of the Dekalb board to perpetuate its own control. The Complaint itself shows that the Dekalb board had rational business reasons for buying the stock owned by the Thomas Roberts defendants and their families. According to the Complaint, Thomas Roberts, Jr., proposed to the board that the company be sold because he felt that the company was lagging behind its chief competitor and was "going down the tubes." The board, after hearing a presentation from the head of Dekalb Plant Genetics, disagreed with Thomas Roberts, Jr., and passed a resolution to remain independent. Because the board and Thomas Roberts, Jr., had diametrically opposed views as to the future direction of Dekalb, it was acceptable for the board to appoint a committee to negotiate a possible buy-out of the stock owned by Thomas Roberts, Jr., and his family. *See Grobow.*

The fact that Thomas Roberts, III, was asked to (and did as of March 30, 1991) resign his position as Director of International Marketing of DPRI also gave the Dekalb board an adequate business reason to buy his stock. Thomas Roberts, III, would not likely have been a contented Dekalb director after being passed over for the top position of DPRI and then being asked

to resign as an employee. The Dekalb board could have properly determined that it was in the best interests of the company to purchase the shares of Thomas Roberts, III. *See Grobow.*

The second amended Complaint also makes it clear that a majority of the directors who voted on the proposed repurchase were independent, outside directors. (Complaint, ¶ 5(a)-(1)). This fact also precludes the entrenchment theory of the plaintiff. Plaintiff has, therefore, failed to allege particularized facts sufficient to create a reasonable doubt that the Dekalb directors' were disinterested in the challenged repurchase.

The failure to have made a pre-suit demand as to these claims, therefore, cannot be excused and the defendants are entitled to a judgment on the pleadings dismissing the claims based on an alleged desire of the directors to entrench themselves in office.

                                    XI

The Complaint further alleges that pre-suit demand would have been futile because the challenged transaction constituted corporate waste. The Thomas Roberts defendants' stock was repurchased for $40 per share and plaintiff alleges that the fair market value of Class A stock was $36 per share at the time of the repurchase. Plaintiff relies solely on the allegation that Dekalb, for purposes of certain company incentive plans, valued Class A stock at a price equal to the trading price of Class B stock on the prior day. Class B stock was trading at $36 per share at the time of the challenged repurchase. Plaintiff, therefore, concludes that the Dekalb board bought the Class A stock for a $4 premium and, therefore, the transaction constituted corporate waste.

*7 Even assuming, arguendo, that plaintiff's valuation of Class A stock is accurate, the fact that the board bought the stock at a $4 premium does not constitute a claim for corporate waste. The $4 premium for the Class A stock is not, as a matter of law, so outrageous that no person of ordinary, sound business judgment would deem it worth what the corporation paid. *See Saxe v. Brady,* Del.Ch., 184 A.2d 602 (1962); *Grobow.* Consequently, Count I of the Complaint does not sufficiently allege a claim of corporate waste and judgment on the pleadings as to that claim must also be granted.

                                    XII

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
**(Cite as: 1994 WL 70118, \*7 (Del.Ch.))**

Finally, the Complaint alleges that pre-suit demand was excused because the Dekalb board failed to exercise due care in approving the challenged stock repurchase. Plaintiff alleges that the only action taken by the special committee appointed to negotiate the repurchase was a single telephonic meeting held on July 5, 1991. Plaintiff alleges that no documents were distributed before or during this meeting. It is also alleged in the Complaint that on July 7, 1991, the Dekalb board met and decided to approve the repurchase at a premium price, allegedly without the benefit of a recommendation from the special committee, without materials having been distributed prior to or during the meeting, and without discussing alternatives to the repurchase. (Complaint, ¶ 27-28).

For purposes of deciding the pending motion for judgment on the pleadings, these allegations must be taken as being true. *Haber v. Bell,* Del.Ch., 465 A.2d 353 (1983); *Grobow v. Perot,* Del.Supr., 539 A.2d 180 (1088). Any inferences that may be reasonably drawn therefrom must be construed in favor of the plaintiff. *Del. State Troopers Lodge v. O'Rourke,* Del.Ch., 403 A.2d 1109 (1979). The allegations raise sufficient doubt as to whether the directors of Dekalb complied with their "duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345 (1993); *Aronson,* 473 A.2d at 812. The allegations in the Complaint, if true, therefore, sufficiently state a cognizable claim of breach of the duty of care and create a reasonable doubt that the transaction is protected by the business judgment rule. Pre-suit demand, therefore, must be excused as to that portion of Count I of the second amended Complaint that asserts a claim of lack of due care. Defendants' motion for judgment on the pleadings based on the failure to have made a pre-suit demand as to this claim must, therefore, be denied.

LIMITATION OF DIRECTOR LIABILITY
XIII

The director defendants further argue that Article Ninth of Dekalb's Certificate of Incorporation requires the dismissal of plaintiff's claim of breach of the duty of care. Article Ninth tracks the language of 8 *Del.C.* § 102(b)(7) which permits:

> (7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit ...

**\*8** 8 *Del.C.* § 102(b)(7), however, does not protect directors from liability resulting from acts or omissions done in bad faith. Whether or not the directors acted in bad faith in approving the repurchase is a question of fact not reached at this stage. *Desert Equities v. Morgan Stanley Leveraged,* Del.Supr., 624 A.2d 1199, 1208-09 (1993). Article Ninth of the Dekalb Certificate of Incorporation, therefore, does not require the dismissal of Count I as to the individual defendants, other than the Thomas Roberts' defendants.

Defendants may submit a proposed Order reflecting the rulings herein.

1994 WL 70118 (Del.Ch.), Fed. Sec. L. Rep. P 98,201

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.