# APPENDIX
# PART 6

# TAB 13

Not Reported in A.    Page 1
1996 WL 74725 (Del.Ch.)
(Cite as: 1996 WL 74725 (Del.Ch.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

KHOURY FACTORY OUTLETS, INC., Plaintiff,
v.
Richard SNYDER, Defendant.

No. 11,568.

Draft Report: Dec. 1, 1995.
Final Report: Jan. 8, 1996.

Richard D. Levin, Connolly, Bove, Lodge & Hutz, Wilmington, for Khoury Factory Outlets, Inc.

Richard Snyder, Pro Se.

*MASTER'S REPORT*

KIGER, Master.

*1 This is a report on an action brought in this Court to impose a constructive trust on personal property in the hands of the defendant that arguably belongs rightfully to the plaintiff and to award damages against the defendant for a variety of alleged wrongs. The plaintiff is a corporation and the defendant is its former landlord. This case came to me shortly before its scheduled trial date. A motion to dismiss was filed about that time and, in reviewing the file, it seemed unreasonable to lose the trial date when the motion, on its face, was not persuasive.

The basis for dismissal stated in the motion is a lack of jurisdiction in this Court. When the motion was presented orally in the courtroom at the start of the trial, it was far from clear that it was well founded. Therefore, the parties and their witnesses being available, the trial went forward. As the case progressed, I began to have doubts about the propriety of the proceeding, but refrained from stating my views at the time. The manner in which the case was tried was particularly irritating most of the time. Allowing for the fact that the defendant was representing himself and is not trained as a lawyer, it still seemed as though the presentation of the case was needlessly vexing. Hence my reluctance to act precipitately in this matter. Having now had time to reflect on the evidence presented and to read the briefs submitted by the parties (which are no more truly helpful than the presentation of the case was agreeable), it is now my view that there is a lack of jurisdiction such that this case must be dismissed with leave to refile in a court of proper jurisdiction.

I
Background

*A. Introduction.* In order to make sense of this case and to explain coherently why I believe this Court does not have jurisdiction to grant the relief sought, it is necessary to state the underlying facts in more detail than would be appropriate in most such cases. This is being done to present a proper record for appeal should one be taken, and in so doing to demonstrate my familiarity with the case and the reasons that it was not readily apparent that there was a lack of jurisdiction. Most of the facts relevant to a decision as to jurisdiction did not appear in the record before the trial, and their bearing on the jurisdictional issue was not especially clear during the trial. It is the development of a factual record that makes it possible to evaluate the motion to dismiss in its proper context.

*B. Findings of fact.* Based on my review of the exhibits submitted by the parties and my review of the transcripts prepared for them and filed with the Court, I find the facts of this case to be as follow.

Plaintiff is a Delaware corporation that arguably no longer exists for failure to pay its franchise taxes. It is or was solely owned by Mr. and Mrs. George Khoury. In August, 1987, Mr. Khoury began to negotiate with Richard Snyder, the only defendant in this case, with an eye to leasing property in New Castle County, Delaware that he believed Mr. Snyder to own. [FN1]

*2 The relative sophistication of the people involved in this case has been made an issue by plaintiff. I am satisfied from the testimony of George Khoury and Richard Snyder that at the time they bargained for the rental of the DuPont Highway property each was a businessman of considerable experience. Each is well-educated and by the summer of 1987 each had had extensive experience owning and operating businesses. Neither one could be said to be unintelligent or a novice in the business world. Indeed, while I had trouble at the trial understanding Mr. Snyder at times, it is clear, upon reflection and upon study of the trial transcript, that he and Mr. Khoury are both shrewd businessmen who are well-versed in the ways of the business world and, in Mr. Snyder's case at least, in the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

area of landlord-tenant relations. The contention that Mr. Khoury was a naif who was taken advantage of by Mr. Snyder is, in my opinion, without merit.

The real estate these two men met to discuss in August, 1987 is known as 4010 DuPont Highway. The structure at that location is a large building that was in bad repair at the time. When Mr. Khoury and Mr. Snyder met to discuss the rental, Mr. Snyder presented Mr. Khoury with a standard lease form, which they marked up together over coffee. Mr. Snyder told Mr. Khoury to take the lease to his lawyer to have it retyped, which he did. The lawyer he consulted is counsel for him in this case. *See* docket no. 28, 329-330 (Question to Khoury from his lawyer: "When you came to see me to draft the lease, what did you tell me?"); docket no. 29, 465-466. After the lease was retyped, with the handwritten changes discussed by Mr. Khoury and Mr. Snyder, a copy was mailed to Mr. Snyder.

Several of the provisions of the lease entered into by these parties are important and need to be stated clearly. At the top of the lease form is the caption "*COMMERCIAL LEASE*". Numbered paragraph 1.1, captioned "*DEMISED PREMISES* ", states that the property subject to the lease is "4010 South DuPont Highway...in the building...on the real property situate at 4010 South DuPont Highway, New Castle, Delaware together with the use of the driveways and the parking areas situate upon the Lot."

Under the heading "*REPAIRS AND MAINTENANCE*", paragraph 8.1 states, in pertinent part, that
> Tenant further agrees and covenants, at its own cost, to repair and maintain the Demised Premises, including but not limited to, plumbing, heating, air conditioning, ventilation, electrical and lighting facilities and equipment, fixtures, wall, ceilings, windows, doors and plate glass if applicable.

Although it is not treated in the same general area of the agreement as the paragraph just quoted, attention is given to "Tenant's Improvements" in paragraph 27.1:
> Tenant, at its sole cost and expense, shall have the option of making improvements to the Demised Premises to a maximum of $30,000.00 in the first year of the term of this Lease. In the event Tenant constructs these improvements, Tenant shall be entitled to an abatement of the monthly rental by up to $500.00 per month until the total expenditures approved in writing by the Landlord have been amortized to a maximum of sixty (60) months. Improvements shall include, but not [be] limited to, repairs and maintenance to plumbing, heating, air conditioning, ventilation, electrical fixtures, walls, ceilings, windows, doors, and plate glass.

*3 What is clear from these two paragraphs of the lease is that Mr. Snyder was not agreeing to make improvements to the "plumbing, heating, air conditioning, ventilation, electrical fixtures, walls, ceilings, windows, doors, and plate glass" and that arrangements had been made to give plaintiff a break on the rent if improvements were made with respect to these items. No where does it state in the lease that the improvements were not to inure to the benefit of the landlord or that the plaintiff had any right to compensation for making them other than the abatement of rent. To the extent abatement of rent was covered at the hearing, and to the extent one can make sense of the testimony, plaintiff seems to have received the benefit of its bargain.

