# APPENDIX

# PART 7

# TAB 15

Not Reported in A.
2003 WL 22284323 (Del.Ch.)
(Cite as: 2003 WL 22284323 (Del.Ch.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Barbie RATTNER, Plaintiff,

v.

D. James BIDZOS, Stratton D. Sclavos, Timothy Tomlison, Roger H. Moore, David

J. Cowan, Anil H.P. Pereira, Douglas L. Wolford, Robert J. Korzeniewski, James

M. Ulam, Quentin P. Gallivan, Dana L. Evan, Kevin R. Compton, William L.

Chenevich, Gregory L. Reyes and Scott G. Kriens, Defendants,

and

VERISIGN, INC., a Delaware corporation, Nominal Defendant.

No. Civ.A. 19700.

Submitted April 7, 2003.
Decided Sept. 30, 2003.
As Revised Oct. 7, 2003.

James S. Green, and Kevin A. Guerke, of Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware; Peter D. Bull, and Joshua M. Lifshitz, of Bull & Lifshitz, LLP, New York, New York, for Plaintiff, of counsel.

David C. McBride, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; David M. Furbush, and Noah D. Boyens, of O'Melveny & Myers LLP, Menlo Park, California, for Defendants, of counsel.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

**\*1** Plaintiff Barbie Rattner ("Rattner") brings this derivative action on behalf of Nominal Defendant VeriSign, Inc. ("VeriSign" or the "Company") alleging that Defendants James D. Bidzos ("Bidzos"), Stratton D. Sclavos ("Sclavos"), Timothy Tomlinson ("Tomlinson"), Roger H. Moore ("Moore"), David J. Cowan ("Cowan"), Anil H.P. Pereira ("Pereira"), Douglas L. Wolford ("Wolford"), Robert J. Korzeniewski ("Korzeniewski"), James M. Ulam ("Ulam"), Quentin P. Gallivan ("Gallivan"), Dana L. Evan ("Evan"), Kevin R. Compton ("Compton"),

William L. Chenevich ("Chenevich"), Gregory L. Reyes ("Reyes") and Scott G. Kriens ("Kriens") (collectively, the "Individual Defendants") breached their fiduciary duties owed to the Company and its shareholders. Specifically, Rattner asserts that the Individual Defendants breached their fiduciary duty of care by inadequately maintaining accounting controls and utilizing improper accounting and audit practices. Rattner also contends that certain Individual Defendants sold securities while in possession of material inside information, thereby breaching their fiduciary duties, and that the remaining Individual Defendants have committed waste. In addition, Rattner seeks contribution and indemnification from the Individual Defendants for claims that have been or may be pursued against the Company based upon the Individual Defendants' alleged misconduct.

Defendants have moved to dismiss each of Rattner's claims under Court of Chancery Rule 23.1 for failure to make a demand upon the VeriSign board of directors (the "Board"). They argue that the conclusory allegations of the Stockholder's Amended Derivative Complaint (the "Amended Complaint") fail to create a reasonable doubt as to whether a majority of the Board is capable of rendering an impartial decision regarding the pursuit of this derivative litigation. Defendants have also moved to dismiss, under Court of Chancery Rule 12(b)(6), Rattner's claims for breach of fiduciary duty and waste.

For the reasons that follow, I conclude that, because demand is not excused under Court of Chancery Rule 23.1, this action must be dismissed.

I. BACKGROUND [FN1]

FN1. This background is taken from the allegations of the Amended Complaint. *White v. Panic,* 783 A.2d 543, 547 n. 5 (Del.2001).

A. *The Parties*

Rattner is, and has been at all relevant times, a common stock shareholder of VeriSign. VeriSign, a Delaware corporation, was founded in April 1995. It is a leading provider of digital trust services, enabling various Internet users to engage in secure digital commercial transactions and communications.

The Individual Defendants are the current directors and the senior officers of the Company. Sclavos is the Chairman of the Board and Bidzos is the Vice

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.                                                                                    Page 11
(Cite as: 2003 WL 22284323, *1 (Del.Ch.))

Chairman of the Board. The remaining directors on the eight member Board are Moore, Cowan, Compton, Chenevich, Reyes and Kriens (collectively, along with Sclavos and Bidzos, the "Director Defendants"). Of the current Board members, the only director who held a senior management position at the time this action was filed [FN2] is Sclavos, who is also VeriSign's President and Chief Executive Officer. [FN3] Bidzos served as Chairman of the Board (April 1995 through March 12, 2002) and Chief Executive Officer (April 1995 through July 1995). Prior to becoming a VeriSign director in February 2002, Moore had been President and Chief Executive Officer of Illuminet Holdings, Inc. ("Illuminet") from December 1995 until December 2001, when VeriSign acquired Illuminet.

> FN2. This action was filed on June 12, 2002; Rattner lodge her Amended Complaint on October 4, 2002.

> FN3. Sclavos has served as the Company's President and Chief Executive Officer since April 1995.

*2 The remaining Individual Defendants, with the exception of Tomlinson, [FN4] are senior officers of the Company. Pereira is VeriSign's Executive Vice President and General Manager, Enterprise and Service Provider Division, who formerly, from October 2000 to January 2001, served as VeriSign's Senior Vice President and Group General Manager of the Enterprise and Service Provider Division. Wolford serves as VeriSign's Senior Vice President and Group General Manager of Web Presence Services. Korzeniewski is the Executive Vice President of Corporate and Business Development, and has held that position since June 2000. Ulam, since October 2001, has been Senior Vice President, General Counsel of the Company; previously he served as Vice President, General Counsel of VeriSign from the time of his joining the Company in June 2000. Gallivan is VeriSign's Executive Vice President, Worldwide Sales and Services, a position he has held since April 1, 1999. Finally, Evan has served, since January 1, 2001, as the Company's Executive Vice President of Finance and Administration and Chief Financial Officer.

> FN4. Tomlinson served as a director (April 1995 until May 2002) and as the Company's Secretary (April 1995 through October 2000). Tomlinson is also a partner in the law firm of Tomlinson, Zisko & Master LLP (the "Tomlinson Firm"). In 2000, VeriSign paid approximately $900,000 to the Tomlinson Firm.

B. *The Misstatements*

Rattner principally complains of alleged insider trading and a failure to oversee properly the accounting practices at VeriSign. Common to both allegations is a series of allegedly misleading statements made over a twelve-month period from January 2001 through January 2002 (the "Relevant Period"). On January 24, 2001, VeriSign released its fourth quarter and fiscal 2000 financial results (the "January 24 Release"). The release noted that during the fourth quarter, the Company earned revenues of $197.4 million, representing a 613% increase over the previous year's fourth quarter results. For fiscal 2000, VeriSign reported revenues of $474.8 million, amounting to a 460% increase over revenues in the previous fiscal year. These revenues resulted in pro forma net income for the quarter, excluding the amortization of goodwill and intangible assets and acquisition-related charges of $45.5 million, equivalent to $0.21 diluted earnings per share; pro forma net income for fiscal 2000 was $129.1 million. However, after including the charges for amortization of goodwill and intangible assets and other acquisition related charges, the fiscal 2000 net loss was $3.1 billion. [FN5] The release also highlighted the international expansion undertaken by the Company in fiscal year 2001. However, Rattner alleges that the picture was not as rosy as was portrayed.

> FN5. Amended Compl. ¶ 48.

In the Amended Complaint, Rattner asserts that, because of a failure to maintain and oversee properly the accounting practices at VeriSign, the statements contained in the January 24 Release conveyed inaccurate information. Specifically, VeriSign improperly recorded "round trip revenue" and barter transactions, thus artificially inflating the Company's reported revenues for fiscal 2000. VeriSign also failed to record impairments in the value of certain investments it made in other companies during a round of private equity financing that commenced in the third quarter of 2000 . [FN6] Thus, Rattner concludes that because the Company failed to record revenues accurately and write down impaired asset values on a timely basis, in violation of Generally Accepted Accounting Principles ("GAAP"), the earnings projections and financial statements contained in the January 24 Release were overly optimistic and materially misleading.

> FN6. Charges related to these investments

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

were $74 million in fiscal 2001 and $94.8 million in the first half of fiscal 2002. *Id.* ¶ 49.

**\*3** Other undisclosed accounting practices of the Company also are claimed to have contributed to an inflated market price for VeriSign common stock. Rattner alleges that the Individual Defendants either "were manipulating" [FN7] or "should have been aware of the manipulation" [FN8] of the reported days sales outstanding (DSO) by including the deferred revenue, and excluding the accounts receivable, of companies acquired by VeriSign. Furthermore, Rattner also contends that there were other material misstatements made during the Relevant Period. Rattner notes that:

> FN7. *Id.* ¶ 47; *cf. id.* ¶ 62 (noting that "VeriSign" engaged in manipulation).

> FN8. *Id.* ¶ 70.

[t]he Company also failed to disclose that (i) the integration of Illuminet and H.O. Systems failed as the number of enterprise clients declined after the acquisitions; (ii) the Company would incur almost $80 million in charges, engage a[sic] massive restructuring and layoff a substantial portion of its workforce as a result of the acquisitions of Illuminet and H.O. Systems; [and] (iii) the Company would need to massively increase its allowance for doubtful accounts. [FN9]

> FN9. *Id.* ¶ 47. The Amended Complaint only informs that the acquisition of H.O. Systems, Inc. ("H.O.Systems") closed on February 8, 2002. *Id.* ¶ 76.

These allegedly improper accounting practices and material misstatements reappeared in numerous financial statements, releases and public statements during the Relevant Period, rendering each materially misleading for the reasons previously noted. To this end, the Amended Complaint quotes extensively from myriad sources publicly disseminated by the Company during the Relevant Period, each allegedly materially misleading, including: statements made by Sclavos at a February 1, 2001, analysts' meeting, the Company's 10K report for fiscal year 2000 issued on March 28, 2001; an April 26, 2001, press release; a July 26, 2001, press release; a September 24, 2001, article in *Bloomberg;* an October 25, 2001, press release; and a January 24, 2002, press release. [FN10] The alleged effect of these numerous material misstatements was to inflate artificially the stock price of VeriSign over the course of the Relevant Period.

> FN10. *See id.* ¶¶ 50-55, 57, 58, 60, 64-69.

