## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **IN RE BIOPURE CORPORATION** | ) | **Master Docket No. 1:04-cv-10177-NG** |
| **DERIVATIVE LITIGATION** | ) | **(Consolidated Derivative Action)** |
| | ) | |
| | ) | **Assigned to Judge J. Nancy Gertner** |
| | ) | |
| _____ | ) | **Magistrate Judge Alexander** |

## PLAINTIFFS' MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE VERIFIED
## CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    ANY DEMAND ON BIOPURE'S BOARD WOULD HAVE BEEN FUTILE  . . 8

            1.    Legal Standards Governing Demand Futility . . . . . . . . . . . . . . . . . . . . . . 8

            2.    Plaintiffs Have Particularly Pled Under Rule 23.1 that a Majority
                  of the Board Lacks Disinterestedness and Independence  . . . . . . . . . . . 10

                  a.    Defendant Rausch Is Interested By Virtue of His Insider Selling  11

                  b.    Plaintiffs Have Alleged a Substantial Likelihood of Liability as to
                        All Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                  c.    As Executive Officers Defendant Moore and Defendant Rausch
                        Lack Independence from the Director Defendants . . . . . . . . . . . 17

                  d.    Defendants Sanders, Rausch, Judelson, Moore, Koop, Harrington
                        and Crout Have Professional Entanglements . . . . . . . . . . . . . . . . 19

            3.    Demand Is Excused Because the Business Judgment Prong Has Been
                  Satisfied (Pursuant to the Second Prong of *Aronson)*  . . . . . . . . . . . . . . 21

      B.    THE COMPLAINT MORE THAN ADEQUATELY PLEADS THE
            INDIVIDUAL CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

            1.    Legal Standards Governing Plaintiffs' Causes of Action . . . . . . . . . . . . 24

            2.    Plaintiffs Have More than Adequately Pled Damages to Biopure . . . . . . 25

            3.    The Complaint Adequately Alleges the Individual Defendants'
                  Breaches of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

4.    Plaintiffs Have Adequately Stated a Claim for Insider Trading and Misappropriation of Information Against Defendant Rausch . . . . . . . . 28

5.    Plaintiffs Have Stated a Claim for Unjust Enrichment . . . . . . . . . . . . . 30

6.    Plaintiffs Have Stated a Claim for Waste . . . . . . . . . . . . . . . . . . . . . . 31

C.    BIOPURE'S CERTIFICATE OF INCORPORATION CANNOT BAR PLAINTIFFS' CLAIMS AT THIS STAGE OF THE LITIGATION . . . . . . . . . 32

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

*Aronson v. Lewis,* 473 A.2d 805 (Del. 1984), *overruled on other grounds sub nom. Brehm v. Eisner*,
746 A.2d 244 (Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Bartlett v. New York, N.H., & H.R.R. Co.,*
221 Mass. 530 (Mass. 1915) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,*
845 A.2d 1040 (Del. Supr. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Beneville v. York,*
769 A.2d 80 (Del. Ch. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Bergstein v. Texas Int'l Co.,*
453 A.2d 467 (Del. Ch. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Brophy v. Cities Serv. Co.,*
70 A.2d 5 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Cede & Co. v. Technicolor, Inc.,*
634 A.2d 345 (Del. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Citron v. Fairchild Camera and Instrument Corp.,*
569 A.2d 53 (Del. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Conley v. Gibson,*
355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Desert Equities v. Morgan Stanley Leveraged,*
624 A.2d 1109 (Del. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Dollens v. Zionts,* No. 01 C028626,
2002 WL 1632261 (N.D. Il. July 22, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Edgeworth v. First Nat'l Bank,*
677 F. Supp. 982 (S.D. Ind. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Educadores Puertorriquenos en Accion v. Hernandez,*
367 F.3d 61 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Emerald Partners v. Berlin,*
787 A.2d 85 (Del. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Fitzgerald v. Cantor,* No. 16297,
1998 WL 326686 (Del. Ch. June 16, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Grimes v. Donald,* 673 A.2d 1207 (Del. 1996), *overruled on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Grobow v. Perot,*
539 A.2d 180 (Del. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 21, 22

*Guttman v. Huang,*
823 A.2d 492 (Del. Ch. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 28

*Harhen v. Brown,*
431 Mass. 838 (Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Harris v. Carter,*
582 A.2d 222 (Del. Ch. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*Heineman v. Datapoint Corp.,*
No. 7956, 1990 WL 154149 (Del. Ch. Oct. 9, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Abbott Labs. Derivative S'holders Litig.,*
325 F.3d 795 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 23, 34

*In re Cendant Corp. Derivative Action Litig.,*
189 F.R.D. 117 (D.N.J. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 23, 25

*In re First Woburn Bancorp., Inc.,*
No. 13725, 1999 WL 33318823 (Del. Ch. Oct. 5, 1999) . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Gen. Instrument Corp. Sec. Litig.,*
23 F. Supp. 2d 867 (N.D. Ill. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*In re HealthSouth Corp. S'holders Litig.,*
845 A.2d 1096 (Del. Ch. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*In re Lernout & Hauspie Secs. Litig.,*
286 B.R. 33 (D. Mass. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Nat'l Auto Credit, Inc. S'holders Litig.,*
No. 19028, 2003 WL 139768 (Del. Ch. Jan. 10, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re New Valley Corp.,*
 No. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Oxford Health Plans, Inc., Sec. Litig.,*
 192 F.R.D. 111 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Paxson Communication Corp. S'holders Litig.,*
 No. 17568, 2001 WL 812028 (Del. Ch. July 12, 2001) . . . . . . . . . . . . . . . . . . . . . . . . 21

*In re Storage Tech. Corp. Sec. Litig.,*
 804 F. Supp. 1368 (D. Colo. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Stratus Computer, Inc. Sec. Litig.,*
 No. 89-2075-Z, 1992 WL 73555 (D. Mass. Mar. 27, 1992) . . . . . . . . . . . . . . . . . . . . . 8

*In re Symbol Tech. Sec. Litig.,*
 762 F. Supp. 510 (E.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*JPMorgan Chase Bank v. Winnick,*
 No. 03 Civ. 8535(GEL), 2004 WL 1418197 (S.D.N.Y. June 23, 2004) . . . . . . . . . . . . 27

*Kahn v. Roberts,*
 No. 12324, 1994 WL 70118 (Del. Ch. Feb. 28. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Kamen v. Kemper Fin. Servs., Inc.,*
 500 U.S. 90 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kaplan v. Wyatt,*
 499 A.2d 1184 (Del. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Katz v. Chevron Corp.,*
 22 Cal. App. 4th 1352 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Khoury Factory Outlets, Inc. v. Snyder,*
 No. 11,568, 1996 WL 74725 (Del. Ch. Jan. 8, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Malone v. Brincat,*
 722 A.2d 5 (Del. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*McCall v. Scott,*
 250 F.3d 997 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

v

*Omnicare, Inc. v. NCS Healthcare, Inc.*,
     818 A.2d 914 (Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Pogostin v. Rice,* 480 A.2d 619 (Del. 1984), *overruled in part on other grounds sub nom. Brehm,*
*Eisner*, 746 A.2d 244 (Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21

*Rales v. Blasband*,
     634 A.2d 927 (Del. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Rattner v. Bidzos*,
     No. 19700, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003) . . . . . . . . . . . . . . . . . . . . 13, 14

*Sanders v. Wang*,
     No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) . . . . . . . . . . . . . . . . . . . . . . . 34

*Schock v. Nash*,
     732 A.2d 217 (Del. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Seaford Funding Ltd. P'ship v. M&M Assocs. II, L.P.*,
     672 A.2d 66 (Del. Ch. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Seminaris v. Landa*,
     662 A.2d 1350 (Del. Ch. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Telxon Corp. v. Bogomolny*,
     792 A.2d 964 (Del. Ch. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*White v. Panic*,
     783 A.2d 543 (Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## STATUTES, RULES AND REGULATIONS

Del. Ch. Ct. R.
     23.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Del. Corp. Code
     §102(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-34

Fed. R. Civ. P.
     8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
     8(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     23.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## I.    INTRODUCTION

Plaintiffs allege that between March 17, 2003 and July 14, 2004 (the "Relevant Period"), Defendants caused Biopure Corporation ("Biopure" or the "Company") to issue false and misleading statements pertaining to its flagship product Hemopure®, an investigational human blood substitute used for the treatment of acutely anemic surgical patients. Hemopure's® approval by the United States Food and Drug Administration ("FDA") was crucial to Biopure's investors and thus, Biopure's survival in the biotechnology market. As early as March 2003, however, the FDA informed Defendants that it had serious "safety concerns" for Hemopure® arising out of adverse event data from the Company's Phase III orthopedic surgery trial submitted with the Company's Biologic License Application ("BLA"). The Defendants knew that public knowledge of this information would be the death knell for Biopure as it not only jeopardized the approval of Hemopure®, but at the very least, would also delay the first commercial distribution of Hemopure® beyond Defendants' publicly disclosed target date of mid-2003. To maintain Biopure's rising stock price, Defendants suppressed the FDA's "safety concerns" and continued to tout publicly the progress of Hemopure®. Prompted by an inquiry by the Securities and Exchange Commission ("SEC") on December 22, 2003, however, Defendants were forced to admit, in part, after the close of the market on December 24, 2003, Christmas Eve, that the FDA had expressed "safety concerns" with Hemopure® and as a result, placed all trauma trials on clinical hold. Defendants' revelations caused Biopure stock to lose over 90% of the Company's market value during the Relevant Period.

