# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

IN RE BIOPURE CORPORATION    )    **Master Docket No. 1:04-cv-10177 (NG)**
DERIVATIVE LITIGATION    )
    )
    )    **Assigned to Judge Nancy Gertner**
    )
    )    **Magistrate Judge Alexander**

## COMPENDIUM OF UNREPORTED AUTHORITIES
### CITED IN DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

Robert A. Buhlman, BBO #554393
Eunice E. Lee, BBO #639856
Michael D. Blanchard, BBO #636860
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

**Case**

**Tab**

*Apple Computer, Inc. v. Exponential Tech., Inc.*, No. 16315, 1999 WL 39547
(Del. Ch. Jan. 21, 1999) ........................................................................1

*Bodkin v. Mercantile Stores Co., Inc.*, No. 13770, 1996 WL 652763 (Del. Ch.
Nov. 1, 1996) ........................................................................................2

*Geinko v. Padda,* No.00 C 5070, 2002 WL 276236 (N.D. Ill. Feb. 27, 2002) ...................3

*Decker v. Clausen,* Nos. Civ.  A. 10,684 & 10,685, 1989 WL 133617 (Del. Ch.
Nov. 6, 1989) ........................................................................................4

*Demoulas v. Demoulas Super Markets, Inc.*, No. 033741BLS, 2004 WL 1895052
(Mass. Super. Aug. 2, 2004) ..................................................................5

*Dollens v. Zionts*, No. 01 C02826, 2002 WL 1632261 (N.D. Ill. July 22, 2002) ...............6

*Kaltman v. Sidhu,* No. Civ. 3:03-CV-1057-H, 2004 WL 357861 (N.D. Tex. Feb.
26, 2004) ..............................................................................................7

*Lewis v. Fites,* No. Civ. A. 12566, 1993 WL 47842 (Del. Ch. Feb. 19, 1993) ...................8

*Litt v. Wycoff,* No. Civ. A. 19083, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ...............9

*In Re PEC Solutions Securities Litigation,* NO. 03-CV-331, 2004 WL 1854202
(E.D. Va. May 25, 2004) ......................................................................10

*In re Paxson Communication Corporation Shareholders Litigation,* No. Civ. A.
17568, 2001 WL 812028 (Del. Ch. July 12, 2001) ..................................11

*Rattner v. Bidzos*, No. 19700, 2003 WL 22284323 (Del. Ch. Nov. 8, 1999) ...................12

*SSDD Enterprises, Inc. v. Village of Lansing,* No. 95 C 6064, 1996 WL 238931
(N.D. Ill. May 3, 1996) ........................................................................13

*In re Sonus Networks, Inc. Derivative Litigation*, No. 040753BLS, 2004 WL
2341395 (Mass. Super. Sept. 27, 2004) ..................................................14

*Spector v. Sidhu,* No. Civ. 3:03-CV-0841-H, 2004 WL 350682 (Jan. 26, 2004
N.D. Tex.) ..........................................................................................15

*In re Stratus Computer, Inc. Sec. Litigation,* Civ.A. 89-2075-Z, 1992 WL 73555
(D. Mass. March 27, 1992) ..................................................................16

*In re WorldCom, Inc. Sec. Litigation*, No. 02 CIV. 3288, 2003 WL 23022035
(S.D.N.Y. Dec. 1, 2003) ......................................................................17

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for each party electronically, on December 20, 2004.


/s/Michael D. Blanchard
Michael D. Blanchard

# EXHIBIT 1

Not Reported in A.2d                                                                    Page 1
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

c

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.

APPLE COMPUTER, INC., Plaintiff,

v.

EXPONENTIAL TECHNOLOGY, INC., Gordon
Campbell, Donald R. Shriner, George S.
Taylor, Paul Dali and Eddie Kawamura, Defendants.

**No. 16315.**

Jan. 21, 1999.

Jesse A. Finkelstein, and Raymond J. DiCamillo, of
Richards, Layton & Finger, Wilmington, Delaware, for
Plaintiff.

William D. Johnston, and Matthew G. Zaleski, III, of
Young, Conaway, Stargatt & Taylor, LLP, Wilmington,
Delaware; Michael H. Kalkstein, and David S. Elkins, of
Graham & James LLP, Palo Alto, California, for
Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, Chancellor.

**\*1** This is an action by Plaintiff Apple Computer, Inc.
("Apple") against Exponential Technology, Inc.
("Exponential") and its top director/officers (the
"Directors"). [FN1] In its capacity as Exponential
shareholder, Apple seeks (1) to set aside the sale of
Exponential's patent portfolio (allegedly substantially all of
Exponential's assets), (2) to have a custodian appointed to
wind up Exponential's affairs, and (3) to nullify litigation
support agreements with two defendant director/officers and
Exponential's Chief Operating Officer. Exponential and its
Directors argue that Apple's real motivation is to distract
Exponential from its ongoing lawsuit against Apple for
breach of contract brought in California state court (the
"California Action"). Exponential has moved to dismiss or
for partial summary judgment, and seeks to stay these
proceedings.

> FN1. At the relevant times. Gordon
> Campbell was Chairman of the Exponential Board of Directors.
> Donald R. Shriner was Exponential President and
> CEO and a director; George S. Taylor was Chief
> Technical Officer and a director; and Paul Dali and
> Eddie Kawamura were members of the board.
> Exponential and the Directors filed this motion
> together. To simplify the discussion. I refer to
> Exponential to describe their collective position.

I conclude that Apple has adequately pled a *prima facie*
breach of 8 Del. C. § 271 by alleging that Exponential sold
substantially all of its assets, its patent portfolio, without
seeking shareholder approval. Even so, subsequent
shareholder ratification would moot Apple's patent sale
claim. Because it is unclear how the alleged failure of some
Exponential shareholders to date their proxies would affect
the ratification, however, I cannot consider partial summary
judgment on that basis until the parties develop the record
on this discrete question. At the same time, I conclude that a
stay of counts I and II would not jeopardize Delaware
adjudication of those claims, would permit the parties to use
the California Action's evidentiary record on Apple's
purported wrongdoing to assist valuation of Exponential's
allegedly valuable chose in action against Apple, and would
prevent this litigation from disrupting the California Action.
Therefore, I will stay counts I and II pending the California
judge's final judgment.

As for Apple's request for appointment of a custodian, I
conclude that the facts as pled by Apple cannot sustain the
remedy requested. Apple pleads facts showing that
Exponential's management started closing operations in
response to a drastically altered business environment and
that management is currently pursuing a $500 million claim
against Apple. I dismiss the request for appointment of a
custodian for failure to plead facts showing that the
Directors abandoned Exponential.

Apple claims that the litigation support agreements
constitute gift or waste. Similarly, I find that the facts as
alleged by Apple show that the agreements fall well within
the range of reasonable compensation for services.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 2
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

Furthermore, Apple fails to plead particularized facts excusing it from making demand against the board. This claim too must be dismissed.

## I. BACKGROUND

Apple is in the business of manufacturing and selling personal computers, bundled with Apple's proprietary operating system, MacOS. Apple also markets name-brand computer peripherals and software. The company is incorporated and headquartered in California. Chiefly known for its Macintosh, PowerPC and-most recently-iMac computers, Apple runs a distant second to Microsoft Windows, Intel Pentium chip-based machines (the Wintel platform) in the global PC market.

**\*2** Exponential is a privately-held Delaware corporation based in San Jose, California. Until May 15, 1997, Exponential designed and marketed CPUs, specifically PowerPC CPUs, for the PC market. [FN2] Apple was one of Exponential's original investors, its largest shareholder, and biggest customer. In April 1994, Apple purchased 1.5 million shares of Exponential's freely convertible Series A Preferred Stock at $1 per share [FN3] and a warrant granting Apple the right to buy an additional 1.5 million shares of Series A at the same price. At the same time, Apple and Exponential executed an agreement to have Exponential "design, develop, prototype and test, and procure fabrication and assembly of" PowerPC CPUs according to an agreed upon schedule (the "Product Agreement"). [FN4]

> [FN2.] A central processing unit ("CPU") is the microprocessing chip that serves as the "brains" of a PC. "PC" stands for "personal computer." The PowerPC CPU is a reduced instruction set chip ("RISC") designed to serve as the brains of the PowerPC "open standard" hardware architecture jointly developed by IBM. Motorola, and Apple. Apple designed a version of the PowerPC running MacOS. More information on this technology can be found at IBM. *PowerPC Microprocessor product information.* http://www . chips.ibm.com/products/ppc/overview/ (as of Dec. 17, 1998)

> [FN3.] This purchase constituted 25% of Exponential's outstanding preferred shares.

> [FN4.] Compl. ¶ 12.

In October 1996, Exponential and Apple entered into a second agreement setting forth the terms by which Exponential would sell its CPUs to Apple (the "Purchase Agreement"). The parties also modified the delivery schedule appended to the Product Agreement. They agreed that Exponential would deliver a 500 megahertz CPU to Apple by April 1, 1997.

In December 1996, Apple bought 519,480 shares of Exponential Series C Preferred Stock at $3.85 per share and a warrant to buy another 750,000 at the same price. This purchase confirmed Apple's status as Exponential's largest shareholder, giving Apple just under 10% of the voting preferred shares. [FN5] Apple placed one of its employees on the Exponential board.

> [FN5.] Apple believes that its Exponential preferred holdings constituted 9.53% of all outstanding shares if calculated on a fully converted basis. Compl. ¶ 13.

In late March 1997, defendant Donald R. Shriner ("Shriner"), Exponential's President and CEO, wrote Apple's management to inform them that Exponential could not meet its April deadline for developing a 500Mhz CPU and anticipated that the CPU would not be ready until at least September. Both parties are silent as to what transpired immediately afterward, but they agree that on May 22, 1997, Exponential sent its shareholders a letter [FN6] informing them that management had closed Exponential's San Jose facility and would soon decide whether to close the Austin facility as well. Exponential's management blamed Apple for its woes, stating in the letter that Apple refused to work out the parties' problems and forced Exponential out of business by effectively preventing Exponential from selling its CPUs to makers of Apple clones. The letter also stated that Exponential would seek a buyer for its patent portfolio, and Exponential did so. It sold its forty-five odd patents by auction to S3, a graphics chip maker and Delaware corporation, for over $10 million.

Not Reported in A.2d                                                                                                Page 3
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

FN6. Apple argues that the contents of Exponential's letter to its shareholders is not properly before the Court because it is attached to Exponential's Dorris Affidavit and not the complaint. Although I include the facts contained in the letter as background, the details contained in the writings do not alter the core facts pled in Apple's complaint and, furthermore, Apple references the letter in its complaint: (1) "Campbell informed Exponential's shareholders in writing that Exponential had been shut down permanently;" and (2) "Exponential announced that it had auctioned off the Patent Portfolio." Comp. ¶¶ 15, 16. Therefore, under *In re Santa Fe Pacific Corp. Shareholders Litig.,* it is proper for me to examine the contents of the letter, so long as I do not rely on its truthfulness. Del.Supr., 669 A.2d 59, 68-70 (1995) ("Without the ability to consider the document at issue. 'complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure." ') (*citing Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991)). Even without the embellished facts, the core facts relevant to the disposition of this motion are contained in Apple's complaint.

Exponential is using those funds to pay off creditors and to underwrite a lawsuit it filed against Apple on September 15, 1997, in California Superior Court. [FN7] In the California Action, Exponential alleges Apple forced it out of business, claiming breach of contract, breach of fiduciary duty, and intentional and negligent interference with contractual relations and with prospective economic advantage. Exponential seeks damages in the amount of $500 million.

FN7. *Exponential Tech. Inc. v. Apple Computer, Inc.,* Cal. Sup.Ct. County of Santa Clara, Case No. CV768801.

**\*3** Concurrently, Exponential is winding up its CPU design-related operations. Exponential has laid off its employees and closed its doors. Effective September 24, 1997, its board approved litigation support agreements with

defendants Donald Shriner and Gordon Campbell, Exponential Chairman ("Campbell"), as well as nondefendant Stephanie Dorris, Chief Financial Officer ("Dorris"). [FN8] The support packages cost Exponential a minimum of $23,200 and maximum of $66,000 per month. The agreement entitles Exponential to a minimum of 342 and maximum of 502 hours of work per month. Exponential prepaid Campbell, Shriner, and Dorris for a year's worth of their minimum salary under the litigation support agreements. (*See* Table 1 below.)

FN8. Shriner and Campbell receive $5,600 per month for thirty-two hours of work. Ms. Dorris is charged with not only litigation support, but continuing the winding up process. She is paid $12,000 per month for ninety-six hours work. If any one of them exceeds his or her hourly quota, each has the right to earn overtime pay at $125 per hour, but each individual's monthly salary is capped at $22,000 per month.

```
-------------------------------------------------------
Table 1
    Breakdown of Monthly Payments
under Litigation Support Agreements
            initial    initial    max
hours   max  salary    total      total
            hours      salary *
overtime     overtime  hours
salary
**
Shriner      32                $ 5,600      131
$ 16,400        163    $ 22,000
Cambell      32                  5,600      131
16,400          163    22,000
Dorris       96               12,000        80
10,000          176    22,000
Grand        160           $ 23,200        342
$ 19,600        502    $ 66,000
 Total
FN* Shriner & Campbell's initial salary
is $175 per hour. Dorris' initial
  hourly wage is $125.
FN* * All three earn overtime at $175
```

Westlaw.

Not Reported in A.2d
1999 WL 39547 (Del.Ch.)
(Cite as: 1999 WL 39547 (Del.Ch.))

per hour.

--------------------------------------------------------------------------

Apple filed a § 220 action in this Court seeking to inspect Exponential's books and records. Exponential reached agreement with Apple and turned over certain books and records. On April 13, 1998, Apple filed this action. Responding to Apple's claim that shareholder approval was required of the patent portfolio sale under 8 *Del. C.* § 271, Exponential asked its shareholders to ratify the sale. A majority of the common stock shareholders of record, and of the aggregated preferred stock (Series A, B, and C) shareholders of record, delivered written consents to Exponential ratifying sale of the patent portfolio. Some of the shareholders failed to date the consents.

## II. PARTIES' CONTENTIONS

Apple asserts three basic claims: (1) Exponential failed to allow its shareholders to vote on its sale of the patent portfolio; (2) Exponential's management abandoned the company and a custodian should be appointed; and (3) the litigation support agreements constitute waste of Exponential's assets. The following details the nature of Apple's claims, the parties' positions as to the motion to dismiss each claim, and my decision as to each claim.

### A. Sale of the Patent Portfolio

#### 1. *Apple's Claims*

Apple pleads three versions of the unlawful sale of assets claim. Count I alleges that Exponential's sale of the patents violated 8 *Del. C.* § 271 because the patents constituted "substantially all of its assets" and the sale was not put to the shareholders for a vote, much less approved by "a majority of stockholders entitled to vote thereon." [FN9] Exponential's certificate of incorporation tracks the language of § 271 and Apple's count II claims that the sale breached that provision in Exponent's certificate. Count III alleges that Exponential's management breached its fiduciary duties and violated the shareholder franchise under *Blasius* [FN10] by denying the shareholders the opportunity to vote on the sale.

FN9. 8 *Del. C.* § 271.

FN10. *Blasius Indus., Inc. v. Atlas Corp.*, Del. Ch., 564 A.2d 651 (1988).

### 2. *Exponential's Grounds for Dismissal/Partial Summary Judgment*

**\*4** In its motion to dismiss, Exponential attacks the patent sale claims in four ways. First, it alleges that the sale did not constitute a sale of all or substantially all of Exponential's assets as a matter of law, so no shareholder right to approve the transaction arose. Second, it argues that Apple's failure to join S3 as a party to this action constitutes grounds for dismissal. Third, Exponential asserts that the shareholders' ratification of its patent portfolio sale after the fact moots counts I, II, and III and constitutes grounds for rendering summary judgment in its favor on those claims. Finally, Exponential alleges that as to the Directors, Apple has pled no facts showing breach of the duty of loyalty; therefore, Exponential's § 102(b)(7) certificate of incorporation provision moots all damages claims asserted against the Directors.

### 3. *Analysis*

In evaluating a complaint subject to a motion to dismiss, I must deny the motion unless I am reasonably certain that the plaintiff cannot recover under any set of facts that could be proven to support the action. [FN11] Furthermore, I must accept all well-pled facts as true and grant all reasonable inferences drawn from the pleadings in favor of the plaintiff. [FN12] Bearing in mind that plaintiff must give defendant only fair notice of the claim and that I am to liberally construe the complaint, my task is to dismiss only those claims that are deficient as a matter of law.

FN11. *See Rabkin v. Philip A. Hunt Chem Corp.*, Del.Supr., 498 A . 2d 1099, 1104 (1985).

FN12. *See Grobow v. Perot*, Del.Supr., 539 A.2d 180, 188 n.6 (1988).

As a preliminary matter, I note that counts I and II are identical for the purposes of this motion to dismiss. The certificate's language tracking § 271 creates a claim

Not Reported in A.2d                                                                    Page 5
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

differing in no material way from the statutory claim described in count I. Both are directed against Exponential, not the Directors. On the other hand, count III's apparent invocation of *Blasius* review attempts to elevate the same factual allegations into more than a claim for breach of the duty of care and names the Directors, not Exponential, as the wrongdoers. That implication deserves scrutiny.

Apple correctly states that a board's failure to comply with § 271 (if proven at trial) is a breach of fiduciary duty. Not all breaches of a shareholder vote-related statutory duty, however, invoke *Blasius*. [FN13] *Blasius* recognized that the shareholder franchise is a cornerstone of corporate democracy and cannot be subjugated to the board's desire to entrench itself. [FN14] *Blasius* and similar cases involve tactical maneuvers by incumbent boards seeking to ward off hostile acquirers and defeat dissident slates. In *Blasius* itself, the incumbent board appointed new members at the eleventh hour to preclude shareholders from filling those seats by electing a hostile acquirer's candidates . [FN15] Similarly, in *Aprahamian v. HBO & Co.,* the directors delayed a shareholder meeting to prevent the incumbent directors' electoral defeat. [FN16] In these cases, the board's duty of loyalty was not necessarily implicated in the traditional sense of self-dealing, but the potential for entrenchment in the face of a hostile acquisition-the type of situation also implicating the *Unocal* standard of intermediate review-did arise. [FN17] Therefore, the Court has carefully scrutinized board action implicating shareholder franchise rights in these situations because of the inherent possibility that the board will frustrate a shareholder vote in order to protect itself. [FN18]

> **FN13.** *See, e.g., Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1377 (1996) (not applying *Blasius* because board took action affecting shareholder franchise in conjunction with shareholder approval of transaction).

> **FN14.** *Blasius,* 564 A.2d at 659 (explaining "[w]hy the deferential business judgment rule does not apply to board acts taken for the primary purpose of interfering with a stockholder's vote, even if taken advisedly and in good faith.").

> **FN15.** *See id.* at 663 (enjoining board's appointment of new directors because it impermissibly interfered with shareholder franchise by preventing shareholders from electing a majority of dissident directors at upcoming election).

> **FN16.** Del. Ch., 531 A.2d 1204, 1206-07 (1987) (enjoining board from delaying director election where board's motivation was to prevent incumbents' defeat by dissident slate).

> **FN17.** *See Stroud v. Grace,* Del.Supr., 606 A.2d 75, 92 n.3 (1992) ( "Board action interfering with the exercise of the franchise often arose during a hostile contest for control where an acquiror launched both a proxy fight and a tender offer. Such action necessarily invoked both *Unocal* and *Blasius.* The two 'tests' are not mutually exclusive because both recognize the inherent conflicts of interest that arise when shareholders are not permitted free exercise of their franchise.").

> **FN18.** *See Aprahamian,* 531 A.2d at 1206-07 ("In the interests of corporate democracy, those in charge of the election machinery of a corporation must be held to the highest standards in providing for and conducting corporate elections. The business judgment rule therefore does not confer any presumption of propriety on the acts of the directors in postponing the annual meeting.").

**\*5** Here, the patent sale for which a shareholder vote was allegedly required could not serve as an opportunity for entrenchment. It did not invoke either a traditional duty of loyalty conflict or an inherently suspect defense against a hostile bid or election of an insurgent slate. [FN19] A sale of assets is a business decision that might trigger § 271 obligations. In the absence of a hostile acquirer or some other motivation for disenfranchising the shareholders, however, a board's unintentional failure to fulfill its supposed § 271 obligations, while perhaps constituting a breach of fiduciary duty, does not ordinarily trigger *Blasius* review. [FN20] Therefore, Apple has failed to meaningfully distinguish count III's alleged fiduciary duty breach from the

Not Reported in A.2d                                                            Page 6
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

statutory duty-of-care breach alleged in counts I and II. [FN21] Consequently, I treat count III as if it repleads count I (and count II), adding the Directors as defendants.

> FN19. *See Stroud,* 606 A.2d at 91 ("The stringent standards of review imposed by *Stahl* and *Blasius* arise from questions of divided loyalty, and are well-settled.").

> FN20. *See Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1376 (1996) (holding that application of the 'compelling justification' standard set forth in *Blasius* is appropriate only where the 'primary purpose' of the board's action is to interfere with or impede exercise of the shareholder franchise).

> FN21. *Cf. Unitrin, Inc. v. American Gen. Corp.,* Del.Supr., 651 A.2d 1361, 1378-79 (1995) (holding that where a board deliberately employed legal strategies designed to frustrate or completely disenfranchise shareholders, this conduct violated Delaware law, but where the board's primary purpose was not to interfere with or impede exercise of the shareholder franchise, *Blasius* review was inappropriate). Based on *Unitrin* and *Stroud,* I distinguish Exponential's alleged breach of § 271 from a good faith breach of the duty of loyalty in *Blasius.* First of all, in *Blasius,* the offensive conduct, packing the board, was arguably taken in good faith only because the board misapprehended the law. Secondly, it was designed to disenfranchise the shareholders. Here, there was no such wrongful purpose involved in the sale of the patents.

My first task in evaluating Apple's allegation that Exponential and the Directors breached § 271 is to determine whether Apple pleads facts *prima facie* establishing that the patent sale required prior shareholder approval. To establish the framework of what type of asset sales fall under § 271, Exponential quotes *Signal Companies:*
> The [*Signal* ] Court stated that 'all or substantially all' of the assets are involved if:
> the sale is of assets quantitatively vital to the operation of

the corporation *and* is out of the ordinary and substantially affects the existence and purpose of the corporation. [FN22]

> FN22. Defs.' Op. Br. at 16 (quoting *Gimbel v. Signal Cos.,* Del. Ch., 316 A.2d 599, 606 (1974)).

Exponential argues that under this standard, Apple's pleadings are conclusory. Exponential maintains that Apple fails to credit Exponential with the value of its California Action and that Apple's claim that the sale of the patents struck at the heart of Exponential's business purpose ignores the fact that Apple's breach of contract already irreversibly altered Exponential's purpose. Although Exponential may prevail on these factual arguments at trial, they constitute just that-factual arguments. Arguing that Apple's pleadings are conclusory because the claims fail under the fact scenario portrayed by Exponential misinterprets Apple's pleading burden.

Apple has stated that the $10 million sale of the patents precluded Exponential from continuing in the CPU design business and constituted the sale of Exponential's most valuable asset. Apple's pleadings give notice of this claim and if I adopt its version of the facts at trial, it is within the realm of realm of reasonable outcomes that I would agree that the patent sale should have been approved by the shareholders. For instance, Apple may be able to prove that the future, contingent value of the California Action was negligible and, furthermore, show that despite the drastically changed operating environment within which Exponential decided to sell its portfolio, the patent sale itself constituted a watershed event that fundamentally altered Exponential's business mission from designing CPUs to litigating the California Action. Under that set of facts, Apple might reasonably prevail.

**\*6** Exponential also seeks dismissal of the patent sale claims because Apple failed to join S3 as a party to this action. First, I find that S3's participation in this litigation is necessary only to the extent that Apple seeks rescission of the sale. If Apple seeks that relief, it must take the appropriate steps to add S3 to this action. I cannot, however, justify dismissing the entire claim at this juncture because of this potential shortcoming. [FN23]

Not Reported in A.2d                                                                                          Page 7
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

FN23. *See Russell v. Morris,* Del. Ch., C.A. No. 10009, Chandler, V.C. (Feb. 14, 1990), mem. op. at 15 (holding case "is not dismissed under Rule 19(b) [where joinder is not feasible] upon failure of a plaintiff to join an indispensable party.").

Next, turning for a moment to the summary judgment standard, [FN24] Exponential argues that its post-transaction ratification of the patent portfolio sale moots Apple's claims. This argument requires me to interpret our decisions on the issue of ratification. [FN25] Our law divides improper acts by the board into two categories: void and voidable. Void acts, acts that are *ultra vires,* fraudulent, gifts, or waste, are legal nullities incapable of cure. Voidable acts, acts performed in the interest of the company, but beyond the authority of management, are also (if challenged by a shareholder or other person with standing) cause for legal relief. The difference is that if the shareholders ratify the voidable act after the fact, the ratification cures the defect and relates back to moot all claims. [FN26] Apple argues that failure to allow a shareholder vote on the sale of the patent portfolio violated the shareholders' statutory § 271 rights and, thus, was a void act that cannot be later cured. Exponential points out that Apple fails to plead any facts showing that Exponential acted in bad faith by not fulfilling its purported § 271 obligations. This leads Exponential to conclude that the patent sale claims, if viable, were mooted by the shareholders' ratification. Exponential cites *Michelson v. Duncan* as support for this position:

FN24. Summary judgment is granted where the movant shows that no material facts are in dispute and the movant is entitled to judgment as a matter of law. Ch. Ct. R. 56. The movant's burden in this instance shall be to establish that ratification moots the claim as a matter of law (the legal standard) and show that the facts uncontrovertibly indicate that the patent sale was ratified by a majority of common and a majority of preferred shareholders (compliance with the standard). *See Hurtt v. Goleburn,* Del. Supr ., 330 A.2d 134, 135 (1974) (interpreting movant's burden under Superior Court's virtually identical Rule 56 and holding that

moving defendant in medical malpractice case had to establish standard of care for medical profession (a mixed question of fact and law) and to establish that the facts undisputedly showed defendant's compliance with that standard).

FN25. For a discussion of ratification issues, see *In re Wheelabrator Tech., Inc. Shareholder Litig.,* Del. Ch., 663 A.2d 1194 (1995).

FN26. *See Michelson v. Duncan,* Del.Supr., 407 A.2d 211, 218-19 (1979).

It is the law of Delaware, and general corporate law, that a validly accomplished shareholder ratification relates back to cure otherwise unauthorized acts of officers and directors.

\* \* \*

It is only where a claim of gift or waste of assets, fraud, or *ultra vires* is asserted that a less than unanimous shareholder ratification is not a full defense.

\* \* \*

If shareholders have approved an otherwise voidable act, their approval extinguishes any claim for losses based on prior lack of authority of the directors to undertake such action. [FN27]

FN27. *Id.* at 219-20.

Despite the seemingly dispositive language in *Michelson,* our Supreme Court has not uniformly held that post-transaction ratification moots a shareholder claim based on a *voidable* act. Those instances where the Court allowed a ratified transaction to be disputed in court involved, however, the selfish acts of a majority shareholder, acts that implicated the duty of loyalty. [FN28] Here, that is not the case. Apple does not allege facts showing that Exponential's management intentionally sold off the patent portfolio to entrench itself or sold the patent to an entity controlled by management. In the light most favorable to Apple, the facts show that Exponential unintentionally, and in good faith, sold the patent portfolio without seeking shareholder approval.

Not Reported in A.2d                                                                                    Page 8
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

FN28. *See, e.g., Kahn v. Lynch Comm. Sys., Del.Supr., 638 A.2d 1110 (1994); Rosenblatt v. Getty Oil Co., Del.Supr., 493 A.2d 929 (1985)* (shifting burden of persuasion under entire fairness to plaintiff to show transaction was unfair where defendants' obtained shareholder ratification of deal).

**\*7** Our Supreme Court has also held that where a board executes its functions in a grossly negligent manner, that behavior rebuts the business judgment rule and subjects the underlying transaction to entire fairness review. [FN29] I conclude that Apple has pled facts that sufficiently allege Exponential completely failed to even attempt to comply with its statutory obligation to seek shareholder approval under § 271. If true, this allegation constitutes gross negligence. [FN30] Therefore, without shareholder ratification, the board's breach of its duty of care would subject this sale to entire fairness review and the possibility of rescission or rescissory damages (putting aside the Directors' § 102(b)(7) defense). Nonetheless, Exponential's conduct, because it was not in bad faith, constitutes a voidable, not a void act.

FN29. *See Cede & Co. v. Technicolor, Inc., Del.Supr., 634 A.2d 345, 371 (1993)* ("A breach of either the duty of loyalty or the duty of care rebuts the presumption that the directors have acted in the best interests of the shareholders, and requires the directors to prove that the transaction was entirely fair.").

FN30. If a board's uninformed, hasty approval of a merger constitutes gross negligence in breach of its duty of care under *8 Del. C. §§ 141* & *251(b)*, it follows that a failure to hold a shareholder vote under § 271 (and § 141) would constitute gross negligence in violation of the board's duty of care under that statute. *See Smith v. Van Gorkom:* In the specific context of a proposed merger of domestic corporations, a director has a duty under *8 Del. C. § 251(b)*, along with his fellow directors, to act in an informed and deliberate manner in determining whether to approve an agreement of merger before submitting the proposal to the stockholders.

Certainly in the merger context, a director may not abdicate that duty by leaving to the shareholders alone the decision to approve or disapprove the agreement.

Del.Supr. 488 A.2d 858, 873 (1985) (citations omitted).

Accordingly, since Apple has alleged facts that, at the motion to dismiss stage, appear sufficient to rebut the business judgment rule, the question is what effect will shareholder ratification have on the transaction? I understand the language in *Michelson* to support the proposition that ratification moots a good faith error such as alleged here. Even if the Directors (and Exponential) acted in a grossly negligent fashion by ignoring § 271, subsequent ratification of the patent sale by a majority of both common and preferred shareholders would invoke judicial review under the business judgment rule.

That conclusion seems particularly apt here because the harm alleged by Apple was precisely the *opportunity* to vote on the patent sale. [FN31] Assuming § 271 was triggered, but overlooked, the ratification vote itself goes a long way in remedying the harm incurred by the erstwhile disenfranchised shareholders. Thus, I conclude that Exponential's board has already taken the step most appropriate to cure the injury alleged by Apple.

FN31. To adopt Apple's argument that the patent sale was void would in effect create a *per se* rule that a board's violation of § 271 could never be cured. This Court eschews inflexible rules that cannot discriminate good faith acts from disloyal conduct. *See Blasius Indus., Inc. v. Atlas Corp., Del. Ch., 564 A.2d 651, 661 (1988)* ("In two recent cases dealing with shareholder votes, this court struck down board acts done for the primary purpose of impeding the exercise of stockholder voting power. In doing so, a *per se* rule was not applied.").

Accordingly, Apple must resort to claims of gift or waste to overcome the presumption of validity that would cloak the ratified patent sale. As to a potential waste or gift claim, Apple admitted in its complaint that the patents were sold at

Not Reported in A.2d                                                                                      Page 9
1999 WL 39547 (Del.Ch.)
(Cite as: 1999 WL 39547 (Del.Ch.))

auction for more than $10 million and has not alleged that the transaction constituted gift or waste. Therefore, shareholder ratification would moot counts I, II, and III.

That conclusion is hypothetical, however, because Apple raises a challenge to Exponential's ratification vote. Apple charges that the signers of 3,385,723 of the preferred stock consents voting in favor of ratifying the patent sale neglected to date their consents. 8 Del. C. § 228(c) requires that "[e]very written consent shall bear the date of signature of each stockholder." That condition is imposed in order to facilitate enforcement of § 228(c)'s sixty-day time limit for returning consents (measured from return of the first signed consent to the last). [FN32] Exponential does not dispute Apple's factual challenge, but argues that there is no possibility that the sixty-day limit was not fulfilled; therefore, Exponential urges that I should not accord Apple's technical dispute any weight. I cannot agree. I make no decision either way as to whether the undated consents are valid, but defer resolution of this issue to a later date. The parties need time to develop a record on this issue and to provide briefs on the legal implications of § 228(c)'s date requirement within the context of *ex post* shareholder ratification. For the moment, I cannot render summary judgment against counts I, II, and III when the factual basis for the shareholders' ratifying vote is controverted.

> FN32. That section commands:
> Every written consent shall bear the date of signature of each stockholder or member who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the earliest dated consent delivered in the manner required by this section to the corporation, written consents signed by a sufficient number of holders or members to take action are delivered to the corporation by delivery to its registered office in this State, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders or members are recorded. Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt

requested.
8 Del. C. § 228(c).

**\*8** Finally, Exponential argues that counts I, II, and III should be dismissed as moot under 8 Del. C. § 102(b)(7). Apple has not alleged any facts that indicate that the Exponential board's failure to seek shareholder approval was anything more than a good faith error. [FN33] To the extent that counts I, II and III seek monetary damages against the individual Directors, the claims are dismissed. [FN34]

> FN33. *See Arnold v. Society for Savings Bancorp, Del.Supr., 650 A.2d 1270, 1286-88 (1994)* (applying § 102(b)(7) to disclosure claims where plaintiff failed to plead facts implicating duty of loyalty); *Green v. Phillips,* Del. Ch.. C.A. No. 14436, Jacobs, V.C. (June 19, 1996), mem. op. at 14 (dismissing waste claim under § 102(b)(7) because plaintiff failed to plead facts showing board was interested in transaction or otherwise acting in bad faith).

> FN34. Count III is brought solely against the Directors and is accordingly dismissed.

* * *

Count III fails to state a *Blasius* claim. Counts I, II, and III are dismissed under § 102(b)(7) as against the individual Directors.

*B. Business Abandonment & Appointment of a Custodian*

*1. Apple's Claims*

Counts IV and V of Apple's complaint ask the Court to appoint a custodian to manage Exponential. Count IV asserts a claim under 8 Del. C. § 226(a)(3) and Count V asserts an identical claim arising from Exponential's bylaws, which track § 226(a)(3). Apple alleges that Exponential's board of directors has abandoned its design and marketing of CPUs and taken steps to wind up those operations. Apple also urges me to find that Exponential's pursuit of the California Action does not constitute a legitimate business activity for the purposes of § 226(a)(3). As to the latter

Not Reported in A.2d                                                      Page 10
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

argument, Apple draws an analogy to situations where courts have refused to assert personal jurisdiction over juridical persons whose only business in the state was to appear in litigation. [FN35] Apple believes that this Court should adopt the same reasoning that pursuing the California Action is not a business, in determining whether or not Exponential's Directors have abandoned its businesses.

> FN35. *See. e.g., Harman v. Stillwell,* Colo.App., 944 P.2d 665, 669 (1997) ("The few decisions from other jurisdictions upon the point support the conclusion that the commencement and maintenance of a lawsuit do not constitute transacting business for the purpose of a long-arm or similar jurisdictional statute.").

2. *Exponential's Grounds for Dismissal*

Exponential seeks to dismiss Apple's claim for failure to plead any facts supporting a crucial element of the claim. Exponential asserts that it may affirmatively defeat a § 226(a)(3) claim by showing either that it is in the process of winding up certain of its operations and paying off debts or in the process of pursuing the California Action. Either way, it argues, Exponential is conducting legitimate business activities that preclude a finding that the Directors have abandoned Exponential.

3. *Analysis*

As explained below, I dismiss counts IV and V because Apple alleges facts that, under every set of provable circumstances and reasonable inferences therefrom, fundamentally contradict the essential elements of an abandonment claim. The elements of Apple's claim are contained in the language of 8 *Del. C.* § 226(a)(3) itself, which requires the plaintiff to show "the corporation has abandoned its business and has failed within a reasonable time to take steps to dissolve, liquidate or distribute its assets." Former Chancellor Allen noted that the operative words of § 226 are "abandoned its business." [FN36] He analyzed the phrase in two parts:

> FN36. *Giancarlo v. OG Corp.,* Del. Ch., C.A. No.

10669, Allen, C. (June 23, 1989), mem. op. at 4-6.

The first part asks, to what do the words "its business" refer?

\* \* \*

Our law, expressly since 1967 (*see* Section 102(a)(3)) and implicitly from a much earlier date, has recognized that a corporation may validly be formed in order to "engage in any lawful activity." It would be a mistake and unwarranted to conclude that the legislature intended to insert the concept of a binding, limiting, original intention through the device of Section 226(a)(3) at the very time that it amended Section 102(a)(3).
**\*9** Accordingly, I conclude that "its business" does not refer to any original intention more narrow than the purposes clause of a corporation's charter. Rather, in my opinion, "its" business refers to any business within the purposes clause of the corporation's charter in which the corporation purports to be engaged.
Thus, it seems to me the dispositive question is not whether the present situation with respect to OG was or was not within the plan of its originators, but whether the corporation is engaging in any business whatsoever presently or has it "abandoned" all business. [FN37]

> FN37. *Id.*

Thus, as construed in *OG Corp.,* business is to be widely construed to include all legitimate activities-investing, manufacturing, providing services, etc.-in which a corporation may engage.

Former Chancellor Allen went on to investigate the second aspect of business abandonment: What constitutes abandonment? He concluded that it meant the directors had ceased to manage the assets of the company and were not engaging in any activities designed to either continue in business or liquidate. [FN38] What is implied in *OG Corp.,* but frequently overlooked, is that the act of liquidating does not demonstrate that management has abandoned its corporation. It shows that management is engaging in the process of terminating its businesses. A defendant who shows at trial that the corporation is winding up can affirmatively defend against a request for appointment of a

custodian. Of course, if the liquidation is taking place in an illegal or wrongful manner, that wrongdoing may disqualify the liquidation as legitimate "business" under the statute, but any wrongful business activity-such as illegal gambling-would run afoul of the corporation's charter as well as 8 *Del. C.* § 102(a)(3), and presumably would be disqualified as "business" under § 226(a)(3). [FN39]

> **FN38.** *Id.* at 7-8 ("If the directors cease to manage the assets committed to them, if they abandon the business, they may be said to forfeit their claim to control those assets.").

> **FN39.** *See Rosan v. Chicago Milwaukee Corp.,* Del. Ch., C.A. No. 10526, Chandler, V.C. (Feb. 6, 1990), mem. op. at 13 (noting that defendant corporation's charter "authorized it to engage in any 'lawful act or activity for which corporations may be organized'").

In short, *OG Corp.* requires a plaintiff making a § 226(a)(3) claim to show that the corporation is engaging in no legitimate business activity. The claim must fail if the defendant directors can demonstrate to the contrary, *i.e.,* show that the business is still active (or passively investing) in one legitimate line of business or is in the process of liquidating. [FN40] In the context of evaluating a motion to dismiss, I may dismiss a claim if the plaintiff includes in its pleadings facts that incontrovertibly constitute an affirmative defense to a claim. [FN41]

> **FN40.** Even if the plaintiff meets this burden, the corporation has a "reasonable time" to begin liquidating. 8 *Del. C.* § 226(a)(3).

> **FN41.** *Wolf v. Assaf,* Del. Ch., C.A. No. 15339, Steele, V.C. (June 16, 1998), mem. op. at 8-9 (citing *Kansas Reinsur. Co. v. Congressional Mort. Corp. of Texas,* 20 F.3d 1362, 1366 (5th Cir.1987) for the proposition that "when a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate").

Apple's complaint is flawed in two distinct ways. First,

Apple attempts to discredit Exponential's pursuit of the California Action as a legitimate business activity. It makes the novel, but fundamentally inappropriate, analogy to cases involving a court's assertion of personal jurisdiction over somebody whose only "business" in the state has been to pursue a law suit. State courts outside Delaware have held that a juridical person who faithfully appears in court to resolve a dispute has not availed itself of the protections of that jurisdiction and, therefore, is not amenable to personal jurisdiction. [FN42] I do not quibble with the proposition that due process considerations preclude a court from bootstrapping personal jurisdiction for a second lawsuit onto a litigant's appearance in earlier or ongoing litigation. That rationale, however, is completely inapposite to the issue before me.

> **FN42.** *See Harman v. Stillwell,* Colo.App., 944 P.2d 665, 669 (1997); *Ohio Cas. Ins. Co. v. First Nat'l Bank.* Okla.Supr., 425 P.2d 934, 938 (1967) (holding that a foreign corporation was not "doing business" when it engaged in litigation in the state in determining the issue of jurisdiction and process in a suit filed against the foreign corporation.).

**\*10** Indeed, there is no need to draw an answer to this issue from analogy to jurisdictional disputes in sister states. The meaning of business under § 226 has been construed to include any activity permissible under a corporation's charter and 8 *Del. C.* § 102(a)(3). Pursuit of a legal claim in court is well within the range of acceptable-one may even say, common-activities in which corporations engage. Therefore, by admitting to Exponential's pursuit of the California Action and its execution of litigation support agreements with the two director defendants and its COO, Apple's own pleading contains an affirmative defense to its § 226(a)(3) claim: Exponential is engaging in a legitimate business activity.

Secondly, Apple takes the mistaken tack of showing Exponential's winding up process as proof that Exponential is in need of a custodian. As I stated before, the act of winding up or liquidating is grounds for *not* appointing a custodian. Apple pleads that Exponential laid off its employees, ceased operations, informed shareholders of the shutdown, and sold its patent portfolio, without pleading

Not Reported in A.2d                                                                                      Page 12
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

any (nonconclusory) facts alleging wrongdoing. Once again, Apple has alleged facts constituting an affirmative defense to § 226(a)(3). Those winding up functions show that Exponential has *not* failed within a reasonable period to take steps to dissolve, liquidate, or distribute its assets. The fact that Apple objects to Exponential's approach to winding up-in particular, Exponential's decision to pursue the California Action before finally liquidating-is of no import. [FN43] It takes more than allegations that a business is closing down in a reasonable fashion to state a claim under § 226(a)(3).

> FN43. As discussed later (§ III.C.3), Apple's references to Exponential's balance sheet and insinuations of wrongful asset transfers are conclusory.

* * *

By admitting that Exponential is winding up certain operations and continues to pursue the California Action, Apple has pled facts that fatally undercut its § 226(a)(3) claim. Accordingly, I dismiss counts IV and V.

*C. Litigation Support Agreements*

1. *Apple's Claims*

Apple asserts two claims in count VI. First, it insinuates that the Directors are frivolously expending Exponential's dwindling resources. Second, it alleges that Exponential wasted corporate assets by agreeing to the litigation support agreements.

2. *Exponential's Grounds for Dismissal*

Exponential points to the balance sheet used by Apple to document Exponential's supposedly dwindling asset base. It argues that the same sheet shows Exponential paid down its outstanding liabilities and increased shareholder equity in the period during which Apple alleges that Exponential's assets dwindled. As to the litigation support agreements, Exponential contends that Apple has failed to demonstrate that the board was incapable of fairly and independently examining Apple's derivative waste claim. Exponential adds that the agreements are so reasonable that no Court could

ever find them to constitute waste.

Apple responds to the demand futility argument by insisting that a majority of the board members, namely, Campbell, Shriner, and Taylor, who approved the agreements, were not disinterested. Exponential admits that two directors, Campbell and Shriner, were interested. But Exponential disputes Apple's argument that defendant George S. Taylor, director and former Chief Technical Officer ("Taylor"), was beholden to Campbell as an Exponential cofounder and, therefore, incapable of rendering an independent decision. Apple also offers the allegedly wasteful nature of the litigation support agreements as evidence that the Exponential board was incapable of exercising proper business judgment.

3. *Analysis*

**\*11** The rigorous standard for pleading elements of a waste claim contrasts with the liberal approach for evaluating dismissal of a waste claim. A count can be dismissed for failure to state a claim if no set of facts as alleged in the complaint support the relief sought. What this effectively means is that the Court must consider the various factual permutations possible within the framework of the plaintiff's allegations and conclude whether any one conceivable set of facts could possibly merit granting plaintiff relief. If so, the claim cannot be dismissed.

A claim of waste requires a diametrically opposite analysis. It requires the Court to determine whether the corporation has bestowed an asset upon another in exchange for something so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid. [FN44] This strict standard requires the Court to apply a reasonable person standard and deny a claim of waste wherever a reasonable person might deem the consideration received adequate. When this difficult standard is applied in the liberal context of a motion to dismiss, in order for the complaint to survive the motion, the Court must find that in any of the possible sets of circumstances inferable from the facts alleged under the complaint, no reasonable person could deem the received consideration adequate. Conversely, if in each possible set of factual circumstances inferable from Apple's allegations,

Westlaw.

I can conclude that a reasonable person would deem the litigation support (and winding up) services received by Exponential as adequate value in exchange for the fees paid to Shriner, Campbell and Dorris, I must dismiss the claim. [FN45]

> FN44. *See* Grobow v. Perot, Del.Supr., 539 A.2d 180, 189 (1988).

> FN45. *See Steiner v. Meyerson,* Del. Ch., C.A. No. 13139, Allen, C. (July 18, 1995) ("If under the circumstances any, reasonable person might conclude that the deal made sense, then the judicial inquiry ends.").

The facts as alleged by Apple are straightforward and not susceptible to a wide range of possible permutations. I evaluate Count VI assuming that Shriner, Campbell, and Dorris will receive the maximum amount possible under the litigation support agreements, $66,000 per month total. In return, Exponential can expect 502 hours of winding up and litigation support work. [FN46] Apple makes no credible allegations that this compensation will bankrupt Exponential or that Shriver, Campbell, and Dorris lack the ability or intent to provide their support services. Instead, Apple chooses to pillory Exponential's pursuit of the California Action and to insinuate that the litigation support agreements are extravagant extras donated to Shriver, Campbell, and Dorris in return for nothing. Apple's conclusory rhetoric cannot overcome the factual import of Apple's own allegations. Shriver, Campbell, and Dorris agreed to perform litigation support services and, in Dorris' case, to assist Exponential's operational shutdown. The exact pecuniary value of these services is hard to measure, but 502 hours of service per month falls well within the range of reasonable value to receive in exchange for consulting fees of $66,000. I need not evaluate the merits of the California Action itself to conclude that the lawsuit's existence constitutes a reasonable business purpose for entering into the litigation support agreements, and Exponential's undisputed shutdown merits employ of Dorris' efforts to wind up Exponential's operations. Under the allegations contained in Apple's complaint-ignoring its antagonistic aspersions-there is no factual scenario that would defeat my determination that the litigation support

agreements are reasonable in scope and amount. Therefore, Apple's claim fails as a matter of law.

> FN46. By assuming the largest possible transfer of Exponential funds to Shriner, Campbell, and Dorris, I examine Apple's claim under the set of facts most favorable to the conclusion that the services received in return for that expenditure constitutes waste. If 1 were to assume either the minimum prepaid salary or any amount in between. I discern no material impact on my analysis here.

**\*12** As for Apple's generalized assertion that Exponential's assets are dwindling, conclusory remarks about dwindling assets and citations from a balance sheet do not constitute proper pleading of a waste claim. Except for the litigation support agreements, Apple does not document what assets were traded away or what inadequate consideration might have been received. The issue is not the size of the Exponential assets conveyed in contrast to the amount of assets remaining in Exponential, but the size of Exponential assets conveyed in comparison to the value received in exchange. Therefore, this "general waste" claim cannot survive Exponential's motion to dismiss. [FN47]

> FN47. Insofar as Apple's evidence of "general waste" is background information to its specific litigation support agreement claim, that background information does not alter my earlier conclusion that the specific claim is deficient as a matter of law.

Finally, I conclude as an additional basis for dismissing count VI that Apple fails to plead facts demonstrating demand futility. To assert a derivative claim, Apple must comply with Chancery Court Rule 23.1 and rebut the presumption of proper business judgment by pleading particularized facts raising "a reasonable doubt that (a) the directors were disinterested and independent, [or] that (b) the challenged action was otherwise the result of a valid exercise of business judgment." [FN48] Apple pled neither with particularity.

> FN48. *Benerofe v. Cha.* Del. Ch., C.A. No. 14614. Chandler, V.C. (Sept. 12, 1996), mem. op. at 13.

Not Reported in A.2d                                                                                                   Page 14
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

Exponential's board was comprised of five members. Exponential concedes that Campbell and Shriner were interested in the litigation support agreements. Apple claimed that a majority of the board was incapable of rendering proper business judgment and tries to substantiate this assertion by alleging that Taylor was not independent. Apple alleges that Taylor was not independent because "Campbell and Taylor founded Exponential together." [FN49] Apple would have me conclude that this one sentence pleads particularized facts establishing that Taylor did not maintain his independent discretion in approving the litigation support agreements because he was beholden to Campbell as an Exponential cofounder. Apple's allegation is conclusory. The factual predicate, that Taylor and Campbell are cofounders, falls far short of raising a reasonable doubt as to Taylor's disinterestedness. [FN50] Apple fails to plead facts that even suggest that a third Exponential director was incapable of exercising proper business judgment in approving the agreements.

> FN49. Compl. ¶ 46(b).

> FN50. *See Benerofe, supra* note 48, mem. op. at 17 (finding "the fact that the corporation has one controlling shareholder does not, as a matter of law, establish that its directors are dominated or controlled by that shareholder").

Apple's second attempt at proving demand futility is to argue that the board's approval of the allegedly wasteful agreements itself constituted gross negligence. If so, the board's failure to inform itself adequately of the nature of the agreements and exercise due care in approving them would serve as grounds for excusing Apple's failure to make demand. [FN51] I have already concluded that the agreements did not constitute waste, but fell well within the parameters of the board's business judgment. Apple makes no particularized allegations of why the agreements were wasteful or how the board grossly neglected its duties in approving them. Therefore, Apple's conclusory attacks on the litigation support agreements cannot rebut the presumption of validity that attaches to those agreements. Apple has failed to allege gross negligence on the part of the Directors sufficient to excuse Apple from making demand.

> FN51. *Id.* at 20 (weighing presumption of business judgment rule against particularized facts alleging gross negligence).

**\*13** Consequently, by failing to allege particularized facts raising a reasonable doubt as to the board's due care or disinterestedness in approving the litigation support agreements, Apple has failed to comply with Rule 23.1 and for this reason, too, I must dismiss count VI.

* * *

Count VI is dismissed for failure to plead facts demonstrating waste and, additionally, for failure to meet the pleading requirements of Chancery Court Rule 23.1

*D. Motion to Stay*

1. *Exponential's Grounds for Stay*

Exponential bases its request for a stay as to counts I and II on the need to consider the outcome of the California Action in determining whether the value of that litigation as a chose in action precluded application of § 271 to the patent sale. Exponential believes that a stay is merited under *McWane* [FN52] or *forum non conveniens.*

> FN52. *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* Del.Supr., 263 A.2d 281 (1970).

2. *Apple's Counter-Argument*

Apple disputes the applicability of *McWane* because the California Action and this suit raise substantially different claims. Apple adds that the heavy burden placed on a movant under *forum non conveniens* precludes issuance of a stay. Apple advances the following reasons for denying the stay: (1) this action raises questions of Delaware law; (2) Exponential's failure to show prejudice in collecting evidence and bringing witnesses to Delaware mitigates against staying this action; (3) the dissimilarities between the California Action and this suit preclude deferring to that court's adjudication; and (4) this Court's expertise and expeditious treatment of § 226 matters compels rapid resolution here. Furthermore, Apple argues that even under

Not Reported in A.2d                                                                              Page 15
1999 WL 39547 (Del.Ch.)
(Cite as: 1999 WL 39547 (Del.Ch.))

*McWane,* the California Action cannot provide a basis for a stay because the California court is incapable of acting promptly and because the California court cannot grant all the relief requested in this action. Apple adds that a stay would enable the Directors to continue squandering Exponential's assets. [FN53]

> FN53. Because I concluded above that Apple has not pled facts showing waste or abandonment of Exponential and its assets, Apple's argument that the Directors are squandering assets is unpersuasive and I do not address it further.

3. *Analysis*

This Court applies identical elements in evaluating a motion to stay under *McWane* and under *forum non conveniens:*

(1) The applicability of Delaware law;
(2) The relative ease of access to proof;
(3) The availability of compulsory process for witnesses;
(4) The pendency or non-pendency of a similar action or actions in another jurisdiction;
(5) The possibility of a view of the premises, if appropriate; and
(6) All other practical considerations which would make the trial easy, expeditious and inexpensive.

What distinguishes these standards is the background presumption against which the elements are applied. Under *McWane,* this Court evaluates the motion in light of our policy of discouraging forum shopping and preserving the plaintiff's original choice of a non-Delaware forum; if the elements support the movant's request, "discretion should be freely exercised in favor of the stay." [FN54] Under *forum non conveniens,* however, the presumption is that the Delaware action will proceed, and "[t]he burden rests with the defendant to prove 'the combination and the weight of the factors to be considered balance overwhelmingly in favor of the defendant." ' [FN55]

> FN54. *McWane,* 263 A.2d at 283.

> FN55. *Macklowe v. Planet Hollywood, Inc.,* Del. Ch., C.A. No. 13689. Steele. V.C. (Oct. 4, 1994). mem. op. at 8-9 (citations omitted).

**\*14** Despite the different emphasis, *McWane* and *forum non conveniens* serve the same purpose: to entertain "considerations of comity and the necessities of an orderly and efficient administration of justice" and to avoid "the wasteful duplication of time, effort, and expense that occurs when judges, lawyers, parties, and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts." [FN56] Moreover, both standards invoke the trial court's discretion. Where granted, a motion to stay is not a final decision on the merits, but an interlocutory order. Thus, appellate review of the trial court's decision is limited. The Supreme Court defines its task in this situation as restricted to a determination of whether the trial judge abused his or her discretion. *General Foods Corp. v. Cryo-Maid, Inc.* stands for the proposition that the trial judge's decision to grant or deny the motion, if supported by a reasonable interpretation of the facts, shall not be disturbed. [FN57]

> FN56. *McWane.* 263 A.2d at 283.

> FN57. Del.Supr., 198 A.2d 681, 684 (1964) ("Our function is not to substitute our judgment.... We can only examine the record to determine if possible whether or not there could be a reasonable difference of view upon the propriety of his act.").

Indeed, *Cryo-Maid* epitomizes the lenient appellate review of a non-final stay granted under *forum non conveniens.* The Court noted that the trial judge found that the parties' incorporation in Delaware had been used to assert Delaware jurisdiction over a contract dispute that took place in Illinois and that invoked New York state law. [FN58] The *Cryo-Maid* Court found that the Chancellor seemed persuaded that plaintiff's motivation in choosing Delaware as the forum was to harass defendant as part of its strategic jockeying in the matter. [FN59] The Court noted, on the other hand, that the Delaware action was first filed, a factor traditionally mitigating against a stay, and that the Delaware plaintiff would need to add counterclaims in Illinois to get the relief sought in Chancery. [FN60] Balancing these factors, the Court held that the decision to stay or not stay resided with the trial judge and even if the Supreme Court disagreed with the result, it would not reverse the trial judge's grant of a stay. [FN61]

Not Reported in A.2d                                                                  Page 16
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

FN58. *Id.* at 682, 684.

FN59. *Id.*

FN60. *Id.* at 684.

FN61. *Id.* at 685 ("The matter is one to be determined as a discretionary act in the light of all facts and circumstances and in the interest of expeditious and economic administration of justice. The Vice Chancellor has decided upon this basis and there is in this record nothing which shows him clearly to have been wrong."). *But cf. McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* Del.Supr., 263 A.2d 281, 283 (1970) (reversing trial court's refusal to stay later-filed Delaware action as abuse of discretion). *McWane* expressly affirms the *Cryo-Maid* Court's holdings, so I will rely on the wide authority vested in me by that decision. *Id.* at 284.

Exponential now calls upon me to exercise that discretion. I must first decide whether to evaluate Exponential's motion under *McWane* or *forum non conveniens.* This threshold question turns on whether or not the out-of-state action is first filed and involves the same or similar parties disputing the same or similar issues. If the out-of-state action is not first filed or it involves significantly different parties or issues, *forum non conveniens* applies.

In this matter, the only remaining claims are the § 271 patent sale claims in counts I and II. The California Action, although filed before this action and involving substantially the same litigants, is a breach of contract and breach of fiduciary duty action arising from Exponential and Apple's business relationship. Therefore, the nature of the actions is sufficiently disparate to preclude application of the *McWane* analysis. Exponential must meet the significant burden established by *Cryo-Maid.*

a. The Applicability of Delaware Law

*15 Apple's remaining claims arise from § 271 and the language in its certificate tracking the statute. Therefore, this dispute centers around questions of Delaware law best decided by this Court. It does not, however, require a

summary proceeding, a factor that would emphasize the need to proceed with this matter immediately. For this element to factor in favor of Apple, I must conclude that by granting the stay, I relinquish the opportunity to decide these questions of Delaware law. In this instance, however, the California Action would not resolve those issues. I am reassured that when the stay lifts at the conclusion of that trial, it will be this Court to which the litigants turn for resolution of the § 271 claims and, consequently, accord this factor no weight. [FN62]

FN62. The *Cryo-Maid* Court added the Delaware law element to motion-to-stay analysis to recognize this state's policy of deciding questions of Delaware law rather than having another jurisdiction handle them. *Cryo-Maid,* 198 A.2d at 683 (adding "whether or not the controversy is dependent upon the application of Delaware law which the courts of this State more properly should decide than those of another jurisdiction"). That policy is not implicated here, because, as with a motion to stay pending a motion to dismiss, the ultimate resolution of the Delaware legal issues remains with this Court.

b. The Relative Ease of Access to Proof

Exponential argues in favor of a stay because the California judge's award in that action will help this Court determine whether Exponential's chose in action had significant value at the time of the patent sale. I am not persuaded that the ultimate outcome of that trial will change this Court's analysis of the Directors' § 271 duties. To the extent that the value or non-value of Exponential's claim against Apple will affect this Court's evaluation of whether the patents constituted substantially all of the assets of Exponential, that value must be calculated based on what the Board knew at the time of the patent sale. To factor the eventual outcome of the litigation into the propriety of their valuation of the chose in action would effectively require the Directors to look into a crystal ball and predict the future. What triggers § 271 is a sale of substantially all the company's assets. If the chose in action constituted enough value at the time of the sale to preclude application of § 271, that value must be determined as it was perceived at that time.

Not Reported in A.2d                                                                                           Page 17
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

In this sense, however, evidence gathered in the California Action should be useful in resolving this § 271 dispute. (The opposite would not be true.) Exponential and Apple are in the process of establishing an evidentiary record in the California Action documenting and rebutting each other's alleged wrongdoing. This record of alleged wrongdoing will reflect what the parties knew at the time of the patent sale about Apple's alleged breach of contract and fiduciary duty. Relying on not only that evidence, but the California Court's assessment of that evidence's credibility and import will help the parties document what the Board knew about the California Action when the patents were sold. That knowledge in turn will enable me to me assess whether the chose in action's value precluded application of § 271 to the patent sale. Therefore, granting the stay would assist creation of a full record upon which to resolve Apple's § 271 claims. It would also save the litigants the time and effort wasted when simultaneously engaging in discovery for two related matters. A stay will prevent duplicative waste of effort by allowing the litigants here to review the California Action's record before embarking upon further discovery in this matter.

c. The Availability of Compulsory Process for Witnesses

*16 Neither party addressed serious concerns as to this issue in their briefs. I conclude that this element is irrelevant.

d. The Pendency or Non-Pendency of a Similar Action or Actions in Another Jurisdiction

This inquiry is broader ranging than the threshold issue of whether to apply *McWane* or *forum non conveniens*. It embraces tactical issues as well as the question whether the two actions will be duplicative. I have already determined that the substantive dispute of the California Action is not the same as the § 271 claims.

I did not conclude, however, that there is no strategic nexus between the two actions. Exponential accuses Apple of pursuing this action to disrupt Exponential's California Action. In particular, it criticizes Apple's request to appoint a custodian as a strategic attempt to topple its litigation opponent's leadership. I did not factor this argument into my evaluation of Exponential's motion to dismiss because

ulterior motives are irrelevant to my disposition of the parties' legal rights.

In the course of evaluating the most efficient scheduling of these parties' Delaware dispute, however, I do not think that it is an abuse of discretion to factor in the fortuitously coincidental, if not strategically advantageous, timing of Apple's suit. In doing so, I am not sanctioning Apple for pursuing the Delaware action. I will, however, note that Exponential's efforts vis-à-vis the California Action will be diverted to defending this action, if both proceed at the same time. Therefore, the presence of the earlier-filed California Action, while not deserving of the *McWane* analysis, does weigh in favor of a stay.

e. The Possibility of a View of the Premises if Appropriate

This element is irrelevant.

f. All Other Practical Considerations Which Would Make the Trial Easy, Expeditious, and Inexpensive

No other considerations have been addressed by the parties.

                                    * * *

Having evaluated each factor, I will balance them to determine whether Exponential has shown that the circumstances overwhelmingly favor granting a stay.

• Although Apple's § 271 claims should be tried in Delaware, this element is of no consequence because the California court will not decide the substantive issues involved in this action and Apple will have its day in a Delaware court.
• Gathering of proof will be facilitated by a stay because conclusion of the California Action will provide a record to assist valuation of that action as it existed at the time of the patent sale;
• Pendency of a similar action in California favors a stay in order to allow the parties to focus on one matter at a time and avoid any fortuitous distractions that might arise from pursuing both actions simultaneously; and
• Elements c, e and f are immaterial.

All of these factors favor granting the stay. The only countervailing prejudice to Apple would be the delay implicit in the stay. I conclude that the facts

Not Reported in A.2d
1999 WL 39547 (Del.Ch.)
**(Cite as: 1999 WL 39547 (Del.Ch.))**

overwhelmingly support Exponential's motion [FN63] and I stay counts I and II in accord with "considerations of comity and the necessities of an orderly and efficient administration of justice." [FN64]

> FN63. *See Dimeling, Schreiber & Park v. Packaging Indus. Group, Inc.,* Del. Ch., C.A. No. 1157-K. Chandler, V.C. (Nov. 15, 1991), mem. op. at 4 ("The doctrine [of *forum non conveniens* ] empowers a Court to decline jurisdiction whenever considerations of convenience, expense and the interests of justice dictate that litigation in the forum selected by the plaintiff would be unduly inconvenient, expensive or otherwise inappropriate.") (citing *Monsanto Co. v. Aetna Casualty and Surety Co.,* Del.Super., 559 A.2d 1301, 1304 (1988)).

> FN64. *McWane,* 263 A.2d at 283.

4. *Summary*

***17** Counts I and II against Exponential are hereby stayed pending judgment in the California Action. I add the proviso that either party may submit a request for reconsideration of this order, if at any time it appears that the California Action is not proceeding towards a timely resolution because of the opposing party's delay, the California court's administrative backlog, or any other legitimate reason (except the requesting party's own intransigence.)

### III. CONCLUSION

For the reasons set forth above, I dismiss counts I and II against the individual directors and counts III, IV, V, and VI, in their entirety, and I conditionally stay counts I and II against Exponential.

IT IS SO ORDERED.

1999 WL 39547 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

Not Reported in A.2d                                                                    Page 1

1996 WL 652763 (Del.Ch.), 22 Del. J. Corp. L. 1156
**(Cite as: 1996 WL 652763 (Del.Ch.))**

C

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

Francis and Irene BODKIN, Plaintiffs,

v.

MERCANTILE STORES COMPANY, INC.; Minot K.
Milliken; Roger Milliken; Gerrish
H. Milliken; H. Keith Brodie; Rene C. McPherson; Roger
K. Smith; John A.
Herdeg; Thomas J. Malone; Francis G. Rodgers; George S.
Moore; and David L.
Nichols, Defendants.

**C.A. No. 13770.**

Submitted Oct. 22, 1996.
Decided Nov. 1, 1996.

Pamela S. Tikellis, of Chimicles, Jacobsen & Tikellis,
Wilmington; Gary S. Jacobson, Lovell & Skirnick, L.L.P.,
New York City, of counsel for Plaintiffs.

Stuart B. Young, and Bruce L. Silverstein, of Young,
Conaway, Stargatt & Taylor, Wilmington; Eliot Lauer, and
Joseph P. Goldberg, of Curtis, Mallet-Prevost, Colt &
Mosle, New York City, of counsel, for Defendant
Mercantile Stores Company, Inc.

Andrew B. Kirkpatrick, Jr., William O. LaMotte, III, and
Karen Jacobs Louden, of Morris, Nichols, Arsht & Tunnell,
Wilmington, for Defendants Minot K. Milliken, Roger
Milliken, Gerrish Milliken, H. Keith Brodie, Rene C.
McPherson, Roger K. Smith, John A. Herdeg, Thomas J.
Malone, Francis G. Rodgers, George S. Moore and David L.
Nichols.

MEMORANDUM OPINION

CHANDLER, Vice Chancellor.

**\*1** Shareholders allege that corporation's directors sought to
entrench themselves in office and terminated negotiations
for the sale of the company because the potential acquiror
refused to accept "lavish" severance packages for top

corporate executives or a particular tax treatment demanded
by three of the company's eleven directors. Because I find
that the shareholders in this derivative suit fail to allege that
the negotiations posed an actual threat to the directors'
positions and fail to demonstrate that the proposed tax
structure afforded a different treatment to the directors than
that afforded to shareholders, defendants' motion to dismiss
for failure to make demand upon the board is granted.

## I. BACKGROUND

Plaintiffs, Francis and Irene Bodkin, own 500 shares of
Mercantile Stores Company, Inc. ("Mercantile") common
stock purchased at $55 3/8 on September 9, 1994, in
reliance upon reports that Mercantile was involved in
negotiations for the sale of the company. One week later,
Mercantile announced that it had ended negotiations. Press
reports identified May Department Stores Company ("May
Stores") as the potential acquiror. Upon these
announcements, the share price of Mercantile common
stock dropped $16 13/32 to $38 23/32 . Defendants are
Mercantile and its entire eleven-member Board of Directors.
Three directors, brothers Roger and Gerrish Milliken and
their cousin Milot Milliken (collectively, the "Millikens"),
are Mercantile's largest shareholders with a combined
ownership of just over forty percent of Mercantile's
outstanding common stock.

Plaintiffs allege that by rejecting the May Stores' offer and
terminating negotiations, Mercantile's Board breached its
fiduciary duties to Mercantile's shareholders. Specifically,
plaintiffs allege that defendants sought to entrench
themselves in their positions and terminated negotiations
because May Stores would not accept "lavish" severance
packages for senior Mercantile executives or a particular tax
treatment insisted upon by the Millikens. In addition,
plaintiffs argue that demand should be excused because the
Board is dominated and controlled by the Millikens and a
majority of the directors have disabling conflicts of interest
preventing them from exercising independent business
judgment. Defendants filed a motion to dismiss for failure to
comply with the demand and pleading requirements of
Chancery Court Rule 23.1 and for failure to state a claim as
required by Rule 12(b)(6).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 2
1996 WL 652763 (Del.Ch.), 22 Del. J. Corp. L. 1156
(Cite as: 1996 WL 652763 (Del.Ch.))

II. MOTION TO DISMISS FOR FAILURE TO SATISFY
DEMAND AND PLEADING REQUIREMENTS
OF RULE 23.1

Defendants allege that plaintiffs have failed to comply with the demand and pleading requirements of Chancery Court Rule 23.1. Consequently, they ask this Court to dismiss the complaint until plaintiffs have first made a pre-suit demand upon the Mercantile Board of Directors. Plaintiffs claim to satisfy Rule 23.1 requirements by demonstrating that demand is excused because directors, constituting a majority of the Board, have financial interests or entrenchment motives which prevent them from exercising independent business judgment. Because I find that plaintiffs have failed to demonstrate that the Millikens have a financial interest adverse to that of other shareholders or demonstrate (or even allege) that the May offer posed an actual threat of removal from office to a majority of the directors, defendants' motion to dismiss for failure to make demand is granted.

**\*2** Chancery Court Rule 23.1 sets forth the pleading requirements for a derivative suit. Under this rule, a complaint shall:

"allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

It is admitted that plaintiffs have failed to make a demand upon the Board. What is questioned is whether plaintiffs have pled "with particularity" sufficient reasons for failing to make such demand.

A. *The Aronson Test*

To determine whether a plaintiff, in the absence of making a demand upon a board, has satisfied the demand requirements of Rule 23.1, this Court "must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." [FN1] Despite its conjunctive connection, the test provides two independent ways in which a plaintiff may successfully meet the demand requirements. [FN2] First,

plaintiffs may plead particularized facts alleging that a majority of the directors were interested in the transaction, as indicated by the existence of financial interests or entrenchment motives. [FN3] In the alternative, plaintiffs may plead particularized facts alleging that directors, constituting a majority of the board, were dominated or controlled by a party with an interest in the transaction and thus unable to independently exercise business judgment. [FN4] Second, plaintiffs may plead particularized facts alleging that the directors, although disinterested and independent, failed to exercise proper business judgment. [FN5]

> FN1. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984).

> FN2. *Levine v. Smith,* Del.Supr., 591 A.2d 194, 206 (1991).

> FN3. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988).

> FN4. *Id.* at 189.

> FN5. *Id.*

B. *Plaintiffs' Complaint*

Plaintiffs claim they have satisfied the first prong of *Aronson* by pleading particularized facts supporting the allegation "that a majority of Mercantile's eleven-member board have [sic] disqualifying financial or entrenchment interests such that the directors could not have made the decision to terminate merger negotiations impartially, nor can they now be expected impartially to prosecute an action against defendants." [FN6] Furthermore, plaintiffs' complaint states that the Board "is dominated and controlled by the Millikens and is thereby disabled from independently considering whether to bring an action arising from the breaches of fiduciary duty alleged herein." [FN7] Thus, plaintiffs' complaint may be read to allege claims based on both a lack of disinterest and a lack of independence.

> FN6. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 21.

Not Reported in A.2d                                                                                          Page 3
1996 WL 652763 (Del.Ch.), 22 Del. J. Corp. L. 1156
**(Cite as: 1996 WL 652763 (Del.Ch.))**

FN7. 2d. Am.Compl. at ¶ 20(a).

1. Interest:

According to the complaint, negotiations with May Stores were terminated, in part, because "the deal could not be structured to assuage the Millikens' concern about their personal tax liabilities." [FN8] Plaintiffs assert that such tax concerns are a financial interest which raises a reasonable doubt that the Millikens are disinterested in the transaction. Defendants, relying on *Aronson,* argue that to be disqualifying, a financial interest must provide "a personal financial benefit ... not equally shared by the stockholders" [FN9] and that plaintiffs have failed to satisfy Rule 23.1 because they have not alleged particularized facts demonstrating how the May Stores' offer would accord the Millikens a tax treatment any different than that which would be accorded to other shareholders. At oral argument, plaintiffs acknowledged that the complaint lacks particularized facts, but asserted that a reasonable inference may be made, based on the size of the Millikens' stock holdings and the length of time the Millikens have held these shares, that the Millikens have a relatively lower tax basis and a relatively larger tax liability than other shareholders. Thus, plaintiffs claim that although the tax structure of the transaction would apply to all shareholders equally, the unique effect of this structure upon the Milliken directors would be sufficient to raise a reasonable doubt as to their ability to exercise independent business judgment.

FN8. *Id.* at ¶ 12.

FN9. *Aronson* at 812.

**\*3** Even if plaintiffs' assertions that a reasonable inference may be made as to the existence of the Millikens' unique tax liabilities were sufficient to meet the particularized pleading requirements of Rule 23.1, such unique personal tax liabilities alone do not create a reasonable doubt that the Millikens are disinterested. In support of their argument for a more subjective standard, plaintiffs rely on *Rales v. Blasband:*

Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. In such

circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision. [FN10]

FN10. *Rales v. Blasband,* Del.Supr., 634 A.2d 927, 936 (1993).

But, plaintiffs misinterpret the Supreme Court's statement in *Rales.* The "materially detrimental impact" refers to the *application* of the tax treatment upon the directors, not the resulting personal *effect* upon the directors generated by the uniform application of the tax laws. Thus, without facts demonstrating that the Millikens received one type of tax treatment and the other shareholders a different type, the fact that the Millikens may have disfavored the proposed offer because of personal financial concerns does not rebut the presumption that they acted in a disinterested fashion. The Millikens' personal tax liabilities may lead them to oppose the structure of the offer. But those interests, which arise because they are shareholders, do not establish a disabling conflict for them as directors, absent particularized allegations that the transaction did not apply to them on terms equal with all other shareholders. [FN11]

FN11. *In re Anderson, Clayton Shareholders Litig.,* Del.Ch., 519 A.2d 680 (1986).

Failing to raise a reasonable doubt that the directors were financially disinterested, plaintiffs may satisfy the first prong of *Aronson* by casting doubt on the presumption that the directors' decisions were valid exercises of business judgment and not motivated by entrenchment purposes. [FN12] Such a claim, however, requires an allegation that the challenged transaction posed an *actual threat* to the directors' positions on the Board. [FN13] Here no such allegation exists. Plaintiffs merely state that directors "have breached and are continuing to breach their fiduciary duties to Mercantile's shareholders in order to entrench themselves in office and to continue receiving their compensation, fees, and emoluments of office." [FN14] If this were the directors' "sole or primary purpose" behind the termination of negotiations, it would be a breach of fiduciary duty. [FN15] But without an allegation that the offer posed an actual threat to their continued employment as directors, and

Not Reported in A.2d                                                                                    Page 4
1996 WL 652763 (Del.Ch.), 22 Del. J. Corp. L. 1156
**(Cite as: 1996 WL 652763 (Del.Ch.))**

without the supporting particularized facts required by Rule 23.1, I cannot find that plaintiffs have raised a reasonable doubt that the directors are disinterested in the transaction and not influenced by entrenchment motives.

> FN12. *Moran v. Household Int'l., Inc.,* Del.Ch., 490 A.2d 1059, 1071, *aff'd,* Del.Supr., 500 A.2d 1346 (1985); *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 627 (1984).

> FN13. *Grobow v. Perot,* Del.Ch., 526 A.2d 914, 922-23 (1987), *aff'd,* Del.Supr., 539 A.2d 180 (1988).

> FN14. 2d. Am.Compl. at ¶ 17.

> FN15. *Pogostin* at 627.

 2. Independence:

**\*4** Plaintiffs also seek to satisfy the first prong of *Aronson* by alleging particularized facts in support of their claim that the board "is dominated and controlled by the Millikens." [FN16] These facts include allegations that three of the eight directors who are not related to the Milliken family hold positions as directors on the board of the privately-held Milliken & Company, and one of the other eight directors is the president, chief operating officer and director of Milliken & Company as well as a director of Lockhart Power Co., a subsidiary of Milliken & Company. While these and other facts may be sufficiently particularized to meet the pleading standards of Rule 23.1, plaintiffs have not demonstrated a reasonable doubt that the Millikens are disinterested. Without this link to an interested party, plaintiffs' allegations fail to raise a reasonable doubt that the Board as a whole is disinterested. [FN17]

> FN16. 2d. Am.Compl. at ¶ 20(a).

> FN17. *Grobow* at 189; *Friedman v. Beningson,* Del.Ch., C.A. No. 12232, Allen, C. (Dec. 4, 1995).

Because plaintiffs have failed to make a demand on the Mercantile Board of Directors, or to demonstrate with particularized allegations why demand is excused, I grant defendants' motion to dismiss. [FN18] Having dismissed the

complaint on this basis, I need not reach the issues raised by defendants' Rule 12(b)(6) motion. [FN19]

> FN18. Ch.Ct.Rule 23.1.

> FN19. *Colonial Sec. Corp. v. Allen,* Del.Ch., C.A. No. 6778, Longobardi, V.C. (April 18, 1983).

It is so ordered.

END OF DOCUMENT

# EXHIBIT 3

Not Reported in F.Supp.2d                                                                                      Page 1
2002 WL 276236 (N.D.Ill.), Fed. Sec. L. Rep. P 91,711
(Cite as: 2002 WL 276236 (N.D.Ill.))

**H**
**Motions, Pleadings and Filings**

United States District Court, N.D. Illinois, Eastern Division.

Robert C. GEINKO, Mark Pugh, Steve Fagerman, and
Kenneth Janowski Plaintiffs,
v.
K. Shan PADDA, Steven L. Holden, John Reilly, William
D. Lautman, EGS
Securities Corp., and KPMG, LLP, Defendants.

**No. 00 C 5070.**

Feb. 27, 2002.

MEMORANDUM OPINION AND ORDER
COAR, District J.

**\*1** This action arises from Plaintiffs' sale of their business, Strategic Reimbursement Services, Inc. ("SRS"), to Sabratek Corporation ("Sabratek") for allegedly overvalued shares of Sabratek stock (the "SRS Transaction"). Plaintiffs sue Sabratek's highest-ranking officers and directors, its investment banking advisor on the SRS Transaction, and its principal accounting firm alleging violations of the securities laws as well as violations under Illinois state law.

On September 28, 2001, this Court dismissed without prejudice Plaintiffs' original complaint against these defendants because of Plaintiffs' failure to plead facts sufficient to give rise to a strong inference of scienter under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See Geinko v. Padda, No. 00 C 5070, 2001 WL 1163728, at *1 (N.D.Ill. Sept. 28, 2001) (hereinafter "Geinko I "). On November 5, 2001, Plaintiffs filed an Amended Complaint and attached copies of the facts alleged in three other independent actions in attempt to cure their pleading deficiencies. [FN1] On December 13 and 14, 2001, all Defendants moved to dismiss the Amended Complaint for lack of jurisdiction. Defendants Padda, Holden, Reilly, Lautman, and KPMG argue that Plaintiffs' Section 10(b) and Rule 10b-5 claims are time-barred, in the alternative that the Amended Complaint is defective under Federal Rule of Civil Procedure 8, and in the other alternative, along with defendant EGS, that Plaintiffs fail to state a claim

under Federal Rule of Civil Procedure 12(b)(6) based on the pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA. This Court now considers whether Plaintiffs' Amended Complaint alleges sufficient facts to withstand these motions to dismiss.

> FN1. These actions are: (1) a complaint filed by the Securities and Exchange Commission, No. 01 C 7463 (N.D.Ill.) (hereinafter the "SEC Complaint"); (2) a complaint filed by the class action plaintiffs in Brisker, et. al. v. Padda, et. al., No. 00 C 6186 (N.D.Ill.) (hereinafter the "Brisker Complaint"); and (3) a "Motion to Compel Arbitration of Purchase Price Dispute" that was filed by Baxter Healthcare Corporation, an unrelated third party, in a Delaware bankruptcy court (hereinafter the "Baxter Motion").

I. Background

This Court herein incorporates the background facts that it stated in its previous opinion, Geinko I, 2001 WL 1163728, at* 1-2. While the Amended Complaint is 86 pages (which is 65 pages longer than Plaintiffs' Original Complaint), and while Plaintiffs attach over 300 pages of additional material, there are few new facts that Plaintiffs directly allege themselves. The Amended Complaint provides a summary of the allegations in paragraphs 1-8. Specifically these paragraphs summarize "The Fraudulent Accounting Scheme" and the "Defendants' Direct Misrepresentations." Plaintiffs allege that "within weeks of the closing" the fraudulent scheme and the defendants' misrepresentations "began to be revealed." Plaintiffs outline a time line that indicates when and to what extent they received knowledge of the defendants' fraud:

• On or about late July or early August 1999, Reilly informed Geinko and Plaintiffs' accountant that KPMG's New York office wanted to restate Sabratek's financial statements to correct the improper capitalization of R & D expenses reported as intangible assets in Sabratek's statements. According to Reilly, KPMG's Chicago office, which had audited Sabratek's financial statements and consulted on the suspect R & D transactions, opposed the restatement.

**\*2** • On or about August 2, 1999, Sabratek announced that

Not Reported in F.Supp.2d                                                                                    Page 2

2002 WL 276236 (N.D.Ill.), Fed. Sec. L. Rep. P 91,711

**(Cite as: 2002 WL 276236 (N.D.Ill.))**

its second-quarter 1999 earnings would be "significantly" below estimated but nonetheless further stated that an "extensive review of its accounting policies" would result in no change in prior periods' reported results. This announcement precipitated a sharp 30% one-day decline in Sabratek's share price to $14.46.

• On or about August 13, 1999, Sabratek announced a delay in the release of its second-quarter earnings "pending completion of a review with its independent auditors" (i.e., KPMG), precipitating a further one-day decline in Sabratek's share price of more than 36% to $6.97.

• On or about August 23, 1999, Sabratek announced plans for a restructuring and the further delay in its second-quarter earnings release, as well as the resignation of Padda. This announcement triggered a further 57% one-day decline in Sabratek's share price to $2.75.

• On October 7, 1999, "any remaining doubts concerning defendants' scheme to defraud plaintiffs were dispelled" by Sabratek's announcement that Sabratek's audited financial statements for the two years ended March 31, 1999 greatly overstated Sabratek's earnings and were materially misstated when issued. The proposed adjustment of approximately $39 million, restating as expenses amounts that had been improperly mischaracterized as assets, completely wiped out Sabratek's reported pre-tax earnings for the entire two-year period. In fact, the proposed adjustment was more than double (248%) Sabratek's reported pre-tax earnings for the two-year period. This announcement resulted in a further one-day decline in Sabratek's share price of more than 52% to $1.03.

• Based on Plaintiffs' further investigation and analysis, Plaintiffs learned that the material misstatements were even greater than what they announced on October 7, 1999. In total, as of December 31, 1998, the fraudulent scheme at Sabratek resulted in a $50-million overstatement in Sabratek's pre-tax earnings for the prior three years-or more than $35 million in undisclosed pre-tax losses compared to the approximately $15 million in pre-tax profits Sabratek had reported.

• After October 7, 1999, Sabratek was reduced to the status of a penny stock, its shares were delisted from trading on the NASDAQ, and Sabratek entered

bankruptcy liquidation.

Paragraphs 9-10 identify the extraneous material they attach to the Amended Complaint. Plaintiffs state: "[i]n addition to their own investigation, plaintiffs' allegations are based upon facts alleged by other public and private litigants ...." The actions whose allegations Plaintiffs refer to are the SEC and Brisker Complaints and the Baxter Motion. [FN2] Much of the Amended Complaint either sets out established rules of conduct [FN3] or lists facts and/or conclusions taken from the SEC and Brisker Complaints and the Baxter Motion. [FN4]

> FN2. Plaintiffs explain in Paragraph 11 that except where alleged, the underlying information relating to defendants' misconduct is not available to the Plaintiffs, and that it lies within the possession and control of defendants. Plaintiffs assert that they believe that substantial evidentiary support will exist for the allegations set forth in the Amended Complaint after they have a reasonable opportunity for discovery.

> FN3. Paragraphs 24-50 set out the required disclosures under the Securities Exchange Act of 1934 as well as the general accepted accounting principles ("GAAP") and the general accepted auditing standards ("GAAS"), and paragraphs 62-63 further reiterate GAAP principles.

> FN4. For example, paragraphs 55-61 list the facts alleged in the SEC Complaint and paragraphs 64-80 outline the facts alleged in the SEC Complaint and identifies *red flags* from these facts that were alleged in the SEC Complaint. Similarly, paragraphs 94-101 list "additional allegations" taken from the Baxter Motion and paragraphs 108-109, 111, 113- 114, 117, and 121 list allegations in the Brisker Complaint. Further, other paragraphs in the Amended Complaint do not directly cite to these third-party actions, but they indirectly refer to them by citing to the paragraphs in the Amended Complaint that *do* directly cite to the third-party actions. *See e.g.,* ¶¶ 138, 141, and 144.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                        Page 3
2002 WL 276236 (N.D.Ill.), Fed. Sec. L. Rep. P 91,711
**(Cite as: 2002 WL 276236 (N.D.Ill.))**

## II. Discussion

A complaint fails to state a claim upon which relief can be granted, *see* Fed.R.Civ.P. 12(b)(6), only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The plaintiff gets the benefit of the doubt with ambiguities and inferences. Also, the Court treats well-pleaded facts as true for purposes of the motion. *See, e.g., Chu v. Sabratek Corp.,* 100 F.Supp.2d 815 (N.D.Ill.2000) ("Chu I"). In fraud cases, though, Federal Rule of Civil Procedure 9(b) requires plaintiffs to state "with particularity" the circumstances constituting the fraud. *See* Fed.R.Civ.P. 9(b). In Seventh Circuit vernacular, this means that plaintiffs must plead facts related to the "who, what, when, where, how" of the fraud. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1996). The PSLRA further requires plaintiffs to "specify each statement alleged to have been misleading, [and] the reason why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

### A.

**\*3** As a preliminary matter, several of the defendants argue that the Amended Complaint should be dismissed on procedural grounds. First, defendants argue that the Amended Complaint violates Fed.R.Civ.P. 8(a) and (e). Specifically, defendants Padda, Holden, Reilly, and KPMG argue that the Amended Complaint does not contain a short and plain statement of the claim and that each averment is not simple, concise, and direct, as the rule requires. Second, defendants Padda, Holden, Reilly, and KPMG argue that Plaintiffs' section 10(b) claim is time barred.

#### 1. Fed.R.Civ.P. 8

Under Rule 8, a complaint "must be presented with intelligibility sufficient for a court or opposing party to understand whether a valid claim is alleged and if so what it is." *Vicom, Inc. v. Harbridge Merchant Servs. Inc.,* 20 F.3d 771, 776 (7th Cir.1994). Defendants argue that because the Amended Complaint is 86 pages, because it is replete with allegations made by third parties in other allegations, and because Plaintiffs also attach copies of these third party actions that consist of approximately 300 additional pages,

the Amended Complaint violates Rule 8. Plaintiffs, on the other hand, argue that established jurisprudence allows them to attach copies of the complaints filed in other actions and that the Amended Complaint does not violate Rule 8 because it is well organized and it is not inordinately lengthy given that their Amended Complaint alleges a massive fraudulent scheme involving many defendants.

For support, Plaintiffs cite to *Davis v. Ruby Foods, Inc.,* 269 F.3d 818, 820 (7th Cir.2001), in which the Seventh Circuit held that a district court is not authorized to dismiss a complaint merely because it contains repetitious and irrelevant matter and that "it is an abuse of discretion ... to dismiss a complaint merely because of the presence of superfluous matter." As defendants point out, however, the complaint in *Davis* was a 20-page *pro se* sexual harassment complaint and the Seventh Circuit expressly recognized that its general rule had exceptions. *Id.* Two exceptions that the *Davis* court cited were *In re Westinghouse Securities Litigation,* 90 F.3d 696 (3d Cir.1996), which was a 240-page, 600-paragraph securities class action complaint, and *Michaelis v. Nebraska State Bar Ass'n,* 717 F.2d 437 (8th Cir.1983), which was a 98-page, 144-paragraph civil rights complaint.

This Court notes that there is some tension between the particularity requirements of pleading fraud under the PSLRA and 9(b) and Rule 8, but that these particularity demands do not negate the commands of Rule 8. *See Vicom,* 20 F.3d at 776. That being said, this Court does not believe that the Amended Complaint in this case is "prolix and confusing." While Plaintiffs may have attached superfluous and irrelevant matter to their Amended Complaint, *see* Section II.B. *infra,* and while some of the paragraphs serve as background rather than allegations, the Amended Complaint is not an unwieldy, "puzzle-style" complaint. Rather, the Amended Complaint is well organized and Plaintiffs clearly delineate the charges they allege against each individual defendant. This Court therefore declines to dismiss the Amended Complaint on this ground.

#### 2. Statue of Limitations for Section 10b Claims

**\*4** Defendants also move to dismiss the Amended Complaint on grounds that Plaintiffs' Section 10(b) claim is

Not Reported in F.Supp.2d                                                                                    Page 4
2002 WL 276236 (N.D.Ill.), Fed. Sec. L. Rep. P 91,711
(Cite as: 2002 WL 276236 (N.D.Ill.))

time barred. An action under Section 10(b) must be filed "within one year after the discovery of the facts constituting the violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilberston,* 501 U.S. 350, 364 (1991). "Discovery" occurs, and the applicable one-year period begins to run, when the potential plaintiff is put on "inquiry notice." *Fujisawa Pharmaceutical Co. v. Kapoor,* 115 F.3d 1332, 1334 (7th Cir.1997). Inquiry notice requires only that plaintiff have enough facts to prompt a reasonable person to begin investigating. *Kauthar SDV DHD v. Sternberg,* 149 F.3d 659, 670 (7th Cir.1998). Whether a plaintiff had sufficient facts to put him on inquiry notice of a securities fraud claim under 10b-5, however, is a question of fact and it therefore is often inappropriate for resolution on a motion to dismiss. *Marks v. CDW Computer Cntrs., Inc.,* 122 F.3d 363, 367 (7th Cir.1997).

This action was filed on August 18, 2000, and Defendants argue that Plaintiffs were on inquiry notice prior to August 18, 1999. First, on June 7, 1999, the *Chu* [FN5] Amended Complaint was filed, of which Plaintiffs admit they were aware at the time it was filed. Defendants argue that while the *Chu* Amended Complaint by itself would have prompted any reasonable person to conduct further inquiry, there are even more facts that put Plaintiffs on inquiry notice more than a year before they filed this action. These facts are: Sabratek's announcement on August 2, 1999 that its second-quarter 1999 earnings would be significantly below estimates; Sabratek's announcement on August 13, 1999 that there would be a delay in the release of its second-quarter earnings "pending completion of [a] review with its independent auditors ...."; Sabratek's stock price dropping in this period from approximately $20.66 to $6.97 a share, despite Padda's alleged mid-June 1999 statement that the stock would soon be trading at $40 per share; and "in late July or early August 1999," plaintiff Geinko was told by a Sabratek officer that KPMG's New York office "demanded" a restatement of Sabratek's financial statements to correct the "improper" capitalization of R & D expenses. Based on these facts, Defendants believe that Plaintiffs were on inquiry notice more than a year before August 18, 2000, when they filed their original complaint.

FN5. *Chu v. Sabratek,* 100 F.Supp.2d 827, 838

(N.D.Ill.2000).

Plaintiffs, on the other hand, argue that although they were aware of the delay in the release of the financials and a dispute between KPMG's New York and Chicago offices, "the significance of these matters was not 'confirmed or substantiated' until October 7, 1999, when Sabratek announced that it intended to restate approximately $39 million in assets as expenses." Plaintiffs further argue that even if the July and August facts to which Defendants refer somehow aroused Plaintiffs' suspicions, Plaintiffs were not in a position to acquire the necessary facts to state a meritorious claim within the confines of Rule 11.

*5 While a close call, this Court finds that Defendants have not met their burden of showing that the allegations in the Amended Complaint conclusively demonstrate that Plaintiffs were on inquiry notice prior to August 18, 1999. With respect to the *Chu* Amended Complaint, Defendants point out that Plaintiffs were aware of it when it was filed, but they neglect also to point out that Plaintiffs allegedly were told at least twice that there was no merit to the facts alleged in the *Chu* Amended Complaint; once in a conference call sometime between June 15 and 20 and again through a press release on June 21, 1999. *See* Am. Compl. ¶¶ 147(a), 148, and 159. Further, in that same press release, Plaintiffs similarly were reassured that the financial statements were prepared in accordance of GAAP, and defendant Padda stated, "We stand by those financial statements." Am. Compl. ¶ 148. Finally, an additional significant event occurred on or about August 23, 1999, when Sabratek announced plans for a restructuring, a further delay in its second-quarter earnings release, and the resignation of Padda. This announcement triggered a further 57% one-day decline in Sabratek's share price to $2.75. The facts to which Defendants point as putting Plaintiffs on inquiry notice must be examined in context. Thus, while inquiry notice may begin before a plaintiff is in possession of all facts sufficient to file a complaint immediately, *see Fujisawa,* 115 F.3d at 1336, in this case, given the sequence of events and the discussion among the parties, it is not clear that Plaintiffs were on inquiry notice prior to August 18, 1999. This Court, therefore, declines to dismiss the Amended Complaint on this ground.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                       Page 5
2002 WL 276236 (N.D.Ill.), Fed. Sec. L. Rep. P 91,711
**(Cite as: 2002 WL 276236 (N.D.Ill.))**

### B.

Like the original complaint, Count I of the Amended Complaint alleges securities fraud in direct violation of Section 10b of the Securities Exchange Act and Rule 10b-5 [FN6]. The elements of a Section 10(b) claim are: (1) knowing or recklessly indifferent (2) misstatement or omission, (3) of material fact (4), in connection with the purchase or sale of securities, (5) upon which plaintiff has relied and (6) to the plaintiff's detriment. *E.g., In re HealthCare Compare Corp.,* 75 F.3d 276, 280 (7th Cir.1996). As with the original complaint, all of the defendants challenge the Amended Complaint for failing to allege any misstatements with sufficient particularity under Rule 9b, and for failing to allege scienter under the PSLRA.

> FN6. Count I is a threshold claim because before plaintiffs can state a claim under Section 20(a) of the Securities Exchange Act for "control person liability" (Count II), they must make sufficient allegations of a primary violation under Section 19(b) and 10b-5. *See Geinko I,* 2001 WL 1163728, at *9. Further, Counts III-V are state-law claims and are entertained only if the federal claims to which they are pendant survive. *Id.*

When this Court dismissed Plaintiffs' original complaint, this Court stated that "[i]f, like the plaintiffs in *Chu,* plaintiffs are able to plead more specific facts, including 'red flags' ... such additional facts would likely mean the survival of their complaint." *Geinko I,* 2001 WL 1163728, at *9 n. 8. The Amended Complaint now contains 223 paragraphs and 86 pages (which is 65 pages longer than Plaintiffs' Original Complaint), and Plaintiffs attach over 300 pages of additional material. Defendants, however, argue that by attaching the SEC Complaint, the Brisker Complaint, and the Baxter Motion, that Plaintiffs attempt to piggyback on contested allegations made by third parties in independent actions rather than plead, as this Court instructed, more specific facts as their own allegations. More importantly, by simply attaching complaints filed in other cases, Plaintiffs sidestep the requirements of Rule 11. Accordingly, defendants argue that these imported allegations are improper and should be ignored. [FN7] Thus, the threshold issue before this Court is whether Plaintiffs, in order to allege sufficient facts that provide a basis of scienter, may recite alleged facts extrapolated from other actions against some of the same defendants.

> FN7. Even though this Court found that the Amended Complaint does not violate Rule 8, it still can ignore superfluous or improper matter that do not amount to allegations.

**\*6** Plaintiffs argue that "established jurisprudence" allows them to refer to and attach copies of these independent actions, and they cite *Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir.1982) and *In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d 194, 216 (S.D.N.Y.1999) for support. These cases, however, hardly support Plaintiffs' proposition. In *Lewis,* the Third Circuit held that reliance on information printed in the *Wall Street Journal* was sufficient to satisfy the certification requirement of Fed.R.Civ.P. 23.1, because "[r]eliance on an article in the *Wall Street Journal* is not reliance on an insubstantial or meaningless investigation" and "plaintiffs and their attorneys need not make further expenditures to prove independently that which may be read with some confidence of truthfulness and accuracy in a respected financial journal." 671 F.2d at 788. *Lewis,* however, dealt with Fed.R.Civ.P. 23.1, and not with Rule 11, which conveys a non-delegable duty upon the signing attorney to conduct his own independent analysis of the facts and law which form the basis of a pleading or motion. *See Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 125-127 (1989). In light of the Supreme Court's ruling in *Pavelic,* if the signing attorney cannot rely on the analysis of a member of his law firm to have ascertained the facts, it is a non sequitur that he somehow can rely on the analysis of attorneys in *different actions* and who are presumably from different law firms.

*In re Livent* similarly is inapposite. Plaintiffs rely on that case because it contains the following paragraph: "It is also apparent that much of the Complaint is culled from Livent's SEC filings and the SEC complaint in the separate civil action against several of the Individual Defendants. These sources, and others, are acknowledged in Paragraph 211 of the Complaint, which sufficiently alleges Plaintiffs' sources of information." *In re Livent,* 78 F.Supp.2d at 216. As defendant KPMG points out, however, in *In re Livent,* the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
2002 WL 276236 (N.D.Ill.), Fed. Sec. L. Rep. P 91,711
**(Cite as: 2002 WL 276236 (N.D.Ill.))**

defendants apparently argued only that the plaintiffs had failed to identify adequately the source for the allegations *that were pleaded* in the complaint. The pervasive defect in the Amended Complaint in this case, however, is that it does not make clear what Plaintiffs directly allege as fact, and what Plaintiffs merely are asserting that someone else has alleged. In other words, Plaintiffs' attorneys cannot shirk their Rule 11 obligation to conduct an appropriate investigation into the facts that is reasonable under the circumstances by merely stating that "the SEC alleges" certain additional facts. [FN8]

> FN8. Significantly, Plaintiffs do not allege any of these facts as their own. The Amended Complaint refers to the SEC Complaint more than 70 times, the Brisker Complaint 13 times, and the Baxter Motion (or its exhibits) 9 times. Plaintiffs do not attest to independently examining the materials underlying these third-party allegations; they did not contact the attorneys for the plaintiffs in these actions or the witnesses quoted. As defendant KPMG points out, if this Court were to accept Plaintiffs' view of pleading fraud, two plaintiffs could file separate actions each relying on the allegations in the other's complaint and both would state a claim for fraud. Clearly, Rule 11's requirements do not allow this type of pleading loophole.

In *Geinko I,* this Court noted that in their original complaint, Plaintiffs had gone so far "as to compare their complaint to the complaint in *Chu* and suggest that since Judge Castillo found scienter as to certain defendants there, this Court ought to find that the plaintiffs here have adequately plead scienter." *Geinko I, 2001 WL 1163728, at \*5*. With their Amended Complaint, Plaintiffs have not done better. Essentially, in response to this Court's request that Plaintiffs plead more specific facts, and that they allege "red flags" similar to those alleged in *Chu,* Plaintiffs merely have recited facts from other actions, attached copies of those actions, and asserted that red flags emerge from those facts. Clearly, this is not enough; the hearsay allegations [FN9] that Plaintiffs offer in their Amended Complaint are improper, and therefore superfluous, and they will not be

considered. This Court gives Plaintiffs 14 days to amend their complaint an additional time in conformance of Rule 11. This Court notes, however, that Plaintiffs must do more than merely include the words, "based on information and belief," because alleging fraud on information and belief is insufficient. *See Bankers Trust Co. v.. Old Republic Ins. Co., 959 F.2d 677, 683-84 (7th Cir.1992).* While the duty to plead with particularity is relaxed in cases where facts indicating "circumstances constituting fraud" are inaccessible to plaintiff, *id.,* in this case Plaintiffs would need to explain clearly (rather than just conclusively state) why this is the case and cite adequate case law in support. [FN10] If Plaintiffs fail to amend their complaint satisfactorily within the 14 days, this action will be dismissed with prejudice because the remaining facts in the Amended Complaint do not cure the pleading deficiencies that this Court identified in *Geinko I.*.

> FN9. For support that these are hearsay allegations, defendant Padda cites *SSDD Enters., Inc. v. Village of Lansing,* No. 95 C 6064, 1996 WL 238931, at \*2 n. 7 (N.D.Ill. May 3, 1996), in which the court held that allegations from newspaper articles are hearsay and were made on information and belief, which the court then disregarded as violating Rule 11. In this case, while Plaintiffs do not take facts from newspapers but from other complaints in which arguably Rule 11 applied, it is still hearsay because Rule 11 imposes a non-delegable duty upon the signing attorney to conduct his own independent analysis. *See Pavelic, 493 U.S. at 125-127.*

> FN10. For example, Plaintiffs baldly assert that it was appropriate for them to rely upon and submit the third-party actions because they do not have the resources of the SEC or of the class action plaintiffs' counsel.

### III. Conclusion

**\*7** For the reasons stated herein, this Court GRANTS the defendants motions on pleading grounds, but grants Plaintiffs 14-days leave to amend their complaint to conform to the requirements of Rule 11. If Plaintiffs fail to

Not Reported in F.Supp.2d                                                                    Page 7
2002 WL 276236 (N.D.Ill.), Fed. Sec. L. Rep. P 91,711
**(Cite as: 2002 WL 276236 (N.D.Ill.))**

amend their complaint satisfactorily within the 14 days, this action will be dismissed with prejudice and without further notice.

2002 WL 276236 (N.D.Ill.), Fed. Sec. L. Rep. P 91,711

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23524352 (Trial Motion, Memorandum and Affidavit) Joint Motion for Entry of Stipulation and Consent Order (May. 20, 2003)

• 2003 WL 23524343 (Trial Motion, Memorandum and Affidavit) Joint Motion for Entry of Corrected Dismissal Order and Judgment (Apr. 03, 2003)

• 2003 WL 23524336 (Trial Motion, Memorandum and Affidavit) Joint Motion for Entry of Order Dismissing Action Against Kpmg LLP With Prejudice (Mar. 24, 2003)

• 2003 WL 23525055 (Trial Pleading) Defendant Kpmg LLP's Answer and Affirmative Defenses to Counts I, II, III, and IV of the Second Amended Complaint (Feb. 14, 2003)

• 2003 WL 23524330 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Leave to Take More Than Ten (10) Depositions (Feb. 04, 2003)

• 2003 WL 23524324 (Trial Motion, Memorandum and Affidavit) Defendant KPMG LLP's Motion for Entry of Orders (Jan. 21, 2003)

• 2003 WL 23524313 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Plaintiffs' Motion to Compel Discovery From Defendant Kpmg Llp (Jan. 08, 2003)

• 2003 WL 23524310 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum In Opposition to Defendant Kpmg Llp's Motion for A Protective Order In Response to Plaintiffs' Notice of Deposition Pursuant to Rule 30(b)(6) (Jan. 06, 2003)

• 2002 WL 32509612 (Trial Motion, Memorandum and Affidavit) Defendant KPMG LLP's Supplemental Memorandum In Support of Its Motion for A Protective Order In Response to Plaintiffs' Notice of Deposition

Pursuant to Rule 30(b)(6) (Dec. 19, 2002)

• 2002 WL 32509626 (Trial Motion, Memorandum and Affidavit) Joint Motion for Limitation of Discovery During Settlement Negotiations and Modification of Schedule (Dec. 13, 2002)

• 2002 WL 32509600 (Trial Motion, Memorandum and Affidavit) Defendant KPMG LLP's Motion To Compel Discovery From Plaintiffs (Dec. 12, 2002)

• 2002 WL 32509607 (Trial Motion, Memorandum and Affidavit) Defendant KPMG LLP's Memorandum of Law In Opposition To Plaintiffs' Motion To Compel the Production of Documents (Dec. 12, 2002)

• 2002 WL 32509618 (Trial Motion, Memorandum and Affidavit) Defendant Kpmg Llp's Motion for A Protective Order in Response To Plaintiffs' Notice of Deposition Pursuant To Rule 30(b)(6) (Dec. 03, 2002)

• 2002 WL 32509599 (Trial Motion, Memorandum and Affidavit) Joint Motion for A Protective Order (Nov. 13, 2002)

• 2002 WL 32509591 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion To Compel Discovery From Deffendant Kpmgllp (Nov. 07, 2002)

• 2002 WL 32509594 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Motion to Compel Discovery From Defendant KPMG LLP (Nov. 07, 2002)

• 2002 WL 32509585 (Trial Motion, Memorandum and Affidavit) Joint Motion of Plaintiffs and Defendants Padda, Holden, Reilly, and Lautman to Extend Stay Pending Completion of Settlement (Jul. 15, 2002)

• 2002 WL 32509582 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Defendant KPMG LLP In Support of its Motion to Dismiss Count III of the Second Amended Complaint and to Strike Portions of Plaintiffs' Prayer for Relief (Jun. 26, 2002)

• 2002 WL 32509579 (Trial Motion, Memorandum and

Not Reported in F.Supp.2d                                                              Page 8
2002 WL 276236 (N.D.Ill.), Fed. Sec. L. Rep. P 91,711
**(Cite as: 2002 WL 276236 (N.D.Ill.))**

Affidavit) Plaintiffs' Memorandum of Law in Opposition to KPMG's Motion to Dismiss Count III of Second Amended Complaint and to Strike Portions of Plaintiffs' Prayer for Relief (Jun. 11, 2002)

• 2002 WL 32509576 (Trial Motion, Memorandum and Affidavit) Joint Motion for Entry of Order of Dismissal with Prejudice of Claims Against Egs Securities Corp. (May. 31, 2002)

• 2002 WL 32509573 (Trial Motion, Memorandum and Affidavit) Defendant KPMG LLP's Motion to Dismiss Count III of the Second Amended Complaint and to Strike Portions of Plaintiffs' Prayer for Relief (May. 17, 2002)

• 2002 WL 32509569 (Trial Motion, Memorandum and Affidavit) Defendant KPMG LLP's Motion to Dismiss Count III of the Second Amended Complaint and to Strike Portions of Plaintiffs' Prayer for Relief (May. 10, 2002)

• 2002 WL 32510835 (Trial Pleading) Defendant KPMG LLP's Answer and Affirmative Defenses to Counts I, II, and IV of the Second Amended Complaint (May. 10, 2002)

• 2002 WL 32510833 (Trial Pleading) Second Amended Complaint (Apr. 16, 2002)

• 2002 WL 32509551 (Trial Motion, Memorandum and Affidavit) EGS Securities Corp.'s Reply Memorandum in Support of its Motion to Dismiss Plaintiffs' First Amended Complaint (Feb. 07, 2002)

• 2002 WL 32509556 (Trial Motion, Memorandum and Affidavit) Defendant Lautman's Reply Memorandum in Support of Motion to Dismiss the First Amended Complaint (Feb. 07, 2002)

• 2002 WL 32509561 (Trial Motion, Memorandum and Affidavit) John Reilly's Reply Memorandum in Support of his Motion to Dismiss the Amended Complaint (Feb. 07, 2002)

• 2002 WL 32509565 (Trial Motion, Memorandum and Affidavit) Defendant K. Shan Padda's Reply Memorandum in Support of Motion to Dismiss Amended Complaint (Feb. 07, 2002)

• 2002 WL 32509529 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Defendant Kpmg LLP in Support of its Motion to Dismiss the First Amended Complaint (Jan. 25, 2002)

• 2002 WL 32509539 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of law in Opposition to Defendants' Motions to Dismiss (Jan. 17, 2002)

• 2001 WL 34554206 (Trial Motion, Memorandum and Affidavit) Defendant KPMG LLP's Motion to Dismiss the First Amended Complaint (Dec. 20, 2001)

• 2001 WL 34554209 (Trial Motion, Memorandum and Affidavit) Defendant KPMG LLP'S Memorandum of Law in Support of Its Motion to Dismiss the First Amended Complaint (Dec. 20, 2001)

• 2001 WL 34554210 (Trial Motion, Memorandum and Affidavit) Defendant Egs Securities Corp.'s Motion to Dismiss Plaintiffs' first Amended Complaint (Dec. 14, 2001)

• 2001 WL 34554212 (Trial Motion, Memorandum and Affidavit) John Reilly's Motion to Dismiss the Amended Complaint (Dec. 14, 2001)

• 2001 WL 34554213 (Trial Motion, Memorandum and Affidavit) Defendant Stephen Holden's Motion to Dismiss First Amended Complaint (Dec. 14, 2001)

• 2001 WL 34554214 (Trial Motion, Memorandum and Affidavit) Defendant K. Shan Padda's Memorandum in Support of Motion to Dismiss Amended Complaint (Dec. 14, 2001)

• 2001 WL 34554211 (Trial Motion, Memorandum and Affidavit) Defendant Lautman's Memorandum In Support of Motion to Dismiss The First Amended Complaint (Dec. 13, 2001)

• 2001 WL 34554365 (Trial Pleading) First Amended Complaint (Nov. 05, 2001)

• 2000 WL 34334103 (Trial Pleading) Complaint (Aug. 18, 2000)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 9
2002 WL 276236 (N.D.Ill.), Fed. Sec. L. Rep. P 91,711
**(Cite as: 2002 WL 276236 (N.D.Ill.))**


• 1:00CV05070 (Docket) (Aug. 18, 2000)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Not Reported in A.2d                                                                                Page 1
1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022
**(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)**

**c**

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

John Paul DECKER and International Apparel Associates,
Plaintiffs,
v.
A.W. CLAUSEN, et al., Defendants.
and
Bankamerica Corporation, Nominal Defendant.
William STEINER, Plaintiff,
v.
A.W. CLAUSEN, et al., Defendants.
and
Bankamerica Corporation, Nominal Defendant.

**Civ. A. Nos. 10,684, 10,685.**

Submitted: Sept. 8, 1989.
Decided: Nov. 6, 1989.

**\*\*1024** R. Bruce McNew, Pamela Tikellis, and Carolyn
Mack, Greenfield & Chimicles, Wilmington, Kenneth A.
Jacobsen, Greenfield & Chimicles, Haverford, Pa. and
Patrick J. Grannan, Greenfield **\*\*1025** & Chimicles, Los
Angeles, Cal., for plaintiffs Decker and International
Apparel Associates.

Joseph A. Rosenthal, Morris, Rosenthal, Monhait & Gross,
P.A., Wilmington, of counsel: Goodkind Labaton & Rudoff,
New York City, for plaintiff Steiner.

Martin P. Tully, Morris, Nichols, Arsht & Tunnell,
Wilmington, for Individual defendants.

R. Franklin Balotti, Richards, Layton & Finger,
Wilmington, for defendant United Education Software.

Bruce M. Stargatt, Young, Conaway, Stargatt & Taylor,
Wilmington, and Jack W. Londen, Morrison & Foerster,
San Francisco, Cal., for BankAmerica Corporation.

MEMORANDUM OPINION
BERGER, Vice Chancellor.

**\*1** In the spring of 1989, several derivative actions were
filed by stockholders of BankAmerica Corporation ("BAC")
seeking recovery for alleged mismanagement of student
loans by BAC's subsidiary, Bank of America National Trust
& Savings Association (the "Bank"). Several actions were
filed in various state courts in California and at least one
remains pending in the Superior Court for the County of Los
Angeles (the "California action"). Two Delaware actions,
one brought by John Paul Decker and International Apparel
Associates (collectively, "Decker") and one by William
Steiner ("Steiner"), were filed at about the same time as the
earliest of the California actions.

Steiner has essentially abandoned his Delaware action in
favor of the California action (in which he is one of the
named plaintiffs), whereas Decker, who is not a party to the
California action, has been pursuing his claim in this
jurisdiction. Specifically, on June 6, 1989, Decker filed an
amended complaint that purports to allege three derivative
causes of action against the BAC directors, one derivative
cause of action against United Education & Software, Inc.
("United") and one individual cause of action against the
BAC directors. This is the decision, after briefing and
argument, on BAC and the defendant directors' motion to
dismiss the derivative allegations in the Decker action
[FN1].

**\*\*1026** The claims at issue center on the Bank's
involvement in a student loan program. The Bank,
allegedly, is the largest student loan lender in California
and, for several years, has been acting as trustee in
connection with more than $1 billion in student loans issued
by California Student Loan Finance Corp. ("CSLFC"), a
non-profit corporation in the business of packaging student
loans as securities for sale to institutional investors. The
student loans, which allegedly have a very high default rate,
were guaranteed by the U.S. Department of Education. That
guarantee formed a substantial part of the value of the
student loans, and was effective only if the lender complied
with federal regulations and procedures relating to the
servicing of the loans.

The Bank used United to service the student loans and to
perform the functions necessary for maintaining the federal
guarantees. However, an alleged computer breakdown at

1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022
**(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)**

United in 1987 left United unable to satisfy the federal loan servicing requirements. Both the Bank and United allegedly failed to rectify this problem and, as a result, the federal guarantees were withdrawn. The Bank has recognized that this series of events (which precipitated lawsuits against the Bank by other banks that had backed the student loans with letters of credit) has caused or is likely to cause substantial losses. In the fourth quarter of 1988, the Bank allegedly set aside a $98 million reserve in connection with the student loan program, and an additional undisclosed amount was reserved in the first quarter of 1989.

Based upon these facts (which are set out in greater detail in the amended complaint), Decker asserts three derivative causes of action against the BAC directors: (1) willful failure to control and manage BAC and the Bank, amounting to a fraud upon BAC and its stockholders; (2) negligent failure to exercise ordinary care; and (3) constructive fraud based upon the BAC directors' alleged concealment and misrepresentation of material facts. Decker's fourth cause of action charges that United breached its contractual obligations **1027 by failing to service the student loans properly, and that United fraudulently induced BAC and the Bank to enter into the loan servicing agreement by representing that United was ready, willing and able to service the loans when it knew that it was unable to fulfill those commitments.

**\*2** The amended complaint includes seven pages of reasons why Decker's failure to make presuit demand on the BAC directors would have been futile and should, therefore, be excused. Those reasons may be grouped into the following general categories: (1) the BAC directors participated in and/or approved the alleged wrongdoing; (2) the directors have taken no action in response to demands made by other stockholders, and the board's handling of other derivative claims has been inadequate; (3) the directors are actively defending law suits brought by other banks concerning the wrongs alleged in the Decker complaint; (4) the directors receive substantial salaries as directors and, thus, have benefitted from the wrongs alleged; and (5) the directors would not sue themselves.

Under Delaware law, the "demand requirement ... is a rule of substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 809 (1984). It is "inextricably bound to issues of business judgment," and is "a recognition of the fundamental precept that directors manage the business and affairs of corporations." *Id.* at 812. Demand is excused where the complaint alleges, with particularity, facts that "raise a reasonable doubt as to (i) director disinterest or independence or (ii) whether the directors exercised proper business judgment in approving the challenged transaction." *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 186 (1988).

To succeed on the first prong of the demand futility test, Decker must show that the BAC directors may not have been disinterested or independent. The directors' independence could be challenged by alleging, with particularity, facts showing that they "were dominated or otherwise controlled by an individual or entity interested in the transaction." *Id.* at 189. As to disinterest, the Decker complaint must include particularized factual allegations showing entrenchment or a financial interest on the part of the BAC directors. *See id.* at 188.

None of the allegations in the amended complaint raises a reasonable doubt that the BAC directors were disinterested or independent. There is nothing in the nature of the loan servicing problems that would suggest either an entrenchment motive or any **1028 interest, in the sense of self-dealing, on the part of the directors. The amended complaint alleges that the BAC directors participated in and/or approved the alleged wrongs. However, such allegations, like the claim that demand would be futile because the directors would have to sue themselves, have been rejected consistently by our courts. *See Aronson v. Lewis,* 473 A.2d at 817; *see also Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 625 (1984); *Good v. Getty Oil Co.,* Del.Ch., 514 A.2d 1104, 1107-08 (1986).

Decker's allegation that BAC's liability insurance would not cover an action brought by the company against its own directors and the allegation that the directors recommended a charter amendment limiting their liability are but variations on the "directors suing themselves" and "participating in the wrongs" refrain. They provide no

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

particularized facts creating a reasonable doubt that the directors are disinterested or independent. The fact that they receive salaries for serving as directors, likewise, is insufficient to excuse demand. *Grobow v. Perot,* 539 A.2d at 188. Finally, the suggestion that demand is excused because the directors did not respond to another stockholder's demand or because they are defending related litigation is without merit. *See Kaplan v. Peat, Marwick, Mitchell & Co.,* Del.Supr., 540 A.2d 726, 731 n. 2 (1988); *Allison v. General Motors Corp.,* 604 F.Supp. 1106, 1113 (D.Del.) *aff'd mem.,* 782 F.2d 1026 (3d Cir.1985).

*3 Decker seems to recognize that the list of reasons for demand futility contained in his amended complaint is insufficient. Instead, he argues that the directors are interested because the prospect is very good that they will be found liable. This argument draws on language in *Aronson* suggesting that directors may be interested for purposes of the demand requirement "in rare cases [where] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson v. Lewis,* 473 A.2d at 815. However, since a finding of director interest on this ground would require a finding that the second prong of the demand futility test had been satisfied, it seems more appropriate to address the question of the applicability of the business judgment rule directly.

To satisfy the second prong of the demand futility test, the factual allegations of the amended complaint must create a reasonable doubt that the BAC directors exercised proper business judgment. This analysis includes the question of whether the directors fulfilled their duty of procedural due care, by becoming fully informed, and their duty of substantive due care, by not engaging in, e.g., a waste **1029 of corporate assets. *See Grobow v. Perot,* 539 A.2d at 189. The amended complaint includes many allegations detailing United's failure to perform its student loan servicing tasks. It also details at least one method by which the Bank should have become aware of United's problems long before it did. As early as the spring of 1987, the Bank allegedly received monthly reports indicating that a substantial number of claims made with respect to the

student loans were being denied by the agencies responsible for the federal guarantees. This high denial rate should have alerted the Bank that United was not carrying out its loan servicing functions correctly. Other more specific aspects of United's operations also allegedly should have been known to the Bank. For example, for a five month period in 1988, more than 200,000 change-of-status notices were left unprocessed by United while that company was undergoing a computer conversion. The prompt processing of such status code changes is critical to the successful operation of the student loan program and the Bank allegedly knew of this problem or made no effort to discover it.

Whether these allegations would excuse demand if the defendants were the Bank and its directors would be a close question. The amended complaint alleges that serious problems existed with the student loan program and that the Bank either ignored those problems or was unaware of them for as much as a year. These allegations could possibly be enough to create a reasonable doubt that the directors of the Bank exercised due care in overseeing the student loan program.

That question need not be resolved, however, as neither the Bank nor the Bank's directors are defendants in this action. Rather, the defendants are the directors of the Bank's parent company, BAC. There are no allegations that the parent and subsidiary have the same or interlocking boards, and it appears from Decker's identification of the individual defendants that none of them is, in fact, a director of the Bank. Thus, it does not follow that any of the problems United was having, even if known to the Bank, were or should have been known to the directors of BAC. Under normal circumstances, a board of directors ought to be able to rely on its subsidiary's directors to oversee that subsidiary's management and attend to any problems that may arise. The amended complaint includes no factual allegations suggesting that the individual defendants here should not have relied upon the Bank's directors. Decker's conclusory allegations that the BAC directors "should have known" about problems with United and the student loans are unsupported and, therefore, do not create a reasonable doubt that the BAC **1030 directors neglected their duties or were grossly negligent in attempting to carry them out.

Westlaw.

Not Reported in A.2d                                                                                      Page 4

1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022

**(Cite as: 1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022)**

**\*4** Based upon the foregoing, I find that the amended complaint fails to allege facts which, if true, would create a reasonable doubt as to the BAC directors' disinterest, independence or proper exercise of business judgment. Accordingly, the motion to dismiss Counts 1-4 of the amended complaint is granted. IT IS SO ORDERED.

> FN1. After this motion to dismiss had been briefed and argument had been scheduled, Steiner filed a motion to consolidate his action with Decker's and a motion to stay the consolidated actions. Both of those motions were opposed not only by defendants but also by Decker. The thrust of Steiner's argument was that, as a matter of judicial economy and comity, the same claims should not be litigated in two different jurisdictions. These, of course, are compelling considerations. However, in light of my disposition of the pending motion to dismiss all of the derivative claims in the Decker amended complaint, I conclude that the motions to consolidate and to stay are mooted.

1989 WL 133617 (Del.Ch.), 15 Del. J. Corp. L. 1022

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Slip Copy                                                                                                   Page 1
18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
**(Cite as: 2004 WL 1895052 (Mass.Super.))**

Superior Court of Massachusetts.

Arthur S. DEMOULAS, individually and derivatively on
behalf of Demoulas Super
Markets, Inc.
v.
DEMOULAS SUPER MARKETS, INC. et al. [FN1]

FN1. Arthur T. Demoulas, individually and as Trustee of the Arthur T. Demoulas Revocable Trust; Sumner Darman; Edward H. Pendergast; J. Terrence Carleton; Charles Roazen; and William J. Shea.

No. 033741BLS.

Aug. 2, 2004.

*FINDINGS AND RULINGS AFTER EVIDENTIARY HEARING*

ALLAN VAN GESTEL, Justice of the Superior Court.

**\*1** This matter is before the Court after a bifurcated evidentiary hearing on the issue of whether the directors, or at least a majority of the directors, of Demoulas Supermarkets, Inc. were "interested" when acting on the matters in issue. See Memorandum and Order on Rule 16 Conference, dated October 14, 2003. The matters in issue and the procedural and legal posture warrant explication before the Court sets forth its findings and rulings on the matters considered.

PROCEDURAL AND LEGAL BACKGROUND

This is a Mass.R.Civ.P. Rule 23.1 derivative action, basically between Arthur S. Demoulas ("Arthur S.") and his cousin Arthur T. Demoulas ("Arthur T."), with allegations spilling over against the directors of Demoulas Super Markets, Inc. ("DSM"). The amended complaint characterizes the case as a "demand excused" case. [FN2]

FN2. The defendant directors insist that there was a demand, and that it was denied. That issue, so far, has only been raised on a motion to dismiss. It remains open for another day.

In general, before filing a derivative action on behalf of a corporation, a plaintiff "must establish that ... all available means to obtain relief through the corporation itself" are exhausted by making a demand on the corporation's board of directors to prosecute the litigation ... The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or a majority of shareholders should set the corporation's business policy, including decisions whether to pursue a lawsuit ... However, if a majority of directors are alleged to have participated in the wrongdoing, or are otherwise interested, a plaintiff may seek to have the demand on the board excused as futile. This is referred to as a "demand excused" case.

*Harhen v. Brown*, 431 Mass. 838, 844 (2000).

The demand requirement is found in Mass.R.Civ.P. Rule 23.1 wherein it is said, "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority, and the reasons for his failure to obtain the action or for not making the effort."

This case was filed in 2003, prior to the enactment of the new Massachusetts Business Corporation Act, G.L.c. 156D. See Chapter 127 of the Acts of 2003. This new law did not become effective until July 1, 2004. [FN3] It is prior to the date of filing a derivative claim that any demand must be made. Consequently, the law that will be applied to the present evidentiary proceeding--at least insofar as it relates to pre-suit demand requirements-- will be that in place prior to the new Act.

FN3. The Court makes this observation because, at least for certain purposes, it may now be dealing with a creature that is about to become extinct. Under G.L.c. 156D, the new Massachusetts Corporation Act, in Sec. 7.42, a demand must be made prior to the commencement of every derivative case, whether or not the directors are independent with respect to the matter subject to the demand.

A demand on the directors may be excused as futile if the directors are "otherwise interested." *Harhen, supra,* 431

Slip Copy                                                                 Page 2
18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
**(Cite as: 2004 WL 1895052 (Mass.Super.))**

Mass. at 844.

In *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 523 (1997), the SJC affirmed a finding by the trial judge that the then directors of DSM were "interested" in that they "had a business or financial relationship with Telemachus [Demoulas]'s family, were subject to his controlling influence, or stood to benefit personally from the transactions at issue."

**\*2** This Court has already determined that in the present situation a majority of the current directors are not shown by the amended complaint to have any business or financial relationship with Arthur T. or his side of the Demoulas family, nor have they been shown to stand to benefit personally from the transaction at issue. Thus, unless they are shown to be subject to Arthur T.'s controlling influence, under the standards for determining interestedness set out in *Demoulas [, supra,* 424 Mass.] at 523-24 and *Harhen [, supra,* 431 Mass.] at 842-43 and n. 5, they must be considered and treated ... as disinterested. Memorandum and Order on Motions to Dismiss, September 22, 2003 [16 Mass. L. Rptr. 701].

The triggering event for this lawsuit is a September 9, 2002, memorandum request from Arthur T. addressed to the DSM directors, asking them to facilitate his "desire to have the freedom to pursue [his] own interests within the same type of business as DSM or any other type of business. To have such freedom of action, [he] would need to end any fiduciary duty [he has] to DSM in any capacity." Arthur T. advised the DSM board, "In order to accomplish this, I propose to resign my position with the company if [the board will] permit me to transfer my shares of the company's Class B common stock to my wife Maureen, who will then transfer them to an irrevocable voting trust." By so doing, Arthur T. said, his wife "will receive the economic benefits associated with the shares, but the trustee will have sole voting power."

Arthur S., by his complaint, seeks a declaration pursuant to Mass.G.L.c. 231A, Sec. 1, that "Arthur T. has fiduciary obligations to DSM and to Arthur S., that he may not extinguish by nominally transferring the economic benefits associated with his DSM stock to his wife, and voting rights relating to that stock to a 'trustee' selected by Arthur T. and

who will be paid, and subject to removal at regular intervals, by his wife."

Arthur S. also seeks related declaratory and injunctive relief, as well as "all damages caused by [the defendant directors'] waiver of the existing restrictions upon the transfer of Arthur T.'s shares, and their failure and refusal to impose meaningful restrictions on Arthur T.'s rights to compete with, solicit the employees of, usurp the corporate opportunities of, or misappropriate the confidential information of, DSM, in breach of their fiduciary duties to DSM."

DSM is a close corporation under Massachusetts law. It "was initially formed as a Delaware corporation in 1964; in 1982, a new Massachusetts corporation was formed and the Delaware corporation was merged into it." *Demoulas, supra,* 424 Mass. at 511.

DSM's Articles of Organization prevent the transfer of any shares in the company to anyone unless those shares are first offered for sale to DSM. If offered, the market value of the shares is to be determined by an expert appraisal. Upon completion of the appraisal, the DSM board may then choose to purchase, or not to purchase, those shares. If the board elects not to purchase the shares, they then may be sold to any third party or entity. The Articles further provide that the directors may waive DSM's right to insist upon the foregoing procedure. Arthur T.'s memorandum to the directors of September 9, 2002, sought such a waiver.

**\*3** The directors held a number of meetings at which they considered Arthur T.'s request. [FN4] At the first meeting, on September 18, 2002, the proposal was defeated by a vote of four to two, with one director abstaining. At the second meeting, on November 13, 2002, after a presentation by Arthur T., the directors voted five to two to approve the waiver. The five voting in favor included the directors who are named as defendants in this action. This latter vote was conditioned upon Arthur T.'s willingness to enter into an agreement that, according to Arthur S., would leave Arthur T. "free to compete [with DSM] in the Real Estate Business and would impose restrictions of little practical significance on his ability to compete with DSM in the Supermarket Business, to solicit DSM employees, or to utilize DSM's

corporate opportunities."

> FN4. Apparently, since the resolution of *Demoulas, supra,* 424 Mass. 501, all meetings of the DSM board of directors have been stenographically transcribed. Thus, this Court has been provided with and has reviewed the transcripts of each directors' meeting at which Arthur T.'s request for a waiver was discussed and acted upon.

The situation regarding the demand and the question of interestedness or bias on the part of certain DSM directors breaks into two different parts. First, there is the action by the defendant directors in ultimately voting in favor of Arthur T.'s request for a waiver, coupled with the demand that the corporation sue, among others, those directors for whatever damages, if any, may accrue therefrom. Second, there is the issue of whether the corporation should proceed with Arthur S.'s demand for a declaratory judgment relating to whether Arthur T., after his proposed transfer of his stock to his wife, and then to a voting trust, still retains any fiduciary duties to DSM. While not ripe for determination at this time, each of those situations appears burdened with substantive weaknesses, and the second, relating to the declaratory judgment, has a potential procedural limitation; both it appears should be kept in mind when assessing the various directors' status.

On the issue of voting to grant the waiver, this Court has some difficulty in understanding what it is that constitutes legally redressable "wrongdoing" on the part of Arthur T. in requesting, and the various defendant directors in considering and acting upon, a waiver that is expressly provided for and included in the DSM Articles of Organization. Was it wrong for the directors to act upon Arthur T.'s request? If they refused to act, could Arthur T. have brought his own derivative suit against them for not acting? Indeed, could Arthur S. himself have brought a somewhat differently focused derivative suit against the directors if they failed to act and deny Arthur T.'s request? In short, it really appears to be the business judgments exercised by the directors in voting contrary to Arthur S.'s wishes that he is complaining about. Should a disagreement with the exercise of business judgment be found to state a claim upon which relief may be granted and excuse Arthur

S. from the demand requirement?

What may--or may not, depending upon things that have not yet occurred--become a wrongdoing on Arthur T.'s part depends upon the extent to which, despite his transfer of stock that he holds in a closely held Massachusetts corporation, he may still retain fiduciary duties to DSM. Those issues, however, seem quite premature, at least until a Court has before it the facts about what he has done. So far as this Court knows, Arthur T. has not even made the transfer of his stock at this time. Thus, how can the interestedness or bias of the directors affecting their actions with regard to a declaratory judgment suit be measured if what is before the Court is nothing more than a hypothetical proposition on which the determinative facts have not yet occurred?

**\*4** These concerns cannot be ignored and should be included in the blend of the stew that relates to whether a demand can be excused.

There are two cases that provide some--but far from total--guidance on how to proceed and what to look for, *Harhen, supra,* 431 Mass. 838, mentioned above, and *Houle v. Low,* 407 Mass. 810 (1990). Both cases dealt with the status of special litigation committees and are incomplete in their teachings because of the situational and procedural postures in which they were decided.

*Harhen* came up after allowance of a motion to dismiss. It involved, basically, whether a special litigation committee, appointed by admittedly disinterested directors, was sufficiently alleged in the complaint to be interested. If the allegations of interestedness were adequate, then the committee's determination not to proceed with the litigation would not be governed by the business judgment rule; and if the allegations were insufficient, then the business judgment rule would apply. The SJC determined that the allegations in the complaint did not meet the Rule 23.1 pleading-with-particularity standard and affirmed the dismissal.

*Houle* came up after the allowance of a motion for summary judgment in which the trial court determined that there were no material factual matters in dispute on the issue of the

Slip Copy                                                                                           Page 4
18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
**(Cite as: 2004 WL 1895052 (Mass.Super.))**

disinterestedness of a one-person special litigation committee appointed by clearly interested directors in a closely-held corporation. The SJC in *Houle* determined that there were disputed factual matters on the issue and remanded for a hearing.

Neither *Harhen* nor *Houle* presents the same legal or procedural issues as are presented here. Thus, while there is language in those cases that provides some indication as to what the law may be, they are far from conclusive on the points in issue here.

The Court embraces two things from *Harhen* and *Houle*.

From *Harhen* it follows the teaching that the SJC has adopted 1 ALI Principles of Corporate Governance: Analysis and Recommendations Secs. 1.15 and 1.23 (1994) for purposes of determining whether a director is "interested" in a matter presented in a derivative action. *Harhen, supra, 431 Mass. at 842-43 and n. 5; Demoulas, supra, 424 Mass. at 523-24*. Only one of the four ALI principles is applicable in this case. It is found in sec. 1.23(a)(4) which reads:

    (a) A director ... is "interested" in a transaction or conduct if

    ...

    (4) The director ... is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's ... judgment with respect to the transaction or conduct in a manner adverse to the corporation.

From *Houle* this Court adopts the SJC's direction that there needs to be "an evidentiary hearing before [the Court] without a jury to determine whether ... [the directors] were independent and unbiased." *Houle, supra, 407 Mass. at 824*.

**\*5** What, then, is the "transaction" on which Arthur T.'s controlling influence "could reasonably be expected to affect ... director[s'] judgment ... in a manner adverse to the corporation"? This Court, as noted above, sees two issues: (1) the action ultimately favoring Arthur T.'s request for a waiver; and (2) whether, after the waiver is granted and the stock is transferred, Arthur T. still retains any fiduciary

duties.

The Judgment Following Rescript entered in the underlying case in *Demoulas v. Demoulas Supermarkets, Inc.,* Middlesex Superior Court # 90-2344-B, dated February 4, 1999, in Section 20 thereof, reads as follows:

    The shareholders [of DSM shall] elect a new board of directors that shall henceforth consist of:

    i. Two members of the George Demoulas family or their nominees, including Arthur S. Demoulas;

    ii. Two members of the Telemachus Demoulas family or their nominees [,] excluding Telemachus Demoulas, D. Harold Sullivan and James T. Curtis; and

    iii. Three disinterested, independent directors who meet the standards of independence as published by the New York Stock Exchange ("NYSE").

It is in the context of the previous procedural and substantive issues that this Court conducted an evidentiary hearing on the DSM directors' interestedness and bias, and now makes the following findings of fact and rulings of law.

FINDINGS OF FACT

All of DSM's stock is owned, in various ways, by different members of the Demoulas family. The heirs of George Demoulas constitute the "Class A" shareholder group. Arthur S., a son of George Demoulas, is a Class A shareholder. The wife and children of the late Telemachus A. Demoulas are members of the "Class B" shareholder group. Arthur T., a son of Telemachus Demoulas, is a Class B shareholder.

Rafaele Demoulas ("Rafaele") is the widow and administratrix of the estate of Evan Demoulas, another son of George Demoulas and a Class A shareholder. In an arrangement alluded to but not explained to the Court, Rafaele recently has been permitted by the Class B shareholders to propose one of the B directors of DSM, and Rafaele votes the estate's shares with the Class B shareholder group when electing A-B directors.

The Court in the earlier Demoulas litigation mentioned above awarded control of 2,500 shares of DSM to what is now Arthur S.'s branch of the family and who are entitled to select and vote for A directors and 2,450 shares to what is

Slip Copy                                                                                                                Page 5
18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
**(Cite as: 2004 WL 1895052 (Mass.Super.))**

now Arthur T.'s branch of the family and who are entitled to select and vote for B directors. However, because of a dispute between Arthur S. and his sister-in-law Rafaele, and with litigation thereon pending in the Middlesex Probate and Family Court, 75 of the A shares are not voted.

There is nothing that compels any A or B shareholder to vote his or her shares in any particular way or block, except that only A shareholders can vote for A directors and only B shareholders can vote for B directors. Despite the absence of any requirements therefor, however, the two branches of the Demoulas family tend to vote in blocks, except occasionally for Rafaele. Without the 75 shares that are subject to the Arthur S./Rafaele dispute, voting control in connection with the A-B directors is in Arthur T.'s side of the family if they all vote the same way.

**\*6** Currently, and at all times material to this proceeding, the Class A directors are and have been Gerard J. Levins ("Levins") and Arthur S. The Class B directors are and have been Sumner Darman ("Darman") and Edward H. Pendergast ("Pendergast"). Pendergast, however, was selected by Rafaele, although he was elected exclusively by the Class B shareholders. The A-B directors are and have been J. Terrence Carleton ("Carleton"), Charles Roazen ("Roazen") and William J. Shea ("Shea"). Shea serves and always has served as chairman.

The Court observes that Arthur S. is not charging Levins, who appears to be an attorney in the significant employ of Arthur S. and Arthur S.'s regular supporter in DSM corporate matters, with being interested or biased in connection with the issues for which demand is claimed to be excused. Levins has not been named as a defendant by Arthur S. in this litigation. No evidence was presented by anyone charging Levins with disqualifying interest or bias. Perhaps this clarifies Arthur S.'s position that it is not *whether* a director acts upon and votes on Arthur T.'s request that is wrongdoing; it is instead *how* that director votes, which, of course, seems to be a matter of business judgment. In any event, this Court finds that, for these purposes, Levins is not shown to be an interested or biased director.

Arthur S., while certainly interested in the outcome, is not

interested and biased against himself and the interests of the other A shareholders, except perhaps Rafaele, in any way such as to legally be disqualified from acting on his own demand or to enable him to claim that any demand on the directors was excused.

For all purposes of this case, the same seven directors have been in office. Thus, if any two of the remaining five A-B or B directors are disinterested and unbiased, there will be, along with Levins and Arthur S., a disinterested and unbiased majority on the board and a demand by Arthur S. ought not be excused.

Next the Court will find the facts regarding the three A-B directors, Carleton, Roazen and Shea. None of these three directors, indeed none of the five remaining directors, has any financial relationship to Arthur T. or his side of the family.

J. Terrence Carleton is a 49-year-old graduate of Bentley College and holds an MBA from Suffolk University. His employment history includes two years at Bache, Halsey, Stuart and Shields as a securities analyst; eight years as a senior analyst and institutional investor at Kidder, Peabody, the final two years being after General Electric Credit Corporation acquired Kidder, Peabody; and his last fifteen years have been in charge of the Technology Communications practice and as a senior corporate executive at the Boston advertising firm of Hill, Holliday, Connors, Cosmopoulos. Carleton serves on the boards of other companies as well.

Carleton was selected for board membership by Arthur T. He was first elected to the board on June 17, 2002.

**\*7** Carleton met Arthur T. many years ago when they both were undergraduate students at Bentley College. The two men were not close friends in college, nor were they enemies. Thereafter, Carleton and Arthur T. would cross paths infrequently at Bentley College alumni gatherings, but they were not otherwise social acquaintances. Carleton had a somewhat similar Bentley College-related relationship with Evan Demoulas, Rafaele's late husband.

Carleton is a Trustee of Bentley College, and in that

Slip Copy                                                                 Page 6
18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
**(Cite as: 2004 WL 1895052 (Mass.Super.))**

capacity he became aware that Arthur T. was considering a relatively large gift to the college. Although Carleton was involved in Bentley's fund-raising campaign, he was not a participant in any discussions with Arthur T. regarding the gift. The gift, which was actually from the Telemachus and Irene Demoulas Family Foundation, was in the amount of $1 million, and the check, dated July 1, 2003, was signed by Arthur T. In that same year the Telemachus and Irene Demoulas Family Foundation made a similar $1 million gift to Boston College.

Carleton never discussed Arthur T.'s waiver request or any other DSM corporate matters with Arthur T. outside of the DSM board meetings.

On the first occasion that the waiver request was brought before the board in September 2002, Carleton abstained from voting because he was new to the board and wanted further information on which to make a judgment.

Charles Roazen received his MBA in 1954 from the Harvard Graduate School of Business Administration. Thereafter, he became employed by Standard Auto Gear Co., Inc., a family-owned company started by his grandfather in 1910. From 1956 to 1988, Roazen served as the President of Parts Distributors, Inc., another closely-held family business in the automotive aftermarket. Parts Distributors, Inc. operated several distribution centers and 30 auto parts stores in eastern New England.

Roazen also became a co-owner and director of Carquest, Inc., the second-largest national marketer in the automotive aftermarket. Between 1982 and 1983 Roazen served as chairman of AIS, Inc., which was involved in selling insurance to trade associations. In 1982, Roazen cofounded Counterworks, Inc., which provided turnkey computer systems for point-of-sale applications in inventory-intensive retail businesses. In 1988 Roazen founded, and still serves as chair of, First Management Services, Inc., a closely-held family enterprise providing financial and real estate management services.

Roazen, through his wife's position as a beneficiary of a substantial family trust, has available to him resources worth approximately $10 million.

Prior to joining the DSM board, Roazen had never met any members of the Demoulas family. He was asked to join the board by Sumner Darman, a longtime friend and lawyer who did legal work for the Roazen family.

Roazen has no social relationship with Arthur T., and he never discussed Arthur T.'s waiver request with him outside of a directors meeting.

**\*8** Roazen was first elected to the board in June 1999.

William J. Shea is 56 years old and serves as chair of the DSM board. Shea received a Master's Degree from Northeastern University in 1972. After receiving his degree, Shea began his employment with the national accounting firm, Coopers & Lybrand. At Coopers & Lybrand, Shea rose to partner and subsequently became the firm's Vice Chairman.

In 1993 Shea joined BankBoston Corporation, where he became Vice Chairman and Chief Financial Officer. At BankBoston, Shea had oversight for financial operations, treasury operations, capital markets, international operations, and national consumer financing activities. In 2001 Shea became the Chief Operating Officer of Conseco, Inc., a large insurance and financial services company in Indiana. A year later Shea was elected President and Chief Executive Officer of Conseco, and in 2003 he was elected to its board of directors.

Shea did not know any member of the Demoulas family before coming on the DSM board. He was, however, acquainted with Robert Farnham, Arthur T.'s brother-in-law, through meetings at youth hockey games played by Shea's and Farnham's sons.

Shea has no social relationship with Arthur T., and he never discussed Arthur T.'s waiver request with him outside of a directors meeting.

Shea, like Roazen, was first elected to the DSM board in June 1999.

There is nothing in Carleton's, Roazen's or Shea's introduction to the DSM board of directors that in any way demonstrates that any of them, when they arrived, were

Slip Copy                                                                                   Page 7
18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
(Cite as: 2004 WL 1895052 (Mass.Super.))

subject to Arthur T.'s controlling influence. Further, their personal business histories compel the inference that they would not likely submit to such control.

The same certainly can be said of Edward H. Pendergast, one of the two B directors. For approximately 38 years Pendergast has worked as a Certified Public Accountant in the Boston area. He has served on the boards of numerous companies and is actively involved in the accounting profession. For many years Pendergast has served as director of the Boston Chapter of the National Association of Corporate Directors, an entity of which he also has been Vice President. Pendergast also has moderated an orientation program for newly elected directors sponsored by the Boston Chapter of the NACD, which program includes emphasis on director "disinterestedness."

Since 1989 Pendergast has operated his own firm, Pendergast & Company, providing corporate financial services to entrepreneurially driven businesses. He assists clients in developing and implementing financial strategies, in securing equity or debt financing, in taking businesses public, in developing strategic alliances, in valuing businesses and in assisting in key negotiations.

As noted above, Pendergast was suggested for a DSM board seat by Rafaele Demoulas, an A director. He was elected as a B director in June of 2001.

The remaining B director, Sumner Darman, is in a somewhat different position from that of the rest--except, perhaps, for Gerard Levins. He, too, is a lawyer, and he has performed a significant amount of legal work for DSM and Arthur T. at times when DSM was under the control of Arthur T.'s father, Telemachus Demoulas. Darman also has represented Arthur T.'s interests in real estate and trust and estate matters from time to time. While this does not necessarily cloak Darman with a mantel of interestedness or bias, it gets him closer than all the rest--again, except, perhaps, for Levins.

**\*9** Given the foregoing, the Court must next make findings on those issues raised by Arthur S. about the defendant directors, aside from their initial invitation or nomination to the DSM board, that could be seen as making any of

Carleton, Roazen, Shea or Pendergast interested or biased in the matters at hand.

The Court begins not with findings, but rather with allegations by Arthur S. in his complaint. Each of these allegations will then be explicated by particular findings. The allegations may be summarized as follows:

1. The Class B shareholders, in alliance with Class A shareholder Rafaele Demoulas, have selected the A-B directors. (Complaint Paras. 15 & 16.)

2. The A-B directors were "selected by, or requested to act as directors by Telemachus Demoulas, Arthur T. or a person acting on their behalf." "Their continuing status and substantial compensation as directors of DSM is wholly dependent on the continuing support of Arthur T. and his branch of the Demoulas family." (Complaint Para. 16.)

3. The five defendant directors "have consistently advanced the interests of Arthur T.'s branch of the Demoulas family at the expense of DSM and its other shareholders." (Complaint Para. 17.)

Examples of these actions are: allowing DSM to pay Telemachus Demoulas a $1,000,000-per-year consulting fee and to make "substantial annual contributions" to his DSM Profit Sharing Plan, and providing him a company car; allowing Arthur T. to remain as a high-paid executive of DSM; allowing Telemachus Demoulas and Arthur T. to serve as trustees of the DSM Profit Sharing Plan; allowing Darman to serve as counsel to DSM while also serving as personal counsel to Arthur T., to serve as intermediary between DSM's independent counsel and Arthur T. over the matter in issue, and giving improper advice regarding the consequences of Arthur T.'s proposal; allowing the same accounting firm that serves Arthur T. and his side of the family to also serve as accountants for DSM; and ignoring alleged evidence that Arthur T. had invested in a spring water company that was a corporate opportunity for DSM. (Complaint Para. 17, sub-paras. a through f.)

4. The defendant directors voted in favor of Arthur T.'s proposal to waive the limitations on his transfer of stock despite Arthur T.'s stated intention to compete with and harm DSM. (Complaint Paras. 20, 23, 24 & 33.)

5. The defendant directors voted to approve an agreement

18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
**(Cite as: 2004 WL 1895052 (Mass.Super.))**

with Arthur T. that was grossly favorable to Arthur T. in his ability to compete with DSM, acquire its corporate opportunities and solicit away its employees. (Complaint Para. 27.)

6. The defendant directors failed to seek appropriate independent legal advice before voting on Arthur T.'s proposal and contract. (Complaint Para. 29.)

7. The defendant directors attempted to justify their actions on Arthur T.'s proposal by proffering "entirely pretextual" comments. (Complaint Para. 32.)

With regard to the first allegation, as noted above, there is insufficient evidence of an "alliance" between Class A shareholder Rafaele and the Class B shareholders for this Court to make findings thereof. Nevertheless, with respect to each of the A-B directors involved here, Rafaele did vote for their election in the same way as all of the B shareholders.

*10 On the second allegation, the Court finds that of the three A-B directors and the two B directors, only Carleton, Shea and Darman were suggested for their positions by some person who is a member of Arthur T.'s side of the family. Even Shea's connection, however, was only with Farnham, a brother-in-law of Arthur T. Roazen and Pendergast were not selected by any member of Arthur T.'s side of the family.

Further, as alleged, given the current status of the stock available to vote, the B shareholders hold a majority of voting stock and, if they all voted in a block, could remove all of the A-B directors, or any one of them, on short notice. Such a vote, if made, would, of course, remove any director from his status as such and deprive him of his compensation as a director. The extent to which Arthur T. has sufficient control over the votes of the remaining B shareholders, however, was not the subject of any evidentiary presentation to this Court. Certainly, as witnessed by the Arthur S./Rafaele dispute, Arthur S. does not have control over all of the A shareholders. None of the other B shareholders, nor Rafaele, the A shareholder said to be in alliance with the B shareholders, testified or submitted any affidavit evidence.

The third allegation asserts that the A-B and B directors "have consistently advanced the interests of Arthur T.'s branch of the Demoulas family at the expense of DSM and

its other shareholders." As a generalized statement, this Court was not presented with sufficient evidence to make such a finding. No evidence was presented on all votes on all issues to enable a finding that the votes consistently favored Arthur T.'s branch of the family, as opposed to the best interests of DSM as a corporation. Arthur S. does, however, provide evidence on certain particular actions which are said by him to be examples of favoritism to the Arthur T. side. The Court will, therefore, address each example proffered.

The first of these issues relates to the compensation afforded to Telemachus Demoulas during the time of the defendant directors' terms in office and prior to his death. The evidence supports the following findings: Telemachus was in the employ of DSM for more than 60 years, although at the end, and particularly after the decision in *Demoulas v. Demoulas Supermarkets, Inc.,* 424 Mass. 501 (1997), his day-to-day involvement with the company was greatly diminished; his compensation of $1 million per year, however, was set by management, not the directors; when questions were raised at directors meetings by Arthur S. about Telemachus's compensation, the board designated a committee consisting of Levins and a now former director named Behrakis to review the matter; after presenting the results of that review to the directors on October 23, 2001, Levins moved that Telemachus Demoulas's compensation be eliminated, and directors Darman, Shea, Roazen and Pendergast voted against it; next Behrakis presented a motion to reduce Telemachus Demoulas's salary to $300,000 per year; the Behrakis motion did not receive a second, including by either Arthur S. or Levins; no further action was taken on the subject at the October 23, 2001, meeting; later, at a meeting on May 15, 2002, Levins again moved to eliminate Telemachus Demoulas's salary, but to pay him a reasonable consulting fee for the time he actually consulted with any member of the management team, which vote failed two to five, with Darman, Shea, Roazen and Pendergast, along with Behrakis, voting in the negative; [FN5] the subject did not come up again prior to Telemachus Demoulas's death in 2003.

> FN5. Carleton did not become a director until June 2002, and, therefore, he did not participate in this,

18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
**(Cite as: 2004 WL 1895052 (Mass.Super.))**

or several of the other matters complained of

**\*11** Arthur S. next charges the defendant directors with failure to question Arthur T.'s salary. The evidence supports the following findings on this issue: Arthur T. has worked for DSM for about 27 years; his compensation is not set by the directors, but rather by management; members of management reported to the directors that Arthur T. has been "a great asset to the company"; Arthur T.'s compensation is significant, but less than each of the four vice presidents of DSM; in or around October 2001, Arthur T.'s salary was increased by management from $520,000 per year to $750,000 per year; on several occasions, various directors and members of management made statements to the effect that Arthur T. was not really an important employee at DSM and that the company would not suffer if he left; no board vote on Arthur T.'s compensation was presented at the evidentiary hearing.

While the amount of compensation for Telemachus Demoulas and Arthur T. might seem large to many, when viewed within the backdrop of what DSM produces generally, and has produced recently for shareholders like Arthur S. specifically, a vastly different portrait emerges.

The gross annual income of DSM was said by Arthur S. to be "a little less than" $2 billion dollars a year. The approximate annual net income, he suggested, is around $180 million.

In November 2002, DSM distributed $545 million to its shareholders. The directors' vote for that distribution came at the same September 18, 2002, meeting that Arthur T. first presented his request for a waiver. Arthur S.'s share of that distribution was "in the ballpark of 54 and a half million dollars."

Arthur S. charges the defendant directors with failure to properly supervise the activities of Arthur T. with regard to the DSM profit sharing plan. The evidence supports the following findings on this issue: Arthur T. and D. Harold Sullivan have been trustees of the profit sharing plan since 1986; the directors appoint the trustees; the plan is for the DSM employees and, at the time of the hearing, had approximately $250 million in assets; no person suggested by Arthur S. or his family has ever been a trustee of the plan; there was a history of litigation and Department of Labor issues regarding the plan, all of which was resolved long before any of the present directors were elected; at a March 27, 2001, directors meeting, the trustees of the plan were directed to report to the board at the next meeting with respect to the management, assets and related matters involving the plan; the directors engaged the law firm of McDermott, Will & Emery to advise them on their duties regarding the plan; on advice of McDermott, Will & Emery to director chair Shea, the trustees of the plan were excused from coming to the next meeting because of, Shea said, the law firm's concern that their appearance might subject the board to duties with respect to the plan; no McDermott, Will & Emery witness testified at the evidentiary hearing; again, at the October 23, 2001, directors meeting, the directors defeated a vote to request the plan trustees to appear and decided instead to hire a consultant to review the trustees' performance; Mercer Consulting, however, was not engaged as that consultant until after the filing of this law suit; there is no evidence of poor performance by the plan, in which company profits of approximately 15% of DSM's payroll are invested yearly, yielding a fund currently well in excess of $200 million; the trustees retain professional investment advisers to manage the plan assets, which include both State Street Bank and Goldman, Sachs; the plan is audited yearly by an independent accounting firm.

**\*12** Arthur S. complains that the defendant directors have improperly continued to retain Sullivan & Bille, the accounting firm that also acts for members of Arthur T.'s family. The evidence supports the following findings on this issue: Sullivan & Bille has performed accounting work for DSM for many years; D. Harold Sullivan of that firm was a close personal friend of Telemachus Demoulas for 40 years; Sullivan was criticized for his activities in support of Telemachus Demoulas against the interests of DSM in the prior lawsuit; Deloitte & Touche currently reviews Sullivan & Bille's work for DSM, pursuant to a court order, and has not identified any material problems with that audit work; there was an effort to switch the accounting work to KPMG, but a motion to do so was defeated by Darman, Roazen, Carleton and Shea.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 10
18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
**(Cite as: 2004 WL 1895052 (Mass.Super.))**

During the course of consideration of Arthur T.'s request, and on advice of the then President of the Massachusetts Bar Association, the directors engaged attorney James Wallace of Bowditch & Dewey to advise them and to negotiate terms with Arthur T. regarding his situation after the transfer of his stock. The Court does not find the engagement of Mr. Wallace to be, as charged by Arthur S., a failure to seek appropriate legal advice on Arthur T.'s proposal and contract.

The coordinator or intermediary from the directors to Mr. Wallace was Darman, who also acted as counsel for DSM. Arthur S. charges that Darman, because he also served as counsel to Arthur T., had conflicts of interest that made his role as intermediary with Mr. Wallace inappropriate.

It seems appropriate to recite Mr. Wallace's final conclusions to the directors after his review of the situation. Mr. Wallace provided to the directors a letter dated June 13, 2003, containing his opinions on certain issues. The letter is attached to the complaint as Exhibit E. In the letter he opined that, in the absence of a noncompetition agreement, an at-will employee like Arthur T. may leave his employment and, subject to certain restrictions, engage in competition with his former employer, but he could not misappropriate trade secrets or use confidential information for his own interests. Mr. Wallace also observed, however, that Arthur T. is a minority shareholder as well as an employee and therefore has fiduciary duties--explained in the letter--running to DSM arising from that status. Mr. Wallace's letter concludes with the following two paragraphs addressing the proposed agreement with Arthur T.:

> Absent controlling case law, it cannot be said with certainty that Arthur T.'s transfer of the DSM shares to Maureen and Maureen's subsequent transfer of the shares to the voting trust release Arthur T. of his fiduciary duties to DSM and the other shareholders. Therefore, with respect to the issue of corporate opportunities, we cannot advise DSM and its Board of Directors that entering into the proposed agreement with Arthur T. provides DSM with greater protections than DSM is entitled to under common law. On the other hand, the non-competition and non-solicitation provisions of the proposed agreement

clearly afford DSM greater protection than it would have vis-a-vis Arthur T. as a former employee.

**\*13** Given the uncertain state of the law and the dynamics of the parties, the Board must make a business judgment and take the action that it believes is in the best interests of the company.

After the discussions at the August 4, 2003, directors meeting, by a vote of five to two, the proposed transfer of Arthur T.'s shares and the agreement negotiated by Mr. Wallace were approved. It was the five defendant directors who voted in favor.

Whatever may be the legal or ethical issues relating to Darman serving as the intermediary with Mr. Wallace--a subject upon which this Court makes no ruling here--it seems quite clear, and this Court finds, that Mr. Wallace was not inhibited in any way in his work, and his advice to the directors was clearly spelled out. Whether he would have opined differently had he known more about Darman's representation of Arthur T. or had he known that Arthur T. also had a controlling interest in more than just the stock standing in his name, at this time, at least, remains unknown because Mr. Wallace was not a witness, nor did he submit any affidavit, at the evidentiary hearing. This Court, therefore, finds that the directors were not misled or ill advised by Mr. Wallace as a result of Darman's professional relationship with Arthur T.

Arthur S. also alleged that the defendant directors ignored evidence that Arthur T. had invested in a spring water company that was said by Arthur S. to be a corporate opportunity for DSM. The Court makes no findings on this issue. It recalls no evidence on the point. Arthur S. makes no request for findings on this issue, perhaps for the same reason.

Arthur S. charges that the defendant directors voted to approve the agreement with Arthur T. and grant his requested waiver despite Arthur T.'s stated intention to compete with DSM. This Court does not find differently. Arthur T.'s reasoning for seeking the waiver are clearly spelled out in his initial memorandum of September 9, 2002, quoted above, in pertinent part, on p. 3.

The last claim in the complaint is that the defendant

directors' stated reasons justifying their vote on Arthur T.'s proposal were "entirely pretextual." This Court makes no finding or ruling on this charge because whatever the directors' stated reasons were does not constitute evidence that they were under the "controlling influence" of Arthur T.

### RULINGS OF LAW

The Court begins these rulings of law with some general comments regarding matters of corporate governance and the role of the Court in connection therewith.

   The purpose of the distinction between interested and disinterested directors is to ensure that the directors voting on a plaintiff's demand can exercise their business judgment in the best interests of the corporation, free from significant contrary personal interests and apart from the domination and control of those who are alleged to have participated in wrongdoing. See *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993). If the plaintiff has failed to allege facts that meet this standard with regard to particular board members for purposes of a ruling on a motion to dismiss, that member is deemed "disinterested."
**\*14** *Harhen, supra,* 431 Mass. at 843-44.

As stated earlier,

   The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or a majority of shareholders should set the corporation's policy, including the decision whether to pursue a lawsuit. See *Bartlett v. New York, NH and H.R.R.,* [221 Mass. 530, 532 (1915) ]; *Dunphy v. Traveller Newspaper Ass'n,* 146 Mass. 495, 497 (1888) ( "It would be contrary to the fundamental principles of corporate organization, to hold that a single shareholder can at any time launch the corporation into litigation ... to prevent methods of management which [he or she] thinks unwise").
*Id.* at 844.

   The fact that the procedural requirement of a demand is excused in a given case ... does not extinguish the substantive principle that the decision as to what is in the corporation's best interest is a matter of business judgment. An independent and unbiased committee can weigh and balance the divers factors in a given case and make a business judgment as to the proper course of

action.
*Houle, supra,* 407 Mass. at 821.

"[C]ourts must be careful not to usurp the committee's valuable role in exercising business judgment." *Id.* at 822.
   The judge must determine, on the basis of the evidence presented, whether the committee reached a reasonable and principled decision. Even in those cases where a committee is independent and conducts a thorough investigation, the judge may conclude that the committee's decision is contrary to the great weight of the evidence. In conducting its review, the court should look to factors such as those identified by ALI, which include the likelihood of a judgment in the plaintiff's favor, the expected recovery as compared to the out-of-pocket costs, whether the corporation itself took corrective action, whether the balance of corporate interests warrants dismissal, and whether dismissal would allow any defendant who has control of the corporation to retain a significant improper benefit. See ALI Principles of Corporate Governance, sec. 7.08 (Tent. Draft No. 8, 1988).
*Id.* at 824-25.

*Houle,* in footnote 10, counsels that the "evidence" referred to "will often constitute policy factors which bear on the propriety, in a business sense, of pursuing the derivative suit. The judge should weigh such considerations along with all others to determine whether they fairly support the committee's ultimate decision." And in footnote 11, the *Houle* court states, without explaining how, that "[t]he factors which contribute to making a corporation a close corporation may ... bear on the independence and good faith of a committee in such a corporation," and "a reviewing court should consider those factors in its inquiry."

As said above, *Harhen* and *Houle* each were focused on special litigation committees appointed by boards of directors, which appointing-directors were in one instance disinterested and in the other interested. This Court, in this case, sees no valid reason to treat the directors themselves any differently, and it will not.

**\*15** This Court detects in *Harhen* and *Houle,* two very recent decisions, a distinct and strong message that the SJC

Case 1:04-cv-10177-NG     Document 28-2     Filed 12/20/2004     Page 55 of 183

Westlaw.

Slip Copy                                                                                                                Page 12
18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
(Cite as: 2004 WL 1895052 (Mass.Super.))

wants trial judges to recognize that it is directors that determine issues and exercise business judgments for corporations, not judges whose total knowledge of what makes good business sense is enormously limited. Arthur S. brushes aside *Dunphy v. Traveller Newspaper Ass'n, 146 Mass. 495, 497 (1888)*, as a 19th-century relic. He seems to overlook the fact that *Dunphy* was cited with approval in *Harhen,* a 21st-century decision.

Corporations, it must be remembered, are not institutions established to ponder and make judgments on matters of morality and purity; they exist primarily to make money for the shareholders. The "raised eyebrow" is said to be the compass to find liability by someone inured to the rough and tumble of the world of commerce; rascality, not an absence of purity, is what is seen as wrongdoing in the business world. See, e.g., *Levings v. Forbes & Wallace, Inc ., 8 Mass.App.Ct. 498, 504 (1981).* Nor should this case metamorphose into a form of Dickensian *Christmas Carol,* replete with ghosts from Christmases past providing grounds for litigation over every perceived slight.

The mere fact that directors were selected, nominated and elected by a particular shareholder has long been rejected as insufficient to establish a director's lack of independence or disinterestedness. *Dunphy, supra,* 146 Mass. at 498. See also *Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984); *White v. Panic,* 793 A.2d 356, 366 (Del.Ch.2000).

Arthur T. may be grasping for a vehicle that freed him from fiduciary obligations to DSM, a company that has made him a very wealthy man. Arthur S., in an identical economic position from the same DSM, may well want to build a high barricade to thwart his cousin's desire. But their personal animosity-- well demonstrated in the annals of Massachusetts law--is not what should be the controlling feature here. Rather, what is important is the best interests of DSM and how that is achieved by those asked to direct it. The test of whether the directors have failed, or have favored Arthur T. over Arthur S., is not dressed in absolute perfection, but rather in whether they acted in good faith, unfettered by the controlling influence of Arthur T.

Arthur S. and the Court disagree over who, as between him and the defendant directors, has the burden of proof in the

present situation. One can read *Houle* and *Harhen* over and over again and still be left with doubt. Consequently, this Court, having now seen and heard the antagonists on the witness stand, under oath, and reviewed the documentary evidence, will proceed to decide the issue without being controlled by any burden of proof position.

What was presented by the evidentiary hearing and the briefing that followed revealed a tacit admission by Arthur S. that no single act or factor is sufficient to establish that Arthur T. maintained a controlling influence over the unbiased business judgment of any of the directors, particularly Carleton, Roazen, Shea and Pendergast. Thus, Arthur S. asks this Court to aggregate events and find bias from an array of separate incidents and past decisions claimed to favor Arthur T. and his side of the family as "powerful evidence of a controlling interest." See Plaintiff's Post-Hearing Reply Memorandum, p. 5. These other facts, however, must "raise a significant prospect that the directors would be adjudged liable to the corporation or its shareholders." ALI Principles, sec. 1.23(c).

**\*16** On the very next page of Arthur S.'s Post-Hearing Memorandum, he lays out the essence of his position:

   A single decision favorable to a control group might have been on the merits. However, it is highly unlikely that an unbroken succession of decisions that protect or advance the interests of a control group is the product of unfettered business judgment--particularly in the absence of any decision that was opposed by the control group or that favored other stockholders over the control group. That is a pattern that exists in this case.

Even as an abstract statement, this Court finds the foregoing hard to credit under the circumstances presented here. But when examined more closely, it fails completely.

First, the use of the phrase "highly unlikely" suggests something that means that the Court must presume the defendant directors were under the controlling interest of Arthur T. This Court declines to rest this case on such a presumption.

Next, Arthur S.'s case is grounded on two propositions upon which any evidence was lacking: (1) "an unbroken succession of decisions that protect or advance the interests

of a control group"; and (2) the existence of a "control group."

As stated above, the Court was not presented with "an unbroken succession of decisions"; nor were the events that were presented shown to protect or advance the interests of any control group, as opposed to addressing issues in the interest of DSM. It is the latter that is the duty of directors, not the favoring of one shareholder over another. Here, some of the decisions challenged were the product of events that occurred before any of the defendant directors held their positions. See for example, the setting of Telemachus Demoulas's compensation, the employment of the trustees for the DSM Profit Sharing Plan and the engagement of Sullivan & Bille as accountants. The fact that the new directors only discussed, but did not take determinative action on these points, hardly can be said to be "an unbroken succession of decisions" favoring anyone. Further, on several of the matters occurring before June 2002, Carleton was not even a board member. On others, who but DSM is favored? See the matters relating to the trustees and their action with regard to the DSM Profit Sharing Plan or the retention of Sullivan & Bille as accountants.

Perhaps the factor that shatters this whole theory is the issue of what is meant by the phrase "control group." Of course the Court understands Arthur S. to mean those people who own a majority of the votable stock in DSM. But the phrase "control group" has a special meaning in corporate law. It refers to a group with authority to direct the corporation's actions. See, e.g., *Upjohn Co. v. United States,* 449 U.S. 383 (1981). Persons in a control group of certain corporations are subject to special obligations under the securities laws. See, e.g., *In re Fidelity/Micron Securities Litigation,* 964 F.Supp. 204 (D.Mass.1997).

**\*17** Arthur S. has alluded to, but presented no explanatory information regarding, some form of "arrangement" between his sister-in-law, Rafaele, an A shareholder and the B shareholders. Absent such an arrangement--indeed, even with it--the A shareholders control 2,500 shares of DSM, and the B shareholders control only 2,450 shares. This should put the A shareholders in control. What prevents the A shareholders from exercising their controlling vote--assuming, of course, they could agree among

themselves to vote as a block--is the dispute between Arthur S. and Rafaele. This does not make the B shareholders a control group, other than potentially, unless there is something that has not been shown that binds them to vote as a group, and even then only as long as Arthur S. and Rafaele continue to squabble. In short, it would seem that voting control, which is what Arthur S. appears to be equating with the phrase "control group," is within the A shareholders' ability to achieve if they would only resolve their own internal dispute. They, thus, seem like Shakespeare's "enginer ... hoist with his own petar." [FN6] This does not make a control group of the various B shareholders in a way that makes the directors, or some of them, appear to have produced a succession of decisions favorable to that group.

> FN6. The Tragicall Historie of Hamlet Prince of Denmarke, Act III, Scene iv, lines 206-07.

Recently, the Delaware Chancery Court stated the issue now before this Court as follows: "At bottom, the question of independence turns on whether a director is, for any reason, incapable of making a decision with the best interests of the corporation in mind." *In re Oracle Corp. Derivative Litigation,* 824 A.2d 917, 938 (Del.Ch.2003). "The primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the Board, rather than extraneous considerations or influences." *Beam v. Stewart,* 845 A.2d 1040, 1049 (Del.2004). Having these principles in mind, this Court concludes and rules that, to the extent it may be their burden to prove, the DSM directors Carleton, Roazen, Shea and Pendergast, at least, have established that they were not "interested" or "biased," nor were they under the controlling influence of Arthur S. in acting upon his request for a waiver for the transfer of his stock in DSM to his wife Maureen, and then for her subsequent transfer of such stock to an irrevocable voting trust.

Further, and to the extent relevant to this issue, this Court rules that the decision by the DSM directors to grant the waiver was not lacking in rational business judgment. The process, from September 2002 through August 2003, as revealed in the verbatim transcripts of the directors meetings, demonstrates to the reader the careful and

Slip Copy                                                                                                                            Page 14
18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)
**(Cite as: 2004 WL 1895052 (Mass.Super.))**

extensive attention given by the DSM directors to the matter in issue and the lack of bias in the process. Such a reading also reflects the difficulty faced by this particular board in attempting to run a company in the midst of the family shareholders' immense animosity. Every director's act or word is suspected of having an ulterior motive at its base.

**\*18** The denial--given the opportunity--to proceed to a trial seeking damages, which seem ephemeral at this time, or a declaratory judgment, which seems premature at this time, would not be an aberrant exercise of business judgment by those directors.

This board was faced with several options that it could not--and did not-- avoid considering. On Arthur T.'s request for a waiver it could: (1) refuse to act and run the risk that it would be sued by Arthur T., or that he would consider any refusal to act to be a de facto denial to set in motion the appraisal and purchase option, thereby freeing him to transfer his stock as he saw fit; (2) act on the request, and deny it, thereby setting up the same scenario as in the first option; (3) act, conduct the appraisal and buy his stock, thereby freeing him from any fiduciary obligations and providing him with a large sum of money with which to compete; (4) act and allow the request, with an attempt to obtain some protection from future competition and the acquisition of corporate opportunities, and get sued by Arthur S., as it was. Indeed, there may be other options as well. But key to all this is Mr. Wallace's closing words in his letter of June 13, 2003: "Given the uncertain state of the law and the dynamics of the parties, the Board must make a business judgment and take the action that it believes is in the best interests of the company."

The courts of Massachusetts have contributed substantial time and effort to sort out the issues relating to ownership and control of DSM by and among the members of the Demoulas family. Judge Lopez, in splitting the stock ownership with 2,500 for Arthus S.'s side and 2,450 for Arthur T.'s side, directed a massive shift in control. It is not the Massachusetts courts' fault that a rift between two of the A shareholders now has, for the present at least, nullified Judge Lopez's efforts.

Similarly, Judge Lopez rendered a significant ruling when

she established a basis whereby a board of directors for DSM could be split equally with two each between the A and B shareholders, and with an additional three disinterested directors to be elected by all shareholders choosing to vote. Again, it is not the Massachusetts courts' fault that the affected parties' own inability to agree has resulted in a shift in that balance.

Nor, however, are those shifts in any way proof of disqualifying interest or lack of good faith by those directors who struggle to act in DSM's best interest in the midst of a familial rugby scrum that greatly impedes their efforts.

In so ruling, this Court makes no determination whatsoever regarding the effect of such a stock transfer as sought by Arthur T., in the manner proposed, on any continuing fiduciary duties he may continue to have to DSM, a closely-held Massachusetts corporation.

18 Mass.L.Rptr. 130, 2004 WL 1895052 (Mass.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Not Reported in F.Supp.2d                                                                Page 1
2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Jeffrey DOLLENS and Jeff Vukovich, derivatively on
behalf of Westell
Technologies, Inc., Plaintiffs,
v.
Marc ZIONTS, J. William Nelson, Howard L. Kirby, Jr.,
Thomas A. Reynolds, III,
Robert C. Penny, III and Melvin J. Simon, Defendants.

No. 01 C02826.

July 22, 2002.

Officers and directors moved to dismiss shareholders' derivative action. The District Court, Lefkow, J., held that: (1) shareholders sufficiently alleged that a demand on the board of directors before filing derivative action based on insider trading would have been futile, and (2) except for one corporate insider, claims for breach of fiduciary duty were not sufficiently alleged since there was no basis to infer from the complaint that any of defendants was a declarant or otherwise involved in making false or misleading statements.

Motion granted in part and denied in part.

West Headnotes

**[1] Corporations** ☞320(5)
101k320(5) Most Cited Cases
Shareholders sufficiently alleged that a demand on the board of directors before filing derivative action based on insider trading would have been futile; shareholders adequately pled that five of the eight directors would face a substantial likelihood of personal liability that would prevent them from exercising impartiality in considering a shareholder demand. Fed.R.Civ.P. 23.1.

**[2] Federal Civil Procedure** ☞636
170Ak636 Most Cited Cases
Except for one corporate insider, claims against officers and directors for breach of fiduciary duty based on alleged misrepresentations they made to the public in order to artificially inflate company's stock price were not

sufficiently alleged since there was no basis to infer from the complaint that any of them was a declarant or otherwise involved in making false or misleading statements. Fed.R.Civ.P. 9(b).

**[3] Corporations** ☞307
101k307 Most Cited Cases
Delaware law permitted a separate claim of breach of fiduciary duty against officers and directors based on insider trading.

**[4] Corporations** ☞320(2)
101k320(2) Most Cited Cases
Shareholders could not bring a derivative action to recover expenses from a pending securities action involving company until the case has proceeded to final judgment or settlement.

**[5] Corporations** ☞320(7)
101k320(7) Most Cited Cases
Shareholders' derivative claim against officers and directors for damages based on company's "integrity in the market" and "loss of goodwill" was conclusional and insufficient because shareholders did not apprise defendants of the basis and extent of the alleged damages.

*MEMORANDUM OPINION AND ORDER*

LEFKOW, J.

**\*1** This case is before the court on the motion of defendants Marc Zionts ("Zionts"), J. William Nelson ("Nelson"), Howard L. Kirby, Jr. ("Kirby"), Thomas A. Reynolds, III ("Reynolds"), Robert C. Penny, III ("Penny") and Melvin J. Simon ("Simon") [FN1] who are or were officers or directors of Westell Technologies, Inc. ("Westell"), to dismiss the consolidated complaint brought by two individual shareholders, Jeffrey Dollens ("Dollens") and Jeff Vukovich ("Vukovich"), derivatively on behalf of Westell. In their motion to dismiss, defendants contend (1) that the complaint fails to adequately plead a prerequisite to suit, namely, that a demand by plaintiffs on Westell's board of directors to take action against defendants on behalf of the corporation would be futile, (2) that allegations of fraud underlying the claims in Counts I and II are not pled with particularity as required by Federal Rule of Civil Procedure 9(b), and (3) that Count II fails to plead a legally cognizable theory of damages. For the reasons articulated below, the court grants in part and denies in part defendants' motion to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
2002 WL 1632261 (N.D.Ill.)
(Cite as: 2002 WL 1632261 (N.D.Ill.))

dismiss.

> FN1. Defendants currently hold or held the following positions at Westell: Zionts was Chief Executive Officer ("CEO") from December 1997 until March 1, 2001 and a director from January 2000 until March 1, 2001; Nelson was President and Chief Operating Officer from December 1997 until March 1, 2001 when he became CEO succeeding Zionts and a director since January 2000; Kirby has been a director since March 2000; Reynolds has been a director since January 2000; Penny has been a director since 1998; and Simon has been the Assistant Secretary and Assistant Treasurer and a director since 1992.

MOTION TO DISMISS STANDARDS

A motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)* challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080* (7th Cir.1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Kennedy v. Nat'l Juvenile Det. Ass'n, 187 F.3d 690, 695* (7th Cir.1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson v. E.J. Brach Corp., 176 F.3d 971, 977* (7th Cir.1999); *Zemke v. City of Chicago, 100 F.3d 511, 513* (7th Cir.1996).

In addition to the mandates of *Rule 12(b)(6), Federal Rule of Civil Procedure 9(b)* requires "all averments of fraud" to be "stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc., 20 F.3d 771, 777* (7th Cir.1994); *see also DiLeo v. Ernst & Young, 901 F.2d 624, 627* (7th

Cir.1990) ("Although states of mind may be pleaded generally [under *Rule 9(b)* ], the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story.").

FACTS

Plaintiffs' consolidated derivative complaint alleges the following facts, which are taken as true for purposes of this motion: Nominal defendant Westell, a Delaware corporation headquartered in Aurora, Illinois, is a provider of Digital Subscriber Line ("DSL") technology, which allows high-speed data to be transported through local telephone lines. (Compl.¶ 13.) On May 9, 2000, financial analyst Charles Pluckhahn ("Pluckhahn") of Stephens, Inc., issued a report, stating "[o]n a conference call with analysts, Westell's management indicated that its largest customer of CPE [customer premises equipment] is still unannounced and this new customer would continue to be its largest during the coming fiscal year." Although this customer was "unannounced," Westell "leaked" to analysts that SBC Communications ("SBC"), was driving demand for Westell's DSL equipment. (*Id.* ¶ 14.) Specifically, another analyst, Joseph Bellace ("Bellace") of Jefferies & Co., reported on May 16, 2000 that:

> *2 Demand for DSL related equipment (about 44% of company revenues) continues to be very strong, with good visibility extending for the next three months. Accelerated deployment of DSL service by British Telecom and SBC Communications (an unannounced customer) are driving this performance.

(*Id.*) The net effect of these positive reports was that the price of Westell stock received a temporary bounce to close at $28 a share on May 17, 2000; on June 26, 2000, however, the price of stock closed at $14.6875 a share. (*Id.* ¶¶ 15-16.)

Despite the positive reports, defendants knew by late June 2000 that SBC would be cutting back its purchases of DSL modems from Westell. Defendants acquired this non-public information through their positions as directors and/or senior officers of Westell and their receipts of reports, attendance at meetings, and access to all of Westell's books, records and other proprietary information. (*Id* . ¶ 12.) Defendants realized that when this information became public, it would seriously affect Westell's revenues, earnings

Not Reported in F.Supp.2d                                                          Page 3
2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

and price of common stock. (*Id.* ¶ 16.) Defendants thus embarked on a massive hype campaign to inflate the price of Westell's stock so that they could unload as much stock as possible before the news concerning SBC's cutbacks in purchases of Westell's DSL modems became public. (*Id.*)

For example, Westell announced on June 28, 2000 that it entered into a new partnership (although it did not specify with whom or what company) to meet the "expanding demand" for its products because it was "running at full capacity in its existing Aurora facility." (*Id.* ¶ 17.) On June 29, 2000, Barry Sine ("Sine"), an analyst at Kaufman Brothers, reported that he spoke with Westell and that "[b]ased on the massive demand for DSL services by Westell's customers," he expected Westell to report strong results for the June quarter. (*Id.* ¶ 18.) He further reported "we believe SBC Communications will again be the company's largest account, despite the fact that it is still an unannounced customer." Sine then issued a "Strong Buy" rating on Westell with a price target of $65 a share. (*Id.* ¶¶ 17-18.)

On July 7, 2000, Bellace issued a "Buy" rating on Westell with a $50 price target. (*Id.* ¶ 19.) As a result of his consultations with officers at Westell, he projected that Westell's 2001 revenues (for the period April 1, 2000 to March 31, 2001) would be $400 to $425 million. As with Sine, Bellace did not know about SBC's cutbacks. On the same day Bellace issued his Buy report, Westell stock increased by 25%, ending at $19 a share.

On July 18, 2000, Westell issued what one analyst called a "blockbuster announcement." (*Id.* ¶ 20.) Westell announced that it had established a supplier relationship with SBC. Analysts following Westell responded with uniformly positive reports. On July 20, 2000, an analyst at Kaufman Brothers issued a report reiterating its "Strong Buy" on Westell and $65 price target. The report stated:

**\*3** Westell Technologies followed yesterday's blockbuster announcement that it had won SBC Communications (SBC $43 5/8) as a customer with second quarter results that were well above our estimate, consensus, whisper and even telepathic expectations.... The key driver of revenue was the company's DSL customer premises equipment (CPE) business, which posted $61.9 million in revenue,

40% higher than our estimate and up 282% sequentially.

\* \* \*

We are today more bullish on shares of Westell Technologies than ever.
(*Id.* ¶¶ 20-22.)

Similarly, on July 21, 2000 another analyst at Chase Hambrecht & Quist Inc. issued a report rating Westell a "Buy" with a $70 price target. The report stated that:
Growth was once again driven by rapid acceleration in the Company's DSL businesses; [w]e believe that the Company maintains numerous opportunities for additional upside as it continues to capitalize upon its strong relationships with its strategic partners....

\* \* \*

It appears that Westell's DSL businesses continue to fire on all cylinders.
(*Id.* ¶ 23.) As a result of Westell's announcement, the market's reaction was swift and dramatic. (*Id.* ¶ 21.) The price of Westell's common stock rose up to $28.50 a share by July 21, 2000 and closed at $30 a share on July 25, 2000.

From July 21 to August 1, 2000, defendants sold about 450,000 shares of Westell stock total, reaping proceeds of almost $11.5 million. (*Id.* ¶ 24.) Specifically, between July 21 and August 1, 2000, Zionts, who had never sold any Westell stock before this time, sold 231,440 shares at between $28 and $29 a share or approximately 65% of his holdings, reaping proceeds of $5,557,730; on July 21, 2000, Nelson sold 100,000 shares at $27.38 a share or approximately 40% of his holdings, reaping proceeds of $2,738,000; between July 24 and August 1, 2000, Kirby, who had never sold any Westell stock before this time, sold 80,000 shares at between $22.79 and $29.09 a share or approximately 20% of his holdings, reaping proceeds of $2,057,700; on July 24, 2000, Reynolds sold 27,200 shares at $28.46 a share or approximately 30% of his holdings, reaping proceeds of $774,122; on July 25, 2000, Penny sold 4,098 shares at $30 a share, reaping proceeds of $122,940; and on July 25, 2000, Simon sold 5,000 shares at $30 a share, reaping proceeds of $150,000. (*Id.* ¶ 10(a)-(f).)

Only days after defendants unloaded their Westell stock, the

real story about SBC's cutbacks emerged. In early August, Bellace reported that SBC had, beginning in June 2000, changed its purchasing requirements for DSL modems, and thus would be ordering fewer modems in the future from Westell. (*Id.* ¶ 25.) The stock price tumbled right back to the mid-to-high teens immediately upon release of the news (which was admittedly known by Westell management six to eight weeks earlier). (*Id.*) As was later reported by Pluckhahn, it was not merely a decline in usage by SBC that had caused Westell's problems but also that SBC had begun purchasing more from Westell's main competitor, Efficient Networks. (*Id.*)

**\*4** On October 18, 2000, Westell admitted that the decline in orders from SBC would have a material negative effect on its revenues and earnings. Westell reported second quarter DSL revenues of $49.5 million, many millions lower than what it had assured analysts two months earlier. As a result of this announcement, Westell's stock price dropped to $5.94 a share on October 19, 2000.

Since the release of the various negative reports and with Westell's poor growth prospects, several Westell shareholders commenced a class action on or about October 27, 2000 against Westell (and others), alleging that Westell's public disseminations were materially false and misleading in violation of federal securities laws. [FN2] Further, on or about August 2, 2001, plaintiffs filed the instant derivative action against nominal defendant Westell and the six named defendants, alleging various breaches of fiduciary duties for insider trading and misappropriation of information under Count I and for exposing Westell to significant liability and damages under Count II.

FN2. There is also the federal securities class action *In re Westell Technologies, Inc. Sec. Litig.,* No. 00 C 6735, which is related to the instant derivative action. (*See* Order, Sept. 4, 2001).

DISCUSSION

A. Dismissal for failure to plead demand futility

[1] In a derivative action, a shareholder plaintiff seeks to enforce a right that belongs to the corporation. *See Kamen v. Kemper Fin. Servs. Inc., 500 U.S. 90, 95, 111 S.Ct. 1711,* 114 L.Ed.2d 152 (1991). "[G]iven 'the basic principle of corporate governance that the decisions of a corporation-including the decision to initiate litigation-should be made by the board of directors or the majority of shareholders,' most jurisdictions require a pre-suit demand be made of the corporation's board of directors." *In re Abbott Laboratories Derivative Shareholders Litig., 293 F.3d 378, 386* (7th Cir.2002), quoting *Kamen, 500 U.S. at 95.* A pre-suit demand "allows the directors to exercise their business judgment and determine whether litigation is in the best interest of the corporation." *In re Abbott, 293 F.3d at 386.*

Federal Rule of Civil Procedure 23.1 requires the derivative complaint to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Because the requirement of a shareholder plaintiff to make a demand on the board of directors "is more than a pleading requirement, it is a substantive right of the shareholder and the directors[.] ... [T]he law of the state of incorporation ... controls these substantive rights and governs what excuses are adequate for failure to make a demand." *In re Abbott, 293 F.3d at 387.* Delaware is Westell's state of incorporation and the parties agree that Delaware law applies here.

Plaintiffs concede that they made no demand on Westell's board of directors prior to filing their complaint. However, they aver that a demand would have been futile because five of the eight directors on Westell's board personally benefitted from conduct alleged in their complaint and, therefore, were interested and could not have impartially responded to a demand. (Compl.¶¶ 11, 44.) In determining whether a demand would be futile, the court must consider whether

**\*5** ... the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Rales v. Blasband, 634 A.2d 927, 933-34 (Del.1993).* [FN3]

Not Reported in F.Supp.2d                                                                 Page 5
2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

"To establish a reasonable doubt, plaintiffs are not required to plead facts that would be sufficient to support a judicial finding of demand futility ... [n]or must plaintiffs demonstrate a reasonable probability of success on the merits." *McCall v. Scott,* 239 F.3d 808, 816 (6th Cir.2001), citing *Grobow v. Perot,* 539 A.2d 180, 186 (Del.1988) and *Rales,* 634 A.2d at 934.

> FN3. Because plaintiffs assert that they are not challenging a business decision by Westell's board of directors, the demand futility test in *Rales,* 622 A.2d at 934, and not *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984), applies here. *See In re Abbott,* 293 F.3d at 387, 388 n. 3.

"[W]hether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness and independence of a majority of the Board must be determined from the accumulation of all the facts taken together." *McCall,* 239 at 816-17. A director is interested when "he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a 'materially detrimental impact' on a director but not the corporation or its stockholders." *Id.* at 825, quoting *Rales,* 634 A.2d at 936. However, "the 'mere threat' of personal liability in the derivative action does not render a director interested[.]" *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995). Rather, "reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present 'a substantial likelihood' of liability on the part of a director." *McCall,* 239 F.3d at 825, citing *Rales,* 634 A.2d at 936. Moreover, "[e]ven if a director has no personal interest in a decision, his discretion must also be free from the influence of other interested persons." *Seminaris,* 662 A.2d at 1354. A director is independent if he can make a decision "based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Rales,* 662 A.2d at 936, quoting *Aronson v. Lewis,* 473 A.2d 805, 816 (Del.1984).

Defendants assert that the complaint fails to plead a substantial likelihood of liability on the part of the director defendants (Nelson, Kirby, Reynolds, Penny and Simon) because it does not attribute any of the alleged

misrepresentations or knowledge of the SBC problems to these defendants. Defendants further contend the complaint alleges only that defendants are directors (with the exception of Nelson who also is CEO and Simon who also is the Assistant Secretary and Assistant Treasurer) and sold Westell stock, and rely primarily on *McCall,* 239 F.3d at 825. [FN4] Plaintiffs assert the director defendants were clearly interested because they knew public disclosure of the decline in orders by SBC would have a material effect on Westell's stock price and sold their stock from July 21 to August 1, 2000. Plaintiffs rely on *In re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 115-16 (S.D.N.Y. Mar.9, 2000) and *In re Cooper Companies, Inc. Shareholders Derivative Litig.,* No. 12584, 2000 WL 1664167, at *6-7 (Oct. 31, 2000).

> FN4. Moreover, defendants argue the complaint fails to plead that there is a substantial likelihood of liability on the part of the director defendants because it does not allege they engaged in conduct more egregious than mere or gross negligence and also point to Westell's Charter, which precludes directors' liability for actions based on negligence or gross negligence under Section 102(b)(7) of the Delaware Code, 8 Del. Laws 102(b)(7) (2000). Plaintiffs, however, apparently do not intend to pursue a claim for breach of duty of care (Resp. at p. 8) although they aver in their derivative complaint that "[t]he Director Defendants' sales of Westell stock, while in possession and control of this material, non-public information, was a breach of their fiduciary duties of loyalty, good faith, and *due care.*" (Compl.¶ 37) (emphasis added). Thus, the court does not consider whether plaintiffs adequately plead demand futility based on defendants' alleged breach of duty of care or other negligent conduct. See *McCall v. Scott,* 239 F.3d 808, *reh'g granted,* 250 F.3d 997 (6th Cir.2001), addressing the demand futility exception with respect to directors' liability based on a breach of duty of care claim.

**\*6** In *McCall,* the court held that the plaintiffs' derivative complaint did not adequately plead demand futility under

Not Reported in F.Supp.2d                                                                    Page 6
2002 WL 1632261 (N.D.Ill.)
(Cite as: 2002 WL 1632261 (N.D.Ill.))

Delaware law based on insider trading allegations because it did not link the directors' alleged acquisition of non-public material information with their stock sales. 239 F.3d at 825-26. The court recognized that "when directors and officers own stock or receive compensation in stock, they should be expected to trade those securities in the normal course of events." Id. at 825. As such, it concluded "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information.... Further, fraudulent intent may be inferred from the timing and quantities of the trades." Id. (internal citations and quotations omitted).

In applying these standards, the *McCall* court looked at the plaintiffs' factual allegations of insider trading over a two year period or from January 1995 to April 1997 and found that the plaintiffs only generally averred that some of the directors sold millions of dollars of the company's stock "at prices artificially inflated by the undisclosed fraudulent practices authorized or permitted by the Board." *Id.* Moreover, the court determined that some of these director defendants maintained their substantial holdings of company stock during this time period and that the plaintiffs also failed to plead, regarding certain directors, the "relative holdings or the timing of the transfers." *Id.* The court then concluded "[a]lthough relying upon the 'red flags' to allege that the directors knew or recklessly disregarded [the company's] improper policies and practices, plaintiffs failed to connect the timing of any of the stock transactions to those warnings." *Id.* at 825-26.

In *In re Oxford Health Plans, Inc., 192 F.R.D. at 115-16,* the court held that the plaintiffs properly pled demand futility where the director defendants knew of management's misrepresentations to the financial markets concerning the company's financial crisis but feared that taking action would harm the company's market price, result in increased regulatory oversight, slow the growth of the company, and jeopardize their personal and financial interests and their personal ties to the company's CEO. It further determined that any independence or disinterested status of the directors was lost because two of the director defendants sold company stock when they were in possession of material non-public adverse information.... and another director

received substantial annual contract payments through the board.

In *In re Cooper Companies, Inc. Shareholders Derivative Litig., 2000 WL 1664167, at \*6-7,* the court held that the plaintiffs properly pled demand futility because three directors including the co-chairman profited from and/or participated in a fraud scheme to profit from the purchase and sale of bonds based on inside information. Further, it concluded that two directors lacked independence because they were corporate inferiors to the co-chairman and absented themselves from an emergency board meeting.

**\*7** After a review of these cases, the court concludes that plaintiffs' allegations do create a reasonable doubt that a majority of Westell's board of eight directors could have exercised disinterested and independent business judgment in responding to a shareholder demand. Defendants attempt to distinguish *In re Oxford Health Plans, Inc.* and *In re Cooper Companies, Inc. Shareholders Derivative Litig.* by arguing that the plaintiffs in those cases pled more particularized facts. Plaintiffs' allegations here, however, are similar to the facts pled in those cases because, although plaintiffs do not specify the exact manner in which defendants knew SBC would order fewer modems from Westell (Compl ¶¶ 10, 12), plaintiffs allege the director defendants learned about this non-public information by late June 2000 and sold their Westell stock when the price was artificially inflated by Westell's "blockbuster announcement" that it won SBC as a customer. Further, right after the director defendants sold their stock, the negative news of SBC's cutbacks became public and Westell stock declined from a high of $30 a share to the mid-to-high teens.

Moreover, unlike the facts in *McCall* where the court examined insider trading allegations within a time period of over two years or from January 1995 to April 1997, here plaintiffs' allegations focus on a ten day time period during which the director defendants sold their Westell stock. Specifically, plaintiffs allege Nelson unloaded 40% of his holdings between July 24 and August 1, 2000; Kirby, who never sold Westell stock before, unloaded 20% of his holdings on July 24; and Reynolds unloaded 30% of his holdings on July 25. Although in smaller amounts, still

coincident in timing, Simon sold 5,000 shares, and Penny sold 4,098 shares on July 25, realizing profits of $150,000 and $122,940, respectively. [FN5] As to Simon, a director and the Assistant Secretary and Assistant Treasurer, and Penny, an outside director, plaintiffs do not allege that Simon or Penny unloaded large amounts of their personal holdings of Westell stock or that prior to that time period, they never traded their Westell stock. However, Delaware law provides that "where all the defendant directors allegedly engaged in insider trading within a matter of weeks based upon the same inside information, ... the insider trading claims should be viewed collectively." *Strougo v. Carroll,* No. 8040, 1991 WL 9978, at *4, 17 Del. J. Corp. L. 352, 362 (Del. Ch. Jan. 29, 1991) (unpublished); *see also In re Gen. Instrument Corp. Sec. Litig.,* 23 F.Supp.2d 867, 874 (N.D.Ill.1998), quoting *Strougo.* As such, plaintiffs have adequately pled that five of Westell's eight directors would face a substantial likelihood of personal liability that would prevent them from exercising impartiality in considering a shareholder demand. *See Strougo, 1991 WL 9978, at *4, 17 Del. J. Corp. L. at 362* ("Common sense suggests that, at a board meeting at which plaintiff's demand might be considered, the defendant directors' interest in their own alleged wrongdoing would affect their decisions as to whether to sue their co-directors for the same alleged wrongs."). Accordingly, defendants' motion to dismiss for failure to plead demand futility is denied.

> FN5. Plaintiffs include Zions' sales of stock during that ten day period when arguing that the director defendants were interested. However, when plaintiffs filed their derivative complaint in August 2001, Zionts had not been a director for approximately five months or since March 2001. *Rales, 634 A.2d at 934* (stating demand futility pled "as of the time the complaint is filed"); (*see also* Compl. ¶ 11.)

B. Dismissal for failure to plead fraud with particularity

**\*8** Alternatively, defendants argue that even if plaintiffs' demand is excused as futile, plaintiffs' complaint should be dismissed for failure to plead fraud with specificity in Counts I and II under Federal Rule of Civil Procedure 9(b).

Plaintiffs respond (in a footnote) that they do not need to plead their claims for breach of fiduciary duty under Rule 9(b) (Resp. p. 10 n. 5) but plaintiffs also rely on *In re Cendant Corp. Derivative Action Litig.,* in which the court applied the Rule 9(b) standard. 189 F.R.D. 117, 131 (D.N.J.1999) (holding the plaintiffs pled fraud with particularity in their insider trading claim under Delaware law because the plaintiffs alleged the defendants knew at the time of their stock sales that the company's earning reports were inflated by accounting improprieties, which would cause the inflated price of the company's stock to fall down).

Although plaintiffs claim they are only alleging that defendants engaged in insider trading, they also allege that defendants made misrepresentations to the public in order to artificially inflate Westell's stock price. [FN6] Indeed, plaintiffs' derivative complaint arises from the same operative facts as those identified in the class action complaint in *In re Westell Technologies, Inc. Sec. Litig.,* No. 00 C 6735 (see Mem. Op. and Order, Oct. 26, 2001 at p. 20). [FN7] Therefore, the court will apply Rule 9(b). *See In re Gen. Instrument Corp. Sec. Litig.,* No. 96 C 1129, 1997 WL 610452, at * 10 (N.D.Ill. Sept.24, 1997).

> FN6. Plaintiffs make the following allegations: Westell disseminated false and misleading information (Compl.¶ 4) and kept the public "in the dark about the nature and extent of the SBC problem" (*Id .* ¶ 19), and defendants engaged in "a massive hype campaign ... to inflate the price of the Company's stock[.]" (*Id.* ¶ 16.)

> FN7. Whether plaintiffs meet the Rule 9(b) standard involves another argument raised by defendants in their motion to dismiss, which is that Nelson, Kirby, Reynolds, Penny and Simon be dismissed for the same reasons the court dismissed Nelson, Kirby and Reynolds as defendants in the *In re Westell Technologies, Inc. Sec. Litigation,* No. 00 C 6735. Therefore, the court addresses that argument here as well.

[2] In the class action, the plaintiff alleged that defendants Zionts, Nelson, Kirby, Reynolds and other defendants not

Not Reported in F.Supp.2d                                                                                      Page 8
2002 WL 1632261 (N.D.Ill.)
(Cite as: 2002 WL 1632261 (N.D.Ill.))

named in the instant derivative action violated the Securities Act of 1934 by knowingly and/or recklessly making false and misleading statements to the class plaintiffs through press releases and conversations with analysts. Further, the plaintiff alleged that some of these defendants personally profited from these misrepresentations by selling their personal holdings to the class plaintiffs after artificially inflating the price of Westell stock. On defendants' motion to dismiss, the court found it could be reasonably inferred from the plaintiff's class complaint that Westell's spokesperson made the allegedly false and misleading statements as authorized by Zions and other Westell top management. However, the court dismissed Nelson, Kirby and Reynolds as defendants because there was no basis to infer from the class complaint that any of them was a declarant or otherwise involved in making false or misleading statements even though it found the plaintiff alleged a strong inference of scienter based on insider trading as to Nelson, Kirby and Reynolds as well as Zions.

[3] For these same reasons, all of the defendants except for Zions must be dismissed with respect to any claims of breach of fiduciary duty based on alleged misrepresentations they made to the public since there is no basis to infer from plaintiffs' derivative complaint that any of them was a declarant or otherwise involved in making false or misleading statements. Nevertheless, Delaware law provides a separate claim of breach of fiduciary duty based on insider trading. *See In re Cendant Corp. Derivative Action Litig., 189 F.R.D. at 131 (D.N.J.1999); accord Oberly v. Kirby, 592 A.2d 445, 463 (Del.1991)* ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such a profit or advantage is not gained at the expense of the fiduciary [,]" citing *Brophy v. Cities Serv. Co., 70 A.2d 5, 7 (Del.Ch.1949)*). Thus, for the same reasons plaintiffs adequately pled demand futility, the claim for insider trading will remain against each defendant. Accordingly, defendants' motion to dismiss for failure to plead fraud with particularity is granted in part and denied in part with respect to Counts I and II.

C. Dismissal for failure to plead a legally cognizable theory of damages under Count II

*9 Defendants next move to dismiss Count II, asserting plaintiffs fail to plead a legally cognizable theory of damages. Specifically, defendants argue that plaintiffs' claims for damages based on Westell's potential exposure in defending class actions including significant legal liability and costs is premature and damages based on harm to Westell's integrity in the market and goodwill is conclusional.

[4] With respect to plaintiffs' claim for damages based on Westell's exposure to defending class actions, plaintiffs cannot bring a derivative action to recover expenses from a pending securities action involving Westell until the case has proceeded to final judgment or settlement. *In re United Telecomm., Inc. Sec. Litig., No. 90-2251-EEO, 1993 WL 100202, at *3 (D.Kan. Mar.4, 1993); cf. In re Symbol Tech. Sec. Litig., 762 F.Supp. 510, 516-17 (E.D.N.Y.1991)* (holding that the derivative plaintiff could not seek litigation expenses associated with a securities class action that had not yet proceeded to final judgment or settlement under a claim for corporate waste). Thus, this claim for damages is premature and must be dismissed. *See In re Symbol, 762 F.Supp. at 516-17.*

[5] Moreover, with respect to plaintiffs' claim for damages based on Westell's "integrity in the market" and "loss of goodwill" (Compl.¶¶ 4, 27, 28, 41), this claim is conclusional and insufficient because plaintiffs do not apprise defendants of the basis and extent of the alleged damages. *In re United Telecomm., 1993 WL 100202, at *2; accord In re Symbol, 762 F.Supp. at 517* (rejecting an injury in the marketplace theory and stating "damages must be shown to directly flow from the wrongful acts of defendants, and not the mere commencement of legal proceedings against the corporation."). Therefore, this claim is dismissed. [FN8]

> FN8. However, where plaintiffs allege that defendants are liable to Westell under Count II (Compl.¶ 42), a claim for damages based on that allegation is legally cognizable since Delaware law "has long recognized the availability of a stockholder derivative action to recover profits obtained by corporate insiders through breach of their fiduciary duties." *In re Symbol, 762 F.Supp. at*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2002 WL 1632261 (N.D.Ill.)
**(Cite as: 2002 WL 1632261 (N.D.Ill.))**

517. Therefore, that claim for damages under Count II must remain.

Accordingly, defendants' motion to dismiss Count II for failure to plead a legally cognizable theory of damages is granted in so far as plaintiffs plead damages based on Westell's defending the pending federal securities action (Compl.¶¶ 4, 27, 41) and Westell's loss of integrity in the market (*id.* ¶¶ 28, 41) and goodwill (*id.* ¶ 41).

ORDER

Wherefore, and for the reasons stated above, defendants' motion to dismiss plaintiffs' verified derivative complaint [# 26-1] is granted in part and denied in part.

2002 WL 1632261 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Not Reported in F.Supp.2d                                                     Page 1
2004 WL 357861 (N.D.Tex.)
**(Cite as: 2004 WL 357861 (N.D.Tex.))**

C
**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.

Peter KALTMAN, Plaintiff,
v.
Sanjiv S. SIDHU, Gregory A. Brady, Harvey B. Cash,
Robert L. Crandall, Michael
H. Jordan, and William M. Beecher, Defendants,
and
I2 TECHNOLOGIES, INC., Nominal Defendant.

**No. Civ. 3:03-CV-1057-H.**

Feb. 26, 2004.

Tom A. Cunningham, Richard J. Zook, Cunningham,
Darlow, Zook & Chapoton, Houston, TX, Marian P. Rosner,
Robert C. Finkel, Wolf Popper, New York, NY, for
Plaintiff.

Michael A. Swartzendruber, Fulbright & Jaworski, Edward
S. Koppman, Akin, Gump, Strauss, Hauer & Feld, Aimee
Williams Moore, Baker Botts, Dallas, TX, Michael P. Lynn,
Lynn, Tillotson & Pinker, Warren Lewis Dennis, Proskauer
Rose, Washington, DC, for Defendants.

Robert W. Coleman, Brown McCarroll, Dallas, TX, John P.
Stigi, III, Wilson, Sonsini, Goodrich & Rosati, Palo Alto,
CA, for Interested Party.

*MEMORANDUM OPINION AND ORDER*
SANDERS, Senior J.

**\*1** Before the Court are Defendants Harvey B. Cash, Robert
L. Crandall, and Michael H. Jordan's Motion to Dismiss,
filed October 17, 2003; Nominal Defendant i2
Technologies, Inc., and Defendants Sanjiv S. Sidhu and
William M. Beecher's Motion to Dismiss, filed October 17,
2003; Defendant Gregory A. Brady's Motion to Dismiss,
filed October 17, 2003; Plaintiff's Response, filed
November 24, 2003; Defendants' Cash, Crandall, and

Jordan's Reply, filed December 19, 2003; Nominal
Defendant i2 Technologies, Inc., and Defendants Sidhu,
Brady, and Beecher's Reply, filed December 19, 2003;
Plaintiff's Supplemental Authority, filed January 7, 2004;
and Nominal Defendant i2 Techonologies, Inc., and
Defendants Sidhu, Brady, and Beecher's Response to
Plaintiff's Supplemental Authority, filed January 23, 2004.
Also before the Court is Nominal Defendant i2
Technologies, Inc., and Defendants Sidhu and Beecher's
Request for Judicial Notice, filed October 17, 2003.
Defendants seek dismissal of Plaintiff's Consolidated
Shareholder Derivative Complaint. Upon review of the
pleadings, briefs, and relevant authorities, the Court is of the
Opinion for the reasons stated below that Defendants'
Motions to Dismiss should be GRANTED and Nominal
Defendant i2 Technologies, Inc., and Defendants Sidhu and
Beecher's Request for Judicial Notice should be DENIED as
moot.

I. BACKGROUND

This is a shareholder derivative suit filed by Peter Kaltman
on behalf of Nominal Defendant i2 Technologies, Inc.
("i2"). Plaintiff filed his Amended Derivative Complaint
("Complaint") on September 12, 2003, seeking to recover
$556,281,110.00 in bonuses, equity-based compensation, and
profits realized from the sale of i2 Technologies
securities by Defendants Sidhu, Beecher, and Brady.
(Compl. at 2). Plaintiff brings his claims pursuant to Section
304 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley")
and Delaware common law. (*Id.*). Plaintiff is, and was
during the time the acts complained of occurred, a
shareholder. (Compl. at 8). Defendants are, or were at the
time the complaint was filed, directors and/or officers of i2.
(Compl. at 8-13).

Plaintiff's complaint stems from a re-audit i2 performed in
2003 for financial years 1999, 2000, and 2001, which
resulted in a restatement of i2's financial statements for
those years and a loss in its stock price. (Compl. at 13-16,
18- 24). Plaintiff alleges that the restatement was the result
of "misconduct" on the part of Defendants, and, therefore,
Defendants Sidhu, Beecher, and Brady must reimburse i2
for all bonuses and incentive-based compensation and for all
profits earned on stock trades during 1999, 2000, and 2001.

Not Reported in F.Supp.2d                                                                                     Page 2
2004 WL 357861 (N.D.Tex.)
**(Cite as: 2004 WL 357861 (N.D.Tex.))**

(*Id.* at 2-3). Plaintiff also makes claims against the three officer defendants, Sidhu, Beecher, and Brady, for insider trading. (*Id.* at 3). Plaintiff does not state a specific cause of action against the three director defendants, Cash, Crandall, and Jordan. (*See generally,* Compl.).

**\*2** All Defendants, including Nominal Defendant i2, move to dismiss Plaintiff's complaint. Defendants argue that Plaintiff failed to establish demand futility pursuant to Federal Rule of Civil Procedure 23.1 and Delaware law; that the complaint does not meet the particularity requirements of Federal Rule of Civil Procedure 9(b); that Plaintiff's action is barred by i2's Certificate of Incorporation; and that the Sarbanes-Oxley Act claim fails as a matter of law. The Court will address these arguments below.

II. ANALYSIS

Defendants first argue that Plaintiff lacks standing to sue derivatively because he did not make demand on i2's Board of Directors. (Def. Cash, Crandall, and Jordan's Mot. at 2-3). Defendants argue that if demand is not made on the Board prior to filing a derivative suit, the complaint must comply with the requirements of Federal Rule of Civil Procedure 23.1 and Delaware law and plead with particularity the reasons demand is excused. (*Id.*). In a derivative action, Rule 23.1 requires that the complaint "shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R .Civ.P. 23.1. Because i2 is a Delaware corporation, "the substantive corporation law of Delaware determines whether or not the demand requirements of Fed.R.Civ.P. 23.1 have been satisfied ." *Rales v. Blasband,* 634 A.2d 927, 932 n. 7 (Del.1993). Delaware law requires a stockholder to make a demand on the Board of Directors to pursue the corporate claim "[b]ecause directors are empowered to manage, or direct the management of, the business and affairs of the corporation, 8 Del.C. § 141(a)." *Id.* at 932.

In the instant case, Defendants argue that the test articulated by the Delaware Supreme Court in *Rales v. Blasband,* 634 A.2d 927 (Del.1993), is the appropriate test to use in determining whether demand in this case is excused as futile. Defendants argue the *Rales* test is appropriate because Plaintiff is not challenging a business decision made by the Board. (*See* Def. Cash, Crandall and Jordan's Mot. at 4). *Rales* requires the Court to determine whether "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales,* 634 A.2d at 934. To create a doubt that the board of directors could exercise its independent and disinterested business judgment, the Plaintiff would need to allege with particularity facts that create a reasonable doubt that the board is "capable of acting free from personal financial interest and improper extraneous influences." *Id.* at 935. The *Rales* test is employed where "directors are sued because they have failed to do something ... demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand." *Id.* at 934 n. 9.

**\*3** Plaintiff argues that he is challenging a business decision of the Board, and thus, the Court should use the test developed in *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984), to determine if demand is excused. (Pl.'s Mot. at 14). *Aronson* requires the Court to determine whether "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson,* 473 A.2d at 814. Therefore, the Court must make two inquiries, "one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof." *Id.* The basic difference between the *Rales* test and the *Aronson* test is the second inquiry the Court makes under the *Aronson* test that the Court does not make under the *Rales* test.

After examining the Complaint, the Court concludes that the *Rales* test is appropriate in the instant case because Plaintiff does not challenge any conscious business decision of the Board. [FN1] The only action of the Board that Plaintiff

Not Reported in F.Supp.2d                                                Page 3
2004 WL 357861 (N.D.Tex.)
(Cite as: 2004 WL 357861 (N.D.Tex.))

challenges in the instant case is the failure of the Board to "pursue its remedies and seek disgorgement of those monies" made by Defendants Sidhu, Beecher, and Brady from allegedly trading on inside information and from receiving bonuses as a result of financial misconduct. (*See* Compl. at 24-29). The *Rales* test is appropriate where the allegation is that the Board failed to do something. *See Rales,* 634 A.2d at 924, n. 9.

> FN1. The Court has considered Plaintiff's argument "that director conduct falls outside the protection of the business judgment rule if all of the alleged facts, if true, imply that the defendant directors knew they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss. *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 289 (Del.Ch.2003)." (Pl.'s Response at 14-15). The Court does not find that Plaintiff's Complaint alleges any facts that would imply that the Outside Directors acted without adequate information or deliberation. The Complaint is devoid of facts regarding how the directors made any decisions, and thus fails to show that the directors' conduct falls outside the protection of the business judgment rule. Therefore, the Court's decision in the instant case would be the same even if the Court analyzed whether demand is excused using the *Aronson* test.

In the instant case, therefore, the Court must consider whether "the particularized factual allegations of [the] derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934. To create a doubt that the board of directors could exercise its independent and disinterested business judgment, the plaintiff needs to allege with particularity facts that create a reasonable doubt that the board is "capable of acting free from personal financial interest and improper extraneous influences." *Id.* at 935.

In the instant case, when the complaint was filed the Board of Directors of i2 consisted of Sanjiv S. Sidhu, Harvey B. Cash, Robert J. Crandall, and Michael H. Jordan. (*See* Def. Cash, Crandall, and Jordan's Mot. at 6-7). Defendants concede that Sidhu, as i2's President and Chief Executive Officer, is an insider and, thus, could arguably be considered interested. (*See* Def. Cash, Crandall, and Jordan's Mot. at 7). The remaining directors, Cash, Crandall, and Jordan, however, are outsiders, meaning they are not also officers of the company and so are not automatically considered interested or not independent. (*See id.*). Defendants argue that because the majority of the Board is comprised of outside directors, pre-suit demand would be excused if a majority of the Board meets the *Rales* test. (*Id.*). The Court agrees and will therefore only consider whether Plaintiffs' Complaint meets the test of disinterested and independent as to the three outside directors, Cash, Crandall, and Jordan.

**\*4** "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales,* 634 A.2d at 936. "To establish lack of independence, [Plaintiff] must show that the directors are 'beholden' to the [interested director] or so under [his] influence that their discretion would be sterilized." *Id.*

In the instant case, Plaintiff offers eight reasons why the Board is not independent or disinterested. (Compl. at 30-32). Plaintiff argues 1) that Defendant Sidhu cannot be reasonably expected to argue against his own interests by authorizing the company to seek reimbursement from him; 2) that Defendant Sidhu dominates the Board and owns approximately 27% of the company's outstanding shares; 3) that Defendants Crandall and Jordan are not disinterested because they were appointed to the Board, not elected, and that Defendants Cash, Crandall, and Jordan comprised the Audit Committee and would not sue themselves because of their potential liability for their business decisions regarding the investigations of accounting improprieties; 4) that all individual Defendants signed at least one Form 10-K or 10-Q that has since been restated; 5) that the directors

Not Reported in F.Supp.2d                                                          Page 4
2004 WL 357861 (N.D.Tex.)
**(Cite as: 2004 WL 357861 (N.D.Tex.))**

cannot be expected to pursue these claims because one of the directors is also a defendant in a securities fraud class action; 6) that Defendants Sidhu and Brady have close ties, evidenced by their joint ownership of a yacht; 7) that the directors allowed the Officer Defendants to sell stock and to receive bonuses while there were allegations of financial impropriety pending; and, 8) that the Board has failed to act. (Compl. at 30-32).

Defendants argue that Plaintiffs' assertions as to why demand is excused fall into four basic categories: "1) [the Outside Directors] were complicit in the alleged wrongdoing; 2) [the Outside Directors] are dominated and controlled by other persons; 3) [the Outside Directors] would not pursue derivative claims because of parallel securities litigation; and 4) [the Outside Directors] have failed to take action." (*See* Def. Cash, Crandall, and Jordan's Mot. at 8). The Court agrees with Defendants' characterization of Plaintiffs' arguments and will use these characterizations to address whether demand is excused.

1. The Directors' Potential Liability

The Delaware Supreme Court has explained that "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." *Rales,* 634 A.2d at 936. Only when the potential for liability rises from a mere threat of personal liability to a substantial likelihood of personal liability will directors be considered interested. *Id. See also Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984). In the instant case, Plaintiff asserts that the outside Directors were interested because they faced potential liability on the wrongs Plaintiff alleges in the Complaint. [FN2] However, Plaintiff has alleged no particularized facts that raise his assertion from a mere threat to a substantial likelihood of personal liability. Plaintiff has pleaded no particularized facts which create a reasonable doubt that Defendants Cash, Crandall, or Jordan's actions were not valid exercises of business judgment. *See Rales,* 634 A.2d at 936. In fact, Plaintiff has not even stated a particular claim against the Outside Directors in his complaint or stated particular facts regarding the Outside Directors' actions on the Board. (*See generally,* Compl.). This is not sufficient to conclude that

the majority of the Board is interested.

> FN2. Plaintiff relies on *McCall v. Scott,* 239 F.3d 808 (6th Cir.2001). Plaintiff argues that allegations of a breach of the duty of care will amount to a substantial likelihood of director liability for corporate losses where directors have "exhibited intentional ignorance of and willful blindness to red flags signaling fraudulent practices throughout the corporation." (Pl.'s Response at 16). The Court notes that the Sixth Circuit also cited with approval a case holding "that when director liability is predicated upon ignorance of liability creating activities only a sustained or systematic failure of the board to exercise oversight--such as an utter failure to attempt to assure a reasonable information and reporting system exists--will establish the lack of good faith that is a necessary condition to liability." *McCall,* 239 F.3d at 817 (*citing In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959, 971 (Del.Ch.1996)). In the instant case, the Court finds that the Complaint makes no allegations that would show that the Outside Directors "exhibited intentional ignorance of or willful blindness to red flags" or of a sustained failure to exercise oversight, such that the Outside Directors face a substantial likelihood of liability.

2. Domination and Control of the Board

*5 "To establish a lack of independence, [Plaintiff] must show that the [outside] directors are 'beholden' to [Sidhu] or so under [his] influence that their discretion would be sterilized." *Rales,* 634 A.2d at 936. Plaintiff must "allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Aronson,* 473 A.2d at 816. In the instant case, Plaintiff alleges that Defendant Sidhu dominates and controls the Board such that the Outside Directors are not independent. Plaintiff makes a conclusory statement that Sidhu dominates the Board and that he owns 27% of the company's shares. (Compl. at 30). Plaintiff also seems to argue that Defendants Crandall and Jordan lack independence because they were appointed to the Board, not

Not Reported in F.Supp.2d                                                                                            Page 5
2004 WL 357861 (N.D.Tex.)
**(Cite as: 2004 WL 357861 (N.D.Tex.))**

elected. (*Id.*). Plaintiff also argues that Sidhu and Brady have close personal ties as evidenced by their joint ownership of a yacht. [FN3] (*Id.*). None of Plaintiff's allegations are sufficient to excuse demand. The Delaware Supreme Court found a similar argument in *Aronson* to be insufficient to prove a lack of independence. *See Aronson, 473 A.2d at 815-16.* Plaintiff in the instant case has failed to "allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Id.* at 816 (citations omitted). The Court cannot conclude "that the complaint factually particularizes any circumstances of control and domination to overcome the presumption of board independence, and thus render demand futile." *Aronson, 473 A.2d at 817.*

> FN3. The Court finds the last argument to be inapposite because Brady is not on the Board and his relationship with Sidhu is not relevant to the present inquiry. Additionally, there is no allegation that Brady dominates or controls any of the Outside Directors.

3. Parallel Securities Litigation

Plaintiff argues that the directors cannot be expected to pursue these claims because one of the directors is also a defendant in a securities fraud class action. (Compl. at 30). The only director to be named as a defendant in the securities fraud class action is Defendant Sidhu. *See Scheiner v. Sidhu, et al.,* 3:01-CV-418-H, currently pending in this Court. Plaintiff argues that if the other directors were to pursue the derivative claims he alleges in his complaint, that this would be "an acknowledgment of the merits of the shareholders' claims." (Compl. at 30). Similar allegations have been held to be insufficient to create a reasonable doubt that directors are interested or not independent. *See Seminaris v. Landa,* 662 A.2d 13.50, 1355 (Del. Ch.1995). The Court finds Plaintiff's conclusory allegation insufficient to render demand futile.

4. Board's Failure to Take Action

Plaintiff argues that demand is futile because the Board has failed to take action to seek reimbursement of the profits,

bonuses, and compensation. (Compl. at 31-32). The Court agrees with Defendants that Plaintiff has failed to allege with particularity what information the Outside Directors knew, who knew it, when they knew it, or how they "abdicated their investigation to management." (*See* Def. Cash, Crandall, and Jordan's Mot. at 15). This allegation is, therefore, insufficient to excuse demand. In an unpublished opinion, the Delaware Court of Chancery stated, "The mere fact that [the Board] has elected not to sue before the derivative action was filed should not of itself indicate 'interestedness." ' *Richarson v. Graves,* C.A. No. 6617, 1983 WL 21109, *3 (Del.Ch. March 7, 1983).* The Court of Chancery went on to explain that "it is the Board's inaction in most every case which is the *raison d'etre* from Rule 23.1." *Id.* In the instant case, the Court agrees that Plaintiffs' assertions are not indicative of interestedness. Plaintiffs assertions here are insufficient to create a reasonable doubt and thus excuse demand.

III. CONCLUSION

**\*6** The Court concludes that Plaintiff has not created a reasonable doubt that the board is "capable of acting free from personal financial interest and improper extraneous influences," and has thus failed to demonstrate that demand is excused. *Rales, 634 A.2d at 935.* In light of this conclusion, the Court does not need to address Defendants' other arguments for why the case should be dismissed. Because Plaintiff did not make demand on the Board and failed to allege with particularity why demand was excused, as required pursuant to Federal Rule of Civil Procedure 23.1 and Delaware law, the Court GRANTS Defendants' Motions to Dismiss.

For the reasons stated above, Defendants' Motions to Dismiss are GRANTED and Plaintiff's Complaint is DISMISSED pursuant to Fed.R.Civ .P. 12(b)(6). Nominal Defendant i2 Technologies, Inc., and Defendants Sidhu and Beecher's Request for Judicial Notice is DENIED as moot.

SO ORDERED.

2004 WL 357861 (N.D.Tex.)

**Motions, Pleadings and Filings (Back to top)**

Westlaw.

Not Reported in F.Supp.2d                                                                                     Page 6
2004 WL 357861 (N.D.Tex.)
**(Cite as: 2004 WL 357861 (N.D.Tex.))**


• 3:03CV01057 (Docket) (May. 16, 2003)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

Not Reported in A.2d                                                                                        Page 1

1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046
**(Cite as: 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046)**

C

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

Harry LEWIS, Plaintiff,

v.

Donald V. FITES, George A. Schaefer, James W.
Wogsland, Charles E. Rager, Frank
N. Grimsley, R.R. Thornton, Lilyan H. Affinito, John W.
Fondahl, Louis V.
Gerstner, Jr., Robert E. Gilmore, James P. Gorter, Walter H.
Helmerich, III,
Jerry R. Junkins, Charles F. Knight, Lee L. Morgan, and
Rawleigh Warner, Jr.,
Defendants,
and
Caterpillar, Inc., Nominal Defendant.

**Civ. A. No. 12566.**

Submitted: Nov. 10, 1992.
Decided: Feb. 19, 1993.

**\*\*1048** Kevin Gross, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, of counsel: Stanley M. Grossman, Marc I. Gross, and Judith R. Schneider, of Pomerantz Levy Haudek Block & Grossman, New York City, and Norman Berman, of Berman DeValerio & Pease, Boston, MA, for Plaintiff.

Lawrence A. Hamermesh, of Morris, Nichols, Arsht & Tunnell, Wilmington, of counsel: Douglas A. Poe, Franklin P. Auwarter, and Mitchell D. Raup, of Mayer, Brown & Platt, Chicago, Ill, for defendants.

MEMORANDUM OPINION
BERGER, Vice Chancellor.

**\*1** In this derivative action, a stockholder of defendant, Caterpillar Inc. ("Caterpillar"), alleges that the company's officers and directors breached their fiduciary duties in connection with the dissemination of periodic financial reports. In addition to Caterpillar, the complaint names as defendants thirteen directors, including three present or former officers, and three other Caterpillar officers who are not directors of the company. This is the decision on defendants' motion to dismiss for failure to make demand pursuant to Chancery Court Rule 23.1.

The facts, summarized below, are drawn from the complaint and a consent order, referred to in the complaint, entered by the Securities and Exchange Commission ("SEC") on March 31, 1992 (the "Consent Order"). Caterpillar, a Delaware corporation with operations throughout the world, manufactures heavy industrial machinery. The claims in this case relate to Caterpillar's Brazilian subsidiary, Caterpillar Brazil, S.A. ("CBSA"). In 1989, CBSA accounted for approximately 23% of Caterpillar's net profits, although CBSA's revenues represented only 5% of Caterpillar's total revenues. CBSA's exceptional 1989 results were based largely on non-operating factors such as Brazil's high inflation and a favorable currency exchange rate. In December, 1989, Brazil **\*\*1049** elected a new President who was expected to institute economic reforms to curb inflation.

Caterpillar's management recognized that changes implemented by the new administration in Brazil could have a significant impact on CBSA's 1990 performance. Caterpillar reports its financial results on a consolidated basis and historically management had not viewed each subsidiary's profits as reliable indicators of its contribution to the parent company. In January of 1990, however, Caterpillar's accounting department began to analyze CBSA's performance separately. Management's analysis was reported to Caterpillar's board at the February 1990 board meeting. Caterpillar's directors were told that the situation in Brazil was "volatile" and that operations in Brazil would have a significant negative impact on Caterpillar's overall results for 1990.

Approximately two weeks after the February board meeting, Caterpillar filed its 1989 Form 10-K. As in prior years, the 1989 financial results were reported on a consolidated basis. As a result, CBSA's disproportionate impact on Caterpillar's overall profits was not disclosed. The Management Discussion and Analysis ("MD & A") section of the Form 10-K did not provide very much information about Brazil. It stated:

Not Reported in A.2d                                                                Page 2
1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046
(Cite as: 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046)

Sales rose 14% in 1989 [in Latin America], the sixth consecutive year of improvement. The biggest gain was in Brazil, where very high inflation rates increased demand for hard goods, including earth moving equipment. (Given the extraordinarily high rate of inflation in Brazil, many contractors preferred to own hard assets, such as equipment, rather than depreciating cruzados.) Toward yearend, however, sales growth in Brazil moderated as interest rates rose.

**\*2** OUTLOOK

... Sales in Brazil, however, could be hurt by post-election policies which will likely aim at curbing inflation.

Consent Order, p. 6.

On March 15, 1990, Fernando Collor de Mello, Brazil's newly elected President, took office. President Collor immediately instituted sweeping economic changes, including an 80% reduction in the amount of currency in circulation and a plan to devalue the Brazilian currency. The Consent Order describes these reforms as creating an "economic crisis [where] even large companies were unable to meet their payrolls or pay normal trade payables." Consent Order, p. 4. However, the impact of these changes on CBSA did **\*\*1050** not become manifest until after the close of its first quarter on March 31, 1990.

At Caterpillar's April 1990 board meeting, management advised the directors that profits in Brazil would be substantially lower in 1990 than they had been in 1989. Management discussed the likely negative effects of President Collor's new programs, but the 1990 forecast was not revised because management considered the situation in Brazil too volatile and difficult to predict. On May 9, 1990, Caterpillar filed its Form 10-Q for the first quarter of 1990. The MD & A section of that report did not disclose anything about CBSA's anticipated performance. It stated only that demand in Brazil had increased but that Caterpillar continued to be concerned about Brazil's uncertain economic situation.

Caterpillar continued to monitor the impact of Brazil's new policies on CBSA throughout April and May of 1990. By June, Caterpillar had concluded that CBSA would suffer significant losses in 1990 as a result of the Brazilian economic reforms. Accordingly, on June 25, 1990,

Caterpillar issued a press release announcing that results for 1990 would be substantially lower than previously projected. Later that day, Caterpillar also disclosed CBSA's importance to the company's 1989 earnings and advised stock analysts that Caterpillar's disappointing results for the second quarter of 1990 were caused largely by circumstances in Brazil. The next day, Caterpillar stock opened at 51 3/4 , down 9 5/8 points from the previous day's opening price.

Following these disclosures, the SEC began an investigation and two class action law suits were filed. The class action suits charged Caterpillar and its management with violations of federal securities laws based upon alleged false statements and omissions in the company's 1989 Form 10-K and first quarter 1990 Form 10-Q. On March 31, 1992, the SEC investigation was concluded by the issuance of the Consent Order in which the SEC found that Caterpillar violated Section 13(a) and Rules 13a-1 and 13a-13 of the Exchange Act. As part of the Consent Order, Caterpillar voluntarily implemented procedures to ensure future compliance with MD & A requirements. The federal court actions are still pending.

Plaintiff claims that the alleged misstatements and omissions in Caterpillar's SEC filings have exposed the company to significant potential liability and that the company is already being injured by the cost of defending the pending class actions. Plaintiff alleges that the individual defendants breached their fiduciary duties by failing to fully disclose material information concerning CBSA and by failing **\*\*1051** to maintain adequate controls to assure proper disclosure of the same information. Plaintiff made no demand on Caterpillar's board before instituting this action. Rather, plaintiff alleges that demand would have been futile and, therefore, demand is excused pursuant to Chancery Court Rule 23.1. Defendants moved to dismiss on several grounds. However, in light of my conclusion that plaintiff has not adequately pled demand futility, I will not reach the alternative grounds for dismissal urged by all defendants or the jurisdictional argument raised by those individual defendants who are not also directors of Caterpillar.

**\*3** The test for determining whether a derivative plaintiff

Not Reported in A.2d                                                                           Page 3
1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046
**(Cite as: 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046)**

has adequately alleged demand futility is well settled:

> (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.

*Levine v. Smith,* Del.Supr., 591 A.2d 194, 205 (1991). The complaint alleges that Caterpillar's directors have been aware of the alleged wrongs for more than two years but have taken no action because they participated in and approved the alleged wrongs and would have to sue themselves. Allegations of this sort offered as an excuse for failure to make demand have been rejected repeatedly. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 815, 818 (1984); *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 625 (1984); *Haber v. Bell,* Del.Ch., 465 A.2d 353, 359, 360 (1983). Plaintiff offers two additional factors to buttress his claim that defendant directors are interested for purposes of the demand requirement. In the complaint, he notes that defendants agreed to the entry of the Consent Order. Since the Consent Order establishes a violation of federal securities law, plaintiff argues that defendant directors are much more likely to be held liable in this case than in a case where there has been no finding of wrongdoing. This heightened threat of personal liability, according to plaintiff, creates a reasonable doubt that Caterpillar's directors are disinterested. Plaintiff also suggested, at oral argument, that several of Caterpillar's directors were interested in withholding information about CBSA because they were then standing for re-election and the undisclosed information would reflect poorly on them.

Neither of these additional facts excuse demand. The Consent Order does not contain any admission of wrongdoing and it does **1052 not include any findings concerning Caterpillar's directors. Thus, the Consent Order does not create a substantial likelihood of director liability. *See Aronson v. Lewis,* 473 A.2d at 815. The fact that three directors were being considered for re-election at the time of the alleged wrongdoing, likewise, fails to excuse demand. First, a majority of the Caterpillar directors were not slated for election at that time and, therefore, were not interested in avoiding disclosures in order to continue on the board.

Second, the complaint contains no allegations suggesting that the positions of those directors who were seeking re-election were actually threatened. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988).

Alternatively, plaintiff argues that demand should be excused because there is a reasonable doubt that the directors' conduct was the product of a valid exercise of business judgment. He argues that Caterpillar's directors engaged in a knowing violation of federal securities laws. Before the two financial statements at issue were filed, the Caterpillar board knew that CBSA's profits in 1990 would be substantially lower than in 1989. Plaintiff describes this as being "obviously" material information that should have been fully disclosed. Plaintiff's Memorandum of Law, p. 15. Plaintiff acknowledges that Caterpillar's general counsel opined on the adequacy of the disclosures before the board approved filing the 1989 Form 10-K. However, plaintiff contends that reliance on outside opinions and reports is not sufficient to insulate the directors as a matter of law. *See Avacus Partners, L.P. v. Brian,* Del. Ch., Civil Action No. 11,001, Allen, C. (October 24, 1990), Mem.Op. at 16. Here, plaintiff suggests that the board's reliance was misplaced in light of the information known to the directors. Accordingly, plaintiff argues that there is a reasonable doubt that the directors' conduct will be protected by the business judgment rule.

**4** The problem with this argument is that it is premised on an assumption that I am not prepared to make. Plaintiff seems to be arguing that because the directors knew of the economic problems affecting CBSA, they also must have known that Caterpillar's MD & A disclosures were inadequate and misleading. The facts set forth in the Consent Order suggest the opposite:

> The MD & A sections of the 1989 10-K and 10-Q for the first quarter of 1990 were drafted by employees in Caterpillar's accounting department. Prior to the issuance of those reports, the language of the MD & A was reviewed by the Controller, Financial Vice President, Treasurer, and **1053 the company's legal, economic, and public affairs departments. After that, the language of the MD & A was reviewed by the top officers of the Company.

Not Reported in A.2d                                                                                    Page 4

1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046

**(Cite as: 1993 WL 47842 (Del.Ch.), 18 Del. J. Corp. L. 1046)**

> The board of directors reviewed the final draft of the 1989 Form 10-K, including the MD & A, at the February 1990 board meeting. At that time, the board, including top management who were members of the board, received a written opinion of the company's independent auditor that the financial statements complied with the rules and regulations of the Commission, and also an opinion of the company's General Counsel that the Form 10-K complied with all the rules and regulations of the Commission.

Consent Order, p. 5 (footnotes omitted). While it is true, as plaintiff suggests, that the directors' reliance on these reports does not totally insulate them from potential liability, that reliance certainly is a factor to be considered in deciding whether there is a reasonable doubt as to the applicability of the business judgment rule. Here, there is nothing in the complaint to suggest that the directors' reliance was unreasonable. Accordingly, I conclude that the complaint fails to satisfy the second prong of the demand futility test and that the complaint, therefore, must be dismissed for failure to make demand.

IT IS SO ORDERED.

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

Not Reported in A.2d                                                                                 Page 1
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
(Cite as: 2003 WL 1794724 (Del.Ch.))

C

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

H. Allen LITT, Trustee of the H. Allen Litt, Esq., P.C. Pension Fund, Dated
September 1, 1984, Derivatively on Behalf of Nominal Defendant, Progress
Financial Corporation, Plaintiff,
v.
W. Kirk WYCOFF, Stephen T. Zarrilli, Joseph R. Klinger, Charles J. Tornetta, A.
John May, Kevin J. Silverang, William O. Daggett, William L. Mueller, Paul M.
Lanoce, G. Daniel Jones, and John E.F. Corson, Defendants, and
PROGRESS FINANCIAL CORPORATION, a Delaware corporation, Nominal Defendant.

No. Civ.A. 19083-NC.

Submitted April 24, 2002.
Decided March 28, 2003.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, Sherrie R. Savett, Carole A. Broderick, Michael T. Fantini, and Christopher L. Nelson, of Berger & Montague, P.C., Philadelphia, Pennsylvania, for Plaintiff.

Kenneth J. Nachbar, and William M. Lafferty, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Defendants W. Kirk Wycoff, Stephen T. Zarrilli, Joseph R. Klinger, Charles J. Tornetta, A. John May, Kevin J. Silverang, William O. Daggett, William L. Mueller, Paul M. Lanoce, G. Daniel Jones, and John E.F. Corson.

MEMORANDUM OPINION
NOBLE, Vice Chancellor.

I. INTRODUCTION

**\*1** Plaintiff H. Allen Litt brings this derivative action, in his capacity as trustee of the H. Allen Litt, Esq. P.C. Pension

Fund, [FN1] on behalf of nominal defendant, Progress Financial Corporation, a Delaware corporation and thrift holding company ("Progress Financial" or the "Company"). Progress Financial, in turn, is the sole shareholder of Progress Bank, a federally chartered savings bank (the "Bank"). [FN2] The boards of directors of the Company and the Bank are identical in composition. The Plaintiff alleges that the directors of Progress Financial breached their fiduciary duties to the Company and its shareholders by conducting lending activities, which the Plaintiff contends were inappropriate for a thrift entity, through the TechBanc division: [FN3] by paying bonuses to officers, in the form of warrants received from lending customers, for securing business for the TechBanc division (the "Incentive Compensation Plan"); and by paying certain other fees and commissions to officers and directors.

> FN1. The caption lists Mr. Litt as the trustee of the pension fund. The Complaint alleges that "Plaintiff H. Allen Litt is, and was at all relevant times, a shareholder of nominal defendant Progress Financial." Compl. ¶ 2. Throughout this opinion, I presume standing of the Plaintiff, either personally or as trustee of the pension fund, on the basis of this allegation.

> FN2. The Complaint is often ambiguous about which entity, the Company or the Bank, took specific actions. For the purposes of this Memorandum Opinion, however, the differences are not material to my analysis. Therefore, I refer to the entities nonspecifically throughout this opinion as "Progress" wherever distinction is unnecessary or impossible.

> FN3. It is unclear whether TechBanc is a division of the Company or of the Bank. The Complaint refers to TechBanc as "the Bank's soon to be defunct division," Compl. ¶ 4(e), and as "the Company's 'Special Lending Division.' " Id. ¶ 19.

The Defendants have moved to dismiss the action because the Plaintiff failed to make demand upon Progress' board of directors as required by Court of Chancery Rule 23.1. For reasons discussed below, the motion to dismiss is granted.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 2
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

II. FACTUAL BACKGROUND [FN4]

> FN4. The facts upon which I base this decision and, unless otherwise specified, all facts discussed in this opinion are taken from the well-pled allegations of the Complaint and any documents incorporated by reference. See *White v. Panic,* 783 A.2d 543, 547-48 n. 5 (Del.2001).

The Defendants, who are directors of Progress Financial and the Bank, are W. Kirk Wycoff ("Wycoff"), Joseph R. Klinger ("Klinger"), Stephen T. Zarrilli ("Zarrilli"), Charles J. Tornetta ("Tornetta"), A. John May [FN5] ("May"), Kevin J. Silverang [FN6] ("Silverang"), William O. Daggett, Jr. ("Daggett"), William L. Mueller ("Mueller"), Paul M. LaNoce ("LaNoce"), G. Daniel Jones ("Jones"), and John E.F. Corson ("Corson"). Wycoff is, in addition, the President and Chief Executive Officer of both the Company and the Bank and is the Chairman of the Board of the Company. Klinger also serves as Executive Vice President of the Bank. [FN7]

> FN5. May is a partner at the law firm of Pepper, Hamilton LLP, which provides legal services to the Company.

> FN6. Silverang is a partner at the law firm of Buchanan Ingersoll, which provides legal services to the Company.

> FN7. Klinger may be an officer of the Company as well. See Compl. ¶ 28 (discussing the Company's award of compensation to its executive officers, including Klinger).

Tornetta's family members are partners in 436 Plymouth Road Associates, L.P. ("Plymouth Road"). Progress Financial has a fifteen-year lease on property owned by Plymouth Road on which Progress Financial makes lease payments totaling $85,000 annually.

Zarrilli was Chief Executive Officer and Chief Financial Officer of U.S. Interactive, Inc. ("USIT"). USIT, under Zarrilli's leadership, was a significant borrower from Progress. During that time, Wycoff and Zarrilli developed a "significant and longstanding relationship." [FN8] Zarrilli

became a director of Progress in June 2000 and left his position at USIT on September 15, 2000. USIT filed for bankruptcy in January 2001. Zarrilli is a major shareholder of USIT; USIT's May 1, 2000, proxy statement disclosed that Zarrilli owned nearly 600,000 shares of USIT common stock.

> FN8. *Id.* ¶ 5.

The Complaint is primarily focused on the TechBanc division's business. Over time, the lending activities conducted through the TechBanc division had the effect of changing the allocation of Progress' lending and leasing portfolio by increasing the percentage of Progress' assets allocated to commercial loans. [FN9] TechBanc specialized in lending to start-up Internet and technology companies. Following a review and examination of the Bank, the Office of Thrift Supervision ("OTS") issued a directive requiring the Bank to:

> FN9. This impact on the portfolio allocation is alleged to have caused the Bank to violate the Home Owners' Loan Act's ("HOLA") qualified thrift lender test, which requires thrift institutions, such as the Bank, to maintain a certain percentage of their portfolio in housing, small business and consumer-related assets. See 12 U.S.C. § 1467a(m) (codifying the qualified thrift lender test). The Complaint also asserts that the TechBanc lending activities have resulted in large losses to the Bank. The only specifics given are that as a result of making more loans with higher risks, Progress was required to increase its loss reserves, which resulted in the Company reporting a loss of $1.4 million in the second quarter of 2001. This allegation, however, is amplified by the allegation that the losses reported in 2001 were caused by the need to reverse a $2.6 million gain (reported in 2000) on USIT warrants which had subsequently declined in value.

**\*2** "(i) reduce its lending to early stage companies; (ii) increase its leverage capital ratio ...; and (iii) increase its valuation allowance and implement improved credit review and monitoring programs." [FN10]

Not Reported in A.2d                                                                Page 3
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

FN10. Compl. ¶ 35 (quoting Progress Financial Corp. Press Release of July 12, 2001).

Progress issued a press release announcing that the directors had approved a resolution to bring the Bank into compliance with the directive. In addition, Progress announced its intention to "wind down [its] technology-based portfolio of loans to pre-profit clients," [FN11] apparently a decision to discontinue or to change radically the lending activities of the TechBanc division.

FN11. *Id.*

Progress received warrants from borrowers on loans made through TechBanc. In 1999, Progress initiated the Incentive Compensation Plan through which officers and employees received a portion of the warrants that were issued to Progress. The grant of warrants was tied to the making of the loan and was not based on the repayment performance of the borrower. The employees to whom these warrants were transferred could liquidate them 180 days after receipt either in the open market or by having Progress cash out the warrants. Through this plan, Wycoff received warrants to acquire shares in five companies in 1999. [FN12] In 2000, Progress cashed out Wycoff's warrants in three companies for $78,255. The Complaint states, in addition, that it is believed that Klinger also received warrants through the Incentive Compensation Plan.

FN12. *See infra* note 14.

USIT was a lending customer of the TechBanc division and Progress received USIT warrants in conjunction with the loans. [FN13] In 2000 Progress Financial reported a gain of $2.6 million due to a market value adjustment on these warrants. Then, after USIT filed for bankruptcy in January 2001, the Company had to reverse the adjustment and report a loss in the first quarter of 2001. As a result, the financial picture of Progress Financial, as reflected in the 2000 financial statement, was somewhat rosier than would prove to be true. Both Klinger and Wycoff received bonuses and the Compensation Committee determined executive compensation based on the inflated 2000 financial statement. [FN14]

FN13. Some of these warrants were transferred to Wycoff through the Incentive Compensation Plan. The Complaint specifically states that in 1999 Wycoff received warrants to acquire 7,000 shares of USIT at $3.50 per share. The August 1999 initial public offering price of USIT was made at $10.00 per share.

FN14. The Complaint sets forth Wycoff's compensation in some detail. "For the period 1998-2000, Wycoff received base salary from the Company of $1,098.035. In 2000, Wycoff received options to purchase 42,000 shares of Progress Financial stock as part of his compensation.... These options ... have a potential realizable value of almost $800,000. Wycoff further received for the period 1998-2000 ... incentive payments and bonuses totaling $831,040. All of the above does not include the warrants he received personally for making high risk loans to preprofit companies as set forth in ¶ 19." Compl. ¶ 4(a). Wycoff also "receive[d] from the Company perquisites worth $50,000 per year." *Id.* ¶ 4(e).

Wycoff was also rewarded with ten percent of any warrants that were received by the Bank as part of the loan transaction. The warrants Wycoff received in 1999 are described by the Plaintiff as follows:

(a) 12,490 shares of VerticalNet, Inc. at $2.79 per share, which had the first public offering of its stock in February 1999 at a price of $8.00 per share;

(b) 6,001 shares of IQEplc at $4.16 per share, which had the first public offering of its stock in May 1999 at a price of $12.50 per share;

(c) 3,400 shares of Internet Capital Group, Inc. at $5.00 per share, which had the first public offering in August 1999 at a price of $6.00 per share;

(d) 6,250 shares of Ravisent Technologies, Inc. at $3.56 per share, which had the first public offering of its stock in July, 1999 at a price of $12.00 per share;

(e) 7,000 shares of U.S. Interactive, Inc. at $3.50 per share, which had the first public offering of its stock in August of 1999 at a price of $10.00 per

Not Reported in A.2d                                                                                    Page 4
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

share.
*Id.* ¶ 19.

Progress also utilized bonuses to reward employees and, in one case, an outside director for their efforts to accomplish certain goals of the business in areas outside the scope of the Incentive Compensation Plan. For example, Progress paid Wycoff bonuses for efforts to raise capital for limited partnerships-Ben Franklin/Progress Capital Fund, L.P. and NewSpring Ventures, L.P. [FN15]-as well as an incentive payment of over $150,000 on the sale of Procall Teleservices, Inc. ("Procall"), a teleservices subsidiary of the Company. Daggett, a director who is not alleged to have been an employee of Progress, also received a payment of more than $150,000 in connection with the sale of Procall. In addition to bonuses and incentive payments, Progress made loans to executive officers, directors, and their affiliates. [FN16]

    FN15. The Complaint alleges that Wycoff is a partner of both limited partnerships but does not give any more information regarding the nature, extent, or origin of the interest.

    FN16. The Company's 2001 proxy materials disclosed that such loans totaled $4.2 million. The 1999 proxy materials disclosed that such loans totaled $6.2 million. The 2000 proxy materials disclosed loans to directors at preferred rates, noting that no individual director had received more than $60,000 in preferred-rate loans. Compl. ¶ 34.

### III. ANALYSIS

**\*3** Defendants have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for the Plaintiff's failure to make demand on Progress Financial's board of directors (the "Board") or to plead demand futility sufficiently. The Plaintiff admits that demand was not made and instead argues that demand should be excused as futile. Under the two-pronged *Aronson* test, [FN17] demand will be excused as futile where the "particularized facts alleged in the complaint create a reasonable doubt (*i.e.,* reason to doubt) that (1) the directors upon whom the demand would be made were disinterested and independent or (2) the

challenged transaction was otherwise the product of a valid exercise of business judgment." [FN18] Therefore, the Court must determine whether the Complaint includes allegations of "particularized facts creating a reasonable doubt that the actions of the defendants were protected by the business judgment rule." [FN19] The Plaintiff is entitled to the benefit of reasonable inferences that may be drawn from the particularized facts alleged but may not rely upon conclusory allegations. [FN20]

    FN17. *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984); *see Brehm v. Eisner,* 746 A.2d 244, 256 (Del.2000).

    FN18. *Zupnick v. Goizueta,* 698 A.2d 384, 386 (Del. Ch.1997); *see also Aronson,* 473 A.2d at 814.

    FN19. *Brehm,* 746 A.2d at 255.

    FN20. *Id.*

The Board, as comprised on August 29, 2001, the date the Complaint was filed, is the board for purposes of evaluating whether demand is required or excused. [FN21] The Complaint names eleven directors as defendants. It is not clear whether these eleven constitute the entire Progress Financial board. For purposes of evaluating the demand requirement, I draw the inference that the eleven individual defendants named in the Complaint were the only directors of Progress Financial as of August 29, 2001.

    FN21. *See, e.g., Haseotes v. Bentas,* 2002 Del. Ch. LEXIS 106, at * 14 (Del. Ch.); *Needham v. Cruver,* 1993 Del. Ch. LEXIS 76, at *8-9 (Del. Ch.); *Harris v. Carter,* 582 A.2d 222, 229-32 (Del. Ch.1990).

A. *Disinterest and Independence: First Prong of the Aronson Test*

In order to excuse demand under the first prong of *Aronson,* a plaintiff must plead particularized facts that raise a reasonable doubt whether a majority of the board upon which demand would be made was disinterested in the challenged transaction or was able to exercise independent business judgment with respect to it. [FN22] A director is

2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

"interested" when he or she appears on both sides of the challenged transaction or expects to derive a personal benefit from it, such as in a self-dealing transaction. [FN23] Where self-dealing is not alleged, the benefit accruing to the allegedly interested director must be shown to be material to that director. [FN24] A benefit is material when its importance to the director, in the opinion of the Court, is such that the director probably could not fulfill his or her fiduciary duties to the corporation "without being influenced by [an] overriding personal interest." [FN25] A director is considered "independent" unless the complaint alleges particularized facts to show that the director is unable to base his or her decisions on the corporate merits of the issue before the board. [FN26] For example, the complaint may demonstrate a "direction of corporate conduct in such a way as to comport with the wishes or interests of" the controlling person [FN27] or may plead facts that indicate the director is so "beholden to" or influenced by the controlling person that the director is unable to exercise discretion with respect to corporate decisions. [FN28]

> FN22. *Aronson,* 473 A.2d, at 814.

> FN23. *Id.* at 812; *Orman v. Cullman,* 794 A.2d 5, 23 (Del. Ch.2002). *See also Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 362 (Del.1993).

> FN24. *Orman,* 794 A.2d at 23, 25 n. 50.

> FN25. *In re GM Class H S'holders Litig.,* 734 A.2d 611, 617 (Del. Ch.1999).

> FN26. *Aronson,* 473 A.2d at 816.

> FN27. *Kaplan v. Centex Corp.,* 284 A.2d 119, 123 (Del. Ch.1971); *see also Aronson,* 473 A.2d at 816; *Orman,* 794 A.2d at 24.

> FN28. *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993); *see also Aronson,* 473 A.2d at 815; *Orman,* 794 A.2d at 24.

**\*4** The Complaint makes no allegation that Mueller, Jones, Corson, or LaNoce are unable to consider demand disinterestedly and independently. On the other hand, the Defendants concede that Wycoff and Klinger may be

considered interested for the purposes of evaluating the Rule 23.1 demand requirement. Thus, demand would not be excused under the first prong of *Aronson* unless the allegations of the Complaint raise a reasonable doubt about the disinterest or independence of at least four of the remaining five directors (Zarrilli, Tornetta, Daggett, May, or Silverang). [FN29]

> FN29. The Plaintiff has not attempted to allege that anyone other than Wycoff dominated the other directors' independent judgment regarding Progress' affairs.

*1. Stephen T. Zarrilli*

Zarrilli was the Chief Executive Officer of USIT until September 15, 2000. He left that position approximately three months after becoming a member of Progress' board in June 2000. While Zarrilli was CEO of USIT, but apparently prior to his service as a director of Progress, USIT received loans from Progress. After Zarrilli left USIT, it filed for bankruptcy-necessitating, for purposes of Progress' financial statement, a readjustment of the valuation of the USIT warrants received in connection with the loans. Zarrilli holds nearly 600,000 shares of USIT common stock. While Zarrilli was at USIT, he developed a "significant" relationship with Wycoff because Zarrilli controlled USIT's decision to become a lending customer of Progress.

Construing these facts in the light most favorable to the Plaintiff, Zarrilli, in his capacity as an officer of USIT, caused USIT to apply for loans-loans that the Plaintiff alleges turned out to be detrimental to Progress. The Complaint notes ominously that Zarrilli's service on the Board overlapped his employment at USIT for about three months. The pertinent question is not whether a director has been employed by a customer of the corporation. The critical issue, instead, is whether the director was conflicted in his loyalties with respect to challenged board actions. The Complaint contains no allegations of this sort. Significantly missing is any indication that Zarrilli had conflicting loyalties or made any decision based upon conflicting loyalties-that after Zarrilli became a director, for example, Progress made any loans to USIT or that USIT received any preferential treatment in the servicing of its loans.

Not Reported in A.2d                                                                                          Page 6
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

Furthermore, there is no suggestion that any of the actions taken after he became a director of Progress benefited Zarrilli directly or benefited USIT, thereby assisting Zarrilli indirectly as a USIT shareholder. Thus, the Complaint fails to plead particularized facts that raise a reasonable doubt of Zarrilli's disinterest in the challenged transactions.

In addition, the allegation that Zarrilli and Wycoff developed a "relationship" while Zarrilli was at USIT is insufficient to raise a reasonable doubt as to Zarrilli's independence from Wycoff. Neither mere personal friendship alone, [FN30] nor mere outside business relationships alone, [FN31] are sufficient to raise a reasonable doubt regarding a director's independence. Also, the Plaintiff has not made any cognizable allegation that Zarrilli developed a sense of "owingness" to Wycoff as the result of the loans that Progress may have made to USIT before Zarrilli joined the Board.

> FN30. *See, e.g., Crescent/Mach I Partners, L.P. v. Turner,* 2000 Del. Ch. LEXIS 145, at *40-41 (Del. Ch.).

> FN31. *See, e.g., Goldman v. Pogo.com, Inc.,* 2002 Del. Ch. LEXIS 71, at *14 (Del. Ch.); *Orman, 794 A.2d at 26-27; Crescent/Mach I Partners, L.P.,* 2000 Del. Ch. LEXIS 145, at *40-41.

**\*5** Thus, I find that the Complaint fails to raise a reasonable doubt that Zarrilli is disinterested in the challenged transactions or capable of exercising business judgment independently of Wycoff.

*2. Charles J. Tornetta*

The Complaint alleges that Progress leases property from a limited partnership and that Tornetta's "family members" are the partners. The lease is for fifteen years and the lease payments amount to slightly over $7,000 per month to the limited partnership. The particularized factual allegations end there. From this, the Plaintiff would have the Court infer that Tornetta is beholden to Wycoff who may be in a position at the end of the lease to elect not to renew it. [FN32] Again, the factual allegations fall far short of providing a basis for the Court to do so. First, the

relationship between Tornetta and the "family members" who are partners of the limited partnership is unspecified. Second, there are no facts supplied from which the Court may infer that the amount of the lease payment represents a significant departure from fair market value or is material to Tornetta or to any of Tornetta's family members. In some circumstances, this Court has determined that material financial interests of close family members may factor into the disinterest and independence analysis under the *Aronson* test. [FN33] Here, however, the failure to allege with particularity both close familial relationship and materiality amounts to a failure to raise a reasonable doubt regarding Tornetta's disinterest and independence. [FN34]

> FN32. The Plaintiff may also be suggesting somewhat obliquely that Wycoff would be in a position to cause Progress to breach the lease prior to its expiration and, consequently, Tornetta must stay in Wycoff's good graces to ensure the uninterrupted income to the partnership. When stated directly, the implausibility of the suggestion-that for this reason Tornetta has no choice but to keep Wycoff happy-becomes obvious since the limited partnership would doubtless have a remedy at law for breach of the lease.

> FN33. *See, e.g., Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 Del. Ch. LEXIS 144, at *28-29 (Del. Ch.2002) (considering a director's son's primary employment with the corporation as one of several factors supporting a reasonable doubt whether the director could consider demand impartially where such demand was adverse to the interests of the corporate CEO); *Mizel v. Connelly,* 1999 Del. Ch. LEXIS 157, at *11-14 (Del. Ch.) (discussing why one of the directors may be unable to consider demand impartially where such demand was adverse to his grandfather's interests).

> FN34. The Complaint does not support any contention that Wycoff, as Chief Executive Officer, is vested with unilateral non-reviewable authority to breach contracts on behalf of Progress, was the unilateral decision-maker for leasing the property in question, or could be expected to be the

Not Reported in A.2d                                                                                      Page 7
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

unilateral decision-maker with respect to renewal of the fifteen-year lease upon its expiration.

I also question whether the renewal or non-renewal of a single fifteen-year lease of property, which is not alleged to be at a rate substantially above market value, could suffice to raise a reasonable doubt of a director's independence or disinterest even if the quantum of income derived from the lease were material to Tornetta or his close family members. Finally, the Complaint alleges that "Tornetta and his family own substantial tracts of real estate that Defendant Wycoff has caused and will continue to cause to be leased by Progress Financial, in exchange for Tornetta's acquiescence to Wycoff's decisions." Compl. ¶ 7. This allegation, especially when contrasted with the allegations regarding the Plymouth Road lease, lacks the particularity required by Rule 23.1.

*3. William O. Daggett*

The Complaint alleges only one fact with regard to the disinterest or independence of Daggett: that Progress paid Daggett and Wycoff over $150,000 each as a commission for their respective roles in the sale of Procall. The payments are described as "excessive" by the Plaintiff, but there are no allegations related to the value or sale price of Procall or to how Wycoff and Daggett participated in its sale. It is therefore impossible to determine whether the payments were excessive, and it would be unreasonable to infer that they were. Furthermore, there are no allegations that either Wycoff or Daggett stood on both sides of the transaction or that either the Procall transaction as a whole or the commission payments specifically were unfair to Progress Financial or its shareholders. I cannot, therefore, ascertain how this single commission earned on a one-time sale of a subsidiary would render Daggett beholden to anyone and thus unable to exercise his independent business judgment. Moreover, this allegation does not call into question Daggett's disinterest in any of the other challenged transactions.

Nonetheless, it is clear that Daggett does have a personal financial interest in this sizeable fee that he received from Progress. In addition, I accept that a single fee of $150,000

for unspecified services may be material to Daggett. Thus, I conclude that the Plaintiff has raised a reasonable doubt as to whether Daggett was disinterested in the commissions paid in connection with the sale of Procall. For all other challenged transactions, however, the Plaintiff has failed to raise a reasonable doubt that Daggett is disinterested and independent.

**\*6** Thus, I have determined that the Complaint does not raise a reasonable doubt as to the independence or disinterest of Zarrilli, Tornetta, or, for all transactions other than the bonuses paid on the sale of Procall, Daggett. I need not consider, therefore, whether the other directors, May or Silverang, are disinterested and independent. For the reasons stated above, I find that, under the first prong of *Aronson,* demand would not be excused under Court of Chancery Rule 23.1 because at least six of the eleven directors (Zarrilli, Tornetta, Mueller, LaNoce, Jones, and Corson and, for all but one transaction, Daggett, as well) are disinterested and independent and, thus, able to review fairly any demand made pursuant to Rule 23.1.

**B. *Valid Exercise of Business Judgment: Second Prong of the* Aronson *Test***

Even though a majority of the board is determined to be disinterested and independent, demand may be excused under the second prong of the *Aronson* test. In order for demand to be so excused, the plaintiff must allege particularized facts that give rise to a reasonable doubt whether the challenged transaction is entitled to the protection of the business judgment rule. [FN35] A plaintiff may rebut the presumption that the board's decision is entitled to deference by raising a reasonable doubt whether the action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation. [FN36] Thus, in order to excuse demand when a majority of the board at the time of demand is found to be disinterested and independent, the plaintiff must plead particularized facts sufficient to raise a reasonable doubt that the action was taken in good faith or a reasonable doubt that the board was adequately informed in making the decision. The Complaint fails to do so.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

FN35. *Aronson,* 473 A.2d at 814-15.

FN36. *Id.* at 812.

The Complaint does not allege any particularized facts regarding the process by which the Board initiated or approved the challenged actions, notably approval of the Incentive Compensation Plan. Similarly, the Complaint does not allege that the Board failed to obtain appropriate legal advice or other professional guidance before implementing either the TechBanc program or the Incentive Compensation Plan.

The decision to offer bonuses to employees who bring in business that a company is seeking to attract would normally be within the ambit of a board's business judgment. Indeed, the Complaint fails to allege any specific reasons, except for the possible violation of state and federal banking requirements, why the Board should have been concerned about the propriety of the Incentive Compensation Plan [FN37]-no warnings from banking regulators and no investigation or enforcement activity conducted or contemplated. The Court will not infer that the Board acted recklessly or in bad faith, absent specific particularized allegations of fact giving rise to such an inference. [FN38] Here, read in the light most favorable to the Plaintiff's position, the allegations are that the directors approved an incentive compensation program by which certain officers and employees would receive bonuses for procuring new business in a market niche in which the Board had decided to seek to expand Progress' participation-loans to fledgling technology companies. As it has turned out, this may have been a poor (or poorly timed) decision, but employee compensation decisions made by a fully informed, disinterested, and independent board of directors are usually entitled to the protection of the business judgment rule. [FN39]

> FN37. The Complaint does allege that the changes to the Bank's loan and lease portfolio structure, due to the loans made through the TechBanc division, caused banking regulators to issue a directive that Progress reduce lending through the TechBanc division, increase loss reserves, and take various other actions. This, however, does not call into

question the Board's exercise of business judgment and does not help the Plaintiff's case for excusing demand because the Complaint also alleges that the Board cooperated and fully complied with the only negative response received from banking regulators with regard to the challenged actions. I refrain, however, from relying upon this allegation to draw an inference that the OTS reviewed and did not find fault with the Incentive Compensation Plan.

FN38. *See Aronson,* 473 A.2d at 814.

FN39. *See* 8 *Del. C.* § 122(5) (officer and agent compensation); *id.* § 141(h) (director compensation); *White,* 783 A.2d at 553 n. 35 (noting the board's discretion in setting executive compensation); *Brehm,* 746 A.2d at 262 & n. 56 (indicating that when setting executive compensation, the outer limit of the discretion of the board is defined by unconscionable conduct, waste, or fraud); *Grimes v. Donald,* 673 A.2d 1207, 1215 (Del.1996) (observing that when "an independent and informed board, acting in good faith, determines that the services of a particular individual warrant large amounts of money, whether in the form of current salary or severance provisions, the board has made a business judgment. That judgment normally will receive the protection of the business judgment rule unless the facts show that such amounts, compared with the services to be received in exchange, constitute waste or could not otherwise be the product of a valid exercise of business judgment."); *Lewis v. Hirsch,* 1994 Del. Ch. LEXIS 68, at *10-11 (Del. Ch.) (stating that executive compensation is "ordinarily left to the business judgment of a company's board of directors"); *Tate & Lyle PLC v. Staley Cont'l, Inc.,* 1988 Del. Ch. LEXIS 61, at *19-22 (Del. Ch.) (finding business judgment rule did protect disinterested directors' approval of compensation packages for other directors); *see also* *Telxon Corp. v. Meyerson,* 802 A.2d 257, 265-66 (Del.2002); *In re Nat'l Auto Credit, Inc. S'holders Litig.,* 2003 Del. Ch. LEXIS 5, at *50-55

Not Reported in A.2d                                                                                      Page 9
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

(Del. Ch.).

**\*7** In his brief opposing the motion to dismiss, the Plaintiff defends his failure to allege particularized facts in the Complaint on the basis that the corporate records of Progress Financial, which could provide factual detail for particularized allegations, are in the exclusive possession and control of the Defendants. Because 8 _Del. C._ § 220 provides shareholders reasonable access to corporate records, this argument is both inaccurate and unavailing. Both this Court and the Supreme Court have admonished plaintiffs to make use of the "tools at hand" on many occasions. [FN40] Plaintiffs who fail to do so act at their own hazard. [FN41]

> FN40. Specifically, plaintiffs are encouraged to invoke 8 _Del. C._ § 220 in order to establish whether the records of the corporation support or refute the suspicion of wrongdoing prior to filing a derivative action. _See, e.g., White,_ 783 A.2d at 549 n. 15; _Brehm,_ 746 A.2d at 262 n. 57, 266; _Rales,_ 634 A.2d at 934-35 n. 10; _Ash v. McCall,_ 2000 Del. Ch. LEXIS 144, at \*56 n. 56 (Del. Ch.).

> FN41. _See White,_ 783 A.2d at 555-57 & n. 54; _Mizel,_ 2000 Del. Ch. LEXIS 157, at \*16 n. 5.

The allegation that the Board's decision to implement the compensation program was illegal and, thus, not entitled to the benefits of the presumptions of the business judgment rule, is more troubling. The Complaint alleges that the Incentive Compensation Plan violated the banking laws of the United States, 18 U.S.C. § 215, and the Commonwealth of Pennsylvania, 7 P.S. § 1413. In addition, it is alleged that the Incentive Compensation Plan transgressed federal banking regulations, specifically 12 C.F.R. § 570 and OTS Regulatory Bulletin 27b. Defendants' alleged violation of these statutory and regulatory provisions, according to the Plaintiff, requires application of a per se rule that illegal conduct authorized by the Board excuses the Plaintiff from any duty to make pre-suit demand upon the Board.

_1. Bribery Statutes: 18 U.S.C. § 215 and 7 P.S. § 1413_

In order to plead that demand is excused because the

challenged corporate act was illegal and not within the scope of the business judgment rule, the Plaintiff must at least plead particularized facts that raise a reasonable doubt about the legality of the corporate act in question. [FN42] However, the allegations in the Complaint fail to support a reasonable inference that adoption of the Incentive Compensation Plan constituted criminal conduct. [FN43]

> FN42. For examples of the use of the criminal law to support fiduciary duty claims against corporate directors, see _In re Caremark Int'l Derivative Litig.,_ 698 A.2d 959, 970-72 (Del. Ch.1996); _In re Baxter Int'l, Inc. S'holders Litig.,_ 654 A.2d 1268, 1270-71 (Del. Ch.1995). Both of these cases address a board's supervisory responsibilities; they do not directly address the directors' liability for their own actions as directors. In _Gagliardi v. Trifoods Int'l, Inc.,_ 1996 Del. Ch. LEXIS 87 (Del. Ch.), _published in part,_ 683 A.2d 1049 (Del. Ch.1996), this Court observed that "[t]he business outcome of an investment project that is unaffected by director self-interest or bad faith cannot itself be an occasion for director liability. That is the hard core of the business judgment doctrine." _Id._ at \* \*10-11 (footnote omitted). The Court further explained:
> "By 'bad faith' is meant a transaction that is authorized for some purpose other than a genuine attempt to advance corporate welfare _or is known to constitute a violation of applicable positive law._ There can be no personal liability of a director for losses arising from 'illegal' transactions if a director were financially disinterested, acted in good faith, and relied on advice of counsel reasonably selected in authorizing a transaction."
> _Id._ at \* \*11 n. 2 (citation omitted) (emphasis added). The Complaint does not allege whether the Board had the benefit of advice of counsel when it approved the Incentive Compensation Plan.

> FN43. For purposes of ruling on this motion to dismiss, I consider the text of the pertinent statutes, regulations, and OTS Regulatory Bulletin 27b, which are integral to the Complaint and

Westlaw.

Not Reported in A.2d                                                                        Page 10
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

incorporated by reference therein. *See* *In re Santa Fe Pac. Corp. S'holders Litig., 669 A.2d 59, 69-70 (Del.1995).*

Violation of either 18 U.S.C. § 215 or 7 P.S. § 1413 constitutes criminal conduct. [FN44] The plain language of these statutes is designed to prohibit bribery of banking personnel. [FN45] It does not appear to apply in the situation where a bank pays either salary or bonuses to its own employees for doing their jobs. In fact, 18 U.S.C. § 215(c) reads, "This section shall not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." Furthermore, the Plaintiff fails to direct the Court to any precedent for enforcing either statute in the context of bonuses paid by a bank to its own employees, nor to any past, present, or contemplated enforcement actions or investigations of Progress on the basis that the Incentive Compensation Plan violated any applicable law. Thus, the Complaint fails to raise a reasonable doubt that the directors, by adopting and implementing the Incentive Compensation Plan, violated (or facilitated the violation of) either statute and, therefore, does not raise a reasonable doubt whether the decision to implement the plan was not illegal. [FN46]

> FN44. 18 U.S.C. § 215(a) provides in pertinent part: Whoever (1) corruptly gives, offers, or promises anything of value to any person, with intent to influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution; or (2) as an officer, director, employee, agent, or attorney of a financial institution, corruptly solicits or demands for the benefit of any person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution; shall be [punished in accordance with the statute].
>
> Violation of 18 U.S.C. § 215 is a felony punishable by a fine of up to $1 million or three times the value of the consideration offered and up to thirty

years in prison, unless the amount offered is less than $1,000. 18 U.S.C. § 215(a).

> 7 P.S. § 1413(a) provides in pertinent part:
>
> No director, trustee, officer, employee or attorney of an institution or of an affiliate of the institution shall: (i) receive anything of value for procuring or attempting to procure any loan from or investment by the institution.
>
> Violation of 7 P.S. § 1413 is a misdemeanor punishable by a fine of not more than $1,000 plus the amount received and no more than one-year imprisonment. 7 P.S. § 2102(a) (specifying penalty for violation of 7 P.S. § 1413 and other provisions of the Commonwealth's banking code).

> FN45. Violation of § 215 is commonly referred to as "bank bribery." *See, e.g.,* *United States v. Kenrick,* 221 F.3d 19, 26 (1st Cir.2000); *United States v. Haese,* 162 F.3d 359, 363 (5th Cir.1998); *United States v. Jennings,* 160 F.3d 1006, 1015 (4th Cir.1998); *United States v. Cohen,* 152 F.3d 321, 323 (4th Cir.1998).

> FN46. In this case, there is no allegation that any criminal prosecution or regulatory enforcement action has ever been initiated under either of these statutory provisions. I note that when a plaintiff seeks to invoke a statute, regulation, or regulatory guidance to define the standard against which a corporate board's actions are to be measured and when those actions, in the absence of such a statute, regulation, or guideline, would not otherwise implicate fiduciary duty considerations, there are two factors which, while not precluding judicial intervention here, counsel for caution. First, the absence of any enforcement action, particularly where the regulators are alleged to have been aware of the conduct, suggests that the regulators, who are presumed to have expertise in their particular field, did not consider the conduct worthy of further enforcement proceedings. Second, the Court is being asked to construe statutes and regulations of the federal government and a statute of another state in ways that the

Not Reported in A.2d                                                                     Page 11
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

Plaintiff does not allege they have ever been interpreted or applied in the past.

*2. Banking Regulations and Guidelines: 12 C.F.R. § 570 and OTS Regulatory Bulletin 27b*

**\*8** In order for the Plaintiff to demonstrate that demand should be excused under the second prong of *Aronson,* he must demonstrate that the decision to adopt the Incentive Compensation Plan was not entitled to the protection of the business judgment rule at the time the board made the decision. Although it is possible that the Incentive Compensation Plan (or other programs approved by the Board) may have ultimately run afoul of the banking regulations cited by the Plaintiff, the particularized allegations of the Complaint fail to provide a basis for doubting whether the Board's actions, when measured against the relevant regulatory requirements as of the time of the actions, were the product of a valid exercise of business judgment.

Through 12 C.F.R. Part 570, the OTS has adopted safety and soundness standards for savings associations. [FN47] When a thrift institution fails to meet these standards, OTS may require the development and implementation of a compliance plan to address its concerns. The OTS' concerns for excessive executive compensation are addressed, first, in the context of "Operational and Managerial Standards," which, *inter alia,* require thrift institutions to "maintain safeguards to prevent the payment of compensation, fees, and benefits that are excessive or that could lead to material financial loss to the institution." [FN48] Second, and somewhat more specifically, the safety and soundness standards contain a "Prohibition on Compensation That Constitutes an Unsafe and Unsound Practice" which provides:

FN47. OTS promulgated the regulations under the authority of the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1831p-1. The Interagency Guidelines Establishing Standards for Safety and Soundness are set forth in Appendix A to 12 C.F.R. Part 570.

FN48. 12 C.F.R. § 570, app. A.II.I.

Excessive compensation is prohibited as an unsafe and unsound practice. Compensation shall be considered excessive when amounts paid are unreasonable or disproportionate to the services performed by an executive officer, employee, director, or principal shareholder considering the following:
1. The combined value of all cash and non-cash benefits provided to the individual;
2. The compensation history of the individual and other individuals with comparable expertise at the institution;
3. The financial condition of the institution;
4. Comparable compensation practices at comparable institutions, based on factors such as asset size, geographic location, and the complexity of the loan portfolio or other assets;

* * *

6. Any connection between the individual and any fraudulent act or omission, breach of trust or fiduciary duty, or inside or abuse with regard to the institution; and
7. Any other factors the agencies determine to be relevant. [FN49]

FN49. 12 C.F.R. § 570, app. A.III.A.

Furthermore, "[c]ompensation that could lead to material financial loss to an institution is prohibited as an unsafe and unsound practice." [FN50]

FN50. 12 C.F.R. § 570 app. A.III.B.

By Regulatory Bulletin 27b, the OTS provides guidance to its examiners regarding reasonable compensation arrangements and to the directors of thrift institutions regarding the performance of their responsibilities in overseeing executive compensation. OTS has specifically addressed the issue of incentive pay for thrift executives:
**\*9** An increasing number of businesses today rely on incentive pay to motivate managers and employees to excel. OTS encourages incentive-based compensation but prohibits arrangements that provide incentives contrary to the safe and sound operation of the association. For example, compensation based primarily on short-term operating results may encourage unreasonable risk-taking to achieve short-term profits. The board of directors

Not Reported in A.2d                                                        Page 12
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

should closely monitor compensation tied to current operating results. [FN51]

FN51. Regulatory Bulletin 27(b).

The Board's decision to pursue an aggressive plan for making loans to startup technology companies through TechBanc did not turn out well. The problems arising from Progress' loans to pre-profit companies resulted in a directive from OTS which required Progress, *inter alia,* to:
(i) reduce its lending to early stage technology companies; (ii) increase its leverage capital ratio ... and its total risk-based capital ratio ...; and (iii) increase its valuation allowance and implement approved credit review and monitoring programs. [FN52]

FN52. Compl. ¶ 35 (quoting Progress Financial Corp. Press Release of July 12, 2001).

The Board approved a resolution in July 2001, that implemented the terms of the OTS directive. At that time, Progress announced that it had suspended payment of its quarterly dividend and that it would "exit the business of lending to pre-profit companies and ... wind down [its] technology-based portfolio of loans to pre-profit clients ." [FN53] The Plaintiff does not allege that OTS then, or at any other time, either questioned or challenged the Incentive Compensation Plan. [FN54]

FN53. *Id.*

FN54. The OTS directive that resulted in the July 2001 resolution restricted the granting of "[h]igh risk loans," which were defined to include "certain commercial business loans and other credit relationships that (i) the Bank originates through its Tech-Banc/Specialized Lending Division, (ii) involve the receipt by the Bank or an affiliate of warrants [or] other equity interest, (iii) are made to a pre-profit company or a company reliant on venture capital funding, or (iv) are otherwise determined by the OTS to have a higher than ordinary degree of credit risk." Compl. ¶ 36.

Determining whether the Board's adoption of the Incentive Compensation Plan to stimulate TechBanc loans to

pre-profit technology companies was the result of the exercise of its business judgment requires an evaluation of the Board's actions as of the time of that decision. The Plaintiff frames the Complaint as a challenge to the Incentive Compensation Plan and not as a direct attack on the TechBanc lending program. According to the Plaintiff, the Incentive Compensation Plan was imprudent, in part, because it was too successful in achieving its goals: it resulted in too many loans having been made by TechBanc to pre-profit companies. The Plaintiff has not alleged with particularity facts evidencing that the compensation received by Progress executives was "excessive" when the amount is measured in the context of an enterprise of the Progress' scope. Instead, he alleges that the Incentive Compensation Plan created too great an incentive to make the loans that the Board wanted Progress to make. As a result, these loans ultimately turned out to have been unduly risky and, therefore, caused financial harm to Progress. The Plaintiff argues that the Incentive Compensation Plan, which induced Progress executives to make these loans, violated the regulatory prohibition upon excessive compensation because it "[led] to material financial loss." [FN55] In substance, the Plaintiff asks that the conduct of the Board be measured by the results of the TechBanc pre-profit loan program.

FN55. *See* 12 C.F.R. § 570 app. A.II.I.; *id.* § 570 app. A.III . B. It is not altogether clear that the Plaintiff has successfully alleged that the TechBanc program, in fact, resulted in "material financial loss." Part of the Plaintiff's criticism is that warrants which resulted in a paper profit in one year had to be reversed as an accounting matter when their value plunged. While that caused a loss in the second year, the cumulative effect on income over the two-year period does not appear to have been material. Furthermore, that OTS required Progress to increase its loss reserves because of the TechBanc operations does not necessarily mean that losses, in fact, resulted. It may be that the increase in reserves resulted from perceived risk instead of actual loss. Nevertheless, for purposes of this Memorandum Opinion, the Court will accept the Plaintiff's allegation that the TechBanc program

Not Reported in A.2d                                                                Page 13
2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126
**(Cite as: 2003 WL 1794724 (Del.Ch.))**

caused "material financial loss."

**\*10** The exercise of business judgment cannot be evaluated, as the Plaintiff seems to suggest, merely by looking at the results of that business judgment. While challenges are seldom, if ever, made to business judgments that turn out well, the simple fact that the business decision caused significant loss does not dictate how that decision should be classified or evaluated. The Plaintiff's allegations regarding the Board's authorization of the Incentive Compensation Plan (or the TechBanc loan program) are paltry. There are, for example, no particularized allegations about "comparable compensation at comparable institutions" or that Wycoff's compensation (or the compensation of other executives) was "disproportionate to the services rendered." [FN56]

> FN56. Furthermore, if the focus is on financial losses attributable to the TechBanc loan program, there are few objective factors set forth in the Complaint by which the conduct of the Board, at the time of decision, can be measured. Loans were made to pre-profit technology companies, a concept which, with the hindsight of 2003, may be easy to criticize. At the time of the loans, however, the eventual failure of many of those ventures was not as apparent. In addition, one may wonder, particularly in light of the policies reflected in HOLA, whether it was a wise decision for the directors of a savings institution to view the start-up technology sector as a promising target for new business. Nonetheless, these factors do not support the argument that the decision to implement the TechBanc loan program was beyond the scope of the Board's business judgment.

It may be fair to charge the Board with knowledge that the TechBanc loan program *could* have resulted in material financial loss to Progress because, in the most simplistic sense, any new major venture entails risk and that risk carries potential adverse consequences. [FN57] The decision to run the risks of that loan program, when evaluated as of the time of the Board's decision, was not such an improvident decision as to deny the directors the presumption of the business judgment rule. Thus, the

decision of the Board to pay Progress executives incentive compensation to implement the TechBanc loan program does not, even though the incentive pay may have encouraged the executives to make the loans that caused material financial loss to Progress, constitute conduct beyond the scope of the business judgment rule. [FN58]

> FN57. The Plaintiff also focuses on the "short-term" nature of the incentive compensation program because the warrants were awarded to the executives responsible for making the loans without any assurance that the loans would, in fact, turn out to be "profitable ." Although I accept for purposes of this motion to dismiss that the Incentive Compensation Plan awarded "compensation based on short-term operating results," that conclusion is not as self-evident as the Plaintiff argues. First, one can read "operating results" to refer to short-term profits, thus reflecting a concern that accounting judgments might be affected by the potential for additional compensation. The Plaintiff alludes to this possibility when he questions the profits resulting from the increase in value (during USIT's better times) of the USIT warrants. Compl. ¶ 28. Second, warrants, or their value to Progress' executives, have a time-delayed aspect: not only must Progress' executives wait 180 days to cash out but also the value must be sustained for that period. In theory, at least, warrants may be viewed as a means of affording the opportunity to participate in long-term appreciation in value. Moreover, the guidelines set forth in Regulatory Bulletin 27(b) direct boards to "closely monitor compensation tied to current operating results." Significantly, Regulatory Bulletin 27(b) does not expressly to bar compensation tied to short-term results.

> FN58. The Plaintiff relies on several cases from other jurisdictions in support of his claim. None, however, is helpful to his cause. For example, in *Reilly Mortgage Group, Inc. v. Mount Vernon Savings & Loan Ass'n, 568 F.Supp. 1067 (E.D.Va.1983)*, demand on a bank's board of

directors was excused because of the cumulative effect of many shortcomings in the directors' conduct including the allegation that the board approved a course of conduct in violation of federal and state regulations, continued to approve the allegedly illegal practices after repeated warnings from state and federal regulators, failed to hold stockholder meetings, and personally profited from the allegedly wrongful conduct. In this case, the TechBanc loan program was halted promptly after regulatory concern was expressed and a large majority of directors has not been alleged with particularity to have personal or financial interest in the Incentive Compensation Program or the TechBanc loan program. Other cases relied upon by the Plaintiff, such as *Amerifirst Bank v. Bomar,* 757 F.Supp. 1365 (S.D.Fla.1991), emphasize that the analysis was under a Rule 12(b)(6) standard and did not reflect a requirement that allegations be made with particularity. In *Federal Deposit Ins. Corp. v. Schreiner,* 892 F.Supp. 869 (W.D.Tex.1995), alleged violations of a federal banking regulation were evaluated in the context of specific examples of objective violations of the regulation as of when the bank's board made the challenged decision (*e.g.,* loans to insiders made on terms not substantially similar to loans to persons not associated with the bank; loans violated bank's own loan policy).

The Plaintiff also cites *Joy v. North,* 692 F.2d 880 (2d Cir.1982), *cert. denied,* 460 U.S. 1051 (1983), as providing a yardstick for measuring the Board's conduct. In *Joy,* however, the challenged loan put the bank in "a classic 'no win' situation." *Id.* at 896. Here, the Board was focused, as it appeared possible at the time, on the significant upside potential of loans to startup technology companies. Moreover, the Complaint does not allege that the Board could not reasonably have concluded that these loans (or the portfolio of these loan evaluated as a whole) would be profitable or that the Board did not consider the potential risks that could be recognized at the time. While it is apparent with

the benefit of hindsight that the Board did not give sufficient weight to the risks associated with the TechBanc loan portfolio, the decision to implement the TechBanc loan program, with the aid of the Incentive Compensation Plan, does not allow a challenge by the Plaintiff to the Board's conduct without a prior demand under *Aronson's* second prong.

The Complaint may also be read as seeking to allege that the Board failed to exercise appropriate supervision over the TechBanc loan program and the Incentive Compensation Program as they were implemented. Compl. ¶ 55(ii). The particularized facts of the Complaint demonstrate that promptly following the directive issued by the OTS which required that the TechBanc loan program be modified (a directive with no alleged mention of the Incentive Compensation Plan), the Board called off the TechBanc loan program and commenced efforts to reduce Progress' exposure to the adverse affects of that program. Thus, there are no particularized allegations that the directors failed to exercise supervision over the TechBanc loan program or the Incentive Compensation Plan (as opposed to their authorization of those programs) that would implicate the standards of *In re Caremark Int'l Deriv. Litig.,* or *In re Baxter Int'l, Inc. S'holders Litig.*

The Plaintiff's theory ultimately proves too much. He looks to the unhappy results of the TechBanc program approved by the directors and implemented with the inducements provided through the Incentive Compensation Plan. With his allegation of material financial harm, he then invokes federal banking regulations which require directors to avoid executive compensation plans that result in "material financial loss." Because the TechBanc program resulted in material financial loss, the directors, in the view of the Plaintiff, are personally liable; that is, in this instance, they are the functional equivalent of guarantors. That, however, is not the province of corporate directors. To adopt the Plaintiff's analytical methodology would discourage risk-taking and would unduly restrict the exercise of the business decision-making process which is contemplated by

Section 141 of the Delaware General Corporation Law. Indeed, the Plaintiff's analysis turns on whether the business decision was successful, but such a post-hoc analysis of director conduct is not sponsored by the second prong of *Aronson.* [FN59] In sum, the Plaintiff's allegations about the Incentive Compensation Plan do not excuse demand under *Aronson's* second prong. [FN60]

> FN59. As explained in *Gagliardi*:
> But directors will tend to deviate from [the] rational acceptance of corporate risk *if* in authorizing the corporation to undertake a risky investment, the directors must assume some degree of personal risk relating to *ex post facto* claims of derivative liability for any resulting corporate loss.
> Corporate directors of public companies typically have a very small proportionate ownership interest in their corporations and little or no incentive compensation. Thus, they enjoy (as residual owners) only a very small proportion of any "upside" gains earned by the corporation on risky investment projects. If, however, corporate directors were to be found liable for a corporate loss from a risky project on the ground that the investment was too risky (foolishly risky! stupidly risky! egregiously risky!-you supply the adverb), their liability would be joint and several for the whole loss (with I suppose a right of contribution). Given the scale of operation of modern public corporations, this stupefying disjunction between risk and reward for corporate directors threatens undesirable effects.
> 683 A.2d at 1052.
> Moreover, although the Plaintiff argues that "the Board knowingly approved corporate action in violation of law," Pl.'s Opp'n to Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Compl. at 26, the Complaint does not allege with particularity that the Board, when it approved the Incentive Compensation Plan or the TechBanc loan program, knew that its actions were illegal.

> FN60. It is not clear that the Plaintiff relies upon an alleged violation of HOLA to excuse demand

under the second prong of *Aronson.* According to the Plaintiff, the Board failed to meet the "qualified thrift leader" test when it failed to maintain 65% of its "portfolio assets" in housing, small business, and consumer related assets. Compl. ¶¶ 3, 33. The Plaintiff alleges that Progress failed that test when only 62.35% of its assets were invested in "qualified thrift investments." *Id.* ¶ 33. There is, however, no allegation that the Board was aware that its lending practices would lead to this result; moreover, there is no allegation that the Board failed to take remedial measures when it learned of the status of the Bank's portfolio.
The Plaintiff does not allege that demand is excused because of other challenged conduct, such as the commissions paid in the Procall sale or the participation in the limited partnerships with which Wycoff was affiliated.

### IV. CONCLUSION

The Complaint, when read in the light most favorable to the Plaintiff's position, has failed to allege with particularity facts sufficient to raise a reasonable doubt whether a majority of the board was disinterested and independent or whether the challenged actions were the product of the exercise of the board's business judgment. Demand is therefore not excused and, because demand was not made, the Complaint is dismissed.

**\*11** IT IS SO ORDERED.

2003 WL 1794724 (Del.Ch.), 28 Del. J. Corp. L. 1126

END OF DOCUMENT

# EXHIBIT 10

Slip Copy                                                                Page 1
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Virginia.

In re PEC SOLUTIONS, INC. SECURITIES LITIGATION

**No. 03-CV-331.**

May 25, 2004.

John Christopher Pasierb, Cohen, Gettings & Caulkins, PC, Arlington, VA, Conor R. Crowley, Finkelstein, Thompson & Loughran, Washington, DC, for Plaintiffs.

Lyle Roberts, Gregory A. Harris, Wilson, Sonsini, Goodrich & Rosati, Reston, VA, for Defendants.

*MEMORANDUM OPINION*

LEE, J.

**\*1** THIS MATTER is before the Court on Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint. This case concerns a federal securities class action on behalf of all persons who purchased the securities of PEC Solutions between October 23, 2002, and March 14, 2003. The question before the Court is whether the Complaint demonstrates securities fraud in that the Defendants recklessly made false and misleading statements regarding the financial condition of PEC Solutions, Inc. that damaged the Plaintiffs. The Court concludes that the Plaintiffs' securities fraud and control person liability claims must be dismissed because: (1) the Defendants' statements are protected by the safe harbor provision of the Reform Act because they were accompanied by meaningful cautionary language and they were not worded as guarantees; (2) Plaintiffs' fail to plead fraud with particularity because there are insufficient details and the Plaintiffs do not show that many of the statements made were false; (3) Plaintiffs' fail to establish scienter because the Complaint does not show how the Defendants' acted outside the standard of ordinary care; and (4) without facts to support claims of securities fraud, there can be no liability based upon control person liability.

**I. BACKGROUND**

Plaintiffs are persons who purchased the securities of PEC Solutions between October 23, 2002, and March 14, 2003 (the "Class Period"). Defendant PEC Solutions, Inc. (hereinafter "PEC" or the "Company") is a Delaware Corporation with its principal offices in Fairfax, Virginia. PEC is in the business of providing secure, interoperable technology solutions for clients in law enforcement, intelligence, defense, and civilian agencies within the federal government and at state and local levels. Defendants David Karlgaard ("Karlgaard"), Paul Rice ("Rice"), Stuart Lloyd ("Lloyd"), and Alan Harbitter ("Harbitter"), collectively the "Individual Defendants", are the officers and directors of PEC.

This action stems from problems related to PEC's subcontract with NCS/Pearson, Inc., later known as Pearson Government Solutions, Inc. ("Pearson"), a contractor with the U.S. Government responsible for the recruitment, assessment, and selection of federal air travel passenger screeners. The Transportation Security Administration ("TSA") was the government agency that awarded Pearson a general contract. The TSA was created by Congress in the aftermath of September 11, 2001, and was responsible for establishing a federal security workforce to screen air travel passengers in all of the nation's 429 commercial airports. Pearson's responsibilities under the contract with the TSA included finding and assessing qualified candidates and providing the day-to-day servicing in human resource support for the 45,000 federal screeners to be hired and deployed nationwide. Pearson entered into a subcontract with PEC (hereinafter the "Pearson subcontract"), which was responsible for the electronic capture and transfer of the applicants' fingerprints and the collection of the applicants' biographical information.

**\*2** The cost of the TSA's contract with Pearson was originally estimated at $104 million. Ultimately, more than $700 million was required to complete the contract. These cost overruns became the subject of an audit by the Defense Contract Audit Agency ("DCAA") and several investigations, including one by the Inspector General of the United States Department of Transportation. Additionally, the government investigated Pearson's performance under

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the contract because the press reported that several of the people hired as federal airport screeners had criminal records. Pending the completion of the investigations, the government suspended payment under the contract with Pearson.

The Defendants are alleged to have violated the duty to investors to promptly provide accurate and truthful information with respect to PEC's financial condition and performance, growth, and operations. Plaintiffs contend that the Defendants were aware of the problems that Pearson was having in relationship to its contract with the TSA. However, PEC issued several press releases during this period that, Plaintiffs argue, did not accurately reflect how Pearson's problems affected PEC's earnings and financial health. The result of the Defendants' alleged breach is that the Plaintiffs were induced to purchase PEC's common stock at inflated market prices. The Defendants are accused of not only deceiving and defrauding the investing public, but also of selling their personally held shares of PEC common stock in violation of federal securities laws.

## II. DISCUSSION

### A. Standard of Review

#### 1. *Federal Rule of Civil Procedure 12(b)(6)--Failure to State a Claim Upon Which Relief Can be Granted*

A Rule 12(b)(6) motion should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Fed.R.Civ.P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When considering a motion to dismiss for failure to state a claim upon which relief can be granted, a court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. *See In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 627 (E.D.Va.2000). However, a court is not limited to the four corners of the complaint. A court may consider any document that is explicitly relied upon in the complaint. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410 (3d Cir.1997); *Gasner v. County of Dinwiddie,* 162 F.R.D. 280 (E.D.Va.1995). All reasonable inferences must be made in

favor of the nonmoving party. *See In re MicroStrategy,* 115 F.Supp.2d at 627 (citing *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)). A motion to dismiss tests only "the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses." *Id.*

#### 2. *Section 10(b) of the Securities Exchange Act of 1934 & Federal Rule of Civil Procedure 9(b)*

**\*3** To establish liability under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and under Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege that "(1) in connection with a purchase or sale of securities, (2) the defendant made a false statement or omission of material fact (3) with scienter (4) upon which the plaintiff justifiably relied (5) that proximately caused the plaintiff damages." *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 613 (4th Cir.1999); *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

When proceeding under a fraud on market theory, the plaintiff need not plead direct reliance or that the fraudulent practice was in connection with a particular sale or purchase of securities. Instead, the plaintiff need only show the means of dissemination and the materiality of the misrepresentation. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968); *Miller v. Asensio,* 101 F.Supp.2d 395 (D.S.C.2000).

In addition to meeting the requirements under Section 10(b), a plaintiff must also meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure that "the circumstance constituting fraud ... be stated with particularity" in the complaint. Fed.R.Civ.P. 9(b). Rule 9(b) provides the standard for pleading a fraud case; furthermore, Congress has codified the pleading standard that a plaintiff must meet in a securities fraud action in order to survive a 12(b)(6) motion to dismiss--the Private Securities Litigation Reform Act.

#### 3. The Private Securities Litigation Reform Act (the "PSLRA" or "Reform Act")

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 3
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

The PSLRA codifies the requirements of Rule 9(b) and further requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, ... state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In order to meet this requirement, the complaint must contain the time, place, speaker, and contents of the allegedly false statement. *Borow v. nView Corp., 829 F.Supp. 828, 833* (E.D.Va.1993); *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir.1999)* (finding that as to scienter, plaintiffs are required to plead who, what, when, where, and how). Additionally, unlike Rule 9(b), which permits scienter to be averred generally, the PSLRA requires that the complaint in a securities fraud case "state with particularity facts giving rise to a *strong inference* that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (*emphasis added* ). A complaint that fails to comply with these requirements must be dismissed on defendant's motion. *See* 15 U.S.C. § 78u-4(b)(3)(A).

The Fourth Circuit has chosen not to focus the scienter inquiry on categories of facts such as motive and opportunity. *See Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338 (4th Cir.2003)*. Rather, courts must conduct a case-specific analysis examining all of the allegations in order to determine whether they collectively establish a strong inference of scienter. *Id.* The Court in *In re MicroStrategy* concluded that in reviewing whether a plaintiff has pled a "strong inference that the defendant acted with the requisite state of mind," a court must "(1) take the factual allegations in the complaint as true, (2) draw whatever inferences regarding the defendant's state of mind are supported by the these allegations, and (3) determine whether these inferences, individually or cumulatively provide a strong--or persuasive and cogent-- inference that the defendant possessed the requisite state of mind." 115 F.Supp.2d at 627. While the existence of particular facts demonstrating motive and opportunity to commit fraud may be relevant to the scienter inquiry, the weight accorded to those facts depends upon the circumstances of each case. *Ottmann, 353 F.3d at 345-46*. Accordingly, the totality of the circumstances alleged must demonstrate a strong

inference of the requisite state of mind. *In re MicroStrategy, 115 F.Supp.2d at 627*.

**\*4** The Fourth Circuit has held that a plaintiff may allege the required state of mind, or scienter, for securities fraud liability by pleading intentional misconduct or recklessness. *See Ottmann, 353 F.3d at 344; Phillips, 190 F.3d at 620*. Intentional misconduct encompasses deliberate illegal behavior. *See City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1260 (10th Cir.2001)*. Recklessness is a slightly lesser species of intentional misconduct and must be based on "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips, 190 F.3d at 621; Ottmann, 353 F.3d at 343-44; accord In re MicroStrategy, 115 F.Supp.2d at 633; Arnlund v. Deloitte & Touche, LLP, 199 F.Supp.2d 461, 474 (E.D.Va.2002)*.

B. Analysis

Plaintiffs' securities fraud claims must be dismissed because the Plaintiffs': (1) fail to plead fraud based upon the Defendants' statements regarding PEC's financial condition with the requisite particularity; (2) fail to properly plead loss causation; (3) fail to plead fraud based upon GAAP violations with sufficient particularity; and (4) fail to allege facts establishing a strong inference of scienter.

1. *Statement-by-Statement Analysis*

Plaintiffs' claims based upon the Individual Defendants' statements regarding PEC's financial condition made in press releases, conference calls, and newspaper articles must be dismissed because the Plaintiffs fail to allege fraud with the particularity required by Rule 9(b) and the Reform Act. Specifically, Plaintiffs do not allege facts that demonstrate how the Individual Defendants' statements are false and/or misleading. Additionally, the Individual Defendants forward-looking statements cannot be a basis for the Plaintiffs' fraud claims because the statements are either: (1) inactionable and immaterial as a matter of law because they are not worded as guarantees or (2) protected by the safe harbor provision of the Reform Act because they are

Slip Copy                                                                                              Page 4
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

accompanied by meaningful cautionary language.

Courts have employed a statement-by-statement analysis in evaluating whether the complaint "specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, ... state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b); *see also Arnlund v. Smith,* 210 F.Supp.2d 755, 762-63 (E.D.Va.2002); *In re First Union Corp. Sec. Litig.,* 128 F.Supp.2d 871, 889 (W.D.N.C.2001). The complaint must plead with particularity the time, place, speaker, and contents of the allegedly false statements. *Borow,* 829 F.Supp. at 833.

Rule 9(b) requires that allegations of fraud be pled with specificity. Fed.R.Civ.P. 9(b). Along these lines, plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false. *In re First Union,* 128 F.Supp.2d at 886. Group pleading fails to satisfy the requirement that the who, what, when, where, why, and how be specified. *Id.*

**\*5** Additionally, actionable false or misleading statements must also be material. *See In re First Union,* 128 F.Supp.2d at 884; *Raab v. General Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993) (finding optimistic predictions about the future inactionable and immaterial as a matter of law). A fact is a material "if there is a substantial likelihood that a reasonable [investor] (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman v. Food Lion, Inc.,* 97 F.3d 675, 682-83 (4th Cir.1999). However, the determination of materiality is a mixed question of law and fact; and the standard for a motion to dismiss is whether "no reasonable juror could determine that the alleged statements would have assumed actual significance in the deliberations of the reasonable investor." *In re MicroStrategy,* 115 F.Supp.2d at 657 (quoting *Press v.*

*Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999)). Furthermore, under the Reform Act, when statements are forward-looking, they are not actionable, even though they may be material, if they are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ. 15 U.S.C. § 78u-5(c)(1).

a. *Press release and conference call on October 22, 2002.*

In October of 2002, PEC reported its financial results for the third quarter, issued press releases, and held conference calls in order to discuss these results. Plaintiffs' claims based upon these statements must be dismissed because: (1) the Defendants cannot be held liable for failing to disclose facts that did not exist; (2) Plaintiffs do not plead that the statements were false or misleading with the required particularity; and (3) the Defendants' forward-looking statements are immaterial and protected by the safe harbor provision of the Reform Act.

On October 22, 2002, the Company issued a press release announcing its financial results for the third quarter of 2002, which was the period ending September 30, 2002. The Company posted an earnings per share of $0.25, which exceeded analysts' projections of $0.17 per share. In this press release, Defendant Rice commented on the results by stating "over the third quarter, PEC experienced significant acceleration in certain engagements related to the federal government's homeland security mission, and in the application of biometric identification technologies to various mission requirements...." Compl. ¶ 48. The press release also quoted Defendant Rice on several key business developments focusing on the Pearson subcontract. "Significant incremental orders were received for PEC's transportable automated fingerprint capture and biometric identification systems (called PACTS)." Compl. ¶ 48.

Also, during a conference call with analysts on October 22, 2002, Defendant Lloyd represented that "the Company's Day Sales Outstanding ("DSO") for the third quarter were 88 days, down from last quarter's 91 days." Compl. ¶ 50. During the same call, Defendant Rice explained that PEC's ongoing business in the current government spending environment by stating that PEC's "ongoing business is not

Slip Copy                                                                                                      Page 5
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

directly impacted by a continuing resolution funding requirement ... because we have largely the long-term engagements that are incrementally authorized and funded on a regular basis." Compl. ¶ 50. In this call, Defendant Karlgaard touted the results for the quarter and stated that based on the growth in the Pearson subcontract, the Company was poised to grow and meet its revenue objectives for the year. For instance, Defendant Karlgaard mentioned revenue growth and that the Company should meet its revenue objectives for the year. Compl. ¶ 50. Defendant Karlgaard stated among other things that "this was truly an exceptional quarter for PEC. We experienced a very strong quarter partly because of quick-response orders for mobile biometric solutions relating to homeland security...." Compl. ¶ 50.

**\*6** Plaintiffs allege that the statements made by Defendants on October 22, 2002, were false and misleading because they failed to disclose: (1) that Pearson had stopped paying PEC on the Pearson subcontract in August; (2) that by December 2002, PEC was owed $15.6 million on the Pearson subcontract; (3) that Pearson and PEC were the subject of a DCAA audit due to huge cost overruns and wasteful billing; (4) that TSA had stopped paying Pearson pending the completion of the audit; and (5) that PEC might be forced to refund some of their earnings once the audit was completed. Compl ¶¶ 41, 68, 31, and 33. In other words, at base Plaintiffs' allegation is that the statements made in the press release gave the impression that there were no problems with one of the Company's largest sources of revenue, the Pearson subcontract, when indeed there were major problems that ultimately led to substantial losses for the Plaintiffs.

First, the Defendants's statements of October 22, 2002, are not actionable because the Defendants cannot be held liable for failing to disclose facts that did not exist. For instance, Plaintiffs state that the Defendants' October statements are false and misleading because "by December 31, 2002, PEC had a receivable of $15.6 million from Pearson." Compl. ¶ 68. However, Defendants' cannot be held liable based upon a statement made in October when there is no proof that the fact existed until December. Even if PEC had accounts receivable on the Pearson subcontract in August,

September, or October, Plaintiffs do not allege the specific amount owed at that time. The Court cannot find that statements regarding the circumstances of Pearson's payments to PEC are false, where there is insufficient information regarding the amount owed. In fact, the Defendants allege that Pearson continued to make payments under the contract, including a $10 million payment in January 2003. Moreover, this payment is important because it demonstrates that Plaintiffs' contention that Pearson would not pay PEC until the conclusion of the audit is false because the DCAA's audit of Pearson began in June 2003 and, as far as Defendants are aware, is still ongoing. Mot. to Dismiss at 10 n. 7.

Moreover, Plaintiffs cannot demonstrate that the DCAA was conducting an audit of PEC at the time the October statements were made. The Plaintiffs basis for this allegation is the congressional testimony of Mac Curtis, President of Pearson, and Kenneth Mead, Inspector General of the U.S. Department of Transportation. Regarding Mr. Curtis, Plaintiffs' quote him as saying "the DCAA has come in and audited a lot of our subcontractors, starting in August-September [2002] time frame,...." Compl. ¶ 31. However, Mr. Curtis never mentions PEC in the context of an audit. Furthermore, Mr. Mead is quoted as saying that the DCAA "questioned over $124 million of almost $620 million audited." Again, there is no mention of PEC. Given that these two statements are the only support for Plaintiffs' allegations regarding an audit of PEC, there is no basis for Plaintiffs' claims based upon a DCAA audit of PEC. Accordingly, Plaintiffs' claims of fraud based upon allegations of audit must be dismissed.

**\*7** Second, Plaintiffs do not plead that the Defendants' statements were false and misleading with particularity. With respect to Defendants' statements regarding revenue growth, increased earnings per share, increased number of engagements, and lower DSOs, Plaintiffs fail to demonstrate how these statements were false. Plaintiffs do not plead facts that demonstrate how PEC's reports regarding revenue growth, increased earnings per share, increased number of engagements, and lower DSOs are inconsistent or misstated. Furthermore, Plaintiffs do not mention when each of the Individual Defendants learned when each statement was

Slip Copy                                                                Page 6
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

false or how they learned the statement were false. Additionally, Plaintiffs make conclusory statements regarding the misleading nature of the October statements, but do not state with specificity how the statements were misleading.

Third, the Court finds that the statements made on October 22, 2002, inactionable because they are immaterial as a matter of law. When determining the materiality of an allegation, the Court must consider the allegation as it relates to the "total mix" of information available to the plaintiff at the time. *Phillips,* 109 F.3d at 615 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). The "total mix" of information includes publicly available information. *Id* at 615, 617. As in *Phillips,* Plaintiffs in the instant action rest their Complaint "on mischaracterizations of the public record, exaggeration of [statements], and isolation of [those] statement[s] from [their] context and from the wealth of information publicly available when [they] were made." 4 F.3d at 615. For instance, Plaintiffs allege that PEC failed to disclose that the Pearson subcontract was experiencing problems or no growth. Compl. ¶ 51(a). However, PEC disclosed that "future revenues based on the Pearson contract were uncertain" and that "the Company would have to start speculating more as we talk about the future and what other elements of it [the project] they're [Pearson] going to engage us on." Mot. to Dismiss at 13; 10/22/02 Call. Tr. at 20.

Fourth, to the extent that the Defendants' statements are forward-looking, they are protected by the Safe Harbor provision of the Reform Act. The Reform Act's safe harbor provision shields defendants from liability where the alleged materially false and misleading statements are forward-looking and accompanied by meaningful cautionary language or where the plaintiff fails to plead specific facts showing that the defendants had actual knowledge that each forward-looking statement was false or misleading when made. 15 U.S.C. § 78u-5(c)(1). A statement is forward-looking if it concerns a projection of financial items and if its truth or falsity is discernible only after it is made. 15 U.S.C. § 78u-5(i)(1); *Smith v. Circuit City Stores, Inc.,* 286 F.Supp.2d 707, 722 (E.D.Va.2003)(citing *Harris v. Ivax*

*Corp.,* 182 F.3d 799, 805 (11th Cir.1999)). Additionally, cautionary language is meaningful if it conveys information about factors that could realistically cause results to materially differ from those projected. *See* In re Humphrey Hospitality Trust, Inc. Sec. Litig., 219 F.Supp.2d 675, 683-84 (D.Md.2002).

**\*8** For example, Defendants' statements regarding expected revenue growth, Compl. ¶ 48, and expected earnings per share, *id,* are forward-looking statements because they involve financial projections that will not be determined to be true or false until some point in the future. Moreover, these statements are protected by the safe harbor provision because at the beginning of all of PEC's investor calls, including the one in October 2002, investors are given a warning about factors that could materially alter the projections given. The warning states that "we may make forward-looking statements that involve risks and uncertainties. These risks and uncertainties could cause PEC Solutions' results to differ materially from management's current expectations and adversely affect the financial condition of the Company." *See* 10/22/02 Call Tr. at 1; Mot. to Dismiss at 12. Similarly, all press releases state that "This press release may contain forward-looking information ... and is subject to the safe harbor created by [the Reform Act]." *See* Mot. to Dismiss at 12. Accordingly, the Defendants' forward-looking statements are not actionable pursuant to the safe harbor provision of the Reform Act. 15 U.S.C. § 78u-5.

**b.** *November 14, 2002, quarterly report*

On November 14, 2002, PEC filed its quarterly report for the period ending September 30, 2002. Plaintiffs' claims based upon the statements made in this report must be dismissed because Plaintiffs fail to allege fraud with particularity and the forward-looking statements are protected by the safe harbor provision of the Reform Act. The report reiterated the Company's earnings and accounts receivables published in the October 22, 2002, press release, and stated, among other things, that "Management believes the effect of audit adjustments, if any, on periods not yet audited, will not have a material effect on the financial statements." Compl. ¶ 53.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs allege that the statements contained in the November 2002 quarterly report were false and misleading because the Company failed to disclose: (1) that TSA had stopped paying Pearson; (2) that Pearson had stopped paying PEC; and (3) the true effects of the government's audit on its revenue. Compl. ¶ 51. These statements are forward-looking within the meaning of the safe harbor provision because they are financial projections. Additionally, it is protected by the safe harbor provision of the Reform Act because it is accompanied by meaningful cautionary language that stated "Payments to the Company on contracts with agencies and departments of the U.S. Government are subject to adjustment upon audit by the U .S. Government." Compl. ¶ 53. The language is meaningful because it advises the investor that adjustments may have to be made. Moreover, without facts to support the existence of a DCAA audit, Plaintiffs do not have a basis to state that this statement is false. Furthermore, to the extent that this and other statements in the quarterly report are fraudulent, Plaintiffs' claims based upon these statements nevertheless fail because Plaintiffs do not plead with particularity. For instance, there are no facts alleged that discuss who made these statements. Accordingly, Plaintiffs' claims based upon these statements must be dismissed as inactionable.

c. *February 11, 2003, press release and conference call and February 12, 2003, news article.*

**\*9** Plaintiffs' claims based upon the statements made in the February press release, conference call, and news article must be dismissed because: (1) the Plaintiffs fail to plead fraud with particularity; (2) the Defendants' forward-looking statements are either immaterial or protected by the safe harbor provision of the Reform Act; and (3) the Defendants cannot be held liable based upon statements made by third parties.

On February 11, 2003, PEC filed its 10-K form, which announced the financial results for the fourth quarter of 2002 and the fiscal year 2002, ending December 31, 2002. The Company reported earnings of $0.20 per share for the quarter and $0.75 per share for the year. Compl. ¶ 55. Additionally, the Company missed its projected revenues because it posted revenues of $48.3 million for the quarter as opposed to the $51 million forecasted.

Defendant Karlgaard commented on the results in a press release dated February 11, 2003. He said "PEC is pleased to report that fiscal year 2002 was a record year in growth and profitability for the company ... We think these numbers demonstrate a strong, consistent record of performance...." Compl. ¶ 55. Plaintiffs quote the text of the press release in paragraph 55 and then simply state in paragraph 59 that these statements are false and misleading for the same "reasons set forth in ¶ 49." [FN1] Compl. ¶ 59. Plaintiffs do not specifically state why Defendant Karlgaard's statement was false or how it was misleading. Moreover, Plaintiffs fail to identify the specific statements that are allegedly misleading and to identify how the omitted facts made those statements misleading. *See Longman v. Food Lion, Inc., 197 F.3d 675, 682 (4th Cir.1999); see also Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir.1990)* (duty to disclose facts under the securities laws "does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead.") (internal quotations and citations omitted). Without an explanation as to how these general statements are incomplete or misleading, other than to say that a certain disclosure should have been made, Plaintiffs' claims of fraud based upon Defendant's Karlgaard's February 11, 2003, statement must fail.

> FN1. Paragraph 49 of the Complaint states that the statements are materially false and misleading because the Defendants failed to disclose: (1) that Pearson and PEC were being investigated and audited; (2) that there were cost overruns on the TSA contract; (3) that as a result of the cost overruns TSA stopped paying Pearson and Pearson stopped paying PEC; (4) that work had halted on the TSA contract and would not continue until the completion of the audit; (5) that PEC might be forced to refund a portion of its fees; (6) that PEC's financial results were materially inflated because of a failure to maintain a proper reserve for uncollectible receivables; and (7) that given the foregoing PEC had no basis for its revenue projections. Compl. ¶ 49.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 8
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

Plaintiffs' securities fraud claims based upon Defendant Lloyd's statements must fail because these statements are immaterial as a matter of law and protected by the safe harbor provision of the Reform Act. In the same press release dated February 11, 2003, Defendant Lloyd stated that "revenue is expected to be between $48 to $49 million for the first quarter 2003, and diluted EPS should be between 17 and 18 cents for the quarter. Guidance for 2003 is for revenue to grow between 30 percent and 40 percent, resulting in revenue between $240 to $255 million. EPS is estimated to be between 85 to 92 cents for the full year 2003." Compl. ¶ 55. This statement contains financial projections, which are "not actionable under federal securities laws." *Raab, 4 F.3d at 290* (quoting *Krim v. Banctexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir.1993)*). Moreover, statements such as this one lack materiality because "the market price of a share is not inflated by vague statements predicting growth." *Id.*

*10 Additionally, Defendant Lloyd's statements are protected by the safe harbor provision of the Reform Act because the statement was accompanied by meaningful cautionary language. The press release noted that "This press release may contain forward-looking information ... and it subject to the safe harbor created by the [Reform Act]." Compl. ¶ 55. Furthermore, the Company warned investors about certain risks in the 2002 Form 10-K, which is incorporated by reference. *See In re Humphrey Hospitality Trust, 219 F.Supp.2d at 684* (noting that SEC filings incorporated by reference are adequate to invoke safe harbor protection). For example, PEC disclosed that "if the Federal government does not adopt a budget ... Federal agencies may be forced to suspend our contracts due to a lack of funding." 2002 Form 10-K. This statement constitutes meaningful cautionary language because it warns the investor that PEC's projections may be subject to fluctuation. In the same Form 10-K, PEC disclosed that "An audit could result in a substantial adjustment to our revenues because any costs found to be improperly allocated to a specific contract will not be reimbursed, while improper costs already reimbursed must be refunded." *Id.* Similarly, this disclosure warns investors that audits are routine and that the results can materially affect revenue projections. Given that Defendant Lloyd's statements were

forward-looking financial projections accompanied by meaningful cautionary language, these statements are inactionable as a matter of law because they are protected by the safe harbor provision of the Reform Act. *See 15 U.S.C. § 78u-5.*

Also, PEC's conference call conducted on February 11, 2003, cannot be a basis for Plaintiffs' claims of securities fraud because Plaintiffs fail to plead fraud with specificity. PEC's Director of Corporate Communications, John McNeilly, stated towards the beginning of the phone call that PEC's revenue for the fourth quarter "was down 3% under planned departments." Compl. ¶ 56. He also said that PEC was experiencing "temporary discontinuity" in one of its biometric contracts. Compl. ¶ 56. Defendant Rice expounded on that point and indicated that the Company's shortfall was "related to [the] biometrics program and sort of spinning one phase of that effort down and not spinning up the next phase of that effort in the manner that we expected...." Compl. ¶ 56. Plaintiffs assert that these statements were false and misleading because the Defendants did not disclose the problems associated with the Pearson subcontract.

Plaintiffs do not specify how the exclusion of additional information about the biometrics contract renders the Company's statements misleading or false. Simply mentioning biometrics products does not trigger a duty to disclose "every tangentially related fact that might interest investors" about the biometrics contract. *See Anderson v. Abbott Labs., 140 F.Supp.2d 894, 903 (N.D.Ill.2001), aff'd, Gallagher v. Abbott Labs., 269 F.3d 806 (7th Cir.2001).* Moreover, the Company disclosed in its 2002 Form 10-K that future revenues based upon the Pearson subcontract were uncertain noting that "if any ... prime contractors eliminate or reduce their engagements with us, or have their engagements eliminated or reduced by their end-clients, we will lose a source of revenues, which if not replaced, will adversely affect our operating results." 2002 Form 10-K at 10. PEC also noted that following termination, "if the client requires further services of the type provided in the contract, there is frequently a competitive rebidding process ... Even if we do win the rebid, we may experience revenue shortfalls ... [which] could harm operating results for those

Slip Copy                                                                                                        Page 9
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

periods." *Id.* Plaintiffs do not present facts that demonstrate that PEC's statements were false and misleading despite the Defendants' disclosure warning investors that the figures associated with the biometrics contract were subject to change. Without specific facts demonstrating how the statements in the February 2003 conference calls were false or misleading, Plaintiffs securities fraud claims based upon these statements must be dismissed.

**\*11** The statements discussed in the February 11, 2003, press release and conference call were analyzed in an article published by the Dow Jones Business News on February 12, 2003. This article also mentioned several analysts' opinions that PEC's projections would be difficult to meet. The Individual Defendants cannot be held liable for securities fraud based upon the article published by the Dow Jones Business News because the Individual Defendants do not control what is published by this third party.

Plaintiffs argue that the statements made in the Dow Jones Business News were false and misleading because the Defendants misrepresented that the Pearson contract would continue to contribute to the company's future earnings. The issue is whether companies can be held liable based upon statements contained in articles published by the news media or other third-parties. It is well settled that companies cannot be held liable for the independent statement of a third party, where the company does not exercise control over the third party. *See Raab,* 4 F.3d at 288. Without control over the third party publication, the company's statements can be taken out of context, misquoted, or stripped of important qualifiers. *Id.* Accordingly, the Plaintiffs' allegations with respect to the February 12, 2003, article published by the Dow Jones Business News are insufficient to establish liability.

2. *Failure to allege loss causation*

Plaintiffs do not show that the Defendants' alleged misrepresentations caused their damages. Specifically, Plaintiffs do not sufficiently allege that the price of the stock was artificially inflated due to a fraudulent misrepresentation. In order to establish loss causation for a securities fraud claim, the plaintiff must allege: (1) that he or she purchased a security at a market price that was

artificially inflated due to a fraudulent misrepresentation and (2) that the artificial inflation was actually lost due to the alleged fraud. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 196 (2d Cir.2003). In other words, the Plaintiffs must show that the stock decline occurred as a result of the disclosure of the misrepresentations. *Id.*

Plaintiffs' single statement regarding loss causation is in response to the Defendants' guidance that the revenue for the fourth quarter, the fiscal year, and earnings per share would be lower than expected. This guidance was stated in a press release dated March 14, 2003, where PEC announced that its financial projections would be lower than expected due to "anticipated delays in new government awards stemming from the unusually late passing of the 2003 Federal civilian agency budget." Compl. ¶ 60. Plaintiffs aver that this announcement "shocked the market, causing the stock to lose over 40% of its market value by dropping more than $6 per share on 17-times its average daily volume, falling to a fraction of its $37.25 Class Period high and causing damage to Plaintiff and the Class." Compl. ¶ 61. However, Plaintiffs never mention how the Defendants' alleged misrepresentations led to the fall of the stock price. A conclusory statement that the stock price fell as a result of a company's guidance is not enough to show that the decline in the stock price was due to a defendant's fraud or misstatements.

3. *Failure to sufficiently allege Generally Accepted Accounting Principles (GAAP) violations*

**\*12** Similar to Plaintiffs' general allegations of securities fraud, Plaintiffs' claims of accounting fraud are not sufficiently particular as required by Rule 9(b) and the Reform Act. *See* Fed.R.Civ.P. 9(b); 15 U.S.C. § 78u-4(b)(1). For instance, Plaintiffs cite Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), which states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. Compl. ¶ 63. Also, Plaintiffs mention that "GAAP requires that financial statements account for existing uncertainties as to probable losses." Compl. ¶ 64. Then, Plaintiffs allege PEC's reported earnings during the quarter ending September 30, 2002, were materially

Slip Copy                                                                                                Page 10
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

understated because "Defendants knew, or recklessly disregarded, that PEC Solutions' reserve for uncollectible receivables at September 30, 2002 was materially understated...." Compl. ¶ 64. In addition, during this quarter, PEC's "accounts receivables increased by more than 38% ... However, during this same period, PEC Solutions' reserve for uncollectible accounts actually declined, to $322,000 from $325,000." Compl. ¶ 64. Based upon these facts and given that (1) PEC had egregious billing practices; (2) the DCAA commenced an audit of PEC's billing practices; and (3) PEC was not receiving payment on Pearson subcontract, Plaintiffs allege that PEC failed to reserve for its uncollectible accounts.

Plaintiffs cite the language of the applicable standard, then make conclusory allegations regarding the Defendants' violations of the standard without supporting their claims with documentation or statements regarding how the Company violated the standard. However, Plaintiffs fail to allege why PEC's reports are violations of GAAP and how the reports violated the rules. These details are necessary to adequately plead a fraud claim based upon GAAP violations. *See In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 893 (8th Cir.2002)* (finding that in order to plead a violation of FAS 5, plaintiffs must identify the contracts in question, the terms of the contracts, the approximate amount of any misstatement, and the source for the misstated amount); *Smith, 286 F.Supp.2d at 718* (finding no violation of GAAP where Plaintiffs failed to cite documents, meetings, or individuals in support of their GAAP claim).

First, Plaintiffs state no facts to support their claims that PEC had egregious billing practices, that DCAA was conducting an audit of PEC, or that PEC had not been paid by Pearson at the time the figures were reported to the SEC. Second, Plaintiffs do not state how PEC's reported uncollectible reserve amount is fraudulent or misleading. There are no documents, meetings, or individuals cited to back up Plaintiffs' claims. On the other hand, Defendants' financial statements were reviewed by independent auditors, who provided an opinion that the Company's financial statements were fairly prepared in accordance with GAAP. Plaintiffs do not challenge this opinion and "a failure to challenge the independent auditors' opinions weakens an allegation that a defendant violated GAAP." *Smith, 286 F.Supp.2d at 719.* Given that Plaintiffs do not provide sufficiently particular information regarding how PEC's financial statements violated GAAP, Plaintiffs' claims based upon allegations of accounting fraud must be dismissed.

4. *Failure to allege facts establishing a strong inference of scienter*

**\*13** The Reform Act requires that, with respect to each allegation, the complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *See Ottmann, 353 F.3d at 344; 15 U.S.C. § 78u-4(b)(2).* A plaintiff may allege the required state of mind, or scienter, by pleading either intentional misconduct or recklessness. *See Ottmann, 353 F.3d at 344.* Intentional misconduct encompasses deliberate illegal behavior. *See Fleming, 264 F.3d at 1260.* On the other hand, recklessness must be based upon highly unreasonable acts that the defendant knew or obviously must have known would present a danger of misleading the plaintiff. *See Phillips,* 190 F.3d at 321. Additionally, "allegations of scienter must be based on a substantial factual basis in order to create a 'strong inference' that the defendant acted with the required state of mind." *Phillips, 190 F.3d at 621* (quoting *Zeid v. Kimberley, 973 F.Supp. 910, 918 (N.D.Cal.1997)*). Moreover, "a court should not consider each relevant factual allegation solely in isolation ... but rather, as a part of the overall factual picture painted by the complaint." *In re MicroStrategy, 115 F.Supp.2d at 631; see also Ottmann, 353 F.3d at 345* (finding that in each case the court should examine all of the allegations to determine whether they collectively establish a strong inference of scienter). Specific facts demonstrating motive and opportunity may be relevant, but are typically insufficient to establish a strong inference of scienter by themselves. *See Ottmann, 353 F.3d at 345-46; Fleming, 264 F.3d at 1262.*

Plaintiffs allege that the Individual Defendants, by virtue of their association with and control over PEC, received information reflecting the "true facts" regarding PEC's business operations such that they (1) knew the public documents and statements were materially false and misleading and (2) knowingly participated in the issuance of these statements to the public in violation of federal

Slip Copy                                                                                                                   Page 11
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

securities laws. Compl. ¶ 76. Additionally, Plaintiffs allege that the Defendants knew or recklessly disregarded material facts including: (1) the DCAA's audit and investigation of PEC; (2) substantial cost overruns associated with the contract with the TSA; (3) Pearson stopped paying PEC under the subcontract; (4) PEC might be forced to refund a portion of the fees that it received for its work on the Pearson subcontract; (5) and PEC's accounts receivables were materially understated.

First, Plaintiffs fail to establish the existence of fraud and where there is no fraud, there can be no state of mind for fraud. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos., 75 F.3d 801, 813-14 (2d Cir.1996).* As stated above, Plaintiffs present no facts that demonstrate that PEC was the subject of a DCAA audit at the time the alleged false and misleading statements were made. Furthermore, Plaintiffs do not allege how the Defendants' statements are false and misleading based upon the alleged overbilling. Similarly, with respect to Pearson's nonpayment of PEC, Plaintiffs do not state with particularity why the Defendants' alleged non-disclosure of this fact renders all of the Defendants' statements about PEC's financial condition false or misleading. Plaintiffs cannot show that the Defendants' statements are false and misleading based upon the failure to disclose information regarding the possibility of being required to refund money to the TSA because the Defendants did disclose that the refunding of fees earned was a possibility in PEC's financial statements. Lastly, Plaintiffs do not provide sufficiently particular information regarding how the alleged material understatement of accounts receivables is false or misleading. Therefore, Plaintiffs fail to demonstrate a strong inference of scienter because Plaintiffs' allegations of fraud have been shown to be insufficiently supported by factual information.

**\*14** Second, Plaintiffs' allegations of scienter fail because the Court cannot simply infer or imply knowledge of material facts based upon conclusory allegations. *See Fleming, 264 F.3d at 1264; In re Criimi Mae, Inc. Sec. Litig., 94 F.Supp.2d 652, 661 (D.Md.2000)* (noting that merely implying the Defendants must have known of false and misleading statements regarding the financial condition

of the company is insufficient to raise a strong inference of scienter). The mere fact that a defendant occupied a senior position in the company is not sufficient to impart knowledge of the specific fact of materiality. *See Fleming, 264 F.3d at 1264.* Plaintiffs simply state that the Defendants knew or recklessly disregarded material facts based upon their positions in the Company. Compl. ¶ 76. Plaintiffs do not show how the Defendants deliberately engaged in illegal behavior or knew, or obviously should have known, that facts not disclosed by PEC regarding PEC's financial condition during the periods it was actively working on the Pearson subcontract were material. Allegations that a defendant must have known that a statement was false and misleading because of his or her position in the company are "precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny." *Fleming,* 264 F.3d at 1364 (quoting *In re Advanta, 180 F.3d at 539).* Without particularized facts giving rise to a strong inference of scienter, Plaintiffs' claims of securities fraud must be dismissed.

Third, Plaintiffs fail to demonstrate the existence of a motive and opportunity to commit fraud. Although the presence of facts demonstrating motive and opportunity alone may not be sufficient to give rise to a strong inference of scienter, such facts are nonetheless relevant to the question of whether the required state of mind exists. *See Ottmann, 353 F.3d at 345-46.*

Plaintiffs allege that the Individual Defendants were motivated to overstate PEC's costs on the Pearson subcontract because the Company's accounting policies allow the Company to "recognize revenues on cost reimbursement contracts as services are provided," which "are equal to the costs incurred in providing these services plus a proportionate amount of [the] fee earned." Compl. ¶ 78. In other words, Plaintiffs allege that the Individual Defendants were "motivated to overbill on the Pearson Subcontract so that PEC Solutions could inflate the amount of its reported revenues and profits during the Class Period." Compl. ¶ 78.

The first issue with Plaintiffs' allegation regarding overbilling is that the Plaintiffs fail to plead with

Slip Copy                                                                                                Page 12
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

particularity the facts creating a strong inference that *each* of the Individual Defendants had the motive and opportunity to commit fraud or consciously or recklessly made material statements or failed to disclose material information. *In re Trex Co. Sec. Litig.,* 212 F.Supp.2d 596 (W.D.Va.2002). Without information regarding how each of the Individual Defendants had the required state of mind, Plaintiffs allegations of scienter cannot be a basis for Plaintiffs' claims of securities fraud. *Id.* Second, the general motive that the Individual Defendants were motivated to inflate the amount of revenues and profits is an insufficient motive for fraud under the circumstances. *See id* at 607 (finding that the general motive of a corporation or its officers to increase share price and to paint a favorable business picture of the corporation are not sufficient motives for fraud). Consequently, Plaintiffs have not shown a sufficient motive for the Individual Defendants to have committed fraud based upon the overstatement of costs and overbilling.

**\*15** Fourth, Plaintiffs' principal allegations regarding scienter refer to the Individual Defendants' alleged insider trading; however, these allegations are insufficient because Plaintiffs fail to show that the insider trading was unusual or suspicious. A plaintiff attempting to show the required state of mind based upon allegations of insider trading must show that (1) the individual defendants were engaged in insider trading and (2) the trading was unusual or suspicious. *See In re MicroStrategy,* 115 F.Supp.2d at 643 (citing *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 198 (1st Cir.1999)). As a part of this inquiry, courts consider several factors, including the insider's previous trading history, the amount and percentage of shares sold by insiders, and the timing of the sale. *See, e.g., Roncini v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001) ("Insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.") (internal quotations and citations omitted).

Plaintiffs simply list the dates trades were made, the number of shares sold, the price per share, and the value of the shares, and then make the conclusory statement that the timing was unusual and suspicious because the Individual Defendants knew about the problems associated with the

Pearson subcontract. *See* Compl. ¶ 47. Plaintiffs do not mention the Individual Defendants previous trading history or the percentage of stock sold. Accordingly, these allegations are insufficient to support an inference of scienter because Plaintiffs do not allege the context or the scope of the Individual Defendants' trading. *See In re Advanta,* 180 F.3d at 540 ("If the stock sales were unusual in scope or timing, they may support an inference of scienter.").

Similarly, in order to survive a motion to dismiss, Plaintiffs must allege, for *each* Defendant, facts regarding overall stock holdings, the percentage of stock sold, how the proceeds compared to their overall compensation, and how these sales compare to their previous trading history. *See Glaser v. Enzo Biochem, Inc.,* 303 F.Supp.2d 724, 747 (E.D.Va.2003). Since Plaintiffs do not allege facts with respect to the how the Individual Defendants engaged in unusual or suspicious insider trading, Plaintiffs allegations of insider trading are insufficient to demonstrate the required state of mind.

In fact, a closer look at the scope and context of the Individual Defendants' trades actually negates the inference of scienter. With the exception of Defendant Lloyd, the amount of stock sold during the Class Period constituted less than two percent of the total holdings of the Individual Defendants. *See* Mot. to Dismiss at 15. With respect to Defendant Lloyd, the percentage of stock sold was 13 percent of his total holdings. *See id.* These percentages are not of the sort usually considered suspicious by courts. *See, e.g., In re First Union,* 128 F.Supp.2d at 898 (finding disposal by corporate officers of less than 5% of total holdings insufficient to plead scienter as "such a trivial amount of trading affirmatively demonstrates the absence of scienter."); *In re E. spire Communs., Inc. Sec. Litig.,* 127 F.Supp.2d 734, 743 (D.Md.2001) ( "fact that an individual defendant sold so little stock can be construed as negating the inference that there was fraud."); *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1094 (9th Cir.2002) (finding sale of 13 percent not suspicious). The Individual Defendants' failure to significantly profit from allegedly fraudulent insider trading negates the idea that they had a motive to commit fraud.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 13
2004 WL 1854202 (E.D.Va.)
**(Cite as: 2004 WL 1854202 (E.D.Va.))**

**\*16** Moreover, the fact that three of the four Individual Defendants acquired PEC stock during the class period, further negates any idea that the Individual Defendants had a motive to commit fraud. On February 13, 2003, Defendants Karlgaard and Rice exercised options for 32,046 shares of PEC stock. *See* Mot. to Dismiss at 25. On the same date, Defendant Lloyd exercised options for 48,978 shares of PEC stock. These exercises of stock options took place less than one month before the stock price declined as a result of the guidance announcement of May 14, 2003. Defendants Karlgaard, Rice, and Lloyd made no sales between the time period when they exercised options in February and the May announcement. Without factual support to negate the inference that the Individual Defendants did not have a motive to inflate the price of the stock given that they purchased the stock just before the guidance was revised, Plaintiffs' claims based upon the allegation of insider trading must be dismissed.

5. *Plaintiffs' claim pursuant to Section 20(a) of the Exchange Act must be dismissed*

Where claims pursuant to Rule 10b-5 do not lie, nor may claims pursuant to Section 20(a). *See Longman,* 197 F.3d at 686. Given that Plaintiffs' claims based upon securities fraud fail, there is insufficient evidence upon which to base Plaintiffs' Section 20(a) claim for "control person" liability; accordingly, this claim shall be dismissed.

III. CONCLUSION

Plaintiffs' claims of securities fraud must be dismissed because the complaint fails to: (1) plead fraud with the requisite particularity and specificity; (2) properly allege loss causation; and (3) demonstrate that the Defendants' forward-looking statements are actionable given that they are immaterial either because they are not worded as guarantees or because they are protected by the safe harbor provision of the Reform Act. Additionally, Plaintiffs' claim based upon control person liability must be dismissed because where there is no claim based upon securities fraud, a claim for control person liability cannot lie.

Furthermore, Plaintiffs Motion for Leave to Amend the Consolidated Class Action Complaint is denied because

Plaintiffs have had opportunities to plead a proper cause of action and the Court finds that further amendment would be futile for the reasons stated above.

A separate judgment order pursuant to Rule 58 of the Federal Rules of Civil Procedure will issue shortly.

The Clerk is directed to forward this Opinion to the counsel of record.

2004 WL 1854202 (E.D.Va.)

**Motions, Pleadings and Filings (Back to top)**
• 1:03CV00331 (Docket) (Mar. 18, 2003)

END OF DOCUMENT

# EXHIBIT 11

Not Reported in A.2d                                                                                          Page 1
2001 WL 812028 (Del.Ch.)
**(Cite as: 2001 WL 812028 (Del.Ch.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

In re PAXSON COMMUNICATION CORPORATION SHAREHOLDERS LITIGATION

**No. CIV.A. 17568.**

Submitted: April 25, 2001.
Decided: July 10, 2001.
July 12, 2001.

Joseph A. Rosenthal, Jr., of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; of Counsel: Kenneth J. Vianale and Robert R. Adler, of Milberg Weiss Bershad Hynes & Lerach LLP, Boca Raton, Florida; Milberg Weiss Bershad Hynes & Lerach LLP, New York, New York; Stull, Stull & Brody, New York, New York; Law Offices of Curtis V. Trinko, LLP, New York, New York; Weiss & Yourman, New York, New York; Attorneys for Plaintiffs.

Kenneth J. Nachbar and James G. McMillan, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of Counsel: Tracy Nichols, of Holland & Knight LLP, Miami, Florida; Attorneys for Defendants.

MEMORANDUM OPINION

CHANDLER, Chancellor.

**\*1** This action arises out of the alleged rejection of a cash offer for Paxson Communications Corporation ("Pax" or the "Company") from Fox Network ("Fox") and the later acceptance by Pax of a series of agreements (the "NBC Transactions") with the National Broadcasting Company, Inc. ("NBC"). The plaintiffs allege that Fox made an all cash offer of $20 per share for Pax common stock (the "Fox Offer") that was summarily rejected by the directors and/or senior officers of Pax. [FN1] Shortly after the alleged Fox Offer, NBC invested $415 million in Pax in exchange for convertible preferred stock, certain warrants, and the right to purchase certain shares owned by Pax's controlling

stockholder, Lowell W. Paxson.

> FN1. These directors and/or officers of Pax are Lowell W. Paxson, the Chief Executive Officer ("CEO") and Chairman of the Pax Board of Directors (the "Pax Board"), William E. Simon Jr., Jeffrey Sagansky, James Bocock, Bruce Burnham, and James Greenwald (collectively, the "Individual Defendants").

Based on these events, the plaintiffs make two claims, each premised on the Individual Defendants' alleged violations of their fiduciary duties of loyalty and care. Plaintiffs first assert a direct claim, arguing that the defendants abdicated their duty to evaluate and fairly respond to the Fox Offer with a view towards maximizing shareholder value and thereby depriving the Company's shareholders of a substantial premium that Fox (or perhaps another potential bidder) might have been willing to provide ("Claim I"). They also present a derivative claim on behalf of Pax to redress injuries suffered (and to be suffered) by the Company as a result of the Individual Defendants' purported violations of their fiduciary duties ("Claim II"). This is the Court's decision on the defendants' motion to dismiss these two claims.

I. FACTUAL BACKGROUND

Defendant Pax is a Delaware corporation with its headquarters in West Palm Beach, Florida. Pax is a network television broadcasting company that owns and operates the largest group of broadcast television stations in the United States. Pax is a publicly traded company whose Class A common stock trades on the American Stock Exchange. Pax's capital structure also includes Class B common stock. The Class B stock, beneficially owned entirely by Pax Chairman Lowell Paxson, is identical to the Class A stock except that each Class B share possesses ten votes per share. Class A shares possess one vote per share.

The Individual Defendants were the six members of the Pax Board at the time of the challenged NBC Transactions. Lowell Paxson, Jeffrey Sagansky, and James Bocock were also officers of the Company during the period in question. Through his ownership of 39.2% of the Pax Class A stock

and 100% of the Pax Class B stock, Mr. Paxson controls approximately 75% of Pax's voting power.

On or about August 9, 1999, Pax issued a press release announcing that it had formally retained Salomon Smith Barney ("Salomon") to explore potential strategic alternatives for the Company. In this press release, Pax stated that the Pax Board had decided to pursue this course of action in anticipation that the Federal Communications Commission would loosen ownership restrictions affecting the broadcasting industry.

**2** The plaintiffs contend that shortly after issuing this press release, Pax received an unsolicited offer from Fox to acquire Pax for approximately $20.00 per share. They further allege that Pax responded to the Fox Offer with a counter-offer of $26.00 per share, but failed to enter into a genuine negotiating process with Fox aimed at selling the Company. As Pax common stock had traded between $6.00 and $17.4375 over the preceding twelve months, the plaintiffs conclude that this aborted attempt to sell Pax deprived them as Pax shareholders of a substantial premium.

On September 15, 1999, Pax entered into the NBC Transactions. These three agreements included an investment agreement (the "Investment Agreement"), a call option agreement (the "Call Agreement"), and a stockholder agreement (the "Stockholder Agreement"). In the aggregate, NBC and its affiliates paid approximately $415 million for the rights they received in the NBC transactions.

In the first of these transactions, the Investment Agreement, Pax agreed to: (i) sell 41,500 shares of newly created preferred stock in Pax to a wholly owned subsidiary of NBC ("NBC Sub I"), convertible at any time into 31,896,032 shares of Pax Class A common stock for an initial conversion price of $13.01 per share; (ii) issue a warrant ("Warrant A") to another wholly owned subsidiary of NBC ("NBC Sub II") to purchase up to 13,065,507 shares of Pax common stock at an exercise price of $12.60 per share; and, (iii) issue a warrant ("Warrant B") to NBC Sub II to purchase another 18,966,620 shares of Pax common stock at an exercise price equal to the average closing prices of the Class A common stock for the 45 consecutive trading days

before the warrant exercise date, subject to a minimum exercise price of $22.50 per share during the three years after September 15, 1999. Subject to certain conditions and limitations, Warrants A and B are exercisable for ten years from September 15, 1999.

Concurrently with the Investment Agreement, a wholly owned subsidiary of NBC entered into the Call Agreement with Lowell Paxson, personally, and certain entities controlled by him. By the terms of the Call Agreement, the NBC subsidiary was granted the right (the "Call Right") to purchase all, but not less than all, of Mr. Paxson's 8,311,639 shares of Pax's Class B common stock (the "Call Shares"). Under the Call Agreement, the NBC subsidiary may purchase the Call Shares at a price equal to the greater of (i) the average of the closing sale prices of the Class A common stock for the 45 consecutive trading days ending on the trading date immediately preceding the date of exercise of the Call Right; and (ii) $22.50 per share for any exercise of the Call Right within three years of September 15, 1999, or $20.00 per share if the Call Right is exercised thereafter.

The third of the NBC transactions, the Stockholder Agreement, provided, among other things, for NBC to have representation on the Pax Board if permitted by applicable law. The Stockholder Agreement also requires NBC's consent for Pax to take certain actions, including the adoption of a shareholder's rights plan, amendments to Pax's organizational documents, and issuances of stock or other securities.

**3** If NBC converts the newly created preferred shares, exercises both warrants, and purchases Lowell Paxson's Class B shares, NBC would own approximately 49% of the equity in Pax and control almost 70% of its voting power.

## II. ANALYSIS

### A. Standard on a Motion to Dismiss

A motion to dismiss under Court of Chancery Rule 12(b)(6) will be granted where it appears with "reasonable certainty" that the plaintiff could not prevail on any set of facts that can be inferred from the pleadings. [FN2] The plaintiff, however, is entitled to all reasonable inferences that can be

Not Reported in A.2d                                                                              Page 3
2001 WL 812028 (Del.Ch.)
**(Cite as: 2001 WL 812028 (Del.Ch.))**

drawn from the complaint. [FN3] With this standard in mind, I turn to my analysis of the two claims pending before me.

> FN2. *Solomon v. Path Communications Corp.,* Del.Supr., 672 A.2d 35, 38 (1996) (citing *In re USACafes, L.P. Litig.,* Del. Ch., 600 A.2d 43, 47 (1991).

> FN3. *Id.* (citing *In re USACafes,* 600 A.2d at 47).

**B. Claim I**

Claim I purports to be a class action claim for breach of fiduciary duty. The defendants insist that Claim I is in fact a derivative claim that can be brought only on the Company's behalf and, therefore, must be dismissed for failure to state a direct claim.

The Delaware courts are often faced with the complex task of distinguishing derivative claims from individual claims. [FN4] The distinction between the rights of the corporation as opposed to the individual rights of shareholders is often "a narrow one" that can have extremely important consequences for litigation. [FN5] Among these consequences are:

> FN4. *See generally* Donald J. Wolfe. Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 9-2(a), 516-26 (1998).

> FN5. *Kramer v. Western Pacific Indus., Inc.,* Del.Supr., 546 A.2d 348, 351-52 (1988).

the possible dismissal for an unjustified failure to demand that the board institute litigation; the general inability of a derivative plaintiff to engage in discovery relevant to the demand issue when dismissal on such grounds is sought; [and,] the ability of a special litigation committee of the board to terminate even a properly instituted derivative action as to which demand has been shown to be futile. [FN6]

> FN6. Wolfe and Pittenger, § 9-2(a) at 516.

In determining whether a given claim is derivative or direct in nature, this Court must look to " 'the nature of the wrong alleged' and the relief, if any, which could result if plaintiff were to prevail." [FN7] In determining the nature of the wrong alleged, the Court will not be bound by the plaintiff's characterization of the claim in the complaint, but rather must look to "the body of the complaint." [FN8]

> FN7. *Kramer,* 546 A.2d at 352 (quoting *Elster v. American Airlines, Inc.,* Del. Ch., 100 A.2d 219, 221-23 (1953)).

> FN8. *Kramer,* 546 A.2d at 352 (quoting *Lipton v. News Int'l PLC,* Del.Supr., 514 A.2d 1075, 1078 (1986).

To have standing to sue directly rather than derivatively on behalf of the corporation, the plaintiff must have been injured "*directly* or *independently* of the corporation." [FN9] In other words, the plaintiff needs to have sustained a "special injury," defined as "a wrong inflicted upon [a shareholder] alone or a wrong affecting any particular right which [that shareholder] is asserting,--such as his preemptive rights as a stockholder, rights involving the control of the corporation, or a wrong affecting the stockholders and not the corporation." [FN10]

> FN9. *Kramer,* 546 A.2d at 352.

> FN10. *Lipton,* 514 A.2d at 1079 (citing *Elster v. American Airlines, Inc.,* Del. Ch., 100 A.2d 219, 222 (1953)).

Although there is no standard test that shall be mechanistically applied in all cases to determine whether a given claim is derivative or direct, probably the most-cited formulation is that of former Chancellor Brown in *Moran v. Household International Inc.:*

**\*4** To set out an individual action, the plaintiff must allege either 'an injury which is separate and distinct from that suffered by other shareholders,' ... or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation. [FN11]

> FN11. 490 A.2d 1059, 1070 (1985), *aff'd,*

Not Reported in A.2d                                                                                    Page 4
2001 WL 812028 (Del.Ch.)
(Cite as: 2001 WL 812028 (Del.Ch.))

Del.Supr., 500 A.2d 1346 (1986) (quoting 12b Fletcher Cyclopedia of Corps, § 5921, at 452 (perm.ed., rev.vol.1984)).

The Supreme Court has made clear that although Chancellor Brown's *Moran* formulation may serve as "a quite useful guide," that test is not conclusive. [FN12] Rather, Delaware courts must ultimately look "to whether the plaintiff has alleged 'special' injury, in whatever form." [FN13]

> FN12. *Lipton,* 514 A.2d at 1078.

> FN13. *Id.*

In this case, the plaintiffs assert that they have suffered two distinct, direct injuries that each bestow standing on the plaintiffs to bring direct claims against the defendants. Plaintiffs point to the dilution of their ownership interest, earnings per share and voting power due to the effect of the NBC Transactions. Additionally, plaintiffs argue that the Pax Board's failure to pursue the Fox Offer in favor of the NBC Transactions resulted in the loss of the opportunity for the shareholders to receive optimum value for their investment in Pax. I address each of these contentions in turn.

First, the plaintiffs argue that "it is well-settled that equity dilution and diminution of one's voting power constitutes a direct injury to the shareholders and not the corporation." [FN14] They contend that the NBC Transactions will dilute the equity and voting power of the plaintiff shareholders should NBC Sub I convert its 41,500 shares of preferred stock into 31,896,032 shares of common stock and NBC Sub II exercise its warrants to purchase a total of 32,032,127 shares of Pax common stock.

> FN14. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 9.

Plaintiffs point to two cases, *In re Tri-Star Pictures, Inc. Litigation* [FN15] and *Oliver, et al. v. Boston University, et al.* [FN16] to support the proposition that their dilution claim is direct rather than derivative. Their reliance on these two cases, however, is misplaced. In *Tri-Star,* the plaintiffs, former stockholders of Tri-Star Pictures, Inc. ("Tri-Star"), challenged an assets for stock transaction between Tri-Star

and Coca-Cola Company ("Coca-Cola"), a 36.8% stockholder of Tri-Star before the transaction. [FN17] The complaint alleged that Coca-Cola had wrongfully manipulated the transaction to receive an excessive amount of Tri-Star shares in exchange for assets having a lower value. As a result of the transaction, Coca-Cola obtained an 80% stock interest in Tri-Star and the public shareholders, who had formerly owned 43.4% of the common equity, now owned only 20% of Tri-Star's equity. [FN18] Because Coca-Cola, a significant stockholder of Tri-Star before the transaction, did not suffer a similar dilution of their percentage ownership or their voting power as compared to the plaintiffs, the Supreme Court held that the plaintiffs had suffered a special injury not shared equally by all shareholders. [FN19] This rendered the plaintiffs' claims direct and not derivative in nature. [FN20]

> FN15. Del.Supr., 634 A.2d 319 (1993).

> FN16. Del. Ch., C.A. No. 16570, mem. op., Steele, V.C. (July 18, 2000).

> FN17. *Tri-Star,* 634 A.2d at 321.

> FN18. *Id.* at 330-31.

> FN19. *Id.* at 330.

> FN20. *Id.*

**\*5** Similarly, in *Boston University,* plaintiffs, investors in Seragen, Inc. ("Seragen"), argued that the defendants, controlling shareholders, directors, and officers of Seragen, unfairly took advantage of their controlling position to dilute the minority's interests, engage in self-dealing, and effect a merger that resulted in a disproportionate amount of consideration to be paid to the controlling shareholders. [FN21] The Court held that for the purposes of a motion to dismiss, the plaintiffs had adequately alleged a direct claim, noting that "the defendants engaged in self-dealing that resulted in reduced voting power and stock dilution." [FN22]

> FN21. *Boston University,* mem. op. at 1-2.

> FN22. *Id.* at 6.

Not Reported in A.2d                                                                                                Page 5
2001 WL 812028 (Del.Ch.)
**(Cite as: 2001 WL 812028 (Del.Ch.))**

Together, *Tri-Star* and *Boston University* stand for the proposition that dilution claims are individual in nature where a significant stockholder's interest is increased "at the sole expense of the minority." [FN23] *Tri-Star* and *Boston University* have no application, in my opinion, where the entity benefiting from the allegedly diluting transaction, NBC, is a third party rather than an existing significant or controlling stockholder. This identical distinction was also made by Vice Chancellor Jacobs in *Turner v. Bernstein.* [FN24] In that case, Vice Chancellor Jacobs noted that a claim of stock dilution and a corresponding reduction in a stockholder's voting power states a direct claim

> FN23. *Tri-Star,* 624 A.2d at 330.

> FN24. Del. Ch., C.A. No. 16190, slip op. at 44-45, Jacobs, V.C. (Feb. 9, 1999). *See also In re Ply Gem Indus., Inc. Shareholders Litig.,* Del. Ch., Consol. C.A. No. 15779-NC, Noble, V.C. (June 26, 2001).

only in transactions where a significant stockholder sells its assets to the corporation in exchange for the corporation's stock, and influences the transaction terms so that the result is (i) a decrease (or 'dilution') of the asset value and voting power of the stock held by the public stockholders and (ii) a corresponding increase (or benefit) to the shares held by the significant stockholder. [FN25]

> FN25. *Id.*

Under this principle, to the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares of Pax results from the issuance of new equity to a third party (NBC), plaintiff's dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed.

Plaintiffs also argue that the Call Agreement between NBC and Lowell Paxson confers a benefit on him, namely, "the potential sale of his Class B stock for prices unavailable to the public shareholders at the time (or, indeed, thereafter up to the present)." [FN26] Thus, plaintiffs assert that the overall injury to Pax's shareholders is not shared equally by all shareholders, Lowell Paxson is engaging in self-dealing, and Claim I is therefore direct. This argument also fails, as

it fundamentally misunderstands the nature of a call option.

> FN26. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 10.

As explained above, the Call Agreement entered into by a wholly owned subsidiary of NBC with Lowell Paxson, personally, and certain entities controlled by him, grants the NBC subsidiary the right to purchase all, but not less than all, of Mr. Paxson's Class B Shares of Pax at a price specified by the agreement for a period of ten years. The Call Agreement does not necessarily confer on Mr. Paxson "the opportunity to sell [his] shares to NBC for between $20.00 and $22.00 per share." [FN27] Rather, the Call Agreement grants NBC the right, for a specified period, to purchase Mr. Paxson's shares *only if NBC should so desire.* Thus, Mr. Paxson has obligated himself to sell his Pax shares to NBC at a fixed price or if higher, the market price, but only if NBC chooses to exercise its Call Right. As stockholders are assumed to act in their own economic self-interest, NBC will exercise its Call Right only if it believes it is in its own best interests to do so. [FN28] That is, NBC will exercise should it believe that the value of Mr. Paxson's stock exceeds the call price.

> FN27. *Id.* at 3.

> FN28. *See* *Unitrin, Inc. v. American Gen. Corp., Del.Supr., 651 A.2d 1361, 1380-81 (1995).*

**\*6** As the defendants point out, the Call Agreement actually places several very important burdens on Mr. Paxson's ownership of the Class B stock. First, Mr. Paxson has precluded himself from selling his shares to any other person or entity besides NBC for the duration of the Call Right. No other Pax stockholder has similarly had his liquidity taken away in this manner. Second, Mr. Paxson has agreed to relinquish a portion of any possible appreciation in his Pax stock above $20.00 or $22.50 per share. No other Pax shareholder has similarly relinquished his right to equity appreciation by having to sell at a defined or average price. Third, Mr. Paxson has agreed to sell his Class B stock, which alone provides control of the Company, to NBC at NBC's sole discretion, without necessarily receiving the control premium his shares would ordinarily command.

Not Reported in A.2d                                                                                      Page 6
2001 WL 812028 (Del.Ch.)
**(Cite as: 2001 WL 812028 (Del.Ch.))**

As the Call Agreement imposes substantial burdens on Mr. Paxson, in contrast to the substantial benefits alleged by plaintiffs, this argument in favor of plaintiffs' standing to bring a direct claim also fails.

In the plaintiffs' second attempt to support a direct claim, they allege that the defendants' failure to properly explore the Fox Offer, and later engage in serious negotiations with Fox, deprived the plaintiffs of the opportunity to realize the optimum value for their Pax stock. This, according to the plaintiffs, caused them to suffer individual injury. In substance, the plaintiffs argue that as soon as the Pax Board announced that Pax had retained Salomon to "explore strategic alternatives," the plaintiffs were entitled to a reasonable inference that the individual defendants had engaged in an active bidding process seeking to sell Pax and were under a fiduciary obligation to maximize value for the Pax shareholders in accordance with *Revlon, Inc. v. McAndrews & Forbes Holdings, Inc.* [FN29] This argument fails for at least two reasons.

> FN29. Del.Supr., 506 A.2d 173 (1986); *see also Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 47 (1994) ("Under Delaware law there are, generally speaking and without excluding other possibilities, two circumstances which may implicate *Revlon* duties. The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company.") (quoting *Paramount Communications, Inc. v. Time Inc.*, Del.Supr., 571 A.2d 1140, 1150 (1990).

First, the plaintiffs have failed to distinguish these facts from the numerous cases that have previously held that allegations that directors wrongfully failed to pursue business combinations are derivative in nature. Vice Chancellor Hartnett's opinion in *Sumers v. Beneficial Corporation* is representative of this line of authority. [FN30] In *Sumers,* the plaintiff alleged that directors of Beneficial Corporation announced that the corporation was for sale and then "summarily and arbitrarily rejected, without timely disclosure to the public shareholders," acquisition offers made at substantial premiums over the

market price. [FN31] The Court held that

> FN30. Del. Ch., C.A. No. 8788, mem. op., Hartnett, V.C. (Mar. 9, 1988). *See also Bodkin v. Mercantile Stores Co.,* Del. Ch., C.A. No. 13770, mem. op., Chandler, V.C. (Nov. 1, 1996); *Lewis v. Spencer,* Del. Ch., C.A. No. 8651, mem. op., Berger, V.C. (Oct. 31, 1989), *aff'd,* Del.Supr., 577 A.2d 753 (1990).

> FN31. *Sumers,* mem. op. at 2.

[t]he complaint in the present suit ... does not state any claim of breach of contractual rights, nor any facts which, if true, would constitute a special or individual cause of action. Plaintiffs' injury, if any, is the same as the injury to all other stockholders of [the corporation]. [FN32]

> FN32. *Id.* at 4.

In the present case, the plaintiffs have represented to the Court that "[t]he Class B stock is identical to the Class A stock except for voting power. The economic attributes are identical." [FN33] They have failed to identify any significant difference between the facts in this matter and those found in the *Sumers* line of cases.

> FN33. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 10 n. 5.

**\*7** Second, *Revlon* does not apply where the plaintiffs cannot allege that a sale or change of control has taken place or necessarily will take place such that the public shareholders of a corporation have been or will be deprived of a control premium. To the contrary, it is clear from the complaint that Mr. Paxson controls Pax through his ownership of 39.2% of the Company's Class A stock and 100% of the Company's class B stock. These holdings collectively represent 75% of Pax's voting power. If NBC exercises its Call Right, a possibility that is by no means assured, it will control Pax. If NBC does not exercise, Mr. Paxson will retain control. In either circumstance therefore, the minority public shareholders of Pax will be subject to a controlling shareholder. The only difference would be the identity of that controlling shareholder. In other words, the public shareholders of Pax will never be in the position to

Not Reported in A.2d                                                                      Page 7
2001 WL 812028 (Del.Ch.)
(Cite as: 2001 WL 812028 (Del.Ch.))

collectively control the corporation and therefore receive a control premium for their shares.

This Court's recent decision in *In re Digex Shareholders Litigation* [FN34] is directly on point as to *Revlon's* applicability to the facts of this case. There, WorldCom, Inc. ("WorldCom") sought to acquire Digex, Inc. ("Digex"). However, another company, Intermedia Communications, Inc. ("Intermedia"), was the majority shareholder of Digex. Ultimately, Worldcom entered into a merger with Intermedia instead of Digex, a transaction by which it would effectively acquire Intermedia's controlling stake in Digex. During the litigation that ensued, Digex's minority public stockholders sought to assert a *Revlon* claim that they had been deprived of a substantial premium for their shares. The Court rejected this claim, noting that "[t]he Digex minority existed before the proposed merger and it will not change under the proposed transaction. What will change is the ownership of Digex's majority shareholder, Intermedia." [FN35] Similarly here, even if NBC exercises its Call Right, from the perspective of a Pax minority shareholder, all that will change is the identity of the majority shareholder. [FN36]

> FN34. Del. Ch., C.A. No. 18336, mem. op., Chandler, C. (Dec. 13, 2000).
>
> FN35. *Id.* at 40.
>
> FN36. *See also In re Santa Fe Pac. Corp. Shareholders Litig.*, Del.Supr., 669 A.2d 59, 70-71 (1995) ("Plaintiffs appear to rest their claim of a duty to seek the best value reasonably available on allegations that the Board initiated an active bidding process. Plaintiffs do not consider, however, that this method of invoking the duty requires that the Board also seek to sell control of the company or take other actions which would result in a break-up of the company.")

The plaintiffs try to avoid *Digex's* reasoning by asserting that the entire Company was for sale, thus triggering the directors' *Revlon* duties, as soon as Pax announced that it "had formally retained Salomon to explore strategic alternatives." [FN37] Plaintiffs' contend that they are

entitled to the reasonable inference that the announcement of the engagement of an investment bank to "explore strategic alternatives" is well-known industry lexicon for a company that has initiated an active sales process. [FN38]

> FN37. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 3, 10-11.
>
> FN38. *Id.* at 10-11.

This assertion is simply not in accord with Delaware law. The phrase "strategic alternatives" contemplates the possibility of many types of transactions. A sale of the company may be one. It goes without saying, however, that many other types of transactions including special dividend payments, stock repurchases, stock issuances, or recapitalizations are all within the purview of "strategic alternatives." Moreover, numerous cases have held that *Revlon* duties have not applied even where companies have hired investment bankers. [FN39] This case is no different.

> FN39. *See, e.g., In re Santa Fe Pac. Corp.*, 669 A.2d at 70-71; *In re Delta & Pineland Co. Shareholders Litig.*, Del. Ch., C.A. No. 17707, mem. op., Chandler, C. (June 21, 2000).

**\*8** Finally, plaintiffs insist most urgently that this case is controlled by Vice Chancellor Strine's opinion in *In re Gaylord Container Corp. Shareholders Litigation.* [FN40] They invoke *Gaylord* to support their argument that they have suffered a direct injury as a result of being "prevented from receiving an adequate offer for their shares." [FN41] Plaintiffs' reliance on *Gaylord* is misplaced. *Gaylord* involved *Unocal* claims where a board of directors allegedly enacted defensive measures intended to restrict shareholder action and to make an acquisition virtually impossible without the board's consent. Here, the plaintiffs have alleged no *Unocal* claims, nor are there facts present here which could support such a claim. The arguments made in *Gaylord* simply do not apply to the facts present in this case.

> FN40. Del. Ch., 747 A.2d 71 (1999).
>
> FN41. Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 11.

Not Reported in A.2d                                                                                      Page 8
2001 WL 812028 (Del.Ch.)
**(Cite as: 2001 WL 812028 (Del.Ch.))**

For all of the reasons discussed above, the plaintiffs' claims are solely derivative in nature. As such, Claim I must be dismissed for failing to state a direct claim.

*C. Claim II*

The plaintiffs have asserted a derivative claim on behalf of Pax to redress injuries allegedly suffered and to be suffered by the Company as a direct result of the Individual Defendants' purported fiduciary duty violations. The defendants argue that Claim II must be dismissed because it fails to meet the pleading requirements of Chancery Rule 23.1 to excuse plaintiffs' failure to make pre-suit demand on the Pax Board. [FN42] Not surprisingly, plaintiffs respond that they are properly excused from making demand because the Pax Board acted for entrenchment purposes, Mr. Paxson dominated and controlled the Pax board, and Mr. Paxson enjoyed a personal financial interest not shared with the other stockholders.

> FN42. Ct. Ch. R. 23.1. The rule states in pertinent part, "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

To allege with particularity that a demand upon the board would have been futile, the plaintiffs must establish a reasonable doubt that: (1) a majority of the board of directors is disinterested and independent; and (2) the challenged transaction was a valid exercise of business judgment. [FN43]

> FN43. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984).

The plaintiffs have attempted to establish reasonable doubt under the first prong of the *Aronson* test by arguing that the directors of Pax were motivated by their desire to remain entrenched. They base this allegation on the argument that had the defendants negotiated a takeover by Fox, the positions of the Individual Defendants may have been in jeopardy. Conversely, the transaction ultimately entered into with NBC did not oust the Individual Defendants from their positions at Pax. [FN44] Therefore, the plaintiffs contend that it is reasonable to infer that the defendants' alleged rejection of the Fox Offer was motivated by their desire to entrench themselves in office rather than from a desire to engage in an "investment-oriented" transaction as opposed to an outright sale of the Company.

> FN44. The plaintiffs seem to disregard the fact that if NBC gains control of Pax pursuant to the NBC Transactions, the Individual Defendants stand a distinct possibility of being ousted from their positions.

The plaintiffs also contend that because Mr. Paxson has granted NBC the Call Right, he enjoys a unique financial benefit not shared by the other Pax shareholders. As discussed above, the plaintiffs appear to have misunderstood the nature of a call option. There is no assurance that the Call Right will ever be exercised. In fact, as noted above, Mr. Paxson has encumbered ownership of his class B Pax shares in several ways that are unique to him. Additionally, even if NBC exercises the Call Right, the resulting stock sale will merely be because NBC, a third party, has concluded that that decision is in its, not Mr. Paxson's, best interests.

**\*9** Under the standard to be applied in cases where plaintiffs plead pre-suit demand futility, "the decision to reject a takeover proposal, hostile or friendly, will not excuse demand absent particularized allegations of a breach of fiduciary duty, such as self-dealing, fraud, overreaching, or lack of good faith." [FN45] Nothing even close to such an allegation has been made here. Further, the plaintiffs essentially argue that demand must be excused in any case where directors refrain from selling a company. As *Pogostin* makes clear, this is not the law of Delaware. [FN46]

> FN45. *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 627 (1984).

> FN46. *Id.*

Moreover, it is well-established that a successful claim of demand futility requires the existence of an *actual threat* to

Not Reported in A.2d                                                                                    Page 9
2001 WL 812028 (Del.Ch.)
**(Cite as: 2001 WL 812028 (Del.Ch.))**

the directors' positions on the board. [FN47] No such allegation exists here either, as director removal could not occur without the consent of the controlling shareholder, Mr. Paxson. There has been no allegation that Mr. Paxson sought to remove himself or any other Pax director from office. [FN48]

>   FN47. *See, e.g., Bodkin,* mem. op. at 8; *Greenwald v. Batterson,* Del. Ch., C.A. No. 16475, mem. op. at 11, Lamb, V.C. (July 26, 1999) ("the mere allegation that directors have taken action to entrench themselves without an allegation that the directors believed themselves vulnerable to removal from office, will not reveal demand."); *Grobow v. Perot,* Del. Ch., 526 A.2d 914, 922-23 (1987), *aff'd,* Del.Supr., 539 A.2d 180 (1988).

>   FN48. *See Bodkin,* at 8.

The plaintiffs also attempt to satisfy *Aronson* by arguing that a majority of Pax's directors were dominated and controlled by Mr. Paxson. Specifically, they contend that directors Sagansky and Bocock are beholden to Lowell Paxson merely because they are officers of Pax. That is, the plaintiffs point out that Mr. Paxson is Mr. Sagansky's and Mr. Bocock's superior in the Company, he has voting control of Pax, and he has the power to elect all of the Company's directors and appoint its officers. [FN49]

>   FN49. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 15.

Nevertheless, under *Aronson,*

>   in the demand context even proof of majority ownership does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person. [FN50]

>   FN50. *Aronson,* 473 A.2d at 815.

In reviewing whether demand has been satisfied, after "giving little or no weight to vague conclusory statements,

... [the Court] must evaluate, under the reasonable doubt standard, whether the facts pleaded with particularity are consistent with domination of the independence of the judgment of the remaining board members." [FN51] Even where the *potential* for domination or control by a controlling shareholder exists, the complaint must allege particularized allegations that would support an inference of domination or control. [FN52]

>   FN51. *Friedman v. Beningson,* C.A. No. 12231, mem. op. at 10, Allen, C. (Dec. 4, 1995).

>   FN52. *See, e.g., Friedman* (noting where the plaintiffs alleged domination of board decision making by a corporation's Chairman, CEO, President, and 36% stockholder, "[f]rom a practical perspective, this confluence of voting control with directorial and official decision making authority, while not itself sufficient under the cases to support a conclusion of reasonable doubt is nevertheless quite consistent with control of the board."); *Heineman v. Datapoint Corp.,* Del.Supr., 611 A.2d 950, 955 (1992) (holding in a case where a controlling stockholder allegedly dominated and controlled the board through his control of the positions of other directors as well as his control of business organizations in which the other directors were investors that "an allegation of controlling stock ownership does not raise, *per se,* a reasonable doubt as to the board's independence.... To raise such a doubt a party attacking a corporate transaction must advance particularized factual allegations from which the Court of Chancery can reasonably infer that the board members who approved the transaction are acting at the direction of the allegedly dominating individual or entity." (citations omitted).)

Here, paragraph 43 of the Complaint alleges that defendants Sagansky and Bocock enjoy certain "emoluments of office" that they seek to retain. [FN53] At no point do the plaintiffs describe or list any of these alleged emoluments. The complaint also alleges that defendants Sagansky and Bocock receive "substantial salaries, bonuses, payments, benefits, and/or other emoluments." [FN54] Again, these

Not Reported in A.2d                                                                            Page 10
2001 WL 812028 (Del.Ch.)
(Cite as: 2001 WL 812028 (Del.Ch.))

generalized allegations do not contain any details that would suggest impropriety specifically on behalf of these two directors/officers of Pax. The complaint contains no information concerning what amounts of stock or cash have been paid either to Sagansky or to Bocock as compensation or as a bonus. There is no information plead regarding the stock ownership positions of either of these directors/officers in the Company that might help to illustrate what the Fox Offer might have meant to them financially. There are no allegations concerning any payments that may have flowed to these two director/officers should they have been terminated, constructively or otherwise, had the alleged Fox Offer been pursued. [FN55]

        FN53. Compl., ¶ 43(1).

        FN54. Compl., ¶ 43(2).

        FN55. This short list of information the plaintiffs may have pled to support their claims is merely illustrative and is in no way to be construed as exhaustive or as sufficient.

*10 Moreover, the Complaint alleges that "[t]he Board members also have close personal and business ties with each other." [FN56] This allegation is also hopelessly vague. The plaintiffs have not pled the existence of any particular personal relationship between either Bocock or Sagansky and Paxson. The plaintiffs have pled no facts beyond this very generalized statement that supports this allegation in any way.

        FN56. Compl., ¶ 43(2). For an example where allegations of interestedness were found sufficient to withstand a 12(b)(6) motion, *see In re Ply Gem Indus., Inc. Shareholders Litig.*, Del. Ch., Consol. C.A. No. 15779-NC, Noble, V.C. (June 26, 2001).

In sum, the plaintiffs have not pled, with any particularity, facts that could support an excusal of demand under the reasonable doubt standard. This lack of specificity is simply insufficient to satisfy even the barest requirements set forth by *Aronson* and its progeny.

Finally, I note in passing plaintiffs' allegation that, in

rejecting the Fox Offer in favor of the NBC Transactions, Mr. Paxson acted out of a personal desire to remain entrenched and to continue to enjoy the emoluments of office. Quite frankly, I am unable to grasp the distinction (accepting the premise that Mr. Paxson desires to remain in office) between a cash sale to Fox as opposed to the series of transactions that would lead to NBC being in control of Fox. In either circumstance, Mr. Paxson would seem to have about the same chance of remaining in office. Furthermore, it appears from plaintiffs' allegations that Mr. Paxson must be willing to forego a substantial cash premium on his significant holdings of Pax stock offered by way of the Fox Offer, in order to continue to enjoy certain unspecified "emoluments of his offices" in Pax. [FN57] This would not have been in Mr. Paxson's economic best interests and thus seems to defy logic. [FN58]

        FN57. Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss, at 15. Plaintiffs essentially posit that Mr. Paxson declined a premium that totaled over $200 million in order to continue to enjoy the emoluments of his offices. I note that NBC has the right to exercise the Call Option whenever it wishes, removing Mr. Paxson from control of the Company. This fact seems to have been overlooked in the plaintiffs' analysis.

        FN58. *See Parnes v. Bally Entertainment Corp.*, Del. Ch., C.A. No. 15192, mem. op. at 31-32, Chandler, C. (Feb. 23, 2001).

                    III. CONCLUSION

Based on all the foregoing reasons, I conclude that the complaint in the present suit alleges claims that are solely derivative in nature. Due to the plaintiffs' failure to comply with the demand requirements of Court of Chancery Rule 23.1, the complaint is therefore dismissed.

An Order has been entered consistent with the determination reached in this memorandum opinion.

                    ORDER

For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

Westlaw.

Not Reported in A.2d                                                                    Page 11
2001 WL 812028 (Del.Ch.)
**(Cite as: 2001 WL 812028 (Del.Ch.))**

ORDERED that the complaint is dismissed for failure to comply with Court of Chancery Rule 23.1.

2001 WL 812028 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

Not Reported in A.2d                                                             Page 1
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Barbie RATTNER, Plaintiff,

v.

D. James BIDZOS, Stratton D. Sclavos, Timothy Tomlison, Roger H. Moore, David

J. Cowan, Anil H.P. Pereira, Douglas L. Wolford, Robert J. Korzeniewski, James

M. Ulam, Quentin P. Gallivan, Dana L. Evan, Kevin R. Compton, William L.

Chenevich, Gregory L. Reyes and Scott G. Kriens, Defendants,

and

VERISIGN, INC., a Delaware corporation, Nominal Defendant.

No. Civ.A. 19700.

Submitted April 7, 2003.
Decided Sept. 30, 2003.
As Revised Oct. 7, 2003.

James S. Green, and Kevin A. Guerke, of Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware; Peter D. Bull, and Joshua M. Lifshitz, of Bull & Lifshitz, LLP, New York, New York, for Plaintiff, of counsel.

David C. McBride, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; David M. Furbush, and Noah D. Boyens, of O'Melveny & Myers LLP, Menlo Park, California, for Defendants, of counsel.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

**\*1** Plaintiff Barbie Rattner ("Rattner") brings this derivative action on behalf of Nominal Defendant VeriSign, Inc. ("VeriSign" or the "Company") alleging that Defendants James D. Bidzos ("Bidzos"), Stratton D. Sclavos ("Sclavos"), Timothy Tomlinson ("Tomlinson"), Roger H.

Moore ("Moore"), David J. Cowan ("Cowan"), Anil H.P. Pereira ("Pereira"), Douglas L. Wolford ("Wolford"), Robert J. Korzeniewski ("Korzeniewski"), James M. Ulam ("Ulam"), Quentin P. Gallivan ("Gallivan"), Dana L. Evan ("Evan"), Kevin R. Compton ("Compton"), William L. Chenevich ("Chenevich"), Gregory L. Reyes ("Reyes") and Scott G. Kriens ("Kriens") (collectively, the "Individual Defendants") breached their fiduciary duties owed to the Company and its shareholders. Specifically, Rattner asserts that the Individual Defendants breached their fiduciary duty of care by inadequately maintaining accounting controls and utilizing improper accounting and audit practices. Rattner also contends that certain Individual Defendants sold securities while in possession of material inside information, thereby breaching their fiduciary duties, and that the remaining Individual Defendants have committed waste. In addition, Rattner seeks contribution and indemnification from the Individual Defendants for claims that have been or may be pursued against the Company based upon the Individual Defendants' alleged misconduct.

Defendants have moved to dismiss each of Rattner's claims under Court of Chancery Rule 23.1 for failure to make a demand upon the VeriSign board of directors (the "Board"). They argue that the conclusory allegations of the Stockholder's Amended Derivative Complaint (the "Amended Complaint") fail to create a reasonable doubt as to whether a majority of the Board is capable of rendering an impartial decision regarding the pursuit of this derivative litigation. Defendants have also moved to dismiss, under Court of Chancery Rule 12(b)(6), Rattner's claims for breach of fiduciary duty and waste.

For the reasons that follow, I conclude that, because demand is not excused under Court of Chancery Rule 23.1, this action must be dismissed.

I. BACKGROUND [FN1]

FN1. This background is taken from the allegations of the Amended Complaint. *White v. Panic,* 783 A.2d 543, 547 n. 5 (Del.2001).

A. *The Parties*

Not Reported in A.2d                                                                                    Page 2
2003 WL 22284323 (Del.Ch.)
(Cite as: 2003 WL 22284323 (Del.Ch.))

Rattner is, and has been at all relevant times, a common stock shareholder of VeriSign. VeriSign, a Delaware corporation, was founded in April 1995. It is a leading provider of digital trust services, enabling various Internet users to engage in secure digital commercial transactions and communications.

The Individual Defendants are the current directors and the senior officers of the Company. Sclavos is the Chairman of the Board and Bidzos is the Vice Chairman of the Board. The remaining directors on the eight member Board are Moore, Cowan, Compton, Chenevich, Reyes and Kriens (collectively, along with Sclavos and Bidzos, the "Director Defendants"). Of the current Board members, the only director who held a senior management position at the time this action was filed [FN2] is Sclavos, who is also VeriSign's President and Chief Executive Officer. [FN3] Bidzos served as Chairman of the Board (April 1995 through March 12, 2002) and Chief Executive Officer (April 1995 through July 1995). Prior to becoming a VeriSign director in February 2002, Moore had been President and Chief Executive Officer of Illuminet Holdings, Inc. ("Illuminet") from December 1995 until December 2001, when VeriSign acquired Illuminet.

> FN2. This action was filed on June 12, 2002; Rattner lodge her Amended Complaint on October 4, 2002.

> FN3. Sclavos has served as the Company's President and Chief Executive Officer since April 1995.

**\*2** The remaining Individual Defendants, with the exception of Tomlinson, [FN4] are senior officers of the Company. Pereira is VeriSign's Executive Vice President and General Manager, Enterprise and Service Provider Division, who formerly, from October 2000 to January 2001, served as VeriSign's Senior Vice President and Group General Manager of the Enterprise and Service Provider Division. Wolford serves as VeriSign's Senior Vice President and Group General Manager of Web Presence Services. Korzeniewski is the Executive Vice President of Corporate and Business Development, and has held that position since June 2000. Ulam, since October 2001, has been Senior Vice

President, General Counsel of the Company; previously he served as Vice President, General Counsel of VeriSign from the time of his joining the Company in June 2000. Gallivan is VeriSign's Executive Vice President, Worldwide Sales and Services, a position he has held since April 1, 1999. Finally, Evan has served, since January 1, 2001, as the Company's Executive Vice President of Finance and Administration and Chief Financial Officer.

> FN4. Tomlinson served as a director (April 1995 until May 2002) and as the Company's Secretary (April 1995 through October 2000). Tomlinson is also a partner in the law firm of Tomlinson, Zisko & Master LLP (the "Tomlinson Firm"). In 2000, VeriSign paid approximately $900,000 to the Tomlinson Firm.

B. *The Misstatements*

Rattner principally complains of alleged insider trading and a failure to oversee properly the accounting practices at VeriSign. Common to both allegations is a series of allegedly misleading statements made over a twelve-month period from January 2001 through January 2002 (the "Relevant Period"). On January 24, 2001, VeriSign released its fourth quarter and fiscal 2000 financial results (the "January 24 Release"). The release noted that during the fourth quarter, the Company earned revenues of $197.4 million, representing a 613% increase over the previous year's fourth quarter results. For fiscal 2000, VeriSign reported revenues of $474.8 million, amounting to a 460% increase over revenues in the previous fiscal year. These revenues resulted in pro forma net income for the quarter, excluding the amortization of goodwill and intangible assets and acquisition-related charges of $45.5 million, equivalent to $0.21 diluted earnings per share; pro forma net income for fiscal 2000 was $129.1 million. However, after including the charges for amortization of goodwill and intangible assets and other acquisition related charges, the fiscal 2000 net loss was $3.1 billion. [FN5] The release also highlighted the international expansion undertaken by the Company in fiscal year 2001. However, Rattner alleges that the picture was not as rosy as was portrayed.

> FN5. Amended Compl. ¶ 48.

Not Reported in A.2d                                                                                      Page 3
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

In the Amended Complaint, Rattner asserts that, because of a failure to maintain and oversee properly the accounting practices at VeriSign, the statements contained in the January 24 Release conveyed inaccurate information. Specifically, VeriSign improperly recorded "round trip revenue" and barter transactions, thus artificially inflating the Company's reported revenues for fiscal 2000. VeriSign also failed to record impairments in the value of certain investments it made in other companies during a round of private equity financing that commenced in the third quarter of 2000 . [FN6] Thus, Rattner concludes that because the Company failed to record revenues accurately and write down impaired asset values on a timely basis, in violation of Generally Accepted Accounting Principles ("GAAP"), the earnings projections and financial statements contained in the January 24 Release were overly optimistic and materially misleading.

> FN6. Charges related to these investments were $74 million in fiscal 2001 and $94.8 million in the first half of fiscal 2002. *Id.* ¶ 49.

**\*3** Other undisclosed accounting practices of the Company also are claimed to have contributed to an inflated market price for VeriSign common stock. Rattner alleges that the Individual Defendants either "were manipulating" [FN7] or "should have been aware of the manipulation" [FN8] of the reported days sales outstanding (DSO) by including the deferred revenue, and excluding the accounts receivable, of companies acquired by VeriSign. Furthermore, Rattner also contends that there were other material misstatements made during the Relevant Period. Rattner notes that:

> FN7. *Id.* ¶ 47; *cf. id.* ¶ 62 (noting that "VeriSign" engaged in manipulation).

> FN8. *Id.* ¶ 70.

[t]he Company also failed to disclose that (i) the integration of Illuminet and H.O. Systems failed as the number of enterprise clients declined after the acquisitions; (ii) the Company would incur almost $80 million in charges, engage a[sic] massive restructuring and layoff a substantial portion of its workforce as a result of the acquisitions of Illuminet and H.O. Systems; [and]

(iii) the Company would need to massively increase its allowance for doubtful accounts. [FN9]

> FN9. *Id.* ¶ 47. The Amended Complaint only informs that the acquisition of H.O. Systems, Inc. ("H.O.Systems") closed on February 8, 2002. *Id.* ¶ 76.

These allegedly improper accounting practices and material misstatements reappeared in numerous financial statements, releases and public statements during the Relevant Period, rendering each materially misleading for the reasons previously noted. To this end, the Amended Complaint quotes extensively from myriad sources publicly disseminated by the Company during the Relevant Period, each allegedly materially misleading, including: statements made by Sclavos at a February 1, 2001, analysts' meeting, the Company's 10K report for fiscal year 2000 issued on March 28, 2001; an April 26, 2001, press release; a July 26, 2001, press release; a September 24, 2001, article in *Bloomberg;* an October 25, 2001, press release; and a January 24, 2002, press release. [FN10] The alleged effect of these numerous material misstatements was to inflate artificially the stock price of VeriSign over the course of the Relevant Period.

> FN10. *See id.* ¶¶ 50-55, 57, 58, 60, 64-69.

C. *Alleged Wrongdoing by the Individual Defendants*

With the knowledge that the market price of VeriSign stock was artificially inflated, and while in possession of other material non-public information, during the Relevant Period "certain defendants" sold over 875,000 shares of VeriSign stock for proceeds in excess of $47 million, and Moore sold approximately 995,000 shares of Illuminet stock for over $37 million. [FN11] Specifically:

> FN11. A central problem with the Amended Complaint is that one is never certain who is selling how much and which sales are being challenged. As with questions surrounding which Director Defendants have been implicated in certain federal securities class action lawsuits, *see infra* text accompanying note 79, this defect stems

from the inconsistent use of defined terms and a failure to use defined terms. Often in the Amended Complaint, Rattner notes that "certain defendants" engaged in allegedly illicit transactions, but nowhere are these ambiguous assertions clarified. Particularly unhelpful is the definition provided in the Third Cause of Action, well after the discussion of the underlying facts of this dispute:

108. Certain defendants (the "Insider Trading Defendants"), at all relevant times, occupied fiduciary positions with VeriSign and were privy to confidential material inside information concerning VeriSign and its operations.

Amended Compl. ¶ 108.

I draw the inference that the challenged sales include all of the sales by Individual Defendants during the Relevant Period. Therefore, at issue are the sales of VeriSign common stock and Illuminet options by Bidzos, Cowan, Evan, Gallivan, Korzeniewski, Pereira, Sclavos, Tomlinson, Ulam, Wolford, and Moore (collectively, the "Selling Defendants") so noted. *See id.* ¶ 37.

a) Bidzos sold 15,000 shares of VeriSign common stock on May 22, 2001, for net proceeds of $991,890;

b) Cowan sold 20,800 shares on February 1, 2001; 53,125 shares during the period of May 1-2, 2001; and 22,000 shares on November 13, 2001 (a total of 95,925 shares), of VeriSign common stock for total net proceeds of $5,132,773;

c) Evan sold 500 shares on January 31, 2001; 6,500 shares during the period of February 1-28, 2001; 3,000 shares on March 1, 2001; 60,100 shares during the period of May 1-31, 2001; 4,000 shares during the period of May 17-21, 2001; 12,500 shares during the period of August 1-29, 2001; and 10,000 shares during the period of November 13-14, 2001 (a total of 96,600 shares), of VeriSign common stock for total net proceeds of $5,025,988;

**4** d) Gallivan sold 37,000 shares during the period of February 6-28, 2001; 3,000 shares on March 1, 2001; and 82,994 shares during the period of May 2-8, 2001 (a total of 122,994 shares), of VeriSign common stock for total net proceeds of $7,164,007;

e) Korzeniewski sold 15,000 shares on February 2, 2001;

25,000 shares on May 3, 2001; 74,626 shares during the period of May 3-31, 2001; 15,000 shares on August 27, 2001; and 33,700 shares during the period of November 2-13, 2001 (a total of 163,326 shares), of VeriSign common stock for total net proceeds of $8,442,775;

f) Pereira sold 800 shares on January 31, 2001; 9,700 shares during the period of February 6-28, 2001; 2,500 shares on March 1, 2001; 47,600 shares during the period of May 2-31, 2001; 11,000 shares during the period of August 3-31, 2001; and 15,000 shares during the period of November 7-30, 2001 (a total of 86,600 shares), of VeriSign common stock for total net proceeds of $4,676,900;

g) Sclavos sold 50,000 shares on February 28, 2001; 135,000 shares during the period of May 7-31, 2001; and 60,375 shares during the period of August 3-29, 2001 (a total of 245,375 shares), of VeriSign common stock for total net proceeds of $13,229,650;

h) Tomlinson sold 875 shares on January 30, 2001; 1,875 shares on February 26, 2001; 1,875 shares during the period of May 1-21, 2001; 1,775 shares on August 1, 2001; and 2,400 shares during the period of November 7-13, 2001 (a total of 8,800 shares), of VeriSign common stock for total net proceeds of $476,827;

i) Ulam sold 8,000 shares on March 1, 2001; 2,711 shares during the period of May 22-31, 2001; and 2,500 shares on August 3, 2001 (a total of 13,211 shares), of VeriSign common stock for total net proceeds of $697,925; and

j) Wolford sold 5,000 shares on January 31, 2001, and 12,900 shares on May 8, 2001 (a total of 17,900 shares), of VeriSign common stock for total net proceeds of $1,174,000. [FN12]

> FN12. Amended Compl. ¶ 37.

Thus, during the Relevant Period, the Selling Defendants (except Moore) sold a total of 875,731 shares of VeriSign common stock for aggregate net proceeds of $47,512,615. Moore disposed of 995,000 in-the-money, unexercised Illuminet stock options at some point between March 26, 2001 and April 3, 2002, earning net proceeds of $37,113,500. [FN13]

> FN13. *Id.* The per option value received by Moore was estimated by Rattner based upon the market

Not Reported in A.2d                                                                                   Page 5
2003 WL 22284323 (Del.Ch.)
(Cite as: 2003 WL 22284323 (Del.Ch.))

value of Illuminet common stock as of December 12, 2001, the closing date of the merger between Illuminet and VeriSign, less the per share exercise price.

Moreover, the material misstatements which opened the door for the Selling Defendants to engage in improper insider trading were allegedly the products of the Individual Defendants' breaches of fiduciary duty in failing to oversee adequately the Company's accounting procedures. The Amended Complaint maintains that the Individual Defendants "knew, or were reckless in not knowing, the facts which indicated that the fiscal 2000 and 2001 Form 10-Ks and all of the Company's interim financial statements, press releases, public statements, and filings with the SEC" were misleading. [FN14] Moreover, it is alleged, the Individual Defendants systematically failed to assure VeriSign's compliance with applicable federal and state laws, SEC rules and regulations, FASB Statements of Concepts and GAAP.

FN14. *Id.* ¶ 94.

D. *Subsequent Events*

*5 In February 2002, rumors began circulating as to the accounting practices employed by VeriSign. [FN15] On March 19, 2002, the Company, in its 10-K for 2002, disclosed that 10% of its 2001 revenues were derived from reciprocal deals with either its customers or other companies in which it had invested. That day, the price of VeriSign shares fell by more than 9%, closing down $2.61 to $26.42. [FN16] On April 25, 2002, a VeriSign press release noted, in addition to its financial and operating results for the first quarter of 2002, that DSO had increased to 81 days, and that the Company was restructuring its operations in order to best accommodate the recently acquired companies of Illuminet and H.O. Systems. Upon this news, the price of VeriSign shares tumbled from $18.24 to $9.89. [FN17] A July 25, 2002 press release noted that the Company had recorded a $4.6 billion charge in connection with a non-cash charge relating to a portion of the Company's goodwill and intangible assets, as directed by FASB Statement No. 142. [FN18] On August 7, 2002, VeriSign announced that its marketing practices were under investigation by the Federal

Trade Commission, regarding allegedly misleading direct-mail advertising campaigns. The Company is also the target of several securities fraud class action lawsuits filed in the Northern District of California.

FN15. *Id.* ¶ 71.

FN16. *Id.* ¶¶ 72-73.

FN17. When the Amended Complaint was filed, VeriSign traded at $4 per share.

FN18. Amended Compl. ¶ 79.

II. CONTENTIONS

In the Amended Complaint, Rattner primarily advances two theories of wrongdoing by the Individual Defendants. First, Rattner alleges that the Selling Defendants, in violation of their fiduciary duties, engaged in insider trading; that is, the Selling Defendants profited from selling VeriSign common stock (or, in the case of Moore, selling Illuminet options) while knowing that improper accounting practices at VeriSign, the products of which were publicly disseminated through material misstatements, created an inflated market price. [FN19] In support of this claim, Rattner notes several aspects of the challenged stock sales executed during the Relevant Period. First, the Individual Defendants, by virtue of their positions, were privy to material, undisclosed information concerning the alleged accounting improprieties. Second, the timing of the sales, in that many of the Individual Defendants sold their holdings simultaneously and on days immediately following the release of allegedly misleading information or, in the case of Moore, after the announcement of the acquisition of Illuminet yet before that acquisition's closing, raises suspicions that the sales were part of an overall scheme of insider trading. Third, Rattner alleges that the sales of VeriSign stock (or Illuminet options) by the Selling Defendants during the Relevant Period were not consistent with the Individual Defendants' previous trading activity. Finally, Rattner notes that many of the Individual Defendants sold substantial portions of their VeriSign (or Illuminet) holdings for millions of dollars. Rattner further contends that all of the Director Defendants committed

Not Reported in A.2d                                                                                                Page 6
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

waste by allowing the Selling Defendants to misappropriate a valuable asset, in the form of proprietary information, of the Company. [FN20]

> FN19. Rattner also alleges that some of the Individual Defendants participated in or encouraged the improper accounting practices. *Id.* ¶ 47.

> FN20. These claims will be referred to collectively as the "Insider Trading Claims."

**\*6** Rattner also presses a second set of claims concerning the alleged dissemination of misleading statements to the market and the improper oversight exercised in failing to assure the accuracy of VeriSign's accounting systems. Rattner charges the Individual Defendants with inadvertent, if not knowing, misdeeds in maintaining accurate financial reporting and recording systems, conduct which ultimately permitted the Selling Defendants to engage in insider trading and resulted in damages to the Company. [FN21] More pertinently, in the demand excusal context, and in essence, Rattner alleges that the Director Defendants "have engaged in a sustained and systematic failure to exercise their oversight responsibilities to ensure that VeriSign complied with Federal and State Laws, rules and regulations and to ensure the integrity of its financial reporting." [FN22] Thus, by failing to oversee adequately the Company's financial reporting and recording systems, the Director Defendants breached their fiduciary duties. [FN23]

> FN21. Amended Compl. ¶¶ 98, 101.

> FN22. *Id.* ¶ 100.

> FN23. Collectively, these claims will be referred to as the "Accounting Oversight Claims."

Because of the Individual Defendants' misdeeds, Rattner claims that the Company has suffered harm in that VeriSign's goodwill and integrity in the market have been impugned. Furthermore, the Company has been injured by bearing the cost of defense and being subjected to potential liability stemming from the pending class actions in federal court. Rattner thus requests that the following relief be granted: (1) that the Individual Defendants account to

VeriSign for all damages and costs sustained now or in the future; (2) that the Individual Defendants return to VeriSign all salaries and remuneration of any kind received while the Individual Defendants were in breach of their fiduciary duties; (3) that a constructive trust be imposed on all profits derived from insider trading by the Selling Defendants; and (4) a declaration that VeriSign is entitled to contribution and indemnification for any claims that have been, or may be, asserted against it in connection with the Individual Defendants' alleged misconduct.

In response to the Amended Complaint, Defendants have moved to dismiss this action for failure to comply with Court of Chancery Rule 23.1. [FN24] Defendants argue that Rattner has not pled with particularity in the Amended Complaint facts which demonstrate that demand is futile. They contend that Rattner, in the Amended Complaint, does not allege with particularity facts that would constitute insider trading, and thus a disabling interest, by a majority of the Board. Similarly, Rattner fails to allege with particularity that the Board failed to exercise proper oversight regarding the Company's financial recording and reporting systems. Moreover, Defendants note that merely because the Director Defendants would be asked to authorize suit against themselves does not necessarily prevent a majority of the Board from exercising disinterested and independent business judgment in deciding the merits of, and whether to pursue, Rattner's claims. Therefore, Defendants request that this action be dismissed.

> FN24. The Defendants have also moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6). However, given my disposition of the Defendants' motions to dismiss under Court of Chancery Rule 23.1, the Defendants' motion to dismiss under Court of Chancery Rule 12(b)(6) will not be addressed. Similarly, I do not address Defendants' contention that this action should be dismissed because "prosecution of this amended action is not in the best interests of the Company." Op. Br. in Supp. of Defs.' Mot. to Dismiss at 13.

### III. ANALYSIS

**\*7** Court of Chancery Rule 23.1 requires that, in derivative

Not Reported in A.2d                                                                     Page 7
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

actions, "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." The demand requirement embodied in Court of Chancery Rule 23.1 is an acknowledgement that a shareholder's prosecution of a derivative action necessarily impinges upon the power and autonomy of a board of directors to manage the affairs of the corporation, including whether or not to pursue a cause of action belonging to the corporation. [FN25] The hurdle of proving demand futility also serves an important policy function of promoting internal resolution, as opposed to litigation, of corporate disputes and grants the corporation a degree of control over any litigation brought for its benefit. [FN26]

> FN25. *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990); *Aronson v. Lewis,* 473 A.2d 805, 811-12 (Del.1984).

> FN26. *Spiegel,* 571 A.2d at 773; *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at *5 (Del.Ch. June 21, 2000).

A critical requirement of Court of Chancery Rule 23.1 is that the complaint must allege *with particularity* the reasons for demand excusal.

> Those pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.... What the pleader must set forth are particularized factual statements that are essential to the claim.... A prolix complaint larded with conclusory language ... does not comply with these fundamental pleading mandates. [FN27]

> FN27. *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000) (footnotes omitted).

In considering whether a derivative plaintiff has satisfied Court of Chancery Rule 23.1, I am confined to reviewing the well-pled allegations of the complaint. [FN28] While I am unable to accept cursory contentions of wrongdoing in

light of the obligation to plead facts with particularity, I must accept as true all well-pled allegations of fact in the complaint, and all reasonable inferences from non-conclusory allegations contained in the complaint must be drawn in favor of the plaintiff. [FN29] With these principles in mind, I turn to the question of whether Rattner has pleaded with particularity that demand upon the Board would be futile and, thus, is excused.

> FN28. *White,* 783 A.2d at 547 n. 5; *Zimmerman v. Braddock,* 2002 WL 31926608, at *7 (Del.Ch. Dec.20, 2002); *Ash v. McCall,* 2000 WL 1370341, at *6 (Del.Ch. Sept.15, 2000).

> FN29. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988).

The business judgment rule and demand excusal are "inextricably bound." [FN30] When a derivative suit challenges decisions made by directors in accordance with their managerial authority, "stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim." [FN31] However, it is also recognized that the business judgment rule only operates in instances of action by the board of directors or a conscious decision to refrain from acting. [FN32] The business judgment rule has no role in the case of inaction by the board of directors. [FN33] From this dichotomy, two overlapping yet different tests have been developed to determine whether demand is excused.

> FN30. *Aronson,* 473 A.2d at 812.

> FN31. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993).

> FN32. *Aroson,* 473 A.2d at 813.

> FN33. *Id.; Guttman v. Huang,* 823 A.2d 492, 499-500 (Del.Ch.2003); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *14 n. 39 (Del.Ch. Dec.18, 2002).

**\*8** If a derivative suit challenges a decision made by a board of directors, then demand futility is properly evaluated

under that test announced in *Aronson v. Lewis.* [FN34] Under the *Aronson* test, "[t]o determine whether demand would be futile, the Court must determine whether the particular facts, as alleged, create a reason to doubt that: '(1) the directors are disinterested and independent' or '(2) the challenged transaction was otherwise the product of a valid exercise of business judgment." ' [FN35] Thus, *Aronson* adopted a two-pronged analysis for determining whether demand is futile: the first prong inquires into the independence and disinterestedness of the directors, and the second prong focuses on the substantive nature of the challenged transaction and the directors' approval thereof. [FN36]

> FN34. *Rales, 634 A.2d at 933* ("The essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors is being challenged in the derivative suit."); *Haseotes v. Bentas,* 2002 WL 31058540, at *4 (Del.Ch. Sept.3, 2002).

> FN35. *In re Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 285 (Del.Ch.2003) (quoting *Aronson,* 473 A.2d at 814).

> FN36. *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984); *Aronson,* 473 A.2d at 814.

The parties, however, agree that, here, because Rattner does not challenge any particular action undertaken by the Board as a whole, the standard established in *Rales v. Blasband* governs the determination of demand futility. Thus, under the *Rales* test,

> a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile. [FN37]

> FN37. *Rales,* 634 A.2d at 934.

Because there has been no action or decision by a board of directors, a premise of the *Aronson* test, that of the application of the business judgment rule, is lacking, and accordingly it is under the *Rales* test that the fundamental right of boards of directors to manage the affairs of corporations is recognized. [FN38] Thus, in examining "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations," [FN39] the focus is upon the disinterestedness and the independence of a majority of the board of directors in responding to a demand.

> FN38. *In re Fuqua Indus., Inc. S'holders Litig.,* 1997 WL 257460, at *13 (Del.Ch. May 13, 1997); *Kohls v. Duthie,* 791 A.2d 772, 780 (Del.Ch.2000); *see also Rales,* 634 A.2d at 933 ("[t]he absence of board action ... makes it impossible to perform the essential inquiry contemplated by *Aronson*--whether the directors have acted in conformity with the business judgment rule [in consciously deciding to act or refrain from acting]").

> FN39. *Rales,* 634 A.2d at 934.

Under the *Rales* test, demand is excused if the particularized facts of the Amended Complaint create a reasonable doubt that, at the time the original complaint was filed, a majority of the Board could have exercised disinterested and independent business judgment in responding to Rattner's demand. Rattner does not challenge the independence of any Director Defendant; thus, the inquiry turns to the disinterestedness of the Director Defendants at the time this action was filed. Directors are considered disinterested for purposes of determining demand futility when they "appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." [FN40] Directorial interest may also be said to exist when " 'a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." ' [FN41]

> FN40. *Aronson,* 473 A.2d at 812; *see also Orman v. Cullman,* 794 A.2d 5, 23 (Del.Ch.2002).

Not Reported in A.2d                                                                                  Page 9
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

FN41. *Orman,* 794 A.2d at 23 (quoting *Rales,* 634 A.2d at 936).

*9 Often, as is the case here, a derivative suit essentially asks the directors to authorize a suit against themselves and, thus, to act against their own personal interests.

The conundrum for the law in this area is well understood. If the legal rule was that demand was excused whenever, by mere notice pleading, the plaintiffs could state a breach of fiduciary duty claim against a majority of the board, the demand requirement of the law would be weakened and the settlement value of so-called "strike suits" would greatly increase, to the perceived detriment of the best interests of stockholders as investors. But, if the demand excusal test is too stringent, then stockholders may suffer as a class because the deterrence effects of meritorious derivative suits on faithless conduct may be too weak. [FN42]

FN42. *Guttman,* 823 A.2d at 500.

Except in "egregious circumstances," the "mere threat" of personal liability does not constitute a disabling interest for a director considering a derivative plaintiff's demand. [FN43] "[H]owever, a 'substantial likelihood' of personal liability prevents a director from impartially considering a demand." [FN44] It is this difference, between a "mere threat" of personal liability and (i) "a substantial likelihood" of personal liability or (ii) a "mere threat" in "egregious circumstances," as addressed in the context of the first prong of *Aronson* [FN45] and the test established in *Rales,* [FN46] that accommodates and balances the competing policy concerns of adequately policing boards of directors while guarding against strike suits. With this framework in mind, I turn to determining whether, at the time this action was originally filed, a majority of the Board could have impartially considered a demand made upon the Board and, thus, whether demand is excused. [FN47]

FN43. *H-M Wexford LLC v. Encorp, Inc.,* 2003 WL 21254843, at *14 (Del.Ch. May 27, 2003) (citing *Aronson,* 473 A.2d at 815; *Malpiede v. Towson,* 780 A.2d 1075, 1085 (Del.2001)).

FN44. *Seminaris v. Landa,* 662 A.2d 1350, 1354

(Del.Ch.1995) (quoting *Rales,* 634 A.2d at 936; *see also Benerofe v. Cha,* 1996 WL 535405, at *6 (Del.Ch. Sept.12, 1996).

FN45. *See, e.g., Malpiede,* 780 A.2d at 1085; *Kohls,* 791 A.2d at 782 n. 36 (noting that "[i]n a way, this inquiry [into whether a defendant director was interested in the decision to bring litigation because of a substantial threat of personal liability] is *related* to the second prong of the *Aronson test.*" ) (emphasis added); *Katz v. Halperin,* 1996 WL 66006, at *8-*9 (Del.Ch. Feb.5, 1996).

FN46. *See, e.g., Rales,* 634 A.2d 936; *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1269 (Del.Ch.1995).

FN47. Accordingly, for purposes of determining demand futility, the Individual Defendants who are not Director Defendants are largely irrelevant.

For demand to be excused, the particularized facts of the Amended Complaint must create a reasonable doubt that, at the time this action was filed, four of the eight directors on the Board could have exercised their disinterested business judgment in considering a demand. [FN48] Rattner argues that demand is excused for both the Insider Trading Claims and the Accounting Oversight Claims for several reasons. Rattner asserts that demand would have been futile because "[c]ertain defendants personally profited from the wrongful activities alleged by selling VeriSign stock at artificially inflated prices." [FN49] While this allegation carries some uncertainty, [FN50] I understand Rattner to contend that because four of the eight directors are alleged to have traded VeriSign (or Illuminet) securities on the basis of non-public and material knowledge, a majority of the Board is not disinterested and, thus, is incapable of impartially considering a demand. Next, Rattner claims that demand would have been futile because all of the Director Defendants are accused of breaching their fiduciary duties by having failed to exercise adequate oversight over the Company's financial recording and reporting systems, thereby leading to the wrongful conduct complained of in this action. Finally, Rattner notes that "[c]ertain of the Individual Defendants are defendants in the federal

Not Reported in A.2d                                                                                                     Page 10
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

securities class action suits described [in the Complaint], and face a substantial likelihood of liability given the misstatements" made during the Relevant Period. [FN51]

> FN48. *See In re The Limited, Inc. S'holders Litig., 2002 WL 537692, at \*7 (Del.Ch. Mar.27, 2002); Beneville v. York, 769 A.2d 80, 85-87 (Del.Ch.2000).* Again, because Rattner never seriously argues that any member of the Board lacks independence, the sole focus of my inquiry is into the disinterestedness of a majority of the Board.

> FN49. Amended Compl. ¶ 102(a). The Defendants argue that the allegation that "certain defendants" are incapable of considering a demand is itself plead with insufficient particularity. However, I will presume that, in the context of an effort to justify a failure to make demand upon the Board, Rattner is referring to those Defendants who are directors and who sold shares of VeriSign.

> FN50. *See supra* note 11.

> FN51. Amended Compl. ¶ 102(d).

A. *The Insider Trading Claims*

**\*10** In order for demand to be excused with respect to the Insider Trading Claims, a reasonable doubt must exist that four of the eight VeriSign directors are incapable of exercising their disinterested business judgment in considering a demand. Rattner contends that this requirement for demand futility is satisfied as "[f]our of the directors who sold their shares on the basis of inside information are interested because each of them received a personal financial benefit from those transactions." [FN52] With respect to the Insider Trading Claims, Rattner does not challenge the disinterestedness of four (Compton, Chenevich, Reyes, and Kriens) of the directors. Therefore, were Rattner's attack upon any of the remaining four directors (Bidzos, Sclavos, Moore and Cowan) unsuccessful, a "majority" of the Board would not be implicated and demand would not be excused.

> FN52. Pl.'s Answering Br. at 10.

Before I begin my analysis of demand excusal with respect to the Insider Trading Claims, it is important to note what facts, in connection with the Insider Trading Claims, are *not* alleged, at all or with particularity, in the Amended Complaint. Rattner merely posits, without any particularized facts, that the Director Defendants knew of inside information, and that they knew of (or directly participated in) the allegedly material misstatements. [FN53] Thus, absent from the particularized allegations of the Amended Complaint are the "precise roles that [the Director Defendants] played at the [C]ompany [and] the information that would have come to their attention in those roles." [FN54] The Amended Complaint is also devoid of any particularized facts that could lead to the inference that the timing of the trades reflected the Selling Defendants' impermissible insider trading. The Amended Complaint contains no particularized facts regarding the timing of the Director Defendants' trades in relation to permitted trading periods; while the pattern observed does reflect trading activity on behalf of the Director Defendants after the release of allegedly misleading statements, no particularized allegation of the Amended Complaint answers whether this temporal proximity was in fact part of the Company's practice to prevent Company insiders from improperly benefiting from informational asymmetries. [FN55] Moreover, although Rattner cursorily alleges that there were differences between prior years and the Relevant Period, [FN56] the Amended Complaint does not shed light upon the trading practices of the Director Defendants prior to the Relevant Period. [FN57] Finally, the Amended Complaint often refers to allegedly improper sales by the Director Defendants as occurring over nearly a one-month time span. While not determinative, certainly the failure of Rattner to pinpoint the timing of the challenged sales detracts from her alleged theory of selling soon after the release of misleadingly bullish statements.

> FN53. Rattner's best effort toward alleging with particularity the Director Defendants' knowledge, and how they acquired such knowledge, is set forth in Paragraph 33 of the Amended Complaint:
> 33. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business,

Westlaw.

operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors['] meetings and committees thereof and via reports and other information provided to them in connection therewith.

Although Rattner may have sought to satisfy the requirement to plead facts with particularity, Paragraph 33 of the Amended Complaint charges directors, solely upon the basis of their status as directors, with knowledge of alleged corporate activity. The conclusory assertions contained in Paragraph 33 fail to allege with particularity what information the directors knew and how they acquired such knowledge. The conclusory nature of Rattner's allegations is perhaps most obvious in Paragraph 34 of the Amended Complaint which provides in part: 34. It is appropriate to treat the Individual Defendants as a group for pleading purposes and *to presume* that the false, misleading and incomplete information they conveyed in the Company's public filings and press releases as alleged herein are the collective actions of the narrowly defined group of defendants identified above .... (emphasis added).

FN54. *Guttman,* 823 A.2d at 503.

FN55. *See* *id.* at 503-04.

FN56. Amended Compl. ¶ 85(c).

FN57. *See* *Guttman,* 823 A.2d at 498.

Rattner argues that, with respect to the Insider Trading Claims, demand is excused because four of the eight directors have been implicated in alleged insider trading. Delaware has recognized a cause of action against directors who abuse their knowledge of a corporation's private information at the expense of unwitting purchasers of their stock. [FN58] Recently, however, this Court noted the differences between archetypical claims of self-dealing and insider trading claims, concluding:

FN58. *Brophy v. Cities Serv. Co.,* 70 A.2d 5, 8 (Del.Ch.1949).

**\*11** As a matter of course, corporate insiders sell company stock and such sales, in themselves, are not quite as suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting at both sides of the negotiating table. Although insider sales are (rightly) policed by powerful forces--including the criminal laws--to prevent insiders from unfairly defrauding outsiders by trading on non-public information, it is unwise to formulate a common law rule that makes a director "interested" whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information. [FN59]

FN59. *Guttman,* 823 A.2d at 502. The Court further explained:
This would create the same hair-trigger demand excusal that *Aronson* and *Rales* eschewed. The balanced approach that is more in keeping with the spirit of those important cases is to focus the impartiality analysis on whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition.
*Id.*

Thus, critically, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." [FN60]

FN60. *Stepak v. Ross,* 1985 WL 21137, at *5 (Del.Ch. Sept.5, 1985);* see also *Guttman,* 823 A.2d at 505 ("Delaware case law makes the same

policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter."); *Rosenberg v. Oolie,* 1989 WL 122084, at *3 (Del.Ch. Oct.16, 1989) ("[I]f 'a person "in a confidential or fiduciary position, in breach of his duty, *uses his knowledge* to make a profit for himself, he is accountable for such profit" " ') (quoting *Brophy,* 70 A.2d at 8).

After reviewing the Amended Complaint, I conclude that Rattner has not pleaded facts with particularity that create a reasonable doubt that a majority of the Board is disinterested with respect to the Insider Trading Claims. It is important to note that only one Director Defendant is a senior manager of the Company; that is, only Sclavos held a senior management position with VeriSign at the time this action was filed. The Amended Complaint alleges general knowledge in a conclusory fashion on behalf of the Director Defendants, explained solely by virtue of their service in their various capacities. Thus, even somehow assuming Sclavos suffers from a disabling interest, nothing has been pleaded with particularity as to the scienter of seven of the eight members of the Board. [FN61]

> FN61. As noted above, Rattner has not questioned the independence from Sclavos of the seven other directors.

The Amended Complaint's allegations implicating Moore's sale of unexercised Illuminet options also fail to taint the disinterestedness of Moore in considering a demand made upon the Board. On September 23, 2001, VeriSign and Illuminet entered into a merger agreement. As consideration, VeriSign would exchange 0.93 shares of VeriSign common stock for each outstanding share of Illuminet and, thus, would issue 30.4 million shares for the outstanding shares of Illuminet, as well as assume Illuminet's outstanding employee stock options. [FN62] Rattner complains that "[a]t some point after announcement of the Illuminet acquisition, but prior to being elected to the [Board], Moore exercised Illuminet options (or VeriSign options exchanged in the Merger) and sold the underlying stock." [FN63] The Complaint fails to allege with any specificity when the sales were made or whether the shares

were all sold at one time. [FN64] Moreover, if trading resulting from the Illuminet options is assumed to be relevant to the purpose of determining demand futility with respect to the Insider Trading Claims, the Amended Complaint still fails to allege particularized facts that compromise Moore's impartiality. Not one particularized allegation in the Amended Complaint explains what inside knowledge Moore traded upon or how he gleaned such information. [FN65] Therefore, I conclude that the Amended Complaint fails to allege the particularized facts necessary to raise a reasonable doubt as to Moore's ability to exercise his disinterested business judgment.

> FN62. Amended Compl. ¶ 63.

> FN63. *Id.* ¶ 20. The Illuminet acquisition was announced in September 2001; Moore became a director of VeriSign in February 2002. Rattner also alleges that "rather than convert his Illuminet options into VeriSign options, defendant Moore exercised and sold off his Illuminet options." *Id.* ¶ 63. Rattner also contends that Moore's disposition of his Illuminet interest was "unusual in nature and timing," *id.* ¶ 85, because the "sales occurred after announcement of the acquisition of Illuminet by VeriSign and prior to closing of that transaction." *Id.* ¶ 85(e).

> FN64. Rattner alleges that, in March 2001, Moore held 995,000 "in the money" options and by April 2002 had disposed of them. *Id.* ¶ 37 n. 1.

> FN65. Rattner asserts that "Moore, while in possession of other material adverse non-public information, sold approximately 995,000 of his privately-held Illuminet stock." *Id.* ¶ 82. Rattner does not identify that "material adverse non-public information" to which she refers.

**\*12** Additionally, I note that the Amended Complaint fails to allege any facts with particularity that would permit me to draw a reasonable inference that the challenged sales were executed upon the basis and because of non-public information. Much is made about the timing and size of the sales. However, as has been noted, [FN66] the Amended

Not Reported in A.2d                                                                                     Page 13
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

Complaint does not assist in determining whether the pattern of executed trades was the product of an orchestrated scheme to defraud the market and the Company's shareholders or good faith adherence to Company policy or consistent with prior individual practices. Additionally, while several Individual Defendants disposed of large percentages of their stock holdings, of the four Director Defendants, only two (Cowan and Moore) can be characterized as having disposed of a "large" percentage of their holdings. [FN67] Essentially, Rattner seeks to impose liability and excuse demand on the basis that the Director Defendants sold VeriSign stock (or Illuminet options) during the Relevant Period. If accepted, Rattner's theory would take a step toward the implementation of the very common law rule warned of in *Guttman.* It is a step which I decline to take. Thus, I conclude that, with respect to the Insider Trading Claims, Rattner has failed to plead with particularity factual allegations which, at the time this action was filed, create a reasonable doubt that a majority of the Board was disinterested and therefore incapable of impartially considering a demand.

> FN66. *See supra* notes 53-55 and accompanying text.

> FN67. In determining whether demand is excused, I am confined to the controlling complaint and may consider documents referred to in the complaint when such documents are integral to a plaintiff's claim or are incorporated into the complaint by reference. *In re New Valley Corp. Deriv. Litig.,* 2001 WL 50212, at *4-*6 (Del.Ch. Jan.11, 2001). Rattner, in her brief, argues that the large percentages disposed of by the Individual Defendants support her alleged theory of insider trading. *See* Pl.'s Answering Br. at 12 n. 7 (citing "2002 Proxy"). However, nowhere in the Amended Complaint did Rattner allege the total personal holdings of the individual Director Defendants. Here, the "2002 Proxy," a citation subject to uncertainty, was not referred to in the Amended Complaint. Also, the document is not integral to Rattner's claim.

*B. The Accounting Oversight Claims*

Rattner also claims that demand is excused with respect to the Accounting Oversight Claims because all of the members of the Board are potentially liable for failure to exercise proper supervision over VeriSign's financial recording and reporting systems. In this situation, the *Rales* test, in examining the "interest" of the challenged directors, asks whether "the directors face a 'substantial likelihood' of personal liability, [and thus whether] their ability to consider a demand impartially is compromised ..., excusing demand." [FN68]

> FN68. *Guttman,* 823 A.2d at 501.

Rattner's Accounting Oversight Claims are best described as a type of *Caremark* [FN69] claim. As was noted in *In re Caremark International Derivative Litigation,* a claim for failure to exercise proper oversight is one of, if not the, most difficult theories upon which to prevail. [FN70] In the typical *Caremark* case, "[i]n order to hold the directors liable, [a] plaintiff will have to demonstrate that they were grossly negligent in failing to supervise these subordinates." [FN71] Here, once again, it is instructive to review not what facts the Amended Complaint alleges, but what facts the Amended Complaint fails to allege, with particularity.

> FN69. *In re Caremark Int'l Deriv. Litig.,* 698 A.2d 959 (Del.Ch.1996).

> FN70. *Id.* at 967; *see also Guttman,* 823 A.2d at 505-06.

> FN71. *Seminaris,* 662 A.2d at 1355.

The Amended Complaint sets forth vast tracts of quoted materials from public sources, detailing wrongdoings in the form of alleged misstatements. The Amended Complaint also summarizes numerous SEC rules and regulations, and FASB and GAAP standards. However, conspicuously absent from any of the Amended Complaint's allegations are particularized facts regarding the Company's internal financial controls during the Relevant Period, notably the actions and practices of VeriSign's audit committee. [FN72] The Amended Complaint also is similarly wanting of any facts regarding the Board's involvement in the preparation of the financial statements and the release of financial

Not Reported in A.2d                                                                                           Page 14
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

information to the market.

> FN72. As has been noted, relevant facts include "whether the company had an audit committee during that period, how often and how long it met, who advised the committee, and whether the committee discussed and approved any of the allegedly improper accounting practices." *Guttman, 823 A.2d at 498*.

**\*13** Rattner calls attention to what she suggests should have been a "red flag" to the Director Defendants, placing them on notice of the systematic failure of the Company's internal controls. The Amended Complaint, relatively briefly, attempts to explain that the Defendant Directors should have been on notice of certain alleged misstatements, noting that "VeriSign" purchased companies with large amounts of deferred revenues, allegedly in order to manipulate its DSO by increasing its deferred revenue and excluding its accounts receivables, thereby creating the false impression of growth. [FN73] Specifically, the Amended Complaint alleges that DSO were steadily rising from the second quarter of 2000 (DSO of 32) through the first quarter of 2002 (when DSO peaked at 81), which should have signaled to the VeriSign directors that something was amiss, given that VeriSign's revenue stream is "mainly derived from subscription based products and services (over 85% of revenue) which are recognized ratably and ordinarily should carry a low DSO of 45--50 days or less." [FN74] However, it is again important to recall the structure of the Board, in that only one Director Defendant is alleged to have been a senior manager of the Company at the time this action was filed. There is nothing alleged with particularity in the Amended Complaint that would either demonstrate or permit me to draw the reasonable inference that the Director Defendants were aware of a possibly onerous elevation in a single financial statistic. [FN75] As has been noted, claimed red flags "are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer." [FN76] Thus, the Amended Complaint, in the one instance it alleges a reason why the Director Defendants could somehow have been aware of alleged misdoings at the Company, still falls short of pleading with particularity facts that would excuse demand.

> FN73. Amended Compl. ¶ 62.

> FN74. *Id.* ¶ 70.

> FN75. *See In re Citigroup Inc. S'holders Litig., 2003 WL 21384599, at \*2 (Del.Ch. June 5, 2003)*.

> FN76. *Id.*

None of these allegations contained in the Amended Complaint (individually or collectively) pleads with particularity sufficient to sustain an inference that the Defendant Directors were guilty of gross negligence. While the Amended Complaint is quick to prattle off numerous alleged infractions of laws, rules and principles, Rattner never notes the accounting procedures employed by the Company or the Board's involvement in VeriSign's financial recording and reporting systems. The only information one can snare from the Amended Complaint is that there exists a body of rules regarding the accuracy of recording and reporting financial information which may have been violated. Equally as important, I am unable, from the face of the Amended Complaint, to determine what role, if any, the Board or its members played in the internal processes of collecting and disseminating financial information. The most I can safely admit knowledge of is that Compton, Chenevich and Kriens were members of the Audit Committee during the Relevant Period and, thus, that the Company had an Audit Committee. [FN77] Therefore, I am unable to conclude that a majority of the Board faces a substantial likelihood of liability for failing to oversee VeriSign's compliance with required accounting and disclosure standards. [FN78]

> FN77. Ironically, these Director Defendants are three of the four directors who were not alleged to have engaged in insider trading.

> FN78. To the extent that Rattner alleges intentional wrongdoing by the Director Defendants, I note that, for the same reasons set forth above, the Amended Complaint does not allege with particularity facts that at all show knowing participation by any of the Director Defendants (with the possible exception of Sclavos as the only

2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

management director). I also observe that, in contrast to Rattner's alternative theories of wrongdoing, the issue of demand futility with respect to claims of intentional wrongdoing would be judged under the two-pronged *Aronson* standard. *See supra* text accompanying note 35. However, given the highly conclusory nature of the Amended Complaint, the Amended Complaint fails to plead with particularity demand futility under either prong

**\*14** Finally, Rattner asserts another theory as to why demand is excused: because "[c]ertain of the Individual Defendants are defendants in ... federal securities class action suits ... and face a substantial likelihood of liability given the misstatements of VeriSign' [sic] earnings and the trading in VeriSign stock during the stated class period in those actions." [FN79] Here, too, the Amended Complaint leaves far too much to the imagination. The only particularized facts contained in the Amended Complaint regarding the federal securities class action lawsuits are that such suits were filed and are pending in the Northern District of California. One is left to guess at which of the Individual Defendants, indeed if any of the Director Defendants, are defendants in the federal securities class action lawsuits. These conclusory and cryptic allegations are insufficient to satisfy the demand excusal requirements of Court of Chancery Rule 23.1.

FN79. Amended Compl. ¶ 102(d).

Thus, a symptomatic and ultimately fatal defect to all of Rattner's claims is a failure to plead facts with particularity. Here, the cause of this systematic failure is left to supposition, although one suspects that the "first to file custom" and the resulting "unseemly race to the court house" may be at fault. [FN80] In her brief, Rattner noted:

FN80. *Rales,* 634 A.2d at 934-35 n. 10; *see also In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at \*1.

[I]t is unclear from a review of public filings how exactly Moore's Illuminet options were disposed. Indeed, prior to filing the Amended Complaint, plaintiff's counsel

requested an explanation from defendants' counsel regarding Moore's disposition since it is critical to the demand futility analysis. After taking the matter under advisement, defendants' counsel refused to provide any information. [FN81]

FN81. Pl.'s Answering Br. at 12 (citation omitted).

Our cases have consistently advised would-be derivative plaintiffs to utilize the "tools at hand" before filing complaints. [FN82] In particular, the books and records provisions of 8 Del. C. § 220 may be quite helpful for derivative plaintiffs confronted with the need to satisfy the pleading requirements of Court of Chancery Rule 23.1 [FN83] They might have been helpful here; Rattner has never stated whether she availed herself of the tools at hand before embarking upon what is now discovered to have been an ultimately--at least in this venue--unsuccessful journey. Thus, both the causes of the Amended Complaint's deficiencies and whether an often overlooked tool for plaintiffs could have been useful remain a mystery. What is clear is that the Amended Complaint fails to set forth particularized facts that create a reasonable doubt as to the disinterest or independence of a majority of the Board at the time this action was filed so as to excuse demand.

FN82. *See Brehm,* 746 A.2d at 266-67; *In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at \*1; *Guttman,* 823 A.2d at 504.

FN83. *See e.g., In re The Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 279 (Del.Ch.2003).

IV. CONCLUSION

For the foregoing reasons, the Amended Complaint will be dismissed. [FN84] An order will be entered in accordance with this Memorandum Opinion.

FN84. The dismissal as to Rattner will be with prejudice. *See* Court of Chancery Rule 15(aaa).

ORDER

AND NOW, this *30th* day of September, 2003, for the reasons set forth in the Court's Memorandum Opinion of

Westlaw.

Not Reported in A.2d                                                                                      Page 16
2003 WL 22284323 (Del.Ch.)
**(Cite as: 2003 WL 22284323 (Del.Ch.))**

even date,

**\*15** IT IS HEREBY ORDERED that the above-entitled action be, and the same hereby is, dismissed. This dismissal is with prejudice as to Plaintiff Bobbie Rattner.

2003 WL 22284323 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 13

1996 WL 238931                                                                          Page 1
1996 WL 238931 (N.D.Ill.)
**(Cite as: 1996 WL 238931 (N.D.Ill.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.

SSDD ENTERPRISES, INC., an Illinois Corporation,
Sherri L. Bloom, Donna L.
Krebs, Deborah Diaz, and Sief El-Sharif, Plaintiffs,
v.
VILLAGE OF LANSING, an Illinois Municipal
Corporation, Robert West, Dean R.
Stanley, Paul Warn, Christopher Misner, James Congilio,
Peter Grutzuis, Timothy
Glinski, and Dale Anderson, Defendants.

No. 95 C 6064.

May 3, 1996.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, United States Magistrate Judge.

**\*1** Plaintiffs in this action are owners and employees of "Thee Body Shoppe," an adult entertainment lounge located in Lansing, Illinois that offers performances of nude female dancers to its customers. After the Village of Lansing made numerous attempts to restrict the nature of the entertainment at Thee Body Shoppe, Plaintiffs brought this action under 42 U.S.C. § 1983, charging Defendants with violating their rights under the First Amendment. Plaintiffs' suit seeks an injunction against further enforcement actions of the Village, a declaration that the Lansing public indecency ordinance is unconstitutional, and an award of damages. Two motions are currently pending before this court: Defendants' motion to dismiss Plaintiffs' First Amended Complaint, and Plaintiffs' motion for a preliminary injunction. For the reasons set forth below, Defendants' motion is granted and Plaintiffs' complaint is dismissed without prejudice. Plaintiffs' motion for preliminary injunction is denied as moot.

*BACKGROUND* [FN1]

Plaintiff SSDD Enterprises, Inc. ("SSDD") is an Illinois corporation that operates an adult entertainment lounge called "Thee Body Shoppe" at its principal place of business in Lansing, Illinois. (Complaint ¶ 5.) Plaintiffs Deborah Diaz and Sief El-Sharif are the only shareholders, directors, and officers of SSDD. (*Id.*) Plaintiffs Sherrie L. Bloom and Donna L. Krebs are employed as dancers at Thee Body Shoppe. (*Id.* ¶ 6.)

Defendant Village of Lansing ("Village") is a municipal corporation organized and operating under the laws of the State of Illinois. (*Id.* ¶ 7.) Defendant Robert West is mayor of the Village, Defendant Dean R. Stanley is the Police Chief, and Defendant Dale Andersen is the Village attorney. (*Id.* ¶¶ 8, 9 11.) Defendants Paul Warn, Christopher Misner, James Congilio, Peter Grutzuis, and Timothy Glinski are officers employed by the Lansing Police Department. (*Id.* ¶ 10.)

Since at least October of 1985, the property on which Thee Body Shoppe stands has been zoned by Lansing Ordinance 85-032 with a "special use" designation for live entertainment and dancing. (Complaint ¶ 13.) In August 1994, SSDD began to present live entertainment on the property. [FN2] (*Id.* ¶ 38.) Specifically, female employees performed dances that expressed "emotional and sensual but non-obscene themes" to customers while partially clothed in thong bottoms and tops covering the areolas of their breasts. (*Id.*) SSDD also served alcohol to its customers before, during, and after the performances.

The Village filed suit in the Circuit Court of Cook County shortly thereafter, claiming that SSDD's performances violated Village Ordinance 85-032. [FN3] (*Id.* ¶ 39.) Finding the performances at Thee Body Shoppe to be in compliance with the ordinance, the court ruled against the Village and enjoined any further interference. [FN4] Seeking to effect its purpose through an alternate avenue, allege Plaintiffs, the Village then approached the Illinois Liquor Control Commission and requested the revocation of SSDD's liquor license. (*Id.*) The Commission revoked the license in January 1995, and alcohol has not been served on the premises of Thee Body Shoppe since that time. (*Id.* ¶ 40.)

**\*2** Responding to the resulting loss of income and profits, SSDD chose to change the format of the performances at Thee Body Shoppe. While the dances performed by the

On December 18, 1995, Plaintiffs filed the amended eight-count complaint at issue here. In Count I, Plaintiffs allege that the Ordinance and activities of the Village preclude the dissemination of material protected by the First Amendment. (Complaint ¶ 65.) Count II alleges that the Ordinance and actions of the Village constitute a system of censorship violative of the First Amendment. (*Id.* ¶ 67.) In Count III, Plaintiffs allege that the Ordinance is unconstitutionally vague, and in Count IV, that the Village's attempts to enforce the Ordinance violate their right to equal protection under the law. (*Id.* ¶¶ 69, 71-73.) Count V challenges the Ordinance and the activities of the Village as "an unconstitutional attempt to regulate and chill the exercise of First Amendment protected expression." (*Id.* ¶ 75.) In Count VI, Plaintiffs allege that the Ordinance is violative of their rights to property and liberty as guaranteed by the Fourteenth Amendment, and in Count VII that the Village acted "with the deliberate and malicious intent to cause plaintiffs damage and to deprive plaintiffs of the rights and protections guaranteed by the Constitution ...." (*Id.* ¶¶ 77, 79-80.) Finally, Count VIII alleges a "pendant state claim." [FN12] (*Id.* ¶ 82.)

**\*4** In addition to seeking an award of damages, Plaintiffs' complaint asks for injunctive and declaratory relief with respect to the Ordinance and the enforcement activities of the Village. Defendants filed their motion to dismiss on January 12, 1996, and Plaintiffs filed their motion for a preliminary injunction on February 2. [FN13] On February 28, the state court granted the Village summary judgment on its counterclaim and permanently enjoined SSDD from "facilitating and providing totally nude entertainment." (Order of Feb. 28, 1996, Circuit Court of Cook County, No. 95 CH 6196.) [FN14]

*DISCUSSION*

As discussed below, the court concludes that Defendants' motion to dismiss is dispositive. For the sake of convenience and economy, therefore, the court will address that motion first. Dismissal of Plaintiffs' complaint is appropriate only if it appears beyond a doubt that Plaintiffs can prove no set of facts in support of each of their claims which would entitle them to relief. *Zarnes v. Rhodes,* 64 F.3d 285, 289 (7th Cir. 1995). Defendants raise a number of

grounds for dismissal: (1) this court should abstain from deciding Plaintiffs' case under the doctrine enunciated in *Younger v. Harris,* 401 U.S. 37 (1971); (2) Plaintiffs Diaz and El-Sharif do not have standing to sue; (3) the prior voluntary dismissals in state and federal court act as an adjudication on the merits of Plaintiffs' complaint under Federal Rule of Civil Procedure 41(a)(1); and (4) Counts I through VIII of Plaintiffs' complaint fail to state a cause of action. (Motion to Dismiss, at 1-3.) The court will begin with the issue of abstention.

I. *Younger Abstention*

In *Younger v. Harris,* 401 U.S. 37, 53 (1971), the Supreme Court held that absent extraordinary circumstances federal courts should abstain from interfering with ongoing state criminal proceedings. [FN15] *Simpson v. Rowan,* 73 F.3d 134, 137 (7th Cir. 1995). The Court has since expanded application of the *Younger* doctrine to state proceedings that are civil or quasi-criminal in nature. *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 605-07 (1975); *Mannheim Video, Inc. v. County of Cook,* 884 F.2d 1043, 1044 (7th Cir. 1989), *cert. denied,* 495 U.S. 957 (1990). Abstention is appropriate in the case at bar, urge Defendants, because any determination on the merits of this case would interfere with the adjudication of the Village's state court counterclaim. (Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (hereinafter "Defendants' Memorandum"), at 2-3.) Plaintiffs disagree, arguing that the *Younger* doctrine has no application here because the state proceeding is not criminal or quasi-criminal in nature, the elements that mandate application of *Younger* abstention have not been met, and Defendants' bad faith warrants federal intervention as an exception to the abstention doctrine. (Plaintiff's Response to Defendant's Motion to Dismiss (hereinafter "Plaintiffs' Response"), at 4-5, 8-9.)

A. *Younger Applies to Defendants' Civil Proceeding*

**\*5** While the Village's counterclaim against SSDD is certainly not criminal in nature, it clearly falls within the category of civil proceedings to which *Younger* has been extended. In *Huffman,* the Sheriff and prosecuting attorney of an Ohio county instituted a civil nuisance proceeding against the managers of a pornographic theater. 420 U.S. at

1996 WL 238931                                                                    Page 4
1996 WL 238931 (N.D.Ill.)
**(Cite as: 1996 WL 238931 (N.D.Ill.))**

595-98. After the state court ordered the theater closed pursuant to the Ohio public nuisance statute, the managers sought injunctive and declaratory relief in federal court. *Id.* at 598. A three-judge court in the Northern District of Ohio held for the plaintiffs on the merits of their constitutional claims. *Id.* at 599. The Supreme Court vacated the judgment, however, holding that the district court should have abstained under *Younger* in spite of the civil nature of the state court proceeding. *Id.* at 612-13. Emphasizing that the nuisance proceeding was "akin" to a criminal proceeding, the Court explained that the principles of comity and federalism that warranted abstention in *Younger* were equally applicable to the Ohio civil proceeding. *Id.* at 603-08.

In the present action, the Village filed a counterclaim rather than instituting its own civil action under the Lansing public indecency ordinance. The resulting proceeding, however, is essentially the same: a civil action to enforce the Ordinance through equitable relief. The Village's attempt to enforce the Lansing public indecency ordinance here is no different than the *Huffman* defendants' attempt to enforce the Ohio nuisance statute. Plaintiffs' arguments to the contrary, then, the *Younger* doctrine may be invoked in favor of the Village's counterclaim. [FN16]

B. *The Younger Elements*

Having found that *Younger* abstention may apply to the circumstances of this case, the court must now determine whether abstention is indeed appropriate here. Under the three-part test enumerated by the Seventh Circuit, abstention under *Younger* is appropriate if (1) the state proceedings are ongoing, (2) the proceedings implicate important state interests, and (3) there is an adequate opportunity in the state proceedings to raise constitutional challenges. *Trust & Inv. Advisers, Inc. v. Hogsett, 43 F.3d 290, 295 (7th Cir. 1994).*

1. *Ongoing State Proceedings*

Although the state proceeding was ongoing at the time that Defendants filed their motion to dismiss, the state court has now granted final judgment in favor of the Village on its counterclaim. (*See* Order of Feb. 28, 1996, Circuit Court of

Cook County, No. 95 CH 6196.) If Plaintiffs have appealed this decision to the Illinois Appellate Court, the state court proceeding is still "ongoing" and element (1) is satisfied. None of the litigants have informed the court as to whether Plaintiffs have taken an appeal. Regardless of Plaintiffs' decision in this respect, however, the court finds element (1) to be satisfied because "a necessary concomitant of *Younger* is that a party in [Plaintiffs'] posture must exhaust [its] state appellate remedies before seeking relief in the District Court ...." *Huffman, 420 U.S. at 608; see also Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of New York and New Jersey Police Dep't, 973 F.2d 169, 173 n.2 (3d Cir. 1992); Foster v. Zeeko, 540 F.2d 1310, 1320 (7th Cir. 1976).*

**\*6** Returning again to the facts of *Huffman,* the managers of the pornographic theater there did not file their complaint in federal court until the state court had already ordered the theater closed under the Ohio nuisance statute. 420 U.S. at 607. The plaintiffs chose not to pursue an appeal from the state court's decision, and their right to do so had quite possibly lapsed by the time of the district court's decision on the merits. *Id.* at 608. On appeal to the Supreme Court, the managers argued against abstention on the ground that there was no "pending state court proceeding" at the time the district court acted. *Id.* at 607. The Court disagreed. Explaining that "it is typically a judicial system's appellate courts which are by their nature a litigant's most appropriate forum for the resolution of constitutional contentions," the Court held that "*Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies." *Id.* at 609.

Here, as in *Huffman,* the state court rendered a final judgment prior to any dispositive action by the district court. In addition, it appears from the face of the state court's final judgment order that SSDD raised, and the state court considered, challenges to the constitutionality of the Lansing public indecency ordinance. [FN17] (*See* Order of Feb. 28, 1996, Circuit Court of Cook County, No. 95 CH 6196.) Plaintiffs should have attempted to remedy an adverse decision on these issues by direct appeal. Thus, even if Plaintiffs have not appealed the decision of the Cook County Circuit Court, the resulting lack of an "ongoing

proceeding" is not a bar to *Younger* abstention.

Plaintiffs also suggest that element (1) is not satisfied because the present federal action was filed before the Village filed its counterclaim in state court. (Plaintiffs' Response, at 8-9.) When a state proceeding follows the initiation of a federal action, abstention under *Younger* is appropriate only if there have been no proceedings on the merits in the federal case. *Mannheim Video,* 884 F.2d at 1044. The plaintiff in *Mannheim Video,* an adult video arcade and gift shop, brought a suit in federal court challenging the constitutionality of the adult use provisions of the Cook County zoning ordinance. 884 F.2d at 1043. At the time the plaintiff filed its federal action, it was already defending a state action that alleged violations of the county's building ordinances. Defendant county amended its state court complaint by adding allegations that the video arcade violated adult use provisions of the Cook County zoning ordinance shortly after that ordinance was upheld on appeal in a separate case. *Id.* at 1044. The Seventh Circuit affirmed the district court's decision to dismiss the federal action pursuant to the *Younger* abstention doctrine. *Id.* at 1045-46. The court found that there had been no proceedings on the merits of the federal case and that the case was still in an "embryonic stage" even though the district court had ruled on the county's motion to dismiss for failure to state a claim. *Id.* at 1045- 46.

**\*7** The development of the case *sub judice* can only be characterized as more embryonic than the case before the district court in *Mannheim Video.* The only dispositive motion filed so far in this case is the one under consideration here. The court's adjudication of Plaintiffs' motion for a temporary restraining order--certainly not a dispositive motion--can hardly be categorized as a proceeding on the merits. Therefore, the fact that Plaintiffs' federal filing predated Defendants' counterclaim does not preclude abstention under *Younger.* [FN18]

### 2. *Important State Interests*

The second element enumerated in *Hogsett* is easily satisfied despite Plaintiffs' cursory argument that "[t]he proceedings in the state court focus on enforcement of a local ordinance and no statewide issues are implicated."

(Plaintiffs' Response, at 8.) In ruling on the enforceability and constitutionality of the Lansing ordinance, the state court is deciding important issues regarding the extent to which a municipality in Illinois may regulate protected expression. While the direct effect of the outcome may be limited to a single locality, other municipalities throughout Illinois may follow Lansing's lead if the Village is successful.

### 3. *Opportunity to Raise Constitutional Challenges*

As for the third element enumerated in *Hogsett,* there is no dispute concerning Plaintiffs' opportunity to raise their constitutional challenges in the state court proceeding. Neither party suggests that the Circuit Court of Cook County is not competent to hear federal constitutional challenges to the Lansing public indecency ordinance. Moreover, it appears that SSDD *did* raise at least some of its constitutional challenges in defense of the Village's counterclaim. As mentioned above, the state court's final judgment order stated that "Lansing's Ordinance is Constitutional and enforceable ...." (*See* Order of Feb. 28, 1996, Circuit Court of Cook County, No. 95 CH 6196.)

Plaintiffs nevertheless challenge element (3) by arguing that they have no adequate opportunity to raise their federal *claim,* or to invoke its remedies, in state court. (Plaintiffs' Response, at 7-8.) As Defendants point out, Plaintiffs are plainly incorrect. (Defendants' Reply, at 4.) It is well established that state courts have jurisdiction over 28 U.S.C. § 1983 claims. *Howlett v. Rose,* 496 U.S. 356, 358 (1990) ("State courts as well as federal courts have jurisdiction over § 1983 cases."); *Holmes v. Chicago Transit Auth.,* 505 F. Supp. 877, 879-80 (N.D. Ill. 1981) (finding that Circuit Court of Cook County had jurisdiction over the plaintiff's section 1983 claims). In fact, in the state court complaint that it dismissed voluntarily, SSDD sought declaratory and injunctive relief quite similar to that which Plaintiffs seek in the current section 1983 complaint. (First Amended Complaint for Declaratory Judgment and Injunction, Case No. 95 CH 6196, Ex. C to Defendants' Memorandum.)

**\*8** To be sure, SSDD could not raise a section 1983 damages claim in defense to the Village's counterclaim. But it could have reinstated its earlier action or filed a new

1996 WL 238931                                                                                      Page 6
1996 WL 238931 (N.D.Ill.)
**(Cite as: 1996 WL 238931 (N.D.Ill.))**

complaint asserting such claims, and this satisfies *Younger*'s requirement that Plaintiffs be afforded an adequate opportunity to raise their federal claims in the state proceeding. *See Jacobson v. Village of Northbrook Mun. Corp., 824 F.2d 567, 569 (7th Cir. 1987), recognized in Simpson v. Rowan, 73 F.3d 134, 137 n.5 (7th Cir. 1995).* In *Jacobson,* the Village of Northbrook instituted enforcement proceedings against the plaintiff in state court after he chose not to pay the fines for his parking tickets. 824 F.2d at 568. The plaintiff filed a section 1983 complaint in federal court, alleging that the state ordinance was unconstitutional and seeking damages. *Id.* Affirming the decision of the district court, the Seventh Circuit held that abstention under *Younger* was appropriate even though the plaintiff's federal complaint contained a damages claim that could not be raised as a defense to the enforcement action:

  [T]he traffic division has jurisdiction to entertain the plaintiff's argument regarding the constitutionality of the Village ordinance as a defense to the Village complaint. And to the extent that the plaintiff also seeks damages under § 1983 for the alleged harassment, there is every indication that he could have this claim heard as well.... [T]here is an adequate state forum for all the plaintiff's claims to be addressed.

*Id.* at 569. Similarly, the Chancery Division of the Cook County Circuit Court was an adequate state forum for all of the claims that Plaintiffs now assert in federal court. [FN19]

C. *Exceptions to Younger*

With all three *Hogsett* elements favoring abstention, the only question remaining for the court is whether there are any extraordinary circumstances that mandate a departure from the *Younger* doctrine. In the past, federal courts have intervened on this basis for any one of three reasons:

  (1) the "state proceeding is motivated by a desire to harass or is conducted in bad faith," *Huffman, 420 U.S. at 611, 95 S.Ct. at 1212; (2)* there is "an extraordinary pressing need for immediate equitable relief," *Kugler v. Helfant, 421 U.S. 117, 124-25, 95 S.Ct. 1524, 1531, 44 L.Ed.2d 15 (1975);* or (3) the challenged provision is flagrantly and patently violative of express constitutional prohibitions. *Jacobson, 824 F.2d at 570.*

*Esmail v. Macrane, 862 F. Supp. 217, 233 (N.D. Ill. 1994), rev'd on other grounds, 53 F.3d 176 (7th Cir. 1995).* As Plaintiffs have not argued that there is an extraordinary need for immediate relief, the second reason is inapplicable here. [FN20] The third reason can be discarded with little discussion. Lansing's public indecency ordinance is not "flagrantly and patently violative of express constitutional prohibitions"; indeed, it appears to be nearly identical to an Indiana ordinance upheld by the Supreme Court after constitutional review. *See Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991).*

*9 The first reason requires more lengthy discussion. To invoke the bad faith exception to the *Younger* doctrine, a plaintiff must allege specific facts that support more than just a conclusory finding of bad faith. *Collins v. County of Kendall, 807 F.2d 95, 98 (7th Cir. 1986), cert. denied, 483 U.S. 1005 (1987).* The evidence must show that state prosecution "was brought in bad faith for the purpose of retaliating for or deterring the exercise of constitutionally protected rights." *Id.* (quoting *Grandco Corp. v. Rochford, 536 F.2d 197, 203 (7th Cir. 1976)).* Plaintiffs' complaint contains numerous allegations of bad faith and harassment. (*See* Complaint ¶¶ 37, 39, 43, 47, 49, 61, 62.) Notably, however, the vast majority of these allegations relate to events which occurred prior to the enactment of the Lansing public indecency ordinance. All of the arrests that Plaintiffs complain of occurred in February and March of 1995, and involved charges under the Illinois obscenity and nuisance statutes. (*Id.* ¶¶ 43-46.) The Lansing public decency ordinance was not enacted until late June, and thus the arrests cannot be considered part of an attempt--bad faith or not--to enforce it.

Plaintiffs are left with the following allegations of bad faith and harassment regarding enforcement of the Ordinance itself: Lansing police officers frequently stop and question customers and employees of Thee Body Shoppe as they enter or exit the premises (*id.* ¶ 49); uniformed officers are stationed in Thee Body Shoppe's parking lot on a nightly basis (*id.*); and the Village filed its counterclaim against Plaintiffs in bad faith. (*Id.* ¶ 61.) While perhaps annoying and somewhat detrimental to Plaintiffs' business, these activities simply do not rise to the level of egregious

1996 WL 238931                                                              Page 7
1996 WL 238931 (N.D.Ill.)
**(Cite as: 1996 WL 238931 (N.D.Ill.))**

conduct that would require, as an exception to *Younger,* federal interference with the state action. Plaintiffs fail to allege any facts to suggest that the officers' conduct is anything other than a legitimate effort to police the Ordinance. Furthermore, while Thee Body Shoppe resumed its nude performances in October 1995, Plaintiffs have not alleged that the officers responded by arresting any dancers or otherwise disrupting the lounge's business activities.

The court would reach the same conclusion even if the arrests and warrantless searches that took place in early 1995 were considered part of the Village's attempts to enforce the Ordinance. Plaintiffs allege that agents of the Village conducted approximately ten arrests and up to three warrantless searches on the premises of Thee Body Shoppe. (Complaint ¶¶ 43-47.) One of the arrestees was acquitted of the charges against her, and charges against seven others were dismissed. (*Id.* ¶ 53.) The Seventh Circuit has found that prosecution allegations more extensive than these do not amount to bad faith under *Younger. See Collins,* 807 F.2d 95 (allegations of 34 criminal prosecutions instituted over two-year period, in addition to five searches and seizures pursuant to a valid warrant, not sufficient to establish bad faith exception to *Younger); Grandco,* 536 F.2d 197 (allegations of "well over 100" criminal prosecutions and several colorable searches not sufficient to establish bad faith exception to *Younger); see also American Nat'l Bank of Chicago v. Parkman,* 702 F. Supp. 168, 172 (N.D. Ill. 1988). [FN21]

**\*10** Plaintiffs are undoubtedly correct in concluding that Defendants want to rid the Village of Lansing of all live adult entertainment. Indeed, the Village attempted to shut Thee Body Shoppe down even before it began presenting performances that involved nudity. (Complaint ¶ 39.) The court discerns little evidence of bad faith in the Village's attempts to reach its goal, however. Once the Circuit Court ruled that SSDD's clothed performances were legal, the Village desisted from further prosecution on that basis. While agents of the Village made a small number of arrests after Thee Body Shoppe changed its format to allow for nude performances, to this court's knowledge there have been no further arrests, despite the fact that the nude performances resumed over six months ago. Those courts

that have intervened under the bad faith exception typically rely on evidence of malicious activity that is simply not present here. *See, e.g., Dombrowski v. Pfister,* 380 U.S. 479, 487-89 (1965) (bad faith exception to *Younger* applied where state seized enough material from plaintiffs to cripple operation of their civil rights organization, and then threatened to prosecute even after a state court found the seizures to be illegal); *Esmail v. Macrane,* 862 F. Supp. 217 (N.D. Ill. 1994) (bad faith exception applied where the plaintiffs alleged that "Defendants ordinarily maintained a practice of ignoring misconduct which would have prevented a liquor license under Section 3-3-5 and that Defendants used Section 3-3-5 to deny Plaintiffs a liquor license merely to punish Plaintiffs for successfully challenging the city in prior legal proceedings"), *rev'd on other grounds,* 53 F.3d 176 (7th Cir. 1995); *Contreras v. City of Chicago,* No. 94 C 4201, 1994 WL 700263 (N.D. Ill. Dec. 13, 1994) (bad faith exception to *Younger* applied where the plaintiffs alleged "with sufficient particularity facts supporting their charges that the defendants' actions were motivated by racial animus").

With regard to Defendants' counterclaim, the procedural history here does not support a finding of bad faith in the filing of that pleading. Plaintiffs characterize Defendants' decision to file a counterclaim as "forum shopping" and an attempt to "end-run the federal system" to "deprive the plaintiffs of [[their] federal forum." (Plaintiffs' Response, at 3-4.) Defendants offer a legitimate reason, however, for filing their counterclaim when they did. After the series of arrests which occurred in late February and early March of 1995, Plaintiffs ceased their presentations of performances involving nudity. (Complaint ¶ 55.) On "advice of counsel," performances involving nudity resumed in late October 1995. (Memorandum in Support of Motion for a Preliminary Injunction, at 3.) The Village sought leave to file its counterclaim at this time simply because it was the first occasion on which SSDD violated the provisions of the Ordinance. The accusation that the Village's enforcement efforts constitute an attempt to "end-run" the federal system has no merit. The Village would have found this court very unreceptive had it filed an action to enforce its local ordinance in federal court.

1996 WL 238931                                                                                         Page 8
1996 WL 238931 (N.D.Ill.)
**(Cite as: 1996 WL 238931 (N.D.Ill.))**

**\*11** By contrast, Plaintiffs offer no explanation for their own procedural maneuvering. The case before Judge Norgle involved many of the same claims that Plaintiffs assert here, and almost all of the same plaintiffs. Why did Plaintiffs choose to voluntarily dismiss that action? They certainly could have amended their complaint with the additional counts, rather than dismissing the entire case *on the same day* that they filed the present action. Plaintiffs have not offered any specific allegations to demonstrate that the Village filed its counterclaim in bad faith. Thus, the "bad faith" exception to the *Younger* doctrine has no application here.

D. *The Scope of Abstention*

For the reasons discussed above, Plaintiffs have failed to allege facts that adequately support any of the exceptions to the *Younger* doctrine. This court concludes that it must abstain. The analysis does not end here, however; the court must now determine exactly what portion of Plaintiffs' case it is to abstain from adjudicating, and what form that abstention should take. Directing the court's attention to the fact that SSDD is the only Plaintiff common to both the federal case and the state case, Plaintiffs suggest that abstention should be applied on a plaintiff-by-plaintiff basis, or that *Younger* should not be applied here at all. (Plaintiffs' Response, at 8-9.) Plaintiffs offer no case law to support this contention, and, indeed, the Seventh Circuit case of *Collins v. County of Kendall,* 807 F.2d 95 (7th Cir. 1986), *cert. denied,* 483 U.S. 1005 (1987), suggests the opposite. In *Collins,* the owner of an adult bookstore and two of its employees brought suit in federal court against a county and several of its officers, seeking to enjoin and obtain damages from a pattern of bad faith prosecution. 807 F.2d at 96. The district court dismissed the case on *Younger* abstention grounds. *Id.* at 98-99. On appeal, one plaintiff argued that the *Younger* doctrine should not have been applied to her because, unlike the other plaintiffs, no state cases were pending against her at the time of the decision. The Seventh Circuit affirmed the district court's decision, stating that "[t]here plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them." *Id.* at 101 (quoting *Doran v. Salem Inn, Inc.* 422

U.S. 922, 928 (1975)).

The court found that all three plaintiffs were related as either owners or employees of the same bookstore, and that they all shared the same interest in contesting the state litigation. *Id.* at 102. The same relatedness exists among the Plaintiffs in the case at bar. Plaintiffs SSDD, Diaz, and El-Sharif own and operate Thee Body Shoppe, and Plaintiffs Bloom and Krebs are employees there. And while only SSDD is a party to the state litigation, all of the Plaintiffs have the same interest in contesting the state proceedings. Thus, the claims of all five Plaintiffs here are properly subject to abstention.

**\*12** Nevertheless, the court shall abstain from adjudicating only those claims that bear sufficient relation to the state court proceeding. The counterclaim filed by the Village seeks enforcement of the Lansing public indecency ordinance. Plaintiffs' section 1983 complaint seeks declaratory, injunctive, and compensatory relief with respect to the Ordinance and with respect to Defendants' efforts to police the Ordinance, but, read liberally, it also seeks compensatory relief for the actions of Defendants that occurred before the Ordinance was even enacted. Abstention is proper only for the former claims for relief, and not for the claims relating to the arrests and other activities that occurred in February and March of 1995. Counts III, IV, and VI concern only the Lansing public indecency ordinance. Therefore, the court will abstain from deciding Counts III, IV, and VI completely, and from the remaining counts in part; Counts I, II, V, VII, and VIII will survive abstention to the extent that they seek compensation for any unlawful conduct that pre-dated the Ordinance.

Finally, the court reaches the question of what form the abstention should take. Significantly, Plaintiffs' post-Ordinance claims contain a damages component as well as a prayer for injunctive and declaratory relief. (Complaint, at 28.) While claims subject to *Younger* abstention are ordinarily dismissed, damages claims "should not be dismissed outright if the claims for damages cannot be redressed in the state proceeding." *Nelson v. Murphy,* 44 F.3d 497, 502 (7th Cir.), *cert. denied,* 116 S. Ct. 671 (1995). Instead, a court should stay those claims pending the outcome of the state case. *Simpson v. Rowan,* 73 F.3d 134,

Westlaw.

1996 WL 238931                                                                                           Page 9
1996 WL 238931 (N.D.Ill.)
(Cite as: 1996 WL 238931 (N.D.Ill.))

139 (7th Cir. 1995) (granting of stay appropriate where plaintiff had no opportunity to "pursue his request for monetary relief at his state murder trial"). As discussed above, however, Plaintiffs here have had ample opportunity to raise their damages claims in the state proceeding. [FN22] Therefore, Counts III, IV, and VI are dismissed *in toto*, and Counts I, II, V, VII, and VIII to the extent that they seek injunctive, declaratory, and compensatory relief with regard to Lansing's public indecency ordinance and the actions taken to enforce it.

## II. *Rule 41(a)(1)*

Plaintiffs are left with claims for damages arising from the arrests, alleged warrantless searches, and other expression-restricting activities conducted by Defendants prior to enactment of the Ordinance. Again, it is not altogether clear from the face of the complaint that Plaintiffs intended to reassert these claims, which were the subject of the voluntarily-dismissed section 1983 action in front of Judge Norgle. Read liberally, however, the complaint seeks redress for Defendants' alleged acts of harassment in February and March of 1995. It is possible that Plaintiffs originally intended to abandon these claims, but then later changed their minds. In Plaintiffs' original complaint in the present action, paragraph 51 reads: "These prior actions [both the federal and state actions] remain pending, but the Plaintiffs intend to voluntarily dismiss those actions and to substitute the instant complaint, *which seeks relief upon grounds not asserted in those prior actions.* " (Complaint for Declaratory Relief, Damages, and Injunction ¶ 51 (emphasis added).) In the amended complaint that is at issue here, the corresponding paragraph simply reads: "All prior civil actions in state and federal court have been voluntarily dismissed." (Complaint ¶ 54.)

**\*13** Defendants argue, regardless of what Plaintiffs' intent may have been, that the pre-Ordinance harassment claims were raised in both of the previously-dismissed law suits, and that as such they should be stricken pursuant to Federal Rule of Civil Procedure 41(a)(1). (Defendants' Memorandum, at 8-10; Defendants' Reply, at 7-8.) Rule 41 provides, in relevant part:

    [A]n action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal ..., or (ii)

by filing a stipulation of dismissal .... Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim.

FED. R. CIV. P. 41(a)(1). Plaintiffs did not dismiss their original federal case by filing a notice or stipulation of dismissal. Instead, the court ordered the case dismissed after considering a timely-filed motion for voluntary dismissal. (*See* Minute Order of Nov. 8, 1995 by the Honorable Charles R. Norgle, Case No. 95 C 752.) Therefore, Rule 41(a)(1) is technically inapplicable here. [FN23] *Cf.* FED. R. CIV. P. 41(a)(2).

Nevertheless, dismissing Plaintiffs' pre-Ordinance claims would likely comport with the spirit of the Rule 41(a)(1) exception. "It is well known that the purpose of the 'two dismissal' rule is to 'prevent unreasonable abuse and harassment."' *Ogden Allied Sec. Servs. v. Draper & Kramer, 137 F.R.D. 259, 260 (N.D. Ill. 1991)* (quoting *American Cyanamid Co. v. McGhee, 317 F.2d 295, 297 (5th Cir. 1963)*). Plaintiffs offer no reasonable explanation for their decision to dismiss, rather than amend, the previous federal action, [FN24] and the fact that Plaintiffs both moved to voluntarily dismiss the previous action and filed the present action on the same day suggests that they were maneuvering to proceed before a more favorable judge. [FN25] In addition, one would expect a complaint seeking damages for constitutionally-violative arrests to make further mention of the Illinois obscenity and nuisance statutes pursuant to which those arrests were conducted. Plaintiffs' complaint names these statutes, but does not allege that Defendants sought to enforce them with the knowledge that such enforcement efforts would not hold up in court. [FN26] In light of the murky nature of the complaint and Plaintiffs' failure to explain their reasons for dismissing, rather than amending, the previous federal action, this court will dismiss the remaining counts in Plaintiffs' complaint. Given that Rule 41(a)(1) is technically inapplicable here, however, Plaintiffs' remaining counts are dismissed without prejudice. [FN27]

1996 WL 238931                                                                              Page 10
1996 WL 238931 (N.D.Ill.)
**(Cite as: 1996 WL 238931 (N.D.Ill.))**

*CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss is granted and Plaintiffs' First Amended Complaint for Declaratory Relief, Damages, and Injunction is dismissed without prejudice. To the extent that Counts I, II, V, VII, and VIII seek compensatory relief with regard to Defendants' pre-Ordinance conduct, they are dismissed without prejudice to the filing of an amended complaint on or before June 1, 1996. The remainder of Plaintiffs' complaint is dismissed on *Younger* abstention grounds without prejudice to further state proceedings or to reconsideration by this court under substantially changed circumstances. Plaintiffs' motion for a preliminary injunction is denied as moot.

FN1. The facts that follow are taken from the allegations in Plaintiffs' First Amended Complaint for Declaratory Relief, Damages, and Injunction ("Complaint"), which are presumed true for the purposes of Defendants' motion to dismiss.

FN2. Thee Body Shoppe is fully enclosed so that performances on the premises are visible only to customers. (*Id.* ¶ 15.)

FN3. Plaintiffs have not supplied the date on which the Village instituted this action against SSDD, nor has either party set forth the provisions of Village Ordinance 85-032.

FN4. Also absent from Plaintiffs' complaint is a copy of the state court's order. The details of the ruling are thus unknown.

FN5. Plaintiffs apparently refer to Chapter 720 of the Illinois code, which provides, in relevant part:
A person commits obscenity when, with knowledge of the nature or content thereof, or recklessly failing to exercise reasonable inspection which would have disclosed the nature or content thereof, he:
....
(2) Presents or directs an obscene play, dance or other performance or participates directly in that portion thereof which makes it obscene ....

....
Any material or performance is obscene if: (1) the average person, applying contemporary adult community standards, would find that, taken as a whole, it appeals to the prurient interest; and (2) the average person, applying contemporary adult community standards, would find that it depicts or describes, in a patently offensive way, ultimate sexual acts or sadomasochistic sexual acts, whether normal or perverted, actual or simulated, or masturbation, excretory functions or lewd exhibition of the genitals; and (3) taken as a whole, it lacks serious literary, artistic, political or scientific value.
720 ILCS 5/11-20.

FN6. Plaintiffs have not supplied the citation for this statute.

FN7. Plaintiffs' complaint contains several other allegations that describe or characterize the Village's activities during this time period. Paragraph 58 offers eleven quotes from several local newspapers that covered the dispute between the Village and Thee Body Shoppe. (Complaint ¶ 58.) Paragraph 59 describes an incident in which Defendant Andersen, the Village Attorney, approached SSDD's landlord and asked that he refrain from paying certain property taxes so that the Village could revoke Thee Body Shoppe's business license. (*Id.* ¶ 59.) Defendants argue that the newspaper quotations should be stricken from the complaint because they constitute inadmissible hearsay. (Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, at 10.)
The court agrees that the newspaper allegations are hearsay and notes, further, that the allegations in both paragraphs 58 and 59 were made upon "'information and belief,' a clearly improper locution under the current federal rules, which impose (in the amended Rule 11) a duty of reasonable precomplaint inquiry not satisfied by rumor or hunch." *Bankers Trust Co. v. Old*

1996 WL 238931                                                                    Page 11
1996 WL 238931 (N.D.Ill.)
**(Cite as: 1996 WL 238931 (N.D.Ill.))**

*Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992).* While the controlling case in this respect--*Bankers Trust*--is arguably distinguishable from the case at bar in that it involved allegations of fraud subject to Federal Rule of Civil Procedure 9(b), a number of post-*Bankers Trust* courts have similarly ignored allegations made upon information and belief even where claims other than fraud are made. *See Multi-M Int'l, Inc. v. Paige Medical Supply Co., Inc., 142 F.R.D. 150, 152 (N.D. Ill. 1992); Gallagher v. Kopera, 789 F. Supp. 277, 278 (N.D. Ill. 1992); Anderson v. Cooper,* No. 92 C 5949, 1994 WL 46675, at *1-*2 (N.D. Ill. Feb. 14, 1994). *But see Zakutansky v. Bionetics Corp., 806 F. Supp. 1362, 1363 n.3 (N.D. Ill. 1992)* (Shadur, J.) (observing that *Bankers Trust*'s disapproval of "information and belief" pleading was made "only in the context of allegations of fraud"). Given that Plaintiffs offer no explanation for their failure to conduct further precomplaint inquiry (presumably, Plaintiffs could have spoken directly with those individuals quoted in the newspaper excerpts and with their own landlord), this court will follow the reasoning in *Bankers Trust* and disregard the allegations in paragraphs 58 and 59 as violative of Rule 11.

In reaching this conclusion, the court is cognizant of Plaintiffs' attempt to substantiate the allegations in paragraph 59 with three affidavits submitted in support of their preliminary injunction motion. (*See* Diaz Aff., El-Sharif Aff., and Klisiak Aff., Exs. to Memorandum in Support of Plaintiffs' Renewed Motion for a Preliminary Injunction.) Each of these affidavits describes a meeting at which Mr. Abduljabar (Thee Body Shoppe's landlord) described his suspicious run-in with Village Attorney Andersen. Because any testimony by the affiants regarding Mr. Abduljabar's statements would be inadmissible as hearsay in open court, the affidavits are of little value here.

FN8. Plaintiffs have not supplied the date on which the suit was filed.

FN9. Plaintiffs have also not supplied the date of the order denying their motion for a temporary restraining order.

FN10. Plaintiffs do not provide a clear timeline for any of these events, but it appears that Plaintiffs filed the present federal action simultaneously with their motion to voluntarily dismiss the previous federal case, and before they moved to voluntarily dismiss the state case. (*See* Motion for Voluntary Dismissal, Case No. 95 C 752, filed Oct. 23, 1995; Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, at 3.)

FN11. While the Village was not granted leave to file their counterclaim until November 1, Defendants claim (without opposition by Plaintiffs) that they *submitted* the counterclaim to the state court (and presumably served it on Plaintiffs' counsel) on October 31--before Plaintiffs filed their motion for voluntary dismissal of the state action. (Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, at 3.)

FN12. Count VIII fails to allege any specific state law cause of action. Instead, Plaintiffs simply assert that "[t]he actions taken by the defendant Village and those acting on the defendant Village's behalf were intentional, wilful, wanton, and malicious and were not the result of negligence or innocent mistake." (Complaint ¶ 82.)

FN13. The court ruled on a number of other matters in this action between the filing of Plaintiffs' complaint and the filing of Plaintiffs' motion for a preliminary injunction: the court denied Plaintiffs' motion for a temporary restraining order, ordered Defendants' motion for sanctions stricken with leave to renew, and granted the Village's motion to remand Case No. 95 CH 6196 to state court. (*See* Minute Orders of Nov. 16, 1995, Dec. 8, 1995, and Jan. 29, 1996 by the Honorable Rebecca R. Pallmeyer.) None of these rulings are pertinent to the motions presently before the court.

1996 WL 238931                                                                                      Page 12
1996 WL 238931 (N.D.Ill.)
**(Cite as: 1996 WL 238931 (N.D.Ill.))**

**FN14.** The handwritten order of the Circuit Court of Cook County is set forth in full below:

This matter coming up for Ruling on Lansing's Motion for Summary Judgment, the Court having heard argument on February 6, 1996 and having reviewed the pleadings and case law, the Court also considering defendant's motion to stay presented to the court and plaintiff upon the court's ruling on plaintiff's Motion, the court being otherwise fully advised in the premises; It Is Hereby Ordered:

1. Lansing's Ordinance is Constitutional and enforceable and summary judgment is granted in favor of Lansing and defendant is permanently enjoined from facilitating and providing totally nude entertainment. Performers at defendant's club shall wear at a minimum, pasties and a G-string.

2. This Order is stayed for 14 days to and including March 13, 1996.

3. This Order is a Final Judgment Order.

(Order of Feb. 28, 1996, Circuit Court of Cook County, No. 95 CH 6196.)

**FN15.** Plaintiffs note, correctly, that abstention "should be rare and utilized only in exceptional circumstances." (Plaintiff's Response to Defendant's Motion to Dismiss, at 7.) The circumstances under which *Younger* abstention applies, however, are among the "few well defined classes of cases that fall outside the norm where abstention is not only permissible but expected." *Trust & Inv. Advisors, Inc. v. Hogsett,* 43 F.3d 290, 294 (7th Cir. 1994).

**FN16.** Plaintiffs argue, additionally, that *Younger* only applies to civil proceedings that involve the violation of a state statute (as opposed to a local ordinance). (Plaintiffs' Response, at 5 n.1.) Again, this court disagrees. As Defendants point out, the Seventh Circuit has applied the *Younger* doctrine to a case in which the state proceeding involved the violation of a county zoning ordinance. *See Mannheim Video,* 884 F.2d at 1044. (Reply and Support of Defendants' Motion to Dismiss (hereinafter "Defendants' Reply"), at 3.)

**FN17.** If true, this fact serves to distinguish the case at bar from *Mustfov v. Rice,* 663 F. Supp. 1255, 1259 (N.D. Ill. 1987), which confined *Huffman*'s exhaustion requirement under the *Younger* doctrine to cases in which the constitutional claim raised in federal court was actually raised in the state court proceeding.

**FN18.** Plaintiffs attempt to distinguish *Mannheim Video* by emphasizing that "the state civil action [in that case] had been pending long before the federal action was ever filed." (Plaintiffs' Response, at 9.) This distinction is irrelevant. The claim pertinent to the federal action was not added to the state court complaint until *after* the federal action had been filed. 884 F.2d at 1044.

**FN19.** The *Jacobson* decision also dispels any concerns over the Chancery Division's ability to entertain a claim for damages. The court recognized that under the law of Illinois all divisions of the circuit court have "equal and concurrent subject matter jurisdiction," and explained that "[i]f the circuit court's assignment procedures do not permit the damages claim to be litigated along with the injunction issue, then the plaintiff can move to have the cause transferred to the appropriate division in the circuit court." 824 F.2d at 569 (citations omitted).

**FN20.** It would be difficult for Plaintiffs to show such extraordinary need. The Circuit Court of Cook County has ordered, in enforcing the Ordinance, that "Performers at [SSDD's] club shall wear at a minimum, pasties and a G-string." (Order of Feb. 28, 1996, Circuit Court of Cook County, No. 95 CH 6196.) In finding an almost identical statute constitutional in *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560 (1991), the Supreme Court stated:

[T]he requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic....

....

... It is without cavil that the public indecency statute is "narrowly tailored"; Indiana's requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose. 501 U.S. at 571-72. While it is possible, as Plaintiffs argue in their brief in support of a preliminary injunction, that they are suffering harm through a violation of their First Amendment rights, that harm cannot be characterized as so extraordinary that immediate relief is required, given that the Circuit Court of Cook County has interpreted the Ordinance in the least restrictive manner.

FN21. It is worth noting that the alleged actions of the Village Attorney, which the court refused to consider for the purposes of this motion, *see supra* note 7, would not likely alter this court's conclusion regarding the bad faith exception to the *Younger* doctrine. While an attempt to persuade Plaintiffs' landlord to forego paying property taxes suggests a malicious intent, the incident was isolated and the alleged plan was not carried to fruition. *Cf. Grandco,* 536 F.2d at 204 (isolated incidents of questionable searches and seizures not sufficient to warrant finding of bad faith); *Cepela v. City of Chicago Heights,* No. 86 C 7890, 1988 WL 56206, at *1 (N.D. Ill. May 20, 1988) (where defendant told landlord "that if he rented to black persons the premises would be posted as unfit," but plaintiffs failed to allege that they rented to any black persons, subsequent demolition proceeding was not brought in bad faith). Furthermore, the Village Attorney's alleged misconduct appears to have little, if anything, to do with enforcement of the Lansing public indecency ordinance.

FN22. Moreover, given that the state chancery court has entered an order of final judgment against SSDD, Plaintiffs' present claims may be barred by the doctrines of *res judicata* and collateral estoppel. *See Nelson,* 44 F.3d at 503. As of this date, however, Defendants have not raised these defenses.

FN23. The court agrees with Defendants, however, that Plaintiffs' two prior actions were "based on or included" the claims at issue here. The federal case in front of Judge Norgle clearly included constitutional claims regarding Defendants' enforcement activities in early 1995. And while the counts in SSDD's state court complaint sought declaratory and injunctive relief with respect to the Ordinance, those counts were based, in part, upon claims against the Village's pre-Ordinance enforcement activities. (*See* First Amended Complaint for Declaratory Judgment and Injunction, Case No. 95 CH 6196, Ex. C to Defendants' Memorandum, at 7- 8 ("On February 2 and March 2, 4, and 6, 1995 ... Defendants ... fully and completely disrupted and interfered with many of [Thee Body Shoppe's] protected expressive activities .... The sole purpose of the warrantless, custodial arrests by the Village agents was to restrict the expressive conduct on the Subject Property.").)

FN24. Plaintiffs do claim that they voluntarily dismissed the pending actions in order to avoid "claim splitting" (Plaintiffs' Response, at 10), but this goes to the reasons behind their decision to dismiss the state court complaint, not the federal complaint.

FN25. As Defendants point out, on several occasions Judge Norgle denied Plaintiffs' motion for a temporary restraining order and preliminary injunction. (*See* Minute Orders of Feb. 10, 1995 and March 14, 1995 by the Honorable Charles R. Norgle, Case No. 95 C 752.)

FN26. Indeed, neither party saw fit to submit briefing on these statutes.

FN27. Defendants also argue for partial dismissal on the basis that Plaintiffs Diaz and El-Sharif, as officers, directors and shareholders of SSDD, have no standing to sue for an injury suffered by the

1996 WL 238931                                                                Page 14
1996 WL 238931 (N.D.Ill.)
**(Cite as: 1996 WL 238931 (N.D.Ill.))**

corporation. (Defendants' Memorandum, at 7-8.) Mindful of the fact that Plaintiffs may amend their complaint, prompting Defendants to reassert this ground for dismissal, the court will briefly touch on this issue. While Diaz and El-Sharif may not have standing to independently sue for economic injury to SSDD (or to themselves, indirectly, as shareholders), both allege a more personal injury--arrest and subsequent prosecution pursuant to the Village's "policy" of suppressing protected expression. (Complaint ¶ 45.)

The court finds that these allegation are sufficiently independent of the allegations of injury to SSDD to confer standing on Diaz and El-Sharif. The court would also point out that it shares Defendants' concerns about Plaintiffs' "Pendant State Claim" (Count VIII). (Defendants' Memorandum, at 19-21.) Plaintiffs allege no specific state law cause of action, and merely state that "[t]he actions taken by the defendant Village and those acting on the defendant Village's behalf were intentional, wilful, wanton, and malicious and were not the result of negligence or innocent mistake." (Complaint ¶ 82.) If Plaintiffs should decide to replead this count (confined, at this time, to allegations relating to Defendants' pre-Ordinance conduct), the court will expect more specificity.

1996 WL 238931 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 14

Westlaw.

Slip Copy                                                                                                    Page 1
18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)
**(Cite as: 2004 WL 2341395 (Mass.Super.))**

Superior Court of Massachusetts.

In re SONUS NETWORKS, INC. DERIVATIVE
LITIGATION. [FN1]

FN1. See Pre-Trial Order No. 1 consolidating
*Tillman v. Ahmed et al.,* Suffolk No. 04-0754 BLS
with *Palina v. Ahmed et al.,* Suffolk No. 04- 0753
BLS and re-defining the caption of the
consolidated action as "In re Sonus Networks, Inc.
Derivative Litigation."

No. 040753BLS.

Sept. 27, 2004.

*MEMORANDUM AND ORDER ON MOTIONS TO
DISMISS*

ALLAN VAN GESTEL, Justice.

**\*1** This matter is before the Court on the defendants'
motions pursuant to Mass.R.Civ.P. Rule 12(b)(6) and Rule
23.1 to dismiss this consolidated action. The grounds for the
motions are, among others, that the now-consolidated
complaints do not comply with Rule 23.1 because the
plaintiffs failed to make a pre-suit demand upon the board
of directors and because the plaintiffs have failed to allege
with particularity sufficient grounds to excuse their failure
to make such demand. Additionally, the defendants move
for dismissal on grounds that the complaints fail to state a
claim, and because any claims for damages are premature.

BACKGROUND

Sonus Networks, Inc. ("Sonus") is a Delaware corporation,
said to be headquartered in Westford, Massachusetts. Sonus
is a provider of voice-over-IP infrastructure solutions that
enable voice services to be delivered over packet-based
networks.

The plaintiffs purport to be Sonus shareholders and have
brought their derivative suits against most members of
Sonus's board of directors and certain of its executive
officers. The essence of the complaints are: that six
members of Sonus's board of directors and certain of its
executive officers, despite their responsibility for
maintaining and establishing internal controls and ensuring

that Sonus's financial statements were based on accurate
financial information, permitted Sonus to issue false press
releases regarding its financial statements; that the
defendant Hassan Ahmed ("Ahmed"), Sonus's President and
CEO, made false statements in three interviews regarding
Sonus's financial condition, and he signed Sonus's allegedly
incorrect financial statements; and that three of the directors,
who served as members of the Sonus Audit Committee,
approved the incorrect financial statements and, therefore,
are direct participants in the wrongdoing. The complaints
further charge that the defendant directors failed to prevent
and permitted Sonus to file improper financial statements
with the Securities and Exchange Commission and
elsewhere. Allegedly, once the true condition of Sonus's
financial situation came to light in January 2004, and
thereafter, the Sonus stock price is said to have plummeted,
erasing over $1 billion of the Company's market
capitalization.

On February 20, 2004, the plaintiffs filed these derivative
actions. The suits were not preceded by any demand, written
or oral, that the board take any particular action with respect
to the plaintiffs' allegations. Instead, the plaintiffs assert that
any demand upon the members of the board would have
been a "futile, wasteful and useless act."

Five of the seven present directors of Sonus are outside
directors, [FN2] meaning they are not otherwise employees
of Sonus. One of the outside directors, H. Brian Thompson
("Thompson"), has not been named as a defendant. [FN3]

FN2. Ahmed and defendant Rubin Gruber are
conceded by Sonus to be "inside
directors/officers."

FN3. The plaintiffs ask this Court not to consider
the public filing by Sonus of Form 3 with the
Securities and Exchange Commission ("S.E.C.")
reflecting that Sonus's board of directors has seven
members. The Court declines to cast a blind eye to
this established fact. The plaintiffs' request is
unusual, to say the least, given that this is a
situation presenting the determination of whether
pre-suit demand on the directors should be
excused. Should the Court not be told how many

female employees continued to be "expressive and non-obscene," the dance sets often concluded with the dancer in a state of complete nudity. (Complaint ¶ 42.) The Village found these theatrical embellishments, or lack thereof, unpalatable. On February 2, 1995, agents of the Village entered Thee Body Shoppe and arrested a dancer for violating the Illinois obscenity statute. [FN5] (Id. ¶ 43.) The officers warned Diaz, El-Sharif, and several dancers that a similar fate would befall any other dancer who performed in the nude. Alleging violations of their constitutional rights, SSDD and several other Plaintiffs in the present action immediately filed suit in federal court. (See Complaint, Case No. 95 C 752, filed Feb. 6, 1995.) On February 10, 1995, Judge Norgle of this court denied the plaintiffs' motion for a temporary restraining order. (Minute Order of Feb. 10, 1995 by the Honorable Charles R. Norgle, Case No. 95 C 752.) According to Plaintiffs, Judge Norgle's disposition of the motion was premised on the abstention doctrine; charges filed pursuant to the arrests were still pending in state court. (Complaint ¶ 53.)

Agents of the Village arrested SSDD employees under similar circumstances on March 2, March 4, and March 6. In addition, Plaintiffs Diaz and El-Sharif were arrested on the latter two dates and charged with violations of the Illinois nuisance statute. (Id. ¶¶ 45, 46.) [FN6] Each of these police raids on Thee Body Shoppe involved anywhere from ten to twenty uniformed and plain clothes officers, and most of the customers left as a result of the disruptions caused by the arrests. (Id. ¶¶ 44-46) During the course of the raids, Lansing police officers conducted warrantless searches of the non-public areas of Thee Body Shoppe, such as private offices, desks, and the basement dressing area for the dancers. (Id. ¶ 47.) The arresting officers told Bloom, Diaz, and several other dancers that the arrests would stop if "all of the dancers would wear thong bottoms so that they would be dancing partially clothed." (Complaint ¶ 48.)

In response to the Village's actions, SSDD suspended all performances that involved nudity until October 1995, at which time nude performances resumed "at the advice of counsel." (Id. ¶ 55.) In September 1995, Plaintiff Bloom was acquitted of the obscenity charges that had been filed against her. (Id. ¶¶ 53, 57.) The charges against seven other

individuals were subsequently dismissed, and as of the date of Plaintiffs' Amended Complaint there were no pending criminal actions arising out of the original series of arrests. (Id.) While Plaintiffs do not complain of any further arrests, they do allege that Lansing police officers continue to visit the premises of Thee Body Shoppe on a daily basis. (Id. ¶ 43.) In addition, assert Plaintiffs, Lansing police officers stationed in Thee Body Shoppe parking lot routinely stop and question customers and employees as they enter and leave the building. (Id. ¶ 49.) [FN7]

*3 Not content to rely on the Illinois obscenity statute, the Village on June 20, 1995 passed Ordinance No. 95-016 ("the Ordinance"), creating the offense of public indecency. (Complaint ¶¶ 21-22.) A person commits the offense of public indecency under the Ordinance if he or she "knowingly or intentionally, in a public place; (1) engage[s] in sexual intercourse; (2) engage[s] in deviate sexual conduct; (3) appear[s] in a state of nudity; or (4) fondle[s] [his or her] own genitals or those of another person." (Ordinance No. 95-016, Village of Lansing, Ex. to Complaint.) The Village further amended the Ordinance on July 11, 1995, revising the definitions of "nudity" and "public place" as set forth therein. (Complaint ¶¶ 28, 32-34.) The Ordinance is specifically patterned after an Indiana statute which survived constitutional review in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991). (Complaint ¶ 35.)

While still pursuing its federal case, SSDD filed suit in state court to challenge the constitutionality of the Lansing public indecency ordinance. (Id. ¶ 50.) [FN8] SSDD then filed, and the state court denied, a motion for a temporary restraining order. (Id. ¶ 53.) [FN9] At this point, plaintiffs in both the state and federal actions (including SSDD, which was a party to both) moved to voluntarily dismiss their cases. (Id. ¶ 54.) On October 23, 1995, before the motions for voluntarily dismissal were granted, [FN10] Plaintiffs filed the present eight-count complaint in federal court. Just prior to granting the motion for voluntary dismissal on November 2, 1995, the state court granted the Village leave to file a counterclaim against SSDD that sought to enjoin Plaintiffs from violating the Lansing public indecency ordinance. [FN11] Judge Norgle granted the motion for voluntary dismissal in the original federal case on November 8.

18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)
**(Cite as: 2004 WL 2341395 (Mass.Super.))**

overcome the powerful presumptions of the business judgment rule" by alleging sufficient particularized facts to support an inference that demand is excused because the board is "*incapable* of exercising its power and authority to pursue the derivative claims directly." In *Aronson v. Lewis,* we held that a demand on the board is excused only if the complaint contains particularized factual allegations raising a reasonable doubt that either: (1) "the directors are disinterested and independent" or (2) "the challenged transaction was other than the product of a valid exercise of business judgment."
*White v. Panic,* 783 A.2d 543, 551 (Del.Supr.2001).

However, the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.
*Aronson, supra,* 473 A.2d at 815.

"The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction."
*Pogostin v. Rice,* 480 A .2d 619, 624 (Del.Supr.1984).

The Court looks then at the question of whether a reasonable doubt is created that the challenged transactions were other than the product of valid exercises of business judgment.

The challenged transactions relate to: (1) Sonus's maintaining and establishing internal controls to ensure that Sonus's financial statements were based on accurate financial information; Sonus's issuance of press releases regarding its financial statements; the defendant Ahmed's statements, in three interviews, regarding Sonus's financial condition, and his signing of Sonus's allegedly incorrect financial statements; the fact that three of the directors, who served as members of the Sonus Audit Committee, approved the financial statements; and the fact that the defendant directors failed to prevent and permitted Sonus to file improper financial statements with the S.E.C. and elsewhere.

**\*4** [There] is a very large--though not insurmountable--burden on stockholders who believe they should pursue the remedy of a derivative suit instead of selling their stock or seeking to reform or oust these directors from office.
Delaware has pleading rules and an extensive judicial gloss on those rules that must be met in order for a stockholder to pursue a derivative remedy. Sound policy supports these rules, as we have noted. This Complaint, which is a blunderbuss of a mostly conclusory pleading, does not meet that burden, and it was properly dismissed.
*Brehm, supra,* 746 A.2d at 267.

What is challenged in the complaint are not specific actions by the board, but rather generalized allegations reflecting poor supervision over financial statements, particularly with regard to the controls over how they were prepared and the publication thereof to the S.E.C. and the investing public. There are no particularized allegations as to any specific act by any particular board member individually or by the board as a whole. See *Rales, supra,* 634 A .2d. at 933.

Thus, here, a reading of the complaints, however lengthy, cannot be said to provide to the Court--and it is the Court, not the plaintiffs, that must harbor this doubt--a "reasonable doubt" that any activities by the directors, individually or as a group, were other than the product of valid exercises of business judgment. [FN4]

> FN4. If the test was whether "there is a *reasonable inference* that the business judgment rule is not applicable" [emphasis added], as applied below in *Aronson* by the Vice Chancellor, this Court might well reach a different conclusion. But the Vice Chancellor was specifically overruled on that issue by the Delaware Supreme Court. See *Aronson, supra,* 473 A.2d at 814.

The Court next turns to the issue of the disinterestedness and independence of the board members. A presumption of propriety must be the starting point in the absence of clear allegations to the contrary. *Aronson, supra,* 473 A.2d. at 812, 815. See also *Grimes v. Donald,* 673 A.2d 1207, 1216 (Del.1996).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 4
18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)
(Cite as: 2004 WL 2341395 (Mass.Super.))

As noted above, the Sonus board has seven members, five outside directors and Ahmed and Gruber. One of the outside directors, Thompson has not been named as a defendant. [FN5] Consequently, he must be deemed disinterested without further discussion. The Court will, therefore, consider the status of the pleadings relating to the remaining four outside directors: Edward T. Anderson ("Anderson"), Paul J. Fern ("Fern"), Albert A. Notini ("Notini") and Paul J. Severino ("Severino").

> FN5. The complaints were each filed on February 20, 2004, and the defendants' motions to dismiss revealing Thompson's existence as a director were served on March 22, 2004. The plaintiffs have yet, however, to take any steps to add Thompson as a party. Apparently, they prefer to have this Court decide the present motions and thereafter seek leave to amend their complaints. That is not the order of preference for this Court. The complaints will live or die as written when the arguments were presented to the Court.

It is alleged that Anderson sold certain Sonus stock, allegedly at a significant profit and on insider information. The details, however, are scant. "[T]he mere fact that stocks were traded by ... [a] director does not establish a breach of the duty of loyalty." *McCall v. Scott,* 239 F.3d 808, 825 (6th Cir.2001); *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1224 (1st Cir.1996).

Further, according to Form 4 filed with the S.E.C. on July 22, 2003, Anderson's stock sale occurred on July 18, 2003, and was stock "held in trust for the benefit of his family and minor children," not shares personally held by him. This sale was over six months before the January 2004 announcement of Sonus's financial reporting problems. And the complaints contain no particularized allegations of facts that would demonstrate any impropriety with Anderson's stock sale. Consequently, this Court cannot, on this charge, conclude that Anderson lacks the independence necessary, or is too interested, to be considered other than a disinterested and independent director of Sonus.

**\*5** As to all of the directors, there is an absence of specific or particularized allegations regarding how they would have

been put on notice of any accounting problems or improprieties. Thus, again, this is no basis for excusing a demand. See, e.g, *Guttman v. Huang,* 823 A.2d 492, 498 (Del.Ch.2003).

There are allegations that Fern and Severino, by virtue of their positions on Sonus's Compensation Committee, exert control over fellow board members. Again, however, there are no particularized allegations of any interest on the part of these allegedly controlling directors that would render them less than disinterested and independent. See *Brehm, supra,* 746 A.2d at 258. See also *White v. Panic,* 793 A.2d 356, 366 (Del.Ch.2000); *Langner v. Brown,* 913 F.Supp. 260, 266 (S.D.N.Y.1996).

Again there are some allegations about different business relationships shared among or between some of the directors. Directors are not, however, interested or lacking in independence merely because they share outside professional associations or relationships. *Kohls v. Duthie,* 765 A.2d 1274, 1284 (Del.Ch 2000); *Green v. Phillips,* C.A. No. 14436, 1996 WL 342093, at \*5 (Del.Ch. June 19, 1996). "There is nothing sinister or corrupt in the single fact of association or affiliation in financial matters. There must be some further fact before there is anything wrong about it." *Bartlett, supra,* 221 Mass. at 537. No reasonable doubts are raised by the relationships alleged here.

Lastly, the conclusory allegations about generalized misconduct establishing personal liability and those about insurance coverage are insufficient to excuse the demand requirement. See *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995); *Rales, supra,* 634 A.2d at 936; *Kaufman, supra,* 479 A.2d at 287; *Aronson, supra,* 473 A.2d at 817-18. "Demand is not excused simply because plaintiff has chosen to sue all directors ... To hold otherwise would permit plaintiffs to subvert the particularity requirements of Rule 23.1 simply be designating all directors as targets." *Grimes, supra,* 673 A.2d at 1216 n. 8.

Demand has not been shown to be excused in these cases.

The Court does not assess in any way the other contentions by the defendants in support of their motions to dismiss.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 5
18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)
**(Cite as: 2004 WL 2341395 (Mass.Super.))**

As a result of the foregoing analysis of Delaware law and a review of the complaints, this Court concludes that the complaints must be dismissed. Further, the Court accepts the Delaware Supreme Court's reasoning that such dismissal ought to be without leave to further amend. See *White, supra,* 783 A.2d at 555.

ORDER

For the foregoing reasons, the Defendants' Motions to Dismiss the Complaint, as amended (Paper # 11 in case No. 04-0753 BLS and Paper # 13 in case No. 04-0754 BLS), are *ALLOWED,* without leave to amend. Final judgment shall enter accordingly, dismissing the cases, with each party to bear his or its own costs.

18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 15

Slip Copy                                                                                                                Page 2
18 Mass.L.Rptr. 295, 2004 WL 2341395 (Mass.Super.)
**(Cite as: 2004 WL 2341395 (Mass.Super.))**

directors there are? And, if so, why do the plaintiffs themselves, in the very first sentence of the Statement of Facts portion of their opposition, state: "The Complaint names an overwhelming majority--six out of seven--of the members of the Board of Directors as defendants ... ?" Is the Court not entitled to know that there are seven?

The complaints themselves are lengthy and detailed, with allegations contained in 95 numbered paragraphs, many with subparagraphs and lengthy quotations from written materials, spread over 41 pages. The authors seem to have overlooked the dictates of Mass.R.Civ.P. Rule 8(a)(1) calling for a short and plain statement of the claim.

## DISCUSSION

**\*2** Given Sonus's status as a Delaware corporation, much of the argument for and against the motions to dismiss cites to Delaware law. The law of a corporation's state of incorporation provides the circumstances under which a pre-suit demand would be futile. *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95-96 (1991); *Harhen v. Brown,* 431 Mass. 838, 844 (2000); *Bartlett v. New York, N.H., & H.R.R. Co.,* 221 Mass. 530, 538 (1915). Thus, this Court will begin by reciting some general principles of Delaware law that apply here.

The focus, principally, is on the issue of the absence and alleged futility of making a pre-suit demand on the Sonus board of directors.

> A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation ... The existence and exercise of this power carries with it certain fundamental fiduciary obligations to the corporation and its shareholders ... Moreover, a stockholder is not powerless to challenge director action which results in harm to the corporation. The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management. The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it. The nature of the action is two-fold.

First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it.

By its very nature the derivative action impinges on the managerial freedom of directors. Hence, the demand requirement of Chancery Rule 23.1 exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits. Thus, by promoting this form of alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations.

*Aronson v. Lewis,* 473 A.2d 805, 811-12 (Del.Supr.1984). See also *Brehm v. Eisner,* 746 A.2d 244, 253 (Del.Supr.2000).

Whatever the underlying allegations, if a derivative plaintiff fails to carry the burden of demonstrating that demand should be excused, the complaint must be dismissed. *Kaufman v. Belmont,* 479 A.2d 282, 286 (Del.Ch.1984).

If a plaintiff does not actually make demand prior to filing suit, he or she "must set forth ... particularized factual statements that are essential to the claim." *Brehm, supra,* 746 A.2d at 254. The pleading requirements of Rule 23.1 are "an exception to the general notice pleading standard" and "more onerous than that required to withstand a Rule 12(b)(6) motion to dismiss." *Levine v. Smith,* 591 A.2d 194, 207, 210 (Del.Supr.1991).

**\*3** The plaintiff is required to plead with particularity that "reasonable doubt" exists either that: (1) a majority of the board is disinterested and independent; or (2) that the challenged transaction was a valid exercise of business judgment. *Aronson, supra,* 473 A.2d at 814; *Rales v. Blasband,* 634 A.2d 927, 933 (Del.Supr.1993). Thus, in determining demand futility, the Court "must make two inquiries, one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof." *Id.*

> To satisfy [the] requirement [of alleging with particularity the reasons for the plaintiff's failure to demand action from the board], the "stockholder plaintiff[ ] must

Not Reported in F.Supp.2d                                                                                     Page 2
2004 WL 350682 (N.D.Tex.)
**(Cite as: 2004 WL 350682 (N.D.Tex.))**

the integration capabilities and performance of its software product TradeMatrix." (Compl. at 2). Plaintiffs' complaint stems from a re-audit i2 performed in 2003 for financial years 1999, 2000, and 2001, which resulted in a restatement of i2's financial statements for those years and a loss in stock price. (Compl. at 32).

All Defendants, including nominal defendant i2, move to dismiss Plaintiffs' complaint. Defendants argue that Plaintiffs failed to establish demand futility pursuant to Federal Rule of Civil Procedure 23.1 and Delaware law; that the complaint does not meet the particularity requirements of Federal Rule of Civil Procedure 9(b); that Plaintiffs' action is barred by i2's Certificate of Incorporation; that Plaintiffs' product-related action is barred by res judicata; and that the Sarbanes-Oxley Act claim fails as a matter of law. The Court will address these arguments below.

## II. ANALYSIS

**\*2** Defendants first argue that Plaintiffs lack standing to sue derivatively because they did not make demand on i2's Board of Directors. (Def. Cash, Crandall, and Jordan's Mot. at 2-3). Defendants argue that if demand is not made on the Board prior to filing a derivative suit, the complaint must comply with the requirement of Federal Rule of Civil Procedure 23.1 and Delaware law that plead with particularity the reasons demand is excused. (Id.). In a derivative action, Rule 23.1 requires that the complaint "shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. Because i2 is a Delaware corporation, "the substantive corporation law of Delaware determines whether or not the demand requirements of Fed.R.Civ.P. 23.1 have been satisfied." Rales v. Blasband, 634 A.2d 927, 932 n. 7 (Del.1993). Delaware law requires a stockholder to make a demand on the Board of Directors to pursue the corporate claim, or to show why demand is excused "because the directors are incapable of making an impartial decision regarding such litigation." Id. at 932.

In the instant case, both sides agree that the test articulated

by the Delaware Supreme Court in *Rales* is the appropriate test to use in determining whether demand in this case is excused as futile. (*See* Def. Cash, Crandall and Jordan's Mot. at 5; Pl.'s Mot. at 9). The *Rales* test is employed where "directors are sued because they have failed to do something ... demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand." *Rales,* 634 A.2d at 934 n. 9. In the instant case, the Court must consider whether "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934. To create a doubt that the board of directors could exercise its independent and disinterested business judgment, the Plaintiff would need to allege with particularity facts that create a reasonable doubt that the board is "capable of acting free from personal financial interest and improper extraneous influences." *Id.* at 935.

In the instant case, when the complaint was filed the Board of Directors of i2 consisted of Sanjiv S. Sidhu, Harvey B. Cash, Robert J. Crandall, and Michael H. Jordan. (*See* Def. Cash, Crandall, and Jordan's Mot. at 7). Both sides agree that Sidhu, as i2's President and Chief Executive Officer, is an insider and, thus, could arguably be considered interested. (*See* Def. Cash, Crandall, and Jordan's Mot. at 7; Pl.'s Mot. at 10). The remaining directors, Cash, Crandall, and Jordan, however, are outsiders, meaning they are not also officers of the company and so are not automatically considered interested or not independent. (*See id.*). Defendants argue that because the majority of the Board is comprised of outside directors, pre-suit demand would be excused if a majority of the Board meets the *Rales* test. The Court agrees and will therefore only consider whether Plaintiffs' Complaint meets the test of disinterested and independent as to the three outside directors, Cash, Crandall, and Jordan.

**\*3** "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," or "where a corporate decision will have a materially detrimental impact

Not Reported in F.Supp.2d                                                                                    Page 3
2004 WL 350682 (N.D.Tex.)
**(Cite as: 2004 WL 350682 (N.D.Tex.))**

on a director, but not on the corporation and the stockholders." *Rales,* 634 A.2d at 936. "To establish lack of independence, [Plaintiff] must show that the directors are 'beholden' to the [interested director] or so under their influence that their discretion would be sterilized." *Id.*

In the instant case, Plaintiffs offer eight reasons why the Board is "incapable of making an independent and disinterested decision to institute and vigorously prosecute this action." (Compl. at 38). Plaintiffs argue 1) that each of the individual Defendants "participated in, approved or recklessly disregarded the wrongs complained of" in the complaint; 2) that Defendants Sidhu and Brady are not disinterested or independent because they are officers of the company, have personally engaged in the wrongful actions, have personally benefitted from such wrongful actions, and are named as defendants in the securities fraud class actions; 3) that Defendants Sidhu, Brady, Cash, Crandall, and Jordan approved and signed the allegedly false and misleading Annual Reports and so are not disinterested or independent; 4) that Defendants Sidhu, Brady, Cash, Crandall, and Jordan received but dismissed credible information regarding the violations of GAAP and abdicated their role in investigating those claims; 5) that the directors would be required to sue themselves and/or their fellow directors "who are their friends and with whom they have entangling alliances and interlocking business relationships, interests, and dependencies"; 6) that the directors have not taken any action to seek redress for the wrongdoing alleged in the Complaint, although they knew of it, that the Board approved filing a motion to dismiss the Scheiner class action, and that the Board is dominated and controlled by Sidhu and Brady; 7) that Defendants Sidhu and Brady have not offered to reimburse i2 for their bonuses and incentive-based compensation or to turn over their profits from the alleged insider trading; 8) that the Board's insurance coverage has an "insured vs. insured" exclusion clause, so the directors will not sue the officers or directors because then they would not be covered by their insurance. (Compl. at 38-41).

Defendants argue that Plaintiffs' assertions as to why demand is excused fall into four basic categories: 1) that the directors face potential liability on Plaintiffs' claims; 2) that

the Board is dominated and controlled by Defendants Sidhu and Brady, who face potential liability; 3) that the Board has so far failed to take action by either filing suit against the wrongdoers, voluntarily returning the monies sought in the instant case, or by endorsing the filing of the motion to dismiss in the fraud class action; and 4) that the insurance clause precludes coverage if the directors filed against themselves or the officers. (*See* Def. Cash, Crandall, and Jordan's Mot. at 8). The Court agrees with Defendants' characterization of Plaintiffs' arguments and will use these characterization in addressing whether demand is excused.

1. The Directors' Potential Liability

**\*4** The Delaware Supreme Court has explained that "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." *Rales,* 634 A.2d at 936. Only when the potential for liability rises from a mere threat of personal liability to a substantial likelihood of personal liability will directors be considered interested. *Id. See also Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984). In the instant case, Plaintiffs assert that the outside Directors were interested because they faced potential liability on the wrongs Plaintiffs allege in the Complaint. However, Plaintiffs have alleged no particularized facts that raise their assertion from a mere threat to a substantial likelihood of personal liability. Plaintiff has pleaded no particularized facts which create a reasonable doubt that Defendants Cash, Crandall, or Jordan's actions are not valid exercises of business judgment. *See Rales,* 634 A.2d at 936. This is not sufficient to conclude that the majority of the Board is interested.

2. Domination and Control of the Board

"To establish a lack of independence, [Plaintiffs] must show that the [outside] directors are 'beholden' to [Sidhu and Brady) or so under their influence that their discretion would be sterilized." *Rales,* 634 A.2d at 936. Plaintiffs must "allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.' " *Aronson,* 473 A.2d at 816. In the instant case, Plaintiffs allege that Defendants Sidhu and Brady, insiders,

Not Reported in F.Supp.2d                                                                                           Page 4
2004 WL 350682 (N.D.Tex.)
**(Cite as: 2004 WL 350682 (N.D.Tex.))**

dominate and control the Board such that the outside Directors are not independent. However, Plaintiffs offer nothing more than the bare assertion that the directors have "entangling alliances and interlocking business relationships, interests, and dependencies." (Compl. at 39). Plaintiffs allege no specific facts in support of this assertion, and therefore, the Court cannot conclude "that the complaint factually particularizes any circumstances of control and domination to overcome the presumption of board independence, and thus render demand futile." *Aronson,* 473 A.2d at 817.

3. Board's Failure to Take Action

Plaintiffs also argue that demand is futile because the Board has not taken action to stop the allegedly wrongful action, nor has the Board taken action to seek recompense for the allegedly wrongful action. (Compl. at 40). This allegation is insufficient to excuse demand. In an unpublished opinion, the Delaware Court of Chancery stated, "The mere fact that [the Board] has elected not to sue before the derivative action was filed should not of itself indicate 'interestedness.' " *Richarson v. Graves,* C.A. No. 6617, 1983 WL 21109, *3 (Del.Ch. March 7, 1983). The Court of Chancery went on to explain that "it is the Board's inaction in most every case which is the *raison d'etre* from Rule 23.1." *Id.* In the instant case, the Court agrees that Plaintiffs' assertions are not indicative of interestedness. Plaintiffs assertions here are insufficient to excuse demand.

**\*5** Plaintiffs also assert that demand is futile because Sidhu and Brady have not volunteered to reimburse i2 for their profits from the alleged insider trading and the Board has not sought reimbursement from them. (Compl. at 40- 41). The inquiry for the Court remains whether such allegations create a reasonable doubt that the Board cannot act independently or disinterestedly. *See Guttman v. Huang,* 823 A.2d 492, 502 (Del.Ch.2003). "[I]t is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information." *Id.* Plaintiffs here, however, have not even alleged that the outside Directors participated in the alleged insider trading. (*See* Compl. at 40). The argument, therefore, must be that

the outside Directors are not independent from Sidhu, the insider Director accused of insider trading. As discussed above, however, Plaintiffs have alleged no particularized facts to support their assertion that the Board lacked independence. Therefore, the mere allegation of insider trading by one insider Director is not sufficient to excuse demand on the entire Board.

4. "Insured vs. Insured" Exclusion Clause

Plaintiffs' final argument is that demand should be excused because i2's directors' and officers' liability insurance coverage contains an "insured vs. insured" exclusion clause, thus preventing the Board from suing itself because then they would lose their liability coverage. (Compl. at 41). Many courts have found the mere existence of this clause, without more, to be insufficient to excuse demand. *See Matter of Prudential Ins. Co. Litigation,* 282 N.J.Super. 256, 659 A.2d 961, 973 (N.J. Super Ct. Ch.Div.1995) (citing cases from the Delaware Court of Chancery, the Southern District of New York, and the Eleventh Circuit holding that the existence of an insured vs. insured exclusion clause is insufficient to excuse demand, explaining that it would eviscerate the demand requirement in almost all cases). The Court finds no reason to view Plaintiffs' argument as anything more than an argument that the Directors would be forced to sue themselves, and, as discussed above, this argument fails to excuse demand in the instant case.

III. CONCLUSION

The Court concludes that Plaintiffs have not created a reasonable doubt that the board is "capable of acting free from personal financial interest and improper extraneous influences," and have thus failed to demonstrate that demand is excused. *Rales,* 634 A.2d at 935. In light of this conclusion, the Court does not need to address Defendants' other arguments for why the case should be dismissed. Because Plaintiffs did not make demand on the Board and failed to allege with particularity why demand was excused, as required pursuant to Federal Rule of Civil Procedure 23.1 and Delaware law, the Court GRANTS Defendants' Motions to Dismiss.

Not Reported in F.Supp.2d                                                      Page 5
2004 WL 350682 (N.D.Tex.)
**(Cite as: 2004 WL 350682 (N.D.Tex.))**


**\*6** For the reasons stated above, Defendants' Motions to Dismiss are GRANTED and Plaintiffs' Complaint is DISMISSED pursuant to Fed.R.Civ .P. 12(b)(6).

SO ORDERED.

2004 WL 350682 (N.D.Tex.)

**Motions, Pleadings and Filings (Back to top)**
• 3:03CV00841 (Docket) (Apr. 23, 2003)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 16

Not Reported in F.Supp.                                              Page 1
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

⚐

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.

In Re STRATUS COMPUTER, INC. SECURITIES
LITIGATION, Defendant.

**CIV. A. 89-2075-Z.**

March 27, 1992.
Recommendations on Motions to Dismiss Dec. 10, 1991.

Thomas G. Shapiro, Shapiro, Grace & Haber, Boston,
Mass., for plaintiffs.

Maynard Mohan Kirpalani, Parker, Coulter, Daley & White,
Boston, Mass., for defendant Stratus Computer, Inc.

Peter M. Saparoff, Palmer & Dodge, Helen A. Robichaud,
Gaston & Snow, Boston, Mass., for defendants Status
Computer, Inc., William E. Foster and Gary Haroian.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher &
Flom, Boston, for defendants William H. Thompson, Robert
E. Donahue and Robert A. Freiburghouse.

Peter J. MacDonald, Hale & Dorr, Boston, Mass., for
defendants Alexander V. D'Arbeloff, Robert M. Morrill,
Paul J. Ferri, Gardner C. Hendrie and J. Burgess Jamieson.

ZOBEL, District Judge.

**\*1** The Objection to the recommendation pertaining to
Counts I, II and IV are overruled. Plaintiff does not object to
the recommendation pertaining to Count III. The Court
accepts the Magistrate Judge's findings and
recommendations and allows the motion to dismiss. The
complaint shall be dismissed as to all defendants. Donald
Oldham having never been served, the complaints against
him is dismissed for failure to make service.

*FINDINGS AND RECOMMENDATIONS ON
DEFENDANTS MOTIONS TO DISMISS*
ALEXANDER, United States Magistrate Judge.

These motions have been referred to this Court by Order of

Reference. The defendants move to dismiss each count of
the plaintiffs' Consolidated Amended Complaint on a
various grounds. The factual background is culled from the
allegations of the complaint, which the Court takes as true
for the purposes of the motions to dismiss under
Fed.R.Civ.P. 12(b)(6). *See Lessler v. Little,* 857 F.2d 866,
867 (1st Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct.
1130, 103 L.Ed.2d 192 (1989) (citations omitted). This
Court will not dismiss a count for failure to state a claim
unless "it appears beyond doubt that [plaintiffs] can prove
no set of facts [that] would entitle [them] to relief." *Id.*
(citations omitted).

FACTUAL BACKGROUND

*Plaintiffs*

Plaintiff Laurel Catania purchased 500 shares of stock in the
defendant Stratus Computer, Inc. (Stratus) on August 23,
1989. Plaintiff Stephen DelGrasso purchased 200 shares of
Stratus stock on August 18, 1989. Plaintiff John Garabidian
purchased 200 shares of Stratus stock on August 28, 1989.
Plaintiff Bruce Wilhelmy purchased 1,000 shares of Stratus
stock on September 15, 1989. Plaintiff Elliot Shwartz
purchased 100 shares of Stratus stock on August 9, 1989.
These plaintiffs bring suit on behalf of themselves and a
class of all who purchased shares of Stratus stock between
July 25, 1989, and September 19, 1989. Plaintiff Steven D.
Bergman brings his action as a derivative suit on behalf of
Stratus.

*Defendants*

Stratus is a Massachusetts corporation. It manufactures and
sells fault tolerant computer systems, used in automatic
teller machine networks and securities trading systems,
among other applications. Defendant William E. Foster is
President, Chief Executive Officer and Chairman of the
Board of Stratus. Defendant Gary E. Haroian is Senior Vice
President of Finance and Administration, Chief Financial
Officer and Treasurer. Defendant Robert Freiburghouse is
Senior Vice President of Engineering. Defendant Robert
Donahue is Vice President and Controller. Defendant
William H. Thompson is Senior Vice President of
Marketing. Defendant J. Donald Oldham is Vice President.
Defendants Alexander V. D'Arbeloff, Robert M. Morrill,

Not Reported in F.Supp.    Page 2
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

Paul J. Ferri, Gardner C. Hendrie and J. Burgess Jamieson are directors of Stratus.

*Facts*

Stratus has been a highly successful company in the computer industry. Stratus sells its products both internationally and domestically. The domestic channels for its sales are under distribution agreements with IBM Corporation (IBM) and Olivetti & Co., S.P.A. (Olivetti). In 1988, the sales to IBM accrued to 32% of Stratus's revenues, while the sales to Olivetti made up 8% of revenues.

**\*2** Since 1982, Stratus has grown annually from 40% to 50%. In the April 3, 1989, edition of *Business Week,* defendant Foster predicted 30% growth for the third quarter of 1989. In a Letter to Shareholders in the Annual Report for the fiscal year ended January 1, 1989, which was disseminated in late March of 1989, defendant Foster expressed confidence and optimism in Stratus's performance and growth. The statement mentioned historical increases in growth and emphasized the unique aspects of Stratus, as well as its relationship with IBM, as attributes. The statement discussed efforts to build sales through product development. The statement highlighted the telecommunications industry, declaring that Stratus expected to exceed the projected industry growth rate of 25%, due to its unique attributes. The statement recounted past international growth, and expressed the expectation that the same international growth rate would continue in 1989. The statement represented that Stratus's "products are in greater demand than ever before," and asserted as "fact" that Stratus was "positioned to achieve even greater long term success." *Consolidated Amended Complaint* ¶ 36. On March 27, 1989, Prudential-Bache Securities, Inc. issued a report quoting defendant Haroian as stating that "the company feels that a 40%-60% [annual growth] is sustainable for the long term." *Id.* ¶ 37.

As growth had continued in the first quarter, defendant Foster made statements to the *Origin Universal News Service* on April 25, 1989, and to *The Boston Globe* on April 26, 1989, discussing that growth. He emphasized Stratus's international performance, noting that it offset softness in the domestic market. He stated that "we remain confident in our continued growth both domestically and internationally." *Id.* ¶ 38.

Stratus's Form 10-Q for the quarter ended April 2, 1989, depicted an increase in net revenues of 41%. The defendants attributed the increase to "the growth in the marketplace" and "the rapidly growing customer base." Financial analysts stated that the first quarter results concurred with their projections.

On May 2, 1989, defendant Foster represented to *The Boston Globe* that domestic sales had slowed, but that the strength of Stratus's other markets was such that there would be no overall slowing down. On May 15, 1989, *Computer World* reported Stratus's growth in the Pacific Rim, noting that Stratus expected the same growth in 1989.

In a July 29, 1989, press release announcing earnings for the second quarter of 1989, Foster emphasized those aspects that had contributed to the growth, noting an increase in customer accounts, both domestically and internationally. The plaintiffs contend that this statement, coupled with projections of a 30% increase in earnings, was materially misleading, because Stratus knew or recklessly disregarded indications that a decrease in the domestic market would make the overall business outlook inaccurate.

**\*3** Revenues and income for the second quarter and for the six months of the first two quarters of 1989 increased by greater than 30%. On August 4, *Value Line* estimated that Stratus's 1989 sales would reflect a 34% increase over 1988 sales. It noted a 25% rate of growth in the United States, stating that sales through IBM were expanding at a rate of approximately 45%.

The complaint alleges that, during the class period, Stratus was in contact with professional participants in the stock market and that the individual defendants periodically provided information to analysts at meetings. Stratus confirmed the reasonableness of the analysts' estimates for 1989, at these meetings, including at a meeting on September 12, 1989, at Cowen & Co., in New York City. On September 17, 1989, *The New York Times* estimated revenues at $360 million for the year. By late July of 1989, the complaint alleges, the defendants knew or recklessly

Not Reported in F.Supp.2d                                    Page 1
2004 WL 350682 (N.D.Tex.)
**(Cite as: 2004 WL 350682 (N.D.Tex.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.

Alan SPECTOR, Derivatively on Behalf of Nominal
Defendant i2 Technologies,
Inc., Plaintiff,
v.
Sanjiv S. SIDHU, Gregory A. Brady, William M. Beecher,
David C. Becker, Harvey
B. Cash, Robert L. Crandall, and Michael H. Jordan,
Defendants,
and
I2 TECHNOLOGIES, INC., Nominal Defendant.

**No. Civ.3:03-CV-0841-H.**

Jan. 26, 2004.

William B. Federman, Federman & Sherwood, Oklahoma City, OK, John G. Emerson, Jr., Emerson Poynter, Houston, TX, for Plaintiff/Consol Plaintiff.

Michael A. Swartzendruber, Fulbright & Jaworski Edward S. Koppman, Akin, Gump, Strauss, Hauer & Feld, Michael P. Lynn, Lynn, Tillotson & Pinker, George Edward Bowles, Locke, Liddell & Sapp, Brian R. Becker, Brian Becker & Associates, Robert W. Coleman, Joel E. Geary, Brown McCarroll, Aimee Williams Moore, Baker Botts, Dallas, TX, Warren Lewis Dennis, Proskauer Rose, Jenifer Berger, Bryan Cave, Washington, DC, Bruce C. Oetter, Bryan Cave, St Louis, MO, John P. Stigi, III, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

SANDERS, Senior J.

**\*1** Before the Court are Defendants Harvey B. Cash, Robert L. Crandall, and Michael H. Jordan's Motion to Dismiss, filed September 30, 2003; Nominal Defendant i2 Technologies, Inc., and Defendants Sanjiv S. Sidhu, William M. Beecher, and David C. Becker's Motion to Dismiss, filed September 30, 2003; Defendant Gregory A.

Brady's Motion to Dismiss, filed September 30, 2003; Plaintiffs' Response, filed October 31, 2003; Defendants' Cash, Crandall and Jordan's Reply, filed November 26, 2003; Nominal Defendant i2 Technologies, Inc., and Defendants Sidhu, Beecher, and Becker's Reply, filed November 26, 2003; Plaintiff's Supplemental Memorandum, filed December 18, 2003; and Defendants Cash, Crandall, and Jordan's Response to Plaintiff's Supplemental Memorandum, filed December 30, 2003. Also before the Court is Nominal Defendant i2 Technologies, Inc., and Defendants Sidhu, Beecher, and Becker's Request for Judicial Notice, filed September 30, 2003. Defendants seek dismissal of Plaintiffs' Consolidated Shareholder Derivative Complaint. Upon review of the pleadings, briefs, and relevant authorities, the Court is of the Opinion for the reasons stated below that Defendants' Motions to Dismiss should be GRANTED.

I. BACKGROUND

This is a shareholder derivative suit filed by Alan Spector and Thomas C. Olson, Jr., on behalf of nominal defendant i2 Technologies, Inc.("i2"). [FN1] Plaintiffs filed a Consolidated Shareholder Derivative Complaint ("Complaint") on July 24, 2003, which alleges the Board of Directors and certain executive officers breached their fiduciary duties and violated common law from March 31, 1999 to the present ("Relevant Period"), and seeks remedies for these alleged breaches and violations and for remedies pursuant to the Sarbanes-Oxley Act of 2002. (Compl. at 2). Plaintiffs are, and were during the Relevant Period, shareholders. (Compl. at 4). Defendants are, or were at the time the complaint was filed, directors and/or officers of i2.

> FN1. Thomas C. Olson, Jr.'s case was originally filed as *Olson v. Sidhu,* Civil Action Number 3:03-CV-0869-H, but was consolidated under the instant caption by Court Order on June 23, 2003.

Specifically, Plaintiffs allege that the named individual defendants, Sanjiv S. Sidhu, Gregory A. Brady, William M. Beecher, David C. Becker, Harvey B. Cash, Robert L. Crandall, and Michael H. Jordan, "caused [i2] to improperly recognize revenue in violation of Generally Accepted Accounting Principals ("GAAP") and to falsely publicize

disregarded that projected levels of sales were not attainable.

On September 18, 1989, the defendants announced that revenues and earnings for the third quarter would not meet expectations, due to weakness in the domestic market. They indicated a 20% to 25% rate of growth in the short term. Dow Jones, *Business Week* and *McGraw Hill News* reported this information. *Value Line* reduced its earnings estimates for 1989. The price of Stratus's stock fell from $33- 1/2 on September 15, 1989 to $26. Third quarter earnings ultimately released on October 20, 1989, indicated an increase in earnings of only 12%, due to a weak domestic market.

Plaintiffs allege that the directors made several sales of Stratus stock with material knowledge of the decline in growth. Defendant Oldham sold 2,825 shares on September 5 and 14. Defendant Thompson sold 3,000 shares on August 25. Defendant Donahue sold 1,807 shares on August 24. Defendant Freiburghouse sold 28,938 shares on August 1 and 30,000 shares on May 12.

ANALYSIS

*Count I*

Count I alleges that the defendants made materially misleading statements that would create the impression that Stratus was growing at a 30% rate, when the defendants knew or recklessly disregarded indications that such a growth rate was not attainable. Count I claims that these misleading statements, made with knowledge of their falsity or reckless disregard for the truth, violated sections 10(b) and 20 of the Securities and Exchange Act, as well as Rule 10b-5, promulgated by the Securities and Exchange Commission. Stratus and each of the individual defendants, except defendant Oldham move to dismiss this count. Their primary contention is that the count fails to satisfy the pleading requirements of Rule 9(b).

According to Rule 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The First Circuit has

identified three purposes behind this rule:

**\*4** (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations.

*New England Data Services., Inc. v. Becher,* 829 F.2d 286, 289 (1st Cir.1987). Because the danger of strike suits is great in cases alleging securities fraud, this circuit will construe Rule 9(b) strictly in that context. *Id.* at 288; *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991).

Under Rule 9(b), while the pleadings need not prove the case, they "must 'specif[y] ... the time, place and content of .. [each] alleged false representation.' " *Konstantinakos v. Federal Deposit Ins. Corp.,* 719 F.Supp. 35, 38 (D.Mass.1989) (quoting *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 229 (1st Cir.1980)). The First Circuit has stated that Rule 9(b) "requires specification of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *McGinty,* 633 F.2d at 228, *quoted in New England Data Services,* 829 F.2d at 288. The pleadings, however, must provide a minimal foundation of indicia as to the misleading qualities of the statements. *See id.* (pleadings failed to satisfy Rule 9(b), because "the complaint does not explain what was misleading about any of the challenged statements"); *Wittenberg v. Continental Real Estate Partners, LTD-74A,* 478 F.Supp. 504, 508 (D.Mass.1979) (complaint must "state how each statement amounted to a misrepresentation.") (citation omitted), *aff'd per curiam,* 625 F.2d 5 (1st Cir.1980). The First Circuit has recently stated that the complaint must include "factual allegations that would support a reasonable inference that adverse circumstances existed ... and were known and deliberately disregarded by defendants." *Romani,* 929 F.2d at 878. "The requirement that supporting facts be pleaded applies even when the fraud relates to matters peculiarly within the knowledge of the opposing party." *Id.* (citing *Wayne Investment v. Gulf Oil Corp.,* 739 F.2d 11, 13-14 (1st Cir.1984); *New England Data Services,* 829 F.2d at 288); *see also In re Healthco International, Inc.,* Civil Action No. 91-10710-MA,

Not Reported in F.Supp.                                                                   Page 4
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

Memorandum and Order at 14 n. 9 (D.Mass. Nov. 7, 1991). Thus, the complaint may not rest on mere allegations and conclusions, *Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir.1985);* nor may it be so groundless in fact that it proceeds only on mere "information and belief." *See Driscoll v. Landmark Bank for Sav., 758 F.Supp. 48, 51 (D.Mass.1991)* (citing *Wayne, 739 F.2d at 14).*

The complaint alleges statements attributable to the nominal defendant Stratus and defendants Foster and Haroian that are sufficiently specific to satisfy the time, place and content requirements. As to defendants Donahue, Freiburghouse and Thompson, however, the complaint does not allege anything except vague connections by virtue of their positions. Merely being a director or officer is not ground for imposition of liability under § 10(b). *Loan v. Federal Deposit Ins. Corp., 717 F.Supp. 964, 968 (D.Mass.1989).* Rule 9(b) requires specification of which defendants are accused of performing what acts. *Hayduk, 775 F.2d at 443; Loan, 717 F.Supp. at 968* ("[w]here multiple defendants are involved, each person's role in the alleged fraud must be particularized in order to satisfy Rule 9(b)"); *see also Konstantinakos, 719 F.Supp. at 39* (complaint dismissed, *inter alia,* because there were no allegations as to the roles of each individual defendant). On this basis, alone, this Court should dismiss Count I as to defendants Donahue, Freiburghouse and Thompson.

**\*5** As to the other defendants, while the statements alleged to be fraudulent are set out in the complaint according to the time, place and content requirements, they do not meet the standard recently set by the First Circuit in *Romani.* Beyond the time, place and content requirement, the complaint must allege adverse circumstances that were known and disregarded. *Romani, 929 F.2d at 878.* The plaintiffs, here, do not state any facts that would serve as a starting point on which to build a case of knowing or reckless disregard of adverse circumstances. [FN1] Rather, the complaint is alleged on mere "information and belief." The First Circuit has circumscribed the use of this manner of pleading fraud in the most explicit terms. [FN2]

As Magistrate Judge Ponsor recently noted in a similar case:

The allegations of fraud here are so generic that [they] could

have been drafted by any competent practitioner generally familiar with securities fraud case law, without any independent knowledge of defendants' conduct, simply by collating language from leading cases with excerpts from defendants' ... 10-Q forms, annual reports and press releases.

*Wilkes v. Heritage Bancorp, Inc., 1990 WL 263612 (D.Mass.1990).* Courts in this district have repeatedly dismissed complaints that merely quote company statements or predictions as supporting facts for fraud. *See, e.g., Driscoll, 758 F.Supp. 48; Akerman v. Bankworcester Corp., 751 F.Supp. 11 (D.Mass.1990); Loan, 717 F.Supp. at 967.* Such an exiguous body of factual support will not pass muster. Count I fails to meet the requirements of Rule 9(b).

*Count II*

Count II alleges that the defendants Donahue, Freiburghouse, Oldham and Thompson traded Stratus stock on inside information, in contravention of sections 10(b) and 20(A)(a) of the Securities and Exchange Act and Rule 10b-5. Defendants Donahue, Freiburghouse and Thompson move this Court to dismiss Count II.

The defendants first contend that the Court should dismiss Count II for failure to comply with Rule 9(b). This Court finds persuasive the defendants' argument that Rule 9(b) is applicable. In *Hayduk,* the First Circuit indicated that Rule 9(b) applies in any case where " *'fraud lies at the core of the action.'* " *Hayduk, 775 F.2d at 443* (quoting *Lopez v. Bulova Watch Co., Inc., 582 F.Supp. 755, 766 (D.R.I.1984)*) (emphasis in original). The plaintiff is essentially arguing that the defendants engaged in a conspiracy to defraud. As Rule 10b-5 states, it is unlawful:

(c) To engage in any act, practice, or course of business which operates or would operate as a *fraud or deceit* upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (emphasis added). As one court noted, "Congress ... amended the Exchange Act to expressly provide a private right of action for contemporaneous buyers and sellers asserting *claims of fraud committed through insider trading.*" *Elysian Federal Savings Bank v.*

Not Reported in F.Supp.                                                                 Page 5
1992 WL 73555 (D.Mass.)
(Cite as: 1992 WL 73555 (D.Mass.))

*First Interregional Equity Corp., 713 F.Supp. 737 (D.N.J.1989)*. Thus, it would appear that insider trading claims demand application of Rule 9(b).

**\*6** Having determined that Rule 9(b) applies, Count II should be dismissed against defendants Donahue, Freiburghouse and Thompson for the same reasons as Count I. [FN3] The factual allegations simply do not make reference to them, except to identify their status. There is no allegation as to what information they knew but did not disclose.

Defendants Donahue, Freiburghouse and Thompson also argue for dismissal on the grounds that none of the plaintiffs traded securities "contemporaneously" with them, as required under the Securities and Exchange Act. *See* 15 U.S.C. § 78t-1(a). Judge McNaught has ruled out an interpretation of "contemporaneous" that would include purchases by the plaintiffs *before* the defendants. *Backman v. Polaroid Corp., 540 F.Supp. 667, 670 (D.Mass.1982); see also Abelson v. Strong, 644 F.Supp. 524, 527 (D.Mass.1986)* (allegations that plaintiffs purchased "during the period of market manipulation" were not sufficient to confer standing on plaintiffs to bring insider trading suit). He also refused to include within that term purchases that occurred four days (two trading days) after a defendant's sale. *Backman, 540 F.Supp. at 671.* The facts of that case would bar all claims except plaintiff Garibidian's claim against defendant Thompson, as Garibidian purchased within three days (one trading day) of Thompson's sale. The defendants argue persuasively, however, that the logic of Judge McNaught's decision requires an interpretation of "contemporaneous" to mean "same day." [FN4] Under such an interpretation, none of the plaintiffs would have standing to bring the class suit under Count II.

*Count III*

Count III is a more cursory version of Count I, alleging that the defendants other than the derivative director defendants engaged in negligent misrepresentation by refusing to exercise reasonable care in the statements they made. This assertion appears to relate back to the allegations that the defendants acted in reckless disregard of indications that earnings would decrease. What these indications were is not clear. Count III is even less particular than Count I. The defendants move to dismiss it.

This district has clearly held that Rule 9(b) applies to claims of negligent misrepresentation. *Howard v. Cycare Systems, Inc., 128 F.R.D. 159 (D.Mass.1989); Morgan v. Financial Planning Advisors, 701 F.Supp. 923 (D.Mass.1988); Flier v. Billingsley, 1988 WL 92465 (D.Mass.1988)*. The same rule against pleadings on "information and belief" and the same policy against allowing "strike suits" apply to negligent misrepresentation claims as apply to outright claims of fraud. *Howard, 128 F.R.D. at 162* (quoting *Wayne, 739 F.2d at 13-14); Simcox v. San Juan Shipyard, Inc., 754 F.2d 430, 439 (1st Cir.1985)*. Furthermore, without the duties imposed by the securities laws, it is unclear upon what this claim is based. The factual statements appear to have been true when made, and the other statements are "statements of opinion [or] of conditions to exist in the future," which are not actionable under Massachusetts law. *Morgan, 701 F.Supp. at 927* (quoting *Pepsi Cola Metropolitan Bottling Co. v. Pleasure Island, Inc., 345 F.2d 617, 622 (1st Cir.1965)*). Massachusetts law, moreover, generally imposes a requirement of privity in order to bring a claim of negligent misrepresentation. *Capitol Indemnity Corp. v. Freedom House Development Corp., 487 F.Supp. 839, 842 (D.Mass.1980)*. It is unclear how the plaintiffs in this case could meet that requirement, given that they are merely purchasers on a public stock exchange. *See, e.g., In re Consumers Power Company Securities Litigation, 105 F.R.D. 583, 596-98 (E.D.Mich.1985)* (stock purchasers lacked privity and, thus, could not sue for negligent misrepresentation). Thus, Count III should be dismissed.

*Count IV*

**\*7** Count IV is a derivative suit brought by plaintiff Bergman on behalf of Stratus for breach of fiduciary duty to Stratus by the individual defendants. The defendants invoke four grounds for dismissal of this count: (1) failure to meet Rule 9(b)'s particularity requirement; (2) failure to meet Rule 8(a)'s pleading requirement; (3) failure of the plaintiff to plead with particularity the circumstances excusing demand on the corporation, as required by Rule 23.1; and (4) failure to verify the complaint, as required by Rule 23.1. Each of these grounds supports dismissal.

Westlaw.

Not Reported in F.Supp.                                                                    Page 6
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

The defendants' first argument is that Rule 9(b) applies and that plaintiff Bergman has not complied with it. Oddly, plaintiff Bergman does not respond to this argument, but merely incorporates by reference the arguments of the other plaintiffs with regard to Rule 9(b) under the other counts of the complaint. This Court sees nothing to rebut the defendants' arguments.

Judge Keeton has stated that Rule 9(b)'s particularity requirement "extends to averments of fraud or mistake, whatever may be the theory of legal duty-- statutory, tort, contractual, or *fiduciary.* " *Shapiro v. Miami Oil Producers, Inc.,* 84 F.R.D. 234, 236 (D.Mass.1979) (emphasis added); *see also Hayduk,* 775 F.2d at 443 ("where fraud lies at the core of the action, Rule 9(b) applies"). If the breach of fiduciary duty derives from conduct that is negligent, rather than fraudulent, however, Rule 9(b) would not apply. *Shapiro,* 84 F.R.D. at 236. That the breach of fiduciary duty alleged here derives from conduct that is fraudulent, and not merely negligent, is plain from the complaint. Plaintiff Bergman claims: that each of the directors "participated in, knew of, and was on notice of the wrongful and illegal conduct" (*Consolidated Amended Complaint* ¶ 82(e)); that the directors "knowingly engaged in self-dealing from which they profited personally" (*Id.* ¶ 82(f)); and that the defendants' conduct violated their fiduciary duties of candor and loyalty "requir[ing] them to disseminate truthful information" (*Id.* ¶ 83). The derivative count plainly asserts the sort of claim for which Rule 9(b) contemplates the application of its particularity requirement.

Having determined that Rule 9(b) applies, it is immediately apparent that Count IV does not comply with the rule. The allegations are vague and amorphous. It is not at all clear which defendants are alleged to have performed what specific acts that would constitute a violation of fiduciary duty. *See Hurley v. Federal Deposit Ins. Corp.,* 719 F.Supp. 27, 31 (D.Mass.1989) ("Where multiple defendants are involved, each defendant's role in the fraud must be particularized.... This requirement serves to place each defendant on notice of what role he is alleged to have played in the fraud.") (citations omitted); *Margaret Hall Foundation, Inc. v. Atlantic Financial Management, Inc.,* 572 F.Supp. 1475, 1481 (D.Mass.1983) ("In a securities

fraud case ..., it is clear that the complaint should 'particularize as to each ... of the defendants the activities for which the plaintiff seeks to hold them accountable.' ") (quoting *Lerman v. ITB Management Corp.,* 58 F.R.D. 153, 156 (D.Mass.1973)). Count IV only discusses the defendants in collective terminology, making no reference to any particular act of any individual defendant.

**\*8** Beyond the vague allegations of participation, implication, knowledge and dissemination there is no reference to adverse circumstances that would provide a foundation upon which to build these charges. While the charges seem to stem from Counts I through III, five of the six directors sued under Count IV are in no way implicated in Counts I through III. It is, thus, by no means clear whom plaintiff Bergman alleges to have done what. Not only does Count IV fail to provide the defendants with the notice requisite to the preparation of meaningful responses, but the danger of holding the individual defendants *in terrorem* and subjecting them to a frivolous suit that might likely injure their reputations is high. *See New England Data Services,* 829 F.2d at 289; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539, 552 (1975), *reh'g denied,* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975). Thus, Count IV warrants dismissal under Rule 9(b).

The defendants also argue that Count IV fails to comply even with the basic pleading requirements of Rule 8(a) and, thus, should be dismissed under Rule 12(b)(6) for failure to state a claim. Their argument on this ground is also persuasive. Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief. Fed.R.Civ.P. 8(a). As the First Circuit has stated:

While a complaint need only set out 'a generalized statement of facts,' there must be enough information 'to outline the elements of the pleaders' claim.' ... More detail is required than a plaintiff's bald statement 'that he has a valid claim of some type,' and courts do 'not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened....' "

*Kadar Corp. v. Milbury,* 549 F.2d 230, 233 (1st Cir.1977)

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

(quoting Wright & Miller, Federal Practice and Procedure: Civil § 1357). The complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80, 85 (1957).

Nowhere does Count IV charge the outside directors with any specific wrongdoing. Rather, Count IV seems to implicate them only because of their status as directors. That tenuous connection, however, is an insufficient basis for alleging a cause of action. *Cf. Konstantinakos,* 719 F.Supp. at 39 (mere status as directors is insufficient basis to support cause of action for securities fraud in which directors did not participate); *Schmid v. National Bank of Greece, S.A.,* 622 F.Supp. 704, 712 (D.Mass.1985), *aff'd,* 802 F.2d 439 (1st Cir.1986) ("An officer of a corporation does not incur personal liability for a tort committed by the corporation or by another corporate officer merely by virtue of the office which he holds in the corporation.") (citations omitted). As Judge Tauro has noted, where a complaint alleges "violation of ... fiduciary duties" without "attempt[ing] to delineate among the defendants their participation or responsibilities in the activities which are the subject of th[e] suit," it does not give the defendants the notice required of either Rule 8(a) or Rule 9(b), *Lerman,* 58 F.R.D. at 155 & n. 2 (D.Mass.1973).

**\*9** Yet another reason for dismissing Count IV is the failure of plaintiff Bergman to make a demand on the board of directors that the corporation bring the lawsuit. Rule 23.1 requires that, in a derivative action, the complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ..., and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. The First Circuit has explained:

The purpose of the demand requirement is, of course, to require resort to the body legally charged with conduct of the company's affairs before licensing suit in the company's name by persons not so charged. Given the expense of litigation and the normal presumptions running in favor of those acting for the company, this seems only reasonable.

*Heit v. Baird,* 567 F.2d 1157, 1162 n. 6 (1st Cir.1977).

Thus, the particularity requirement under Rule 23.1 "is not a technical rule of pleading, but one of substantive right." *In re Kauffman Mutual Fund Actions,* 479 F.2d 257, 263 (1st Cir.1973), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973) (quoting *Bartlett v. New York, N.H. & H.R.R.,* 221 Mass. 530, 538, 109 N.E. 452, 456 (1915)).

There are two phases of the demand requirement. Not only must any reasons excusing demand satisfy the substantive state law, but Rule 23.1 imposes an independent federal requirement that such reasons be pled with particularity. *Tural v. Rogatol Distributors, Inc.,* No. 91-1472 (1st Cir. Nov. 27, 1991). In pleading the reasons excusing demand, the particularity rule requires more specificity of the complaint than mere allegations of "participation" or "acquiescence" in the challenged conduct. *Grossman v. Johnson,* 674 F.2d 115, 124 (1st Cir.1982), *cert. denied, Grossman v. Fidelity Municipal Bond Fund, Inc.,* 459 U.S. 838, 103 S.Ct. 85, 74 L.Ed.2d 80 (1982), *reh'g denied,* 459 U.S. 1138, 103 S.Ct. 774, 74 L.Ed.2d 986 (1983). The factual allegations of the complaint must describe misconduct with specificity. *Heit,* 567 F.2d at 1161 (citing 3B Moore's Federal Practice ¶ 23.1.19, at 23.1-83 (Rev. ed. 1977)).

Much of the rationale behind this Court's finding that Count IV does not satisfy the Rule 9(b) particularity requirement applies *a fortiori* to the Rule 23.1 particularity requirement. In vague and conclusory fashion, Count IV asserts six reasons justifying demand futility, none of which have specific factual support in the complaint and one of which contradicts an earlier count in the complaint. According to the complaint, demand would be futile because:

(a) The acts complained of herein constitute violations of the federal securities and other federal laws and fiduciary duties owed by directors and officers and these acts are incapable of ratification;

(b) Each of the directors is implicated in the dissemination of the false and misleading statements and omissions alleged herein;

**\*10** (c) Each member of the Board of Directors had access to confidential financial information indicating Stratus' true

Not Reported in F.Supp.                                                                    Page 8
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

and [sic] financial condition and prospects.

(d) Social, business and other relationships tie the officers and directors of Stratus to one another, and any legitimate 'independent' action by Stratus against any of the individual defendants would be impossible;

(e) Each of the current directors participated in, knew of, and was on notice of the wrongful and illegal conduct alleged herein; and

(f) Five of the six directors who comprise Stratus' board have been involved in trading in Stratus' common stock on the basis of material non-public information and will be personally liable for any wrongdoing, in that they knowingly engaged in self-dealing from which they profitted [sic] personally.

*Consolidated Amended Complaint* ¶ 82.

Starting with the most egregious deviation from Rule 23.1, item (f) stands in peculiar contrast to the conspicuous absence of five of the six directors from any of the other counts of the complaint, including Count II--the count alleging insider trading. Such a mysterious and vague assertion cannot satisfy the particularity requirement. Count II, moreover, fails to state a claim or meet the particularity requirement of Rule 9(b). *See supra.* Item (a) is also suspect, as this complaint fails to allege particular conduct that would violate the federal securities laws. What other federal laws may be implicated is unclear. [FN5]

Finally, allowing a complaint to circumvent the demand requirement through allegations as vague and conclusory as items (b) through (e) would render the demand requirement nugatory. These items, in light of the factual allegations of the complaint, cannot be understood to allege particular misconduct by the individual directors nor particular circumstances specific to each director. "[S]tripped of these conclusory allegations, the facts set forth in the complaint" fail to "make out with sufficient particularity misconduct that would excuse a demand on directors." *Heit,* 567 F.2d at 1161 (citing 3B Moore's Federal Practice ¶ 23.1.19, at 23.1-83 (Rev. ed. 1977).

These allegations are similar to the one Judge Tauro found

insufficient to satisfy Rule 23.1's particularity requirement in *Lerman.* In that case, the plaintiff alleged:

Demand upon the Fund to bring this action would be futile because those in control of the Fund are alleged wrongdoers. Statutes place such decisions in the directors and control of such an action would be subject to control of the wrongdoers, preventing diligent prosecution.

*Lerman,* 58 F.Supp. at 156 (quoting *Complaint* ¶ 24). The allegations in the case at bar have the same degree of particularity as the allegation in *Lerman. Kauffman* and *Heit* require more than such vague and conclusory allegations. [FN6]

Yet another ground for dismissing Count IV is Rule 23.1's verification requirement. Rule 23.1 states, in part: "In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ... the complaint shall be verified...." Fed.R.Civ.P. 23.1. Verification is another safeguard to ensure that complaints in derivative suits are well-grounded in fact and to prevent frivolous litigation. *Smachlo v. Birkelo,* 576 F.Supp. 1439, 1442 (D.Del.1983) (citations omitted). Plaintiff Bergman contends that his verification of the first complaint should excuse verification of the Consolidated Amended Complaint. The case law, however, stands against him. *See, e.g., Federal Deposit Ins. Corp. v. Kerr,* 637 F.Supp. 828, 843 (W.D.N.C.1986) (requiring verification of Second Amended Complaint); *Stein v. Aldrich* [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,473, at 92,781 (S.D.N.Y.1980) (amended complaint "must be verified by plaintiff"). In this case, verification of the Consolidated Amended Complaint might have eliminated some of the discrepancies. Thus, on any of these grounds, Count IV should be dismissed.

*Conclusion*

*11 In light of these findings, this Court recommends that Counts I, II, III and IV be dismissed as to all defendants except defendant Oldham, who has not filed a motion to dismiss.

FN1. The complaint offers several statements of

Not Reported in F.Supp.                                                                          Page 9
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

accurate historical facts regarding past growth, products and performance. These statements place Stratus in a positive light. There are also many statements of opinion and predictions offering an optimistic prognosis on the expected rate of growth. Some of the opinions and predictions are specifically quantifiable. *See Priest v. Zayre,* Civil Action No. 86-2411-Z, Memorandum of Decision at 5 (D.Mass. May 1, 1987). Nonparty statements by the media and financial analysts bolstered this optimistic impression. While the complaint gives the times, places and contents of statements made expressing confidence in the projected rate of Stratus's growth, it does not allege quantifiable information that the defendants could have known and disregarded. *Cf. Healthco,* Civil Action No. 91-10710-MA, Memorandum and Order at 14, n. 9 ("Plaintiffs aver no facts as to how Defendants' accounting system would or should have made them aware of any concrete financial figures for the fourth quarter before ... [defendant] announced its expected losses for the fourth quarter.") Without allegations of lack of reasonable basis, knowing falsehood or recklessness that satisfy Rule 9(b), the predictions are not actionable. *See Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1453-54 (D.Mass.1989).

The complaint merely leaves this Court to infer adverse circumstances from the rather vague charges of insider trading (which, as will be discussed *infra* under Count II, are inadequate). Notably, however, there are no allegations of sales of stock by defendants Foster and Haroian, the only defendants to whom the plaintiffs have attributed representations that would satisfy the time, place and content requirements. Charges that some defendants sold stock, while other defendants made optimistic projections about the company, clearly will not, without a particularly pled conspiracy, satisfy Rule 9(b). *Fingar v. Prudential-Bache Securities, Inc.,* 662 F.Supp. 1119, 1124 (E.D.N.Y.1987). Here, the plaintiffs seem to plead a conspiracy by knowledge, which is inadequate. *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th

Cir.1990), *cert. denied,* 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) (quoting *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986) ("the case 'against an aider, abettor, or conspirator may not rest on a bare inference that the defendant must have had knowledge of the facts....' ").

FN2. *Romani,* 929 F.2d at 828 ("Where allegations of fraud are ... based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief."); *Hayduk,* 775 F.2d at 444 ("Without supporting facts regarding the circumstances surrounding the formation of the conspiracy to defraud plaintiffs or plaintiffs' basis for believing that a conspiracy existed for the purpose of defrauding them, the allegation becomes a conclusional accusation of the sort that is proscribed by Rule 9(b)."); *Wayne,* 739 F.2d at 14 (complaint may not proceed on mere "information and belief" without some independent factual basis for alleging fraud--"even when the fraud relates to matters peculiarly within the knowledge of the opposing party"); *see also Driscoll,* 758 F.Supp. at 51 ("Allegations in the form of mere conclusions, accusations, or speculation are not sufficient to meet Rule 9(b)'s particularity requirement without supporting facts surrounding the scheme to defraud or a basis for believing such a scheme existed.") (citing *Hayduk,* 775 F.2d at 444; *Wayne,* 739 F.2d at 14). As Judge Caffrey has stated: "Rule 9(b) does not require the plaintiff to present specific evidence; however, the plaintiff must identify some facts or circumstances to support the allegations of fraud...." *Id.* at 52.

FN3. This Court has not received a motion from defendant Oldham.

FN4. As Judge McNaught noted, the rationale for limiting recovery to those who traded during the same period of insider trading is that " '[n]on-contemporaneous traders do not require the special protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of

Not Reported in F.Supp.                                                                              Page 10
1992 WL 73555 (D.Mass.)
**(Cite as: 1992 WL 73555 (D.Mass.))**

trading with someone who has superior access to information.' " *Id.* at 670 (quoting *Fridrich v. Bradford,* 542 F.2d 307, 326-27 (6th Cir.1976) (Celebrezze, concurring)); *see also Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 94-95 (2d Cir.1981) (same). Judge Skinner cited *Backman* and *Wilson* with approval in *Abelson,* 644 F.2d at 527. In a more open-ended violation, such as large scale "tipping," this rationale would not apply, and the rule might be less restrictive. *See Backman,* 540 F.Supp. at 670 n. 1.

FN5. Item (a) would also encounter difficulties in the substantive prong of the demand analysis. The assertion that the defendants violated federal statutes is an insufficient basis for excusing demand, at least under federal law. *Lewis v. Sporck,* 612 F.Supp. 1316, 1322-23 (N.D.Cal.1985). Nor does it matter that the directors would essentially have to sue themselves. *Id.*

FN6. Insofar as five of the six defendants are not named in the count alleging insider trading and insofar as that count does not pass muster, the substantive prong of the demand requirement also poses a major difficulty. The complaint fails to implicate a majority of the directors in wrongdoing. *See Datz v. Keller,* 347 Mass. 766, 196 N.E.2d 922, 923 (1964) (dismissing complaint for insufficiently making "allegations of fact that both a majority of the directors and the holders of a majority stock interest are in the group of wrongdoers, or under their control"), *cited in Houle v. Low,* 407 Mass. 810, 813 n. 3, 556 N.E.2d 51, 53 n. 3 (1990); *accord Jackson v. Stuhlfire,* 28 Mass.App.Ct. 924, 926, 547 N.E.2d 1146, 1148 (1990); *see also Hayden v. Perfection Cooler Co.,* 227 Mass. 589, 593, 116 N.E. 871, 873 (1917) (derivative plaintiff must make "specific allegations that the majority of the directors were wilfully disregardful of the interests of the corporation"). The language of these cases indicates that Massachusetts law would only

excuse demand for harm caused to the corporation by a majority of the directors. Here, the complaint fails to allege conduct beyond "mere approval of corporate action, absent self-interest or other indication of bias." *Kauffman,* 479 F.2d at 264; *see also Heit,* 567 F.2d at 1162 ("As the complaint fails to set forth facts showing that a majority of the directors ... engaged in a facially improper transaction, we hold that the failure of the plaintiff to make a demand on the directors before commencing this suit was unexcused, and dismissal of the case for noncompliance with Rule 23.1 was proper."); *Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983) ("absent specific allegations of self-dealing or bias on the part of a majority of the board, mere approval and acquiescence are insufficient to render demand futile").

1992 WL 73555 (D.Mass.)

END OF DOCUMENT

# EXHIBIT 17

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
2003 WL 23022035 (S.D.N.Y.)
**(Cite as: 2003 WL 23022035 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

In re WORLDCOM, INC. SECURITIES LITIGATION
This Document Relates to: All Actions

**No. 02 CIV.3288 DLC.**

Dec. 1, 2003.

**Background:** In consolidated securities litigation regarding massive fraud at a telecommunications corporation, members of the board of director's audit committee moved to dismiss a claim under § 10(b) of the Securities Exchange Act alleging abandonment of their oversight responsibility.

**Holding:** The District Court, Cote, J., held that there were insufficient allegations as to scienter to state a claim against the committee members.
Motion granted.

West Headnotes

**Securities Regulation ☞60.51**

349Bk60.51 Most Cited Cases

Complaint in consolidated securities litigation regarding massive fraud at a telecommunications corporation failed to adequately alleged the scienter of members of the board of director's audit committee, as required to state a claim under § 10(b) of the Securities Exchange Act regarding the committee's alleged abandonment of its responsibility to oversee the corporation's internal audit department and outside auditor; there was no allegation of a specific obligation imposed on the committee that they ignored, such that it would be fair to infer that they either knew of the fraud or must have been aware of it, and no allegation of any documents or information in connection with the work of the outside auditor that the committee members had a duty to review and failed to review. 15 U.S.C.A. § 78j.

Max W. Berger, John P. Coffey, Steven B. Singer, Beata Gocyk-Farber, John C. Browne, Jennifer L. Edlind, Bernstein Litowitz Berger & Grossman LLP, New York, Leonard Barrack, Gerald J. Rodos, Jeffrey W. Golan, Mark R. Rosen, Jeffrey A. Barrack, Pearlette V. Toussant,

Barrack Rodos Bacine, Philadelphia, PA, for Lead Plaintiff in the Securities Litigation.

Paul Curnin, David Elbaum, David H. LaRocca, Simpson Thacher & Bartlett LLP, New York, for Director Defendants.

OPINION & ORDER

COTE, District J.

**\*1** This Opinion addresses the alleged abandonment by a board of director's audit committee of its responsibility to oversee the company's internal audit department and the company's outside auditor. The specific issue presented is whether the plaintiffs have sufficiently alleged in their complaint that audit committee members were either aware of a massive fraud at WorldCom, Inc. ("WorldCom") or reckless as to its existence.

Defendants James C. Allen, Judith Areen, Max E. Bobbitt, and Francesco Galesi (the "Audit Committee Defendants") have moved to dismiss Claim VI of the First Amended Consolidated Class Action Complaint filed in this complex securities litigation. For the following reasons, the motion is granted.

*Background*

Beginning on April 30, 2002, class actions arising from allegations of wrongdoing at WorldCom were assigned to this Court. On August 15, 2002, the class actions were consolidated and the New York State Common Retirement Fund was appointed Lead Plaintiff. The Lead Plaintiff filed a Consolidated Class Action Complaint on October 11, 2002 ("Complaint").

On May 19, 2003, the Audit Committee Defendants' motion to dismiss one of the claims pleaded against them in the Complaint--the Section 10(b) claim brought pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), ("Section 10(b)")--was granted. *See In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2003 WL 21219049, at *35 (S.D.N.Y. May 19, 2003) ("May 19 Opinion"). Familiarity with the May 19 Opinion is assumed.

The May 19 Opinion dismissed the Section 10(b) claim

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
2003 WL 23022035 (S.D.N.Y.)
**(Cite as: 2003 WL 23022035 (S.D.N.Y.))**

against the Audit Committee Defendants for the failure to plead their scienter with sufficient particularity to support a strong inference of fraudulent intent. *Id.* at * 15-16, 22-23. In particular, the May 19 Opinion found that the strongest allegations against these defendants rested on the descriptions of the duties imposed on them. The May 19 Opinion also found, however, that the Complaint had failed to identify the information that the Audit Committee was obligated to monitor pursuant to those duties and that would have disclosed the fraud to them if they had monitored it. *Id.* at *23. The Lead Plaintiff was granted leave to amend this portion of the Complaint. *Id.* at *35.

On August 1, 2003, the Lead Plaintiff filed the First Amended Consolidated Class Action Complaint ("Amended Complaint"). The allegations in the Amended Complaint concerning the Audit Committee Directors are described below.

The description of the financial fraud at WorldCom appears in the May 19 Opinion and will not be repeated in its entirety here. *See id.* at *5. Briefly stated, however, the Amended Complaint alleges that WorldCom's senior management directed the manipulation of the WorldCom financial statements through excessive write-offs, unjustified transfers of significant costs from operating expenses to capital expenditures which could be depreciated over time, and top-side adjustments that inflated the company's reported earnings. Neither WorldCom's internal audit department nor its outside auditor reviewed the company's general ledger. An audit of general ledger entries would have disclosed that a massive accounting fraud was afoot.

**\*2** As described by the SEC and a Blue Ribbon Committee of the New York Stock Exchange and the NASD, audit committees of a corporation's board of directors are the corporate participant best able to oversee and monitor the participation of management and the independent auditor in the financial reporting process. Audit committees should ensure that, to deter fraud, corporations employ quality accounting policies, internal controls, and independent and objective auditors.

The Audit Committee for the WorldCom Board of Directors

was led by Bobbitt, who served as its Chair. Bobbitt and Allen both had started their careers as auditors for Arthur Andersen ("Andersen"). With the exception of Galesi, each of the Audit Committee Defendants had financial expertise. The Audit Committee only met for three to five hours each year. Between 1999 and March 2002, the Audit Committee held no executive sessions with the Director of WorldCom's Internal Audit Department ("Internal Audit"). Prior to February 2002, the minutes of the Audit Committee meetings were brief, boilerplate summaries. No minutes were kept for any executive session.

To perform its work on behalf of the Board of Directors, the Audit Committee was required to have a detailed understanding of WorldCom's financial systems and internal controls. WorldCom's SEC filings represented that the Audit Committee reviewed the company's periodic financial statements, communicated with the company's independent accountants, and reviewed the company's internal accounting controls. The Charter for the Audit Committee required it to monitor the company's financial reporting processes and internal control systems, to appraise the audit efforts of Andersen and Internal Audit, to provide an open avenue of communication among senior management, Internal Audit and the Board, and to seek advice of counsel. WorldCom policy required Internal Audit to report to both Sullivan and the Audit Committee.

Despite its responsibility to monitor WorldCom's internal control systems and to appraise the audit efforts of Internal Audit, the Audit Committee did not perform those duties. The Audit Committee allowed WorldCom's Chief Financial Officer to determine whether the Director of Internal Audit would address the Audit Committee at its meetings. The Audit Committee did not suggest changes to Internal Audit's annual audit plan. The Audit Committee received only the final audit report from Internal Audit for each year, and sometimes only the executive summary for that report. Internal Audit provided the Audit Committee with a list of audits scheduled for the year, and general updates and summaries of information that Internal Audit thought important. The Audit Committee allowed management to choose which audits Internal Audit would perform and did not require Internal Audit to investigate the company's

Not Reported in F.Supp.2d                                                      Page 3
2003 WL 23022035 (S.D.N.Y.)
**(Cite as: 2003 WL 23022035 (S.D.N.Y.))**

financial statements. If the WorldCom financial statements had been audited, the financial fraud at WorldCom would have been uncovered.

**\*3** In the Fall of 2001, Internal Audit became aware of corporate accruals amounting to about $2.3 billion. Had the Audit Committee established a "direct reporting relationship" with Internal Audit as required by WorldCom policy, that finding would have been communicated to the Audit Committee. If the Audit Committee then had ordered verification of the accruals, the verification would have revealed the capital expenditure fraud at WorldCom at least eight months sooner than it was disclosed.

The Audit Committee did not require Internal Audit to provide Andersen with copies of its final reports, nor did it make certain that the two were communicating about the materiality of weaknesses identified by Internal Audit. In essence, the Audit Committee did not ensure that there was any meaningful communication between Internal Audit and Andersen. If there had been, Internal Audit may have learned that its assumption that Andersen reviewed the flow of transactions through to the general ledger and external reports was false. Also, if there had been such communication, Internal Audit would have told Andersen about the material weaknesses in internal controls that Internal Audit had identified.

As described above, the Audit Committee was also required to communicate with Andersen and appraise its audit efforts. After 1997, the Audit Committee did not require Andersen to present annual management recommendation letters to it. Andersen had a duty under GAAS to present such letters. The Audit Committee relied instead on quarterly presentations by Andersen and pre-earnings discussions among Andersen, the Chair of the Audit Committee and the CFO.

If the Audit Committee had been actively communicating with Andersen it would have learned that Andersen had not received the list of significant "eliminating and top-side" entries that it had requested from management, and that management also had refused to provide Andersen with a computerized version of the company's general ledger. In essence, the Audit Committee failed to ensure that Andersen

received the information that it needed to conduct its audits. If Andersen had received that information, it would have discovered several of the accounting irregularities at the heart of the fraud.

The Audit Committee should have questioned Andersen about its use of a non-traditional audit approach. Had it done so it would have learned that Andersen did not verify financial statements and account records.

Bobbitt assisted in the restructuring of Ebbers' personal loans, and knew as a result that the disclosures in the company's SEC filings about the use of loan proceeds and the sufficiency of Ebbers' assets to satisfy the $408 million in outstanding loans and guarantees were materially false and misleading. The Audit Committee members were at least reckless in not discovering that the company did not have a system for monitoring corporate loan proceeds, that the company did not conduct a valuation of Ebbers' non-stock assets, and that the company had not made sure to get complete and current financial information from Ebbers.

**\*4** The size of WorldCom's restatement means that the Audit Committee necessarily either knew of the fraud or was reckless. Also, the Audit Committee failed to correct a deficiency in WorldCom's internal controls that it learned about in June 2001. [FN1]

> FN1. The two allegations in this paragraph are essentially unchanged from allegations in the Complaint, and were found by the May 19 Opinion to be inadequate to state a Section 10(b) claim. *See In re WorldCom, Inc. Sec. Litig.,* 2003 WL 21219049, at *22.*

*Discussion*

The Audit Committee Defendants move to dismiss the claim in the Amended Complaint that they engaged in securities fraud in violation of Section 10(b) of the Exchange Act. The standard for pleading a Section 10(b) claim was set forth in the May 19 Opinion, and is incorporated herein. *See In re WorldCom, Inc. Sec. Litig.,* 2003 WL 21219049, at *15-16.*

In brief, a Section 10(b) claim requires the complaint to allege an intent to deceive, manipulate or defraud through

Not Reported in F.Supp.2d                                                    Page 4
2003 WL 23022035 (S.D.N.Y.)
**(Cite as: 2003 WL 23022035 (S.D.N.Y.))**

the statement of particularized facts that give rise to a strong inference of fraudulent intent. *Id.* at *15. Among the ways fraudulent intent, or scienter, may be pleaded is through facts that constitute strong circumstantial evidence of recklessness. *Id.* at *16. This includes allegations that a defendant had access to information contradicting her public statements, that a defendant failed to review information that she had a duty to monitor, and that a defendant ignored obvious signs of fraud. *Id.* at *17 (citing *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000)). A defendant's conduct must represent such "an extreme departure from the standards of ordinary care" that it is fair to infer that the defendant either knew of or must have been aware of the fraud. *Id.* (citing *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000)).

The Lead Plaintiff contends that it has adequately alleged the scienter of the Audit Committee Defendants by pleading sufficient facts to show that they were reckless in two ways. First, the Audit Committee Defendants failed to communicate effectively with Internal Audit. If they had, they would have learned in the Fall of 2001, that there was a $2.3 billion capital expenditures discrepancy. Second, the Audit Committee Defendants failed to communicate with WorldCom's outside auditor, Andersen. If they had, they would have learned that WorldCom's management had refused to provide Andersen with critical information in connection with the audits of WorldCom. Neither of these arguments, nor the subsidiary arguments made by Lead Plaintiff, succeeds in establishing that the Amended Complaint has adequately alleged these defendants' scienter.

1. Monitoring and Appraising the Internal Audit Function

The Lead Plaintiff has not described any documents or information in connection with WorldCom's internal auditing function that the Audit Committee Defendants had a duty to review and failed to review. Instead, the Lead Plaintiff has pointed to the general duties imposed on the Audit Committee Defendants in the WorldCom SEC filings to review the company's internal accounting controls, and in the Committee's Charter to monitor WorldCom's financial reporting processes and internal control systems, to appraise the audit efforts of Internal Audit, and to provide an open avenue of communication between Internal Audit and the

Board. The Lead Plaintiff has not, however, described with particularity that the Audit Committee failed to do any of these vaguely worded tasks.

**\*5** The Lead Plaintiff has not pointed to any specific obligation imposed on the Audit Committee Defendants that they ignored such that it would be fair to infer that they either knew of the fraud or must have been aware of it. There is no allegation, for instance, that the Audit Committee Defendants did not communicate and meet with Internal Audit, or that they never received or reviewed information about the auditing work performed by Internal Audit. Instead, the Amended Complaint describes what the Audit Committee Defendants might have learned if they had done a better job or if they had been more aggressive or diligent. Section 10(b), however, does not impose liability for negligence or impose obligations *ex post facto.* There is simply no adequate basis to infer from the allegations in the Amended Complaint that the Audit Committee Defendants themselves were aware or must have been aware of the accounting fraud at WorldCom.

The Lead Plaintiff places particular emphasis on the allegations that the Audit Committee Defendants failed to communicate effectively with Internal Audit in the Fall of 2001, when the defendants could have learned of a $2.3 billion capital expenditures discrepancy and thereby uncovered the fraud before they each signed WorldCom's 2001 Form 10-K in March 2002. The Amended Complaint asserts, however, that Internal Audit personnel accepted the explanations provided by WorldCom employees for the discrepancy in the accruals they were investigating. Therefore, even if the Lead Plaintiff had sufficiently alleged a breach of a well-defined duty to communicate, it has not alleged that Internal Audit would have reported to the Audit Committee in the Fall of 2001 that it had uncovered information indicative of fraud or wrongdoing, or even information requiring further investigation.

The Lead Plaintiff contends that scienter may be inferred from the fact that the Audit Committee Defendants allowed Internal Audit to report directly to WorldCom's CFO. The Lead Plaintiff has identified no duty imposed on the Audit Committee, however, to ensure that such direct reporting did not occur. Moreover, the Amended Complaint describes

Not Reported in F.Supp.2d                                                  Page 5
2003 WL 23022035 (S.D.N.Y.)
(Cite as: 2003 WL 23022035 (S.D.N.Y.))

organized and direct communication between Internal Audit and the Audit Committee, and contains no allegation that Internal Audit ever complained to the Audit Committee in those discussions that the CFO was interfering with Internal Audit's work or preventing it from investigating troublesome issues that it had identified.

Lead Plaintiff argues that the Audit Committee should have required Internal Audit to investigate WorldCom's financial statements instead of its operations. While it may have been appropriate for the Audit Committee to do this, the Lead Plaintiff has identified no specific duty imposed on the Audit Committee that required it to do this.

2. Communicating with and Appraising the Outside Auditor

Similarly, the Lead Plaintiff has not described any documents or information in connection with the work of WorldCom's outside auditor that the Audit Committee Defendants had a duty to review and failed to review. Instead, the Lead Plaintiff has described the generally stated duties imposed on the Audit Committee Defendants in the WorldCom SEC filings to communicate with Andersen, and in the Charter to monitor WorldCom's financial reporting processes, and to appraise the audit efforts of Andersen. The Lead Plaintiff has not, however, described with particularity that the Audit Committee actually failed to perform any of these broadly described functions. Even when read with the deference to which it is entitled, the Amended Complaint simply contends that the Audit Committee Defendants should have done their jobs better than they did.

*6 The Lead Plaintiff emphasizes that the Audit Committee Defendants should have ensured that Andersen obtained the books and records that it needed to conduct its audits effectively. The Amended Complaint describes regular and direct communication between the Chair of the Audit Committee and Andersen, but no instance in which Andersen advised anyone on the Audit Committee that management was denying it access to any records or other information that it needed to perform its work.

The Lead Plaintiff argues that it was the responsibility of the Audit Committee Defendants to get annual management comment letters from Andersen. The Amended Complaint

does not allege that the Audit Committee had any such specific duty.

The Lead Plaintiff faults the Audit Committee Defendants for never learning that Andersen used a non-traditional audit approach for WorldCom. While this may be evidence of negligence, it does not provide a basis from which to infer that the defendants were aware or must have been aware of the fraud at WorldCom.

Finally, the Lead Plaintiff points out that the Audit Committee failed to take the steps that would have revealed that particular line items had been manipulated by WorldCom management to falsify the company's financial reports. Without pointing to specific documents that would have revealed the fraud and that the Audit Committee Defendants had a duty to review, and without alleging specific duties imposed on these defendants that they ignored, and which if performed would have disclosed the fraud to them, the Lead Plaintiff has failed to allege the defendants' scienter with the particularity required by law.

In sum, the Lead Plaintiff contends that the Audit Committee Defendants were so lax in the performance of their duties to communicate with Internal Audit and Andersen that they effectively abrogated their responsibilities to the corporation and its shareholders. The Amended Complaint fails to plead with the particularity required by law that the Audit Committee had well defined duties in this regard, that they omitted to perform those duties, and that it may be inferred from the Audit Committee's omission that they either knew or must have known of the accounting fraud at WorldCom. The Amended Complaint's allegations reveal at most an Audit Committee that accepted too readily the reports given to it by management, Internal Audit and Andersen, and that was anemic in its oversight function. The allegation that a defendant generally failed to perform a job well, however, is not a substitute for the particularized pleading that a defendant knowingly or recklessly engaged in fraud.

Conclusion

The motion by defendants James C. Allen, Judith Areen, Max E. Bobbitt and Francesco Galesi to dismiss Claim VI

Westlaw.

Not Reported in F.Supp.2d                                                      Page 6
2003 WL 23022035 (S.D.N.Y.)
**(Cite as: 2003 WL 23022035 (S.D.N.Y.))**

in the Amended Consolidated Class Action Complaint is
granted.

SO ORDERED:

2003 WL 23022035 (S.D.N.Y.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.