### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **IN RE BIOPURE CORPORATION** | ) | **Master Docket No. 1:04-cv-10177-NG** |
| **DERIVATIVE LITIGATION** | ) | **(Consolidated Derivative Action)** |
| | ) | |
| | ) | **Assigned to: Judge J. Nancy Gertner** |
| | ) | |
| | ) | **Magistrate Judge Alexander** |

**VERIFIED CONSOLIDATED SECOND AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

### I.

### NATURE OF THE ACTION

1.     This is a shareholders derivative action brought in the right of, and for the benefit of, nominal defendant Biopure Corporation ("Biopure" or the "Company") against its Board of Directors (the "Board") and certain top officers to remedy defendants' breaches of fiduciary duties and other violations of law which have inflicted millions of dollars in damages upon Biopure's reputation, goodwill and standing in the business community and have exposed it to millions of dollars in potential liability for violations of state and federal law including subjecting the Company to civil penalty in a civil action filed by the Securities and Exchange Commission ("SEC"). This action arises out of defendants' causing Biopure to file false financial statements and to issue misleading statements and conceal material facts from investors and the public concerning Hemopure®, one of the Company's primary products, between March 17, 2003 and the Present (the "Relevant Period"). Defendants' misconduct has caused severe, irreparable, injury and damages to

1

the Company, particularly to its reputation and goodwill in the investment and business community, and has virtually destroyed this once valuable franchise causing it to become a penny stock and erasing over $350 million in market capitalization or over 90% of the market value of the Company, severely reducing its financing options and placing the Company in serious peril of having its common stock delisted by Nasdaq.

## II.

## SUMMARY OF THE ACTION

2.      Biopure is a biotechnology company that develops, manufacturers and markets oxygen therapeutics, a new class of pharmaceuticals that are intravenously administered to deliver oxygen to the body's tissues.  The Company had developed two products, one of which is Hemopure® (hemoglobion glutamer - 250 (biovine)), which is an investigational product for the treatment of acutely anemic surgical patients and for the elimination, delay or reduction of red blood cell transfusions in these patients.  Hemopure® is a human blood substitute made from refined cow hemoglobin which acts like red blood cells to deliver oxygen to the body.  However, unlike donated blood, Hemopure® does not have to be matched to a patient's blood type.

3.      As a biotechnology company, Biopure's value is mainly determined by the prospects of its getting approval of Hemopure® for human use. Because Hemopure® is the Company's flagship product, investors rely on and consider material all information and communications concerning Hemopure® between Biopure and the U.S. Food and Drug Administration ("FDA").

4.      On July 31, 2002, Biopure submitted a Biologic License Application ("BLA") to the FDA seeking regulatory approval to market Hemopure® in the U.S. for use in orthopedic surgery.

2

On that date, the *Boston Globe* ran an indepth article questioning the Company's suspicious concealment of information concerning Hemopure®'sstatus. The article stated in relevant part:

> Though Biopure completed its two Phase III trials in November 2000, the company has been extraordinarily secretive about the results. In a departure from common practice, it has declined to release the comprehensive results of the potentially pivotal experiments. Instead, it has disclosed bits and pieces of the results, none of which are definitive.
>
> "It's out of the ordinary," said Dr. Mark Monane, biotechnology and life sciences analyst for Needham & Co. in New York. "We generally expect to get the results of phase 2 trials, then phase 3 trials, then a filing to the FDA. I don't think there's a regulatory rule requiring it, but most investors would like to hear about the phase 3 data before the filing. In general, phase 3 trials are material events and there's a need to disclose the results to investors."

5.     In September 2002, the Company received a grant from the U.S. Department of the Army to conduct clinical trials of Hemopure® for the treatment of trauma patients. In March 2003, the Company submitted a "trauma study protocol" to the FDA in connection with its plans to conduct a phase II clinical trial of Hemopure® for the treatment of trauma patients. At the time, this information was not revealed by Biopure to the public.

6.     During the Relevant Period, the defendants continually represented they were optimistic of achieving FDA approval to market Hemopure® to orthopedic patients. However, unbeknownst to the public, as early as March 2003, the FDA had informed the defendants that the proposed clinical trials could not go forward, citing "safety concerns" arising from adverse event data submitted as part of the Company's BLA which sought FDA approval to market Hemopure® to orthopedic surgery patients. Thus, the defendants were on notice that FDA approval of the BLA, which would allow the first commercial distribution, if any, of Hemopure® in the United States, was in serious jeopardy and would be delayed beyond the mid-2003 target date defendants had previously stated.

7.    Specifically, in April 2003, Biopure began receiving negative information from the FDA. On or about April 9, 2003, the FDA imposed a clinical hold barring the company from conducting clinical trials of Hemopure® on trauma victims because of "safety concerns" arising out of the FDA's preliminary assessment of Biopure's BLA. In or about May 2003, the FDA denied Biopure's request to lift the clinical hold. Then, on or about July 30, 2003, Biopure received two lengthy and detailed letters from the FDA. In one letter, the FDA again refused to allow the clinical trials because of "an unreasonable and significant risk of illness or injury" to human subjects. The other letter was the FDA's complete response letter to the BLA, in which the FDA informed Biopure that it was not approving Biopure's BLA at that time because of extensive and significant deficiencies in Biopure's application and because of concerns about the lack of safety and efficacy of Hemopure®. Receipt of the complete response letter meant that the FDA had completed its review of the BLA and would have an additional six months to review a resubmission by the company, if and when the company addressed all deficiencies identified by the FDA. One year later, the defendants still had not addressed all deficiencies raised in the complete response letter and decided instead to shift the Company's focus to developing Hemopure® for a different application.

8.    On August 1, 2003, two days after receiving a complete response letter from the FDA, defendants caused or allowed Biopure to issue a false and misleading press release that gave the  impression the company had received positive news from the FDA.  That day, Biopure's stock closed at $7.30 per share, a 22% increase over its previous day close.  For four additional months from August until December 11, 2003, defendants caused or allowed Biopure to continue to conceal that it had received a complete response letter from the FDA, to continue to make false statements about its dealings with the FDA and to fail to disclose the true scope and nature of the deficiencies

4

with the BLA identified by the FDA.  Indeed, on one occasion in September 2003, defendants caused or allowed Biopure to disclose in a prospectus filed with the SEC that the July 30 letter it received was a complete response letter.  When Biopure's stock price dropped on heavy trading, defendants caused or allowed Biopure to issue statements to investors that the ***reference to the letter as a complete response letter was a "mistake" by a "junior lawyer at a law firm" retained by the company***.  The disclosure was quickly "fixed" with the filing of an amended prospectus that omitted the reference to the letter as a "complete response letter."

9.      Finally, under the threat of civil litigation by the SEC, on December 24, 2003, after the close of the market on Christmas Eve, the defendants announced a potential SEC inquiry for securities fraud, and for the first time, disclosed material problems with is Hemopure® product and the FDA approval process.  The defendants caused the Company to announce that:

(1)      On Monday, December 22, 2003, the Company had received a Wells Notice from the SEC.  The SEC sends a Wells notice to a company or an individual after its staff has completed an investigation and determined that sufficient wrongdoing has occurred to warrant civil charges being filed. The SEC sent a Wells notice to Biopure, defendant Thomas A. Moore ("Moore"), Biopure's President and Chief Executive Officer ("CEO") and Howard Richman, the Company's former vice president of regulatory affairs, ***for failing to adequately disclose material information about Biopure's communications with the FDA concerning the Company's application***;

(2)      For the first time, that in March 2003, the Company had sought FDA permission to begin new clinical trial testing of Hemopure® in hospitalized trauma patients and that the FDA has repeatedly denied the request;

(3)      The FDA had refused to allow the study because of material "safety concerns" from the Company's Phase III orthopedic surgery trial;

(4)      The FDA had placed a "clinical hold" on any trauma trials, and requested more information, including additional animal studies, before Hemopure® could be tested in humans under trauma conditions; and

(5)    Despite Biopure's supplemental filings on July 30, 2003, the FDA again had denied Biopure's request that it lift its "clinical hold," barring any Hemopure® trauma trials.

10.    In response to this news, the Company's common stock fell to under $2 per share in January 2004, from a Relevant Period high of over $8 per share in August and September of 2003, erasing over $266 million in market capitalization, or 75% of the Company's market value during the Relevant Period, and severely reducing the Company's financing options.

11.    Moreover, on February 5, 2004, just over a month after the SEC had recommended civil action against the Company and Moore for misleading investors concerning Hemopure®, the SEC and the FDA announced plans to work together in an attempt to crack down on companies that make false and misleading statements concerning their products under review by the FDA.  On that date, the SEC issued a press release entitled "SEC and FDA Take Steps to Enhance Inter-Agency Cooperation."  The press release stated in relevant part:

> The Securities and Exchange Commission announced today that members of its senior staff and senior personnel of the Food and Drug Administration (FDA) are continuing and enhancing their cooperative efforts in support of the Commission's activities An exchange of letters memorializes the initiatives to be taken by the FDA to support the Commission in carrying out its mission to protect investors and maintain the integrity of the nation's securities markets.

> *  *  *

> Stephen M. Cutler, Director of the Commission's Division of Enforcement, and a signatory of the SEC's letter, said, "The Commission staff appreciates FDA's strong interest in coordinating our agencies' activities in a cooperative manner. **When companies misrepresent the status of the FDA's review of their products, investors can be harmed.  We are eager to continue working with the FDA to aggressively address such situations and to enhance our already-productive relationship."**

12.     Commenting on the SEC's announcement, an article by Adam Feuerstein appearing in *TheStreet.com* on February 10, 2004, entitled "Cyberonics' Disturbing Pattern of Chatter," relative to Biopure, stated in relevant part:

> The Food and Drug Administration and the Securities and Exchange Commission recently announced plans to work together to crack down on companies that make false or misleading statements about products under FDA review.
>
> *   *   *
>
> ***Companies often take it upon themselves to offer one-sided, typically very positive, accounts of their all-important interactions with the FDA, often to the point of misleading investors, ImClone and Biopure being classic examples.***
> Executives who like to tout their dealings with the FDA know full well that regulators are barred by law from offering their own version of events. (Case in point, the FDA declined to comment for this story about its interactions with Cyberonics.)
>
> Last week, the FDA and the SEC announced a joint effort to catch companies that try to take advantage of this situation. "If companies know we have these mechanisms in place, they will know it does not pay to make misleading statements to the investing public, that the law will catch up with them," FDA chief Mark McClellan told BioCentury, an industry newsletter. "The best advice for companies is to be straightforward in your dealings with investors. Don't misrepresent the information that you receive from the FDA," he added.

13.     On February 24, 2004, the defendants caused the Company to suddenly announce that defendant Moore, the Company's President and CEO, had resigned, effective immediately. In response to this shocking news, the Company's stock plunged another 16% in afternoon trading closing at $1.36 on the day on a volume of 3.5 million shares. Thus, since early August Biopure's stock lost over 85% of its value.

14.     An article dated February 25, 2004 by Jeffrey Krasner appearing in *The Boston Globe* entitled "Biopure CEO Resigns Moore's Departure Amid Company's Woes Sparks 16% Stock Drop" commented on the Company's troubles over the last 18 months. The article stated in relevant part:

Moore's resignation caps a disastrous 18-month run in which Biopure delayed plans to build a manufacturing plant, misleadingly told investors that a Food and Drug Administration letter indicated Hempure would likely be approved, withheld information from shareholders that the FDA had stopped a clinical trial due to safety concerns, and unveiled layoffs totaling nearly 50 percent of its workforce.

15.     Then, on April 30, 2004, after the close of the market, the defendants caused the Company to issue another press release stating that on April 29, 2004, the SEC had issued additional Wells Notices to four individuals concerning the same matters disclosed in the previous press release dated December 24, 2003 about the Company's misrepresentations concerning its communications with the FDA.  The defendants caused the Company to state that "[t]he notices indicate that the SEC staff may recommend that the Commission bring a civil action against Biopure's non-executive chairman Dr. Charles A. Sanders, former board member Dr. J. Richard Crout, Chief Technology Officer and board member Carl W. Rausch, and general counsel Jane Kober for possible violations of the federal securities laws."

16.     On this news, the Company's stock collapsed another 35% on heavy trading from a close on April 30, 2004 of $1.25 to a close on May 3, 2004 of $.90, and thus becoming a penny stock.  The Company's stock has continued to plummet dropping to below $.70 per share.  Thus, from a Relevant Period high of over $8 per share in August and September of 2003, the defendants have erased over $350 million in market capitalization or over 90% of the Company.  Even worse, because the bid price for the Company's stock has remained below $1.00 per share for 30 continuous days, Nasdaq had informed the Company it is in seriously risk of being delisted which would be a devastating result for the Company.   In fact, the Company was only able to avoid delisting by doing a 1:6 reverse stock split. Nevertheless, even after the reverse stock split (which caused the stock to close at an adjusted $1.59 per share on May 31, 2005), and especially in light of the SEC filing suit

against the Company, the Company's stock has continued to steadily decline trading only at slightly above the $1.00 per share minimum threshold.

17.    As a result of the defendants misrepresentations and nondisclosures concerning its communications with the FDA, Biopure's stock traded at artificially inflated prices during the Relevant Period. Certain insiders, including defendant Carl W. Rausch ("Rausch"), took advantage selling hundreds of thousands of shares of his personally held stock for proceeds of nearly $1.6 million at prices as high as $7.53 per share.

18.    As a direct result of this illegal course of conduct, the Company has been exposed to tens of millions of dollars in potential liability for violations the nation's securities laws and regulations and has been named in numerous federal securities class action lawsuits filed in the United States District Court for the District of Massachusetts, on behalf of investors who purchased Biopure's shares. These lawsuits allege that investors purchased shares of the Company based on false and materially misleading statements regarding the financial condition of the Company and that they have been significantly damaged thereby. Specifically, those actions allege that defendants caused Biopure to: (i) deceive the investing public regarding Biopure's business, operations, management and intrinsic value of Biopure common stock; (ii) be exposed to tens of millions of dollars in potential securities fraud liability for issuing a false and misleading registration statements and prospectuses during the Relevant Period in order to issue over 5.5 million common shares for over $35 million in proceeds; (iii) enable certain defendants and insiders to sell significant amounts of their personally-held shares of Biopure common stock at artificially inflated prices; and (iv) cause Biopure shareholders to purchase Biopure securities at artificially inflated prices during the Relevant Period. These lawsuits were consolidated before this in the action styled *In re Biopure Securities*

*Litigation*, Civil Action No. 03-12628-NG (the "securities fraud action").   The securities fraud action asserts claims against the Company for violations Section 10(b) of the Securities Exchange Act ("Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20A of the Exchange Act. Defendants also increased the Company's general and administrative costs by almost $2.3 million during the first nine-months of 2003, due in large part to defendants causing Biopure to take a substantial non-cash charge to fund certain directors' stock purchases and to pay of "recruiting" costs.

19.    On September 14, 2005, the SEC filed a civil injunctive proceeding against the Company as well as defendants Moore, Howard Richman ("Richman") and Jane Kober ("Kober"). The SEC's suit seeks, among other things, damages against the Company in the form of a civil penalty and ***seeks an order barring defendants Moore, Richman and Kober from serving as officers or directors of any publicly held company***.   Defendants caused Biopure to issue a press release disclosing their intention to seek dismissal of the suit.   Evidently, defendants are more interested in evading liability for the harm that they have caused Biopure rather than fulfilling their fiduciary duties.  The press release provided in part:

> Biopure Corporation announced today that the U.S. Securities and Exchange Commission (SEC) today filed a civil injunctive proceeding against the company, two former officers and one current officer.
>
> "The company intends to seek dismissal of the SEC's claims or judgment in its favor and expects to prevail," said Robert A. Buhlman of Bingham McCutchen LLP, counsel to the company. "Biopure intends to establish that its disclosures were accurate based on governing law, testimony provided by the FDA to the SEC, the FDA's review procedures and practices, and what was communicated by FDA at the relevant times."
>
> A principal claim by the SEC is based on a contention by the SEC that confuses the safety of the product with the safety of a proposed clinical trial design. The claim is that the company should have disclosed in April 2003 that FDA put on

hold a proposed clinical trial of the company's investigational oxygen therapeutic Hemopure® in trauma patients in the hospital setting. Under FDA regulations, a proposed trial is either placed on hold within 30 days or it may proceed as submitted. When FDA communicated the hold, it asked data questions described as "safety concerns."

