# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


STEVE SACHS, ET AL.,          )
          Plaintiffs          )
                              )
                    v.        )      CIVIL ACTION NO. 04-30032-MAP
                              )
STEVEN SPRAGUE, ET AL.,       )
          Defendants          )


MEMORANDUM REGARDING DEFENDANTS'
MOTION TO DISMISS
(Dkt. No. 29)

November 22, 2005


PONSOR, D.J.


I. INTRODUCTION

      This is a shareholder derivative action brought by

shareholders of Wave Systems Corporation ("Wave" or the

"Company"), on behalf of the Company, against certain of its

officers and directors for, among other things, breaching

their fiduciary duties by disseminating, or permitting the

dissemination of, false and/or misleading statements

regarding the Company's condition and prospects.  Citing

Fed. R. Civ. P. 23.1, 12(b)(6), and 9(b), nominal Defendant

Wave and the individual Defendants moved to dismiss

Plaintiffs' verified consolidated amended complaint

("amended complaint") on the grounds that Plaintiffs neither made a pre-suit demand upon Wave's Board nor demonstrated why a demand would have been futile.  The court allowed this motion to dismiss on September 26, 2005.  This memorandum will set forth the reasons supporting this ruling.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

"When presented with a motion to dismiss, the district court must take as true 'the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor.'"  Medina-Claudio v. Rodriguez-Mateo, 292 F.3d 31, 34 (1st Cir. 2002) (citations omitted).  What follows, then, is a brief version of such facts as alleged in Plaintiffs' amended complaint.

Wave is incorporated under the laws of the State of Delaware.  (Dkt. No. 24, Am. Compl. ¶ 20.)  Since its inception in 1988, this self-described "development stage company" had never managed to successfully market any of its digital security services or technologies.  (Id. at ¶ 5.) By December 31, 2002, the Company found itself over $230 million dollars in debt and in need of $11 million in cash to continue operations in 2003.  (Id. at ¶ 6.)

-2-

With no major revenue source in sight, the Company was forced to close a private placement of Series H Stock on April 30, 2003. (Id. at ¶ 7.) Although this private investment in the publicly held Company resulted in net proceeds of $4,465,571, the placement terms, from Wave's perspective, were quite onerous. (Id.) Not only did they restrict the Company's capacity to generate additional funds through future equity offerings by giving the Series H shareholders a right of first refusal, they also required Wave to pay significant dividends to these preferred shareholders. (Id.) Because the Company lacked the resources to redeem the preferred stock or pay the dividends, Wave's status as a going concern seemed to rest on the automatic conversion of these preferred shares to Class A Common Stock. Under the terms of the placement, such a conversion could only occur if the closing bid on Wave's stock exceeded $1.90 for fifteen of twenty consecutive trading days. (Id. at ¶ 8.) With the stock consistently trading at under $1.00 per share in the Spring of 2003, it appeared unlikely this condition would be met.

On May 15, 2003, the Company issued a press release in which Director and Chief Executive Officer, Defendant Steven

Sprague ("Sprague"), stated that "key industry participants are finally beginning to recognize the value Wave can add and are evaluating ways that they can work with us to benefit from our position." (Id. at ¶ 45.) In its Form 10-K/A filed on June 30, 2003, Wave expanded on Sprague's optimistic assessment by forecasting $5 million in sales based upon "the anticipation that various deals we are working on will close." (Id. at ¶ 54 (noting the Company's continuing efforts to "solidify[] strategic alliances with the major personal computer manufacturers to force collaborative efforts to distribute its products to consumers").)

On July 31, 2003, with the market primed to expect a substantial revenue stream, the Company issued a press release, announcing an agreement with Intel Corporation that would "enable Intel to bundle Wave's software and services with a future Intel desktop motherboard." (Id. at ¶ 55.) Although the terms of the deal were not disclosed (id. at ¶ 57 (citation omitted)), Wave's stock soared and closed that day at $2.25 per share, a gain of 168% from the day before (id. at ¶ 56).

The Company's stock was still on the rise when, on

-4-

August 4, 2003, Wave announced a partnership with IBM
destined to "significantly help us in our objective to
deliver open and interoperable solutions to business
customers." (Id. at ¶ 61.) Once again, despite the fact
that the deal's terms were undisclosed (id. at ¶ 64
(citation omitted)), the market reacted positively, and
Wave's stock closed at $4.42 per share, up $.77 per share
from its previous closing price (id. at ¶ 63).

