**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **IN RE BIOPURE CORPORATION** | ) | **Master Docket No. 1:04-cv-10177-NG** |
| **DERIVATIVE LITIGATION** | ) | **(Consolidated Derivative Action)** |
| | ) | |
| | ) | **Assigned to: Judge J. Nancy Gertner** |
| | ) | |
| _____ | ) | **Magistrate Judge Alexander** |

**REPLY MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

TABLE OF AUTHORITIES ............................................................................................ ii

I.    INTRODUCTION ............................................................................................. 1

II.   ARGUMENT ..................................................................................................... 2

      A.    THE PROPOSED AMENDMENT IS CLEARLY NOT FUTILE ........................ 2

            1.    The SAC Clearly Pleads Demand Futility ................................. 2

                  i.    The SAC More Than Adequately Pleads the Prerequisites
                        to Demonstrate Defendant Rausch Is Interested Due to His
                        Insider Selling ................................................................. 3

                  ii.   The SAC Pleads Particularized Facts Demonstrating the
                        Entire Board Faces a Substantial Likelihood of Liability
                        and Is Not Protected by the Business Judgment Rule ..................... 5

            2.    The SAC Unquestionably States Claims Upon Which Relief Can
                  Be Granted ............................................................................. 11

                  i.    Defendants Cannot Rely Upon Biopure's Certificate of
                        Incorporation, Especially at This State of the Litigation .............. 12

                  ii.   The SAC Pleads Abundant and Legally Cognizable
                        Damages to Biopure ........................................................ 13

                  iii.  The Insider Trading Claims Are More Than Sufficiently
                        Pled for Purposes of Fed. R. Civ. P. 12(b)(6) ................................ 13

      B.    DEFENDANTS WILL NOT BE UNDULY PREJUCIDED BY THE
            AMENDMENT ........................................................................................ 14

            1.    Defendants Cannot Seriously Claim to Be Unduly Prejudiced by
                  the Amendment When Discovery Has Not Even Begun .......................... 14

            2.    Plaintiffs' Failure to Comply With Local Rule 15.1 Was Harmless
                  Given That Plaintiffs Afforded Defendants a Thirty-Day Extension
                  to Respond to the Motion to Amend ........................................ 18

III.  CONCLUSION .............................................................................................. 19

# TABLE OF AUTHORITIES

**CASES**

*Acosta-Mestre v. Hilton Int'l of Puerto Rico, Inc.*,
    156 F.3d 49 (1st Cir. 1998) .......................................................................... 14, 15

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ................................................................................ 17

*Foman v. Davis*,
    371 U.S. 178 (1962) ......................................................................................... 14

*Grant v. News Group Boston, Inc.*,
    55 F.3d 1 (1st Cir. 1995) ................................................................................. 15

*Hayes v. New England Millwork Distribs., Inc.*,
    602 F.2d 15 (1st Cir. 1979) ............................................................................. 15

*In re Emerging Commc'ns, Inc. S'holder Litig.*,
    No. Civ.A. 16415, 2004 WL 1305745 (Del. Ch. June 4, 2004) ...................... 10

*In re Stratus Computer, Inc. Sec. Litig.*,
    No. CIV.A. 89-2075-Z, 1992 WL 73555 (D. Mass. Mar. 22, 1992) ................. 8

*In re Symbol Techs. Sec. Litig.*,
    762 F. Supp. 510 (E.D.N.Y. 1991) ........................................................... 10, 13

*JPMorgan Chase Bank v. Winnick*,
    No. 03 Civ. 8535(GEL), 2004 WL 1418197 (S.D.N.Y. June 23, 2004) ...... 4, 10

*Landy v. D'Alessandro*,
    316 F. Supp. 2d 49 (D. Mass. 2004) ............................................................... 12

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) .................................................................................... 12

*McGinty v. Beranger Volkswagen, Inc.*,
    633 F.2d 226 (1st Cir. 1980) ............................................................................. 8

*Mittleman v. U.S.*,
    997 F. Supp. 1 (D.D.C. 1998) ......................................................................... 16

*Nasson v. Van Winkle*,
    No. CIV.A. 91-11823-WF, 1994 WL 175049 (D. Mass. Apr. 19, 1994) ........ 15

*Nett ex rel. Nett v. Bellucci*,
    269 F.3d 1 (1st Cir. 2001) ............................................................................... 18

*Quaker State Oil Refining Corp. v. Garrity Oil Co.*,
    884 F.2d 1510 (1st Cir. 1989) ........................................................................ 16

*Sachs v. Sprague*,
    No. CIV.A. 04-30032-MAP, 2005 WL 3116592 (D. Mass. Nov. 22, 2005) .............. 4, 14

*Serrano Medina v. U.S.*,
    709 F.2d 104 (1st Cir. 1983) .......................................................................... 16

*Stepanischen v. Merchants Despatch Transp. Corp.*,
    722 F.2d 922 (1st Cir. 1983) .......................................................................... 15

*Swanson v. Van Otterloo*,
    177 F.R.D. 645 (N.D. Iowa 1998) ................................................................... 16

*Telxon Corp. v. Bogomolny*,
    792 A.2d 964 (Del. Ch. 2001) ........................................................................ 11

*Tiernan v. Blyth, Eastman, Dillion & Co.*,
    719 F.2d 1 (1st Cir. 1983) ............................................................................. 16

## STATUTES

8 Del. Corp. Code
    §102(b)(7) ................................................................................................. 12

