Westlaw.

Not Reported in A 2d                                                                                                    Page 1

Not Reported in A 2d, 2004 WL 1305745 (Del Ch )
**(Cite as: Not Reported in A 2d)**

**H**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING
Court of Chancery of Delaware.
In re EMERGING COMMUNICATIONS, INC.
SHAREHOLDERS LITIGATION
No. Civ.A. 16415.

Submitted Aug. 30, 2003.
Decided May 3, 2004.
Revised June 4, 2004.

Thomas J Allingham II, Leonard P. Stark,
Rosemary S. Goodier, Douglas E McCann, and
James A. Whitney, of Skadden, Arps, Slate,
Meagher & Flom LLP, Wilmington, Delaware; for
Greenlight Capital Qualified L.P., Greenlight
Capital L.P. and Greenlight Capital Offshore, Ltd.
Norman M Monhait, of Rosenthal, Monhait, Gross
& Goddess, P.A., Wilmington, Delaware; Shane T.
Rowley, of Faruqi & Faruqi, LLP, New York, New
York; for Brickell Partners and the Class, of
counsel
Thomas A. Beck, Raymond J DiCamillo, Catherine
G Dearlove and Kelly C. Ashby, of Richards,
Layton & Finger, Wilmington, Delaware; P. Kevin
Castel and Jonathan R. Donnellan, of Cahill Gordon
& Reindel, New York, New York; for Emerging
Defendants Communications, Inc., Jeffrey J.
Prosser, Innovative Communication Corporation
and Innovative Communication Company, LLC, of
counsel
David C. McBride and Bruce L. Silverstein, of
Young Conaway y Stargatt & Taylor, Wilmington,
Delaware; Attorneys for the Board Defendants;
Kevin C. Logue, and Ryan K. Roth Gallo, of Paul,
Hastings, Janofsky & Walker LLP, New York, New
York; Attorneys for Defendants Richard N.
Goodwin, John G. Vondras, Salvatore Muoio,
Terrence A Todman, Sir Shridath Ramphal; and
Paul J Ruskin, of the Law Offices of Paul J.
Ruskin, Douglaston, New York; Attorney for

Defendant John P. Raynor, of counsel

OPINION

JACOBS, J. [FN*]

> FN* Sitting by designation as Vice
> Chancellor under DEL CONST, art. IV, §
> 13(2).

*1 Addressed in this Opinion are the merits of
consolidated statutory appraisal and class actions
for breach of fiduciary duty These actions all arise
out of the two-step "going private" acquisition of
the publicly owned shares of Emerging
Communications, Inc ("ECM"), by Innovative
Communications Corporation, L.L.C. ("Innovative
"), ECM's majority stockholder. The first step tender
offer was commenced on August 18, 1998 by
Innovative for 29% of ECM's outstanding shares at
a price of $10.25 per share The balance of ECM's
publicly held shares were acquired in a second-step
cash-out merger of ECM into an Innovative
subsidiary, at the same price, on October 19, 1998.

At the time of this two-step transaction (the "
Privatization"), 52% of the outstanding shares of
ECM, and 100% of the outstanding shares of
Innovative, were owned by Innovative
Communication Company, LLC ("ICC"). ICC, in
turn, was wholly owned by ECM's Chairman and
Chief Executive Officer, Jeffrey J. Prosser ("Prosser
"). Thus, Prosser had voting control of both of the
parties to the Privatization transaction.

In June 1998, shortly after the Privatization
proposal was announced, a fiduciary duty class
action was brought on behalf of the former public
shareholders of ECM by Brickell Partners, an ECM
shareholder. On February 10, 1999, four months
after the Privatization was consummated, an
appraisal action was filed by Greenlight Capital,
L.P. and certain of its affiliates (collectively, "
Greenlight"). A settlement of the Brickell Partners

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

class action was thereafter proposed and later withdrawn. Greenlight, which had objected to the proposed settlement, filed a separate fiduciary duty action on behalf of both its 750,300 "appraisal shares" and 2,026,685 ECM minority shares to which Greenlight had been assigned the litigation rights. Thereafter, the Brickell fiduciary duty action and the Greenlight appraisal and fiduciary duty actions were consolidated, and were tried on the merits between September 17, 2001 and November 6, 2001. Post-trial briefing and the submission of other memoranda were completed on August 30, 2003.

This is the decision of the Court, after trial, on the merits of the consolidated fiduciary and appraisal actions.

## I. THE FACTS

Next recited are the material facts, many of which are undisputed. Where there are disputes, the facts are as found below. Although the recited facts set forth the basic storyline, they are not intended to be comprehensive. To avoid unduly diverting the reader from the essential plotline, other facts that are relevant to discrete issues are discussed elsewhere in this Opinion in the context where those issues are addressed.

### A. The Parties

#### 1. The Plaintiffs

The plaintiffs, as noted are Brickell Partners, which represents a class of persons who owned shares in ECM between May 29, 1998 and October 19, 1998; and Greenlight, which comprises three investment funds that focus on special situation value investments. At the time of the tender offer, Greenlight owned 750,300 shares of ECM, and it was also the assignee of the litigation rights (which Greenlight had previously acquired) to 2,026,685 ECM minority shares. Greenlight brings its appraisal action on behalf of the 750,300 shares that it owns outright. Greenlight brings its class action

on behalf of those shares, and also on behalf of the 2,026,685 ECM shares as to which Greenlight holds the litigation rights.

#### 2. The Defendants

*2 There are two groups of defendants: (1) the "ECM defendants," which consist of ECM, ICC, and Innovative; and (2) the "Board defendants," who were ECM's directors at the time of the Privatization. In addition to Jeffrey Prosser, who was also ECM's Chairman and Chief Executive Officer, ECM's directors were Richard Goodwin; John Raynor; Sir Shridath Ramphal; Salvatore Muoio; John Vondras; and Terrence Todman. Each of the board defendants served as an ECM director at Prosser's request.

##### (a) The ECM Defendants

ECM, a Delaware corporation that was headquartered in the U.S.Virgin Islands ("USVI"), was formed in 1997 to receive the Virgin Islands operations of ECM's corporate predecessor, Atlantic Tele-Network, Inc. ("ATN"), in connection with a division of ATN's business. At the time of the October 1998 Privatization, ECM's principal business was the Virgin Islands Telephone Co. ("Vitelco"), which was the exclusive provider of local wired telephone services in the USVI. Vitelco represented the largest portion of ECM's business and accounted for approximately 88% of its revenues. ECM's other businesses included Vitelcom, an indirect subsidiary engaged in selling and leasing telecommunications equipment; and Vitelcom Cellular ("VitelCellular"), which provided cellular service in the USVI. ECM also owned SMB Holdings, which provided cellular service to the island of St. Maarten/St Martin.

Innovative, a Virgin Islands corporation that was 100% owned by ICC, is a Delaware limited liability company with its principal place of business in the USVI. As earlier noted, at the time of the Privatization, Prosser owned the entire (100%) membership interest in ICC, which in turn owned 52% of ECM's common stock, and 100% of the

© 2005 Thomson/West. No Claim to Orig. U.S Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

stock of Innovative

### (b) *The Board Defendants*

The Board Defendants, and their respective backgrounds, are described at this point.

### *Richard N. Goodwin*

Richard Goodwin, a member of the Massachusetts Bar, is a noted author of books on American history, government, and politics. In 1959, Mr. Goodwin served as a law clerk to United States Supreme Court Justice Felix Frankfurter, and during the 1960's, he served as Assistant Special Counsel to President John F. Kennedy. After President Kennedy's assassination, Goodwin served as Deputy Assistant Secretary of State for Inter-American Affairs and as Special Assistant to President Lyndon B. Johnson. In the late 1960's Mr. Goodwin served as campaign advisor to Senator Robert F. Kennedy. During the 1980's and part of the 1990's, Mr Goodwin also served as a consultant to the government of the USVI.

### *Shridath S. Ramphal*

Sir Shridath S. Ramphal ("Ramphal"), a native of Guyana, is a Barrister at Law who has held numerous prestigious government and academic positions. Between 1965 and 1993, Ramphal served successively (from 1965 to 1975) as Solicitor General of British Guyana, Assistant Attorney General of the West Indies, Attorney General of Guyana, and Guyana's Minister of Foreign Affairs of Justice. From 1975 to 1990, Ramphal served as Secretary General of the British Commonwealth, a group of 58 nations headquartered in London, England. Ramphal also served as Vice President of the United Nations General Assembly (from 1968 to 1973), Chairman of the United Nations Committee on Development Planning (from 1984 to 1987), Special Advisor to the United Nations Conference on Environment and Development (1992), Chairman of the West Indian Commission (1990 to 1992), and as President of the World Conservation Union (from 1990 to 1993). Finally, Ramphal served as chancellor of the University of Guyana from 1988 to 1992, and as chancellor of the University of Warwick in the United Kingdom and chancellor of the University of the West Indies, since 1989.

**\*3** Apart from these positions, Ramphal served as a director of, and a paid consultant to, ATN (ECM's corporate predecessor) in 1992, 1993, 1994, and 1995, during which years he was paid (respectively), $20,000, $140,000, $140,000, and $120,000.

### *John G. Vondras*

John G. Vondras ("Vondras") is a professional engineer, with over 25 years of independent experience in the telecommunications industry. Vondras has served and continues to serve as a director (and as President Director) of PT ARIAWEST International, a joint venture company that operates a partnership with PT TELKOM, which provides wireless and land based telephone services in Indonesia. In 1986, Vondras spent two weeks in the USVI assisting Prosser on technical due diligence in Prosser's purchase of Vitelco. Vondras also served as a director of ATN.

