Not Reported in A 2d

Not Reported in A 2d, 2004 WL 1305745 (Del Ch.)
**(Cite as: Not Reported in A.2d)**

Page 24

characteristics of ECM [FN79] are reasons not to apply the second ("supersmall firm") premium that Bayston layered atop the 1.7% small stock/small company premium, those characteristics do not justify ignoring the incremental risk, not fully captured by beta, that typically accompanies a small sized firm.

> FN78. Trial Tr Vol. 2 (Bayston) 395; JX 315.

> FN79. Plaintiffs point out that ECM's returns are not volatile, because its principal subsidiary is well-established, lacks competition, has protection against unforeseen events through regulatory relief, and has access to low-cost capital through the RTFC

Accordingly, the Court accepts the 1.7% small stock/small firm premium that Mr. Bayston added to his 9.9% cost of equity, and arrives at a total cost of equity for ECM of 11.6%

### (b) The 2.4% "Supersmall Firm" And "Hurricane Risk" Premium

Far more controversial, and less grounded in finance theory and legal precedent, is the additional 2.4% premium added by Bayston to account for what he determined was the incremental risk of ECM being both a "supersmall" firm and also subject to unusually hazardous weather risk, specifically, hurricanes.

Bayston's justification for adding an incremental premium of 1%-1.5% to ECM due to its " supersmall" size occupies less than one page of defendants' 150 page brief That justification boils down to an assertion that the 1.7% small firm premium reflected only Ibbotson's average premium for small firms, but that Ibbotson contains "more particularized data which permits an assessment of the appropriate premium for a company, such as [ECM] 'which is much smaller . than the average companies within the Ibbotson data " ' [FN80] Other than to assert that that additional adjustment of the

discount rate "reflects the reality of investment returns in such micro-cap companies" [FN81] the defendants offer no analysis, discussion of specific data, reference to any finance text, or other rationale for their "supersmall" firm premium.

> FN80. Def's Answering Post-Trial Br at 87 (citing Trial Tr Vol. 2 (Bayston) at 271).

> FN81 *Id*

Defendants' support for an incremental premium that if accepted would further increase ECM's cost of capital, falls woefully short of the showing that is required. The defendants offer nothing to persuade the Court that ECM's risk profile fits what they contend is the "reality" of investment returns for micro-cap companies ECM may be small, but it is also a utility that was unusually protected from the hazards of the marketplace. ECM was well established, it had no competition, it was able to borrow at below-market rates, and it was cushioned by regulators from extraordinary hazards (for example, by tax abatements). Implicit in the defendants' position, but nowhere straightforwardly argued, is the assumption that these advantages, however extraordinary, were not enough to offset the added risk created by ECM's "supersmall" size. It is the defendant's burden to support that assumption, and they have not done that.

**\*21** By adding a second incremental premium to ECM's cost of equity to account for the risk of size, Bayston appears to have performed a mechanical exercise, rather than make a nuanced, textured judgment. Accordingly, the Court determines that the defendants have not established a credible justification for their incremental "supersmall" firm premium, and declines to add that premium to the cost-of-equity.

Apart from the "supersmall firm" premium, Bayston also added a company-specific incremental premium for hurricane risk. The effect was to increase the cost of equity by 1-1.5%, to increase the discount rate by a range of .7% to 1.05%, and to decrease enterprise value by $18 to $24 million (*i.e.*,

© 2005 Thomson/West No Claim to Orig. U.S. Govt Works.

Not Reported in A 2d                                                                 Page 25

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

by $1.64 to $2.19 per share). Bayston's justification for this incremental premium was that (1) as a result of Hurricane Hugo in 1989 and Hurricane Marilyn in 1995, Vitelco (ATN) suffered losses, not reimbursed by insurance or Universal Service Fund revenues, of approximately $80 million; and (2) ECM's management believed that hurricanes would pose a significant risk to ECM's business in the future, in that future storm losses would not be reimbursable by insurance because (management was informed) coverage would no longer be available.

This analysis is faulty on factual and conceptual grounds. First, it overstates the amount of unreimbursed hurricane damage. That amount, Mr Heying testified, totaled about $55 million for the entire 70 years preceding the merger. [FN82] Second, defendants' claim that management knew as of the merger date that its hurricane insurance would not continue, relies entirely on Prosser's trial testimony, [FN83] which is not corroborated by any contemporaneous document and is inconsistent with ECM's SEC filings and RTFC loan documents, none of which indicate any impending loss of hurricane loss coverage [FN84] Third, assuming that the risk of future storm losses should be accounted for in some way, the defendants have not supported their argument that the appropriate way to do that is by increasing the cost of equity. Defendants cite no finance literature supporting that approach, nor have they supported their argument empirically, such as (for example) by comparing ECM's company-specific weather-related risk (net of mitigation factors) to the "average" or "mean" weather-related risk for all companies, or even for all "small" companies

> FN82. Trial Tr Vol. 8 (Heying) at 1513.
>
> FN83. *Id.*, Vol. 10 (Prosser) at 1758-59; Defs' Consol. Post-Trial Br. at 93
>
> FN84. *See* JX 155 at SC4189 (1997 10K); JX 165 at RTFC 2426 (covenanting to maintain storm insurance for two years).

The absence of theoretical and evidentiary support

leaves this Court unpersuaded that the risk of unrecoverable hurricane damage loss is so embedded in ECM's business as to require a structural increase in ECM's cost of equity. Absent theoretical and empirical guidance, a more rational approach would be to factor that risk into ECM's cash flow projections such as (for example) by dividing the net hurricane-related loss by a statistically representative number of years to arrive at a loss deduction from projected cash flow for each forecast year Unfortunately, neither side performed such a calculation.

**\*22** The only rational approach that is supported by the record is the plaintiffs' proposal that if the Court finds that the weather-related risk is not appropriately accounted for in Zmijewski's cash flow projections, the Court should reduce Zmijewski's enterprise value calculation by the dollar amount of the estimated effect of the hurricane risk, *i.e.*, by $18 to $24 million. That suggested approach supplies the frame of reference for the analysis that follows

The plaintiffs' proposed approach to the weather risk issue raises two questions. The first is whether that risk has already been fully accounted for in Prof. Zmijewski's cash flow projections; if not, the second issue becomes what should be the amount of the resulting deduction from enterprise value. The record shows that the projections were based on historical results, and that they included the insurance premiums [FN85] Because (as defense expert Gilbert Matthews conceded) it would not be appropriate to include the cost of insurance coverage in a forecast without taking into account the benefit of the protection provided by that insurance, [FN86] the only loss that should be accounted for is the hurricane-related loss that was not reimbursed by insurance. Although the plaintiffs argue that that loss was implicitly included in Prof. Zmijewski's forecast, the Court has found no evidence to support that assertion The Court is, therefore, unable to conclude that Professor Zmijewski factored those unreimbursed losses into his cash flow forecast.

> FN85. Trial Tr. Vol 8 (Heying) at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

1460-62

FN86 *Id.*, Vol. 6 (Matthews) at 1073

Accordingly, it is appropriate (as plaintiffs concede) to deduct the dollar value effect of those losses from enterprise value. The question becomes: what amount should be deducted? The possibilities range from $18 to $24 million. Because the defendants overstated the magnitude of the unreimbursed losses caused by hurricane damage, the Court finds that an appropriately conservative deduction would be at the low end of the range, *i.e.*, $18 million or $1.64 per share.

To summarize, the Court determines that the correct cost of equity for ECM at the merger date was 11.6% (Bayston's initial 9.9% plus a 1.7% small firm/small stock premium). That cost of equity figure does not include a premium for hurricane damage risk. That risk shall be accounted for by deducting $18 million ($1.64 per share) from the enterprise value calculated (independent of that risk) with the DCF inputs as determined in this Opinion. The result will be to reduce the enterprise value by that $18 million ($1.64 per share) amount.

For the reasons previously discussed, the Court cannot accept in its entirety the DCF valuation of either side's expert. Although the Court accepts the plaintiffs' position that the projected cash flows and terminal value should be derived from the June projections, it has determined independently the disputed elements of the WACC and CAPM formulas from which the discount rate is computed. Based upon the Court's findings, the appropriate discount rate is determined to be 8.69%, and the fair value of ECM as of the merger date is determined to be $38.05 per share. [FN87]

FN87. The $38.05 fair value represents the difference between the value of $39.69 per share and the $1.64 per share hurricane loss adjustment. The $39.69 per share value, as well as the 8.69% discount rate, were computed by all counsel at the

request of the Court. (*See* letter dated March 17, 2004 from the Court to all counsel.) In this letter the Court asked counsel to compute the discount rate and the resulting fair value, based upon the DCF inputs determined in this Opinion. On April 2, 2004, Mr. Allingham responded to the Court on behalf of all counsel, setting forth the manner in which the $39.69 per share value was arrived at. (Letter dated Apr. 2, 2004 from Thomas J. Allingham, II, Esquire, to the Court). In that letter, counsel identified one additional variable that the Court would be required to determine: ECM's assumed growth rate. As disclosed in counsel's April 2, 2004 letter, the parties' different growth rate assumptions yielded a matrix of values ranging from $39.69 to $40.88 per share. Deciding to err on the side of conservatism, the Court selected the lowest value within that range-$39.69 per share-from which $1.64 per share was deducted to arrive at the ultimate adjudicated fair value for ECM of $38.05 per share.

