**4**

**Westlaw.**

Not Reported in A.2d                                                                                                  Page 1

Not Reported in A.2d, 2006 WL 391931 (Del.Ch.)

**(Cite as: 2006 WL 391931 (Del.Ch.))**

C
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
DAVID B. SHAEV PROFIT SHARING ACCOUNT, Plaintiff,
v.
C. Michael ARMSTRONG, Alain J.P. Belda, Kenneth J. Bailkin, George David, Kenneth T. Derr, John M. Deutch, Ann Dibble Jordan, Robert I. Lipp, Reuben Mark, Michael T. Masin, Dudley C. Mecum, Richard D. Parsons, Andrall E. Pearson, John S. Reed, Robert E. Rubin, Robert B. Shapiro, Franklin A. Thomas, Sanford I. Weill, and Arthur Zankel, Defendants,
and
CITIGROUP, INC., Nominal Defendant.
No. Civ.A. 1449-N.

Submitted Jan. 26, 2006.
Decided Feb. 13, 2006.

Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware; Robert I. Harwood, Samuel Rosen, Weschler Harwood LLP, New York, New York, for the Plaintiff.

Jesse A. Finkelstein, John D. Hendershot, Richards, Layton & Finger, Wilmington, Delaware; Mitchell A. Lowenthal, Carmine D. Bocuzzi, Tanisha L. Massie, Cleary, Gottlieb, Steen & Hamilton, LLP, New York, New York, for the Individual Defendants.

David L. Finger, Finger & Slanina, LLC, Wilmington, Delaware; Richard A. Rosen, Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, for the Nominal Defendant.

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

*1 The facts at issue in this case were first sued on two years ago in a case captioned *In re Citigroup Inc. Shareholders Litigation.* [FN1] In that case, the plaintiffs claimed, among other things, that certain directors of Citigroup either knew or should have known about allegedly fraudulent relationships between the nominal defendant Citigroup and its clients Enron and Worldcom and, therefore, breached their fiduciary duties in either approving or recklessly failing to discover those links. The court dismissed those claims because the complaint presented a set of "wholly conclusory" allegations devoid of the particularized facts needed to show that the company's board of directors was disqualified from considering a demand under Court of Chancery Rule 23.1. Indeed, all that complaint alleged was that Citigroup had suffered losses due to employee misconduct, and that the board, whether they knew about it or not, ought to be held liable. In dismissing the action, the court observed that the plaintiffs had failed to use the "tools at hand," including a Section 220 books and records demand, before filing suit.

> FN1. 2003 Del. Ch. LEXIS 61 (Del. Ch. June 5, 2003); *aff'd sub nom. Rabinowitz v. Shapiro,* 839 A.2d 666 (Del.2003) (TABLE).

Knowing that the *In re Citigroup* plaintiffs were admonished by the court for failing to take advantage of their Section 220 rights before bringing their claim, the new plaintiff in this case, David B. Shaev Profit Sharing Account, represented by the same lawyers, has appropriately investigated the Enron and WorldCom transactions through a "books and records" action. Evidently, Shaev has discovered that the individual director defendants had no contemporaneous knowledge of the alleged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2
Not Reported in A.2d, 2006 WL 391931 (Del.Ch.)
**(Cite as: 2006 WL 391931 (Del.Ch.))**

misconduct by Citigroup employees. Thus, the new derivative complaint is necessarily narrower than the earlier dismissed case, concentrating on the theory that the individual defendants violated their fiduciary duties in failing to detect and stop the improper transactions. Therefore, the plaintiff urges, demand is excused because a majority of the current board faces a substantial likelihood of liability.

