**10**

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

**H**

United States District Court, N.D. California.
In re SPLASH TECHNOLOGY HOLDINGS, INC.
SECURITIES LITIGATION
**No. C 99-00109 SBA.**

Sept. 29, 2000.

ORDER

ARMSTRONG, J.

**\*1** This matter comes before the Court on Digital Origin, Inc., FKA Radius, Inc.'s, and Charles W. Berger's Motion to Dismiss the First Amended Complaint [# 57-1]. Having read and considered the papers submitted by the parties, having considered the arguments advanced by the parties at the hearing, and being fully informed, the Court hereby GRANTS in part and DENIES in part Defendants' Motion to Dismiss.

*BACKGROUND*

Splash Technology Holdings, Inc. ("Splash") develops, produces, and markets color servers that provide an integrated link between desktop computers and digital color laser copiers. Splash's products enable the copiers to provide networked color printing and scanning. During fiscal years 1994, 1995, and 1996, Xerox and Fuji Xerox constituted Splash's sole customers.

Splash originally was a division of Radius, Inc. and was known as the Color Server Group ("CSG"). Radius spun off Splash in 1996. Prior to 1996, Radius had incurred substantial operating losses--$131.7 million in F95, $77.4 million in F94, and $20.1 million in F93. Independent auditors concluded in a report for the fiscal year ending 9/30/95 that Radius' ability to continue as a viable entity was in substantial doubt. Its liabilities doubled its assets. Radius' limited cash resources limited its ability to purchase inventory, which in turn constrained its ability to manufacture and sell products. (FAC at ¶ 4).

Pursuant to the terms of the January 1997 spin off of CSG, Radius retained a 20% interest in the newly formed entity--Splash. In addition, Radius received $20 million from Summit Partners. Radius' Chief Executive Officer and President, Charles W. Berger ("Berger"), was installed as a member of Splash's board. [FN1] In the fall of 1996, Splash completed its initial public offering ("IPO"), which raised $26.6 million. Per the terms of the IPO, Radius, along with Splash insiders, agreed to a "lock-up" pursuant to which it would not sell any additional shares of Splash stock onto the open market for 180 days from the IPO. (FAC at ¶ 5-7).

> FN1. Mr. Berger exercises shared investment and voting power with Radius' shares, but he disclaimed any beneficial ownership of such shares. Lisi Decl. Ex. s at 55 and n. 5.

Radius' involvement in the Splash spin-off occurred within a broader context. In February of 1995, Radius had contracted with IBM Credit Corp. ("ICC") for a $30 million Inventory and Working Capital Financing Agreement ("ICC Agreement"). All of Radius' assets secured the advances under the ICC Agreement. By September 3, 1995, Radius had fallen into default on some of its obligations to ICC. Rather than pursuing contractual remedies for Radius' default, ICC agreed to an amendment to the Agreement pursuant to which Radius was required to pay all of the net proceeds of the CSG spin-off to ICC. (FAC at ¶ 32). In addition, Radius pledged its Splash common stock to ICC in order to secure its obligations to ICC. [FN2]

> FN2. The complaint is not entirely clear whether this provision arose as part of the same amendment that made Radius responsible for paying to ICC the proceeds

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

(Cite as: 2000 WL 1727405 (N.D.Cal.))

of the spin-off.

Although the Splash stock grew quite rapidly from its opening price of $11 per share to a high of $38 on January 31, 1997, Radius could not reap the benefits of this growth since the lock-up provision prevented it from selling its Splash stock. By April 1, 1997, approximately one week before the expiration of the IPO lock-up, the shares had fallen to a value of $22.375. At this point, Radius and Berger allegedly joined with the other defendants to "artificially re-inflate" Splash's stock. (FAC at ¶ 8).

*2 The focal point of the allegedly fraudulent scheme instituted by the defendants was a Secondary Offering of Splash stock. Throughout the spring and summer of 1997, defendants--but not Radius or Berger directly--made a number of allegedly false and misleading statements designed to boost the price of the stock. The statements allegedly succeeded in that Splash's stock reached a per share value of more than $43 by July of 1997. A roadshow followed the rise of Splash's stock. During this roadshow, Splash officers Macgillivray and Platt allegedly made new false and misleading statements.

On August 25, 1997, the secondary offering resulted in a sale of 3.25 million shares for total proceeds of $105.6 million. Radius sold 875,000 of its available 1,741,127 shares for a total of $27,020,000. Four days later, as part of an overallotment, Radius sold an additional 121,875 shares for $3,763,500. Thus, in this four day period, Radius sold 57% of its holdings for a total of $30,783,500.

Radius sold another 35,000 shares in early December of 1997. Approximately one week later, Splash's primary competitor, EFI, announced a revenue and earnings shortfall that it attributed to aggressive reductions of inventory by its customers, delays in purchases associated with product transitions, and weaknesses in Asian economies. (FAC at ¶ 15). In the aftermath of these disclosures, Splash's shares fell by 21%. When Splash responded to the decline by stating that it "remains comfortable" with previous estimates, its

stock rebounded.

On January 13, 1997, Splash disclosed that it expected slower growth in 1998 than in 1997. (FAC at ¶ 17). Between January 13, 1997, and October 1998, however, Splash allegedly made new false and misleading statements. On October 13, 1998, Splash made a "stunning" revelation that caused its stock to plunge.

On January 9, 1999, plaintiffs Scott and Wu filed an action for securities fraud against the Splash defendants (Splash Technology, Inc., Kevin K. Macgillivray, Joan P. Platt, Timothy D. Kleffman, and Christine A. Beheshti), Berger, and Radius. Plaintiff Libros filed an identical action on January 28, 1999. This Court's May 3, 1999, order consolidated both actions.

Pursuant to an August 26, 1999, stipulation, plaintiffs sought leave to amend in the face of motions to dismiss filed by defendants to the original complaint. In the stipulated order granting leave to amend, plaintiffs "explicitly acknowledge[d] [that] defendant may move to dismiss the Amended Complaint with prejudice on the grounds that [plaintiffs] already have received an opportunity to amend their Complaint." At least one of the factors motivating plaintiffs' request to file an amended complaint was the Ninth Circuit's decision in *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970 (9th Cir.1999), which, in plaintiffs' words, "create[d] a brand new definition of scienter and standard for pleading it." Pl's August 10, 1999, Reply in Support of Motion for Continuance at 2. Plaintiffs filed their First Amended Complaint ("FAC"), a ninety-six (96) page document, on January 19, 2000.

*3 Defendants Berger and Radius now move to dismiss with prejudice the FAC. Defendants base their motion on (1) FAC's failure to allege the circumstances of defendant's allegedly false and misleading statements with particularity, (2) the FAC's failure to allege scienter in great detail, (3) the FAC's failure to establish a sufficient factual predicate for control person liability, (4) the applicable statute of limitations, and (5) the FAC's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

failure to comply with Rule 8's requirement of a short and plain statement.

*STANDARD OF REVIEW*
A. Motion to Dismiss Generally

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should not be granted unless it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969); *Everest and Jennings, Inc. v. American Motorists Ins. Co.,* 23 F.3d 226, 228 (9th Cir.1994). All reasonable inferences are to be drawn in favor of the plaintiff. *Jacobson v. Hughes Aircraft,* 105 F.3d 1288, 1296 (9th Cir.1997).

When the complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986). Leave to amend is properly denied "where the amendment would be futile." *DeSoto Yellow Freight Sys.,* 957 F.2d 655, 658 (9th Cir.1992).

B. Pleading Requirements In Securities Fraud Actions

The plaintiffs bring this action for allegedly false and misleading statements made in violation of § 10(b) and the Securities Exchange Act of 1934 ("the 1934 Act") and SEC Rule 10(b)(5). Section 10(b) of the 1934 Act prohibits the use of "manipulative or deceptive" activities in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Rule 10(b)(5), which specifies what practices are manipulative or deceptive, provides that it shall be unlawful:

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. A successful showing of a Rule 10b-5 violation requires four elements: (1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages. *Paracor Finance, Inc. v. General Electric Capital,* 96 F.3d 1151, 1157 (9th Cir.1996) (en banc).

