1

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

C

Briefs and Other Related Documents

United States District Court,N.D. Illinois, Eastern Division.
CEMENT-LOCK, an Illinois limited liability company, and
Richard Mell, an individual, Plaintiffs,
v.
GAS TECHNOLOGY INSTITUTE, an Illinois corporation,
Institute of Gas Technology, an Illinois corporation, En-
desco Services, Inc., an Illinois corporation, Endesco Clean
Harbors, LLC, an Illinois limited liability company, Stanley
S. Borys, an individual, James E. Dunne, an individual,
Francis S. Lau, an individual, Cement-Lock Group, LLC, a
Delaware limited liability company and nominal defendant,
Defendants.
**No. 05 C 0018.**

Sept. 30, 2005.

Jerald P. Esrick, Elizabeth Mary Troy Keiley, Robert Loren
Wagner, Wildman, Harrold, Allen & Dixon, Chicago, IL,
for Plaintiffs.
Alexander S. Vesselinovitch, Daniel J. Polatsek, Katten
Muchin Rosenman LLP, Joel David Bertocchi, J. Gregory
Deis, Mayer, Brown, Rowe & Maw LLP, Chicago, IL, for
Defendants.

*MEMORANDUM OPINION AND ORDER*
PALLMEYER, J.
**\*1** This lawsuit is the culmination of seven years of dashed
commercial hopes for a new technology to decontaminate
wastes and convert them into a beneficial cement additive.
On January 3, 2005, Cement-Lock LLC and Richard Mell
(collectively, "Plaintiffs"), as members of Cement-Lock
Group, brought a derivative action against the nominal De-
fendant, Cement-Lock Group, and several other alleged
wrongdoers, including Gas Technology Institute, Institute of
Gas Technology, Endesco Services, Inc., Endesco Clean
Harbors, LLC, Stanley S. Borys, James E. Dunne, and Fran-
cis S. Lau (collectively, "Defendants").

The eleven counts of Plaintiffs' Complaint follow a 50-page
preamble that asserts "[w]hat began as a legitimate enter-
prise to obtain funding to commercialize and market a tech-
nology for remediating contaminated materials and convert-

ing them into a cement additive, has become a massive
fraud with Defendants stealing and diverting grant funds
through a pattern of racketeering involving acts of mail
fraud, wire fraud, money laundering, and more." (Compl. at
¶ 1.) Plaintiffs paint a picture of a board of directors gone
bad: millions of dollars in grant money earmarked for the
development of the technology, but instead used to pay De-
fendants' salaries and to fund unrelated or nonexistent
projects. Plaintiffs claim Defendants passed up lucrative de-
velopment projects for the technology in favor of providing
broad licenses to their own partners and employees in non-
arm's-length transactions so as to keep the technology in its
infancy and facilitate Defendants' misappropriation of grant
money. Defendants allegedly concealed or misrepresented
information concerning much of the grant money, the non-
arm's-length transactions, and the financial condition of Ce-
ment-Lock Group to Plaintiffs, so that Plaintiffs did not or
could not question Defendants' actions resulting in losses to
Cement-Lock Group.

In the motion now before the court, Defendants seek dis-
missal of six of the eleven counts: Count I, alleging that all
Defendants breached fiduciary duties to the nominal De-
fendant, Cement-Lock Group; Counts II and III, alleging vi-
olations of the Racketeer Influenced and Corrupt Organiza-
tions Act ("RICO"), 18 U.S.C.A. § 1962(c) & (d); and
Counts IV, V, and VI, alleging that Defendants fraudulently
concealed and fraudulently or negligently misrepresented
the sources and amounts of money granted to fund the Tech-
nology and the resulting misappropriation of this money, the
true financial condition of Cement-Lock Group and En-
desco Clean Harbors, the non-arm's-length licenses granted
to Endesco Clean Harbors, and the true condition of the de-
velopment projects for the technology. For the reasons ex-
plained here, Defendants' motion is granted with respect to
the RICO claims, but otherwise denied.

*BACKGROUND*

The following facts are derived from Plaintiffs' complaint,
as on a motion to dismiss, the court accepts all well-pleaded
allegations as true. *Jackson v. E.J. Brach Corp.,* 176 F.3d
971, 977-78 (7th Cir.1999). From 1993 to 1996, Sarabjit
and Surjit Randhava and Richard Kao invented and de-
veloped a novel process for decontaminating soils and sedi-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 2
Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

ments that are contaminated with organic and inorganic wastes, and then converting them into a beneficial cement additive (the "Technology"). (Complaint at ¶ 45.)

> FN1. The complaint includes 306 numbered paragraphs and spans seventy pages. Rather than attempting to recount those allegations in full detail, the court will present a brief synopsis here, and identify more specific facts relevant to the parties' arguments in the court's analysis of those arguments.

**\*2** In 1994 and 1995, the Randhavas met with representatives of the Institute of Gas Technology and the Gas Research Institute regarding potential development of the Technology. (*Id.* at ¶ 46.) The Institute of Gas Technology is an energy research center serving the major providers and users of natural gas and has particular experience in developing new technologies. (*Id.* at ¶¶ 21, 46 .) The Gas Research Institute is a scientific research organization that plans, manages, and finances research and development of gaseous fuels, and has access to substantial funding sources. (*Id.* at ¶¶ 22, 46.) The complaint does not discuss the content or outcome of these talks between the Randhavas, the Institute of Gas Technology, and the Gas Research Institute.

In 1995 and 1996, the Randhavas, through their company Unitel Technologies, Inc., worked with Brookhaven National Laboratories, a United States Department of Energy research laboratory, to conduct research into alternative methods for disposing of or remediating sediments dredged from the New York/New Jersey harbors. (*Id.* at ¶ 47.) The Randhavas and Brookhaven National Laboratories funded two demonstration experiments that confirmed the Technology was a cost-effective method for remediating sediments and creating a versatile cement by-product that exceeded industry standards. (*Id.* at ¶¶ 48-49.)

On October 24, 1996, the Randhavas formed Cement-Lock, LLC, to develop, commercialize, and market the Technology. (*Id.* at ¶ 50.) On December 24, 1996, the Randhavas and Kao, along with Michael Mensinger, Amirali Rehmat (an employee of Institute of Gas Technology), and Anthony Lee (an employee of Institute of Gas Technology), as inventors, filed two patent applications with the United States

Patent and Trademark Office ("USPTO") to patent the Technology. The patents were awarded in 1998 and 1999. (*Id.* at ¶ 51.) In 1997, they filed successful applications for patents in Taiwan and Australia, and for an International Patent. (*Id.* at ¶ 52.) The inventors assigned their intellectual property rights in the patents to Cement-Lock. (*Id.* at ¶ 53.) In addition, Cement-Lock filed two applications in the USPTO to obtain registration of CEMENT-LOCK as a service mark and ECOMELT as a trademark, both of which are valid, subsisting registrations. (*Id.* at ¶ 54.)

> FN2. Plaintiffs do not further identify Michael Mensinger.

> FN3. Plaintiffs do not further identify Rehmat's position.

The talks between the Institute of Gas Technology and the Randhavas resumed from April through August 1997. The Institute of Gas Technology, through its representatives Stanley Borys and Anthony Lee, initially proposed that the Institute of Gas Technology acquire an equity, or ownership, interest in Cement-Lock through Endesco Services. (*Id.* at ¶ 55.) Defendant Endesco Services is a wholly-owned subsidiary of Institute of Gas Technology; Stanley Borys is its Chief Executive Officer and President. (*Id.* at ¶ 23.) The Randhavas rejected that proposal. (*Id.*) After a series of negotiations, Borys proposed creating a limited liability company called Cement-Lock Group ("Cement-Lock Group") with Endesco Services, Cement-Lock, and Alderman Richard Mell as members, which would develop and market the Technology into a commercially successful process. (*Id.* at ¶ 56.) Borys and Lee proposed that Cement-Lock would contribute the Technology, its own expertise, scientific and engineering, and its intellectual property rights; Institute of Gas Technology and Endesco Services would contribute their staff, marketing resources, and access to funding sources; and Mell would assist in finding investors and potential customers for the Technology. (*Id.*) Borys and Lee represented to the Randhavas that a $5 billion worldwide market existed for the Technology, and they threatened that the Institute of Gas Technology would market the Technology on its own if the Randhavas refused to create Cement-Lock Group. (*Id.* at ¶¶ 57-58.) The Institute of Gas Technology's representatives assured the Randhavas that the Gas

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                           Page 3

Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

Research Institute was already lined up as a funding source of $4.5 million for a demonstration plant in New York or New Jersey. (*Id.* at ¶ 59.) Unknown to the Randhavas or Mell, the Institute of Gas Technology was in serious financial difficulties. (*Id.* at ¶ 60.)

> FN4. Plaintiffs do not further identify Lee's position.

> FN5. Mell is the well-known alderman of Chicago's 33rd Ward. He has served in that capacity since 1975.

> FN6. Plaintiffs do not explain how the Institute of Gas Technology could market the Technology belonging to Cement-Lock.

> FN7. Plaintiffs do not explain why this was unknown to the Randhavas and Mell.

**\*3** The Randhavas, on behalf of Cement-Lock, accepted Institute of Gas Technology's proposal to create Cement-Lock Group on September 5, 1997, at a meeting between Borys, Surjit Randhava, and Mell. (*Id.* at ¶ 61.) In November 1997, Institute of Gas Technology and Endesco Services created Endesco Clean Harbors as a wholly-owned subsidiary of Endesco Services. (*Id.* at ¶ 71.) Lee told Cement-Lock and Mell that Endesco Clean Harbors was created because the Gas Research Institute insisted that it deal with a company separate from Cement-Lock Group to handle development of the Technology. (*Id.* at ¶ 72.) Endesco Services controls and directs all actions of Endesco Clean Harbors, which has no employees of its own. (*Id.*) All of the managing employees of Endesco Clean Harbors have been employed by the Institute of Gas Technology at some point. (*Id.*)

> FN8. Where this opinion mentions "Cement-Lock" as opposed to the names of the individual members of Cement-Lock, the complaint does not specify which member of Cement-Lock was involved.

