4

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 1
Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
In re NEW SEABURY COMPANY LIMITED PARTNER-
SHIP, Debtor.
NEW SEABURY PROPERTIES, LLC, Appellant,
v.
NEW SEABURY COMPANY LIMITED PARTNERSHIP,
Appellee.
**No. Civ.A. 03-10745-DPW.**

March 5, 2004.

John J. Monaghan, Lynne B. Nowak, Holland & Knight,
LLP, Boston, MA, for Appellant/Debtor.
Daniel E. Rosenfeld, Kirkpatrick & Lockhart, Boston, MA,
Robert N. Michaelson, Winick & Reich, New York, NY, for
Appellee.

*MEMORANDUM AND ORDER*
WOODLOCK, J.

**\*1** This appeal brings the Bankruptcy Court's disposition of
certain cash in connection with a stipulation regarding the
sale of the Debtor's business before me for the second time.
The Bankruptcy Court originally found that the Debtor,
New Seabury Company Limited Partnership, was not en-
titled to any of the disputed funds. In the initial appeal, I re-
versed and remanded to the Bankruptcy Court to determine
how much of those funds the Debtor was entitled to. On re-
mand, the Bankruptcy Court found that the Debtor was en-
titled to all of the disputed funds. The principal secured
creditor, New Seabury Properties, LLC ("NSP"), appeals
from the Bankruptcy Court's decision on remand, and asks
me to reconsider my initial ruling. I will reaffirm my earlier
ruling with an expanded rationale but will leave to further
proceedings the calculation of the portion of disputed funds
to which the Debtor is entitled.

I. BACKGROUND

A. Factual history

The Debtor owned and operated a planned resort com-
munity in Mashpee, Massachusetts known as New Seabury.

It filed a petition for relief under Chapter 11 of the Bank-
ruptcy Code, 11 U.S.C. §§ 1101 *et seq.,* on March 31, 1997.
During the pendency of the proceedings, NSP acquired two
of the largest secured claims.

The Debtor and NSP each filed a plan of reorganization.
Following a hearing, on May 15, 1998 the Bankruptcy
Court issued an Order and Preliminary Decision stating that
it did not believe that the Debtor's plan was confirmable, but
that NSP's plan was. During the two days leading up to a
confirmation hearing on May 29, 1998, the Debtor and NSP
engaged in protracted negotiations to resolve the differences
between them. The negotiations culminated in the execution
of a stipulation ("Stipulation") on the day of the hearing.

The Stipulation essentially provided that the Debtor would
withdraw its reorganization plan and its motion to recon-
sider NSP's plan, and would consent to the confirmation of
NSP's plan ("Plan"). The Plan provided that the Debtor
would transfer to NSP "all of the Debtor's right, title and in-
terest in and to the Purchased Assets." The term "Purchased
Assets" referred to those assets required by NSP to be trans-
ferred pursuant to the Plan, and "Assets" were defined as all
property of the estate of the Debtor, whether tangible or in-
tangible, real or personal, and whether then existing or
owned or acquired by the "Effective Date." The Effective
Date was the date of the sale, which was to be not later than
twenty-one days after the confirmation date.

The Debtor's business had consisted of three separate but re-
lated divisions: the Hotel Division, the Recreation Division,
and the Real Estate Division. The Stipulation excepted the
Real Estate Division from the sale of assets under the Plan:
The real estate brokerage segment of the Debtor's business,
including all licenses and permits required to operate that
segment of the business, shall be retained by the Debtor.

**\*2** On June 15, 1998 the Bankruptcy Court entered an order
approving the Stipulation and confirming the Plan. After a
one month delay due to problems not relevant here, the clos-
ing began on July 21, 1998. However, during the closing,
disputes over the terms arose. The principal issue in dispute,
then as now, was whether the Debtor was entitled to retain
the net revenue ("Disputed Funds") that the Debtor alleged
had been generated by the Real Estate Division, but which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

was contained in a commingled general operating account of the Debtor's business.

In order to close as much as possible of the sale, the parties signed most of the documents two months later on September 17, 1998, but specifically excepted the disputed areas pending resolution or a further determination as to the parties' rights. Reflecting that status, the bill of sale ("Bill of Sale") provided that the Debtor agreed to sell to NSP:

all of [Debtor's] right[,] title and interest in the Purchased Assets (as such term is defined in and limited by the Order [confirming the Plan] ) including, without limitation, the Purchased Assets ... (except that, notwithstanding the foregoing, the Purchased Assets conveyed to [NSP] shall specifically exclude (i) any assets being retained by [Debtor] pursuant to the Stipulation ... and (iii) and property, assets and rights, generated by or associated with [Debtor's] Real Estate Brokerage Operations (the "Brokerage Operations") including cash generated by the Brokerage Operations from January 1, 1998 through September 16, 1998 in the amount of $553,762.00 subject to the right of NSP to dispute the Debtor's entitlement to these funds, which shall remain in the Debtor's account until such time as the Court adjudicates the rights of the [Debtor] and NSP thereto, or until further agreement of the parties ... )

B. Procedural history

The parties were not able to resolve the dispute concerning the Disputed Funds, and on December 18, 1998 NSP filed a motion in Bankruptcy Court for an order compelling the Debtor to convey the funds to NSP. On March 11, 1999 the Bankruptcy Court found, based on the language of the Stipulation and the Bill of Sale, that the funds were the property of NSP.

