5

Slip Copy                                                                                                                    Page 1
Slip Copy, 2006 WL 250698 (N.D.Ill.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
 United States District Court,N.D. Illinois, Eastern Division.
Scott MCSPARRAN and Laura Ulrich, Derivatively On Behalf of Career Education Corporation Plaintiffs,
v.
John M. LARSON, Patrick K. Pesch, Wallace O. Laub, Keith K. Ogata, Dennis H. Chookaszian, Robert E. Dowdell, Thomas B. Lally, Nick Fluge, Jacob P. Gruver, and Todd H. Steele, Defendants,
andCAREER EDUCATION CORPORATION, a Delaware Corporation, Nominal Defendant.
No. 04 C 0041, 04 C 4778.

Jan. 27, 2006.

Brian O. O'Mara, Travis E. Downs, III, William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins, Brian J. Robbins, Marc M. Umeda, Robbins Umeda & Fink, LLP, San Diego, CA, George Barrett, Douglas S. Johnston, Jr., Timothy L. Miles, Barrett, Johnston & Parsley, Nashville, TN, Patrick J. Sherlock, Attorney at Law, Chicago, IL, for Plaintiffs.
David H. Kistenbroker, Karl Richard Barnickol, Mary Ellen Hennessy, Katten Muchin Rosenman LLP, Daniel E. Reidy, Alicia Marie Hawley, James Cordray Dunlop, Jones Day, Chicago, IL, for Defendants.
Walter C. Carlson, Courtney Ann Rosen, Richard Bradshaw Kapnick, Tara Kocheran Charnes, Sidley Austin Brown & Wood LLP, Chicago, IL, for Nominal Defendant.

*MEMORANDUM OPINION AND ORDER*
ANDERSEN, J.
**\*1** This matter is before the court on the defendants' motion to dismiss. For the reasons stated below, defendants' motion to dismiss is denied.

*BACKGROUND*

Scott McSparran and Laura Ulrich (hereinafter collectively "plaintiffs") filed a Verified Shareholders' Consolidated Derivative Complaint ("Complaint") on behalf of Career Education Corporation ("CEC"), suing every member of CEC's Board of Directors and certain key officers. The facts set forth herein are those alleged in the Complaint. We take the allegations set forth in the plaintiffs' Complaint as true, as we must in addressing a motion to dismiss. Much of plaintiffs' 75-page, 164-paragraph Complaint contains allegations we need not analyze at this stage in the litigation. However, we will discuss those allegations that allow plaintiffs' Complaint to survive the motion to dismiss.

CEC is a provider of private, for-profit post secondary education, with 51 campuses located throughout the United States, Canada, France, the United Kingdom, and the United Arab Emirates. In addition to its physical locations, CEC maintains an on-line presence through its e-learning division, American InterContinental University-Online. While CEC is formally incorporated in Delaware, plaintiffs maintain that CEC is headquartered in this District, which is also where a significant portion of the alleged wrongs and transactions the plaintiffs set forth in the Complaint occurred.

Plaintiffs claim that defendants violated their fiduciary duty and other laws resulting in damages to CEC of several million dollars in legal and other fees and a significantly diminished business reputation. The gravamen of plaintiffs' Complaint is that defendants artificially inflated CEC's stock price so that they could sell their holdings of CEC's stock at a higher price than the true value of the company would warrant. In an effort to accomplish this, the defendants are alleged to have caused CEC to take several actions that were not in the company's best interests, including enrolling students without complete financial aid, enrolling students that did not actually attend classes, and claiming inflated job-placement rates for CEC graduates.

The Complaint dedicates a significant amount of attention to the regulatory regime in which CEC operated. Many CEC students receive federal loans and funding administered under Title IV of the Federal Higher Education Act ("HEA"), 20 U.S.C. § 1070 *et. seq.* This receipt of federal funds subjects CEC to the regulations of the Department of Education. On July 1, 2003, CEC announced that it had acquired Whitman Education Group ("Whitman"). As the defendants were supposedly aware, this acquisition would trigger a review of both Whitman and CEC by the Department of Education to decide CEC's eligibility for continued participation in HEA programs. In spite of increased scrutiny from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                        Page 2
Slip Copy, 2006 WL 250698 (N.D.Ill.)
**(Cite as: Slip Copy)**

Department of Education and the grave results such a review could visit upon CEC, plaintiffs claim that the defendants caused CEC to falsify records and receive federal student loan funds to which it was not entitled. Additionally, plaintiffs recite numerous other statistics closely monitored by the Department of Education and investors alike that plaintiffs claim the defendants caused CEC to manipulate, such as job placement rates and enrollment figures.

