6

Not Reported in A.2d                                                                                                      Page 1
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

C

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Barbie RATTNER, Plaintiff,
v.
D. James BIDZOS, Stratton D. Sclavos, Timothy Tomlison, Roger H. Moore, David J. Cowan, Anil H.P. Pereira, Douglas L. Wolford, Robert J. Korzeniewski, James M. Ulam, Quentin P. Gallivan, Dana L. Evan, Kevin R. Compton, William L. Chenevich, Gregory L. Reyes and Scott G. Kriens, Defendants,
andVERISIGN, INC., a Delaware corporation, Nominal Defendant.
No. Civ.A. 19700.

Submitted April 7, 2003.
Decided Sept. 30, 2003.
As Revised Oct. 7, 2003.

James S. Green, and Kevin A. Guerke, of Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware; Peter D. Bull, and Joshua M. Lifshitz, of Bull & Lifshitz, LLP, New York, New York, for Plaintiff, of counsel.
David C. McBride, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; David M. Furbush, and Noah D. Boyens, of O'Melveny & Myers LLP, Menlo Park, California, for Defendants, of counsel.

MEMORANDUM OPINION
NOBLE, Vice Chancellor.
*1 Plaintiff Barbie Rattner ("Rattner") brings this derivative action on behalf of Nominal Defendant VeriSign, Inc. ("VeriSign" or the "Company") alleging that Defendants James D. Bidzos ("Bidzos"), Stratton D. Sclavos ("Sclavos"), Timothy Tomlinson ("Tomlinson"), Roger H. Moore ("Moore"), David J. Cowan ("Cowan"), Anil H.P. Pereira ("Pereira"), Douglas L. Wolford ("Wolford"), Robert J. Korzeniewski ("Korzeniewski"), James M. Ulam ("Ulam"), Quentin P. Gallivan ("Gallivan"), Dana L. Evan ("Evan"), Kevin R. Compton ("Compton"), William L. Chenevich ("Chenevich"), Gregory L. Reyes ("Reyes") and Scott G. Kriens ("Kriens") (collectively, the "Individual Defendants") breached their fiduciary duties owed to the Company and its shareholders. Specifically, Rattner asserts that the Individual Defendants breached their fiduciary duty of care by inadequately maintaining accounting controls and utilizing improper accounting and audit practices. Rattner also contends that certain Individual Defendants sold securities while in possession of material inside information, thereby breaching their fiduciary duties, and that the remaining Individual Defendants have committed waste. In addition, Rattner seeks contribution and indemnification from the Individual Defendants for claims that have been or may be pursued against the Company based upon the Individual Defendants' alleged misconduct.

Defendants have moved to dismiss each of Rattner's claims under Court of Chancery Rule 23.1 for failure to make a demand upon the VeriSign board of directors (the "Board"). They argue that the conclusory allegations of the Stockholder's Amended Derivative Complaint (the "Amended Complaint") fail to create a reasonable doubt as to whether a majority of the Board is capable of rendering an impartial decision regarding the pursuit of this derivative litigation. Defendants have also moved to dismiss, under Court of Chancery Rule 12(b)(6), Rattner's claims for breach of fiduciary duty and waste.

For the reasons that follow, I conclude that, because demand is not excused under Court of Chancery Rule 23.1, this action must be dismissed.

I. BACKGROUND

FN1. This background is taken from the allegations of the Amended Complaint. *White v. Panic,* 783 A.2d 543, 547 n. 5 (Del.2001).

A. *The Parties*

Rattner is, and has been at all relevant times, a common stock shareholder of VeriSign. VeriSign, a Delaware corporation, was founded in April 1995. It is a leading provider of digital trust services, enabling various Internet users to engage in secure digital commercial transactions and communications.

The Individual Defendants are the current directors and the senior officers of the Company. Sclavos is the Chairman of

Not Reported in A.2d                                                                                                             Page 2
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

the Board and Bidzos is the Vice Chairman of the Board. The remaining directors on the eight member Board are Moore, Cowan, Compton, Chenevich, Reyes and Kriens (collectively, along with Sclavos and Bidzos, the "Director Defendants"). Of the current Board members, the only director who held a senior management position at the time this action was filed is Sclavos, who is also VeriSign's President and Chief Executive Officer. Bidzos served as Chairman of the Board (April 1995 through March 12, 2002) and Chief Executive Officer (April 1995 through July 1995). Prior to becoming a VeriSign director in February 2002, Moore had been President and Chief Executive Officer of Illuminet Holdings, Inc. ("Illuminet") from December 1995 until December 2001, when VeriSign acquired Illuminet.

> FN2. This action was filed on June 12, 2002; Rattner lodge her Amended Complaint on October 4, 2002.
>
> FN3. Sclavos has served as the Company's President and Chief Executive Officer since April 1995.

*2 The remaining Individual Defendants, with the exception of Tomlinson, are senior officers of the Company. Pereira is VeriSign's Executive Vice President and General Manager, Enterprise and Service Provider Division, who formerly, from October 2000 to January 2001, served as VeriSign's Senior Vice President and Group General Manager of the Enterprise and Service Provider Division. Wolford serves as VeriSign's Senior Vice President and Group General Manager of Web Presence Services. Korzeniewski is the Executive Vice President of Corporate and Business Development, and has held that position since June 2000. Ulam, since October 2001, has been Senior Vice President, General Counsel of the Company; previously he served as Vice President, General Counsel of VeriSign from the time of his joining the Company in June 2000. Gallivan is VeriSign's Executive Vice President, Worldwide Sales and Services, a position he has held since April 1, 1999. Finally, Evan has served, since January 1, 2001, as the Company's Executive Vice President of Finance and Administration and Chief Financial Officer.

> FN4. Tomlinson served as a director (April 1995 until May 2002) and as the Company's Secretary (April 1995 through October 2000). Tomlinson is also a partner in the law firm of Tomlinson, Zisko & Master LLP (the "Tomlinson Firm"). In 2000, VeriSign paid approximately $900,000 to the Tomlinson Firm.

