# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE BIOPURE CORPORATION | ) | **Master Docket No. 1:04-cv-10177-NG** |
| DERIVATIVE LITIGATION | ) | **(Consolidated Derivative Action)** |
| | ) | |
| | ) | **Assigned to: Judge J. Nancy Gertner** |
| | ) | |
| _____ | ) | **Magistrate Judge Alexander** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION OF THE SPECIAL LITIGATION COMMITTEE OF BIOPURE CORPORATION FOR A STAY OF PROCEEDINGS UNTIL SEPTEMBER 1, 2006 AND RESPONSE TO BIOPURE COPORATION'S SUBMISSION ADDRESSING DISCOVERY RELATIVE TO THE SPECIAL LITIGATION COMMITTEE PROCESS**

Jeffrey P. Fink (*pro hac vice*)
Caroline A. Schnurer
ROBBINS UMEDA & FINK, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990

Douglas S. Johnston, Jr. (*pro hac vice*)
George E. Barrett (*pro hac vice*)
Timothy L. Miles (*pro hac vice*)
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue, North
Nashville, TN 37201
Telephone: 615/244-2202

Plaintiffs' Co-Lead Counsel

Mary T. Sullivan, BBO #487130
SEGAL ROITMAN & COLEMAN
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: 617/742-0208

Plaintiffs' Liaison Counsel

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

I.     INTRODUCTION ................................................................................................. 1

II.    PROCEDURAL HISTORY RELEVANT TO THE MOTION ......................................... 3

III.   ARGUMENT ....................................................................................................... 6

      A.     The SLC Should Not Be Allowed to Delay This Litigation Any Further ............. 6

            1.     Blanket Stays Are Disfavored and the Court Has Wide Discretion to Deny the Stay ............................................................................................. 6

            2.     The Relevant Factors Counsel Strongly Against a Stay ............................ 8

                  i.     The Lack of Independence and Impartiality of the SLC Members Counsel Strongly Against a Stay .................................... 9

                  ii.     The Timeliness of the Motion and Proceedings in the Related Cases Counsels Strongly Against a Stay ...................................... 15

      B.     Given the SLC's Extensive Involvement with the Board During the Pendency of This and the Related Cases, a Stay Until September 1, 2006 Is Excessive...... 17

      C.     Regardless of the Court's Determination Otherwise, Plaintiffs Should Be Afforded at Least Limited Discovery .................................................................. 19

III.   CONCLUSION ................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbey v. Computer & Comm'cns Tech. Corp.*,
   457 A.2d 368 (Del. Ch. 1983) ................................................. 18

*Abbey v. Computer & Comm'cns Tech. Corp.*,
   No. 6941, 1982 WL 17840 (Del. Ch. Dec. 10, 1982) ............................ 19

*Asahi Glass Co., Ltd. v. Toledo Eng'g. Co., Inc.*,
   262 F. Supp. 2d 839 (N.D.Ohio, 2003) ...................................... 6

*Biondi v. Scrushy*,
   820 A.2d 1148 (Del. Ch. 2003) .................................... 13, 14, 17

*Emmanuel Liebman Target Benefit Pension Plan v. Zable*,
   No. 88-1195-JLI(M), slip op. (S.D. Cal. Nov. 3, 1988) .......................... 6

*Grafman v. Century Broad. Corp.*,
   743 F. Supp. 544 (N.D. Ill. 1990) .................................... 7, 9, 16

*Hasan v. CleveTrust Realty Investors*,
   729 F.2d 372 (6th Cir. 1984) ................................................. 9

*Holmstrom v. Coastal Indus.*,
   645 F. Supp. 963 (N.D. Ohio 1986) .......................................... 15

*In re Bank of New York Derivative Litig.*,
   No. 99CIV.9977(DC), 2000 WL 1708173 (S.D.N.Y. Nov. 14, 2000) ................... 7, 15, 16, 17

*In re Biopure Corp. Derivative Litig.*,
   424 F. Supp. 2d 305 (D. Mass. 2006) ........................................ 6

*In re Oracle Corp. Derivative Litig.*,
   808 A.2d 1206 (Del. Ch. 2002) .............................................. 18

*In re Storage Tech. Corp. Sec. Litig.*,
   804 F. Supp. 1368 (D. Colo. 1992) .......................................... 16

*In re Walt Disney Co. Derivative Litig.*,
   731 A.2d 342 (Del. Ch. 1998), *aff'd in part, rev'd in part and remanded sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ........................................ 11

*Joy v. North*,
   692 F.2d 880 (2d Cir. 1982) ................................................. 9

*Katell v. Morgan Stanley Group, Inc.*,
No. 12343, 1993 WL 390525 (Del. Ch. Sept. 27, 1993) ........................................................ 18

*Katz v. Renyi*,
722 N.Y.S.2d 860 (N.Y.A.D. 2001) ................................................................................. 9, 15

*Pompeo v. Hefner*,
No. 6806, 1983 WL 20284 (Del. Ch. Mar. 23, 1983)......................................................... 18

*Sonkin v. Barker*,
670 F. Supp. 249 (S.D. Ind. 1987)............................................................................................ 8

*Strougo on Behalf of Brazil Fund, Inc. v. Padegs*,
986 F. Supp. 812 (S.D.N.Y. 1997) .................................................................................. 18, 19

*Zapata Corp. v. Maldonado*,
430 A.2d 779 (Del. 1981) ....................................................................................... 7, 9, 13, 14

## STATUTES RULES AND REGULATIONS

15 U.S.C.
§77k(a)(2) ........................................................................................................................... 12

Fed. R. Civ. Proc.
23.1 ......................................................................................................................................... 8

## I.    INTRODUCTION

Plaintiffs John and Laurie Parrott ("Plaintiffs") respectfully submit this memorandum in opposition to the motion of the so-called Special Litigation Committee ("SLC") of nominal defendant Biopure Corporation ("Biopure" or the "Company") for a stay of proceedings until September 1, 2006 and in response to Biopure's submission addressing discovery relative to the SLC process.  As evidenced herein, the SLC's motion and Biopure's submission are two more (unsurprising) attempts by Defendants to delay this litigation.

