Table of Contents

# SCHEDULE 14A
(Rule 14a-101)

**INFORMATION REQUIRED IN PROXY STATEMENT**

**SCHEDULE 14A INFORMATION**

Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Amendment No.     )

Filed by the Registrant ☑

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ Confidential, For Use of the Commission Only (as permitted by Rule 14a-6(e) (2))

☑ Definitive Proxy Statement

☐ Definitive Additional materials

☐ Soliciting Material Under Rule 14a-12

# BIOPURE CORPORATION

(Name of Registrant as Specified in Its Charter)

(Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i) (1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

Table of Contents

*Voting*

Only stockholders of record at the close of business on the record date, January 23, 2006, are entitled to receive notice of the annual meeting and to vote the shares of class A common stock that they held on that date.

The Company has only one class of voting common stock outstanding, its class A common stock. Each outstanding share of class A common stock is entitled to one vote on each matter to be voted upon at the meeting.

If you complete and properly sign the accompanying proxy card and return it to the Company, it will be voted as you direct. If you are a registered stockholder and attend the meeting, you may deliver your completed proxy card in person or vote in person at the meeting. "Street name" stockholders who wish to vote at the meeting will need to obtain a proxy form from the institution that holds their shares.

Stockholders can vote their shares over the Internet or by telephone. You will find voting instructions printed on the enclosed proxy card.

Even after you have submitted your proxy, you may change your vote or revoke your proxy at any time before the proxy is exercised (in other words, at the meeting) by filing with the Secretary of the Company either a notice of revocation or a duly executed proxy bearing a later date. The powers of the proxy holders will be suspended if you attend the meeting in person and so request, although attendance at the meeting will not by itself revoke a previously granted proxy.

*No Dissenters' Rights*

Delaware law does not provide for dissenters' or appraisal rights in connection with the approval of the actions described in this proxy statement.

**BOARD MATTERS**

*Code of Business Conduct and Ethics*

The Company has a code of ethics that applies to all Company employees, officers and directors, including the Chief Executive Officer and the Chief Financial Officer, in carrying out their work-related responsibilities. Copies of the code of ethics may be obtained free of charge by making a written request to the Company's Secretary.

*Director compensation*

Until the reverse split of the class A common stock in May 2005, each non-employee director received an annual grant of options to purchase 10,000 shares of class A common stock, except for Dr. Sanders, who generally received an annual grant of options to purchase 50,000 shares for service as Chairman of the Board. Following the reverse stock split, the standard compensation became an annual grant of options to purchase 20,000 shares of class A common stock, and the amount for service as Chairman became 40,000 shares. On October 13, 2005, each director received an option to purchase 18,333 shares, reflecting the new policy, and Dr. Sanders received an option to purchase 31,667 shares. As a new director who joined the board in August, Mr. Neels was granted an option to purchase 30,000 shares. He will begin to receive the standard compensation at the time of the 2006 award to all non-employee directors. Each option grant permits the holder to purchase shares at their fair market value on the date of grant. Mr. Pieper is also paid $15,000 annually for serving as director and $20,000 annually for serving as chairman of the Audit Committee. Directors who are also employees of the Company receive no additional compensation for service as directors.

Table of Contents

The two members of the Nominating Committee meet in person or by telephone and otherwise communicate as necessary to discuss possible candidates as nominees. The Company does not keep a record of the Nominating Committee meetings. The Nominating Committee recommended one candidate during 2005, Mr. Neels.

*Audit Committee.* The Audit Committee consists of Mr. Pieper, Chairman, and Mr. Harrington and Mr. Judelson. Dr. Sanders served as a member of the Audit Committee until the date of the 2005 annual meeting. All members of the Audit Committee are "independent" as defined in the listing standards of the National Association of Securities Dealers and Section 10A(m) of the Securities Exchange Act of 1934. The Board of Directors has determined that Mr. Pieper and Mr. Harrington are both "Audit Committee financial experts" as defined by the SEC.

The Audit Committee oversees the accounting and financial reporting processes of the Company and audits of its financial statements. It is the responsibility of the Committee to maintain free and open communication between the Committee, the Company's independent registered public accounting firm, the internal accounting staff and management of the Company. The Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities, and personnel of the Company. The Committee also has the power to retain legal, accounting and other advisors, as it deems necessary to carry out its duties. The Committee is required to pre-approve the audit and non-audit services performed by the independent registered public accounting firm in order to assure that the provision of those services does not impair the auditor's independence. The Audit Committee preapproves recurring fees, such as income tax return preparation fees, with specified estimated fee amounts, in advance. Unless a type of service to be provided has received pre-approval from the Audit Committee, it requires specific pre-approval in each instance by the Audit Committee (up to an agreed upon maximum amount). This approval may be given by the Chairman. In such a case he reports on the approval at the next Audit Committee Meeting. Any proposed services exceeding pre-approved cost levels also require specific pre-approval by the Audit Committee. The Board of Directors has adopted a written charter for the Audit Committee. The charter was included in the Company's Proxy Statement for the 2004 annual meeting. The Audit Committee met eight times in fiscal 2005.

