Table of Contents

Filed Pursuant to Rule 424(b)(5)<br>Registration Nos. 333-114559 and 333-106288

**PROSPECTUS SUPPLEMENT, DATED DECEMBER 20, 2005**
(To Prospectus Dated November 18, 2004 and Prospectus Dated July 3, 2003)

# BIOPURE®

**8,800,000 shares of Class A Common Stock and
Warrants to purchase 8,800,000 shares of Class A Common Stock**

We are offering 8,800,000 shares of our Class A common stock and warrants to purchase 8,800,000 additional shares of our Class A common stock. Each investor will receive a warrant to purchase one share of our Class A common stock, at an exercise price of $0.85 per share, for each share of Class A common stock purchased. This prospectus supplement also covers the offer and sale of 8,800,000 shares of our Class A common stock issuable upon exercise of the warrants. Our warrants are not listed for trading. Our Class A common stock is listed on the Nasdaq National Market under the symbol "BPUR." On December 20, 2005, the last reported sale price per share of our Class A common stock on the Nasdaq National Market was $0.75.

Investing in our Class A common stock and warrants involves a high degree of risk. See "Risk Factors" beginning on page S-10 of this prospectus supplement for a discussion of important risks that you should consider before making an investment decision.

We have agreed to pay the underwriters fees set forth in the table below and to issue to them warrants to purchase Class A common stock and to provide them with indemnification as described in "Plan of Distribution" in this prospectus supplement. This prospectus supplement also covers the issuance of such warrants to the underwriters and the offer and sale of the shares of our Class A common stock issuable upon the exercise those warrants.

|  | Per Share of Class A Common Stock and Associated Warrant* | Total* |
|---|---|---|
| Public Offering Price | $0.6800 | $5,984,000 |
| Underwriting Discount | $0.0408 | $ 359,040 |
| Proceeds, before expenses, to Biopure | $0.6392 | $5,624,960 |

\* Table excludes shares of Class A common stock issuable on exercise of warrants offered hereby.

We expect to deliver the shares of Class A common stock and warrants against payment on or about December 27, 2005.

The Securities and Exchange Commission and state regulators have not approved or disapproved these securities, or determined if this prospectus supplement or the accompanying prospectuses are accurate or complete. Any representation to the contrary is a criminal offense.

**DAWSON JAMES
SECURITIES, INC.**          **NOBLE INTERNATIONAL
INVESTMENTS, INC.**

The date of this prospectus supplement is December 20, 2005

**Table of Contents**

- *Cardiopulmonary Bypass Surgery* In addition to the limb ischemia trial described above, the U.K. has also authorized our Phase 2 clinical trial protocol for a non-randomized, multi-center, prospective registry of patients undergoing multi-vessel coronary artery bypass graft (CABG) surgery. This pilot trial is designed to assess the safety and feasibility of Hemopure in reducing heart damage, as measured by cardiac enzyme (CK-MB) elevation, and enhancing tissue preservation during cardiopulmonary bypass. Secondary endpoints include measurements of major adverse cardiac events, kidney function, transfusion requirements, cognitive impairment and length of hospital stay.

In the trial, a total of 60 patients will be consecutively enrolled in two groups to receive either standard-of-care treatment or intravenous administration of approximately 60 grams of hemoglobin in the form of Hemopure prior to cardiopulmonary bypass. Patients will be monitored until hospital discharge or six days, whichever occurs first, with a follow-up assessment at 30 days post-surgery. An independent data safety monitoring committee will monitor safety throughout the study period.

*Litigation*

*SEC Injunctive Proceeding*

On September 14, 2005, the U.S. Securities and Exchange Commission (SEC) filed a civil injunctive proceeding against Biopure, two former officers and one current officer. The SEC is seeking a permanent injunction restraining and enjoining the defendants from violating or aiding and abetting violations of federal securities laws, a civil monetary penalty from each of the defendants, and an order barring the former and current officer defendants from serving as officers or directors of any publicly-traded company. The complaint does not specify the amount of the civil monetary penalty sought.

A principal claim by the SEC is that the Company should have disclosed in April 2003 that the FDA put on hold a proposed clinical trial of Hemopure in trauma patients in the hospital setting. Under FDA regulations, a proposed trial is either placed on hold within 30 days or it may proceed as submitted. When the FDA communicated the hold, it asked data questions described as "safety concerns." The Company's position is that it was not required to disclose the hold status of the proposed trial in a new indication. The Company did not disclose the filing of the proposed protocol. It is not uncommon for there to be a dialogue with the FDA over a proposed trial. The Company did not view the data questions or the proposed trial itself to be material to an investment decision, as opposed to normal back-and-forth between the FDA and clinical trial sponsors. In addition, in-hospital trauma was not planned as an indication for commercial development, and the Company spent an insignificant amount of resources on the proposed trial.

