Not Reported in A.2d                                                                                                          Page 1
Not Reported in A.2d, 1993 WL 390525 (Del.Ch.), 19 Del. J. Corp. L. 797
**(Cite as: Not Reported in A.2d)**

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Gerald KATELL and Desert Equities, Inc., Plaintiffs,
v.
MORGAN STANLEY GROUP, INC.; Morgan Stanley & Co. Incorporated; Cigna Corp.; Morgan Stanley Leveraged Equity Fund, L.P.; Cigna Capital Advisors, Inc.; Cigna Leveraged Capital Fund, Inc.; Morgan Stanley Leveraged Capital Fund, Inc.; SIBV/MS Holdings, Inc.; Jefferson Smurfit Corp.; Container Corporation of America; Silgan Holdings Inc.; Silgan Corporation; Donald P. Brennan and Alan E. Goldberg, Defendants.
**CIV. A. No. 12343.**

Submitted: Aug. 17, 1993.
Decided: Sept. 27, 1993.

**\*\*799** Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Harold E. Kohn and Joanne Zack, of Kohn, Nast & Graf, P.C., Philadelphia, PA of counsel: Elwood S. Kendrick, Law Office of Elwood S. Kendrick, Inc., and Nancy Miller Bennett, Los Angeles, CA, for plaintiffs.

A. Gilchrist Sparks, III and David G. Thunhorst of Morris, Nichols, Arsht & Tunnell, Wilmington, of counsel: Lewis A. Kaplan, Allan J. Arffa, and Stuart M. Cobert, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City for defendants Morgan Stanley Group Inc., Morgan Stanley & Co. Inc., Morgan Stanley Leveraged Capital Fund, Inc., The Morgan Stanley Leveraged Equity Fund, L.P., Donald P. Brennan and Alan E. Goldberg.

Peter J. Walsh, of Bayard, Handelman & Murdoch, P.A., Wilmington, of counsel: Marc P. Cherno, and Jane Wasman, of Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendants CIGNA Corp., CIGNA Capital Advisers, Inc. and CIGNA Leveraged Capital Fund, Inc.

Kevin G. Abrams, of Richards, Layton & Finger, Wilmington, of counsel: Thomas A. Reynolds III, David B. Love, and Frank H. Langrock, of Winston & Strawn, Chicago, for defendants SIBV/MS Holdings, Inc., Jefferson Smurfit Corp. and Container Corp. of America.

Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, of counsel: Kenneth M. Kramer, **\*\*800**Michael W. Jahnke, and James R. Warnot, Jr., of Shearman & Sterling, New York City, for defendants Silgan Holdings, Inc. and Silgan Corp.

MEMORANDUM OPINION

CHANDLER, Vice Chancellor.

**\*1** In this derivative action initiated on behalf of The Morgan Stanley Leveraged Equity Fund, L.P. (the "Partnership"), two limited partners of the Partnership ("plaintiffs") are alleging that the general partners of the Partnership breached the fiduciary duty they owed to the Partnership when they entered into certain transactions. In response to the filing of this suit, Morgan Stanley Leveraged Capital Fund Inc. ("Morgan Stanley Capital") and CIGNA Corporation ("CIGNA"), the two general partners of the Partnership (collectively "defendants"), and eighty percent in interest of the limited partners of the Partnership designated a Special Litigation Committee (the "Committee") to investigate the allegations of the complaint. The Partnership granted the Committee the authority to request to the appropriate judicial authority, after such investigation, prosecution or termination of the action. Consequently, Morgan Stanley Capital and CIGNA move that all proceedings in this action be stayed pending the report of the Committee.

Previously, in *Katell v. Morgan Stanley Group, Inc.,* Del.Ch., C.A. No. 12343, Chandler, V.C., slip op. at 5, I held that the *Zapata* special committee doctrine can be extended to Delaware partnership law, on a case-by-case basis, when partners "create[ ] a valid special litigation committee in accordance with the terms of their particular partnership agreement." In that case, I found that the Partnership had not created a valid special litigation committee because the agreement purporting to create the litigation committee (the "First Agreement") violated the contract governing the Partnership, the Agreement of Limited Partnership dated July 31, 1985 (the "Partnership Agreement"). Specifically, I found that the First Agreement violated the Partnership Agreement because the First Agreement was an amendment to the Partnership Agreement that was not duly approved by both general partners and more than fifty percent in interest of the limited partners. *See Katell, supra.*

Not Reported in A.2d    Page 2
Not Reported in A.2d, 1993 WL 390525 (Del.Ch.), 19 Del. J. Corp. L. 797
**(Cite as: Not Reported in A.2d)**

Subsequent to this decision, Morgan Stanley Capital, CIGNA and eighty percent in interest of the limited partners consented to an amendment to the Partnership Agreement (the "Amendment") which purports to designate CIGNA as a special committee of the general partners for the purpose of investigating the claims in this **801 action and, after such investigation, requesting to the appropriate judicial authority, prosecution or termination of the action.

