ATTORNEY WORK PRODUCT
PRIVILEGED AND CONFIDENTIAL

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE BIOPURE CORPORATION DERIVATIVE LITIGATION | ) ) ) ) ) ) | Master Docket No. 1:04-cv-10177 (NG) |
| | | Assigned to Judge Nancy Gertner |
| | | Magistrate Judge Alexander |

## SPECIAL LITIGATION COMMITTEE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE VERIFIED CONSOLIDATED SECOND AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

Page

I.   *Preliminary Statement* ...................................................................................................... *1*

II.  *Background* ............................................................................................................................ 2

    A.   The Derivative Complaint .......................................................................................... 2

    B.   Appointment of the Special Litigation Committee .................................................... 4

    C.   The Special Litigation Committee's Investigation .................................................... 4

III. *ARGUMENT* ........................................................................................................................ 5

    A.   Under Governing Delaware Law, The Zapata Test Determines Whether A Derivative Action Should Be Dismissed On The Basis Of A Decision By A Special Litigation Committee ...................................................................................... 6

        1.   Delaware Law Establishes The Authority Of Special Litigation Committees ...................................................................................................... 6

        2.   Under Delaware Law, A Court Should Review The Limited Issues Raised By The SLC's Motion Under The Same Standard As That For A Motion For Summary Judgment ....................................................................... 8

    B.   Dismissal of This Action Is Appropriate Because The SLC Has Satisfied The Zapata Test ........................................................................................................... 9

        1.   The SLC Has Met Its Burden To Demonstrate Its Independence, Good Faith, And A Reasonable Basis Supporting Its Conclusions .......... 10

            a.   The SLC Is Independent ............................................................... 10

            b.   The SLC Has Established Its Good Faith In Conducting Its Thorough Investigation ................................................................ 11

            c.   The SLC Has Demonstrated The Reasonableness Of Its Conclusions .................................................................................. 12

                (i)   The SLC Had A Reasonable Basis In Fact and Law For Concluding That, Based On The Merits Of The Claims, The Derivative Action Should be Dismissed ................................................................ 13

                (ii)  The SLC Also Had A Reasonable Basis For Concluding That Even If The Action Had Sufficient Merit To Justify Its Prosecution, Economic And Business Considerations Dictate That The Action Not Be Pursued ............................................................. 19

**TABLE OF CONTENTS**
**(continued)**

Page

2.  There Is No Need For The Court To Apply Its Own Business Judgment Since The SLC Has Clearly Demonstrated Its Independence And Good Faith And The Bases Supporting Its Conclusions..............................................................................22

IV.  *CONCLUSION*..............................................................................*23*

## TABLE OF AUTHORITIES

### FEDERAL CASES

Page

*Burks v. Lasker,* 441 U.S. 471 (1979) ........................................................................ 6

*CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69 (1987) ................................... 6

*In re LTV Steel Co., Inc., 333* B.R. 397 (N.D. Ohio 2005) ........................................ 15

*McLean v. Alexander,* 599 F.2d 1190 (3d Cir. 1979) ................................................. 16

*In re Par Pharmaceutical, Inc.,* 750 F.Supp. 641 (S.D.N.Y. 1990) ........................... 11

*In re Tower Air, Inc.,* 416 F.3d 229 (3d Cir. 2005) .............................................. 14, 15

### STATE CASES

*Agostino v. Hicks,* 845 A.2d 1110 (Del. Ch. 2004) ..................................................... 6

*Auerbach v. Bennett,* 47 N.Y.2d 619 (N.Y. 1979) ..................................................... 11

*Beacon Wool Corp. v. Johnson,* 331 Mass. 274 (1954) ............................................... 5

*Biondi v. Scrushy,* 820 A.2d 1148 (Del. Ch. 2003) ..................................................... 7

*Carlton Investments v. TLC Beatrice Intern. Holdings, Inc.,* No. 13950, 1997 WL 38130
    (Del. Ch. Jan. 29, 1997) ...................................................................................... 11

*Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156 (Del. 1995) ............................... 15

*Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963 (Del. Ch. 2000) ................ 11

*Gerzof, M, M.D. v Cignal Global Commc'ns, Inc.,* No. 00-3337, 2001 WL914519 (Mass.
    Super. Aug 13, 2001) ........................................................................................... 5

*Harrison v. Netcentric Corp.,* 433 Mass. 465, 744 N.E.2d 622 (2001) ........................ 5

*Kaplan v. Centex Corp.,* 284 A.2d 119 (Del. Ch. 1971) ............................................ 15

*Kaplan v. Wyatt,* 499 A.2d at 1184 (Del. 1985) ........................................................ 23

*Kaplan v. Wyatt,* 484 A.2d 501 (Del. Ch. 1984) aff'd, 499 A.2d 1184 (Del. 1985) .......... 8, 10, 13

*Katell v. Morgan Stanley Group,* 1995 WL 376952 (Del. Ch. June 15, 1995) ........................ 13

*Kindt v. Lund,* No. Civ. A. 17751-NC, 2003 WL 21453879 (Del. Ch. May 30, 2003) ........ 22, 23

*Lewis v. Fuqua,* 502 A.2d 962 (Del. Ch. 1985) ........................................................ 13

*Malone v. Brincat,* 722 A.2d 5 (Del. 1989) .............................................................. 15

*Metro Communications Corp. v. Advanced Mobilecomm Technologies, Inc.,* 854 A.2d
    121 (Del. 2004) ................................................................................................. 15

*Official Committee of Unsecured Creditors of Integrated Health Services v. Elkins,*
    No. 20228-NC, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004) .............................. 14, 15

*Olsen v. Siefert,* No. 976456, 1998 WL 1181710 (Mass. Super. Aug. 28, 1998) ........................ 5

*In re Oracle,* 867 A.2d 904 (Del. 2004) (Del. Ch. 2003) ............................................................ 19

*In re Oracle Corp.,* 824 A.2d 917 (Del. Ch. 2003)................................................................. 8, 23

*Rales v. Blasband,* 634 A.2d 927 (Del Supr. 1993) ................................................................... 10

*Shamrock v. Iger,* No. 1330-N, 2005 Del. Ch. LEXIS 83 (Del. June 6, 2005) .......................... 15

*In re Walt Disney Co. Deriv. Litig.,* No. 15452, 2005 Del. Ch. LEXIS 113 (Del. Ch. Aug.
    9, 2005) ................................................................................................................................ 14

*Zapata v. Maldonado,* 430 A.2d 779 (Del. 1981).......................................... 6, 7, 8, 9, 10, 13, 22

## STATUTES

Fed. R. Civ. P. 23.1 ........................................................................................................................ 7

Fed. R. Civ. P. 56 ........................................................................................................................... 8

8 Del. C. § 141(c)(1) ....................................................................................................................... 7

8 Del. Code §§ 141(a) .............................................................................................................. 1, 22

The Special Litigation Committee of Biopure Corporation, on behalf of Nominal Defendant Biopure Corporation, respectfully submits this Memorandum of Law In Support of its Motion to Dismiss the Verified Consolidated Second Amended Complaint (the "Complaint" or "Compl.").

## I.    PRELIMINARY STATEMENT

Plaintiffs brought this action, purportedly on behalf of Biopure Corporation ("Biopure" or the "Company"), against Biopure's former Chief Regulatory Officer, Biopure's former Chief Executive Officer (and former Board member), Biopure's General Counsel, and six current or former members of Biopure's Board of Directors (the "Director Defendants") (collectively the "Defendants").    Based on what Plaintiffs allege to be a series of misleading statements, the Complaint asserts five causes of action against the Defendants:  1) breach of fiduciary duty; 2) abuse of control; 3) waste; 4) gross mismanagement; and 5) unjust enrichment.  A sixth claim arises out of the stock sales of a single Director, Carl W. Rausch.

