interviews and document reviews conducted by its Counsel, and based on the record of SEC's own extensive investigation. Pieper Ex. B pp 24-64. The SLC reviewed the law applicable to the various claims. Pieper Decl. Ex B pp 67-70. The SLC then considered the facts and how they related to the various claims against each of the defendants. Pieper Decl., Ex B pp 70-86.

Since Biopure is a Delaware corporation, the SLC reviewed the standards of conduct required of officers and directors under Delaware law. The SLC focused in particular on the Delaware business judgment rule, and noted that there is no credible claim of breach of duty of loyalty (with the possible exception of the insider trading claim against Director Rausch) or other circumstances under which the rule may not apply. Plaintiffs must overcome the presumptions of the rule to establish that any of the Defendants are liable for breach of fiduciary duty or any of the variations of that claim alleged in the complaint. *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (plaintiffs, who bring suit against defendants for breach of fiduciary duties, face "a near-Herculean task" in rebutting the business judgment rule).

The business judgment rule presumes that the Defendants, in making corporate decisions, "act(ed) in good faith, on an informed basis, (and with the honest belief) that their action (was) in the best interests of the Company." *Id*. Essentially, in the absence of "fraud, bad faith, or self-dealing" or an irrational business purpose behind the contested decisions, the Defendants' actions will be upheld. *In re Walt Disney Co. Deriv. Litig.*, No. 15452, 2005 Del. Ch. LEXIS 113, at *151 (Del. Ch. Aug. 9, 2005) ("The business judgment rule serves to protect and promote the role of the board as the ultimate manager of the corporation" and operates to preclude a court, who is "ill equipped to engage in post hoc substantive review of business decision," "from imposing itself unreasonably on the business and affairs of the corporation.").

Significantly, a court will not examine "the *reasonableness* of the Board's actions" if the "Board exercised *some* business judgment." *Official Comm. Of Unsecured Creditors of Integrated Health Services v. Elkins*, No. 20228-NC, 2004 WL 1949290, at *14 (Del. Ch. Aug. 24, 2004) (emphasis in the text); *see also, In re LTV Steel Co., Inc.*, 333 B.R. 397, 410 (N.D.

14

Ohio 2005) ("[i]f the director takes certain *minimal* steps, such as being informed about the background of a transaction, the rule protects a director from being held liable for the consequences of his or her actions"); *Official Committee*, 2004 WL 1949290, at *12 n. 58 (differentiating between nondeliberation and not enough deliberation in determining a board's liability).

Under Delaware law, both officers and directors are protected by the business judgment rule. See *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995) ("[T]he business judgment rule attaches to protect corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments."); *Kaplan v. Centex Corp.*, 284 A.2d 119, 124 (Del. Ch. 1971) ("the decision of the executive officers may also come within the (business judgment rule)"); *In re Tower Air, Inc.*, 416 F.3d at 238-239 (discussing that plaintiffs overcame the presumptions of the rule as to both the officers and directors of the Company). Accordingly, here, all Defendants are entitled to the presumption of the business judgment rule.

In view of the Rule's application to directors and officers, in order to succeed on the pleaded claims, the Company would be required to rebut the rule's presumption and demonstrate that Defendants acted in bad faith, fraudulently, or with self-interest, and that Defendants' actions had no rational basis. Meeting this burden is particularly difficult in a case based on disclosure failures. In Delaware, a plaintiff must prove that defendants acted "knowingly" or "deliberately" in disseminating false information that resulted in corporate injury or damage to investors. See *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1989) ("directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty."); see also *Shamrock v. Iger*, No. 1330-N, 2005 Del. Ch. LEXIS 83, at *22-23 (Del. June 6, 2005) ("plaintiff must show that board 'deliberately' misled stockholders"). A plaintiff must overcome a "high bar" to prove a disclosure claim and the level of proof is even stricter than the level of scienter required for common law fraud. See *Metro Communications Corp. v. Advanced Mobilecomm Technologies, Inc.*, 854 A.2d 121, 157-58 n.

