LEXSEE 845 A.2D 1040

**MONICA A. BEAM, derivatively on behalf of MARTHA STEWART LIVING OMNIMEDIA, INC., Plaintiff Below, Appellant, v. MARTHA STEWART, SHARON L. PATRICK, ARTHUR C. MARTINEZ, NAOMI O. SELIGMAN, DARLA D. MOORE; JEFFREY W. UBBEN, L. JOHN DOERR, and MARTHA STEWART LIVING OMNIMEDIA, INC., Defendants Below, Appellees.**

**No. 501, 2003**

**SUPREME COURT OF DELAWARE**

**845 A.2d 1040; 2004 Del. LEXIS 162**

**February 3, 2004, Submitted
March 31, 2004 Decided**

**PRIOR HISTORY:**      [**1] Court Below: Court of Chancery of the State of Delaware, in and for New Castle County. Upon appeal from the Court of Chancery. C.A. No. 19844.
Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 833 A.2d 961, 2003 Del. Ch. LEXIS 98 (Del. Ch., 2003)

**DISPOSITION:**    Affirmed.

**COUNSEL:** Pamela S. Tikellis, Esquire (argued), Robert J. Kriner, Jr., Esquire, and Brian D. Long, Esquire, of Chimicles & Tikellis LLP, Wilmington, Delaware; Of Counsel: Nicholas E. Chimicles, Esquire and James R. Malone, Jr., Esquire, of Chimicles & Tikellis LLP, Haverford, Pennsylvania; Lawrence A. Sucharow, Esquire and Joel Bernstein, Esquire of Goodkind, Labaton, Rudoff & Sucharow LLP, New York, New York; Reginald A. Krasney, Esquire of Wayne, Pennsylvania, for Appellant.

A. Gilchrist Sparks, III, Esquire, and S. Mark Hurd, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Barry G. Sher, (argued), and Brett D. Jaffe, Esquire, of Fried, Frank, Harris, Shriver & Jacobson LLP, New York, New York, for Appellees Patrick, Martinez, Seligman, Moore, and Ubben and Nominal Appellee Martha Stewart Living Omnimedia, Inc.

Andre G. Bouchard, Esquire, of Bouchard, Margules [**2] & Friedlander, P. A., Wilmington, Delaware; Of

Counsel: Barbara Moses, Esquire, of Morvillo, Abramowitz, Grand, Iason & Silberberg, P. C., New York, New York, for Appellee Stewart.

**JUDGES:** VEASEY, Chief Justice, HOLLAND, BERGER, STEELE and JACOBS, Justices, constituting the Court en banc.

**OPINION BY:** VEASEY

**OPINION**

    [*1044]  **VEASEY**, Chief Justice:

    In this appeal we review and affirm the judgment of the Court of Chancery in dismissing under Rule 23.1 a claim in a derivative suit because the plaintiff failed to make presuit demand on the corporation's board of directors and failed to demonstrate demand futility. In his opinion, [1] the Chancellor dealt with several issues and provided a detailed account of the facts of the case. We summarize only those facts most pertinent to this appeal. The single issue before us is that of demand futility, no appeal having been taken on the other issues.

        1    *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961 (Del. Ch. 2003).

    The Chancellor analyzed in [**3] detail the plaintiff's demand futility allegations. We agree with the Chancellor's well-reasoned opinion. But, pursuant to our plenary appellate review, we undertake a further

845 A.2d 1040, *1044; 2004 Del. LEXIS 162, **3

explication of certain points covered by the Chancellor, including the matter of director independence.

*Facts*

The plaintiff, Monica A. Beam, owns shares of Martha Stewart Living Omnimedia, Inc. (MSO). Beam filed a derivative action in the Court of Chancery against Martha Stewart, the five other members of MSO's board of directors, and former board member L. John Doerr. [2] In four counts, Beam's amended complaint (the "complaint") challenged three types of activity by Stewart and the MSO board. The

Court of Chancery dismissed three of the four claims under Court of Chancery Rule 12(b)(6). Those dismissals were not appealed and are not before us.

> [2] The action against Doerr was dismissed with prejudice and no appeal was taken. Therefore, nothing involving Mr. Doerr is before this Court.

In the single claim at issue on appeal [**4] (Count 1), Beam alleged that Stewart breached her fiduciary duties of loyalty and care by illegally selling ImClone stock in December of 2001 and by mishandling the media attention that followed, thereby jeopardizing the financial future of MSO. The Court of Chancery dismissed Count 1 under Court of Chancery Rule 23.1 because Beam failed to plead particularized facts demonstrating presuit demand futility.

When Beam filed the complaint in the Court of Chancery, the MSO board of directors consisted of six members: Stewart, Sharon L. Patrick, Arthur C. Martinez, Darla D. Moore, Naomi O. Seligman, and Jeffrey W. Ubben. The Chancellor concluded that the complaint alleged sufficient facts to support the conclusion that two of the directors, Stewart and Patrick, were not disinterested or independent for purposes of considering a presuit demand.

The Court of Chancery found that Stewart's potential civil and criminal liability for the acts underlying Beam's claim rendered Stewart an interested party and therefore unable to consider demand. [3] The Court also found that Patrick's position

[*1045] as an officer and inside director, [4] together with the substantial compensation she receives from the [**5] company, raised a reasonable doubt as to her ability

objectively to consider demand. [5] The defendants do not challenge the Court's conclusions with respect to Patrick and Stewart.

