LEXSEE 502 A.2D 962

**HARRY B. LEWIS, Plaintiff, v. J. B. FUQUA, et al, Defendants**

Civil Action No. 7188

Court of Chancery of Delaware, New Castle

502 A.2d 962; 1985 Del. Ch. LEXIS 547

June 21, 1985, Submitted
November 12, 1985, Decided

**SUBSEQUENT HISTORY:** [**1] Revised November 14, 1985.

**PRIOR HISTORY:** On defendants' motion to dismiss in response to the recommendation of a special litigation committee.

**DISPOSITION:** DENIED.

**COUNSEL:** Joseph A. Rosenthal, Esquire, and Norman M. Monhait, Esquire, Morris And Rosenthal, P.A., Wilmington, and Of Counsel: Steven Oestreich, Esquire, Wolf, Popper, Ross, Wolf & Jones, New York, New York, Attorneys for Plaintiff.

A. Gilchrist Sparks, III, Esquire, and Michael Houghton, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Of Counsel: Collin Brown, Esquire, Attorneys for Defendants.

E. Norman Veasey, Esquire, Richards, Layton & Finger, Wilmington, Attorney for Defendants.

**JUDGES:** Hartnett, Vice Chancellor.

**OPINION BY:** HARTNETT

**OPINION**

[*964] The corporate defendant, Fuqua Industries, Inc., moved to dismiss this stockholder derivative action pursuant to a recommendation of a Special Litigation Committee appointed by the Board of the corporation to inquire into the validity of the claims set forth in the Complaint. The motion must be denied because the movant has neither borne its burden of showing that the Special Litigation Committee was independent nor that the Committee established a reasonable basis for its conclusions. [**2] Nor would dismissal of the suit at this juncture be in the best interests of the corporation.

I

Harry Lewis, the plaintiff, a shareholder of Fuqua Industries, Inc., a Delaware corporation, filed this stockholder derivative action on behalf of the corporation alleging the usurpation of a corporate opportunity by the individual defendants. Mr. Lewis alleged that J. B. Fuqua, Chairman of the Board and Chief Executive Officer of Fuqua Industries, along with thirteen of the other fourteen individual defendants breached their fiduciary duty to the corporation by diverting a valuable corporate opportunity to themselves. The plaintiff made no pre-suit demand on the Board of Directors of the corporation to bring an action to redress the alleged wrongs but alleged in his Complaint that any pre-suit demand on the Board of Fuqua Industries, pursuant to Chancery Rule 21.1, was excused because it would have been futile.

The Complaint alleged that J. B. Fuqua diverted an opportunity to purchase stock in the Triton Group Limited ("Triton") from Fuqua Industries, Inc. to himself and fourteen other individual defendants -- thirteen of whom are present or former directors or officers of the corporation, [**3] or both. Triton is a Delaware holding company whose primary assets are a $160 million ($2.59 per share) tax loss, two real estate projects and some cash. Triton had two classes of stock outstanding, both of which were publicly traded: Triton Common Stock, and Triton Series A Convertible Preferred Stock. The Triton Preferred Stock carried voting rights and each share was convertible into 24.5 shares of Triton Common Stock. In

the fall of 1982 Fuqua Industries became interested in Triton and began discussions with American Financial Corporation ("AFC") about acquiring AFC's interest in Triton. AFC was Triton's largest shareholder at this time. Fuqua Industries' interest in Triton centered around Triton's substantial tax loss which could be carried forward and its intention was to acquire one or more profitably operating companies and then use Triton's tax loss carry-forward to shelter the future earnings of these acquisitions from income taxes. Fuqua Industries was hopeful that it could duplicate the success it had in the past with a similar investment -- the acquisition of Pier 1 corporation. AFC's ownership in Triton included both Triton Common and Preferred Stock.