To continue with the provisions of the lease, paragraph 8.2 states that "Unless otherwise expressly provided herein, the Landlord shall not be required to make any improvements or repairs of any kind or character to the Demised Premises during the term of this Lease." And in paragraph 8.3, the lease provides that at the end of the tenancy the tenant shall surrender the keys to the landlord and shall surrender the premises in good condition, reasonable wear and tear excepted.

The lease also covers storage of tenant's property in paragraph 18.1:
> If on termination of this Lease by expiration or otherwise, or on abandonment of the Demised Premises, Tenant shall fail to remove any of Tenant's property from the Demised Premises, Tenant hereby authorized the Landlord, at Landlord's option, to cause such property to be removed and placed in storage or on such termination, to sell such property at public or private sale, with ten (10) days notice, and to apply the proceeds thereof, after payment of all expenses of removal, storage and sale, to the indebtedness, if any, of the Tenant to Landlord, the surplus, if any, to be paid to Tenant upon demand. Landlord shall in no event be responsible for the value, accounting, preservation or safekeeping of such property. Landlord's inventory of abandoned or stored property shall be final and incontestable. Tenant shall pay to the Landlord upon demand, any and all expenses incurred in such removal and all storage charges against such property so long as

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the same shall be in the Landlord's possessions or under the Landlord's control.

The term of the lease was two years. With respect to renewal, the lease grants plaintiff the option to renew the lease for a period of three years, but conditions the exercise of the option on its "giving notice by certified mail to Landlord, return receipt requested, at least sixty (60) days before the expiration of the then existing term." This language is found in paragraph 28.3 of the lease.

Once the lease had been agreed to, and perhaps before it was typed in final form, the Khourys began to take the necessary steps to make the structure suitable for the business they intended to operate there. There is no dispute that the building was in bad shape and required a substantial outlay of funds.

*4 Whether the Khourys handled the renovation wisely or in a cost effective manner is debateable. After listening to the testimony, there is substantial doubt in my mind as to how well they intended to repair the building. It is my impression, based on George Khoury's testimony, that they tried to do it on the cheap, perhaps because they had a cash flow problem, and as a result the repairs were not made as well as they might have been. What emerges very clearly from the trial is that the Khourys were adept at moving funds through the bank accounts of a variety of businesses they operated, and as a result it is hard to feel confident as to exactly how much money was spent on this property and where the money came from.

For example, Mr. Khoury testified at some length about the roof he contracted to put on this building. Several contractors worked on it. At the end of the day, it is hard to say that he got a good roof, or how much was actually paid for the roof that was installed. It is also an open question how much he owes one of the roofers who got a judgement against him for work done. Mr. Khoury may present himself as an innocent, but the picture that I have of him after listening to his testimony and reviewing it in the transcript is that he is every bit as slippery as Mr. Snyder.

Eventually, the Khourys were able to sublet part of their space to a small food business. This business bought equipment from them by financing the purchase. The Khourys held the debt and retained a security interest in the equipment. As the relationship with Mr. Snyder deteriorated for a number of reasons-- one of them being plaintiff's tendency to fall behind on the rent--Mr. Snyder determined to end the tenancy.

The Khourys did not notify Mr. Snyder of their intention to renew in a timely fashion as required by the lease [FN2], and so he notified them that for this reason he was terminating the lease and they had until September 30, 1989 to vacate the premises.

The Khourys removed items of personal property in August and September, 1989. They did not give the keys over to Mr. Snyder at the end of the tenancy because they gave them instead to their subtenant, who was then bargaining with Mr. Snyder for use of the premises. Mr. Snyder thereafter wrote several letters to the Khourys asking them to remove such of their property as remained on the premises, but when they did not claim the property, he decided to give it to charity, and did.

The relationship between the Khourys and their subtenants was no better than their relationship with Mr. Snyder. When the subtenants fell behind in their payments on the equipment they bought from the Khourys, the Khourys sued them, and the subtenants in turn filed for bankruptcy. Meanwhile, the Khourys had sued Mr. Snyder by bringing the present action in this Court. It was stayed while the action in the Bankruptcy Court proceeded, and only fairly recently was brought back to life.

*C. Nature of the claims made by the plaintiff.* The relief sought by the plaintiff, according to the prayer in their complaint, is a judgment
  *5 1. Declaring defendant hold all said equipment and fixtures in trust for plaintiff;
  2. Requiring defendant to reconvey said property to plaintiff;
  3. Declaring defendant hold the Security Deposit in trust for plaintiff;
  4. Requiring defendant pay plaintiff $3,000.00 as double the sum of said security deposit;
  5. Adjudging defendant liable to plaintiff for the reasonable rental value of plaintiff's Equipment and Fixtures since August 31, 1989;
  6. Adjudging defendant liable to plaintiff for waste and any other such deterioration which may have occurred by reason of use of plaintiff's Equipment and Fixtures by defendant and others;
  7. Declaring defendant hold title to said improvements conducted by plaintiff in trust for plaintiff;
  8. Adjudging defendant liable to plaintiff for $52,000.00, which sum represents the costs of the improvements made by plaintiff to defendant's Rental Property;
  9. Declaring defendant breached his implied

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

covenant of good faith and fair dealing with plaintiff, and was thereby unjustly enriched;
10. Adjudging defendant liable to plaintiff for any and all further costs incurred by plaintiff as a result of defendant's breach of his implied covenant of good faith and fair dealing with plaintiff;
11. For costs of this suit.
12. For pre-judgment and post-judgment interest;
13. For such other relief as the Court may deem just and equitable.

The quotation is verbatim. When one reads it in its entirety, one must question why the suit was brought in a court of equity. The basic action is said to be as much for a constructive trust as for damages, and imposition of a constructive trust is clearly within the equitable jurisdiction of this Court, but the characterization of a claim with certain words does not thereby create jurisdiction. *See McMahon v. New Castle Associates,* Del.Ch., 532 A.2d 601 (1987), and *see* the discussion of this case *infra.* The imposition of a constructive trust is alleged to be warranted because without it the defendant will be unjustly enriched at the plaintiff's expense, another traditional reason for being in a court of equity.

II
Issues

A number of issues are suggested by these facts. I shall consider them in the order that seems most logical to me.

*A. The validity of the lease.* Plaintiff contends that the lease for the rental property is not valid, at least with respect to some of its provisions. Mr. Snyder contends that it is a valid commercial lease. Any decision on this issue has consequences for other issues as well.