## C. *Alleged Wrongdoing by the Individual Defendants*

With the knowledge that the market price of VeriSign stock was artificially inflated, and while in possession of other material non-public information, during the Relevant Period "certain defendants" sold over 875,000 shares of VeriSign stock for proceeds in excess of $47 million, and Moore sold approximately 995,000 shares of Illuminet stock for over $37 million. [FN11] Specifically:

> FN11. A central problem with the Amended Complaint is that one is never certain who is selling how much and which sales are being challenged. As with questions surrounding which Director Defendants have been implicated in certain federal securities class action lawsuits, *see infra* text accompanying note 79, this defect stems from the inconsistent use of defined terms and a failure to use defined terms. Often in the Amended Complaint, Rattner notes that "certain defendants" engaged in allegedly illicit transactions, but nowhere are these ambiguous assertions clarified. Particularly unhelpful is the definition provided in the Third Cause of Action, well after the discussion of the underlying facts of this dispute:
>
> 108. Certain defendants (the "Insider Trading Defendants"), at all relevant times, occupied fiduciary positions with VeriSign and were privy to confidential material inside information concerning VeriSign and its operations.
> Amended Compl. ¶ 108.
> I draw the inference that the challenged sales include all of the sales by Individual Defendants during the Relevant Period. Therefore, at issue are the sales of VeriSign common stock and Illuminet options by Bidzos, Cowan, Evan, Gallivan, Korzeniewski, Pereira, Sclavos, Tomlinson, Ulam, Wolford, and Moore (collectively, the "Selling Defendants") so noted. *See id.* ¶ 37.

a) Bidzos sold 15,000 shares of VeriSign common stock on May 22, 2001, for net proceeds of $991,890;
b) Cowan sold 20,800 shares on February 1, 2001; 53,125 shares during the period of May 1-2, 2001; and 22,000 shares on November 13, 2001 (a total of 95,925 shares), of VeriSign common stock for

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

total net proceeds of $5,132,773;

c) Evan sold 500 shares on January 31, 2001; 6,500 shares during the period of February 1-28, 2001; 3,000 shares on March 1, 2001; 60,100 shares during the period of May 1-31, 2001; 4,000 shares during the period of May 17-21, 2001; 12,500 shares during the period of August 1-29, 2001; and 10,000 shares during the period of November 13-14, 2001 (a total of 96,600 shares), of VeriSign common stock for total net proceeds of $5,025,988;

*4 d) Gallivan sold 37,000 shares during the period of February 6-28, 2001; 3,000 shares on March 1, 2001; and 82,994 shares during the period of May 2-8, 2001 (a total of 122,994 shares), of VeriSign common stock for total net proceeds of $7,164,007;

e) Korzeniewski sold 15,000 shares on February 2, 2001; 25,000 shares on May 3, 2001; 74,626 shares during the period of May 3-31, 2001; 15,000 shares on August 27, 2001; and 33,700 shares during the period of November 2-13, 2001 (a total of 163,326 shares), of VeriSign common stock for total net proceeds of $8,442,775;

f) Pereira sold 800 shares on January 31, 2001; 9,700 shares during the period of February 6-28, 2001; 2,500 shares on March 1, 2001; 47,600 shares during the period of May 2-31, 2001; 11,000 shares during the period of August 3-31, 2001; and 15,000 shares during the period of November 7-30, 2001 (a total of 86,600 shares), of VeriSign common stock for total net proceeds of $4,676,900;

g) Sclavos sold 50,000 shares on February 28, 2001; 135,000 shares during the period of May 7-31, 2001; and 60,375 shares during the period of August 3-29, 2001 (a total of 245,375 shares), of VeriSign common stock for total net proceeds of $13,229,650;

h) Tomlinson sold 875 shares on January 30, 2001; 1,875 shares on February 26, 2001; 1,875 shares during the period of May 1-21, 2001; 1,775 shares on August 1, 2001; and 2,400 shares during the period of November 7-13, 2001 (a total of 8,800 shares), of VeriSign common stock for total net proceeds of $476,827;

i) Ulam sold 8,000 shares on March 1, 2001; 2,711 shares during the period of May 22-31, 2001; and 2,500 shares on August 3, 2001 (a total of 13,211 shares), of VeriSign common stock for total net proceeds of $697,925; and

j) Wolford sold 5,000 shares on January 31, 2001, and 12,900 shares on May 8, 2001 (a total of 17,900 shares), of VeriSign common stock for total

net proceeds of $1,174,000. [FN12]

FN12. Amended Compl. ¶ 37.

Thus, during the Relevant Period, the Selling Defendants (except Moore) sold a total of 875,731 shares of VeriSign common stock for aggregate net proceeds of $47,512,615. Moore disposed of 995,000 in-the-money, unexercised Illuminet stock options at some point between March 26, 2001 and April 3, 2002, earning net proceeds of $37,113,500. [FN13]

> FN13. *Id.* The per option value received by Moore was estimated by Rattner based upon the market value of Illuminet common stock as of December 12, 2001, the closing date of the merger between Illuminet and VeriSign, less the per share exercise price.

Moreover, the material misstatements which opened the door for the Selling Defendants to engage in improper insider trading were allegedly the products of the Individual Defendants' breaches of fiduciary duty in failing to oversee adequately the Company's accounting procedures. The Amended Complaint maintains that the Individual Defendants "knew, or were reckless in not knowing, the facts which indicated that the fiscal 2000 and 2001 Form 10-Ks and all of the Company's interim financial statements, press releases, public statements, and filings with the SEC" were misleading. [FN14] Moreover, it is alleged, the Individual Defendants systematically failed to assure VeriSign's compliance with applicable federal and state laws, SEC rules and regulations, FASB Statements of Concepts and GAAP.

FN14. *Id.* ¶ 94.

D. *Subsequent Events*

*5 In February 2002, rumors began circulating as to the accounting practices employed by VeriSign. [FN15] On March 19, 2002, the Company, in its 10-K for 2002, disclosed that 10% of its 2001 revenues were derived from reciprocal deals with either its customers or other companies in which it had invested. That day, the price of VeriSign shares fell by more than 9%, closing down $2.61 to $26.42. [FN16] On April 25, 2002, a VeriSign press release noted, in addition to its financial and operating results for the first quarter of 2002, that DSO had increased to 81 days, and that the Company was restructuring its operations in order to best accommodate the recently acquired companies of Illuminet and H.O. Systems. Upon this news, the price

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

of VeriSign shares tumbled from $18.24 to $9.89. [FN17] A July 25, 2002 press release noted that the Company had recorded a $4.6 billion charge in connection with a non-cash charge relating to a portion of the Company's goodwill and intangible assets, as directed by FASB Statement No. 142. [FN18] On August 7, 2002, VeriSign announced that its marketing practices were under investigation by the Federal Trade Commission, regarding allegedly misleading direct-mail advertising campaigns. The Company is also the target of several securities fraud class action lawsuits filed in the Northern District of California.

FN15. *Id.* ¶ 71.

FN16. *Id.* ¶¶ 72-73.

FN17. When the Amended Complaint was filed, VeriSign traded at $4 per share.

FN18. Amended Compl. ¶ 79.

## II. CONTENTIONS

In the Amended Complaint, Rattner primarily advances two theories of wrongdoing by the Individual Defendants. First, Rattner alleges that the Selling Defendants, in violation of their fiduciary duties, engaged in insider trading; that is, the Selling Defendants profited from selling VeriSign common stock (or, in the case of Moore, selling Illuminet options) while knowing that improper accounting practices at VeriSign, the products of which were publicly disseminated through material misstatements, created an inflated market price. [FN19] In support of this claim, Rattner notes several aspects of the challenged stock sales executed during the Relevant Period. First, the Individual Defendants, by virtue of their positions, were privy to material, undisclosed information concerning the alleged accounting improprieties. Second, the timing of the sales, in that many of the Individual Defendants sold their holdings simultaneously and on days immediately following the release of allegedly misleading information or, in the case of Moore, after the announcement of the acquisition of Illuminet yet before that acquisition's closing, raises suspicions that the sales were part of an overall scheme of insider trading. Third, Rattner alleges that the sales of VeriSign stock (or Illuminet options) by the Selling Defendants during the Relevant Period were not consistent with the Individual Defendants' previous trading activity. Finally, Rattner notes that many of the Individual Defendants sold substantial portions of their VeriSign (or Illuminet)

holdings for millions of dollars. Rattner further contends that all of the Director Defendants committed waste by allowing the Selling Defendants to misappropriate a valuable asset, in the form of proprietary information, of the Company. [FN20]

FN19. Rattner also alleges that some of the Individual Defendants participated in or encouraged the improper accounting practices. *Id.* ¶ 47.

FN20. These claims will be referred to collectively as the "Insider Trading Claims."

*6 Rattner also presses a second set of claims concerning the alleged dissemination of misleading statements to the market and the improper oversight exercised in failing to assure the accuracy of VeriSign's accounting systems. Rattner charges the Individual Defendants with inadvertent, if not knowing, misdeeds in maintaining accurate financial reporting and recording systems, conduct which ultimately permitted the Selling Defendants to engage in insider trading and resulted in damages to the Company. [FN21] More pertinently, in the demand excusal context, and in essence, Rattner alleges that the Director Defendants "have engaged in a sustained and systematic failure to exercise their oversight responsibilities to ensure that VeriSign complied with Federal and State Laws, rules and regulations and to ensure the integrity of its financial reporting." [FN22] Thus, by failing to oversee adequately the Company's financial reporting and recording systems, the Director Defendants breached their fiduciary duties. [FN23]

FN21. Amended Compl. ¶¶ 98, 101.

FN22. *Id.* ¶ 100.

FN23. Collectively, these claims will be referred to as the "Accounting Oversight Claims."

Because of the Individual Defendants' misdeeds, Rattner claims that the Company has suffered harm in that VeriSign's goodwill and integrity in the market have been impugned. Furthermore, the Company has been injured by bearing the cost of defense and being subjected to potential liability stemming from the pending class actions in federal court. Rattner thus requests that the following relief be granted: (1) that the Individual Defendants account to VeriSign for all damages and costs sustained now or in the future; (2) that the Individual Defendants return to VeriSign all

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

salaries and remuneration of any kind received while the Individual Defendants were in breach of their fiduciary duties; (3) that a constructive trust be imposed on all profits derived from insider trading by the Selling Defendants; and (4) a declaration that VeriSign is entitled to contribution and indemnification for any claims that have been, or may be, asserted against it in connection with the Individual Defendants' alleged misconduct.

In response to the Amended Complaint, Defendants have moved to dismiss this action for failure to comply with Court of Chancery Rule 23.1. [FN24] Defendants argue that Rattner has not pled with particularity in the Amended Complaint facts which demonstrate that demand is futile. They contend that Rattner, in the Amended Complaint, does not allege with particularity facts that would constitute insider trading, and thus a disabling interest, by a majority of the Board. Similarly, Rattner fails to allege with particularity that the Board failed to exercise proper oversight regarding the Company's financial recording and reporting systems. Moreover, Defendants note that merely because the Director Defendants would be asked to authorize suit against themselves does not necessarily prevent a majority of the Board from exercising disinterested and independent business judgment in deciding the merits of, and whether to pursue, Rattner's claims. Therefore, Defendants request that this action be dismissed.

FN24. The Defendants have also moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6). However, given my disposition of the Defendants' motions to dismiss under Court of Chancery Rule 23.1, the Defendants' motion to dismiss under Court of Chancery Rule 12(b)(6) will not be addressed. Similarly, I do not address Defendants' contention that this action should be dismissed because "prosecution of this amended action is not in the best interests of the Company." Op. Br. in Supp. of Defs.' Mot. to Dismiss at 13.

### III. ANALYSIS

*7 Court of Chancery Rule 23.1 requires that, in derivative actions, "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." The demand requirement embodied in Court of Chancery Rule 23.1 is an acknowledgement

that a shareholder's prosecution of a derivative action necessarily impinges upon the power and autonomy of a board of directors to manage the affairs of the corporation, including whether or not to pursue a cause of action belonging to the corporation. [FN25] The hurdle of proving demand futility also serves an important policy function of promoting internal resolution, as opposed to litigation, of corporate disputes and grants the corporation a degree of control over any litigation brought for its benefit. [FN26]

FN25. *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990); *Aronson v. Lewis,* 473 A.2d 805, 811-12 (Del.1984).

FN26. *Spiegel,* 571 A.2d at 773; *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at *5 (Del.Ch. June 21, 2000).