As a result of the Defendants' decision to disseminate false and misleading information as to Hemopure®, and derivatively Biopure, by ignoring the FDA's concerns with Hemopure®, Plaintiffs brought this shareholder derivative action on behalf of and for the benefit of Biopure

against its Board of Directors (the"Board") and certain top officers to remedy Defendants' egregious breaches of fiduciary duties and other violations of law which have inflicted millions of dollars of damages upon Biopure and have virtually destroyed this once promising and valuable franchise. Despite Plaintiffs' well-pled Complaint,[1] Defendants now seek to have this Court dismiss this action with prejudice on the grounds that Plaintiffs failed to adequately plead demand futility and their causes of action. Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Verified Consolidated Amended Shareholder Derivative Complaint ("Defs.' Mem.") at 3-4. As set forth below, the egregious breaches by these faithless fiduciaries do not entitled them to the protections of a presuit demand. Furthermore, for purposes of a Rule 12 motion to dismiss, Plaintiffs have more than adequately pled their individual causes of action. Accordingly, Defendants' Motion to Dismiss must be overruled.

## II.    STATEMENT OF THE FACTS

Biopure is a biotechnology company that develops, manufacturers and markets oxygen therapeutics, a new class of pharmaceuticals that are intravenously administered to deliver oxygen to the body's tissues. ¶2. The Company had developed two products, one of which is Hemopure® [hemoglobin glutamer - 250 (biovine)], which is an investigational product for the treatment of acutely anemic surgical patients and for the elimination, delay or reduction of red blood cell transfusions in these patients. *Id.* Hemopure® is a human blood substitute made from refined cow hemoglobin which acts like red blood cells to deliver oxygen to the body. However, unlike donated blood, Hemopure® does not have to be matched to a patient's blood type.

---

[1] "Complaint" refers to Plaintiffs Verified Consolidated Amended Shareholder Derivative Complaint. All paragraph ("¶__") references are to the Complaint unless otherwise stated.

As a biotechnology company, Biopure's value is mainly determined by the prospects of its getting approval of Hemopure® for human use. Because Hemopure® is the Company's flagship product, investors rely on and consider material all information and communications concerning Hemopure® between Biopure and the FDA. ¶3. On July 31, 2002, Biopure submitted a BLA to the FDA seeking regulatory approval to market Hemopure® in the U.S. for use in orthopedic surgery. ¶¶4, 31. At that time, the Company was questioned concerning its suspicious concealment of information concerning Hemopure's® status.

In September 2002, the Company received a grant from the U.S. Department of the Army to conduct clinical trials of Hemopure® for the treatment of trauma patients. ¶¶5, 32. In March 2003, the Company submitted a "trauma study protocol" to the FDA in connection with its plans to conduct a phase II clinical trial of Hemopure® for the treatment of trauma patients. ¶¶5, 33. At the time, this information was not revealed by Biopure to the public. *Id.*

During the Relevant Period, the Defendants continually represented they were optimistic of achieving FDA approval to market Hemopure® to orthopedic patients. ¶¶6, 34. However, unbeknownst to the public, as early as March 2003, the FDA had informed the Defendants that the proposed clinical trials could not go forward, citing "safety concerns" arising from adverse event data submitted as part of the Company's BLA which sought FDA approval to market Hemopure® to orthopedic surgery patients. *Id.* Thus, the Defendants were on notice that FDA approval of the BLA, which would allow the first commercial distribution, if any, of Hemopure® in the United States, was in serious jeopardy and would be delayed beyond Defendants' mid-2003 target date. *Id.*

Indeed, it was not until the Company was under the threat of civil litigation by the SEC that they disclosed for the first time all material problems related to their Hemopure® product and the

FDA approval process.   ¶7.   Defendants deliberately released the following press release on

Christmas Eve, December 24, 2003, after the close of the markets, disclosed a potential SEC inquiry

for securities fraud:

> (1)    On Monday, December 22, 2003, the Company had received a Wells Notice from the SEC.  The SEC sends a Wells notice to a company or an individual after its staff has completed an investigation and determined that sufficient wrongdoing has occurred to warrant civil charges being filed. The SEC sent a Wells notice to Biopure, defendant Thomas A. Moore ("Moore"), Biopure's President and Chief Executive Officer ("CEO") and Howard Richman, the Company's former vice president of regulatory affairs, ***for failing to adequately disclose material information about Biopure's communications with the FDA concerning the Company's application***;

> (2)    For the first time, that in March 2003, the Company had sought FDA permission to begin new clinical trial testing of Hemopure® in hospitalized trauma patients and that the FDA has repeatedly denied the request;

> (3)    The FDA had refused to allow the study because of material "safety concerns" from the Company's Phase III orthopedic surgery trial;

> (4)    The FDA had placed a "clinical hold" on any trauma trials, and requested more information, including additional animal studies, before Hemopure® could be tested in humans under trauma conditions; and

> (5)    Despite Biopure's supplemental filings on July 30, 2003, the FDA again had denied Biopure's request that it lift its "clinical hold," barring any Hemopure® trauma trials.

*Id.*   In the same Christmas Eve press release, the Defendants caused the Company to admit it knew

of the adverse information concerning Hemopure® and its communications with the FDA, but

nonetheless failed to disclose the same during the Relevant Period:

> Biopure Corporation reported that on December 22, 2003, it received a "Wells Notice" from the staff of the Securities and Exchange Commission (SEC) indicating the staff's preliminary decision to recommend that the SEC bring a civil injunctive proceeding against the company.  As permitted under the Wells process, Biopure intends to respond promptly and thoroughly in writing before the SEC staff formally decides what action, if any, to recommend.  The company's chief executive officer

and its former senior vice president of Regulatory and Operations also received Wells Notices.

Biopure believes the notices relate to the company's disclosures concerning its communications with the Food and Drug Administration (FDA) about a trauma study protocol the company submitted to the Agency in March 2003 and about the company's biologies license application (BLA) for Hemopure® [hemoglobin gluatamer-250 (bovine)]. ***The company did not publicly disclose its communications with the FDA about the proposed trauma protocol and investigational new drug application (IND) because it does not believe communications about proposed clinical trials are material prior to the initiation of a trial.*** ¶42.

Thus, during the Relevant Period, the Defendants knew but failed to disclose:

(1)     All material facts and information about Biopure's Hemopure® applications with the FDA, including all material, adverse communications received from the FDA concerning Hemopure's® safety;

(2)     That in March 2003 Biopure submitted a trauma protocol for Phase II clinical trial of Hemopure® for the treatment of "hemorrhagic shock casualties in the hospital setting" and that the FDA placed this trauma protocol under a new investigational drug application;

(3)     That by May 2003, the FDA placed a "clinical hold" on Biopure's proposed trauma trial "due to safety concerns";

(4)     That in June/July 2003, the FDA requested that the Company perform three additional pre-clinical animal studies of Hemopure® in conscious swine to address safety and dosage concerns before any trials would be allowed on humans and that despite Biopure's submission of additional finding, the FDA still refused to allow the Hemopure® trauma study; and

(5)     That based on adverse event data submitted with the Company's Phase III orthopedic surgery trial, the FDA had voiced "safety concerns" about Hemopure® that would prevent clinical studies for trauma and, at best, severely delay approval for use in orthopedic surgery. ¶44.

In response to the shocking Christmas Eve announcement and admission, the Company's common stock fell to under $2 per share in January 2004, from a Relevant Period high of over $8 per share in August and September of 2003, erasing over $266 million in market capitalization, or

75% of the Company's market value. ¶8.  Spurned by the conduct of corporate boards like Biopure, just one month after the Company's shocking admission and receipt of Wells Notices from the SEC recommending civil action against the Company and defendant Moore, the SEC and the FDA announced plans to work together in an attempt to crack down on companies that make false and misleading statements concerning their products under review by the FDA.  ¶¶9, 49.  A February 5, 2004 press release issued by the SEC entitled "SEC and FDA Take Steps to Enhance Inter-Agency Cooperation" stated in relevant part that "*[w]hen companies misrepresent the status of the FDA's review of their products, investors can be harmed.  We are eager to continue working with the FDA to aggressively address such situations and to enhance our already-productive relationship.*" *Id.*

Less than three weeks later, the Company announced that defendant Moore, the Company's President and CEO had resigned effective immediately.  ¶¶11,51.  The market reacted badly to this shocking news, and the Company's stock plunged another 16% in afternoon trading.  On the day, the stock closed at $1.36 on a volume of 3.5 million shares, contributing  to what had become a cumulative loss of over 85% of the Company's value since the Christmas Eve announcement.  *Id.*

Unfortunately for the Company, the stream of bad news continued.  On April 30, 2004, after the close of the market, the Defendants caused the Company to announce that additional SEC Wells Notices had been issued to defendants Sanders, Crout, Rausch and Kober, recommending that the Commission add these individuals as Defendants in its civil action against Moore for possible violations of the federal securities laws.  ¶¶13, 54. On this news, the Company's stock price slid another 35% on heavy trading, from an April 30, 2004 close of $1.25 to $.90 on May 3, 2004.  ¶¶14, 56.