The company disagrees that it was required to disclose the hold status of the proposed trial in a new indication. The company did not disclose the filing of the proposed protocol. It is not uncommon for there to be a dialogue with the FDA over a proposed trial. The company does not and did not view the data questions or the proposed trial itself to be material to an investment decision, as opposed to normal back-and-forth between the FDA and clinical trial sponsors. In addition, in-hospital trauma was not planned as an indication for commercial development and the company spent an insignificant amount on the proposed trial.

FDA had designated the in-hospital trauma trial as a separate investigational new drug application (IND) from the company's then-pending biologics license application (BLA) for a proposed orthopedic surgery indication. The FDA questions about data were asked in the context of the in-hospital trauma IND and referred to data that had also been submitted in the BLA. The company intends to prove that the FDA questions were specific to the in-hospital trauma IND, and FDA was not addressing the status of the orthopedic surgery BLA in its communications about the IND.

The in-hospital trauma IND at issue in the SEC action was withdrawn by the company in November 2003. That withdrawn in-hospital trauma IND is not to be confused with the currently proposed IND for treatment of trauma patients in the out-of-hospital setting. That out-of-hospital trauma IND is currently on hold after FDA asked different questions than were asked in April 2003.

A second contention in the SEC suit concerns a separate communication by FDA with the company about the orthopedic surgery BLA. The SEC staff has claimed that the company's disclosures concerning a July 30, 2003 FDA letter about the BLA was too positive in tone, in the staff's view. The August 1, 2003 press release about the letter said that FDA had completed its review of the BLA and that the letter asked for additional information, which it did. The July 30 BLA letter did not ask for additional clinical trials and the August 1 press release reported that. The July 30 BLA letter did not mention "safety concerns" and neither did the press release.

### III.

### JURISDICTION AND VENUE

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 (a)(2) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

21.    This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

22.    Venue is proper in the Court because nominal defendant Biopure is headquartered in this District and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the defendants either resides in or maintains executive offices in this District, and defendants have substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## IV.

## PARTIES

23.    Plaintiffs John Parrott and Laurie Parrott are residents of the State of Washington, are and were at relevant times complained of herein, shareholders of nominal defendant Biopure.

24.    Nominal defendant Biopure is a Delaware corporation with its principal executive offices located at 11 Hurley Street, Cambridge, MA 02141.

25.    Defendant Moore was, at all relevant times prior to his sudden resignation on February 24, 2004, a director of Biopure, its President and CEO.  Moore is a citizen of New Jersey. As an officer and director of Biopure, Moore owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  But as late as July,

12

2002, when Biopure filed the Hemopure® FDA application, Moore had not begun working at Biopure full-time, despite being the Company's President and CEO. Moreover, as its President and CEO, Moore had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Moore owed to Biopure and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a result of his wrongdoing, Moore has been sued by the SEC and has been named as a defendant in the securities fraud action brought against the Company by its shareholders. In addition, Moore certified the Company's financial statements filed with the SEC during the Relevant Period including its Form 10-Q's without disclosing the adverse material information concerning the Company's communications with the FDA regarding Biopure and therefore Moore is a direct participant in the wrongdoing. For FY:03, the Company paid Moore $350,012 in salary and granted him 18,000 options to purchase Biopure stock. As of October 31, 2003, Moore owned 818,000 Biopure options. By virtue of his executive positions with Biopure, his longer term personal, professional and financial relationships with Charles A. Sanders ("Sanders"), Rausch, David N. Judelson ("Judelson") and the other members of the Biopure Board, and personal participation in the underlying misconduct, Moore is not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein.

26.     Defendant Rausch was, at all relevant times hereto, Vice Chairman, Chief Technical Officer ("CTO") and a director of Biopure until his resignation on or about September 6, 2005.

Rausch is a citizen of Massachusetts.  As Vice Chairman of Biopure, Rausch owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as CTO, Rausch had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Rausch owed to Biopure and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  As a result of his wrongdoing, Rausch has been named as a defendant in the securities fraud action brought against the Company by its shareholders.  During the Relevant Period, Rausch engaged in massive insider trading disposing of 246,574 shares of his personally held Biopure stock for proceeds of $1,596,900 as follows:

| DATE SOLD | SHARES SOLD | SHARE PRICE | TOTAL |
|-----------|-------------|-------------|-------|
| 4/15/03 | 30,000 | $3.13 | $93,900 |
| 6/5/03 | 2,000 | $6.06-$6.07 | $12,000 |
| 6/24/03 | 3,000 | $5.58-$5.698 | $17,000 |
| 6/25/03 | 2,700 | $5.80-$5.97 | $16,000 |
| 6/26/03 | 34,374 | $5.80-$5.90 | $201,000 |
| 6/27/03 | 20,000 | $5.95-$6.00 | $120,000 |
| 6/30/03 | 5,000 | $6.14-$6.16 | $31,000 |
| 8/5/03 | 10,000 | $7.50-$7.53 | $75,000 |
| 8/6/03 | 2,000 | $7.50-$7.54 | $15,000 |
| 8/7/03 | 8,000 | $7.00 | $56,000 |
| 8/8/03 | 10,000 | $7.05-$7.28 | $72,000 |

14

| 8/12/03 | 10,000 | $7.00-$7.15 | $71,000 |
| 8/13/03 | 9,500 | $7.02-$7.15 | $67,000 |
| 8/28/03 | 100,000 | $7.50 | $750,000 |
| **TOTAL** | 246,574 | | 1,596,900 |

These shares constituted 33.7% of the Biopure shares owned by Rausch at the beginning of the Relevant Period. In 1984, Rausch co-founded Biopure with defendant David N. Judelson ("Judelson"). Rausch and Judelson are close friends and confidants. For example, Rausch sold some of his personally held Biopure stock to Judelson. Rausch and Judelson appointed Charles A. Sanders as Chairman and Moore CEO, President and as a director in 2002. Moreover, Judelson serves on Biopure's Compensation Committee which determines Rausch's salary, bonuses and stock options. For FY:03 and FY:04, the Company paid Rausch $350,012 and $355,512, respectively, in salary and granted him 18,000 and 10,000 options to purchase Biopure stock, respectively. As of October 31, 2003, Rausch owned 308,653 Biopure options. By virtue of his executive positions with the Company, his stock sales, his personal participation in the underlying misconduct, and his long term personal, professional and financial relationships with Sanders, Moore, Judelson and the other members of the Biopure Board, Rausch is not disinterested, is not independent and could not have adequately considered a pre-suit demand to bring the allegations contained herein.

27.     Defendant Judelson was, at all relevant times hereto, Vice Chairman of Biopure and a member of its Compensation Committee. Judelson is a citizen of New York. As Vice Chairman of Biopure, Judelson owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Compensation Committee, Judelson had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company. Rather than

fulfill these important fiduciary duties Judelson owed to Biopure and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  In 1984, Judelson co-founded Biopure with Rausch. Judelson and Rausch are close friends and confidants.  For example, Rausch sold some of his personally held Biopure stock to Judelson. Rausch and Judelson appointed Sanders as Chairman and Moore as CEO, President and as a director in 2002.  Moreover, Judelson serves on Biopure's Compensation Committee which determines Moore and Rausch's salary, bonuses and stock options.  By virtue of his executive positions with the Company, his personal participation in the underlying misconduct and his extensive and long-term personal, professional, and financial relationships with Rausch, Moore and Sanders, and the other members of the Biopure board, Judelson is not independent, is not disinterested and could not have adequately considered a pre-suit demand to bring the allegations contained herein.

28.     Defendant Sanders is, and at all relevant times hereto was, a director of Biopure, Chairman of its Compensation Committee and a member of the Nominating and Audit Committees. Sanders is a citizen of North Carolina. As a director of  Biopure, Sanders owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as Chairman of its Compensation Committee and as a member of its Nominating and Audit Committees, Sanders had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company, particularly, as a member of its Audit Committee, with ensuring that the Company's financial statements and corresponding press releases included all material information including the

16

Company's communication with the FDA concerning Hemopure®. Rather than fulfill these important fiduciary duties Sanders owed to Biopure and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a result of his wrongdoing, Sanders is a named defendant in the securities fraud action brought against the Company by its shareholders. Sanders previously served as General Director of Massachusetts General Hospital and Professor of Medicine at Harvard Medical School, along with Douglas M. Hansell, M.D. who currently serves as Biopure's Vice President of Medical Affairs and served with Sanders at Massachusetts General Hospital and at Harvard. As a member of the Audit Committee, Sanders approved the Company's financial statements without including the adverse material information concerning the Company's communications with the FDA regarding Hempoure® and therefore Sanders is a direct participant in the wrongdoing. By virtue of his positions with Biopure, his personal participation in the underlying misconduct, and his extensive and long-term personal, professional and financial relationships with Moore, Rausch and Judelson, Sanders is not disinterested, is not independent and would not have adequately considered a pre-suit demand to bring the allegations contained herein.

29. Defendant C. Everett Koop, M.D. ("Koop") is, and at all relevant times hereto was, a director of Biopure. Koop is a citizen of New Hampshire. As a director of Biopure, Koop owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Rather than fulfill these important fiduciary duties Koop owed to Biopure and its shareholders he actively participated in or knowingly encouraged, sponsored or

approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Koop is a consultant for other companies in the pharmaceutical industry such as Biopure, regularly speaking on their behalf in front on regulatory bodies. For instance, in April 1999, Koop spoke at a Congressional Advisory Hearing on the national blood supply on behalf of Biopure, along with another former Biopure executive. In fact, on December 4, 1990, weeks before Koop joined the Board, Koop was hired by Biopure and was give the title of "Chairman of Scientific Advisory Committee" charged with advising the company on domestic, worldwide and military applications of its products and developing medical and scientific relationships with health organizations and medical centers around the world. By virtue of his current and past executive and/or consulting positions with the Company, his personal participation in the underlying misconduct and his long-term personal, professional and financial relationships with Moore, Rausch, Sanders and Judelson, Koop would never authorize a suit for the claims asserted herein because it would threaten these relationships and jeopardize his livelihood.

30.    Defendant Daniel P. Harrington ("Harrington") is, and at all relevant times hereto was, a director of Biopure, Chairman of its Audit Committee and a member of the Nominating Committee. Harrington is a citizen of Ohio. As a director of Biopure, Harrington owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as Chairman of its Audit Committee and as member of its Nominating Committee, Harrington had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company, particularly, as a member of its Audit Committee, with ensuring that the Company's financial statements and

18

corresponding press releases included all material information including the Company's communication with the FDA concerning Hemopure®. Rather than fulfill these important fiduciary duties Harrington owed to Biopure and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As Chairman and as a member of the Audit Committee, Harrington approved the Company's financial statements without including the adverse material information concerning the Company's communications with the FDA regarding Hemopure® and therefore Harrington is a direct participant in the wrongdoing. Harrington has served as President of HTV Industries, Inc. ("HTV"), one of Biopure's venture capitalist, since 1991. HTV, along with Judelson and Moore, took part in the Company's April 2003 public offering in which it raised over $13 million. In the offering, HTV purchased 516,529 shares of the Company's common stock and warrants to purchase an additional 103,306 shares while Moore and Judelson each purchased 206,612 shares and warrants to purchase to an additional 41,322 shares. According to the Company's most recent Proxy Statement, Harrington owns 1,560,089 shares of Biopure or 4.7% of the Company's outstanding common stock which includes 1,498,219 shares and warrants to purchase 11,111 shares owned by HTV. By virtue of his close personal, professional and financial relationships with Rausch, Judelson, Sanders and Moore and the other members of the Biopure Board, his personal participation in the underlying misconduct, and his and HTV's purchases and ownership of substantial shares of Biopure's stock, Harrington could not adequately investigate and would never authorize a suit for the claims asserted herein.

31.     Defendant J. Richard Crout, M.D. ("Crout") was at times relevant hereto, a director of Biopure and a member of its Audit Committee until April 2004.  Crout is a citizen of Maryland. As a director of Biopure, Crout owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company.  Moreover, as a member of its Audit Committee, Crout had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company, particularly, as a member of its Audit Committee, with ensuring that the Company's financial statements and corresponding press releases included all material information including the Company's communication with the FDA concerning Hemopure®.  Rather than fulfill these important fiduciary duties Crout owed to Biopure and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  As a member of the Audit Committee, Crout approved the Company's financial statements without including the adverse material information concerning the Company's communications with the FDA regarding Hemopure® and therefore Crout is a direct participant in the wrongdoing. In addition, as a result of his wrongdoing, Crout  is a named defendant in the securities fraud action brought against the Company by its shareholders. Crout owns Crout Consulting and is a pharmaceutical industry consultant, and his vocation is providing regulatory and drug development advice to pharmaceutical and biotechnology companies. In fact, Crout previously served as a division chief for the FDA.  Similarly, Crout and Sanders have long served together on the Trimeris board of directors.  In 1994, Paul A. Miller was named to the newly-created position of Marketing Manager-Nutritional Products at MBf USA where it was announced he would work closely with Koop who had also recently joined MBf USA as "Chairman

of its Advisory Board," to guide the development and global launch of the Company's vitamin supplement and nutritional products line. Prior to joining MBf USA, Miller had most recently served under Crout at as the Consumer Segment Product Manager for Boehringer Mannheim Corp., prior to Crout founding Crout Consulting. By virtue of his personal participation in the underlying misconduct, extensive and long-term personal, professional and financial relationships with Rausch, Moore, Sanders and Judelson and the fact that Crout's primary vocation is serving as a consultant pharmaceutical companies such as Biopure, he would never authorize a suit for the claims asserted herein because it would damage his personal, professional and financial relationships and could potentially jeopardize his livelihood.

32.     Defendant Kober was, at all relevant times hereto, Biopure's Senior Vice President, General Counsel and Secretary. Kober is a citizen of Massachusetts. As an officer of Biopure, Kober owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover as its Senior Vice President, General Counsel and Secretary, Kober had also assumed important managerial responsibilities at Biopure which required her to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Kober owed to Biopure and its shareholders she actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached her fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As Biopure' s General Counsel, Kober reviewed and approved the Company's false and misleading financial statements and press releases and therefore is a direct participant in the wrongdoing. As a result of her wrongdoing, Kober from has been sued by the SEC. Kober also serves as a director of HTV.

21

33.     Defendant Richman was, at times relevant hereto, Biopure's Senior Vice President of Regulatory Affairs and Operations from spring 2003 until October 2003, when he was terminated. Richman is a citizen of Texas.  As an officer of Biopure, Richman owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover as its Senior Vice President of Regulatory Affairs and Operations, Richman had also assumed important managerial responsibilities at Biopure which required him to be well informed about the day-to-day operations of the Company.  Rather than fulfill these important fiduciary duties Richman owed to Biopure and its shareholders he actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to the shareholders of Biopure by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions.  As Biopure' s Senior Vice President of Regulatory Affairs and Operation, Richman reviewed and approved the Company's false and misleading financial statements and press releases and therefore is a direct participant in the wrongdoing.  As a result of his wrongdoing, Richman has been named as a defendant in civil injunctive proceeding filed by the SEC.

34.     The defendants identified above in ¶¶25-33 are collectively referred to hereinafter as the "Individual Defendants."  For demand futility purposes, the defendants identified in ¶¶25-31, who made up the Board at the time this action was instituted, are collectively referred to sometimes as the Director Defendants.

# V.

## FACTS

## BACKGROUND

35.    The Center for Biologics Evaluation and Research ("CBER") is a center within the FDA that regulates biologics, such as Hemopure®, for human use. Biologics, which are also called biologic products or biological products, are products that generally are derived from living sources, in contrast to drugs, which generally are chemically synthesized.