On August 12, 2003, Wave filed the first of four filings
with the SEC in which the Company characterized its recent
deals with Intel and IBM as "Material Changes." (Id. at ¶¶
75, 81-83.) Two days later, during a conference call with
analysts, Sprague finally revealed that the Intel deal was a
non-exclusive licensing agreement with no minimum licensing
requirements. (Id. at ¶ 78.) Sprague also admitted that
although the Company's products were compatible with IBM's,
Wave did not have a licensing agreement with the computer
giant. (Id.) Despite these revelations, Wave's CEO stood
by the Company's earlier predictions of significant revenue
growth. (Id.) Pressed to indicate the source of his
sanguinity, Sprague told analysts that "we've been much more
comfortable than perhaps our shareholders can be because

-5-

it's hard to see the data that we have.  But we're very comfortable."  (Id. at ¶ 79.)

In the meantime, on August 5, 2003, Wave's Chief Financial Officer, Defendant Gerard K. Feeney ("Feeney"), sold 100,000 shares of the Company's stock for $500,000 (id. at ¶ 69); on August 6, 2003, Sprague himself sold 150,000 Wave shares for $533,841 (id. at ¶ 70); and, on August 19, 2003, Wave Director, Defendant Nolan Bushnell ("Bushnell"), sold 10,000 shares of Wave stock for $35,742 (id. at ¶ 71). These sales caught the spike in Wave's stock value at $3.17-$5.00 per share, and neither Feeney, Sprague, nor Bushell filed a timely SEC Form 4 reporting them.  (Id. at ¶¶ 69-71; see also id. at ¶ 72 (alleging that Sprague neglected to report the sale of other Wave shares in early August 2003).)

In December 2003, the SEC commenced an investigation relating to "certain public statements made by Wave during and around August 2003, as well as certain trading in Wave's securities during such time."  (Id. at ¶ 87.)  On this news, the Company's shares closed at $1.50 on December 18, 2003. (Id. at ¶ 88.)

In February 2004, Plaintiffs Steve Sachs, Jeff Swanson, and Charlene Harvey each filed separate shareholder

-6-

derivative complaints. (Dkt. No. 9, Pl. Swanson's Opp. Mot.

Consolidate 3.) Based on counsel's representations, this

court allowed a motion to consolidate all Wave derivative

actions on September 3, 2004. (Dkt. No. 16, Mem. & Order

1.) Plaintiffs subsequently filed a six-count Verified

Consolidated Amended Complaint against: "the Insider Selling

Defendants for Breach of Fiduciary Duties for Insider

Selling and Misappropriation of Information" (Count I); "All

Defendants for Breach of Fiduciary Duty" (Count II); "All

Defendants for Abuse of Control" (Count III); "All

Defendants for Gross Mismanagement" (Count IV); "All

Defendants for Waste of Corporate Assets" (Count V); and

"All Defendants for Unjust Enrichment" (Count VI). (Dkt.

No. 24, Am. Compl. ¶¶ 96-123.)

In their amended complaint, Plaintiffs concede that they

"have not made any demand upon the present Board . . . to

institute this action." (Id. at ¶ 94.) In support of their

contention that "such a demand would [have been] a futile,

wasteful and useless act" (id.), Plaintiffs point to the

following "facts": (1) Sprague and Bushnell sold shares of

Wave Systems while in possession of "adverse non-public

information" (id. at ¶ 94(a)(i)-(ii)); (2) Defendants John

E. McConnaughy, Jr. ("McConnaughy") and John E. Bagalay
("Bagalay"), as members of Wave's Compensation Committee,
control the pay of the other three board members (id. at
¶ 94(b)); (3) McConnaughy, Bagalay, and Bushnell face a
substantial likelihood of personal liability for neglecting
their oversight responsibilities as members of Wave's Audit
Committee (id. at ¶ 94(d)); (4) each Board member breached
his fiduciary duty by failing to prevent and/or correct
material misrepresentations made by the Company (id. at
¶ 94(e)); (5) the board members, through their "inter-
related business, professional and personal relationships,
have developed debilitating conflicts of interest" (id. at
¶ 94(f)); and (6) Sprague and his father, Peter, so dominate
the Board that the other four directors "are incapable of
making an impartial determination whether to sue Steven
Sprague" (id. at ¶ 94(g)).

## III. DISCUSSION

Defendants first move to dismiss all counts under Fed.
R. Civ. P. 23.1.  Rule 23.1 dictates that the derivative
plaintiff must "allege with particularity the efforts, if
any, made by the plaintiff to obtain the action the
plaintiff desires from the directors . . . or [the reasons]

-8-

for not making the effort." Defendants argue that none of

the reasons Plaintiffs offer for their admitted failure to

make a pre-suit demand satisfy Rule 23.1, and therefore, the

entire suit must be dismissed.

In addition, Defendants move to dismiss under Fed. R.