Fed. R. Civ. P.
    9(b) ................................................................................................... 8, 14
    10(c) ........................................................................................................ 1
    12(b)(6) ..................................................................................... 11, 13, 14
    15(a) ............................................................................................... 1, 2, 19
    16(b)(1) .................................................................................................. 16
    23.1 .............................................................................................. 8, 11, 14

Local Rule

    15.1 .................................................................................................. 18, 19
    15.1(b) .................................................................................................... 18

## I.    INTRODUCTION

Plaintiffs, derivatively on behalf of Biopure Corporation ("Biopure" or the "Company"), file this Reply Memorandum in Support of their Motion for Leave to Amend to file their [Proposed] Verified Consolidated Second Amended Shareholder Derivative Complaint for Breach of Fiduciary Duties, Abuse of Control, Gross Mismanagement, Waste of Corporate Assets, Unjust Enrichment and for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information ("SAC"). Plaintiffs respectively submit that the requirements for amending under Fed. R. Civ. P. 15(a) are satisfied and urge the Court to grant their motion and allow the filing of the SAC.

As demonstrated in Plaintiffs' opening memorandum, and as further explained below, despite Defendants'[1] erroneous protestations to the contrary, all the requirements for amending under Fed. R. Civ. P. 15(a) are met, and accordingly, the Court should grant this motion and allow the filing of the SAC.  First, the SAC is clearly not futile.  In fact, for the reasons set forth in their Opposition to Defendants' Motion to Dismiss the Verified Consolidated Amended Shareholder Derivative Complaint ("Pls.' Opp. to MTD"), the First Amended Complaint more than adequately pleaded demand futility and the individual causes of action.  Plaintiffs will not burden the Court by repeating those extensive arguments here, but instead, pursuant to Fed. R. Civ. P. 10(c), incorporate by reference the arguments contained in their previous opposition unless otherwise noted.   As explained below, the new additions provide further detail and specificity to the allegations contained in the previous complaint and demonstrate -- once and for all -- the futility of demand and that the SAC unquestionably states a cause of action under the relevant pleading standards.

---

[1]  "Defendants" refers collectively to defendants Thomas A. Moore ("Moore"), Carl W. Rausch ("Rausch"), David N. Judelson ("Judelson"), Charles A. Sanders, M.D. ("Sanders"), Everett Koop, M.D. ("Koop"), Daniel P. Harrington ("Harrington"), J. Richard Crout, M.D. ("Crout"), Jane Kober ("Kober") and proposed defendant (by amendment) Howard Richman ("Richman"). "Director Defendants" refers  collectively to defendants Moore, Rausch, Judelson, Sanders, Koop, Harrington and Krout, who composed the board of directors of Biopure at the time this action was commenced.

1

Second, as to failure to state a claim, plaintiffs will also briefly address below: (i) the fact that the Biopure's articles of incorporation do not apply to the claims asserted here, and even if they did, this question clearly cannot be resolved on a motion to dismiss; (ii) Defendants' continuing and disingenuous argument that Biopure has not suffered any damages, an argument that deserves little attention; and (iii) that the SAC clearly pleads a claim for which relief can be granted as to the insider trading claim against defendant Rauch.[2]  Finally, plaintiffs briefly address below the fact that the Defendants will clearly not be unduly prejudiced by the amendment.

In summary, as set forth below, the requirements of Fed. R. Civ. P. 15(a), which requires that "leave [to amend] shall be freely given ..." are met, and the Court should accordingly grant the instant motion and allow the filing of plaintiffs' SAC in the interest of justice.

## II.    ARGUMENT

### A.    THE PROPOSED AMENDMENT IS CLEARLY NOT FUTILE

#### 1.    The SAC Clearly Pleads Demand Futility

Like plaintiffs' previously filed first amended complaint, their SAC pleads demand futility in great and specific detail including (i) that executive officers defendants Moore and Rausch lacked independence from the other Director Defendants, ¶¶25-26, 134(c);[3] and (ii) that defendants Sanders, Rausch, Judelson, Moore, Koop, Harrington and Crout have debilitating professional entanglements. ¶¶25-31.  These issues have been thoroughly briefed and will not be repeated here.  *See* Pls.' Opp. to MTD at 17-20.

---

[2] Defendants also briefly reargue that the SAC does not state a claim for waste or unjust enrichment. Because Defendants offer nothing new in support of these positions, Plaintiffs will not reargue these issues here at they believe they have previously been thoroughly addressed.  *See* Pls.' Opp. to MTD at 30-32.

[3] All paragraph references ("¶__" or "¶¶___") are to plaintiffs' SAC.

> **i.     The SAC More Than Adequately Pleads the Prerequisites to Demonstrate Defendant Rausch Is Interested Due to His Insider Selling**