### *Salvatore Muoio*

Salvatore Muoio ("Muoio") is a principal and general partner of S Muoio and Co., LLC, an investment advising firm, with significant experience in finance and the telecommunications sector. Mr. Muoio's background includes employment as a securities analyst and vice president at Lazard Fréres & Co., from 1995 to 1996 in the telecommunications and media sector, and then for Gabelli & Co., Inc., from 1985 to 1995, serving both as a generalist and in the communications sector. During his career, Mr. Muoio has been quoted in many well-regarded financial newspapers and periodicals.

### *Terrence A. Todman*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d

Not Reported in A 2d, 2004 WL 1305745 (Del Ch )
**(Cite as: Not Reported in A.2d)**

Terrence Todman, ("Todman"), a USVI native, is a former United States ambassador to Argentina, Denmark, Spain, Costa Rica, Guinea, and Chad, and has served as special advisor to the Governor of the USVI. Todman, who is now retired, serves on the boards of directors of several other companies, including Areolineas Argentinas and the Exxel Group.

### *John P. Raynor*

John P. Raynor, ("Raynor"), a practicing attorney, was a partner of an Omaha, Nebraska law firm, and served as Prosser's personal attorney as well as ECM's counsel. Raynor was also a business associate of Mr. Prosser, had been a director of ATN, and acted as Prosser's advisor in formulating the terms of the Privatization transaction.

### B. Background Leading To The Formation of ECM

ECM's corporate predecessor, Atlantic TeleNetwork, Inc. ("ATN"), was a company that Prosser and a partner, Cornelius Prior, formed in 1987 to acquire the Virgin Islands Telephone Corporation ("Vitelco").

Vitelco, which was ATN's (and later ECM's) principal subsidiary, was (and still is) the exclusive provider of local wired telephone service in the USVI, where Vitelco operates a modern, fully digital telecommunications network. Vitelco was an extremely valuable asset, for several reasons. At the time of the Privatization, Vitelco faced no competition in the foreseeable future, and was guaranteed an 11 5% rate of return on the rate base for local telephone service by the Virgin Islands Public Service Commission. Vitelco's business, which is essentially non-cyclical and not materially affected by recession or inflation, was enhanced by its membership in the Rural Telephone Finance Cooperative ("RTFC"), a non-profit lending cooperative that provided Vitelco with capital at below-market interest rates. Prosser and his entities had access to RTFC financing only because of their affiliation with Vitelco.

*4 Moreover, Vitelco had been essentially free from taxation. In May 1997, Vitelco was granted by the USVI Industrial Development Commission ("IDC") a five year tax abatement from 90% of income taxes and 100% of gross receipts, property and excise taxes (running from October 1998 through October 2003). The tax abatement was granted to help Vitelco recover from uninsured damage caused by Hurricane Marilyn in 1995. The tax abatement lasted for almost the entire period from the time ATN acquired Vitelco, until the Privatization.

In January 1991, ATN acquired an 80% interest in a second telephone company: Guyana Telephone & Telegraph Company Limited ("GT & T"). Eleven months later, ATN completed an initial public offering of over 5 million shares of its common stock at $19 per share. As a result, Prosser and Prior together owned about 65% of ATN's stock.

By 1993, Prosser and Prior had a falling out. That led to a management deadlock, which effectively precluded Prosser from pursuing his acquisition strategy. With the co-CEOs at loggerheads and the ATN board deadlocked, Prosser and Prior sued each other in June 1995. In February 1996, Prior and Prosser entered into a global settlement of their disputes, in which they terminated all litigation and released all claims.

As part of the settlement, Prosser and Prior attempted to sell ATN, and engaged two investment banks-Prudential and PaineWebber-to assist in that endeavor. Both banks concluded that a buyer should be willing to pay $25 to $30 per share for ATN, which represented a 150% to 200% premium over ATN's market price. But, potential acquirors expressed interest only in acquiring ATN's Virgin Islands operations, primarily Vitelco.

Because ATN could not be sold as an entirety, and because selling only the USVI business would not resolve the management deadlock, Prosser and Prior decided to split ATN into two new companies (the "Split Off") One of those companies, to be controlled by Prosser, would consist of ATN's Virgin Islands Group. That company was ECM. The other company, which would be controlled by Prior, was New ATN, to which GT & T would be

© 2005 Thomson/West. No Claim to Orig. U.S Govt. Works.

Not Reported in A.2d                                                                                      Page 5

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

transferred. The Split Off was approved by ATN's board of directors and shareholders, and was consummated on December 30, 1997. Although ATN had no controlling stockholder before the Split Off (Prosser and Prior owned a large but not majority position), as a result of the Split Off Prosser ended up owning 52% of ECM's 10,959,131 shares, and ECM's public shareholders were relegated to the position of minority stockholders.[FN1]

> FN1. Knowing that he would control ECM and Vitelco after the Split Off, Prosser began acquiring telecommunication and other media companies. On December 30, 1997, the same date as the Split Off closed, ICC (wholly owned by Prosser) closed its acquisition of three Caribbean Cable Companies (BVI Cable TV; St. Croix Cable TV, Inc.; and St. Maarten Cable TV) and the Daily News. ICC closed on its agreement to purchase St. Thomas Cable (executed in September 1997) on April 3, 1998. The plaintiffs contend that these acquisitions were all corporate opportunities of ATN and ECM.

On December 31, 1997, ECM began trading as a public company on the American Stock Exchange. Shortly after Prosser obtained control of ECM, he appointed his long-time ATN directors, Raynor and Ramphal, to the ECM board. Prosser also appointed Messrs. Goodwin, Muoio and Vondras to the ECM board.

### C. The Proposed, But Later Aborted, Merger of Innovative Into ECM

ECM's life as a public company was short-only ten and one half months. That was not accidental: before the Split Off had been completed, Prosser indicated that he intended to merge Innovative into ECM, and he began exploring a combination of the two companies in January 1998. On January 20, 1998, ECM hired Prudential to advise it on the fairness of a potential merger of Innovative into ECM's subsidiary ATNCo (the "Proposed Merger"

) During the next month, Prosser formulated the terms of the Proposed Merger, assisted by Prudential, the law firm of Cahill, Gordon and Reindel, ECM's legal advisors ("Cahill Gordon"), and director John Raynor.

*5 On February 27, 1998, Prosser sent to each ECM director an outline of the terms of the Proposed Merger, a draft merger agreement, and proposed resolutions creating a special board committee that would consist of Messrs. Raynor, Goodwin, and Ramphal. At the March 9, 1998 meeting of the ECM board, Prosser formally presented the Proposed Merger, whereby Innovative would merge into ATNCo (the wholly-owned ECM subsidiary that held Vitelco) in exchange for the issuance of $35 million of ATNCo convertible preferred stock to ICC (Innovative's parent). No privatization of ECM was contemplated as part of this transaction. At the March 9, 1998 board meeting, the ECM board also constituted a special committee, consisting of Messrs. Goodwin, Raynor, and Ramphal (the "First Special Committee"), to consider Prosser's Proposed Merger. Those persons were appointed at the suggestion of Prosser.[FN2] At that time, Raynor, who was an ECM director and a Prosser business associate, was on retainer as ECM's attorney and had helped Prosser formulate the terms of the Proposed Merger.

> FN2. Trial. Tr. Vol. 10 (Prosser) 1785.

The law firm retained to serve as counsel to the First Special Committee was Cahill Gordon. The firm that was retained as the financial advisor to ECM and the First Special Committee in connection with the Proposed Merger was Prudential. From April 3, 1998 through May 20, 1998, Prudential engaged in discussions with ICC about the Proposed Merger terms.

Whether or not the First Special Committee actively considered the Proposed Merger is a heavily disputed issue. Goodwin testified that that Committee never met, that it had no financial or legal advisor, and that the Proposed Merger was "dropped within the month."[FN3] The other Committee members also testified that the First

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 6

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Special Committee never met and that it had no
advisors. [FN4]

> FN3. Trial Tr. Vol. 4 (Goodwin) 829-35,
> 845-46, 853.

> FN4. *See* Trial Tr. Vol. 7 (Ramphal)
> 1423-1425; Raynor Dep. 118-119.

The record, however, shows that Prudential and
Cahill Gordon were retained by, and performed
work for, the First Special Committee. [FN5] The
scenario in which the Proposed Merger supposedly "
languished" shortly after it first surfaced, is
inconsistent with JX 218, which is Prudential's
extensive documentary presentation of the Proposed
Merger to the Special Committee. Joint exhibit 218
was sent to the Committee members on May 22,
1998 in preparation for the Committee's meeting
scheduled for May 27, 1998. In that document
Prudential valued ATN-the wholly owned ECM
subsidiary into which Innovative would be
merged-at $25 to $30 per share. [FN6] It is difficult
to square Prudential having sent this
document-which evidenced that that firm had done
significant work-to the First Special Committee as
late as May 22, if in fact the Proposed Merger had
languished or if the Special Committee had been
disbanded after a week or two, as Goodwin testified.