C. What Weight Should Be Accorded To ECM's Market Price As Evidence Of Fair Value?

*23 To support their claim that the fair value of ECM on the merger date was no more than $10.38 per share, the defendants urge that "where, as here, the market for a publicly traded security is an active and efficient one, the market price [of ECM's common stock] is, at the least, important corroborative evidence of value ..." [FN88] For that argument, the defendants rely upon the expert testimony of Professor Burton Malkiel of Princeton University. Professor Malkiel opined that ECM's stock "was trade[d] in an efficient market with enough volume and a low enough bid-asked spread, and that it reflected news without delay; and these ... indicators led [Prof. Malkiel] to conclude that ECM was traded in an efficient market and that the [$7.00 per share] market price of ECM common stock prior to the buyout ... was a reasonable reflection of its value." [FN89] Intending no disrespect to Professor Malkiel, the Court is unable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 27

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

to accept his conclusion in this specific case. However sound Professor Malkiel's market price-based theory may be in other circumstances, that theory is inapplicable to these facts because its premise is not supported by either the trial record or Delaware law

> FN88. Defs Consol. Ans. Post-Trial Br at 105
>
> FN89. Trial Tr Vol. 9 (Malkiel) at 1597-1598

Delaware law recognizes that, although market price should be considered in an appraisal, the market price of shares is not always indicative of fair value [FN90] Our appraisal cases so confirm [FN91]

> FN90. *Cede & Co. v Technicolor, Inc.,* 684 A.2d 289, 301 (Del.1996) (the " market price of shares may not be representative of true value ").
>
> FN91. *See, e.g., Harris v. Rapid-American Corp,* C.A. No. 6462, 1992 WL 69614, at *1, *4. (Del.Ch. Apr.6, 1992) ($28 merger price, representing a 28% premium over unaffected trading price, was barely one-third of adjudicated fair value of $73.29); *In re Shell Oil Co .,* C.A. No. 8080, 1990 WL 201390, at *14-15, *38 (Del.Ch. Dec.11, 1990), *aff'd,* 607 A.2d 1213 (Del.1992) (market price $44, adjudicated fair value $71.20);

Moreover, the record undermines any assertion that ECM's common stock was traded in an efficient market. Indeed, it was precisely because ECM's stock market price did not reflect ECM's underlying values that Prosser decided to abandon the proposed merger and instead acquire the ECM minority interest in the Privatization Prosser himself told his fellow ECM directors that the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not being followed by

Wall Street analysts. [FN92] Moreover, because Prosser always owned the majority interest, the market price of ECM stock always reflected a minority discount. [FN93]

> FN92. *See* note 7, *supra.*
>
> FN93. Trial Tr. Vol. 1(Zmijewski) at 95-96; Finger Dep (Jan. 11, 2000) at 143-144.

Professor Malkiel admitted that markets occasionally make errors, that the market could have been wrong about ECM, and that it is possible for a stock that trades even in an efficient market to be mispriced, especially in the short run. [FN94] Professor Malkiel also conceded that the market may be inefficient if material information is withheld from it [FN95] In the case of ECM, while the stock was trading freely, (*i.e.,* before Prosser announced the Privatization), the market never had the benefit of any disclosed earnings or projections of future results, including the June Projections. [FN96]

> FN94. Trial Tr. Vol. 9 (Malkiel) at 1651-52, 1665-66, 1676-79. In this case, ECM stock traded publicly for only five months.
>
> FN95. *Id* at 1633.
>
> FN96. Trial Tr. Vol. 1 (Zmijewski) at 93-94, 158-159.

For these reasons, the Court rejects the defendants' argument that the market price of ECM stock corroborates the $10.25 price as the fair or intrinsic value of ECM on the date of the merger In this case, ECM's unaffected stock market price merits little or no weight.

### D The Corporate Opportunity Claims

**\*24** The plaintiffs contend that to the value of ECM as determined by the DCF method, there should be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d                                                                 Page 28

Not Reported in A 2d, 2004 WL 1305743 (Del Ch.)
**(Cite as: Not Reported in A.2d)**

added an additional $3 79 per share, representing the combined value of the Caribbean Cable Companies [FN97] and the Daily News Those companies, which ICC (wholly owned by Prosser) acquired on December 30, 1997, are claimed to have been corporate opportunities of ECM that Prosser wrongfully usurped. The plaintiffs urge that Prosser had a fiduciary duty to make those opportunities available to ECM, and that consequently, ECM's minority shareholders were entitled to share in the value of those opportunities on the merger date

> FN97. The Caribbean Cable Companies were BVI Cable TV, St. Croix Cable TV, Inc., St. Thomas-St. John Cable TV and St Maarten Cable TV.

The Court cannot agree, because ECM did not come into existence until December 30, 1997, long after Prosser had had signed definitive purchase agreements on June 9, 1997 to acquire personally three of the Cable Companies, and an agreement to acquire the fourth Cable Company on September 8, 1997. [FN98] Because ECM did not exist, and therefore had no public shareholders at the time Prosser signed those agreements, Prosser was not a fiduciary, and could not have owed any fiduciary duties to ECM. [FN99]

> FN98. Pretrial Order, ¶ s 81, 95

> FN99. *See Anadarko Pet Corp v. Panhandle East Corp*, 521 A 2d 624, 628 (Del.Ch.1987) (holding that a parent corporation owes no fiduciary duty to its wholly-owned subsidiary, and that no fiduciary duty arose until the subsidiary had outside stockholders).

If the Cable Companies and the Daily News were corporate opportunities, they were opportunities of ATN, which owned all the assets later allocated to Messrs. Prior and Prosser in the Split Off. In an Indemnity Agreement entered into among Prosser, Prior, and ATN as part of the Split Off, ATN and Prior relinquished any rights they had to such a

claim. In that Agreement, ATN and Prior covenanted "not to bring any action suit or proceeding against Prosser or ECI with respect to any of the matters ... relating to the business, operations or management of [ATN] or any of its Subsidiaries prior to and including the Closing." [FN100]

> FN100. JX 22 at ECI 0857, § 3 01(b) The Indemnity Agreement was one of the terms of the Split Off that was disclosed to, and approved by, ATN stockholders JX 22.

In short, ECM had no corporate opportunity claim because ECM did not exist at the time the opportunities arose and were taken. If a corporate opportunity claim existed, it belonged to ATN, which relinquished that claim in connection with the Split Off. Accordingly, the corporate opportunity claims cannot form any part of ECM's fair value as of the merger date.

### E. The Fair Value Of ECM And The Unfairness Of The Merger Price

As a consequence of the foregoing determinations, the fair value of ECM on the merger date is found to be $416,996,000, or $38.05 per share. [FN101] Under 8 *Del. C* § 262, Greenlight, as the single appraisal claimant, is entitled to recover that per share amount, multiplied by the 750,300 shares for which it seeks appraisal, plus interest as determined in Part III F, *infra*, of this Opinion.

> FN101. The fair value of $416,996,000 ($38 05 per share) is equal to the discounted cash flow valuation of ECM that results from the DFC inputs determined in this Opinion ($434,996,000, or $39.69 per share), which less $18 million ($1 64 per share), which represents the hurricane losses not reimbursed by insurance. *See* Apr 2, 2004 Letter from Thomas J. Allingham, II, Esquire, to the Court, discussed in note 87, *supra*

© 2005 Thomson/West No Claim to Orig U.S Govt Works

Not Reported in A.2d                                                                    Page 29

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

From that fair value finding it further follows that the $10.25 per share merger price was not a "fair price" within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger v. UOP, Inc.* [FN102] Although that, without more, is dispositive, the unfairness of the merger price rests upon more than that one bit of simple deductive logic. The overwhelming weight of the credible evidence of record also compels that conclusion.

FN102. 457 A.2d 701 (Del.1983).

**\*25** The only competent evidence that the merger price was fair was the fairness opinion that Houlihan furnished to the Second Special Committee, and the testimony of Mr. Bayston in support of the fairness opinion rendered by his firm, Duff & Phelps. But whatever evidentiary force Houlihan's opinion might have had was totally undermined by the fact that (i) Houlihan never had the benefit of the June projections, and (ii) the defendants never called Houlihan, upon whose valuation the Special Committee and the board relied, to testify at trial in support of its valuation conclusion. The defendants have never explained their failure to do that. For these reasons, and because it was within the defendant's power to call Houlihan as a witness, [FN103] the only logical inference-and the inference this Court has drawn-is that Houlihan's testimony would have been unfavorable to the defendant's position. [FN104] The RTFC's approximately $28 per share valuation of ECM-which is credible because the RTFC relied on it in deciding to extend to Prosser a multimillion dollar loan to finance the Privatization-was almost thrice the magnitude of the $10.25 per share value that Houlihan was willing to pronounce as fair. And even Duff & Phelps, the defendants' trial valuation expert, was apparently unable to opine that $10.25 per share was fair: that firm valued ECM at not less than $10.38 per share.

FN103. The defendants do not contend that Houlihan was unavailable to testify.

FN104. *Demby v. State,* 744 A.2d 976, 978-979 (Del.2000) (citing *Wheatley v.*

*State,* 465 A.2d 1110 (Del.1983)).

The several infirmities that led the Court to reject the Duff & Phelps valuation have been discussed and need not be repeated here. One additional infirmity merits discussion, however, and that is Mr. Bayston's use of impermissible post-merger data in arriving at some of his conclusions. In his deposition Mr. Bayston conceded that he had relied on post-merger evidence in preparing his projections, including his CapEx assumptions:

Q. So that in making your assessment about the best estimate of the costs of the company going forward, you examined and took into account the company's cost experience in the period between the appraisal date and the date of the preparation of your report?
A. That's correct. [FN105]

FN105. Bayston Dep. 286-87.

Q. Now, in formulating your more aggressive assumption for capital expenditures, did you take into account the company's capital expenditures experienced between the appraisal date and the date when you prepared your report?
A. I believe we looked at that issue. [FN106]

FN106. *Id.* at 293.

Although at trial Bayston claimed that he misspoke on his deposition, [FN107] that recantation is not credible because if in fact Bayston misspoke, he did so repeatedly over the course of many deposition pages. Moreover, Bayston had extensive litigation-related contact with ECM's management, [FN108] which would have made it extremely difficult to avoid incorporating post-merger evidence in his valuation.

FN107. Trial Tr. Vol. 1 (Bayston) 209, Vol. 2 (Bayston) 320, 323, 329.

FN108. Trial Tr. Vol. 2 (Bayston)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

252-253, 328-329 (discussions about capital expenditures); 333 -334 (discussing extensive conversations with ECM management.)