After hearing argument on January 26, 2006, the court stated that it would grant the defendants' motion to dismiss. The rationale for the conclusion is summarized in this memorandum opinion. In short, the court agrees to dismiss the action because the new complaint alleges little more than the last complaint--and literally nothing to suggest that the defendants willfully or recklessly ignored information that would have led to the discovery of the misconduct at issue. Even drawing every reasonable inference in the plaintiff's favor, the most the complaint alleges is that some admittedly troubling things happened at Citigroup, that the directors had erected a full panoply of audit systems designed to detect such misconduct, that for some reason the system failed to work, and that damages to Citigroup ensued. Plainly, allegations of this kind do not state a claim for relief under Delaware law. In fact, such a liability regime would be antithetical to the policy of this state. When a board rationally makes a decision, its actions are protected by the business judgment rule. And when a board fails to act, under Delaware law, a claim will survive a motion to dismiss based on Rule 23.1 only if the plaintiff presents well-pleaded facts to suggest a reasonable inference that a majority of the directors consciously disregarded their duties over an extended period of time. The complaint in this case does not nearly satisfy that exacting standard.

I.

*2 Citigroup, a Delaware corporation, is the world's second largest financial services company by assets, employing 270,000 people in 102 countries. The plaintiff's allegations in this case, however, concern the company's relationships with two of its former clients, the ill fated Enron and WorldCom corporations. Specifically, this case concerns the board of directors' failure to discover certain relationships between Citigroup and those two entities, and thus to prevent the serious financial penalties that Citigroup experienced because of its involvement with what turned out to be fraudulent business practices. In that sense, therefore, the claims in this case do not implicate any specific action by the board of directors, or the approval of any action, but inaction and carelessness. In order to understand these claims the court must necessarily describe the alleged extent of Citigroup's involvement with Enron and WorldCom.

A. *The Enron Transactions*

The complaint alleges that Citigroup was deeply complicit in an illegal scheme by Enron to boost its profits and profit growth in the late 1990s. In summary, the plaintiff alleges that Citigroup helped structure or finance one or more of Enron's illicit special purpose entities (SPEs), thus allowing Enron to falsify its financial statements and misrepresent its financial condition by hiding billions of dollars in debt that should have been on Enron's balance sheet. Simultaneously, the complaint alleges that the defendants failed to become aware that Salomon Smith Barney Inc., a wholly owned subsidiary of Citigroup, was issuing extremely positive, false, and misleading analyst reports on Enron, extolling its business success, the strength of its financial condition, and its prospects for strong earnings and revenue growth. The complaint goes on to allege that in return for Citigroup's participation in Enron's various schemes, Citigroup was awarded huge underwriting and consulting fees, interest payments, and commitment fees. The plaintiff additionally alleges that top Citigroup executives were permitted to invest personal funds totaling approximately $15 million in the LJM2 partnership, an entity secretly controlled by Enron, and used to engage in illusory transactions to artificially inflate Enron's profits.

B. *The WorldCom Transactions*

The plaintiff's allegations regarding Citigroup's involvement with WorldCom implicate research ratings published by Salomon Smith Barney. From 1998 to 2001, Salomon Smith Barney officially

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 3
Not Reported in A.2d, 2006 WL 391931 (Del.Ch.)

**(Cite as: 2006 WL 391931 (Del.Ch.))**

published a five category stock rating system: Buy, Outperform, Neutral, Underperform, or Sell. In reality, the plaintiff alleges, Salomon Smith Barney analysts issued only the three most positive ratings. Indeed, from 1998 through 2000, according to the complaint, Salomon Smith Barney research analysts issued virtually no Sell or Underperform ratings among the more than 1,000 stocks they rated.

At all relevant times, Jack Grubman was Salomon Smith Barney's top telecom research analyst, and was allegedly an important factor in Salomon Smith Barney's success in telecom investment banking. The complaint states that Grubman followed Salomon Smith Barney's "de facto three-category rating system," assigning no Sell ratings, and only two Underperform ratings, in his entire tenure. As to WorldCom in particular, Grubman first awarded the company a Buy rating in June 2000, when the stock was trading at $46 a share. He maintained this same rating until April 2002, when the stock had declined to only $4 a share, and WorldCom was only three months from bankruptcy. The plaintiff alleges that Grubman's motivation to issue these inflated ratings was pecuniary gain. By issuing high ratings to Citigroup investment banking clients, the plaintiff argues, Salomon Smith Barney was able to help Citigroup attract investment banking business. Specifically, the plaintiff claims that between October 1997 and February 2002, including two years in which Grubman rated WorldCom a Buy, Salomon Smith Barney advised WorldCom on approximately 23 investment banking deals, collecting $107,078,477 in fees. Because Grubman's compensation was determined by his participation in investment banking activities, the complaint alleges that Grubman took advantage of his high ratings to earn an average of approximately $20 million in compensation in each year from 1998 to 2001.