*4 In order to state claims for securities fraud under Section 10(b) of the 1934 Act and Rule 10b-5, a complaint must meet three pleading barriers. First, it must meet the general requirement established by Federal Rule of Procedure 8(a) that complaints give a short and plain statement of the claim. Second, it must conform with the particularity obligations imposed by Rule 9(b). *In re Glenfed, Inc. Securities Litigation,* 42 F.3d 1541, 1545 (9th Cir.1994). Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally."

The Private Securities Litigation Reform Act ("PSLRA") poses the third pleading hurdle. The PSLRA reiterates the particularity obligations of 9(b). First, the complaint must specify "each statement alleged to have been misleading." 18 U.S.C. § 78u-4(b)(1). Second, it also must specify the reason or reasons why the statement was false or misleading. *Id.* If an allegation regarding a misleading statement is made on information or belief, the complaint must state with particularity all facts forming the basis for the belief. *Id; In re Silicon Graphics, Inc. Securities Litigation,* 970 F.Supp. 746, 763 (N.D.Cal.1997). [FN3]

    FN3. A bit of confusion arises here. The requirements of 15 U.S.C. § 78u-4(b)(1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

apply to statements that are untrue as to a material fact or omit to state a material fact. Violations of 10b-5(a) and (c), unlike 10b-5(b), are *not* limited to statements. Thus, it would appear that § (b)(1) of the PSLRA does not apply to violations under 10b-5(a) or (c). Plaintiffs allege some primary violations under those sections. ( *See* Pl's Opp'n at 11 *et seq.*). This ultimately is a distinction without a difference. Rule 9(b) applies to allegations of fraud in general, not just fraudulent statements; thus, 9(b) applies to fraudulent acts as well as fraudulent statements. *See Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir.1989). Because § (b)(1) of the PSLRA reiterates 9(b)'s requirements, allegations of fraudulent acts must meet the same standard as allegations of fraudulent statements.

Section (b)(2) of the PSLRA still applies to claims premised on fraudulent acts and statements since all three sections of 10b-5 require a state of mind. *See generally, In re Silicon,* 183 F .3d at 975-977 (discussing the scienter requirement that applies to all claims under § 10(b) of the 1934 Act).

The third element of the PSLRA moves beyond 9(b)'s requirements. When pleading scienter, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at (b)(2). In this circuit, this heightened scienter pleading standard "requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness"--a degree of recklessness strongly suggesting actual intent. *In re Silicon Graphics Inc. Securities Litigation,* 183 F .3d 970, 979 (9th Cir.1999) (emphasis added). A complaint merely alleging that a defendant had the motive and opportunity to commit fraud is insufficient. *Id.*

*DISCUSSION*

I. Failure to State a Claim under Rule 9(b) and/or PSLRA

In light of the PSLRA, two basic inquiries now arise when courts consider a motion to dismiss a securities fraud claim. The first issue is whether the complaint alleges a manipulative or deceptive practice with sufficient particularity. *See Schaeffer v. Evolving Systems, Inc.,* 29 F.Supp.2d 1213, 1220 (D.Co.1998). The second issue is whether the complaint states with particularity allegations giving rise to a strong inference of deliberate or conscious recklessness. *See id.* Defendants have challenged the complaint on both of these grounds.

A. Information and Belief

Before conducting the two-step analysis, one preliminary observation is merited. When an allegation regarding a misleading statement is made on information or belief, the complaint must state with particularity all facts forming the basis for the belief. 18 U.S.C. § 78u-4(b)(1); *Silicon,* 970 F.Supp. at 763. A complaint, such as the instant one, that fails to demonstrate that plaintiffs have personal knowledge of the facts pled is deemed pled on information and belief. *See Brady v. Anderson,* 1998 U.S. Dist. LEXIS 20774,*11- 12 (C.D.Cal.1998). In a such a complaint, failing to allege the sources of the plaintiff's information about internal reports, how the plaintiff learned of the reports, who drafted them, and which officers received them is not adequate. *In re Silicon,* 183 F.3d at 985.

*5 Analyzing whether a plaintiff sufficiently pled the facts forming the basis of his belief in large part parallels the analysis of whether a plaintiff sufficiently pled scienter. *See Silicon,* 970 F.Supp. at 766. If a plaintiff cannot provide a sufficient basis for conclusions he draws about an internal report, then he likely cannot connect any particular defendant to any particular information in the report for purposes of scienter. As the district court in *Silicon* observed, "the information and belief pleading requirement appears to be an integral part of the [Second Circuit's] strong inference standard for pleading scienter." Given that the Second Circuit's formulation of the scienter pleading standard formed the basis for the PSLRA's heightened pleading requirements, looking to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

Second Circuit for guidance is appropriate. As did the district court in *Silicon,* the Court here considers the information and belief analysis as integral to the scienter analysis below. *See Heliotrope,* 189 F.3d at 979 (finding that plaintiff had failed to plead facts giving rise to a strong inference of scienter since it had not identified any documents, their contents, their preparers, which officers reviewed them, nor the source of plaintiff's information regarding the documents).

To some extent, the information and belief analysis also infiltrates the falsity analysis. Courts have not paid much care to this issue. Because the presence of contemporaneous reports is one way to demonstrate falsity and because pleading with particularity the circumstances of the falsity requires some detailed allegations involving the reports, the information and belief analysis, along with the scienter analysis, naturally seeps into the falsity analysis.

B. Manipulative or Deceptive Practices

Whereas 10b-5(b) focuses on fraudulent statements, 10b-5(a) and (c) are not by their terms restricted to statements. In this case, plaintiffs allege both fraudulent statements and acts as their requisite manipulative or deceptive practices.

1. False or Misleading Statements

Similar to Rule 9(b), the PSLRA requires the complaint first to specify each misleading statement and then to specify the reason(s) why the statement was misleading. 18 U.S.C. § 78u-4(b)(1). In 9(b) terms, the complaint must specify both the circumstances of the statement, including its time, place, and content, and the circumstances indicating the falseness of the statement when it was made. *See Glenfed,* 42 F.3d at 1547-8. When alleging that particular statements were false or misleading, the complaint must make "specific references to specific facts." *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1251 (N.D.Cal.1998). Moreover, the complaint must allege that the "true facts" arose *prior* to the allegedly misleading statement. *Id* at 1250. This requirement helps protect against

pleading fraud by hindsight, *see In re Silicon,* 183 F.3d at 988, and helps prevent providing a complaint passageway through the pleading stage merely because it alleges that the allegedly fraudulent statements conflict with the current state of facts. *Glenfed,* 42 F.3d at 1548. *See generally Ronconi v. Larkin,* 1998 WL 230987, (N.D.Cal.1998) (J. Legge) (" '[P]laintiffs must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood." ' (citing *Glenfed,* 42 F.3d at 1549)).

*6 The most direct way of setting forth an explanation why a statement was false or misleading when made is to identify either (1) inconsistent contemporaneous statements or (2) inconsistent contemporaneous information (such as an internal report) that was made by or was available to the defendants. *Glenfed,* 42 F.3d at 1549; *In re Oak Technology Securities Litigation,* 1997 WL 448168, *3 (N.D.Cal.1997). For example, the complaint can allege specific contemporaneous problems undermining a defendant's optimistic claims, such as low sales volumes and losses at stores. *See Fecht v. Price Co.,* 70 F.3d 1078, 1083 (9th Cir.1995). When alleging that an internal report existed contemporaneous to the misleading statements, the complaint should provide an adequate description of the contents of the report, including some specifics from the reports and some facts indicating the reliability of the reports. *Silicon,* 183 F.3d at 985; *see Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 979 (9th Cir.1999) (faulting complaint for failing to identify any contemporaneous documents nor their content, who prepared them, and who reviewed them). [FN4]

> FN4. *Silicon* did not crisply differentiate between which of its comments applied to the information and belief standard and which applied to the scienter standard. *Heliotrope* also blended these analyses, although it implicitly recognized a distinction. After faulting the complaint for failing to plead information concerning internal reports with particularity, the court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 6

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

wrote: "Nor does Heliotrope's complaint, considered in its entirety, state facts that create a strong inference of the required degree of intent." 189 F.3d at 980. The use of the term "nor" suggests that the court's comments concerning pleading the specifics of the internal reports did not relate solely to the scienter issue.