Cement-Lock Group was formed as a Delaware limited liability company on December 1, 1997. (*Id.* at ¶ 61.) The primary purpose behind creation of Cement-Lock Group was to seek out and obtain research grant funding to develop the Technology, commercialize it, and then license it to private companies and local, state, federal, and foreign government agencies. (*Id.* at ¶ 63.) The Board understood that Endesco Clean Harbors would apply for and receive research funding on behalf of Cement-Lock Group. (*Id.* at ¶ 73; ¶ 76.) Cement-Lock Group has three members: Cement-Lock (consisting of the Randhavas and Kao), Mell, and Endesco Services. (*Id.* at ¶ 18.) The first two members, Cement-Lock and Mell, are the Plaintiffs in this action. Under the operating agreement, Endesco Services holds a 51% membership interest in Cement-Lock Group, Cement-Lock holds a 39% interest, and Mell holds a 10% interest. (*Id.*) The profits and losses and revenues of Cement-Lock Group are allocated 45% to Endesco Services, 45% to Cement-Lock, and 10% to Mell. (*Id.* and ¶¶ 61-62.)

Initially, Cement-Lock Group's operating Board had seven managers: three representatives designated by Endesco Services, three representatives designated by Cement-Lock, and one representative designated by Mell. (*Id.* at ¶ 65.) Endesco Services chose Stanley Borys (the president of ESI), Anthony Lee (an employee of Institute of Gas Technology), and Amirali Rehmat (an employee of Institute of Gas Technology) to serve on the Board; Cement-Lock chose the Randhavas and Kao. (*Id.* at ¶ 65.) At the Cement-Lock Group's inception on December 1, 1997, Mell granted Borys a power of attorney to vote on Mell's behalf. (*Id.*) The operating Board had the express authority to control the management and operations of the company. (*Id.* at ¶ 66.)

On December 1, 1997, Borys (on behalf of Cement-Lock Group) and Rehmat (on behalf of Endesco Clean Harbors), with the knowledge, but allegedly not approval, of Plaintiffs (Cement-Lock and Mell), signed a license agreement. The license gave Endesco Clean Harbors a seventeen-year, royalty-free exclusive right to practice the Technology in New York and New Jersey, treating to 100,000 cubic yards of sediment per year. (*Id.* at ¶¶ 75-77.) Cement-Lock Group received no consideration for this exclusive license. (*Id.*) Borys and Lee represented to Cement-Lock and Mell that this license was necessary to further develop the Technology because Endesco Clean Harbors would apply for and receive grant funds on behalf of Cement-Lock Group. (*Id.* at ¶ 76.)

> FN9. The complaint does not identify how it was

Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

that Rehmat, an employee of the Institute of Gas Technology, participated in this transaction on behalf of Endesco Clean Harbors.

**\*4** On December 2, 1997, Cement-Lock assigned its service mark, trade name, and trademark rights in CEMENT-LOCK and ECOMELT to Cement-Lock Group. (*Id.* at ¶ 68.) Cement-Lock Group licensed back these marks and the trade name to Cement-Lock on the same day. (*Id.*) On December 1 and 2, 1997, Cement-Lock, Institute of Gas Technology and Unitel assigned all rights in the United States, Taiwan, Australia, and International patents to Cement-Lock Group. (*Id.* at ¶ 69.)

On January 26, 1998, the Cement-Lock Group Board authorized Borys and James Dunne, Chief Financial Officer and Secretary of Endesco Services to enter into future licensing agreements on behalf of Cement-Lock Group with Endesco Clean Harbors and other third parties without further Board approval. (*Id.* at ¶¶ 26, 122-23.) Plaintiffs, Cement-Lock and Mell, allege that Lee represented that this arrangement would enhance Cement-Lock Group's ability to obtain research revenues. (*Id.*) Plaintiffs allege the following improprieties on the part of Defendants during 1998:
• The Gas Research Institute granted approximately $4.5 million to Endesco Clean Harbors to sponsor a demonstration facility for the Technology in New York or New Jersey, in return for which Institute of Gas Technology granted the Gas Research Institute a 20% interest in Endesco Clean Harbors. (*Id.* at ¶ 116.)
• Surjit Randhava called Lee three times to inquire about how and when the $4.5 million would be spent, and Lee responded that Endesco Clean Harbors needed all the Gas Research Institute money to satisfy its obligations on the New York/New Jersey project. (*Id.* at ¶ 118.) In reality, Borys and Dunne directed $1 million to Endesco Services and Institute of Gas Technology to cover unrelated debts and expenses, and the remainder of money on favored subcontractors and as kickbacks to a favored contractor and employee of the Gas Research Institute, Peter Barone. (*Id.* at ¶¶ 4, 119.)
• Brookhaven National Laboratories granted approximately $1.5 million to Institute of Gas Technology to fund the Technology demonstration facility in New York/New Jer-

sey. Defendants spent this money to compensate Institute of Gas Technology's and Endesco Services' employees or to purchase inferior equipment for the New York/New Jersey facility. (*Id.* at ¶¶ 120-21, 127.)

In 1999, Defendants continued their efforts to obtain grant money. Borys, Lee, and Barone told Rehmat, Anil Goyal, and Mensinger to apply for grant money based on developing the Technology for use with material other than sediments. (*Id.* at ¶ 128.) The State of Michigan, represented through the Snell Environmental Group ("Snell Group"), granted money to Institute of Gas Technology in an amount unknown to Plaintiffs. (*Id.* at ¶ 129.) Cement-Lock and Mell were not informed of the grant application, nor the award of funds. (*Id.*) The Gas Research Institute awarded funds in unknown amounts to support the extension of the Technology for Detroit River sediment, contaminated concrete, and PCB contaminated soils. Cement-Lock and Mell were not informed of this award. (*Id.* at ¶ 130.)

> FN10. Plaintiffs do not identify Goyal.

> FN11. Mensinger applied for patent applications for the Technology with the Randhavas, Kao, Rehmat and Lee in 1996, but Plaintiffs provide no further information about Mensinger.

> FN12. Plaintiffs provide no further information about the Snell Group.

**\*5** Instead, at the March 24, 1999, Cement-Lock Group Board meeting, Borys and Lee informed the Randhavas and Mell that Cement-Lock Group had no income and needed $150,000 to cover overdue expenses. Borys and Lee further represented that Endesco Clean Harbors would pay Cement-Lock Group this amount in exchange for a license to use the Technology to process an additional 500,000 tons/year of sediment into the beneficial cement additive at a second facility in New York or New Jersey. (*Id.* at ¶ 131.) At that meeting, Borys and Lee also represented that Endesco Clean Harbors was $3 million short and would be unable to pay vendors for their work on the first facility, what had now become the Bayonne, New Jersey project. (*Id.*) In fact, contrary to these representations, Endesco Clean Harbors and Cement-Lock Group had been awarded substantial research

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 5
Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

funding and were short of money only because Defendants were diverting grant money to their own purposes. (*Id.* at ¶ 132.)

> FN13. Plaintiffs do not explain where the $150,000 would come from if Endesco Clean Harbors was $3 million short.

On August 25, 1999, Borys (on behalf of Cement-Lock Group) and Rehmat (on behalf of Endesco Clean Harbors) signed a new licensing agreement, much broader than the license to process 500,000 tons/year of sediment, discussed with Plaintiffs at the board meeting. The new license gave Endesco Clean Harbors an exclusive, worldwide license to process 600,000 tons of all wastes with the Technology, but Cement-Lock Group did not receive the $150,000 because Cement-Lock Group did not have a bank account. (*Id.* at ¶¶ 134-35). Although Cement-Lock and Mell had authorized a license amendment based on the representations that Cement-Lock Group and Endesco Clean Harbors were financially strapped, Cement-Lock and Mell did not authorize such a broad amendment to the license agreement. (*Id.*)

> FN14. Plaintiffs do not explain why Cement-Lock Group did not have a bank account, do not state whether Plaintiffs were aware of this, and do not identify the person(s) responsible.

The Cement-Lock Group Board next met on March 8, 2000. (*Id.* at ¶ 136.) At that meeting, Dunne claimed that the Gas Research Institute was willing to grant another $450,000 to Endesco Clean Harbors in return for a 50% ownership in Endesco Clean Harbors, the entity applying to the Gas Research Institute for grant funds for the Technology. (*Id.*) Defendants concealed from Plaintiffs the fact that a Gas Research Institute employee, Barone, was receiving kickbacks from Borys and Dunne in return for helping to misappropriate grant money. (*Id.* at ¶ 137.) In April 2000, Institute of Gas Technology and the Gas Research Institute combined to form the Gas Technology Institute. (*Id.* at ¶ 22.) Plaintiffs do not have further information regarding the ownership and corporate structure of these entities. (*Id.* at ¶ 138.) The Gas Technology Institute ("Gas Technology Institute") is a research, development, and training organization serving energy and environmental markets. (*Id.*)

> FN15. Plaintiffs do not explain why Dunne, who was not a member of the operating Board until 2000, was present at these and other Board meetings.

The grants continued in 2000:
• The Gas Research Institute granted Endesco Clean Harbors approximately $1.45 million purportedly to study the feasibility of using the Technology with sewage sludge, coal ash, and petroleum waste. This grant was diverted to the newly-formed Institute of Gas Technology, subcontractors, or consultants for little or no work, and a portion of it was received as a kickback by Barone, and concealed from Cement-Lock and Mell. (*Id.* at ¶¶ 139-40.)
**\*6** • The Gas Research Institute granted Endesco Clean Harbors $5.2 million purportedly for large-scale testing of the Technology for a variety of applications. This grant was used to cover Defendants' payroll, expenses, losses, other projects, and as profit, as well as for minimal or no-work consulting agreements and subcontracts to Molecular Thermoengines and others, and for kickbacks to Barone, and concealed from Cement-Lock and Mell. (*Id.* at ¶¶ 139, 141.)

> FN16. Plaintiffs allege that Molecular Thermoengine was one of several subcontractors who participated in the scheme to divert money from Cement-Lock Group and the Technology by accepting money from Defendants for little or no work, under the guise of work related to the Technology.

• Nevertheless, although Cement-Lock Group should have had money from the grants, Lee informed Surjit Randhava and Mell that Cement-Lock Group was facing serious financial problems. (*Id.* at ¶ 141.)