The Debtor appealed the Bankruptcy Court's order to this Court. On October 21, 1999, finding that the phrase "real estate brokerage segment of the Debtor's business" included cash, I reversed and remanded to the Bankruptcy Court to determine the amount of cash in the general operating account, if any, attributable to the Real Estate Division.

On remand, the Bankruptcy Court conducted a one-day trial.

It received testimony on several disputed accounting questions, most notably, the appropriate "start date" for computing the revenues and losses attributable to the Real Estate Division, and how to classify a discounted country club initiation fee made available to home buyers who bought through the Real Estate Division. The Bankruptcy Court found the Debtor's method of accounting was proper on both of these questions, and on that basis found that the entire amount of disputed funds, $479,457, was attributable to the Real Estate Division. On February 7, 2002 it issued an order awarding that amount to the Debtor.

**\*3** NSP appealed the Bankruptcy Court's order and presses three main arguments. First, it urges me to abandon my earlier ruling reversing the Bankruptcy Court, and reinstate the Bankruptcy Court's original decision that the various written instruments (the Plan, the Stipulation, and the Bill of Sale) did not provide that the Debtor would retain any cash. Second, NSP argues that even if my earlier ruling is left in place, the Bankruptcy Court erred by selecting an arbitrary "start date" for computing the revenues and losses attributable to the Real Estate Division. Third, NSP argues that the Bankruptcy Court erred by accepting the Debtor's accounting methodology for the country club membership credits.

II. DISCUSSION

A. Jurisdiction and standard of review

The parties agree that I have jurisdiction under 28 U.S.C. § 158(a) to review the Bankruptcy Court's order on remand. A district court deciding an appeal from a bankruptcy court "may affirm, modify or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." Fed. R. Bankr.P. 8013. On intermediate appeal to a district court, a final order of the bankruptcy court is subject to the same familiar standards of review normally employed in direct appeals to the courts of appeals in civil cases generally. The district court accepts all bankruptcy court findings of fact unless "clearly erroneous," Fed. R. Bankr.P. 8013, but reviews rulings of law *de novo. In re LaRoche,* 969 F.2d 1299, 1301 (1st Cir.1992). Interpretation of unambiguous contractual language is also reviewed *de novo. In re SPM Mfg. Corp.,* 984 F.2d 1305, 1311 (1st Cir.1993).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

More contentious is whether I may review my own earlier ruling remanding the case in the first place. The Debtor argues that I cannot review my earlier ruling, because neither 28 U.S.C. § 158(a) nor § 158(d) grants jurisdiction to a district court to hear an appeal of its own decision in a bankruptcy case. Section 158(a) limits the district court's jurisdiction to appeals from judgments, orders, and decrees "of bankruptcy judges," and § 158(d) confers jurisdiction over appeals from district court rulings to "[t]he courts of appeals." Neither provision applies, on its face, to a district court reviewing its own ruling.

The Debtor frames the issue in far too wooden a manner. While § 158 appears to divide the world into appeals from bankruptcy courts to district courts, and appeals from district courts to courts of appeals, it does nothing to disturb a district court's power to reconsider its own ruling. That power is plain. "[A]ny order or other form of decision ... which adjudicates fewer than all the claims ... is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Fed.R.Civ.P. 54(b). "Interlocutory orders ... remain open to trial court reconsideration, and do not constitute the law of the case." *Perez-Ruiz v. Crespo-Guillen,* 25 F.3d 40, 42 (1st Cir.1994); *Davis v. Lehane,* 89 F.Supp.2d 142, 147 (D.Mass.2000). Section 158 is in this sense irrelevant to my jurisdiction to review my earlier ruling, because NSP is not *appealing* my decision to me, but rather asking me to *reconsider* it. Alternatively framed, I could view NSP's efforts in this matter as an appeal of the Bankruptcy Court's order under § 158(a), in which NSP asserts that the Bankruptcy Court made certain legal errors; the fact that it may have done so pursuant to my instructions is formally irrelevant.