**\*2** Moreover, the Complaint identifies specific information the defendants supposedly had in their possession that should have alerted them to the problems at CEC. Much of this information was public, such as newspaper articles, court papers, SEC filings, and analyst reports. Other information was allegedly in the hands of certain defendants, such as the comparisons between accurate "non-scrubbed" data about financial packaging for each and every enrolled student and inaccurate "scrubbed" data that was reported to the public. The Complaint also quotes from CEC polices that plaintiffs contend should have brought this information to the attention to Audit Committee of CEC's Board of Directors, if not the entire CEC Board of Directors.

If the allegations in the Complaint are believed, this false accounting was not the result of lax oversight; it was intentional. All defendants save one are alleged to have sold significant stock holdings while CEC's stock was artificially inflated by the false numbers reported by CEC. The Complaint lists the proceeds gained from each stock sale by individual defendants. According to the plaintiffs, defendants' scheme enabled them to dispose of 2.8 million shares of CEC stock for proceeds of over $136 million.

The Complaint posits that the defendants knew exactly what was happening at CEC and lied about the extent of the problems CEC faced even after the accounting irregularities came to light, all so that they could continue to sell stock at high prices. After setting forth numerous instances of defendants attempting to conceal accounting irregularities, the Complaint says the defendants caused CEC to violate Generally Accepted Accounting Principles and its own Audit Committee Charter "by failing to, among other things, properly implement, review, and oversee: (i) the Company's financial statements and its financial reporting process; and (ii) the systems of internal accounting and financial control."

Also detailed in the Complaint are the ties between CEC's CEO and Chairman of the Board, and each and every other member of CEC's Board of Directors. While CEC's CEO and Chairman of the Board unquestionably had some degree of control over the compensation of officers of CEC, the Complaint does not allege other business relationships that would allow him to control the compensation of outside directors. Instead, the Complaint refers to general social and business ties and mentions fees paid to the directors for their services.

### DISCUSSION

Before the Court is a shareholder derivative complaint. A derivative action is brought by individual shareholders on behalf of a corporation. However, a hallmark of corporation law is that directors, rather than shareholders, manage the business affairs of the corporation. *See, e.g.,* 8 Del. C. § 141(a) ("The business and affairs of a corporation organized under this chapter shall be managed by or under the direction of a board of directors except as may otherwise [be provided].") Derivative actions "impinge on the managerial freedom of directors. Hence, the [the requirement that a plaintiff demand that a company's board of directors bring suit prior to initiating their own action on behalf of the company] .. exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies and then to provide a safeguard against strike suits." *Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984), *overruled on other grounds by* Brehm v. Eisner, 746 A.2d 244, 253 (Del.2000). Nevertheless, the requirement that a plaintiff pleading a derivative complaint must make a demand upon a corporation's board is excused when such a demand would be futile. *Heineman c. Datapoint Corp.,* 611 A.2d 950, 952 (Del.1992) ("Equity will not require a useless act" and thus "where demand upon the board would be 'futile,' the demand requirement will be excused.")

**\*3** In determining the plaintiffs' pleading requirements we will follow the Federal Rules of Civil Procedure. Pursuant to Federal Rule of Civil Procedure 12(b)(6), when deciding a motion to dismiss, the court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *Jones v. General Electric Co.,* 87 F.3d 209, 211

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(7th Cir.1996); *Wilson v. Formigoni,* 42 F.3d 1060, 1062 (7th Cir.1994). However, the normally liberal pleading standards of the Federal Rules of Civil Procedure are heightened in this case by Rule 23.1, which requires a plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. Pleading with particularity means that a plaintiff must include "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624,627 (7th Cir.1990).

### I. Demand Futility

Because CEC was incorporated under the laws of Delaware, we will apply Delaware law in determining whether plaintiffs are excused from making a demand upon CEC's Board of Directors prior to initiating a suit. We note that, although plaintiffs claim Illinois law applies, they correctly recognize Illinois case law follows Delaware case law in determining the proper tests for demand futility. *In Re Abbott Laboratories Derivative Shareholders Litigation,* 325 F.3d 795, 803 (7th Cir.2001) (*"In Re Abbott Labs"* ). The Supreme Court of Delaware created a two-part test for demand futility in *Aronson v. Lewis.* Under this test, we ask whether "a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgement." *Aronson,* 473 A.2d at 814. Plaintiffs assert two main grounds for demand futility: (i) the Board of Directors is dominated and controlled by CEC's CEO and Chairman of the Board; and (ii) a majority of the Board of Directors are interested in the outcome of this litigation because they face a substantial likelihood of liability for claims predicated on the fact their decisions were not protected by the business judgement rule. As such, the two-part test laid out in *Aronson* is distilled in the present case into questions of independence and interest.