B. *The Misstatements*

Rattner principally complains of alleged insider trading and a failure to oversee properly the accounting practices at VeriSign. Common to both allegations is a series of allegedly misleading statements made over a twelve-month period from January 2001 through January 2002 (the "Relevant Period"). On January 24, 2001, VeriSign released its fourth quarter and fiscal 2000 financial results (the "January 24 Release"). The release noted that during the fourth quarter, the Company earned revenues of $197.4 million, representing a 613% increase over the previous year's fourth quarter results. For fiscal 2000, VeriSign reported revenues of $474.8 million, amounting to a 460% increase over revenues in the previous fiscal year. These revenues resulted in pro forma net income for the quarter, excluding the amortization of goodwill and intangible assets and acquisition-related charges of $45.5 million, equivalent to $0.21 diluted earnings per share; pro forma net income for fiscal 2000 was $129.1 million. However, after including the charges for amortization of goodwill and intangible assets and other acquisition related charges, the fiscal 2000 net loss was $3.1 billion. The release also highlighted the international expansion undertaken by the Company in fiscal year 2001. However, Rattner alleges that the picture was not as rosy as was portrayed.

> FN5. Amended Compl. ¶ 48.

In the Amended Complaint, Rattner asserts that, because of a failure to maintain and oversee properly the accounting practices at VeriSign, the statements contained in the January 24 Release conveyed inaccurate information. Specifically, VeriSign improperly recorded "round trip revenue" and barter transactions, thus artificially inflating the Company's reported revenues for fiscal 2000. VeriSign also failed to record impairments in the value of certain investments it made in other companies during a round of private equity financing that commenced in the third quarter of 2000 . Thus, Rattner concludes that because the Company failed to re-

Case 1:04-cv-10177-NG    Document 53-7    Filed 04/27/2006    Page 4 of 16

Not Reported in A.2d                                                                                               Page 3
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

cord revenues accurately and write down impaired asset values on a timely basis, in violation of Generally Accepted Accounting Principles ("GAAP"), the earnings projections and financial statements contained in the January 24 Release were overly optimistic and materially misleading.

> FN6. Charges related to these investments were $74 million in fiscal 2001 and $94.8 million in the first half of fiscal 2002. *Id.* ¶ 49.

**\*3** Other undisclosed accounting practices of the Company also are claimed to have contributed to an inflated market price for VeriSign common stock. Rattner alleges that the Individual Defendants either "were manipulating" or "should have been aware of the manipulation" of the reported days sales outstanding (DSO) by including the deferred revenue, and excluding the accounts receivable, of companies acquired by VeriSign. Furthermore, Rattner also contends that there were other material misstatements made during the Relevant Period. Rattner notes that:

> FN7. *Id.* ¶ 47; *cf. id.* ¶ 62 (noting that "VeriSign" engaged in manipulation).

> FN8. *Id.* ¶ 70.

[t]he Company also failed to disclose that (i) the integration of Illuminet and H.O. Systems failed as the number of enterprise clients declined after the acquisitions; (ii) the Company would incur almost $80 million in charges, engage a[sic] massive restructuring and layoff a substantial portion of its workforce as a result of the acquisitions of Illuminet and H.O. Systems; [and] (iii) the Company would need to massively increase its allowance for doubtful accounts.

> FN9. *Id.* ¶ 47. The Amended Complaint only informs that the acquisition of H.O. Systems, Inc. ("H.O.Systems") closed on February 8, 2002. *Id.* ¶ 76.

These allegedly improper accounting practices and material misstatements reappeared in numerous financial statements, releases and public statements during the Relevant Period, rendering each materially misleading for the reasons previously noted. To this end, the Amended Complaint quotes extensively from myriad sources publicly disseminated by the Company during the Relevant Period, each allegedly materially misleading, including: statements made by Sclavos at a February 1, 2001, analysts' meeting, the Company's 10K report for fiscal year 2000 issued on March 28, 2001; an April 26, 2001, press release; a July 26, 2001, press release; a September 24, 2001, article in *Bloomberg;* an October 25, 2001, press release; and a January 24, 2002, press release. The alleged effect of these numerous material misstatements was to inflate artificially the stock price of VeriSign over the course of the Relevant Period.

> FN10. *See id.* ¶¶ 50-55, 57, 58, 60, 64-69.

C. *Alleged Wrongdoing by the Individual Defendants*

With the knowledge that the market price of VeriSign stock was artificially inflated, and while in possession of other material non-public information, during the Relevant Period "certain defendants" sold over 875,000 shares of VeriSign stock for proceeds in excess of $47 million, and Moore sold approximately 995,000 shares of Illuminet stock for over $37 million. Specifically:

> FN11. A central problem with the Amended Complaint is that one is never certain who is selling how much and which sales are being challenged. As with questions surrounding which Director Defendants have been implicated in certain federal securities class action lawsuits, *see infra* text accompanying note 79, this defect stems from the inconsistent use of defined terms and a failure to use defined terms. Often in the Amended Complaint, Rattner notes that "certain defendants" engaged in allegedly illicit transactions, but nowhere are these ambiguous assertions clarified. Particularly unhelpful is the definition provided in the Third Cause of Action, well after the discussion of the underlying facts of this dispute:
> 108. Certain defendants (the "Insider Trading Defendants"), at all relevant times, occupied fiduciary positions with VeriSign and were privy to confidential material inside information concerning VeriSign and its operations.
> Amended Compl. ¶ 108.
> I draw the inference that the challenged sales in-

Case 1:04-cv-10177-NG   Document 53-7   Filed 04/27/2006   Page 5 of 16

Not Reported in A.2d                                                                                                    Page 4
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

clude all of the sales by Individual Defendants during the Relevant Period. Therefore, at issue are the sales of VeriSign common stock and Illuminet options by Bidzos, Cowan, Evan, Gallivan, Korzeniewski, Pereira, Sclavos, Tomlinson, Ulam, Wolford, and Moore (collectively, the "Selling Defendants") so noted. *See id.* ¶ 37.

a) Bidzos sold 15,000 shares of VeriSign common stock on May 22, 2001, for net proceeds of $991,890;

b) Cowan sold 20,800 shares on February 1, 2001; 53,125 shares during the period of May 1-2, 2001; and 22,000 shares on November 13, 2001 (a total of 95,925 shares), of VeriSign common stock for total net proceeds of $5,132,773;

c) Evan sold 500 shares on January 31, 2001; 6,500 shares during the period of February 1-28, 2001; 3,000 shares on March 1, 2001; 60,100 shares during the period of May 1-31, 2001; 4,000 shares during the period of May 17-21, 2001; 12,500 shares during the period of August 1-29, 2001; and 10,000 shares during the period of November 13-14, 2001 (a total of 96,600 shares), of VeriSign common stock for total net proceeds of $5,025,988;