At the outset, Plaintiffs note that they have filed a motion to disqualify defendants' counsel from simultaneously representing the clearly adverse interests of Biopure and the Individual Defendants.[1]  Notably, the Individual Defendants have presented the Court with no filing on the instant motion.

Despite the fact that Plaintiffs' consolidated shareholder derivative action has been pending in this Court for more than two years, on May 1, 2006, defendants, in a translucent act of desperation, appointed Jay B. Pieper ("Pieper") and Guido J. Neels ("Neels"), both of whom are current members of Biopure's Board of Directors (the "Board"), to serve on a purported SLC to investigate Plaintiffs' allegations.  Defendants now seek, under the guise of the so-called SLC, to impose a blanket stay of discovery in this action.  Blanket stays of discovery and proceedings, however, are highly disfavored.  Moreover, although Delaware law permits a stay pending an investigation by a truly independent and unbiased SLC, the circumstances of this action bring it squarely into the exceptions to this general rule.  Upon consideration of a variety of factors, including, but not limited to, whether the SLC is truly independent and unbiased, the status of the

---

[1] The Individual Defendants are Thomas A. Moore ("Moore"), Carl W. Rausch ("Rausch"), David N. Judelson ("Judelson"), Charles A. Sanders, M.D. ("Sanders"), Everett Koop, M.D. ("Koop"), Daniel P. Harrington ("Harrington"), J. Richard Crout, M.D. ("Crout"), Jane Kober ("Kober") and Howard Richman ("Richman").

1

proceedings in the instant matter and the status of any related proceedings, the Court will find that all of these factors counsel strongly against a stay in this more than two-year old case.

Specifically, and tellingly, the SCL is not composed of truly outside and unbiased individuals with no prior connections or relations to the Company. To the contrary, the SLC is composed of two current members of Biopure's Board who, on behalf of the Company and since their tenure on the Board, have repeatedly submitted public filings which stated that this derivative action, along with the federal securities fraud action ("Securities Action")[2] and the action brought on behalf of the U.S. Securities and Exchange Commission ("SEC") ("SEC Action"), are "*without merit*." Thus, Mr. Pieper and Mr. Neels' animosity toward this derivative action, the Securities Action and the SEC Action (which has since been settled) is documented publicly. As set forth below, a SLC must be composed of members whose impartiality and independence is not suspect. Here, Mr. Pieper and Mr. Neels' independence and impartiality is more than just suspect, it is obvious; therefore, the SLC's motion to stay should be denied in its entirety.

Additionally, the timeliness of the SLC's motion likewise counsels strongly against a stay. Specifically, the purported SLC was created well over two years after the initiation of this derivative action, after the Court denied defendants' motion to dismiss and the same day as the Court denied defendants' motion for reconsideration. In addition, when viewed in relation to the status of the proceedings in the related Securities Action, the timing of the SLC's motion is quite convenient. Given the Court's wide latitude of discretion to determine whether or not to grant a SLC's request for a stay, Plaintiffs respectfully request that the Court deny the SLC's request for a stay pending its purported investigation.

---

[2] "Securities Action" refers to *In re Biopure Corp. Secs. Litig.*, 1:03-cv-12628-NG.

In the alternative, if the Court believes that a short stay is warranted, Plaintiffs oppose the imposition of a stay until September 1, 2006. Mr. Pieper and Mr. Neels are current members of the Biopure Board and have been for quite some time. Presumably, these directors have overseen and/or participated in the direction of this derivative litigation, the Securities Action, and SEC Action to date, including an announced settlement with the SEC. Therefore, the issues, witnesses and documents are all familiar to them and thus, a three month stay is not necessary.

Finally, the Court should allow Plaintiffs at least limited discovery to proceed in this litigation during the SLC's purported investigation. Doing so will minimize delay when the SLC presents its expected report or recommendation to dismiss this derivative action and/or moves the Court to dismiss this derivative action, and will neither impede nor delay any so-called investigation. Furthermore, Plaintiffs submit that much of Plaintiffs' previously submitted discovery requests are relevant to the issues which the Court will confront when the SLC makes its certain recommendation to dismiss the action. In fact, responses to many, if not most, of those requests would likely be included in the 37,000 pages of material already made available to both the SEC and the Securities Action. For these reasons, limited discovery would be an efficient means to minimize the expected delay created by the SLC's purported investigation.