### Report of the Audit Committee

*The following Report of the Audit Committee does not constitute soliciting material and should not be deemed filed or incorporated by reference into any other Company filing under the Securities Act of 1933 or the Securities Exchange Act of 1934, except to the extent the Company specifically incorporates this Report by reference therein.*

In fulfilling its responsibilities during fiscal 2005, the Audit Committee reviewed and discussed the unaudited quarterly and annual financial statements with management and the Company's independent registered accounting firm, in each case prior to the release to the public of the results for the period. The Audit Committee reviewed the 2005 audited financial statements. These meetings included a discussion with management of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in and concerning the financial statements. The quarterly "earnings release" meetings with both management and the Company's independent registered accounting firm included review and discussion of significant accounting issues and the financial statements as well as the quarterly review by the independent registered accounting firm or the status of the annual audit, as applicable.

The Audit Committee discussed with the Company's independent registered accounting firm all matters required to be discussed pursuant to Statement on Auditing Standards No. 61, *Communications with Audit Committees*. The Audit Committee and the independent registered accounting firm, with and without management present, also discussed the results of the audit and the overall quality of the Company's financial reporting.

Table of Contents

Zafiris G. Zafirelis, 61, has been President, Chief Executive Officer and a director of Biopure since June 2004. In January 2006 he was elected Chairman of the Board. From 2002 to 2004 he was Chief Executive Officer and a director of MedQuest Products, a developer of implantable ventricular assist devices. From 1996 until 2002 he was Chief Executive Officer of CardiacAssist, Inc., where he also served as a director beginning in 2000. He holds a graduate diploma in chemistry from the University of Rhodesia and an M.B.A. from the University of Southern California.

### Directors Continuing in Office

*Class II Directors.* The following directors have terms ending in 2007:

**Daniel P. Harrington**, 50, has served as a director of Biopure since August 1999. He has been President of HTV Industries, Inc. since 1991. HTV Industries, Inc. is a holding company with manufacturing operations and investments in various industries. He holds a B.B.A. degree from Stetson University and an M.B.A. from Xavier University. Mr. Harrington is a director of Churchill Downs, Inc., Portec Rail Products, Inc. and First State Financial Corporation.

**Jay B. Pieper**, 62, has served as a director of Biopure since October 2004. Since May 1995, Mr. Pieper has served as Vice President for Corporate Development and Treasury Affairs for Partners HealthCare Systems, Inc., the parent of Brigham and Women's Hospital and Massachusetts General Hospital. He is a director of Eclipsys Corporation, a provider of software to healthcare providers.

*Class III Directors.* The following directors have terms ending in 2008:

**Charles A. Sanders, M.D.**, 74, has served as a director of Biopure since October 1997. From July 1989 until his retirement in May 1995, Dr. Sanders was the Chairman and Chief Executive Officer of Glaxo Inc. Dr. Sanders serves on the boards of Genentech, Inc., Vertex Pharmaceuticals, Inc., Cephalon, Inc. and Fisher Scientific International and previously was a member of the President's Committee of Advisors on Science and Technology. He was previously General Director of Massachusetts General Hospital and Professor of Medicine at Harvard Medical School. He received his M.D. degree from the Southwestern Medical College of the University of Texas.

**David N. Judelson**, 77, is a co-founder and has served as Vice Chairman of Biopure since 1984. In 1956 Mr. Judelson also co-founded Gulf and Western Industries, Inc., renamed Paramount Communications, Inc., where he served as President and Chief Operating Officer from 1967 to 1983. He is a co-founder and Chairman of Digital Compression Technology, L.P., a privately owned telecommunications development company founded in 1993. Mr. Judelson holds a bachelor of mechanical engineering degree from New York University College of Engineering.

**Guido J. Neels**, 57, became a director of Biopure in August 2005. From July 2004 until retiring in November 2005, Neels served as chief operating officer of Guidant Corporation, a world leader in the development of cardiovascular medical products, where he was responsible for the global operations of Guidant's four operating units: Cardiac Rhythm Management, Vascular Intervention, Cardiac Surgery, and Endovascular Solutions. From December 2002 to July 2004, he was group chairman, Office of the President, responsible for worldwide sales operations, corporate communications, corporate marketing, investor relations and government relations. He holds a M.B.A. degree from Stanford University and a business engineering degree from the University of Leuven in Belgium.

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE DIRECTOR NOMINEES.**

The affirmative vote of a plurality of the votes cast at the meeting is required for the election of a director. A properly executed proxy marked "WITHHOLD AUTHORITY" with respect to the election of a director will not be voted for the director, although it will be counted for purposes of determining whether there is a quorum.