When the protocol for the in-hospital trauma trial was filed, the FDA designated it as a separate investigational new drug application (IND) from the Company's then-pending biologics license application (BLA) for a proposed orthopedic surgery indication. The FDA questions about data were asked in the context of the in-hospital trauma IND and referred to data that had been submitted in the BLA. The Company intends to prove that the FDA questions were specific to the in-hospital trauma IND, and the FDA was not addressing the status of the orthopedic surgery BLA in its communications about the IND.

The in-hospital trauma IND at issue in the SEC action was withdrawn by the Company in November 2003.

A second contention in the SEC suit concerns a separate communication by the FDA with the Company about the orthopedic surgery BLA. The SEC staff has claimed that, in its view, the Company's disclosures concerning a July 30, 2003 FDA letter about the BLA were too positive in tone.

The Company differs with the SEC about the allegations in the SEC complaint and is defending the case vigorously. In October, we filed an answer to the SEC complaint. We are pressing to move the case speedily.

*Private Class Action and Derivative Litigation*

Following the Company's announcement in December 2003 that it was being investigated by the SEC, the Company, two directors (one a former director), its former Chief Executive Officer, its former

**Table of Contents**

Chief Technology Officer and its former Chief Financial Officer were named as defendants in a number of similar, purported class action complaints, filed between December 30, 2003 and January 28, 2004 (the "Complaints"), in the U.S. District Court for the District of Massachusetts (the "Court") by alleged purchasers of the Company's common stock. Those complaints have since been consolidated in a single action. The consolidated complaint claims that the Company violated the federal securities laws based on the same allegations pursued by the SEC. The complaint does not specify the amount of alleged damages plaintiffs seek to recover. The complaint sets forth a class period of March 2003 through December 24, 2003. The defendants believe that the complaint is without merit and intend to defend the actions vigorously. At this time, the Company cannot estimate what impact these cases may have on its financial position or results of operations.

The seven members of the Company's Board of Directors during the period March through December 2003 and certain officers during that period were named as defendants in two shareholder derivative actions filed on January 26, 2004 and January 29, 2004 in the same Court. A consolidated, amended complaint has been filed and a request to amend again to copy the SEC's civil injunctive complaint has also been filed. The Company is named as a defendant, even though in a derivative action any award is for the benefit of the Company, not individual stockholders. The consolidated, amended complaint alleges that the individual directors and an officer breached fiduciary duties in connection with the same disclosures referenced in the purported securities class action. The complaint does not specify the amount of the alleged damages plaintiffs seek to recover. A different stockholder also made demand on the Company's directors on June 30, 2004 that they pursue similar claims on behalf of the Company, and a similar derivative case was filed in the Trial Court of Massachusetts, Middlesex County, on September 25, 2005. At this time, the Company cannot estimate what impact, if any, these cases may have on its financial position or results of operations.

*South Africa*

In early 2005, Biopure acquired control of the registration for Hemopure in South Africa, where the product is approved for the treatment of surgical anemia. As part of its preparations to initiate sales, the Company has appointed a sales agent for Hemopure in South Africa. The agent, Abalazi Bio Ventures (Pty) Ltd., is a new company formed to sell biotechnology products in the region and will act as Biopure's exclusive agent to market Hemopure in South Africa and, if lawfully saleable, other countries in Africa (except Egypt) and the Indian Ocean Islands. The CEO of Abalazi Bio Ventures is the former general manager of a large, multi-national American pharmaceutical company in South Africa.

Biopure has a small staff in South Africa for training, marketing and adherence to local regulations. Biopure recently submitted documentation to the U.S. Department of Agriculture (USDA), which is directly communicating with South Africa's Department of Agriculture (SADA) regarding the company's compliance with new South African import regulations regarding the health of the source animals, blood collection methods and material custody of the raw material and intermediate and final product. We are now awaiting SADA clearance to export product to South Africa. We are also currently training two experienced sales representatives from Abazali Bio Ventures, who will be solely dedicated to selling Hemopure. These sales representatives are expected to start calling on doctors shortly after the importation issue is resolved and the product is released for sale.

*EDQM Certification*

In August 2005, the European Directorate for the Quality of Medicines (EDQM) issued Biopure updated Certificates of Suitability of Monographs of the European Pharmacopoeia for Hemopure and Oxyglobin. These documents certify that our products meet the European Pharmacopoeia criteria for minimizing the risk of transmitting animal Transmissible Spongiform Encephalopathies (TSE). EDQM certification is required for all new and approved human and veterinary medicinal products that are manufactured from ruminant materials and marketed in the European Union. As part of the certification process, Biopure was required to provide technical information on the manufacturing process, the origin of the raw material and type of tissue used, the cattle traceability and auditing, and a risk analysis from an independent r expert.