Unlike the First Agreement, the Amendment appears to be in accordance with the terms of the Partnership Agreement. Article XIV of the Partnership Agreement provides that the terms and provisions of the Partnership Agreement may be modified with the written consent of both general partners and those limited partners whose contributions constitute more than 50% of all capital contribution then made to the Partnership. The Amendment, because it is a modification of Section 3.1 of the Partnership Agreement,[FN1] requires approval by written consent of both general partners and more than fifty percent in interest of the limited partners. Both general partners, CIGNA and Morgan Stanley Capital, and nineteen limited partners whose contributions constitute eighty percent of all capital contributions of the partnership, consented to the Amendment. As a result, the Amendment creating the Committee complies with the provisions of the Partnership Agreement and consequently the *Zapata* special litigation committee doctrine can be applied to this situation.

> FN1. In *Katell, supra,* I found that the First Agreement modifies Section 3.1 of the Partnership Agreement because it allows one general partner to make determinations concerning the initiation and settlement of legal actions in direct contradiction of Section 3.1 of Partnership Agreement which provides that such determinations must be made by both general partners acting together. Because the Amendment is an exact replica of the First Agreement, it, too, is a modification of Section 3.1 of the Partnership Agreement.

*2 Plaintiffs, in fact, do not really challenge the above result. Rather, they assert that the Committee is not a proper special litigation committee under *Zapata* and its progeny. Plaintiffs contend that *Zapata* requires the establishment of an *independent* litigation committee. Subsequently, they assert that the Committee is not independent and that it is defendants' burden to prove the independence of the Committee.[FN2] I find plaintiffs' argument wholly misplaced.

> FN2. In fact, both plaintiffs and defendants spend the greater portion of their briefs arguing the independence, or lack thereof, of the special litigation committee.

At this point in time, alleged lack of independence of the special litigation committee "forms no basis to deny [the Partnership] of the *Zapata* advantage of utilizing the litigation committee approach." *Pompeo v. Hefner, Lewis v. Hefner,* Del.Ch., C.A. Nos. 6806, 6872, Brown, C., slip op. at 3 (March 23, 1983) (letter opinion). This is **802 true because a challenge to a special litigation committee's independence is premature if it comes before the special litigation committee has made a recommendation of dismissal to the proper judicial authority.

*Zapata* provides the steps by which a court must judge the recommendation of a special litigation committee. Among other things, a court should consider the independence of the committee and the bases upon which the committee's decision is based. But, a court does not look at these factors *until after* the special litigation committee has made a recommendation to dismiss the suit. Before such a recommendation is made, challenges to the committee's independence are simply inappropriate.

The *Hefner* cases cited above provide a near perfect example of the prematurity of plaintiffs' charge. There, shareholders of Playboy challenged the independence of the Playboy Board of Director's special litigation committee. In rejecting the shareholder's assertions, Chancellor Brown stated,
*Zapata* starts with the assumed premise that the board, or a majority of it, is tainted by an alleged self-interest. This naturally gives rise to immediate common-sense suspicion as to the true independence of a new or untainted director who is appointed by the board as an independent committee to investigate the worthiness of the charges of wrongdoing made against the members of the appointing board.
Under *Zapata,* however, *the independence of the litigation*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                         Page 3
Not Reported in A.2d, 1993 WL 390525 (Del.Ch.), 19 Del. J. Corp. L. 797
**(Cite as: Not Reported in A.2d)**

*committee does not take on critical significance until such time as the committee moves this Court to dismiss the derivative action based on the findings of its investigation.* At that point, under *Zapata,* it becomes the function of this Court to pass on the good faith and independence of the litigation committee together with the reasonableness of the basis for its dismissal recommendation. Should the litigation committee not recommend a dismissal, presumably its independence becomes a moot question insofar as the derivative plaintiff is concerned.

*Id.* at 3-4 (citations omitted) (emphasis added). Consequently, Chancellor Brown refused to address the independence of Playboy's special litigation committee.