On September 22, 2004, Defendants moved to dismiss the Complaint.  The Court denied the motion and found that Plaintiffs' claims that Defendants were "interested", satisfied "the threshold question of demand futility" and that the claims otherwise were adequately plead to survive the motion.  Following the decision, the Company's Board of Directors, pursuant to its authority under 8 Del. Code §§ 141(a) and (c)(1), appointed two of its members to serve as a Special Litigation Committee ("SLC" or "Committee").  These two directors were relative newcomers.  They did not join the Board until after the events alleged in the Complaint had transpired and except for their membership on the Board, they did not have any affiliation with the Company or any relationship with any of the Defendants.  The SLC was authorized to exercise the authority of the Board regarding what action, if any, should be taken concerning this derivative action.

The SLC retained counsel to investigate Plaintiffs' allegations and advise the Committee

concerning the Company's pursuit of the litigation. Counsel, like the Committee members, did not have any prior relationship with the Company or any of the defendants. Following the investigation, the SLC prepared a report to document its findings and conclusions. The SLC found that the Company would have to overcome difficult legal hurdles to prevail in the litigation and that it was unlikely to succeed. In addition to this merits analysis, the SLC found other considerations disfavored continued pursuit of the litigation. The SLC believed that continuation of the litigation would divert the Company's precious financial and human resources away from its business plan. The SLC was concerned that that the litigation was, and would continue to be, harmful to the Company's relationship with the Food and Drug Administration ("FDA"), its principal regulator, that it could impede the Company's ability to raise capital through offerings of its securities and that it could lead to the resignation of outside directors important to it. The SLC considered damages uncertain and was concerned by the Company's exposure to significant indemnification obligations and other legal costs and that the Company's insurer may deny coverage based on certain policy exclusions. A settlement in a related Securities and Exchange Commission action and the likely settlement of the stockholder class action, which has since occurred, were additional reasons for not pursuing Plaintiffs' claims. Accordingly, the SLC is requesting that the Court dismiss this derivative action.

## II.    BACKGROUND

### A.    The Derivative Complaint.

Biopure is a publicly traded biotechnology company, incorporated in Delaware in 1984 and based in Cambridge, Massachusetts. Compl. ¶¶ 2, 24. Hemopure, the Company's main product, is manufactured from purified cow's blood and acts as an oxygen delivery agent, similar to human donated blood.

There are two different possible indications for Hemopure relevant to the allegations before the Court here. On July 31, 2002, Biopure submitted a Biologic License Application ("BLA") to the FDA seeking regulatory approval to market Hemopure in the United States for

2

use in orthopedic surgery. Compl. ¶ 4. While the BLA was under consideration by the FDA, Biopure filed a proposed protocol to begin a new clinical trial of Hemopure in a different indication than the orthopedic surgery indication of the BLA. Specifically, the new protocol, first submitted to the FDA in March 2003, proposed a new clinical trial of Hemopure in trauma patients in a hospital setting, using a higher dose of Hemopure than had been used in earlier trials. Compl. ¶ 5. Within thirty days of the submission of the new, proposed protocol, the FDA put the trauma protocol on clinical hold. The FDA's review of the pending BLA continued. Later, on July 30, 2003, the FDA sent Biopure a letter (the "BLA Letter") stating that the FDA had completed its review of the BLA and asking questions and seeking further explanations about the BLA.

Plaintiffs' Complaint alleges that during the period March through December 2003, Defendants caused or permitted Biopure to mislead investors about the BLA Letter and prospects for obtaining FDA approval of Biopure's application to market its product Hemopure for use in orthopedic surgery. In addition, Plaintiffs allege that one of the directors, Carl Rausch, sold stock over the course of a year and a half, purportedly on the basis of insider information (knowledge of the undisclosed FDA communications), and that Rausch is subject to civil liability for common law insider trading violations. According to Plaintiffs, Biopure failed to disclose that the FDA placed on hold the proposed clinical trial for Hemopure for the trauma indication, failed adequately to disclose FDA communications concerning the BLA, especially the July 30, 2003 BLA Letter (Compl. ¶ 8), and otherwise failed to report accurately the Company's financial condition (Compl. ¶¶ 16 - 18).