15

88 (Del. 2004) (plaintiffs must demonstrate that defendants acted "knowingly" in making misleading disclosures, not just recklessly). Thus, under Delaware law, the burden that would apply to the proposed claims would be even more stringent than the burden imposed on a plaintiff asserting a common law fraud or securities claim. *See McLean v. Alexander*, 599 F.2d 1190, 1202 (3d Cir. 1979) ("standard of liability for common law fraud under Delaware law is the same as that for liability in an action implied from § 10(b)"). The SLC examined the allegations against each of the Defendants in light of the above.

Plaintiffs' Complaint asserts six causes of action: 1) breach of fiduciary duty; 2) abuse of control; 3) gross mismanagement; 4) waste of corporate assets; 5) unjust enrichment; and 6) breach of fiduciary duty for insider selling and misappropriation of information.

In regard to the non-management directors (i.e., Dr. Sanders, Mr. Harrington, Mr. Judelson, Dr. Koop and Dr. Crout), the allegations in the Complaint are sparse. In essence, Plaintiffs claim that these Directors participated in the issuance of the press releases and financial filings, which were purportedly misleading for failing to disclose, among other things, the "clinical hold" and the purported "complete response letter." However the Plaintiffs made no allegations, nor has the SLC seen any evidence, that any Director was inattentive or disregarded or failed to consider carefully information provided by corporate officers or any other source. Furthermore, in the case of the clinical hold, Plaintiffs cannot prove and the SLC did not conclude that these Defendants *knew* of the clinical hold at certain times. Moreover, the Directors had no reason to doubt that management was providing accurate and complete information based on management's understanding of relevant circumstances.

The SLC's review of the evidence shows that Drs. Sanders and Crout, two individuals with some experience in working with the FDA and knowledge about the drug approval process, used their expertise and backgrounds to make informed conclusions based on the information available to them. The SLC's review further showed that it was reasonable for non-medical members of the Board to rely on explanations from management and others more versed in FDA

matters to interpret the FDA letter and its implications for Biopure. The SLC's interview of Peter Hutt, a leading FDA expert, revealed that the views of Drs. Sanders and Crout relative to the BLA letter were reasonable. Finally, the SLC's investigation found insufficient evidence to suggest that any of the outside Directors were motivated to mislead investors in order to inflate Biopure's share price. In addition, the nature of the allegations against these Directors, namely that they would temporarily mislead the public about the progress of the BLA, when the public would surely find out once the FDA accepted or rejected the application, does not sufficiently illustrate motive. Accordingly, the SLC reasonably concluded that there is no basis for Plaintiffs claims that these directors were deficient in performing their duties even if the Directors' judgments were wrong under the circumstances.[6] Pieper Decl. Ex A ¶¶70-74.

With respect to Defendant Moore, the SLC did not see anything in the facts alleged, and its investigation has uncovered no facts that would sustain Plaintiffs' allegations that Mr. Moore acted recklessly or with fraudulent intent with respect to disclosures concerning the BLA Letter and the development of Hemopure. The SLC believes that Plaintiffs failed to set forth any facts that might overcome the presumptions of the business judgment rule. The SLC also noted that Mr. Moore did not personally profit from any transactions in Biopure stock during the period from April 9, 2003 to the end of the relevant period. Mr. Moore has never sold any Biopure shares with the exception of one private transaction involving another Biopure director, in which

---

[6] The SLC's investigation occurred after the SEC conducted its own thorough investigation. As previously discussed, the SLC benefited from the documents gathered and interviews conducted during that investigation. Moreover, SEC determined after its own comprehensive investigation that there was no basis for claims against Dr. Crout, Mr. Harrington, Mr. Judelson, Dr. Koop, and Dr. Sanders, giving weight to the SLC's own conclusions. As to the Defendants against whom the SEC did pursue claims, it should be noted that the SEC only considers the basic issue of whether a valid basis exists for alleging a violation of law. The SEC does not consider the ability to recover losses or the cost of litigation. It also does not consider the legitimate business interests of the Company -- the cost to the Company of litigation, the disruption to the Company's business, the effect on the Company's Board, the effect on the Company's ability to raise capital, and -- perhaps most importantly, the effect on the Company's relations with the regulatory agency in whose hands the fate of its product rests, the FDA. As discussed below, the SLC considered these interests and, in the valid exercise of its own business judgment, determined that no claims should be pursued.