> [3] Stewart was, at all relevant times, MSO's chairman and chief executive. She controls over 94 of the shareholder vote. *Beam*, 833 A.2d at 966. She also personifies MSO's brands and was its primary creative force. *Id*. at 968.
> [4] Patrick is the president and chief operating officer of MSO. *Id*. at 966.
> [5] *Id*. at 977-78.

We now address the plaintiff's allegations concerning the independence of the other board members. We must determine if the following allegations of the complaint, and the reasonable inferences that may flow from them, create a reasonable doubt of the independence of either Martinez, Moore or Seligman: [6]

> 4. Defendant Arthur C. Martinez ("Martinez") is a director of the Company, a position that he has held since January 2001. Until December [**6] 2000, Martinez served as Chairman of the board of directors of Sears Roebuck and Co., and was its Chief Executive Officer from August 1995 until October 2000. Martinez joined Sears, Roebuck and Co. in September 1992 as the Chairman and Chief Executive Officer of Sears Merchandise Group, Sears's former retail arm. From 1990 to 1992, he was Vice Chairman of Saks Fifth Avenue and was a member of Saks Fifth Avenue's board of directors. Martinez is currently a member of the board of directors of PepsiCo, Inc., Liz Claiborne, Inc. and International Flavors & Fragrances, Inc., and is the Chairman of the Federal Reserve Bank of Chicago. *Martinez is a longstanding personal friend of defendants Stewart and Patrick. While at Sears, Martinez established a relationship with the Company, which marketed a substantial volume of products through Sears. Martinez was recruited for the board by Stewart's longtime personal friend, Charlotte Beers. Defendant Patrick was quoted in an article dated March 22, 2001*

845 A.2d 1040, *1045; 2004 Del. LEXIS 162, **6

appearing in Directors & Board as follows: "Arthur is an old friend to both me and Martha."

5. Defendant Darla D. Moore ("Moore") is a director of the Company, a position [**7] she has held since September 2001. Moore has been a partner of Rainwater, Inc., a private investment firm, since 1994. Before that, Moore was a Managing Director of Chase Bank. Moore is also a trustee of Magellan Health Services, Inc. *Moore is a longstanding friend of defendant Stewart. In November 1995, she attended a wedding reception hosted by Stewart's personal lawyer, Allen Grubman, for his daughter. Also in attendance were Stewart and Stewart's friend, Samuel Waksal. In August 1996, Fortune carried an article highlighting Moore's close personal relationship with Charlotte Beers and defendant Stewart. When Beers, a longtime friend and confidante to Stewart, resigned from the Company's board in September 2001, Moore was nominated to replace her.*

6. Defendant Naomi O. Seligman ("Seligman") is a director of the Company, a position that she has held since [*1046] September 1999. Seligman was a co-founder of Cassius Advisers, an e-commerce consultancy, where she has served as a senior partner since 1999, and is a co-founder of the Research Board, Inc., an information technology research group, where she served as a senior partner from 1975 until 1999. Seligman currently serves as [**8] a director of Akamai Technologies, Inc., The Dun & Bradstreet Corporation, John Wiley & Sons and Sun Microsystems, Inc. *According to a story appearing on July 2, 2002 in The Wall Street Journal, Seligman contacted the Chief Executive Officer of John Wiley & Sons (a publishing house) at defendant Stewart's behest last year to express concern over its planned publication of a biography that was critical of Stewart.*

***

8. Martinez, Moore, Seligson [sic], and Ubben are hereinafter referred to collectively as the Director Defendants. By reason of Stewart's overwhelming voting control over the Company, each of the Director Defendants serves at her sufferance. Each of the Director Defendants receive [sic] valuable perquisites and benefits by reason of their service on the Company's Board.

...

***

6   The Court of Chancery did not address Ubben's ability to consider demand in its Rule 23.1 analysis of Count 1. The parties also do not press the issue here, perhaps because Beam's demand futility allegations with respect to Ubben related more to a claim that was dismissed under Rule 12(b)(6) than to the Rule 23.1 dismissal of Count 1. Because the parties do not argue and the court below did not address the issue of Ubben's independence, we do not address it. Thus, we assume for purposes of this appeal that the presumption of Ubben's independence is unrebutted. The plaintiff also appears to have waived her claim that Martinez is not independent. *See infra* note 33.

[**9] **DEMAND ALLEGATIONS**

73. ....No demand on the Board of Directors was made prior to institution of this action, as a majority of the Board of Directors is not independent or disinterested with respect to the claims asserted herein.

***

77. *Defendant Martinez is not disinterested in view of his longstanding personal friendship with both Patrick and Stewart.*

78. *Defendant Moore is not disinterested in view of her longstanding personal relationship with defendant Stewart.*

79. *Defendant Seligman is not disinterested; she has already shown that she will use her position as a director*

845 A.2d 1040, *1046; 2004 Del. LEXIS 162, **9

*at another corporation to act at the behest of defendant Stewart when she contacted the Chief Executive Officer of John Wiley &Sons in an effort to dissuade the publishing house from publishing a biography that was critical of Stewart.*

80. The Director Defendants are not disinterested as they are jointly and severally liable with Stewart in view of their failure to monitor Stewart's actions. Moreover, pursuit of these claims would imperil the substantial benefits that accrue to them by reason of their service on the Board, given Stewart's voting control. [7]

> [7] Amended Complaint at 2-4, 19-20, *Beam*, 833 A.2d 961 (emphasis added).