On March [**4] 3, 1983, discussions between Fuqua Industries and AFC culminated in the purchase of 425,365 shares of Triton Preferred Stock from AFC by Fuqua Industries at an equivalent price of $ .45 per share. Prior to this purchase, on February [*965] 25, 1983, Mr. J. B. Fuqua purchased from AFC 2 million shares of Triton Common Stock. On March 7, 1983, fourteen of the other individual defendants -- upon the solicitation of J. B. Fuqua -- purchased AFC's remaining 1,260,450 shares of Triton Common Stock. All of the AFC Triton Common Stock in question was purchased at a price of $ .45 per share. The end result of these transactions was that Fuqua Industries acquired all of AFC's Triton Preferred Stock and J. B. Fuqua and other individual defendants acquired all of AFC's Triton Common Stock.

After this sale AFC suggested that in order to assure a more orderly change in control of Triton, someone should also buy out the interest of Anthony B. Walsh in Triton. Mr. Walsh, along with two other persons allied with him, occupied three seats on Triton's Board of Directors. In response to AFC's suggestion, J. B. Fuqua caused Fuqua Industries to purchase the Walsh Block's shares of Triton at [**5] a price equal to $ .30 more per share than was paid to AFC for its stock in Triton. The Walsh Block included 79,420 shares of Triton Preferred Stock and 315,780 shares of Triton Common Stock (1.1% of the outstanding Triton Common Stock). Following the purchase of the Walsh Block, Mr. Walsh and the two other directors aligned with him resigned from Triton's Board of Directors. J. B. Fuqua, thereupon, became the Chairman of Triton's Board of Directors, naming two nominees to fill the two remaining seats. The Board of Fuqua Industries never formally rejected the opportunity of the corporation to purchase the Common Stock shares of Triton owned by AFC.

II

Plaintiff contends that the purchase of the Triton Common Stock by J. B. Fuqua and the other individual defendants amounted to the usurpation of a corporate opportunity which belonged to Fuqua Industries, Inc. The Complaint alleged that Fuqua Industries never abandoned its interest in acquiring Triton Common Stock, nor did the Board of Directors of the corporation formally reject the opportunity of the corporation to purchase the Triton Common Stock on behalf of Fuqua Industries. In response to these allegations in the Complaint, [**6] the Board of Directors of Fuqua Industries formed a Special Litigation Committee of one person to review the merits of plaintiff's claims.

The Board of Directors named Terry Sanford as the single member Committee. Mr. Sanford, although a member of the Board of Directors of Fuqua Industries, had not participated in the purchase of the Triton stock. He was, however, named as a defendant in this action and was a member of the Board at the time of the alleged wrongs. Mr. Sanford, who is well known nationally, has had a distinguished career, including being President of Duke University and Governor of North Carolina. Through his affiliation with Duke University and his extensive political career, Mr. Sanford has had numerous contacts with J. B. Fuqua. J. B. Fuqua, in turn, has made several contributions to Duke University and is presently a Trustee of the University.

The Sanford Committee, along with its counsel -- the distinguished law firm of Rogers and Hardin -- employed an array of methods to gather the information upon which to base the conclusions of the Committee. In its investigation, the Sanford Committee and its counsel reviewed the pleadings and numerous documents and [**7] interviewed many people whom the Committee thought could provide relevant information, taking four and a half months to perform its investigation. During this time Mr. Sanford kept in touch with the Committee's counsel through telephone conferences and three personal meetings. The final result of the Sanford Committee investigation, not surprisingly, was a recommendation that Fuqua Industries not pursue any legal action against any present or former officer or director of the Company or any of its wholly owned subsidiaries and [*966] that the corporation seek to have the suit dismissed.

III

The Delaware Supreme Court in *Zapata v. Maldonado*, Del. Supr., 430 A.2d 779 (1981) set forth a procedure for Court review of a report of a Special Litigation Committee appointed to review a stockholder's derivative suit where the committee recommends that a motion to dismiss suit be filed.

A motion to dismiss brought in response to a report of a Special Litigation Committee is a hybrid motion created by *Zapata* which takes qualities from a Chancery Rule 41(a)(2) motion to dismiss and a Chancery Rule 56 motion for summary judgment.