First of all, it is hard to imagine any dispute that the lease covers the entire property known as 4010 DuPont Highway, that is, the entire building and the adjacent land owned by the Snyders. This is the gist of the lease. There is nothing in the lease that suggests, let alone demonstrates, that something less than the entire property was demised to plaintiff. Plaintiff argues strenuously that it used only a portion of the building, and that may be, but the fact is that the lease it entered was for the entire property, and if it chose to use less than it was entitled to use, that is not the landlord's fault.

*6 The next bone of contention has to do with the amount of space covered by the lease. Plaintiff argues that much of what was done or attempted by Mr. Snyder is illegal under the Delaware Landlord-Tenant Code, but this contention is valid only if 25 *Del. C.* § 5103 is not applicable to this case. Under that section, Chapters 53, 55, 61, 65, 67 and 70 of Title 25 do not apply to commercial units where the aggregate rental area is greater than 5,000 square feet. 25 *Del. C.* § 5103(a)(1). "Rentable area" is defined as "an area computed by measuring to the inside finished surface of the perimeter walls of a rental unit including the area occupied by columns, elevator shafts, stair shafts, flues, pipe shafts, ducts and the like." *Id.,* §5102(12). A commercial unit "is a structure or that part of a structure which is used for purposes other than a dwelling unit or farm unit." *Id.,* §5102(1). The unit was clearly a commercial unit as defined in the statute. Furthermore, a reading of the lease establishes that it was being leased out as a commercial unit. The question, then, is whether the aggregate rentable area covered by the lease was great enough that the provisions of certain chapters of the Landlord-Tenant Code do not control the terms of the lease.

I think the answer is yes. No one presented a survey at the hearing, although such would be one excellent way of placing this information in evidence. Obviously, it is something the Khourys would like to keep out of the record. The information supplied by Mr. Snyder, however, is persuasive enough.

One of the documents placed in evidence by plaintiff is a copy of a lease between Mr. Snyder and Casablanca Moroccan Cuisine, Inc., a tenant that let the property after plaintiff vacated. The lease is dated December 20, 1989. Unlike the lease plaintiff had, this lease very clearly applies to "right side of building comprising approx 4500 sf separated by partial wall from balance of building." Petitioner's Ex. 37, p. 1. Attached to this document is another document captioned "Amendment Agreement" which is undated, but appears to take effect on December 1, 1990. It states, in pertinent part, that
   ...the parties...hereby agree as follows:
   1. Two Thousand (2,000) square feet of additional rental space on the property known as 4010 DuPont Highway, New Castle, Delaware, adjacent to four thousand five hundred (4,500) square feet currently leased under the said Agreement [of December 20, 1989, i.e., the underlying agreement to which this document is attached], shall be added to the premises leased by Tenant from Landlord.

What is interesting about this document is that the basic agreement, dated December 20, 1989, makes

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

clear that the portion of the building then being rented is 4,500 square feet, but this document predates by almost six months the filing of the complaint in this action. Therefore, it cannot be said that the lease with Casablanca is manufactured evidence. Furthermore, the issue of square footage is not raised in the complaint, nor is it such an obvious issue that Mr. Snyder ought to have anticipated it, and so he cannot be accused of trying to manufacture evidence.

*7 There is also the evidence of Petitioner's Exhibit 14. This is ambiguous at best. Combined with Petitioner's Exhibit 19, it appears to calculate the interior square footage of the building at 4010 DuPont Highway at 5,935 square feet. This is not clearly stated on Exhibit 14, but it is hard to imagine another meaning for the numbers that appear there. The document was prepared by Mr. Khoury. He was examined on it at length by Mr. Snyder, *see* docket no. 28, pages 210-223, *passim*. While he was evasive as to the meaning of many of the numbers shown on his exhibit, and never said definitively that he rented more than 4,000 square feet, the common sense meaning of the exhibits and the lease is that over 5,000 square feet was being rented.

Finally on this subject, Mr. Snyder attempted to present evidence through the owner of Casablanca, Riyad Albaroki, that the interior of the building was comprised of about 6,500 square feet. Docket no. 29, pages 502-509, *passim*. What is interesting about this testimony is that Mr. Albaroki presented evidence that he had obtained insurance on the building for 5,848 square feet. *Id.*, 508-509.

In fine, when one looks at the evidence in this case, there is every reason to believe, even without a survey, that the premises rented by plaintiff exceeded 5,000 square feet. There is no evidence other than the self-serving testimony of Mr. Khoury that it was for less than 5,000 square feet. Moreover, there is every reason to believe that this commercial lease is the product of arms's length negotiation between competent adults, one of whom (plaintiff) was represented by counsel.

*B. The improvements.* One of the claims in this case is for the value of improvements made by plaintiff to 4010 DuPont Highway. It rests on Mr. Snyder's alleged failure to carry out certain duties imposed on landlords by statute, specifically, the duty to supply and maintain a fit rental unit (25 *Del. C.* § 5303) and all that is entailed in doing this. There is reason to believe, based on Mr. Albaroki's testimony, that the property was in bad shape when he took it over and, therefore, that the improvements were not all that Mr. Khoury claims they were. Be that as it may, paragraphs 8.1 and 8.2, already quoted, place the burden of making certain improvements on the tenant as a result of arm's length negotiation. No one, after all, placed a gun to the Khourys's heads and compelled them to rent this particular property in order to open a new business. As already discussed, the nature of the enterprise and the amount of space leased exempted Mr. Snyder from having to comply with the provisions of 25 *Del. C.* § 5303.

Because it is my view that the lease is binding and that the exceptions provided for commercial leases as set forth in 25 *Del. C.* §5103 apply in this case, this claim against Mr. Snyder is not a valid claim. Hence, any theory that plaintiff made improvements to the property in order to supply some deficiency of the landlord and, therefore, that failure to recognize this act as conferring unjust enrichment on the landlord, is without merit.

*8 *C. Returning the equipment.* There are several problems with this portion of the plaintiff's case. First, the evidence presented at trial makes it very clear that plaintiff sold most of the equipment at issue--perhaps all of it--to its subtenant. Plaintiff may have retained a security interest in the equipment, but having sued the subtenants in another court and then gone through Bankruptcy Court, the status of plaintiff's rights in this equipment, if any, is far from clear to me, based on the present record. In any event, plaintiff knew when it filed the complaint in this Court that it had already sold the equipment to the subtenants and was hardly the owner in the sense that it was before the sale. At best, it had some derivative interest in the property, but what that may be is impossible to tell from the record.

There is another issue of ownership that was brought out by Mr. Snyder that is very disturbing. Was plaintiff ever the owner of the property it claims Mr. Snyder has wrongfully withheld from it? I have my doubts that it was.