A critical requirement of Court of Chancery Rule 23.1 is that the complaint must allege *with particularity* the reasons for demand excusal.

Those pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.... What the pleader must set forth are particularized factual statements that are essential to the claim.... A prolix complaint larded with conclusory language ... does not comply with these fundamental pleading mandates. [FN27]

FN27. *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000) (footnotes omitted).

In considering whether a derivative plaintiff has satisfied Court of Chancery Rule 23.1, I am confined to reviewing the well-pled allegations of the complaint. [FN28] While I am unable to accept cursory contentions of wrongdoing in light of the obligation to plead facts with particularity, I must accept as true all well-pled allegations of fact in the complaint, and all reasonable inferences from non-conclusory allegations contained in the complaint must be drawn in favor of the plaintiff. [FN29] With these principles in mind, I turn to the question of whether Rattner has pleaded with particularity that demand upon the Board would be futile and, thus, is excused.

FN28. *White,* 783 A.2d at 547 n. 5; *Zimmerman v. Braddock,* 2002 WL 31926608, at *7 (Del.Ch. Dec.20, 2002); *Ash v. McCall,* 2000 WL 1370341, at *6 (Del.Ch. Sept.15, 2000).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FN29. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988).

The business judgment rule and demand excusal are "inextricably bound." [FN30] When a derivative suit challenges decisions made by directors in accordance with their managerial authority, "stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim." [FN31] However, it is also recognized that the business judgment rule only operates in instances of action by the board of directors or a conscious decision to refrain from acting. [FN32] The business judgment rule has no role in the case of inaction by the board of directors. [FN33] From this dichotomy, two overlapping yet different tests have been developed to determine whether demand is excused.

FN30. *Aronson,* 473 A.2d at 812.

FN31. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993).

FN32. *Aroson,* 473 A.2d at 813.

FN33. *Id.; Guttman v. Huang,* 823 A.2d 492, 499-500 (Del.Ch.2003); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *14 n. 39 (Del.Ch. Dec.18, 2002).

*8 If a derivative suit challenges a decision made by a board of directors, then demand futility is properly evaluated under that test announced in *Aronson v. Lewis.* [FN34] Under the *Aronson* test, "[t]o determine whether demand would be futile, the Court must determine whether the particular facts, as alleged, create a reason to doubt that: '(1) the directors are disinterested and independent' or '(2) the challenged transaction was otherwise the product of a valid exercise of business judgment." ' [FN35] Thus, *Aronson* adopted a two-pronged analysis for determining whether demand is futile: the first prong inquires into the independence and disinterestedness of the directors, and the second prong focuses on the substantive nature of the challenged transaction and the directors' approval thereof. [FN36]

FN34. *Rales,* 634 A.2d at 933 ("The essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors is being challenged in the derivative suit."); *Haseotes v. Bentas,* 2002 WL 31058540, at *4 (Del.Ch. Sept.3, 2002).

FN35. *In re Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 285 (Del.Ch.2003) (quoting *Aronson,* 473 A.2d at 814).

FN36. *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984); *Aronson,* 473 A.2d at 814.

The parties, however, agree that, here, because Rattner does not challenge any particular action undertaken by the Board as a whole, the standard established in *Rales v. Blasband* governs the determination of demand futility. Thus, under the *Rales* test,

a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile. [FN37]

FN37. *Rales,* 634 A.2d at 934.

Because there has been no action or decision by a board of directors, a premise of the *Aronson* test, that of the application of the business judgment rule, is lacking, and accordingly it is under the *Rales* test that the fundamental right of boards of directors to manage the affairs of corporations is recognized. [FN38] Thus, in examining "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations," [FN39] the focus is upon the disinterestedness and the independence of a majority of the board of directors in responding to a demand.

FN38. *In re Fuqua Indus., Inc. S'holders Litig.,* 1997 WL 257460, at *13 (Del.Ch. May 13, 1997); *Kohls v. Duthie,* 791 A.2d 772, 780 (Del.Ch.2000); *see also Rales,* 634 A.2d at 933 ("[t]he absence of board action ... makes it impossible to perform the essential inquiry contemplated by *Aronson*--whether the directors have acted in conformity with the business judgment rule [in consciously deciding to act or refrain from acting]").

FN39. *Rales,* 634 A.2d at 934.

Under the *Rales* test, demand is excused if the particularized facts of the Amended Complaint create a reasonable doubt that, at the time the original complaint was filed, a majority of the Board could

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

have exercised disinterested and independent business judgment in responding to Rattner's demand. Rattner does not challenge the independence of any Director Defendant; thus, the inquiry turns to the disinterestedness of the Director Defendants at the time this action was filed. Directors are considered disinterested for purposes of determining demand futility when they "appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." [FN40] Directorial interest may also be said to exist when " 'a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." ' [FN41]

> FN40. *Aronson*, 473 A.2d at 812; *see also Orman v. Cullman*, 794 A.2d 5, 23 (Del.Ch.2002).

> FN41. *Orman*, 794 A.2d at 23 (quoting *Rales*, 634 A.2d at 936).

*9 Often, as is the case here, a derivative suit essentially asks the directors to authorize a suit against themselves and, thus, to act against their own personal interests.

> The conundrum for the law in this area is well understood. If the legal rule was that demand was excused whenever, by mere notice pleading, the plaintiffs could state a breach of fiduciary duty claim against a majority of the board, the demand requirement of the law would be weakened and the settlement value of so-called "strike suits" would greatly increase, to the perceived detriment of the best interests of stockholders as investors. But, if the demand excusal test is too stringent, then stockholders may suffer as a class because the deterrence effects of meritorious derivative suits on faithless conduct may be too weak. [FN42]

> FN42. *Guttman*, 823 A.2d at 500.

Except in "egregious circumstances," the "mere threat" of personal liability does not constitute a disabling interest for a director considering a derivative plaintiff's demand. [FN43] "[H]owever, a 'substantial likelihood' of personal liability prevents a director from impartially considering a demand." [FN44] It is this difference, between a "mere threat" of personal liability and (i) "a substantial likelihood" of personal liability or (ii) a "mere threat" in "egregious circumstances," as addressed in the context of the first prong of *Aronson*

[FN45] and the test established in *Rales,* [FN46] that accommodates and balances the competing policy concerns of adequately policing boards of directors while guarding against strike suits. With this framework in mind, I turn to determining whether, at the time this action was originally filed, a majority of the Board could have impartially considered a demand made upon the Board and, thus, whether demand is excused. [FN47]

> FN43. *H-M Wexford LLC v. Encorp, Inc.,* 2003 WL 21254843, at *14 (Del.Ch. May 27, 2003) (citing *Aronson,* 473 A.2d at 815; *Malpiede v. Towson,* 780 A.2d 1075, 1085 (Del.2001)).

> FN44. *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995) (quoting *Rales,* 634 A.2d at 936); *see also Benerofe v. Cha,* 1996 WL 535405, at *6 (Del.Ch. Sept.12, 1996).

> FN45. *See, e.g., Malpiede,* 780 A.2d at 1085; *Kohls,* 791 A.2d at 782 n. 36 (noting that "[i]n a way, this inquiry [into whether a defendant director was interested in the decision to bring litigation because of a substantial threat of personal liability] is *related* to the second prong of the *Aronson test.* " ) (emphasis added); *Katz v. Halperin,* 1996 WL 66006, at *8-*9 (Del.Ch. Feb.5, 1996).

> FN46. *See, e.g., Rales,* 634 A.2d at 936; *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1269 (Del.Ch.1995).

> FN47. Accordingly, for purposes of determining demand futility, the Individual Defendants who are not Director Defendants are largely irrelevant.

For demand to be excused, the particularized facts of the Amended Complaint must create a reasonable doubt that, at the time this action was filed, four of the eight directors on the Board could have exercised their disinterested business judgment in considering a demand. [FN48] Rattner argues that demand is excused for both the Insider Trading Claims and the Accounting Oversight Claims for several reasons. Rattner asserts that demand would have been futile because "[c]ertain defendants personally profited from the wrongful activities alleged by selling VeriSign stock at artificially inflated prices." [FN49] While this allegation carries some uncertainty, [FN50] I understand Rattner to contend that because four of the eight directors are alleged to have traded VeriSign (or

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.

Page 18

(Cite as: 2003 WL 22284323, *9 (Del.Ch.))

Illuminet) securities on the basis of non-public and material knowledge, a majority of the Board is not disinterested and, thus, is incapable of impartially considering a demand. Next, Rattner claims that demand would have been futile because all of the Director Defendants are accused of breaching their fiduciary duties by having failed to exercise adequate oversight over the Company's financial recording and reporting systems, thereby leading to the wrongful conduct complained of in this action. Finally, Rattner notes that "[c]ertain of the Individual Defendants are defendants in the federal securities class action suits described [in the Complaint], and face a substantial likelihood of liability given the misstatements" made during the Relevant Period. [FN51]

> FN48. *See In re The Limited, Inc. S'holders Litig.,* 2002 WL 537692, at *7 (Del.Ch. Mar.27, 2002); *Beneville v. York,* 769 A.2d 80, 85-87 (Del.Ch.2000). Again, because Rattner never seriously argues that any member of the Board lacks independence, the sole focus of my inquiry is into the disinterestedness of a majority of the Board.

> FN49. Amended Compl. ¶ 102(a). The Defendants argue that the allegation that "certain defendants" are incapable of considering a demand is itself plead with insufficient particularity. However, I will presume that, in the context of an effort to justify a failure to make demand upon the Board, Rattner is referring to those Defendants who are directors and who sold shares of VeriSign.

> FN50. *See supra* note 11.

> FN51. Amended Compl. ¶ 102(d)

### A. *The Insider Trading Claims*

**\*10** In order for demand to be excused with respect to the Insider Trading Claims, a reasonable doubt must exist that four of the eight VeriSign directors are incapable of exercising their disinterested business judgment in considering a demand. Rattner contends that this requirement for demand futility is satisfied as "[f]our of the directors who sold their shares on the basis of inside information are interested because each of them received a personal financial benefit from those transactions." [FN52] With respect to the Insider Trading Claims, Rattner does not challenge the disinterestedness of four (Compton, Chenevich, Reyes, and Kriens) of the directors. Therefore, were Rattner's attack upon any of the remaining four directors

(Bidzos, Sclavos, Moore and Cowan) unsuccessful, a "majority" of the Board would not be implicated and demand would not be excused.

> FN52. Pl.'s Answering Br. at 10.

Before I begin my analysis of demand excusal with respect to the Insider Trading Claims, it is important to note what facts, in connection with the Insider Trading Claims, are *not* alleged, at all or with particularity, in the Amended Complaint. Rattner merely posits, without any particularized facts, that the Director Defendants knew of inside information, and that they knew of (or directly participated in) the allegedly material misstatements. [FN53] Thus, absent from the particularized allegations of the Amended Complaint are the "precise roles that [the Director Defendants] played at the [C]ompany [and] the information that would have come to their attention in those roles." [FN54] The Amended Complaint is also devoid of any particularized facts that could lead to the inference that the timing of the trades reflected the Selling Defendants' impermissible insider trading. The Amended Complaint contains no particularized facts regarding the timing of the Director Defendants' trades in relation to permitted trading periods; while the pattern observed does reflect trading activity on behalf of the Director Defendants after the release of allegedly misleading statements, no particularized allegation of the Amended Complaint answers whether this temporal proximity was in fact part of the Company's practice to prevent Company insiders from improperly benefiting from informational asymmetries. [FN55] Moreover, although Rattner cursorily alleges that there were differences between prior years and the Relevant Period, [FN56] the Amended Complaint does not shed light upon the trading practices of the Director Defendants prior to the Relevant Period. [FN57] Finally, the Amended Complaint often refers to allegedly improper sales by the Director Defendants as occurring over nearly a one-month time span. While not determinative, certainly the failure of Rattner to pinpoint the timing of the challenged sales detracts from her alleged theory of selling soon after the release of misleadingly bullish statements.