Since first becoming a penny stock in May 2004, the Company's stock has slipped to below $.70 per share. From a Relevant Period high of over $8 per share in September of 2003, the Defendants have erased over $350 million in market capitalization, representing over 90% of the Company's net worth. *Id.* In addition, defendant Rausch disposed of nearly $1.6 million worth of his personally held Biopure stock during the Relevant Period while possessing material, adverse non-public information. ¶¶15, 23, 46-47, 65(a)(i), 93-97. Finally, the Company's reputation and credibility has been irrevocably tarnished, as numerous news articles and press releases lambasted Biopure and its management for misleading investors and for failing to prevent Rausch's insider trading. *See, e.g.,* ¶¶10, 12, 47, 48, 50, 53, 57, 58, 60, 61. Indeed, one commentator referred to Biopure as a "class example" of how "[c]ompanies often take it upon themselves to offer one-sided, typically very positive, accounts of their all-important interactions with the FDA, often to the point of misleading investors." ¶50. Finally, as a result of the Defendants' actions and misconduct, Biopure is in jeopardy of having its common stock delisted -- a result which would be devastating for the Company and its shareholders. ¶59.

## III.    ARGUMENT

### A.    ANY DEMAND ON BIOPURE'S BOARD WOULD HAVE BEEN FUTILE[2]

#### 1.    Legal Standards Governing Demand Futility

Biopure is headquartered in Massachusetts, but incorporated in Delaware; therefore, the parties are in agreement that the substantive laws of Delaware regarding demand futility apply. Defs.' Mem. at 6.  "[A] court that is entertaining a derivative action ... must apply the demand futility exception as it is defined by the law of the State of incorporation." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991); *Harhen v. Brown*, 431 Mass. 838, 844 (Mass. 2000); *Bartlett v. New York, N.H., & H.R.R. Co.*, 221 Mass. 530, 538 (Mass. 1915).  Under Delaware law, it is well settled that demand need not be alleged if the facts plead show that such a demand would have been futile.[3]  *Aronson v. Lewis,* 473 A.2d 805, 807 (Del. 1984), *overruled on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  Further, Del. Ch. Ct. R. 23.1 provides that the

---

[2] Defendants rely on *In re Stratus Computer, Inc. Sec. Litig.*, No. 89-2075-Z, 1992 WL 73555 (D. Mass. Mar. 27, 1992) to support their assertions that Plaintiffs have failed to particularly plead demand futility.  Defs.' Mem. at 8-9.  The *Stratus* court provides that the derivative plaintiff in *Stratus* alleged "six reasons justifying demand futility, none of which have specific factual support in the complaint and one of which contradicts an earlier count in the complaint." *Id.* at *9.  Unlike *Stratus*, Plaintiffs here have provided factual support for their allegations of demand futility.  These facts are further discussed herein.  Defendants further state that in light of *Stratus*, Plaintiffs' demand futility allegations found in ¶65(e)-(l) are "conclusory" and "boilerplate."  Defs.' Mem. at 8.  In evaluating the sufficiency of Plaintiffs' demand futility allegations, however, this Court must look to the **totality** of the circumstances.  *See, e.g., In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 128 (D.N.J. 1999) (citing *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990)).  Therefore, a finding by this Court of one allegation being insufficient, will not necessarily affect Plaintiffs' remaining demand futility allegations.

[3] In assessing demand under Delaware law, all reasonable inferences must be drawn in the light most favorable to the plaintiff.  *Cendant*, 189 F.R.D. at 127.  Moreover, a plaintiff is not required to plead evidence, nor is proof of success on the merits required.  *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

"complaint shall also allege with *particularity*... the reasons for the plaintiff's failure to obtain the action or for not making the effort."[4]

In the landmark case of *Aronson*, the Delaware Supreme Court established the legal standard for assessing demand futility in shareholder derivative actions. Under *Aronson*, presuit demand is excused where, under the facts alleged, a reasonable doubt[5] is created that (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson*, 473 A.2d at 814. Importantly, the test is disjunctive. "If a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test, then he has demonstrated that demand would be futile." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995). *See also Grobow v. Perot*, 539 A.2d 180 (Del. 1988). Defendants contend that only the first prong, commonly known as the *Rales* test, of the *Aronson* test applies because Plaintiffs do not challenge a Board decision. Defs.' Mem. at 6. To the contrary, Plaintiffs clearly challenge the Defendants' decision to *not* publicly disclose adverse, material information from the FDA concerning Hemopure® which they knew, but deemed "immaterial." Plaintiffs allege

---

[4] Federal Rule of Civil Procedure 23.1 similarly requires a plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... as well as reasons for the plaintiff's failure to obtain the action or for not making the effort."

Here, as throughout, all citations are deemed omitted and all emphasis is deemed added unless otherwise stated.

[5] The term "reasonable doubt" can be said to mean "reason to doubt" that a Board of directors is capable of making an independent decision. *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996), *overruled on other grounds sub nom. Brehm*, 746 A.2d 244. The standard "is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where[, as here,] the claim is not based on mere suspicions or stated solely in conclusory terms." *Id*. This is because "the derivative suit ... [is a] potent tool[ ] to redress the conduct of a torpid and unfaithful management." *Rales*, 634 A.2d at 933.

that Defendants' purposeful nondisclosure caused Biopure to issue false and misleading public statements regarding Hemopure®. ¶¶16, 44. A "conscious failure to act" has been deemed sufficient to satisfy the second prong of *Aronson*. *See In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 806 (7th Cir. 2003) (where directors are aware of known violations and "chose" ***not*** to address the violations, defendants cannot claim "unconsidered" inaction). Consequently, the applicable demand futility analysis is the two-pronged *Aronson* test, not the test set forth in *Rales*. *See Seminaris*, 662 A.2d at 1353-54 ("[t]he familiar two step *Aronson* test applies to derivative claims that attack a business judgment of the board").

### 2. Plaintiffs Have Particularly Pled Under Rule 23.1 that a Majority of the Board Lacks Disinterestedness and Independence [6]

Under the first prong of *Aronson*, demand is excused, if Plaintiffs plead facts sufficient to raise a reasonable doubt regarding the disinterestedness or independence of a majority of directors. 473 A.2d at 814; *Beneville v. York,* 769 A.2d 80, 85-6 (Del. Ch. 2000). Specifically,

[A] court must determine whether or not the particularized factual allegations of a

---

[6] In their Motion to Dismiss, Defendants improperly take a "divide and conquer" approach to Plaintiffs' demand futility allegations. Defs.' Mem. at 7-21. As discussed *supra* n.2, courts must look to the ***totality*** of the circumstances. *See, e.g., Cendant*, 189 F.R.D. at 128 ("[t]he trial court must not rely on any one factor but examine the totality of the circumstances and consider all of the relevant factors") (citing *Harris*, 582 A.2d at 229). *See also In re Oxford Health Plans, Inc., Sec. Litig.,* 192 F.R.D. 111, 118 (S.D.N.Y. 2002) (applying Delaware law) (in evaluating demand futility the court considered the totality of the circumstances); *In re Gen. Instrument Corp. Sec. Litig.*, 23 F. Supp. 2d 867, 875 (N.D. Ill. 1998) (citing *In re Storage Tech. Corp. Sec. Litig.*, 804 F. Supp. 1368, 1375-76 (D. Colo. 1992)) (applying Delaware law) (same); *Edgeworth v. First Nat'l Bank*, 677 F. Supp. 982, 993 (S.D. Ind. 1988) (applying federal law) (same); *Bergstein v. Texas Int'l Co.*, 453 A.2d 467, 469 (Del. Ch. 1982) (applying Delaware law) (same). For example, Defendants contend that the "'insured v. insured' exclusion in Biopure's D&O policy" does not satisfy the particularity requirement for demand futility. Defs.' Mem. at 20. As discussed herein, Plaintiffs' allegations, including the insured v. insured exclusion, reviewed in totality are clearly sufficient for the Court to conclude that a majority of the Board could not have impartially considered a demand to commence this action.

> derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.  If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Rales*, 634 A.2d at 934.  Therefore, Plaintiffs need only raise a reasonable doubt as to ***four*** of the **seven** Board members.  *See Beneville*, 769 A.2d at 84-87.  In fact, as demonstrated below, all seven director defendants deliberately chose ***not*** to disclose the FDA's unfavorable commentary concerning Hemopure's® safety.  ¶¶16, 44.  Consequently, the director defendants disseminated knowingly false and material information concerning Hemopure®.  ¶¶6, 16. Further, defendant Rausch's illegal insider sales, ¶¶15, 23, 46-48, 65(a)(i),  and defendants Harrington, Sanders and Crout's approval of the Company's false statements as members of the Audit Committee, ¶¶25, 27, 28, 65(d),  render them interested and unable to act upon a demand.   Also, defendants Moore and Rausch lack independence as they are dependent on their employment with Biopure, ¶¶22, 23, 65(c), and defendants Sanders, Rausch, Judelson, Moore, Koop, Harrington and Crout lack independence as they have professional entanglements.  ¶¶22-28.  For these reasons, and for others discussed below, demand upon the Board was futile.

### a.    Defendant Rausch Is Interested By Virtue of His Insider Selling[7]

A director is considered interested[8] if he receives a personal financial benefit from a

---

[7] Defendants assert that the "alleged sale of stock by a *single director* cannot establish the lack of independence of disinterestedness of the *seven-person board* as a matter of law."  Defs.' Mem. at 14-15.  Defendants' interpretation of Plaintiffs' insider sales allegation is completely twisted.  Contrary to Defendants' assertions, Plaintiffs do not allege that because defendant Rausch engaged in illegal insider sales, the entire Board lacks independence or is interested.  Plaintiffs simply allege that defendant Rausch is interested as a result of his insider sales, not that his interestedness is imputed upon the other director defendants.