36.    Companies that manufacture biologics for introduction into interstate commerce are required to hold a license for the products. These licenses are issued by the FDA, through CBER. Licensing of biologics is similar to the new drug approval process for human drugs, and generally proceeds as follows: First, a manufacturer conducts initial laboratory and animal testing of the biologic, which does not require prior FDA approval. Next, a manufacturer submits an investigational new drug ("IND") application to the FDA for permission to conduct clinical trials in humans for a particular indication. Following clinical trials, the manufacturer will submit a BLA to the FDA for approval. The FDA's review of new BLAs, and for new indications for already approved products, requires evaluating the scientific and clinical data submitted by manufacturers to determine whether the product meets the FDA's standards for approval.

37.    During the Relevant Period, the FDA's performance goals and procedures, adopted in connection with the Prescription Drug User Fee Act of 1992, as periodically reauthorized ("PDUFA"), provided that the FDA had ten months to review a BLA. The FDA was also entitled to a 90-day extension if an applicant were to submit a major amendment to its application during the final three months of the review period. Once the FDA completed its review of a BLA, if a product met the standards for approval, the FDA would approve the product for marketing. If the product

23

did not meet the standards for approval, the FDA would issue a "complete response letter" (sometimes referred to as an "action letter") setting forth the deficiencies of the application.

38.    After the FDA issues a complete response letter for a BLA, the applicant could make a further submission. For non-minor resubmissions, PDUFA performance goals and procedures provided the agency with an additional six months to reply to the applicant's response, once the applicant had answered all questions and addressed all deficiencies set forth in the complete response letter.

39.    On July 31, 2002, Biopure submitted a BLA to the FDA seeking regulatory approval to market Hemopure® in the U.S. for use in orthopedic surgery. On that date, the Company issued a press release entitled "Biopure Submits Hemopure® Marketing Application to the U.S. FDA." The press release stated in relevant part:

> Biopure Corporation today announced that it has submitted an electronic Biologic License Application (BLA) to the U.S. Food and Drug Administration (FDA) for its oxygen therapeutic Hemopure® [hemoglobin gultamer - 250 (bovine), or HBOC-201]. The company is seeking regulatory approval to market this pharmaceutical product in the United States for the treatment of the signs and symptoms of acute anemia in adult patients undergoing orthopedic surgery, and for the purpose of eliminating, delaying or reducing the need for red blood cells in these patients.

40.    In September 2002, the Company received a $980,000 grant from the U.S. Department of the Army to fund a randomized, standard therapy-controlled, single center Phase II clinical trial in consenting trauma patients as a precursor to broader trials.

41.    In March 2003, the Company submitted a "trauma study protocol" to the FDA in connection with its plans to conduct a Phase II clinical trial of Hemopure® for the treatment of trauma patients. However, at the time, this information was not revealed by Biopure to the public.

42.    During the Relevant Period, the Individual Defendants continually represented they were optimistic of achieving FDA approval to market Hemopure® to orthopedic patients. However,

unbeknownst to the public, as early as March 2003, the FDA had informed the defendants that the proposed clinical trials could not go forward, citing "safety concerns" arising from adverse event data submitted as part of the Company's BLA which sought FDA approval to market Hemopure® to orthopedic surgery patients. Thus, the defendants were on notice that FDA approval of the BLA, which would allow the first commercial distribution, if any, of Hemopure® in the United States, was in serious jeopardy and would be delayed beyond the mid-2003 target date defendants had previously stated.

## SUBSTANTIVE ALLEGATIONS AND IMPROPER STATEMENTS MADE DURING THE RELEVANT PERIOD

43.     In a letter to shareholders dated February 4, 2003, **which** was contained in Biopure's fiscal 2002 Annual Report, defendant Moore touted the filing of Biopure's BLA and described the company's priorities. The letter begins by declaring that Biopure "realized a tremendous achievement" by filing its BLA for use of Hemopure® in an orthopedic surgery setting. Defendant Moore further stated that Biopure "anticipate[s] that the [FDA] will complete its review of our BLA by mid 2003." The letter described Biopure's "Business Strategy" with four bullet points. The first bullet referred to Biopure's BLA: "[s]uccessfully launch Hemopure® under an orthopedic surgery indication in the United States." The second bullet referred to its trauma trials: "[c]linically develop Hemopure® for trauma, ischemia, and adjunctive cancer therapy indications."

44.     Under the heading, "Changing Gears for the Future," defendant Moore disclosed that Biopure was developing Hemopure® for use by trauma victims: "Our first clinical priority is to demonstrate the product's utility in stabilizing trauma patients in the emergency room and pre-hospital, or ambulance, setting."

25

45.    On or about March 7, 2003, Biopure submitted an IND application to the FDA seeking permission to conduct clinical trials of Hemopure® on human trauma victims in hospitals. The submission relied upon and referred the FDA to data from the clinical trial previously submitted in support of the Company's pending BLA.

46.    On March 17, 2003, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q for the period ending January 31, 2003. The Form 10-Q, signed and certified by defendant Moore reported that the Company had a net loss of $0.36 per share during the first quarter fiscal 2003 compared to a net loss of $0.38 for the same period last year. In addition the Form 10-Q included the following representations concerning the Company's Hemopure® research and development efforts, stating in relevant part:

> Research and development expenses continue to include amounts for support of the BLA review process including responding to FDA inquiries, preparing for and participating in FDA inspections of facilities and documentation and preparing for a possible FDA Advisory Panel presentation. These BLA support costs were $2,232,000 for the first fiscal quarter of 2003 and are expected to continue at approximately the same level ***until the middle of this calendar year, when the Company is hopeful that it will receive action by the FDA on the BLA.***
>
> ***If the FDA were to grant marketing approval for Hemopure® this calendar year, we anticipate that we would have material revenues from this project in fiscal 2004.*** We do not anticipate that we will attain profitability, however, until we are able to increase our manufacturing capacity. There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure®, the timing of the construction of additional capacity and other factors that may affect our ability to generate a profit from our research and development of Hemopure®.

47.    On or about March 25, 2003, the Individual Defendants caused the Company to issue a press release announcing that it has raised $13.4 million in gross proceeds through the sale of 5,548,480 shares of its common stock at $2.42 per share. The press release stated in relevant part:

> Hemopure® [hemoglobin glutamer - 250 (bovine)] is approved in South Africa for the treatment of adult surgical patients who are acutely anemic and for the purpose

26

of eliminating or reducing the need for allogenic red blood cell transfusion in these patients. Biopure's application to market Hemopure® in the United States for a similar indication in adult patients undergoing elective orthopedic surgery is currently being reviewed by the U.S. Food and Drug Administration....

The previously announced $4.9 million in FY02/03 Congressional appropriations administered through the U.S. Army and anticipated $4 million in U.S. Navy funding from a Cooperative Research and Development Agreement (CRADA) *for clinical trials of Hemopure® in trauma* are project-specific funds independent from Biopure's reported cash on hand. Completion of the pivotal RESUS clinical trial of Hemopure® in trauma is contingent upon further funding. $908,900 of the Army funding is from Grant DAMD17-02-1-0697, for which the U.S. Army Medical Research Acquisition Activity, 820 Chandler Street, Fort Detrick MD 21702-5014 is the awarding and administering acquisition office.

48.    On or about April 9, 2003, members of the FDA staff telephoned defendant Richman, to inform Biopure that the agency was imposing a clinical hold barring the company from initiating any clinical trials in connection with the trauma IND. The FDA staff stated that the clinical hold was imposed because of "safety concerns" arising out of data relating to the BLA clinical trials and because of "a preliminary assessment of the BLA." Specifically, the FDA staff expressly referred to data relating to serious adverse events suffered by participants in the BLA clinical trials, and stated that "the trial was on hold for safety and that in FDA's judgment it is unsafe to put this product in this patient population at this time."

49.    Although he was not on the April 9 telephone call with the FDA, defendant Moore learned of the clinical hold by April 10, 2003, the next day. Defendant Kober was made aware, at least, that the FDA had questions about Biopure's trauma IND by early May and learned of the clinical hold no later than June 17, 2003.

50.    On or about April 16 and April 17, 2003, after the Company received notice of the clinical hold, the Individual Defendants caused or allowed Biopure to file with the SEC a Post-Effective Amendment No. I to a Form S-3 Registration Statement that had been filed in March

2003 and Rule 424(b)(3) prospectus supplements ("April Offering Filings") for the sale of up to

1,000,000 shares of common stock and warrants for the purchase of up to 500,000 shares of common

stock. These were signed by defendants Moore, Sanders, Richards, Judelson, Rausch, Harrington,

Koop and Crout.   Defendants Moore and Kober substantially participated in drafting, reviewing

and/or approving the April Offering Filings, and defendant Richman reviewed disclosures regarding

the regulatory status of Biopure's FDA submissions.

     51.    In the April Offering Filings, the following statements were made, among others:

We Cannot Expand Indications for Our Products Unless We Receive FDA Approval
for Each Proposed Indication

    The FDA requires a separate approval for each proposed indication for the
use of Hemopure® in the United States. We have applied for an indication for
Hemopure® that will only involve its perioperative use in patients undergoing
orthopedic surgery. Subsequently, we expect to expand Hemopure®'s indications.
To do so, we will have to design additional clinical trials, submit the trial designs to
the FDA for review and complete those trials successfully ....

*  *  *

The Company expects to initiate additional pre-clinical and clinical trials this year
to expand the indications for Hemopure® beyond surgery.

*  *  *

We are also developing Hemopure® for potential use in trauma and other medical
applications.

     52.    Biopure's April Offering Filings were false and misleading because they misstated

the true status of Biopure's clinical trials for the trauma indication. For example, although the filings

discussed the potential use of Hemopure® for trauma victims, the April Offering Filings failed to

disclose that the FDA had barred Biopure from conducting clinical trials on trauma victims for

safety reasons.  Moreover, the April Offering Filings falsely stated that an indication involving

Hemopure®'s perioperative use in orthopedic surgery was the "only" indication applied for, when,

in truth, Biopure had also sought permission to conduct trials for the trauma indication. The April Offering Filings disclosed a future "expectation" to expand Hemopure®'s indications, design additional trials and submit them to the FDA for review, when in truth, Biopure already had designed additional clinical trials, submitted the trial designs to the FDA for review, and received a clinical hold from the FDA. The April Offering Filings referred to development plans for the trauma indication without disclosing that the FDA placed the trauma indication on clinical hold for safety reasons arising out of the FDA's preliminary assessment of Biopure's BLA.

53.    On or about April 25, 2003, the FDA sent Biopure a letter, addressed to defendant Richman, confirming that the agency had imposed a hold on clinical trials of the trauma IND because "subjects would be exposed to an unreasonable and significant risk of injury."  The letter reiterated that the safety concerns that compelled the imposition of a clinical

hold arose out of a preliminary assessment of the company's BLA. The FDA stated that "results of a pivotal human trial, used in support of the Hemopure® BLA, and referred to in the IND, indicated that use of Hemopure®, compared to human blood was associated with a higher incidence of life-threatening SAEs [Serious Adverse Events], including death and cardiac arrest." Defendants Moore and Richman received a copy of this letter by no later than April 30, 2003.

54.    On or about May 6, 2003, the Individual Defendants caused or allowed Biopure to file with the SEC a Rule 424(b)(3) prospectus supplement to the April Offering Filings, dated May 2, 2003, and a Rule 424(b)(3) prospectus supplement to the April Offering Filings, dated May 5. 2003 (collectively, the "May Prospectus Filings"). The May Prospectus Filings, in the aggregate, provided for the sale of up to 1,715,687 shares of common stock and warrants to purchase up to 343,138 shares of common stock. The May Prospectus Filings incorporated by reference certain of Biopure prior public filings, including prior offering documents and periodic reports.  Defendants

Moore and Kober substantially participated in drafting, reviewing and/or approving the May Prospectus Filings, and defendant Richman reviewed disclosures regarding the regulatory status of Biopure's FDA submissions.

55.     Biopure's May Prospectus Filings failed to disclose that the FDA had barred Biopure from conducting clinical trials of Hemopure® on trauma victims for safety reasons arising out of a preliminary assessment of Biopure's BLA.  Further, the May Prospectus Filings incorporated by reference the false and misleading statements and omissions contained in the April Offering Filings.

56.     On May 12, 2003, in response to the FDA's clinical hold, Biopure made an extensive submission to the FDA to request that the FDA lift its clinical hold. The submission, termed a "complete response" to the FDA's letter received on April 25, 2003, was signed by defendant Richman.  Defendants Moore and Richman participated in drafting and reviewing the response, and defendant Kober was aware of the submission when it was made.

57.     On or about May 14, 2003, the Individual Defendants caused or allowed Biopure to file a Form 8-K with the SEC.  Defendants Moore and Kober reviewed and approved the May 14 Form 8-K prior to its filing.  The filing attached as an exhibit a Standby Equity Distribution Agreement, dated April 16, 2003, between Biopure and BNY Capital Markets, Inc. ("BNY") pursuant to which Biopure could issue and sell up to $10,000,000 of shares of its class A common stock from time to time through BNY, as Biopure's exclusive agent for the offer and sale of the shares. Among the terms of the agreement disclosed in the Form 8-K was Biopure's representation and warranty that the company's registrations statements and prospectuses:

> ... conformed and will conform in all material respects to the requirements of the Exchange Act and the rules and regulations of the Commission promulgated thereunder, and none of such documents contained or will contain at such time an untrue statement of a material fact or omitted or will omit to state a material fact

necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

The Form 8-K filed on May 14, 2003, was false and misleading because, as alleged herein, the April Offering Filings and May Prospectus Filings contained omissions and misstatements of material facts.

58.    On or about May 22, 2003, the Individual Defendants caused the Company to issue a press release announcing its financial results for the second fiscal quarter ended April 30, 2003. Defendants Moore, Richman and Kober each substantially participated in drafting, reviewing and/or approving the press release.  For the quarter, the Company reported a net loss of $0.35 per common share, compared with a net loss of $0.49 per common share, for the corresponding period in 2002. Regarding the FDA's pending approval of Biopure's  Hemopure® BLA.  The press release stated in relevant part:

> Biopure is hopeful that in mid 2003 the FDA will complete its review and act on Biopure's biologic license application (BLA) to market Hemopure® in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery.  As part of this review, the agency has inspected the company's manufacturing and data-handling facilities and has audited its contract research partners and several clinical sites in the United States and South Africa.  Biopure has responded to all questions raised by the FDA to date.

59.    The press release also contained a section entitled "Recent Corporate Events." Among the "Recent Corporate Events" listed was a statement referring to clinical trials for a trauma indication: "Biopure is preparing for a Phase 2a in-hospital trauma trial."

60.    The press release was misleading because the press release described planned clinical trials for a trauma indication, while the Individual Defendants knew or should have known that the FDA had placed the in-hospital trauma trial on clinical hold due to safety concerns arising out of its preliminary assessment of the BLA.

31

61.    That same day, defendants Moore and Richman participated in a conference call with analysts and investors regarding the earnings release for the second quarter.  During the conference call, defendant Moore stated, among other things:

> [W]e continue to be very hopeful of an [FDA] response on our [biologics] license application by mid-year or sooner, and we continue to not be aware of any major issues with that application at this time.

*  *  *

> Our aim will be to have the product, again, assuming we get approved, on or about June 1 st to the end business [sic] and moving product no later than October 1 st.

*  *  *

> Parkman Hospital is going to be our initial clinical center to conduct the already announced in-hospital trauma trials that will set us up for subsequent pre-Hospital trials to establish an additional trauma indication for Hemopure®.