Civ. P. 12(b)(6). Dismissal pursuant to Rule 12(b)(6) is

only appropriate if "it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim

which would entitle him to relief." Medina-Claudio, 292

F.3d at 34 (citations omitted). Defendants contend that

each count in the amended complaint falls short of this

plaintiff-friendly standard. They argue that whereas Counts

II-VI fail to allege any legally cognizable theory of

damages and are barred by an exculpatory clause in Wave's

Certificate of Incorporation, Count I (insider trading)

fails to comply with the particularity requirements of Fed.

R. Civ. P. 9(b) and neglects to plead the elements of the

claim.

A.   <u>Pleading Demand Futility.</u>

"Before bringing a derivative suit on behalf of a

corporation, a plaintiff must 'demonstrate that the

corporation itself had refused to proceed after suitable

demand, unless excused by extraordinary conditions.'"

Caviness v. Evans, 229 F.R.D. 354, 358 (D. Mass. 2005)

(quoting Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90,

95-96 (1991)).  The rationale for this policy is quite

simple.

> The purpose of the demand requirement is, of
> course, to require resort to the body legally
> charged with conduct of the company's affairs
> before licensing suit in the company's name by
> persons not so charged.  Given the expense of
> litigation, and the normal presumptions running in
> favor of those acting for the company, this seems
> only reasonable.

Heit v. Baird, 567 F.2d 1157, 1162 n.6 (1st Cir. 1977); see

also id. at 1160 (noting that Rule 23.1 "has been vigorously

enforced" in the First Circuit); Gonzalez Turul v. Rogatol

Distributors, Inc., 951 F.2d 1, 2 (1st. Cir. 1991) (citation

omitted) ("To be allowed, sua sponte, to place himself in

charge without first affording the directors the opportunity

to occupy their normal status, a stockholder must show that

his case is exceptional.").

To determine whether the circumstances pled in

Plaintiffs' amended complaint would have made a demand

futile, this court must turn to the laws of Delaware, the

state of Wave's incorporation.  See Landy v. D'Alessandro,

-10-

316 F. Supp. 2d 49, 57 (D. Mass. 2004).   In <u>Rales v.</u>

<u>Blasband</u>, 634 A.2d 927 (Del. 1993), the Delaware Supreme

Court instructed courts to

> determine whether or not the particularized factual
> allegations of a derivative stockholder complaint
> create a reasonable doubt that, as of the time the
> complaint is filed, the board of directors could
> have properly exercised its independent and
> disinterested business judgment in responding to a
> demand.

<u>Id.</u> at 934.  Only "[i]f the derivative plaintiff satisfies

this burden," will demand "be excused as futile."   <u>Id.</u>

    At the time Plaintiffs' amended complaint was filed,

there were five directors on Wave's Board -- Sprague,

Bushnell, Bagalay, McConnaughy, and George Gilder

("Gilder").  (Dkt. No. 24, Am. Compl. ¶ 94.)  Accordingly,

Plaintiffs "must create a reasonable doubt concerning the

disinterestedness or independence of at least [three] of

these directors."  <u>Caviness</u>, 229 F.R.D. at 358-59; <u>see also</u>

<u>Orman v. Cullman</u>, 794 A.2d 5, 22 (Del. Ch. 2002) ("[A]

plaintiff must normally plead facts demonstrating 'that a

<u>majority</u> of the director defendants have a financial

interest in the transaction or were dominated or controlled

by a materially interested director.'") (citations omitted).

    1.   <u>Reasonable Doubt.</u>

-11-

In <u>Grobow v. Perot</u>, 539 A.2d 180 (Del. 1988), <u>overruled</u>

<u>on other grounds by</u> <u>Brehm v. Eisner</u>, 746 A.2d 244 (Del.

2000), the Delaware Supreme Court, wary of articulating a

"rote and inelastic" test for demand futility, concluded

> that it would be neither practicable nor wise to
> attempt to formulate a criterion of general
> application for determining reasonable doubt.  The
> facts necessary to support a finding of reasonable
> doubt either of director disinterest or
> independence . . . will vary with each case.
> Reasonable doubt must be decided by the trial court
> on a case-by-case basis employing an objective
> analysis.

<u>Id.</u> at 186.  For the plaintiff whose claim "is not based on

mere suspicions or stated solely in conclusory terms," the

concept of reasonable doubt "is sufficiently flexible and

workable."  <u>Grimes v. Donald</u>, 673 A.2d 1207, 1217 (Del.

1996), <u>overruled on other grounds by</u> <u>Brehm</u>, 746 A.2d 244.