The SAC also continues to plead that defendant Rausch is interested by virtue of his insider trading by disposing of 246,574 shares of his personally held stock while in possession of material, non-public, information concerning the adverse communications with the FDA concerning Hemopure® which were yet to be disclosed, reaping proceeds of $1,596,900. ¶¶17, 26, 114-115, 134(a).  Additionally, the SAC adds the specific dates and amount of each sale of stock by defendant Rauch, and that these sales constituted 33.7% of his holdings at the beginning of the Relevant Period.  ¶26.  Specifically, Rauch disposed of 30,000 shares in April 2003, 67,074 shares in June 2003, and 149,500 shares between August 5 and 28, 2003, including disposing of 100,000 shares on August 28.  ¶26.  In January 2003, Rauch owned just over 2 million shares.  ¶115.  Thus, these sales - made in a short five-month period - constituted over 12% of Rausch's holdings in which he reaped nearly $1.6 million in proceeds.  ¶26, 116.  Moreover, these sales were highly suspicious both in timing and amount.  After selling 30,000 shares in April 2003 at $3.13 per share (and days after the Company began receiving negative news from the U.S. Food and Drug Administration ("FDA") concerning Hemopure® as set forth below), Rausch sold over 67,000 shares in June 2003 and after the Company's shares had jumped to around $6.00 per share and while continuing to conceal information about the safety of Hemopure® and FDA communications about the product as set forth in detail below.  ¶26, 105.  Additionally, Rausch's sales in August 2003, including a single sale of 100,000 shares on the 28th, came just days after the Company had issued a very positive, albeit false and misleading, press release concerning the prospects of Hemopure® before the FDA.  ¶125.

Thus, the SAC pleads in exact detail the dates and amount of each sale by defendant Rausch, ¶26;  the percentage of his holdings at the beginning of the relevant period these sales constituted and the percentage of shares sold, *id.*; these trades were highly suspicious as a majority came in June

and August of 2003, after the Company had issued favorable press releases concerning Hemopure®, but of course, while Rausch was in possession of the knowledge of the adverse FDA communications concerning Hemopure® which were yet to be disclosed. *See*, *e.g.*, ¶¶115-116, 134(a).

Furthermore, it cannot be seriously disputed that as an executive officer (Chief Technical Officer), a director (Vice Chairman) and co-founder of the Company, ¶¶26, 115-116, defendant Rausch would be charged with this insider knowledge. *See*, *e.g.*, *JPMorgan Chase Bank v. Winnick*, No. 03 Civ. 8535(GEL), 2004 WL 1418197, at *4 n.7 (S.D.N.Y. June 23, 2004) (appropriate at pleading stage to allow inference those who ran day-to-day operations of company had knowledge of alleged wrongdoing).[4]

Therefore, these allegations are more than sufficient to demonstrate that defendant Rausch was interested by virtue of his insider sales and thus a demand on him would have been futile. The Court need look no further than Defendants' own case law including their citation to the *Sachs* case where the court assumed -- for demand futility purposes -- that two directors had a disabling interest "who sold Company stock in August 2003 as its price was cresting." *Sachs v. Sprague*, No. CIV.A. 04-30032-MAP, 2005 WL 3116592, at *6 (D. Mass. Nov. 22, 2005). Certainly if the allegations in *Sachs* were sufficient, then the much more detailed and particularized allegations here concerning defendant Rausch's sales are more than sufficient to demonstrate a demand upon him would have been futile. *See also* Pls.' Opp. to MTD at 11-13. In fact, it is hard to imagine what more plaintiffs could be expected to plead on this issue.

---

[4] Unless otherwise noted, copies of all unreported cases cited herein have previously been supplied to Court by the parties and therefore are not resubmitted again.

          **ii.**      **The SAC Pleads Particularized Facts Demonstrating the Entire Board Faces a Substantial Likelihood of Liability and Is Not Protected by the Business Judgment Rule**

Plaintiffs also respectfully submit that their previous first amended complaint clearly pled that a demand was also futile as the Director Defendants faced a substantial likelihood of liability and also because they are not protected by the so-called "business judgment rule." *See* Pls.' Opp. to MTD at 14-17, 21-24. The SAC pleads that a majority of the Board of Directors ("Board"), defendants Moore, Rausch, Sanders and Crout are all defendants in the securities fraud action pending before this Court. Moreover, the allegations in the SAC also built upon and refine the prior allegations and now more clearly demonstrate a demand upon all Director Defendants would have been futile.

Before elaborating on these additional allegations, it is once again important to point out a critical fact that takes this case out of the realm of every case relied upon by Defendants and most other cases for that matter. Biopure is neither a company that engages in the manufacture of multiple products nor a pharmaceutical company that develops, manufactures and markets a multitude of pharmaceutical products. ***To the contrary, Biopure primarily does one thing -- it makes Hemopure®.*** It is the Company's flagship product. The Company's value is primarily (if not solely) determined by the prospects of getting Hemopure® approved for human use. ¶3. Thus, here, investors and the public rely on and consider material ***all*** communications between Biopure and the FDA concerning Hemopure®. *Id.* The Defendants cannot escape this distinguishing and critical fact.

Against this background, the SAC pleads the following additional allegations which plaintiffs summarize here for the sake of brevity. In April 2003, the Defendants began receiving negative information from the FDA. Specifically, on or about April 9, 2003, the FDA imposed a clinical hold barring the Company from conducting clinical trials of Hemopure® on trauma victims because of

"safety concerns" arising out of the FDA's preliminary assessment of Biopure's Biologic License Application ("BLA"). ¶¶7, 48-49. On or about May 30, 2003 the Defendants were informed that the FDA had denied the Company's request to lift the clinical hold. ¶¶7, 63. Then, on or about July 30, 2003, the Defendants received two lengthy and detailed letters from the FDA. ¶¶7, 83-87. In one letter, the FDA again refused to allow the clinical trials because of "an unreasonable and significant risk of illness or injury" to human subjects. ¶¶7, 86. The other letter was the FDA's complete response letter to the BLA in which the FDA informed the Company and Defendants that it was not approving Biopure's BLA at that time because of extensive and significant deficiencies in Biopure's application and because of concerns about the lack of safety and efficacy of Hemopure®. ¶¶7, 84-85. Receipt of the complete response letter meant that the FDA had completed its review of the BLA and would have an additional six months to review a resubmission by the Company, if and when the Company addressed all deficiencies identified by the FDA. ¶7. One year later, the Defendants still had not addressed all deficiencies raised in the complete response letter and decided instead to shift the Company's focus to developing Hemopure® for a different application. ¶7.