> FN5 *See, e.g.,* JX35 (Prudential retainer
> letter); JX96 (draft fairness opinion); JX
> 265 (Prudential presentation to Cahill
> Gordon and First Committee); JX218
> (Prudential Presentation to Special
> Committee containing its evaluation of the
> Proposed Merger); Trial Tr. Vol 8
> (Heying) (stating Prudential and Cahill
> Gordon were retained; Trial Tr Vol 10
> (Prosser) 1796-98 (same)

> FN6 JX 218, Appendix, EC 020890-893
> The Proposed Merger, if consummated,
> would have benefited ECM and its
> minority shareholders by combining all the
> media holdings Prosser had assembled
> (telephone, cellular and cable), using

Vitelco's cash flow and capital, under the
single corporate umbrella of ECM. Those
benefits were not made available to ECM's
minority stockholders in the Privatization
By definition, only Prosser received those
benefits

### D. Prosser Abandons the Merger In Favor Of The Privatization

During the third week of May 1998, Prosser began
having significant reservations about the Proposed
Merger, because the low market interest in ECM's
common stock had caused that stock to be
undervalued. [FN7] On May 21, 1998, Prosser,
together with Raynor, met with representatives of
Prudential and Cahill Gordon to discuss the
feasibility of Innovative acquiring all of the
outstanding stock of ECM. By that point, Prosser
had decided (in Raynor's words) to "flip the
transaction." [FN8] Having concluded that the
market was not recognizing ECM's intrinsic value,
Prosser switched from being a seller of ECM stock
to becoming a buyer of that stock. Although Prosser
had placed a value of $13.25 per share on ECM for
purposes of the Split Off that had occurred only 5
months before, as a buyer of that same stock he was
now proposing to pay only $9.125 per share

> FN7. Prosser Dep. June 7, 2000, at 67-69
> On the first day ECM stock was traded, its
> high and low sales prices were $8.25 and
> $7.875, respectively. During the second
> calendar quarter of 1997 (April 1-June 30),
> ECM shares traded at prices ranging from
> a high of $8.9375 to a low of $6.25 per
> share. On the last trading day before the
> public announcement of the Privatization,
> the reported closing price was $7.00 per
> share. JX 155 at SC4133. Prosser informed
> the ECM board that the ECM stock price
> had failed to reach the desired appreciation
> as a result of the small public float and the
> fact that the stock was not followed by
> Wall Street analysts. JX 155 at SC 4111.

> FN8. Raynor Dep. 173.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**\*6** Between May 22 and May 28, Prosser, Prudential and Cahill formulated the terms of a Privatization proposal to be presented to ECM's board. On May 28, Raynor, Prosser and Thomas Minnich, ECM's Chief Operating Officer, informed the RTFC that they had decided to abandon the Proposed Merger and to take ECM private. The next day, Prosser delivered to the ECM board a letter withdrawing the Proposed Merger and proposing instead that Innovative acquire all the ECM shares it did not already own. The proposed Privatization was structured as a first-step cash tender offer for ECM's publicly traded shares at $9.125 per share, to be followed by a second-step cash-out merger at the same price.[FN9]

> FN9. JX 150.

Prosser's May 29th letter was the first occasion that the ECM board and the First Special Committee (other than Raynor) learned of the abandonment of the Proposed Merger in favor of the Privatization. Those directors were never told of the roles played by Prudential, Cahill and Raynor-all supposedly retained to represent the interest of the ECM minority stockholders-in formulating the terms of the newly-substituted going private transaction.[FN10]

> FN10. The $9.125 per share merger price was arrived at by Prosser in consultation with Prudential, and no one else had a significant role in that decision. Prosser Dep. June 7, 2000 at 73-74. The First Special Committee members (other than Raynor) were not told of the ongoing plans to change the transaction until May 29, 1998. Goodwin Dep August 11, 2000 at 48-52, 62.

On the same day that Prosser proposed the Privatization, he told ECM's board that he (Prosser) had retained ECM's former advisors, Prudential and Cahill Gordon, to represent Innovative as the buyer in that transaction. Prudential was an especially valuable advisor to ECM, because it understood ECM's business and properties and had been ECM's

only advisor during its brief life as a stand-alone company. Thus, the advisors that initially were retained to work *for* the interests of ECM and its minority stockholders would now be working to serve the interests of Innovative, the party now bargaining *against* ECM. There is no evidence that the ECM board objected either to Prosser's co-opting these valuable advisors, or to the timing of the proposed Privatization.[FN11]

> FN11. At that time (May 1998), Prosser knew that ECM's stock price was artificially depressed, because the market was not viewing ECM as a U.S. telephone company, but, rather, as a developing nation/third world phone company. That perception, Prosser knew, was unfair, because ECM had all the characteristics of a U.S. telephone company-a stable government, dollar economy, English language, American courts and legal system-and none of the characteristics of a third world company. Trial Tr., Vol. 10 (Prosser) at 1728-29; 1801-02, 1807. Rather than educate the market or afford it time to understand ECM's true characteristics, Prosser exploited the market unfairness by proposing the Privatization at a price that reflected a "premium" over ECM's then-current depressed market price level.

### E. The Formation Of The Second Special Committee And The Negotiation Of The Transaction Terms

At the May 29 ECM directors' meeting, the board formed another special committee (the "Second Special Committee") to review the fairness of the proposed Privatization. The directors selected to serve as members of this Second Special Committee were Messrs. Richard Goodwin, John Vondras, and Shridath Ramphal.[FN12]

> FN12. In their briefs the parties dispute whether Mr. Muoio had also been appointed to the Second Special

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del Ch.)
(Cite as: Not Reported in A.2d)

Page 8

Committee Plaintiffs argue that he was, pointing to the minutes of the May 29 meeting (JX 97), which recite that Muoio was appointed. The defendants argue that those minutes were incorrect, and point to testimony that Muoio was never on the Committee. The materiality of this fact dispute is, to say the least, obscure. Because even the plaintiffs concede that Muoio "did not serve" (Pl. Op. Trial Br. 27), the Court concludes that it is more probable than not that Muoio was never appointed.

There were several obstacles to the ability of these three directors to operate as a fully functioning Special Committee. Located on different continents and separated by a time difference of 14 hours, the three Committee members were never able to meet in person. Instead, they had to conduct their business by telephone and fax. Even teleconferences were difficult to arrange and as a result, the Second Special Committee never met collectively-even by telephone-to consider the $10.25 final negotiated offer whose approval it ultimately recommended.

Because one of the Second Special Committee members lived in Indonesia and the other lived in England, practicality dictated that Goodwin would be the Committee chair. In that capacity, Goodwin was designated to-and did-take the lead role in negotiating with Prosser and in selecting the Committee's legal and financial advisors. Mr. Goodwin interviewed William Schwitter of Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"), as a potential legal advisor to the Second Special Committee, and on June 5, 1998, the Committee retained the Paul Hastings firm as its legal counsel. Later, after meeting with representatives of J.P. Morgan and Houlihan Lokey Howard & Zukin ("Houlihan") at his home in Massachusetts, Goodwin recommended that the Committee retain Houlihan as its financial advisor, and in mid-July, 1998, the Second Special Committee retained Houlihan in that capacity. [FN13]

FN13. Plaintiffs challenge the

independence of both Mr. Schwitter and Houlihan, pointing out that Schwitter had been recommended by Cahill Gordon, counsel for Innovative, and that Houlihan (as well as all other potential financial advisors) "were first vetted by Prudential, which was now working solely for Prosser." Moreover (plaintiffs assert), Houlihan was ultimately recommended by Mr. Goodwin, because Goodwin felt that Houlihan (unlike Morgan Stanley) would not "[push] Prosser too hard," which might cause Prosser to back off and result in a lower stock price. Morgan Stanley, on the other hand, was "more aggressive" in pursuit of the retention, and was insisting on a fee arrangement that was linked to any increase above Prosser's initial $9.125 offer that Morgan could obtain.

These arguments are strained at best. Although at one time Schwitter was an attorney at Cahill, at the time that Cahill recommended Schwitter (among other attorneys), he was a partner at a competitor firm and there is no evidence that Schwitter was beholden to Cahill or that he acted other than loyally as counsel to the Special Committee. Nor is there evidence that the retention of Houlihan prejudiced the Second Special Committee. The weakness was in the bargaining position of the Special Committee in relation to that of Prosser, who was not prepared to support or accept any alternative business transaction other than the Privatization. That is, the Committee's only options were to make a deal with Prosser on whatever terms he was willing to accept, or no deal at all (in which case the stock price might fall, to the minority stockholders' detriment). The defendants' response is that the Special Committee had ample bargaining power to negotiate a fair price, because it had the power to "just say no," *i.e.,* to veto the Privatization proposal, and that the Committee would approve the Privatization only if it was the best available transaction and represented fair value for the stock. Although the Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d, 2004 WL 1305745 (Del Ch )
**(Cite as: Not Reported in A.2d)**

ultimately concludes that the Special Committee was ineffectual, it is not for the reason that Paul Hastings and Houlihan had been retained as the Second Special Committee's advisors

*7 As part of its pre-financial analysis investigation of ECM, Houlihan conducted (among other things) a review of ECM's financial information. That information included financial projections for ECM, dated March 25, 1998 (the "March projections"), that had been prepared by James Heying, ECM's then-Chief Financial Officer and Executive Vice President of Acquisitions. [FN14] What Houlihan was *not* provided, however, were financial projections dated June 22, 1998 (the "June projections") [FN15] that Prosser had caused Heying to prepare as part of Prosser's and ICC's application to the RTFC to finance the acquisition of ECM's minority shares

FN14 JX 13, 14

FN15 JX 38

The June projections forecasted substantially higher growth than did the March projections. Based on the June projections, as modified by the RFTC, the RFTC concluded in July 1998 that ECM was worth (for loan approval purposes) approximately $28 per share. [FN16] Recognizing that the Privatization gave Prosser "the opportunity to retain control at a price below the true market value of the company," [FN17] the RTFC approved financing that would enable Prosser to offer up to $11 40 per share. [FN18] That suggests, and Prosser later confirmed, that he always planned (and gave himself sufficient elbow room) to increase his initial offer by some amount [FN19] Moreover, the $60 million RTFC loan represented the amount Prosser had asked for, not the limit of what the RTFC would have allowed him to borrow [FN20]

FN16. JX 167 at RTFC 698, 707, 720. The RTFC made certain downward modifications to the June projections so that its valuation would be on the

conservative side. Using a 12% medium risk discount in its DCF analysis, the RTFC valued ECM at $27.84 per share *Id.*

FN17. JX 167 at RTFC 710; Reed Dep. 113-15

FN18. *See* JX 167 at RTFC 710. ("The initial offer price will be $9.25. The loan amount includes an additional $11 4 million to accommodate a $2 15 increase to the initial offer price ")

FN19. *See* Prosser June 8, 2000 Dep. 270-71 ("I am quite certain that we had requested enough room to go up so that we would have the ability to fund at a higher price obviously than nine and a quarter..." )

FN20 Trial Tr Vol 10 (Prosser) 1813-14.