Striving to portray Mr. Bayston's contacts with management as a strength, the defendants criticize Prof. Zmijewski for "not even attempt[ing] to talk to [ECM] management in connection with his analysis." [FN109] But Prof. Zmijewski cannot fairly be faulted for doing what litigation experts in the valuation area customarily do: conducting careful due diligence using the sworn testimony and contemporaneous discovery record. What Zmijewski did not do in valuing ECM was to rely upon unsworn, post-merger conversations with management. Nor did Prof. Zmijewski rely upon post-merger data to determine the inputs on which his DCF analysis depended.

FN109. Def. Consol. Ans. Post-trial Br. at 52.

### F Interest

**\*26** Once the fair value of the dissenting shareholders' shares is ascertained, our appraisal statute requires the Court to determine "the fair rate of interest, if any" after considering "all relevant factors." [FN110] The interest may be simple or compound, and this Court has broad discretion to determine whether interest should be simple or compound, but the Court must explain its choice. [FN111] As the Chancellor recently stated in *Cede & Co. v. JRC Acquisition*

FN110. 8 *Del. C.* § 262(h).

FN111. 8 *Del. C.* § 262(i); *M.G. Bancorporation, Inc. v. Le Beau,* 737 A.2d at 527. *Gonsalves v. Straight Arrow Publishers, Inc.,* 725 A.2d 442 (Table), 1999 WL 87280 at \*4 (Del., Feb.25, 1999).

This Court's decision in *Gonsalves v. Straight Arrow Publishers, Inc.* is an accepted method for determining the rate of interest in appraisal actions

*Gonsalves* rests on the principle that an interest award should serve two purposes First, it should disgorge the respondent of any benefit it received from the use of the petitioner's funds. Second, the interest award should compensate the petitioner for the loss of the use of its money. The second purpose, however, is countenanced with the understanding that the election to 'reject the merger and to pursue appraisal does not shift to the corporation all responsibility for losses [the petitioner] may incur as a result of [its] inability to use the funds retained by the corporation' and that the petitioner can mitigate its losses and obtain perfect 'compensation for the loss of the use of their funds by borrowing the fair value of their shares.' *Gonsalves,* and several other decisions, have found that these twin purposes are served by awarding interest by weighing equally the respondent's actual costs of borrowing and based upon an objective prudent investor standard, the petitioner's opportunity cost. [FN112]

FN112. *Cede & Co. v. JRC Acquisition, Corp.,* No. 18648, 2004 WL 286963, at \*12 (Del.Ch. Feb.10, 2004) (internal citations omitted)

Greenlight claims that it is entitled to an interest award of 22%, compounded daily, from the merger date. To further the compensatory purpose of the interest award, Greenlight argues, the Court should use Greenlight's actual rate of return on its invested capital-37%-for the period beginning October 1, 1998 Because 37% is what Greenlight claims it would have earned on its appraisal award had that award been paid on the merger date, only that rate would restore Greenlight to the financial position it would have had if the merger price were entirely fair. To further the restitutionary purpose of an interest award, Greenlight urges the Court to use the interest rate that ECM pays to short term, unsecured creditors (a category that includes Greenlight in this appraisal). Since the date of the merger, that rate has been 7%. Weighting both rates equally, Greenlight arrives at a rate of 22% which, Greenlight urges, should be compounded daily.

The defendants insist that Greenlight is entitled to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

simple interest at 5.24%, or at most, interest at that rate compounded no more frequently than monthly. Although the defendants agree that the "restitutionary purpose of awarding interest is typically addressed by basing one half of the interest award on the corporation's cost of borrowing," [FN113] they contend that as of September 30, 1998, ECM's weighted average interest rate on its $190.4 million of debt was 6.59%.

> FN113. Defs' Consol. Post-Trial Br. at 110. *See Gilbert v. M.P.M. Enters., Inc.*, 709 A.2d 663, 674 (Del.Ch., 1997); *aff'd*, 731 A.2d 790 (Del.1999) and *Chang's Holdings, S.A. v. Universal Chems. And Coatings, Inc.*, No. 16856, 1994 WL 681091, at *2 (Del. Ch. Nov. 22, 1994)

*27 As for the compensatory purpose of an interest award, the defendants claim that because this Court has historically applied an objective "prudent investor" standard, (*viz.*, what a prudent investor would have achieved if it had invested the proceeds at the date of the merger) Greenlight's subjective claimed 37% return on its investments is irrelevant as a matter of law. In this case, the prudent investor rate, as determined by Mr. Bayston who relied on the mix of investments specified by Delaware case law, implied an interest rate of 5.54% as of the date of the Duff & Phelps report, and 3.88% as of the date of trial. Because both sides agree that borrowing costs and compensatory measures should be weighed equally, the appropriate rate of interest is 5.24% [ (6.59% + 3.88%) /2]. Finally, defendants argue, Greenlight cites no authority for its request that interest be compounded. Defendants urge that the interest award should be either simple interest or, if interest is compounded, the compounding should be no more frequent than monthly, consistent with the case law. [FN114]

> FN114. *See ONTI, Inc. v. Integra Bank*, 751 A.2d at 927-29 (interest compounded monthly); *Hintmann v. Frede Weber, Inc.*, 1998 WL 83052 (Del.Ch. Feb.17, 1998) (same); *Grimes v. Vitalink*

*Communications Corp.*, No. 12334, 1997 WL 538676, at *13 (Del.Ch. Aug.28, 1997)

These colliding contentions generate four issues: (1) what was ECM's cost of borrowing, (2) what was Greenlight's opportunity cost, (3) based on those inputs, what is the appropriate rate of interest, and (4) should the form of the award be simple or compound interest, and if interest is compounded, over what interval? These issues are now addressed.

Although defendants argue that 6.59% was ECM's cost of borrowing, as Greenlight points out, that represents ECM's average, not its marginal, cost of short term unsecured debt, which was 7%. [FN115] According the Court finds that ECM's cost of borrowing was 7%.

> FN115. JX 235 at 26, Ex. 2B.

As for Greenlight's opportunity cost, *JRC Acquisition* and *Gonsalves* establish that that cost is to be determined on the basis of an objective "prudent investor" standard, not Greenlight's subjective claimed 37% investment return. The defendants argue that the prudent investor rate of return was 5.54% as of the date Duff & Phelps submitted its report and 3.88% at the time of the trial. Greenlight does not propose any alternative "prudent investor" rate of return. To err on the conservative side, the Court adopts 5.54% as the prudent investor rate of return.

The Delaware cases require that the interest rate be determined by weighting the cost of borrowing and the prudent investor rate of return equally. On that basis, the appropriate rate of interest on the appraisal award is determined to be 6.27%, running from the date of the Privatization merger. [FN116]

> FN116. Computed as follows: 7.00% + 5.54% / 2 = 6.27%.

The final issue relating to interest is whether the interest should be simple or compound and if compounded, over what interval. Greenlight cites

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

no authority or evidence that daily compounding is appropriate in this case. But, Greenlight, which is in the business of investing money, has nonetheless satisfied the Court that it would have been able to earn interest on its appraisal award on a compound basis. Moreover, the Court finds, as did the Chancellor in *JRC Acquisition,* that "the dual purpose of compensation and restitution may only be served by a compounding interval at least as frequent as one month." [FN117]

> FN117. *JRC Acquisition, supra,* at *15 (quoting *Grimes v. Vitalink Communications Corp., supra,* 1997 WL 538676 at *11). The defendants also concede that if interest is to be compounded, that the compounding be at one month intervals.

**\*28** Accordingly, interest on Greenlight's appraisal award shall be at the rate of 6.27%, compounded monthly, from the date of the merger to the date of judgment.

## IV. WAS THE TRANSACTION THE PRODUCT OF FAIR DEALING?

### A. Threshold Issues

An entire fairness analysis normally requires the Court to decide, in addition to whether the price paid in an interested merger was "fair," whether the merger was the product of "fair dealing." This case, however, raises three issues that must be confronted at the threshold. The first is whether this Court's determination that the merger price was not fair makes it unnecessary to engage in a "fair dealing" analysis. The Court concludes that a fair dealing analysis is required. The second issue is whether the plaintiffs are barred from asserting their fiduciary duty claims. The Court finds that they are not. The third issue is which side has the burden of proof. The Court determines that the burden falls upon the defendants. What follows is the basis for the Court's rulings on these threshold issues.

### 1. Is A Fair Dealing Analysis Required?

In this case, this Court's determination of ECM's "fair value" disposes of both Greenlight's appraisal action and the "fair price" aspect of the plaintiffs' fiduciary duty claim. The determination that price is not fair raises a preliminary, threshold question of whether in this case any "fair dealing" analysis need be undertaken at all. It is arguable that where (as here) the merger price is found to be unfair, it would be difficult, if not impossible, for the merger to be found "entirely fair" even if the process leading up to the merger involved fair dealing. [FN118] That supposition, if correct, would lead to the result that where the merger price is found not to be fair, that finding establishes, *ipso facto,* the unfairness of the merger, thereby obviating the need for any analysis of the process oriented issues. The Supreme Court has not yet addressed that question, however.

> FN118. *See Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1140 (Del.Ch.1994), *aff'd,* 663 A.2d 1156 (Del.1995) ("Plainly in a cash-out merger, price is a dominant concern, most especially where the buyer already has voting control of the enterprise, such as a parent-sub merger.")

What the Supreme Court has decided is that where an interested merger is found to be unfair and the corporation's charter has a Section 102(b)(7) exculpatory provision, this Court must then proceed to "identify the breach or breaches of fiduciary duty upon which liability [for damages] will be predicated in the *ratio decidendi* of its determination that entire fairness has not been established." [FN119] That is, "when entire fairness is the applicable standard of judicial review, a determination that the director defendants are exculpated from paying monetary damages can be made only *after the basis* for their liability has been decided." [FN120]

> FN119. *Emerald Partners v. Berlin,* 787 A.2d at 94 (quoting *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1165 &

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 33

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

n 16 (Del.1995)).

FN120 *Id.* (emphasis in original).