C. *The Role Of Citigroup's Board*

*3 The complaint asserts that the Citigroup board of directors was entirely unaware of the frauds described above throughout the relevant period. With regard to Enron, the complaint states that "with the massive fraud that Citigroup management caused Citigroup to engage and participate in with Enron for a period of years, not one scrap of paper made its way to the Board for review." [FN2] Similarly, the plaintiff claims that "notwithstanding the pervasive culture of misrepresentation in analyst reports at SSB ... the Board received no material concerning this systematic wrongdoing that reached the highest levels of SSB, and received no material concerning Grubman's relationship with WorldCom." [FN3] This is crucial, the plaintiff alleges, because the board should have known when it acquired Salomon Smith Barney that the danger of such conflicts was high. "[W]ith Citigroup's acquisition of Salomon Smith Barney, Citigroup was to become a 'financial supermarket,' aggressively pursuing investment and commercial banking business. As a result, the [board] had an obligation to ... have in place a functioning monitoring system to enable them to ferret out SSB's egregious misconduct...." [FN4] When they failed to do so, the plaintiff alleges that the board became responsible for the frauds described above.

FN2. Compl. ¶ 70.

FN3. *Id.* at ¶ 98.

FN4. *Id.*

D. *The Consequences Of The Enron And WorldCom Frauds*

In part due to the above transactions, Citigroup has been forced to pay approximately $2.6 billion to settle litigation with investors in WorldCom, $2 billion to settle litigation with investors in Enron, and $135 million in fines to the Securities and Exchange Commission, New York State, and New York City. In addition, as a result of Enron's bankruptcy filing, Citigroup was forced to write off over $600 million in outstanding loans to Enron. In sum, therefore, the complaint alleges that the defendants' purported breaches of fiduciary duty cost Citigroup a total of some $5 billion.

II.

On the basis of the facts above, the plaintiff alleges that the individual defendants violated their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 4
Not Reported in A.2d, 2006 WL 391931 (Del.Ch.)
**(Cite as: 2006 WL 391931 (Del.Ch.))**

fiduciary duties to the Citigroup shareholders. Specifically, the complaint alleges that the board lacked procedures to become aware of the described conduct, in violation of their duties to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial affairs of Citigroup. No materials were created, presented, or disseminated to the board concerning the company's relationship with WorldCom, nor were materials disseminated concerning Citigroup's transactions with Enron prior to Enron's bankruptcy. Consequently, Shaev claims, the board received no material contemporaneously with the alleged misconduct that would have enabled Citigroup to avoid paying over $5 billion to settle litigation arising from these examples of misconduct. Further, the plaintiff alleges that demand is excused because a majority of the individual defendants were board members during the time of the alleged wrongful conduct, and because there is a substantial likelihood that the members of the board will be held liable for breaching their fiduciary duty of loyalty.

*4 The defendants respond by noting that no well-pleaded facts link the directors to any misconduct. Nor, in their view, did the defendants receive any information that should have alerted them to the well-pleaded employee misconduct within Citigroup. Therefore, the defendants argue that the complaint has failed to plead particularized facts sufficient to establish a breach of fiduciary duty for inaction, and that the plaintiff's claims must be dismissed for failure to satisfy the demand requirement set out by Delaware law and by Court of Chancery Rule 23.1.

III.
The general form of fiduciary duty claims is, by now, well known: shareholders usually bring suit against corporate directors for having approved or acquiesced in an action that the plaintiff alleges is a violation of the directors' fiduciary duties of loyalty and due care. Most notably in *In re Caremark Int'l Inc. Derivative Litigation,* [FN5] and then in other cases, however, this court has taken cognisance of allegations that the directors failed to act when they otherwise should have done so.

FN5. 698 A.2d 959 (Del. Ch.1996).