In the instant case, as to defendants Radius and Berger, plaintiffs brand three risk disclosure statements in the Prospectus and Registration Statement for the Secondary Offering in August of 1997 as false and misleading and attributable to Radius and Berger. Plaintiffs have failed to plead the falsity of these statements when made with sufficient particularity.

a. Radius

The FAC does not specify any allegedly misleading statements made by Radius. Plaintiffs do not allege that it does. Rather, plaintiffs allege that Berger operated on Radius' behalf and under its control when he allegedly made false and misleading statements in the Prospectus and the Registration Statement for the Secondary Offering, which Berger signed.

b. Berger

In July 1997, Berger signed a Registration Statement that contained four allegedly false or misleading statements: 1) Splash's quarterly operating results could be affected in the event that the purchasing patterns of Xerox and Fuji Xerox change in the future; 2) no assurance existed as to the future level of sales to Xerox or Fuji Xerox, any decrease in future sales would materially and adversely affect the Company's financial condition, and fluctuations in currency exchange rates could cause price fluctuations which ultimately could result in a reduction in net revenue and profitability; 3) Radius and ICC had an amended loan agreement in which Radius pledged as collateral all of its Splash stock; and 4) no assurance existed that Quintar, a division acquired by Splash in May 1997, will not continue to incur net losses. FAC at ¶¶

94 and 102-106.

Defendants do not contend that the complaint fails to plead the who, what, when, and where of these allegedly fraudulent statements. Rather, defendants fault the complaint for failing to plead with requisite particularity the falsity of these statements.

\*7 As to the first statement regarding the effect of a possible change in purchasing patterns by Xerox and Fuji Xerox, the complaint alleges that "defendants" knew prior to April 1997 that Fuji Xerox was changing its fiscal year, which would change the seasonality pattern to its purchases and would weaken sales in the "3/98 quarter." This allegation fails to meet the requirement for pleading falsity. Most significantly, it fails to allege specifically the form in which this information was available or revealed, opting instead only to say undifferentiated "defendants" "knew" this information and, repeatedly, that the information came from undisclosed internal operating and budget reports compiled by undisclosed people. Absent specific allegations of the *source* of this information allegedly known by Radius and Berger or some contemporaneous statement by Radius and Berger reflecting familiarity with this information, plaintiffs have failed to meet the falsity pleading burden. In addition, plaintiffs, who apparently are pleading on information and belief, fail to plead their basis for allegedly knowing the content of these reports.

A similar analysis holds for the second statement regarding future sales and the possible adverse impact from fluctuations in foreign currencies. Although the complaint alleges that economic conditions in Japan *already* had deteriorated, the levels of orders *already* had declined, and fluctuations in currency exchange rates *already* were causing Splash's products to be more expensive, it again fails to specify the source/form of this information nor how plaintiffs learned of the information. (*See* ¶ 105).

Plaintiffs' attempt to show the falsity of the third statement fails as well. Plaintiffs note that the Registration Statement omitted in its discussion of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 7

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

the agreement between ICC and Radius that "the borrowing base calculation under the working capital line of credit was modified [In a February 14, 1997, amendment] to include, in the amounts available for borrowing, an amount equal to 25% of the 'excess value' of Splash stock." FAC at ¶ 107. The agreement defined "excess value" as the difference between the value of Radius' holdings when calculated at $25 per share and the actual market value of Radius' Splash holdings. Plaintiffs maintain that knowledge of this provision would have alerted investors that the value of the Splash stock was $25.

The information regarding a February 1997 amendment to an agreement between two third parties (i.e. Splash was not a party to the agreement) does not establish the falsity of the Prospectus, which apparently set the price of Splash stock in the Secondary Offering at $32.50 per share (FAC at ¶ 107). First, the provision in the amendment does not obviously bear on Radius' or Berger's/Radius' belief regarding the value of Splash stock. Plaintiffs apparently seize on the term "excess value" as somehow revealing of Berger's/Radius' belief. The fact that Radius could borrow from ICC as a percentage of the amount by which the market value of Splash stock exceeded $25/share more logically suggests how much collateral ICC needed than it makes any comment on Radius' belief. Regardless of the true meaning of the excess value provision, plaintiffs are not entitled to unwarranted inferences on a motion to dismiss. *In re Verifone Securities Litigation,* 11 F.3d 865, 868 (9th Cir.1993). Drawing a conclusion that the excess value provision reflected Radius' belief of the value of Splash stock constitutes an unwarranted inference. Second, the amendment, reached approximately five months prior to the Prospective, is not contemporaneous to the allegedly misleading statement and thus does not necessarily reflect Radius' belief at the relevant time. [FN5] Plaintiffs have failed to demonstrate how the excess value provision constitutes a material omission. [FN6]

FN5. Plaintiff's complaint blunts this observation a bit by alleging that "[p]rior to 5/12/97, Radius negotiated, apparently

unsuccessfully, with ICC to reduce the excess value figure from $25 to $22." FAC at ¶ 107.

FN6. Berger and Radius also stress that *Radius* disclosed the February 1997 amendment in a Supplement to Radius' November 1996 Prospectus. Whether this disclosure sufficiently placed the "excess value" provision into the market so as to effectively counterbalance any misleading impression resulting from Splash's Prospectus and Registration Statement is simply another way of considering whether the omitted provision was material--an apparently fact-specific inquiry. *See In re Worlds of Wonder Securities Litigation,* 721 F.Supp. 1140, 1145 (N.D.Cal.1989). The Ninth Circuit, however, recently took judicial notice that the market was aware of information that was contained in news articles prior to the disclosure at issue in that case but was omitted from the disclosure. *Heliotrope General, Inc. v. Ford Motor Co.,* 189 F.3d 971, 981 n. 18 (9th Cir.1999). Since the omitted information in this case regarding the contract provision was disclosed in Radius' Supplement, the Court may take judicial notice that the market already was aware of the information.

**\*8** Plaintiffs' final allegation of an adverse condition concerns the financial prospects for Quintar Holdings Corp. Whereas the Registration Statement merely warned that no assurance existed that Quintar will not continue to incur net losses, plaintiffs allege that defendants knew that Quintar would *continue* to lose substantial money for the foreseeable future. FAC at ¶ 94. The complaint specifically alleges that Craig Douglas, Quintar's chief executive, told Splash Vice President Timothy Kleffman and other *unnamed* Splash executives this information. It fails to allege, however, when Douglas shared this information--an allegation crucial for determining whether the statement was contemporaneous.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 8

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

Based on the above review, the FAC fails to plead the circumstances concerning the falsity of any statement in the Registration Statement and Prospectus with sufficient particularity. [FN7]

> FN7. Plaintiffs also attribute to Berger and Radius all of the statements discussed in the Court's order regarding the Splash defendants' Motion to Dismiss, although they have not articulated any viable basis for claiming liability against Berger and Radius for these statements. Regardless, the Court hereby incorporates from that order its analysis and conclusions with respect to those statements.

2. Fraudulent Selling Activity

As indicated above, plaintiffs allege fraudulent acts in addition to fraudulent statements as the basis for their claim. In particular, plaintiffs allege that Berger and Radius violated 10b-5 by selling massive amounts of Splash stock without disclosing adverse material facts. (Opp'n at 12:21-2). Plaintiffs rely on the same allegations discussed above concerning falsity. In addition to the above arguments, defendants contend that non-speaking defendants cannot be liable under Rule 10b-5.

In addition to creating liability for material misstatements, Section 10 of the 1934 Act prohibits the commission of a manipulative act. *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 177 (1994); *see In re ZZZZ Best Securities Litigation,* 864 F.Supp. 960, 971-2 (C.D.Cal.1994) (holding that liability under § 10(b) or Rule 10b-5 is *not* limited to the making of materially false or misleading statements or omissions). *Central Bank* refused to extend this zone of liability, however, so as to encompass those who aid and abet a person who commits a manipulative or deceptive act. *Central Bank,* 511 U.S. at 177. Conspiracy culpability does not independently give rise to liability under the securities laws. *Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1998) (en banc). Nevertheless, even in the post-*Central Bank* world, allegations that a group of defendants acted together to violate the

securities laws may still give rise to liability "as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme." *Id.* In this case, to the extent defendants are arguing that a complaint must fail if it alleges the existence of a scheme even if it alleges that each participant in the scheme committed a manipulative act, their argument fails.