On February 2, 2001, Lee (on behalf of Cement-Lock Group) and Rehmat (on behalf of Endesco Clean Harbors), both employees of the Gas Technology Institute, signed another licensing agreement from Cement-Lock Group to Endesco Clean Harbors under instructions from Borys and Dunne. (*Id.* at ¶ 142.) This agreement gave Endesco Clean Harbors a royalty-free, worldwide, exclusive license to use the Technology to process 1.1 million tons/year of any waste product into a beneficial cement additive, purportedly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

in return for $150,000. Plaintiffs allege that Defendants concealed this agreement from Cement-Lock and Mell and that Endesco Clean Harbors never paid the $150,000 license fee. (*Id.*) On March 30, 2001, Lee sent a letter to Surjit Randhava and Mell claiming that Cement-Lock Group was in serious debt and owed the Gas Technology Institute $216,000, and that Endesco Clean Harbors had loaned Cement-Lock Group $100,000. (*Id.* at ¶ 146.) Plaintiffs claim Cement-Lock Group's financial situation was troubled only because the grant money awarded to it had been improperly diverted. Cement-Lock Group never in fact received the $100,000. (*Id.*) The granting of funds for the Technology continued in 2001:

• The Gas Research Institute granted the Institute of Gas Technology approximately $2.8 million to fund a feasibility study for the State of Michigan's initiative to treat Detroit River sediment on a larger scale, and to extend the scope of the Technology to lumber and marine waste applications. (*Id.* at ¶ 143.) This money was diverted to the Institute of Gas Technology to pay unrelated payroll expenses of Defendants, to cover other Institute of Gas Technology and Gas Technology Institute projects, or to be taken as profit. Other portions of the grant were diverted for subcontracts to Molecular Thermoengines and others for minimal work and for kickbacks to Barone in the amount of $168,000. This diversion was concealed from Cement-Lock and Mell. (*Id.* at ¶ 144.)

• The Gas Research Institute granted another approximately $4 million, purportedly to integrate the Technology with thermo-depolymerization and wastewater sludge treatment techniques developed at Institute of Gas Technology and Gas Technology Institute. (*Id.* at ¶ 143.) Two million dollars was diverted to Changing World Technologies, an Institute of Gas Technology-affiliated company; some of the money was diverted to cover Gas Technology Institute's payroll expenses and overhead fees; and other portions of the grant were diverted for subcontracts for minimal work, and for kickbacks to Barone. Thus fraudulent diversion, too, was concealed from Cement-Lock and Mell. (*Id.* at ¶ 145.)

**\*7** • The State of New Jersey granted approximately $1.25 million in response to a proposal by Endesco Clean Harbors to conduct an additional test of the Technology at the proposed New Jersey facility. This money was diverted to Gas Technology Institute to cover its internal expenditures, and

concealed from Cement-Lock and Mell. (*Id.* at ¶ 147.)

On November 16, 2001, the Cement-Lock Group Board met to discuss a change in the operating agreement which would rescind the voting power of attorney that Mell had given Endesco Services in 1997. Mell believed the Institute of Gas Technology and Gas Technology Institute had failed to meet its commitments to Cement-Lock Group. (*Id.* at ¶ 148.) Endesco Services agreed to the amendment on the condition that it be given veto power over any sale of Cement-Lock Group intellectual property for any sum less than $10 million. (*Id.*) On December 3, 2001, Lee (on behalf of Cement-Lock Group) and Randhava agreed to give Unitel (the Randhava's company) a ten-year, non-exclusive, royalty-bearing license for the Technology to process 10 million tons/year worldwide, except in Alabama, Taiwan and Kuwait. (*Id.* at ¶ 150 .) On December 10, 2001, the Cement-Lock Group members met to approve the amendment to the operating agreement giving Mell his vote and Endesco Services their veto power. (*Id.* at ¶ 149.) By this time, however, without informing Cement-Lock or Mell, Lee had changed the language of the agreement, to give Endesco Services veto power not only over any sale but also any license of Cement-Lock Group intellectual property for less than $10 million. (*Id.*)

Prior to the next Board meeting, the Gas Technology Institute terminated Rchmat's employment; the complaint does not explain why. As a result, on February 6, 2002, the Cement-Lock Group Board unanimously removed Rehmat as a manager on the Board. (*Id.* at ¶ 151.) James Dunne, now the Vice President of Finance and Administration and Chief Financial Officer of Gas Technology Institute, and Chief Financial Officer and Secretary of ESI, was appointed to the Cement-Lock Group Board to replace Rehmat and was made its Secretary. (*Id.* at ¶ 26.) On June 24, 2002, Lee (on behalf of Cement-Lock Group) and Barone (on behalf of Endesco Clean Harbors) amended the 2001 license agreement, increasing Endesco Clean Harbors' license frights to process waste to 1.6 million tons/year. (*Id.* at ¶ 152.) This amendment was purportedly made in return for a $100,000 payment to Cement-Lock Group, but Cement-Lock Group did not receive the money, and the transaction was concealed from Cement-Lock and Mell. (*Id.*) The funds also

Westlaw.

Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

continued to pour in for the Technology:

> FN17. Plaintiffs do not explain how Barone, an
> employee of the Gas Research Institute, but not a
> member of the Cement-Lock Group Board, had the
> power to amend the 2001 license agreement.

• The State of Michigan approved a grant of an additional
approximately $2.75 million to Gas Technology Institute in
2002, ostensibly for further research into using the Techno-
logy to process Detroit River sediment into the beneficial
cement additive. This grant was concealed from Cement-
Lock and Mell. (*Id.* at ¶ 153.)

**\*8** • Gas Technology Institute received a $1.2 million grant
from Brookhaven National Laboratories to support the New
Jersey project. This grant was concealed from Cement-Lock
and Mell. (*Id.* at ¶ 154.)

In late 2002, Goyal disclosed to the president of the Gas
Technology Institute, John Riordan, that Cement-Lock
Group funds were being misappropriated and misdirected at
the direction of Borys and senior staff members. (*Id.* at ¶
165.) Riordan ordered an internal investigation of the alleg-
ations and handed the matter to the FBI. (*Id.*) Soon after,
Gas Technology Institute terminated Lee. (*Id.* at ¶ 155.)

> FN18. As noted earlier, Plaintiffs have not identi-
> fied Goyal, but the court presumes he was em-
> ployed by the Gas Technology Institute.

As a result of his termination from the Gas Technology In-
stitute, on January 30, 2003, Lee was unanimously removed
from the Cement-Lock Group board at an annual meeting of
members of Cement-Lock Group. (*Id.* at ¶ 155.) Endesco
Services replaced Lee with Frances Lau, who became Pres-
ident of Cement-Lock Group. (*Id.* at ¶¶ 27, 155.) Lau is Dir-
ector of Thermal Chemical Conversion Research at Gas
Technology Institute and President of Endesco Clean Har-
bors. (*Id.* at ¶ 27.) Also at the January 30, 2003, Board
meeting, Borys revealed to the Randhavas and Mell, for the
first time, that there had been allegations-the complaint does
not make clear by whom-that Endesco Clean Harbors funds
had been misappropriated. (*Id.* at ¶ 166.) Borys said former
Institute of Gas Technology and Gas Technology Institute
employees were responsible and that the "proper authorit-

ies" (again, unidentified in the Complaint) were investigat-
ing. (*Id.*)

On April 7, 2003, Lau (on behalf of Cement-Lock Group)
and Dunne (on behalf of Endesco Clean Harbors), both em-
ployees of Institute of Gas Technology and Gas Technology
Institute, amended Endesco Clean Harbors' license again,
this time increasing the amount of waste it could process to
2.1 million tons/year, and assuring Endesco Clean Harbor
the exclusive right to process the first 1.1 million tons
waste. (*Id.* at ¶ 156.) This transaction was made in return for
a $100,000 payment to Cement-Lock Group that it never re-
ceived, and was concealed from Cement-Lock and Mell.
(*Id.*) On April 18, 2003, at a Cement-Lock Group Board
meeting, Borys informed the managers that approximately
$5 million had been misappropriated by former Gas Tech-
nology Institute employees, and Gas Technology Institute
counsel, Thomas O'Laughlin, assured Board members that
federal authorities were not likely to prosecute the matter.
(*Id.* at ¶ 168.) Borys, Dunne, and Lau still failed to reveal
their involvement in any wrongdoing. (*Id.*)

In 2003, the State of Michigan cancelled its earlier grant of
$2.75 million because of alleged impropriety and misappro-
priation of funds by Gas Technology Institute employees re-
lated to the Technology. (*Id.* at ¶ 157.) At the same time, the
State of New Jersey promised $5 million to support the New
Jersey facility. (*Id.* at ¶ 158.) This promise was concealed
from Cement-Lock and Mell, and Plaintiffs do not know if
the grant was received. (*Id.*) One more grant did come in
2003: the Gas Research Institute provided $3.4 million to
Endesco Clean Harbors, purportedly for work on the New
Jersey facility. (*Id.* at ¶ 159 .) The members and operating
board of Cement-Lock Group, including Cement-Lock and
Mell, were not informed of this grant. (*Id.*)

> FN19. Plaintiffs erroneously cite Paragraph 135 re-
> garding this grant; presumably they meant to cite
> Paragraph 153 in which they allege that the State of
> Michigan approved a grant in 2002 for approxim-
> ately $2.75 million to Gas Technology Institute to
> fund further research into using the Technology to
> process Detroit River sediment.

> FN20. Plaintiffs do not explain how Michigan offi-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                   Page 8

Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

cials learned about any impropriety at Gas Technology Institute.