**\*4** In either case, I conclude that I may entertain NSP's "appeal" in full. Nevertheless, my review of my earlier ruling is constrained by the law of the case doctrine, which states that "subject to exceptions, a court must respect and follow its own rulings made at a prior stage in the same case." *Conley v. United States,* 323 F.3d 7, 12 (1st Cir.2003) (citation omitted). The three generally recognized exceptions to this principle are "(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order ." *Davis,* 89

F.Supp.2d at 147; *see also Cohen v. Brown Univ.,* 101 F.3d 155, 168 (1st Cir.1996), *cert. denied,* 520 U.S. 1186, 117 S.Ct. 1469, 137 L.Ed.2d 682 (1997). These exceptions are "narrowly configured and seldom invoked," *United States v. Connell,* 6 F.3d 27, 31 (1st Cir.1993), and a court should be "loathe to [invoke them] in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (internal quotation marks omitted). As Judge Magruder put it, "mere doubt on our part is not enough to open up the point for full reconsideration. Often when the decision is originally rendered we have doubts enough. We do the best we can, make our decision and pass on to something else." *White v. Higgins,* 116 F.2d 312, 317 (1st Cir.1940).

> FN1. The Debtor also argues that my remand order was not "final" for purposes of § 158(d). This is correct but unimportant, given my analysis of NSP's appeal as a motion for reconsideration.

### B. The Previous Order

In my original Memorandum and Order, I found the Stipulation's provision that "[t]he real estate brokerage segment of the Debtor's business, including all licenses and permits required to operate that segment of the business, shall be retained by the Debtor" to be unambiguous. Drawing upon early-to-mid-20th century cases concerning testamentary construction, I held that the quoted phrase included the cash, if any, in the Debtor's general operating account that could be attributed to the Real Estate Division.

> FN2. The Bankruptcy Court had also found it unambiguous, but reached a precisely opposite result.

Further reflection has persuaded me that this case law is not fully sufficient to support my conclusion. Wills involve different modes of construction than arm's-length commercial transactions, let alone settlements in bankruptcy proceedings, because the relationships between the parties, the ultimate goals of the instruments, and the interpretive goals of the court differ.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

In a will, "the unquestioned rule of construction ... is to give effect to the [testator's] intent where possible." *Kelley v. Neilson,* 433 Mass. 706, 716, 745 N.E.2d 952 (2001) (internal quotation marks omitted). Because the beneficiary generally has no role in preparation of the instrument, "intent" is singular: the beneficiary has no intent in a bequest. Not only is there only one party whose intent matters, but that party is, by definition, no longer available to aid further in the interpretive undertaking.

Several other problems unique to wills shape the principles of their construction. During the time that many of the cases that I cited were decided, wills were-and no doubt, to some extent, still are today-often written by laymen, and courts are inclined to construe their language generously. Courts have therefore been exhorted "not [to] be diverted ... by lack of correct and formal legal structure and methods of expression." *Goodwin v. New Eng. Trust Co.,* 321 Mass. 502, 504, 73 N.E.2d 890 (1947). Furthermore, the court may assume that the testator wanted to *benefit* the beneficiary. Rigorous maxims of construction such as *expressio unius est exclusio alterius,* which are useful in limiting the acts of legislatures or protecting arm's-length commercial parties from being held to more than they bargained for, are relaxed when interpreting a gratuitous transfer. *Knowlton v. Forbush,* 322 Mass. 703, 704, 79 N.E.2d 198 (1948) (if overall testamentary intent is clear from reading whole will, then "the intent so manifested will be carried out even though not specifically expressed in formal words"). Finally, many wills decisions involve a strong undercurrent of equity, in which a court strains to interpret written language to benefit one who seems deserving.

> FN3. The cases on this topic seem to peter out in the 1960s.

**\*5** In sum, courts are likely to construe a bequest generously, because the testator manifestly sought to give something of value to a worthy beneficiary, and because any verbal missteps in the will are neither the beneficiary's fault, nor errors against which the beneficiary could have protected himself. Neither consideration applies directly to the Stipulation, but they appear to underlie the wills cases that I cited in my earlier opinion. For example, *In re Estate of Durham,* 62 Ill.App.2d 111, 210 N.E.2d 632, 634 (Ill.App.Ct.1965), which I discussed at length, involved a business owner who left his entire business to his one employee, a secretary who had served him for over ten years both professionally and personally, including, for example, buying his groceries. Had the funds at issue not been included with the "business," those funds would have passed into the residuary estate. *See id.* at 633-34.

Similarly, in the classic case of *Coyle v. Donaldson,* 91 N.J. Eq. 138, 108 A. 308 (N.J.Eq.1919), which is cited in virtually all the other cases on this topic, the court construed the coal "business" to include cash, not just to preserve the business as a going concern, but also to effect the testator's larger intent. Had the cash been separated from the business, it would have passed to a son whom the testator apparently did not trust to manage his own money, rather than the recipient of the business itself, a grandson who "had been employed by the testator in the coal business since leaving school ... to the satisfaction and with the confidence of the grandfather and testator." *Id.* at 309.