### A. Independence of Directors

Delaware courts have noted that "[a]t bottom, the question of independence turns on whether a director is, *for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind. That is, the Supreme Court cases ultimately focus on impartiality and objectivity." *In re Oracle Corp. Derivative Litigation,* 824 A.2d 917, 938 (Del.Ch.2003), quoting *Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1232 (Del.Ch.2001), *rev'd in part on other grounds,* 817 A.2d 149 (Del.2002), *cert. denied,* 538 U.S. 1032, 123 S.Ct. 2076, 155 L.Ed.2d 1061 (2003) (emphasis in original). However, "neither mere personal friendships alone, nor mere outside business relationships alone, are sufficient to raise a reasonable doubt regarding a director's independence." *Litt v. Wycoff,* No. 19083-NC, 2003 Del. Ch. LEXIS 23, 16 (Del. Ch. Mar. 25, 2003). Nor does the fact that directors receive directorial fees destroy their independence. *Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988), *overruled on other grounds by Brehm,* 746 A.2d at 253-54; *see also White v. Panic,* 793 A.2d 356, 366 (Del.Ch.2000) ("[T]he fact that each [director] is paid an annual retainer of $30,000 plus a fee of $1000 for each meeting attended and annual grants of stock options does not make them beholden to [the company's CEO].").

**\*4** There is no substantial reason to question the independence of a majority of CEC's Board of Directors. Plaintiff has not put forth any allegations outside directors have their salary set by any board member, or are otherwise financially dependent upon other directors. If mere social acquaintances and prior business relationships with other board members coupled with the receipt of directorial fees destroyed a board member's independence, few boards would have any independent members. Moreover, every reason plaintiff sets forth to question the independence of CEC's Board of Directors runs contrary to Delaware law.

### B. Interest of Directors

In determining whether the defendants have an interest in the litigation that would render a demand upon them futile we look to whether the factual allegations in the Complaint "create a reasonable doubt as to the disinterestedness of the directors at the time the Complaint was filed." *Blasband v. Rales,* 971 F.2d 1034, 1048 (3rd Cir.1992) (applying Delaware law). A reasonable doubt regarding a director's in-

terest is raised when a corporate decision "will have a materially detrimental impact on a director, but not on the corporation or the stockholders." *Rales v. Balasband,* 634 A.2d 927, 936 (Del.1993). As such, if plaintiffs' Complaint pleads facts that indicate a majority of CEC's Board of Directors face a "substantial likelihood" of personal liability, a demand upon the Board of Directors is futile. *Aronson,* 473 A.2d at 815.

Generally, board members are protected from individual liability by the business judgment rule, which provides a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts." *Aronson,* 473 A.2d at 812. Nevertheless, individual liability for directors can result from two possible contexts: (i) such liability can "follow from a board decision that results in a loss because that decision was ill advised [,] 'negligent,' " or intentionally adverse to the best interests of the company and (ii) that liability may "arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." *In re Caremark International Inc. Derivative Litigation,* 698 A.2d 959, 964 (Del.Ch.1996).

*In re Abbott Labs* was a case initially dismissed for failure to adequately plead demand futility. 325 F.3d 795. The Seventh Circuit Court of Appeals reversed that dismissal and found that:
[g]iven the extensive paper trail ... concerning the violations [giving rise the derivative complaint] and the inferred awareness of the problems, the facts support a reasonable assumption that there was a 'sustained and systematic failure of the board to exercise oversight,' in this case intentional in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for [six years] resulted in substantial corporate losses....

**\*5** *Id.* at 809.

The Seventh Circuit then stressed that "[t]he totality of the complaint's allegations need only support a reasonable doubt of business judgment protection, not a judicial finding that the directors' actions are not protected by the business judgment rule." *Id.* at 808.

The Seventh Circuit is not alone in recognizing that a board's extreme indifference or failure to act may create individual liability for board members. *In re Caremark,* 698 A.2d at 970 ("a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by noncompliance with applicable legal standards.") Moreover, it is beyond dispute that a director who profits from confidential corporate information and takes actions adverse to the corporation's best interest is personally liable to the corporation. *Brophy v. Cities Service Co.,* 70 A.2d 5, 8 (Del.Ch.1949) (If "a person in a confidential or fiduciary position, in breach of his duty, uses that knowledge to make a profit from himself, he is accountable for such profit....").