**\*4** d) Gallivan sold 37,000 shares during the period of February 6-28, 2001; 3,000 shares on March 1, 2001; and 82,994 shares during the period of May 2-8, 2001 (a total of 122,994 shares), of VeriSign common stock for total net proceeds of $7,164,007;

e) Korzeniewski sold 15,000 shares on February 2, 2001; 25,000 shares on May 3, 2001; 74,626 shares during the period of May 3-31, 2001; 15,000 shares on August 27, 2001; and 33,700 shares during the period of November 2-13, 2001 (a total of 163,326 shares), of VeriSign common stock for total net proceeds of $8,442,775;

f) Pereira sold 800 shares on January 31, 2001; 9,700 shares during the period of February 6-28, 2001; 2,500 shares on March 1, 2001; 47,600 shares during the period of May 2-31, 2001; 11,000 shares during the period of August 3-31, 2001; and 15,000 shares during the period of November 7-30, 2001 (a total of 86,600 shares), of VeriSign common stock for total net proceeds of $4,676,900;

g) Sclavos sold 50,000 shares on February 28, 2001; 135,000 shares during the period of May 7-31, 2001; and 60,375 shares during the period of August 3-29, 2001 (a total of 245,375 shares), of VeriSign common stock for total net proceeds of $13,229,650;

h) Tomlinson sold 875 shares on January 30, 2001; 1,875 shares on February 26, 2001; 1,875 shares during the period of May 1-21, 2001; 1,775 shares on August 1, 2001; and 2,400 shares during the period of November 7-13, 2001 (a total of 8,800 shares), of VeriSign common stock for total net proceeds of $476,827;

i) Ulam sold 8,000 shares on March 1, 2001; 2,711 shares during the period of May 22-31, 2001; and 2,500 shares on August 3, 2001 (a total of 13,211 shares), of VeriSign common stock for total net proceeds of $697,925; and

j) Wolford sold 5,000 shares on January 31, 2001, and 12,900 shares on May 8, 2001 (a total of 17,900 shares), of VeriSign common stock for total net proceeds of $1,174,000.

> FN12. Amended Compl. ¶ 37.

Thus, during the Relevant Period, the Selling Defendants (except Moore) sold a total of 875,731 shares of VeriSign common stock for aggregate net proceeds of $47,512,615. Moore disposed of 995,000 in-the-money, unexercised Illuminet stock options at some point between March 26, 2001 and April 3, 2002, earning net proceeds of $37,113,500.

> FN13. *Id.* The per option value received by Moore was estimated by Rattner based upon the market value of Illuminet common stock as of December 12, 2001, the closing date of the merger between Illuminet and VeriSign, less the per share exercise price.

Moreover, the material misstatements which opened the door for the Selling Defendants to engage in improper insider trading were allegedly the products of the Individual Defendants' breaches of fiduciary duty in failing to oversee adequately the Company's accounting procedures. The Amended Complaint maintains that the Individual Defendants "knew, or were reckless in not knowing, the facts which indicated that the fiscal 2000 and 2001 Form 10-Ks and all of the Company's interim financial statements, press releases, public statements, and filings with the SEC" were misleading. Moreover, it is alleged, the Individual Defend-

CASE 1:04-cv-10177-NG    Document 53-7    Filed 04/27/2006    Page 6 of 16

Not Reported in A.2d                                                                                                        Page 5
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

ants systematically failed to assure VeriSign's compliance with applicable federal and state laws, SEC rules and regulations, FASB Statements of Concepts and GAAP.

> FN14. *Id.* ¶ 94.

### D. *Subsequent Events*

**\*5** In February 2002, rumors began circulating as to the accounting practices employed by VeriSign. On March 19, 2002, the Company, in its 10-K for 2002, disclosed that 10% of its 2001 revenues were derived from reciprocal deals with either its customers or other companies in which it had invested. That day, the price of VeriSign shares fell by more than 9%, closing down $2.61 to $26.42. On April 25, 2002, a VeriSign press release noted, in addition to its financial and operating results for the first quarter of 2002, that DSO had increased to 81 days, and that the Company was restructuring its operations in order to best accommodate the recently acquired companies of Illuminet and H.O. Systems. Upon this news, the price of VeriSign shares tumbled from $18.24 to $9.89. A July 25, 2002 press release noted that the Company had recorded a $4.6 billion charge in connection with a non-cash charge relating to a portion of the Company's goodwill and intangible assets, as directed by FASB Statement No. 142. On August 7, 2002, VeriSign announced that its marketing practices were under investigation by the Federal Trade Commission, regarding allegedly misleading direct-mail advertising campaigns. The Company is also the target of several securities fraud class action lawsuits filed in the Northern District of California.

> FN15. *Id.* ¶ 71.
>
> FN16. *Id.* ¶¶ 72-73.
>
> FN17. When the Amended Complaint was filed, VeriSign traded at $4 per share.
>
> FN18. Amended Compl. ¶ 79.

### II. CONTENTIONS

In the Amended Complaint, Rattner primarily advances two theories of wrongdoing by the Individual Defendants. First, Rattner alleges that the Selling Defendants, in violation of their fiduciary duties, engaged in insider trading; that is, the Selling Defendants profited from selling VeriSign common stock (or, in the case of Moore, selling Illuminet options) while knowing that improper accounting practices at VeriSign, the products of which were publicly disseminated through material misstatements, created an inflated market price. In support of this claim, Rattner notes several aspects of the challenged stock sales executed during the Relevant Period. First, the Individual Defendants, by virtue of their positions, were privy to material, undisclosed information concerning the alleged accounting improprieties. Second, the timing of the sales, in that many of the Individual Defendants sold their holdings simultaneously and on days immediately following the release of allegedly misleading information or, in the case of Moore, after the announcement of the acquisition of Illuminet yet before that acquisition's closing, raises suspicions that the sales were part of an overall scheme of insider trading. Third, Rattner alleges that the sales of VeriSign stock (or Illuminet options) by the Selling Defendants during the Relevant Period were not consistent with the Individual Defendants' previous trading activity. Finally, Rattner notes that many of the Individual Defendants sold substantial portions of their VeriSign (or Illuminet) holdings for millions of dollars. Rattner further contends that all of the Director Defendants committed waste by allowing the Selling Defendants to misappropriate a valuable asset, in the form of proprietary information, of the Company.

> FN19. Rattner also alleges that some of the Individual Defendants participated in or encouraged the improper accounting practices. *Id.* ¶ 47.
>
> FN20. These claims will be referred to collectively as the "Insider Trading Claims."