## II.    PROCEDURAL HISTORY RELEVANT TO THE MOTION

On May 14, 2004, this Court entered an order, *inter alia*, consolidating two related shareholder derivative actions, establishing a master docket and setting forth the scheduling for the filing of a consolidated derivative complaint and the time for defendants to respond (Docket Entry No. 13). Pursuant to a subsequent stipulation (Docket Entry No. 14), Plaintiffs filed their amended consolidated complaint on July 14, 2004 (Docket Entry No. 15). Pursuant to an order granting an assented to motion (Docket Entry No. 16), defendants filed a motion to dismiss the

consolidated amended complaint on September 27, 2004 (Docket Entry No. 20). Plaintiffs filed their opposition to the motion to dismiss on November 11, 2004 (Docket Entry No. 25) and defendants filed a reply on December 20, 2004 (Docket Entry No. 28).

Mr. Pieper, current Board member and SLC appointee, was installed on the Biopure Board on October 12, 2004; while SLC appointee, Mr. Neels, became a member of the Board on August 26, 2005. On September 14, 2005, the SEC filed a civil proceeding seeking injunctive relief as well as a civil penalty against Biopure, two former officers and a current officer. That same day, the Biopure Board, including Mr. Neels and Mr. Pieper, authorized Biopure to issue a press release providing in part:

> Biopure Corporation announced today that the U.S. Securities and Exchange Commission (SEC) today filed a civil injunctive proceeding against the company, two former officers and one current officer.
>
> *"The company intends to seek dismissal of the SEC's claims or judgment in its favor and expects to prevail," said Robert A. Buhlman of Bingham McCutchen LLP, counsel to the company. "Biopure intends to establish that its disclosures were accurate based on governing law, testimony provided by the FDA to the SEC, the FDA's review procedures and practices, and what was communicated by FDA at the relevant times."*
>
> A principal claim by the SEC is based on a contention by the SEC that confuses the safety of the product with the safety of a proposed clinical trial design. The claim is that the company should have disclosed in April 2003 that FDA put on hold a proposed clinical trial of the company's investigational oxygen therapeutic Hemopure® in trauma patients in the hospital setting. Under FDA regulations, a proposed trial is either placed on hold within 30 days or it may proceed as submitted. When FDA communicated the hold, it asked data questions described as "safety concerns."
>
> *The company disagrees that it was required to disclose the hold status of the proposed trial in a new indication. The company did not disclose the filing of the proposed protocol. It is not uncommon for there to be a dialogue with the FDA over a proposed trial. The company does not and did not view the data questions or the proposed trial itself to be material to an investment decision, as opposed to normal back-and-forth between the FDA and clinical trial sponsors. In addition, in-hospital trauma was not planned as an indication for*

> ***commercial development and the company spent an insignificant amount on
> the proposed trial.***
>
> FDA had designated the in-hospital trauma trial as a separate
> investigational new drug application (IND) from the company's then-pending
> biologics license application (BLA) for a proposed orthopedic surgery indication.
> The FDA questions about data were asked in the context of the in-hospital trauma
> IND and referred to data that had also been submitted in the BLA. The company
> intends to prove that the FDA questions were specific to the in-hospital trauma
> IND, and FDA was not addressing the status of the orthopedic surgery BLA in its
> communications about the IND.
>
> The in-hospital trauma IND at issue in the SEC action was withdrawn by
> the company in November 2003. That withdrawn in-hospital trauma IND is not to
> be confused with the currently proposed IND for treatment of trauma patients in
> the out-of-hospital setting. That out-of-hospital trauma IND is currently on hold
> after FDA asked different questions than were asked in April 2003.
>
> A second contention in the SEC suit concerns a separate communication
> by FDA with the company about the orthopedic surgery BLA. The SEC staff has
> claimed that the company's disclosures concerning a July 30, 2003 FDA letter
> about the BLA was too positive in tone, in the staff's view. The August 1, 2003
> press release about the letter said that FDA had completed its review of the BLA
> and that the letter asked for additional information, which it did. The July 30 BLA
> letter did not ask for additional clinical trials and the August 1 press release
> reported that. The July 30 BLA letter did not mention "safety concerns" and
> neither did the press release.

Plaintiffs' Verified Consolidated Second Amended Shareholder Derivative Complaint (Docket

Entry No. 42), ¶¶19, 130 (emphasis added).

On October 12, 2005, Plaintiffs filed a motion to amend their pleadings so as to include

previously unknown, and unknowable, details of defendants' unlawful actions largely based on

new information from the SEC's filing (Docket Entry No. 29). On November 25, 2005,

defendants filed their opposition to Plaintiffs' Motion to Amend (Docket Entry No. 32).

Plaintiffs' reply was filed December 28, 2005 (Docket Entry No. 34).  On January 30, 2006, the

Court held a hearing on defendants' motions to dismiss and the Plaintiffs' motion to amend, as

well as similar motions filed in the Securities Action.

On March 28, 2006, the Court denied Defendants' Motion to Dismiss and granted Plaintiffs' Motion to Amend (Docket Entry No. 40). *See also In re Biopure Corp. Derivative Litig.*, 424 F. Supp. 2d 305 (D. Mass. 2006). Thereafter, defendants, including nominal defendant Biopure, moved for reconsideration of the Court's ruling on their motion to dismiss, or in the alternative for certification of the issues for interlocutory appeal. On May 1, 2006, the very same day the purported SLC was created, the Court held a status conference and entered an order denying defendants' motion for reconsideration and denied certification of the issues for interlocutory appeal.

The SLC filed the instant motion to stay on May 23, 2006 (Docket Entry No. 58). The very next day, Biopure filed its submission addressing discovery relating to the SLC's investigation process (Docket Entry No. 60). Finally, on May 26, 2006, Plaintiffs filed their motion to disqualify Bingham McCutchen, LLP from continuing their conflicted dual representation of both nominal defendant Biopure and the Individual Defendants in this derivative action (Docket Entry No. 61).