S-7

Table of Contents

**PROSPECTUS**

# BIOPURE®

### $50,000,000

### Preferred Stock
### Class A Common Stock
### Warrants

The securities covered by this prospectus may be sold from time to time by Biopure Corporation. We may offer the securities independently or together in any combination for sale directly to purchasers or through underwriters, dealers or agents to be designated at a future date.

When we offer securities we will provide you with a prospectus supplement describing the specific terms of the specific issue of securities, including the offering price of the securities. You should carefully read this prospectus and the prospectus supplement relating to the specific issue of securities before you decide to invest in any of these securities.

Our common shares are traded on the Nasdaq National Market under the symbol "BPUR". On November 15, 2004, the last reported sale price for our common stock on The Nasdaq Stock Market was $0.40 per share.

---

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

---

The securities may be offered and sold to or through underwriters, dealers or agents as designated from time to time, or directly to one or more other purchasers or through a combination of such methods. See "Plan of Distribution." If any underwriters, dealers or agents are involved in the sale of any of the securities, their names, and any applicable purchase price, fee, commission or discount arrangements between or among them, will be set forth, or will be calculable from the information set forth, in the applicable prospectus supplement.

**Investing in these securities involves risks.
See "Risk Factors" beginning on page 6.**

The date of this prospectus is November 18, 2004.

---

Table of Contents

may not be related to our product. These events may affect the statistical analysis of the safety and efficacy of our product. If we obtain marketing authorization for a product, the authorization will be limited to the indication for which our clinical trials have demonstrated the product is safe and effective.

In addition, many factors could delay or result in termination of ongoing or future clinical trials. Results from ongoing or completed pre-clinical or clinical studies or analyses could raise concerns over the safety or efficacy of a product candidate. For example, in April, 2003, the FDA placed our proposed Phase 2 clinical trial of Hemopure for the treatment of trauma on clinical hold citing safety concerns based on a review of data from our Phase 3 clinical trial in patients undergoing surgery. We cannot assure investors that the FDA will not place other clinical trials we sponsor on hold in the future. A clinical trial may also experience slow patient enrollment or insufficient drug supplies. Patients may experience adverse medical events or side effects, and there may be a real or perceived lack of effectiveness of, or of safety issues associated with, the product we are testing.

We may not have the financial resources to fund required trials and our operations until FDA marketing authorization for Hemopure is obtained, if ever.

*We cannot expand indications for Hemopure unless we receive FDA approval for each proposed indication.*

The FDA requires a separate approval for each proposed indication for the use of Hemopure in the United States. In order to market Hemopure for more than one indication, we will have to design additional clinical trials, submit the trial designs to the FDA for review and complete those trials successfully. If the FDA approves Hemopure for an indication, it may require a label cautioning against Hemopure's use for indications for which it has not been approved.

*The Securities and Exchange Commission staff has preliminarily determined to recommend a civil injunctive proceeding against us and several of our former and current officers and directors. We and several of our former and current directors and officers are subject to consolidated class action lawsuits and we and seven of our former and current directors are subject to consolidated derivative actions.*

During the fourth quarter of fiscal 2003, we were notified of a confidential investigation by the Securities and Exchange Commission. On December 22, 2003, we and our former chief executive officer and board member and our former senior vice president, regulatory and operations, each received a "Wells Notice" from the SEC staff indicating the staff's preliminary determination to recommend that the SEC bring a civil injunctive proceeding against the Company and such former officers. On April 29, 2004, our current chairman, a former director, our current chief technology officer and our current general counsel each also received a Wells Notice from the SEC staff indicating the staff's preliminary determination to recommend that the SEC bring a civil injunctive proceeding against them. We have responded in writing to the "Wells Notice" received by the Company explaining why the SEC ought not to bring a proceeding. The investigation is ongoing and, to our knowledge, no formal recommendation has been made to date and we do not know what action, if any, the SEC staff may finally recommend.

Following our announcement of the Wells Notices, a number of class action lawsuits, subsequently consolidated, were filed against us and several of our former and current executive officers. In addition, all members of our board of directors as of December 22, 2003 and the Company are named as defendants in two derivative actions filed in January of 2004, and subsequently consolidated, claiming that such directors breached fiduciary duties in connection with the same disclosures that are the subject of the class action lawsuits. Details about the SEC investigation, the class actions and the derivative actions are contained in our most recent report on Form 10-Q which is incorporated herein by reference. We believe the class action lawsuits and derivative actions are without merit, and we intend to defend against them vigorously.

There can be no assurance as to the outcome of any of these proceedings. Members of our board of directors and management may spend considerable time and effort cooperating with the SEC in its investigation and defending the class action lawsuits and derivative actions, which may adversely affect our business, results of operations and financial condition. We may incur substantial costs in connection with

9