**\*3** In *Hefner,* Chancellor Brown recognized the potential for inefficiency if a court declines to rule on a special litigation committee's **\*\*803** independence before the committee makes a recommendation to the court, but subsequently refuses to follow the committee's recommendation for dismissal because the committee lacks independence. Consequently, Chancellor Brown seemed to imply that if the constitution of a litigation committee gives rise to a conclusive presumption of lack of independence, it would serve to deprive the corporation's or partnership's power to use the *Zapata* procedure. [FN3] *Id.* at 6.

> FN3. Chancellor Brown stated, "There is nothing of record to indicate that [the appointer of the special litigation committee] has done anything to influence the activities of the Litigation Committee and I cannot conclude that [the appointer's] majority status does so. [Its] majority shareholder status is certainly an element to consider when and if the issue arises under the *Zapata* procedure. However, it is not of itself a dispositive factor at this point such as, in practical effect, would serve to deprive Playboy's board in advance of the power to utilize the *Zapata* procedure." *Id.* at 5-6.

I find that such a conclusive presumption does not exist in this case. Plaintiffs charge that CIGNA cannot be an independent special litigation committee because it is a defendant in this suit, was a general partner at the time the transactions giving rise to this action took place and has been "controlled by" Morgan Stanley Capital in previous situations. Morgan Stanley Capital, on the other hand, alleges that CIGNA did not have a separate interest in the transactions at issue and is not currently involved in any other financial dealings with Morgan Stanley Capital. Contrary to plaintiffs' assertions, their allegations do not amount to a conclusive presumption of lack of independence; they merely show CIGNA's participation in the ongoing relationship of the Partnership. As a result, I cannot conclude that plaintiffs allegations give rise to a conclusive presumption that CIGNA, as the special litigation committee, lacks independence.

Moreover, Plaintiffs' allegations in this case are not much different from those in *Zapata* and *Hefner.* In *Zapata,* the plaintiffs challenged the independence of the special litigation committee, asserting that the committee could never be independent because it owed its position and authority to those it was charged to investigate, the Board of Directors. There, the Supreme Court held that a special litigation committee's independence is to be tested judicially *when the committee moves the court to dismiss the action.* [Zapta v. Maldonado, 430 A.2d 779, 787 (1981)](). Likewise, in the *Hefner* cases, the plaintiffs alleged that Playboy's special litigation committee lacked independence **\*\*804** because the special litigation committee consisted of one person who was appointed by and could be terminated by, and thus, conjectured the plaintiff, could be influenced by, the majority shareholder of Playboy. Following *Zapata,* Chancellor Brown stated that these allegations, if found to be true, were simply "additional evidentiary factor[s] to be considered in the event that [the special committee's] independence is put into issue by a motion of [it] to dismiss the suit." *Hefner,* slip op. at 5. In neither of these cases were the plaintiffs' allegations sufficient to give rise to a conclusive presumption that the committee lacked independence. So too, here, plaintiffs have simply failed to show that the facts of this case give rise to a conclusive presumption that CIGNA lacks independence.

**\*4** Because I find that the Partnership's creation of a special litigation committee complies with the Partnership Agreement and that the Committee does not conclusively lack independence, Delaware law requires that all proceedings in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                                           Page 4
Not Reported in A.2d, 1993 WL 390525 (Del.Ch.), 19 Del. J. Corp. L. 797
**(Cite as: Not Reported in A.2d)**

this action be stayed pending the Committee's investigation. *Kaplan v. Wyatt,* Del.Ch. 457 A.2d 368 (1983), *aff'd,* Del.Supr. 499 A.2d 1184 (1985); *Abbey v. Computer & Communications Technology Corp.,* Del.Ch. 457 A.2d 368 (1983). The only question that remains is the length of time the proceedings should be stayed. According to *Abbey,* the length of the stay of discovery must be related to the complexity of the derivative action. *Abbey,* 457 A.2d at 376. Defendants claim that a review of the two transactions at issue, both multi-million dollar transactions involving numerous parties, will take approximately four to six months. Plaintiffs offer nothing to dispute this contention. Accordingly, I grant a stay of the proceedings for five months. Because I have determined that plaintiffs' allegation that the special litigation committee lacks independence is premature, I deny plaintiffs' request for limited discovery to brief this issue.

IT IS SO ORDERED.

Del.Ch.,1993.
Katell v. Morgan Stanley Group, Inc.
Not Reported in A.2d, 1993 WL 390525 (Del.Ch.), 19 Del. J. Corp. L. 797

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.