On December 24, 2003, Biopure announced that the Company and two individuals had received "Wells Notices" from the United States Securities and Exchange Commission ("SEC") and described claims that might be asserted (Compl. ¶ 9). In the release, the Company stated that it believed that the Wells Notices concerned the Company's disclosures relating to its communications with the FDA and the trauma study and the BLA. In short order, a stockholder

class action was filed and then, on its heels, this derivative action was filed.

### B.    Appointment of the Special Litigation Committee.

On May 1, 2006, Biopure's Board of Directors voted to form the SLC, a special litigation committee composed of two outside directors, to conduct an investigation of the claims asserted by Plaintiffs in this action.  Declaration of Jay B. Pieper, Exhibit A ("Piper Decl. __").  Neither member of the SLC, Jay B. Pieper or Guido J. Neels, was on the Biopure Board or affiliated with Biopure during the time period relevant here, March 17, 2003 to December 24, 2003.  Pieper Dec. ¶3; Declaration of Guido J. Neels ¶3 ("Neels Decl. __")  Apart from their Board positions Mr. Pieper and Mr. Neels are unrelated to any of the Defendants.  In June 2006, the SLC retained John A. D. Gilmore and Theodore Altman of DLA Piper US LLP ("SLC Counsel") as its counsel and began the investigation.  *Id.* at ¶ ¶ 7.  SLC Counsel had no prior relation with the Company or any Defendants.  Declaration of John A. D. Gilmore ("Gilmore Decl.___").

### C.    The Special Litigation Committee's Investigation.

As detailed in the SLC Report, the SLC conducted a thorough examination of the allegations and claims in the Complaint.  Report of the Special Litigation Committee of Biopure Corporation at 5-7 (the "SLC Report").  Pieper Decl. Exhibit A ¶¶8, 9; Neels Decl. ¶¶8, 9.  SLC Counsel devoted over 1,000 hours to the investigation.  SLC Counsel interviewed numerous individuals, including all of the Defendants in this action, except one, who was in poor health, considered a large number of documents, and reviewed the record associated with the investigation by the United States Securities and Exchange Commission, which included transcripts of testimony taken from twenty witnesses (including all of the Defendants) and thousands of pages of documents.  SLC Counsel also interviewed Biopure's current CEO, Mr. Zafirelis, and a former chief counsel of and expert on the FDA, Peter Hutt.  SLC Counsel also reviewed the Company's insurance policies and indemnification obligations and considered applicable law.

4

SLC Counsel periodically reported to the Committee through telephone conferences and in-person meetings on the progress of their work and responded to questions from the Committee. Pieper Decl. ¶¶ 7, 8; Neels Decl. ¶¶ 7, 8.

The Committee personally heard presentations from counsel for both the Plaintiffs and the Defendants and received and reviewed a follow up letter from Plaintiffs' counsel. Pieper Decl. ¶8; Neels Decl. ¶7.

Through this process, the Committee reached conclusions about whether it was in the best interests of Biopure to pursue this litigation. At the Committee's request, SLC Counsel undertook to prepare a report on the investigation and the Committee's analysis and conclusions, consulting with the SLC as they prepared the report. Pieper Decl. Ex. B, ¶10; Neels Decl. ¶9.