Mr. Moore did not earn a profit. The SLC also failed to find any evidence that Mr. Moore was under any pressure, from Biopure's Board or otherwise, in relation to the price of Biopure's stock. Pieper Decl. Ex B, ¶¶ 75-78.

The SLC's review of the allegations against Defendant Richman failed to find that Dr. Richman's decisions and disclosures were made in bad faith. Although there is a dispute in the record regarding conversations between Dr. Richman and a member of the FDA, the SLC does not have a reasonable basis for crediting either version of events more than the other. In addition, the question of whether Dr. Richman's interpretation of the BLA Letter was reasonable is more significant than the details of those conversations. As previously discussed, Peter Hutt testified that both Mr. Moore and Dr. Richman's interpretation of the letter was reasonable. In addition, there is no evidence that Dr. Richman ever sold stock or attempted to sell stock or would have personally benefited from the failure to disclose information in any other manner. The SLC reasonably concluded that his decisions and disclosures were not in bad faith. Pieper Decl. Ex B ¶¶ 79-80.

With respect to the majority of the allegations against Jane Kober, the evidence is clear that Ms. Kober did not have any additional relevant information that was not known to Mr. Moore or Dr. Richman concerning the events in question. The SLC also found that Ms. Kober properly relied upon Mr. Moore and Dr. Richman and others (including expert regulatory counsel at Hyman Phelps) to interpret the meaning of regulatory communications from the FDA and to advise on disclosure issues in light of the interpretations provided to her *and* the content of the regulatory communications. The SLC found that Ms. Kober's decisions regarding disclosure were reasonable and cannot be equated with recklessness or intentional misconduct. Nor has the SLC seen any evidence or motive for her to render advice other than to the best of her ability and based on a reasonable review of all available information. Ms. Kober did not personally profit from any transactions in Biopure stock, and, therefore she lacked any motive to artificially inflate the value of Biopure shares. Pieper Decl. Ex B ¶¶ 82-83.

The SLC's review of the allegations against Mr. Rausch shows that he had a limited role in the events alleged in the Complaint and the evidence fails to show that he acted recklessly or in bad faith or disregarded his obligations to Biopure. The evidence also fails to support Plaintiffs' allegation that Mr. Rausch's motivation for selling Biopure shares was based on non-public, inside information. Mr. Rausch's testimony, which is corroborated by others' testimony and the record, makes it highly unlikely his sales were "based on non-public, material information", rather than his own personal financial situation. In order for Plaintiffs to establish their claim against Mr. Rausch for insider trading, they must show that he: 1) possessed material, non-public Company information, and 2) that he used that information improperly by making trades because he was motivated, in whole or in part, by the substance of that information. *See In re Oracle,* 867 A.2d 904, 934, 954-55 (Del. 2004) (holding that motivation behind the sales as well as the size of the stock sales were part of the court's analysis). The SLC's review demonstrates that it is unlikely Plaintiffs will be able to sustain this burden. [7]Pieper Decl. Ex B pp 83-87.

> (ii) **The SLC Also Had A Reasonable Basis For Concluding That Even If The Action Had Sufficient Merit To Justify Its Prosecution, Economic And Business Considerations Dictate That The Action Not Be Pursued**

The SLC, in addition to considering the merits of the of the derivative action, also weighed the potential benefits and detriments to Biopure from the prosecution of the derivative action, assuming that the case has sufficient legal merit to justify its prosecution. These factors, as the SLC reasonably concluded, weigh very heavily against the continuance of this action. Pieper Decl. Ex B pp 86-92.