[**10] ***Decision of the Court of Chancery***

The Chancellor found that Beam had not alleged sufficient facts to support the conclusion that demand was futile because he determined that the complaint failed to raise a reasonable doubt that these outside directors are independent of Stewart. Because Patrick and Stewart herself are not independent for demand purposes, all the plaintiff need show is that one of the remaining directors is not independent, there being only six board members. [8] The allegations relating to Moore, Seligman and Martinez are set forth above.

> [8] If three directors of a six person board are not independent and three directors are independent, there is not a majority of independent directors and demand would be futile. *See Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000) (holding that demand is excused where a board is evenly divided between interested and disinterested directors).

[*1047] It is appropriate here to quote the Chancellor's analysis of the allegations regarding [**11] these three directors:

> The factual allegations regarding Stewart's friendship with Martinez are inadequate to raise a reasonable doubt of his independence. While employed by Sears, Martinez developed business ties to MSO due to Sears' marketing of a substantial quantity of MSO products. Martinez was recruited to serve on MSO's board of directors by Beers, who is

described as Stewart's longtime personal friend and confidante and who was at that time an MSO director. Shortly after Martinez joined MSO's board, Patrick was quoted in a magazine article saying, "Arthur [Martinez] is an old friend to both me and Martha [Stewart]." Weighing against these factors, the amended complaint discloses that Martinez has been an executive and director for major corporations since at least 1990. At present he serves as a director for four prominent corporations, including MSO, and is the chairman of the Federal Reserve Bank of Chicago. One might say that Martinez's reputation for acting as a careful fiduciary is essential to his career-- a matter in which he would surely have a material interest. *Furthermore, the amended complaint does not give a single example of any action by Martinez [**12] that might be construed as evidence of even a slight inclination to disregard his duties as a fiduciary for any reason. In this context, I cannot reasonably infer, on the basis of several years of business interactions and a single affirmation of friendship by a third party, that the friendship between Stewart and Martinez raises a reasonable doubt of Martinez's ability to evaluate demand independently of Stewart's personal interests.*

> The allegations regarding the friendship between Moore and Stewart are somewhat more detailed, yet still fall short of raising a reasonable doubt about Moore's ability properly to consider demand on Count I. In 1995, Stewart's lawyer, Allen Grubman, hosted a wedding reception for his daughter. Among those in attendance at the reception were Moore, Stewart, and Waksal. In addition, *Fortune* magazine published an article in 1996 that focused on the close personal friendships among Moore, Stewart, and Beers. In September 2001, when Beers resigned from MSO's board of directors, Moore was selected to replace her. *Although the amended complaint lists fewer positions of*

845 A.2d 1040, *1047; 2004 Del. LEXIS 162, **12

*fiduciary responsibility for Moore than were listed for Martinez, it is clear* [**13] *that Moore's professional reputation similarly would be harmed if she failed to fulfill her fiduciary obligations. To my mind, this is quite a close call. Perhaps the balance could have been tipped by additional, more detailed allegations about the closeness or nature of the friendship, details of the business and social interactions between the two, or allegations raising additional considerations that might inappropriately affect Moore's ability to impartially consider pursuit of a lawsuit against Stewart. On the facts pled, however, I cannot say that I have a reasonable doubt of Moore's ability to properly consider demand.*

*No particular felicity is alleged to exist between Stewart and Seligman. The amended complaint reports in ominous tones, however, that Seligman, who is a director both for MSO and for JWS, contacted JWS' chief executive officer about an unflattering biography of Stewart slated for publication. From this, the Court is asked to infer that Seligman acted in a way that preferred the protection of Stewart over her fiduciary duties to one or both of these* [*1048] *companies. Without details about the nature of the contact, other than Seligman's wish to* "express [**14] *concern," it is impossible reasonably to make this inference. Stewart's public image, as plaintiff persistently asserts, is critical to the fortunes of MSO and its shareholders. As a fiduciary of MSO, Seligman may have felt obligated to express concern and seek additional information about the publication before its release. As a fiduciary of JWS, she could well have anticipated some risk of liability if any of the unflattering characterizations of Stewart proved to be insufficiently researched or made carelessly. There is no allegation that Seligman made any inappropriate attempt to prevent the* *publication of the biography.* Nor does the amended complaint indicate whether the biography was ultimately published and, if so, whether Seligman's inquiry is believed to have resulted in any changes to the content of the book. *As alleged, this matter does not serve to raise a reasonable doubt of Seligman's independence or ability to consider demand on Count I.*

In sum, plaintiff offers various theories to suggest reasons that the outside directors might be inappropriately swayed by Stewart's wishes or interests, but fails to plead sufficient facts that [**15] could permit the Court reasonably to infer that one or more of the theories could be accurate. [9]

---

[9] *Beam*, 833 A.2d at 979-81 (footnotes omitted) (emphasis added).

### Demand Futility and Director Independence

This Court reviews de novo a decision of the Court of Chancery to dismiss a derivative suit under Rule 23.1. [10] The scope of this Court's review is plenary. [11] The Court should draw all *reasonable* inferences in the plaintiff's favor. Such reasonable inferences must logically flow from particularized facts alleged by the plaintiff. [12] "Conclusory allegations are not considered as expressly pleaded facts or factual inferences." [13] Likewise, inferences that are not objectively reasonable cannot be drawn in the plaintiff's favor.

[10] *White v. Panic*, 783 A.2d 543, 549 (Del. 2001); *Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000).
[11] *Brehm*, 746 A.2d at 253.
[**16]
[12] *White*, 783 A.2d at 549.
[13] *Id.*

Under the first prong of *Aronson*, [14] a stockholder may not pursue a derivative suit to assert a claim of the corporation unless: (a) she has first demanded that the directors pursue the corporate claim and they have wrongfully refused to do so; or (b) such demand is

excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation. [15] The issue in this case is the quantum of doubt about a director's independence that is "reasonable" in order to excuse a presuit demand. The parties argue opposite sides of that issue.