According to the *Zapata* Court:

> "After an [**8] objective and thorough investigation of a derivative suit, an independent committee may cause its corporation to file a pretrial motion to dismiss in the Court of Chancery. The basis of the motion is the best interests of the corporation, as determined by the committee. The motion should include a thorough written record of the investigation and its findings and recommendations. Under appropriate Court supervision, akin to proceedings on summary judgment, each side should have an opportunity to make a record on the motion. As to the limited issues presented by the motion noted below, the moving party should be prepared to meet the normal burden under Rule 56 that there is no genuine issue as to any material fact and that the moving party is entitled to dismiss as a matter of law. The Court should apply a two-step test to the motion.
>
> First, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions. Limited discovery may be ordered to facilitate such inquiries. The corporation should have the burden of proving independence, good faith and a reasonable investigation, rather than presuming independence, good faith and [**9] reasonableness. If the Court determines either that the committee is not independent or has not shown reasonable bases for its conclusions, or, if the Court is not satisfied for other reasons relating to the process, including but not limited to the good faith of the committee, the Court shall deny the corporation's motion. If, however, the Court is satisfied under Rule 56 standards that the committee was independent and showed reasonable bases for good faith findings and recommendations, the Court may proceed, in its discretion, to the next step." 430 A.2d at 788 (citations omitted)

IV

The first matter to be considered, therefore, is whether the moving parties have sustained their burden of showing that the Special Litigation Committee was independent. As set forth in *Zapata*, in making that determination I must apply Chancery Rule 56 standards. The standard for a Rule 56 motion for summary judgment is that the movant has the burden of demonstrating the absence of any material issue of fact, and any doubt as to the existence of such an issue will be resolved against him. *Nash v. Connell*, Del. Ch., 34 Del. Ch. 20, 99 A.2d 242 (1953); *Brown v. Ocean Drilling & Exploration* [**10] *Co.*, Del. Supr., 403 A.2d 1114 (1979).

Unlike in *Kaplan v. Wyatt*, Del. Ch., 484 A.2d 501 (1984), *aff'd.*, Del. Supr., 499 A.2d 1184 (1985), where the Special Litigation Committee consisted of two members, the Committee here consisted of but one person -- Terry Sanford. Although Mr. Sanford is well renowned, there are circumstances which must lead the Court to have questions as to his independence. He was a member of the Board of Directors of Fuqua Industries at the time the challenged actions took place; he is one of the defendants in this suit; he has had numerous political and financial dealings with J. B. Fuqua who is the chief executive officer [*967] of Fuqua Industries and who allegedly controls the Board; he is President of Duke University which is a recent recipient of a $10 million pledge from Fuqua Industries and J. B. Fuqua; and J. B. Fuqua has, in the past, made several contributions to Duke University and is a Trustee of that University.

These potential conflicts of interest or divided loyalties, when considered as a whole, raise a question of fact as to whether Terry Sanford could act independently.

This is not to say that he actually acted improperly, [**11] but I find that the moving party has not borne its burden of showing the absence of any possible issue of fact material to the issue of the independence of Mr. Sanford. See *Warshaw v. Calhoun*, Del. Ch., 42 Del. Ch. 437, 213 A.2d 539 (1965), *aff'd.*, Del. Supr., 43 Del. Ch. 148, 221 A.2d 487 (1966).

The only instance in American Jurisprudence where a defendant can free itself from a suit by merely appointing a committee to review the allegations of the complaint is in the context of a stockholder derivative suit. A defendant who desires to avail itself of this unique power to self destruct a suit brought against it ought to make certain that the Special Litigation Committee is truly independent. If a single member committee is to be used, the member should, like Caesar's wife, be above reproach.

Terry Sanford is, unfortunately, the sole member of the Committee. His past and present associations raise a question of fact as to his independence. This alone is grounds to deny the motion to dismiss under the first test set forth in *Zapata*.