Exhibit B to the complaint is a typed list of the personal property claimed by plaintiff and upon which it asks this Court to impose a constructive trust. It is very straight-forward and appears to list items such as one might expect to find in a food preparation business. During discovery, however, the attorney for Mr. Snyder asked for a copy of the security agreement between plaintiff and its subtenant. The document that was supplied did not contain a listing of the equipment covered by the agreement, and so that list was sent under separate cover. *See* Respondent's Exhibit 5. The

list that was sent is identical to the one given in the complaint, even down to the manner in which the items are listed, except that the list in the complaint was retyped for the occasion and the list attached to the security agreement was typed on stationery that gave a name and an address otherwise absent from this proceeding. Let me explain.

When one reads these documents as a set, the problem is obvious. The security agreement, *see* Petitioner's Exhibit 29, states at paragraph III that the subtenants are the owners of the personal property that is the subject of the agreement, and that they own it free and clear except for the security interest created by that agreement in plaintiff. The attachment to the agreement, as shown in Respondent's Exhibit 5, is typed on the stationery of a business called "Artist in the Kitchen", which business had an address of 502 West Fourth Street, Wilmington, Delaware. At the top of this list is the heading "Equipment List For Blimpie's Restaurant". A Blimpie's restaurant was operated by the Khourys at the address given. To all appearances, the subtenants gave a security interest to plaintiff in property they acquired from someone other than plaintiff.

Who, then, owned this property before the security agreement was executed? Plaintiff's subtenants or Artist in the Kitchen or Blimpie's? There is no way of knowing. What does seem fairly clear is that neither the Khourys or plaintiff was the owner of the property before the subtenants bought it. Mr. Khoury attempted to explain away these anomalies at the trial, but his explanation is lame. The gist of it is that he and his wife operated businesses under different names and were careless about which names they used when and for which purpose. Already noted is the problem with repairs allegedly made to the DuPont Highway property, the evidence suggesting that some of the materials supposedly bought for those repairs were actually for other jobs elsewhere. In sum, it is hard to have any confidence in plaintiff's assertion that it ever owned the property it claims should be returned to it and upon which it seeks the imposition of the constructive trust.

*9 Assuming for the sake of argument that plaintiff did own the personal property listed in its complaint and that it wants it returned, the proper means of proceeding is by an action for replevin. Replevin is a form of action for recovery of personal property that has been taken or withheld from the owner unlawfully, *Harlan & Hollingsworth Corp. v. McBride*, Del.Supr., 69 A.2d 9 (1949), and is determined in Superior Court before a jury, *In Re Markel*, Del.Supr., 254 A.2d 236 (1969). As a matter of statute, replevin may be sought in the Justice of the Peace Courts as well. 10 *Del. C.* § 9304.

The matter does not end here, however. The lease provides for the landlord to dispose of the tenant's property if left behind at the end of the lease. Aside from whatever right Mr. Snyder may have to rely on the explicit terms of the lease, the record shows that he made repeated requests to plaintiff to remove its property, and finally gave the apparently abandoned property to charity only when all else failed. The charity in question is Smyrna Congregation of Jehovah's Witnesses. *See* Respondent's Exhibit No. 17. It is hard to understand how the plaintiff can claim that Mr. Snyder has wrongfully withheld its property from it (if the property is indeed the plaintiff's property) when he asked plaintiff to remove it from his premises on a number of occasions and plaintiff did not do so.

*D. The claims for declaratory judgement and for money damages.* The balance of the claims are for declaratory judgements or money damages, all of which come within the jurisdiction of other courts. The claim of unjust enrichment sounds like something that would be brought in a court of equity, but there is little else that might support a claim for equity jurisdiction. I will return to it momentarily. Putting it aside for now, it is far from clear to me, after sitting through the trial and reading the plaintiff's brief, that there is a basis for jurisdiction in this Court.

Plaintiff argues in its brief that "The need for equitable intervention and the kind of relief required is decided based on the situation at the time the relief is actually granted. *Guarantee Bank v. Magness Const. Co.*, Del.Ch., 462 A.2d 405, 409 (1983)." Docket no. 33, p. 13. Actually, the decision cited was rendered by the Supreme Court, not the Court of Chancery, as indicated in the quotation. [FN3] The matter before the Supreme Court was an appeal from a decision in this Court. What Justice McNeilly actually wrote is

> When equity takes jurisdiction of a cause and decides that relief shall be granted, the relief, including damages, if any, will be tailored to suit the situation as it exists on the date the relief is granted and the choice of relief is largely a matter of discretion with the trial judge.

This is very different from what appears in the plaintiff's brief. As I read the Supreme Court opinion in *Magness,* jurisdiction must be established before this Court can do anything, and only *after* such jurisdiction has been established does the question arise as to the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

fashioning of relief. This approach is entirely consistent with Chancellor Allen's remarks in *McMahon, supra:*

> *10 Chancery jurisdiction is not conferred by the incantation of magic words. Neither the artful use nor the wholesale invocation of familiar chancery terms in a complaint will itself excuse the court, upon a proper motion, from a realistic assessment of the nature of the wrong alleged and the remedy available in order to determine whether a legal remedy is available and fully adequate. If a realistic evaluation leads to the conclusion that an adequate legal remedy is available this court, in conformity with the command of section 342 of title 10 of the Delaware Code will not accept jurisdiction over the matter.

This quotation summarizes the state of the law on this issue as well as can be done. All that remains is to deal with the last of the "magic words" invoked in an attempt to confer jurisdiction where none existed.

*E. Unjust enrichment.* A constructive trust is one means by which a court of equity attempts to deal with unjust enrichment. The general concept of a constructive trust was outlined in *Adams v. Jankouskas,* Del.Supr., 452 A.2d 148 (1982). The Court wrote that "a constructive trust does not arise from the presumed intent of the parties, but is imposed when a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another *to whom he owed some duty.*" (Emphasis supplied.) In a footnote, the Supreme Court quoted at length from *Pomeroy's Equity Jurisprudence,* §166, at 210-211 (5th ed. 1941) on the characteristics of a constructive trust.

> Constructive trusts [by contrast with resulting trusts] are by equity for the purpose of working out right and justice, where there was no intention of the party to create such a relation, and often directly contrary to the intention of the one holding the legal title. All instances of constructive trust may be referred to what equity denominates fraud, either actual or constructive, including acts or omissions in violation of fiduciary obligations. If one party obtains the legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner....Courts of equity, by thus extending the fundamental principle of trusts--that is, the principle of a division between the legal estate in one and the equitable estate in another--to cases of actual or constructive fraud and breaches of good faith, are enabled to wield remedial power of tremendous efficacy in protecting the rights of property.