> FN53. Rattner's best effort toward alleging with particularity the Director Defendants' knowledge, and how they acquired such knowledge, is set forth in Paragraph 33 of the Amended Complaint:
> 33. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, operational trends,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors['] meetings and committees thereof and via reports and other information provided to them in connection therewith.

Although Rattner may have sought to satisfy the requirement to plead facts with particularity, Paragraph 33 of the Amended Complaint charges directors, solely upon the basis of their status as directors, with knowledge of alleged corporate activity. The conclusory assertions contained in Paragraph 33 fail to allege with particularity what information the directors knew and how they acquired such knowledge. The conclusory nature of Rattner's allegations is perhaps most obvious in Paragraph 34 of the Amended Complaint which provides in part: 34. It is appropriate to treat the individual Defendants as a group for pleading purposes and *to presume* that the false, misleading and incomplete information they conveyed in the Company's public filings and press releases as alleged herein are the collective actions of the narrowly defined group of defendants identified above .... (emphasis added).

FN54. *Guttman*, 823 A.2d at 503.

FN55. *See id.* at 503-04.

FN56. Amended Compl. ¶ 85(c).

FN57. *See Guttman*, 823 A.2d at 498.

Rattner argues that, with respect to the Insider Trading Claims, demand is excused because four of the eight directors have been implicated in alleged insider trading. Delaware has recognized a cause of action against directors who abuse their knowledge of a corporation's private information at the expense of unwitting purchasers of their stock. [FN58] Recently, however, this Court noted the differences between archetypical claims of self-dealing and insider trading claims, concluding:

FN58. *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del.1949).

*11 As a matter of course, corporate insiders sell company stock and such sales, in themselves, are not quite as suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting at both sides of the negotiating table. Although insider sales are (rightly) policed by powerful forces--including the criminal laws--to prevent insiders from unfairly defrauding outsiders by trading on non-public information, it is unwise to formulate a common law rule that makes a director "interested" whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information. [FN59]

FN59. *Guttman*, 823 A.2d at 502. The Court further explained:
This would create the same hair-trigger demand excusal that *Aronson* and *Rales* eschewed. The balanced approach that is more in keeping with the spirit of those important cases is to focus the impartiality analysis on whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition.
*Id.*

Thus, critically, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." [FN60]

FN60. *Stepak v. Ross*, 1985 WL 21137, at *5 (Del.Ch. Sept.5, 1985); *see also Guttman*, 823 A.2d at 505 ("Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter."); *Rosenberg v. Oolie*, 1989 WL 122084, at *3 (Del.Ch. Oct.16, 1989) ("[I]f 'a person "in a confidential or fiduciary position, in breach of his duty, uses his *knowledge* to make a profit for himself, he is accountable for such profit" ' ") (quoting *Brophy*, 70 A.2d at 8).

After reviewing the Amended Complaint, I conclude that Rattner has not pleaded facts with particularity that create a reasonable doubt that a majority of the Board is disinterested with respect to the Insider Trading Claims. It is important to note that only one Director Defendant is a senior manager of the Company; that is, only Sclavos held a senior management position with VeriSign at the time this action was filed. The

Not Reported in A.
(Cite as: 2003 WL 22284323, *11 (Del.Ch.))

Amended Complaint alleges general knowledge in a conclusory fashion on behalf of the Director Defendants, explained solely by virtue of their service in their various capacities. Thus, even somehow assuming Sclavos suffers from a disabling interest, nothing has been pleaded with particularity as to the scienter of seven of the eight members of the Board. [FN61]

> FN61. As noted above, Rattner has not questioned the independence from Sclavos of the seven other directors.

The Amended Complaint's allegations implicating Moore's sale of unexercised Illuminet options also fail to taint the disinterestedness of Moore in considering a demand made upon the Board. On September 23, 2001, VeriSign and Illuminet entered into a merger agreement. As consideration, VeriSign would exchange 0.93 shares of VeriSign common stock for each outstanding share of Illuminet and, thus, would issue 30.4 million shares for the outstanding shares of Illuminet, as well as assume Illuminet's outstanding employee stock options. [FN62] Rattner complains that "[a]t some point after announcement of the Illuminet acquisition, but prior to being elected to the [Board], Moore exercised Illuminet options (or VeriSign options exchanged in the Merger) and sold the underlying stock." [FN63] The Complaint fails to allege with any specificity when the sales were made or whether the shares were all sold at one time. [FN64] Moreover, if trading resulting from the Illuminet options is assumed to be relevant to the purpose of determining demand futility with respect to the Insider Trading Claims, the Amended Complaint still fails to allege particularized facts that compromise Moore's impartiality. Not one particularized allegation in the Amended Complaint explains what inside knowledge Moore traded upon or how he gleaned such information. [FN65] Therefore, I conclude that the Amended Complaint fails to allege the particularized facts necessary to raise a reasonable doubt as to Moore's ability to exercise his disinterested business judgment.

> FN62. Amended Compl. ¶ 63.

> FN63. Id. ¶ 20. The Illuminet acquisition was announced in September 2001; Moore became a director of VeriSign in February 2002. Rattner also alleges that "rather than convert his Illuminet options into VeriSign options, defendant Moore exercised and sold off his Illuminet options." Id. ¶ 63. Rattner contends that Moore's disposition of his

Illuminet interest was "unusual in nature and timing," id. ¶ 85, because the "sales occurred after announcement of the acquisition of Illuminet by VeriSign and prior to closing of that transaction." Id. ¶ 85(e).

> FN64. Rattner alleges that, in March 2001, Moore held 995,000 "in the money" options and by April 2002 had disposed of them. Id. ¶ 37 n. 1.

> FN65. Rattner asserts that "Moore, while in possession of other material adverse non-public information, sold approximately 995,000 of his privately-held Illuminet stock." Id. ¶ 82. Rattner does not identify that "material adverse non-public information" to which she refers.

*12 Additionally, I note that the Amended Complaint fails to allege any facts with particularity that would permit me to draw a reasonable inference that the challenged sales were executed upon the basis and because of non-public information. Much is made about the timing and size of the sales. However, as has been noted, [FN66] the Amended Complaint does not assist in determining whether the pattern of executed trades was the product of an orchestrated scheme to defraud the market and the Company's shareholders or good faith adherence to Company policy or consistent with prior individual practices. Additionally, while several Individual Defendants disposed of large percentages of their stock holdings, of the four Director Defendants, only two (Cowan and Moore) can be characterized as having disposed of a "large" percentage of their holdings. [FN67] Essentially, Rattner seeks to impose liability and excuse demand on the basis that the Director Defendants sold VeriSign stock (or Illuminet options) during the Relevant Period. If accepted, Rattner's theory would take a step toward the implementation of the very common law rule warned of in *Guttman.* It is a step which I decline to take. Thus, I conclude that, with respect to the Insider Trading Claims, Rattner has failed to plead with particularity factual allegations which, at the time this action was filed, create a reasonable doubt that a majority of the Board was disinterested and therefore incapable of impartially considering a demand.

> FN66. See supra notes 53-55 and accompanying text.

> FN67. In determining whether demand is excused, I am confined to the controlling complaint and may consider documents referred to in the complaint when such

documents are integral to a plaintiff's claim or are incorporated into the complaint by reference. *In re New Valley Corp. Deriv. Litig.,* 2001 WL 50212, at *4-*6 (Del.Ch. Jan.11, 2001). Rattner, in her brief, argues that the large percentages disposed of by the Individual Defendants support her alleged theory of insider trading. *See* Pl.'s Answering Br. at 12 n. 7 (citing "2002 Proxy"). However, nowhere in the Amended Complaint did Rattner allege the total personal holdings of the individual Director Defendants. Here, the "2002 Proxy," a citation subject to uncertainty, was not referred to in the Amended Complaint. Also, the document is not integral to Rattner's claim.

## B. *The Accounting Oversight Claims*

Rattner also claims that demand is excused with respect to the Accounting Oversight Claims because all of the members of the Board are potentially liable for failure to exercise proper supervision over VeriSign's financial recording and reporting systems. In this situation, the *Rales* test, in examining the "interest" of the challenged directors, asks whether "the directors face a 'substantial likelihood' of personal liability, [and thus whether] their ability to consider a demand impartially is compromised ..., excusing demand." [FN68]

FN68. *Guttman,* 823 A.2d at 501.

Rattner's Accounting Oversight Claims are best described as a type of *Caremark* [FN69] claim. As was noted in *In re Caremark International Derivative Litigation,* a claim for failure to exercise proper oversight is one of, if not the, most difficult theories upon which to prevail. [FN70] In the typical *Caremark* case, "[i]n order to hold the directors liable, [a] plaintiff will have to demonstrate that they were grossly negligent in failing to supervise these subordinates." [FN71] Here, once again, it is instructive to review not what facts the Amended Complaint alleges, but what facts the Amended Complaint fails to allege, with particularity.

FN69. *In re Caremark Int'l Deriv. Litig.,* 698 A.2d 959 (Del.Ch.1996).

FN70. *Id.* at 967; *see also Guttman,* 823 A.2d at 505-06.

FN71. *Seminaris,* 662 A.2d at 1355.

The Amended Complaint sets forth vast tracts of

quoted materials from public sources, detailing wrongdoings in the form of alleged misstatements. The Amended Complaint also summarizes numerous SEC rules and regulations, and FASB and GAAP standards. However, conspicuously absent from any of the Amended Complaint's allegations are particularized facts regarding the Company's internal financial controls during the Relevant Period, notably the actions and practices of VeriSign's audit committee. [FN72] The Amended Complaint also is similarly wanting of any facts regarding the Board's involvement in the preparation of the financial statements and the release of financial information to the market.

FN72. As has been noted, relevant facts include "whether the company had an audit committee during that period, how often and how long it met, who advised the committee, and whether the committee discussed and approved any of the allegedly improper accounting practices." *Guttman,* 823 A.2d at 498.

**\*13** Rattner calls attention to what she suggests should have been a "red flag" to the Director Defendants, placing them on notice of the systematic failure of the Company's internal controls. The Amended Complaint, relatively briefly, attempts to explain that the Defendant Directors should have been on notice of certain alleged misstatements, noting that "VeriSign" purchased companies with large amounts of deferred revenues, allegedly in order to manipulate its DSO by increasing its deferred revenue and excluding its accounts receivables, thereby creating the false impression of growth. [FN73] Specifically, the Amended Complaint alleges that DSO was steadily rising from the second quarter of 2000 (DSO of 32) through the first quarter of 2002 (when DSO peaked at 81), which should have signaled to the VeriSign directors that something was amiss, given that VeriSign's revenue stream is "mainly derived from subscription based products and services (over 85% of revenue) which are recognized ratably and ordinarily should carry a low DSO of 45--50 days or less." [FN74] However, it is again important to recall the structure of the Board, in that only one Director Defendant is alleged to have been a senior manager of the Company at the time this action was filed. There is nothing alleged with particularity in the Amended Complaint that would either demonstrate or permit me to draw the reasonable inference that the Director Defendants were aware of a possibly onerous elevation in a single financial statistic. [FN75] As has been noted, claimed red flags "are only useful when they are either waived in one's face or displayed so that they are

visible to the careful observer." [FN76] Thus, the Amended Complaint, in the one instance it alleges a reason why the Director Defendants could somehow have been aware of alleged misdoings at the Company, still falls short of pleading with particularity facts that would excuse demand.