[8] A plaintiff may raise a reason to doubt a director's disinterestedness in one of two ways: (i) by alleging that the director received "a personal financial benefit from a transaction that is not equally

transaction that is not equally shared by the stockholders. *Pogostin v. Rice,* 480 A.2d 619, 624 (Del. 1984), *overruled in part on other grounds sub nom. Brehm,* 746 A.2d 244; *Rales,* 634 A.2d at 936. Without a doubt, insider trading confers this type of personal financial benefit. *Gen. Instrument,* 23 F. Supp. 2d at 875 (applying Delaware law); *Oxford Health,* 192 F.R.D. at 118 (same). Plaintiffs have particularly pled that defendant Rausch sold 246,574 shares of his own Biopure stock during the Relevant Period while in possession of adverse, material non-public knowledge.[9] ¶¶23, 47, 48, 65(a)(i).

Defendants minimize Plaintiffs' allegations, however, and assert that Plaintiffs do not allege "the dates of the sales, the portion of holdings sold, the portion retained, whether and how Rausch obtained insider information, or facts to show that the sales were made 'based upon and because of' insider information." Defs.' Mem. at 15. Defendants apparently have failed to carefully read Plaintiffs' Complaint which evidences that defendant Rausch sold his shares of Biopure stock in April 2003, in June 2003 and between August 5, 2003 and August 28, 2003. ¶¶47, 48. Further, the Complaint provides that defendant Rausch owned over 2 million shares of Biopure stock in January 2003, ¶47, and sold 246,574 shares, more than 12% of his shares in the subsequent months. ¶¶23, 47, 65(a)(i). In return, defendant Rausch received a personal financial benefit and collected over $1,596,900 million in proceeds. ¶¶23, 65(a)(i). Plaintiffs also allege that as a result of Rausch's

---

shared by the stockholders"; or (ii) by alleging facts demonstrating a "substantial likelihood" that the director will be held personally liable for the alleged misconduct. *Rales,* 634 A.2d at 934-36.

[9] Defendants querie, "If the Director Defendants knew material, adverse information, why would one Director buy from another Director?." Defs.' Mem. at 25. The fact that Rausch sold To Judelson, however, is completely irrelevant to whether he engaged in insider selling. Plaintiffs simply used the fact that Rausch sold to Judelson to support their demand futility allegations. As such, Defendants have completely taken this allegation out of context.

positions as Vice Chairman, CTO and a director, Rausch would have been exposed to this information.  For example, Plaintiffs allege that "[a]s a result of ... [his] ... access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings," Rausch knew about the Company's communications with the FDA and, consequently, the Company's adverse non-public information regarding Hemopure®.  ¶65(a).  Lastly, Plaintiffs' Complaint makes clear that Rausch traded on the basis of material, adverse non-public information as evidenced by the timing of his trades shortly after favorable press releases were disseminated to the public.[10]  ¶¶15, 46-48, 65(a)(i).

Further, the benefits derived from these insider sales did not devolve upon Biopure or the stockholders in general.  In fact, the opposite is true.  Shareholders who bought the stock sold by defendant Rausch lost as they purchased shares at an artificially inflated price; meanwhile, defendant Rausch reaped total proceeds of $1,596,900 before the truth about Hemopure® was revealed and before Biopure's market capitalization fell by $350 million.  ¶¶1, 23, 45, 65(a)(i).  Due to his personal interest in the challenged transaction, futility is established as to defendant Rausch.[11]

_____

[10] For example, on May 30, 2003, the Defendants caused the Company to issue a press release wherein defendant Moore stated that they were "very pleased with the FDA's progress in reviewing our application.... We're also continuing our preparations to roll out the product to leading orthopedic surgery centers following approval."  ¶38.  Shortly thereafter in June 2003, the Company's shares increased to approximately $6 per share and defendant Rausch sold approximately 67,000 of his shares.  ¶47.  Then again on August 1, 2003, the Defendants caused the Company to announce that "Hemopure® was a step closer to approval, as the FDA was not requesting any more clinical trials."  *Id.*  This caused the Company's stock to rise by 22% to $7.30.  *Id.*  On August 5, 2003, just five days after this favorable announcement, Defendant Rausch sold more than $1 million worth of his Biopure shares.  *Id.*

[11] Defendants cite *Rattner v. Bidzos*, No. 19700, 2003 WL 22284323, at *11 (Del. Ch. Sept. 30, 2003), and *Guttman v. Huang,* 823 A.2d 492, 503-04 (Del. Ch. 2003), to support their allegation that Plaintiffs have failed to plead with particularity allegations of insider selling.  Defs.' Mem. at 15.  However, both *Rattner* and *Guttman* distinguished between non-management director defendants

> **b.     Plaintiffs Have Alleged a Substantial Likelihood of Liability as to All Defendants**

As discussed above, *see supra* n. 7, another way to raise a reasonable doubt as to a director's disinterestedness is by alleging facts demonstrating a "substantial likelihood" that the director will be held personally liable for the alleged misconduct. *Rales*, 634 A.2d at 934-36. Defendants contend that "[t]here is nothing in the Complaint that could establish a 'substantial likelihood' that any one of the director defendants will be subject to liability, let alone a majority of them.... " Defs.' Mem. at 13. To the contrary, Plaintiffs have pled with particularity the basis of personal liability for the director defendants as each director defendant caused Biopure to disseminate false and misleading statements pertaining to the safety of Hemopure®. ¶¶16, 44.

Moreover, any suit by the director defendants of Biopure to remedy these wrongs would likely expose them and Biopure to further violations of laws which would result in civil actions being filed against one or more of the Defendants. To date, defendants Moore, Sanders, Crout and

---

and management director defendants as to insider selling. Although the *Rattner* court held that plaintiff failed to show that seven of the eight director defendants were interested by virtue of their insider sales, the court assumed that the eighth alleged insider selling director defendant suffered from a disabling interest because he was a senior manager at the time the action was filed, potentially placing him in a position to have adverse material non-public information. 2003 WL 22284323, at *11. The *Rattner* court also noted, however, that plaintiff did not even question this director defendant's independence from the seven other director defendants. *Id.* Likewise in *Guttman*, the court purposefully excluded two director defendants, one of whom was the CEO and the other senior counsel at the law firm retained by the company to assist with the SEC investigations. As in *Rattner*, the *Guttman* court made an "assumption" that by virtue of their management positions, those two directors' independence and/or disinterestedness was compromised. 823 A.2d at 503.

Here, director defendant Rausch served in executive management as CTO at the time that Plaintiffs' Complaint was filed. ¶¶23, 65(c). Rausch also served as Vice Chairman and as a director. *Id.* Defendant Rausch sold 246,574 of his own shares for total insider proceeds of $1,596,900 million. ¶¶23, 65(a)(i). Furthermore, Plaintiffs alleged that defendant Rausch lacked independence from the other director defendants. ¶¶23, 65(g). Therefore, in light of *Rattner* and *Guttman,* a reasonable doubt is raised as to defendant Rausch's disinterestedness.

-14-

Rausch have each received a Wells Notice issued by the SEC indicating that the SEC may recommend civil action against these Defendants. ¶¶7, 13, 22, 23, 25, 28, 42, 48, 54, 57. The Wells Notices related to these Defendants' failures to disclose communications with the FDA concerning Hemopure® and the FDA's safety concerns. ¶¶42, 43. Further, the federal securities class action names Moore, Sanders, Crout and Rausch as defendants. *See* Consolidated Amended Complaint, *In re Biopure Securities Litigation,* No. 03-12628-NG, United States District Court, District of Massachusetts.[12] Nevertheless, Defendants further purport that "a super-majority of the Board faces *no* potential for liability in the securities class actions" and that "only four Director Defendants are alleged to have received Wells Notices from the SEC." Defs. Mem. at 10. Plaintiffs need only show and have shown that ***four*** of the director defendants face a substantial likelihood of liability.[13]

_____

[12] Defendants assert that Plaintiffs allege that "*only two* [Defendants] are allegedly named as defendants in the securities class actions." Defs.' Mem. at 10. Plaintiffs, however, filed this Complaint before the Consolidated Amended Complaint which now includes all four Defendants named above.

[13] Defendants Moore, Sanders, Crout and Rausch are named in a current federal securities class action. A prior federal securities class action, *Meyer v. Biopure Corp.*, 221 F. Supp. 2d 195 (D. Mass. 2002), brought against Biopure and Rausch alleged that those defendants' failure to disclose deficiencies, missing data and various problems with Hemopure's® clinical trials. That action was subsequently dismissed by Judge Edward F. Harrington. Judge Harrington, however, provided the following timely and insightful basis for his reasoning:

> Plaintiffs also plead no basis for inferring that it is highly likely that these alleged omissions were either intentional or highly reckless. *See Aldridge*, 284 F.3d at 82. ***This is not a situation where the facts omitted from the press release are so clearly important*** that the fact of nondisclosure alone gives rise to a strong inference of scienter, ***since plaintiffs do not suggest that the "missing" data would show that Hemopure was unsafe*** or that the "missing" data would otherwise differ in any material manner from the data that was released.