62.    During the call, defendants Moore and Richman misled investors and Biopure's shareholders about the true information the company had received from the FDA.  For example. the statement that "we continue to not be aware of any major issues with that application at this time" was made when these defendants knew or should have known the FDA had already informed the Company of serious concerns about data from the pivotal BLA clinical trial, which necessitated imposing a bar on clinical trials on trauma victims for safety reasons. Moreover, the clinical hold was imposed based on the FDA's preliminary assessment of the BLA. In addition, the reference to a particular hospital as Biopure's "initial clinical center to conduct the already announced in-hospital trauma trials" was misleading because defendants failed to disclose that the clinical hold barred Biopure from initiating the "already announced in-hospital trauma trials." The conference call was further misleading because while defendants touted the potential use of Hemopure® for trauma

32

victims, they knew or should have known that the FDA had barred Biopure from conducting clinical trials on trauma victims for safety reasons based on the FDA's preliminary assessment of the BLA.

63.     On or about May 30, 2003, the FDA sent two letters to Biopure, addressed to defendant Richman, in response to Biopure's May 12 request to lift the clinical hold. In one May 30 letter, the FDA informed Biopure that the clinical hold would not be lifted. The FDA stated that Biopure's request contained serious inconsistencies and failed to address the FDA's safety concerns. In addition, the FDA informed Biopure that its "conclusions about product safety remain unchanged," and the FDA required the company to conduct "at least three additional studies in conscious swine" to address particular concerns prior to any testing in humans.

64.     In the other May 30, 2003 letter to Biopure, the FDA informed Biopure that it was extending the deadline to complete its review of Biopure's BLA for 90 days, until August 29, 2003. The FDA expressly stated that the extension was taken because information submitted by Biopure in its May 12 request to lift the clinical hold on the trauma indication contained significant new analyses of the BLA clinical data and therefore was a "major amendment" to Biopure's BLA.

65.     Defendants Moore and Richman received copies of both May 30 letters on or about May 30, 2003, and defendant Kober received a copy of, at least, the May 30 letter extending the deadline for the FDA to complete its review of the BLA on or about May 30, 2003.

66.     On or about May 30, 2003, the Individual Defendants caused the Company to issue a press release announcing that the FDA had notified Biopure that it will complete its review and act on the Company's BLA for Hemopure® by August 29, 2003. Defendants Moore, Richman and Kober each substantially participated in drafting, reviewing and/or approving the press release. Defendant Moore, on behalf of the Company, commented on the FDA's review process:

33

Biopure submitted its BLA on July 31, 2002. Under FDA performance goals. .., the agency has up to 10 months from the submission date to review and act on the BLA, making the original action due date June 1, 2003. As part of the normal review process, Biopure has responded to FDA questions regarding the application. The agency has classified the latest responses submitted in mid-May 2003 as additional analyses of previously submitted data, which under FDA standard operating procedures automatically provides the agency up to three months beyond the original action due date to review the data.

"We're very pleased with the FDA's progress in reviewing our application...." "We continue to work closely with the agency toward a final decision that will allow us to make Hemopure® available as an alternative to red blood cell transfusion. We're also continuing our preparations to roll out the product to leading orthopedic surgery centers following approval."

67.    Biopure's May 30 press release was false and misleading because it misstated the information the company had received from the FDA. For example, the May 30 Press Release falsely stated that Biopure had responded to FDA questions regarding the BLA, when, in truth, the company had responded to questions relating to the trauma IND and the clinical hold, which the company had never disclosed.  The press release further stated that Biopure's submission was "part of the normal review process" of the BLA and was Biopure's "latest responses" to FDA questions on the BLA when the Individual Defendants knew or should have known the submission was the company's complete response to the FDA's April 25 clinical hold letter and was expressly made *in an effort* to persuade the FDA to lift the clinical hold.

68.    In addition, the May 30 press release failed to disclose, among other things, that the 90-day extension resulted from Biopure's request to lift the clinical hold.  The press release failed to disclose that the FDA had placed the trauma IND on clinical hold.  The press release further failed to disclose that the FDA had refused to lift the clinical hold even after Biopure had made a substantial submission to the agency.  Further, the press release failed to disclose that the clinical

34

hold was imposed based on the FDA's concerns about the safety of Hemopure® arising out of the same data that was submitted in support of the BLA.

69.    Later that same day, defendants Moore and Richman participated in an investor conference call.  During the conference call, defendant Moore stated, among other things:

> We view this notification [of the 90-day extension] as a very positive development for Hemopure®. First of all, we have a date which the agency has indicated their intent to give us an action letter. Second, it confirms what we already knew, that is, that the agency has devoted considerable effort to this application. And third, as we also already knew, that now our investor community knows, there is nothing in our application which is warranted a denial of that application at the three key decision points we've passed so far in the PDUFA process. By that, I mean our BLA was accepted, it was also continued through the mid-cycle review conducted by the agency, and now, at the PDUFA guideline date for a first response, we've not had a denial, but rather a going forward to additional consideration. The added time we're going to get over the next three months will not only allow us to insure we can fully answer any additional questions the FDA might choose to send our way, but also allow us to complete legal negotiations and to continue forward with the commercial preparations we are making against a hopeful approval on August 29th for the name of introducing this product on or about the October introductory guideline we mentioned in our conference call last week. So we feel very positive about this ....

70.    Also during the conference call, defendants Moore and Richman engaged in the following exchange with stock analysts who participated in the call:

> Analyst 1:    [D]id the FDA request any additional data to be submitted, or why do you think that basically the FDA extended the timeline for the review process?
>
> Moore:    The FDA did not request any additional data ....
>
> Richman:    ... This is what normally happens with any submission. As Tom has told the public over the past many months, is that we are in continued dialogue with the agency and during that period of time, they have requested information which we have sent back to them. It's a normal process with any application. Be that as it may, the agency, during the course of reviewing the information has the opportunity to take additional time to allow them to give a complete and additional thorough review of all, information to make a thorough conclusion on application. This type of response from the FDA is very common with biologic licensing applications. Most recently, in 2001 and 2002,

of the 11 BLAs that were submitted to the Food and Drug Administration, all 11 of them went on to the extended period of time for review which was outside the normal PDUFA 10 months. It is within the PDUFA guidelines to allow them to do that and they still meet their matrix for approval for their guidance acumen.

\* \* \*

Analyst 2: . . . I guess I'm a little bit confused on the timing of the submission of whatever it is you did submit to the FDA given that your original BLA was submitted in July 31st of last year. I guess my question is why are you still having to provide information to the FDA? You said mid-May there was a resubmission of some sort. Why nine and a half months after the original BLA was submitted are you still having to provide information?

Moore: It's actually ... it's a continual process of providing information. I'm going to let Howard comment on this specifically, but it would be difficult to categorize how many hundreds of questions we've answered in the review of this BLA to date. This mid-May submission was some additional analysis which we provided on data that was already in the BLA. At the time, we didn't consider it a major amendment to the BLA but the FDA looked at that as a reason to extend it. But I'll let Howard comment on that.

Richman: ... Just as a point of clarification this is a normal occurrence. I've been lucky to be involved with 12 other approval processes outside of Biopure, and this is a normal thing that happens. We're_ in fact. in constant contact with the agency when they're requesting information in real time. So this is not anything new that can happen. And what we have done is supply responses back to their continual questions to allow them, again, as I mentioned earlier, to give complete and thorough response to this first in class application.

Analyst 2: I understand there was a continuing dialogue and questions and answers, but it would seem that for there to be some sort of submission that would extend the PDUFA date another two months, it would have to be something material. And I guess I'm just surprised that nothing was disclosed in mid-May when this additional submission was made.

Moore: To be clear, we were simply responding to a new set of questions from FDA. It did not involve any new data. And so frankly, it was well within the range of other questions we've answered in the past. When we made that response, we didn't characterize it as a major

amendment to the BL A. I think the FDA chose to do that and I think that really, how do I phrase this diplomatically, I think that's a way for them to get this additional consideration time as opposed to some startling new insight on the application. But that's not my role to call I would say, as Howard has already said, so far the FDA's extended on 11 straight BLAs, so we're number 12.

*  *  *

Analyst 3:    ... Could you please be a little more specific in terms of -- the company has submitted additional analyses of previously submitted data. Could you be a little more specific as to what elements of the clinical data that that refers to?

Moore:    I can't be a lot more specific.

Analyst 3:    I mean, is it safety, is it statistical procedure, is it some auditing of patient records? I mean, could you just be somewhat more specific?

Moore:    Well, all patient records have been audited and so all that's been done, so that's not at issue as far as I know anyway.

Analyst 3:    Or merely is it formatting or you know?

Moore:    It's actually - - it was a dialogue really about how to look at the clinical data. As you know, there are various analyses used to look at our efficacy and safety data and we just had a dialogue about the different ways you could look at the analyses that are performed on the data. And that's really as far as I want to characterize it.

Analyst 3:    But could you just give us maybe a broader ballpark sense as to - - you know, just a broad area that it is -- is there a specific area that it's in that's a broad area that maybe you could characterize it? That's more specific than just it's the clinical data?

Moore:    Well, I mean, all the clinical data has to do with safety and efficacy. That's the only thing in measure in these clinicals. And so, the dialogue is over those clinical and safety and efficacy data. And again, we have answered some questions on a pretty broad basis. When I talk about it as how to look at the clinical analysis, it's exactly what it was. So I think that's as far and as specific as I really want to be at this point.

71.    The statements made by defendants Moore and Richman, during the conference call, were false and misleading because these statements falsely portrayed information that the Company had received from the FDA. For example, these defendants falsely characterized the 90-day extension as merely part of a normal, continuing dialogue with the FDA about the pending BLA, when, in truth, it arose out of Biopure's submission to lift the clinical hold on the trauma IND. In addition, these defendants' optimistic statements about the 90-day extension were misleading because they were contrary to the express reasons for the extension given by the FDA staff. In answering direct questions from analysts, these defendants provided false information about the true reason for the 90-day extension. Further, these defendants failed to disclose that the FDA had placed the trauma IND on clinical hold due to safety concerns and that the clinical hold was imposed based on the FDA's preliminary assessment of the BLA.

72.    On or about June 16, 2003, the Individual Defendants caused or allowed Biopure to file with the SEC a Form 10-Q quarterly report for the quarter ended April 30, 2003.  The Form 10-Q was signed by defendant Moore, who certified that it did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." Defendants Moore and Kober substantially participated in drafting, reviewing and/or approving the nonfinancial reporting sections of the Form l0-Q, and defendant Richman reviewed disclosures regarding the regulatory status of Biopure's FDA submissions.

73.    On or about June 19, 2003, the Individual Defendants caused or allowed Biopure to file a Form S-3 registration statement and prospectus with the SEC and on or about July 2, 2003, the Individual Defendants caused or allowed Biopure to file a Pre-Effective Amendment No. I for Form S-3 registration statement and prospectus with the SEC for the sale of common stock and warrants

for the purchase of common stock (collectively, the "Summer 2003 Shelf Registration"). On or about July 3, 2003, Biopure filed a Rule 424(b)(3) prospectus with the SEC for the sale of common stock and warrants for the purchase of common stock ("July 3 Prospectus").

74.     Defendants Moore, Sanders, Judelson, Rausch, Harrington, Koop and Krout signed the Summer 2003 Shelf Registration. Defendants Moore and Kober substantially participated in drafting, reviewing and/or approving the Summer 2003 Shelf Registration and July 3 Prospectus, and defendant Richman reviewed disclosures regarding the regulatory status of Biopure's FDA submissions.

75.     In each of the Form 10-Q filed on June 16, 2003, Summer 2003 Shelf Registration, and July 3 Prospectus, the Individual Defendants caused or allowed Biopure to make the following statements, among others:

> We Cannot Expand Indications for Our Products Unless We Receive FDA Approval for Each Proposed Indication
>
> The FDA requires a separate approval for each proposed indication for the use of Hemopure® in the United States. We have applied for an indication for Hemopure® that will only involve its periopcrative use in patients undergoing orthopedic surgery. Subsequently, we expect to expand Hemopure®'s indications. To do so, we will have to design additional clinical trials, submit the trial designs to the FDA for review and complete those trials successfully....

76.     Biopure's June 16 Form 10-Q, Summer 2003 Shelf Registration, and July 3 Prospectus were false and misleading because they presented misinformation about the true status of Biopure's clinical trials for the trauma indication. For example, the Form 10-Q filed on June 16, 2003, Summer 2003 Shelf Registration, and July 3 Prospectus failed to disclose that the FDA had barred Biopure from conducting clinical trials of Hemopure® on trauma victims for safety reasons. The Form 10-Q, Summer 2003 Shelf Registration, and July 3 Prospectus falsely stated that an indication involving Hemopure®'s perioperative use in orthopedic surgery was the "only" indication

applied for, when, in truth, Biopure had also sought permission to conduct trials for the trauma indication. The Form 10-Q, Summer 2003 Shelf Registration, and July 3 Prospectus disclosed a future "expectation" to expand Hemopure®'s indications, design additional trials and submit them to the FDA for review, when the Individual Defendants knew or should have known Biopure already had designed additional clinical trials, submitted the trial designs to the FDA for review, and received a clinical hold from the FDA.

77.    On or about July 2, 2003, the Individual Defendants caused or allowed Biopure to make a submission to the FDA in response to the FDA's May 30 letters in a further attempt to have the clinical hold lifted. Defendant Richman prepared and signed this submission at defendant Moore's direction, and defendant Moore received and reviewed it prior to submission to the FDA.

78.    On or about July 17, 2003, Biopure filed a Form 8-K with the SEC. Defendants Moore and Kober reviewed and approved the July 17 Form 8-K prior to its filing.  A placement agency agreement dated July 17, 2003 was attached as an exhibit to the For 8-K.  The agreement was entered into between Biopure and ThinkEquity Partners LLC pursuant to which ThinkEquity Partners LLC would act as exclusive placement agent for Biopure for the sale by Biopure of up to $17,250,000 of shares of its class A common stock. Among the terms of the agreement that was disclosed in the Form 8-K was Biopure's representation and warranty that the company's registrations statements and prospectuses:

> ... conformed and will conform in all material respects to the requirements of the Exchange Act and the rules and regulations of the Commission promulgated thereunder, and none of such documents contained or will contain at such time an untrue statement of a material fact or omitted or will omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

79.    The Form 8-K was false and misleading to investors because the company's prior filings referred to in the Form 8-K contained material misstatements of material facts and omissions.

80.    On or about July 18, 2003, the Individual Defendants caused Biopure to file a Rule 424(b)(5) prospectus supplement to the July 3 Prospectus with the SEC for the sale of up to 3,083,000 shares of common stock to institutional investors ("July 18 Offering Document").  The July 18 Offering Document incorporated by reference certain of Biopure prior public filings, including prior offering documents and periodic reports. Defendants Moore and Kober substantially participated in drafting, reviewing and/or approving the July 18 Offering Document, and defendant Richman reviewed disclosures regarding the regulatory status of Biopure's FDA submissions.

81.    Biopure's July 18 Offering Document failed to disclose that the FDA had barred Biopure from conducting clinical trials of Hemopure® on trauma victims for safety reasons. Further, the July 18 Offering Document incorporated by reference the Company's prior public filings, alleged herein, that contained false statements and omissions regarding the clinical hold imposed by the FDA based on safety concerns arising from a preliminary assessment of Biopure's BLA.

82.    On our about July 23, 2003, the Individual Defendants caused the Company to issue a press releasing announcing that it has raised $17.2 million in gross proceeds through the sale of 3,083,000 shares of its common stock at $5.58 per share.

83.    On July 30, 2003, Biopure received two letters from the FDA: a complete response letter in which the FDA informed Biopure that its BLA was not approved, and a letter in which the FDA again declined to lift the clinical hold on the trauma IND.

84.    The July 30 complete response letter began by stating that:

41

The Center for Biologics Evaluation and Research (CBER) has completed the review of all submissions made relating to your Biologics License Application, Our review finds that the information and data submitted are inadequate for final approval action at this time based on the deficiencies outlined below.