2.    <u>Interest.</u>

In the context of a pre-suit demand, directors are

entitled to a presumption of disinterest.  <u>See</u> <u>Beam ex rel.</u>

<u>Martha Stewart Living Omnimedia, Inc. v. Stewart</u>, 845 A.2d

1040, 1048-49 (Del. 2004).  Under <u>Rales</u>, this presumption

disappears if "a corporate decision will have a materially

detrimental impact on [the] director, but not on the

corporation and the stockholders." 634 A.2d at 936.[1] To demonstrate a disabling interest that "prevents a director from impartially considering a demand," a plaintiff must plead facts that establish a "substantial likelihood" of a director's personal liability. Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995) (citations omitted).

3.    Independence.

For a director to be "independent," he or she must be both disinterested and free from "the influence of other interested persons." Id.; see also Aronson v. Lewis, 473 A.2d 805, 816 (Del. 1984), overruled on other grounds by Brehm, 746 A.2d 244 (stating that an independent director must be able to make a decision "based on the corporate merits of the subject before the board rather than extraneous considerations or influences"). "To establish lack of independence, [plaintiffs] must show that the directors are 'beholden' to the [interested directors] or so under their influence that their discretion would be sterilized." Rales, 634 A.2d at 936; see also In re Oracle

---

[1] This presumption of disinterest also disappears if a director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." Rales, 634 A.2d at 936 (citations omitted).

<u>Corp. Derivative Litig.</u>, 824 A.2d 917, 938-39 (Del. Ch.
2003) (citations omitted) (noting that a director may be
"beholden" due to "personal or other relationships" with an
interested party).

B.    <u>Analysis.</u>

In their Response and Objection to Defendants' Motion to
Dismiss, Plaintiffs assert that there is reasonable doubt
concerning a majority of the board's disinterest based upon
each director's failure to fulfill his obligation to
supervise corporate conduct.  (Dkt. No. 33, Pls.' Resp. &
Objection Defs.' Mot. Dismiss 9.)  This claim finds scant
support in Delaware law.[2]  <u>See</u> <u>In re Caremark Int'l, Inc. v.</u>
<u>Derivative Litig.</u>, 698 A.2d 959, 971 (Del. Ch. 1996).

In <u>Caremark</u>, a case cited by Plaintiffs, the court
observed that, "[t]he claim . . . that the directors . . .
violated a duty to be active monitors of corporate
performance . . . is possibly the most difficult theory in

_____

[2]  Notably, Plaintiffs made no effort during oral
argument to buttress the contention that "each of the
Individual Defendants face a substantial likelihood of
liability for . . . permitting the Company and defendants
Sprague and Bushnell, and Feeney to engage in [unlawful]
conduct."  (Dkt. No. 33, Pls.' Resp. & Objection Defs.' Mot.
Dismiss 9, 10; <u>see</u> Dkt. No. 39, Tr. Hr'g 42:17-64:16, Mar.
10, 2005.)

-14-

corporation law upon which a plaintiff might hope to win a
judgment." Id. at 967. For the Caremark court, a
director's obligation to monitor corporate performance
entailed a duty to ensure the existence of an adequate
"corporate information and reporting system." Id. at 970.

Here, there are no allegations concerning the absence of
such a system that might give rise to the inference that
there was a "sustained and systematic failure of the board
to exercise oversight." Guttman v. Huang, 823 A.2d 492, 506
(Del. Ch. 2003) (citation omitted); see also id. at 507 ("I
am, of course, not opining that [the Company's] directors
actually implemented an adequate system of financial
controls. What I am opining is that there are not well-pled
factual allegations . . . that the . . . independent
directors committed any culpable failure of oversight under
the Caremark standard."). Nor are there any particularly
pled facts supporting "an inference that the directors . . .
possess[ed] knowledge of facts suggesting potential . . .
improprieties . . . and took no action to respond to them."
Id. at 507 n.36 (citation omitted).

Instead, Plaintiffs iterate (and reiterate) the charge
that each individual Defendant, by virtue of his

-15-

position(s),

> knew the adverse non-public information about the
> business of Wave Systems, as well as its finances,
> markets and present and future business prospects,
> via access to internal corporate documents,
> conversations and connections with other corporate
> officers and employees, attendance at management
> and Board of Directors' meetings and committees
> thereof and via reports and other information
> provided to him in connection therewith.

(Dkt. No. 24, Am. Compl. ¶¶ 21, 22, 23, 24, 25, 26.)

This tendency to discuss Defendants in "collective terminology," In re Stratus Computer, Inc., Civ. A. 89-2075-Z, 1992 WL 73555, at * 8 (D. Mass. Mar. 27, 1992),[3] evinces a failure "to heed the numerous admonitions by [Delaware's] judiciary for derivative plaintiffs to obtain books and records before filing a complaint," Guttman, 823 A.2d at 493; see also In re Citigroup Inc. S'holders Litig., No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) (suggesting derivative plaintiffs' "failure to use the 'tools at hand'" was "the product of a race to the courthouse"); White v.