For more than eight months, from April 9 until December 24, 2003, the Defendants concealed the clinical hold from investors while touting a potential use of Hemopure® by trauma victims in multiple securities offerings, public filings, press releases and investors' conference calls. ¶¶50-51, 54, 57-59, 61-62, 66, 69-70, 72-75, 78, 80, 82, 90, 94, 96-97, 99, 103, 106, 108. All of these filings and/or statements were materially false and misleading because, *inter alia*, Defendants concealed the negative information received from the FDA concerning Hemopure® and the fact that the FDA had barred the Company from conducting clinical trials of Hemopure® on trauma victims for safety reasons and they misrepresented the status and/or communications with the FDA concerning Hemopure®. ¶¶52, 55, 60, 67, 71, 76, 79, 81, 92, 95, 98, 100-101, 104, 107, 109.

Moreover, on August 1, 2003, two days after receiving the complete response letter from the FDA, Defendants caused or allowed Biopure to issue a false and misleading press release that gave the impression that the Company had received positive news from the FDA.  ¶¶8, 90.  Following the issuance of this press release, Biopure's stock price rose 22.27%, from a closing price of $5.97 on July 31, 2003 to a closing price of $7.30 on August 1, 2003.  ¶¶8, 91.  In the days following this positive - but false - release, defendant Rausch, a co-founder of the Company and a former board member and a former Vice Chairman, and Chief Technical Officer, disposed of thousands of shares of his personally held Biopure stock reaping over $1.6 million dollars in proceeds.  ¶¶17, 26, 115.

For four additional months, from August until December 11, 2003, Defendants caused or allowed Biopure to continue to conceal that it had received a complete response letter from the FDA, to continue to make false statements about its dealings with the FDA and to fail to disclose the true scope and nature of the deficiencies with the BLA identified by the FDA.  ¶¶8, 94, 96-97, 99, 103, 106, 108.  Indeed on one occasion in September 2003, Defendants caused or allowed Biopure to disclose in a prospectus filed with the SEC that the July 30 letter it received was a complete response letter.  ¶¶8, 103.  When Biopure's stock price dropped on heavy trading, Defendants caused or allowed Biopure to issue statements to investors that the ***reference to the letter as a complete response letter was a "mistake" by a "junior lawyer at a law firm" retained by the Company.***  ¶¶8, 104.  The disclosure was quickly "fixed" with the filing of an amended prospectus that omitted the reference to the letter as a "complete response letter."  ¶¶8, 105.

Moreover, the additional allegations in the SAC clearly implicate the other Director Defendants, in addition to defendant Moore.  For example, in their opposition, Defendants erroneously state that "[n]owhere do the Plaintiffs allege that any of the purported conduct asserting in paragraphs ... 43-109 (the new allegations) occurred with respect to any particular Director Defendant other than Mr. Moore."  Defendants' and Howard Richman's Opposition to Plaintiffs'

Motion for Leave to Amend ("Defs.' Opp.") at 6 (emphasis in original). This emphasized assertion is patently false.

Indeed, many of the materially false and misleading financial statements (and the most important) were securities offerings. In connection therewith, the Company was required to file Registration Statements, each of which were signed by the entire Board of Biopure, including each Director Defendant, and each of which were materially false and misleading. ¶¶50, 74, 99. The SAC clearly pleads the false and misleading statements in these Registration Statements and precisely why they were false and misleading. ¶¶15-52, 75-76, 100-101. Thus, the new allegations clearly implicate the Director Defendants and plaintiffs do not simply engage in "group pleading" as erroneously asserted by Defendants. These allegations are particularly pled for purposes of Fed. R. Civ. P. 23.1, and in fact, are more than sufficient for Fed. R. Civ. P. 9(b) which in the First Circuit "requires specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir. 1980). Here, plaintiffs have pled the dates of each Registration Statement, (April 16 and 17, 2003, ¶50; June 19 and July 2, 2003, ¶73; and August 22, 2003, ¶99), the place, (with the Securities and Exchange Commission ("SEC"), ¶¶50, 73, 99) and as noted above, the content of the false representations. ¶¶15-52, 75-76, 100-101. Thus, unlike Defendants' reliance on *In re Stratus Computer, Inc. Sec. Litig.*, No. CIV.A. 89-2075-Z, 1992 WL 73555, at *8 (D. Mass. Mar. 22, 1992), plaintiffs here do not simply seek "to implicate [the outside directors] only because of their status as directors." Defs.' Opp. at 7 (quoting *Stratus*). Instead, unlike *Stratus*, plaintiffs have charged and specifically pled wrongdoing against the Director Defendants. *Cf. Stratus*, 1992 WL 73555, * 8 ("Nowhere does Count IV charge the outside directors with any specific wrongdoing.").