Although Prosser made the June projections available to his legal advisor (Cahill), his financial advisor (Prudential), and his lender (the RTFC), the June projections were never provided to the Second Special Committee, Houlihan, or the ECM board Instead, Prosser directed Heying to send Houlihan the March projections, even though the June projections were available by that point As a result, the Committee and its advisors believed-mistakenly-that the March projections were the most recent projections available [FN21]

FN21 Trial Tr Vol 7 (Vondras) 1351-52.

On August 4, 1998, the Committee met with Houlihan to discuss Houlihan's preliminary analysis, which had been furnished to the Committee members in the form of a draft presentation booklet. After explaining in detail his firm's assumptions and methodologies, Houlihan's representative informed the Committee that it was not prepared to opine that $9.125 was a price that was fair to the minority stockholders. After further discussion, the Second Special Committee agreed that $9.125 would not provide adequate compensation to the ECM minority.

© 2005 Thomson/West. No Claim to Orig. U.S Govt. Works.

Not Reported in A 2d                                                                          Page 10

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Before beginning its negotiations with Prosser, the Committee members discussed different strategies for obtaining the highest possible price for the minority shareholders. The Committee was not ready to reject Prosser's offer outright without at least attempting first to negotiate a higher price. One strategy the Committee discussed was to present Prosser with a "final price" they believed was fair and acceptable. They concluded, however, that the approach best calculated to achieve the highest price was not to demand a specific price from Prosser, but, rather, to negotiate with Prosser for the highest price he would pay for the shares and then determine whether that price represented fair value for the minority stockholders. [FN22]

> FN22. There is evidence that sometime after the August 4th meeting, Houlihan told Goodwin that a one point increase above the original $9.125 offer, i e, an increase to $10.125, would enable Houlihan to furnish a fairness opinion. *See* JX 219, at SC 04099 (the so-called " Goodwin Diary"), where in his entry for August 7, Goodwin recites that he told Prosser that Houlihan had concluded that the initial offer was too low, and that " [a]fter much back and forth [Prosser] said that he could go up another point (*which was price Houlihan had told me privately would be acceptable* )" Although Goodwin claimed at trial that Houlihan never told him that [Trial Tr. Vol. 5 (Goodwin) 911], Goodwin did not denigrate any other parts of what he wrote in the Goodwin Diary ( *see, e g, id* at 915-18, 923). The defendants suggest no reason why this particular diary entry should be viewed as inaccurate when the other entries were not.

**\*8** Between August 5 and August 10, 1998, in a series of telephone conversations, [FN23] Messrs. Goodwin and Prosser negotiated the buyout price for ECM's publicly held shares During the first conversation, which took place on August 7, Goodwin told Prosser that his initial offer of $9.125 was inadequate. According to an entry that Goodwin made in his "diary":

> FN23. Goodwin testified that in negotiating by telephone, rather than traveling to the Virgin Islands, he could much more "maintain the necessary detachment and impassivity" than he could in Prosser's presence. Trial Tr. Vol 4 (Goodwin) 771.

After much back and forth [Prosser] said that he could go up another point (which was price Houlihan had told me privately would be acceptable). If this failed [Prosser] was considering making a private tender which he calculated would give him around 90% of all the stock. If he could not get it at what he considered a fair price [he] might withdraw his offer and let the stock go to market level [FN24]

> FN24. JX 219 at SC 04099.

Eventually, Prosser told Goodwin that he would consider the matter and call Goodwin back. Shortly thereafter, Prosser raised his offer by one eighth of a point, to $9.25 per share. Goodwin reported that offer to the Second Special Committee, which rejected it as inadequate. Goodwin then called Prosser and told Prosser that he would have to improve his offer. In a later negotiation, Prosser raised his offer to $10 per share. Again, Goodwin reported that offer to his fellow Committee members and to Houlihan. The Committee rejected that revised offer, and thereafter, Prosser raised his offer to $10.125 per share. The Second Special Committee rejected that offer as well.

In response, Prosser raised his offer to $10.25 per share, but told Goodwin that $10.25 was his final offer Because the price had been going up in roughly quarter point increments, Goodwin countered by asking for $10.50 per share. Prosser rejected that request, pointing out that $10.25 was already "straining the limits of [his] financing" for the transaction. [FN25] At that point, Goodwin made a judgment that the Committee "had reached the limits of how far we could push .," [FN26] and informed the other Committee members-Ramphal and Vondras-of his conclusion. Ramphal and Vondras agreed to stop the negotiations at that

© 2005 Thomson/West. No Claim to Orig. U.S Govt Works

Not Reported in A 2d                                                    Page 11

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

point. [FN27]

> FN25. Trial Tr. Vol. 4 (Goodwin) 778; JX 142 The record shows that, in fact, Prosser's financing would have enabled him to increase his offer to $11.40 per share, and that the implied equity value of ECM was $305 million, or $28 per share. JX 167 at RFTC 698, 720; Reed Dep. 162-163; Prosser 6/7/00 Dep. 93-96. Goodwin testified that Prosser's representation about the limits of his financing, truthful or not, had no impact except to signal to him (Goodwin) that the negotiations had to end.

> FN26. Trial Tr. Vol. 4 (Goodwin) 779

> FN27. The plaintiffs contend that the negotiations between Prosser and Goodwin were not arm's length, and that, in fact, the Special Committee's entire process was "bankrupt." To prove that point, the plaintiffs rely heavily upon the fact that Goodwin's regular practice was to send faxes to Special Committee members (or their counsel) through Prosser's secretary, Eling Joseph, and ask her to fax it to the others. Although Goodwin told Ms. Joseph that the Committee materials were confidential, this practice did create the potential of giving Prosser access to almost every document that circulated among the Special Committee, including Houlihan's financial analysis. Goodwin did not deny having routed his communications through Ms Joseph, and defended that practice on the basis of convenience, not necessity. The defendants respond that there is no evidence that Prosser or his advisors saw these faxes Prosser testified that Ms. Joseph never disclosed any of those materials to him, including Houlihan's valuation materials. The record discloses, however, that at least on one occasion the confidentiality of the faxed Committee materials was breached. Even if that had not occurred, this practice cannot help but

undermine confidence in the integrity of the bargaining process. It is manifest that Goodwin's decision to route those materials through the secretary who shared the same office as Prosser-Goodwin's bargaining adversary-rather than route them through the office of the Committee's counsel, Mr. Schwitter, created a serious risk of compromising the Committee's process and its effectiveness in negotiating the highest available value

Thereafter, Goodwin asked Houlihan if it could furnish a fairness opinion at $10.25 per share. Houlihan responded that it could, because that price was within the valuation ranges resulting from its market multiple analysis and its discounted cash flow (DCF) analysis.

The Committee having obtained what they believed was the highest available price, the question then became whether that price was fair. On August 12, 1998, Goodwin and Vondras had a telephonic meeting with Houlihan and Paul Hastings to review Prosser's $10.25 offer Having updated its financial analysis, Houlihan concluded that the revised offer price of $10.25 was fair to ECM's public shareholders from a financial point of view. Goodwin and Vondras thereafter voted to recommend that the full ECM board approve the Privatization. [FN28]

> FN28. Ramphal did not attend the Committee's August 12 meeting, even by telephone. Shortly after the meeting, Goodwin contacted Ramphal and gave him a detailed account of what had occurred.

#### F. ECM's Directors and Shareholders Approve The Proposed Privatization

**\*9** A telephonic meeting of the ECM board to consider Prosser's revised offer to buy all of ECM's publicly held stock for $10.25 per share, was held on August 13, 1998, the following day. Present at that meeting were Mr Schwitter and Houlihan representatives Not attending were Messrs. Prosser (at the request of the Board) and Todman (due to a

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works.

Not Reported in A.2d                                                      Page 12

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

scheduling conflict). The Board members who had not served on the Special Committee had received copies of Houlihan's fairness analysis before the meeting. [FN29]

> FN29. Because the copies were sent after the Committee had acted on August 12, the non-Committee member directors had less than a day to review the Houlihan materials.

At the meeting, the Special Committee members described the process they had employed. Houlihan then explained its financial analysis and confirmed that in its opinion, the $10.25 per share price was fair to the minority stockholders from a financial point of view. After discussion, the board determined to approve the Privatization, but only if a majority of the shares held by the minority stockholders were tendered in the first-step tender offer. The meeting was then adjourned to August 17, 1998, at which time the board was told that Prosser would agree to this non-waivable minimum tender condition. The full board, acting upon the unanimous recommendation of the Second Special Committee, then voted to approve the Privatization.