That mandate, I find, is applicable here. In this case the defendants have raised a § 102(b)(7) exculpatory defense. In determining that the merger price was not fair, this Court did not address whether the unfairness was the product of a breach of fiduciary duty or if so, the nature or character of that duty. Accordingly, a "fair dealing" analysis is required in this case, if only to enable the Court to determine the "basis for the [defendants'] liability" for § 102(b)(7) exculpation purposes.

### 2. The "No Standing" Affirmative Defense

**\*29** The defendants have interposed the affirmative defense that the plaintiffs lack standing to assert any fiduciary duty claims. That defense comes in two parts. First, the defendants concede that Greenlight has standing to assert fiduciary claims on behalf of the 750,300 ECM shares that it owns outright. The defendants argue, however, that Greenlight lacks standing to assert any claims on behalf of the former holders of 2,026,685 shares that sold to Greenlight their "litigation rights" to assert the fiduciary claims associated with those shares. [FN121] Second, the defendants claim that no former shareholders of ECM can recover anything in respect of any shares that they tendered into the tender offer or voted in favor of the merger. Neither argument, in this Court's view, withstands scrutiny.

> FN121. The assignments of litigation rights to Greenlight are found in the record at JX9.

### (a) The Litigation Rights Validity Issue

The plaintiffs contend that Greenlight lacks standing to assert any claims based upon the assigned "litigation rights," because: (1) unliquidated fiduciary claims are not assignable as a matter of Delaware law and public policy, and (2) Greenlight purchased the litigation rights in violation of the parties' Confidentiality Stipulation

in the appraisal action. Moreover (argue defendants), (3) if the assignments were invalidated, the litigation rights would not revert back to the assignors, *i.e.,* to the plaintiff class, because by selling these claims those stockholders waived their right to assert their fiduciary claims and must therefore be excluded from the class.

Assuming without deciding that the defendants can be heard to challenge the validity of the assignments, [FN122] it is established Delaware law that choses in action that survive the death of the victim are validly assignable. [FN123] In this case, the choses in action are breach of fiduciary duty and fraud claims. Those claims survive to (or against) a personal representative under 10 *Del. C.* § 3701. [FN124] For purposes of determining which claims are assignable and which are not, Delaware law does not distinguish between claims that are liquidated and those that are unliquidated.

> FN122. There is authority holding that only a party to the assignment can contest its validity. *See Wagner v. United States,* 573 F.2d 447 (7th Cir.1978); *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350, 353 (S.C.1991); 6A C.J.S. *Assignments* § 71 (1975).

> FN123. *Industrial Trust Co. v. Stidham,* 33 A.2d 159, 160-61 (Del.1942); *Garford Motor Truck Co. v. Buckson,* 143 A. 410, 411 (Del Super Ct 1927).

> FN124. Section 3701 provides:
> All causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued....[A]ll actions, so surviving, may be instituted or prosecuted by or against the executors or administrators of the person to or against whom the cause of action accrued.

Nor is there any basis for the defendants to argue that the assignments must be deemed invalid on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

public policy grounds because they are champertous. The short answer is that they are not champertous. Champerty requires "an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense." [FN125] Greenlight's purchase of the litigation rights was not champertous, because Greenlight has always been involved in the litigation. Greenlight was a shareholder when the Privatization was announced; Greenlight was a member of the shareholder class and always had the right-and standing-to pursue an individual fiduciary duty remedy simultaneously with its appraisal action. Champerty cannot be charged against one with an interest in the matter in controversy. [FN126]

> FN125. *Gibson v. Gillespie*, 152 A. 589, 593 (Del.Super.Ct.1928); *see also Compaq Computer Corp. v. Horton*, 631 A.2d 1, 5, n. 1 (Del.1993).

> FN126. *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182 (Del.1988).

**\*30** The defendants next urge that Greenlight should be denied standing to sue because it purchased the litigation rights in violation of Paragraph 2 of the Confidentiality Stipulation, which provides that:

Discovery Material shall be used solely for purposes of this litigation, and shall not be used for any other purpose, including, without limitation, any business or commercial purpose, *provided,* however, that Discovery Material may be used in connection with any litigation among the parties relating to the merger between [ECM] and [ICC] .... effective as of October 19, 1998 [FN127]

> FN127. D.I. 19 in Appraisal Action, Par. 2.

Specifically, the defendants contend that Greenlight "used" confidential Discovery Material to purchase the litigation rights in violation of the quoted paragraph. Although Greenlight did possess confidential information, the defendants have not shown that Greenlight used that information in acquiring the litigation rights. Even if Greenlight did use Discovery Material, the defendants have not established that such use was prohibited by the Confidentiality Stipulation, which permitted Discovery Material to be used in both the Appraisal Action ("this litigation") and in "any litigation relating to the Merger" (*i.e.,* the fiduciary duty action challenging that Merger). Nor have the defendants shown that Greenlight disclosed confidential Discovery Material publicly in the marketplace, or otherwise failed to abide by the Confidentiality Stipulation terms.

Finally, the defendants have suffered no prejudice as a result of the assignment of the litigation rights, because those rights belonged to the members of the class. Absent an assignment, the defendants would have had to defend against those claims asserted on behalf of the class in any event. Thus, the defendants can hardly claim cognizable prejudice as a result of the assignment of those same claims to one member of the class that elected to sue individually. [FN128]

> FN128. Stated another way, if the Court granted defendants the relief they seek, the assignments would be void and the right to recover would revert to the class. A failed assignment of claims does not (as defendants assert without support), *constitute a waiver* of those claims. The defendants would still pay the same amount in damages; there would simply be a different name on the check. Not allowing the class member-assignors to recover would give the defendants a windfall for no valid factual or legal reason.

### (b) The Waiver Issue

The defendants next urge that members of the ECM shareholder class who tendered into the first step tender offer, or who voted for the Privatization merger, waived their right to challenge the fairness of that transaction. This argument is flawed, because it presupposes that the shareholders who

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                            Page 35

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

tendered or voted made a fully informed decision based on full disclosure. As found elsewhere in this Opinion, that is not the case, because the defendants violated their duty of disclosure to the stockholders of ECM in several respects. On that basis alone the defendants' argument must be rejected. [FN129]

> FN129. *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840 (Del.1987)(acquiescence requires an informed act). For that same reason, the Court rejects the defendants' argument that the Class members who accepted the benefits of the merger must be deemed to have acquiesced in the merger. As Vice Chancellor Strine held in *Clements v. Rogers*, 790 A.2d 1222 (Del.Ch.2001), a plaintiff who accepts the merger consideration could not have acquiesced where she knew some, but not all of the material facts. The predicament in which Class of former ECM shareholders found themselves was indistinguishable from *Clements*.

### (c) The Burden of Proof Issue

The final threshold issue is which side has the burden of proof. Both sides agree that because the Privatization is a self-dealing transaction of which the majority stockholder stands on both sides, entire fairness is the standard of review *ab initio*. [FN130] The only question is whether the burden of proof, which normally falls upon the defendants, has shifted to the plaintiffs in this particular case.

> FN130. *Emerald Partners v. Berlin, supra,* 787 A.2d at 92, 97.

**\*31** The defendants argue that the burden of establishing that the merger was not entirely fair has shifted to the plaintiffs, because the merger was approved by both an informed independent committee of disinterested directors and an informed majority of minority stockholders. [FN131] The short answer is that the merger was not approved by a committee of independent directors who were properly informed or independent of

Prosser, nor was it approved by an informed vote of a majority of ECM's minority stockholders.

> FN131. *Kahn v. Lynch Communications Sys., Inc.*, 638 A.2d 1110, 1117 (Del.1994)

In an entire fairness context, where the predicate for a burden-shifting argument is that the merger was negotiated by a special committee, the defendants must establish to the satisfaction of a carefully scrutinizing court, that the special committee was " fully informed." [FN132] As discussed more fully elsewhere in this Opinion, the Special Committee and a majority of ECM's minority shareholders voted to approve the merger, but their votes were not fully informed. A highly material fact was not disclosed either to the Special Committee or to the minority stockholders, namely, that the most recent projections-the June projections-had been provided to Prosser and his financial advisor (Prudential) and his lender (RTFC) but not to the Special Committee. Members of the Special Committee testified that they and Houlihan should have been provided with the June Projections. [FN133] Moreover, the June Projections were not disclosed in the proxy statement, and the proxy disclosures relating to that issue falsely and misleadingly suggested that the shareholders were being provided with all of the projections to which Prosser and his advisers had been privy. The portion of the proxy statement that contained the March projections (identified therein only as Company projections) stated:

> FN132. *Id* at 1120

> FN133. Trial Tr. Vol. 7 (Vondras) 1296, 1351-52; Vol. 4 (Goodwin) 751; Vol. 5 (Goodwin) 929-30. Mr. Vondras testified that the Special Committee "was deprived of information that [he] would have considered important in [his] assessment of Prosser's offer" and that the Committee and Houlihan ".. should have had the most current data, and it would have used that in their analysis. Would it change the ... numbers? May or may not have. I don't

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A 2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

know, but they should have had that data."
Trial Tr. Vol. 7 (Vondras) 1351-52.

Although the Company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr Prosser and the parent [ICC, LCC], the purchaser [ICC] is making these projections available to all stockholders. [FN134]

> FN134. JX 155 at SC4128.

As more fully discussed *infra*, the proxy statement and the tender offer documents omitted to disclose other material facts as well The material omission relating to the June Projections, however, is sufficient, in and of itself, to undermine the informed character of the Special Committee approval that is a predicate to shifting the burden of proof in an entire fairness case.