In order to bring a derivative claim in Delaware, the plaintiff must either make a pre-suit demand on the board itself, or plead that such demand would be futile. One threshold problem that *Caremark* claims raise is that the usual pleading standard for demand futility, for determining whether the plaintiff ought to be made to ask the board to pursue the suit itself, is semantically inapplicable. As the Supreme Court explained the traditional rule in *Aronson v. Lewis,* [FN6]

FN6. 473 A.2d 805 (Del.1984).

Our view is that in determining demand futility the Court of Chancery in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. [FN7]

FN7. *Id.* at 814.

But in a *Caremark* claim, there is no challenged transaction to test against the business judgment rule. Consequently, in *Rales v. Blasband,* [FN8] the Supreme Court set out a separate test for demand futility in this limited set of cases. In order to determine whether demand should be excused,

FN8. 634 A.2d 927 (Del.1993).

a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. [FN9]

FN9. *Id.* at 934.

This court has held in the past that the *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination. It allows, in other words,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 5
Not Reported in A.2d, 2006 WL 391931 (Del.Ch.)
**(Cite as: 2006 WL 391931 (Del.Ch.))**

a court to determine both whether a corporate board on which demand might be made is disinterested and independent, and whether a majority of directors face a substantial likelihood of personal liability, because doubt has been created as to whether their actions were products of a legitimate business judgment. [FN10]

> FN10. *Guttman v. Huang,* 823 A.2d 492, 501 (Del. Ch.2003).

*5 Satisfying the plaintiff's burden in a *Caremark* case is a difficult task. One option for the plaintiff is to plead that the directors on which demand would be made are not disinterested or independent. [FN11] Alternatively, a plaintiff can allege that a board violated its fiduciary duty by utterly failing to exercise oversight of the corporation, such as by failing to assure the existence of reasonable information and reporting systems. [FN12] Concretely, this latter allegation might take the form of facts that show the company entirely lacked an audit committee or other important supervisory structures, [FN13] or that a formally constituted audit committee failed to meet. And in a closely related type of claim, a *Caremark* plaintiff can plead that "the directors were conscious of the fact that they were not doing their jobs," [FN14] and that they ignored "red flags" indicating misconduct in defiance of their duties. [FN15] A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning. But the one thing that is emphatically not a *Caremark* claim is the bald allegation that directors bear liability where a concededly well-constituted oversight mechanism, having received no specific indications of misconduct, failed to discover fraud.

> FN11. In the context of board inaction, such facts might include allegations that a board of directors is dominated or controlled by key members of management, who the rest of the board unknowingly allowed to engage in self-dealing transactions. The plaintiff in this case, however, makes no allegation that any directors have material interests in the challenged transactions.

> FN12. *Caremark,* 698 A.2d at 971.

> FN13. *Guttman,* 823 A.2d at 507; other recent Delaware cases support this construction of the *Caremark* pleading requirements. *See e.g., Beam ex rel v. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 833 A.2d 961 (Del. Ch.2003), *aff'd,* 845 A.2d 1040 (Del.2004) (holding that because the duty to monitor refers to issues surrounding the corporation and its activities, a board of directors has no duty to monitor the personal affairs of its employees, including the personal affairs of the company's founder with whom it is closely associated; *Rattner v. Bidzos,* 2003 Del. Ch. LEXIS 103, *44-45 (Del. Ch. Sept. 30, 2003) (following *Guttman,* 823 A.2d at 507 in holding that a *Caremark* claim fails when it omits to allege particularized facts "regarding the Company's internal financial controls during the Relevant Period," or of "the Board's involvement in the preparation of financial statements and the release of information to the market."); *Seminaris v. Landa,* 662 A.2d 1350, 1354-55 (Del. Ch.1995) (dismissing a *Caremark* claim because the plaintiff pled insufficient facts to "demonstrate that [the defendants] were grossly negligent in failing to supervise [their] subordinates").

> FN14. *Guttman,* 823 A.2d at 506.

> FN15. *Id.* at 507.