The crucial issue is whether, assuming Radius and Berger are not liable for any statements that they made, the complaint alleges that they committed a manipulative act. Plaintiffs focus on the stock sales in which these two insiders allegedly participated. As an initial matter, stock sales by insiders who utilize undisclosed material information to their benefit can constitute manipulative or deceptive acts for purposes of § 10 of the 1934 Act. *See Chiarella v. United States,* 445 U.S. 222, 1115 (1980) (criminal context); *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1203 (1st Cir.1996) ; *Neubronner v. Milken,* 6 F.3d 666, 669-70 (9th Cir.1993) (recognizing insider trading as an implied private cause of action under § 10(b) and Rule 10b-5). Two problems, one real and one possible, undermine reliance on this theory in this case. First, insider trading claims under § 10(b) and Rule 10b-5 are limited to individuals who traded contemporaneously with the insider; moreover, contemporaneous trading is a "circumstance constituting fraud" that requires heightened pleading. *Neubronner,* 6 F.3d at 670. In this case, plaintiffs have not alleged with particularity that they traded contemporaneously with Radius and Berger. Second, the general tenor of this FAC is that defendants committed fraud on the market through their false and misleading disclosures. At least one court has found that fraud on the market and insider trading are not easily reconcilable theories in the same case. *See Simon v. American Power Conversion Corp.,* 945 F.Supp. 416, 425 (D. RI 1996). After all, whereas the focus in a fraud on the market case is to compensate market participants for "artificial boosts or deflations in stock prices caused by material misrepresentations," the focus in a "disclose or abstain" case is to compensate investors who were exploited by insider traders as a result of an informational disadvantage.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

*Id.*

**\*9** The Court finds that plaintiffs have failed plead with the requisite particularity that the stock sales by Radius and Berger constitute a manipulative or deceptive act for purposes of § 10b or Rule 10b-5. Whether liability against these defendants may arise from the group published-information doctrine will be discussed *infra.*

C. Scienter Requirement

The scienter analysis is unnecessary if the Court finds that plaintiffs have failed to plead falsity. *Karacand v. Edwards,* 53 F.Supp.2d 1236, 1252 (D.Utah 1999) (J. Kimball) ("Where plaintiffs fail to plead falsity, a fortiori they have not established that defendants knew those statements were false"). Because plaintiffs' scienter pleading is deficient even if they pled falsity with sufficient particularity, the Court hereby identifies with respect to scienter the areas requiring attention in any second amended complaint.

As discussed earlier, a complaint must plead in "great detail" facts demonstrating deliberate recklessness. *Silicon Graphics,* 183 F.3d at 983. In a complaint pleaded on information and belief, failing to allege the sources of the plaintiff's information about internal reports, how the plaintiff learned of the reports, who drafted them, and which officers received them is not adequate. *In re Silicon,* 183 F.3d at 985. Plaintiffs seek to meet this burden by emphasizing defendants' "suspicious" stock sales during the class period and by touting defendants' internal knowledge of Splash.

1. Defendants' Internal Knowledge

As a matter of law, courts have attributed critical facts to corporate insiders when assessing scienter and have then concluded, based on this imputed knowledge, the presence of a strong inference of deliberate recklessness. For instance, one court imputed knowledge of the potential incompatibility between two of a company's products, information which would affect the most significant contract in the company's history, to the President/CEO, the

Vice President/CFO, and the Chairman of the Board, who had co-founded the company and had served as chairman for eleven years. *In re Ancor Communications, Inc.,* 22 F.Supp.2d 999, 1005 (D.Minn.1998). Another court attributed to the *company* and, implicitly, the President/CEO and the CFO knowledge of the key facts concerning a critical transaction. *Chalverus v. Pegasystems, Inc.,* 59 F.Supp.2d 226, 235 (D.Mass.1999).

*Ancor* and *Chalverus* suggest that alleging the existence of undisclosed critical facts in concert with a defendant's prominent role in the corporation may support a strong inference that the defendant acted with deliberate recklessness when he made allegedly false or misleading statements. Such an approach, however, is not likely viable in the aftermath of *Silicon,* which bemoaned the absence of details about internal reports--such as their specific content, drafters, and reviewers. *Silicon,* 183 F.3d at 985 ("In the absence of such specifics, we cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge of [the company's] problems that would cause their optimistic representations to the contrary to be consciously misleading."). *Silicon* explicitly rejected speculating about the insiders' knowledge. *Id.*

**\*10** Regardless of whether the *Ancor* and *Chalverus* approaches are sufficient in this circuit in light of *Silicon,* plaintiffs have not alleged that Berger and/or Radius possess a role at Splash comparable to those occupied by the defendants in those cases. Neither Berger nor Radius was an officer for Splash nor a Chairman of the Board. Save one, all of the defendants in *Ancor* and *Chalverus* were either the company itself or officers of the company. The one exception was a Chairman of the Board who had co-founded the company. [FN8] Thus, in finding that imputing knowledge to corporate insiders is appropriate in some circumstances, *Ancor* and *Chalverus* did not have the occasion to determine whether an outside, non-chairman director and a minority shareholder constitute "corporate insiders."

FN8. Although Berger allegedly played a significant role in the spin off of CSG into

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

Splash, he did not chair Splash's board.

The above analysis does not in any way suggest that only Chairpersons of the Board who co-founded the company or officers may constitute corporate insiders. As discussed earlier, however, plaintiffs' complaint fails to establish a detailed basis for concluding that Berger and Radius, regardless of their titles, occupied an insider role. The complaint ranges from cautious to conclusory in its description of the defendants' relationship with Splash. In one particularly revealing cautious statement, plaintiffs allege that "Berger was much more involved in [Splash's] day-to-day operation than is normally the case with an outside director." FAC at ¶ 37. This statement is ambiguous. It may mean that Berger was more involved than is typical of other outside directors at Splash or of outside directors at corporations generally. Regardless of the proper resolution of this ambiguity, the statement does *not* actually allege that Berger was involved in the day-to-day operations of the corporation. Conclusory allegations in other parts of the FAC might suggest as much, but, as previously discussed, conclusory allegations are insufficient to establish with particularity Berger's and Radius' alleged insider roles. [FN9] (*See e.g* FAC at ¶¶ 34 and 42).

> FN9. The only previously undiscussed allegation offered by plaintiffs in support of Berger's alleged insider status is plaintiffs' citation to paragraph 38. This paragraph falls entirely in line with plaintiffs' pattern of making conclusory allegations. It fails to allege any particular evidence that Berger actually "constantly monitored" the key factors affecting Splash' business or had become "intimately familiar" with the factors affecting the copier industry in Japan.

In inviting the Court to impute knowledge to Berger and Radius based on their purported roles in Splash, the plaintiffs implicitly acknowledge their inability to allege with particularity directly, rather than circumstantially, that Berger and Radius actually possessed the knowledge that may support

an inference of scienter. In this regard, the instant case contrasts markedly with *In re Digi International, Inc. Sec. Litig.,* 6 F.Supp.2d 1089 (D.Minn.1998), a case to which *plaintiffs* directed the Court's attention. In *Digi,* the company's public disclosures allegedly communicated only a partial picture of one of its significant investments. No question arose concerning whether the defendants *knew* the details that had been omitted. In concluding that the plaintiff's allegations constituted "strong circumstantial evidence of conscious behavior," the court focused on, among other things, the defendants' failure to disclose the full details of the transaction, their positions of control in the company and responsibility for various public disclosures, and their incentive-based compensation. *Digi,* 6 F.Supp.2d at 1097. The defendants in *Digi* were the President/CEO, the CFO, and the Vice President. *Id.* at 1093.