**\*9** Also in 2003, the Randhavas, through their company Unitel, pursued development of the Technology in Taiwan on behalf of Cement-Lock Group. (*Id.* at ¶¶ 173-74.) Plaintiffs believe that two more facilities in Hong Kong and China would have followed if the Taiwan facility were successful. (*Id.* at ¶ 175.) The Randhavas needed one additional vote to get an amendment of Unitel's non-exclusive 2001 license from Cement-Lock Group to develop the Technology in Taiwan; Borys refused to give Unitel approval to proceed, but Mell consented on September 24, 2003. (*Id.* at ¶¶ 176-77.) On September 26, 2003, however, Lau sent Unitel a letter claiming the amendment violated Endesco Clean Harbors's license, and Borys, Dunne, and Lau sent a letter claiming the amendment was invalid because of the December 10, 2001, amendment to the operating agreement, giving Endesco Services veto power over any sale or license of Cement-Lock Group's intellectual property under $10 million. (*Id.* at ¶ 178.) Also on September 26, 2003, in response to these representations, which Plaintiffs now claim are based on non-arm's-length deals, Mell changed his vote. (*Id.* at ¶¶ 180-81.) Without the expanded license, Unitel was forced to abandon its efforts to develop the Technology in Taiwan. (*Id.* at ¶ 182.)

On January 6, 2004, Sarabjit Randhava requested that Gas Technology Institute's General Counsel, Thomas O'Laughlin, send copies of financial statements for Cement-Lock Group to the members of Cement-Lock Group's Board. (*Id.* at ¶ 160.) O'Laughlin did so, but according to Plaintiffs, the financial statements O'Laughlin furnished inaccurately depict Gas Technology Institute's financial situation. (*Id.*) On April 26, 2004, as was done the previous three years, LaVerne Tedeski, the Corporate Administrator for Gas Technology Institute, sent two proposed unanimous written consents to the members of the Board to ratify and approve all acts and deeds of the Board of Cement-Lock Group. The Randhavas, Kao and Mell had signed the consents in 2001, 2002, and 2003, but they declined to sign it in 2004 because they learned of Defendants' improprieties in late 2003 and early 2004. (*Id.* at ¶ 161.) Plaintiffs allege that the FBI continues to investigate the alleged wrongdoings in

this case. (*Id.* at ¶ 171.)

On April 27, 2004, the Randhavas, Kao, and Mell, as a majority of the seven-member Board of Cement-Lock Group, authorized the filing of a lawsuit on behalf of Cement-Lock Group against Defendants and Peter Barone. (*Id.* at ¶¶ 4, 32-33.) That complaint, filed on May 28, 2004 (Case Number 04-3734, "previous complaint"), contained the same eleven claims as in the instant complaint: breach of fiduciary duty, RICO, RICO conspiracy, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, unjust enrichment, accounting, trademark infringement, unfair competition, and deceptive trade practices.

**\*10** On July 1, 2004, Borys, Dunne, and Lau resigned from the Cement-Lock Group Board, and on December 6, 2004, counsel for Defendants informed Cement-Lock Group that Endesco Services intended to call a meeting of the Cement-Lock Group members on December 16, 2004, to amend the operating agreement to add two managers to the operating Board. (*Id.* at ¶¶ 34, 37.) These managers would be appointed by Endesco Services for the purpose of acquiring majority control of the Board and dismissing the lawsuit against Defendants. (*Id.*) On December 16, 2004, Defendants amended the operating agreement as they had planned, giving Endesco Services a 5-4 majority on the Board. (*Id.* at ¶ 41.) Having lost a majority, the Cement-Lock Group voluntarily dismissed the previous complaint against Defendants. (*Id.* at ¶¶ 39-40.)

Plaintiffs filed the instant Complaint as a derivative action on January 3, 2005, before the open Board positions were filled. (*Id.* at ¶¶ 42-43.) Defendants now move to dismiss the first six counts of the Complaint: Count I alleges that each Defendant owed fiduciary duties to Cement-Lock Group and Plaintiffs and breached these duties by: (1) misappropriating more than $30 million in grant money meant to develop the Technology to pay Defendants' debts, expenses, salaries, and other projects unrelated to the Technology; (2) carrying out non-arm's-length transactions that allowed Defendants to profit from licenses of the Technology without actually developing the Technology; and (3) profiting from subcontracts with conspiring parties who received kickbacks for little or no substantive work done on developing the Technology. (*Id.* at ¶ 97.) In Counts II and III,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                  Page 9

Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

Plaintiffs claim that Defendants, together with a list of other individuals and corporations, constitute an enterprise under RICO which began in 1997 and continues today to perpetrate a pattern of mail and wire fraud and money in misappropriating millions of dollars belonging to Cement-Lock Group. In Counts IV, V, and VI, Plaintiffs claim that Defendants fraudulently concealed from Plaintiffs material facts which Defendants had a duty to disclose, and fraudulently and negligently misrepresented facts to Plaintiffs to prevent them from interfering with Defendants' misappropriation of the funds.

### DISCUSSION

Defendants move to dismiss Counts I through VI of the Complaint pursuant to Federal Rule of Civil Procedure 12. The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the plaintiff's complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). On a motion to dismiss, the court accepts all well-pleaded allegations in a claim as true and draws all reasonable inferences in favor of the plaintiff. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 977-78 (7th Cir.1999) (citation omitted). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In other words, a complaint will survive a 12(b)(6) motion if it "narrates an intelligible the grievance that, if proved, shows a legal entitlement to relief." *U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir.2003) (citations omitted).

> FN21. Defendants invoke Rule 12(b)(1) with respect to the RICO claims, but "[c]ivil RICO 'standing' is usually viewed as a 12(b)(6) question of stating an actionable claim, rather than as a 12(b)(1) question of subject matter jurisdiction." *Anderson v. Ayling*, 396 F.3d 265, 269 (3d Cir.2005) (citations omitted). *See also Lemer v. Fleet Bank, N.A.*, 318 F.3d 113, 129-130 (2d Cir.2003). Therefore, the court will analyze Defendants' motion under the standards appropriate for Rule 12(b)(6).

**\*11** Defendants argue that Plaintiffs' derivative action must be dismissed due to Plaintiffs' failure to make a demand on the Cement-Lock Group Board, as required by Federal Rule of Civil Procedure 23.1. They urge, further, that all six claims at issue here fail to state a claim upon which relief can be granted under Rule 12(b)(6) because Plaintiffs have suffered no harm as a result of Defendants' alleged misconduct, and even if they have suffered harm, the harm was not proximately caused by Defendants' alleged actions. Finally, Defendants argue that Plaintiffs have not met pleaded fraud with particularity under Federal Rule of Civil Procedure 9(b). The court addresses these arguments in turn.

### I. Demand Would Be Futile.

Cement-Lock and Mell bring this suit as a derivative action, as shareholders of Cement-Lock Group seeking to enforce a rights belonging to Cement-Lock Group. Federal Rule of Civil Procedure 23.1, which governs derivative actions, mandates that a derivative complaint state with particularity "the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. Defendants argue that because Plaintiffs filed the instant derivative suit before making a demand on Cement-Lock Group's Board, the Complaint should be dismissed.

In general, a plaintiff must make a demand on a company's governing body to redress the alleged harm prior to instituting a lawsuit on the company's behalf. *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 804 (7th Cir.2003). An exception exists, however, if demand would be futile. To determine whether demand is futile under Illinois law, Illinois courts apply the standard set forth by the Delaware Supreme Court in *Aronson v. Lewis*, 473 A.2d 805 (Del.1984). *Abbott Labs.*, 325 F.3d at 807. "The two-pronged test in *Aronson* provides that demand futility is established if, accepting the well-pleaded facts as true, the alleged particularized facts raise a reasonable doubt that either (1) the directors are disinterested or independent or (2) the challenged transaction was the product of a valid exercise of the directors' business judgment." *Abbott Labs.*, 325 F.3d at 807.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 10
Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

FN22. Both parties agree that Illinois law applies to Plaintiffs' state law claims.

*Aronson* also sets forth the test for determining whether directors are disinterested or independent. A disinterested director "can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from [the challenged transaction] in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Id.* (citing *Aronson,* 473 A.2d at 812-14). To demonstrate a reasonable doubt as to directors' independence, a plaintiff must show that the directors profited by their alleged wrongful actions at the expense of the company and made decisions based on "extraneous considerations or influences" rather than on the "corporate merits of the subject." *Abbott Labs.,* 325 F.3d at 807 (citations omitted).

***12** Plaintiffs urge that their allegations meet this test. The court agrees. The Complaint makes numerous allegations that Cement-Lock Group's directors were interested and diverted profits and business opportunities from Cement-Lock Group for their own benefit. In addition, Plaintiffs allege that Defendants' actions following the filing of the first Complaint in this matter show that a demand on Defendants would be futile: Dunne, Borys and Lau withdrew from the Cement-Lock Group Board and the Board changed its bylaws in order to get the previous lawsuit dismissed. (Complaint at ¶¶ 32-44). As of the time the instant Complaint was filed, Defendants had not appointed managers to fill the open positions on the Board, leaving the Board-with less than a quorum-powerless to act.

FN23. Endesco Services filled the vacant positions two days after the instant lawsuit was filed, putting Borys, Dunne, and Lau back on the Board and adding David Smith and Suresh Babu, both Gas Technology Institute employees. (*See* Def. Mot. at p. 12.)

As Defendants themselves recognize, one of the purposes of the demand requirement is to allow a corporation time to remedy shareholder complaints prior to actual judicial intervention. (Def. Reply at p. 18.) *See also Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 533, 104 S.Ct. 831, 78 L.Ed.2d

645 (1984). That purpose is amply met here; Defendants had several months to make some attempt to remedy Plaintiffs' complaints after the filing of the first lawsuit on May 28, 2004. The previous complaint alleged the same counts as the instant Complaint, and the second suit was not filed until January 3, 2005. Taken together, Defendants' actions in getting the previous complaint dismissed, and the seven months Defendants had to attempt to remedy Plaintiffs' complaints, raise a reasonable doubt that Defendant directors were disinterested or independent. Demand is therefore excused in this case.

FN24. Defendants could have attempted to remedy Plaintiffs' complaints by investigating and putting an end to the alleged wrongdoing and perhaps filing a lawsuit themselves against the perpetrators.

II. Injury Was Proximately Caused By Alleged Acts

Defendants argue that if demand is excused, each of Plaintiffs' first six claims still fail because Plaintiffs do not show that Defendants' actions proximately caused concrete, non-speculative harm to Cement-Lock Group. Proximate cause demands "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). In *Holmes,* the Supreme Court found that the conspirators' conduct of manipulating stock did not proximately cause injury to customers who were only injured insofar as the stock manipulation first injured the broker-dealers and left them without means to pay the customers' claims. *Id.* at 272. Defendants here contend that Cement-Lock Group is an indirect victim like the customers in *Holmes.* Defendants argue that the direct victims of misappropriation of grant funds are the research funding sources: the states of New Jersey and Michigan, Brookhaven National Laboratories, and the Gas Research Institute.