I will not here exhaustively review the remaining cases cited in my original memorandum, other than to say that most of them are suffused with explicit concern for keeping a family business in the capable hands of a deserving child. *See, e.g., Chavis v. Myrick,* 190 Va. 875, 58 S.E.2d 881 (Va.1950) (testator's interest in business was devised to only child; had cash not been included, it would have abated to pay debts, to the benefit of testator's sister and niece); *In re Estate of Friedrichs,* 107 Cal.App. 142, 290 P. 54, 55-56 (Cal.Dist.Ct.App.1930) (testator's interest in business was devised to stepson who had worked for him since age fourteen; had bank account not been included with business, it would have gone not to stepson "who served him so loyally for over forty years" but to second wife, who received everything else in estate under residuary gift); *In re Lowe,* 149 A.D. 347, 134 N.Y.S. 537 (N.Y.App.Div.1912) (family business was devised to testator's only child; had cash not been included, it would have gone to nephews and nieces and rendered business insolvent), *modified on other grounds,* 206 N.Y. 671, 99 N.E. 722 (N.Y.1912).

A Chapter 11 bankrupt cannot fairly claim the benefits of this analogy; it is, after all, not a deserving child inheriting the family business, but rather an insolvent permitted to re-

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 5

Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)

**(Cite as: Not Reported in F.Supp.2d)**

main in business for the benefit of creditors. Nevertheless, the bankruptcy court should treat the writings surrounding a reorganization with an eye toward the equities of reorganization. Moreover, as explained below, I find my earlier interpretation-that the term "business" in the Stipulation necessarily included cash-to be buttressed by other modes of analysis, including the law of contract interpretation.

**\*6** To the extend that the Stipulation may be compared to an ordinary business contract, Massachusetts law adjures that it " 'should be given a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties." ' *City of Haverhill v. George Brox, Inc. ., 47 Mass.App.Ct. 717, 720, 716 N.E.2d 138 (1999)* (quoting *Bray v. Hickman, 263 Mass. 409, 412, 161 N.E. 612 (1928)*). NSP presses an argument combining the principles of *expressio unius est exclusio alterius* and *ejusdem generis*. Under this view, the Stipulation does not grant the cash to the Debtor because it does not mention the cash. And if the Stipulation *does* include anything beyond what is precisely enumerated, then it must be of a similar nature to those enumerated items, such as licenses or permits. While I adhere to my earlier conclusion that the phrase "including all licenses and permits" is inclusive, not exclusive, I nevertheless take the occasion to explore NSP's argument more fully.

The fact that the Stipulation does not mention cash appears to cut against the Debtor. If the parties intended the Debtor to receive the cash attributable to the Real Estate Division, it is important to ask why they did not include a few words on how to determine which cash is fairly attributable to that division-especially since, according to the Debtor's methodology, that amount comes to nearly one-fourth of the total cash in the general operating account. As the proceedings on remand illustrate, there were several controverted questions involved in calculating the amount attributable to the Real Estate Division. One might have expected the parties to negotiate these issues if the Debtor was intended to receive the cash.

> FN4. This is especially so when comparatively minor issues such as licenses, permits, and NSP's right to use certain of Debtor's desks rent-free *were* spelled out in the Stipulation.

General commercial practice is not altogether helpful. NSP argued below, and the Debtor agrees, that in an ordinary commercial transaction, "the sale of a business normally does not include the transfer of cash. Cash is treated as a credit to the sale price and retained by the seller.... [T]he purchasing party acquires only the assets required to operate the business."

Despite the logic of that general proposition, applying it to this case is tricky. NSP argued below that *it* was the seller, because it somehow *reconveyed* the Real Estate Division *back* to the Debtor, retaining the cash in the process. This contorted argument evidently was as unpersuasive to the Bankruptcy Court as it would be to me, and NSP wisely does not press it again on appeal. Here, however, the Debtor capitalizes on NSP's words, and argues that the *Debtor* was the seller, based on the phrasing of the Plan and the Bill of Sale. The Stipulation recites that "under the NSP Plan, NSP is to acquire substantially all the assets of the Debtor." The Bill of Sale, executed after the dispute over the Disputed Funds had arisen, explicitly defines "Seller" as the Debtor. Thus, according to the Debtor, by analogy to general commercial practice, it (as seller) should retain the cash. The Debtor's argument is more logical than NSP's, but still fails to capture the nuances of the situation. The Real Estate Division (whatever it included) was the one part of the business that was *not* sold to NSP. Neither party's sophistry alters the fact that the Real Estate Division was not sold by either of them to the other, but was rather "retained by the Debtor."