Plaintiffs' Complaint contains two alternative allegations. Defendants were allegedly either active participants in a scheme to report false accounting of revenues and enrollment figures so that they could sell their holdings of CEC stock at inflated prices, or they failed to act in the face of evidence that should have prompted remedial measures. Either of these two scenarios could result in personal liability for the defendants. In support of these allegations, the Complaint details company policy that should have brought CEC's false accounting to the attention of the defendants, quotes from news articles, court filings, and analyst reports that discussed allegations of false accounting, and names of two defendants who supposedly received comparisons of accurate information versus the inaccurate information that was provided to the public and the federal government. Additionally, the Complaint alleges that all defendants except for one sold sizable stock holdings while they knew, or should have known, of significant, non-public, problems with CEC's reported financial and enrollment figures. In fact, the plaintiffs contend that the reason CEC was engaged in the reporting of false figures was primarily to allow defendants to profit from selling their holdings of CEC stock.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 5
Slip Copy, 2006 WL 250698 (N.D.Ill.)
**(Cite as: Slip Copy)**

The Complaint also explains that the reporting of false figures to the federal government was extremely adverse to the interests of CEC due to the dire consequences a revocation of HEA loan eligibility would visit upon the company.

The alleged lack of oversight provided by the CEC Board of Directors mirrors that discussed in the Seventh Circuit's *In re Abbot Labs* opinion. While *In re Abbott Labs* involved six years in which the board had actual knowledge of correspondence from government officials warning of legal violations, which is longer than the relevant time period set forth in plaintiffs' Complaint, the period of time oversight failed to meet the board's obligations is not determinative. Moreover, *In re Cendant* stressed that corporate boards have an obligation to undertake a good faith obligation to ensure that reporting systems are in place that alert board members to significant risks faced by the company. As such, it is not only the public pronouncements by newspapers, analysts, and litigants that arguably created a duty for the board to act. Instead, if the allegations in the Complaint are true, the public pronouncements were merely a symptom of the ills brought upon CEC by massive oversight failures or intentional manipulation of financial and enrollment figures.

**\*6** At this stage in the litigation plaintiffs have met their burden of pleading with particularly their reasons for demand futility. The plaintiffs have told us the "who, what, when, where, and how" of a story that a raises a reasonable doubt about the defendants' personal liability. Since the defendants may have personal liability, they are interested parties to any demand upon the Board of Directors to institute litigation. As such, plaintiffs are excused from making a demand upon the Board of Directors based on the doctrine of demand futility. Moreover, we note that defendants do not contend that they have taken any actions to pursue the rights asserted in the Complaint, despite the two-year pendency of this litigation.

We will not parse the language of the Complaint to determine whether it states a claim for securities fraud, which would raise substantial questions concerning scienter, materiality, and pleading requirements. While properly plead allegations of securities fraud would certainly place the defendants at great personal risk, we have already determined that plaintiffs failure to make a demand upon the Board of Directors is excused under the doctrine of demand futility. As such, we need not make any further inquires at this juncture.

### III. Damages

Defendants also argue for dismissal on the grounds that no damages were pled. It is axiomatic that a plaintiff must set forth a theory of damages. Plaintiffs have done so in the present Complaint. Plaintiffs allege that CEC spent several million dollars in legal and other fees and suffered a substantially diminished business reputation as a result of defendants' actions. If true, this has ramifications for everything from CEC's stock price and borrowing ability to student retention and enrollment rates. As such, the defendants have pled damages. *See, e.g.,* In re Cendant Corporation Derivative Action Litigation, 189 F.R.D. 117, 134-5 (D.N.J.1999).

### CONCLUSION

For all the foregoing reasons, defendants' motion to dismiss [265] is denied. It is so ordered.

N.D.Ill.,2006.
McSparran v. Larson
Slip Copy, 2006 WL 250698 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 1767416 (Trial Pleading) Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement, Waste of Corporate Assets, Unjust Enrichment and for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information (Jul. 20, 2004)

• 2004 WL 1969902 (Trial Pleading) Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement, Waste of Corporate Assets, Unjust Enrichment and for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information (Jul. 20, 2004)

• 1:04cv04778 (Docket) (Jul. 20, 2004)

• 2004 WL 2175229 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to the Competing Lead Plaintiff Motions and in Further Support of the Motion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
Slip Copy, 2006 WL 250698 (N.D.Ill.)  
**(Cite as: Slip Copy)**

of Phil M. Campbell and Laurence Ratnofsky for Appointment as Lead Plaintiff and for Approval of Selection of Lead and Liaison Counsel (Feb. 24, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.