**\*6** Rattner also presses a second set of claims concerning the alleged dissemination of misleading statements to the market and the improper oversight exercised in failing to assure the accuracy of VeriSign's accounting systems. Rattner charges the Individual Defendants with inadvertent, if not knowing, misdeeds in maintaining accurate financial reporting and recording systems, conduct which ultimately permitted the Selling Defendants to engage in insider trading and resulted in damages to the Company. More pertinently,

Not Reported in A.2d                                                                                                   Page 6
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

in the demand excusal context, and in essence, Rattner alleges that the Director Defendants "have engaged in a sustained and systematic failure to exercise their oversight responsibilities to ensure that VeriSign complied with Federal and State Laws, rules and regulations and to ensure the integrity of its financial reporting." Thus, by failing to oversee adequately the Company's financial reporting and recording systems, the Director Defendants breached their fiduciary duties.

> FN21. Amended Compl. ¶¶ 98, 101.
>
> FN22. *Id.* ¶ 100.
>
> FN23. Collectively, these claims will be referred to as the "Accounting Oversight Claims."

Because of the Individual Defendants' misdeeds, Rattner claims that the Company has suffered harm in that VeriSign's goodwill and integrity in the market have been impugned. Furthermore, the Company has been injured by bearing the cost of defense and being subjected to potential liability stemming from the pending class actions in federal court. Rattner thus requests that the following relief be granted: (1) that the Individual Defendants account to VeriSign for all damages and costs sustained now or in the future; (2) that the Individual Defendants return to VeriSign all salaries and remuneration of any kind received while the Individual Defendants were in breach of their fiduciary duties; (3) that a constructive trust be imposed on all profits derived from insider trading by the Selling Defendants; and (4) a declaration that VeriSign is entitled to contribution and indemnification for any claims that have been, or may be, asserted against it in connection with the Individual Defendants' alleged misconduct.

In response to the Amended Complaint, Defendants have moved to dismiss this action for failure to comply with Court of Chancery Rule 23.1. Defendants argue that Rattner has not pled with particularity in the Amended Complaint facts which demonstrate that demand is futile. They contend that Rattner, in the Amended Complaint, does not allege with particularity facts that would constitute insider trading, and thus a disabling interest, by a majority of the Board. Similarly, Rattner fails to allege with particularity that the Board failed to exercise proper oversight regarding the Company's financial recording and reporting systems. Moreover, Defendants note that merely because the Director Defendants would be asked to authorize suit against themselves does not necessarily prevent a majority of the Board from exercising disinterested and independent business judgment in deciding the merits of, and whether to pursue, Rattner's claims. Therefore, Defendants request that this action be dismissed.

> FN24. The Defendants have also moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6). However, given my disposition of the Defendants' motions to dismiss under Court of Chancery Rule 23.1, the Defendants' motion to dismiss under Court of Chancery Rule 12(b)(6) will not be addressed. Similarly, I do not address Defendants' contention that this action should be dismissed because "prosecution of this amended action is not in the best interests of the Company." Op. Br. in Supp. of Defs.' Mot. to Dismiss at 13.

### III. ANALYSIS

*7 Court of Chancery Rule 23.1 requires that, in derivative actions, "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." The demand requirement embodied in Court of Chancery Rule 23.1 is an acknowledgement that a shareholder's prosecution of a derivative action necessarily impinges upon the power and autonomy of a board of directors to manage the affairs of the corporation, including whether or not to pursue a cause of action belonging to the corporation. The hurdle of proving demand futility also serves an important policy function of promoting internal resolution, as opposed to litigation, of corporate disputes and grants the corporation a degree of control over any litigation brought for its benefit.

> FN25. *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990); *Aronson v. Lewis,* 473 A.2d 805, 811-12 (Del.1984).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10177-NG    Document 53-7    Filed 04/27/2006    Page 8 of 16

Not Reported in A.2d                                                                                                Page 7
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

>   FN26. *Spiegel,* 571 A.2d at 773; *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at *5 (Del.Ch. June 21, 2000).

A critical requirement of Court of Chancery Rule 23.1 is that the complaint must allege *with particularity* the reasons for demand excusal.

Those pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.... What the pleader must set forth are particularized factual statements that are essential to the claim.... A prolix complaint larded with conclusory language ... does not comply with these fundamental pleading mandates.

>   FN27. *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000) (footnotes omitted).

In considering whether a derivative plaintiff has satisfied Court of Chancery Rule 23.1, I am confined to reviewing the well-pled allegations of the complaint. While I am unable to accept cursory contentions of wrongdoing in light of the obligation to plead facts with particularity, I must accept as true all well-pled allegations of fact in the complaint, and all reasonable inferences from non-conclusory allegations contained in the complaint must be drawn in favor of the plaintiff. With these principles in mind, I turn to the question of whether Rattner has pleaded with particularity that demand upon the Board would be futile and, thus, is excused.

>   FN28. *White,* 783 A.2d at 547 n. 5; *Zimmerman v. Braddock,* 2002 WL 31926608, at *7 (Del.Ch. Dec.20, 2002); *Ash v. McCall,* 2000 WL 1370341, at *6 (Del.Ch. Sept.15, 2000).

>   FN29. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988).

The business judgment rule and demand excusal are "inextricably bound." When a derivative suit challenges decisions made by directors in accordance with their managerial authority, "stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim." However, it is also recognized that the business judgment rule only operates in instances of action by the board of directors or a conscious decision to refrain from acting. The business judgment rule has no role in the case of inaction by the board of directors. From this dichotomy, two overlapping yet different tests have been developed to determine whether demand is excused.

>   FN30. *Aronson,* 473 A.2d at 812.

>   FN31. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993).

>   FN32. *Aroson,* 473 A.2d at 813.

>   FN33. *Id.; Guttman v. Huang,* 823 A.2d 492, 499-500 (Del.Ch.2003); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *14 n. 39 (Del.Ch. Dec.18, 2002).

**\*8** If a derivative suit challenges a decision made by a board of directors, then demand futility is properly evaluated under that test announced in *Aronson v. Lewis.* Under the *Aronson* test, "[t]o determine whether demand would be futile, the Court must determine whether the particular facts, as alleged, create a reason to doubt that: '(1) the directors are disinterested and independent' or '(2) the challenged transaction was otherwise the product of a valid exercise of business judgment.' " Thus, *Aronson* adopted a two-pronged analysis for determining whether demand is futile: the first prong inquires into the independence and disinterestedness of the directors, and the second prong focuses on the substantive nature of the challenged transaction and the directors' approval thereof.

>   FN34. *Rales,* 634 A.2d at 933 ("The essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors is being challenged in the derivative suit."); *Haseotes v. Bentas,* 2002 WL 31058540, at *4 (Del.Ch. Sept.3, 2002).