## III.    ARGUMENT

### A.    The SLC Should Not Be Allowed to Delay This Litigation Any Further

#### 1.    Blanket Stays Are Disfavored and the Court Has Wide Discretion to Deny the Stay

Federal law, which is applicable to this procedural motion, is unequivocal that blanket stays are disfavored and the burden on the party seeking such protection is a heavy one. *Asahi Glass Co., Ltd. v. Toledo Eng'g. Co., Inc.*, 262 F. Supp. 2d 839, 845 (N.D.Ohio, 2003). For example, in *Emmanuel Liebman Target Benefit Pension Plan v. Zable*, No. 88-1195-JLI(M), slip op. (S.D. Cal. Nov. 3, 1988), a stockholders' derivative suit like this one, defendants moved for a stay. Magistrate Judge Harry McCue, denied the motion to stay, holding:

The Court denies defendants' motion for a stay of discovery pending final resolution of their challenges to the legal sufficiency of plaintiffs' complaint. ***Blanket stays of discovery are disfavored and an applicant for such a stay must make out a clear case of hardship or inequity to him which outweighs the interests of the other parties and the Court in an expeditious resolution of the litigation to obtain such relief.*** *Landis v. North American Co.*, 299 U.S. 248, 255 (1936). Defendants have not made out a clear case of hardship or inequity such as to justify a blanket stay of discovery. Even if plaintiffs are required to amend their complaint as a result of defendants' challenges, it seems likely the case will go forward to ultimate resolution on the merits and discovery will ultimately play an important role in the case, be it tried or resolved by way of settlement. ***In the Court's view, it is important that complex class action and derivative cases like this one be prosecuted and resolved on an expedited basis, if possible, and the Court finds that a blanket stay of discovery is inconsistent with that goal.***

*Id.* at 1-2.[3]

In addition, to prevail on a motion to stay, the movant must make a clear showing of a particular and specific need for such an order. Here, defendants fail to make a "clear," let alone any showing of a need for a stay.

Nonetheless, Plaintiffs acknowledge that under applicable Delaware law the general rule is actually to stay discovery pending the report of a SLC. *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981). However, the general rule is far from absolute. Appointment of a SLC does not automatically stay derivative actions. Rather, the decision whether to stay the action is committed to the Court's discretion. *See Grafman v. Century Broad. Corp.,* 743 F. Supp. 544, 548 (N.D. Ill. 1990) ("the corporation's power to investigate derivative claims does not translate into an absolute right to halt all related proceedings"); *In re Bank of New York Derivative Litig.*, No. 99CIV.9977(DC), 2000 WL 1708173, at *3 (S.D.N.Y. Nov. 14, 2000) (stating "Courts have discretion to stay discovery of a derivative suit pending a special litigation committee's decision on whether the corporation should pursue the claims against the officers and directors," and

---

[3] Here, as throughout, all citations are deemed omitted and all emphasis is deemed added unless otherwise noted.

denying both the stay motion and the motion to dismiss); *Sonkin v. Barker*, 670 F. Supp. 249, 253 (S.D. Ind. 1987) ("[i]mposition of a stay is also within the sound discretion of the trial court"); Fed. R. Civ. Proc. 23.1 (Advisory Committee Note).

In *Sonkin*, the court held that even though Indiana had a specific statute (unlike Delaware) providing for a stay of derivative litigation pending the review by a SLC, it would not stay the proceedings pending defendant's SLC's review *because the stay was not mandatory and would unduly delay the prosecution of plaintiff's claims*. Specifically, the court held:

> First, even assuming the new law's application to this lawsuit, the statute provides that the court *may stay* any proceeding until the investigation is completed. For the reasons this court has already cited, *a stay of the proceedings at this stage would not serve the economies of time and effort for the court or the litigants*. Furthermore, PSI *has not demonstrated that the efforts of the special litigation committee will be hampered by the continued progression of discovery* in these related lawsuits. Indeed, *the consolidated discovery that will occur in all of these actions, regardless of a stay in this case, could benefit the committee in conducting its investigation*.

670 F. Supp. at 254-55.

Because "a stay of proceedings at this stage would not serve the economies of time and effort for the court or the litigants," the Court should exercise its discretion and deny the SLC's motion.

### 2.    The Relevant Factors Counsel Strongly Against a Stay

As discussed below, a number of courts have denied SLC motions to stay discovery on the basis of either the lack of independence of the SLC members, the untimeliness of the motion, or the status of discovery in related cases. The instant matter represents the confluence of all three factors.

In addition, courts' refusals to grant stays pending SLC investigations reflect the growing recognition that SLCs suffer an inherent structural bias rendering them particularly susceptible to abuse. Indeed, as far back as 1982, only a year after *Zapata*, the Second Circuit noted:

> The reality is … that special litigation committees created to evaluate the merits of certain litigation are appointed by the defendants to that litigation. It is not cynical to expect that such committees will tend to view derivative actions against the other directors with skepticism. Indeed, if the involved directors expected any result other than a recommendation of termination at least as to them, they would probably never establish the committee.