### III.   ARGUMENT

**THE DERIVATIVE COMPLAINT SHOULD BE DISMISSED ON THE BASIS OF THE BIOPURE SLC'S EXERCISE OF BUSINESS JUDGMENT.**

The Complaint is expressly derivative in nature -- brought by two (of many thousands) Biopure shareholders, purportedly on behalf of Biopure, challenging the conduct of Biopure's agents concerning the disclosure of the FDA communications. Claims of this nature, if there are any, belong to the Company--in this case, a corporation incorporated under the laws of the State of Delaware.[1]  Critically, the question of whether to bring litigation on behalf of Biopure -- like any other business decision -- is not one to be resolved by the shareholders. Rather, that decision

---

[1] The rule in Massachusetts is that a "court should look to the law of the state of incorporation to determine the liability of corporate directors." See *Gerzof, M, M.D. v Cignal Global Commc'ns, Inc.,* No. 00-3337, 2001 WL914519 *2 (Mass. Super. Aug 13, 2001) (affirming the general rule in *Beacon Wool Corp. v. Johnson*, 331 Mass. 274, 279 (1954), which held that a Massachusetts court should look to the law of state of incorporation to determine corporate directors' liability); *Olsen v. Siefert*, No. 976456, 1998 WL 1181710, at *4 (Mass. Super. Aug. 28, 1998) (holding that Delaware law applied to a Delaware corporation's internal affairs and the relations between the corporation and its officers, directors and shareholders, including allegations of a breach of a duty); *Harrison v. Netcentric Corp.*, 433 Mass. 465, 471, 744 N.E.2d 622, 628 (2001) (adhering to and reaffirming Massachusetts policy that the "State of incorporation dictates the choice of law regarding the internal affairs of a corporation.").

is one reserved for a company's board of directors or, as in this case, a committee of the board exercising the board's power and authority. *See Zapata v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) ("Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 Del. C. § 141(a).") (footnotes omitted).[2]  Here, because the Board-appointed SLC determined that the claims in this action are not in the Company's best interests to pursue, this case should be dismissed.

A.    **Under Governing Delaware Law, The *Zapata* Test Determines Whether A Derivative Action Should Be Dismissed On The Basis Of A Decision By A Special Litigation Committee.**

1.    **Delaware Law Establishes The Authority Of Special Litigation Committees.**

The authority of a special litigation committee is governed by the law of the state of incorporation. *See Burks v. Lasker*, 441 U.S. 471, 486 (1979), *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 90 (1987).  Under Delaware law, a board of directors, by a resolution passed by the majority of the board, may designate a committee of directors to exercise all of the powers and authority of the board in the management and business affairs of the corporation. Thus, an SLC which has been properly delegated authority by a board has the power to move for dismissal or summary judgment if the board has that same power. *See Zapata*, 430 A.2d at 785.

Delaware statutory and case law provides that even in instances in which demand upon a

---

[2]  *See also Agostino v. Hicks*, 845 A.2d 1110, 1115-16 (Del. Ch. 2004):

> It is black-letter law that the board of directors of a Delaware corporation exercises all corporate powers and manages, or directs others in the management of, the business and affairs of the corporation.  One corporate power exercised by the board of directors is the conduct of the litigation that seeks to redress harm inflicted upon the corporation, including harm inflicted upon the corporation by its officers and directors from a breach of fiduciary duty owed to the corporation and its shareholders. (Internal footnote omitted.)

board, required under Fed. R. Civ. P. 23.1, has been excused, the board retains its power to control decisions involving corporate litigation. A majority of the board may delegate power to a special litigation committee of disinterested board members even in instances in which the majority of the board is interested. *Zapata*, 430 A.2d at 786 ("We do not think that the interest taint of the board majority is per se a legal bar to the delegation of the board's power to an independent committee composed of disinterested board members."). Once that delegation has been made by way of a board resolution, the special litigation committee may commence its own independent investigation of the allegations. Upon the conclusion of that investigation, the special litigation committee may decide to move to dismiss the action, take control of the litigation, or allow the derivative action plaintiffs to proceed with the litigation. *Zapata* 430 A 2d at 785 ("…the board entity remains empowered under 141(a) to make decisions regarding corporate litigation").