Mr. Zafirelis informed the SLC that potential investors had stressed the importance of the

---

[7] The SEC did not assert a claim against him for insider trading. The claims it did assert were settled with a consent on terms in which Rausch neither admitted nor denied the allegations.

Company not being involved in the litigation out of a concern that money invested could be dissipated along with the time and attention of Company personnel. The SLC believes that an affirmative business judgment to pursue this litigation would not be looked upon favorably by the investment community, which is so vital to the continued success of the Company. This is particularly true as the Company has settled both the SEC action and the class action.

The SLC also noted the fact that as part of the settlement with the SEC, Biopure agreed to retain an independent compliance consultant to conduct a comprehensive review of Biopure's disclosure, compliance and other policies and procedures and to propose procedures designed to ensure that all material information concerning clinical trial results and the FDA review and approval process is disclosed in a timely manner. Biopure is obligated to adopt the consultant's recommendations, subject to a limited right of Biopure to raise objections. Based on this, the SLC believes that corporate governance reforms will be adequately addressed by the consultant.

Mr. Zafirelis and Biopure's counsel, in their meetings with the SLC, also expressed great concern that the continuation of the derivative action could lead to further disruption of Biopure's relationship with the FDA. If this action proceeds, FDA personnel, with whom the Company undoubtedly will have future interaction, will be called as witnesses. As factual disputes exist between some of the Defendants and FDA employees, deposing and questioning FDA employees could lead to aggressive cross-examination by counsel for some of the Defendants, which does not seem to be in the to the best interests of Biopure.

The SLC's review found that if a business judgment was made to prosecute the derivative action on behalf of the company, there is a substantial danger that all of the current Board members named as defendants would resign, as would the general counsel. The CEO, Zafiris Zafirelis, informed the SLC that it would be difficult to find new Board members and a new general counsel to fill those roles, especially given the important role the current Board members

have played in helping the company to obtain continued financing. [8]

The SLC also examined the damages allegedly suffered by Biopure: loss of market capitalization, loss of goodwill, impairment of ability to raise funds, costs of defending the SEC and class actions, and diversion of management attention from its core business. The SLC believes that returns on all of these claims are speculative at best. First, the costs of defending the SEC and the class action were paid by insurance (except for the applicable deductible). Second, the class action has settled in principle (an expected result when the SLC conducted its review, as counsel explained) and the settlement will be paid by insurance. Third, it is entirely speculative to assert that the Company suffered greater loss of goodwill by disclosing in December 2003 what Plaintiffs essentially say should have been disclosed sooner. The SLC further believes that issues such as impairment of the Company's ability to raise money and a diversion of management attention would be aggravated and not solved by the continuance of this action.

The SLC also took into account the fact that Biopure would be responsible for the payment of legal fees for prosecuting the action if it decided to proceed with the action. Pursuant to the Company's Bylaws and Delaware law, Biopure is obligated to provide a defense to all Defendants in the derivative action, subject to the right of recoupment if it is ultimately determined that the Defendants were not entitled to indemnification. The SLC believes that it is highly likely that each of the nine Defendants would insist on separate counsel as many of the Defendants did in the SEC investigation. Biopure would be required to advance funds--funds that it desperately needs--to lawyers. Moreover, even if a Defendant is found liable to Biopure, under Delaware law, the Court of Chancery or the relevant court may still determine that, despite the adjudication against the Defendant, he or she is entitled to indemnity under the

---

[8] Of the four officers and/or directors that the SEC brought actions against, three (Messrs Moore, Richman, and Rausch) have left the company. The fourth remains as general counsel but settled with the SEC.

circumstances. 8 Del. Code § 145(b). Therefore, in addition to being exposed to legal fees, Biopure may find itself legally responsible for any judgment that it obtained.