14 *See Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984) (setting forth two steps of a demand futility analysis: whether (1) "the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment").

15 *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993); *see also* DEL. CH. R. 23.1 (providing the demand requirements for initiation of derivative suits by stockholders).

[**17] The key principle upon which this area of our jurisprudence is based is that the directors are entitled to a *presumption* that they were faithful to their fiduciary duties. [16] In the context of presuit [*1049] demand, the burden is upon the plaintiff in a derivative action to overcome that presumption. [17] The Court must determine whether

a plaintiff has alleged particularized facts creating a reasonable doubt of a director's independence to rebut the presumption at the pleading stage. [18] If the Court determines that the pleaded facts create a reasonable doubt that a majority of the board could have acted independently in responding to the demand, the presumption is rebutted for pleading purposes and demand will be excused as futile. [19]

16 *See Aronson*, 473 A.2d at 812 ("It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.").

17 *Levine v. Smith*, 591 A.2d 194, 205-06 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 187-89 (Del. 1988).

[**18]

18 *Rales*, 634 A.2d at 934.

19 *Id*.

A director will be considered unable to act objectively with respect to a presuit demand if he or she is interested in the outcome of the litigation or is

otherwise not independent. [20] A director's interest may be shown by demonstrating a potential personal benefit or detriment to the director as a result of the decision. [21] "In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the ...personal consequences resulting from the decision." [22] The primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or influences. [23] This broad statement of the law requires an analysis of whether the director is disinterested in the underlying transaction and, even if disinterested, whether the director is otherwise independent. More precisely in the context of the present case, the independence inquiry requires us [**19] to determine whether there is a reasonable doubt that any one of these three directors is capable of objectively making a business decision to assert or not assert a corporate claim against Stewart.

20 *See Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) ("The basis for claiming excusal would normally be that: (1) a majority of the board has a material financial or familial interest; (2) a majority of the board is incapable of acting independently for some other reason such as domination or control; or (3) the underlying transaction is not the product of a valid exercise of business judgment." (footnotes omitted)); *see also In re eBay, Inc. S'Holders Litig.*, C.A. No. 19988-NC, 2004 Del. Ch. LEXIS 4 (Del. Ch. Feb. 11, 2004) (demand was excused where futility analysis turned not on personal relationship but on allegations that compensation to non-interested directors in the form of not-yet-vested stock options created a reasonable doubt of their independence for presuit pleading purposes; although allegations were made of "personal ties," the analysis addressed only the financial ties and whether that raised the pleading inference that the non-interested directors were beholden to the interested directors).

[**20]

21 *Cf. Rales*, 634 A.2d at 936 ("A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact

on a director, but not on the corporation and the stockholders." (citation omitted)).

22   *Id.*

23   *Id.* (quoting *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984)).

### Independence Is a Contextual Inquiry

Independence is a fact-specific determination made in the context of a particular case. The court must make that determination by answering the inquiries: [*1050] independent from whom and independent for what purpose? To excuse presuit demand in this case, the plaintiff has the burden to plead particularized facts that create a reasonable doubt sufficient to rebut the presumption that either Moore, Seligman or Martinez was independent of defendant Stewart.

In order to show lack of independence, the complaint of a stockholder-plaintiff must create a [**21] reasonable doubt that a director is not so "beholden" to an interested director (in this case Stewart) that his or her "discretion would be sterilized." 24 Our jurisprudence explicating the demand requirement

> is designed to create a balanced environment which will: (1) on the one hand, deter costly, baseless suits by creating a screening mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms; and (2) on the other hand, permit suit by a stockholder who is able to articulate particularized facts showing that there is a reasonable doubt either that (a) a majority of the board is independent for purposes of responding to the demand, or (b) the underlying transaction is protected by the business judgment rule. 25 The "reasonable doubt" standard "is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." 26

24   *Id.*

25   *Grimes*, 673 A.2d at 1217 (footnote omitted).

26   *Id.* In her reply brief the plaintiff seemingly argues that our use of the phrases "reason to doubt" and "reasonable belief" in *Grimes* has somehow watered down the pleading threshold set forth in our jurisprudence. Reply Brief at 3-4. Nothing in *Grimes* was intended to weaken the traditional, objective reasonable doubt standard to be applied to the pleading threshold. *See Grimes*, 673 A.2d at 1217 n. 17 ("The concept of reasonable belief is an objective test and is found in various corporate contexts."); *see also Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988) (noting that determination of demand futility "necessarily ...involves an objective analysis of the facts").