V

Although not necessary to do so in view of my holding that there is a question of fact as to whether the Special Litigation Committee [**12] was independent, I will also consider the issue of the reasonableness of the investigation by the Sanford Committee, and the reasonableness of the basis for the findings and recommendations of the Committee. *Kaplan v. Wyatt*, Del. Ch., 484 A.2d 501, 508 (1984), *aff'd.*, Del. Supr., 499 A.2d 1184 (1985).

I find that the Sanford Committee addressed all the issues presented in the complaint and also researched an additional issue of whether the Company's directors had a personal interest in the challenged transaction. The investigation spanned four and a half months and was thorough and exhaustive as to all possible claims for recovery. I therefore find that the investigation conducted by the Committee was reasonable.

The plaintiff also attacks the reasonableness of the basis of the Sanford Committee's conclusions. I find that the movant has not borne its burden of establishing a reasonable basis for the conclusions of the Sanford Committee.

VI

The Sanford Committee investigation focused on two possible theories of recovery by plaintiff: a corporate opportunity theory and an interested director theory. As to the corporate opportunity theory, the Committee concluded that, [**13] under applicable Delaware law, the opportunity to purchase Triton Common Stock was not a corporate opportunity at all, but instead an opportunity which the individuals were entitled to treat as their own. As will be seen, the conclusion reached by the Committee on this issue is flawed and therefore did not have a reasonable basis.

A.

In determining the possible existence of a corporate opportunity the Sanford Committee recognized three possible tests: (1) the expectancy test, (2) the line of business test, and (3) the fairness test. Claiming that the application of any of these tests by this Court has been varying and imprecise, the Sanford Committee chose to find that the most often used test is the fairness test. In reviewing the fairness test, as it applies to the challenged transaction, the [*968] Sanford Committee pinpointed a so-called "Delaware Variation". It found that the initial formulation of the fairness test was announced in *Guth v. Loft*, Del. Supr., 23 Del. Ch. 255, 5 A.2d 503 (1939). The Sanford Committee, however, decided that later Delaware cases have modified the *Guth* fairness test so that, in its view, it is no longer necessary to consider whether [**14] an opportunity came to the attention of a corporate manager or director in his individual or corporate capacity. See, *Science Accessories v. Summagraphics*, Del. Supr., 425 A.2d 957, 963 (1980). The Sanford Committee therefore decided that four elements now must be considered in determining the existence of a corporate opportunity under the fairness test: (1) the "interest or expectancy" test, also called the "essential" test; (2) the "line of business" test; (3) the "practical advantage" test; and (4) the "use of corporate resources" test. The Sanford Committee concluded that none of the elements necessary as to these four tests were present in the challenged transaction and, therefore, no corporate opportunity existed to have been diverted.

B.

In the application of the first so-called "interest or expectancy" test to determine whether a corporate opportunity existed at all, the Sanford Committee found

that the opportunity to purchase Triton Common Stock was not essential to Fuqua Industries, nor did the failure to purchase Triton Common Stock cause any affirmative harm to the Corporation. The Sanford Committee concluded that when the directors decided to purchase the Triton [**15] Common Stock for themselves, the corporation had no contractual right to purchase the stock and, therefore, had no present interest in the purchase of the stock. The Sanford Committee also decided that Fuqua Industries ceased to have an expectancy in the purchase of the Triton Common Stock because although the corporation had an apparent expectancy in the purchase of the stock, it had rejected the opportunity -- thus negating its expectancy.

The Sanford Committee did concede, however, a necessity for a scrutiny of Fuqua Industries' alleged decision not to purchase the Triton Common Stock because the decision was made by the very people who ultimately bought the stock. The Sanford Committee decided, however, that because the Board of Fuqua Industries had rejected the opportunity to purchase the stock on behalf of the corporation before the directors decided to purchase the stock for themselves, the directors were disinterested when they voted to reject the purchase. The Sanford Committee therefore found that a court would scrutinize the decision not to purchase the stock for the corporation under the business judgment test as opposed to the much more burdensome intrinsic fairness [**16] test.