(Emphasis in original). 452 A.2d 152. What, then, is unjust enrichment, and when is conduct so unconscionable as to call into play the powers of a court of equity?

*11 The doctrine of unjust enrichment has five elements that must be present for the doctrine to apply: "(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and impoverishment; (4) absence of justification for the enrichment and impoverishment; and (5) absence of a remedy provided by law." *Abbeville Lbr. Co. v. Richard,* La.Ct.App., 350 So.2d 1292 (1977), 1300, cited with approval in *A & A Metal Bldgs. v. I-S, Inc.,* N.D.Supr., 274 N.W.2d 182 (1978), 189.

In the present case, there is a dispute as to whether an enrichment took place. Mr. Khoury maintains that the plaintiff spent money to improve the Snyders's real estate, but Mr. Snyder disputes whether there was an improvement, and Mr. Albaroki testified that the place was in terrible shape when he took over, a few weeks after plaintiff vacated. Mr. Albaroki testified that he spent a great deal of his own money to make the building useable.

There is even a question as to whether there was an impoverishment, at least in my mind, because the expenditure of money on the premises was bargained for and plaintiff received an abatement of rent. In other words, it got something for what it gave. If it ended up not getting as much value for the money as it would have liked, that is not Mr. Snyder's fault.

The connection between the expenditure by plaintiff and any effect on the Snyders's building is not an issue here, but justification is an issue. Plaintiff and Mr. Khoury bargained over what was done. A bilateral contract existed, *Marvel and O'Hara v. Danneman,* D.Del., 490 F.Supp. 170 (1980), because there was an exchange of promises. Whatever happened was not unjustified.

Lastly, there is no absence of a remedy at law. Plaintiff seeks money damages. This Court does not award

Not Reported in A.                                                                                                  Page 8
(Cite as: 1996 WL 74725, *11 (Del.Ch.))

money damages if that is all that is sought. Hence, this Court is without jurisdiction to entertain this cause.

### III
### Conclusion

To summarize my views on this case,

1. The case is essentially one between a tenant and its former landlord, and as such any dispute over the lease ought to have been brought in a Justice of the Peace Court, 25 *Del. C.* §9301, or in some other law court. A dispute over the terms of a lease, when all that is sought amounts to damages and replevin of personal property, should not be in this Court.

2. The constructive trust issue is a red herring. There has been no clear showing that the property in question belonged to plaintiff; there is, in fact, ample reason to believe that it did not. Beyond that, there is no basis in the present record to establish unjust enrichment of the defendant if a constructive trust is not imposed. Consequently, there is no basis in this record to impose a constructive trust on anything.

3. If the relief plaintiff truly seeks is the return of personal property it claims is in the hands of the defendant, which the defendant denies, the proper remedy is replevin. That remedy is available elsewhere, and so is not available in this Court. 10 *Del. C.* §9304.

*12 4. To the extent plaintiff seeks declaratory judgements and money damages, those remedies are available elsewhere, and so are not available in this Court. 10 *Del. C.* §§ 541, 1322, 6501, 9301.

There being no jurisdiction pursuant to which this Court can act on the relief sought by plaintiff, the cause should be dismissed with leave to refile in a court of appropriate jurisdiction.

### ORDER

WHEREAS, a draft report was issued in this case on December 1, 1995, and no exceptions being filed thereto, the draft report was filed as the final report on January 8, 1996, and no exceptions being filed thereto and more than twenty days having passed.

NOW, THEREFORE, the Court having reviewed the final report dated January 8, 1996, and it appearing that there are grounds to so hold, said report is hereby approved and the findings of fact made therein are hereby adopted and in reliance thereon this case is hereby dismissed.

IT IS SO ORDERED.

FN1. Why is Richard Snyder the only defendant? The evidence suggests that the real property at the heart of this case is owned jointly by him and his wife, so it would seem elementary that she should be a party also, but she is not. Rather than conjure with this aspect of this bizarre case and so delay this report further, I merely note this oddity for what it is worth and proceed to the other issues.

FN2. In addition to being untimely, the notice of intent to renew does not appear to have been sent to Mr. Snyder by certified mail, return receipt requested, as required by the lease. At least, there is no evidence in the file that it was given to him in that manner.

FN3. In addition to the incorrect citation for this case, Court of Chancery Rule 171(h) requires that copies of unreported cases cited in a brief be attached to the brief and filed with the Court, but I cannot find that either of the unreported cases cited by the plaintiff in its brief has been provided as required. Indeed, one of them, *McMahon*, was subsequently reported, as noted in the body of this report, but that is not evident from the plaintiff's brief.

1996 WL 74725 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# TAB 14

Not Reported in A.
1999 WL 550369 (Del.Ch.), 25 Del. J. Corp. L. 1025
(Cite as: 1999 WL 550369 (Del.Ch.))

Page 32

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Steven M. **MIZEL**, Plaintiff,
v.
John E. **CONNELLY**, John S. Aylsworth, Terrence L. Wirginis, Karl G. Andren, and Royal P. Walker, Jr., Defendants,
and
PRESIDENT CASINOS, INC., Nominal Defendant.

No. Civ.A. 16638.

July 22, 1999.
As Corrected Aug. 2, 1999.

Norman M. Monhait, Carmella P. Keener, of Rosenthal Monhait Gross & Goddess, Wilmington, DE; Matthew M. Houston, of Wechsler Harwood Halebian & Feffer, New York, NY, for Plaintiffs, of counsel.

Stephen E. Herrmann, of Richards, Layton & Finger, Wilmington, DE; Gerard K. Sandweg, Jr., Lawrence C. Friedman, of Thomas Coburn, St. Louis, MO, for Defendants, of counsel.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

*1 The derivative complaint in this case challenges a transaction between nominal defendant President Casinos, Inc. and a corporation wholly owned by President Casinos' Chairman, Chief Executive Officer ("CEO"), and largest stockholder, John E. Connelly. Connelly and two of Connelly's management subordinates (one of whom is Connelly's grandson) comprise a majority of the board of directors (the "Board") of President Casinos. Since Connelly was clearly interested in the challenged transaction and is in a position to "exert considerable influence" over the economic fates of his two subordinates, a reasonable doubt exists regarding the independence of the President Casinos' Board. *Rales v. Blasband*, Del.Supr., 634 A.2d 927, 937 (1993). As such, demand is excused and the defendants' motion to dismiss under Court of Chancery Rule 23.1 will be denied.