> FN73. Amended Compl. ¶ 62.
>
> FN74. *Id.* ¶ 70.
>
> FN75. *See In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *2 (Del.Ch. June 5, 2003).
>
> FN76. *Id.*

None of these allegations contained in the Amended Complaint (individually or collectively) pleads with particularity sufficient to sustain an inference that the Defendant Directors were guilty of gross negligence. While the Amended Complaint is quick to prattle off numerous alleged infractions of laws, rules and principles, Rattner never notes the accounting procedures employed by the Company or the Board's involvement in VeriSign's financial recording and reporting systems. The only information one can snare from the Amended Complaint is that there exists a body of rules regarding the accuracy of recording and reporting financial information which may have been violated. Equally as important, I am unable, from the face of the Amended Complaint, to determine what role, if any, the Board or its members played in the internal processes of collecting and disseminating financial information. The most I can safely admit knowledge of is that Compton, Chenevich and Kriens were members of the Audit Committee during the Relevant Period and, thus, that the Company had an Audit Committee. [FN77] Therefore, I am unable to conclude that a majority of the Board faces a substantial likelihood of liability for failing to oversee VeriSign's compliance with required accounting and disclosure standards. [FN78]

> FN77. Ironically, these Director Defendants are three of the four directors who were not alleged to have engaged in insider trading.
>
> FN78. To the extent that Rattner alleges intentional wrongdoing by the Director Defendants, I note that, for the same reasons set forth above, the Amended Complaint does not allege with particularity facts that at all show knowing participation by any of the Director Defendants (with the possible

exception of Sclavos as the only management director). I also observe that, in contrast to Rattner's alternative theories of wrongdoing, the issue of demand futility with respect to claims of intentional wrongdoing would be judged under the two-pronged *Aronson* standard. *See supra* text accompanying note 35. However, given the highly conclusory nature of the Amended Complaint, the Amended Complaint fails to plead with particularity demand futility under either prong

**\*14** Finally, Rattner asserts another theory as to why demand is excused: because "[c]ertain of the Individual Defendants are defendants in ... federal securities class action suits ... and face a substantial likelihood of liability given the misstatements of VeriSign' [sic] earnings and the trading in VeriSign stock during the stated class period in those actions." [FN79] Here, too, the Amended Complaint leaves far too much to the imagination. The only particularized facts contained in the Amended Complaint regarding the federal securities class action lawsuits are that such suits were filed and are pending in the Northern District of California. One is left to guess at which of the Individual Defendants, indeed if any of the Director Defendants, are defendants in the federal securities class action lawsuits. These conclusory and cryptic allegations are insufficient to satisfy the demand excusal requirements of Court of Chancery Rule 23.1.

> FN79. Amended Compl. ¶ 102(d).

Thus, a symptomatic and ultimately fatal defect to all of Rattner's claims is a failure to plead facts with particularity. Here, the cause of this systematic failure is left to supposition, although one suspects that the "first to file custom" and the resulting "unseemly race to the court house" may be at fault. [FN80] In her brief, Rattner noted:

> FN80. *Rales,* 634 A.2d at 934-35 n. 10; *see also In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1.

[I]t is unclear from a review of public filings how exactly Moore's Illuminet options were disposed. Indeed, prior to filing the Amended Complaint, plaintiff's counsel requested an explanation from defendants' counsel regarding Moore's disposition since it is critical to the demand futility analysis. After taking the matter under advisement, defendants' counsel refused to provide any information. [FN81]

Not Reported in A.                                                                    Page 23
(Cite as: 2003 WL 22284323, *14 (Del.Ch.))

FN81. Pl.'s Answering Br. at 12 (citation omitted).

Our cases have consistently advised would-be derivative plaintiffs to utilize the "tools at hand" before filing complaints. [FN82] In particular, the books and records provisions of 8 *Del. C.* § 220 may be quite helpful for derivative plaintiffs confronted with the need to satisfy the pleading requirements of Court of Chancery Rule 23.1 [FN83] They might have been helpful here; Rattner has never stated whether she availed herself of the tools at hand before embarking upon what is now discovered to have been an ultimately--at least in this venue--unsuccessful journey. Thus, both the causes of the Amended Complaint's deficiencies and whether an often overlooked tool for plaintiffs could have been useful remain a mystery. What is clear is that the Amended Complaint fails to set forth particularized facts that create a reasonable doubt as to the disinterest or independence of a majority of the Board at the time this action was filed so as to excuse demand.

FN82. *See Brehm,* 746 A.2d at 266-67; *In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1; *Guttman,* 823 A.2d at 504.

FN83. *See e.g., In re The Walt Disney Co.*

*Deriv. Litig.,* 825 A.2d 275, 279 (Del.Ch.2003).

IV. CONCLUSION

For the foregoing reasons, the Amended Complaint will be dismissed. [FN84] An order will be entered in accordance with this Memorandum Opinion.

FN84. The dismissal as to Rattner will be with prejudice. *See* Court of Chancery Rule 15(aaa).

ORDER

AND NOW, this *30th* day of September, 2003, for the reasons set forth in the Court's Memorandum Opinion of even date,

*15 IT IS HEREBY ORDERED that the above-entitled action be, and the same hereby is, dismissed. This dismissal is with prejudice as to Plaintiff Bobbie Rattner.

2003 WL 22284323 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# TAB 16

Not Reported in A.
1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924
(Cite as: 1999 WL 1044880 (Del.Ch.))

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

Lisa **SANDERS**, Plaintiff,
v.
Charles B. **WANG**, Sanjay Kumar, Russell M. Artzt,
Willem F.P. de Vogel, Richard
A. Grasso, Irving Goldstein and Shirley Strum Kenny,
Defendants,
and
COMPUTER ASSOCIATES INTERNATIONAL,
INC., Nominal Defendant.
Edward BICKEL, derivatively on behalf of Computer
Associates International,
Inc., Plaintiff,
v.
Charles B. **WANG**, Sanjay Kumar, Russell M. Artzt,
Willem F.P. de Vogel, Irving
Goldstein, and Richard A. Grasso, Defendants,
and
COMPUTER ASSOCIATES INTERNATIONAL,
INC., Nominal Defendant.

No. 16640.

Submitted Aug. 4, 1999.
Decided Nov. 8, 1999.

Pamela S. Tikellis, James C. Strum and Robert J.
Kriner of Chimicles & Tikellis, Wilmington, DE,
Bruce E. Gerstein, Scott Fisher, Barry S. Taus and
Stephen H. Schwartz of Garwin, Bronzaft, Gerstein &
Fisher, New York, New York, Fred Taylor Isquith and
Gregory M. Nespole of Wolf Haldenstein Adler
Freeman & Herz, New York, New York, for Plaintiff
Edward Bickel, of counsel.

Norman M. Monhait of Rosenthal, Monhait, Gross &
Goddess, Wilmington, Delaware, Martin P. Unger of
Tenzer Greenblatt, New York, New York; George H.
Linck, New York, New York, for Plaintiff Lisa
Sanders, of counsel.

Alan J. Stone and Jessica Zeldin of Morris, Nichols,
Arsht & Tunnell, Wilmington, Delaware, Moses
Silverman and Jonathan J. Freedman of Paul, Weiss,
Rifkind, Wharton & Garrison, New York, New York,
for Defendants Richard A. Grasso, Irving Goldstein,
Shirley Strum Kenny, Willem F.P. de Vogel and
Computer Associates International, Inc., of counsel.

Wayne N. Elliott and James L. Holzman, Prickett,

Jones & Elliott, Wilmington, Delaware, David E.
Nachman and Caroline S. Press, Solomon, Zauderer,
Ellenhorn, Frischer & Sharp, New York, New York,
for Defendants Charles B. Wang, Sanjay Kumar and
Russell M. Artzt, of counsel.

*MEMORANDUM OPINION*

STEELE, Vice Chancellor.

I. Issues Presented
*1 1. Can a board of directors rely upon its
purported discretion to administer a shareholder-
approved "key employee stock ownership plan" to
grant key executives more shares than expressly
authorized by the plain language of the KESOP?
No.

Where an employee stock ownership plan contains a
clear, unambiguous limitation on the total number of
shares authorized, the board of directors may not
exceed this limit based upon a general provision that
does nothing more than grant them discretion to
administer the plan.
2. By establishing a prima facie case that a board
of directors awarded at least 9.5 million more
shares than actually authorized by a stock plan, do
the plaintiffs state claims for gross negligence,
waste of corporate assets and breach of fiduciary
duty? Yes.

An allegation that a board of directors' awarded at
least 9.5 million more shares than a stock plan
expressly authorized sufficiently establishes claims for
gross negligence, waste of corporate assets and a
breach of fiduciary duty.
3. Where the pleadings establish with certainty that
a stock plan did not authorize defendant directors
to award the amount of shares they undisputedly
did award, is it appropriate that plaintiffs be
granted judgment on the pleadings for their claims
against the directors for gross negligence, waste,
and breach of the fiduciary duties of loyalty and
care, when the requested relief includes: (a)
rescission of the unauthorized share award; (b)
imposition of a constructive trust over persons
receiving any benefit flowing from that award; (c)
damages against the directors; and, (d) fees and
costs? Not entirely.

When the pleadings can establish with certainty only
that a stock plan did not authorize defendant directors
to award the amount of shares that they actually

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

awarded, judgment on the pleadings is appropriate only to the extent that the plaintiff is entitled to equitable relief as a result of the unauthorized award, whether by (1) rescission of the unauthorized award; and, (2) imposition of a constructive trust over any person receiving benefits resulting from that award. With the record very limited at the pleadings stage and the defendants asserting a triable affirmative defense to the damage claims, any judgment on the plaintiffs' claims seeking compensatory damages would be premature.

## II. Background

### 1. The Basic Allegation

The plaintiffs, shareholders of Computer Associates International, Inc. ("CA"), sue CA's seven directors for gross negligence, corporate waste and for breach of their fiduciary duties by granting three of the board members, who are also the company's top executives, [FN1] 20.25 million shares of CA common stock under the 1995 Key Employee Stock Ownership Plan ("KESOP" or the "plan"). The plaintiffs' allege that this share grant to the "Participants" far exceeded the number authorized by the KESOP and assert various claims against the directors flowing from this grant. Though the two plaintiffs' positions vary over exactly how many of the granted shares were excess, they both agree that the board granted excess shares which damaged the corporation.

> FN1. The recipients of these grants are defendants *Charles B. Wang,* Chairman of the Board and CEO of CA; *Sanjay Kumar,* the President and COO of CA; and *Russell P. Artzt,* the Executive Vice President-Research and Development for CA and CA's Senior Development Officer. All three individuals are also directors of CA.