*Id.* at 207. In this matter, the information omitted from the Company's public statements precisely showed "that Hemopure was unsafe." In fact, Defendants withheld the FDA's "safety concerns" of Hemopure® for approximately ten months. Accordingly, defendants Moore, Sanders, Crout and

Defendants allegation of a "super-majority" is nonsense.[14]

Further, as the Complaint alleges, defendants Harrington, Sanders and Crout, as members of the Audit Committee, were charged with ensuring that the Company's financial statements and corresponding press releases included all material information including the Company's communications with the FDA concerning Hemopure®. ¶¶25, 26, 27, 28, 65(d). *See In re Lernout & Hauspie Secs. Litig.*, 286 B.R. 33, 38 (D. Mass. 2002) ("But who will guard these guardians?") (plaintiffs alleged liability against "outside" directors comprising Audit Committee for securities fraud even under heightened pleading standard of the Private Securities Litigation Reform Act). Nonetheless, the Audit Committee, with full knowledge of the Company's communications with the FDA concerning Hemopure®, recommended that the Board include the improper audited financial statements in Biopure's filings with the SEC during the Relevant Period without disclosing material information relating to Hemopure®. ¶65(d). Defendants state that "the Plaintiffs have failed to allege at all, let alone with particularity, *any* accounting irregularities ... nor that the Company's internal controls were insufficient, nor that the Company improperly recognized revenue." Defs.' Mem. at 16. Defendants fail to recognize that the issue at hand is that Defendants' dissemination of press releases touting Hemopure® and its imminent approval and distribution were false and misleading as Defendants knew, but failed to disclose that the FDA had "safety concerns" about Hemopure® and consequently, put a clinical hold on trauma trials. Knowing Biopure's growth

---

Rausch face a substantial likelihood of liability in the federal securities class action. Moreover, contrary to Defendants' contention, Plaintiffs do not need to "plead a single fact that could show that any Defendant had the requisite scienter to sustain the securities fraud actions." Defs.' Mem. at 12.

[14] Moreover, because director defendants' liability coverage will not protect the director defendants in this derivative suit, Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

during the Relevant Period was dependent on the success of its flagship product, Hemopure®, Defendants withheld such information, creating the appearance of a smooth road to future approval of Hemopure® and causing the market to react positively and boost the Company's stock price. Thus, by allowing the press releases to be disseminated without this material, adverse information, Defendants breached their duties and face a substantial likelihood of liability.  Indeed as "[t]he *Aronson* case teaches violations of the law concerning the dissemination of false and misleading financial statements cannot be deemed to be the product of a valid exercise of business judgment, and therefore protected from a demand futility allegation by the case law."  *Oxford Health,* 192 F.R.D. at 117.  Accordingly, Plaintiffs' allegations are sufficient to show that these Defendants face a substantial likelihood of liability.[15]

### c.    As Executive Officers Defendant Moore and Defendant Rausch Lack Independence from the Director Defendants

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. *See also Katz v. Chevron Corp*., 22 Cal. App. 4th 1352, 1367 (1994) (citing *Kaplan v. Wyatt*, 499 A.2d 1184, 1189 (Del. 1985)); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993) ("We have generally defined a director as being independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations.").  Among other situations, a lack of independence has been found where a director is beholden to another by virtue of his/her employment. *Rales*, 634 A.2d at 936-37.  Defendant

---

[15] Defendants cite *Rattner* and *Guttman* to support their allegation that the Audit Committee members are independent and disinterested.  Defs.' Mem. at 14-16.  As both *Rattner* and *Guttman* are insider trading cases, they are not applicable to Defendants' discussion of Audit Committee liability.

Moore and defendant Rausch are both employees of Biopure, and thus, lack independence. ¶¶22, 23, 65(c).

Defendant Moore's principal professional occupation and means of earning a living was his employment position as President and CEO of Biopure. ¶¶22, 65(c). Defendant Rausch's principal professional occupation and means of earning a living is his employment position as CTO of Biopure. ¶¶23, 65(c). Under Delaware law, particularized allegations that an employee-director depends on his employment position for his livelihood are sufficient to raise a reasonable doubt regarding the employee-director's independence from other Board members who have the ability to control his employment and compensation.[16] In order to protect the executive positions they had when Plaintiffs filed their Complaint, defendants Moore and Rausch would not bring suit against the Board, especially defendants Sanders and Judelson, who are members of the Compensation Committee, and themselves.[17] Therefore, defendants Moore and Rausch lack independence.[18]

---

[16] *See, e.g., Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices"); *In re Cooper Co., Inc.*, No. 12584, 2000 WL 1664167, at *6-7 (Del. Ch. Oct. 31, 2000) (allegation that employee-directors "'owed their positions and their livelihood to maintaining the good will'" of other directors "creates reason to doubt that [employee-directors] could have responded impartially to a demand"). *See also Mizel v. Connelly*, No. 16638, 1999 WL 550369, at *8-9 (Del. Ch. July 22, 1999) ("Since [employee-directors] each derive their principal income from their employment at [the corporation], it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment.").

[17] Defendants state that Plaintiffs have failed to show that the "Directors' compensation is extraordinary," Defs.' Mem. at 19, and that "a majority of the Board is overly reliant upon their compensation from Biopure, *i.e.*, that they engage in no other employment and that they are otherwise not financial secure." Defs.' Mem. at 19. At the time Plaintiffs filed their Complaint, defendants Moore and Rausch were executive officers and undoubtedly received their primary compensation from Biopure. Further, the fact that the other director defendants may not make a demand for fear of jeopardizing their "awards," extraordinary or not, ¶65(b), is simply one more factor to be reviewed in totality to determine futility. Moreover, contrary to Defendants' assertions, the Complaint does not allege facts to show that a majority of the director defendants are financially

**d.    Defendants Sanders, Rausch, Judelson, Moore, Koop, Harrington and Crout Have Professional Entanglements**

Demand is excused where the complaint alleges that the members of the Board have current or past business, personal and employment relationships. *See In re New Valley Corp.,* No. 17649, 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001).[19]  Plaintiffs allege with particularity in their Complaint various personal, long-standing business entanglements that keep defendants Moore, Sanders, Rausch, Judelson, Koop, Harrington and Crout from being independent.[20]  ¶¶22-28.  First, defendant Rausch co-founded Biopure with his close friend and confidant, defendant Judelson in

---

independent.  Defs.' Mem. at 19, 20 n.10.  For example, the fact that defendant Sanders previously served as a General Director of Massachusetts General Hospital and Professor of Medicine at Harvard Medical School, in no way evidences his financial independence at the time Plaintiffs filed their Complaint.  Likewise, the fact that defendant Judelson was a former CEO would not have necessarily made him financially independent when Plaintiffs filed their Complaint.

[18]  Furthermore, defendant Rausch has substantial personal equity in the Company.  According to the Company's proxy statement, Rausch in January 2003, prior to his sales of 246,574 shares of Biopure stock, was the Company's fourth-largest shareholder, with control of just over 2 million shares.  ¶47.  Because the value of his Biopure stock will be directly and negatively affected if action is instituted against the Board, defendant Rasuch would not be willing to institute action against the Board and therefore demand would be futile.

[19]  The court in *New Valley* held demand was excused where the Complaint alleged with sufficient particularity that the members of the Board had current or past business, personal and employment relationships even though the nature and extent of the relationships were not entirely clear to the court.  2001 WL 50212, at *7.  Here, too, Plaintiffs have pleaded disqualifying interest with sufficient particularity to survive dismissal, as further discovery and factual development will further reveal the nature of these disabling relationships.

[20]  *See In re FirstEnergy S'holder Derivative Litig.*, 320 F. Supp. 2d 621, 625 (N.D. Ohio 2004) (Honorable James S. Gwin held that "numerous intertwining relationships that suggest the Defendants are not independent or disinterested and are unlikely to sue their fellow Board members.... suggest that the Directors would be antagonistic to the derivative action." Accordingly, Judge Gwin excused demand as futile).

-19-

1984.[21]  ¶¶23, 24.  Second, defendants Judelson and Rausch appointed defendant Moore as CEO in 2002.  *Id*.  Third, defendants Judelson and Rausch appointed defendant Sanders as Chairman in 2002. *Id.*  Defendant Sanders served as the General Director of Massachusetts General Hospital and Professor of Medicine at Harvard Medical School, along with Douglas M. Hansell, M.D. who currently serves as Biopure's Vice President of Medical Affairs and served with Sanders at Massachusetts General Hospital and at Harvard.  ¶25.   Fourth, defendant Moore has long-term personal, professional and financial relationships with the other Board members by virtue of his former executive positions at Biopure.  ¶22.  Fifth, defendant Koop speaks as a consultant for Biopure and other pharmaceutical companies in front of regulatory bodies.  ¶26.  Also, prior to joining the Biopure Board, Koop was hired as Chairman of Biopure's Scientific Advisory Committee.  *Id.*  Sixth, defendant Harrington has served as President of HTV Industries, Inc. ("HTV"), one of Biopure's venture capitalist, since 1991.  Harrington owns 1,560,089 shares of Biopure or 4.7% of the Company's outstanding common stock which includes 1,498,219 shares and warrants to purchase 11,111 shares owned by HTV.  ¶27.   Seventh, defendant Crout is a pharmaceutical industry consultant and owns Crout Consulting which provides regulatory and drug development advice to pharmaceutical and biotechnology companies, such as Biopure.  ¶28. Defendant Crout has also long served on the Trimeris board of directors with Defendant Sanders. *Id.* These allegations of financial, personal and business relationships support Plaintiffs' argument that demand would have been futile.

---

[21] A "long-standing pattern of mutually advantageous business relations" between directors raises a reasonable doubt regarding independence. *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999).  *See also Int'l Equity Capital Growth Fund, L.P. v. Clegg*, No. 14995, 1997 WL 208955, at *5 (Del. Ch. Apr. 21, 1997).