85.    The July 30 complete response letter also summarized the deficiencies of Biopure's BLA in 34 single-spaced pages. In total, the letter contained more than 220 deficiencies and questions regarding Biopure's clinical trials, its data and the safety and efficacy of Hemopure®. Chief among these were questions about the conduct of Biopure's clinical trials and the integrity of its data, in particular whether controls were sufficient to ensure that the data in Biopure's BLA submission was accurate and reliable enough to form the basis for conclusions about safety and efficacy, and about why Biopure failed to perform certain analyses as the FDA had expected and recommended. The FDA further expressly reserved its right to re-evaluate safety and efficacy data pending resolution, if possible, of data integrity issues. The complete response letter stated that the review clock was suspended with its issuance.

86.    In the FDA's other July 30 letter, the FDA again refused to lift the clinical hold on the trauma IND "because human subjects are or would be exposed to an unreasonable and significant risk of illness or injury." In support of that conclusion, the FDA cited many of the same deficiencies and questions raised in its complete response letter to Biopure's BLA. As in the complete response letter, the clinical hold letter also questioned the controls of the clinical trials and the analysis of the resulting data, and raised concerns about the safety of Hemopure®.

87.    Defendants Moore, Richman, and Kober each received a copy of the July 30 complete response letter on or about July 30, 2003. Defendants Moore and Richman received copies of the July 30 clinical hold letter on or about July 30, 2003, and defendant Kober was

made aware of the letter and its contents in discussions with other Biopure management no later than July 31, 2003.

88.    On or about the morning of July 31, 2003, defendant Richman telephoned a member of the FDA staff working on Biopure's BLA and trauma IND applications to discuss Biopure's next step after receipt of the complete response letter. The FDA staff member identified the letter as a complete response letter and told defendant Richman that within 10 days of its receipt, Biopure should take one of the following actions: amend the application; notify the FDA of its intent to amend the application; withdraw the application; or request a hearing. Defendant Richman asked whether because the complete response letter was issued 30 days before the due date, if Biopure were able to respond to the complete response letter within the 30 days, would it receive approval. The FDA staff member responded that with the issuance of a complete response letter, the review clock had stopped and no further review would be considered until Biopure responded to all deficiencies listed in the letter. The FDA staff member further told defendant Richman that a partial response would not be considered for review, a response to all listed deficiencies was required in order to re-start the clock. The FDA staff member further told defendant Richman that once the FDA received Biopure's response to the complete response letter, the agency gets a new review cycle of six months to review those responses.

89.    On or about July 31, 2003, defendant Kober contacted the Company's outside counsel concerning the complete response letter and a draft of a press release that the company intended to issue. The draft press release stated that Biopure had received a letter from the FDA, but did not identify it as a complete response letter. Biopure's outside counsel orally advised defendant Kober that he "didn't have time to read letter but looked like complete response." Outside counsel further advised defendant Kober that the draft release disclosing receipt of the letter looked "unduly

43

optimistic." Outside counsel further advised defendant Kober that issuance of the letter "30 days

early in this context while true isn't great cause optimism [sic]." Defendant Kober informed

defendants Moore and Richman of the substance of outside counsel's comments.

90.    On August 1, 2003, the Individual Defendants caused or allowed Biopure to issue a

press release entitled "Biopure receives FDA Response to Hemopure® Marketing Application."

Defendants Moore, Richman, and Kober each substantially participated in drafting, reviewing and/or

approving the August 1 Press Release.  The press release stated, among other things:

> Biopure Corporation announced today that the U.S. Food and Drug Administration
> (FDA) has completed its review of the company's biologic license application (BLA)
> for Hemopure®(R) [hemoglobin glutamer - 250 (bovine)] and issued a letter
> requesting additional information. The letter focuses primarily on clarification of
> clinical and preclinical data and includes some comments on labeling. It does not
> request additional clinical trials. Biopure has applied to market Hemopure® in the
> United States for the treatment of acutely anemic adult patients undergoing
> orthopedic surgery and for the elimination or reduction of red blood cell transfusions
> in these patients.

> With 30 days remaining in the original BLA review cycle, the issuance of the letter
> has suspended the FDA review clock until Biopure submits a complete response.

> "We're encouraged that the FDA has finished its review and provided comprehensive
> feedback in advance of the formal action due date. By maintaining thirty days on the
> review clock, the FDA is encouraging us to work with them to complete the approval
> process as quickly as possible," said Biopure President and CEO Thomas A. Moore.
> "We'll work with the Agency to address the remaining questions and will provide our
> answers as expeditiously as possible."

91.    Following the issuance of this press release, Biopure's stock price rose 22.27%, from

a closing price of $5.97 on July 31, 2003 to a closing price of $7.30 on August 1, 2003.

92.    Biopure's press release issued on August 1 mistated the information that the company

had received from the FDA.  For example, the press release failed to disclose that Biopure had

received a complete response letter from the FDA. In addition, the press release contained

statements that were misleadingly optimistic despite the fact that Biopure had received two detailed

letters from the FDA that constituted a major setback in its effort to gain FDA approval for Hemopure®. Defendants Moore's statement in the press release that the FDA was "encouraging" Biopure to "complete the approval process as quickly as possible" completely lacked any basis in fact and was inconsistent with the seriousness and number of deficiencies identified by the FDA and the amount of time it would take Biopure to respond. References in the August 1st Press Release to 30 days remaining in the review cycle mistated the amount of time that the FDA would have to respond -- six months -- once Biopure responded to all deficiencies in the letter. The press release further misled investors by stating that the FDA had not requested additional clinical trials when, in truth, the FDA was questioning the integrity of Biopure's data, a preliminary step prior to determination of whether new trials would be necessary and was further refusing to lift the hold barring clinical trials on trauma victims. The press release further failed to disclose anything about the clinical hold, including that the FDA had imposed one, that Biopurc had received a lengthy and detailed letter refusing to lift the clinical hold which identified many of the same deficiencies and raised many of the same questions as the complete response letter, or that Biopure had twice unsuccessfully attempted to persuade the FDA to lift the clinical hold.

93.    On or about August 5, 2003, defendant Kober sent an e-mail to outside counsel specializing in FDA regulatory matter to request assistance with developing a strategy for responding to the FDA's complete response letter. In a response sent that same day, Biopure's outside counsel sent an e-mail to defendant Kober that identified the July 30 letter as a complete response letter.

94.    On or about August 21, 2003, the Individual Defendants caused the Company to issue a press release announcing its financial results for the third fiscal quarter ended July 31, 2003. Defendants Moore, Richman and Kober each substantially participated in drafting, reviewing and/or

45

approving the press release. For the quarter, the Company reported a net loss of $0.28 per common share, compared with a net loss of $0.43 per common share, for the corresponding period in 2002. The press release included the following representations concerning the FDA's review of the Company's Hemopure® BLA, stating in relevant part:

> On July 30th, the FDA sent Biopure a letter stating that the agency has completed its review of the company's BLA to market Hemopure® in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. The letter requests additional information and suspends the BLA review clock with 30 days remaining in the original review cycle. It does not request additional clinical trials.

95.    The press release issued on August 21, 2003 misstated the information that the Company had received from the FDA. For example, the press release failed to disclose that Biopure had received a complete response letter from the FDA. References in the press release to 30 days remaining in the review cycle further misstated the amount of time that the FDA would have to respond -- six months -- once Biopure responded to all deficiencies in the letter. Further, the press release stated the FDA had not requested additional clinical trials when, the Individual Defendants knew or should have known, the FDA was questioning the integrity of Biopure's data, a preliminary step prior to determination of whether new trials would be necessary and was further refusing to lift the hold barring clinical trials on trauma victims. The press release further failed to disclose anything about the clinical hold, including that the FDA had imposed one, that Biopure had received a lengthy and detailed letter refusing to lift the clinical hold which identified many of the same deficiencies and raised many of the same questions as the complete response letter, or that Biopure had twice unsuccessfully attempted to persuade the FDA to lift the clinical hold.

96.    That same day, on August 21, 2003, defendants Moore and Richman participated in

a conference call with investors and analysts.  During the August 21 Investor Call, defendant Moore

stated, among other things:

> The agency has done us a big favor by providing what amounts to a complete
> detailed response and set of questions to Biopure prior to the end of the review cycle,
> and then stopping the review clock with 30 days remaining in the PDUFA cycle.
> They have thereby made a commitment to give us an action letter 30 days after we
> provide our response to their questions. They could just as easily have announced an
> end to the review cycle with their response, in which case they would have had two
> to six months to respond to our answers instead of the 30 day period.
>
> *  *  *
>
> Our efforts to date suggest that we're in good shape so far to be able to answer FDA's
> questions.

97.    During the August 21 Investor Call, defendants Moore and Richman engaged in the

following exchange with a stock analyst who participated in the call:

> Analyst 1:    ... A couple of questions on the letter from the FDA. You used the
> term complete response a couple of times. But, this isn't a complete
> response letter. What is it exactly?
>
> Moore:    It's, and I'll ask Howard Richman to comment on this in just a second.
> It is -- I think Howard will call it a hybrid, and by that I mean it
> genuinely represents all the questions that FDA would like to have us
> answer, and so in that sense it's like a complete response. But
> normally a complete response letter brings an end to the review cycle.
> And the agency has elected not to do that, offering us this precious
> opportunity to get a response 30 days after we submit the answers to
> those questions. And so, that's what it is.
>
> Analyst 1:    It sounds like the response is going to take some time. Can you tell
> me about how many questions are involved? And the followup
> question is, depending on the length of your response, is it reasonable
> to expect that the FDA is going to be able to respond back within that
> 30 day timeline? If you give them a very exhaustive detailed response
> back, as I know you will, isn't it going to take the FDA longer than
> 30 days to respond back?

Moore:          I think that's a very fair question, and that's one of the motivations we have for having a meeting with FDA simply so we can agree on how we're going to order this data and maybe how we can share some of the data as we go so that it makes it easier for them to meet that guideline.

Richman:        I'll share this with yourself and for the other people listening. This type of letter is very unique. As Tom clearly stated for everyone, it is a hybrid, it's something that was done from the (indiscernible) perspective to work with Biopure in this aspect because you're right in stating that people have (indiscernible), this does not follow the area that we've seen where you look on FDA sites or in other complete responses. This was done with the specific intent to work with us. With that being said, it counts in such a way that they want us to be able to get back to them vis-a-vis this meeting and in our answers. Many of our answers will not be that detailed in response, some are in clarification, which will only meet the FDA with some points we're going to discuss with them. Other ones will just provide them information they requested in terms of clarification and follow-up source documents and other information they've asked about. So, when you say about a detailed (indiscernible) response, in many ways it will not be. But it's also clear that the format that they have for us with FDA which will be clarified on a meeting in September will clearly enlighten us and them and give a clear pathway to the response in a correct time frame.

Analyst 2:      ... My question is, what will you do if Biopure doesn't get FDA approval?

Moore:          ... While we are continuing to be cautiously optimistic, we're on the approval track. If you ask us to specifically address this question, which you have, I guess what I'd say is the FDA doesn't really just say no. At least not in a situation like this where an application has been accepted and taken this far down the review track. What the FDA says is here's what you've got to do, guys, if you want to persuade us to say yes. And generally what they'd say is you need more information. I'm going to take a big leap here, Howard (Richman] may hit me. But if the information we've given them so far led them to say we can't approve it then they would've already said we can't approve it. Okay? You don't go back and forth like this because the product is not approvable. The question for the agency is the process of putting together the adequacy of the total data set.

Analyst 3:      Is there anything on the work the trials that the military is doing in trauma yet?

48

Moore:       We've not initiated human clinical trials in trauma with the military
             or for that matter on the civilian side as yet. So, we hope to get
             started on that ASAP. I think probably those trials will begin,
             however, at least after we have -- no sooner than after we filed our
             responses with FDA on the BLA questions. As I mentioned earlier in
             my flurry of discussions about meetings, Naval medical research has
             been very active in doing preclinical work on trauma with our
             product, and then sharing those results in several different forms
             actually. So, work is going on very actively on the trauma side, but
             I don't believe human trials will begin until after we have completed
             our answers to the BLA. Part of this is related to the fact that we
             already are engaged in FDA in a dialogue on a total clinical
             development program in trauma with FDA. And so we expect the
             final discussion on that with FDA will ensue after we've addressed
             the questions they've asked for us on the use in anemia from surgery
             indication.

98.     The August 21 Investor Call presented misstatements concerning the information that
the Company had received from the FDA. For example, the defendants who participated on the call
falsely characterized the July 30 letter as a "hybrid" letter, when, in truth, it was a "complete
response letter." This fact had been confirmed by the FDA to defendant Richman at least two times
by August 21, 2003. Further, these defendants stated that the FDA would have 30 days to review
a submission from Biopure, when, they knew or should have known, the FDA would have six
months to review a submission once Biopure had addressed all deficiencies in the complete response
letter. Defendant Moore's statements that the FDA did a "big favor" for Biopure and had "made a
commitment to give us an action letter 30 days after we provide our response to their questions"
were inconsistent with statements made by the FDA to Biopure and were contrary to the six month
period the FDA would have to review a resubmission. These defendants stated that the Company
was "in good shape" to address the deficiencies and questions in the complete response letter, when,
they knew or should have known, the deficiencies and questions were of such a substantial nature
that Biopure would not be able to respond to them for years. These defendants made overly

49

optimistic statements about the likelihood of FDA approval, when they knew or should have known the deficiencies and questions in the two July 30 letters from the FDA, as well as concerns discussed by the FDA during telephone calls, were major obstacles to obtaining FDA approval. These defendants discussed clinical trials of a trauma indication but concealed the fact that the FDA had barred Biopure from conducting clinical trials on trauma victims for safety reasons.

99.    On or about August 22, 2003, the Individual Defendants caused or allowed Biopure to file a Form S-3 registration statement and prospectus with the SEC for the sale of common stock and warrants for the purchase of common stock by selling security holders ("August Secondary Offering Documents"). Defendants Moore, Sanders, Judelson, Rausch, Harrington, Koop and Crout signed the August Secondary Offering Documents. Defendants Moore and Kober substantially participated in drafting, reviewing and/or approving the August Secondary Offering Documents, and defendant Richman reviewed disclosures regarding the regulatory status of Biopure's FDA submissions.

100.    The August Secondary Offering Documents, omitted the fact that the July 30 letter received by the Company from the FDA was a complete response letter. In addition, the filings made the following statement, among others:

> We Cannot Expand Indications for Our Products Unless We Receive FDA Approval for Each Proposed Indication
>
> The FDA requires a separate approval for each proposed indication for the use of Hemopure® in the United States. We have applied for an indication for Hemopure® that will only involve its perioperative use in patients undergoing orthopedic surgery. Subsequently, we expect to expand Hemopure®'s indications. To do so, we will have to design additional clinical trials, submit the trial designs to the FDA for review and complete those trials successfully ....

101.    Biopure's August Secondary Offering Documents misstated the information that the Company had received from the FDA. For example, the August Secondary Offering Documents

failed to disclose, among other things, that the July 30 letter from the FDA was a complete response letter. The August Secondary Offering Documents failed to disclose that the FDA had barred Biopure from conducting clinical trials of Hemopure® on trauma victims for safety reasons and that Biopure had twice unsuccessfully petitioned the FDA to lift the hold. The August Secondary Offering Documents falsely stated that an indication involving Hemopure®'s perioperative use in orthopedic surgery was the "only" indication applied for, when, in truth, Biopure had also sought permission to conduct trials for the trauma indication. The August Secondary Offering Documents disclosed a future "expectation" to expand Hemopure®'s indications, design additional trials and submit them to the FDA for review, when, the Individual Defendants knew or should have known Biopure already had designed additional clinical trials, submitted the trial designs to the FDA for review, and received a clinical hold from the FDA.

102.    On or about August 26, 2003, acting at the request of Biopure management, Biopure's outside counsel contacted FDA staff to determine whether the FDA planned to issue a second response letter by August 29. Following that conversation, Biopure's outside counsel informed defendants Moore, Richman and Kober in e-mails and discussions that despite the use of some non-standard language and the issuance of the letter 30 days prior to the due date, the July 30 letter that Biopure received was a complete response letter for the BLA. Biopure's outside counsel further confirmed to defendants Moore, Richman and Kober that the review cycle had been completed *without* approval by the FDA and *that* the FDA would have six *months* to review any resubmission from Biopure.