---

[3] (See, e.g., Dkt. No. 24, Am. Compl. ¶ 38 ("[T]he Individual Defendants collectively and individually initiated a course of conduct that was designed to and did . . . conceal the fact that the Company was improperly misrepresenting its financial results," in order to "maintain [their] executive and directorial positions" and "deceive the investing public . . . .").)

<u>Panic</u>, 793 A.2d 356, 365 (Del. Ch. 2000) ("Information
gained by means of a request to inspect corporate books or
records might have led to the facts justifying an inference
that the Director Defendants reached their conclusions
because of considerations other than stockholder
interest."). It also renders Plaintiffs incapable of
adequately pleading a <u>Caremark</u> claim. <u>See</u> <u>Guttman</u>, 823 A.2d
at 506-07.[4]

Of course, as Plaintiffs themselves appear to recognize,
the only directors[5] whose disinterest is suspect are those

_____

[4] Plaintiffs two other theories of director interest
stem from alleged (in)action by Wave's Audit and
Compensation Committees. After electing not to pursue
either of these theories in their Response or during oral
argument, Plaintiffs have resurrected Audit Committee
allegations in their most recent memorandum. (<u>See</u> Dkt. No.
42, Pls.' Resp. Defs.' Mot. to Cite Suppl. Authority 4-6.)
Because the amended complaint is completely silent as to the
workings of Wave's Audit Committee, <u>see</u> <u>Guttman</u>, 823 A.2d at
507 (noting the absence of facts leading to the inference
that an audit committee "met only sporadically and devoted
patently inadequate time to its work"), and neglects to
mention the fees received by outside directors or how such
fees were "material" to Bagalay, Gilder, or McConnaughy, <u>cf.</u>
<u>Landy v. D'Alessandro</u>, 316 F. Supp. 2d 49, 71 (D. Mass.
2004) (specifying the precise remuneration awarded to non-
employee directors), the court need not tarry on these
conclusory allegations.

[5] The allegation that Feeney, a non-director, also
engaged in illegal insider selling is immaterial "for the
purposes of determining demand futility." <u>Rattner v.</u>

who sold Company stock in August 2003 as its price was

cresting. (See Dkt. No. 33, Pls.' Resp. & Objection Defs.'

Mot. Dismiss 9 n.7.)[6] Assuming that such sales did

constitute a disabling interest for Sprague and Bushnell,[7]

_____

Bidzos, No. Civ. A. 19700, 2003 WL 22284323, at *9 n.47
(Del. Ch. Sept. 30, 2003).

     [6] Plaintiffs' skepticism about the timing of Sprague and
Bushnell's stock sales is understandable. As the Second
Circuit has observed, "a spokesperson . . . cash[ing] in his
own stock can in appropriate circumstances be like a ship's
captain exiting into the safety of a lifeboat while assuring
the passengers that all is well." In re Scholastic Corp.
Sec. Litig., 252 F.3d 63, 67 (2nd Cir. 2001). However, this
court is mindful that the amended complaint fails to
describe the relationship between the trades in question and
the Company's permitted trading periods, or the trading
patterns of Defendants prior to the relevant period. See
Guttman v. Huang, 823 A.2d 492, 498 (Del. Ch. 2003);
Rattner, 2003 WL 22284323, at *11 (noting the absence of any
particularized allegations that the "temporal proximity"
between defendant directors' sales and alleged misleading
statements was not "in fact part of the Company's practice
to prevent Company insiders from improperly benefitting from
informational asymmetries").

     [7] As the Guttman court observed,

     [a]lthough insider sales [to marketplace buyers] are
     (rightly) policed by powerful forces -- including
     the criminal laws . . . a director [is not]
     "interested" whenever a derivative plaintiff
     cursorily alleges that he made sales of company
     stock in the market at a time when he possessed
     material, non-public information.

823 A.2d at 502. Because Plaintiffs do not allege that
Sprague or Bushnell sold stock to the Company, this court's
assumption that they were interested, "is merely that, an

Plaintiffs must still overcome the presumption of either

Bagalay's, Gilder's, or McConnaughy's independence.  See

Beam, 845 A.2d at 1050.[8]

In an attempt to impugn their independence, Plaintiffs

make two general claims: (1) "a web of entanglements"

between Gilder[9] and the Spragues gives rise to a reasonable

_____

assumption, and not a legal conclusion."  Id. at 503 n.21.