Furthermore, the SAC clearly pleads facts sufficient to charge the Director Defendants with knowledge of the wrongdoing, *e.g.*, concealment of the adverse safety and other adverse implications concerning Hemopure® received by the FDA.  Plaintiffs do not simply aver this by pleading boilerplate allegations as to each defendants' status as a director.  First, defendant Moore was the Company's Chief Executive Officer prior to his sudden resignation on February 24, 2004 and a defendant in the securities fraud and SEC action, ¶25, and the SAC, as conceded by Defendants, pleads his knowledge and misconduct in abundant detail.  *See* ¶¶43-44, 46, 49, 50, 54, 56-58, 61-61, 65-66, 69-72, 74, 77, 80, 87, 89, 90, 94, 96, 97, 98-99, 102, 106, 108.

Additionally, defendant Rausch served as Biopure's Vice-Chairman and Chief Technical Officer. ¶25. Defendant Judelson likewise served as Biopure's Vice-Chairman and a member of its Compensation Committee.  ¶27.  Defendants Rausch and Judelson co-founded Biopure together. ¶¶26-27.  Defendant Sanders served as the Company's Chairman of the Board and was appointed to this position by Rausch and Judelson.  ¶27.  In addition to his position as Chairman, Sanders also served as Chair of the Compensation Committee and on the Company's Nominating and Audit Committee.  ¶28. Sanders was keenly aware of the importance of safety concerns with Hemopure® as he previously served as General Director of Massachusetts General Hospital and Professor of Medicine at Harvard Medical School.  *Id.*

Likewise, defendant Koop had previously spoken at a Congressional Advisory Hearing on the nation's blood supply on behalf of Biopure.  ¶29.  In fact, prior to joining the Board, Koop was hired by Biopure and was given the title of "Chairman of Scientic Advisory Committee" charged with advising the Company on domestic, worldwide and military applications of its products and developing medical and scientific relationships with health organizations and medical centers around the world.  *Id.*  Defendant Harringon was a director and Chair of the Company's Audit Committee ¶30.  Harrington was also President of HTV Industries, Inc., one of Biopure's venture capitalists

since 1991. *Id.* In fact, Harringon owns over 1.5 million, or 4.7% of the Company's outstanding shares. *Id.* Finally, defendant Craut was a director and member of Biopure's Audit Committee. ¶31. Moreover, he was likewise keenly aware of the importance of the Company's communications with the FDA concerning Hemopure®, as he served not only as a pharmaceutical industry consultant, but more importantly, he previously served as a division chief for the FDA. *Id.* Indeed, because Koop, Craut and Sanders each possessed specialized expertise in the medical community, and as knowledgeable fiduciaries on the subject, their actions in failing to communicate or otherwise act upon the adverse safety information concerning Hemopure®, would subject their actions or inaction to stricter scrutiny. *See In re Emerging Commc'ns, Inc. S'holder Litig.*, No. Civ.A. 16415, 2004 WL 1305745, at *40 (Del. Ch. June 4, 2004) (Exhibit A).

Thus, in addition to the direct allegations against Moore, and each Director Defendant for signing the false Registration Statements, plaintiffs have pled additional facts more than sufficient to demonstrate that Raucsh and Judelson, co-founders and Vice-Chairmen of the Company, and Sanders, Chairman of the Company, had knowledge of the wrongdoing. *JP Morgan*, 2004 WL 1418197, at *4 n.7. Furthermore, as to the other only truly outside directors, Koop, Harrington and Kraut, plaintiffs have pled facts above and beyond what is necessary to charge them with knowledge, especially here again, where all this Company does is primarily develop and market Hemopure®. *In re Symbol Techs. Sec. Litig.*, 762 F. Supp. 510, 515 (E.D.N.Y. 1991) (applying Delaware law) ("[t]he complaint in this action charges the outside directors with knowledge of information which is ***central to the usual and necessary management of the corporation's business affairs***") (emphasis added).

In summary, the SAC more than adequately pleads facts demonstrating the Director Defendants breached their fiduciary duties and face a substantial likelihood of liability and are not entitled to protection of the business judgment rule. Accordingly, for these reasons and all the other

reasons set forth above and previously addressed in Plaintiffs' Opposition to Defendants' Motion to

Dismiss, Plaintiffs have demonstrated that a demand upon Biopure's Board would have been futile,

and thus, not required.

> **2.      The SAC Unquestionably States Claims Upon Which Relief Can Be Granted**

As previously pointed out, once plaintiffs have satisfied the demand futility analysis, a much

more lenient standard becomes applicable to plaintiffs' causes of action and this standard is "***notably***

***lower*** than is true in the context of motions to dismiss for failure to make a presuit demand." *Telxon*

*Corp. v. Bogomolny*, 792 A.2d 964, 974 (Del. Ch. 2001) (emphasis added). *See also* Pls.' Opp. to

MTD at 24 (citing numerous Delaware cases to this effect).

Plaintiffs would add here that the First Circuit has reached the same conclusion in the

context of evaluating the individual causes of action in a shareholder derivative action:

> Thus, I conclude that plaintiff has pled with particularity facts that create reasonable
> doubt that the board is sufficiently disinterested in its May 12, 2003 compensation
> decision to consider demand.  Demand with respect to that particular compensation
> decision is excused as futile.  With respect to Rule 23.1, all claims under plaintiff's
> four counts that claim relief on the basis of this challenged director compensation
> may proceed.  ***These claims must now be evaluated under defendants' motion to***
> ***dismiss under Rule 12(b)(6).***
>
> *              *              *
>
> Defendants also move to dismiss under Fed.R.Civ.P. 12(b)(6). Under Rule 12(b)(6),
> a claim is dismissed "when the allegations [in the complaint] are such that 'the
> plaintiff can prove no set of facts to support [the] claim.'" ... ***This is a difficult***
> ***standard to meet. "Because of the liberal pleading standards of Fed.R.Civ.P. 8, the***
> ***motion to dismiss [under Rule 12(b)(6)] is viewed with disfavor."***  It is also
> important to note that under federal case law the complaint ... need not state with
> precision all elements that give rise to a legal basis for recovery as long as fair notice
> of the nature of the action is provided. ...
>
> *              *              *
>
> ...***I will not dismiss under Rule 12(b)(6) the claims that survived Rule 23.1***.