On August 18, 1998, ECM publicly announced the execution of a definitive merger agreement that provided for the Tender Offer and Merger at $10.25 per share, and that the Tender Offer was subject to the minimum tender condition. The Tender Offer commenced on August 24, 1998. At the time of the Tender Offer, there were 10,959,131 outstanding ECM shares, of which 5,606,873 shares were owned by Prosser through ICC, and the remaining 5,352,258 were held by the public. As of September 25, 1998, 3,206,844 of those shares (*i.e.*, a majority of the minority shares) had been tendered. On October 19, 1998, a special meeting of ECM shareholders took place, at which the Merger was approved by a vote of 5,760,660 FOR, and 4,466 AGAINST, out of 10,959,131 shares entitled to vote. The Merger was consummated that same day.

These appraisal and fiduciary duty class actions followed.

## II. THE PARTIES' CONTENTIONS AND THE ISSUES PRESENTED

As earlier noted, the plaintiffs have brought and litigated two separate actions-a statutory appraisal action and a class action asserting claims that the Privatization was not entirely fair to ECM's minority shareholders. In a statutory appraisal action, the Court must determine the "fair value" of the corporation whose stock is being appraised. [FN30] Plaintiff Greenlight claims that the statutory fair value of ECM at the time of the merger was $41.16 per share, plus the value of certain corporate opportunities that Prosser is claimed to have usurped (valued at $3.79 per share), for a total fair value of $44.95 per share.

> FN30. 8 *Del. C.* § 262(a).

In a class action seeking to invalidate a "going private" acquisition of a corporation's minority stock by its majority stockholder, the standard under which this Court reviews the validity of the transaction and the liability of the fiduciaries charged with breach of duty, is entire fairness. [FN31] That standard of review has two aspects: fair dealing and fair price. [FN32] In this case, the plaintiffs claim that the Privatization was the product of unfair dealing that, in turn, resulted in an unfair transaction price. The transaction (it is claimed) resulted from violations of the defendants' fiduciary duties of loyalty and good faith, for which the defendants are liable and must respond in damages.

> FN31. *Emerald Partners v. Berlin*, 787 A.2d 85 (Del.2001).
>
> FN32. *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983).

**\*10** The plaintiffs' claims, both fiduciary and statutory, and the defenses to those claims, involve a plethora of contentions that are too numerous to catalogue in detail at this point without overburdening an unavoidably lengthy Opinion. The reason, in great part, is that the case was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A 2d                                                          Page 13

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

over-litigated and over-briefed, a state of affairs for which the Court (by allowing the parties to file briefs in excess of the page limit) is responsible. The post-trial briefs and other submissions alone total almost 400 pages, [FN33] and the trial record, not surprisingly, is correspondingly voluminous. To save the reader from losing the forest in the trees, what follows is a "broad brush" sketch of the parties' contentions. A more detailed picture of those contentions-and the specific issues which flow therefrom-is set forth in the sections of this Opinion that follow.

> FN33. The opening post-trial brief is 143 pages, the answering brief is 150 pages, and the reply brief is 72 pages.

In the fiduciary duty class action, the basic issues are whether the defendants dealt fairly with the ECM minority and whether the $10.25 per share transaction price was fair. Because the plaintiffs' class action damages claim is identical (dollar-wise) to their statutory appraisal claim, the fiduciary "fair price," and statutory "fair value," contentions converge and are addressed in connection with the statutory appraisal claim. Accordingly, at this point the Court summarizes the "fair dealing" contentions. Thereafter, it summarizes the fair price/fair value claims.

With respect to fair dealing, the threshold procedural issue is which side has the burden of proof. Because the defendants stood on both sides of the transaction, normally the burden would fall upon them. If, however, the defendants can satisfy the Court that the transaction was approved by a fully functioning independent committee of independent directors or by an informed majority of minority stockholders, the burden shifts to the plaintiff to prove that the transaction was unfair. [FN34] Here, the plaintiffs contend that the Second Special Committee was neither independent nor fully functional, for which reason the burden of proving entire fairness falls upon the defendants. The defendants contend the opposite, and assert that the burden of proof must shift to the plaintiffs.

> FN34. *Weinberger v. UOP, Inc., supra,* *Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110, 1117 (Del.1994).

Turning first to the substantive fair dealing issues, the plaintiffs claim that the Privatization was not the result of fair dealing because: (1) the entire ECM board was "unfairly stacked" in favor of (*i.e.,* beholden to) Prosser, (2) the timing of the transaction and Prosser's co-opting of ECM's advisors were unfair, (3) the Special Committee was neither independent nor properly functioning, and (4) the defendants violated, in various respects, their "duty of candor" to the minority shareholders in both the tender offer disclosure document and in the proxy statement issued in connection with the second step merger.

Not surprisingly, the defendants vigorously resist these claims, and contend that in their dealings with ECM's minority stockholders they acted fairly in all respects. The defendants also raise three affirmative defenses: (1) Greenlight lacks standing to assert any claims based on its acquired "litigation rights," and (2) no former stockholders of ECM can recover the value of any shares that they tendered into the tender offer or voted in favor of the merger; and (3) even if the Privatization was not entirely fair, the defendants are exculpated from damages liability under Article Seventh of ECM's certificate of incorporation.

**\*11** The parties' briefs are largely devoted to the "fair price" and appraisal issues, which in this case (as noted), are one and the same. Typical in litigation of this kind, the overriding question-what ECM was intrinsically worth on the merger date-involves a proverbial "battle of the experts." In this case, the valuation experts were University of Chicago Business School Professor Mark Zmijewski, the plaintiffs' expert who valued ECM at over $41 per share; and Daniel Bayston, a consultant at Duff and Phelps and the defendants' primary valuation expert, [FN35] who valued ECM at $10.38 per share.

> FN35. The defendants called two additional valuation experts: Princeton

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                                                                  Page 14

Not Reported in A 2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A 2d)**

University Professor Burton Malkiel, who
testified about issues relating to ECM's
market value, and Gilbert Matthews, an
investment banker and former managing
partner of Bear Stearns & Co., who
testified as the defendants' rebuttal witness.

These widely differing valuations of the same
company result from quite different financial
assumptions that each sponsoring side exhorts this
Court to accept. To evaluate the parties' competing
approaches requires the Court to resolve a multitude
of DCF-related valuation issues, some of which are
factual and others of which are conceptual.

The first set of issues involve which set of
management projections is appropriate to use in a
discounted cash flow (DCF) valuation of ECM-the
March projections that were furnished to the
Special Committee, or the June projections that
were created closer in time to the merger date but
were furnished only to Prosser, his advisors, and the
RTFC, and not the Special Committee or its
advisors. Professor Zmijewski used the June
projections without modification. Mr. Bayston, on
the other hand, used the March projections and
modified them in ways that the plaintiffs hotly
dispute.

A second set of issues concerns the appropriate
discount rate. In this regard, both Prof. Zmijewski
and Mr. Bayston determined a discount rate using
standard weighted average cost of capital ("WACC"
) and Capital Asset Pricing Model ("CAPM")
formulas. Professor Zmijewski used the WACC
formula without any modifications. Mr. Bayston
modified the WACC formulas and inputs, by adding
various "small firm" and "weather risk" premiums,
substituting new costs of debt, and using a
debt-to-value capital structure that (together with
Bayston's other modifications) has also generated
ardent disputes.

The third and fourth sets of issues center on the
questions of what weight should be accorded to
ECM's stock market price in determining its fair
value; and whether the appraisal (or damages)
award should include the value of certain businesses
that plaintiffs claim were corporate opportunities of

ECM.

The analysis that next follows addresses these fair
value and fair price issues. In Part III of this
Opinion the Court treats the valuation issues raised
by the parties, and concludes that (1) the $10.25
merger price was not fair, and (2) ECM's fair value
(and fair price) on the date of the merger was
$38.05 per share. In Part IV, the Court turns to the
fair dealing issues, and concludes that the burden of
establishing fair dealing remains with the
defendants, who failed to carry that burden. Finally,
in Part V, the Court determines what fiduciary
duties were violated and which defendants are
monetarily liable as a consequence.

### III. THE FAIR PRICE AND FAIR VALUE OF ECM

**\*12** Although each side's experts valued ECM using
both the comparable company and DCF
approaches, in their briefs the parties focus almost
exclusively upon DCF valuation issues. This Court
views the parties' virtual non-treatment of the
comparable company valuation as a tacit concession
that that alternative valuation is a "throwaway" of
no material significance. Accordingly, this Opinion
addresses only the valuation issues presented by the
parties' competing DCF approaches. [FN36]

> FN36. The basic flaw in the comparable
> company approach is that ECM had no
> true comparables, as Mr. Bayston
> conceded. Trial Tr. Vol. 3 (Bayston) at
> 584-585. The DCF methodology, on the
> other hand, is more appropriate because
> ECM had available contemporaneous
> management forecasts, predictable
> earnings and cash flow.

Both sides agree, and our case law recognizes, that
a DCF valuation is based upon three inputs: (a) the
projections of free cash flow for a specified number
of years, (b) the estimated terminal value of the firm
at the end of the "projection period," and (c) the
discount rate. [FN37] Although the parties raise a
plethora of DCF-related issues, those disputes

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                               Page 15

Not Reported in A.2d, 2004 WL 1305741 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

center around four pivotal questions: (1) which projections (March or June) provide the more appropriate free cash flow input to the DCF model; (2) what is the appropriate discount rate for ECM; (3) how much weight (if any) should the market value of ECM's stock be given in the valuation; and (4) should the value resulting from the DCF method be increased by the value of the businesses that are claimed to be corporate opportunities of ECM? The issues that fall within these four groupings are addressed in this Part of the Opinion.