The defendants argue that the burden must shift, nonetheless, because the minimum tender condition, *i e*, the condition that a majority of the minority shareholders tender into the offer, was the functional equivalent of a shareholder ratification of the transaction. But no Delaware case has held that burden-shifting can be accomplished by a tender of shares rather than by an actual vote. Nor should a tender be treated as the equivalent of an informed vote. Shareholders cannot be deemed to have ratified board action unless they are afforded the opportunity to express their approval of the precise conduct being challenged [FN135] Stockholders have materially different interests at stake when tendering, as opposed to voting their shares. In considering whether to tender, stockholders must evaluate the risk of being left worse off, *i e*, left vulnerable to being frozen out at an even lower price, if the other stockholders were to tender into an inadequate offer. As Vice Chancellor Strine incisively observed in *In re Pure Resources S'holders Litig.*:

> FN135. *In re Santa Fe Pac. S'holders Litig.*, 669 A 2d 59, 69 (Del.1995); *see also, In re Cencom Cable Income*

*Partners, L.P.*, No. 14634, 2000 WL 640676, at *5 (Del Ch May 5, 200) (" Ratification can effectively occur only where the specific transaction is clearly delineated to the investor whose approval is sought and that approval has been put to a vote ")

**\*32** Indeed, many commentators would argue that the tender offer form is more coercive than a merger vote In a merger vote, stockholders can vote no and still receive the transactional consideration if the merger prevails In a tender offer, however, a nontendering shareholder faces an uncertain fate. That stockholder could be one of the few who holds out, leaving herself in an even more thinly traded stock with little hope of liquidity and subject to a § 253 merger at a lower price or at the same price or ... at a later (and, given the time value of money, a less valuable) time [FN136]

> FN136. 808 A 2d 421, 442-43 (Del.Ch.2002), *appeal refused*, 812 A 2d 224 (Del.2002) (footnotes omitted)

Accordingly, the burden of proving fair dealing remains with the defendants.

The preliminary issues having been decided, the Court turns next to the substantive fair dealing questions.

### B Fair Dealing Analyzed

A fair dealing analysis requires the Court to address "issues of when the transaction was timed, how it was initiated, structured, negotiated, and disclosed to the board, and how director and shareholder approval was obtained " [FN137]

> FN137. *Rosenblatt v. Getty Oil Co*, 493 A 2d 929, 937 (Del 1985).

#### 1. Timing, Initiation and Structure

Our courts have recognized that a freeze-out merger

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

of the minority proposed by the majority stockholder is inherently coercive. [FN138] Where, as here, the freeze-out merger is initiated by the majority stockholder, that fact, even though not dispositive, is evidence of unfair dealing

> FN138 *See In re Pure Resources, Inc. S'holders Litig., supra,* 808 A.2d at 436; *Kahn v. Lynch Communication Systems, Inc., supra,* 638 A.2d at 1116.

Another circumstance that evidences the absence of fair dealing is where the transaction is timed in a manner that is financially disadvantageous to the stockholders and that enables the majority stockholder to gain correspondingly. [FN139] This case is the diametric opposite of *Jedwab v. MGM Grand Hotels, Inc.,* where this Court found that the timing of a merger was not unfair because there was no "persuasive indication ... that from the minority's point of view this [was] a particularly poor time to liquidate their investment." [FN140] Here, the evidence of unfair timing could not be more persuasive. Prosser's initial proposal was to merge Innovative into a wholly owned subsidiary of ECM. That would have benefited ECM stockholders and enabled them to remain as investors in a larger merged company. Because ECM's stock price was depressed, Prosser abandoned that proposal at the eleventh hour and "flipped" the deal for his sole personal benefit to take advantage of the temporarily and artificially depressed stock price. That stock price then became the "floor" for the equally depressed and unfair Privatization price, and benefited Prosser to the same extent that it disadvantaged the minority stockholders who were now being squeezed out of the enterprise.

> FN139. 509 A.2d 584 (Del.Ch.1986)

> FN140 *Id.* at 598.

In addition to, and apart from the unfairness of its initiation and timing, the transaction was also unfairly structured, in that Prudential and Cahill, the firms that had been retained as advisors to ECM in the initially Proposed (but later abandoned) Merger,

were co-opted by Prosser to serve as his advisors. That switch was unfair to ECM, because during ECM's entire existence, Prudential and Cahill had been its advisers and they possessed material nonpublic information about ECM's values, business and prospects. As such, Prudential and Cahill were in the best position to represent the interests of the ECM minority. Those same advisers were now switching sides to represent interests that were adverse to that same minority.

**\*33** At a minimum, ECM's board (including Prosser) or the Special Committee should have insisted that Prudential and Cahill remain as advisors to ECM, and that Prosser retain other financial and legal advisors. Failing that, the board-or at the very least the Special Committee-should have insisted that Prudential and Cahill recuse themselves from the negotiations. By doing neither, ECM was deprived of the advantage of knowledgeable advisors. That advantage was conferred upon ECM's controlling stockholder and to-be-adversary in the transaction-Prosser. There is no evidence that either the full board or the Special Committee ever considered that issue.

### 2 The Adequacy of the Minority Shareholders' Representation

#### (a) The Independence Of The Board And Of The Special Committee

A critical aspect of any fair dealing analysis is the adequacy of the representation of the minority stockholders' interests. In this case, that issue is particularly critical, because a majority of the ECM board members were not independent of Prosser, making it necessary to appoint a Special Committee to negotiate on the minority stockholders' behalf. Unfortunately, a majority of the Special Committee members also lacked independence, and the one Committee member who arguably was independent did not function effectively as a champion of the minority's interests

Besides Prosser, the ECM board had six members, all of whom Prosser had directly appointed: Raynor,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Ramphal, Muoio, Goodwin, Vondras, and Todman. It is undisputed that Prosser, whose wholly-owned entity was the acquirer of ECM's minority interest, was conflicted. But, most of the remaining directors also had disabling conflicts because they were economically beholden to Prosser. Directors who " through personal or other relationships are beholden to the controlling person[ ]" lack independence from that person. [FN141]

> FN141. *Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984); *see Beam v. Stewart,* --- A.2d ----, No. 501, 2003, Slip Op. at 12 (Del.Mar. 31, 2004).

Raynor, who was Prosser's long time lawyer, was clearly conflicted. In 1996, 1997, and 1998, virtually one hundred percent of the legal fees that Raynor generated for his law firm were attributable to work he performed for Prosser and Prosser-owned entities. Before 1996, the percentage of total fees represented by work Raynor performed for Prosser was always greater than fifty percent. From 1987 through 1998, ATNI and its affiliates, and thereafter ECM and its affiliates, were the largest single client of Raynor's firm. [FN142] In 1998, the year of the Privatization, Raynor became " of counsel" at his firm and was put on a retainer arrangement wherein ATNCo paid compensation of $25,000 per month to Raynor, and $5,000 per month to his firm, to cover Raynor's office rental cost. That amount represented all of Raynor's compensation for 1998. [FN143] Raynor also served as a Prosser nominee to the ATNI board, and as a director of Innovative, ECM, ATNCo and Vitelco. [FN144] As a highly paid consultant to, and later full-time employee of, Prosser and his companies, Raynor was clearly beholden to Prosser and, thus, not independent. [FN145]

> FN142. Raynor Dep (June 12, 2001) at 25-28. In 1997, Raynor's law firm, Raynor, Rensch & Pfeiffer, was paid $479,000 for legal services provided to ECM and its predecessor. JX155 at SC4176. In 1996, the firm was paid $533,000 for its legal services. JX254 at G893.

> FN143. *Id.* at 30-32.

> FN144. *Id.* at 21, 29.

> FN145. *See In re Maxxam, Inc.,* 659 A.2d 760, 773-74 (Del.Ch.1995).

**\*34** If further evidence of non-independence were needed, in July 1998-during ECM's consideration of the Privatization proposal-Prosser agreed to pay Raynor $2.4 million over a five year period as compensation for his past services. There was no negotiation over that fee-Raynor requested $2.4 million and Prosser agreed to it. Nor was the $2.4 million compensation arrangement ever disclosed to the ECM board, Compensation Committee or the Special Committee, yet Raynor voted as an ECM director to approve the Privatization. [FN146] That disclosure omission was highly material. Goodwin testified that the $2.4 million payment arrangement should have been disclosed to the board. [FN147] For Raynor to have participated in the board's Privatization deliberations and vote as an ECM director without disclosing this contemporaneously negotiated compensation arrangement, was misleading to Raynor's fellow directors and a breach of his fiduciary duty owed to them and to ECM.

> FN146. JX 159; Raynor Dep. at 38-39, 61; Trial Tr. Vol. 10 (Prosser) 1834-36; Vol. 5 (Goodwin) 966; Vol. 7 (Vondras) 1732; Vol. 7 (Ramphal) 1444-45

> FN147. Trial Tr. Vol 5 (Goodwin) 966-67.

Ramphal was similarly beholden to Prosser. Ramphal was originally introduced to Prosser by his son-in-law, Sir Ronald Sanders, who had a consulting arrangement with Prosser at that time. Like Sanders, Ramphal also fell into a lucrative consultancy with Prosser. In 1993 and 1994, Ramphal was paid consulting fees of $140,000 in both years, and in 1995 he was paid $120,000. On average, those amounts represented 22.5% of Ramphal's total income for that period. [FN148] Those amounts were in addition to the $30,000 directors' fee that Ramphal received annually.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 39

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN149 Moreover, in 1998, Ramphal received
$115,000 for his service on the ECM Board and
special committees. [FN150]

> FN148. Trial Tr. Vol. 7 (Ramphal)
> 1386-87; Ramphal Dep. 33-34.
>
> FN149. Ramphal Dep. at 34.
>
> FN150. Trial Tr. Vol. 7 (Ramphal) 1390.

Given these undisputed facts, the defendants have
not shown that Ramphal was independent of, *i.e.*,
not beholden to, Prosser, and the Court
affirmatively finds that he was not. [FN151] That
finding is strengthened by the fact that the
consulting arrangement of Ramphal's son-in-law,
Sanders, with Prosser would be put at risk if
Ramphal, as a Special Committee member, took a
position overly adversarial to Prosser. [FN152]
Finally, both Sanders and Ramphal were appointed
as directors of Innovative after the Privatization had
been completed. [FN153]

> FN151. *See Kahn v. Tremont Corp.*, 694
> A.2d 422, 430 (Del.1997) (purportedly "
> independent" director found beholden to
> majority stockholder where, three years
> previously, company had retained his
> consulting services for $10,000 per month
> and more than $325,000 in bonuses); *Kahn
> v. Dairy Mart Convenience Stores, Inc.*,
> No. 12489, 1996 WL 159628, at *6 (Del.
> Ch. Mar. 29, 1996) (holding that consulting
> agreement may render independent
> director too beholden to management to
> remain independent)
>
> FN152. *See Harbor Fin. Partners v.
> Huizenga*, 751 A.2d 879, 889
> (Del.Ch.1999) (a director has a disabling
> conflict where the director's decision could
> advance economic or career opportunities
> of a family member).
>
> FN153. Trial Tr. Vol. 7 (Ramphal) 1422;
> Ramphal Dep. 17, 35-36, 58.