The plaintiff's theory of liability in this case, as set forth in its papers and at oral argument, is simple. The plaintiff concedes that the defendants knew nothing about the challenged transactions, and had erected a full set of supervisory mechanisms to oversee the company. But in the plaintiff's view, only a board violating its fiduciary duties could

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 6
Not Reported in A.2d, 2006 WL 391931 (Del.Ch.)
**(Cite as: 2006 WL 391931 (Del.Ch.))**

possibly have remained ignorant of Citigroup's allegedly corrupt relationships with Enron and WorldCom. These transactions were, in the words of plaintiff's counsel, proverbial "elephants in the room," frauds of such "brobdingnagian" [FN16] enormity that only reckless indifference to fiduciary duty could explain the defendants' now conceded lack of knowledge. Therefore, the plaintiff claims, demand is futile under the test in *Rales*.

> FN16. Pl.'s Opposing Br. at 3. Brobdingnag was the land of the giants in Jonathan Swift's *Gulliver's Travels,* but has now simply come to mean "gigantic."

But these allegations are precisely the type of conclusory statements that do not constitute a *Caremark* claim. The plaintiff conceded at oral argument that Citigroup had a wide range of compliance systems in place, and that they had no reason to believe that these systems were not functioning in a basic sense. Further, the plaintiff simply does not allege that the board failed to ask questions about risks the company was undertaking or that the audit committee did not vigorously investigate the internal workings of Citigroup. So far as either the plaintiff or the court knows, the defendants did all those things, and still failed to detect the WorldCom and Enron frauds. Nor does the plaintiff allege any particularized facts suggesting that the board was presented with "red flags" alerting it to potential misconduct with regard to Enron and WorldCom. [FN17] In fact, the complaint includes no allegations that the board or audit committee or any other supervisory mechanism was ever presented with information pointing it towards the suspect relationships.

> FN17. *Guttman,* 823 A.2d v at 507. In its reply brief, Shaev emphasizes its allegation that a certain Citigroup employee noted a so-called "franchise risk" to the company rooted in its relationship with Enron. Pl.'s Opposing Br. at 1. But the plaintiff never alleges that this observation was brought to the board's attention and that it was ignored. Nor does the complaint allege that the board failed to investigate risks

undertaken by the company in general. In order to show that the board violated some fiduciary duty by inaction, a complaint must do much more than simply say that an employee perceived the company to face risk, even a large risk. It must at least show that the board was faced with risks which it chose not to investigate, or that it blithely abrogated its responsibility to oversee or look for risks. Under that standard, therefore, the additional allegations in the plaintiff's opposing brief do not meet the standard set out in *Caremark* and its progeny.

\*6 The court accepts, in principle, that a director could be found liable for remaining ignorant of a large fraud occurring in plain sight, even if the director is able to show that the company had established a full set of supervisory controls. In this case, however, all the plaintiff has said is that the Enron and WorldCom relationships turned out to have material consequences. The complaint does not even allege that either of the challenged relationships formed an unusually large part of Citigroup's business while the relationships were ongoing. The well-pleaded facts provide no basis to believe, therefore, that the directors ignored a mammoth fraud. Rather, the facts only show that, as in *Caremark* itself, the "liability that eventuated in this case was huge." [FN18] Absent any facts to show that a board's ignorance can only be explained by a breach of fiduciary duty, such as allegations as to the centrality of the fraudulent relationships to the corporation's business, the size of any financial loss is not a sufficient basis on which to rest liability.

> FN18. 698 A.2d at 971.

The most that the complaint alleges is that some hypothetical, especially zealous, board might have discovered and stopped the conduct complained of in this case. But Delaware law requires only diligence, not heroism. Boards are expected to erect mechanisms designed to bring misconduct to their attention, and to investigate in good faith when warnings appear. Because the complaint alleges no failing on the part of the Citigroup board as to these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 7
Not Reported in A.2d, 2006 WL 391931 (Del.Ch.)
**(Cite as: 2006 WL 391931 (Del.Ch.))**

obligations, the defendants' motion to dismiss must necessarily be granted for failure to make proper demand.

IV.

For the foregoing reasons, the defendants' motion to dismiss is GRANTED.

IT IS SO ORDERED. [FN19]

> FN19. To avoid confusion as to the date of dismissal, the court has vacated the minute order of January 26, 2006 and now enters a new order dismissing the complaint for the reasons discussed in this opinion.

Not Reported in A.2d, 2006 WL 391931 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.