**\*11** *Digi* is not controlling, of course, but the contrast between the circumstantial evidence emphasized there and the particular allegations advanced by plaintiffs in this case is illuminating. As already discussed, plaintiffs here have failed to establish with the requisite detail that Berger and Radius even knew of the undisclosed information. In addition, unlike for the defendants in *Digi,* the complaint fails to establish that Radius and Berger in fact possessed the position of control now assumed by plaintiffs. The defendants here are not officers of the corporation. Because the allegations fail to specify with sufficient particularity what defendants knew and/or the full extent of their relationship with Splash, any attempt to impute knowledge to Radius and Berger based on their purported roles in Splash smacks largely as a pure conclusion, one not sufficient in light of the detail required by *Silicon.*

2. Stock Sales

Plaintiffs draw the Court's focus to Radius' stock sales as an alternative means for imputing knowledge and scienter to Berger and Radius. Defendants challenge this attempt on a number of fronts.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 11

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

Unusual or suspicious stock sales by corporate insiders may serve as circumstantial evidence of the requisite scienter but only if the insider trading is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* at 986 (internal quotations and citation omitted). Relevant factors to consider when determining whether the trading meets this standard are (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) the consistency between the sales and the insider's prior trading history. *Id.* Context is important, especially for assessing the weight to attach to the timing of the sales. *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 206 (1st Cir.1999). Although viable circumstantial evidence of scienter, "stock sales alone cannot create a strong inference of scienter." *Lumisys,* 2 F.Supp.2d at 1251. [FN10]

FN10. Plaintiffs' authorities do not contradict this statement. Despite plaintiffs' argument in footnote twelve, *Silicon* did *not* hold that insider trading standing alone can be sufficient to prove scienter. In the passage cited by plaintiffs, *Silicon* merely holds that insider trading in suspicious amounts or at suspicious times can be probative of scienter. Probative and sufficient are not synonymous. The reasoning of *Silicon* lends itself to readings both supporting and refuting plaintiffs' position. On the one hand, the court concluded that "the stock trading was not ... suspicious enough to create a strong inference of the required deliberate recklessness," a comment suggesting that in another case trading alone could be sufficient. *See Silicon,* 183 F.3d at 987. On the other hand, the court admitted that the stock sales of one defendant "appeared extremely significant" but then decried the absence of other circumstantial evidence in concluding that the trading did not raise a strong inference of deliberate recklessness. *Id.* at 987-8. A number of plaintiffs' authorities rest a scienter conclusion on stock sales plus some other circumstantial evidence of scienter. *Kaplan v. Rose,* 49

F.3d 1363, 1379 (9 th Cir.1995) (finding suspicious stock sales in conjunction with allegations that defendants were aware of material undisclosed negative information about company raised sufficient suspicions of defendants' intent); *Friedberg v. Discreet Logic, Inc.,* 959 F.Supp. 42, 51-52 (D.Mass.1997) (finding that amount and time of stock sale plus "other evidence" provided sufficient circumstantial evidence of conscious misbehavior).

In the instant case, plaintiffs have not alleged that Berger sold any of his own stock during the Class Period. Plaintiffs do, however, allege that "Berger sold a suspiciously large percentage of Radius' holdings." (Opp'n at 17:3). If in fact Berger sold stock during the relevant Class Period on Radius' behalf, then plaintiffs allege any inference concerning Radius' scienter arising from these sales reasonably *may* extend to Berger--the agent for the sale. *Cf. Silicon,* 183 F.3d at 987 (finding that insider trading is probative of scienter when conducted at times to maximize *personal* benefit).

Placing aside whether Radius' sales reflect on Berger's scienter, the more pressing question at this point is whether plaintiffs' allegations concerning Radius' sales are sufficient to arouse suspicion.

a. Amount and Percentage of Shares Sold

Radius sold 96.13% of its holdings in Splash stock during the Class Period for a total proceeds of $43,157,566. (FAC at ¶ 54). The total number of shares sold during this time was 1,673,716.

b. Timing of the Sales

*12 Radius sold Splash stock on twenty different occasions during the Class Period. Radius sold the majority of its shares (more than 60%), however, in two transactions over a four-day period in late August of 1997. These sales allegedly were in connection with Splash's August 1997 Secondary Public Offering, which followed on the heels of the allegedly misleading and false statements made in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 12

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

the Registration Statement. Whether these high volume sales bear any connection to the representations in the Registration Statement naturally is disputed by Radius, which notes that the sales merely conformed with its earlier public statements expressing its intention to sell Splash stock pursuant to its loan agreement with ICC. (Lisa Decl. I, Ex. 2 at 59). [FN11]

> FN11. The plaintiffs allege that defendants' misleading and false statements had caused Splash's stock to "skyrocket" from $23 on June 3, 1997 to $32.50 on August 25, 1997. The Registration Statement, however, bears a July 27, 1997 date.

The only argument raised by plaintiffs as to the other eighteen stock sales concerns the sales made on December 5, 1997, and December 8, 1997, of 10,000 and 25,000 shares respectively. Plaintiffs deem the timing of these sales suspicious since EFI made its announcement of lower earnings and other problems on December 11, 1997. Defendants classify these sales as part of its attempt to comply with the terms of the ICC agreement, which it had disclosed to the public.

c. Consistency In Trading Behavior

The third factor asks the Court to compare the defendant's sales during the Class Period with its prior trading history. In this case, no such comparison is available since Radius had not made and could not have made any sales prior to the Class Period. The lock-up agreement pursuant to the Initial Public Offering prevented Radius from selling its Splash holdings for 180 days--until April 1997. (FAC at ¶ 8).

Radius sold almost 60% of its holdings in Splash at a time when allegedly misleading statements had entered and remained in the market. It then sold 35,000 shares shortly before negative information regarding EFI's prospects hit the market. Even if plaintiffs had pled with particularity the circumstances of the allegedly fraudulent statements made in the July 1997 Registration Statement, the timing of the sales prior to the EFI announcement

do not necessarily arouse suspicion. Plaintiffs have provided no particularized basis for concluding that Berger and/or Radius knew of the imminent EFI announcement; the absence of such a particularized allegation renders any "inference" conclusory.

Although the amount and percentage of shares sold by Radius strongly suggest scienter, a contextual analysis casts these sales in a different light. In *Silicon,* one of the defendants sold 65% of his holdings during the relevant time period. This defendant, however, was operating under a legal impediment that prevented him from making sales until the fiscal period in which he finally sold the stock. In addition, the defendant had not maintained day-to-day contact with the corporation's officers, involved himself with the corporation's operations, nor made any allegedly misleading statements. *Silicon,* 183 F.3d at 987-8. The complaint here presents a remarkably similar situation. The lock-up 180 day restraint had prevented Radius from selling his Splash stock until April 1997. As previously discussed, the complaint fails to provide any specific allegations demonstrating that Radius or any official acting on Radius' behalf maintained day-to-day contact with Spalsh's officers. Radius did not make any allegedly misleading statements--although a question remains whether Berger acted on Radius' behalf. In short, the circumstantial evidence of scienter consists solely of Radius' stock sales and plaintiffs' conclusory allegations of Berger's involvement with Splash.

*13 Radius has *not* shown at this stage that the stock sales and the defendants' roles in Splash, whether considered in isolation or in combination, satisfy the burden of pleading in great detail facts showing deliberate recklessness. *See* Karacand v. Edwards, 53 F.Supp.2d 1236, 1252 (D.Utah 1999) ("Where plaintiffs fail to plead falsity, a fortiori 'they have not established that defendants knew those statements were false.''). In reaching this conclusion, Radius' disclosure of its intention to sell its Splash shares should not be decisive. The mere fact that a company made public its intention to sell does not render otherwise suspicious sales unsuspicious. In other words, disclosing one's intent to sell does not mean that the party making that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 13

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

disclosure no longer possesses a motive to engage in fraudulent sales. Although such a disclosure provides perhaps the impetus of sales generally, it does not necessarily explain why the party made sales at particular times. [FN12] On a motion to dismiss, sales made at a time or in an amount arousing suspicion are entitled to that sinister inference on plaintiffs' behalf even if the defendant can provide another frame from which to consider the events in question.

> FN12. The fact that Radius had disclosed an intent to sell begs the question of whether it manipulated the stock's market price. *See Kaplan v. Rose,* 49 F.3d 1363, 1380 (9th Cir.1995) ("[Defendants'] explanations [for their stock sales]--that they wanted to reap financial benefits for personal reasons--merely beg the question of whether they acted on the basis of undisclosed information in order to reap large returns.").

II. Group Published Information

Even if neither Berger's statements in the Prospectus and Registration Statement nor Berger's and Radius' sales of Splash stock constitute manipulative or deceptive practices, plaintiffs allege that Berger and Radius are responsible for false statements in Splash's press releases, annual reports, and documents filed with the SEC under the group published information doctrine.