FN25. The Seventh Circuit has held that the RICO proximate cause requirement follows common law ideas about proximate causation. *Isr. Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.,* 61 F.3d 1250, 1257 (7th Cir.1995).

In contrast to *Holmes,* however, where the customers and

Slip Copy                                                                                                    Page 11
Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

the defendants only interacted through intermediaries, in this case there is a direct relationship among Plaintiffs and Defendants, as they are all members of the Board of Cement-Lock Group. *See also Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 616 (6th Cir.2004).* Cement-Lock Group's relationship with the grant funding sources was a direct target of the alleged scheme. "Indeed, interference with that relationship may well be deemed the linchpin of the scheme's success." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 521 (3d Cir.1998).* Plaintiffs allege that Defendants received the grant money because they misrepresented that the money would be going toward Cement-Lock Group's goal of developing and marketing the Technology. Thus, Plaintiffs allege that the funds belonged to Cement-Lock Group, not the grantors, because the funds were received by Endesco Clean Harbors and Institute of Gas Technology/Gas Technology Institute on Cement-Lock Group's behalf to develop the Technology. Cement-Lock Group was the intended recipient of the funds, and thus a direct victim of the alleged misappropriation of funds.

**\*13** Defendants' argument that the funding sources are the only real victims here relies on language in *Mendelovitz,* in which the Seventh Circuit observed that "a corporation does not have standing to sue for damages allegedly accruing from the actions of its directors or officers against third parties, because there can be no proximate cause." *Mendelovitz v. Vosicky,* 40 F.3d 182, 187 (7th Cir.1994). In the court's view, Defendants' reliance on *Mendelovitz* is misplaced. In *Mendelovitz,* the plaintiff brought a shareholder derivative suit on behalf of Comdisco against its directors for issuing public statements asserting it had the right to engage in activities for which IBM was suing Comdisco. *Id* . at 183. The plaintiff in that case claimed damages to Comdisco in the form of present and future attorneys' fees, potential damages from the litigation, and decreased present and future sales caused by the loss of goodwill and reputation. *Id.* at 184-85. Affirming summary judgment in favor of the defendants, the Seventh Circuit observed that the damages the plaintiffs claimed were not imposed on Comdisco directly through the alleged acts of the defendants. Rather, the attorneys' fees, potential damages, and future sales had to pass through many intermediaries, both identified and unidentified. *Id.* at 185. The plaintiff's damages would re-

quire actions and decisions by third parties like IBM, customers that in the future may file a suit like IBM's, and any customer that chose not to do business with Comdisco. *Id.*

By contrast, Cement-Lock and Mell allege that they have already incurred particular damages. They were harmed, they claim, by: (1) misappropriation of millions of dollars in grant money, which prevented the development of the Technology and results in the future loss of profits from the licensing of the Technology (Complaint at ¶ 222); (2) harm to Cement-Lock Group's business reputation; (3) lost business opportunities to market the Technology to other individuals, corporations, or governmental entities, including Taiwan, Hong Kong, and China (*id.* at ¶ 223); and (4) devaluation of Cement-Lock Group's intellectual property by wasted years in the lifespan of certain patents and confusion and infringement on the Technology's service mark and trademark. (*Id.* at ¶¶ 193-194, 219).

Such damages are neither speculative nor remote. Under the common law, concrete injury to business reputation will satisfy the injury element of standing. *See, e.g., Gully v. Nat'l Credit Union Admin. Bd., 341 F.3d 155, 161 (2d Cir.2003)* (citing *Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 139, 71 S.Ct. 624, 95 L.Ed. 817 (1951)*). This rule of law applies in the context of RICO as well. Although an injury to one's *personal* reputation generally is not an injury to "business or property" under RICO, § 1964(c), an injury to a plaintiff's *business* reputation, resulting in concrete economic, contractual, or business losses, is compensable under RICO. *See, e .g., Lerman v. Joyce Intern., Inc., 10 F.3d 106, 113 (3d Cir.1993); City of Chicago Heights v. Lobue, 914 F.Supp. 279, 285 (N.D.Ill.1996).* Court cases disallowing RICO claims based on injury to reputation are distinguishable from the case at hand. In those cases, the plaintiffs were individuals, not corporations, and the connection between the alleged injuries and the plaintiffs was also too indirect. *See Hamm v. Rhone-Poulenc Rorer Pharm., Inc., 187 F.3d 941, 952 (8th Cir.1999). But cf. Terry A. Lambert Plumbing, Inc. v. W. Sec. Bank, 934 F.2d 976, 983 (8th Cir.1991)* (not doubting the plaintiff was injured in the failure of its business and subsequent damaged business reputation, but finding no proximate cause on other grounds).

**\*14** Second, as evidenced by a multitude of patent and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

trademark infringement cases, devaluation or diminution of intellectual property and patent rights may also amount to concrete injury. *See, e.g., Citizens Fin. Group, Inc. v. Citizens Nat. Bank, 383 F.3d 110, 131 (3d Cir.2004)* (borrowing a senior trademark user's reputation and goodwill is an injury in and of itself, even without evidence of actual loss of goodwill). Third, the value of lost profits caused by a defendant's fraud is a compensable injury. *See, e.g., Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc., 271 F.3d 374, 384 (2d Cir.2001)* (value of lost profits as result of defendant's RICO violations is compensable). And, finally, the value of lost business opportunities is also compensable. *See, e.g., Isr. Travel, 61 F.3d at 1258; Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1343 (2d Cir.1994)* (value of business opportunities lost due to defendant's RICO violations is compensable); *Mid Atlantic Telecom Inc. v. Long Distance Servs., Inc., 18 F.3d 260, 264 (4th Cir.1994)* (lost customers and lost revenues are distinct and independent injuries from defendant's fraud).

Plaintiffs provide numerous specific examples of Cement-Lock Group's injuries from the misappropriation of grant money. Plaintiffs assert that Defendants' failure to use the $30 million in grant money to develop and market the Technology and to develop a demonstration facility in New Jersey caused Cement-Lock Group to lose profits it could otherwise have obtained through royalties or license agreements. (*Id.* at ¶¶ 117, 191, 193.) Further, Defendants blocked development of the Technology in Taiwan: In 2003, the Randhavas found an investor willing to give them money to develop the Technology in Taiwan, and Unitel decided to pursue this opportunity on behalf of Cement-Lock Group. (*Id.* at ¶¶ 173-75.) Defendants thwarted this effort when Borys refused to expand Unitel's non-exclusive 2001 license. (*Id.* at ¶¶ 176-77.)

> FN26. As noted earlier, on December 1 and 2, 1997, Unitel assigned all of its patent rights in the United States, Taiwan, Australia, and its International patent to Cement-Lock Group. On December 3, 2001, Cement-Lock Group granted Unitel a ten-year, non-exclusive, royalty-bearing license for the Technology to process 10 million tons/year worldwide, except in Alabama, Taiwan and Kuwait.

On September 21, 2003, Mell agreed to provide the needed majority vote to approve the amendment, but five days later, Lau sent Unitel a letter claiming that the amendment violated Endesco Clean Harbors' current license which, in a non-arm's-length transaction, had been expanded to allow Endesco Clean Harbors to use the Technology to process 2.1 million tons of sediment per year. (*Id.* at ¶ 178.) In addition, Borys, Dunne, and Lau sent a letter claiming the amendment was invalid due to Endesco Services's veto power over any sale or license of Cement-Lock Group's intellectual property for less than $10 million, although Plaintiffs maintained they did not approve veto power after the licensing of Cement-Lock Group's intellectual property. (*Id.*) They maintain that they were never informed that the actual agreement executed on December 10, 2001, would give Endesco Services veto power over the sale or license of Cement-Lock Group's intellectual property. (*Id.* at ¶ 148-149.) Based on these communications, that were allegedly based on improper transactions, Mell changed his vote, and the Taiwan project was cancelled. (*Id.* at ¶¶ 179-80.)

**\*15** In addition, Plaintiffs show that Cement-Lock Group sustained concrete, economic injury from damage to Cement-Lock Group's business reputation when the State of Michigan cancelled its grant to Cement-Lock Group. Plaintiffs have not explained how or when the State of Michigan discovered the wrongdoing, but they do allege that this cancellation was allegedly based on misappropriation of money by Institute of Gas Technology and Endesco Clean Harbors. (*Id.* at ¶ 157.) Furthermore, Plaintiffs specifically allege that none of the grant money awarded to Cement-Lock Group by any of the funding sources was actually received by Cement-Lock Group or used for its intended purpose to develop the Technology or the demonstration facility in New York or New Jersey:

• The $4.5 million grant from the Gas Research Institute to Endesco Clean Harbors in 1998 to sponsor a demonstration facility for the Technology in New York or New Jersey never made it to the coffers of Cement-Lock Group or the demonstration facility. (*Id.* at ¶¶ 116-119.)

• In 1998, Brookhaven National Laboratories granted approximately $1.5 million to Institute of Gas Technology to fund the demonstration facility, but Cement-Lock Group did

Slip Copy                                                                                                                Page 13
Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

not receive this grant money. (*Id.* at ¶¶ 120, 127.)

• In 1999, at Borys's, Lee's or Barone's direction, Institute of Gas Technology's contracts department mailed a proposal for developing the Technology to the Snell Environmental Group, an entity allegedly acting on behalf of the State of Michigan. The Snell Group granted an amount of money to the Institute of Gas Technology unknown to Cement-Lock and Mell. (*Id.* at ¶ 129.)

• Also in 1999, the Gas Research Institute granted additional funds to Institute of Gas Technology to develop the Technology, again without notice to Cement-Lock and Mell. (*Id.* at ¶ 130.)