> FN5. For example, the Plan defines "Purchased Assets" as "those Assets required by NSP to be conveyed *by the Debtor to NSP* pursuant to the Plan."

**\*7** This illustrates an important point: the general practice of ordinary commercial transactions, though perhaps more pertinent than the law of will construction, is still an imperfect model for this case. If the will construction cases reflect background concerns that the testator's bounty go to deserving beneficiaries, the interpretation of a stipulated amendment to a bankruptcy reorganization plan must likewise recognize certain concerns lurking in the background: that creditors be paid; that the debtor be rehabilitated; and that neither the debtor nor any creditor receive a windfall.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                                          Page 6
Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

None of these concerns lie beneath the surface of the ordinary contract for the sale of a business. I turn, then, to a functional analysis of the parties' arrangement.

On its face, the phrase "segment of the Debtor's business' might not explicitly include cash, but as a matter of common understanding, a "business" ordinarily includes *all* its assets, including cash. A business appraiser using an asset-based approach will include cash as an asset of the business; indeed, cash is so obviously a business asset that it is usually not a subject for discussion. *See, e.g.,* Leslie H. Miles Jr., The *Role of the Appraiser in a Bankruptcy Case,* 19 Am. Bankr.Inst. J. 26 (July-Aug.2000) (discussing "major categories that make up business assets *other than* intangibles, *cash,* and receivables") (emphasis added). Furthermore, since it is clear that the parties intended the Debtor to retain the brokerage "business" as a going concern, rather than merely the sum of its assets, one might presume that the Debtor expected to retain, at a minimum, sufficient cash to keep the business operational.

To be sure, a "segment of ... business" can be a valuable and coherent asset if limited to goodwill, real property, equipment, and intellectual property needed to operate the business, even without cash. The Plan provided for NSP to acquire most of the Debtor's significant business assets, and so it could have been reasonable for the Debtor to agree to withdraw opposition to the Plan in exchange for just these non-cash assets. A reading of the Stipulation that excludes cash might be consistent with the absence of a negotiated cash valuation method, and the bankruptcy context in which the primary goal is to pay back the Debtor's creditors. Furthermore, it might be argued that the parties intended that, if the Debtor was going to make a clean start with the brokerage business, it would do so with its own money.

> FN6. *See, e.g., Polius v. Clark Equip. Co.,* 802 F.2d 75, 76 (3d Cir.1986). In *Polius,* the defendant purchased, for cash, "the construction equipment division" of a larger business. The assets sold included "two manufacturing facilities, inventory, accounts receivable, customer lists, and good will as well as trade names, patents, and trademarks." *Id.* The parties agreed that these were "all of the assets ... 'required to operate the business' of the division

'in the manner in which [it][was] currently being operated." ' *Id.* at 76 (first alteration in original).

> FN7. As events later revealed, the Debtor *has* been able to operate the brokerage business for several years without use of the Disputed Funds. Christopher Burden, the Debtor's principal, injected an undisclosed amount of his personal capital into the business.

Acknowledging these various complexities and competing considerations, I have concluded that my ultimate task is to determine where the loss should lie through a principled treatment of the language the parties employed to reflect the functional resolution they sought. I hold that the loss should lie with NSP, because it was in a better position to protect its interests by writing more detailed contractual language, and because its theory of the limits of a "business" does not lead to a coherent resolution.

**\*8** NSP repeatedly emphasizes that it held the superior bargaining position. I agree. The Bankruptcy Court had already entered a preliminary decision stating that "the Debtor's plan was not confirmable, but NSP's was." Martin Hirsch, NSP's principal negotiator, testified that "[a]t that particular point, we felt we had a very strong case and that we ultimately would prevail." NSP highlights these facts to argue that, since NSP was in a preferred position, it did not have to make a significant concession to the Debtor, and that therefore it did not.

But these facts do not lead to that conclusion. Because NSP was in a superior bargaining position, and because its best alternative to a negotiated agreement was simply to wait for the Bankruptcy Court to confirm the Plan, NSP had the power to dictate the terms of the Stipulation. While the principle of interpreting a writing against the drafter does not apply here, because there is no evidence as to who drafted the particular provision at issue, the same underlying policy concerning that principle, in general, applies. Crediting NSP's contention that it had superior bargaining power and in fact likely could have walked away and gotten all of New Seabury (including the Real Estate Division) through its confirmable alternative plan, there was no impediment to NSP insisting upon a provision expressly "excluding cash."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 7
Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

But it did not. Because NSP was in a better position to assert its interests, and did not, the loss caused by the failure to obtain such a provision may appropriately lie with it.