>   FN35. *In re Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 285 (Del.Ch.2003) (quoting *Aronson,* 473 A.2d at 814).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                                       Page 8
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

FN36. *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984); *Aronson,* 473 A.2d at 814.

The parties, however, agree that, here, because Rattner does not challenge any particular action undertaken by the Board as a whole, the standard established in *Rales v. Blasband* governs the determination of demand futility. Thus, under the *Rales* test,

a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

FN37. *Rales,* 634 A.2d at 934.

Because there has been no action or decision by a board of directors, a premise of the *Aronson* test, that of the application of the business judgment rule, is lacking, and accordingly it is under the *Rales* test that the fundamental right of boards of directors to manage the affairs of corporations is recognized. Thus, in examining "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations," the focus is upon the disinterestedness and the independence of a majority of the board of directors in responding to a demand.

FN38. *In re Fuqua Indus., Inc. S'holders Litig.,* 1997 WL 257460, at *13 (Del.Ch. May 13, 1997); *Kohls v. Duthie,* 791 A.2d 772, 780 (Del.Ch.2000); see also *Rales,* 634 A.2d at 933 ("[t]he absence of board action ... makes it impossible to perform the essential inquiry contemplated by *Aronson*-whether the directors have acted in conformity with the business judgment rule [in consciously deciding to act or refrain from acting]").

FN39. *Rales,* 634 A.2d at 934.

Under the *Rales* test, demand is excused if the particularized facts of the Amended Complaint create a reasonable doubt that, at the time the original complaint was filed, a majority of the Board could have exercised disinterested and independent business judgment in responding to Rattner's demand. Rattner does not challenge the independence of any Director Defendant; thus, the inquiry turns to the disinterestedness of the Director Defendants at the time this action was filed. Directors are considered disinterested for purposes of determining demand futility when they "appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." Directorial interest may also be said to exist when " 'a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.' "

FN40. *Aronson,* 473 A.2d at 812; see also *Orman v. Cullman,* 794 A.2d 5, 23 (Del.Ch.2002).

FN41. *Orman,* 794 A.2d at 23 (quoting *Rales,* 634 A.2d at 936).

*9 Often, as is the case here, a derivative suit essentially asks the directors to authorize a suit against themselves and, thus, to act against their own personal interests.
The conundrum for the law in this area is well understood. If the legal rule was that demand was excused whenever, by mere notice pleading, the plaintiffs could state a breach of fiduciary duty claim against a majority of the board, the demand requirement of the law would be weakened and the settlement value of so-called "strike suits" would greatly increase, to the perceived detriment of the best interests of stockholders as investors. But, if the demand excusal test is too stringent, then stockholders may suffer as a class because the deterrence effects of meritorious derivative suits on faithless conduct may be too weak.

FN42. *Guttman,* 823 A.2d at 500.

Except in "egregious circumstances," the "mere threat" of personal liability does not constitute a disabling interest for a director considering a derivative plaintiff's demand. "[H]owever, a 'substantial likelihood' of personal liability prevents a director from impartially considering a demand." It is this difference, between a "mere threat" of personal li-

Not Reported in A.2d                                                                                                               Page 9
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

ability and (i) "a substantial likelihood" of personal liability or (ii) a "mere threat" in "egregious circumstances," as addressed in the context of the first prong of *Aronson* and the test established in *Rales,* that accommodates and balances the competing policy concerns of adequately policing boards of directors while guarding against strike suits. With this framework in mind, I turn to determining whether, at the time this action was originally filed, a majority of the Board could have impartially considered a demand made upon the Board and, thus, whether demand is excused.

>   FN43. *H-M Wexford LLC v. Encorp, Inc.,* 2003 WL 21254843, at *14 (Del.Ch. May 27, 2003) (citing *Aronson,* 473 A.2d at 815; *Malpiede v. Towson,* 780 A.2d 1075, 1085 (Del.2001)).
>
>   FN44. *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995) (quoting *Rales,* 634 A.2d at 936); see also *Benerofe v. Cha,* 1996 WL 535405, at *6 (Del.Ch. Sept.12, 1996).
>
>   FN45. *See, e.g., Malpiede,* 780 A.2d at 1085; *Kohls,* 791 A.2d at 782 n. 36 (noting that "[i]n a way, this inquiry [into whether a defendant director was interested in the decision to bring litigation because of a substantial threat of personal liability] is *related* to the second prong of the *Aronson test."* ) (emphasis added); *Katz v. Halperin,* 1996 WL 66006, at *8-*9 (Del.Ch. Feb.5, 1996).
>
>   FN46. *See, e.g., Rales,* 634 A.2d at 936; *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1269 (Del.Ch.1995).
>
>   FN47. Accordingly, for purposes of determining demand futility, the Individual Defendants who are not Director Defendants are largely irrelevant.

For demand to be excused, the particularized facts of the Amended Complaint must create a reasonable doubt that, at the time this action was filed, four of the eight directors on the Board could have exercised their disinterested business judgment in considering a demand. Rattner argues that demand is excused for both the Insider Trading Claims and the Accounting Oversight Claims for several reasons. Rattner asserts that demand would have been futile because "[c]ertain defendants personally profited from the wrongful activities alleged by selling VeriSign stock at artificially inflated prices." While this allegation carries some uncertainty, I understand Rattner to contend that because four of the eight directors are alleged to have traded VeriSign (or Illuminet) securities on the basis of non-public and material knowledge, a majority of the Board is not disinterested and, thus, is incapable of impartially considering a demand. Next, Rattner claims that demand would have been futile because all of the Director Defendants are accused of breaching their fiduciary duties by having failed to exercise adequate oversight over the Company's financial recording and reporting systems, thereby leading to the wrongful conduct complained of in this action. Finally, Rattner notes that "[c]ertain of the Individual Defendants are defendants in the federal securities class action suits described [in the Complaint], and face a substantial likelihood of liability given the misstatements" made during the Relevant Period.