*Joy v. North*, 692 F.2d 880, 888 (2d Cir. 1982), *accord Hasan v. CleveTrust Realty Investors*, 729 F.2d 372, 377 (6th Cir. 1984) ("the pressures placed upon such a committee may be so great as to justify a presumption against independence"). For this reason, courts carefully scrutinize stay requests to ensure that a "corporation's investigation is not a mere artifice for delay." *Grafman*, 743 F. Supp. at 548.

Indeed, in a relatively recent case from the New York Court of Appeals, the Court warned that the SLC members should not include members whose impartiality is even ***suspect***. *See Katz v. Renyi*, 722 N.Y.S.2d 860 (N.Y.A.D. 2001) (unanimously affirming trial court's decision to deny motion to stay derivative case where make up of SLC included members whose impartiality was suspect). As detailed below, in the case at bar, the independence and impartiality of the members who make up the SLC is more than just suspect. In fact, the absence of independence and impartiality of Mr. Pieper and Mr. Neels is obvious. This fact alone strongly compels denial of the request for a stay.

> i.    **The Lack of Independence and Impartiality of the SLC Members Counsel Strongly Against a Stay**

A quarter of a century after *Zapata*, the "involved directors'" expectations have been borne out. While there may be one somewhere, Plaintiffs' counsel have been unable to find a

single case in which a SLC recommended continuation of a shareholder derivative complaint against the directors who appointed the SLC. The Individual Defendants have every reason to believe that their case will not be the exception.

Mr. Pieper and Mr. Neels were appointed to the Biopure Board on October 12, 2004 and August 26, 2005, respectively. Accordingly, they have been on the Board during a significant portion of the pendency of not only this derivative action, but also during a portion of the Securities Action, as well as the entirety of the SEC Action.

In addition, Mr. Pieper does not simply serve as a Board member. Since his installation in October 2004, Mr. Pieper has played an integral role on the Board and served as the Chair of the Audit Committee, and, as such, appears to be the only non-employee member of the Board who receives compensation other than stock options. *See* Biopure's Definitive Proxy Statement filed on Form Def 14A with the SEC on February 15, 2006, attached hereto as Exhibit A at 2. According to Biopure's latest Proxy Statement, filed February 15, 2006, Mr. Pieper receives a total of $35,000 annually for his service on the Board:

> Until the reverse split of the class A common stock in May 2005, each non-employee director received an annual grant of options to purchase 10,000 shares of class A common stock, except for Dr. Sanders, who generally received an annual grant of options to purchase 50,000 shares for service as Chairman of the Board. Following the reverse stock split, the standard compensation became an annual grant of options to purchase 20,000 shares of class A common stock, and the amount for service as Chairman became 40,000 shares. On October 13, 2005, each director received an option to purchase 18,333 shares, reflecting the new policy, and Dr. Sanders received an option to purchase 31,667 shares. As a new director who joined the board in August, Mr. Neels was granted an option to purchase 30,000 shares. He will begin to receive the standard compensation at the time of the 2006 award to all non-employee directors. Each option grant permits the holder to purchase shares at their fair market value on the date of grant. **Mr. Pieper is also paid $15,000 annually for serving as director and $20,000 annually for serving as chairman of the Audit Committee.** Directors who are also employees of the Company receive no additional compensation for service as directors.

*Id.* Pieper currently serves on the Audit Committee with defendants Harrington and Judelson and previously served on the Audit Committee with defendant Sanders. *Id.* at 4 ("The Audit Committee consists of Mr. Pieper, Chairman, and Mr. Harrington and Mr. Judelson. Dr. Sanders served as a member of the Audit Committee until the date of the 2005 annual meeting."). Service together on the Company's Audit Committee, however, is not the only connection Mr. Pieper and Mr. Sanders share. Since May 1995, Mr. Pieper has served as Vice President for Corporate Development and Treasury Affairs for Partners HealthCare Systems, Inc., the parent of Brigham and Women's Hospital and Massachusetts General Hospital. *Id*. at 15. Sanders was previously General Director of Massachusetts General Hospital. *Id.*

As for Mr. Neels, he became a Biopure director in August 2005, shortly before his retirement as Chief Operating Officer of Guidant Corporation. During Mr. Neels' tenure at Guidant, Guidant's board of directors was also sued in several shareholder derivative complaints that directly implicated problems within his areas of responsibility.[4]

Like each and every corporate director, Mr. Pieper and Mr. Neels must adhere to fiduciary duties of due care, loyalty and good faith. The duty of due care encompasses a duty to be reasonably informed. *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 362 (Del. Ch. 1998), *aff'd in part, rev'd in part and remanded sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Presumably, Messrs. Pieper and Neels have taken their duties seriously and have made themselves reasonably informed as to this derivative action, the Securities Action and the SEC Action.

---

[4] In fairness, it should be pointed out that Mr. Neels was not a defendant in the Guidant shareholder derivative lawsuits alluded to above.