A special litigation committee may be composed of just a single director, or multiple directors, as long as each member of the committee is independent. *See* 8 Del. C. § 141(c)(1) ("The board of directors may, by resolution passed by a majority of the whole board, designate one or more committees, each committee to consist of one or more of the directors of the corporation."). The Delaware Supreme Court has noted as follows:

> By forming a committee whose fairness and objectivity cannot be reasonably questioned, giving them the resources to retain advisors, and granting them the freedom to do a thorough investigation and to pursue claims against wrongdoers, the company can assuage concern among its stockholders and retain, through the SLC, control over any claims belonging to the company itself.

*Biondi v. Scrushy*, 820 A.2d 1148, 1156 (Del. Ch. 2003).

2.    **Under Delaware Law, A Court Should Review The Limited Issues Raised By The SLC's Motion Under The Same Standard As That For A Motion For Summary Judgment.**

Upon the conclusion of the investigation, a special litigation committee may, if it deems it to be in the best interests of the company, make a motion to terminate the litigation. This motion has been described by the Delaware Supreme Court as a "hybrid summary judgment motion for dismissal because the stockholder plaintiff's standing to maintain the suit has been lost." *Zapata*, 430 A.2d at 787. The Court further noted

> The motion should include a thorough written record of the investigation and its findings and recommendations. Under appropriate Court supervision, akin to proceedings on summary judgment, each side should have an opportunity to make a record on the motion. As to the limited issues presented by the motion noted below, the moving party should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that the moving party is entitled to dismiss as a matter of law.

*Id. See also Kaplan v. Wyatt*, 484 A.2d 501, 506 (Del. Ch. 1984) *aff'd*, 499 A.2d 1184 (Del. 1985) (describing the motion as a "hybrid" between a motion to dismiss and a motion brought pursuant to Rule 41(a)(2)); *In re Oracle Corp.*, 824 A.2d 917, 928 (Del. Ch. 2003) ("the . . . SLC here 'should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that [it] is entitled to dismiss as a matter of law.'").

A court, when deciding a motion brought by an SLC to terminate a derivative action purportedly brought on behalf of a corporation, should look to the undisputed factual record (as it would under Fed. R. Civ. P. 56) and determine whether the SLC is independent, acted in good faith during the course of its investigation, and had reasonable bases for its recommendation of dismissal. The SLC has met these standards and this action should be dismissed in the best interests of Biopure.

**B.    Dismissal of This Action Is Appropriate Because The SLC Has Satisfied The** *Zapata* **Test**

In the current matter, the Biopure Board retained the power to control the litigation even after this Court denied Defendants' Motion to Dismiss both the initial and Proposed Second Amended Complaint, holding that demand upon the Board was futile under the *Aronson* test. *See* March 26 Order (Docket No. 40). *See Zapata*, 430 A.2d at 786 (court dismissed based on a committee's exercise of business judgment despite absence of demand on ground of futility). Consistent with this governing law, Biopure's Board, consisting of Zafiris G. Zafirelis, David N. Judelson, Dr. Charles A. Sanders, Daniel P. Harrington, Dr. C. Everett Koop, Guido J. Neels and Jay B. Pieper, met on May 1, 2006, and appointed Directors Guido J. Neels and Jay B. Pieper to serve as the members of the SLC.  The Board delegated the following authority to the SLC:

> [T]he Special Litigation Committee is authorized to exercise all lawful authority of the Board of Directors in determining what actions, if any, should, in the best interests of the Company, be taken with respect to the above-referenced Derivative Action and any similar suits that have been or may be filed on the Company's behalf.

Pieper Decl. Ex. B.  Since the Board properly delegated its power to the SLC, the SLC rightfully assumed control over this litigation, and it is now proper for the SLC to make this motion to terminate the litigation based on its own independent review of the facts.

Under the *Zapata* test, if the Court determines, under Rule 56 standards, that the SLC has demonstrated its independence, good faith, and has shown a reasonable basis for its findings, the Court may accept the SLC's judgment and terminate the action.  The SLC believes that its investigation and Report comfortably meets these standards and on that basis requests the Court to dismiss the case without further consideration.  The Court, of course, *may,* as a matter of discretion, decide to apply its own independent business judgment as to whether the motion should be granted but it is not required to do so. *Zapata*, 430 A.2d at 788-89.  Even if the Court

9

elects to apply its own business judgment, the SLC submits that the reasons that led it to determine that the action should be dismissed will lead the Court to the same conclusion.