Finally, the SLC considered the fact that the Company's directors and officers insurance policy contains an "insured versus insured" exclusion. If Biopure, through the SLC or otherwise, endorses the continued maintenance of the suit and, thereby participates or assists in an action against another insured, coverage is generally excluded. The SLC believes that if this action were to proceed, the insurer would likely invoke the exclusion and deny coverage, and Biopure would then find itself in a dispute with the insurer about the applicability of the exclusion provision, creating further litigation.

The SLC believes that its comprehensive review of the merits of the Complaint, and its best interests analysis relative to the effect of the continuance of the litigation on the Company, reasonably support its conclusion that the case be dismissed. Based on the SLC's demonstration of its independence and good faith as well as the bases for its conclusions as required under the Delaware Supreme Court's decision in *Zapata*, the SLC respectfully submits to this Court that it should adopt its recommendation to terminate this litigation, as it is in the best interests of the Company to do so.

2. **There Is No Need For The Court To Apply Its Own Business Judgment Since The SLC Has Clearly Demonstrated Its Independence And Good Faith And The Bases Supporting Its Conclusions**

As the SLC has met the standards of the first step of the *Zapata* test, it is unnecessary for this Court to substitute its own business judgment in place of the SLC's independent judgment. The Court may simply accept the SLC decision. Under the *Zapata* standard, the Court has the discretion to conclude that even if the SLC Report meets all of required elements (independence, good faith, and reasonable basis), the Court may still apply its own independent business judgment in determining whether to dismiss the action. *Zapata*, 430 A.2d at 789. Nevertheless, courts have recognized that: "[t]he second step is used when the first step is met, but the result still appears 'irrational' or 'egregious' or some other extreme word." *Kindt v. Lund*, No. Civ. A.

17751-NC, 2003 WL 21453879 (Del. Ch. May 30, 2003) *citing Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Civ. No. 13950, 1997 Del. Ch. LEXIS 86, at *7 (Del. Ch. June 9, 1997).[9] Whether to proceed to this second step is left wholly to the discretion of the court. *See, e.g. Kaplan v. Wyatt,* 499 A.2d at 1184, 1192 (Del. 1985); *In re Oracle Corp.*, 824 A.2d at 928.

The SLC submits that there is no need for this Court to exercise its own independent business judgment in light of the extensive and detailed investigation already performed by the SLC. The SLC's review has already taken into account the factors described above by the *Zapata* court, namely ethical, commercial, promotional, public relations, employee relations, fiscal and legal interests. There is also nothing "irrational" or "egregious" about the SLC's conclusions that the continuance of this litigation is not in the best interests of the Company.

Even if this Court chooses to undertake the second step under the *Zapata* test, the SLC believes that the Court will come to the same conclusions drawn by the SLC and determine that the continuation of this action is clearly not in the best interests of Biopure and that this case should be terminated.

## IV. CONCLUSION

For the forgoing reasons, the SLC, on behalf of Biopure Corporation, respectfully submits that the Complaint be dismissed, in its entirety, with prejudice.

---

[9] In a footnote, the court in *Carlton Investments* observed

> The idea suggested in *Zapata* that the court may -- for reasons of public policy -- require the board to continue a litigation even though an independent committee determined in good faith and on appropriate information that a proposed settlement is advantageous to the corporation, is difficult to understand. It is fair to ask, on what basis may a court legitimately impose the cost and risk of litigation on a party in order to achieve *only a perceived public benefit?* In other contexts the Constitution explicitly protects against such *extractions*. (i.e., *takings* clause of U.S. Constitution).

*Id.* at n 4. (emphasis in the original)

Respectfully Submitted,

SPECIAL LITIGATION COMMITTEE TO
BIOPURE CORPORATION

By its attorneys,

/s/ John A.D. Gilmore
John A.D. Gilmore (BBO #193060)
DLA PIPER US LLP
33 Arch Street, 26th Floor
Boston, MA  02110-1447
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Dated:  June 22, 2007

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 22, 2007.

/s/ John A.D. Gilmore