### [**22] *Personal Friendship*

A variety of motivations, including friendship, may influence the demand futility inquiry. But, to render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence. 27 In this connection, we adopt as our own the Chancellor's analysis in this case:

> Some professional or personal friendships, which may border on or even exceed familial loyalty and closeness, may raise a reasonable doubt whether a director can appropriately consider demand. This is particularly true when the allegations raise serious questions of either civil or criminal liability of such a close friend. Not all friendships, or even most of them, rise to this level and the Court cannot make a *reasonable* inference that a particular friendship does so without specific factual allegations to support such a conclusion. 28

The facts alleged by Beam regarding the relationships between Stewart and these other members of MSO's board of directors largely boil down to a "structural [**23] bias" argument, which presupposes that [*1051] the professional and social relationships that naturally develop among members of a board impede independent decisionmaking. 29 This Court addressed the

structural bias argument in *Aronson v. Lewis*:

> Critics will charge that [by requiring the independence of only a majority of the board] we are ignoring the structural bias common to corporate boards throughout America, as well as the other unseen socialization processes cutting against independent discussion and decisionmaking in the boardroom. The difficulty with structural bias in a demand futile case is simply one of establishing it in the complaint for purposes of Rule 23.1. We are satisfied that discretionary review by the Court of Chancery of complaints alleging specific facts pointing to bias on a particular board will be sufficient for determining demand futility. [30]

27  *Litt v. Wycoff*, C.A. 19083-NC, 2003 Del. Ch. LEXIS 23, at *16 (Del. Ch. Mar. 28, 2003).

28  *Beam*, 833 A.2d at 979 (footnotes omitted).

29  *See* DENNIS J. BLOCK ET AL., THE BUSINESS JUDGMENT RULE 1765 (5th ed. 1998) (describing the "' structural bias' viewpoint. ...[as holding] that the judgment of seemingly disinterested directors-- who are not defendants in a litigation or participants in wrongdoing alleged in a litigation-- is inherently corrupted by the 'common cultural bond' and 'natural empathy and collegiality' shared by most directors"); Michael P. Dooley & E. Norman Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared*, 44 BUS. LAW. 503, 534 (1989) ("As we understand the argument, it is that no professional colleague can be expected to be as neutral on questions of management misbehavior as a court to whom the alleged malefactor is a stranger.").

[**24]

30  473 A.2d 805, 815 n. 8 (Del. 1984). Although the *Aronson* Court spoke of "discretionary" review by the Court of Chancery, a concept that was changed by this Court in *Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000), when we stated that our review of the Court of Chancery decision on presuit demand is de novo, the same principles apply as stated in *Aronson*.

In the present case, the plaintiff attempted to plead affinity beyond mere friendship between Stewart and the other directors, but her attempt is not sufficient to demonstrate demand futility. Even if the alleged friendships may have preceded the directors' membership on MSO's board and did not necessarily arise out of that membership, these relationships are of the same nature as those giving rise to the structural bias argument.

Allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as "friends," even when coupled with Stewart's 94% voting power, are insufficient, [**25] without more, to rebut the presumption of independence. They do not provide a sufficient basis from which reasonably to infer that Martinez, Moore and Seligman may have been beholden to Stewart. Whether they arise before board membership or later as a result of collegial relationships among the board of directors, such affinities-- standing alone-- will not render presuit demand futile.

The Court of Chancery in the first instance, and this Court on appeal, must review the complaint on a case-by-case basis to determine whether it states with particularity facts indicating that a relationship-- whether it preceded or followed board membership-- is so close that the director's independence may *reasonably* be doubted. This doubt might arise either because of financial ties, familial affinity, a particularly close or intimate personal or business affinity or because of evidence that in the past the relationship caused the director to act non-independently vis a vis an interested director. No such allegations are made here. Mere allegations that they move in the same business and social circles, or a characterization that they are close friends, is not [*1052] enough to negate independence for [**26] demand excusal purposes.

That is not to say that personal friendship is always irrelevant to the independence calculus. But, for presuit demand purposes, friendship must be accompanied by substantially more in the nature of serious allegations that would lead to a reasonable doubt as to a director's independence. That a much stronger relationship is necessary to overcome the presumption of independence at the demand futility stage becomes especially compelling when one considers the risks that directors would take by protecting their social acquaintances in the

845 A.2d 1040, *1052; 2004 Del. LEXIS 162, **26

face of allegations that those friends engaged in misconduct. [31] To create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that because of the nature of a relationship or additional circumstances other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director. [32]

[31]  See Dooley & Veasey, supra note 29, at 535 ("Outside directors tend to be men and women who have considerable investments in reputation but who have invested most of their human capital elsewhere.").

[**27]

[32]  See id. ("The structural bias argument asks us to believe that outside directors generally are more willing to risk reputation and future income than they are to risk the social embarrassment of calling a colleague to account."); Bryan Ford, In Whose Interest: An Examination of the Duties of Directors and Officers in Control Contests, 26 ARIZ. ST. L.J. 91, 127 (1994) (recognizing that many factors-- including personal integrity, honesty, concern about their business reputations, and the threat of liability to shareholders-- may motivate directors to exercise their judgment independently of corporate executives); cf. Cal. Pub. Emples Ret. Sys. v. Coulter, C.A. No. 19191, 2002 Del. Ch. LEXIS 144, at *28-29 (Del. Ch. Dec. 18, 2002) (observing that an allegation of a lifelong friendship with an interested party is not alone sufficient to raise a reasonable doubt of a director's disinterest or independence); Kohls v. Duthie, 765 A.2d 1274, 1284 (Del. Ch. 2000) (holding that a personal friendship between a member of a special committee of the board and an interested party to the challenged transaction, as well as the fact that the interested party had once given the director a summer job, were insufficient to challenge the director's ability to exercise his independent judgment with respect to the transaction); Benefore v. Jung Woong Cha, C.A. No. 14614, 1998 Del. Ch. LEXIS 28, at *9 (Del. Ch. Feb. 20, 1998) (stating that an allegation of a longtime friendship was not sufficient to raise a reasonable doubt about a director's ability to exercise his judgment independently of his friend); E. Norman Veasey, The Defining Tension in Corporate Governance in America, 52 BUS. LAW. 393, 406 (1997) ("Friendship, golf companionship, and social relationships are not factors that necessarily negate independence. ...There is nothing to suggest that, on an issue of questioning the loyalty of the CEO, the bridge partner of the CEO cannot act independently as a director. To make a blanket argument otherwise would create a dubious presumption that the director would sell his or her soul for friendship."); cf. also Lynn A. Stout, On the Proper Motives of Corporate Directors (Or, Why You Don't Want to Invite Homo Economicus to Join Your Board), 28 DEL. J. CORP. L. 1, 8-9 (2003) (proposing an "other-regarding" theory of directorial behavior in which directors are motivated to "do a good job" not only by external pressures, but also by internal pressures such as "a director's sense of honor; her feelings of responsibility; her sense of obligation to the firm and its shareholders; and, her desire to 'do the right thing'").