By relying on the business judgment test, the Sanford Committee concluded that the directors had a valid business reason for rejecting the opportunity to purchase the Triton Common Stock: the fear of adverse consequences in the reflection of Triton's losses on Fuqua Industries' financial statement. The Sanford Committee therefore concluded that there was no identifiable corporate opportunity under the first "interest", "expectancy", or "essential" test.

Even assuming, arguendo, that the Sanford Committee was correct and the rule of *Guth* has been modified, the conclusions of the Committee ignore the fact that no Delaware court has yet gone so far as to extend the protection of the business judgment rule to a transaction in which the directors who are passing on the transaction have a conflict of interest or divided loyalties. Cf. *Pogostin v. Rice*, Del. Supr., 480 A.2d 619 (1984); *Aronson v. Lewis*, Del. Supr., 473 A.2d 805 (1984);

*Weinberger v. UOP*, Del. Supr., 457 A.2d 701 (1983). It also ignores the fact that it is undisputed that the Board never formally rejected the opportunity and it is a question of fact as to whether the Board actually so agreed. [*969] [**17] This conclusion of the Sanford Committee therefore did not have a reasonable basis.

C.

The Sanford Committee's analysis of the other three tests to determine if a corporate opportunity existed, also led the Committee to conclude that there was none. In the application of the second or so-called "line of business" test the Sanford Committee conceded that the opportunity to purchase the Triton Common Stock was in Fuqua Industries' line of business. The Committee, however, interpreted case law as suggesting that if there is evidence of a company policy against acquiring a particular opportunity it will negate a finding that the opportunity was in the corporation's line of business. See, e.g., *Equity Corp. v. Milton*, 221 A.2d 494, 497 (1966); *American Investment Co. v. Lichtenstein*, E.D. Mo., 134 F. Supp. 857 (1959) (applying Delaware law).

The Sanford Committee found that Fuqua Industries would have to put Triton's losses on its financial statement, if it acquired any Triton Common Stock, and that this was inconsistent with Fuqua's then policy of maintaining a high earnings profile. This inconsistent policy, in the view of the Sanford Committee, negated the fact that the [**18] opportunity to purchase the Triton Common Stock was in Fuqua Industries' line of business. In all the cases cited by the Committee in support of that proposition, however, the Corporations involved were able to show that they had actually turned down a chance to realize a similar prior opportunity. Here, Fuqua Industries had not only not turned down a similar opportunity; it had actually exploited a similar opportunity in the Pier 1 acquisition. As will be discussed, there is also a factual question as to whether Triton's losses would have to be shown on Fuqua Industries' Financial Statement. The Sanford Committee has therefore not borne its burden of showing that its conclusion on this issue had a reasonable basis.

D.

The Sanford Committee further concluded, in analyzing the third so-called "practical advantage" test to determine if a corporate opportunity existed, that the acquisition of the Triton Common Stock would not have

been a practical advantage to Fuqua Industries. In making this determination, the Sanford Committee cited *Equity Corp.*, supra, for the proposition that one must take a short term view in determining the practical advantage to the Corporation. The [**19] Committee decided that the application of this principle to the challenged transaction showed that the placement of Triton's losses on Fuqua Industries' financial statements would have hampered the Company's high earnings profile and would therefore have been a short term disadvantage. There is a factual question, however, as to whether Triton's losses would have had to have been shown on Fuqua Industries financial statements. Plaintiff calls attention to Accounting Principles Board Opinion No. 18 which appears to require a corporation which holds 20% or more of the voting stock of an investee company to place the losses of the investee company on its books only in proportion to its share of the investee company's common stock. Plaintiff argues that if Fuqua Industries had purchased the common stock of Triton which the directors ended up purchasing for themselves, Fuqua Industries would have had over 20% of the voting stock of Triton (Triton Preferred Stock has voting rights), but it would have owned only 1.1% of Triton's common stock. Plaintiff therefore argues that Fuqua Industries would only have had to place 1.1% of Triton's losses on its financial statement. Plaintiff has, [**20] therefore, raised a question of fact as to whether the purchase of all the available Triton stock by Fuqua Industries would have had an undesirable effect on Fuqua Industries Financial Statements. The Sanford Committee has, therefore, not borne its burden of showing that its conclusion on this issue had a reasonable basis.