I.

A brief recitation of the pertinent facts from the complaint is all that is necessary to resolve the current motion.

Nominal defendant President Casinos, a Delaware corporation, "develops, owns and operates riverboat and/or dockside casions through its subsidiaries." Compl. ¶ 3. The non-nominal defendants in this action are the five directors of President Casinos, who have been in service at all times relevant to this motion. The pertinent facts regarding the defendant directors' employment and ownership interests in President Casions are as follows:

John E. Connelly--President Casinos' Chairman, CEO, and 32.7% stockholder;

John S. Aylsworth--President Casinos' President, Chief Operating Officer ("COO"), and director;

Terrence L. Wirginis--President Casinos' Vice Chairman of the Board, Vice President, consultant, and director, as well as Connelly's grandson;

Karl G. Andren--President Casinos' director, whose full-time occupation is as the Chairman of Circle-Line Sightseeing Yachts, Inc. ("Circle-Line"). Circle-Line is a corporation allegedly controlled by Connelly through his 100% ownership of Circle-Line's parent corporation, New York Cruise Lines, Inc.; and

Royal P. Walker--President Casinos' director whose independence is conceded by the plaintiff.

Compl. ¶¶ 4-8.

The complaint seeks rescission of a July 24, 1997 transaction (the "Transaction") whereby President Casinos acquired the Broadwater Resort and Broadwater Tower (the "Broadwater Properties") in Biloxi, Mississippi. According to the defendants, the Broadwater Properties are located adjacent to President Casinos' existing casino operations in Biloxi and are a "destination resort property." Defs.' Br. at 1. President Casinos purchased the Broadwater Properties from J. Edward Connelly Associates ("JECA") for approximately $40.5 million.

JECA was wholly-owned by defendant Connelly at the time of the Transaction. The Broadwater Properties constituted substantially all of JECA's assets. According to the complaint, the Transaction was defective in the following material respects:

*2 . The $40.5 million Transaction price was excessive since JECA had suffered significant losses in the two years prior to the Transaction and the "Broadwater Properties were old, suffered from deferred maintenance and were considered

obsolete compared to newer resorts in the Biloxi area;"

. The financing for the Transaction was procured at a price "far in excess of commercial norms for such transactions;"

. "The President Casinos' Board, under the control of Connelly, did not obtain information to permit a determination that the consideration to be paid for the Broadwater Properties was fair and reasonable ...;" and

. The President Casinos' Board did not exercise a good faith business judgment in agreeing to the Transaction. Instead, the Board "preferred the interests of Connelly ... over the interests of the Company and its shareholders."

Compl. ¶¶ 14, 16, 19, 21.

As a result, plaintiff alleges that the Transaction is wasteful and the product of breaches of the defendant directors' fiduciary duties of care and loyalty. By this action, plaintiff seeks rescission of the Transaction or other relief to make President Casinos whole for the damages caused by the Transaction.

II.

This matter is before me on the defendants' motion to dismiss under Court of Chancery Rule 23.1. The defendants contend that the complaint fails to raise a reasonable doubt regarding the ability of any of the defendants, other than Connelly, to consider a demand impartially. Furthermore, the defendants argue that the complaint fails to plead particularized facts raising a reasonable doubt that the Transaction was not otherwise the product of a valid exercise of business judgment. As such, the defendants contend that the complaint must be dismissed since plaintiff has failed to satisfy either prong of the familiar *Aronson* test. *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 814-815 (1984).

For his part, plaintiff alleges that he need not make a demand on the Board because he has pled particularized facts demonstrating that Connelly has a direct, personal interest in the Transaction and that defendants Aylsworth, Wirginis, and Andren are beholden to him for their livelihoods. Since these directors constitute four of the five members of the Board, plaintiff contends that demand is excused under the first prong of the *Aronson* test. *Aronson*, 473 A.2d at 814-815. Plaintiff also argues that he has properly pled a waste claim, thus excusing demand under the second prong of *Aronson. Id.*

III.

A plaintiff prosecuting a derivative action must "allege with particularity ... the reason for ... not making" a demand on the board of directors. Ch. Ct. Rule 23.1. In considering the defendants' motion to dismiss under Rule 23.1, the well-pleaded allegations of the derivative complaint must be accepted as true. *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 186 (1988). Conclusory allegations, however, will not be accepted as true. *Id.* at 187; *see also Rales*, 634 A.2d at 931.

*3 To determine whether demand is excused, I must evaluate whether, under the particularized facts alleged, a reasonable doubt is created that either: i) a majority of "the directors are disinterested and independent;" or ii) the "challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814-815. In this case, I need only address the first prong of *Aronson*.

In addressing motions to dismiss under Rule 23.1, this court often confronts the question of whether directors without personal interests in a challenged transaction are so beholden to another director, who does possess such a self-interest, that they cannot consider the demand solely on its merits. *Aronson*, 473 A.2d at 814; *Rales*, 634 A.2d at 936-937. This case is no different.

Here, it is unquestionable that Connelly cannot impartially consider a demand that the Board take legal action to rescind the challenged Transaction. Such a decision would have "potentially significant financial consequences" for Connelly. *Rales*, 634 A.2d at 936.

To excuse demand, plaintiff must therefore demonstrate a reasonable doubt whether two of the four remaining Board members can impartially consider a demand. To establish a lack of independence, plaintiff must plead particularized facts suggesting that two of the directors are "beholden" to Connelly or so under his influence that "their discretion would be sterilized." *Rales*, 634 A.2d at 936.

Plaintiff alleges that defendants Aylsworth, Wirginis, and Andren suffer from such a dependence on Connelly. I will address plaintiff's contentions, starting with defendants Aylsworth and Wirginis.

IV.

Aylsworth is the President and COO of President Casinos. "His positions with President Casinos constitute his principal employment and means of

Not Reported in A. Page 34
(Cite as: 1999 WL 550369, *3 (Del.Ch.))

earning a living. During the Company's 1998 fiscal year, Aylsworth received more than $620,000 in compensation from President Casinos." Compl. ¶ 5.

Wirginis is Vice Chairman of the Board, Vice President, and consultant to President Casinos. "Wirginis is the grandson of defendant Connelly. His positions with President Casinos constitute his principal employment and means of earning a living. During the Company's 1998 fiscal year, Wirginis received more than $239,000 in compensation from President Casinos." Compl. ¶ 6.