### 2. The KESOP and the Challenged Share Grants

**\*2** The CA board adopted the KESOP on May 25, 1995. The shareholders approved the Plan at an Annual Meeting held in August, 1995. Its terms are quite straightforward. The Plan is administered by the Compensation Committee of the board, which "shall be vested with all discretion and authority as it deems necessary or appropriate to administer the Plan and to interpret the provisions of the Plan." [FN2] An express provision authorizes the Compensation Committee "to grant up to 6,000,000 shares of Common Stock to the Participants." [FN3] This is to be done by granting 2 million shares, outright, upon the Plan's adoption [FN4] and then by additional grants of up to 4 million total shares, contingent on CA's common stock

reaching certain specified price targets and maintaining those target prices for at least 30 trading days on the New York Stock Exchange. [FN5] In deciding whether these targets have been met the Committee may adjust the stock price to account for any stock splits that occur after the KESOP was adopted. [FN6] However, the plan does not permit the Committee to adjust the number of shares granted to account for stock splits or any other recapitalization transactions. In addition to share price performance targets determining how many shares may be granted, similar performance targets determine when the shares will actually vest. In particular, § 4.4 permits "Early Vesting" of *all* of the shares granted (the six million total) if the CA share price trades at $180 or more for at least 60 trading days.

> FN2. § 6.1 of the KESOP (The KESOP is Exhibit B of the Complaint).

> FN3. "The Committee is authorized to grant up to 6,000,000 shares of Common Stock to the Participants." § 3.1 of the KESOP.

> FN4. § 3.2 of the KESOP.

> FN5. *Id* at § 3.3 *Additional Grants.*

> FN6. *Id* at § 3.2.

On May 21, 1998, the Compensation Committee certified that the price of CA common stock had traded for at least 60 trading days in a twelve-month period at $180 or better (the actual price was $53.33 per share, which is equivalent to $180, adjusted for the stock splits) which triggered the § 4.4 "Early Vesting" provision. Before this event, in August 1995, June 1996, and November 1997, CA gave all holders of Common Stock one share for every two shares held, amounting to three separate "three for two" stock splits. The Compensation Committee granted the Participants 20.25 million total shares total, which is equivalent to 6 million shares adjusted for these three stock splits.

## III. Contentions

### 1. Plaintiffs

There are two plaintiffs. The first, Lisa Sanders, filed this action on September 15, 1998. She amended her Complaint on October 26, 1998. The second plaintiff, Edward Bickel, intervened in this action with a Complaint in Intervention on November 19, 1998.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
**(Cite as: 1999 WL 1044880, \*2 (Del.Ch.))**

Page 114

Sanders alleges the Committee violated the KESOP by exceeding the limit on additional share grants (four million) in order to adjust for the three stock splits. However, Sanders does not take issue with the initial two million share grant presumably in the belief they were awarded before the stock splits happened. Thus, Sanders believes that the defendant board should have awarded a total of 10.75 million shares (6 million under the plan + 4.75 million in dividends on the initial two million share grant) and that they awarded 9.5 million shares more than authorized. Sanders charges the board with waste of CA's assets, gross negligence and breach of the directors' fiduciary duties of loyalty and care. Sanders seeks: (1) cancellation or rescission of the 9.5 million share award; (2) imposition of a constructive trust over the Participant-directors and an accounting of the benefits received from these shares; (3) damages; and, (4) fees and costs.

**\*3** Bickel takes a harder line, arguing that the KESOP authorizes only six million shares total, and does not permit any adjustment for stock splits, nor any dividends on *any* of the shares. He argues that granting any shares above this limit violates the KESOP. Thus, Bickel believes that the Committee granted 14.25 million shares in excess.

Bickel charges the entire CA board, individually and/or jointly, with waste of corporate assets, mismanagement, gross negligence, and breach of the fiduciary duties of loyalty, due care, and "good faith." Bickel seeks: (1) rescission of the unlawfully awarded shares (14.25 million); and, (2) imposition of a constructive trust over defendants Wang, Kumar and Artzt for any benefits flowing from these shares; and, (3) an injunction against the voting rights of these shares against defendants Wang, Kumar and Artzt; and, (4) damages from all directors individually; and, (5) fees and costs.

In the present motions plaintiffs ask for judgment on the pleadings or, alternatively, for summary judgment on the basis that they have established on the undisputed facts that the CA board exceeded its authority which alone warrants judgment for the plaintiffs on all their claims.

*2. Defendants*

The defendant directors say that:

1. Demand requirements have not been met by the plaintiffs, because
    a) a majority of the directors are disinterested and

independent, and
    b) the share grant resulted from a valid exercise of business judgment;

2. A disinterested Compensation Committee awarded the 20.25 million shares within its discretion to administer the Plan under § 6.2. The Committee believes the Plan gave it authority to adjust the number of shares granted to account for the stock splits that happened after the shareholders approved the Plan.

3. Because plaintiffs disagree over how many excess shares were awarded, their allegations are arbitrary, confirming the defendants' argument that their decision resulted from the valid exercise of business judgment;

4. The terms of the Plan, specifically that all 6 million shares vest when the share price stays at $180 for at least 60 days, demonstrate the Plan's intent to award the Participants 3.75% equity in the company, or about $1.08 billion worth of shares (6 million x $180);

5. The strict reading of the share limitation provision frustrates the purpose of the Plan and penalizes its recipients. In particular, defendants say that plaintiffs' strict reading does not make economic sense because if, instead of stock splits, there had been a "reverse stock split" or a share consolidation, then the defendant Participants would get twice as much equity, or over $2 billion. Defendants say that if this were actually the case that the plaintiffs would then not support their own proposition that a strict reading is required, and would in fact argue just the opposite.

6. In any event, exculpatory provisions in the CA charter and in § 7.3 of the Plan promulgated pursuant to § 102(b)7 of the DGCA, shield the directors from personal liability for money damages.

**\*4** On these various grounds, the defendants move both for dismissal for failure to state claims upon which relief can be granted and for judgment on the pleadings.

### IV. Discussion

*1. The Threshold Question of the Demand Requirement For A Derivative Action*

The defendants argue that the plaintiffs have not met the demand requirements of Delaware law and have not pleaded facts to excuse them from this requirement. Defendants believe this precludes the plaintiffs from pursuing these derivative claims.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

When a shareholder of a corporation discovers acts which somehow injure the corporation, Delaware law requires that the shareholder "demand" that the corporation's board of directors examine the injurious acts and pursue legal redress. This is known as the "demand requirement," and its underlying policy is to curb a myriad of individual shareholders from bringing potentially frivolous lawsuits "on behalf of the corporation," which may tie up the corporation's governors in constant litigation and diminish the board's authority to govern the affairs of the corporation. These suits are commonly known as "strike suits." If this Court had to entertain these lawsuits without a threshold barrier like the demand requirement, then the role of the board of directors as the shareholders' chosen arbiter of the corporation's interests, legal and otherwise, could be constantly frustrated.

There are cases, however, where the *board itself* acts causing shareholder complaint. In these cases a question is rightfully raised over whether the board will pursue these claims with 100% allegiance to the corporation, since doing so may require that the board sue *itself* on behalf of the corporation. So in order to balance the desire to discourage strike suits with the need to hold boards of directors accountable, Delaware law provides a basic test to determine whether a plaintiff may bypass the board of directors to pursue the claims for the corporation.

Under this test a plaintiff may be excused from demanding that the directors sue themselves if that plaintiff can demonstrate, through particularized factual allegations, a reasonable doubt that: (1) the board is disinterested and independent; or; (2) the acts complained of were the product of the board's valid exercise of business judgment. [FN7] Once this showing of "demand futility" is made, by fulfilling at least one of the elements of the test, the plaintiff may file a "derivative" action, under Court of Chancery Rule 23.1.

> FN7. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984).

Here, plaintiffs did not make demand on the CA board and have argued that making demand would be futile. Plaintiffs first say that enough of the CA board is self-interested to make demand futile, since three of the seven directors are recipients of the allegedly excessive share awards, and three of the remaining four directors are responsible for actually making the allegedly wasteful awards. Second, plaintiffs argue that they

have alleged particular facts raising at least a reasonable doubt that the transaction awarding the excess shares was a valid exercise of the board's business judgment by alleging that the share awards far exceed a clear limitation contained in the KESOP.

*5 I need not address whether the CA board is disinterested or independent because I find that the facts alleged raise a reasonable doubt that the share transaction resulted from a valid exercise of business judgment. As a minimum, the plaintiffs have sufficiently alleged facts which, taken as true, show that the CA board violated an express KESOP provision limiting the number of shares they were authorized to award. As I discuss in detail later, the provision is not ambiguous and it is clear from the uncontroverted facts that the number of shares the board actually awarded exceeded its limitation of six million shares. Thus the facts raise doubt that the board's actions resulted from a valid exercise of business judgment.

The defendants raise the issue that the plaintiffs have differing allegations over exactly how many of the shares granted were excess. Defendants say that since the plaintiffs' own allegations here are arguably "arbitrary," they can not lead to reasonable doubt that the awards were an exercise of valid business judgment. I disagree with this argument. In these circumstances, the issue of exactly how many of the awarded shares were excess is secondary to and severable from the primary issue of whether the board exceeded the shareholders' grant of express authority. This ancillary issue of the appropriate number of shares only comes into play after a determination that at least some portion of the 20.25 million share grant exceeded the board's authority. Though the plaintiffs' allegations may differ on this precise point, each plaintiff's core allegation that the board exceeded its authority is still the same.

For immediate purposes here, I find the plaintiffs have sufficiently pleaded facts which cast doubt that the board's alleged acts could be the result of a valid exercise of business judgment. Therefore, demand is excused.

*2. Judgment on the Pleadings/Motion to Dismiss*

Plaintiffs and defendants each move for judgment on the pleadings. Judgment on the pleadings is appropriate where under any set of facts pleaded and drawing all inferences from these facts in favor of the nonmoving party, the moving party would still be entitled to

Not Reported in A.
(Cite as: 1999 WL 1044880, *5 (Del.Ch.))

judgment as a matter of law. [FN8] This substantive standard is the same as that of summary judgment, but without the need to look beyond the pleadings, and "is the proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact ... a determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law." [FN9]

> FN8. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund,* Del.Supr., 624 A.2d 1199 (1993).

> FN9. *Cantera v. Marriott Senior Living Services, Inc.,* Del. Ch., C.A. No. 16498, Lamb, V.C., mem. op. at 9 (citing *Pellaton v. Bank of New York,* Del.Supr., 592 A.2d 473, 478 (1991)). *See also SBC Interactive, Inc. v. Corporate Media Partners,* Del.Supr., 714 A.2d 758, 761 (1998).

Similarly, a motion to dismiss for failure to state a claim upon which relief may be granted, under Court of Chancery Rule 12(b)6 requires that under any possible set of facts consistent with the facts alleged in the complaint the plaintiff would still not be entitled to judgment. [FN10] Any conclusory allegations that lack factual basis in the complaint will not survive a motion to dismiss. [FN11] Further, I must accept all well-pleaded facts as true and construe any inferences from these facts in the light most favorable to the non-moving party. [FN12]

> FN10. *Lewis v. Austen,* Del. Ch., C.A. No. 12937, mem. Op. at 4, Jacobs, V.C. (June 2, 1999) ("a plaintiff must allege facts that, taken as true, establish each and every element of a claim upon which relief could be granted.").