Defendants cite *In re Paxson Communication Corp. S'holders Litig.*, No. 17568, 2001 WL 812028 (Del. Ch. July 12, 2001) to support their argument that Plaintiffs' allegations of entangling relationships are insufficient.[22]  The *Paxson* plaintiffs, however, merely alleged that the "'Board members also have close personal and business ties with each other.'"  *Id.* at *10.  Consequently, the *Paxson* court stated that plaintiffs "have pled no facts beyond this very generalized statement that supports this allegation in any way."  *Id.*  Plaintiffs here have demonstrated far more particularity concerning the entangling business, personal and professional relationships between Rausch, Judelson, Sanders, Moore, Koop, Harrington and Crout.  Thus, the Complaint is ***not*** "devoid of factual allegations concerning the person and financial relations among the Directors." Defs.' Mem. at 18.

### 3.    Demand Is Excused Because the Business Judgment Prong Has Been Satisfied (Pursuant to the Second Prong of *Aronson*)

Because demand is futile pursuant to the first prong of *Aronson,* the Court need not reach the second prong.  *See Pogostin,* 480 A.2d at 624-25.  Nevertheless, under the second prong of *Aronson*, demand is excused if Plaintiffs demonstrate a reasonable doubt as to the Board's exercise of its business judgment.[23]   *Aronson*, 473 A.2d at 814. Plaintiffs particularly allege that the director

---

[22] Defendants also rely on *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040 (Del. Supr. 2004) .  Defs.' Mem. at 18.  Although the *Beam* court held that plaintiffs' allegations in that action were not sufficient, it confirmed that a reasonable doubt as to a director's independence may be raised "because of financial ties, familial affinity, a particularly close or intimate personal or business affinity or because of evidence that in the past the relationship caused the director to act non-independently vis à vis an interested director."  *Id.* at 1051.  For example, Plaintiffs here have alleged that defendants Rausch and Judelson are close friends and confidants.  ¶¶23, 24.  Indeed, defendant Rausch even sold a portion of his stock to Judelson.  *Id*.  Clearly this is evidence of an "intimate personal or business affinity."

[23] The business judgment rule ***only*** applies when the director is free of ***self-interest*** in the transaction. *Grobow,* 539 A.2d at 187.  Accordingly, defendant Rausch due to his insider trading has forfeited

defendants violated the business judgment rule as they chose not to disclose when known the FDA's safety concerns to the public.

The business judgment rule has been described as "'a common-law recognition of the statutory authority to manage a corporation that is vested in the board of directors.'" *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 927 (Del. 2003). It is a "'presumption that in making a business decision the directors of a corporation acted on an informed basis.'" *Id.* To comply with the business judgment rule, however, directors must:

> [I]nform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must act with requisite care in the discharge of their duties.

*Aronson,* 473 A.2d at 812. *See also Seaford Funding Ltd. P'ship v. M&M Assocs. II, L.P.*, 672 A.2d 66, 70 (Del. Ch. 1995). Delaware courts have held that the business judgment rule does not protect a defendant when the challenged actions amount to gross negligence.[24] *Aronson,* 473 A.2d at 812; *In re First Woburn Bancorp., Inc.*, No. 13725, 1999 WL 33318823 (Del. Ch. Oct. 5, 1999); *Citron v. Fairchild Camera and Instrument Corp.*, 569 A.2d 53 (Del. 1989).

In this action, Defendants are not protected by the business judgment rule because in carrying out their decision to disseminate false and misleading public statements pertaining to Hemopure®, Defendants acted with gross negligence in failing to disclose the FDA's "safety concerns." *See Oxford Health*, 192 F.R.D. at 117. These failures were not innocent oversights, but reckless attempts

---

the business judgment rule presumption.

[24] Under Delaware law, gross negligence can be demonstrated by allegations that directors were "uninformed in critical respects." *Grobow,* 539 A.2d at 190.

to hide the truth from the investing public in order to artificially inflate Biopure's stock price.[25]

Indeed, demand is futile where a majority of the Board has been charged with wrongdoing. *Cendant,* 189 F.R.D. at 129-30 (demand is futile where plaintiff alleges directors published false statements in public corporate documents); *Oxford Health*, 192 F.R.D. at 114, 117 (same). Here, Plaintiffs allege that Defendants issued false and materially misleading information to Biopure's shareholders.[26] Specifically, despite knowing of inside information demonstrating that safety concerns existed with Hemopure®, the director defendants consciously refrained from causing Biopure to disclose such information. ¶¶16, 44. This conscious failure to act raises serious doubt that the Board's actions and decisions can be attributed to any rational business purpose or that the director defendants were acting in the best interests of the Company.[27]

In light of the particularized facts pled in the Complaint, there is clearly a reasonable doubt that the Board's misconduct was the product of a valid exercise of business judgment, especially for

---

[25] The court in *Abbott Labs.* stated that "reasonable inferences determined from all the facts taken together ... [show] members of the board in *Abbott* were aware of the problems. When there is a corporate governance structure in place, we must then assume the corporate governance procedures were followed and that the board knew of the problems and decided no action was required." 325 F.3d at 806. Here, Plaintiffs allege that Defendants knew about the FDA's communications and safety concerns concerning Hemopure®. Indeed, Defendants even admit their knowledge of such adverse information during the Relevant Period, but deemed the information immaterial. ¶42.

[26] Plaintiffs allege and evidence throughout the Complaint that the information withheld by Defendants was in fact material. ¶¶1, 4, 7, 22-29, 42, 44, 48, 65(a), 65(d), 96.

[27] Although Defendants completely ignore the allegation, Plaintiffs have specifically plead that, "[e]ach of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests." ¶73.

the purpose of deciding this Motion.[28]

**B.    THE COMPLAINT MORE THAN ADEQUATELY PLEADS THE INDIVIDUAL CAUSES OF ACTION**

**1.    Legal Standards Governing Plaintiffs' Causes of Action**

Once Plaintiffs have satisfied the demand futility analysis, a much more lenient standard becomes applicable to Plaintiffs' causes of action.  Indeed, this standard is "***notably lower*** than is true in the context of motions to dismiss for failure to make a presuit demand." *Telxon Corp. v. Bogomolny*, 792 A.2d 964, 974 (Del. Ch. 2001).  *See also In re Nat'l Auto Credit, Inc. S'holders Litig.*, No. 19028, 2003 WL 139768, at \*12 (Del. Ch. Jan. 10, 2003) (motion to dismiss plaintiff's claims under Rule 12(b)(6), "presents a more lenient standard ... [for] review ... than that posed by the demand requirement"); *Heineman v. Datapoint Corp.*, No. 7956, 1990 WL 154149, at \*1 (Del. Ch. Oct. 9, 1990) (derivative action discussing individual causes of action on a motion to dismiss and stating "we ought not lose sight of the generally lenient standards that are appropriate").

The legal standard applicable to the Defendants' motion to dismiss relating the Plaintiffs' causes of action are well-settled.  The Court must accept all the factual allegations as true and draw all reasonable inferences therefrom in Plaintiffs' favor.  *Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 62 (1st Cir. 2004).  This Court "must apply the notice pleading requirements of Rule 8(a)(2)." *Id.* at 66. Thus, "a complaint need only include 'a short and plain statement of the claim showing the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

---

[28] At the end of their demand futility section, Defendants argue that even if a defendant is found to lack independence, the Board may assume control through a special litigation committee.  Defs.' Mem. at 20-21.  This argument is irrelevant as the Board has not formed such a committee and the statutory recognition of such a committee can co-exist with demand futility.  Moreover, the use and necessity of a special litigation committee validates the policy reasons behind demand futility.

Accordingly, the complaint need only "'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Applying these liberal standards, it is clear that the allegations pled in the Complaint concerning the individual causes of action are more than legally sufficient to withstand a Rule 12(b)(6) motion to dismiss.

### 2.    Plaintiffs Have More than Adequately Pled Damages to Biopure

The Defendants erroneously assert that action should be dismissed -- on a Rule 12(b)(6) motion -- because Plaintiffs have not alleged legally cognizable damages.  Defendants' argument is completely meritless as Plaintiffs have pled abundant legally cognizable damages to Biopure.  First, Plaintiffs have more than adequately complied with Fed. R. Civ. P. 8(a)(3) which requires only "a demand for judgment for the relief the pleader seeks."  Nevertheless, as Defendants' own cases make clear, under Delaware law a claim for damages based on breaches of fiduciary duty "is legally cognizable since Delaware law 'has long recognized the availability of a stockholder derivative action to recover profits obtained by corporate insiders through breach of their fiduciary duties.'" *Dollens v. Zionts*, No. 01 C028626, 2002 WL 1632261, at *9 n.8  (N.D. Il. July 22, 2002) (quoting *In re Symbol Tech. Sec. Litig.*, 762 F. Supp. 510, 517 (E.D.N.Y. 1991)); Defs.' Mem. at 22.  Indeed, this is true even if no actual injury to the corporation is shown.  *Symbol Tech.*, 762 F.Supp. at 517. Thus, Plaintiffs have adequately pled damages for breach of fiduciary duty especially as to defendant Rausch's insider selling and misappropriation of information as well as the receipt of profits and stock options by other Defendants while they were in breach of their fiduciary duties.

Moreover, it is well settled that "[d]amage to one's business and reputation is a cognizable injury for which damages may be awarded if the underlying charges are proved."  *Cendant*, 189

F.R.D. at 135. *See also Symbol Tech.*, 762 F. Supp. at 517 ("plaintiff could show present injury to the Corporation by demonstrating a lessened ability to attract public capital investment, or to obtain institutional financing. Plaintiff could then specifically allege the damages attributable to such loss of credibility in the marketplace."). Accordingly, Plaintiffs' allegations, ¶¶1, 68, that Biopure has suffered irreparable damage to its reputation is cognizable. Indeed, the Complaint is replete with examples of how the Company's reputation and goodwill have been irreparably tarnished. *See, e.g.*, ¶¶10, 12, 47-48, 50, 53, 55, 57-58, 60-61.