103.    On September 12, 2003, the Individual Defendants cause or allowed Biopure to file a Form 424(b)(3) prospectus ("September 12 Prospectus") with the SEC. In the "Risk Factors"

51

section of the September 12 Prospectus, the filing stated that the July 30 FDA letter was a complete response letter.

104.     On September 15, 2003, the following trading day, Biopure's stock price dropped by 6.5% on heavy trading. When asked about this trading activity, Biopure's Director of Corporate Communications attributed the stock movement to the disclosure that Biopure had received a complete response letter. ***In e-mail messages to investors, the Director of Corporate Communications stated that the reference to the letter as a "complete response letter" had been a "mistake" by a "junior lawyer at a law firm" used by the Company***.

105.     On September 15, 2003, the Individual Defendants caused or allowed Biopure to file an amended Form 424(b)(3) prospectus ("September 15 Prospectus") with the SEC.  The September 15 Prospectus omitted the reference to the July 30 letter as a "complete response letter." Defendants Moore and Kober substantially participated in drafting, reviewing and/or approving the September 15 Prospectus, and defendant Richman reviewed disclosures regarding the regulatory status of Biopure's FDA submissions.

106.     Also on or about September 15, 2003, the Individual Defendants caused or allowed Biopure to file with the SEC a Form 10-Q quarterly report for the quarter ended July 31, 2003.  The Form 10-Q was signed by defendant Moore, who certified that it did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." Defendants Moore and Kober substantially participated in drafting, reviewing and/or approving, and defendant Richman reviewed, the non-financial reporting sections of the Form 10-Q.  The Form 10-Q failed to state that the July 30 letter it had received from the FDA was a complete response letter. In addition, the filing made the following statement, among others:

We Cannot Expand Indications for Our Products Unless We Receive FDA Approval for Each Proposed Indication

The FDA requires a separate approval for each proposed indication for the use of Hemopure® in the United States. We have applied for an indication for Hemopure® that will only involve its perioperative use in patients undergoing orthopedic surgery. Subsequently, we expect to expand Hemopure®'s indications. To do so, we will have to design additional clinical trials, submit the trial designs to the FDA for review and complete those trials successfully ....

\* \* \*

We also plan to develop Hemopure® for potential use in trauma and other medical applications.

107.    Biopure's September 15 Form 10-Q misstated the information that the Company had received from the FDA. For example, the filing failed to disclose, among other things, that the July 30 letter from the FDA was a complete response letter. Further, the filing failed to disclose that the FDA had barred Biopure from conducting clinical trials of Hemopure® on trauma victims for safety reasons. The Form 10-Q improperly stated that an indication involving Hemopure®'s perioperative use in orthopedic surgery was the "only" indication applied for, when, in truth, Biopure had also sought permission to conduct trials for the trauma indication. The Form 10-Q disclosed a future "expectation" to expand Hemopure®'s indications, design additional trials and submit them to the FDA for review, when, the Individual Defendants knew or should have known Biopure already had designed additional clinical trials, submitted the trial designs to the FDA for review, and received a clinical hold from the FDA. The Form 10-Q referred to development plans for the trauma indication without disclosing that the FDA placed the trauma indication on clinical hold for safety reasons arising out of the same data submitted in support of Biopure's BLA.

108.    On or about October 30, 2003, the Individual Defendants caused the Company to announce its plan to respond by June 30, 2004, to the FDA's questions regarding its BLA for

Hemopure®.  Defendants Moore, Richman and Kober each substantially participated in drafting, reviewing and/or approving the press release.  The press release stated that the Company has adjusted its operating plan to reduce expenses and conserve cash while it completes its written response to the FDA.  The press release stated in relevant part:

> During the past two months the company has had several substantive interactions with the FDA to clarify the Agency's questions.  Many of Biopure's responses have been completed.  However, some require the retrieval of source medical documents and/or historical blood transfusion data from clinical trial sites in various countries, which will take several months to complete.

Defendant Moore, on behalf of the Company, commented, in pertinent part, as follows:

> "In the best interests of our shareholders, today we've taken the steps necessary to more efficiently run our business while we complete our comprehensive response to all of the FDA's questions...."  "We view the Agency's questions as a 'roadmap' to approval and have set a conservative, achievable target date for our response.  We remain enthusiastically committed to commercializing Hemopure® in the United States as expeditiously as possible."

109.    The press release issued on October 30, 2003 presented misleading information about the true status of Biopure's continued efforts to seek FDA approval for Hemopure®.  For example, the press release concealed from investors and the Company's shareholders that the July 30 letter was a complete response letter. The press release failed to disclose the June 30, 2004 planned response date was dependent upon Biopure pursuing a much narrower indication than in the original BLA. It has been alleged, prior to issuance of the press release, defendants ignored advice from the Company's outside counsel, who after reviewing a draft of the release recommended that company disclose that, "[i] its planned response to FDA, Biopure intends to narrow its focus and seek approval only for anemia in those surgical settings where blood transfusion is not an option." Further, the press release failed to disclose the clinical hold on the trauma IND.

### THE TRUTH IS REVEALED AND THE COMPANY IS SEVERELY DAMAGED

110.    After the close of trading on December 24, 2003, at 5:52 p.m., the Individual

Defendants caused the Company to issue a press release announcing that: (1) the Company,

defendant Moore and a former Vice President had each received Wells Notices from the SEC related

to the Company's inadequate disclosures concerning communications with the FDA about

Hemopure®'s applications; and (2) in March 2003 - undisclosed to the public - the Company had

filed an application with the FDA for the use of Hemopure® in clinical trauma studies, but that the

FDA had repeatedly blocked the trial due to material safety concerns. Specifically, the Individual

Defendants caused the Company to issue a press release entitled "Biopure Receives 'Wells Notice'

From Securities and Exchange Commission," which stated in relevant part.

> Biopure Corporation reported that on December 22, 2003, it received a "Wells
> Notice" from the staff of the Securities and Exchange Commission (SEC) indicating
> the staff's preliminary decision to recommend that the SEC bring a civil injunctive
> proceeding against the company.  As permitted under the Wells process, Biopure
> intends to respond promptly and thoroughly in writing before the SEC staff formally
> decides what action, if any, to recommend.  The company's chief executive officer
> and its former senior vice president of Regulatory and Operations also received
> Wells Notices.
>
> Biopure believes the notices relate to the company's disclosures concerning
> its communications with the Food and Drug Administration (FDA) about a trauma
> study protocol the company submitted to the Agency in March 2003 and about the
> company's biologies license application (BLA) for Hemopure® [hemoglobin
> gluatamer-250 (bovine)].  The company did not publicly disclose its communications
> with the FDA about the proposed trauma protocol and investigational new drug
> application (IND) because it does not believe communications about proposed
> clinical trials are material prior to the initiation of a trial.

111.    In the same press release, and several months after the fact, the Company provided

its first details about the failed trauma study applications and the defendants' communications with

the FDA.

> [In March 2003] Biopure submitted the trauma protocol for a Phase II clinical
> trial of Hemopure® for the treatment of hemorrhagic shock casualties in the hospital
> setting, where red blood cell transfusions are available.  The FDA placed this trauma

protocol under a new IND that is separate from the company's previous IND and its BLA to market Hemopure® for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients.  The protocol sought to administer up to 15 units of Hemopure®, a proposed dosage that was 50 percent higher than administered in previous clinical trials.

After the in-hospital trauma protocol was submitted to the FDA and the new IND was assigned, the Agency placed a clinical hold on the proposed trauma trial due to safety concerns.  The FDA referred to a review of adverse event data from the company's Phase III orthopedic surgery trial, which was submitted in the BLA.  The data from that Phase III trial has been previously presented at medical meetings.

In May 2003, Biopure responded to the FDA's clinical hold and also filed the response as a BLA amendment because it discussed data previously submitted with the BLA.  That amendment resulted in the FDA extending its BLA review period up to 90 days, as previously announced on May 30, 2003.  The Agency also requested three additional pre-clinical animal studies of Hemopure® in conscious swine to address its concerns regarding high-volume administration.  After the company's responses, the FDA has twice declined to lift the clinical hold, most recently in a letter dated July 30, 2003.  This letter is separate from the FDA complete response letter Biopure received on that date in response to its BLA for orthopedic surgery.  The questions in the FDA's trauma letter were the same as some of the questions in the BLA complete response letter and had two additional questions, one about the company's analysis of age-specific effects in individuals over age 75 in the Phase III orthopedic surgery trial and a second question about dosing.

112.    Thus, during the Relevant Period, the Individual Defendants failed to disclose:

(1)    All material facts and information about Biopure's Hemopure® applications with the FDA, including all material, adverse communications received from the FDA concerning Hemopure®'s safety;

(2)    That in March 2003 Biopure submitted a trauma protocol for Phase II clinical trial of Hemopure® for the treatment of "hemorrhagic shock casualties in the hospital setting" and that the FDA placed this trauma protocol under a new investigational drug application;

(3)    That by May 2003, the FDA placed a "clinical hold" on Biopure's proposed trauma trial "due to safety concerns";

(4)    That in June/July 2003, the FDA requested that the Company perform three additional pre-clinical animal studies of Hemopure® in conscious swine to address safety and dosage concerns before any trials would be allowed on humans and that

despite Bioupure's submission of additional finding, the FDA still refused to allow the Hemopure® trauma study; and

(5)     That based on adverse event data submitted with the Company's Phase III orthopedic surgery trial, the FDA had voiced "safety concerns" about Hemopure® that would prevent clinical studies for trauma and, at best, severely delay approval for use in orthopedic surgery.

113.     In response to this news, the Company's common stock fell 14% from a closing price of $2.82 per share on December 24, 2003 to a closing price per share of $2.43, erasing over $17.3 million in market capitalization, and a far cry from the Relevant Period high of $8.25 per share. Indeed, during the Relevant Period, the Company's market capitalization has been slashed by over $350 million erasing over 90% of the Company's value.

114.     In addition, as a result of the Individual Defendants misrepresentations and nondisclosures concerning its communications with the FDA, Biopure's stock traded at artificially inflated prices during the Relevant Period.  Certain insiders, including defendant Rausch, took advantage selling hundreds of thousands of his personally held stock for proceeds of nearly $1.6 million as prices as  high of $7.53 per share.

115.     A December 27, 2003 article in the *Boston Globe* entitled "Biopure Stock Slips After SEC News" commented on the Company's shocking December 24th announcement and on defendant Rausch's suspicious trading prior to the announcement. The article stated in relevant part:

Shares of Biopure Corp. fell 14 percent yesterday, the first day of trading after the Cambridge company's surprise Christmas Eve announcement that federal regulators may bring civil legal action over whether it disclosed enough about its blood-substitute research.  The decline comes at a bad time for Biopure, which is preparing to sell more stock to stay in business.

*In addition, filings show that Carl W. Rausch, the company's co-founder and chief technical officer, sold thousands of shares in August, after the company's announcement of what seemed like favorable federal regulatory actions sent its shares sharply up. They hit an intraday high of $9.03 on Aug. 1. Rausch sold shares on seven days from Aug. 5 to Aug. 28.*

57

Biopure's shares closed at $2.43 yesterday, down 39 cents from their close Wednesday at 1 p.m, a drop of almost 14 percent. At 5:52 p.m. Wednesday, Biopure said the Securities and Exchange Commission had given notice it may pursue legal actions against Biopure, its chief executive Thomas A. Moore and a former executive, Howard Richman, who oversaw the company's dealings with the Food and Drug Administration.

The company said it believes the SEC is looking at whether it misled investors by failing to disclose enough about the progress of its Hemopure® blood substitute. The FDA has asked for more information about a trial completed three years ago of the product for use in voluntary orthopedic surgery. The company also disclosed Wednesday the FDA halted its plans for trial of its product in trauma cases because of safety concerns. The company said it hadn't disclosed that before because it felt the information "wasn't material."

The price of Biopure's shares is very important to the company because it has said it is running out of cash while trying to get federal approval to sell Hemopure®, made from refined cow's blood. It previously disclosed plans to raise up to $15 million through the sale of stock to continue operating through the end of 2004.

The lower the share price, the more stock Biopure will have to sell in order to reach that goal, and thus the greater the dilution to its current shareholders. The company now has 44 million shares outstanding, giving it a market capitalization of $106.5 million.

* * *

*According to SEC filings, Rausch has sold 246,074 shares this year for net proceeds of nearly $1.6 million. He first sold 30,000 shares in April at $3.13. Then, in June, when shares had jumped to around $6, he sold about 67,000 shares over six trading days.*

*In August, he sold 149,500 shares for about $1.1 million. Those sales, starting Aug. 5, came after Biopure said it had received a letter from the FDA requesting additional information on its application to sell Hemopure®. At the time, Biopure said that the letter indicated Hemopure® was a step closer to approval, as the FDA was not requesting additional clinical trials, and that it would respond to the request within two months.*

Biopure's shares shot up on the news and traded above $8 for part of August and September. But Oct. 30, the company said it would need until June 30, 2004, to respond to the FDA's questions, which were detailed in a letter of about 30 pages.

* * *

According to the company's proxy statement, Rausch in January was the company's fourth-largest shareholder, with control of just over 2 million shares.

116.    Also commenting on how Biopure's management had misled the public concerning their communications with the FDA concerning Biopure and on Rausch's insider trading was a December 26, 2003 article appearing in *TheStreet.com* by Adam Feuerstein entitled "Biopure Gets SEC Wells Notice." The article stated in relevant part:

Biopure has received a Wells notice from the Securities and Exchange Commission, informing the company that regulators may file civil endorsement proceedings relating to material disclosures made – and not made – about its experimental blood substitute, Hemopure®.

Tom Moore, Biopure's CEO, also received a Wells notice, as did Howard Richman, former vice president of regulatory affairs, who was fired by the company in October.

*Biopure issued a news release at 5:52 pm EST Dec. 24 disclosing the SEC action, although the company acknowledged receiving the actual Wells notices Monday.  The company's curiously timed statement included its first public acknowledgment that the Food and Drug Administration had "safety concerns" about Hemopure® back in March, contrasting with Biopure's upbeat public pronouncements.*

* * *

The SEC sends a Wells notice to a company or an individual after its staff has completed an investigation and determined that sufficient wrongdoing has occurred to warrant charges to be filed.  As permitted under the Wells notice process, Biopure said it will respond to the SEC in writing before the agency's staff formally decides what action, if any, to take.

*At the center of the SEC's investigation is whether Biopure executives misled the public about its communications with the FDA.  Biopure is seeking Hemopure®'s approval as an oxygen-carrying blood substitute for use in patients undergoing elective orthopedic surgery.  Despite many delays and regulatory setbacks, Biopure's management insisted publicly that Hemopure® was close to approval, until begrudgingly admitting otherwise in October.  In the interim, Biopure and its executives sold millions of dollars in company stock.*

59

* * *

Biopure's Christmas Eve news release revealed new and troubling information about the company's dealings with the FDA. ***Some of this information paints a much more negative picture about Hemopure® and seems to contradict management's bullish pronouncements about the product's chances for approval.***

***For the first time, Biopure disclosed Wednesday that in March it sought FDA permission to start a new clinical trial testing Hemopure® in hospitalized trauma patients. But the FDA refused to allow the study because of "safety concerns" stemming from the company's Phase III orthopedic surgery trial.***

***This marks the first time Biopure has admitted safety problems with Hemopure®.*** However, *TheStreet.com* previously reported on serious safety problems associated with Hemopure® for more than 2.5 years, citing data presented at medical meetings but not made widely available to investors, as well as information obtained from people involved in the Hemopure® clinical study. These concerns included incidences of Hemopure®-treated patients suffering from acute kidney failure, as well as relatively large numbers of deaths in Hemopure® patients aged 75 or older.