[8] Given this court's assumption that Bushnell's stock
sales made him "interested," it need not discuss Plaintiffs'
allegations that his relationship with the Spragues also
compromised his independence.

[9] It should go without saying that Bagalay's service as
a Wave director since 1993 (Dkt. No. 24, Am. Compl. ¶
94(f)(iv)) does not rebut the presumption of his
independence.  Similarly unavailing is the argument that
because McConnaughy and Peter Sprague are trustees of the
Strang Cancer Prevention Clinic (id. at ¶ 94(f)(iii)),
McConnaughy lacks of independence.
    Like the plaintiff in Orman v. Cullman, 794 A.2d 5, 26
(Del. Ch. 2002), Plaintiffs "apparently conceded" Bagalay
and McConnaughy's independence by choosing not to revisit
these allegations in their brief opposing Defendants' motion
to dismiss.  However, in their most recent memorandum,
Plaintiffs claim they have "particularly pled facts
establishing a reasonable doubt as to the lack of
independence of . . . Gilder . . . Bagalay . . . Bushnell
and Sprague arising from a web of entanglements."  (Dkt. No.
42, Pls.' Resp. Defs.' Mot. to Cite Suppl. Authority 3
(emphasis added).)  Suffice it to say, the allegation that
board members enjoy close ties with one another is
"hopelessly vague," In re Paxson Communication Corp.
S'holders Litig., No. Civ. A. 17568, 2001 WL 812028, at *10
(Del. Ch. July 12, 2001), and does not excuse the failure to
make a demand.

-19-

doubt that he was capable of "objectively and independently considering whether to sue [Steven] Sprague" (Dkt. No. 33, Pls.' Resp. & Objection Defs.' Mot. Dismiss 12, 13); and (2) "a majority of Wave's Board is controlled and dominated" by the Sprague family (id. at 15).

In support of their first contention, Plaintiffs cite a 1989 interview, in which Gilder acknowledged his longtime friendship with Peter Sprague (id. at 13.), and note that "Gilder and Steven Sprague often participate together in technology conferences" (Dkt. No. 24, Am. Compl. ¶ 94(f)(ii)).  While "long-standing personal and business ties . . . cannot overcome the presumption of independence that all directors . . . are afforded," In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 355 (Del. Ch. 1998), aff'd in part, rev'd in part and remanded by Brehm, 746 A.2d 244, Plaintiffs' additional allegation that Gilder has staked his reputation on Steven Sprague's success raises an interesting question, but, in the end, is insufficient to forestall dismissal.

Citing a New York Post article, in which Gilder extolled

Steven Sprague's potential as a technology CEO,[10] Plaintiffs

allege that

> if Gilder were to recommend that legal proceedings
> be instituted against Steven Sprague . . . it would
> be an admission by Gilder of Steven Sprague's
> failure as a corporate executive as well as Gilder's
> failure as a technology company analyst and judge of
> corporate executive talent.

(Dkt. No. 24, Am. Compl. ¶ 94(f)(ii).)  "This," Plaintiffs

claim, "Gilder would not do . . . ."  (Id.).

    Ordinarily, a derivative plaintiff seeking to establish

a non-interested director's lack of independence must "plead

facts that would support the inference that . . . the

non-interested director would be more willing to risk his or

---

[10] Christopher Byron, Tech Guru Reboots - Internet
Evangelist's Stock Picks in Peril, Sparks Lawsuits, N.Y.
Post, Aug. 9, 2004, at 31.  According to the author:

> With the Company's Nasdaq-traded stock selling for
> about $1.88 per share, [Gilder] championed a man
> named Steven Sprague to become the Company's
> president and chief operating officer.
>     Saying of Sprague, "I have spent the last 20
> years of my life interviewing and observing
> technology CEO's and I believe Sprague has the
> potential to be the best of the bunch."
>     In fact, Steven is the son of Wave Systems
> founder and Chairman of the Board, Peter Sprague.
> Other than that, Steven possessed no notable
> credentials for the job, at all.

Id.

her reputation than risk the relationship with the interested director." <u>Beam</u>, 845 A.2d at 1052. Here, Plaintiffs contend that, to take the action that they desired, Gilder would have had to risk <u>both</u> his relationship with Steven Sprague <u>and</u> his professional reputation.

The problem with this argument is Plaintiffs' failure to establish: (a) the extent to which Gilder still profits from his reputation as a technology company analyst; (b) that Gilder has a greater "material interest" in his reputation as an analyst than he does as "a careful fiduciary";[11] or (c) that Gilder is simply incapable of admitting a mistake.