*Landy v. D'Alessandro*, 316 F. Supp. 2d 49, 72, 75-76 (D. Mass. 2004) (emphasis added) (internal citations omitted).  Applying these well-established pleading standards both in Delaware and this Circuit, plaintiffs have more than adequately pled the individual causes of action.

>    **i.    Defendants Cannot Rely Upon Biopure's Certificate of Incorporation, Especially at This State of the Litigation**

As plaintiffs previously pointed out, and as conceded by Defendants, Biopure's articles of incorporation, based on 8 Del. Corp. Code §102(b)(7), may ***only*** exempt its ***directors***[5] from certain liability for money damages (not injunctive relief), *e.g.*, duty of due care.  The corporation may ***not*** exempt its directors from liability for violations of the duties of loyalty and good faith, including "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."  *See* Pls.' Opp. to MTD at 32.  As demonstrated above, the SAC plainly pleads conduct which, examined in the light most favorable to the plaintiffs, are violations of the Defendants' duties of good faith and loyalty including the dissemination of serial press releases and SEC filings, such as Registration Statements signed by each of the Director Defendants, that were false and misleading.  Such wrongdoing clearly implicate breaches of the duty of loyalty and good faith. *See Malone v. Brincat*, 722 A.2d 5, 10-11 (Del. 1998).  Thus, §102(b)(7) is inapplicable.

Moreover, even if it was applicable, the issue is clearly not ripe for resolution because §102(b)(7) is an affirmative defense in which Defendants bear the burden of proof demonstrating good faith.  *See* Pls.' Opp. to MTD at 33-34 (citing numerous cases to this effect).  In sum, §102(b)(7) is inapplicable to the conduct Defendants are charged with here, and even if it wasn't , its application could not be resolved until after discovery and the Court is presented with a full-record upon which it can evaluate the Defendants' conduct at issue.

---

[5]  Thus, §102(b)(7) has absolutely no application to defendants Kober and Richman who were not directors.

12

ii.     **The SAC Pleads Abundant and Legally Cognizable Damages to Biopure**

Despite the fact their conduct has literally destroyed this Company, Defendants continue to disingenuously assert Biopure has not been damaged. Nothing could be further from the truth and therefore deserves little further attention. In addition to forcing the Company to waste funds defending itself in the securities fraud action before this Court where it has been subjected to massive potential liability, the Company has suffered a decline of over $350 million in market capitalization or over 90% of the market value of the Company, ¶¶1, 16, 113, 137, and suffered severe and irreparable damages to its reputation and goodwill in the business and investment community, ¶¶1, 137. As plaintiffs previously pointed out, under Delaware law these damages, along with the insider trading proceeds reaped by defendant Rausch, are clearly cognizable damages which the Company may sue to recover. *See* Pls.' Opp. to MTD at 25-26.

Moreover, as a direct result of Defendants' breaches of their fiduciary duties leading to this fiasco, the Company has had to make multiple securities offerings at fire-sale prices just to stay in business, and the Company's stock has become a penny stock, subjecting it to the possibility of delisting. This would be further devastating to the Company, as it would further hamper the Company's ability to obtain financing. ¶¶1, 16, 124, 137. To top it off, the Company has now been subjected to a civil penalty in the recent action filed by the SEC. ¶¶1, 130, 138. In short, plaintiffs have pled abundant damages to this once promising franchise which are both cognizable and ripe.

iii.     **The Insider Trading Claims Are More Than Sufficiently Pled for Purposes of Fed. R. Civ. P. 12(b)(6)**

As previously pointed out by plaintiffs, as cases the Defendants themselves rely upon, even if a claim for insider trading is not sufficiently pled for purposes of demand futility (which it is here), it nonetheless can be sufficiently plead for purposes of stating a claim under Fed. R. Civ. P. 12(b)(6). *See* Pls.' Opp. to MTD at 28-29 (citing *Symbol Techs.*, 762 F.Supp. at 516 relief upon by

Defendants) (while the insider trading claim may not have been sufficiently pled to "withstand a motion to dismiss under Rule 23.1, it cannot be said that [the claim] ... fails to state a claim ... under the parameters of Rule 12(b)(6)").

Defendants now assert the insider trading claim is insufficient as it must comply with Fed. R. Civ. P. 9(b).  Without conceding this point (which plaintiffs strenuously oppose), the Court need look no further than Defendants' own case law including their citation to the *Sachs* case where the court assumed -- for demand futility purposes -- that two directors had a disabling interest "who sold Company stock in August 2003 as its price was cresting." *Sachs*, 2005 WL 3116592, at *6.  If these allegations were sufficient for demand futility purposes, then clearly the allegations here are more than sufficient to state a claim under Fed. R. Civ. P. 12(b)(6).