> FN37. *Cede & Co. and Cinerama v. Technicolor, Inc.*, C.A. No. 7129, 2003 WL 23104613, (Del.Ch. Dec.31, 2003) (*"Cinerama"*) (citing *Taylor v. American Specialty Retailing Group, Inc.*, 2003 WL 21753752 at *3 (Del.Ch. July 25, 2003)).

A. Which Set Of ECM's Projections-March Or June-Is More Reliable For Purposes Of A DCF Valuation On The Merger Date?

Critical to any DCF valuation are the projected revenues, expenses, reserves, and other charges of the firm being valued. On this threshold issue the parties divide, because at Prosser's direction, Heying prepared two sets of management projections, contemporaneously and in the normal course of business. The first set was prepared on March 25, 1998; the second, on June 22, 1998. Plaintiffs' expert, Prof. Zmijewski, used the June projections to derive his projected cash flow inputs, whereas defendants' expert, Duff & Phelps (Bayston) used the March projections, but modified them in significant respects. The issue is what set of projections is the more reliable for purposes of appraising ECM as of the merger date. For the reasons next discussed, the Court determines that the unmodified June projections are the more appropriate and reliable source of inputs for a DCF valuation of ECM.

*First,* as a general proposition (with which defendants' expert, Gilbert Matthews, agreed), "an appraiser should rely on a company's most recent contemporaneous management forecasts unless there are compelling reasons to the contrary." [FN38]

Here, the facts compellingly point to reliance on the June projections, which, unlike the March projections, incorporated ECM's first quarter of actual results as a stand-alone company. The June projections also incorporated significant post-March events that were not included in the March projections, namely, the acquisition of St. Maarten Cellular, a corporate jet, and a headquarters building. All those events were "facts on the ground" that would have to be considered in any valuation of ECM on the merger date. If only the March projections were used, those facts could not be considered.

> FN38. Trial Tr. Vol. 5 (Matthews) 1035.

*13 Prosser conceded that the June projections reflected management's interpretation of the first quarter results in the context of the future performance of ECM, and that they were not unreasonably aggressive. [FN39] Also telling is that the June projections were provided to Prosser's legal and financial advisors in the Privatization (Cahill and Prudential)-but not to the Second Special Committee or its advisors. At Prosser's direction, those projections were also provided to the RTFC, which used them to value ECM as collateral for the Privatization financing. If contemporaneous reliance upon the June projections by Prosser, his lender and his financial and legal advisors was appropriate, then logic and common sense dictate that reliance on these same projections by Prof. Zmijewski in performing his valuation was no less appropriate.

> FN39. Trial Tr. Vol. 10 (Prosser) 1020-1022. This testimony flatly conflicts with the defendants' contention that the St. Maarten Cellular forecast in the June projections was "unreasonably aggressive."

*Second,* the defendants' denigrations of Prof. Zmijewski's reliance on the June projections are unpersuasive. Defendants argue that the June projections are inappropriate for use in an appraisal because they incorporated two projected annual cost savings that (defendants say) are synergistic, *i.e.,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 16

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

merger-related: $2.5 million in savings from the consolidation of ECM and ICC's operations, and $2 million in claimed "going private" savings from the elimination of costs of ECM remaining a public company. Even if those arguments were valid, the proper treatment would be to adjust the June projections for those merger-related cost savings, rather than discard those projections altogether. But more fundamentally, the record shows that (i) the consolidation cost savings were not merger-dependent and (ii) the claimed going private cost savings are not supported by any credible evidence of record.

The cost savings attributed to the consolidation were properly includable in the June projections, because they were contemplated well before the going private merger and could have been achieved without it. Prosser had identified potential consolidation savings before the Privatization occurred. Because Prosser controlled both ECM and ICC, he had the power to accomplish those savings without a business combination, such as by intercompany contractual arrangements. [FN40] To put it differently, the value achieved by Prosser's existing pre-merger ability to effect those cost savings was an asset of ECM at the time of the Privatization merger. It therefore was a benefit in which all ECM stockholders, not just Prosser, were entitled to share. [FN41] That entitlement cannot be defeated by Prosser's unilateral decision not to achieve those savings except as part of a going private merger that would leave him as the sole owner of the enterprise.

> FN40. JX 41 at RTFC 1507; Raynor Dep. 156. Although Prosser claimed at trial that ECM had analyzed and discussed the potential of savings through intercompany agreements and determined that regulatory and union issues precluded it, that testimony is uncorroborated by any document, pre-trial testimony or any other testimony. Heying, who was ECM's Chief Financial Officer, testified that he never discussed the subject of intercompany agreements with Prosser. It is implausible that ECM's CFO and two of its paid

litigation consultants (Bayston and Matthews) would be unaware of that analysis if it had actually been performed, or would be unaware of any discussions about that analysis had any such discussions been held.

> FN41. *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289 (Del.1996).

As for the "going private" savings, the only evidence that those savings are reflected in the June projections is the self-interested testimony of Messrs. Prosser and Heying. No document of record identifies or itemizes those savings. Nowhere are those savings reflected or identified in the June projections or in Joint Exhibit 1, a document Heying prepared during this litigation to summarize the differences between the March and the June projections. Unlike the consolidation savings (which are explicitly identified in a separate line item on both the June projections and the Heying memorandum), there is no separate line item for these alleged savings on either of these documents. That is significant, because at the time he prepared the June projections, Heying prepared a cover memorandum to reflect the most significant changes between the March and the June projections. [FN42] The purported going private savings-representing an alleged $2 million change-is conspicuously absent from Heying's memorandum.

> FN42. JX 168; Trial Tr. Vol 8 (Heying) 1537-1539; Heying June 6, 2000 Dep. 183-84.

**\*14** The defendants claim that the going private savings include reductions in legal fees and professional fees paid to Deloitte Touche and investment relations companies, but defendants introduced no evidence of the magnitude of those fees, even though they possessed all the relevant data. The defendants could not even reach a consensus among themselves about the magnitude of those undocumented claimed savings. Heying testified at various times that it could be $2.2 to $2.5 million, or $2 million, or $1.8 to $2.2 million. [FN43] Bayston (whose source was Heying) testified

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

that the savings were $2 to $2.5 million annually. FN44 Matthews' report quantified those alleged savings exactly at $1,644,000 for 1999-a figure for which Matthews was unable to identify any source during his trial testimony. FN45

> FN43. Heying June 6, 2000 Dep. 196-97; Trial Tr. Vol. 8 (Heying) 1473-74, 1541.

> FN44. Trial Tr. Vol. 3 (Bayston) 536-537

> FN45. Trial Tr. Vol. 6 (Matthews) 1211-14; JX 301, Ex. E

It stands to reason that when a public company goes private, cost savings in some amount will often be achieved. But, in an appraisal proceeding, each party must bear the burden of establishing its own position. FN46 It was the defendants' burden to establish both the existence and the amount of any cost savings from going private. In this case, the defendants nowhere documented the existence, or the amount, of such cost savings, and the testimony of their witnesses on that subject is hopelessly inconsistent. In these circumstances, the defendants have not carried their burden of persuading the Court that the June projections included a significant cost savings of $2.5 million attributable to eliminating ECM as a public company. Accordingly, those savings are not a valid basis for the defendants to disregard, or to denigrate an appraiser's reliance upon, the June projections for purposes of performing a DCF valuation of ECM.

> FN46. *M.G. Bancorporation, Inc. v. LeBeau*, 737 A.2d 513, 520 (Del.1999).

*Third*, the March projections are inappropriate for the additional reason that the defendants' expert, Mr. Bayston, initially relied on those projections, but then modified them by making large adjustments to critical inputs. The effect of those inputs was to depress the cash flows that management had contemporaneously projected. The defendants argue that Bayston's adjustments must also be made to the June projections if this Court finds those projections to be the appropriate starting

point in a DCF valuation. The Court disagrees. It concludes that the June projections, without any modifications, are the most reliable source of inputs to project ECM's future net cash flows.

This Court has consistently expressed a preference for the most recently prepared management projections available as of the merger date. The Court has also been skeptical of *ex post* adjustments to such projections. As Chancellor Chandler observed in *Cede & Co. v. JRC Acquisition Corp.*:
[T]his Court prefers valuations based on management projections available as of the date of the merger and holds a healthy skepticism for post-merger adjustments to management projections or the creation of new projections entirely. FN47

> FN47 *Cede & Co. v. JRC Acquisition Corp.*, No. 18648, 2004 WL 286963, at *2 (Del.Ch. Feb.10, 2004)

*15 The Chancellor echoed that observation in his most recent appraisal opinion in *Cinerama*:
Contemporary pre-merger management projections are particularly useful in the appraisal context because management projections, by definition, are not tainted by post-merger hindsight and are usually created by an impartial body. In stark contrast, *post hoc* litigation-driven forecasts have an "untenably high" probability of containing "hindsight bias and other cognitive distortions." FN48

> FN48. *Cinerama*, at *7 (quoting *Agranoff v. Miller*, 791 A.2d 880, 892 (Del.Ch.2001) ).