Muoio was also a consultant to a Prosser entity and
beholden to Prosser. As of mid-1997, Muoio was on
an annual $200,000 retainer for providing
banking/financial advisory services, [FN154] and he
viewed Prosser as a source of additional future
lucrative consulting fees. In March 1998, Muoio
sought up to an additional $2 million for serving as
financial adviser on a potential acquisition by ECM
of CoreComm Inc. That effort was unsuccessful
only because the acquisition ultimately never took
place. [FN155]

> FN154. JX 144 at EC22472.
>
> FN155. Muoio Dep. at 16-17.

Lastly, Goodwin, Vondras and Todman received
annual directors' fees of $100,000, a generous
amount given that ECM's board met only three or
four times in 1998. [FN156] Goodwin and Vondras
each also received $50,000 and $15,000 for their
service on the Special Committee. [FN157] The
$115,000 Vondras received in 1998 for serving on
ECM's board and Special Committee represented
approximately 10% of his income for that year. [FN158]

> FN156. Trial Tr. Vol. 7 (Ramphal) at
> 1390; Muoio Dep. 18.
>
> FN157. JX 140 at EC5950.
>
> FN158. Trial Tr. Vol. 7 (Vondras)
> 1288-89, 1376.

**\*35** Although the directors' fees received by
Goodwin, Vondras and Todman would not, without
more, necessarily constitute a disabling financial
interest, [FN159] the record shows that all three of
these directors-indeed, all the board
defendants-expected to continue as directors of
Prosser entities and benefit from the substantial
compensation which accompanied that status. In
fact, all of ECM's directors except Muoio were
appointed to the Innovative board after the
Privatization. That expectation, coupled with the
fact that his director and committee fees represented

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 40

a sizeable portion of his income, was sufficient to vitiate Vondras' independence for purposes of considering objectively whether the Privatization was fair to the minority stockholders.

> FN159. *Grobow v. Perot*, 526 A.2d 914, 923, n. 12 (Del.Ch.1987), *aff'd*, 539 A.2d 180 (Del.1988).

The director defendants claim that they did not know they would be invited to join the Innovative board after the Privatization closed in October 1998. The evidence shows otherwise. During the negotiations over the Privatization, the ECM directors were told that they would continue on with the company "in its new incarnation." FN160 The Merger Agreement generated by the board's counsel in connection with the Privatization disclosed that the board defendants would remain directors of the surviving corporation. The Special Committee, through its counsel, received drafts of that Merger Agreement as early as July 17, 1998, before they voted to approve the transaction. FN161

> FN160. Goodwin Dep. Oct. 19, 2001 at 5.

> FN161. JX155 at SC4236; SC4111.

In summary, the Court finds that a majority of the full board of ECM (Prosser, Raynor, Ramphal, Vondras, and Muoio) were beholden to Prosser and, thus, were not independent of him. The Court further finds that a majority of the Special Committee (Ramphal and Vondras) were beholden to, and therefore not independent of, Prosser, leaving Goodwin as the only arguably independent Committee member and Todman as the only arguably independent non-Committee director. As previously found, Goodwin, as Committee chair, did almost all of the Committee's work himself. Unfortunately, the work that Goodwin performed in that role, including his negotiations with Prosser, were fatally compromised and, consequently, inadequate to represent the interests of ECM's minority shareholders effectively. FN162

FN162. As former Justice (then Vice Chancellor) Hartnett appropriately observed in *Lewis v. Fuqua*, 502 A.2d 962, 967 (Del.Ch.1985), in addressing the independence of a special litigation committee appointed to review a derivative action, "[i]f a single member committee is to be used, the member should, like Caesar's wife, be above reproach." Here, as in *Fuqua*, Goodwin's "past and present associations raise a question of fact as to his independence" (502 A.2d at 967), which, given the burden of proof, would ordinarily be resolved against Goodwin's independence. The Court assumes, without deciding, however, that Goodwin was independent, but nonetheless concludes on other grounds that the Special Committee was not an effective representative of the minority stockholders' interests.

#### (b) *The Committee's Ineffectiveness As The Minority's Representative*

There are several reasons why Mr. Goodwin's efforts as the Special Committee's chairman, and as its sole functioning member, were doomed to failure.

The first is that Prosser withheld the June projections, and knowledge of their existence, from the Committee and its advisors, Houlihan and Paul Hastings. As a consequence, Goodwin and Houlihan were deprived of information that was essential to an informed assessment of the fair value of ECM and of the gross inadequacy of merger price Prosser was offering. Thus disabled, Goodwin was not in a position to negotiate vigorously for a substantial increase in Prosser's opening offer ($9.125 per share) or, alternatively, to make a considered judgment to shut down the negotiations, thereby preventing the Privatization from going forward at all. That nondisclosure, without more, was enough to render the Special Committee ineffective as a bargaining agent for the minority stockholders.

**\*36** Second, Prosser misled Goodwin by falsely representing that $10.25 per share was already straining the limits of the financing available to him.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 41

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

In fact, Prosser's financing would have enabled him to increase his offer to $11.40 per share, and the record evidence indicates that the RTFC was willing to lend him more, based on its implied valuation of ECM as conservatively worth about $28 per share. [FN163] There is no evidence that Goodwin knew of Prosser's financing arrangements or the RTFC's valuation (for merger financing purposes) of ECM.

> FN163. *See* Reed Dep. Mar. 16, 2000 at 162-53, 171; Prosser Dep. June 7, 2000 at 93-96; JX 167 at RTFC 698, 720. That is not to suggest that the level at which the deal could be financed is a measure of ECM's fair value. Any such suggestion would be contrary to Delaware law and to the fair value determinations in this case. *See Smith v. Van Gorkom*, 488 A.2d 858, 890-891 (Del.1985) (holding that price at which a leveraged buy-out of a corporation was financially feasible was not determinative of the corporation's fair value). The import of this nondisclosure is that it evidences Prosser's intent to deprive the Special Committee of any real utility as a bargaining agent for the ECM minority.

Third, and finally, Goodwin was careless, if not reckless, by routing all of his communications with the other Special Committee members through Eling Joseph, Prosser's secretary. The result was to give Prosser access to the Committee's confidential deliberations and strategy. That inexplicable method of channeling communications to Goodwin's fellow Committee members further confirms the severe information imbalance that existed between the two "bargaining" sides. In fact, there was no effective bargaining, because Prosser held all the cards and misled Goodwin into believing that he (Goodwin) and the Committee's financial advisor (Houlihan), possessed all the information that was material to negotiating a fair price. Nothing could have been further from the truth.

3. *The Adequacy of the Board And Shareholder*

*Approvals*

The fourth and final aspect of fair dealing concerns the adequacy of the board and shareholder approvals of the challenged transaction. In this case, those approvals were uninformed and, accordingly, of no legal consequence.

It is undisputed that the Privatization was approved by a unanimous vote of all ECM directors, with Prosser abstaining, at a board of directors' meeting held on August 17, 1998. [FN164] The board's approval was not informed, however, because the voting board members were ignorant of the existence of the June Projections and of the inadequacy of the Houlihan valuation that was based upon the March projections.

> FN164. JX 33.

Moreover, Raynor, who was conflicted, voted in favor of the Privatization but did not disclose to the other voting board members, the $2.4 million compensation payout arrangement that he had recently negotiated with Prosser. As previously found, that nondisclosure was material.

By not disclosing these facts, Prosser and Raynor violated the fiduciary duty of disclosure they owed to their fellow directors of ECM. [FN165]

> FN165. *Weinberger v. UOP, Inc.*, supra, 457 A.2d 701.

The approval of the transaction by a majority of the minority shareholders was also legally ineffective, because the misdisclosures and omissions in the disclosure documents sent to shareholders in connection with the Privatization rendered that vote uninformed. Those misdisclosures and omissions also violated the fiduciary duty of disclosure owed by ECM's majority stockholder and by the ECM directors who were responsible for the accuracy of those documents. [FN166] The plaintiffs claim several disclosure violations, but the Court need address only three of them.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 42

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
(Cite as: Not Reported in A.2d)

> FN166. *Id.*; *see also Lynch v. Vickers Energy Corp.*, 383 A.2d 278 (Del.1977)

**\*37** First, the Proxy Statement omitted to disclose to the minority shareholders the existence of the June projections and the fact that those projections had been furnished to Prudential and the RTFC, but were withheld from the Special Committee and its advisors. That omission was materially misleading, not only in its own right but also because the proxy statement contained affirmative representations that the public was being provided with the same projections to which Prosser was privy. The section of the proxy statement containing the March projections (identified there only as "Company projections") disclosed that "[a]lthough the company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr. Prosser and the parent [ICC, LLC], the purchaser [ICC] is making these projections available to all stockholders." [FN167] Those misdisclosures were highly material because knowledge of the June projections would have enabled the shareholders to understand ECM's intrinsic worth and the extent of the market's undervaluation of their company.

> FN167. JX 155 at SC4128.

**Second,** the disclosure documents misled minority stockholders about the Special Committee's and the board's independence from Prosser. The Schedule 14D-9, which was disseminated in connection with the first-step tender offer, disclosed the members of the Special Committee and their compensation, but not their consulting relationships or retainer agreements with other Prosser entities. [FN168] Specifically, there was no disclosure of Raynor's or Ramphal's long-standing financial relationships with Prosser, including Raynor's $2.4 million payout arrangement for past services and Ramphal's significant consulting arrangements or his conflict concerning the economic and career prospects of his son-in-law. Nor was there disclosure of Muoio's consulting fee arrangement that had resulted in payments to him of hundreds of thousands of dollars. Also, because of their role as negotiators on behalf of the minority stockholders, the prior

consulting relationships of Ramphal should have been disclosed. [FN169] The disclosure documents misleadingly suggested that the Special Committee, and perhaps a majority of the entire board, were independent. In fact, that was not true.