On the basis of a presumption that group-published information is the collective action of officers, the group published information doctrine excuses a plaintiff from the obligation imposed by 9(b) of attributing statements to a particular defendant speaker. *See Glenfed II,* 60 F.3d at 593. Group-published information includes prospectuses, registration statements, annual reports, and press releases. *In re Interactive Network, Inc. Securities Litigation,* 948 F.Supp. 917, 920 (N.D.Cal.1996). Although the group-published information doctrine relieves a plaintiff from alleging that each defendant actually spoke, it does not escape the requirements of 9(b) and the PSLRA. [FN13] *Oak Technology,*

1997 WL 448168,*10-11. Thus, it does not affect the requirement that plaintiffs must plead both the circumstances of the alleged misleading statements and the circumstances of the falsity with particularity. *Id.* at *10.

> FN13. A serious question arises whether the group published information doctrine survives the PSLRA. The PSLRA requires a plaintiff to plead with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Some courts have detected inherent tension between a requirement that the complaint allege scienter as to each defendant and a doctrine permitting it to rely on group pleading when asserting that the defendant made the statement for which he must possess scienter. *See Branca v. Paymentech, Inc.,* 2000 WL 145083,*8 (N.D.Tex.2000); *Marra v. Tel-Save Holdings, Inc.,* 1999 WL 317103,*5 (E.D.Pa.1999). Other courts, including some federal courts in California, have concluded that the group published information doctrine survives the PSLRA. *See Copperstone,* C 97-3495 SBA, at 24; *Schlagel v. Learning Tree Int'l,* 1998 WL 1144581,*6 (C.D.Cal.1998) (J. Collins). Although the two above-cited cases finding tension between the group-pleading doctrine and the PSLRA are more persuasively reasoned, the Court assumes for purposes of its analysis that the group published information doctrine survives the PSLRA.

The exception extends to outside directors who either participated in the corporation's day-to-day activities or possessed a special relationship with the corporation, such as participating in the preparation or communication of group information. *Glenfed II,* 60 F.3d at 593; *In re Stac Electronics Securities Litigation,* 89 F.3d 1399, 1411 (9 th Cir.1996). However, conclusory allegations that an outside director participated in the day-to-day activities of the corporation are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                       Page 14

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

insufficient. *Oak,* 1997 WL 448168,*11. In addition, the doctrine does not extend to analyst's reports or oral remarks made by others. *Copperstone v.. TCSI Corp.,* C 97-3495 SBA at 24 (Jan. 19, 1999).

**\*14** Plaintiffs' allegations against Berger include a number of conclusory statements that are insufficient to warrant the exception. Plaintiffs summarily allege that Berger was uncommonly (for an outside director) involved in Splash's day-to-day operations of Splash, that the "defendants" (which would include Berger) "knew the material adverse non-public information about Spalsh's financial results," and the "defendants" participated in the drafting and reviewing of the misleading statements. (FAC at ¶¶ 34-37). These conclusory comments fail to meet the requirements of 9(b) and the PSLRA. *See Oak,* 1997 WL 448168,*11 (pleading that outside directors were involved in the day-to-day operations of the corporation and were privy to inside information is an insufficient premise for liability for alleged misstatements).

In addition to these conclusory allegations, however, the complaint includes specific allegations suggesting Berger's involvement in the Splash's day-to-day operations. For example, the complaint alleges that Berger was in "frequent contact" with Macgillivray and Platt, two of Splash's top executives, received copies of Splash's internal operating and budget reports circulated to executives, signed the Prospectus and Registration Statement, signed a December 21, 1995, Merger Agreement between Splash and Radius that obligated Splash officers to present detailed budgets and projections to Splash directors (which included Berger), received copies of the allegedly false reports and press releases prior to their issuance, and, allegedly like all of the "Splash defendants," was appraised by weekly and monthly reports of the status of orders for and sales of every Splash product. (FAC at ¶¶ 30 and 34-43). These allegations, however, still do not rise to the level of establishing the requisite participation in Splash's day-to-day activities. The pregnant negative of the requirement that outside directors be involved in the day-to-day operations of the corporation is that

some outside directors will lack the requisite involvement. Plaintiffs' allegations do not sufficiently distinguish Berger's involvement with Splash from that of any outside director with the corporation on whose board she serves. "Frequent contact" with company officers by an outside director, whatever "frequent" means, is not obviously exceptional nor is periodically reviewing the company's financial and sales information. Berger's signature on the Prospectus perhaps signals his involvement with that document, (*But See O'Neal Trust v. Vanstar Corp.,* C 98-216 MJJ at 5 (N .D. Cal 1998) (citing *In re Ross Sys. Sec. Litig.,* Fed. Sec. L. Rep. (CCH) ¶ 98,363 (N.D.Cal.1996) ("Without some allegation that an outside director participated in the publication of the allegedly false statements, or had any other 'special relationship' with the corporation, claims that the director merely signed some of the group published documents are not sufficient to meet group pleading requirements.")), but it does not establish his participation in the day-to-day operations of Splash.

**\*15** Plaintiffs allege that the group published information doctrine extends to Radius as well since it shared a special relationship with Splash by virtue of (1) its ownership of 20% of Splash stock, (2) Splash being a Radius "spin-off," (3) the majority of Splash officers being former Radius officers, and (4) Radius' dependence upon its Splash stock for its survival. (FAC at ¶¶ 5 and 32). In addition, to the extent Berger is liable for any statements, Radius also is liable "[s]ince Berger was acting on behalf of Radius as a controlled person of Splash." (Opp'n at 15 n. 11).

Radius, unlike Berger, is *not* an outside director. Plaintiffs present no authority for the proposition that a shareholder who is not also either an officer or director may be liable under the group-published information doctrine. In addition, the example *Glenfed II* gave for evidence of a special relationship--participation in preparing or communicating group information at particular times--is absent here. Plaintiffs do not allege with particularity any statement in which Radius played a role.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 15

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

The plaintiffs do not address defendants' contention that defendants cannot be liable for statements made by third-party analysts. As to Radius and Berger, the Court should dismiss all claims arising from analyst statements.

III. Control Person Liability

Even if the complaint fails to state a claim against Berger and Radius for their individual statements or against them under the group-published information doctrine, plaintiffs' rely on one final alternative theory: control person liability. The complaint alleges that Berger was a control person of Splash by virtue of his dual roles as a Splash director and a CEO, President, and director of Radius, which owned 20% of Splash. (FAC at ¶ 164). In addition, Radius allegedly controlled Berger. (*Id.*). It also appears that plaintiffs are alleging that Radius controlled Spalsh, although the complaint does not easily lend itself to that reading.

Section 20(a) of the 1934 Act provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
In order to state a claim for control person liability, plaintiffs must allege (1) a primary violation of the federal securities laws and (2) that the alleged controlling person possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of the individual allegedly liable for the primary violation. *See Oak,* 1997 WL 448168,*14; *see* 17 C.F.R. § 230.405 (defining "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise"). The threshold requirement of a primary violation, of course, means that the complaint must allege the

primary violation with the particularity always required by 9(b) and PSLRA. *Id.* In order to adequately plead the second element of a control person liability claim, the complaint must plead the circumstances of the control relationship with particularity. *Id.*

*16 The mere fact that ah individual is a director of a firm is not sufficient to show he is a control person of the firm, *see Dennis v. General Imaging, Inc.,* 918 F.2d 496, 509-10 (5 th Cir.1990); *Food and Allied Service Trades Dept., AFL-CIO v. Millfeld Trading Co., Inc.,* 841 F.Supp. 1386, (S.D. N.Y.1994), although it is a "sort of red light," *Paracor Finance, Inc. v. General Electric Capital Corp.,* 96 F.3d 1151, 1163 (9 th Cir.1996) (en banc). A complaint need not allege that the alleged control person actively participated in the alleged wrongful act. [FN14] *Leff v. CIP Corp.,* 540 F.Supp. 857, 867 (S.D. Oh 1982); *see Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9 th Cir.1990). The focus turns on "whether the defendant, acting alone or as a member of an identifiable group, had the power or influence to direct significant aspects of the management of the corporation." *In re Convergent Technologies Sec. Litig.,* 108 F.R.D. 328, 342 (N.D.Cal.1985) (Magistrate Brazil).