• In 2000, the Gas Research Institute granted Endesco Clean Harbors approximately $6.65 million to fund a study of the feasibility of using the Technology with sewage sludge, coal ash, and petroleum waste, and for large-scale testing of the Technology for a variety of applications. (*Id.* at ¶ 139.) None of Defendants informed Cement-Lock and Mell of these grants, and Lee falsely informed the Randhavas and Mell that Gas Technology Institute and Cement-Lock Group were in financial trouble (true, if at all, only due to Defendants' misconduct), to keep Plaintiffs from knowing about the existence of some of the grant money applied for and received and that Gas Technology Institute and Defendants had misappropriated some of the funds to themselves. (*Id.* at ¶ 140 .)

• In 2001, the Gas Research Institute granted Institute of Gas Technology approximately $6.8 million purportedly for Technology-related purposes: (1) to support a feasibility study for Michigan's initiative to treat Detroit River sediment, (2) to extend the scope of the Technology to lumber and marine waste applications, and (3) to integrate the Technology with thermo-depolymerization and wastewater sludge treatment techniques developed at Institute of Gas Technology and Gas Technology Institute. Cement-Lock and Mell were never informed of these grants and portions of the $6.8 million were diverted to: (1) pay unrelated payroll expenses, (2) award subcontracts to Molecular Thermoengines and others for minimal or no work, (3) pay $281,400 in kickbacks to Barone in return for aiding Defendants to misappropriate the grant money and keep it secret, (4) pay an unrelated $2 million to Changing World Technologies, and (5) cover Gas Technology Institute's payroll expenses and overhead fees. (*Id.* at ¶¶ 143-145.)

**\*16** • In 2001, Endesco Clean Harbors submitted a grant proposal to the State of New Jersey and received approximately $1.25 million, purportedly to conduct additional tests of the Technology at the proposed New Jersey facility. This money was concealed from Cement-Lock and Mell and wrongly diverted to Gas Technology Institute to cover its own internal expenditures. (*Id.* at ¶ 147.)

• In 2002, Defendants allegedly concealed from Cement-Lock and Mell: (1) a $2.75 million State of Michigan grant to Gas Technology Institute for funding development of the Technology (*id.* at ¶ 153); and (2) a $1.2 million grant from Brookhaven National Laboratories to support the New Jersey project. (*Id.* at ¶ 154.)

• In 2003, Defendants concealed that the Gas Research Institute provided $3.4 million to Endesco Clean Harbors for work on the New Jersey facility. (*Id.* at ¶ 159.)

The court is satisfied by these allegations that Defendants' actions proximately caused Cement-Lock Group actual injuries. Having concluded that demand is excused and that the Complaint adequately alleges harm to Cement-Lock Group, the court turns to Defendants' challenges to Plaintiffs' specific claims.

### IV. Substantive Claims

#### A. Count I: Breach of Fiduciary Duty

In Count I, Plaintiffs allege that all Defendants breached their fiduciary duties to Cement-Lock Group. In order to succeed on a breach of fiduciary duty claim under Illinois law, a plaintiff must establish the following elements: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Neade v. Portes,* 193 Ill.2d 433, 444, 250 Ill.Dec. 733, 739 N.E.2d 496, 502 (2000). Illinois law, following Delaware law, imposes three primary fiduciary duties on the directors of corporations: the duty of care, the duty of loyalty, and the duty of good faith. *Abbott Labs.,* 325 F.3d at 807. Defendants do not dispute that, as members of the Cement-Lock Group Board, they owed these fiduciary duties to Cement-Lock Group and its minority shareholders. Nor do they argue that the actions alleged by Plaintiffs do not constitute a breach of fiduciary duty. Rather, Defendants pin their hopes of dismissing this Count on a lack of proximate cause

Slip Copy                                                                                    Page 14

Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

between Defendants' alleged actions and the injuries of which Plaintiffs complain.

For the reasons already outlined, Defendants' arguments fail in this regard. Plaintiffs have adequately pleaded that Defendants' alleged acts of misappropriating grant money meant for the development of the Technology proximately caused actual injury to Cement-Lock Group. Defendants breached their fiduciary duties by allegedly: (1) diverting and usurping business opportunities from Cement-Lock Group to develop the Technology by using grant funds for their own use and not the grants' stated purposes; (2) concealing material information from Cement-Lock Group regarding the funding and development of the Technology; (3) engaging in non-arm's-length transactions for their own benefit; and (4) misappropriating and infringing Cement-Lock Group's service mark, trademark, and trade name. (*See* Complaint at ¶¶ 212-18.)

**\*17** Specifically, Plaintiffs allege that on at least four occasions from 1999 to 2003, Defendants and their alleged co-conspirators-while they were employees of the Institute of Gas Technology or the Gas Technology Institute-stood in the shoes of both Cement-Lock Group and Endesco Clean Harbors when creating or expanding licensing agreements between those two entities. Plaintiffs claim that not only were these agreements highly beneficial to Endesco Clean Harbor and detrimental to Cement-Lock Group, but contrary to Defendants' representations, Cement-Lock Group never received consideration for these transactions. *See* Complaint at ¶¶ 134 (Borys and Rehmat); 142 (Lee and Rehmat); 152 (Lee and Barone); 156 (Lau and Dunne). Furthermore, Plaintiffs allege that Borys, Dunne, and Lau failed to maintain proper corporate practices, held an insufficient number of operating Board and member meetings, failed to maintain proper corporate records, and failed to present accurate financial records to the Board or its members. (*Id.* at ¶ 220).

This court declines Defendants' invitation to apply Rule 9(b) to Plaintiffs' allegations of breach of fiduciary duty. "Rule 9(b) is strictly construed; it applies to fraud and mistake and nothing else ." *Kennedy v. Venrock Assocs., 348 F.3d 584, 593 (7th Cir.2003).* Defendants argue that Plaintiffs' claim for breach of fiduciary duty is predicated "almost" exclusively upon Defendants' alleged fraud allegations, (Motion,

p. 16), but the court is less certain. Plaintiffs allege that Defendants breached their fiduciary duties to Cement-Lock Group based on their alleged self-dealing, non-arm's-length deals, and misappropriation of Cement-Lock Group's monetary and intellectual property, even in the absence of fraud. Rule 9(b) does not apply to Plaintiffs' breach of fiduciary duty claim.

Plaintiffs have met their burden under Rule 8(a) of alleging (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Neade, 193 Ill.2d at 444, 250 Ill.Dec. 733, 739 N.E.2d at 502.* The Seventh Circuit and Illinois courts uphold allegations of directors of a corporation similarly diverting and usurping business opportunities from their corporation. *See, e.g., Ray v. Karris, 780 F.2d 636, 642 (7th Cir.1985)* (minority shareholders stated derivative and individual claim for breach of fiduciary duty by directors of bank for alleged misstatements and omissions regarding stock offering for wholly-owned subsidiary of bank); *Lucini Italia Co. v. Grappolini, 231 F.Supp.2d 764, 770 (N.D.Ill.2002)* (corporation stated claim for breach of fiduciary duty where consultant trusted to act on corporation's behalf in negotiating contract with third party instead negotiated contract for consultant's own business); *AutoMed Techs., Inc. v. Eller, 160 F.Supp.2d 915, 922 (N.D.Ill.2001)* (corporation stated claim for breach of fiduciary duties where defendant corporate officer usurped corporate opportunity for his own benefit, and defendants, while still employees of corporation, segregated work and employees to take with them to different entity); *Cwikla v. Sheir, 345 Ill.App.3d 23, 32, 280 Ill.Dec. 158, 801 N.E.2d 1103, 1112 (1st Dist.2003)* (Corporation stated claim for breach of fiduciary duty under more stringent, Illinois fact-pleading standard where treasurer used his position to divert corporate funds to himself and his mother-in-law, for his benefit and to the financial and business detriment of corporation). Plaintiffs have adequately pleaded that Defendants breached their fiduciary duties to Plaintiffs.

### B. Counts II and III: RICO, 18 U.S.C. § 1962(c) and § 1962(d)

**\*18** In Count II, Plaintiffs charge all Defendants with civil RICO violations, 18 U.S.C. § 1962(c); Count III alleges a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                  Page 15

Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988

**(Cite as: Slip Copy)**

conspiracy among Defendants and other individuals and entities to violate RICO, 18 U.S.C. § 1962(d). Section 1962(c) makes it unlawful for "any person employed by or associated with [an] enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a claim under this section, a RICO plaintiff must show "(1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Richmond v. Nationwide Cassel, L.P., 52 F.3d 640, 644 (7th Cir.1995).* Defendants argue that Plaintiffs have not adequately pleaded these elements of a RICO claim. Although Plaintiffs adequately allege that Defendants' wrongful actions proximately caused them certain concrete injuries, Plaintiffs do not adequately allege the substantive elements of RICO. Furthermore, when a plaintiff's RICO claim under 1962(c) fails to plead a violation, the RICO conspiracy claim, § 1962(d), based on the same facts must fail as well. *Stachon v. United Consumers Club, Inc., 229 F.3d 673, 677 (7th Cir.2000).*

Conduct of an Enterprise

Plaintiffs allege that from 1997 to the present, Defendants conducted and participated in an enterprise's affairs by devising and/or executing numerous schemes to obtain and misappropriate funds meant to develop the Technology owned by Cement-Lock Group. Plaintiffs claim that this conduct violates the mail fraud, wire fraud, and money laundering statutes (18 U.S.C. §§ 1341, 1343, 1956, respectively), and are predicate acts for RICO purposes. (Complaint at ¶ 102.)

Plaintiffs claim that Defendants carried out these acts through an "association in fact" enterprise. An association-in-fact enterprise is a "union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The case law establishes that a "RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Richmond, 52 F.3d at 644* (internal citations omitted). Because such an enterprise is "more than a group of people who get together to commit a pattern of racketeering activity, ... there must be an organization with a structure and goals separate from the

predicate acts themselves." *Stachon, 229 F.3d at 675* (internal citations omitted).