An independent reason for finding that the "segment of the Debtor's business" includes the attributable cash is that it is intellectually coherent and practically workable in a way that NSP's reading is not. NSP argues that cash should not be included because it is not specifically listed, and a "business," when sold, does not normally include its cash. But NSP's theory fails to explain, and common sense fails to provide, a stopping point or bare minimum that must be included in a "business." In other words, if it is true that cash is not included unless specifically listed, then it should be equally true that other assets are not included unless specifically listed.

> FN8. The Debtor argues that, if it was only to retain assets enumerated in the Stipulation, then it would have only received "three buildings, empty except for licenses hanging on the otherwise undecorated walls, a license to use the name New Seabury on marketing material that NSP possessed but not the marketing material itself," and so on. This is an overstatement. Most of the items at issue were physically located at the brokerage's offices, which *were* enumerated. Nor does the fact that NSP acquiesced in the Debtor retaining anything somehow prove the parties' intent in forming the Stipulation. Under the Plan, NSP reserved the right not to take title to any asset. Therefore, its acquiescence in the Debtor's retention of any particular asset proves nothing about the Stipulation itself.

The general rubrics for construction of analogous writings do not provide a full answer to the question. Nor does general business practice. A business may be conveyed in a variety of states-all assets, all assets except cash, all nonliquid assets, goodwill and intellectual and real property only, goodwill only, and so on-and therefore the answer must necessarily turn on the degree that any default position has been refined. In this context, the Debtor draws a simple and coherent line: a "business" includes all its assets unless stated otherwise. NSP, having asserted that the line actually falls somewhere *inside* the set of business assets, must

provide a logical place in which to draw it, but has not done so.

**\*9** I therefore reaffirm, on this expanded rationale, my earlier holding that the Debtor was entitled to retain the cash attributable to the brokerage segment of the business. I now turn to the Bankruptcy Court's determination of that amount.

### C. The Bankruptcy Court's Decision on Remand

#### 1. Start Date

The Bankruptcy Court determined that January 1, 1998 was a reasonable and appropriate date to begin measuring the portion of the general operating account attributable to the net income of the Real Estate Division. January 1 was the beginning of the Debtor's fiscal year, when profit and loss statements were reset to zero.

NSP challenges January 1 as an "arbitrary" date and urges reversal on this basis. According to NSP, only May 29, 1998 (the date of the Stipulation) and September 18, 1998 (the date of the sale) are non-arbitrary dates. The Bankruptcy Court correctly rejected September 18, 1998 as the start date, because that would be absurd: such a start date would mean that the parties agreed that the Debtor would retain only whatever cash it earned in the wee morning hours of the day that the rest of the Debtor's business was sold, *i.e.,* zero. The Bankruptcy Court similarly rejected May 29, 1998 on the grounds that the Debtor would thereby only be entitled to the portion of the Disputed Funds generated after the parties reached the Stipulation, and that this would contravene my earlier order.

> FN9. NSP fulminates that "[a]ny funds generated by the Debtor's insolvent business should be available for payment of the creditors." NSP forfeited the benefit of that principle by executing the Stipulation, which, as the Bankruptcy Court put it, "[i]n one fell swoop and in one sentence ... converted a contested Chapter 11 into a divorce case."

I find the Bankruptcy Court's selection of January 1, 1998 to be reasonable and appropriate. If the court had selected May 29, 1998, it would be in effect suggesting that NSP and the Debtor had (even constructively) agreed, on May 29, that

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

the Debtor would convey the cash attributable to the brokerage as of that date, but keep the cash that it earned after the agreement was signed. This might be a rational agreement, but it is significantly more complicated than an agreement that the Debtor keep the cash attributable to the brokerage business, and there was no evidence that the parties had intended to enter into such an arrangement.

January 1, 1998 was, in fact, less arbitrary than either of the dates that NSP provided. It was the beginning of the Debtor's fiscal year and consequently followed the yearly consolidation of the entire business financial results. Moreover, NSP and the Debtor had essentially agreed, in their joint pretrial stipulation, to limit presentation of evidence to revenue generated no earlier than January 1, 1998. While in some ideal sense the least arbitrary start date might have been the date on which the Debtor's brokerage commenced operation, the Debtor's annual accounting practices made January 1, 1998 the serviceable date reflecting the actual conduct of the business.

For these reasons, I hold that the Bankruptcy Court's decision to use January 1, 1998 as the start date was neither arbitrary nor clearly erroneous.

> FN10. Although the Bankruptcy Court framed its finding in terms of what it understood my order to require, I may "affirm on any basis supported by the record." *Carroll v. Xerox Corp.,* 294 F.3d 231, 241 (1st Cir.2002).