>   FN48. *See In re The Limited, Inc. S'holders Litig.,* 2002 WL 537692, at *7 (Del.Ch. Mar.27, 2002); *Beneville v. York,* 769 A.2d 80, 85-87 (Del.Ch.2000). Again, because Rattner never seriously argues that any member of the Board lacks independence, the sole focus of my inquiry is into the disinterestedness of a majority of the Board.
>
>   FN49. Amended Compl. ¶ 102(a). The Defendants argue that the allegation that "certain defendants" are incapable of considering a demand is itself plead with insufficient particularity. However, I will presume that, in the context of an effort to justify a failure to make demand upon the Board, Rattner is referring to those Defendants who are directors and who sold shares of VeriSign.
>
>   FN50. *See supra* note 11.
>
>   FN51. Amended Compl. ¶ 102(d)

   A. *The Insider Trading Claims*

**\*10** In order for demand to be excused with respect to the Insider Trading Claims, a reasonable doubt must exist that

Case 1:04-cv-10177-NG    Document 53-7    Filed 04/27/2006    Page 11 of 16

Not Reported in A.2d                                                                                           Page 10
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

four of the eight VeriSign directors are incapable of exercising their disinterested business judgment in considering a demand. Rattner contends that this requirement for demand futility is satisfied as "[f]our of the directors who sold their shares on the basis of inside information are interested because each of them received a personal financial benefit from those transactions." With respect to the Insider Trading Claims, Rattner does not challenge the disinterestedness of four (Compton, Chenevich, Reyes, and Kriens) of the directors. Therefore, were Rattner's attack upon any of the remaining four directors (Bidzos, Sclavos, Moore and Cowan) unsuccessful, a "majority" of the Board would not be implicated and demand would not be excused.

    FN52. Pl.'s Answering Br. at 10.

Before I begin my analysis of demand excusal with respect to the Insider Trading Claims, it is important to note what facts, in connection with the Insider Trading Claims, are *not* alleged, at all or with particularity, in the Amended Complaint. Rattner merely posits, without any particularized facts, that the Director Defendants knew of inside information, and that they knew of (or directly participated in) the allegedly material misstatements. Thus, absent from the particularized allegations of the Amended Complaint are the "precise roles that [the Director Defendants] played at the [C]ompany [and] the information that would have come to their attention in those roles." The Amended Complaint is also devoid of any particularized facts that could lead to the inference that the timing of the trades reflected the Selling Defendants' impermissible insider trading. The Amended Complaint contains no particularized facts regarding the timing of the Director Defendants' trades in relation to permitted trading periods; while the pattern observed does reflect trading activity on behalf of the Director Defendants after the release of allegedly misleading statements, no particularized allegation of the Amended Complaint answers whether this temporal proximity was in fact part of the Company's practice to prevent Company insiders from improperly benefiting from informational asymmetries. Moreover, although Rattner cursorily alleges that there were differences between prior years and the Relevant Period, the Amended Complaint does not shed light upon the trading practices of the Director Defendants prior to the Relevant Period. Finally, the Amended Complaint often refers to allegedly improper sales by the Director Defendants as occurring over nearly a one-month time span. While not determinative, certainly the failure of Rattner to pinpoint the timing of the challenged sales detracts from her alleged theory of selling soon after the release of misleadingly bullish statements.

    FN53. Rattner's best effort toward alleging with particularity the Director Defendants' knowledge, and how they acquired such knowledge, is set forth in Paragraph 33 of the Amended Complaint:
    33. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors['] meetings and committees thereof and via reports and other information provided to them in connection therewith.
    Although Rattner may have sought to satisfy the requirement to plead facts with particularity, Paragraph 33 of the Amended Complaint charges directors, solely upon the basis of their status as directors, with knowledge of alleged corporate activity. The conclusory assertions contained in Paragraph 33 fail to allege with particularity what information the directors knew and how they acquired such knowledge. The conclusory nature of Rattner's allegations is perhaps most obvious in Paragraph 34 of the Amended Complaint which provides in part:
    34. It is appropriate to treat the Individual Defendants as a group for pleading purposes and *to presume* that the false, misleading and incomplete information they conveyed in the Company's public filings and press releases as alleged herein are the collective actions of the narrowly defined group of

Case 1:04-cv-10177-NG    Document 53-7    Filed 04/27/2006    Page 12 of 16

Not Reported in A.2d                                                                                                    Page 11
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

> defendants identified above .... (emphasis added).
>
> FN54. *Guttman,* 823 A.2d at 503.
>
> FN55. See *id.* at 503-04.
>
> FN56. Amended Compl. ¶ 85(c).
>
> FN57. See *Guttman,* 823 A.2d at 498.

Rattner argues that, with respect to the Insider Trading Claims, demand is excused because four of the eight directors have been implicated in alleged insider trading. Delaware has recognized a cause of action against directors who abuse their knowledge of a corporation's private information at the expense of unwitting purchasers of their stock. Recently, however, this Court noted the differences between archetypical claims of self-dealing and insider trading claims, concluding:

> FN58. *Brophy v. Cities Serv. Co.,* 70 A.2d 5, 8 (Del.Ch.1949).

*11 As a matter of course, corporate insiders sell company stock and such sales, in themselves, are not quite as suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting at both sides of the negotiating table. Although insider sales are (rightly) policed by powerful forces-including the criminal laws-to prevent insiders from unfairly defrauding outsiders by trading on non-public information, it is unwise to formulate a common law rule that makes a director "interested" whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information.

> FN59. *Guttman,* 823 A.2d at 502. The Court further explained:
> This would create the same hair-trigger demand excusal that *Aronson* and *Rales* eschewed. The balanced approach that is more in keeping with the spirit of those important cases is to focus the impartiality analysis on whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition.
> *Id.*

Thus, critically, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information."

> FN60. *Stepak v. Ross,* 1985 WL 21137, at *5 (Del.Ch. Sept.5, 1985); see also *Guttman,* 823 A.2d at 505 ("Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter."); *Rosenberg v. Oolie,* 1989 WL 122084, at *3 (Del.Ch. Oct.16, 1989) ("[I]f 'a person "in a confidential or fiduciary position, in breach of his duty, *uses his knowledge* to make a profit for himself, he is accountable for such profit" ' ") (quoting *Brophy,* 70 A.2d at 8).

After reviewing the Amended Complaint, I conclude that Rattner has not pleaded facts with particularity that create a reasonable doubt that a majority of the Board is disinterested with respect to the Insider Trading Claims. It is important to note that only one Director Defendant is a senior manager of the Company; that is, only Sclavos held a senior management position with VeriSign at the time this action was filed. The Amended Complaint alleges general knowledge in a conclusory fashion on behalf of the Director Defendants, explained solely by virtue of their service in their various capacities. Thus, even somehow assuming Sclavos suffers from a disabling interest, nothing has been pleaded with particularity as to the scienter of seven of the eight members of the Board.

> FN61. As noted above, Rattner has not questioned the independence from Sclavos of the seven other directors.