Moreover, since Messrs. Pieper and Neels have joined its Board, the Company has filed numerous documents with the SEC publicly stating that this derivative action, the Securities Action and the SEC action are "based on the same allegations" and are "without merit."  *See* Ex. B at S-6-S-7, Ex. C at S-6, Ex. D at S-6.[5]  Specifically, each Prospectus, filed in connection with offerings of the Company's common stock, stated that:

> Following our announcement of the Wells Notices, a number of class action lawsuits, subsequently consolidated, were filed against us and several of our former and current executive officers. In addition, all members of our board of directors as of December 22, 2003 and the Company are named as defendants in two derivative actions filed in January of 2004, and subsequently consolidated, claiming that such directors breached fiduciary duties in connection with the same disclosures that are the subject of the class action lawsuits. Details about the SEC investigation, the class actions and the derivative actions are contained in our most recent report on Form 10-Q which is incorporated herein by reference. ***We believe the class action lawsuits and derivative actions are without merit, and we intend to defend against them vigorously.***

*Id.* at 9.[6]

Thus, Messrs. Pieper and Neels, prior to the formation of the SLC, had already drawn their conclusions concerning this derivative action publicly stating they are "without merit." In addition, the Company has issued press releases and, in its capacity as a nominal defendant, using the same counsel as the individually named director defendants, filed papers with this Court arguing that these matters should be dismissed in their entirety.  There is not a scintilla of evidence that Messrs. Pieper and Neels have in any way dissociated themselves from any of

---

[5] Exhibits B, C and D, attached hereto, are Biopure's Prospectuses filed on Forms 424B5 with the SEC on December 21, 2005, January 11, 2006 and January 13, 2006, respectively.

[6] The repeated statements in these Prospectuses that this derivative action was "without merit" are attributable to Messrs. Neels and Pieper because they served as directors of Biopure at the time the Prospectuses were issued.  *See* 15 U.S.C. §77k(a)(2) (liability attaches to "every person who was a director of ... the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted").

these openly expressed conclusions.  To the contrary, the evidence implies that they have joined in these conclusions in publicly filed documents.

Consequently, far from commencing an unbiased and fair investigation, the SLC begins the process with months of previously expressed hostility to the shared allegations in the Securities Action, SEC Action and this derivative action.  If the SLC members have lived up to their fiduciary duties to date, they have already fully informed themselves of the merits of the actions and their opinions and conclusions are closely aligned with those issued by the Company during their tenure, as evidenced by the multiple Prospectuses stating the relevant actions are "without merit."

Only if the two members of the SLC have failed in their fiduciary duties as members of the Biopure Board can they legitimately purport to embark on a fair and unbiased investigation.  However, such a breach of fiduciary duties over the course of twenty months for Mr. Pieper and nearly ten months for Mr. Neels is hardly a confidence-builder regarding either their ability or willingness to perform the functions of a fair and unbiased SLC.  In short, they have already reached, and publicly commented on, their conclusions that this action is without merit and therefore, they have severely compromised their ability to act impartially.

In *Biondi v. Scrushy*, 820 A.2d 1148 (Del. Ch. 2003), the Delaware Chancellor, applying Delaware law refused to issue a stay requested by a special litigation committee because "it would be futile and wasteful to issue a stay when the undisputed facts will make it impossible for the Court to later accept a decision of the SLC because the committee will not be able to satisfy its burden under *Zapata* to show that it exercised independent business judgment."  *Id.* at 1165.

While the specific facts in *Biondi* differ from those here, the Court there stated:

[T]here is one fact alone that would warrant denying a stay and that, in combination with these other factors, makes the denial of a stay an easy call: the

13

public announcement by the SLC's Chairman, director May, of his opinion that the Fulbright & Jaworski report vindicated Scrushy. This extraordinary announcement came at a time when the SLC's own investigation was just getting underway.

*Zapata* presents an opportunity for a board that cannot act impartially as a whole to vest control of derivative litigation in a trustworthy committee of the board – *i.e.*, one that is not compromised in its ability to act impartially. The composition and conduct of a special litigation committee therefore must be such as to instill confidence in the judiciary and, as important, the stockholders of the company that the committee can act with integrity and objectively.

***How can the court and the company's stockholders reasonably repose confidence in an SLC whose Chairman has publicly and prematurely issued statements exculpating one of the key company insiders whose conduct is supposed to be impartially investigated by the SLC?***

*Id.* at 1165-66.

While it does not appear that either Mr. Pieper or Mr. Neels have personally made any statements regarding the viability or lack thereof of the derivative, securities, or SEC allegations, they have, at the very least, allowed (and arguable adopted) official filings and press releases to emanate from the Company critical of those allegations and concluding that they are "without merit." Paraphrasing the *Biondi* court, how can this Court and Biopure's shareholders repose confidence in an SLC whose members have presided over a series of public pronouncements that the very allegations they are charged with fairly and impartially investigating have no merit?

At least one court has stated:

The delegation of corporate power to a special committee, the members of which are hand-picked by defendant-directors, in fact, carries with it inherent structural biases….

The problems of peer pressure and group loyalty exist *a fortiori* where the members of a special litigation committee are not antagonistic, minority directors but are carefully selected by the majority directors for their advice. Far from supporting a presumption of good faith, the pressures placed upon such a committee may be so great as to justify a presumption against independence. *See* Dent, *The Power of Directors to Terminate Shareholder Litigations: The Death of the Derivative Suit*, 75 Northwestern L.Rev. 96 (1981).

14

*Holmstrom v. Coastal Indus.*, 645 F. Supp. 963, 987 (N.D. Ohio 1986).

Like *Holmstrom*, Mr. Pieper and Mr. Neels were carefully selected by the five majority directors, four of whom are defendants in this action, for their advice.  Thus, this is just one more reason among many as to why the circumstances of the instant matter justify a presumption against independence.  Suffice it to say, the impartiality and independence of the SLC is at the very least suspect and therefore the request for a stay should therefore be denied.  *Katz*, 722 N.Y.S.2d 860.