1.    **The SLC Has Met Its Burden To Demonstrate Its Independence, Good Faith, And A Reasonable Basis Supporting Its Conclusions**

The burden is upon the SLC to demonstrate its independence and good faith and that it conducted a reasonable investigation. Zapata 430 A.2d at 788; *See also Kaplan,* 484 A.2d. at 507. On the basis of the record before the Court, the SLC has clearly satisfied its burden.

a.    **The SLC Is Independent.**

Mr. Neels and Mr. Pieper are experienced businessmen with broad outside director experience. Neels Decl. ¶2; Pieper Decl. ¶¶2, 3. They are indisputably independent. First, Mr. Pieper and Mr. Neels are not defendants and were not directors of, employed by or associated with Biopure during or prior to the period in question (March 2003 through December 2003). Mr. Pieper joined the Board in October 2004; Mr. Neels joined in August 2005. Both were asked to join the board by Mr. Zafirelis, who himself joined Biopure after the events giving rise to this litigation occurred. The conduct of Mr. Pieper and Mr. Neels has not been questioned in any of the investigations or litigations regarding the issues giving rise to this litigation.

Second, there are no "compromising ties" between the members of the SLC and the Defendants. Delaware courts have held that a "lack of independence can be shown when facts establish 'that the directors are 'beholden' to [the controlling person] or so under this influence that their discretion would be sterilized.'" *Rales v. Blasband,* 634 A.2d 927, 936 (Del Supr. 1993). Neither Mr. Pieper nor Mr. Neels even knew *any of the Defendants before they joined the Board.* Pieper Decl. ¶4; Neels Decl. ¶3. Moreover, apart from sitting on the Board with the Defendants that are still on the Board, neither Mr. Pieper nor Mr. Neels has formed any business

10

or social ties with the Defendants since joining the Board. Pieper Decl. ¶5; Neels Decl. ¶5. [3]

Third, the SLC's independence is confirmed by the Board resolution creating it. The SLC was given complete, unfettered authority to determine what action to take with respect to the Delaware litigation.

Furthermore, the SLC retained SLC Counsel as its own independent counsel to assist it in conducting its investigation. *See In re Par Pharmaceutical, Inc.*, 750 F.Supp. 641, 647 (S.D.N.Y. 1990) ("Both New York and Delaware law contemplate that a special litigation committee be represented by independent counsel."). SLC Counsel has not represented Biopure or any of the individual Defendants. Gilmore Decl. ¶¶3, 4.

### b.    The SLC Has Established Its Good Faith In Conducting Its Thorough Investigation.

One Delaware court describes the inquiry regarding the SLC's good faith as whether it "act[ed] in a good faith effort to benefit the corporation." *Carlton Investments v. TLC Beatrice Intern. Holdings, Inc.*, No. 13950, 1997 WL 38130 at *1 (Del. Ch. Jan. 29, 1997).[4] The good faith of the SLC should be measured relative to how seriously it conducts the investigation and the level of honesty and conviction that it brings to the review process. The SLC has clearly met

---

[3] One Delaware court noted that even a fifteen year professional and personal relationship between the CEO and a director was not enough, standing alone, to raise a reasonable doubt as to the director's independence. *See, Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 980-81 (Del. Ch. 2000). In regard to Messrs. Pieper and Neels, they have not established any personal relationships with their fellow Board members nor do they have any professional relationship beyond the fact they sit on the Biopure Board.

[4] The New York Court of Appeals has looked at the good faith of the SLC in similar terms. In *Auerbach v. Bennett*, 47 N.Y.2d 619 634-35 (N.Y. 1979), the court cautioned:

> Proof, however, that the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham, consistent with the principles underlying application of the business judgment doctrine, would raise questions of good faith or conceivably fraud which would never be shielded by that doctrine.

this standard.