[**28] **Specific Allegations Concerning Seligman and Moore**

[33]

[33]  In her reply brief in this Court the plaintiff appears to have abandoned any serious contention that she has properly alleged a reasonable doubt that Martinez is independent, focusing instead on her contention that the Chancellor erred in dismissing her complaint as to Moore and Seligman. In her reply brief the plaintiff states: What Plaintiff has asked is that the Court apply the law of Delaware to the allegations in the Amended Complaint. Had the Court of Chancery done so and heeded its expressed doubts, it would not have dismissed the Amended Complaint, because Moore and Seligman (as well as Stewart and Patrick) are not capable of impartially considering demand. Reply Brief at 3 (footnotes omitted). Accordingly, we do not analyze separately the allegations concerning Martinez. Moreover, since it is clear that the plaintiff has not pleaded facts raising a reasonable doubt as to Seligman and Moore, a fortiori, the plaintiff's weaker allegations concerning Martinez must fail.

[**29] 1. Seligman

Beam's allegations concerning Seligman's lack of independence raise an additional [*1053] issue not present in the Moore and Martinez relationships. Those allegations are not necessarily based on a purported friendship between Seligman and Stewart. Rather, they are based on a specific past act by Seligman that, Beam claims, indicates Seligman's lack of independence from Stewart. Beam alleges that Seligman called John Wiley & Sons (Wiley) at Stewart's request in order to prevent an unfavorable publication reference to Stewart. The Chancellor concluded, properly in our view, that this allegation does not provide particularized facts from which one may reasonably infer improper influence.

The bare fact that Seligman contacted Wiley, on whose board Seligman also served, to dissuade Wiley from publishing unfavorable references to Stewart, even if done at Stewart's request, is insufficient to create a reasonable doubt that Seligman is capable of considering presuit demand free of Stewart's influence. Although the court should draw all *reasonable* inferences in Beam's favor, neither improper influence by Stewart over Seligman nor that Seligman was beholden to Stewart is a reasonable [**30] inference from these allegations.

Indeed, the reasonable inference is that Seligman's purported intervention on Stewart's behalf was of benefit to MSO and *its* reputation, which is allegedly tied to *Stewart's* reputation, as the Chancellor noted. [34] A motivation by Seligman to benefit the company every bit as much as Stewart herself is the only reasonable inference supported by the complaint, when all of its allegations are read in context. [35]

34  *Beam*, 833 A.2d at 980-81.

35  The complaint alleges: 16. The Company is highly dependent upon Stewart; as the Company's prospectus for the public offering indicated:

***

We are highly dependent upon our founder, Chairman and Chief Executive Officer, Martha Stewart ....The diminution or loss of the services of Martha Stewart, and any negative market or industry perception arising from that diminution or loss, would have a material adverse effect on our business ....Martha Stewart

remains the personification of our brands as well as our senior executive and primary creative force.

17. The prospectus for the public offering also warned that the Company's business would be affected adversely if "Martha Stewart's public image or reputation were to be tarnished. Martha Stewart, as well as her name, her image and the trademarks and other intellectual property rights relating to these, are integral to our marketing efforts and form the core of our brand name. Our continued success and the value of our brand name therefore depends, to a large degree, on the reputation of Martha Stewart."

Amended Complaint at paras. 16-17, *Beam*, 833 A.2d 961.

[**31] 2. Moore

The Court of Chancery concluded that the plaintiff's allegations with respect to Moore's social relationship with Stewart [*1054] presented "quite a close call" and suggested ways that the "balance could have been tipped." [36] Although we agree that there are ways that the balance could be tipped so that mere allegations of social relationships would become allegations casting reasonable doubt on independence, we do not agree that the facts as alleged present a "close call" with respect to Moore's independence. These allegations center on: (a) Moore's attendance at a wedding reception for the daughter of Stewart's lawyer where Stewart and Waksal were also present; (b) a *Fortune* magazine article focusing on the close personal relationships among Moore, Stewart and Beers; and (c) the fact that Moore replaced Beers on the MSO board. In our view, these bare social relationships clearly do not create a reasonable doubt of independence.

36  The Chancellor concluded as follows: To my mind, this is quite a close call. Perhaps the balance could have been tipped by additional, more detailed allegations about the closeness or

845 A.2d 1040, *1054; 2004 Del. LEXIS 162, **31

nature of the friendship, details of the business and social interactions between the two, or allegations raising additional considerations that might inappropriately affect Moore's ability to impartially consider pursuit of a lawsuit against Stewart. On the facts pled, however, I cannot say that I have a reasonable doubt of Moore's ability to properly consider demand. *Beam*, 833 A.2d at 980.