[*970] E.

Finally, in addressing the fourth so-called "use of corporate resources" test to determine if a corporate opportunity existed, the Sanford Committee found no showing that defendants used any corporate funds in acquiring the opportunity, or that there was any abusive use of corporate resources. The Committee was undoubtedly correct in its finding that no corporate funds were used by the directors when they purchased the Triton stock for themselves but this is not dispositive as to whether a corporate opportunity existed.

VII

The Sanford Committee next addressed the second possible theory of recovery -- the interested director issue. This theory of recovery focuses on the Walsh Block transaction in which Fuqua Industries purchased Triton Common and Preferred Stock at $ .30 more per share than paid by the individual defendants. In regard to this [**21] interested director issue, the Committee recognized three separate tests of liability: (1) a test based on Section 144 of the Delaware General Corporation Law (8 *Del. C.* § 144); (2) the business judgment test; and (3) the intrinsic fairness test.

A.

Title 8, § 144, *Del. C.* provides that if a majority of disinterested directors approve a transaction after full disclosure of all material facts as to such transaction the transaction cannot be challenged. The Sanford Committee conceded that 8 *Del. C.* § 144 was not applicable here, however, because, although the transaction may have been approved, the approval did not take place at a formal Board meeting or necessarily after full disclosure of all material facts. In the eyes of the Sanford Committee, therefore, the business judgment rule test and the intrinsic fairness rule test were the only viable tests which could be used.

B.

The business judgment rule would only be applicable, however, if there was a majority of disinterested directors and there had been no domination of the Board by one or more directors. Conversely, the intrinsic fairness test must be used if there was a majority of interested directors or a [**22] dominating director. The significant difference between the two tests is who has the burden of proof. Cf. *Schreiber v. Pennzoil Co.*, Del. Ch., 419 A.2d 952 (1980).

The Sanford Committee decided that a determination of whether the AFC and Walsh deals were one or two separate transactions would govern whether a court would deem the directors to have been free of conflict of interest or not. The Sanford Committee never specifically addressed the question of domination but merely opined that if the AFC and Walsh deals were treated as two separate transactions, then the Fuqua Industries directors would not have had any conflict of interest, and therefore, the Court would apply the business judgment rule. To the contrary, the Sanford Committee at least impliedly conceded that if the Court treated the AFC and Walsh deals as one transaction then the defendants would appear to have been personally

interested in the transaction and the Court would apply the intrinsic fairness test. From a review of facts, it seems likely that the AFC and Walsh transactions were interrelated and not separate transactions. By the Committee's own analysis, therefore, the appropriate test would be the [**23] intrinsic fairness test. The Committee's conclusion on this issue, therefore, did not have a reasonable basis.

C.

The possible application of the intrinsic fairness test itself presents problems for the directors, as the Sanford Committee conceded. The Sanford Committee's analysis of Delaware case law uncovered two primary points of focus the Committee believed a Court would use in applying the [*971] intrinsic fairness test to the challenged transactions: (1) the profit motive of the interested directors or (2) the intrinsic fairness of the transaction to the Corporation. The Sanford Committee conceded that, as the individual defendants surely entered into the transaction with a profit motive in mind, the profit motive point of focus presented the more probable chance of recovery for the plaintiffs. After deciding that $ .75 per share was a fair price for the Triton stock, the Sanford Committee concluded that the intrinsic fairness of the transaction to Fuqua Industries made recovery by the plaintiff less probable.