Given these facts, I have a reasonable doubt that Aylsworth and Wirginis can impartially consider a demand calling upon them to take action materially adverse to Connelly's interests. Connelly is their management superior--in common parlance, their "boss." Connelly is also the largest stockholder of President Casinos. [FN1]

> FN1. To prevail in a President Casinos' stockholder vote involving a 100% turnout, Connelly need only persuade 17.31% of the remaining 62 .3% of the votes to vote with him (that is, he need obtain less than one-third of the remaining votes). In a vote involving only a 90% turnout (e.g., to elect directors) where only a plurality of the quorum is required, Connelly's burden would be even lighter. It is undoubtedly true that a 32.7% block *may* not be sufficient to constitute control for certain corporation law purposes. See, e.g., *Paramount Communications Inc. v. QVC Network Inc.,* Del. Supr ., 637 A.2d 34, 44 (1994) (subsequent history omitted) (indicating that *Revlon* duties are invoked when a transaction would effect a "change in control" from disaggregated stockholders to a single stockholder with the unilateral power to, inter alia, elect directors, cause a corporate break-up, or effect a merger); *Unitrin, Inc. v. Am. Gen. Corp.,* Del.Supr., 651 A.2d 1361, 1388 (1995) (fact that a repurchase program would have created a 25% block of stock in insider hands was not preclusive of a proxy fight). In deciding a motion to dismiss under Rule 23.1, however, the pragmatic, realist approach dictated by *Rales* requires me to accord great weight to the practical power wielded by a stockholder controlling such a block and to the impression of such power likely to be harbored by the stockholder's fellow directors.

This fact powerfully strengthens the inference that he--as their boss--exerts "considerable influence" over Aylsworth and Wirginis. Since Aylsworth and Wirginis each derive their principal income from their employment at President Casinos, it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment. [FN2]

> FN2. *Friedman v. Beningson.* Del. Ch., C.A. No. 12232, mem. op., Allen, C. (Dec. 4, 1995) dealt with a similar situation. In that case, Mr. Beningson held 36% of the company's stock and served as the company's Chairman, CEO, and President. Based on these facts, Chancellor Allen came to the following conclusion regarding Beningson's influence over the company: "From a practical perspective, this confluence of voting control with directorial and official decision making authority ... is ... itself quite consistent with control of the board." *Id.* at 10. Since this control gave Beningson considerable influence over another director's ability to continue to receive consulting fees, the Chancellor found that the other director was beholden to Beningson for demand excusal purposes. *Id.* at 11; *cf. Robbins & Co. v. A .C. Israel Enter., Inc.,* Del. Ch., C.A. No. 7919, mem. op. at 13, Berger, V.C. (Oct. 2, 1985) ("This Court and others have recognized that substantial minority interests ranging from 20% to 40% often provide the holder with working control.").

*4 *Rales* supports this conclusion. In *Rales,* the Supreme Court considered whether George Sherman, the President and CEO of Danaher Corporation, was beholden to the Rales brothers such that he could not impartially consider a stockholder demand that, if granted, would have resulted in a suit adverse to the Rales brothers' financial interests. Collectively, the Rales brothers owned 44% of the stock of Danaher. Steven Rales was Danaher's Chairman of the Board; Mitchell Rales was Chairman of the Executive Committee of the Danaher Board.

The Supreme Court concluded:
> Although Sherman's continued employment and substantial remuneration may not hinge solely on his relationship with the Rales brothers, there is little doubt that Steven Rales' position as Chairman of the Board of Danaher and Mitchell Rales' position as Chairman of its Executive Committee place them in a position to exert considerable influence over Sherman. In light of these circumstances, there is a reasonable doubt that Sherman can be expected to act independently considering his substantial financial stake in

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                                                   Page 35
(Cite as: 1999 WL 550369, *4 (Del.Ch.))

maintaining his current offices.
634 A.2d at 937; *see also Steiner v. Meyerson*, Del. Ch., C.A. No. 13139, mem. op. at 23, Allen, C. (July 18, 1995) (Chairman and CEO of a company--who was not a controlling stockholder--was in a position to exert "considerable influence" over a director who was the company's President, COO, and CFO, thereby disabling the subordinate from impartially considering a demand adverse to the CEO's interests.); *Kahn v. Tremont Corp.*, Del. Ch., C.A. No. 12339, mem. op. at 6-7, Allen, C. (Apr. 22, 1994) (excusing demand because controlling shareholder indirectly controlled the livelihoods of a majority of the directors).

A further fact supports Wirginis' inability to consider a demand impartially. Wirginis is Connelly's grandson. That fact is of great consequence. I would like to believe (for Wirginis' and Connelly's sakes) that it would be difficult for Wirginis to consider impartially a demand that would be adverse to his grandfather's personal interests. As an objective matter, this relationship gives me "reason to doubt" that Wirginis can impartially consider a demand. *Grimes v. Donald*, Del.Supr., 673 A.2d 1207, 1217 (1996). I could not consider impartially such a demand as to my own grandfather and would recuse in any comparable situation that required me to do so. *Cf. Delaware Judges' Code of Judicial Conduct* Canon 3.C.(1)(d) (1999) (judge should disqualify himself when a relative within the third degree of consanguinity of judge or judge's spouse is a party to the proceeding or an officer, director, or trustee of a party because the judge's "impartiality might reasonably be questioned"). While there is nothing wrong with family members serving together on a board, in my view a "reasonable doubt" is raised when a demand would require a director to support a suit contrary to the interests of a close family member. The logic of analogous authorities supports this conclusion. 1 *Principles of Corporate Governance: Analysis and Recommendations* §§ 1.03, 1.23 (1994) (director is interested in a transaction if the director's grandchild is a party to the transaction); *Model Business Corp. Act* § 8.60 (1996) (conflicting interest exists when the director knows at the time of commitment that her grandchild is a party to the transaction); [FN3] *see also Grimes*, 673 A.2d at 1216 (indicating that a "material financial *or familial* interest" can disable a director) (emphasis added). While it is doubtless true that the traditional ties of loyalty and affection that exist between close family members may not exist in a particular case, the burden should not be on plaintiff to plead that such ties do not exist. *See Grobow*, 539 A.2d at 186 ("Reasonable doubt must be decided by the trial court on a case-by-case basis employing *an objective analysis."* ) (emphasis added). The existence of a very close family relationship between directors should, without more, generally go a long (if not the whole) way toward creating a reasonable doubt. [FN4]

> FN3. Rather oddly, the American Law Institute's *Principles of Corporate Governance: Analysis and Recommendations* and the *Model Business Corporation Act* do not include grandparents in their definitions of "related persons" or "associates," perhaps because the drafters did not foresee an occasion when a grandchild-director would be evaluating a transaction involving his or her grandparent. Logically, it only makes sense to include grandparents within these definitions if grandchildren are included and I hesitate to ascribe a one way view of grandparent-grandchild loyalty to the authors of these respected authorities (even to the authors of the MBCA, who claim to have set forth an exclusive, "bright line" definition). The fact that a demand would require a director to consider authorizing suit against his grandfather implicates the general requirements of interestedness under these authorities. *See, e.g.*, 1 *Principles of Corporate Governance: Analysis and Recommendations* § 1.23(2) (1994) ("A director ... is 'interested' in a transaction ... if ... the director ... has a ... familial relationship with a party to the transaction ... and that relationship would reasonably be expected to affect the director's ... judgment with respect to the transaction ... in a manner adverse to the corporation.").