> FN11. *In re The Walt Disney Company Shareholders' Litigation,* Del. Ch., 731 A.2d 342, 353 (1998).

> FN12. *O'Reilly v. Transworld Healthcare, Inc.,* Del. Ch., C.A. No. 16507, mem. op. at 11, Steele, V.C. (August 20, 1999).

*6 I find that under the undisputed facts in this case, no matter how favorably I draw factual inferences in favor of the defendants, that plaintiffs have established a prima facie case that the CA board exceeded its authority. The CA board can not justify its clear violation of the express terms of the KESOP nor can it justify the unauthorized share awards under any other

legal authority.

The plaintiffs are entitled to a limited judgment on the contract interpretation issue of law raised in the pleadings and, as a result, to equitable relief. However, this case does not warrant any judgment or relief, at this stage, with respect to the plaintiff's money damage claims against the directors. For the reasons explained below, correspondingly the defendants' motions for judgment on the pleadings and/or to dismiss the complaint are denied.

A. Standards for Contract Interpretation

Contract interpretation starts with the terms of the contract. If the terms are plain on their face, then the analysis stops there. [FN13] The "primary goal of contract interpretation is to satisfy the reasonable expectations of the parties at the time they entered into the contract," a process which "often requires a court to engage in an analysis of the intent or shared understanding of the parties" at the time of the contract. [FN14] Under the plain meaning rule of contract construction, if a contract is "clear on its face, the Court should rely solely on the clear literal meaning of the words." [FN15]

> FN13. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* Del.Supr., 702 A.2d 1228, 1232 (1997).

> FN14. *Demetree v. Commonwealth Trust Co.,* Del. Ch., C.A. No. 14354, Allen, C., mem. op. at 7 (Aug. 27, 1996).

> FN15. *Id.*

One begins to analyze the terms by determining whether provisions are "reasonably subject to more than one interpretation." [FN16] Toward that end, contract language "is not rendered ambiguous simply because the parties in litigation differ concerning its meaning." [FN17] Nor is it rendered ambiguous simply because the parties "do not agree upon its proper construction." [FN18] A contract is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." [FN19]

> FN16. *Supermex Trading Co. v. Strategic Solutions Group, Inc.,* Del. Ch., C.A. No. 16183, Lamb, V.C., mem. op. at 7 (May 1, 1998).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
(Cite as: 1999 WL 1044880, *6 (Del.Ch.))

FN17. *City Investing Co. Liquidating Trust v. Continental Cas. Co.,* Del.Supr., 624 A.2d 1191, 1198 (1993). *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1196 (1992).

FN18. *Rhone-Poulenc,* Del.Supr., 616 A.2d at 1196; accord *City Investing,* Del.Supr., 624 A.2d at 1198. See Wright, S 2730.1, at 65 ("The mere assertion that ambiguity or divergent intent exists will not prevent summary judgment from being entered.").

FN19. *MHM/LLC, Inc. v. Horizon Mental Health Mgmt, Inc.,* Del. Ch ., C.A. No. 14465, Steele, V.C., mem. op. at 6 (Oct. 3, 1996) ("To be ambiguous, the provision must be capable of being read reasonably to support the different positions."), *aff'd,* Del.Supr., 694 A.2d 844 (1997).

Delaware courts adhere to the "objective" theory of contracts. A contract's "construction should be that which would be understood by an objective reasonable third party." [FN20]

FN20. *Supermex,* Del. Ch., slip op. at 7 (quoting *Demetree v. Commonwealth Trust Co.,* Del. Ch., C.A. No. 14354, Allen, C., slip op. 7 (Aug. 27, 1996)).

Where the parties have entered into an unambiguous integrated written contract, the contract['s] construction should be that which would be understood by an objective reasonable third party.... [I]nquiry into the subjective unexpressed intent or understanding of the individual parties [to the contract] is neither necessary nor appropriate where words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning. [FN21]

FN21. *Demetree v. Commonwealth Trust Co.,* Del. Ch., C.A. No. 14354, slip op. 7-8. *See also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* Del.Supr., 702 A.2d 1228, 1232 (1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.").

The standards of contract interpretation here are "black letter law" and fully comport with New York contract law, under which the parties agree this Plan

arises.

B. Interpreting this KESOP

The Plan here is simply a contract between CA shareholders (which includes plaintiffs), on one hand, and the defendant board of directors (which includes the management Participants), on the other. One party to the contract (plaintiffs) claims that the other party (defendants, some of whom are beneficiaries, some of whom are fiduciaries under the contract) committed a single act (awarding excess shares) in clear violation of a specific provision of the contract (the share ceiling in § 3.1). The accused party answers this claim saying that another provision in the contract (the "Rules and Interpretation" provision in § 6.2) authorized them to act contrary to the limitation in the first provision and that their actions carried out the implied intent of the contract as well as its specific intent declared under § 1.1.

*7 In analyzing the terms of the Plan, I find they are not susceptible to varying interpretations under any reasonable analysis that could lead to the conclusion that the board had the authority to award excess shares over the limitation found in § 3.1. When the language is "clear and unequivocal, a party will be bound by its clear meaning." [FN22] Section 3.1 could not be more clear in limiting the total share grant under the Plan. While § 6.2 gives the board authority to interpret and administer the Plan, I can not find that the board could reasonably ignore a clear six million share limit in order to authorize an award of 20.25 million shares.

FN22. *Abb Flakt, Inc. v. National Union Fire Insurance Company of Pittsburgh, PA.,* Del.Supr., C.A. No. 299, 1998, Walsh, J., slip op. at 11 (June 28, 1999) (citations omitted).

Further, while § 3.3 explicitly permits any stock splits to be reflected when calculating performance targets, *no other provisions or language* explicitly support the proposition that the § 3.1 limit may be contravened or unilaterally adjusted for these same stock splits. The presence of this § 3.3 authorization and the corresponding and conspicuous absence of a provision authorizing alteration of § 3.1 reinforces my conclusion that the Plan's clear language provided *no power* to alter the limitations in § 3.1 based on any stock split criteria.

Finally, § 1.1 does not state objectives that, read along with the board's § 6.2 discretion, justify ignoring the § 3.1 share ceiling in order to achieve these objectives.

The basic premise of contract law that "in upholding the intention of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein" requires that I give effect to § 3.1, particularly where doing so does not conflict with the plan's other provisions. [FN23] Those who drafted § 1.1 also wrote § 3. It is simply illogical to say that § 3.1 is inconsistent with the Plan's statement of intent found in § 1.1. I must conclude that § 3.1 and its plain meaning is, in fact, integral to understanding the Plan's intent. It is as much a part of understanding how the drafters and the approving shareholders intended the Plan to operate and the purpose of this Plan as any other particular provision.

> FN23. *E.I. du Pont de Nemours & Co. v. Shell Oil Co.,* Del.Supr., 498 A.2d 1108, 1113 (1985). The meaning of contract provisions should be "interpreted using standard rules of contract interpretation which require a court to determine, from the language of the contract, the intent of the parties. In discerning the intent of the parties, the [contract] should be read as a whole and, if possible, interpreted to reconcile all of the provisions of the document." *Kaiser Aluminum Corp. v. Matheson,* Del.Supr., 681 A.2d 392, 395 (1996).

As a practical matter, my rough calculations indicate that even under the strictest reading of the Plan, the three Participants will together still receive nearly $320 million. $320 million is no mere bagatelle. I find it remarkable that defendants would have me believe that CA's shareholders would consider that $320 million for three individuals failed to "encourage, recognize, and reward sustained outstanding individual performance by certain key employees." [FN24]

> FN24. § 1.1 of the KESOP.

Thus, given, (1) a clear, unambiguous contract provision; (2) two other contract provisions subject to interpretation; (3) no facial inconsistency between the three provisions; (4) a single act that clearly violates the unambiguous provision; and, (5) the fact that the sole justification for the act complained of lies in the two provisions that are subject to interpretation, I find that the relevant law weighs against the use of an interpretable provision to materially disregard another provision that could not be clearer on its face. Applying this analysis to the facts, I find that the Committee awarded the 20.25 million shares in clear violation of § 3 .1, and without any legal justification under the Plan.

*8 The defendants make no attempt to find support for their actions under other sources of director power: the CA corporate charter, any CA by-laws, the Delaware General Corporation Act, or the Delaware corporate common law. It is appropriate, nonetheless, to address several of their specific justifications for their view of § 3.1.

(1) Murky "Intent" to Award 3.75% Equity or $1.08 Billion in Shares

The defendants justify their award of more shares than expressly permitted in § 3.1 by arguing that it carries out the "fundamental and unambiguous" intent to award the Participants 3.75% of the company's equity or about $1.08 billion worth of stock, once the relevant performance goals are reached. [FN25] I find the defendants' argument that their construction of the Plan is "unambiguous" to be unsupported by the reality of the Plan's clear terms and, more importantly, by the fact that their result can only be reached by patently violating an express term of the Plan.

> FN25. Defendants' Reply Brief in Support of Defendants' Motions and In Opposition to Both Plaintiffs' Motions at 1.

The defendants admit that they never explained this "unambiguous" intent to the shareholders when seeking approval for the Plan. Further, nothing in the documents I have reviewed shows that this was the case, though it seems it would have been simple enough for the Plan's proponents to describe this "fundamental" feature of the Plan, either in the text of the Plan itself, or, at minimum, in the proxy materials. If the defendant board members believed that at the time they formulated the Plan that its clear and fundamental intent was to award 3.75% equity/$1.08 billion in shares, they have not adequately explained why they did not write a Plan that clearly stated and expressly provided for this result.

Instead, defendants answer by citing authority for the proposition that they did not need to include such a "fundamental and unambiguous" feature of the Plan in clear language because not every single detail of a plan must be spelled out to shareholders. They argue that shareholders should be able to infer this unstated intent by simply reading the Plan's terms together. They say shareholders are capable of making math calculations that arrive at the above result, without needing it explicitly stated. However, the authorities cited were cases in which the information that was not explicitly conveyed was so obvious that those courts rejected the

overly-literal reading the parties had given to the language (such as construing the phrase "an option" as limiting the awardee to one, single option).

Defendants' argument that shareholders could do simple math to arrive at their result takes an over-simplistic, narrow, and self-serving view of what shareholders might conclude from reading the Plan. Many shareholders might have taken at face value the clear provision limiting the award total to six million shares, particularly in the absence of any explicit modifiers accounting for the share price at the time of the award or at the time of intervening stock splits. In making this argument, defendants give absolutely no credence to the possibility that many shareholders (just like plaintiff shareholders here assert) might simply have read the Plan at face value without gleaning the purported underlying, unstated, "fundamental" economic intent. A disguised intent, not immediately obvious in the language of the contract and requiring a tortured construction of its terms, can not overcome plain, unambiguous language.

**\*9** I find the Plan's language straightforward enough that only the plaintiffs' reading can be plausible, and the defendants' reading, at best, distorts the Plan's plain language. The defendants' assertion that the express six million share limit means nothing if it does not result in the Participants getting $1.08 billion worth of stock defies any interpretation of the Plan consistent with the common meaning of its terms and the view of any reasonable person in the position of either party.