Furthermore, Plaintiffs have adequately pleaded a claim of damages for loss in the marketplace. Indeed, Defendants' own citations to *Symbol Tech.* and *Dollens* clearly demonstrate Plaintiffs have adequately pled a damage claim for injury in the marketplace. In both those cases the claims for damages in the marketplace were held "conclusional and insufficient because plaintiffs [did] not apprise defendants of the basis and extent of the alleged damages." *Dollens*, 2002 WL 1632261, at *9. Here, unlike those cases, Plaintiffs have specifically alleged the Defendants' conduct cause Biopure to lose over $350 million in market capitalization or over 90% of the market value of the Company, severely reducing its financing options. ¶¶1, 14, 45, 56, 68. This is more than sufficient to give Defendants notice of the basis and extent of these damages. Therefore, in addition to pleading that the Defendants have exposed the Company to liability for violating the federal securities laws, and have subjected to Company to the expense of an SEC investigation and having to hire independent counsel, Plaintiffs have pled numerous other legally cognizable claims which are more than sufficient under Fed. R. Civ. P. 8(a)(3).

### 3.    The Complaint Adequately Alleges the Individual Defendants' Breaches of Fiduciary Duty

Contrary to the Defendants' erroneous assertion, the Complaint -- for purposes of a Rule 12(b)(6) motion -- adequately alleges each Defendants' participation in the misconduct. First, this argument is entirely meritless because the Defendants have admitted they knew of the adverse information concerning Hemopure® and the Company's communications with the FDA but did not disclose the same during the Relevant Period. ¶42. Because Hemopure® is only on of two products the Company manufactures and is the Company's flagship product from which its value is primarily determined, ¶¶2, 3, this information is clearly central to the management of the Company. As such, all the Defendants, including the outside directors would be charged with its knowledge, at least for the instant purposes for Rule 12. *See Symbol Tech.*, 726 F.Supp. at 515 ("[t]he complaint in this action charges the outside directors with knowledge of information which is central to the usual and necessary management of the corporation's business affairs"). Moreover, it cannot be seriously disputed that as officers and/or co-founders of the Company, defendants Moore, Rausch, Judelson and Kober would be charged with this knowledge. *See, e.g.*, *JPMorgan Chase Bank v. Winnick*, No. 03 Civ. 8535(GEL), 2004 WL 1418197, at *4 n.7 (S.D.N.Y. June 23, 2004) (appropriate at pleading stage to allow inference those who ran day-to-day operations of company had knowledge of alleged wrongdoing). Thus, nothing more is required.[29]

---

[29] Nevertheless, Plaintiffs have clearly plead facts that sufficiently put the Defendants on notice of the breach of fiduciary duty claims in the Complaint. Specifically, Plaintiffs have alleged that: defendant Moore was the Company's CEO and President and a director and has received a Wells Notice as a result of his wrongdoing, ¶¶7, 22, 42; defendant Rausch was Vice Chairman, CTO and co-founded Biopure with defendant Judelson, also Biopure's Vice Chairman and that defendant Rausch received a Wells Notice form the SEC as a result of his wrongdoing, ¶¶13, 23-24, 54; defendants Sanders, Harrington and Crout were all members of Biopure's Audit Committee who, with full knowledge of the Company's communication with the FDA concerning Hemopure®,

### 4.     Plaintiffs Have Adequately Stated a Claim for Insider Trading and Misappropriation of Information Against Defendant Rausch

For purposes of a Rule 12(b)(6) motion to dismiss, Plaintiffs have adequately stated a claim for insider trading and misappropriation of information against defendant Rausch.  Under Delaware law, a director who trades stock on the basis of inside information violates his fiduciary duties to the corporation.  *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (1949).  The Complaint alleges that defendant Rausch, Vice Chairman, CTO and a director of Biopure, disposed of nearly $1.6 million worth of his personally held Biopure stock during the Relevant Period while in possession of material, non-public information.  ¶¶15, 23, 46-47, 65(a)(i), 93-97.  As Defendants' own citation makes clear, these allegations are sufficient for purposes of a Rule 12(b)(6) motion to dismiss:

> With regard to defendants Steinberg, Swartz, Heinan, Schlenker, Mallement, Burke and Bravman, the motion under Rule 12(b)(6) must be denied.  Plaintiff has alleged that each of the above-named defendants profited from insider trading of Symbol Technologies stock, thereby breaching a fiduciary duty owned to the Corporation.

*Symbol Tech.*, 762 F.Supp. at 516.

Defendants' erroneously seek to skew the issue by relying on *Guttman*, a case interpreting insider trading and misappropriation claims in light of the demand futility context, not the Rule 12(b)(6) context.  *Guttman*, 823 A.2d at 503-04.  *Guttman* is inapplicable to the instant analysis

---

recommended that the Board include the improper audited financial statements in Biopure's filings with the SEC during the Relevant Period without disclosing this material information, and that defendant Crout has received a Wells Notice as a result of his wrongdoing, ¶¶13, 25, 27, 28, 54, 65(d); defendant Koop was a director who regularly spoke in its behalf in front of regulatory bodies and was Biopure's Chairman of Scientific Advisory Committee charged with advising the Company on applications of its products and developing medical and scientific relationships with health organizations and medical centers around the world, ¶26; and that defendant Kober was an officer of Biopure, serving as its Senior Vice President, General Counsel and Secretary and that as General Counsel she approved the Company's false and misleading financial statements and press releases and received a Wells Notice from the SEC as a result of her wrongdoing.  ¶¶13, 29, 54.

under Rule 12(b)(6) because there the plaintiffs were attempting to plead demand futility based on

certain defendants insider trading by showing they faced a substantial likelihood of liability for

purposes of Rule 23.1 -- not Rule 12(b)(6)  *Id.*   As the court stated:

> The cursory allegations of the complaint in this action do not come close to meeting
> the plaintiffs' burden to show that these five defendants ***face a substantial threat of
> liability*** for insider trading-based fiduciary duty violations.... This is fatal to plaintiffs'
> effort to ***show demand futility***.

*Id.* at 504.  Indeed, *Guttman* only dealt with and was dismissed on demand futility grounds -- it never

discussed the more lenient pleading requirements for these claims on a motion to dismiss under Rule

12(b)(6) in light of the more particularized requirements for demand futility requirements.  In fact,

the difference between the two pleading standards is illustrated by the *Symbol Tech.* case cited  by

Defendants.   There, the court held that while the allegations of insider trading by one of the

defendants were not sufficient for demand futility purposes, they were nonetheless sufficient for

purposes of a Rule 12(b)(6) motion to dismiss:

> With specific regard to defendant Steinberg, although plaintiff may not have pleaded
> the facts sufficiently to withstand a motion to dismiss under Rule 23.1, it cannot be
> said that Count I of the complaint fails to state a claim against Steinberg under the
> parameters of Rule 12(b)(6).

*Symbol Tech.*, 762 F.Supp. at 516.

The same principle applies here.  Irrespective of whether Plaintiffs' allegations are sufficient

for demand futility purposes as to defendant Rausch (which Plaintiffs strenuously assert they are),

they certainly meet the standard necessary for purposes of Rule 12(b)(6).  Nevertheless, additionally

Plaintiffs allege these trades were highly suspicious as a majority came in June and August of 2003,

after the Company had issued favorable press releases concerning Hemopure®, but of course, while

Rausch was in possession of the knowledge of the adverse FDA communications concerning

Hemopure® which were yet to be disclosed. *See, e.g.,* ¶¶47-48. Thus, even while not required for the instant purposes, Plaintiffs have pled the who (defendant Rausch), what (traded Biopure stock), when (during the Relevant Period and particularly after the Company issued favorable misleading press releases), where (on the open market) and how (while in possession of material, non-public formation).

Accordingly, Plaintiffs have adequately plead a claim against defendant Rausch for insider trading and misappropriation of information for purposes of Rule 12(b)(6).

### 5.     Plaintiffs Have Stated a Claim for Unjust Enrichment

It is undisputed that Delaware law recognizes an unjust enrichment claim. *See, e.g.,* *Fitzgerald v. Cantor,* No. 16297, 1998 WL 326686, at *6 n.25 (Del. Ch. June 16, 1998) (citing *Khoury Factory Outlets, Inc. v. Snyder*, No. 11,568, 1996 WL 74725, at *11 (Del. Ch. Jan. 8, 1996)). Under Delaware law Plaintiffs have clearly pled all the elements of a claim for unjust enrichment. In a recent decision by the Delaware Court of Chancery, *In re HealthSouth Corp. S'holders Litig.,* 845 A.2d 1096, 1105 (Del. Ch. 2003), Vice Chancellor Strine noted the following tenet of Delaware law when upholding a claim for unjust enrichment:

> [T]he unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. To obtain restitution, the plaintiffs were required to show that the defendants were unjustly enriched, that the defendants secured a benefit, and that it would be unconscionable to allow them to retain that benefit. Restitution is permitted even when the defendant retaining the benefit is not a wrongdoer. Restitution serves to deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.

(quoting *Schock v. Nash,* 732 A.2d 217, 232-33 (Del. 1999)) (emphasis omitted).