Also Wednesday, Biopure said it submitted more information to the FDA in May, in an attempt to get the agency to lift the "clinical hold" on the trauma trial. The FDA refused twice, and even asked Biopure to conduct three additional animal studies of Hemopure®. The last FDA rejection came July 30, the company said. Biopure has now given up seeking permission for the trauma study, although the company said it is still pursuing a trauma program.

Biopure said Wednesday that it hadn't previously disclosed anything about its trauma study publicly because the company didn't consider the information material, since the study was never started. ***However, Biopure executives weren't shy about discussing Hemopure® when they could put a positive spin on events.***

As the FDA was blocking the Hemopure® trauma program, Biopure was still trying to get the blood substitute approved for use in orthopedic surgery. On Aug. 1, the FDA told Biopure that the Hemopure® review was completed but that the product could not be approved until additional data and information were submitted. At that time, Biopure executives expressed confidence in press releases and a conference call that the FDA was eager to approve Hemopure® and that it would happen soon.

***Throughout the spring and summer, Biopure management talked repeatedly about how well its communications with the FDA were progressing over Hemopure®'s eventual approval. This bullish talk helped boost Biopure's stock price. On Aug. 1, the day Biopure disclosed the FDA letter, Biopure's stock***

*jumped 22% to $7.30 on heavy volume.  By the end of August, Biopure was trading above $8 per share.*

> *Biopure insiders then sold company stock.  The biggest seller, by far, has been Carl Rausch, Biopure's co-founder and former chief executive.  During the months of June and August, Rausch, whose current title is chief technology officer, sold company stock worth about $1.5 million.*

\* \* \*

In late July, Biopure also raised $17.2 million through the private placement sale of its own common stock to unnamed investors.

> *Eventually, Biopure management couldn't hide the fact that the FDA was nowhere close to approving Hemopure®.  In October, the company acknowledged that it would take almost a year for the company to compile and resubmit the information requested by the agency.  Biopure's stock sunk below $3 per share.*

117.    Moreover, on February 5, 2004, just over a month after the SEC had recommended civil action against the Company and Moore for misleading investors concerning Hemopure®, the SEC and the FDA announced plans to work together in an attempt to crack down on companies that make false and misleading statements concerning their products under review by the FDA.  On that date, the SEC issued a press release entitled "SEC and FDA Take Steps to Enhance Inter-Agency Cooperation."  The press release stated in relevant part:

> The Securities and Exchange Commission announced today that members of its senior staff and senior personnel of the Food and Drug Administration (FDA) are continuing and enhancing their cooperative efforts in support of the Commission's activities An exchange of letters memorializes the initiatives to be taken by the FDA to support the Commission in carrying out its mission to protect investors and maintain the integrity of the nation's securities markets.

> The FDA generally assists the Commission by: (1) providing technical assistance, when appropriate, to the Division of Corporation Finance in its review of Commission filings, and (2) providing documents and information to the Division of Enforcement.  These forms of assistance to the staff will continue, but with certain enhancements.

> Among the initiatives described in the letters exchanged by the SEC and FDA staff are:

61

- A centralized procedure adopted by the FDA for referring to the SEC staff possible instances of securities laws violations by public companies regulated by the FDA.

- Identification of contacts in each of the FDA's main organizational components (known as Centers) to serve as points of contact for the SEC and its staff to use in requesting information from FDA. These individuals would be responsible for assuring that such requests are handled promptly and thoroughly.

- The continued sharing of non-public information by the FDA with the SEC, consistent with FDA's current practice, and a commitment to endeavor to take steps to further expedite this process.

Stephen M. Cutler, Director of the Commission's Division of Enforcement, and a signatory of the SEC's letter, said, "The Commission staff appreciates FDA's strong interest in coordinating our agencies' activities in a cooperative manner. *When companies misrepresent the status of the FDA's review of their products, investors can be harmed. We are eager to continue working with the FDA to aggressively address such situations and to enhance our already-productive relationship."*

118. Commenting on SEC's announcement, an article by Adam Feuerstein appearing in

*TheStreet.com* entitled "Cyberonics' Disturbing Pattern of Chatter," relative to Biopure, stated in

relevant part:

The Food and Drug Administration and the Securities and Exchange Commission recently announced plans to work together to crack down on companies that make false or misleading statements about products under FDA review.

\* \* \*

*Companies often take it upon themselves to offer one-sided, typically very positive, accounts of their all-important interactions with the FDA, often to the point of misleading investors, ImClone and Biopure being classic examples.*

Executives who like to tout their dealings with the FDA know full well that regulators are barred by law from offering their own version of events. (Case in point, the FDA declined to comment for this story about its interactions with Cyberonics.)

Last week, the FDA and the SEC announced a joint effort to catch companies that try to take advantage of this situation. "If companies know we have these mechanisms in place, they will know it does not pay to make misleading statements to the investing public, that the law will catch up with them," FDA chief Mark McClellan told BioCentury, an industry newsletter. "The best advice for companies is to be straightforward in your dealings with investors. Don't misrepresent the information that you receive from the FDA," he added.

119.    Then, on February 24, 2004, the Individual Defendants caused the Company to suddenly announce that defendant Moore, the Company's President and CEO", had resigned, effective immediately. In response to this shocking news, the Company's stock plunged another 16% in afternoon trading closing at $1.36 on the day on a volume of 3.5 million shares.

120.    Commenting on the sudden resignation of Moore, a February 24, 2004 article in *Reuters* entitled "Biopure chief resigns in midst of SEC probe," stated in relevant part:

Biopure, whose stock has plunged in recent months as it struggles to get an experimental blood substitute to market, said on Tuesday that Chief Executive Thomas Moore resigned.

The stock fell 13 percent at $1.41 in afternoon trading

Two months ago the stock dropped 14 percent when Biopure disclosed that securities investigators might level civil charges against Moore and the company for possibly misleading investors and about prospects for the blood substitute Hemopure®.

121.    An article on February 25, 2004 by Jeffrey Krasner appearing in *The Boston Globe* entitled "Biopure CEO Resigns Moore's Departure Amid Company's Woes Sparks 16% Stock Drop," commented on the Company's troubles over the last 18 months. The article stated in relevant part:

Moore's resignation caps a disastrous 18-month run in which Biopure delayed plans to build a manufacturing plant, misleadingly told investors that a Food and Drug Administration letter indicated Hemopure® would likely be approved, withheld information from shareholders that the FDA had stopped a clinical trial due to safety concerns, and unveiled layoffs totaling nearly 50 percent of its workforce.

122.    Then, on April 30, 2004, after the close of the market, the Individual Defendants caused the Company to announce that additional Wells Notices had been issued by the SEC to defendants Sanders, Crout, Rausch and Kober.  On that date at 4:42 p.m. ET, the Individual Defendants caused the Company to issue a press release entitled "Biopure Updates Previously Disclosed Securities and Exchange Commission Inquiry."  The press release stated in relevant part:

> Biopure Corporation reported today that on April 29, 2004, the U.S. Securities and Exchange Commission (SEC) issued additional "Wells Notices" to four individuals concerning matters disclosed in Biopure's press release dated December 24, 2003. ***The notices indicate that the SEC staff may recommend that the Commission bring a civil action against Biopure's non-executive Chairman Dr. Charles A. Sanders, former Board Member Dr. J. Richard Crout, Chief Technology Officer and Board Member Carl W. Rausch, and General Counsel Jane Kober for possible violations of federal securities laws.***

123.    A press release by *Reuters* also on April 30, 2004 stated in relevant part:

> Biopure Corp. said on Friday U.S. securities regulators issued "Wells Notices" to four company officials, indicating they might bring civil action against the executives for possible securities laws violations.

> Biopure said in December that the U.S. Securities and Exchange Commission sent Wells Notices to the company and its chief executive at the time and that the SEC might recommend civil injunction procedures against both.  The company's stock has plunged to about $1, far below last summer's high of about $9, when prospects for the product seemed brighter.

> ***The SEC is concerned that Biopure may have misled investors about the blood substitute, Hemopure®, and that it failed to tell investors that the U.S. Food and Drug Administration had refused to allow it io initiate a clinical trial of the product because of potential side effects.***

124.    On this news, the Company's stock collapsed another 35% on heavy trading from a close on April 30, 2004 of $1.25 to a close on May 3, 2004 of $.90, and thus becoming a penny stock.  The Company's stock has continued to plummet to below $.70 per share. Thus, from a Relevant Period high of over $8 per share in August and September of 2003, the defendants have erased over $350 million in market capitalization or over 90% of the Company.

125.    Another article appearing in *TheStreet.com* on May 3, 2004, entitled "More Legal

Woes for Biopure" commented on the additional Wells Notices and stated in relevant part:

> Struggling biotech company Biopure shares could be under pressure Monday after the company's disclosure that the Securities and Exchange Commission had issued additional Wells Notices to four company officials.
>
> "The notices indicate that the SEC staff may recommend that the commission bring a civil action against Biopure's non-executive Chairman Dr. Charles A. Sanders, former Board Member Dr. J. Richard Crout, Chief Technology Officer and Board Member Carl W. Rausch, and General Counsel Jane Kober for possible violations of federal securities laws," the company said in a statement released late Friday.
>
> *        *        *
>
> In question is the company's characterization of communications with the Food and Drug Administration about its application for the artificial blood substitute Hemopure®, designed to aid acutely anemic patients undergoing orthopedic surgery.
>
> Biopure had submitted an application to the FDA in July 2002 seeking approval.  Twelve months later, the company said the FDA had relatively few questions about -- and required no new tests for -- Hemopure®.  Biopure said it could answer the FDA's questions in 30 to 60 days.  ***As it turns out, the agency had more questions and concerns than the company had originally indicated.***
>
> In early April, Biopure said it may have to conduct more human trials in addition to four more animal tests requested by the agency.  Biopure now says it expects to answer the FDA's questions and to complete the animal testing in the early fall.
>
> ***Late last year, Biopure said for the first time that it had received Wells Notices from the SEC.  Since then, the company has suffered a number of setbacks.  Its stock has plummeted from a 52-week high of $9.03 touched in August 2003 and CEO Thomas A. Moore resigned in February.***

126.    An article appearing in *The Boston Globe* on May 24, 2004 entitled "On Life

Support," stated in relevant part:

**Biopure Corp.**

12-31-99 market capitalization

$370.5 million

65

Current market capitalization

*$35.2 million*

There's blood in the water at the Cambridge blood-substitute maker, as the SEC probes whether executives properly disclosed a clinical-trial shutdown that tanked the stock.  In February, CEO Thomas Moore declared "in my heart, I'm quite sure we will succeed."  The next week, he resigned.

127.    Even worse, on June 23, 2004, the the Individual Defendants caused Biopure to announce that because the daily minimum bid for its stock had remained below $1.00 for 30 consecutive days, it had been notified by Nasdaq it was in serious jeopardy of having its common stock delisted – a result which would be devastating for the Company.  A press release issued on that date by the Company entitled "Biopure Appoints New President and Chief Executive Officer and Restructures the Company; Company Focuses on Clinical Development of Hemopure®® Oxygen Therapeutic Product for Cardiovascular and Trauma Applications and Appoints Distinguished Medical Advisory Board" stated in relevant part:

> Biopure has received notice from the Nasdaq Stock Market that its daily minimum bid price fell, and remained below, $1.00 for 30 consecutive business days.  As a result, Biopure is out of compliance with Nasdaq's $1.00 minimum bid price for continued inclusion.  The company has 180 calendar days, or until December 14, 2004 to regain compliance, and will have an additional 180 calendar days, if at December 14, 2004 the company meets Nasdaq's initial listing criteria other than the bid price requirement.

128.    Further commenting on this latest bad news for the Company and summarizing the other damages inflicted upon the Company as a result of Individual Defendants' misconduct was a June 24, 2004 article appearing in the *Boston Globe* entitled "Troubled Biopure launches revamp; Two executives quit as new CEO is hired; drug plan shifted."  The press release stated in relevant part:

> Foundering Biopure Corp., sought to improve its fortunes yesterday with a broad restructuring plan.

66

The Cambridge biotechnology company hired Zafiris, a former Biopure executive, as its chief executive, disclosed the departures of two high-ranking executives, laid off 25 employees, and changed course in its quest for regulatory approval for its experimental blood substitute, Hemopure®.

*Despite the flurry of activity, however, the bad news for Biopure continued to pour in. The company disclosed that the Nasdaq Stock Market may delist its stock because the bid has been mired below $1 for more than 30 days. The company has until Dec. 14 to pull its stock above the $1 mark.*

On news of yesterday's layoffs and organizational changes, the stock dipped 6.5 percent to 72 cents. Biopure asked a series of questions about its application. *The stock fell even farther in December when the Securities and Exchange Commission launched an investigation, apparently into whether investors were misled about the nature of the FDA's communications.*

\* \* \*

Biopure's vision for a blood substitute that could be used when no real blood is available for a transfusion caught the eye of the investors who saw the potential for huge markets. Hemopure® is made from cow's blood and can be stored at room temperature for three years. It can be used by people of all blood types, and doesn't transmit disease.

*But the company ran into trouble starting in August 2003 when the FDA asked a series of questions about Biopure's application to market Hemopure®, and required new animal trials, a costly time consuming setback that is a strong indication that government reviewers had concerns about the blood substitute's safety for further human testing.*

So instead of opening a manufacturing facility this year in South Carolina, which had been planned as far back as 2002, *the company is coping with SEC investigation and fending off at least half-dozen shareholder lawsuits filed in the US District Court in Boston.*

*In April, the company disclosed that the SEC indicated it may initiate civil actions against some Biopure executives. At the time of the FDA's questions in August 2003 about the Hemopure® applications, executives issued public statements saying the FDA reaction was positive.* The company has said it believed it acted properly.

129. Finally, a July 5, 2004 article by Adam Feuerstein in *TheStreet.com* entitled "Biotech 101: The Road to FDA Approval," described in detail the complete FDA process for BLA's such that

for Biopure's Hemopure®.  Discussing the final approval process, and how certain companies such as Biopure take it upon themselves to mislead investors concerning the approval process, the article stated in relevant part:

**Stamps of Approval**

After the BLA or NDA is filed and an advisory committee, if required, convenes to vote, the final approval decision is left up to the FDA.  You'd think this final step would be straight forward, but it's actually pretty labyrinthine.

The FDA can rule in a variety of ways.  The simplest FDA action is the approval letter, issued by the FDA when the agency deems a drug safe, effective and ready to be marketed.

Conversely, the FDA an issue a non-approvable letter when the agency concludes that a drug's clinical data or safety data do not warrant approval.  This rejection letter of sorts is, of course, bad news an usually precipitates the drug company's plunging stock price.

Investor confusion can be highest, however, when the FDA issues a complete response letter, or likewise, an approvable letter, Simply put, the actions are akin to conditional approvals, meaning that the FDA requires additional information before it can issue a final ruling.  The trick for drug companies-and investors–is figuring out how much additional information is required and how long it will take to compile and resubmit.

Unfortunately, the FDA doesn't make complete response or approvable letters public, so investors have to rely on company's explanation and interpretation of these letters to determine whether a final drug approval is imminent or significantly delayed.