Confined at this stage to the four corners of the amended complaint, this court cannot draw any conclusion about how a decision to sue Steven Sprague might have affected Gilder's career. Admittedly, it could have caused some to question Gilder's judgment. However, in order to conclude that, at the time the original complaints were

_____

[11] <u>Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart</u>, 833 A.2d 961, 980 (Del. Ch. 2003), <u>aff'd by</u> 845 A.2d 1040 (finding that, absent specific allegations to the contrary, a director had a greater "material interest" in his reputation as "a careful fiduciary" than he did in maintaining a relationship with an interested director).

-22-

filed, the prospect of this outcome compromised Gilder's
independence, this court would need information
conspicuously absent from the amended complaint.  Cf. supra
note 4 (noting how Plaintiffs' failure to specify the actual
fees paid by the Compensation Committee rendered Plaintiffs'
allegations of control by committee members conclusory).

Plaintiffs buttress their second broad claim with two
media reports.  The first, a Hoover profile from October 6,
2004, purports to show that the Spragues "own 65% of Wave
Systems Class B common shares, giving them voting control
over the Company."  (Dkt. No. 33, Pls.' Resp. & Objection
Defs.' Mot. Dismiss 15.)  The second, an August 26, 2003
article in Free Republic, describes a series of questionable
loans made by Wave's seven-member 2001 Board "to then-
Chairman and Chief Executive Peter Sprague," and evinces
Steven Sprague's awareness "of the power [over the board
that] he and his father have wielded."  (Id. at 15-17.)
Plaintiffs contend that together these reports describe a
pliant board incapable of holding Steven Sprague accountable
for his misdeeds.

This argument of voting control and general board
pliancy has been emphatically rejected.  Even if the

-23-

Spragues, by virtue of their Class B common stock, did

maintain voting control over the Company,[12] a family's

"control of a corporation does not excuse presuit demand on

the board without particularized allegations of

relationships between the directors and the controlling

[family] demonstrating that the directors are beholden to

the [family]."  Beam, 845 A.2d 1054; see also id. at 1051

(Allegations that [Martha] Stewart and the other directors

moved in the same social circles . . . even when coupled

with Stewart's 94% voting power, are insufficient, without

more, to rebut the presumption of independence.") (emphasis

----

[12] In fact, according to Defendants, a Wave Proxy
Statement from April 29, 2004, cited by Plaintiffs in their
amended complaint, belies allegations of the Sprague
family's voting control. (Dkt. No. 30, Defs.' Mem. Supp.
Mot. Dismiss 18 n.12; see also id. at 18-19 (noting that
"any alleged 'domination and control' must have existed at
the time the action was commenced, i.e. in [February 2004],
not in October 2004 as alleged) (citations omitted).)
    Because the Proxy Statement is a document of public
record, this court is not necessarily confined to the
amended complaint.  Watterson v. Page, 987 F.2d 1, 3 (1st
Cir. 1993) ("[C]ourts have made narrow exceptions . . . for
official public records . . . or for documents sufficiently
referred to in the complaint.").  However, since the Proxy
Statement does not reflect the distribution of Wave shares
in February 2004, the court will assume arguendo that the
Spragues maintained voting control "at the time the original
complaint[s] [were] filed."  Rattner, 2003 WL 22284323, at
*8.

-24-

added).

To demonstrate that, in February 2004, the outside directors were beholden to the Spragues, Plaintiffs point out that Gilder, Bagalay, McConnaughy, and Bushnell were members of the seven-member 2001 Board that approved loans to Peter Sprague totaling over one million dollars "during a year in which the company lost $48.7 million and saw its stock price plunge 40%." (Dkt. No. 24, Am. Compl. ¶ 94(g) (citing A Wave of Delusion, Free Republic, Aug. 26, 2003).)[13] While such conduct may not epitomize "ideal corporate governance," Brehm, 746 A.2d at 256, it falls far short of establishing the outside directors' impotence, Rales, 634

_____

[13] Defendants assert that while "a derivative plaintiff may rely on the truthfulness of reports published by reputable media," White v. Panic, 793 A.2d 356, 365 (Del. Ch. 2000) (emphasis added), "'Free Republic' is not the Wall Street Journal," (Dkt. No. 36, Defs.' Reply Mem. Supp. Mot. Dismiss 9 n.9.) During oral argument, Plaintiffs' counsel also conceded that Free Republic might not carry the same weight as "the Wall Street Journal or the Globe or the New York Times." (Dkt. 39, Tr. Hr'g 50:4-14.) For the record, before finding its way onto the internet blog known as Free Republic, A Wave of Delusion originally appeared in SmartMoney.com -- a Wall Street Journal publication. Because this court "may consider documents referred to in the complaint when such documents are integral to a plaintiff's claim or are incorporated into the complaint by reference," Rattner, 2003 WL 22284323, at *12 n.67, it may take note of the facts set forth in the article in question.