In fact, as demonstrated above, even while not required for the instant purposes, plaintiffs have pled the who (defendant Rausch), what (traded Biopure stock), when (during the Relevant Period and particularly after the Company issued favorable misleading press releases), where (on the open market) and how (while in possession of material, non-public formation).  Accordingly, even if Fed. R. Civ. P. 9(b) was applicable (which Plaintiffs assert it is not), these allegations are nevertheless more than sufficient to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss as Defendants' own cases continue to make clear.

## B.    DEFENDANTS WILL NOT BE UNDULY PREJUCIDED BY THE AMENDMENT

### 1.    Defendants Cannot Seriously Claim to Be Unduly Prejudiced by the Amendment When Discovery Has Not Even Begun

Defendants erroneously assert that the instant motion to amend should be denied as untimely. One reason justifying the denial of a motion to amend is undue delay which results in "'undue prejudice to the opposing party by allowing the amendment.'"  *Acosta-Mestre v. Hilton Int'l of Puerto Rico, Inc.*, 156 F.3d 49, 51 (1st Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182

(1962).  Here, Defendants will clearly suffer no prejudice by allowing the amendment and filing of the SAC.

As pointed out in plaintiffs' opening memorandum, Defendants clearly will not be prejudiced by the amendment because discovery in this action has not even begun.  *Nasson v. Van Winkle*, No. CIV.A. 91-11823-WF, 1994 WL 175049, at *1 (D. Mass. Apr. 19, 1994) (no undue prejudice to defendants in allowing plaintiff to amend where discovery had not begun).  Given the procedural posture of this case, there could be no claim of undue delay given that the Court has yet to enter a scheduling order under Fed. R. Civ. P. 16(b)(1) limiting the time to amend the pleadings.

Indeed, in this Circuit, when courts have denied motions to amend as untimely, they have done so only because it would be prejudicial to the defendants because discovery was nearly completed and would have to be re-opened and/or defendants would have to change their trial strategy.  *See*, *e.g.*, *Acosta-Mestre*, 156 F.3d at 53 (upholding denial of leave to amend and add new party "[s]ince the addition [of the proposed new party] at the eleventh hour would have resulted in further significant delay both in the completion of discovery and the trial of the case ...");  *Grant v. News Group Boston, Inc.*, 55 F.3d 1, 6 (1st Cir. 1995) (finding prejudice from undue delay where discovery would have to be re-opened which has already been extended twice, trial preparation was underway, defendant had nearly competed motion for summary judgment, and amendment would likely change defendant's planned strategy and tactics);  *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 933 (1st Cir. 1983) (finding delay where motion to amend was filed ten days prior to the close of discovery and new claims would have likely required additional discovery).

The Defendants' own cases do not support an opposite conclusion.  For example, Defendants cite *Hayes v. New England Millwork Distribs., Inc.*, 602 F.2d 15 (1st Cir. 1979).  First, in *Hayes*, the court noted the well-settled rule that delay alone is insufficient to justify denial of leave to amend,

15

without consideration of the prejudice to the opposing party. *Id.* at 19. There, the court upheld the denial of a motion to amend where "the parties had already engaged in and apparently had completed discovery when appellant sought to amend his complaint" and "was prompted to amend only when appellee moved for judgment on the pleadings." *Id.* at 20. Similarly, in *Tiernan v. Blyth, Eastman, Dillion & Co.*, 719 F.2d 1 (1st Cir. 1983), also cited by Defendants, the court upheld the denial of a motion to amend but where it "came a month after the date the court had originally targeted to begin trial, and only one and one-half months before the actual start of trial" and where "the three additional claims may well have affected defendants' planned trial strategy and tactics" and therefore "both [the defendant] and the court would likely have required additional time to prepare for trial." *Id.* at 4-5.

In fact, every other case cited by Defendants is in accord. *See Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1517 (1st Cir. 1989) (denial of amendment to counterclaim where "***virtually all discovery had been undertaken*** or at least noticed[,]" "[o]nly two months remained in an already extended discovery period" and where motions for summary judgment had been filed) (emphasis added); *Serrano Medina v. U.S.*, 709 F.2d 104, 106 (1st Cir. 1983) (denial of amendment where "eleventh-hour amendment would result in undue prejudice to the defendants, as it added new parties ... and by raising new and separate claims would require ***additional research and discovery***.") (emphasis added); *Swanson v. Van Otterloo*, 177 F.R.D. 645, 650 (N.D. Iowa 1998) (denial of amendment where "[t]he motion for leave to amend came more than eight months ***after expiration of the applicable deadline in the scheduling order***, two months after the [affirmative] defense was first raised in a motion for summary judgment, and ***only two months prior to trial***.") (emphasis added); *Mittleman v. U.S.*, 997 F. Supp. 1, 10-11 (D.D.C. 1998) (denial of motion to amend after the "extreme delay ... of almost ***ten years***" where motions for summary judgment had been filed and where proposed amendment would nevertheless have been futile.) (emphasis added).

Thus, under the law of this Circuit - as their own cases make clear - Defendants cannot claim undue prejudice by the timing of the proposed amendment here.  Despite the mere passage of time, this case is in its infancy:  discovery has not yet begun, no trial date has been set, no scheduling orders have been entered, no motions for summary judgment have been filed and trial preparation has not begun.  Accordingly, Defendants, including defendant Richman, will clearly not be prejudiced by the amendment by simply having to respond or answer the SAC.