When management projections are made in the ordinary course of business, they are generally deemed reliable. Experts who then vary from management forecasts should proffer legitimate reasons for such variance. FN49

> FN49. *Id.*,(internal citation omitted) (citing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 1305745 (Del Ch )
**(Cite as: Not Reported in A.2d)**

*Gray v. Cytokine Pharmasciences, Inc.,* 2002 WL 853549, at *8 (Del Ch. Apr 25, 2002)) (rejecting valuation because it inexplicably ignored and altered management forecasts in favor of litigation-driven projections) and *Kleinwort Benson Ltd v. Silgan Corp.,* 1995 WL 376911, at *5 (Del.Ch. June 15, 1995) (observing that variations from management projections merit "close inspection" and may impeach the credibility of an expert witness). In the *Cinerama* opinion, the Chancellor concluded that the respondent company's expert's "repeated discarding or modification of contemporaneous ... management forecasts . cast serious doubt upon the integrity and reliability of his expert report" (*Cinerama, supra* at 6), and that "management was in the best position to project the short-term prospects of the company, as they created projections *ex ante,* based upon information gleaned from their particular customers." *Id.* at 8.

The question presented here is whether the defendants have offered "legitimate reasons" for Bayston's modifications to the March projections. The Court concludes that they have not.

The primary modification [FN50] that Bayston made to the March (and, by inference, the June) projections was to increase projected capital expenditures (CapEx). Both the March and the June projections forecasted CapEx of approximately $9 million annually throughout the projection period. Prosser explained that these forecasted capital expenditures were lower than historical levels and were reasonable over the short term, because Vitelco had recently replaced and rebuilt its equipment, thereby reducing the need for short term capital expenditures. [FN51] Heying [FN52] and Matthews [FN53] agreed that the forecasted CapEx were management's best contemporaneous estimates.

> FN50. Bayston's other modifications were to eliminate the "consolidation savings" and $2.5 million of "going private savings"

from the projected revenues. For the reasons already discussed, those modifications have been rejected.

> FN51. Trial Tr. Vol. 10 (Prosser) 1742-43.

> FN52. Trial Tr. Vol. 2 (Bayston) 326 (confirming that Heying told him that management's June CapEx forecasts were their best contemporaneous estimates).

> FN53. Trial Tr. Vol. 5 (Matthews) 1057-60 (no reason to change management CapEx forecast for 1998 through 2002).

Nonetheless, in his cash flow projection Bayston unilaterally increased forecasted CapEx by $3.7 million to $5.7 million per year, because (he claimed) managements "typically" underestimate capital expenditures Bayston could not cite any scholarly research confirming that view Nor could he quantify the average amount of any such underestimations, and he never performed an analysis of whether ECM's management had regularly underestimated CapEx. [FN54] Bayston's CapEx adjustment decreased free cash flow for each of the forecast years by the amount of the adjusted increase, and for the terminal year decreased cash flow by almost 20 percent. The result was a *negative growth* in free cash flow for years 2005 to 2007, resulting in a consequential decrease in Bayston's overall valuation. [FN55]

> FN54. Trial Tr. Vol. 3 (Bayston) 569-72.

> FN55. *Id.,* Vol. 2 (Bayston) 330-332; Trial Tr. Vol. 1 (Zmijewski) 162-63

That adjustment amounts essentially to Bayston substituting his personal judgment of what CapEx should be for the non-litigation business judgment of ECM's management. Bayston's judgment rests solely upon his opinion that "managements" in general underestimate CapEx. The defendants have nowhere demonstrated that that view is generally accepted within the financial valuation community or that *this* management habitually underestimated CapEx for ECM. Bayston's valuation approach

© 2005 Thomson/West No Claim to Orig. U.S. Govt. Works

Not Reported in A 2d

Not Reported in A 2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

evokes a reaction akin to that expressed by the Chancellor in *Cinerama* There, the petitioner's expert had rejected a management forecast on unsubstantiated grounds, and the Court observed: " [The expert's] attempts to arrive at more 'realistic' results with a hindsight valuation that ... completely ignores the closest insiders' projections, and results in a strikingly [low] number. This is simply inexcusable." [FN56]

> FN56. *Cinerama,* at *26. Nor is there merit to the defendants' criticism (articulated through Mr. Matthews) that in Prof. Zmijewski's terminal year (2002), depreciation exceeds CapEx, a state of affairs that cannot go on forever. Trial Tr. Vol 5 (Matthews) 999-1001; Vol 6 (Matthews) 1236-37. The flaw in this criticism is that Zmijewski projected cash flows only; he did not forecast the individual components of free cash flow, including CapEx or depreciation. Accordingly, there is no basis to conclude that Prof. Zmijewski forecasts perpetual divergent depreciation and CapEx Trial Tr., Vol 1 (Zmijewski) 120-123.

**\*16** For these reasons, the Court accepts Prof. Zmijewski's adoption of the June projections, and rejects Mr. Bayston's adoption of (and his modifications to) the March projections, as the basis for the cash flow inputs to the DCF valuation of ECM

B What Is The Appropriate Discount Rate?

The second major group of issues concerns the appropriate rate for discounting the projected free cash flows. Both Prof. Zmijewski and Mr. Bayston determined their discount rate(s) using the Weighted Average Cost of Capital ("WACC") and the Capital Asset Pricing Model ("CAPM") formulas. Professor Zmijewski used the WACC formula, without adjustment, to calculate a discount rate of 8.8% during the 1998-2002 period when ECM's tax abatement would be in effect, and 8.5% thereafter, assuming that ECM's tax abatement

would not be renewed. Mr. Bayston also used the WACC model, but modified the formula and the inputs to that formula by adding various premiums, substituting new debt costs, and using a different debt-to-equity weighting, to arrive at a discount rate of 11.5%

To understand the significance of the disputes that arise under this heading, it is useful to explain how the discount rate is determined under the WACC model. Under WACC, the discount rate is calculated based upon the subject company's cost of capital. WACC is the sum of: (1) the percentage of the company's capital structure that is financed with equity, multiplied by the company's cost of equity capital, *plus* (2) the percentage of the company's capital structure that is financed with debt, multiplied by its after-tax cost of debt. [FN57]

> FN57. *See Cinerama, supra,* at *40; JX 352, p. 11. In formulaic terms, WACC has been expressed thusly (JX 298, at F-1):

© 2005 Thomson/West No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                         Page 20

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

WACC =                         (Leveraged Cost of Equity x Equity    +
                               % of Capital)

                                   (Cost of Long Term Debt x (1-tax
                               rate) x Debt % of Capital)

One element of the WACC formula-the "cost of equity capital"-is determined by the CAPM model. Under CAPM, the cost of equity capital is the risk-free rate of return plus the subject company's risk. The subject company's risk is determined by multiplying the equity risk premium for the market by the company's beta. "Beta" is the measure of a given company's nondiversifiable risk relative to the market, specifically, the tendency of the returns on a company's security to correlate with swings in the broad market. A beta of 1, for example, means that the security's price will rise and fall with the market; a beta greater than 1 signifies that the security's price will be more volatile than the market; and a beta less than 1 indicates that it will be less volatile than the market. [FN58]

FN58. *Cinerama, supra,* at 41 and n. 315.

The approximately 3% discrepancy between the two experts' discount rates (8.8% / 8.5% for Zmijewski vs. 11.5% for Bayston) is attributable primarily to their different determinations of the (1) cost of debt, (2) capital structure, and (3) cost of equity. The issues generated by each of these input differences are now discussed.

### 1. Cost of Debt

Professor Zmijewski calculated the weighted average cost of long term debt for ECM at 6.3 %, which was ECM's actual observed cost of debt. He used that figure because of ECM's historical ability to borrow from the RTFC at below-market rates. Mr. Bayston, on the other hand, determined that ECM's weighted average cost of debt on the merger date was 6.59 %, but he assigned ECM a cost of long term debt of 8 %. Bayston's judgment was that

ECM would not be able to borrow indefinitely from the RTFC at below-market rates and, therefore, ECM would have to borrow from another lender at rates closer to 8 %. [FN59] The issue is which of these two long-term debt cost figures is more reasonable. The evidence of record persuades this Court that the more reasonable long-term debt cost assumption is 6.3%. [FN60]

FN59. Trial Tr. Vol. 2 (Bayston) 286.

FN60. The reason for the discrepancy between the two experts' calculation of ECM's actual weighted cost of debt appears to be that Zmijewski's 6.3% cost figure was as of October 10, 1998 (JX 352 at 22), whereas Bayston's calculation was as of September 30, 1998 (JX 298 at J-1). Because Zmijewski's figure represented ECM's long term debt cost as of a time closer to the merger date than Bayston's, the Court adopts 6.3 % as the relevant actual cost of long term debt for ECM

**\*17** The defendants admit that there is nothing of record which shows that on the merger date, ECM would not have been able to borrow from the RTFC at the weighted average cost of its existing debt. [FN61] As of the merger date, ECM had never borrowed at a rate even as high as 8%. Lending at below-market rates was the RTFC's mission, and as of the merger date management expected it could continue to borrow from the RTFC at favorable interest rates. [FN62] Management never told Mr. Bayston anything to the contrary, [FN63] and the defendants have cited nothing of record that supports Bayston's contrary assumption.

FN61. Def's Consol. Post-Trial Br. at 110.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

> FN62. *See* Reed Dep. 29-30; Trial Tr. Vol.
> 10 (Prosser) 1791; JX 209 at G331-32.

> FN63. Trial Tr. Vol. 3 (Bayston) 502.

For these reasons, the Court accepts Prof.
Zmijewski's 6.3% cost of debt input, and rejects Mr.
Bayston's 8% cost-of-debt assumption, the effect of
which was to increase Bayston's calculated WACC
from 10.9% to 11.16%. [FN64]

> FN64. Ex. H to Pls.' Op. Post-Trial Br.

### 2. *ECM's Debt/Equity Capital Structure*

Another important element of the WACC formula is
the percentage of the capital structure represented
by equity and by long term debt. This factor has
proved to be problematic for both sides, and for the
Court as well.