> FN168. JX 251 at SC 4288-89; *see also* JX155 at SC4108-09

> FN169. *See Clements v. Rogers*, 790 A.2d 1222, 1242-43 (Del.Ch.2001).

**Third,** that disclosure violation was compounded by the false disclosure that a majority of the board that approved the Privatization were members of the Special Committee. [FN170] In fact, only six of the board's seven members voted to approve the transaction, [FN171] and only three of those six were members of the Special Committee. Three is not a majority of seven. Also not disclosed was the related fact that ECM's and the Committee's original advisors who had been retained to represent the interests of all shareholders in the initially Proposed (but later abandoned) Merger, had been co-opted by Prosser and were now working against the minority stockholders whose interests that they were originally hired to further.

> FN170. JX251 at SC4295.

> FN171. JX33.

**\*38** In short, the disclosure documents were crafted to reassure the minority stockholders that their interests had been effectively represented by a Special Committee of directors who were independent of Prosser and his entities on the other side of the transaction. That impression was materially false and misleading and was sufficient, without more, to render the approving vote of the stockholders uninformed. [FN172]

> FN172. *See Clements v. Rogers*, 790 A.2d 1222, 1242-43 (Del.Ch.2001) (accuracy of disclosures concerning the independence and effectiveness of a special negotiating

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

committee are of particular importance were the transaction is with a controlling stockholder).

For all these reasons, the Court finds that the Privatization transaction, and the $10.25 per share merger price that has been adjudicated as unfair, were the product of unfair dealing. Accordingly, the Court concludes that the Privatization was not entirely fair to the minority stockholders of ECM. Having so found, the Court must now assess the liability consequences of that determination.

## V. THE DEFENDANTS' FIDUCIARY DUTY BREACHES AND LIABILITY THEREFOR

Having concluded that the Privatization was not entirely fair, the Court must next determine the nature of the fiduciary duty violation-whether of care, loyalty, or good faith-that resulted in the unfair transaction. [FN173] Under *Emerald Partners v. Berlin,* [FN174] that is necessary to enable the Court to adjudicate which (if any) of the director defendants is liable for money damages, because ECM's § 102(b)(7) charter provision exculpates those directors found to have violated *solely* their duty of care from liability for money damages. Article Seventh of ECM's Certificate of Incorporation provides:

FN173. That determination is required only for purposes of the fiduciary duty class action, not the appraisal. As the Court has found, the defendant that is solely liable in the appraisal proceeding is the surviving corporation in the merger, *i.e.,* Innovative. That entity is liable to Greenlight for $38.05, plus interest, for each ECM share for which appraisal was sought.

FN174. 787 A.2d 85 (Del.2001)

A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of

fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. [FN175]

FN175. Pretrial Stipulation and Order, ¶ 164, at p.20.

By its terms, Article Seventh does not apply to fiduciaries other than directors. Thus, Article Seventh does not apply to Prosser in his capacity as ECM's controlling stockholder, or to ICC or Innovative, the entities that Prosser controlled and through which he effected the Privatization. Prosser, as majority stockholder, breached his duty of loyalty to Greenlight and the plaintiff shareholder class, by eliminating ECM's minority stockholders for an unfair price in an unfair transaction that afforded the minority no procedural protections. For that breach of duty Prosser is liable to Greenlight and the shareholder class. So also are the two Prosser-controlled entity defendants, Innovative and ICC, which were the mechanisms through which Prosser accomplished the Privatization. Those entities are liable for having aided and abetted Prosser's breach of fiduciary duty. [FN176]

FN176. *Weinberger v. Rio Grande Industries, Inc.,* 519 A.2d 116 (Del.Ch.1986); *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984). One of the requirements for "aiding and abetting" liability is the third party's "knowing participation" in the directors' breach of fiduciary duty. In that case, Prosser's knowledge must be attributed to the entities that he controlled and used to effectuate his breaches of duty.

The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 44

for each director.

*39 Prosser is liable in his capacity as a director for breach of his duty of loyalty, conduct that is not exculpated under Article Seventh. Prosser is also liable on the basis that he "derived an improper personal benefit" from the Privatization transaction-which is another exception to the exculpatory coverage of Article Seventh.

Raynor also is liable for breaching his fiduciary duty of loyalty-conduct that is excluded from the exculpatory shield of Article Seventh. Raynor did not personally and directly benefit from the unfair transaction (as did Prosser), but Raynor actively assisted Prosser in carrying out the Privatization, and he acted to further Prosser's interests in that transaction, which were antithetical to the interests of ECM's minority stockholders.

Raynor acted in concert with Prosser, who was the source of Raynor's livelihood, to "flip" the transaction from a merger of Innovative into ATNCo, to a going private merger of ECM into Innovative [FN177] Raynor also assisted Prosser and Innovative in obtaining RTFC financing for the Privatization [FN178] at the time when Raynor was still serving on the First Special Committee, ostensibly to safeguard the interests of ECM's minority stockholders . [FN179] After the Second Special Committee was formed, Raynor attended a meeting with Prosser and two ECM officers and the RTFC to discuss issues relating to the structuring of the revised deal. [FN180] Finally, on July 20, 1998, Opus Capital Partners ("Opus") sent a letter to Goodwin, complaining that the initial $9 125 price was too low and should be around $30. [FN181] This letter was somehow "leaked" to Cahill, Prudential, and Raynor, [FN182] and Raynor reported the contents of the Opus letter to the RTFC, editorializing that "Opus-biggest [shareholder with] dissenting opinion on buy back bought in @$6 or $7/share [but] believes should be valued @ $30 per share." [FN183]

FN177. JX155 at SC4110; Raynor Dep 171-173

FN178. JX184 at RTFC1474

FN179. Trial Tr. Vol. 10 (Prosser) at 1796-97.

FN180. JX 187 at RTFC5145-46.

FN181 JX 32

FN182. JX 280; JX 106; JX 186 at RTFC5135

FN183. JX 186 at RTFC5135; Reed Dep. 153.

Although Raynor did not benefit directly from the transactions, his loyalties ran solely to Prosser because Raynor's economic interests were tied solely to Prosser and he acted to further those economic interests. Accordingly, Raynor is liable to Greenlight and the shareholder class for breaching his fiduciary duty of loyalty and/or good faith. [FN184]

FN184. The Court employs the "and/or" phraseology because the Delaware Supreme Court has yet to articulate the precise differentiation between the duties of loyalty and of good faith. If a loyalty breach requires that the fiduciary have a self-dealing conflict of interest in the transaction itself, as at least one commentator has suggested, then only Prosser is liable on that basis. Raynor would be liable for violating his duty of good faith for consciously disregarding his duty to the minority stockholders. *See* Hillary A. Sale, *Delaware's Good Faith,* 89 Cornell L.Rev. 456 (2004). On the other hand, if a loyalty breach does not require a self-dealing conflict of interest or receipt of an improper benefit, then Raynor would be liable for breaching his duties of loyalty *and* good faith. *See Strassburger v. Earley,* 752 A.2d 557 (Del.Ch.2000) (director whose conduct in a transaction evidences loyalty solely to employer whose interests were adverse to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

corporation held to have violated his duty of loyalty). The Court need not decide that definitional issue, because under either definition, Raynor's conduct amounted to a non-exculpated breach of fiduciary duty.

The Court also concludes, albeit with reluctance, that Muoio is similarly liable, even though Muoio's conduct was less egregious than that of Prosser and Raynor. Unlike Raynor, Muoio did nothing affirmatively to assist Prosser in breaching his fiduciary duties of loyalty and good faith. Like his fellow directors, Muoio was also not independent of Prosser.

Muoio is culpable because he voted to approve the transaction even though he knew, or at the very least had strong reasons to believe, that the $10.25 per share merger price was unfair. Muoio was in a unique position to know that. He was a principal and general partner of an investment advising firm, with significant experience in finance and the telecommunications sector. From 1995 to 1996, Muoio had been a securities analyst for, and a vice president of, Lazard Freres & Co. in the telecommunications and media sector. From 1985 to 1995, he was a securities analyst for Gabelli & Co., Inc., in the communications sector, and from 1993 to 1995, he was a portfolio manager for Gabelli Global Communications Fund, Inc. [FN185]

> FN185. Pretrial Stip. and Order, ¶ 's 40-42.

**\*40** Hence, Muoio possessed a specialized financial expertise, and an ability to understand ECM's intrinsic value, that was unique to the ECM board members (other than, perhaps, Prosser). Informed by his specialized expertise and knowledge, Muoio conceded that the $10.25 price was "at the low end of any kind of fair value you would put," [FN186] and expressed to Goodwin his view that the Special Committee might be able to get up to $20 per share from Prosser. [FN187] In these circumstances, it was incumbent upon Muoio, as a fiduciary, to advocate that the board reject the $10.25 price that the Special Committee was recommending. As a fiduciary knowledgeable of ECM's intrinsic value,

Muoio should also have gone on record as voting against the proposed transaction at the $10.25 per share merger price. Muoio did neither. Instead he joined the other directors in voting, without objection, to approve the transaction.

> FN186. Muoio Dep. at 175.

> FN187. Goodwin Dep. Sept. 6, 2001 at 47.

ECM's directors other than Prosser and Raynor could plausibly argue that they voted for the transaction in reliance on Houlihan's opinion that the merger term price was fair. In Muoio's case, however, that argument would be implausible. Muoio's expertise in this industry was equivalent, if not superior, to that of Houlihan, the Special Committee's financial advisor. That expertise gave Muoio far less reason to defer to Houlihan's valuation. Knowing (or at least having very strong reasons to suspect) that the price was unfair, why, then, would Muoio vote to approve this deal? The only explanation that makes sense is that Muoio, who was seeking future business opportunities from Prosser, decided that it would disserve his interests to oppose Prosser and become the minority's advocate.