> FN14. The absence of any involvement, direct or indirect, in the particular culpable behavior may become the focal point, however, of the good faith defense. *Paracor,* 96 F.3d at 1164.

In the instant case, the complaint does not allege with sufficient particularity that Radius controlled Splash. Plaintiffs focus primarily on the fact that Radius owned approximately 20% of Splash's stock. Ownership of voting securities can be the source of the power to influence and control a corporation's management and policies. 17 C.F.R. § 230.405; *see Leff,* 540 F.Supp. at 867 (refusing to hold on motion to dismiss that party owning 16% of stock in corporation was not a control person). Radius' position in Splash, however, slipped over the course of the class period; in July 1998, Radius sold its remaining share in Splash. Undoubtedly, a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 16

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

significant stock position is relevant, but it does not by itself carry an allegation of control person liability. *Oak,* 1997 WL 448168,*15. Plaintiffs' complaint fails to provide some corroborating, particular evidence of control, hoping instead that the Court will infer the control from the facts that (1) Splash had been a Radius operating division, (2) Radius' CEO and Board Chairman, Berger, served on Splash's Board, and (3) the majority of Splash's officers were former Radius employees. As with the stock evidence, plaintiffs are asking the Court to assume control exists. Although such a favorable inference may prove acceptable under normal pleading standards, it violates the spirit of the heightened pleading requirement by which plaintiffs' complaint should be judged. The FAC does not provide even one specific act of control exercised by Radius or Berger over Splash. The factual allegations do not prove sufficient to state a claim with particularity of control person liability against Radius.

The analysis is similar for Berger. Because he served on Splash's board while employed as Radius' CEO and Board Chairman, plaintiffs attempt to impute Radius' influence to him. As already discussed, the complaint fails to establish that Radius possesses the control over Splash which is asserted in conclusory fashion. Plaintiffs emphasize Berger's signature on the Prospectus and Registration statement as particular evidence of his power to direct and control Splash's management and policies. *See In re The Leslie Fay Cos ., Inc. Sec. Litig.,* 1993 U.S. Dist. LEXIS 15077,*20 (S.D.NY.1993) (resting its finding that the complaint adequately pled control liability *in part* on the fact that each defendant had signed at least one of the SEC filings in which false and misleading statements allegedly were made). The fact that Splash sought Berger's signature unquestionably suggests the possibility of control. Likewise, the complaint's general, conclusory allegations of Berger's access to unspecified inside information and his purported ability to prevent the issuance of the alleged false reports in this case suggest the possibility of control. (FAC at ¶¶ 30(f) and (g)). Although close, these general allegations do not constitute particular evidence of

control. For example, plaintiffs do not allege that x individual in Splash provided Berger y press release on z date with the request that Berger determine whether the disclosure was sufficient. Likewise, the complaint does not allege that Berger contacted x individual in Splash on y day, told him to pursue z policy, and Splash then pursued that policy. Rather, the complaint attempts to adduce circumstantial evidence of control, relying on a series of favorable inferences from this Court. Plaintiffs have failed to allege control with particularity as to either Berger or Radius. [FN15]

> FN15. As is apparent from the Court's other order filed this day, plaintiffs also have failed to allege a primary violation.

IV. Statute of Limitations

*17 As an alternative grounds for dismissal, defendants allege that the statute of limitations bars plaintiffs' claim. Plaintiffs Scott and Wu filed the an action on January 9, 1999.

Claims brought pursuant to § 10(b) and Rule 10b-5 " 'must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." ' *Berry v. Valence Technology Inc.,* 175 F.3d 699, 703 (9 th Cir.1999) (quoting *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350 (1991)). The Ninth Circuit has not determined whether inquiry or instead only actual notice may trigger the one year statute of limitations, although it has recognized that every circuit that has addressed the issue has held that inquiry notice is the appropriate standard. *Id.* at 703-4. The Ninth Circuit has implied that inquiry notice is appropriate. *See Stay Elec.,* 89 F.3d at 1411 (finding adequate notice of the securities fraud existed since "plaintiffs were clearly aware of or suspected fraud" more than one year before adding new defendants) (emphasis added). On the basis of both *Stay* and the universal approach of other circuits, at least one case in this district has determined that inquiry notice should apply. *City Nominees Ltd. v. Macromedia, Inc.,* 1998 WL 267964,*1 (N.D.Cal.1998) (Judge Conti). This Court likewise finds inquiry notice appropriate.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 17

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

Although *Valence* did not explicitly hold that inquiry notice is the appropriate standard, it expressed a preference for the Tenth Circuit's formulation of that standard. *Valence,* 175 F.3d at 704. Under that approach, the statute of limitations does not begin running until a reasonable investor, in the exercise of reasonable diligence, "should have discovered the facts underlying the alleged fraud." *Id.* (internal quotation and citation omitted); *Reisman v. KPMG Peat Marwick LLP,* 965 F.Supp. 165, 171 (D.Mass.1997). In practice, then, inquiry notice implicates a two-part analysis. First, the court must determine when the duty to investigate arose. *Valence,* 175 F.3d at 704. The focus at this stage is on whether the information allegedly triggering the duty constituted a sufficient "storm warning" to alert a reasonable investor of the probability of fraud. *Pilarczyk v. Morrison Knudsen Corp., MK,* 965 F.Supp. 311, 317 (N.D.NY.1997); *Arduini/Messina Partnership v. National Medical Financial Services Corp.,* 74 F.Supp.2d 352, 358 (S.D.NY.1999); *see Reisman,* 965 F.Supp. at 171 (utilizing same standard except substituting "possibility" for "probability"). Second, the court must determine when a reasonably diligent investor, armed with the triggering information, should have discovered the facts forming the basis of the fraud alleged in the complaint. *Valence,* 175 F.3d at 704. Separating the analysis into two parts emphasizes an important point: the statute of limitations does *not* necessarily begin running upon the emergence of facts first exciting inquiry into the specific possibility of fraud. *See id.*

**\*18** When the statute of limitations begins to run as a result of inquiry notice is a factual question. *See Valence,* 175 F.3d at 706 (noting that it would have needed to remand the case for a factual determination of when, if ever, a reasonably diligent investor should have uncovered the facts forming the basis of the alleged fraud if it had found that the magazine article in that case raised sufficient suspicions to cause a reasonable investor to investigate further). The factual inquiry, however, is an objective one. *Seibert v. Nives,* 871 F.Supp. 110, 114 (D.Conn.1994). Thus, dismissal under the statute of limitations is inappropriate on a motion to dismiss as long as the necessary facts are present in papers appropriate for review on a motion to dismiss. *Dodds v. CIGNA Sec., Inc.,* 12 F.3d 346, 352 n. 3 (2d Cir.1993); *Seibert,* 871 F.Supp. at 114.

As plaintiffs alleged in their original complaint, EFI, one of Splash's competitors, revealed on December 12, 1997, that the combination of a downturn in Asian markets, a reduction in orders of EFI products from Asian customers, increased competition, and a declining market share would result in a revenue and earnings shortfall for EFI. OC at ¶¶ 20-2, 118, 120-1. Plaintiffs' original complaint alleged that EFI's disclosure "let the cat out of the bag" about the true facts concerning Splash's future business. *Id.* Splash allegedly had omitted to disclose the downturn in Asian markets, the reduction of orders from Asian customers, and increased competition in the color printer market.

In their FAC, plaintiffs curiously omit their "cat out of the bag" allegation. The FAC still includes many of the other factual allegations above (although, also interestingly, it omitted the allegations concerning EFI's declining market share). It also alleges that Splash's stock fell as much as 21% in the aftermath of EFI's disclosure.

The decisive issue is whether plaintiffs should be bound by the "cat out of the bag" allegation in their original complaint. If the Court literally holds them to the allegation that EFI's announcement effectively revealed Splash's fraudulent statements and omissions, then the statute of limitations for the pre-December 12, 1997, statements commenced running on December 13, 1997. If the Court adopts that approach, no meaningful distinction exists, by plaintiffs' implicit concession, between the date of the announcement and the date when a reasonable investor, exercising reasonable diligence, should have known of the fraud. In other words, plaintiffs' "cat out of the bag" statement constituted a concession that the announcement provided actual notice of the fraud.