"The hallmark of an enterprise is structure." *Richmond, 52 F.3d at 645* (citations omitted). "A listing of entities 'strung together' by the label 'enterprise' is not sufficient to adequately plead the existence of an enterprise under RICO." *Okaya, Inc. v. Denne Indus., Inc.,* No. 00 C 1203, 2000 WL 1727785, at *4 (N.D.Ill. Nov.20, 2000)* (quoting *Richmond, 52 F.3d at 646*). Although Plaintiffs' complaint sets forth massive detail, it does not disclose a hierarchical organization with a structure and goals separate from the predicate acts themselves. In this case, rather than identify the enterprise, Plaintiffs have merely strung together a list of individuals and entities. They allege the wrongdoers included: Gas Technology Institute, Institute of Gas Technology, Endesco Services, Endesco Clean Harbors, Barone, Borys, Dunne, Goyal, Lau, Lee, Mensinger, Rehmat, and others employed by Institute of Gas Technology and Gas Technology Institute unknown to Plaintiffs, as well as the following subcontractors, independent contractors and consultants: Barone Consulting, Molecular Thermoengines, RPMS, Ethan Elden, Brian Hardy, T. Robert Sheng, and others unknown to Plaintiffs. (Complaint at ¶ 83.) Not only is this the first time that RPMS, Elden, Hardy, and Sheng are mentioned in the complaint, but Plaintiffs do not even identify them-or in the case of RPMS, their full names. In addition, although mentioned earlier in the complaint, Molecular Thermoengines, Goyal, and Mensinger are never identified. Neither do Plaintiffs show Rehmat is part of the enterprise. An enterprise member must have some degree of management or control over the RICO enterprise (*Brouwer v. Raffensperger, Hughes & Co., 199 F.3d 961, 965-67 (7th Cir.2000)*), but Plaintiffs allege only that Borys, Dunne, Lau, Lee and Barone created and controlled the enterprise. (*Id.* at ¶¶ 84-85.)

**\*19** Furthermore, "[a] firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself." *Bachman v. Bear, Stearns & Co., Inc., 178 F.3d 930, 932 (7th Cir.1999).* To add the corporations to the individual employees is "to add nothing." *Id.* Endesco Services is a wholly-owned subsidiary of Institute of Gas Technology, and Endesco Clean Harbors is a wholly-owned subsi-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 16
Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

diary of Endesco Services, with no employees of its own. (Complaint at ¶ 72.) In addition, Gas Technology Institute was formed as a combination of the Gas Research Institute and Institute of Gas Technology. Lau, Lee, Barone, and Dunne are or were employees of Institute of Gas Technology and Gas Technology Institute, and Borys is the CEO and President of Endesco Services. This leaves Barone, Lee, Lau, Borys, and Dunne, who allegedly created and controlled the enterprise.

> FN27. Following this logic, the enterprise may not include "others employed by Institute of Gas Technology and Gas Technology Institute unknown to Plaintiffs."

As the court reads the allegations, these five individuals do not constitute an enterprise because they did not have a common purpose other than their individual gain. *See Okaya*, 2000 WL 1727785, at *3. In *Okaya,* the plaintiff had merely alleged that the defendants were organized for the purpose of converting and selling the plaintiff's steel, which served the defendant's self interest. Because the plaintiff alleged no greater joint purpose, the court concluded that the plaintiff did not sufficiently allege an enterprise existed. *Id.* at *4. Similarly, so far as the complaint in this case reveals, Defendants' only purpose was to divert grant money meant for Cement-Lock Group. Specifically, Plaintiffs claim that the purpose of the enterprise was to "systematically divert[ ] the money (1) to themselves, either directly or through excessive fees, (2) to fund other Institute of Gas Technology and Gas Technology Institute projects, (3) to pay Institute of Gas Technology's, Gas Technology Institute's, and Endesco Services' expenses and salaries that were unrelated to Cement-Lock Group or the Technology, and (4) by executing subcontracts with parties affiliated with certain of them whereby Barone and others received payments and kickbacks for little or no substantive work done on developing the Technology." (Complaint at ¶ 227.) As in *Okaya,* this purpose served only Defendants' individual self interest.

> FN28. Plaintiffs have also suggested that Defendants were joined together to prevent the development and commercialization of the Technology. (Complaint at ¶ 90.) That Paragraph claims the enterprise sought to keep the Technology in its re-

search stage so that Defendants could continue to receive grant money for the purported development of the Technology; if the Technology were demonstrated to be commercially successful, further research funding would no longer be necessary, and royalties and licensing fees would go to Cement-Lock Group. (*Id.*) Such a common purpose might well satisfy the enterprise requirement, but as Plaintiffs have not so argued, the court declines to address this possibility.

FN29. As the court finds that Plaintiffs have not adequately pleaded the enterprise element of RICO, the court need not address their allegations as to Defendants' alleged pattern of racketeering. "A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5)." *Roger Whitmore's Auto. Servs., Inc. v. Lake County, --- F.3d ----, Nos. 04-1978, 05-1033, 2005 WL 2297307, at *8 (7th Cir. Sept.22, 2005).* Plaintiffs allege the following predicate acts: mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); and money laundering (18 U.S.C. § 1956). Plaintiffs offer little support for the money laundering charge, (Complaint at ¶ 102), but they have alleged that Defendants' scheme to misappropriate millions of dollars from Cement-Lock Group was accomplished through use of the U.S. Mail and wire transfer, as Defendants sent their grant proposals through the U.S. Mail, and the grant money was sent back to them through the U.S. Mail or wire transferred to them. (Complaint at ¶¶ 104-106.) Plaintiffs allege that these predicate acts had similar participants, purposes and results-Defendants misappropriated grant money from the specified funding sources and Cement-Lock Group was harmed as a result: They can make the necessary showing of continuity by "(1) demonstrating a close-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future." *Whit-*

Westlaw.

*more's,* 2005 WL 2297307 at *11 (citations omitted.) The court believes Plaintiffs have adequately pleaded close-ended continuity, as they allege Defendants committed a substantial number of predicate acts over a substantial period of time, from 1998 through 2003.

### C. Counts IV and V: Fraudulent Misrepresentation and Fraudulent Concealment

Plaintiffs claim that Defendants intentionally and fraudulently concealed from and misrepresented to Cement-Lock Group, its Board, and its members: (1) the sources and amounts of money that were granted to Institute of Gas Technology, Gas Technology Institute, and Endesco Clean Harbors on behalf of Cement-Lock Group to develop the Technology (Complaint at ¶¶ 239, 253), (2) how this money was spent (*id.* at ¶¶ 240, 254); (3) the true financial condition of Cement-Lock Group and Endesco Clean Harbors (*id.* at ¶¶ 241, 255); (4) the parties responsible for misappropriating the money granted for development of the Technology (*id.* at ¶¶ 243, 257); and (5) the true condition and status of the Bayonne, New Jersey facility. (*Id.* at ¶¶ 244, 256.) In addition, Plaintiffs allege that Defendants concealed the non-arm's-length licenses granted to Endesco Clean Harbors (*id.* at ¶ 242); and misrepresented that Institute of Gas Technology, Gas Technology Institute, Endesco Services, and Endesco Clean Harbors were spending large amounts of their own money to support Cement-Lock Group, when in fact they were diverting money for the Technology away from Cement-Lock Group. (*Id.* at ¶ 258.) Plaintiffs allege that these circumstances support their claims of fraudulent misrepresentation (Count IV) and fraudulent concealment (Count V). Defendants move to dismiss these claims on the grounds that (1) Cement-Lock Group's injury was speculative and not proximately caused by Defendants' purported actions; and (2) Plaintiffs allegations do not meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). As explained above, Plaintiffs have shown actual injury and provided the necessary basis upon which damages can be determined with a fair degree of probability. *See* *Shah v. Chicago Title & Trust Co.,* 119 Ill.App.3d 658, 661, 75 Ill.Dec. 357, 457 N.E.2d 147, 150 (1st Dist.1983). The court turns to Defendants' argument that

Plaintiffs' allegations fail to meet the pleading standards of Rule 9(b).

**\*20** Defendants argue that Plaintiffs' fraud allegations fail to adhere to the requirements of Rule 9(b), in that they do not specify which individual Defendant committed each alleged act, and they do not provide sufficient detail on the content of the alleged misrepresentations. "Fed.R.Civ.P. 9(b) requires the plaintiff to state 'with particularity' any 'circumstances constituting fraud' ... This means the who, what, when, where, and how ..." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (quoting Fed.R.Civ.P. 9(b)). "The requirement that fraud be pleaded with particularity compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless. It also forces the plaintiff to conduct a careful pretrial investigation and thus operates as a screen against spurious fraud claims." *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.,* 412 F.3d 745, 749 (7th Cir.2005).

> FN30. The court has not referred to matters outside the pleadings in reaching this conclusion.

Plaintiffs identify the following specific examples of Defendants' misrepresentations, more fully detailed above:
• Lee told Surjit Randhava three times in 1998 that the $4.5 million grant from the Gas Research Institute could not be allocated to Cement-Lock Group because Endesco Clean Harbors needed all the money to satisfy its obligations on the demonstration facility to be built in New York or New Jersey. Contrary to these representations, no tangible plans for the facility had started and $1 million had been diverted to Endesco Services and Institute of Gas Technology to cover unrelated debts and expenses. (*Id.* at ¶¶ 118-119.)
• On January 26, 1998, the Cement-Lock Group Board agreed that Borys and Dunne could enter into future licensing agreements between Endesco Clean Harbors and Cement-Lock Group and others without further Board approval. (*Id.* at ¶¶ 122-23.) Plaintiffs claim Lee misrepresented that this arrangement would make it easier to obtain research revenues for Cement-Lock Group, and that the licenses would enhance Cement-Lock Group, when in fact the licenses only served to increase the grant money flowing to Endesco Clean Harbors and Defendants. (*Id.*)

Westlaw.

Slip Copy                                                                                                    Page 18

Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

• At the March 24, 1999 Board meeting, Borys and Lee informed the Randhavas and Mell that Cement-Lock Group had no income and needed $150,000 immediately to cover overdue expenses, when, in fact, Cement-Lock Group should have been in good financial condition because of the abundance of grant money. Borys and Lee told the Randhavas and Mell that Endesco Clean Harbors would give Cement-Lock Group $150,000 in return for a license to process an additional 500,000 tons/year of sediment at a second facility in New York or New Jersey. Cement-Lock Group did not receive this $150,000. (*Id.* at ¶ 131.)