*2. Country Club Membership Discount Accounting Method*

**\*10** During the period that the Debtor operated New Seabury, it made membership in the country club available at a discount to buyers who bought through the Real Estate Division. This came in the form of a "credit," calculated as a percentage of the Real Estate Division's commission on the sale, that could be applied toward the initiation fee at the country club. For most of New Seabury's history, the Debtor treated the credit as a sort of cross-divisional coupon. When a buyer redeemed the credit, the Debtor recorded the initiation fee as income to the Recreation Division, but recorded the amount of the credit as a loss to the Real Estate Division. However, in August 1998-after the Stipulation had

been executed, after the Plan had been confirmed, and after the closing was intended to have taken place-the Debtor's principal, Christopher Burden, instructed his accountant to "rework the figures for the Real Estate Operations." The accountant complied, and the new accounting treated the initiation fee credits as losses to the Recreation Division, not the Real Estate Division. The practical effect of no longer treating the credits as losses to the Real Estate Division was to increase the net income of the Real Estate Division on the consolidated financial statements.

The original accounting system was acceptable for a consolidated company. Both Susan Tevnan, the Debtor's expert, and John Lynch, NSP's expert, agreed on this point. When the Debtor was one consolidated company, there was very little at stake in this accounting question because it was viewed as "all the same pie."

However, the original credit allocation system did not appear to comply with the "matching principle" of the Generally Accepted Accounting Principles. The matching principle states that revenue and expenses incurred in generating that revenue should be entered on the same books. NSP argues that the credits primarily benefited the real estate brokerage business, and thus should be treated as expenses of the Real Estate Division, while the Debtor argues that they primarily benefited the country club, and thus should be treated as expenses of the Recreation Division.

The Debtor and NSP thus squabble over whether the credits really benefited the Real Estate Division, and, for that matter, whether the Real Estate Division was in competition with other brokerages that could not offer a comparable benefit. These disputes are largely framing questions. The Debtor argues that the credits couldn't benefit the brokerage, because it had no competitors: the Real Estate Division was not part of the Multiple Listing Service, and over ninety percent of its listings were exclusive, only capable of being shown and sold by the Debtor. NSP counters that the proper buyer to look at is not the buyer already committed to buying at New Seabury, who may have no choice of broker, but rather the buyer looking to buy resort property somewhere on Cape Cod, who may be influenced by a benefit (discounted club membership) that no other real estate broker on Cape Cod could offer. Furthermore, even if the

Not Reported in F.Supp.2d                                                                                           Page 9
Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

buyer had no choice of broker, the *seller* certainly did, and a seller could raise the market price of his property (without impairing demand) by selling through the Real Estate Division since, in effect, a portion of the sale price would be refunded to the buyer.

**\*11** The Debtor argues that the primary beneficiary of the credits was the club. Once a member joined the club, he would become a future income stream, paying yearly dues, cart fees, locker fees, bag storage, greens fees for guests, restaurant charges, bar charges, purchases at the pro shop, beach storage fees, cabana fees, and perhaps even wedding or conference fees. Even NSP's General Manager and Chief Financial Officer testified that he knew of at least one member for whom the credit was "the inducement to make their positive decision to join the club."

Based on this and other evidence presented, the Bankruptcy Court found that, while the brokerage did realize some benefit from the credits, "[t]he Recreation Division was the primary beneficiary," and the revised accounting system was correct. I agree with the Bankruptcy Court on these points. However, even given that the revised accounting system was superior to the original system, NSP raises the compelling argument that the original system was acceptable, and that the Debtor should not be permitted to "rework the figures" to its own advantage, after the Stipulation had already been signed and the Plan had already been confirmed. NSP had performed due diligence before signing the Stipulation, and had arguably relied on the Debtor's treatment of the credits as expenses of the brokerage business. The Debtor did not inform NSP of its purported belief that its own accounting system was improper, nor that it intended to change it.

The Bankruptcy Court found that "the Debtor's former methodology of tracking the income and expense of the Credits in its Consolidated Books [was] irrelevant to the matter before [it]." The court's rationale was that it had to "view the Brokerage as an entity entirely separate and independent from the other divisions of New Seabury." Under the reasoning of my earlier order-that the business included cash because that is the meaning of "business" in this context-the Bankruptcy Court's decision may have been understandable. However, under the revised reasoning I have adopted in this order, that logic loses its force. Because I now hold that the cash belongs to the Debtor on grounds relating to the parties' intent in contract formation-in part, because NSP must bear the loss of an ambiguity that it failed to correct-it follows that NSP can only be deemed to have constructively assented to the terms of the bargain it could have reasonably foreseen.

Put more concretely, had NSP, in negotiating the Stipulation, been able to calculate the net income attributable to the Real Estate Division from January 1, 1998 to September 18, 1998, under the accounting system the Debtor then employed, and yet failed to protect its interests by insisting on the phrase "excluding cash," it would have made a $83,846 mistake. By changing its accounting methodology, the Debtor was able to inflate that to a $479,457 mistake. It is one thing for a court to hold NSP to the reasonably foreseeable consequences of its ill-defined bargain with the Debtor; it is quite another for the court to hold NSP to terms that could not possibly have been on the table.