The Amended Complaint's allegations implicating Moore's sale of unexercised Illuminet options also fail to taint the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-10177-NG    Document 53-7    Filed 04/27/2006    Page 13 of 16

Not Reported in A.2d                                                                                                    Page 12
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

disinterestedness of Moore in considering a demand made upon the Board. On September 23, 2001, VeriSign and Illuminet entered into a merger agreement. As consideration, VeriSign would exchange 0.93 shares of VeriSign common stock for each outstanding share of Illuminet and, thus, would issue 30.4 million shares for the outstanding shares of Illuminet, as well as assume Illuminet's outstanding employee stock options. Rattner complains that "[a]t some point after announcement of the Illuminet acquisition, but prior to being elected to the [Board], Moore exercised Illuminet options (or VeriSign options exchanged in the Merger) and sold the underlying stock." The Complaint fails to allege with any specificity when the sales were made or whether the shares were all sold at one time. Moreover, if trading resulting from the Illuminet options is assumed to be relevant to the purpose of determining demand futility with respect to the Insider Trading Claims, the Amended Complaint still fails to allege particularized facts that compromise Moore's impartiality. Not one particularized allegation in the Amended Complaint explains what inside knowledge Moore traded upon or how he gleaned such information. Therefore, I conclude that the Amended Complaint fails to allege the particularized facts necessary to raise a reasonable doubt as to Moore's ability to exercise his disinterested business judgment.

> FN62. Amended Compl. ¶ 63.
>
> FN63. *Id.* ¶ 20. The Illuminet acquisition was announced in September 2001; Moore became a director of VeriSign in February 2002. Rattner also alleges that "rather than convert his Illuminet options into VeriSign options, defendant Moore exercised and sold off his Illuminet options." *Id.* ¶ 63. Rattner also contends that Moore's disposition of his Illuminet interest was "unusual in nature and timing," *id.* ¶ 85, because the "sales occurred after announcement of the acquisition of Illuminet by VeriSign and prior to closing of that transaction." *Id.* ¶ 85(e).
>
> FN64. Rattner alleges that, in March 2001, Moore held 995,000 "in the money" options and by April 2002 had disposed of them. *Id.* ¶ 37 n. 1.

> FN65. Rattner asserts that "Moore, while in possession of other material adverse non-public information, sold approximately 995,000 of his privately-held Illuminet stock." *Id.* ¶ 82. Rattner does not identify that "material adverse non-public information" to which she refers.

*\*12* Additionally, I note that the Amended Complaint fails to allege any facts with particularity that would permit me to draw a reasonable inference that the challenged sales were executed upon the basis and because of non-public information. Much is made about the timing and size of the sales. However, as has been noted, the Amended Complaint does not assist in determining whether the pattern of executed trades was the product of an orchestrated scheme to defraud the market and the Company's shareholders or good faith adherence to Company policy or consistent with prior individual practices. Additionally, while several Individual Defendants disposed of large percentages of their stock holdings, of the four Director Defendants, only two (Cowan and Moore) can be characterized as having disposed of a "large" percentage of their holdings. Essentially, Rattner seeks to impose liability and excuse demand on the basis that the Director Defendants sold VeriSign stock (or Illuminet options) during the Relevant Period. If accepted, Rattner's theory would take a step toward the implementation of the very common law rule warned of in *Guttman.* It is a step which I decline to take. Thus, I conclude that, with respect to the Insider Trading Claims, Rattner has failed to plead with particularity factual allegations which, at the time this action was filed, create a reasonable doubt that a majority of the Board was disinterested and therefore incapable of impartially considering a demand.

> FN66. *See supra* notes 53-55 and accompanying text.
>
> FN67. In determining whether demand is excused, I am confined to the controlling complaint and may consider documents referred to in the complaint when such documents are integral to a plaintiff's claim or are incorporated into the complaint by reference. *In re New Valley Corp. Deriv. Litig.,* 2001 WL 50212, at \*4-\*6 (Del.Ch. Jan.11, 2001). Rattner, in her brief, argues that the large percent-

Case 1:04-cv-10177-NG    Document 53-7    Filed 04/27/2006    Page 14 of 16

Not Reported in A.2d                                                                                                                          Page 13
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

ages disposed of by the Individual Defendants support her alleged theory of insider trading. *See* Pl.'s Answering Br. at 12 n. 7 (citing "2002 Proxy"). However, nowhere in the Amended Complaint did Rattner allege the total personal holdings of the individual Director Defendants. Here, the "2002 Proxy," a citation subject to uncertainty, was not referred to in the Amended Complaint. Also, the document is not integral to Rattner's claim.

### B. *The Accounting Oversight Claims*

Rattner also claims that demand is excused with respect to the Accounting Oversight Claims because all of the members of the Board are potentially liable for failure to exercise proper supervision over VeriSign's financial recording and reporting systems. In this situation, the *Rales* test, in examining the "interest" of the challenged directors, asks whether "the directors face a 'substantial likelihood' of personal liability, [and thus whether] their ability to consider a demand impartially is compromised ..., excusing demand."

>  FN68. *Guttman,* 823 A.2d at 501.

Rattner's Accounting Oversight Claims are best described as a type of *Caremark* claim. As was noted in *In re Caremark International Derivative Litigation,* a claim for failure to exercise proper oversight is one of, if not the, most difficult theories upon which to prevail. In the typical *Caremark* case, "[i]n order to hold the directors liable, [a] plaintiff will have to demonstrate that they were grossly negligent in failing to supervise these subordinates." Here, once again, it is instructive to review not what facts the Amended Complaint alleges, but what facts the Amended Complaint fails to allege, with particularity.

>  FN69. *In re Caremark Int'l Deriv. Litig.,* 698 A.2d 959 (Del.Ch.1996).
>
>  FN70. *Id.* at 967; *see also Guttman,* 823 A.2d at 505-06.
>
>  FN71. *Seminaris,* 662 A.2d at 1355.

The Amended Complaint sets forth vast tracts of quoted materials from public sources, detailing wrongdoings in the form of alleged misstatements. The Amended Complaint also summarizes numerous SEC rules and regulations, and FASB and GAAP standards. However, conspicuously absent from any of the Amended Complaint's allegations are particularized facts regarding the Company's internal financial controls during the Relevant Period, notably the actions and practices of VeriSign's audit committee. The Amended Complaint also is similarly wanting of any facts regarding the Board's involvement in the preparation of the financial statements and the release of financial information to the market.

>  FN72. As has been noted, relevant facts include "whether the company had an audit committee during that period, how often and how long it met, who advised the committee, and whether the committee discussed and approved any of the allegedly improper accounting practices." *Guttman,* 823 A.2d at 498.