### ii.    The Timeliness of the Motion and Proceedings in the Related Cases Counsels Strongly Against a Stay

Even if the Court could overlook these statements, it is too late in the game for Biopure to be taking the action it now is attempting.  This case is more than two years old.  The Company has chosen to extensively litigate every aspect of the case including, in part, motions to dismiss and for reconsideration, requests for certification of issues for interlocutory appeal and opposing Plaintiffs' Motion to Amend.  Much of this, as pointed out above, on Messrs. Pieper's and Neels' watch.  In addition, initial disclosures have been exchanged, and Plaintiffs have submitted Rule 34 Requests for Documents, to which defendants have proffered objections.  *Bank of New York*, 2000 WL 1708173, is instructive.  In *Bank of New York*, defendants moved to dismiss plaintiffs' allegation on the basis of demand futility and ***alternatively*** to stay the proceedings pending the review by an SLC.  *Id.* at *1.  The court denied defendants' motion on demand futility and then denied their motion for a stay pending the review of its SLC, holding that, "***this case has already been pending for more than a year, and a stay of the case at this juncture will only delay matters.***"

*Id*. at *3.  Here, the instant case has been pending for well over two years, or twice as long as in *Bank of New York*.

Additionally, the *Bank of New York* court also noted that "substantial questions exist as to whether the members of the SLC are truly independent and disinterested … [because its] two members are named defendants in this case and both began serving as board members … prior to the commencement of these lawsuits."  *Id*.  The court found that because the "members of the SLC have joined in [the motion to dismiss on demand futility], in which they and the other defendants have strenuously denied any wrongdoing; it is ***difficult to imagine that the SLC will reach any conclusion other than that the complaint lacks merit and therefore should be withdrawn***."  *Id*.  Thus, given the lack of impartiality and independence of the SLC along with the fact this action has been pending for over two years, a stay is not warranted.

Other courts have also denied stays on timeliness grounds, particularly where, as here, the court has already denied a motion to dismiss on demand futility grounds.  For example, in *In re Storage Tech. Corp. Sec. Litig.,* 804 F. Supp. 1368 (D. Colo. 1992), the court also refused to stay proceedings pending the review by an SLC after defendants' demand futility motion was denied.  *Id*. at 1371.  There, defendants appointed the SLC before the court had ruled on defendants' motion to dismiss, but after the complaint was filed.  The court noted that demand futility existed at the time the action was filed, refused to stay the proceedings pending a review by the board's SLC, and required coordinated discovery with the pending securities action.  *Id*. at 1376.

Finally, in *Grafman*, defendants moved to stay pending the newly-appointed SLC's review after their demand futility motion was denied.  The court also denied the stay, holding that "***the corporation's power to investigate derivative claims does not translate into an absolute right to halt all related proceedings*** [and that] [i]t is the duty of the courts to insure that

the corporation's investigation is not a ***mere artifice for delay***." 743 F. Supp. at 548. In the instant matter, the totality of the circumstances evidences that the creation of the SLC and purported investigation simply is one more attempt to delay this litigation.

Another factor to be considered by the Court, and which was in the mix in both the *Biondi* and *Bank of New York* actions, is the status of discovery in any related actions. This Court has granted a short period of "limited" discovery in the Biopure Securities Action, ostensibly limited to class certification issues. Nonetheless, the Individual Defendants have also been ordered to turn over to the federal securities plaintiffs the 37,000 pages of documents produced by Biopure to the SEC, in large measure because the defendants were unable to articulate how they would in any way be prejudiced by turning over documents that had already been provided to the SEC. Notably, although defendants were invited by the Court to address this very issue, neither they nor the SLC have articulated even a single reason explaining how turning over these same documents to Plaintiffs would in any way interfere with any review or investigation the SLC may be undertaking.

### B.    Given the SLC's Extensive Involvement with the Board During the Pendency of This and the Related Cases, a Stay Until September 1, 2006 Is Excessive

Should the Court, in the exercise of its discretion, choose to grant the SLC's request for a stay despite the clear lack of independence of its members and the defendants' laches in appointing the SLC, the stay should be for no longer than thirty days. First, as pointed out above, both Mr. Pieper and Mr. Neels, in the proper exercise of their fiduciary duties, should have familiarized themselves months ago regarding the various actions. Unlike the cases the defendants and the SLC rely upon here, Biopure's SLC consists of two members of the Board, Mr. Pieper who has served for nearly two years and Mr. Neels who has served for nearly one

year.  Their service period encompassed a great deal of the important activity in this case as well

as the related cases.

      The cases relied upon by defendants and the SLC are in sharp contrast to this set of

circumstances.  Memorandum of Law in Support of the Motion of the Special Litigation of

Biopure Corporation for a Stay of Proceedings until September 1, 2006 to Permit the Special

Litigation to Complete Its Investigation at 3-4, 6.  The cited cases, however, are all Delaware

Chancery Court orders relying on Delaware state law and, importantly, hold that to the extent a

stay of discovery is appropriate, it is only appropriate where defendants chose to appoint a SLC

***instead of moving to dismiss***.  *See Abbey v. Computer & Comm'cns Tech. Corp.*, 457 A.2d 368

(Del. Ch. 1983); *In re Oracle Corp. Derivative Litig.*, 808 A.2d 1206 (Del. Ch. 2002); *Katell v.