The good faith of the SLC is evidenced by its independence from ties to the Defendants and by the independence of their counsel. The good faith of the SLC is further evidenced by the scope, care, and diligence of their investigation described in Section II B supra and evidenced by their Report. The SLC's investigation lasted from June 2006 to September 2006. SLC's counsel spent over 1000 hours on the investigation. The Report, which is more than 90 pages long, was delivered in November 2006. To ensure that the SLC had not missed anything from its counsel's review of the extensive written record, from the many interviews conducted, and from their analysis of applicable legal issues, the SLC gave counsel for the Defendants and counsel for the Plaintiffs an opportunity to meet with them and to bring facts or law to their attention that they thought were applicable to the work of the SLC. Plaintiffs' counsel followed up this meeting with a letter to the SLC which the SLC reviewed and considered in its Arguments.

The SLC clearly acted in good faith in conducting an extensive and thorough investigation of the claims brought by Plaintiffs in this action. The SLC acted in the best interests of the Company at all times during the course of its investigation and with the requisite level of honesty and conviction both expected and required in this process.

> c.    **The SLC Has Demonstrated The Reasonableness Of Its Conclusions.**

The Report itself is a testament to the SLC's good faith investigation. It details the process, rationales and conclusions of the SLC. The SLC considered a range of issues: the merits of the allegations and claims, the economic and business needs of the Company and the benefits and costs of pursuing litigation. In determining whether the SLC has reasonable bases for the conclusions contained in its Report, the Court should consider whether the SLC conducted a thorough review of all of Plaintiffs' claims including the length of time the SLC

12

took to conduct its review; the scope and depth of its review of the facts; and its legal analysis of the claims in the Complaint. The Court should also consider the SLC's review and evaluation of the practical consequences to the well being of Biopure if the litigation were to be continued.[5]

The Courts have found reports prepared with similar diligence to be a proper basis for ordering the dismissal of a derivative action. In *Lewis v. Fuqua*, 502 A.2d 962 (Del. Ch. 1985), the court found a special litigation committee's investigation to be reasonable where it lasted four and a half months and examined all the issues presented in the complaint as well as all possible claims for recovery. The court stated that it was not to take an independent look at the merits of the lawsuit, but rather it must find that the special litigation committee's consideration of the merits of the claims alleged was reasonable. *Id.* at 967.

Commentators have recognized that a special litigation committee may consider a number of factors in determining whether a derivative action should be terminated: 1) the merits of the claim; 2) injury to the corporation; 3) costs of prosecution; 4) effect on operations; 5) cost-benefit analysis; 6) knowledge and motivation; and 7) effect of remedial action. Balotti and Finkelstein, Del. Law of Corps. & Bus. Orgs., 3d Ed. § 13.16. (1998). The SLC considered many of these factors during the course of the investigation.

        **(i)**      **The SLC Had A Reasonable Basis In Fact and Law For Concluding That, Based On The Merits Of The Claims, The Derivative Action Should be Dismissed**

With respect to its consideration of the merits of the claims, the SLC, through its counsel, prepared a detailed chronology of events and facts relating to the claims in the case based on the

---

[5] The court examined the standard for reasonable bases for a special litigation committee's conclusions in *Katell v. Morgan Stanley Group*, 1995 WL 376952 (Del. Ch. June 15, 1995). The court observed that the committee must demonstrate it has reasonable bases for its conclusions by pointing to undisputed facts. *Id.* at *12 citing *Zapata*, 430 A.2d at 787. However the *Kaplan* court explained that the SLC does not have to demonstrate that the parties do not dispute material facts regarding the plaintiffs' allegations, but the SLC must show that plaintiffs do not dispute the evidence relied on by the SLC. *Id.* citing *Kaplan*, 484 A.2d at 519. The court went on to explain that the SLC may use undisputed facts to form the bases of its own conclusions as to the factual disputes concerning Plaintiffs' allegation. *Id.*