[**32] Beam attempts to bolster her allegations regarding the relationships between Stewart and Seligman and Moore by emphasizing Stewart's overwhelming voting control of MSO. That attempt also fails to create a reasonable doubt of independence. A stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder. [37] As noted earlier, the relationships alleged by Beam do not lead to the inference that the directors were beholden to Stewart and, thus, unable independently to consider demand. Coupling those relationships with Stewart's overwhelming voting control of MSO does not close that gap. [38]

[37] *See Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) ("[I] n the demand context even proof of majority ownership of a company does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person."); *Stroud v. Milliken Enters., Inc.*, 585 A.2d 1306, 1307 (Del. Ch. 1988) (stating that control of a corporation by a majority stockholder who nominates or elects the directors is not sufficient to raise a reasonable doubt about a director's independence; rather, the nature of the relationships between them must demonstrate that the director is beholden to the stockholder).

[**33]

[38] The plaintiff's counsel was asked at oral argument in this Court if she had any authority for the proposition that social friendship plus such strong voting power of the interested director was sufficient to create a reasonable doubt of

independence alone. Counsel admitted that she could point to no such authority.

3. Stewart's 94% Stock Ownership

### A Word About the **Oracle** *Case*

In his opinion, the Chancellor referred several times [39] to the Delaware Court of Chancery decision in *In re Oracle Corp. Derivative Litigation*. [40] Indeed, the plaintiff relies on the *Oracle* case in this appeal. *Oracle* involved the issue of the independence of the Special Litigation Committee (SLC) appointed by the Oracle board to [*1055] determine whether or not the corporation should cause the dismissal of a corporate claim by stockholder-plaintiffs against directors. The Court of Chancery undertook a searching inquiry of the relationships between the members of the SLC and Stanford University in the context of the financial support of Stanford by the corporation and its management. The Vice [**34] Chancellor concluded, after considering the SLC Report and the discovery record, that those relationships were too close for purposes of the SLC analysis of independence. [41]

[39] *E. g., Beam*, 833 A.2d at 979 n. 60; *id.* at 980 n. 63.

[40] 824 A.2d 917 (Del. Ch. 2003).

[41] *Oracle*, 824 A.2d at 921. It is noteworthy that the Vice Chancellor was concerned and expressed "some shock" that the extent of the Stanford ties was not revealed in the Report of the SLC and was unearthed only in discovery. He noted that "the plain facts are a striking departure from the picture presented in the Report." *Id.* at 929-30.

An SLC is a unique creature that was introduced into Delaware law by *Zapata v. Maldonado* in 1981. [42] The SLC procedure is a method sometimes employed where presuit demand has already been excused and the SLC is vested with the full power of the board to conduct an extensive investigation into the merits of the corporate [**35] claim with a view toward determining whether-- in the SLC's business judgment-- the corporate claim should be pursued. Unlike the demand-excusal context, where the board is presumed to be independent, the SLC has the burden of establishing its own independence by a yardstick that must be "like Caesar's wife"-"above reproach." [43] Moreover, unlike the presuit demand context, the SLC analysis contemplates not only a shift in the burden of persuasion but also the availability of

845 A.2d 1040, *1055; 2004 Del. LEXIS 162, **35

discovery into various issues, including independence.

42   430 A.2d 779 (Del. Ch. 1981).
43   *Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985).

We need not decide whether the substantive standard of independence in an SLC case differs from that in a presuit demand case. As a practical matter, the procedural distinction relating to the diametrically-opposed burdens and the availability of discovery into independence may be outcome-determinative on the issue of independence. 44 Moreover, because the members [**36] of an SLC are vested with enormous power to seek dismissal of a derivative suit brought against their director-colleagues in a setting where presuit demand is already excused, the Court of Chancery must exercise careful oversight of the bona fides of the SLC and its process.

Aside from the procedural distinctions, the Stanford connections in *Oracle* are factually distinct from the relationships present here. 45

[*1056] *Section 220*

44     In *Oracle* we declined to accept an interlocutory appeal last year. *Oracle Corp. v. Barone*, No. 341, 2003, 829 A.2d 141, 2003 Del. LEXIS 392 (Del. July 28, 2003). That matter may come before us at some time in the future.
45     The analysis applied to determine the independence of a special committee in a merger case also has its own special procedural characteristics. In such cases, courts evaluate not only whether the relationships among members of the committee and interested parties placed them in a position objectively to consider a proposed transaction, but also whether the committee members *in fact* functioned independently. *See, e. g., Kahn v. Tremont Corp.*, 694 A.2d 422, 429-30 (Del. 1997) ("[T] he Special Committee ...did not function independently. ...From its inception, the Special Committee failed to operate in a manner which would create the appearance of objectivity in Tremont's decision to purchase the NL stock. As this Court has previously stated in defining director independence: 'it is the care, attention and sense of individual responsibility to the performance of one's duties ...that generally

touches on independence. ' The record amply demonstrates that neither Stafford nor Boushka possessed the 'care, attention and sense of responsibility' necessary to afford them the status of independent directors. The result was that Stein, arguably the least detached member of the Special Committee, became, *de facto*, a single member committee-- a tenuous role. '" (fourth alteration in original) (citation omitted)).T

[**37] Beam's failure to plead sufficient facts to support her claim of demand futility may be due in part to her failure to exhaust all reasonably available means of gathering facts. As the Chancellor noted, 46 had Beam first brought a Section 220 action seeking inspection of MSO's books and records, 47 she might have uncovered facts that would have created a reasonable doubt. For example, irregularities or "cronyism" in MSO's process of nominating board members might possibly strengthen her claim concerning Stewart's control over MSO's directors. A books and records inspection might have revealed whether the board used a nominating committee to select directors and maintained a separation between the director-selection process and management. A books and records inspection might also have revealed whether Stewart unduly controlled the nominating process or whether the process incorporated procedural safeguards to ensure directors' independence. 48 Beam might also have reviewed the minutes of the board's meetings to determine how the directors handled Stewart's proposals or conduct in various contexts. Whether or not the result of this exploration might create a reasonable doubt would [**38] be sheer speculation at this stage. But the point is that it was within the plaintiff's power to explore these matters and she elected not to make the effort.