The value of the Triton stock is debatable, however, and the Committee, therefore, has not borne its burden of showing that $ .75 was a fair price for the Triton [**24] stock and that its conclusion on this issue had a reasonable basis.

D.

In concluding its analysis of the interested director issue, the Sanford Committee decided that there would be little chance of recovery for plaintiff if the Court found the directors to be disinterested and therefore applied the business judgment rule. The Sanford Committee conceded, however, that if the Court found the directors to be interested and applied the intrinsic fairness test the probability of recovery was greater, and was even better if the Court accepted the profit motive point of focus. I agree with the Committee's conclusion that it seems reasonably likely, from the present record, that the individual defendant-directors were interested directors and therefore the business judgment rule would afford no defense to the defendants.

VIII

In summary, the Sanford Committee, based upon what it deemed to be the two possible theories of recovery, recommended that Fuqua Industries pursue no further action against the individual defendants. The Sanford Committee completely ruled out any recovery under the corporate opportunity theory and it decided that any possible recovery under the interested director [**25] theory would be limited to approximately $94,000; ($ .30 X the number of shares of Triton Common Stock purchased by the Company from the Walsh Block). It therefore found that this would be insufficient to justify the expense of further litigation.

The Sanford Committee, not surprisingly, also made a determination that the continued maintenance of this suit is not in the best interests of Fuqua Industries.

It found that the individual defendants had acted in good faith and therefore the pursuit of recovery to vindicate a corporate right was not justified. It further determined that the expense, low probability of recovery, the possible amount of a meager recovery, the disruptive effect on the corporate management and morale, and the possible obligation to indemnify the defendant directors, were decisive factors in their recommendation that Fuqua Industries move for dismissal of this action.

The issue of the good faith of the defendants is a question of fact which cannot be resolved on the present record, before the plaintiffs have had the opportunity to conduct discovery. As previously discussed, the other critical findings of the Committee are not reasonable considering the present [**26] record.

IX

Even if the conclusions and recommendations of the Special Litigation Committee had a reasonable basis, this suit should still not be dismissed at this preliminary stage of the proceedings before the plaintiffs have had an opportunity to conduct discovery.

In *Zapata*, supra, the Delaware Supreme Court held that even if the Court determined that the Special Litigation Committee was independent, acted in good faith, and showed a reasonable basis for its conclusions, the Court could, in its discretion, [*972] proceed to a second step and apply its own independent business judgment as to whether the motion to dismiss should be

granted. The Court stated at 430 A.2d 789:

> "The second step provides, we believe, the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee. The Court should determine, applying its own independent business judgment, whether the motion should be granted. This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith [**27] decisions and still have the corporation's motion denied. The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest. The Court of Chancery of course must carefully consider and weigh how compelling the corporate interest in dismissal is when faced with a non-frivolous lawsuit. The Court of Chancery should, when appropriate, give special consideration to matters of law and public policy in addition to the corporation's best interests.
>
> If the Court's independent business judgment is satisfied, the Court may proceed to grant the motion, subject, of course, to any equitable terms or conditions the Court finds necessary or desirable."

The gravamen of the claim of the plaintiff in this suit is that the directors of Fuqua Industries diverted an opportunity of the corporation to purchase Triton common stock to themselves for their own personal financial gain. If this is true, it is difficult to imagine a more egregious breach of fiduciary [**28] duty. In the present corporate litigation climate, a stockholder's welfare rests almost solely on the judgment and independence of his directors. Any reasonably valid claim that the directors acted because of a conflict of interest involving their own selfish economic interest should bear close scrutiny by an impartial tribunal -- not a one-man committee appointed by the alleged wrong doers.

It may be that ultimately the directors will be able to show that they did not divert a corporate opportunity to themselves. Thus far they have not done so. Plaintiff should be given an opportunity to pursue discovery so that the truth of his allegations may be tested.

The motion to dismiss is therefore dismissed.

IT IS SO ORDERED.