> FN4. The defendants argue that the case of *Seibert v. Harper & Row. Publishers, Inc.*, Del. Ch., C.A. No. 6639, 1984 WL 21874, Berger, V.C. (Dec. 5, 1984) is to the contrary. *Seibert* cannot be read as broadly as defendants wish. The allegation in *Seibert* was that a director was disabled from considering a demand because the director's fellow director was his cousin and a manager of the defendant company. The familial bonds between cousins are often more attenuated than those between grandfather and grandson. Moreover, in *Seibert*, the cousin, who was a manager, had a very tangential personal interest in the challenged transaction quite unlike the direct and substantial personal interest Connelly has in this case. I do not read *Seibert* as holding that a plaintiff pleading a close familial relationship between an otherwise disinterested director and a director who would be substantially and adversely affected if the challenged

transaction were rescinded cannot, in appropriate circumstances, thereby meet its burden to create a reasonable doubt that the otherwise disinterested director cannot impartially consider a demand. To the extent that *Seibert* can be read as standing more broadly for the proposition that familial relationships cannot be consequential in the demand excusal inquiry, I believe the case gives too little weight to the deep bonds that most people have to members of their families and too much credit to the capacity of humans to set aside instinctive feelings of love and loyalty and to deal objectively with the merits when the well-being of a close relative is at stake.

V.

*5 Finally, plaintiff also pleads that defendant Andren is beholden to Connelly because Andren is the Chairman of Circle-Line, a company that is allegedly a wholly-owned subsidiary of New York Cruise Lines, Inc., which is in turn wholly-owned by Connelly. Since Andren's "position with Circle-Line constitutes his principal employment and means of earning a living," Compl. ¶ 7, the complaint raises a reasonable doubt that Andren can impartially consider a demand. *Rales*, 634 A.2d at 937.

Somewhat troubling to me, however, is the fact that Andren has submitted an affidavit stating that neither Circle-Line nor New York Cruise Lines is controlled in any way by Connelly. Andren Aff. ¶ 3. Contrary to plaintiff's assertions, Andren contends that Connelly controlled a partnership that was merged into New York Cruise Lines in 1988, and now has no legal or ownership interest in that company or Circle-Line. *Id.*

I cannot, however, consider Andren's affidavit in determining this motion to dismiss since such a motion is directed to the face of the complaint. *Good v. Texaco, Inc.*, Del. Ch., C.A. No. 7501, 1984 WL 8220, at *2, Brown, C. (May 14, 1984) ("[I]n view of *Aronson's* requirement that the issue of the futility of a demand must be measured against the factual allegations of the complaint, ... the record on a motion to dismiss for failure to make a demand under Rule 23.1 cannot properly be supplemented by affidavit or discovery by either the plaintiff or the defendants."). Indeed, allowing a defendant to introduce affidavits in support of a Rule 23.1 motion to dismiss would create a gross imbalance since "plaintiffs ... are not entitled to discovery to assist their compliance with the particularized pleading requirement of Rule 23.1...." *Scattered Corp. v. Chicago Stock Exch., Inc.*,

Del.Supr., 701 A.2d 70, 77 (1997); *see also Levine v. Smith*, Del.Supr., 591 A.2d 194, 208-210 (1991) (same). Instead, plaintiffs are required to utilize the "tools at hand," such as public filings and corporate records obtained under 8 *Del. C.* § 220. *Scattered Corp.*, 701 A.2d at 78; *Grimes*, 673 A.2d at 1216 nn. 10, 11. [FN5]

> FN5. Although I am discomforted by the possibility that the facts in the complaint that create a reasonable doubt about Andren's independence from Connelly may in fact not be "facts," I am bound to accept them as true. *See Kahn v. Tremont Corp.*, Del. Ch., C.A. No. 12339, mem. op. at 3-4, 8, Allen, C. (Apr. 22, 1994) (Indicating that it is improper to consider evidence submitted by defendants in support of a Rule 23.1 dismissal motion. "If a factual allegation that establishes as a pleading matter a demand-excused case can be conclusively shown to be false, there is no principle of law that prevents the defendant from showing that fact on a Rule 56 application. In that event the Court, of course, would be free to dismiss the case at that stage."); *Kahn v. Tremont Corp.*, Del. Ch., C.A. No. 12339, mem. op. at 4, n. 2, Allen, C. (Aug. 21, 1992) (same). Even though this requirement might seem a bit disturbing in this precise circumstance, I note that Court of Chancery Rule 11 would seem to provide at least some protection from abuse in the Rule 23.1 context. If a defendant can later demonstrate that a company's public filings and easily obtainable corporate documents would have demonstrated the falsity of important elements of a complaint leading to a prior judicial finding of demand excusal, that demonstration would raise a serious question regarding whether the plaintiff's attorney had drafted the factual allegations in the complaint in good faith and after "an inquiry reasonable under the circumstances." After the repeated admonitions of the Supreme Court to use the "tools at hand," *see Rales*, 634 A.2d at 934-935 n. 10; *Grimes*, 673 A.2d at 1216, 1218; *Scattered Corp.*, 701 A.2d at 78, lawyers who fail to use those tools to craft their pleadings do so at some peril. At oral argument, however, counsel for the plaintiff contended that he derived the complaint's allegation that Connelly controls New York Cruise Lines from President Casinos' own public filings.

VI.

Since plaintiff has pled facts creating a reasonable doubt whether four of the five President Casinos'

Not Reported in A.  
**(Cite as: 1999 WL 550369, *5 (Del.Ch.))**

**Page 37**

directors can impartially consider a demand, defendants' motion to dismiss is DENIED. IT IS SO ORDERED.

1999 WL 550369 (Del.Ch.), 25 Del. J. Corp. L. 1025

END OF DOCUMENT

Case 1:04-cv-10177-NG    Document 23-6    Filed 11/12/2004    Page 17 of 17

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.