Further, since the board, as the corporate governing body, considered and approved the Plan long before it reached the shareholders, I will not give them the after-the-fact benefit of their own failure to make their view of the Plan's intent plain to the shareholders. If the board truly intended the shareholders to know that the Plan could result in an award of as much as 3.75% of the equity of the company or $1.08 billion in shares regardless of how many shares needed to be awarded to reach this result, I find it remarkable that neither the board's presentation of the plan to shareholders, the unambiguous terms of the plan, nor any reasonable reading of the Plan as a whole makes that intent clear.

(2) Section 6.2 Does Not Give Defendants Broad Discretion to Interpret and Administer the Plan so they May Adjust the § 3.1 Ceiling For Stock Splits

The defendants argue that the purpose of the Plan, stated in § 1.1, and the shareholders' intent in enacting the Plan are both thwarted by a strict reading of the Plan's terms. They say that § 6.2 gives the

Compensation Committee broad authority to interpret and administer the Plan to carry out its objectives, and allows them to disregard an express provision where that provision is inconsistent with the Plan's objectives. Thus they argue that they may adjust the § 3.1 ceiling to incorporate the stock splits into the final award under the Plan.

I conclude that § 6.2 is not so explicit that it can be used as a source of power for the board to alter the terms of the Plan itself. Interpreting the Plan in order to administer it properly is one thing, fundamentally altering its substantive terms is quite another. More than a loosely worded clause implying flexibility to carry out the logistics of administration must be present. Though I do not think it necessary to look beyond the four corners of the Plan to find that § 6.2 does not empower the board to alter the Plan's terms, I nevertheless find it quite illuminating that other CA stock plans instituted by this very board contain clear, express provisions that empower the board to adjust the grants of shares to account for stock splits. [FN26]

FN26. *See* Exhs. C, D, E, F of the Complaint.

One must recognize that the board had every opportunity and the ability to insert a similar provision in this KESOP. Past practice showed that where the board wanted such authority and the shareholders have been asked to grant it, that after being fully informed of the consequences, they have approved similar provisions. Further, the board's fiduciary role as arbiter of the processes by which all of these plans came about only reinforces my view that they must be held to the plain, unambiguous limitation found in § 3.1. I can not accept that either the board or the shareholders believed that the six million share ceiling, which is literally the first substantive clause of the Plan, is superfluous and can be ignored by an exercise of board discretion. The board's role, at most, under § 6.2 is ministerial in nature and does not permit them to alter materially the numerical limit (the share ceiling). Section 6.2 can not justify altering § 3.1 under any reasonable interpretation of the Plan, particularly given the existence of other plans that show the board and shareholders knew how to authorize this type of material alteration when they so desired.

C. Defendants' Motion to Dismiss

**\*10** For a waste claim to survive a motion to dismiss, the plaintiff must allege facts sufficient to show that the corporation received no consideration for the transferred asset. The standard is stringent and requires

that no person of ordinary business judgment would conclude that the deal was fair to the corporation. It is my view that the alleged acts, drawing all inferences in plaintiffs' favor, raise sufficient question about the appropriateness of the share grants to state a claim of breach of fiduciary duty and for this Court to deny the defendants' motion to dismiss. Decidedly, the characterization of the claim as one for "waste" or for unjust enrichment can not be the focus of analysis. Having concluded as a matter of law that the Board exceeded its authority, the alleged acts clearly call into question whether the transaction as consummated could have benefited CA and whether the breach of fiduciary duty caused corporate officers to be unjustly enriched.

> It is, of course, fundamental that a fiduciary who breaches his duty is liable for *any loss* suffered by the beneficiary of his trust ... [and] any profit made through the breach of trust may be disgorged through the device of constructive trust. [FN27]

> > FN27. *Thorpe v. Cerbco,* Del. Ch., C.A. No. 11713, mem op. at 24, Allen, C. (Oct. 29, 1993), *quoted in* DONALD J. WOLFE & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 12-7(b) (1998).

It seems to me that just as in the corporate opportunity context, a share grant in excess of that authorized by a KESOP calls the mechanism of the constructive trust into play as an effective remedial measure. [FN28] This case presents an interesting but complicating issue in that certain management executives, who also served in a fiduciary capacity, received a benefit wrongfully and unfairly conferred upon them by directors who also served as fiduciaries but who did not receive the benefit. At this stage of the proceedings, it is clear that plaintiffs are entitled to judgment on the pleadings that the directors wrongfully authorized the award and that the director executives who received the award must disgorge the benefit received in order to avoid being unjustly enriched.

> > FN28. *See Guth v. Loft, Inc.,* Del.Supr., 5A 2d 503, 510 (1939).

What remains unclear, subject to further proof and incapable of resolution at this stage of the proceedings, is the nature of the breach of fiduciary duty giving rise to the imposition of a constructive trust in order to redress the unjust enrichment. The claims for money damages relating back to the date of approval or issuance of the unfair share grants implicates the fundamental nature of the breach of fiduciary duty giving rise to the imposition of a constructive trust. A constructive trustee (here, the management executives/ directors who received the improper share grants) may face personal liability for monetary damages if they are necessary to make the shareholders whole. The directors authorizing the share grants face damage claims, yet to be proved, for which they may be liable or from which, depending upon the proof of the nature of their conduct, they may be exculpated.

As stated above, I have only ruled as a matter of law that the board exceeded its authority. I draw no conclusion whether these acts were breaches of the duty of care or duty of loyalty or whether they resulted from negligent or grossly negligent conduct. At this stage, I can only conclude that the plaintiffs have sufficiently stated their claims.

D. Exculpatory Provisions Shielding the Directors

**\*11** The defendants invoke exculpatory provisions from the CA corporate charter and § 7.3 of the KESOP, promulgated pursuant to § 102(b)7 of the DGCA, to shield them from personal liability for any damage claims brought against them for violation of their duty of care. [FN29] The Delaware Supreme Court's decision in *Emerald Partners v. Berlin* instructs this Court that the use of exculpatory provisions to shield fiduciaries from personal liability presents an affirmative defense not amenable to pre-trial disposition. [FN30] However, where the *only* alleged acts are breaches of the duty of care, then this Court may consider the defense for the purpose of pre-trial disposition. [FN31] Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly consider exculpatory provisions. The defendants will have the opportunity to present their affirmative defense as the case progresses. At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness.

> > FN29. "*No Individual Liability.* No member of the Committee or the Board, or any officer of the Company, shall be liable for any determination, decision, or action made in good faith with respect to the Plan or any award under the Plan." § 7.3 of the KESOP.

> > FN30. *Emerald Partners v. Berlin,* Del.Supr., C.A. No. 393, 1998, Walsh, J., slip op. at 16, (March 16, 1999).

FN31. *Id.*

### 3. Only a Limited Judgment Is Possible At This Stage

Since at this stage it is only clear to me as a matter of law that the Plan does not authorize the defendants to award 20.25 million shares, I am only able to enter a limited order granting partial judgment on the pleadings. Sanders alleges an improper award of 9.5 million shares, while Bickel alleges an improper award of 14.25 million shares. As I understand the Plan, the share grants take place in two stages: first, an initial 2 million share grant occurs immediately upon the Plan's adoption, and second, the board may award up to 4 million shares in "Additional Grants," based on share price performance.

It is clear from this that when the shareholders' approved the Plan in August 1995 the Plan *immediately* granted 2 million shares to the Participants. Based on this, it is my opinion that any dividends on CA common stock after this date should rightfully accrue to these awarded shares, even though these shares might not have been vested at the time granted. I believe this arrangement is analogous to an escrow, by which funds are held in an interest bearing account, but not fully accessible to the recipient until a specified condition occurs. Even though the recipient can not access the funds prior to that condition being met, they still receive the benefit of any interest that accrues on the funds in the meantime. In short, what would be the point of "granting" two million shares to the Participants if this "conditional ownership" denies them any of the additional pecuniary benefits flowing from these shares?

Therefore, the 4.75 million shares awarded after the Plan's adoption as dividends on the initial grant are not "Additional Grants" under the Plan; and, thus, do not violate the 4 million share limit on additional grants. These 4.75 million shares are simply stock dividends based upon shares *already properly granted.*

*12 Conversely, the same is not true of the additional share grant of four million shares in May, 1998. This additional grant happened *after* these stock dividends were declared. As explained in the analysis of the contract terms above, there is no authority in the Plan for retroactive adjustments for share dividends/stock splits. Thus, the 9.5 million share grant that purportedly adjusted the 4 million share grant for the dividend/stock splits is invalid.

The board had authority to grant only 10.75 million of the 20.25 million shares granted. Therefore, I can enter judgment on the pleadings that plaintiffs are entitled to cancellation or rescission of the 9.5 million shares issued to the defendants Wang, Kumar, and Artzt. Further, they are entitled to an order imposing a constructive trust in favor of CA over Wang, Kumar and Artzt and an accounting for any profits or benefits directly traceable to these 9.5 million shares.

### 4. Policy

No doubt the strict construction of the KESOP will suggest to some that this Court may not be aware of the tension that exists, particularly in growth-oriented (often technology) companies, between shareholder dilution that may result from aggressively expanding management stock compensation plans and the need to use those plans to attract and maintain skilled management. That is, of course, not correct. Often growth companies must attract and retain the best managers by awarding these executives enhanced equity positions since high-end cash salaries and other compensation may not be economically feasible.

It is certainly the province of shareholders, by way of their franchise, to compensate their executives as lavishly as they deem necessary to ensure the growth and prosperity of their company. However, with the shareholder franchise often quite dispersed, it is critical as a matter of governance policy that this Court ensure that these compensation plans when approved by shareholders are administered in strict accordance with the terms of the Plan and as the shareholders had the right to anticipate.

I am mindful of the understandable arguments put forth by defendants' counsel that strict adherence to the facial terms of the Plan here could have the effect of penalizing the CA executives despite the dividends resulting from their efforts to maximize shareholder value. However no court can blind itself to the reality that: (1) the limitation clause here plainly and unambiguously sets a ceiling for the share grants; and, (2) other shareholder approved CA plans explicitly authorize the board to adjust the grants, while this one plainly does not. The "penalized" executives sit on the CA board which knew that it was free to present shareholders with a KESOP that included a recapitalization adjustment provision and free to seek shareholder approval of an amendment of the terms of the KESOP if they believed it to be deficient in achieving the Plan's objectives. They did neither. The history of this very company shows that a fully informed, rational shareholder electorate could be

Not Reported in A.
**(Cite as: 1999 WL 1044880, *12 (Del.Ch.))**

persuaded to grant the board broad explicit discretionary authority to adjust share grant ceilings if management achieved measurable economic benefits for the shareholders. Given the clear record here that no such shareholder endorsement sanctioned these particular grants, the results of these plaintiffs' challenge should be unsurprising.

## V. Conclusion

**\*13** The defendants exceeded their authority under the KESOP by awarding 9.5 million excess shares to the Participants. The plaintiffs are granted partial judgment on the pleadings in that I order these shares returned to the corporation and a constructive trust imposed on the defendant Participants and an accounting rendered for any economic benefit derived from these shares.

The defendants properly transferred 4.75 million shares (outside of the Plan's six million share limit) to the Participants as stock dividends on shares that the defendants had already granted. As a result, I grant the defendants partial judgment on the pleadings.

The defendants' motion to dismiss plaintiffs' claims are denied.

All other motions of the parties are denied.

Plaintiffs' counsel are to submit an order, approved as to form, consistent with this Memorandum Opinion.

1999 WL 1044880 (Del.Ch.), 25 Del. J. Corp. L. 1036, 24 Employee Benefits Cas. 1924

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.