Plaintiffs have properly plead a claim for unjust enrichment under the standard discussed by Vice Chancellor Strine. Plaintiffs have alleged facts demonstrating that defendant Rausch misappropriated material non-public information regarding Biopure in order to sell 246,574 shares of Biopure stock, thereby reaping $1,596,900 in illegal insider trading proceeds. ¶¶15, 23, 46. Plaintiffs allege that the misuse of such non-public information was purely for personal gain and unjust, and it would be unconscionable to allow this defendant to retain the unjust benefits he has received. Furthermore, Plaintiffs allege that Defendants received salaries, bonuses and other compensation owing from their misconduct that should be returned to the Company. It is clearly alleged in the Complaint that defendant Moore unjustly received $350,012 in salary and 18,000 options to purchase Biopure stock, ¶22, and that defendant Rausch unjustly received $350,012 in salary and 18,000 options to purchase Biopure stock, ¶23. Accordingly, Plaintiffs have adequately pled a claim for unjust enrichment. *See HealthSouth*, 845 A.2d at 1005; *Schock*, 732 A.2d at 232-33.

### 6.    Plaintiffs Have Stated a Claim for Waste

"Waste" is defined as "'an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.'" *White v. Panic*, 783 A.2d 543, 554 (Del. 2001). In a claim for waste of corporate assets, a plaintiff needs to allege that the board "'irrationally squander[ed]' corporate assets." *Id.* at 554. In this case, Plaintiffs have alleged that Defendants squandered the Company's valuable corporate assets by paying incentive based bonuses and granting Biopure options to certain of its executive officers when such bonuses and options were based upon misrepresented financial results of the Company at the direction of the Defendants by failing to apprize shareholders and the public of the adverse communications with the FDA. ¶¶22-23, 86-88. Moreover, the Defendants' misconduct forced the

-31-

Company to expend valuable corporate assets employing independent counsel in order to defend itself against the SEC charges and securities fraud actions. ¶69. Accordingly, Plaintiffs have adequately pled a claim for corporate waste, and therefore Defendants' Motion to Dismiss should be denied.

### C.    BIOPURE'S CERTIFICATE OF INCORPORATION CANNOT BAR PLAINTIFFS' CLAIMS AT THIS STAGE OF THE LITIGATION

The Defendants' argument that they are immunized from liability for Counts I-V of the Complaint because of Biopure's articles of incorporation, based on Del. Corp. Code 8, §102(b)(7), fails for numerous reasons. Pursuant to §102(b)(7), a Delaware corporation may exempt its directors from certain liability for money damages (not injunctive relief), *e.g.*, duty of due care. However, as conceded,[30] a corporation may ***not*** exempt its directors from liability for violations of the duties of loyalty and good faith, including "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law." 8 Del. C. §102(b)(7).[31]

Here, the misconduct that Plaintiffs allege is the repeated dissemination of false and misleading information and material misrepresentations by failing to disclose material information, waste of corporate assets, etc. ¶¶5, 7, 15, 33-41, 44, 46. Misconduct such as this undisputably implicates the duties of loyalty and good faith. *Malone v. Brincat,* 722 A.2d 5, 10-11 (Del. 1998).

In *Malone,* the Delaware Supreme Court specifically addressed the issue of dissemination of false and misleading information where the director defendants were accused of overstating the financial condition of the company on repeated occasions. Noting that such allegations, if true, are

---

[30] *See* Defs.' Mem. at 14.

[31] Furthermore, §102(b)(7) only applies to directors; thus, it has no application to defendant Kober who is not a director.

"egregious," 722 A.2d at 8, the Court stated:

> Shareholders are entitled to rely upon the truthfulness of all information disseminated to them by the directors they elect to manage the corporate enterprise. Delaware directors disseminate information in at least three contexts: public statements made to the market, including shareholders; statements informing shareholders about the affairs of the corporation without a request for shareholder action; and, statements to shareholders in conjunction with a request for shareholder action. Inaccurate information in these contexts may be the result of a violation of the fiduciary duties of care, loyalty or good faith.

*Id.* at 10-11.

The Court went on to observe:

> The duty of directors to observe proper disclosure requirements derives from the combination of the fiduciary duties of care, loyalty and good faith.
> When the directors disseminate information to stockholders when no stock holder action is sought, the fiduciary duties of care, loyalty and good faith apply. ***Dissemination of false information could violate one or more of those duties.***

*Id.* at 11-12.

Simply put, the Complaint is replete with allegations of misconduct which, examined in the light most favorable to the Plaintiffs, are violations of the Defendants' duties of good faith and loyalty. Accordingly, Del. Corp. Code §102(b)(7), by its express terms, does not apply to Plaintiffs' claims.

Furthermore, the issue is clearly not ripe for resolution on a motion to dismiss. *See Emerald Partners v. Berlin*, 787 A.2d 85, 91-92 (Del. 1991). As the Delaware Supreme Court made clear in *Emerald Partners*, where a plaintiff, such as in the instant case, pleads more than a duty of care, such as bad faith or intentional misconduct, the exculpatory provision is treated as an affirmative defense, which is inappropriate to raise on a motion to dismiss. *Id.* at 92 n.41 ("If the plaintiff were to establish by proof at trial a *prima facie* case of loyalty violation, defendants would then have the

burden to establish entire fairness."). *See also Abbott Labs.*, 325 F.3d at 810 (Delaware law) (stating "§102(b)(7) is an affirmative defense, that breach of loyalty claim falls outside of exculpatory waiver provision, and burden of demonstrating good faith rests with party seeking protection of the statute"); and *McCall v. Scott*, 250 F.3d 997, 1000 n.1 (6th Cir. 2001) (Delaware law, same).

Moreover, even if the exact nature of the Defendants' breaches of fiduciary duty were unclear, which Plaintiffs do not believe they are, at this stage of the litigation the Complaint should not be dismissed based on an exculpatory charter provision. *See Sanders v. Wang*, No. 16640, 1999 WL 1044880, at *11 (Del. Ch. Nov. 8, 1999). In *Sanders*, the court declined to dismiss the plaintiffs' complaint based on an exculpatory provision at the **summary judgment stage,** holding:

> Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly consider exculpatory provisions. The defendants will have the opportunity to present their affirmative defense as the case progresses. At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness.

*Id.* at *11. In the instant action, it would be improper to conclude as a matter of law that the Defendants acted in good faith where Plaintiffs clearly plead intentional acts of wrongdoing and bad faith in the Complaint. Therefore, even if there were some uncertainty as to Plaintiffs' allegations regarding Defendants' breaches of fiduciary duties, this case should not be dismissed based on an alleged exculpatory charter provision.

Here, it would be improper to dismiss Plaintiffs' claims based on Del. Corp. Code §102(b)(7). Plaintiffs have clearly alleged facts implicating bad faith and violations of the duty of loyalty, including dissemination of false and misleading statements by failing to disclose material information, and Defendants have yet to demonstrate that they acted in good faith. *See Kahn v. Roberts*, No. 12324, 1994 WL 70118, at *8 (Del. Ch. Feb. 28. 1994) (citing *Desert Equities v.*

-34-

*Morgan Stanley Leveraged*, 624 A.2d 1109, 1208-09 (Del. 1993)) (declining to dismiss fiduciary duty claims based on Delaware exculpatory provision, since "[w]hether or not the directors acted in bad faith in approving the [transaction] is a question of fact not reached at [the pleadings] stage"). Consequently, the Defendants' Motion to Dismiss based on Biopure's articles of incorporation should be denied.

## IV.    CONCLUSION

Plaintiffs have demonstrated that at the time this action was instituted any demand on the Board of Biopure to initiate this lawsuit would have been a futile and wasteful act. Under these circumstances, Delaware states that such a demand upon a company's Board of Directors is not required. Moreover, for the purposes of a Rule 12(b)(6) motion, Plaintiffs have more than adequately pled the individual causes of action. Therefore, Plaintiffs respectively urge the Court to deny the Defendants' Motion to Dismiss in its entirety.[32]

DATED: November 12, 2004.                    Respectfully submitted,

                                             /s/ Timothy L. Miles
                                             _____
                                                 By: Timothy L. Miles

                                             Douglas S. Johnston, Jr. (*pro hac vice*)
                                             George E. Barrett (*pro hac vice*)
                                             Timothy L. Miles (*pro hac vice*)
                                             BARRETT, JOHNSTON & PARSLEY
                                             217 Second Avenue, North
                                             Nashville, TN 37201
                                             Telephone: 615/244-2202
                                             Facsimile: 615/252-3798
                                             djohnston@barrettjohnston.com

---

[32] While Plaintiffs are confident that the Complaint satisfies the applicable pleading standards, if the Court determines that Plaintiffs have not adequately pled the futility demand or their causes of action, leave to amend should be granted.

gbarrett@barrettjohnston.com
tmiles@barrettjohnston.com

Brian J. Robbins
Jeffrey P. Fink (*pro hac vice*)
ROBBINS UMEDA & FINK, LLP
1010 Second Avenue, Suite 2360
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991
robbins@ruflaw.com
fink@ruflaw.com

Plaintiffs' Co-Lead Counsel

Mary T. Sullivan, BBO #487130
SEGAL ROITMAN & COLEMAN
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: 617/742-0208
Facsimile: 617/742-2187

Plaintiffs' Liaison Counsel

James G. Stranch
BRANSTETTER, KILGORE, STRANCH &
JENNINGS
227 Second Avenue North
Nashville, TN 37201
Telephone: 615/254-8801
Facsimile: 615/255-5419

Plaintiffs' Counsel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by regular mail on November 12, 2004.

/s/ Timothy L. Miles
Timothy L. Miles

G:\Biopure\Motions - Opps\Motion to Dismiss\Oppostion to MTD.wpd