*Lest you think drug companies always play straight-up and honest with investors, look at what Biopure (BPUR:Nasdaq) did in July 2003.  The company received a complete response letter from the FDA regarding its human blood substitute Hemopure®.  But instead of telling investors that the FDA was asking for new animal and human clinical studies, Biopure management suggested to investors that the FDA had no substantial issues with Hemopure® and that approval was right around the corner.*

*The truth eventually came out, leading to a decimation of Biopure's stock price, the resignation of most of the company's management, including the CEO, and an ongoing Securities and Exchange Commission investigation.  Hemopure® is nowhere close to being approved.*

130.    On September 14, 2005, the SEC filed a civil injunctive proceeding against the Company as well as defendants Moore, Richman and Kober.  The SEC's suit seeks, among other things, damages against the Company in the form of a civil penalty and *seeks an order barring defendants Moore, Richman and Kober from serving as officers or directors of any publicly held company*. The Individual Defendants caused Biopure to issue a press release disclosing their intention to seek dismissal of the suit.  Evidently, the Individual Defendants are more interested in evading liability for the harm that they have caused Biopure rather than fulfilling their fiduciary duties.  The press release provided in part:

> Biopure Corporation announced today that the U.S. Securities and Exchange Commission (SEC) today filed a civil injunctive proceeding against the company, two former officers and one current officer.
>
> "The company intends to seek dismissal of the SEC's claims or judgment in its favor and expects to prevail," said Robert A. Buhlman of Bingham McCutchen LLP, counsel to the company. "Biopure intends to establish that its disclosures were accurate based on governing law, testimony provided by the FDA to the SEC, the FDA's review procedures and practices, and what was communicated by FDA at the relevant times."
>
> A principal claim by the SEC is based on a contention by the SEC that confuses the safety of the product with the safety of a proposed clinical trial design. The claim is that the company should have disclosed in April 2003 that FDA put on hold a proposed clinical trial of the company's investigational oxygen therapeutic Hemopure® in trauma patients in the hospital setting. Under FDA regulations, a proposed trial is either placed on hold within 30 days or it may proceed as submitted. When FDA communicated the hold, it asked data questions described as "safety concerns."
>
> The company disagrees that it was required to disclose the hold status of the proposed trial in a new indication. The company did not disclose the filing of the proposed protocol. It is not uncommon for there to be a dialogue with the FDA over a proposed trial. The company does not and did not view the data questions or the proposed trial itself to be material to an investment decision, as opposed to normal back-and-forth between the FDA and clinical trial sponsors. In addition, in-hospital trauma was not planned as an indication for commercial development and the company spent an insignificant amount on the proposed trial.

69

FDA had designated the in-hospital trauma trial as a separate investigational new drug application (IND) from the company's then-pending biologics license application (BLA) for a proposed orthopedic surgery indication. The FDA questions about data were asked in the context of the in-hospital trauma IND and referred to data that had also been submitted in the BLA. The company intends to prove that the FDA questions were specific to the in-hospital trauma IND, and FDA was not addressing the status of the orthopedic surgery BLA in its communications about the IND.

The in-hospital trauma IND at issue in the SEC action was withdrawn by the company in November 2003. That withdrawn in-hospital trauma IND is not to be confused with the currently proposed IND for treatment of trauma patients in the out-of-hospital setting. That out-of-hospital trauma IND is currently on hold after FDA asked different questions than were asked in April 2003.

A second contention in the SEC suit concerns a separate communication by FDA with the company about the orthopedic surgery BLA. The SEC staff has claimed that the company's disclosures concerning a July 30, 2003 FDA letter about the BLA was too positive in tone, in the staff's view. The August 1, 2003 press release about the letter said that FDA had completed its review of the BLA and that the letter asked for additional information, which it did. The July 30 BLA letter did not ask for additional clinical trials and the August 1 press release reported that. The July 30 BLA letter did not mention "safety concerns" and neither did the press release.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

131.    Plaintiffs bring this action derivatively in the right and for the benefit of Biopure to redress injuries suffered, and to be suffered, by Biopure as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Biopure is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

132.    Plaintiffs will adequately and fairly represent the interests of Biopure in enforcing and prosecuting its rights.

133.    Plaintiffs are and were owners of the stock of Biopure during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

134.    The Board of Biopure at the time this action was instituted consisted of the following individuals: Director Defendants Moore, Rausch, Judelson, Sanders, Koop, Harrington and Crout. In addition to the particularized reasons set forth in ¶¶25-31, plaintiffs did not make any demand on the Board of Biopure to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the following additional reasons:

a.    As a result of his positions as Vice Chairman, CTO and a director of Biopure, defendant Rosche had access to and review of internal corporate documents.  Further, Rosche knew the adverse non-public information regarding Hemopure® and the Company's discussions with the FDA through conversations and connections with other corporate officers, employees and directors; and attendance at  management and Board meetings.  Since, the apparent success of Hemopure® was the most important aspect of Biopure's business during the Relevant Period, it is reasonable to infer that the FDA's communications with the Company concerning Hemopure® would have been discussed during those management and Board meetings.  While in possession of this material adverse non-public information regarding the Company, defendant Rausch sold  246,574  shares of Biopure stock for proceeds of $1,596,900.  Rausch sold these shares in August 2003 when the Company's stock was trading at its Relevant Period high of over $9.00 per share.  Because defendant Rauch received a personal financial benefit from the challenged insider trading transactions, this defendant is interested.  Also, defendant Rosche faces a substantial threat of liability for breach of his fiduciary duties for insider selling.  Since defendant Rosche has breached his fiduciary duties and it interested, any demand upon him would have been futile;

71

b.    The Compensation Committee of the Board determines, after consulting with the CEO, establishes, authorizes and administers Biopure's compensation policies, practices and plans for Biopure's directors, executive officers and other key personnel. The Compensation Committee is comprised of defendants Sanders and Judelson. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Sanders and Judelson. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Moore, Rausch, Koop, Harrington and Crout is futile;

c.    The principal professional occupation of defendants Moore and Rausch are their employment with Biopure, pursuant to which they received and continue to receive substantial monetary compensations and other benefits. Specifically, for FY:03 Moore received an annual base salary of not less than $350,000. Rausch also received a salary for FY:03 of nearly $350,000. In addition, both Moore and Rausch were granted options to purchase Biopure stock and are entitled to bonuses. Accordingly, defendants Moore and Rausch lack independence from defendants Sanders and Judelson, who exert influence over defendant Moore and Rausch's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendants Moore and Rausch incapable of impartially considering a demand to commence and vigorously prosecute this action;

d.    According to Biopure's Proxy Statements filed with the SEC, Director Defendants Harrington, Sanders and Crout served on the Audit Committee during the Relevant Period. The Audit Committee is responsible for reviewing the activities of Biopure's internal auditors and independent accountants. The Audit Committee evaluates Biopure's organization and its internal controls, policies, procedures and practices to determine whether they are reasonably

designed to: provide for the safekeeping of Biopure's assets; assure the accuracy and adequacy of Biopure's records and financial statements; reviews Biopure's financial statements and reports; monitors compliance with Biopure's internal controls, policies, procedures and practices; and receives direct compliance reports from Biopure's internal auditors and General Counsel and from the independent accountants.  Nonetheless, the Audit Committee, with full knowledge of the Company's communications with the FDA concerning Hemopure®, caused or allowed Biopure to disseminate the improper statements concerning Hemopure® as alleged herein.  By such actions, these defendants breached their duties by causing or allowing the improper financials described above.  As a result of these defendants' breach of their duties, any demand upon them is futile;

        e.      The entire Biopure Board and senior management participated in the wrongs complained of herein.  Biopure's directors are not disinterested or independent due to the following: Director Defendants Moore, Rausch, Judelson, Sanders, Koop, Harrington and Crout served on the Biopure Board during the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above-referenced defendants breached the fiduciary duties that they owed to Biopure and its shareholders in that they failed to reveal to the public the Company's communications with the FDA concerning Hemopure® despite admittedly having such knowledge.  Thus, the Biopure Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Biopure to millions of dollars in liability for possible violations of applicable securities laws;

        f.      The Director Defendants of Biopure, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and

participated in efforts to conceal or disguise those wrongs from Biopure's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

g.       As detailed herein at ¶¶25-31, in order to bring this suit, all of the directors of Biopure would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand. As set forth in particularity in ¶¶25-31 because a majority of the Director Defendants have long-term personal, professional and financial relationships with each other and other board members, a majority of the Director Defendants could not have adequately considered a demand to bring the allegations made herein rendering any such demand futile;

h.       The acts complained of constitute knowing violations of the fiduciary duties owed by Biopure's officers and directors and these acts are incapable of ratification;

i.       Each of the Director Defendants authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

j.       Any suit by the Director Defendants to remedy these wrongs would likely expose the Director Defendants and Biopure to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

k.      Biopure has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Biopure any part of the damages Biopure suffered and will suffer thereby;

l.      If the Director Defendants were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile; and

m.      If Biopure's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Biopure.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, plaintiffs assert, upon information and belief, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Biopure against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Biopure, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a

suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

coverage exists and will provide a basis for the Company to effectuate  recovery.  If there is no

directors' and officers' liability insurance at all then the current directors will not cause Biopure to

sue them, since they will face a large uninsured liability.

135.    Moreover, despite the Director Defendants having knowledge of the claims and

causes of action raised by plaintiffs, the current Board has failed and refused to seek to recover for

Biopure for any of the wrongdoing alleged by plaintiffs herein.

136.    Plaintiffs have not made any demand on shareholders of Biopure to institute this

action since such demand would be a futile and useless act for the following reasons:

a.    Biopure is a publicly held company with approximately 48.17 million shares

outstanding, and tens of thousands of shareholders;

b.    Making demand on such a number of shareholders would be impossible for

plaintiffs  who have no way of finding out the names, addresses or phone numbers of shareholders;

and

c.    Making demand on all shareholders would force plaintiffs to incur huge

expenses, assuming all shareholders could be individually identified.

## DAMAGES TO BIOPURE

137.    As a direct result of the Individual Defendants' breaches of their fiduciary duties and

other violations of law, the Company has been severely damaged.  The Individual Defendants'

nondisclosures concerning the Company's communications with the FDA concerning Hemopure®

have caused severe, irreparable, injury and damage to the company's reputation and goodwill in the

investment and business communities and threaten to virtually destroy this once valuable franchise.

For at least the foreseeable future, the Company will suffer from what is known as the "liar's

discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled securities analysts and the investing public, such that Biopure's ability to raise capital – on favorable terms – will be impaired in the future. Indeed, the Company's market capitalization has already been severely damaged with over $350 million erased, or over 90% of the Company's market value during the Relevant Period, and severely reducing the Company's financing options. Moreover, the Individual Defendants' actions have placed the Company is serious peril of having it's common stock delisted by Nasdaq. Additionally, the Company has had to make numerous public offerings of the Company's securities at fire-sale prices just to stay in business. All of this is a direct result of the Individual Defendants misconduct and breaches of fiduciary duties.

138.  In addition, significant Company money will have to be spent defending the Company in the  securities fraud action brought against the Company as a direct result of the conduct of the Individual Defendants. These lawsuits will costs hundreds of thousands to defend and possibly millions if not tens of millions to resolve. In addition, significant Company funds will have to be expended defending the Company against the SEC civil action which seeks a civil penalty from the Company. . This suit will costs the Company tens of thousands to defend and potentially hundreds of thousands to resove in civil penalities. Moreover, management will have to expend significant time answering these charges instead of being able to focus on the Company's core business. Moreover, the Company  has and will continue to spend significant Company funds employing independent outside counsel.

## VI.

## **CAUSES OF ACTION**

### COUNT I

**Against All Individual Defendants for Breach of Fiduciary Duty**

139.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

140.    The Individual Defendants owed and owe Biopure fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Biopure the highest obligation of good faith, fair dealing, loyalty and due care.

141.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

142.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

143.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Biopure has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

144.    Plaintiffs on behalf of Biopure have no adequate remedy at law.

**COUNT II**
**Against All Individual Defendants for Abuse of Control**

145.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

146.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Biopure, for which they are legally responsible.

147.    As a direct and proximate result of the Individual Defendants' abuse of control, Biopure has sustained significant damages.

148.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

149.    Plaintiffs on behalf of Biopure have no adequate remedy at law.

## COUNT III
### Against All Individual Defendants for Gross Mismanagement

150.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

151.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Biopure in a manner consistent with the operations of a publicly held corporation.

152.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Biopure has sustained significant damages in excess of tens of millions of dollars.

153.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

154.    Plaintiffs on behalf of Biopure have no adequate remedy at law.

## COUNT IV
### Against All Individual Defendants for Waste of Corporate Assets

155.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

156.    As a result of the improper statements and nondisclosures, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, the Individual Defendants have caused Biopure to waste valuable corporate assets by paying incentive based bonuses and stock options to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions including responding the SEC's allegations and securities fraud actions.

157.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

158.    Plaintiffs on behalf of Biopure have no adequate remedy at law.

### COUNT V
### Against All Individual Defendants for Unjust Enrichment

159.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

160.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Biopure.

161.    Plaintiffs, as shareholders and representatives of Biopure, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### COUNT VI
### Against Defendant Rausch for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

162.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

80

163.    At the time of the stock sales set forth herein, the defendant Rausch knew the information described above, and sold Biopure common stock on the basis of such information.

164.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which defendant Rausch used for his own benefit when he sold Biopure common stock.

165.    At the time of his stock sales, defendant Rausch knew of the undisclosed adverse information concerning the Company's communications with the FDA concerning Hemopure®. Defendant Rausch's sales of Biopure common stock while in possession and control of this material adverse non-public information was a breach of his fiduciary duties of loyalty and good faith.

166.    Since the use of the Company's proprietary information for their own gain constitutes a breach of defendant Rausch's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Rausch obtained thereby.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Biopure have an effective remedy;

C.    Awarding to Biopure restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants including all illegal proceeds from insider selling;

D.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.


**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  October 12, 2005              Respectfully submitted,


                                      /s/ Timothy L. Miles
                                      _____

                                      By:    Timothy L. Miles

                                      DOUGLAS S. JOHNSTON, JR. (*pro hac vice*)
                                      GEORGE E. BARRETT (*pro hac vice*)
                                      TIMOTHY L. MILES (*pro hac vice*)
                                      BARRETT, JOHNSTON & PARSLEY
                                      217 Second Avenue, North
                                      Nashville, TN 37201
                                      Telephone: 615/244-2202
                                      Facsimile: 615/252-3798
                                      djohnston@barrettjohnston.com
                                      gbarrett@barrettjohnston.com
                                      tmiles@barrettjohnston.com

                                      BRIAN J. ROBBINS
                                      JEFFREY P. FINK
                                      ROBBINS UMEDA & FINK, LLP
                                      1010 Second Avenue, Suite 2360
                                      San Diego, CA 92101

Telephone: 619/525-3990
Facsimile: 619/525-3991

Plaintiffs' Co-Lead Counsel

MARY T. SULLIVAN, BBO #487130
SEGAL ROITMAN & COLEMAN
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: 617/742-0208
Facsimile: 617/742-2187

Plaintiffs' Liaison Counsel

JAMES G. STRANCH
BRANSTETTER, KILGORE, STRANCH &
JENNINGS
227 Second Avenue North
Nashville, TN 37201
Telephone: 615/254-8801
Facsimile: 615/255-5419

Plaintiffs' Counsel

## **VERIFICATION**

I, John Parrott, hereby declare as follows:

I am a shareholder of Biopure Corporation and have been during the relevant times pertinent

hereto. I certify under penalty of perjury that I have reviewed the foregoing Verified Consolidated

Second Amended Shareholder Derivative Complaint for Breach of Fiduciary Duties, Abuse of

Control, Gross Mismanagement, Waste of Corporate Assets, Unjust Enrichment, and for Breach of

Fiduciary Duties for Insider Selling and Misappropriation of Information ("Consolidated Second

Amended Complaint"),  and authorized its filing and that the contents in the Consolidated Second

Amended Complaint are true to the best of my knowledge, information and belief.

Dated: October 12, 2005.    /s/John Parrott
                 JOHN PARROTT

## **VERIFICATION**

I, Laurie Parrott, hereby declare as follows:

I am a shareholder of Biopure Corporation and have been during the relevant times pertinent hereto. I certify under penalty of perjury that I have reviewed the foregoing Verified Consolidated Second Amended Shareholder Derivative Complaint for Breach of Fiduciary Duties, Abuse of Control, Gross Mismanagement, Waste of Corporate Assets, Unjust Enrichment, and for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information ("Consolidated Second Amended Complaint"), and authorized its filing and that the contents in the Consolidated Second Amended Complaint are true to the best of my knowledge, information and belief.

Dated: October 12, 2005.    /s/Laurie Parrott

LAURIE PARROTT

G:\Cases\Biopure\Complaints\Second Amd Cons Cpt\Second Amd Cons Cpt Final.wpd