A.2d at 936.  Indeed, as the August 26, 2003 article points

out, the directors could, and did, offer a reasonably

logical explanation for the Peter Sprague loans: "having

insiders sell stock in a company that's precarious is more

damaging than having the company make loans to its

officers."  (Dkt. No. 24, Am. Compl. ¶ 94(g) (quoting

Gilder).)  Accordingly, even if the 2001 board actions were

the subject of the litigation, Plaintiffs' allegations could

not "overcome the business judgment rule presumption that

the directors acted in good faith and after a careful

investigation when they voted to authorize the

transaction[s]."  In re Compucom Sys., Inc. S'holders

Litig., No. Civ. A. 499-N, 2005 WL 2481325, at *1 (Del. Ch.

Sept. 29, 2005).

Finally, the picture of Board complicity painted by

Steven Sprague is not nearly as significant as Plaintiffs

suggest.[14]  First, Sprague's remarks conveyed his impression

that the 2001 Wave board was incapable of denying loan

---

[14] Specifically, the article quotes Sprague as saying:
"Put yourself in the shoes of any board of directors that
has to make that call against somebody who probably hired
all the people that are on the board. . . . [Complying] was
the right thing to do."  (Dkt. No. 24, Am. Compl. ¶ 94(g)
(citation omitted).)

requests made by his father -- the founder of the company
"who probably hired all the people that are on the board."
Sprague's comments did not convey any opinion concerning
Gilder, Bagalay, or McConnaughy's capacity to take action
detrimental to him if faced with compelling reasons to do
so.  Second, the quote captures Steven Sprague's impression
of his father's influence over the board in 2001 when Peter
Sprague was Board Chairman and the Company CEO.  In February
2004, Peter Sprague held neither of these positions.  Third,
Sprague was not in the position to offer a "public admission
. . . that the Board is incapable of acting independently of
[him] and his father."  (Dkt. No. 33, Pls.' Resp. &
Objection Defs.' Mot. Dismiss 17.)  Such an admission could
only come from those directors allegedly incapable of
independent action.

Ultimately, because the amended complaint lacks facts
sufficient to support a reasonable inference that a majority
of the board could not exercise disinterested and
independent judgment, Plaintiffs were required to make
demand on the board before pursuing a derivative suit.
Beam, 845 A.2d at 1057.  Because Plaintiffs did not make a
pre-suit demand, their amended complaint must be dismissed.

In reaching this conclusion, the court should not be viewed as interposing a technicality to shield corporate malfeasance. When offering a lawsuit on behalf of a corporation, plaintiffs have an obligation to show clearly, as a preliminary matter, that the corporation lacks the capacity to protect its own interests. When they fail to do this, dismissal is proper.

In this respect, it is significant, and perhaps consoling, to observe that, if improper action was taken, other remedies exist that lack the requirement of a pre-suit demand. Indeed, this court currently has before it a separate lawsuit, <u>Brumbaugh v. Wave Sys. Corp.</u>, 04-cv-30022-MAP, in which individuals who acquired Wave stock between July 31, 2003, and December 18, 2003, now seek to recover damages for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

Equally important, the record indicates that even if Plaintiffs' failure to make a pre-suit demand was ignored, other fatal defects in the amended complaint would require

-28-

dismissal.[15]

## IV. CONCLUSION

For the reasons stated above, this court allowed the Motion to Dismiss (Docket No. 29) of nominal Defendant Wave Systems Corporation and individual Defendants on September 26, 2005.  The clerk is ordered to enter judgment for Defendants on all counts.  This case may now be closed.


                                    /s/ Michael A. Ponsor
                                    MICHAEL A. PONSOR
                                    U.S. District Judge

_____

[15] For example, Counts II through VI fail to provide the individual Defendants with the requisite notice.  See Stratus, 1992 WL 73555, at * 9 (citation omitted) ("[Failing] to delineate among the defendants their participation or responsibilities in the activities which are the subject of th[e] suit . . . does not give the defendants the notice required of either Rule 8(a) or Rule 9(b).").  In addition, Plaintiffs' claims alleging intentional breaches of fiduciary duties are subject to the heightened pleading requirements of Rule 9(b), see Isanaka v. Spectrum Technologies USA Inc., 131 F. Supp. 2d 353, 361-62 (N.D.N.Y. 2001), and claims alleging negligence are clearly barred by the exculpatory clause in Wave's Certificate of Incorporation, see Emerald Partners v. Berlin, 787 A.2d 85, 91 (Del. 2001).