Moreover, plaintiffs clearly can offer a valid reason in their delay in adding Richman as a defendant.  This is shareholder derivative action which by definition "is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it."  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).  Here, plaintiffs have sought to amend and add Richman as a defendant after he was named as a defendant in the federal securities fraud amended complaint brought against the Company filed on July 23, 2004, and after he was named as a defendant in the civil proceeding brought against the Company by the SEC on September 14, 2005.  Both of these events occurred after plaintiffs had filed their first amended complaint in this action on July 14, 2004.  Moreover, plaintiffs moved to amend and add Richman as a defendant on October 12, 2005, less than a month after the filing of the SEC complaint, which sets forth in great detail how defendant Richman breached his fiduciary duties and further exposed the Company to liability.  Defendant Richman's wrongdoing caused the Company to have to waste significant corporate funds defending itself as a result of his faithless conduct.

Therefore, plaintiffs have offered a valid and justifiable reason for their delay in adding Richman as a defendant and neither he, nor any of the other Defendants, will be unduly prejudiced by the proposed amendment.

2.     **Plaintiffs' Failure to Comply With Local Rule 15.1 Was Harmless Given That Plaintiffs Afforded Defendants a Thirty-Day Extension to Respond to the Motion to Amend**

Plaintiffs' counsel have apologized to counsel for Defendants, including Howard Richman, for their unintentional failure to comply with Local Rule 15.1(b) by not serving the motion on Mr. Richman ten days prior to the filing of the motion.  *See* Exhibit B (letter from Timothy L. Miles to Robert A. Buhlman, *et al.*, dated December 23, 2005 ("Miles Letter")).  Plaintiffs also apologize to the Court, but respectfully submit the unintentional oversight was harmless given that plaintiffs agreed to a thirty-day extension for all Defendants to respond to the motion.  *See* Docket Entry No. 31.

As the First Circuit has explained, the purpose behind adopting Local Rule 15.1 was "to prevent the rampant late addition of parties that 'inevitably delays the case and generated unnecessary procedural litigation.'"  *Nett ex rel. Nett v. Bellucci*, 269 F.3d 1, 4 (1st Cir. 2001) (citation omitted).  As the court further explained, "[b]y requiring that parties who will be added to an action through an amended complaint be served with the motion to amend prior to filing the motion with the court, those parties would be able to respond more quickly to the motion to amend when it was filed." *Id.*  In *Nett*, after discovering their initial failure to comply with Local Rule 15.1, the plaintiffs served the party they sought to add as a defendant and also filed a motion to extend time, as well as refiled their motion. *Id.*  On these facts, the First Circuit "after considering the policies underlying Local Rule 15.1 ... conclude[d] that the plaintiffs' failure to comply with that Local Rule was harmless." *Id.* at 5.  The court excused the violation and deemed the motion to amend to have been properly filed on the date it was originally filed. *Id.*

Here, Plaintiffs likewise submit the failure to comply with Local Rule 15.1 was harmless in that Mr. Richman and all Defendants were given a thirty-day extension to respond to the motion.  Mr. Richman is being represented by the same counsel representing all other Defendants and

plaintiffs' counsel have advised counsel for Defendants they are willing to grant Mr. Richman or any other Defendants any additional extensions they may need to respond to the SAC if the instant motion is granted and other extensions that any defendant including Mr. Richman may need. *See* Miles Letter.

Therefore, plaintiffs respectfully submit their failure to comply with Local Rule 15.1 was harmless and urge the Court to excuse the violation.

## III.    CONCLUSION

As demonstrated in plaintiffs' opening memorandum and as further explained above, all the requirements for amending under Fed. R. Civ. P. 15(a) are met. The amendment is not futile and Defendants will clearly not be prejudiced by the amendment. Therefore, plaintiffs respectfully urge the Court to grant their motion and allow the filing of their SAC.

DATED: December 28, 2005          Respectfully submitted,


                                  /s/ Timothy L. Miles
                                  By:    Timothy L. Miles

                                  Douglas S. Johnston, Jr. (*pro hac vice*)
                                  George E. Barrett (*pro hac vice*)
                                  Timothy L. Miles (*pro hac vice*)
                                  BARRETT, JOHNSTON & PARSLEY
                                  217 Second Avenue, North
                                  Nashville, TN 37201
                                  Telephone: 615/244-2202
                                  Facsimile: 615/252-3798
                                  djohnston@barrettjohnston.com
                                  gbarrett@barrettjohnston.com
                                  tmiles@barrettjohnston.com

                                  Brian J. Robbins
                                  Jeffrey P. Fink
                                  ROBBINS UMEDA & FINK, LLP
                                  610 West Ash Street, Suite 1800
                                  San Diego, CA 92101
                                  Telephone: 619/525-3990
                                  Facsimile: 619/525-3991

Plaintiffs' Co-Lead Counsel

Mary T. Sullivan, BBO #487130
SEGAL ROITMAN & COLEMAN
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: 617/742-0208
Facsimile:  617/742-2187

Plaintiffs' Liaison Counsel

James G. Stranch
BRANSTETTER, KILGORE, STRANCH &
JENNINGS
227 Second Avenue North
Nashville, TN 37201
Telephone: 615/254-8801
Facsimile:  615/255-5419

Plaintiffs' Counsel

## CERTIFICATE OF SERVICE

I hereby certify a true and exact copy of the foregoing has been served on all Filing Users through the Court's Electronic Filing System on this the 28th day of December, 2005.


/s/ Timothy L. Miles
Timothy L. Miles