At first glance the difference between the experts on
this variable appears trivial. Professor Zmijewski
arrived at a 28.2% debt-to-enterprise value capital
structure, whereas the debt-to-value capital structure
used by Mr. Bayston was 30%. Mr. Bayston's 30%
figure, however, was a "target," rather than the
actual, percentage of ECM's debt to its total
enterprise value as of the merger date. It is
undisputed that on September 30, 1998 (shortly
before the merger date), ECM's actual long term
debt was $190.4 million. What is disputed is ECM's
total enterprise value. Bayston calculated enterprise
value by (i) multiplying ECM's total outstanding
shares (10,959,131) by the merger price ($10.38 per
share), thus deriving a value of $113.7 million
represented by "equity," and then (ii) adding to that
value the $190.4 million of long term debt, to arrive
at a total enterprise value of $304.1 million. On that
basis, Bayston calculated ECM's actual
debt-to-value ratio at approximately 63%.

Bayston did not use the actual 63% debt-to-value
ratio, however, because in his judgment ECM could
not viably sustain such a highly-leveraged capital
structure over the long term. Accordingly, Bayston
used a 30% "target" figure, which assumed that
management would reduce the debt level from 63%

to 30%. [FN65]

> FN65. Trial Tr. Vol. 3 (Bayston) 499-500.

Professor Zmijewski, unlike Mr. Bayston, based his
28.2% debt-to-value capital structure upon ECM's
actual debt level, as opposed to a "target" debt
level. But, to arrive at his 28.2% figure, Prof.
Zmijewski assumed an enterprise value of $41.16
per share, [FN66] which also was the ultimate fair
value that he had determined for ECM.

> FN66. Professor Zmijewski's original
> debt-to-value ratio was 27.2%, based upon
> a value of $42.94 per share. JX 234 at 46.
> He later adjusted the ratio to 28.2%, based
> upon a fair value of $41.16. JX 235 at Ex
> S-1.

The finance literature supports elements, but not the
entirety, of each side's approach. One treatise
instructs that "the appropriate weights to use [to
define the firm's capital structure in calculating the
WACC] ... are the firm's *long run target weights
stated in terms of market value.*" [FN67] Moreover:

> FN67. Bradford Cornell, *CORPORATE
> VALUATION Tools for Effective Appraisal
> and Decision Making,* 224 (McGraw-Hill
> 1993) (italics in original) (hereinafter "
> Cornell")

**\*18** One simple and popular procedure for
estimating the target weights is to assume that they
equal the company's current market value weights.
Unfortunately, this assumption involves a
circularity. In most cases, a company is being
appraised because the market value of its securities
is unknown, and, therefore, cannot be used to
calculate the weights ... The circularity can be
overcome, in the case of debt and preferred stock by
directly establishing the value of these securities...
However, common stock is still a problem. The
estimated value of the equity depends on the
WACC, which, in turn, depends on the value of the
equity.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 22

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

In light of the circularity, an iterative procedure must be employed to solve simultaneously for the value of the equity and for the WACC. The iterative process begins with the selection of an initial estimate for the market value of the equity; the book value of the equity is a reasonable choice. Based on this initial estimate, the WACC is calculated . Subtracting the value of the debt and preferred stock produces a revised estimate of the equity and a revised equity weight. This revised estimate is then used to calculate a new initial estimate of the equity weight. [FN68]

FN68. Cornell, *supra* at 225

The quoted excerpt does not support the entirety of either side's approach, however. Rather, the quoted treatise appears to support (in some circumstances) Bayston's use of a "target" long term debt weight, but it also supports Zmijewski's employment of an iterative process to solve the circularity problem inherent in the WACC formula. [FN69] Even so, this Court must decide which (if any) of the two competing enterprise values it should accept in determining the percentage of the capital structure represented by debt and the percentage represented by equity.

FN69. Trial Tr. Vol. 1 (Zmijewski) at 164-165; Zmijewski Dep. at 128-130

The difficulty is both that Mr. Bayston's assumed $10.38 per share "enterprise value" and Prof. Zmijewski's assumed $41.16 per share "enterprise value" are identical to the ultimate "fair value" that each expert determined for ECM. Those values exemplify the ultimate circularity inherent in WACC. In this case that circularity is of particular concern, because each expert's ultimate valuation is hotly disputed. Additionally, Mr. Bayston's 30% debt-to-value "target" figure assumes that management would pay down approximately 50% of ECM's debt at some indeterminate future time. That assumption finds no support in the record. For these reasons, the Court is unable to adopt the " enterprise value" assumed by either expert with any

degree of confidence. Yet, the Court must still arrive independently at an enterprise value, and neither side has suggested a neutral or middle ground in their briefs.

Because the purpose of this calculation is to determine WACC based upon a reliable "value of the equity," the only sensible way (in the Court's view) to avoid the circularity in this case is to use an enterprise valuation of ECM that is not litigation-driven. On this record, the only such valuation is the $27.84 per share value, based on a 12% discount rate, that the RTFC determined and actually used for purposes of financing the Privatization. [FN70] Having no better or more reliable information, the Court adopts that value for purposes of determining the percentage of ECM's capital structure represented by long term debt and by equity on the merger date.

FN70. JX 167 at RTFC 698, 700, 707, 720. Prudential's estimate that ATNI could be sold for $25-30 per share in the Split Off, was for a company that included (but was larger than) ECM. Efforts to sell ATNI at that price were unavailing, because no purchaser was interested in acquiring ATNI in its entirety.

*19 As for the percentage represented by long term debt, the only data credibly anchored to the record is the RTFC determination of ECM (ATN)'s net-debt-to-value ratio at 38.8%. Because that ratio was conservatively determined and was calculated as of July 29, 1998, three months before the merger, [FN71] the actual debt-to-value percentage as of the merger date is unknown and can only be estimated. The Court concludes that a debt-to-value ratio of 38% would have been a reasonable estimate and input for purposes of determining a discount rate as of the merger date. From that conclusion it also follows that the percentage of ECM's capital structure represented by equity would have been 62% (*i.e.*, 100%-38%).

FN71. *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 23

### 3. Cost of Equity

Both Prof. Zmijewski and Mr. Bayston used the CAPM formula to calculate ECM's cost of equity. Using that standard approach, Zmijewski derived a cost of equity of 10.4% (for the years when the tax abatement would be in effect), and 10.3% (when the current tax abatement expires). Bayston's initial cost of equity was somewhat lower-9.9%-but Bayston then increased it to 14% by adding "premiums" totaling 4.1%. [FN72] More specifically, Bayston added a "small stock premium" of 1.7% and a "company-specific premium" of 2.4%, the latter consisting of a 1 to 1.5% "super-small stock premium" and a 9 to 1.4% hurricane risk premium." [FN73] Those "premiums" account for most of the difference between these two experts' cost of equity inputs. Accordingly, the issue becomes whether either of these premiums is appropriate in these circumstances. The party seeking to add the premium (here, the defendants) has the burden to establish that they are appropriate. [FN74]

FN72. JX 298 at Ex. F-2; JX 352 at 31.

FN73. Trial Tr. Vol. 2 (Bayston) 261, 168; Def. Consol. Post-Trial. Br. 87

FN74. *ONTI, Inc. v. Integra Bank,* 751 A.2d 904, 920 (Del.Ch.1999)

### (a) The 1.7% "Small Firm/Small Stock" Premium

Although plaintiffs contend that there is no basis in the finance literature or theory for adding a "small firm/small stock" premium to the cost of equity, that is not entirely accurate. There is finance literature supporting the position that stocks of smaller companies are riskier than securities of large ones and, therefore, command a higher expected rate of return in the market. [FN75] Our case law also recognizes the propriety of a small firm/small stock premium in appropriate circumstances. [FN76] The issue, therefore, is not whether a small firm/small stock premium is permissible theoretically, but whether the defendants have shown that a premium of 1.7% is appropriate in this particular case. The Court concludes that the defendants have made that

showing

FN75. *See* treatises cited in *Onti, supra,* 751 A.2d 920 at n. 71; *see also,* Jay Fishman, et. al, *Guide to Business Valuation,* Vol. 1 at 502.15 (Practitioners Publishing Co., 13th ed., 2003)

FN76. *ONTI, supra, Cede & Co. v. JRC Acquisition,* C.A. No. 18648, 2004 WL 286963, at *8 (Del. Ch., Feb. 10, 2004).

Mr. Bayston computed a 1.7% small stock premium by a two step process. First, he determined qualitatively that such a premium was warranted by the size and business of ECM. Second, after reviewing data from the Ibbotson Associates publication, *Stocks, Bonds, Bills and Inflation 1998 Yearbook* ("Ibbotson"), Bayston quantified that premium by subtracting the 11% geometric mean return for large company stocks from the 12.7% mean return for small company stocks. [FN77]

FN77. JX 315; Trial Tr. Vol. 2 (Bayston) 263-264.

**\*20** Plaintiffs do not attack the amount of the premium. Rather, they argue that no small stock/small company premium should have been added at all. They contend that Bayston mechanically and non-qualitatively applied a premium solely because of ECM's size, even though ECM did not fit the typical profile of a "small company." Moreover, plaintiffs argue, recent research data show that contrary to the empirical assumption that implicitly underlies the small stock/small firm premium, small firms have in fact under performed large firms.

The answer to the plaintiffs' second argument is that although large-cap companies may have outperformed small-cap companies for discrete, short periods of time, over the last 10 (indeed, the last 75) years, the mean returns for small companies have exceeded the returns for large-cap companies. [FN78] The short answer to the plaintiffs' first argument is that although the favorable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.