Admittedly, divining the operations of a person's mind is an inherently elusive endeavor. Concededly, the possibility exists that Muoio's decision was driven not by his overriding loyalty to Prosser, but by a sincere belief that the $10.25 price was minimally fair, even if not the fairest or highest price attainable. But in this case that possibility is not sufficient to carry the day, because to establish a director's exculpation from liability under 8 *Del. C.* § 102(b)(7), the burden falls upon the director to show that "[his] failure to withstand an entire fairness analysis is *exclusively* attributable to a violation of the duty of care." [FN188] Muoio has not carried that burden.

> FN188. *Emerald Partners v. Berlin,* 787 A.2d at 98 (italics added).

The credible evidence persuades the Court that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Muoio's conduct is explainable in terms of only one of two possible mindsets. The first is that Muoio made a deliberate judgment that to further his personal business interests, it was of paramount importance for him to exhibit his primary loyalty to Prosser. The second was that Muoio, for whatever reason, "consciously and intentionally disregarded" his responsibility to safeguard the minority stockholders from the risk, of which he had unique knowledge, that the transaction was unfair. [FN189] If motivated by either of those mindsets, Muoio's conduct would have amounted to a violation of his duty of loyalty and/or good faith. [FN190] Because Muoio has not established to the satisfaction of the Court, after careful scrutiny of the record, that his motivation was of a benign character, he is not exculpated from liability to Greenlight and the shareholder class.

> FN189. *See In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del.Ch.2003).

> FN190. *See* note 184, *supra.*

**\*41** That leaves the four remaining directors-Goodwin, Ramphal, Todman, and Vondras-whose conduct, while also highly troublesome, is far more problematic from a liability standpoint than that of Prosser, Raynor, and Muoio. Like Raynor and Muoio, those directors (except possibly Goodwin) were not independent of Prosser, they all voted for the Privatization, and none had a personal conflicting financial interest in, or derived a personal benefit from, that transaction to the exclusion of the minority stockholders.

The conduct of these four directors differs from that of Raynor and Muoio, in that there is no evidence that any of those four affirmatively colluded with Prosser to effectuate the Privatization, or that they otherwise deliberately engaged in conduct disloyal to the minority stockholders' interests. Nor have the plaintiffs shown that any of those directors knew or had reason to believe, that the merger price was unfair.

This is not intended to suggest that these directors

covered themselves in glory, or merit commendation, for the manner in which they discharged their responsibility as fiduciaries. But it is to say, and this Court after considerable reflection finds, that there is no persuasive evidence that the fiduciary violations of the ECM directors other than Prosser, Raynor, and Muoio implicated conduct more egregious than breaches of their duty of care.

A logical starting point in the analysis is first to consider the conduct of the members of the Second Special Committee: Goodwin, Ramphal and Vondras. Because Ramphal was located in London and Vondras in Indonesia, they never met in person with each other or with Goodwin, who became the Committee's sole working member. Put differently, all Committee initiatives and decisions were made initially by Goodwin, subject to concurrence by Ramphal and Vondras, who on all relevant issues willingly deferred to Goodwin and relied upon his recommendations, both as to the Committee's process and the transaction price.

Although Goodwin negotiated a merger price ($10.25 per share) that this Court has found to be unfair, there is no persuasive evidence that Goodwin knew or should have known that this was the case. Primarily, that is because critical information was withheld from Goodwin, from the other Committee members, from and their financial advisor, Houlihan. Based upon information that in material respects was incomplete, Houlihan opined that the negotiated price was fair, and there is no evidence that Goodwin, who had negotiated the price with Prosser, had reason to believe otherwise.

This is not to say that Goodwin carried out this process with the care that would be expected of someone of his distinguished background and accomplishments. No justification has been shown for Goodwin communicating with the other Committee members through Ms. Joseph, the secretary of the minority stockholders' negotiating adversary, Prosser. That misstep constituted a violation of Goodwin's duty of care and resulted in critical information being leaked to the other side. But, that fiduciary breach was of no actionable consequence, because Goodwin had all along been deprived of material information that both he and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Houlihan needed to negotiate a fair price. Consequently, even if Goodwin had maintained adequate security arrangements, there is no basis to conclude that the result would have been any different.

**\*42** The plaintiffs insist, however, that Goodwin's fiduciary violations were of a character far more egregious than duty of care violations. Plaintiffs urge that: (1) Goodwin (as well as Ramphal and Vondras) were financially not independent of Prosser and were motivated to do whatever was needed to remain in Prosser's good graces, (2) Goodwin willingly acceded to retaining the Special Committee's legal and financial advisors from among candidates that had been selected by Prosser or his advisors, (3) Goodwin's "negotiations" with Prosser were nothing more than a scripted minuet wherein Goodwin, on behalf of the Committee, would bargain for a negligible price increase, (4) that bargaining, coupled with the gilt-edged credentials of all three Committee members, would create a credible record of "arm's length" negotiations sufficient to survive entire fairness review. Goodwin's decision to route his communications through Ms. Joseph was, plaintiffs argue, further dramatic evidence that his true loyalties were to serve Prosser and his interests. This conduct, plaintiffs insist, violated Prosser's (and Ramphal's and Vondras's) fiduciary duties of loyalty and/or good faith-conduct that is not exculpated under Article Seventh.

It is correct (and this Court has found) that with the possible exception of Goodwin, none of the Committee members was independent of Prosser, that viewed with perfect hindsight the magnitude of the negotiated price increase was negligible, and that Goodwin permitted his communications with Ramphal and Vondras to be routed through Prosser's secretary. In quite different circumstances that might establish a violation of the duties of good faith and/or loyalty, especially since the burden of establishing exculpation falls upon the directors seeking exculpation. But here that procedural burden does not help the plaintiffs, because the evidence, viewed as a whole, fails to establish a *prima facie* case of bad faith or disloyalty that these directors would be called upon to negate or

disprove.

More specifically, although Goodwin, Ramphal and Vondras, because of their relationship to Prosser, might have been motivated to aid Prosser in his scheme to force out ECM's minority at an unfair price, there is no evidence that they actually engaged in such improperly motivated conduct, or otherwise acted with disloyal intent. To be sure, Goodwin's conduct may fairly be described as having violated his duty of care. And, given the non-independence of Ramphal and Vondras, their wholesale abdications to Goodwin of their responsibility as Committee members to take an active and direct role in the process, also bespeaks a failure to observe the requisite due care. [FN191] But negligent or even gross negligent conduct, however misguided, does not automatically equate to disloyalty or bad faith. There is no evidence that Goodwin, Ramphal and Vondras intentionally conspired with Prosser to engage in a process that would create the illusion, but avoid the reality, of arm's length bargaining to obscure the true purpose of benefiting Prosser at the expense of the minority stockholders.

> FN191. *See Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 368 (Del.1993) ("[W]e have stated that a director's duty of care requires a director to take an active and direct role in the context of a sale of a company from beginning to end.")

**\*43** Nor, in these circumstances, did those directors' conduct amount to a breach of their fiduciary duty to act in good faith. Although the Supreme Court has yet to define the precise conduct that would actionably violate that duty, this Court has recently held that directors can be found to have violated their duty of good faith if they *"consciously and intentionally disregard[ ] their responsibilities,* adopting a 'we don't care about the risks' attitude concerning a material corporate decision." [FN192] Here, there is no evidence that Goodwin, Ramphal, or Vondras acted with conscious and intentional disregard of their responsibilities, or made decisions with knowledge that they lacked material information. Because the conduct of those director

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 48

Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

defendants was, solely and at most; a violation of their duty of care, they are exculpated from liability under Article Seventh.

> FN192 *In re Walt Disney*, 825 A.2d at 289 (italics in original). Elaborating on that formulation, the Chancellor observed that directors actionably violate their duty of good faith if they *"knew that they were making material decisions without adequate information and without adequate deliberation, and ... they simply did not care if the decisions caused the corporations and its stockholders to suffer injury or loss." Id.*

The foregoing analysis and conclusion are equally applicable to the seventh director, Todman. The circumstance that differentiates Todman from Goodwin, Ramphal and Vondras is that Todman played no role in the negotiation of the merger terms, his sole involvement being to cast his vote as a director in favor of the Privatization. Because (unlike Muoio) there is no evidence that Todman knew or had reason to suspect that the price was unfair, it may fairly be concluded that he voted for the transaction in reliance upon the pronouncements by Houlihan and the Special Committee that the merger price was fair. Accordingly, it serves no purpose for the Court to determine whether or not Todman's conduct amounted to a breach of his duty of care, because in either case the record evidence compels the finding that Todman committed no violation of his duty of loyalty or his duty of good faith. Accordingly, Todman is not liable, either because he has not been shown culpable in any respect, or because at most his conduct would have amounted to a breach of his duty of care, for which Todman would be exculpated under Article Seventh.

## VI. CONCLUSION

For the reasons set forth above:

(1) In the appraisal action, Innovative, as the surviving corporation, is liable to Greenlight in the amount of $38.05 per share for each of the 750,300

shares that are subject to the appraisal, plus interest at the rate of 6.27%, compounded monthly, from the date of the merger to the date of the judgment.

(2) In the fiduciary duty action, defendants Innovative, ICC, Prosser, Raynor and Muoio are jointly and severally liable to the plaintiff class and to Greenlight (in its capacity as holder of litigation rights assigned by former ECM shareholders) in an amount equal to $27.80 per share. [FN193]

> FN193. $27.80 per share is equal to the difference between the fair value of ECM on the merger date ($38.05 per share) and the merger price paid to the ECM minority shareholders ($10.25 per share).

Counsel shall confer and submit an agreed form of Final Order and Judgment implementing the rulings made in this Opinion.

Del.Ch.,2004
In re Emerging Communications, Inc. Shareholders Litigation
Not Reported in A.2d, 2004 WL 1305745 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.