On the other hand, if the Court does *not* hold plaintiffs to this allegation in their initial complaint, defendants have failed to demonstrate that the statute of limitations bars plaintiffs' claims.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 18

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

Defendants' failure is conceptual: they assume for purposes of inquiry notice that the date of the EFI announcement is also the date when the statute of limitations commenced. Thus, they fail to address the second question articulated by *Valence:* when a reasonable investor, armed with the triggering information, should have uncovered the alleged fraud. Defendants suggest that news of EFI's problems should have alerted a reasonable investor instantaneously to Splash's fraudulent conduct, and they trumpet the sharp 21% decline in Splash stock as tangible, timely evidence that other investors quickly suspected the fraud. *See City Nominees Ltd. v. Macromedia, Inc.,* 1998 U.S. Dist. LEXIS 7347 (N.D.Cal.1998) (finding that a rapid decline in a stock's value could cause a reasonable investor to inquire into whether fraud had occurred). This assertion misses the second step of the inquiry by implicitly equating the arousal of suspicion with the commencing of the statute of limitations. Without question, the combination of EFI's announcement with the 21% decline in Splash's stock constituted "storm clouds" that would invoke a duty to inquire, [FN16] but the statute of limitations analysis does not end with that finding. *Sterlin,* 154 F.3d at 1205 (remanding because court failed to assess when a reasonable investor should have discovered the facts underlying the alleged fraudulent activity).

> FN16. In response to the decline of Splash's stock, Splash officials made some public comments aimed at restoring public confidence. Such statements, however, do not relieve investors from the duty of inquiring into suspected fraud. *Sterlin v. Biomune Sys. Inc.,* 154 F.3d 1191, 1204 (10 th Cir.1998).

**\*19** Judicial estoppel bars plaintiffs from making a factual assertion now that is inconsistent with an assertion made previously in this proceeding. *Cline v. Industrial Maintenance Engineering & Contracting Co.,* 200 F.3d 1223, 1231 (9 th Cir. Jan. 11, 2000). In a close call, the Court concludes that the "cat out of the bag" statement did not constitute the concession now claimed by defendants. In conceding that the EFI announcement let the cat out of the bag, the

plaintiffs merely may have been contending that the "storm clouds" formed on that day; the Court need not read this statement as a concession that no further inquiry was necessary. The Court DENIES defendants' statute of limitations argument.

V. Failure to Comply with Rule 8

By this point, the deficiencies in plaintiffs' complaint are well-documented. Perhaps anticipating the Court's exhaustion with this FAC, defendants move for one final blow--dismissal under Rule 8. Rule 8(a) requires that pleadings be "short" and "plain." Moreover, each averment in a pleading "shall be simple, concise, and direct." F.R.Civ.P. 8(e).

Plaintiffs' crowded 96 page complaint is neither short nor plain. Complex, verbose allegations are more the rule than the exception in this complaint, as amply evidenced by paragraphs 130-142 in which plaintiffs include a host of allegedly misleading statements and then paragraph 143, which specifies twelve reasons why the statements in the preceding thirteen paragraphs are false or misleading. Making sense of these allegations proves an excruciating, time-sensitive task.

The particularity requirements of Rule 9(b) and the PSLRA account for much of the mind-numbing detail included in plaintiffs' complaint. Prior to the passage of the PSLRA, Judge Norris anticipated the violence that a requirement that scienter be pled with particularity would visit on Rule 8 in securities fraud complaints and captured the difficulties that would be faced by plaintiffs' attorneys in securities fraud cases:

> [The] level of detail [In this complaint] is typical of the modern securities fraud complaint. While I deplore such a radical departure from Rule 8's command of 'simple, concise, and direct' pleadings, it is inevitable that prudent lawyers, faced with the obstacle of an inference of scienter test at the pleading stage, will throw into their complaints every scrap of evidence they can muster.

*Glenfed,* 42 F.3d at 1555 (J. Norris concurring).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 19

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

Tension between Rule 8 and the particularity requirements of the PSLRA and 9(b), to the extent any true tension exists, is not a license to bombard defendants and courts with unwieldy puzzle-style complaints. *See Lumisys,* 2 F.Supp.2d at 1244 (listing a number of cases from federal district courts in California lamenting bloated complaints in securities fraud actions). In some ways, plaintiffs' counsel made a serious effort to address the concerns articulated by other courts. The complaint bolds and italicizes the allegedly actionable statements and attempts to follow each actionable statement or clump of actionable statements with the reasons why the statement(s) is (are) false or misleading. The complaint commences with an introduction and overview, which sketch in relatively brief fashion plaintiffs' theory. The allegations dealing with a strong inference of scienter are carefully distinguished and separated from those dealing with false and misleading statements. These organizational features of the complaint are quite helpful.

**\*20** Despite these attributes, the complaint frequently resembles a puzzle. *Lumisys* provides an enlightening example. In finding that the complaint failed to set forth a short and plain statement of plaintiffs' claims as required by Rule 8, the court faulted the complaint for lumping all the alleged misrepresentations in one fourteen page segment and the following that section with a three page "laundry list" of reasons why the statements allegedly were false when made. *Lumisys,* 2 F.Supp.2d at 1243. The burden fell on defendants and the court to match statements with "true facts." *Id.* Although plaintiffs' organizational structure attempts to some extent to do the matching for the Court, undifferentiated clumping is still a prominent, if not defining, feature. Rather than providing one large clump of allegedly false statements followed by one clump of reasons why the statements are false, plaintiffs' complaint employs a number of smaller groups of allegedly false or misleading statements (*see e.g.* FAC at ¶¶ 70-81, 83-87, 89-98) with each group usually followed by a number of undifferentiated reasons why the statements are false (*see e.g .* ¶ 82, 88, 99). Although matching these statements with a

preceding allegedly false or misleading statement proves quite easy sometimes, it is much more challenging on other occasions. Plaintiffs could have made this process much easier for both defendants and the Court if they had specifically identified which "true facts" referred to which allegedly false or misleading statements. They shall do so in any amended complaint they elect to file consistent with this order.

**V.** *CONCLUSION*
In light of the above analysis, the Court harbors great concern whether plaintiffs should receive leave to file a second amended complaint against Berger and Radius. Plaintiffs directly attribute only a few statements to these defendants and have failed to plead control person liability in sufficient detail. As with the myriad statements discussed in the order responding to the Splash defendants' Motion to Dismiss, the few statements attributable to Radius and Berger are not actionable as pled because both the circumstances of falsity and the scienter lack the requisite detailed allegations.

Trusting the plaintiffs will take seriously their Rule 11 obligations, the Court grants plaintiffs leave to amend their complaint as it applies to Radius and Berger. If plaintiffs cannot address the deficiencies highlighted in this order, they shall not attempt to refile claims against Berger and/or Radius.

For the reasons discussed above, the Court dismisses all claims against Berger and Radius arising from statements made by analysts.

The Court specifically instructs plaintiffs as follows:
(1) With respect to alleged false or misleading statements made by Berger, any amended complaint must (a) allege in sufficient detail the *falsity* of *each* statement and (b) allege the specific source of the information forming the basis of the allegation of falsity and how plaintiffs learned of this information. With respect to these statements and all others for which Berger and Radius allegedly are liable, plaintiffs shall specify the sources of the defendants' alleged internal knowledge.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

**(Cite as: 2000 WL 1727405 (N.D.Cal.))**

Page 20

**\*21** (2) With respect to their group-published information theory against Radius and Berger, plaintiffs shall plead in sufficient detail the defendants' participation in Splash's day-to-day operations.
(3) With respect to their control person liability theory against Radius and Berger, plaintiffs shall plead with sufficient particularity the nature of control exercised by these defendants.

In conclusion, the first amended complained is DISMISSED. This dismissal is without prejudice except as specifically designated above or in the accompanying order regarding the motion brought by the Splash defendants. Plaintiffs shall file any amended complaint no later than *October 25, 2000.* In filing any such amended complaint, plaintiffs shall make every effort to comply with both the letter and the spirit of this order.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2000 WL 1727405 (N.D.Cal.), Fed. Sec. L. Rep. P 91,249

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.