• Borys and Lee also claimed Endesco Clean Harbors was $3 million short and would not be able to make payments to vendors for the demonstration facility in Bayonne, New Jersey, when in fact, Endesco Clean Harbors was receiving large research grants. (*Id.* at ¶ 131.)

**\*21** • On August 25, 1999, Borys and Rehmat signed a new licensing agreement for Endesco Clean Harbors from Cement-Lock Group supposedly in return for $150,000. Cement-Lock and Mell were not informed that the license was broader than originally represented: it granted Endesco Clean Harbors an exclusive, worldwide license to process 600,000 tons of all wastes in any number of facilities. In addition, no cash was transferred to Cement-Lock Group. (*Id.* at ¶¶ 134-135.)

• On March 30, 2001, Lee misrepresented the financial condition of Cement-Lock Group in a letter to Surjit Randhava and Mell, claiming that Cement-Lock Group owed Endesco Clean Harbors $100,000 for a loan Endesco Clean Harbors provided to cover Cement-Lock Group's expenses, and that Cement-Lock Group owed Gas Technology Institute $216,000. The alleged loan proceeds of $100,000 were never paid to Cement-Lock Group. (*Id.* at ¶ 146.)

• On November 16, 2001, at a Cement-Lock Group Board meeting, Endesco Services (Plaintiffs do not state through which representative) conditioned changing the operating agreement to allow Mell to reclaim his voting power on granting Endesco Services veto power over any sale of Cement-Lock Group intellectual property for less than $10 million. (*Id.* at ¶ 148.) On December 10, 2001, Cement-Lock Group members, including Plaintiffs, changed the operating agreement to give Endesco Services veto power over any sale *or license* of Cement-Lock Group intellectual property for less than $10 million. (*Id.* at ¶ 149.)

• At the January 30, 2003, Cement-Lock Group Board meeting, Borys revealed to the Randhavas and Mell, for the first time, of allegations that Endesco Clean Harbors funds had been misappropriated by former Institute of Gas Technology and Gas Technology Institute employees. (*Id.* at ¶ 166.) Goyal, an employee of Gas Technology Institute, made allegations to the president of Gas Technology Institute, John Riordan, that Borys and senior staff members of Gas Technology Institute were misappropriating funds meant for developing the Technology. (*Id.* at ¶ 165.) Plaintiffs allege Borys concealed his role in the misappropriations.

• The financial statements of Cement-Lock Group, which were sent by Gas Technology Institute's General Counsel to Sarabjit Randhava on January 6, 2004, were inaccurate and misleading. (*Id.* at ¶ 160.)

In addition to concealing grant applications, grant moneys received, and non-arm's-length transactions, Plaintiffs allege Defendants concealed from them the fact that the agreed-upon payments by Endesco Clean Harbors in return for license agreements with Cement-Lock Group were never actually made. (Complaint at ¶¶ 142, 152, 156.) Plaintiffs properly allege that they relied on these misrepresentations and concealment as to the financial well-being and licenses of Cement-Lock Group and Endesco Clean Harbors in conducting the affairs of Cement-Lock Group. (*Id.* at ¶¶ 248, 262.) The damage to Cement-Lock Group as a result of this reliance is extensively detailed above.

**\*22** These allegations of fraudulent concealment and misrepresentation are sufficiently specific under Rule 9(b). Plaintiffs provide numerous examples of misrepresentations and concealments, which include either specific dates, or years, where the specific dates are as yet unknown to Plaintiffs. Plaintiffs also sufficiently identify the persons responsible for making the alleged misrepresentations. Several of Plaintiffs' allegations deliberately implicate more than one Defendant as concealing information because more than one Defendant had a duty to disclose the information. In addition, in allegations where Plaintiffs do not have the information as to which of three Defendants committed the wrongdoing, Plaintiffs have sufficiently put Defendants on notice as to the claims against them. *See Dubicz v. Commonwealth Edison Co., 377 F.3d 787, 794-95 (7th Cir.2004)*

Slip Copy                                                                                                                Page 19
Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

(identifying two primary sources for the alleged misrepresentations sufficient). Furthermore, the Complaint identifies particular misrepresentions of certain Defendants, and the material facts that Plaintiffs claim were concealed from them. *See id.* Plaintiffs have adequately stated "with particularly" their claims of fraudulent concealment and fraudulent misrepresentation. Fed.R.Civ.P. 9(b).

D. Count VI: Negligent Misrepresentation

Plaintiffs' negligent misrepresentation claim relies on many of the same facts as their fraudulent misrepresentation claim. Plaintiffs allege in this count that Defendants acted negligently when they misrepresented to Cement-Lock Group, its Board, and its members: (1) the amounts and sources of money being granted to Institute of Gas Technology, Gas Technology Institute and Endesco Clean Harbors on behalf of Cement-Lock Group to develop the Technology (Complaint at ¶ 267); (2) the ways the money was spent (*id.* at ¶ 268); (3) the true financial condition of Cement-Lock Group and Endesco Clean Harbors (*id.* at ¶ 269); (4) the true condition and status of the Bayonne, New Jersey facility (*id.* at ¶ 270); (5) the identity of those was responsible for misappropriating the money granted to develop the Technology (*id.* at ¶ 271); and (6) that Defendant business entities were spending large amounts of their own money to support Cement-Lock Group because Cement-Lock Group was having financial difficulties, when in fact Defendant were not spending their own money on Cement-Lock Group, but were diverting money meant for Cement-Lock Group to themselves. (*Id.* at ¶ 272.)

Defendants argue that Plaintiffs' negligent misrepresentation claim is not cognizable under the economic loss doctrine because Cement-Lock Group suffered only economic losses, which are not recoverable in a negligent misrepresentation claim. *See Moorman Mfg. Co. v. Nat'l Tank Co., 91 Ill.2d 69, 88, 61 Ill.Dec. 746, 435 N.E.2d 443, 451 (1982).* This argument, however, ignores an exception to the economic loss doctrine which applies to this case: "[w]here a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty." *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., 159 Ill.2d 137, 162, 201 Ill.Dec. 71, 636 N.E.2d 503, 514.* The Seventh Circuit ex-

plained that "a claim for economic loss may be pursued in tort as well as contract where, as here, the claim is founded on a duty of care that the law imposed on the defendant irrespective of the terms of the contract." *Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank, 265 F.3d 601, 617 (7th Cir.2001).*

**\*23** In reasoning that the economic loss doctrine would likely not bar negligence claims against banks, which owe a duty of reasonable care, the Seventh Circuit looked to *Congregation of the Passion* and *Collins v. Reynard.* In *Collins,* the Illinois Supreme Court held that the economic loss doctrine does not bar negligence claims against an attorney, 154 Ill.2d 48, 50, 180 Ill.Dec. 672, 607 N.E.2d 1185, 1186 (1992), and in *Congregation of the Passion, 159 Ill.2d at 161, 201 Ill.Dec. 71, 636 N.E.2d at 514,* the Court refused to apply the economic loss doctrine to a negligence claim against an accountant on similar grounds.

Indeed, as in these cases, Plaintiffs allege Defendants owed Cement-Lock Group fiduciary duties of care, good faith, and loyalty separate and apart from any contract between them. This court follows other decisions in this Circuit in extending the exception to the economic loss doctrine to cases where the plaintiff has alleged that the defendants owed an extra-contractual fiduciary duty to the plaintiffs. *See, e.g., Ploog v. HomeSide Lending, Inc., 209 F.Supp.2d 863, 875 (N.D.Ill.2002)* (economic loss doctrine does not bar negligence claim against mortgagor, where mortgagor owed fiduciary duty to mortgagee); *Choi v. Chase Manhattan Mortg. Co., 63 F.Supp.2d 874, 883 (N.D.Ill.1999)* (same). Therefore, Plaintiffs' negligent misrepresentation claim is cognizable under the economic loss doctrine.

Furthermore, Plaintiffs have adequately pleaded a claim for negligent misrepresentation under Illinois law. The elements of such a claim are the same as those for a claim of fraudulent misrepresentation, except that the defendant's mental state is different. *Quinn,* 168 F.3d at 335. The defendant need not know that the statement she made is false; rather, her own carelessness or negligence in ascertaining its truth will suffice for a cause of action. *Id.* In addition, a plaintiff alleging negligent misrepresentation must also allege that the defendant owes a duty to the plaintiff to communicate accurate information. *Id.* In this case, as explained above,

Westlaw.

Slip Copy                                                                                                         Page 20
Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988
**(Cite as: Slip Copy)**

Plaintiffs claim Defendants each owed them a fiduciary duty of care, good faith, fair dealing, and loyalty, and those duties encompass the duty to disclose all material facts. *Connick, 174 Ill.2d at 500, 221 Ill.Dec. 389, 675 N.E.2d at 593*. As explained above, Plaintiffs have adequately alleged the elements for fraudulent misrepresentation, and, because Plaintiffs allege that if Defendants did not knowingly make misrepresentations, they were at least careless or negligent in doing so, they have sufficiently alleged the elements for negligent misrepresentation, as well.

*CONCLUSION*

Defendants' motion to dismiss (Doc. 15) is granted in part and denied in part. Counts II and III of Plaintiffs' Complaint are dismissed without prejudice. Defendants are directed to file their answer to the remaining counts on or before October 21, 2005.

N.D.Ill.,2005.
Cement-Lock v. Gas Technology Institute
Slip Copy, 2005 WL 2420374 (N.D.Ill.), RICO Bus.Disp.Guide 10,988

Briefs and Other Related Documents (Back to top)

• 2006 WL 740521 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants' Motion to Dismiss Counts II and III Entirely and Counts IV - VI Against Francis Lau of the Amended Complaint (Feb. 22, 2006)
• 2006 WL 740520 (Trial Motion, Memorandum and Affidavit) Defendant's Reply to Cement-Lock/Mell & Goyal's Memorandums in Opposition to Gti's Motion to Reassign Case to Judge Pallmeyer Pursuant to Local Rule 40.4 (Feb. 1, 2006)
• 2005 WL 3285848 (Trial Pleading) Answer to Plaintiffs' Complaint (Oct. 21, 2005)
• 2005 WL 176558 (Trial Pleading) Complaint (Jan. 03, 2005)
• 1:05cv00018 (Docket) (Jan. 03, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.