**\*12** While the intent of the parties may appear somewhat murky, it is fairly evident that NSP did *not* intend the Debtor to retain an amount of cash that would become attributable to the brokerage business only after an extensive revision of the Debtor's financials. Furthermore, while it is appropriate for NSP to bear the risk of the Stipulation's ambiguity, it would be inequitable to allow the Debtor to magnify that risk by after-the-fact number manipulation.

> FN11. By "rework[ing] the figures" to shift losses from the Real Estate Division to the Recreation Division, the Debtor not only increased the value of the division that it retained, but also *decreased* the value of the divisions that it had agreed to convey.

The Bankruptcy Court's order was plausible in the context of earlier order, but it now requires closer re-examination in light of the revised rationale of this order. I vacate that portion of the Bankruptcy Court's remand order that adopts the Debtor's revised methodology, and, if the parties are unable to reach a stipulated figure, will remand to determine the amount of cash attributable under the Debtor's original accounting methodology.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 10
Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

FN12. NSP argues in the most cursory fashion-a one-sentence footnote-that "[t]he real estate carrying costs should also be treated as expenses to the real estate brokerage business because the Debtor historically treated them as such." This argument is so laconic that I will deem it waived on this appeal. *See King v. Town of Hanover,* 116 F.3d 965, 970 (1st Cir.1997).

*3. Burden of Proof*

NSP argues that the Bankruptcy Court erred in allocating the burden of proof to NSP, or, at the very least, in conducting the trial as if the Debtor had the burden of proof and then informing NSP that it had the burden of proof in the court's memorandum.

NSP in fact had the burden of proof. The "normal evidentiary rule impos[es] proof obligations on the moving party." *United States v. Rexach,* 482 F.2d 10, 16 (1st Cir.1973), *cert. denied,* 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973); *see also Turner v. Avery,* 947 F.2d 772, 774 (5th Cir.1991) (burden of proof is upon party seeking turnover of property of estate), *cert. denied,* 504 U.S. 985 (1992). This segment of the bankruptcy litigation began with NSP's December 18, 1998 motion for an order, under 11 U.S.C. § 105(a), compelling the Debtor to deliver the Disputed Funds and other assets. NSP was the original movant, and remained so on the remand proceeding. The Debtor did not become the moving party on remand just because it prevailed on appeal, any more than a civil defendant becomes the plaintiff on remand.

NSP claims that the Bankruptcy Court conducted the trial as if the Debtor were the movant; that is, the Debtor gave its opening statement first and called its witnesses first. Having reviewed the transcript, I find this a most disingenuous argument. At the beginning of the proceeding, the Debtor's counsel stated, without objection from NSP's counsel:
We have-between ourselves agreed on a batting order that the Court could certainly change, and the batting order we determined is that I'll go first without-excepting that that puts upon you the burden of proof. We will leave it to the Court to allocate who has the burden in this case....

In other words, NSP and the Debtor agreed that the Debtor would present first under the express condition that this order of presentation did not mean that the Debtor had the burden of proof, and NSP did not then object to the Debtor's suggestion that NSP might have the burden. NSP cannot now argue that the Debtor must have had the burden of proof since it went first. For these reasons, I find no error in the Bankruptcy Court's conduct of the trial with respect to burden of proof.

III. CONCLUSION

**\*13** If by March 22, 2004, the parties are unable to agree upon a stipulated figure, I will remand to the Bankruptcy Court to determine the amount of cash attributable to the brokerage, using January 1, 1998 as a start date, but applying the accounting methodologies employed by the Debtor on the date the Plan was confirmed. The parties shall file a status report by no later than March 24, 2004 regarding the issues to be resolved. In all other respects, the decision of the Bankruptcy Court is AFFIRMED.

FN13. I assume that the parties or the Bankruptcy Court will naturally gravitate towards either the $55,670 figure in the parties' joint pretrial stipulation, or $83,846, the net income of the Real Estate Division reflected on Debtor's financial statements, which treated both the real estate credits and the carrying costs as losses to the Real Estate Division. However, the parties and, if necessary, the Bankruptcy Court are free to determine the appropriate number under the former methodology based on an independent review of the financial data. If the parties are unable to agree, the Bankruptcy Court may, but need not, receive new evidence beyond what has already been presented to it.

D.Mass.,2004.
In re New Seabury Co. Ltd. Partnership
Not Reported in F.Supp.2d, 2004 WL 422728 (D.Mass.)

Briefs and Other Related Documents (Back to top)

• 1:03CV10745 (Docket) (Apr. 18, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.