**\*13** Rattner calls attention to what she suggests should have been a "red flag" to the Director Defendants, placing them on notice of the systematic failure of the Company's internal controls. The Amended Complaint, relatively briefly, attempts to explain that the Defendant Directors should have been on notice of certain alleged misstatements, noting that "VeriSign" purchased companies with large amounts of deferred revenues, allegedly in order to manipulate its DSO by increasing its deferred revenue and excluding its accounts receivables, thereby creating the false impression of growth. Specifically, the Amended Complaint alleges that DSO were steadily rising from the second quarter of 2000 (DSO of 32) through the first quarter of 2002 (when DSO peaked at 81), which should have signaled to the VeriSign directors that something was amiss, given that VeriSign's revenue stream is "mainly derived from subscription based products and services (over 85% of revenue) which are recognized ratably and ordinarily should carry a low DSO of 45-50 days or less." However, it is again important to recall the structure of the Board, in that only one Director Defendant is alleged to have been a senior manager of the Company at the time this action was filed. There is nothing alleged with particularity in the Amended Complaint that would either demonstrate or permit me to draw the reasonable inference

Not Reported in A.2d                                                                                                           Page 14
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

that the Director Defendants were aware of a possibly onerous elevation in a single financial statistic. As has been noted, claimed red flags "are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer." Thus, the Amended Complaint, in the one instance it alleges a reason why the Director Defendants could somehow have been aware of alleged misdoings at the Company, still falls short of pleading with particularity facts that would excuse demand.

> FN73. Amended Compl. ¶ 62.
>
> FN74. *Id.* ¶ 70.
>
> FN75. *See In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *2 (Del.Ch. June 5, 2003).
>
> FN76. *Id.*

None of these allegations contained in the Amended Complaint (individually or collectively) pleads with particularity sufficient to sustain an inference that the Defendant Directors were guilty of gross negligence. While the Amended Complaint is quick to prattle off numerous alleged infractions of laws, rules and principles, Rattner never notes the accounting procedures employed by the Company or the Board's involvement in VeriSign's financial recording and reporting systems. The only information one can snare from the Amended Complaint is that there exists a body of rules regarding the accuracy of recording and reporting financial information which may have been violated. Equally as important, I am unable, from the face of the Amended Complaint, to determine what role, if any, the Board or its members played in the internal processes of collecting and disseminating financial information. The most I can safely admit knowledge of is that Compton, Chenevich and Kriens were members of the Audit Committee during the Relevant Period and, thus, that the Company had an Audit Committee. Therefore, I am unable to conclude that a majority of the Board faces a substantial likelihood of liability for failing to oversee VeriSign's compliance with required accounting and disclosure standards.

> FN77. Ironically, these Director Defendants are three of the four directors who were not alleged to have engaged in insider trading.
>
> FN78. To the extent that Rattner alleges intentional wrongdoing by the Director Defendants, I note that, for the same reasons set forth above, the Amended Complaint does not allege with particularity facts that at all show knowing participation by any of the Director Defendants (with the possible exception of Sclavos as the only management director). I also observe that, in contrast to Rattner's alternative theories of wrongdoing, the issue of demand futility with respect to claims of intentional wrongdoing would be judged under the two-pronged *Aronson* standard. *See supra* text accompanying note 35. However, given the highly conclusory nature of the Amended Complaint, the Amended Complaint fails to plead with particularity demand futility under either prong

**\*14** Finally, Rattner asserts another theory as to why demand is excused: because "[c]ertain of the Individual Defendants are defendants in ... federal securities class action suits ... and face a substantial likelihood of liability given the misstatements of VeriSign' [sic] earnings and the trading in VeriSign stock during the stated class period in those actions." Here, too, the Amended Complaint leaves far too much to the imagination. The only particularized facts contained in the Amended Complaint regarding the federal securities class action lawsuits are that such suits were filed and are pending in the Northern District of California. One is left to guess at which of the Individual Defendants, indeed if any of the Director Defendants, are defendants in the federal securities class action lawsuits. These conclusory and cryptic allegations are insufficient to satisfy the demand excusal requirements of Court of Chancery Rule 23.1.

> FN79. Amended Compl. ¶ 102(d).

Thus, a symptomatic and ultimately fatal defect to all of Rattner's claims is a failure to plead facts with particularity. Here, the cause of this systematic failure is left to supposition, although one suspects that the "first to file custom" and the resulting "unseemly race to the court house" may be at fault. In her brief, Rattner noted:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                 Page 15
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

> FN80. *Rales,* 634 A.2d at 934-35 n. 10; *see also In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1.

[I]t is unclear from a review of public filings how exactly Moore's Illuminet options were disposed. Indeed, prior to filing the Amended Complaint, plaintiff's counsel requested an explanation from defendants' counsel regarding Moore's disposition since it is critical to the demand futility analysis. After taking the matter under advisement, defendants' counsel refused to provide any information.

> FN81. Pl.'s Answering Br. at 12 (citation omitted).

Our cases have consistently advised would-be derivative plaintiffs to utilize the "tools at hand" before filing complaints. In particular, the books and records provisions of 8 Del. C. § 220 may be quite helpful for derivative plaintiffs confronted with the need to satisfy the pleading requirements of Court of Chancery Rule 23.1 They might have been helpful here; Rattner has never stated whether she availed herself of the tools at hand before embarking upon what is now discovered to have been an ultimately-at least in this venue-unsuccessful journey. Thus, both the causes of the Amended Complaint's deficiencies and whether an often overlooked tool for plaintiffs could have been useful remain a mystery. What is clear is that the Amended Complaint fails to set forth particularized facts that create a reasonable doubt as to the disinterest or independence of a majority of the Board at the time this action was filed so as to excuse demand.

> FN82. *See Brehm,* 746 A.2d at 266-67; *In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1; *Guttman,* 823 A.2d at 504.

> FN83. *See e.g., In re* The *Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 279 (Del.Ch.2003).

## IV. CONCLUSION

For the foregoing reasons, the Amended Complaint will be dismissed. An order will be entered in accordance with this Memorandum Opinion.

> FN84. The dismissal as to Rattner will be with prejudice. *See* Court of Chancery Rule 15(aaa).

## ORDER

AND NOW, this 30th day of September, 2003, for the reasons set forth in the Court's Memorandum Opinion of even date,

**\*15** IT IS HEREBY ORDERED that the above-entitled action be, and the same hereby is, dismissed. This dismissal is with prejudice as to Plaintiff Bobbie Rattner.

Del.Ch.,2003.
Rattner v. Bidzos
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.