Morgan Stanley Group, Inc*., No. 12343, 1993 WL 390525 (Del. Ch. Sept. 27, 1993); and

*Pompeo v. Hefner*, No. 6806, 1983 WL 20284 (Del. Ch. Mar. 23, 1983), all involved SLC's

appointed before and in lieu of the filing of a motion to dismiss.  Moreover, in *Oracle*, the SLC,

although consisting of Board members appointed after the alleged unlawful activity, was formed

before the company had taken any action, including the filing of an answer, or even entering into

a scheduling order.  Not one of these cases – countenance a stay in the circumstances here, where

defendants sought dismissal of legitimate claims, but were subsequently denied.  Thus,

defendants' authority fails to support their position for a stay.

      Further, in both *Abbey* and *Strougo on Behalf of Brazil Fund, Inc. v. Padegs*, 986 F.

Supp. 812 (S.D.N.Y. 1997), the SLC consisted of persons appointed to the Board simultaneously

with the creation of the SLC itself.  Despite the fact that the SLC's in these cases were both new

to their respective boards and the litigation, the court in *Abbey* limited the stay to approximately

sixty days, (s*ee Abbey v. Computer & Comm'cns Tech. Corp.*, No. 6941, 1982 WL 17840, at *2

(Del. Ch. Dec. 10, 1982)), and to three months in *Strougo*.  Given that these SLC members here have already been overseeing the conduct of the litigation and working to resolve the allegedly "meritless" but "substantially similar" SEC action, a thirty day stay should be more than adequate.

### C.    Regardless of the Court's Determination Otherwise, Plaintiffs Should Be Afforded at Least Limited Discovery

In the event that the Court determines that some form of a stay is warranted, Plaintiffs request that they be allowed at least limited discovery.  First, Plaintiffs should be granted access to the 37,000 pages of documents which have been provided to both the SEC and to the federal securities plaintiffs.   Neither the SLC nor Biopure addressed this issue in their respective submissions.  Presumably, this is because there is, and can be, no prejudice to the defendants in this action in allowing such access.  Nor can there be any credible claim that providing such access to the Plaintiffs interferes with the SLC, because the Company is already obligated to, and presumably is in the process of providing exactly the same information to the federal securities plaintiffs.   Furthermore, although the defendants have lodged objections to all of Plaintiffs' Request for Production of Documents, it is highly likely that the SEC discovery material will in large measure respond to Plaintiffs' Requests Nos. 1-7, 10, 11 and 12 and possibly some of the remaining four requests.   *See* Plaintiffs' First Requests for Production of Documents and Defendants' Response to Plaintiffs' First Request for Production of Documents, attached hereto as Exhibit E.  In addition, Plaintiffs also seek limited discovery regarding the independence and disinterestedness of the SLC members.

### III.    CONCLUSION

The appointment of a SLC does not automatically entitle defendants to stay a shareholder derivative action.  Rather, the matter is left to the sound discretion of the Court.  In the instant

case, the lack of independence of the members, the belated appointment of the SLC, and the absence of any prejudice to any party militate strongly in favor of a denial of the SLC's Motion for a Stay.

Should the Court find that a short stay should be granted, Plaintiffs' request a stay of no more than thirty days because that would be sufficient, given the length of time the SLC members have served on this Board and the actions of the Company in this and the related actions during the SLC members' tenure.

Finally, if the Court does grant a stay of some kind, defendants should provide Plaintiffs with the same 37,000 pages of material already provided to both the SEC and the federal securities plaintiffs, as well as discovery related to the independence and disinterest of the members of the SLC.

DATED: June 6, 2006.                     Respectfully submitted,

                                         /s/ Jeffrey P. Fink
                                         By:    Jeffrey P. Fink

                                         ROBBINS UMEDA & FINK, LLP
                                         JEFFREY P. FINK (*pro hac vice*)
                                         CAROLINE A. SCHNURER
                                         610 West Ash Street, Suite 1800
                                         San Diego, CA 92101
                                         Telephone: 619/525-3990
                                         Facsimile: 619/525-3991
                                         jfink@ruflaw.com
                                         cschnurer@ruflaw.com

                                         DOUGLAS S. JOHNSTON, JR. (*pro hac vice*)
                                         GEORGE E. BARRETT (*pro hac vice*)
                                         TIMOTHY L. MILES (*pro hac vice*)
                                         BARRETT, JOHNSTON & PARSLEY
                                         217 Second Avenue, North
                                         Nashville, TN 37201
                                         Telephone: 615/244-2202
                                         Facsimile: 615/252-3798
                                         djohnston@barrettjohnston.com

gbarrett@barrettjohnston.com
tmiles@barrettjohnston.com

Plaintiffs' Co-Lead Counsel

MARY T. SULLIVAN, BBO #487130
SEGAL ROITMAN & COLEMAN
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: 617/742-0208
Facsimile: 617/742-2187
msullivan@segalroitman.com

Plaintiffs' Liaison Counsel

JAMES G. STRANCH
BRANSTETTER, KILGORE, STRANCH &
JENNINGS
227 Second Avenue North
Nashville, TN 37201
Telephone: 615/254-8801
Facsimile: 615/255-5419

Plaintiffs' Counsel

## CERTIFICATE OF SERVICE

I hereby certify a true and exact copy of the foregoing has been served on all Filing Users through the Court's Electronic Filing System on this the 6th day of June, 2006.

/s/ Jeffrey P. Fink
Jeffrey P. Fink

G:\Cases\Biopure\Motions - Opps\SLC MTS\Opp to Stay FINAL.doc