46   *Beam*, 833 A.2d at 981-83 & nn. 65-66.
47   *See* DEL. CODE ANN. tit. 8, § 220 (Supp. 2003) (providing that stockholders have the right to inspect a corporation's books and records for "any proper purpose").
48   Although not mandated by Delaware law, it is relevant to note that the New York Stock Exchange listing requirements, for example, require that listed companies have an independent and effective nominating committee. *See* New York Stock Exchange Corporate Governance Rule 303A. 04 (2003), *available at* http://www. nyse. com/pdfs/finalcorpgovrules. pdf; Nat'l Ass'n Sec. Dealers Rule 4350(c)(4), NASD Manual

Online (2003), http://cchwallstreet. com/NASD/NASD_ Rules. Although these requirements may not have been in effect at times relevant to this complaint, it is relevant to note that MSO is an NYSE listed company.

[**39] In general, derivative plaintiffs are not entitled to discovery in order to demonstrate demand futility. [49] The general unavailability [50] of discovery to assist plaintiffs with pleading demand futility does not leave plaintiffs without means of gathering information to support their allegations of demand futility, however. Both this Court and the Court of Chancery have continually advised plaintiffs who seek to

plead facts establishing demand futility that the plaintiffs might successfully have used a Section 220 books and records inspection to uncover such facts. [51]

49  *See Rales v. Blasband*, 634 A.2d 927, 934 n. 10 (Del. 1993) ("Derivative plaintiffs ...are not entitled to discovery to assist their compliance with Rule 23. 1 ...."); *Levine v. Smith*, 591 A.2d 194, 209 (Del. 1991) (refusing to extend the availability of limited discovery to either demand refused cases or demand excused cases, absent the *Zapata* context relating to an SLC).

50  We need not decide if some precise and limited discovery would ever be appropriate in the discretion of the Court of Chancery in the eventuality that a books and records inspection under Section 220 uncovered a significant ambiguity, the resolution of which could be essential to determining the issue of independence.

[**40]

51  The Chancellor cited an extensive string of cases in which our courts have emphasized the availability of the Section 220 action as a possible method of securing facts to support a demand futility claim. *Beam*, 833 A.2d at 981 nn. 65-66. Note in particular the discussion of the *Disney* case where the plaintiffs were permitted to replead, then used the Section 220 procedure, and the new complaint survived a motion to dismiss on the ground that presuit demand was excused. *Id*. at 983-84. *See In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 279 (Del. Ch. 2003).

[*1057]  Because Beam did not even attempt to use the fact-gathering tools available to her by seeking to review MSO's books and records in support of her demand futility claim, we cannot know if such an effort would have been fruitless, as Beam claimed on appeal. Beam's failure to seek a books and records inspection that may have uncovered the facts necessary to support a reasonable doubt of independence has resulted in substantial cost to the parties and the judiciary. [52]

52  We agree with the Chancellor's point about cost and drain on resources in weak cases where the plaintiff does not seek books and records. In *White v. Panic*, 783 A.2d 543 at 549-60 (Del. 2001) (discussed by the Chancellor in *Beam*, 833 A.2d at 982 n. 66), we approved the Vice Chancellor's admonition in that case that a plaintiff should pursue a books and records inspection in order to secure the facts necessary to support an allegation of demand futility if the factual allegations would otherwise fall short. At the same time, we said that a failure to use Section 220 should not alter the standard to be applied to consideration of an allegation of demand futility. *White*, 783 A.2d at 549-50. A plaintiff's use of, or failure to use, a books and records inspection does not change the standard to be applied to review of the complaint. Regardless of whether the plaintiff secured any facts alleged in her complaint through a Section 220 inspection, the court must draw all reasonable inferences in the plaintiff's favor and determine whether those facts create a reasonable doubt of the directors' independence. The allegations of demand futility made in the complaint, and the reasonable inferences drawn therefrom, continue to be the sole basis on which the court should make its demand futility determination. If the particularized facts alleged in the complaint, even if pleaded without benefit of a Section 220 inspection, together with the reasonable inferences from those facts create a reasonable doubt of the independence of a majority of the board, then the complaint is indeed "well-pleaded," despite the fact that a books and records inspection might have gleaned additional facts to support the demand futility claim.

[**41] **Conclusion**

845 A.2d 1040, *1057; 2004 Del. LEXIS 162, **41

Because Beam did not plead facts sufficient to support a reasonable inference that at least one MSO director in addition to Stewart and Patrick was incapable of considering demand, Beam was required to make demand on the board before pursuing a derivative suit. Hence, presuit demand was not excused. The Court of Chancery did not err by dismissing Count 1 under Rule 23.1. The judgment of the Court of Chancery is **AFFIRMED**.

It is ordered that the time within which a motion for reargument may be timely filed under Supreme Court Rule 18 is shortened to five days from the date of this opinion. This is due to the impending change in the composition of the Supreme Court, arising from the retirement of the Chief Justice in April 2004.